No. 15-3160

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

---

Keith D. Nelson,

Appellant,

vs.

United States of America,

Appellees.

---

On Appeal from the United States District Court
District of Arizona
Case No. 4:04-8005-cv-W (FJG)

---

# APPELLANTS MOTION FOR ISSUANCE OF CERTIFICATE OF APPEALABILITY

---


*/s/Paula K. Harms*
Jon M. Sands
Federal Public Defender
Paula K. Harms
Assistant Federal Public
Defender
Capital Habeas Unit
850 W. Adams Suite 201
Phoenix, Arizona 85007
602-382-2816 telephone
602-889-3960 facsimile

*/s/ David A. Ruhnke*
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
973-744-1000 telephone
973-746-1490 facsimile
dr@ruhnkeandbarrett.com

**TABLE OF CONTENTS**

Table of Contents ........ i

I. Procedural history ........ 1

II. Introduction ........ 2

III. Standards for granting a certificate of appealability ........ 7

IV. The grant of the original COA remains in effect ........ 9

V. Facts underlying the deficient performance of trial counsel. ........ 11

A. The division of labor and counsel's workload. ........ 11

B. Failures in the social history investigation. ........ 15

C. Red flags in Mr. Nelson's background. ........ 18

D. The failure to conduct a neuropsychological evaluation and investigate mental health. ........ 22

E. The refusal to submit to a Government evaluation. ........ 28

F. The failure to move for a continuance. ........ 30

VI. Facts illustrating prejudice from trial counsel's performance. ........ 32

A. Neurocognitive deficits. ........ 33

B. Mr. Nelson's paternal and maternal background. ........ 35

C. Mr. Nelson's birth. ........ 39

D. Mr. Nelson's early childhood ........ 41

E. Life in Texas ........ 43

F Mr. Nelson's time in Missouri ........ 47

G. Placement in the Texas Youth Commission ........ 49

H. The return to Missouri ........ 53

I. The time period preceding the crime ........ 56

VII. A COA should issue on whether the facts of the crime necessarily precluded, as a matter of law, a finding of *Strickland* prejudice. ........ 60



Appellate Case: 15-3160 Page: 2 Date Filed: 02/29/2016 Entry ID: 4372433

A. The district court erroneously held that the facts of the crime necessarily precluded a finding of *Strickland* prejudice. ............................63

B. The district court improperly failed to consider or unreasonably discounted mitigation evidence presented at the evidentiary hearing. ........74

1. Dr. Michael Gelbort............................................................................75

2. Dr. Rueben Gur ..................................................................................78

3. Dr. Xavier Amador..............................................................................81

4. Dr. Leslie Lebowitz ............................................................................83

5. Dr. Daniel Martell ..............................................................................84

C. The district court failed to properly consider how the evidence of Mr. Nelson's brain damage and mental illness might have affected the jury's sentencing deliberations. ...............................................................87

D. The district court improperly considered mitigation evidence based on whether it had a nexus to the crime. ......................................................94

E. The low threshold for the issuance of a COA has been met. .......................97

VIII. A COA should issue on whether trial counsel's performance in investigating and presenting constitutionally relevant mitigation evidence was deficient...................................................................98

A. The district court applied the wrong legal standard in assessing trial counsel's performance under *Strickland* because it erroneously focused on whether trial counsel put on "sufficient" mitigation evidence at trial, rather than on whether trial counsel's failure to investigate and present additional readily available evidence was objectively reasonable. ...........................................................................101

1. The proper standard for assessing counsel's performance....................101

2. The district court unreasonably relied on the number of hours that the mitigation specialists billed rather than on the actual preparation conducted by trial counsel to assess counsel's performance. .......................................................................................106

B. The district court committed clearly erroneous factual errors in finding that the mitigation evidence presented at the § 2255 hearing was merely cumulative of the trial evidence. ...........................................108

1. Evidence that Mr. Nelson was raped as a child....................................109

2. Expert evidence that Mr. Nelson is brain damaged. ............................. 112
3. Expert evidence that Mr. Nelson is mentally ill and suffers from the effects of chronic exposure to trauma. ........................................... 114
4. Social history evidence regarding the paternal side of Mr. Nelson's family. ........................................................................................... 116
5. The district court's cumulativeness analysis was fundamentally erroneous. ........................................................................................ 117
IX. The Government's improper closing arguments: ineffective assistance of trial and appellate counsel. .................................................. 120
A. The improper arguments and trial counsel's failure to object. .................. 120
B. Ineffective assistance of appellate counsel for failing to raise this issue. ............................................................................................... 125
Conclusion ........................................................................................... 127
Certificate of service ............................................................................. 128

Appellant, Keith D. Nelson, hereby moves before the United States Court of Appeals for the Eighth Circuit, by and through his undersigned attorneys, for the issuance of a Certificate of Appealability ("COA") pursuant to 28 U.S.C. § 2253(C)(1)(B). Alternatively, Mr. Nelson requests a ruling that the original COA granted by this Court remains in effect. A COA is sought to allow appellate review of the decision of the United States District Court for the Western District of Missouri, Hon. Fernando J. Gaitan, Jr., U.S.D.J., denying all relief and a COA after an evidentiary hearing.

## I. PROCEDURAL HISTORY

On October 14, 1999, Mr. Nelson was charged with interstate kidnapping resulting in death. On October 25, 2001, he pled guilty to that charge and proceeded to the penalty phase. A jury was selected on November 13, 2001 and trial began the following day. On November 28, 2001, the jury recommended a sentence of death that was imposed by the court on March 11, 2002. On direct appeal, this Court upheld the conviction and sentence. *United States v. Nelson*, 347 F.3d 701 (8th Cir. 2003). A petition for certiorari was denied by the United States Supreme Court on November 8, 2004.

Mr. Nelson filed a post-conviction motion to set aside his death sentence on November 6, 2005. A motion to disqualify the district court from participation in

the case was denied on August 21, 2006. On November 21, 2006, the district court denied the post-conviction motion without a hearing and Mr. Nelson appealed. In its original 2006 order denying relief, the district court adopted wholesale the "legal and factual analysis" of Respondents, "as its own by reference hereto." Exh. 3 at 2. On October 30, 2008, this Court granted Nelson's motion for a COA on six claims involving the ineffective assistance of trial and appellate counsel. The remand instructed the district court to hold a hearing on these claims. *Nelson v. United States*, 297 Fed. Appx. 563 (8th Cir. Oct 27, 2008).

## II. INTRODUCTION

An evidentiary hearing was held on the following six claims of ineffective assistance of trial and appellate counsel:

1. Whether trial counsel were ineffective for failing to conduct an adequate mitigation investigation including a failure to move for a continuance;

2. Whether trial counsel were ineffective for failing to conduct an adequate investigation of Mr. Nelson's mental health;

3. Whether trial counsel were ineffective because they advised Mr. Nelson to decline to submit to a mental health examination by Government experts;

4. Whether trial counsel were ineffective for failing to object to inflammatory and improper comments in the Government's closing arguments;

5. Whether appellate counsel conducted an adequate review of the trial record and the law; and,

6. Whether appellate counsel were ineffective for failing to raise on appeal the Government's improper closing arguments.

*Nelson*, 297 Fed. Appx. at 565-66. It is on these six claims that Mr. Nelson seeks a COA.

The hearing went forward on April 14-17, 2014. The district court heard testimony from 14 witnesses and received thousands of pages of exhibits. Mr. Nelson's counsel have limited their discussion in this document to those facts and exhibits needed to clarify the issues on which a remand was ordered. However, in seeking a COA and eventually a new penalty-phase, Mr. Nelson relies on the entire record, all exhibits admitted at the hearing, and all prior proceedings. Counsel note, respectfully, that the "duty to search for constitutional error with painstaking care is never more exacting than in a capital case." *Burger v. Kemp*, 483 U.S. 776, 785 (1987).

Despite the strong presentation made that Mr. Nelson's counsel–both trial and appellate–provided ineffective assistance, the district court denied all relief. This was so even in the face of a finding that trial counsel performed deficiently in investigating the important issue of Mr. Nelson's mental health. At the hearing, even the Government's expert–Daniel Martell, Ph.D.–agreed that Mr. Nelson



Appellate Case: 15-3160 Page: 7 Date Filed: 02/29/2016 Entry ID: 4372433

suffers significant cognitive impairments and that such evidence was mitigating. Nonetheless, in denying relief, the district court's view seemed to be that, as a matter of law, *Strickland* prejudice could never be established because of the nature of the underlying offense. *See infra* discussion at Section VII.

From the inception of the case, and before the hearing was many minutes old, the district court remarked that the purpose of the hearing was for defense counsel "to make a record for the Eighth Circuit." Exh. 4 (TR 04/14/14) at 30-31. Later, expressing impatience at additional testimony from the stand, he stated: "You have the documents in. The Court of Appeals can go back and look and read them at their leisure." Exh. 4 (TR 4/14/14) at 222-225. This hardly presaged a fair consideration of the evidence.

A significant portion of the hearing focused on trial counsel's failure to investigate Mr. Nelson's brain damage and mental illness, the circumstances of his difficult birth, the significant family history of schizophrenia, and substantial evidence of childhood trauma that included extreme neglect, abuse, and sexual molestation.

At Mr. Nelson's original trial, instead of investigating and presenting this compelling case for life, counsel put on a half-hearted mitigation case. The jury deliberated for less than two hours. Only one juror was persuaded of any



Appellate Case: 15-3160 Page: 8 Date Filed: 02/29/2016 Entry ID: 4372433

mitigating circumstance. Because trial counsel had advised Mr. Nelson not to cooperate with the Government's mental health experts, Mr. Nelson was precluded from putting on any mental health expert to testify about any evaluation of Mr. Nelson.[1] As a result, the jury was left completely in the dark about Mr. Nelson's brain damage and mental illness.

Trial counsel, Patrick Berrigan, conceded at the § 2255 hearing that it was his idea to advise Mr. Nelson to refuse to be examined by the Government's mental health experts and that this was unreasonable advice. The district court so found:

> it should have been obvious to [trial counsel], . . . that he would only be allowed to present mental health evidence in mitigation if the Government was also allowed an opportunity to conduct its own examination . . . . [W]ithout knowing what the results of the examination would be, there is no reasonable basis for directing Nelson to refuse the examination.

Exh. 1 at 32-33. The Court found that counsel was deficient for

> cancelling the neuropsychological examination of Nelson and in failing to reschedule such examination and also in failing to have any other assessments conducted to assess whether Nelson suffered any brain damage, dysfunction or other cognitive impairments.

---

[1] As developed at length *infra*, trial counsel never had Mr. Nelson evaluated beyond a brief weekend meeting with a psychologist very late in the process. That evaluation was never completed.



Appellate Case: 15-3160 Page: 9 Date Filed: 02/29/2016 Entry ID: 4372433

*Id*. at 33.

The Government's neuropsychologist–the same expert who was scheduled to evaluate Mr. Nelson in 2001−evaluated Mr. Nelson prior to the post-conviction hearing and agreed that Mr. Nelson has brain damage, illustrating clear prejudice from counsel's failure. In addition, the district court credited Mr. Nelson's own expert testimony on brain damage:

> Dr. Carolyn Crawford identified compromised neurological development Nelson suffered after his birth. The neuropsychological testing and imaging performed as part of the post-conviction challenge, showed that Nelson performed significantly below normal levels on standard testing instruments. Dr. Gur's analysis examines data from the neuropsychological testing, an MRI and a PET scan. This data confirmed that Nelson suffered brain damage.

*Id.* at 34.

Mr. Nelson's claims regarding appellate counsel focused on serious issues of prosecutorial misconduct that involved improper emotional and inflammatory "send a message" arguments in the penalty phase and arguments which misled the jury into believing the ultimate responsibility for the death sentence lay somewhere else.

After a hearing at which both sentencing and appellate counsel admitted they had no reasonable strategic reasons for failing to investigate or present mitigation

or in failing to raise issues of prosecutorial misconduct, the district court denied all relief and refused to grant a COA on any issue. Mr. Nelson presented uncontroverted evidence of brain damage, his difficult birth, sexual abuse, and childhood traumas. The district court specifically found that counsel performed deficiently by failing to investigate mental health and brain damage. In spite of this, the district court found no prejudice from trial counsel's failures. This finding is contrary to a long history of precedent holding that brain damage and severe childhood trauma are precisely the kind of mitigating circumstances that inspire leniency. The ineffectiveness claims this Court ordered remanded became more substantial after a hearing, not less. It was error not to grant a COA.

## III. STANDARDS FOR GRANTING A CERTIFICATE OF APPEALABILITY

The Anti-terrorism and Effective Death Penalty Act ("AEDPA") requires, as a pre-condition to appellate review of the denial of a motion brought pursuant to 28 U.S.C. § 2255, that a COA issue upon a showing that the applicant has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(C)(2). The Supreme Court has determined that this standard is a low bar. Proof of ultimate success is not required and the grant of a COA is especially favored in a capital case.

The leading cases on this issue are *Miller-El v. Cockrell*, 537 U.S. 322

(2003) and *Slack v. McDaniel*, 529 U.S. 473 (2000). A review of these cases reveals that the Supreme Court has simply adapted to the AEDPA the standards that were formerly applied to the issuance of a certificate of probable cause in pre-AEDPA habeas litigation, particularly as that standard was enunciated in *Barefoot v. Estelle*, 463 U.S. 880 (1983). In elaborating on the "substantial showing" language of the statute, *Miller-El* explained that the standard is met if "jurists of reason could disagree with the district court's resolution" of the claim or that "the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327. The determination of whether the standard is met is a "threshold inquiry" that "does not require full consideration of the factual or legal bases adduced in support of the claims. In fact, the statute forbids it." *Id.* at 336. In *Slack*, the Court noted than an applicant met the standard if it was "debatable" whether the district court's assessment of the constitutional claim was correct. *Slack*, 529 U.S. at 484.

The Supreme Court has also been clear that a COA application does not have to show "entitlement to relief." *Miller-El*, 537 U.S. at 337. "The holding in *Slack* would mean very little if appellate review were denied because the prisoner did not convince a judge, or, for that matter, three judges, that he or she would prevail." *Id.* A COA should issue even if it is unclear that relief will ultimately be

obtained. *Id.* at 337-38 (holding that the COA standard "does not require a showing that the appeal will succeed," and instead, "[a] prisoner seeking a COA must prove something more than the absence of frivolity or the existence of mere good faith on his or her part.").

The fact that this is a death penalty case further counsels in favor of granting a COA. In *Barefoot*, the Court emphasized that "in a capital case, the nature of the penalty is a proper consideration" in determining whether to issue a COA. *Barefoot*, 463 U.S. at 893. All of the claims on which Mr. Nelson requests a COA deal with his death sentence, as Mr. Nelson plead guilty to the underlying crimes.

## IV. THE GRANT OF THE ORIGINAL COA REMAINS IN EFFECT

The district court, in 2006, originally denied Mr. Nelson's § 2255 motion without an evidentiary hearing and without issuing a COA on any claims. Exh. 3. Mr. Nelson thereafter moved for a COA from this Court. This Court held that several of Mr. Nelson's claims met the low threshold necessary to obtain a COA and remanded the case to the district court for an evidentiary hearing on those claims. *Nelson v. United States*, 297 Fed. Appx. 563, 565-66, (8th Cir. 2008). Exh. 2.

The lower court's blanket denial of a COA on the remanded claims is erroneous as a matter of law. The original COA granted by this Court remains in



Appellate Case: 15-3160 Page: 13 Date Filed: 02/29/2016 Entry ID: 4372433

effect after the remand. *See United States v. Graham*, 312 Fed. Appx. 79, 80 n.1, (10th Cir. Jan. 3, 2008). In *Graham*, the district court initially denied relief on the § 2255 motion and declined to issue a COA on any claims. The Tenth Circuit thereafter granted a COA on a claim of ineffective assistance of counsel and remanded the matter to the district court for an evidentiary hearing. After conducting the hearing, the district court denied relief on the ineffective assistance claim and again declined to issue a COA. On appeal for the second time, the Tenth Circuit stated that "[b]ecause this appeal is from an adverse ruling by the district court following our remand, the original COA remains in effect." *Id.* Similarly, because Mr. Nelson's appeal is from an adverse ruling by the district court following this Court's remand, the original COA remains in effect.

Indeed, the undersigned has been unable to find any authority stating that an adverse ruling by the district court following a remand nullifies the circuit court's original COA or otherwise deprives the circuit court of post-remand jurisdiction. *See also Piskanin v. Krysevig*, 349 Fed. Appx. 683, 685 n.3 (3d Cir. 2009) (holding that after the appellate court granted the original COA and remanded to the district court, jurisdiction remained in the appellate court, even though the district court had again refused to grant a COA). Accordingly, the original COA issued by this Court remains in effect.



Appellate Case: 15-3160 Page: 14 Date Filed: 02/29/2016 Entry ID: 4372433

## V. FACTS UNDERLYING THE DEFICIENT PERFORMANCE OF TRIAL COUNSEL.

### A. THE DIVISION OF LABOR AND COUNSEL'S WORKLOAD.

The attorney responsible for the penalty-phase investigation, preparation and trial was Patrick Berrigan. He came into the case approximately eight months before trial. The evidence presented at the hearing established that when he accepted an appointment in Mr. Nelson's case in late February 2001, Mr. Berrigan was over-worked and over-committed. Mr. Berrigan also labored under what he viewed as an unspoken yet binding agreement with the Court that he would get one, and only one, continuance of the trial date. The record irrefutably shows that before and during the time when he accepted the appointment in this case and was ostensibly preparing for Mr. Nelson's trial, which was then only eight months down the road, Mr. Berrigan:

- Spent the six weeks following his appointment preparing for and trying a capital case in Kansas, during which time his other cases–Nelson included–"languished." Exh. 4 (TR 4/14/14) at 183, 186-187.

- Faced U.S. Supreme Court deadlines in two or three capital cases where death verdicts had been returned and executions were pending. *Id.* at 183-186.

- Was involved in another "very active" (*Id.* at 187) and demanding federal capital case in Iowa. *Id.* 186-87. In that case, his client's ultimate sentence of death was later set aside on a § 2255 challenge when it was determined Mr. Berrigan had rendered ineffective assistance in that case in part, as here,

because he devoted too little time to trial preparation. *See Johnson v. United States*, 860 F. Supp. 2nd 663, 884 (N.D. Iowa 2012).

- Was heavily involved in a complex medical malpractice case that required Mr. Berrigan's attention and trial preparation that included travel "all over the country" until the case settled on the eve of trial in July 2001. Exh. 4 (TR 4/14/14) at 181.

- On August 8, 2001, just weeks before Mr. Nelson's trial was scheduled to begin, Mr. Berrigan underwent quintuple coronary artery bypass surgery. *Id.* at 207, 233.

- On the same day he underwent the quintuple heart bypass surgery, Mr. Berrigan accepted an appointment in another demanding capital case in Kansas. *Id.* at 187-89; Exh. 9.

Mr. Berrigan's billing records and an internal file memorandum (Exh. 9, Exh. 14, Exh. 15) reflect that in the months leading to Mr. Nelson's trial date he was primarily occupied with these other matters. An inspection of his large and small diaries from this period (Exh. 16, Exh. 17) further make the point. From the time Mr. Berrigan accepted the case in late February 2001, until a few weeks before trial was set to commence, "the overwhelming percentage" of his time was devoted to other matters. Exh. 4 (TR 4/14/14) at 191. He summarized this state of affairs in his deposition:

> And all I can tell you is, you know, I had three active capital cases in addition to Mr. Nelson's trial and three others that were in cert petitions to the U.S. Supreme Court and I had a regular docket and I was trying civil cases and maybe I shouldn't have taken Mr. Nelson's case because I was too damn busy to do what I should



Appellate Case: 15-3160 Page: 16 Date Filed: 02/29/2016 Entry ID: 4372433

> have done.
>
> Looking back, that's kind of how I feel about it now. I shouldn't have agreed to it. And I think Judge Gaitan he wasn't going to give us a continuance after that first one, it's completely unrealistic to be ready to try a case in nine months after you just got on, and it had never happened in my entire career up to this point.
>
> And having committed to it, you know, I felt bound to do it which is sort of a ridiculous reason to go forward just basically out of pride and conceit.

Exh. 13 at pp. 205-206. At the hearing, Mr. Berrigan adopted his deposition testimony (Exh. 13) and the affidavit (Exh. 12) he had previously submitted. Exh. 4 (TR 4/14/14) at 174. At the hearing, he was again asked whether he should have accepted the Nelson case:

> Looking back, no, no. I have the most–utmost respect for Judge Hays. In fact I think she is a brilliant judge, and I've had nothing but wonderful experiences with her. And the same is true of Judge Gaitan, frankly, who I've known almost–I've known him since the start of my legal career and both as a state court trial judge and appellate judge and a federal judge. And I think looking back in my desire not to disappoint them in some way and the trust that they had put in me in taking Mr. Nelson's case, somehow blinded me to my responsibilities to Mr. Nelson, and there's no real good excuse for that. It's nothing but pride and conceit, and I regret it now that I ever agreed to get involved in the case. . . . . I was very busy.

*Id*. at 244-245. On cross-examination, the Government returned to the issue:



Appellate Case: 15-3160 Page: 17 Date Filed: 02/29/2016 Entry ID: 4372433

> Q: I guess what I'm a little bit confused about is [defense counsel] presents all this history about all these other capital cases that you're engaged in and it's almost to the point where you're too overqualified in this area, that you've got yourself spread too thin. Is that what your testimony is?
>
> A: No. I don't–my qualifications and expertise hadn't changed in Mr. Nelson's case. In other words, I'm–this was an aberration in one respect only and that was time. I've never been involved in a case where I was appointed and tried a case essentially in six or seven months. That's never, ever been my experience.
>
> That Angela Johnson case I was on for five years before trial. Typically there's at least a minimum 18 months, 24 months between my appointment and the case coming to trial. This was very, very quick and it turned out to be that I had a lot of other obligations, previous obligations that ended up taking up a lot of my time.

*Id.* at 258. Mr. Berrigan's testimony was consistent that his existing obligations, combined with the trial's short timeframe, rendered it impossible for him to fulfill his obligations to Mr. Nelson.

The record establishes that Mr. Berrigan was completely in charge of the penalty-phase preparation and trial. Upon first entering the case, Mr. Berrigan advised his co-counsel Susan Hunt that he would be solely responsible for the mitigation case. Exh. 4 (TR 4/14/14) at 50. Ms. Hunt, who had no capital experience, accepted that. Mr. Berrigan was, in her words, "calling all the shots" on mitigation issues. *Id.* at 100. The reality, however, was that Mr. Berrigan's



Appellate Case: 15-3160 Page: 18 Date Filed: 02/29/2016 Entry ID: 4372433

existing commitments–as reflected in part by the summary of his CJA billing records in the Nelson case (Exh. 10)–did not allow for that. Moreover, because he was so busy on other matters, Mr. Berrigan had virtually no contact with the mitigation investigator, Tena Francis, or her organization. Exh. 4 (TR 4/14/14) at 272. Despite having assumed sole responsibility for the mitigation case, he believed that Ms. Hunt–who had never been given any responsibility for that phase of the case and, as noted, had no capital trial experience–was in primary contact with Ms. Francis. *Id*. at 214. Ms. Hunt thought the opposite, and assumed, without really knowing, that Mr. Berrigan was not only in contact with the mitigation investigator, *Id*. at 63, 101, but was also spending significant time preparing a penalty phase. *Id*. at 54. Neither assumption was valid. With the exception of one interview of Mr. Nelson's mother, Nancy Nelson, and one or two other local family members, Mr. Berrigan interviewed no penalty-phase witnesses until shortly before trial.

### B. FAILURES IN THE SOCIAL HISTORY INVESTIGATION.

Ms. Francis was first contacted about the case in late November 2000 and was not appointed until February 2001. The Federal Public Defender "FPD" had assumed sole responsibility for the mitigation aspects of the case until that office withdrew, due to a conflict, in August 2000. That office–and in particular AFPD



Appellate Case: 15-3160 Page: 19 Date Filed: 02/29/2016 Entry ID: 4372433

Larry Pace–was also involved in the preparation and trial of another federal capital case throughout the spring of 2000. Exh. 6 (TR 4/16/14) at 619-20. The individual responsible for the mitigation investigation in the FPD's office was Ron Ninemire, a former federal probation officer working as a fulltime investigator with the FPD. Mr. Ninemire, however, had no formal training as a mitigation specialist and later told Ms. Hunt that he really did not believe in the concept of mitigation. Exh. 4 (TR 4/14/14) at 112. As Ms. Hunt observed, a mitigation specialist who does not believe in mitigation "isn't going to be much help in a capital case." *Id*.

Additionally, despite the fact that Ms. Francis' usual practice was to see the client "as often as possible," *id.* at 478, and despite recognizing that the client is the most important single source of information, she visited Mr. Nelson only twice, on consecutive days shortly after Mr. Berrigan's entry into the case, *id.* at 477. Neither she nor any member of her staff ever saw Mr. Nelson again. *Id.* at 478. Although Mr. Nelson, in his first interview with Ms. Francis, broached the fact that he had been sexually abused, that important issue was never followed up. Exh. 5 (TR 4/15/14) at 351; Exh. 6 (TR 4/16/14) at 477.

By the summer of 2001, it was obvious that the mitigation "team" was such in name only. Ms. Francis testified that, other than her one visit to Kansas City,

she was too busy on other matters to do anything but play a supervisory and administrative role in the investigation. Exh. 6 (TR 4/16/14) at 482. Apparently unknown to either of Mr. Nelson's counsel, after the initial meeting in February 2001 with Mr. Berrigan and Ms. Hunt in Kansas City, it had been Ms. Francis' intention all along to turn the investigation over to her employee, Deborah Haddad. *Id.* at 480. Matters slid further downhill as a result of a dispute between Ms. Hunt and Ms. Haddad which led to Ms. Haddad's refusal to continue working on the case after her visit to Kansas City in March 2001. *Id.* at 481-82. At that point, no one from Ms. Francis' office was working on the mitigation case and Ms. Francis herself could not step back into the case because of her own commitments in other cases. *Id.* at 482. For his part, Mr. Berrigan, who had assumed sole responsibility for the mitigation case, seemed oblivious to the fact that no one was working on developing the mitigation case and never pushed Ms. Francis, for example, to engage with the client. *Id.* at 490.

In May 2001, Ms. Francis provided a first draft of a chronology and social history, neither of which was ever updated or supplemented. Exh. 21 at 34-57. Mr. Berrigan acknowledged reviewing the documents and then putting them to the side without apparent further action. Exh. 4 (TR 4/14/14) at 213-14. Virtually no investigation was conducted of the paternal side of Mr. Nelson's family and the

jury never learned of the extensive mental and social pathology that formed Mr. Nelson's genetic makeup. Although at the hearing in this case the Government repeatedly made note of the extensive documentation that had been collected, the reality is that at the penalty phase of Mr. Nelson's trial in the fall of 2001, none of those documents were utilized.

While Ms. Francis' organization billed for a substantial number of hours for work performed in the summer of 2001, an examination of her billing records (Exh. 28) shows that little substantive work was being accomplished. There is no evidence of any continuing effort to gather documents, locate additional witnesses, or to update the first draft of the chronology and social history. There was no contact between the defense team and the mitigation investigator or her employees for nearly the entire summer leading up to the trial. Exh. 6 (TR 4/16/14) at 490. By the end of the summer of 2001, a third person–Lisa Murphy–had come onboard. She had no training in social work and her role was limited to locating potential witnesses and setting up interviews for trial counsel. *Id.* at 492.

### C. RED FLAGS IN MR. NELSON'S BACKGROUND.

Prior to Mr. Berrigan's entry into the case, Mr. Nelson's previous counsel had recognized that an investigation of Mr. Nelson's mental health was required. Counsel also recognized that this was not simply a box to be checked off on a



Appellate Case: 15-3160 Page: 22 Date Filed: 02/29/2016 Entry ID: 4372433

larger due-diligence list. Specific information had been gathered about Mr. Nelson's background that suggested a genetic predisposition to mental illness and obvious indicators of potential brain damage or other cognitive impairments. These red flags included:

- The vicious domestic assault on Mr. Nelson's mother, Nancy Nelson, that sent her into premature labor with her twins, Mr. Nelson and Kenneth Nelson;

- Nancy Nelson's lack of proper prenatal care even while carrying twins;

- Difficulties experienced by Mr. Nelson, a second-born twin, whose brain was deprived of oxygen in the birthing process and who was then hospitalized for the first month of his life;

- A history of traumatic brain injuries throughout his childhood, adolescence, and early adult years;

- The circumstance that two of Mr. Nelson's four brothers were diagnosed as schizophrenics, one of whom was serving a life sentence for murder.

In an *ex parte* motion filed in the spring of 2000 (Exh. 19 at 17), Attorney William Shull sought $20,000 for the appointment of a psychiatrist, Steven Peterson, M.D. In the motion, Mr. Shull noted:

> The United States Supreme Court has clearly indicated that, since the services of experts, including psychiatrists, may well be critical to effective presentation of a capital litigant's defense, such expenses may properly be paid by the Federal Courts
>
> . . . .

> Many capital cases, including this one, involve extensive issues that deal with a defendant's mental and emotional condition at the time of the offense and subsequent times that must be presented to the jury during the penalty phase . . . .

(*Id*. at 18-19; citations omitted.) The motion was granted, but the funds were never utilized and Dr. Peterson never evaluated Mr. Nelson. In a subsequent motion (*Id*. at 67), also granted by the Court, defense counsel sought and received additional funding for the appointment of neuropsychologist Dennis Cowan, Ph.D. In support of the motion, counsel summarized specific aspects of Mr. Nelson's history that highlighted the importance of an assessment for the presence of cognitive impairments:

> Investigation to date has revealed that Defendant was born prematurely and spent the first four months of his life hospitalized with breathing difficulties. This fact combined with other factors raise the suspicion that defendant may have organic brain defects which may lead to mitigation evidence in this case.

*Id*. at 68.

Internal defense memoranda further confirmed counsels' awareness of the necessity of investigating Mr. Nelson's mental health. When the FPD withdrew from the case in August of 2000, investigator Ron Ninemire prepared a detailed close-out memorandum of tasks to be accomplished (Exh. 21 at 3), that included the following observation:



Appellate Case: 15-3160 Page: 24 Date Filed: 02/29/2016 Entry ID: 4372433

> [I]t was interesting that Keith was placed in a hospital for a long period of time at the time of his birth. This needs to be explored more fully. It would appear that all of the boys, with the exception of Steven and Kenny, suffer from a form of mental illness (schizophrenia). It seems prudent that any mitigation investigation must include a psychiatric examination for Keith.

*Id*. at 6. In June 2001, Mr. Berrigan asked mitigation investigator Tena Francis to prepare an affidavit (Exh. 22 at 4) in support of what she thought was a request for additional funding and a continuance of the trial date. Exh. 6 (TR 4/16/14) at 502. Ms. Francis, describing in her affidavit work that remained to be completed, stated:

> There is a significant amount of mental illness on both sides of Keith's family. There is reason to suspect Keith might suffer neurological impairment, caused by hereditary factors, prenatal damage, birthing problems, head injuries suffered as a child, and a possible exposure to neuro-toxins. Those issues need further development in order to make an adequate presentation to the jury.

Exh. 22 at 5, 6. Indeed, Ms. Francis, from her earliest entry into the case suspected that Mr. Nelson had brain damage (Exh. 6 (TR 4/16/14) at 476), which is why her notes of one of her initial conversations with Mr. Shull and Ms. Hunt include the following reference, "has neuropsych hired!!" *Id*. at 475; Exh. 22 at 11.

To summarize, each of Mr. Nelson's trial-level attorneys–including Mr. Berrigan (Exh. 4 (TR 4/14/14) at 196), the attorney ultimately responsible for the failed mitigation case–testified at the hearing that he or she recognized the



Appellate Case: 15-3160 Page: 25 Date Filed: 02/29/2016 Entry ID: 4372433

importance of investigating Mr. Nelson's neurological functioning. Funds were twice allocated for that purpose. The simple truth is that the investigation never occurred. As a result, evidence of Mr. Nelson's neurological impairments was never presented to or considered by the jury that condemned him to death. This failure on counsels' part requires a new penalty phase or, at this stage, the issuance of a COA.

### D. THE FAILURE TO CONDUCT A NEUROPSYCHOLOGICAL EVALUATION AND INVESTIGATE MENTAL HEALTH.

Although Mr. Berrigan recognized and acknowledged the need for a neuropsychological assessment of his client (*Id*. at 196-97), and had the funding to accomplish that goal, one of his first actions in the case was to cancel an appointment that had been made for such an examination. *Id*. at 197; Exh. 11. At the time he told his co-counsel, Ms. Hunt, "'I'm going to cancel the appointment and don't worry about it, I'll figure out somebody else.'" Exh. 4 (TR 4/14/14) at 59. As the record demonstrates, Mr. Berrigan never did "figure out somebody else" and, in his own words, "never got back to it." *Id*. at 200. No assessment of Mr. Nelson for brain damage, dysfunction, or other cognitive impairments was ever accomplished. (E.g., *Id*. at 196.)

Mr. Berrigan did not equivocate about his failure to follow through on a neuropsychological examination. He knew on his arrival in the case that Dr.

Cowan had been appointed to conduct such an examination. *Id*. at 196. The issue of "potential neurological impairment and neurological defects" was something Mr. Berrigan believed should be explored. *Id*. at 197. Although he believed Dr. Cowan was "unequivocally a very qualified neuropsychologist" (*Id*. at 199), Mr. Berrigan cancelled the initial appointment because Dr. Cowan would not have been his first choice and Mr. Berrigan saw no reason to continue with him simply because he had already been approved by the court. *Id*. Mr. Berrigan's intention was to look for a neuropsychologist with more of a national or regional reputation than Dr. Cowan had. *Id*. Describing his failure to follow through on this issue, Mr. Berrigan testified as follows:

> Q: For any reason, tactical or otherwise, did you ever change your mind about the need for a neurological or neuropsychological examination of Mr. Nelson?
>
> A: No, sir.
>
> Q: Can you tell us why it never got done?
>
> A: We dropped the ball. It should have happened. Other things came to the forefront and I never got back to it. There's no good excuse, really no excuse at all.

*Id*. at 200. When asked if his failure to utilize a neuropsychologist was related to a preference for a neurologist, Mr. Berrigan was, again, clear:

> Q: And is there anything about those thoughts about a neurologist that made you decide for tactical reasons or



Appellate Case: 15-3160 Page: 27 Date Filed: 02/29/2016 Entry ID: 4372433

otherwise, that you would not employ a neuropsychological exam?

A: No. Because I didn't. I did not employ a neurologist in lieu of a neuropsych exam. We didn't employ anyone. The plan was to find someone else, another neuropsychologist, to do the evaluation other than Dr. Cowan, and that did not happen.

*Id*. at 219-20. Mr. Berrigan's testimony at the hearing was consistent with both his affidavit (Exh. 12 at ¶2) and his deposition testimony (Exh. 13 at 30, 32, 49-52, 56-57, 78, 119, 190-93, 205).

A chronology of the mental health investigation, introduced at the hearing, helps illustrate how rushed and neglected this essential area of investigation was (Exh. 25):

| | |
|---|---|
| 08/21/2000 | Trial continued to April 2001. |
| 08/25/2000 | Court authorizes $20,000 to retain psychiatrist, Stephen Peterson, M.D. (Funds never utilized.) |
| 01/24/2001 | Court authorizes $2,500 for neuropsychological evaluation by Dennis Cowan, Ph.D. (Funds never utilized.) |
| 02/13/2001 | Patrick Berrigan appointed as Learned Counsel in place of William Shull. |
| 02/28/2001 | Berrigan cancels neuropsychological examination of Nelson that had been scheduled for following day. |
| 03/08/2001 | Trial continued to October 29, 2001. |

| | |
|---|---|
| 08/08/2001 | Berrigan undergoes quintuple bypass surgery. |
| 09/04/2001 | Defense files notice of intent to present mental health mitigation at penalty; attaches CV of expert, Daniel Foster, Psy.D. |
| 09/17/2001 | Defense files ex parte motion to authorize Dr. Foster's services up to $7,500. |
| 10/05/2001 | Dr. Foster interviews Nelson for one hour. |
| 10/06/2001 | Dr. Foster interviews Nelson for 8 hours. Describes meetings as primarily "history-taking and trust-building." |
| 10/10/2001 | Dr. Foster's services authorized up to $7,500. |
| 10/18/2001 | USMJ Hays advised by defense counsel Berrigan that Nelson will not cooperate with Government experts' interview. |
| 10/23/2001 | Defendant's position reiterated before Judge Gaitan. |
| 10/25/2001 | Defendant enters guilty plea to count one of indictment. |
| 10/26/2013 | Court rules defendant's refusal to cooperate means he may not present expert evidence on mental health issues. |
| 10/28/2001 | Nelson attempts suicide. |
| 10/31/2001 | Nelson's competency challenged by defense. |
| 11/07/2001 | Court orders William Logan, MD, to assess Nelson's competency that same day. |
| 11/08/2001 | Court finds Nelson competent and further examination unnecessary. |
| 11/13/2001 | Jury-selection begins. |



Appellate Case: 15-3160 Page: 29 Date Filed: 02/29/2016 Entry ID: 4372433

When this case was tried in 2001, well-established norms of capital defense required an investigation of a capital defendant's mental health. Exh. 18 at ¶¶ 15, 28-31. Each of the trial attorneys who testified–Susan Hunt, William Shull, Patrick Berrigan and Larry Pace–agreed that this was so at the time of Mr. Nelson's trial. Exh. 4 (TR 4/14/14) at 28-29, 151-52, 192-93; Exh. 6 (TR 4/16/14) at 626-27. Mr. Berrigan testified on this issue as follows:

> Q: Do you believe that investigation of mental health is virtually mandated by the 8th Amendment in every case?
>
> A: Yes. And certainly the ABA Guidelines make that very clear.
>
> Q: The ABA Guidelines as they existed in 2003 and the previous ABA Guidelines in 1989; is that correct?
>
> A: Yes, sir. I think that's always been the rule as long as the ABA has had guidelines on death penalty representation.

Exh. 4 (TR 4/14/14) at 192-93. Mr. Berrigan further noted that in any case where the prosecution was actually seeking the death penalty, "it would be the standard of care to have a mental health investigation and eventually evaluation . . . ." *Id.* at 193. In Mr. Nelson's case in particular, Mr. Berrigan determined, "as is the standard of care and practice, that there should be a psychological examination, evaluation, investigation of Mr. Nelson." *Id.* at 195. Mr. Berrigan was aware,

from past capital experience, that brain damage and neurological impairment "can be a significant mitigating circumstance." *Id.* at 215-16. He believed, further, that an investigation of Mr. Nelson's potential neurological impairments was needed. *Id.* at 197. He never changed his mind about the need for such an examination. *Id.* at 200.

Mr. Berrigan was also familiar with the work of neuropsychologists and had employed such experts in his cases many times. *Id.* at 216. As a byproduct of that experience, Mr. Berrigan also knew that, in conducting neuropsychological assessments, there is no need "to delve into the facts and circumstances of the crime," and that neuropsychologists are "not employed to speak to the client about the events at the time of the alleged crime." *Id.* at 216. Instead, utilizing standard testing, the function of a neuropsychologist is "to determine whether or not this client has neurological brain deformities, brain deficits, and to present this information to the attorney that's retained them." *Id.* This is, accordingly, not a case where counsel acted out of ignorance of prevailing professional norms or did not know how to go about investigating potential neurocognitive deficits. Instead, this is a case where counsel were aware of their obligations, had the funding to meet those obligations, but failed to do so.



Appellate Case: 15-3160 Page: 31 Date Filed: 02/29/2016 Entry ID: 4372433

### E. THE REFUSAL TO SUBMIT TO A GOVERNMENT EVALUATION.

The evidence that Mr. Nelson refused to participate in a mental-health examination on the advice of counsel–principally Mr. Berrigan–is undisputed. Both Mr. Berrigan and Ms. Hunt testified that that was the case. Exh. 4 (TR 4/14/14) at 67, 70, 107-109, 234-36, 265-66. Each also believed that had Mr. Nelson been advised to cooperate in the evaluation, he would have done so. *Id*. at 68, 236. In essence this was a decision made by counsel to no discernible tactical end. Mr. Berrigan rejected any suggestion that he was attempting to create an appellate issue, stating, "No. These cases are to be won in trial, not in appeal. It's way too late in the appellate proceedings." *Id*. at 270. Ironically, had Mr. Nelson been allowed to undergo a Government examination, his pre-existing brain damage would have emerged as it did via Dr. Gelbort's testing in 2005 (Exh. 23) and the assessment of the Government's own expert, Dr. Martell, in 2010. Exh. 24.

Throughout the hearing, the Government raised with various counsel the issue that Mr. Berrigan actively litigated the propriety and conditions of a Government evaluation of Mr. Nelson and devoted many hours to researching and writing on the issue. *See e.g.*, Exh. 4 (TR 4/14/14) at 182; 253-55. The Government's point seemed to be that Mr. Berrigan's lack of attention to the mitigation investigation may be excused because of the time he was spending

(wasting, really) on this issue. On closer examination, the reality is that the litigation took place in a vacuum since the defense had not investigated Mr. Nelson's mental health and had no mental health case to present or protect. At the § 2255 hearing, Mr. Berrigan conceded that at the time Mr. Nelson, on the advice of counsel, refused to cooperate in the Government's mental health examination, the defense "had no neuropsychological exam or mental health evidence to offer . . . ." *Id*. at 268. Ms. Hunt, in fact, could not understand why Mr. Berrigan was "making such a big deal of it since we hadn't done any evaluations. We'd done nothing." *Id*. at 94.

The chronology prepared with regard to the issue of the defense mental-health investigation (Exh. 25) shows that a Rule 12.2-type notice was filed well before the defense had even engaged an expert and that the expert in question–Daniel Foster, Psy.D.–saw Mr. Nelson on consecutive days over a single weekend one month before trial and never completed his evaluation. Exh. 26 at 1. As stated in his report, "[W]e were unable to complete an evaluation. Our time was spent primarily in trust-building and history taking." *Id*. at 4. Mr. Berrigan, for his part, did not consider what Dr. Foster did as a complete or comprehensive mental examination of Mr. Nelson. Exh. 4 (TR 4/14/14) at 239. The only purpose of Dr. Foster's preliminary report–which was faxed to counsel the night before the case



Appellate Case: 15-3160 Page: 33 Date Filed: 02/29/2016 Entry ID: 4372433

went to the jury–was to preserve, for reasons that are unclear or poorly thought out, a "proffer" of what his testimony would have been. *Id.* at 255. As stated, the faxed report of Dr. Foster was, by its own terms, incomplete and preliminary.

Mr. Berrigan's view, that he did not want to have a jury hear the last word as rebuttal from Government experts (an experience derived from cases he had tried in the state courts of Missouri (*Id.* at 227)), does not justify his failure to investigate the issue. Mr. Berrigan could have as easily advised Mr. Nelson to submit to a Government examination since any defense mental-health evidence could be withdrawn if that evaluation were deemed harmful and the Government's experts would not be permitted to testify since their sole purpose was to rebut any defense case. Mr. Berrigan understood he retained that option. *Id.* at 267.

If Mr. Berrigan's views on this issue were deemed "reasonable," it would mean that counsel would never explore the issue of mental-health-based mitigation. There was no strategic component to this failure at all. Indeed, Mr. Berrigan did not even consider the possibility that the Government's selected mental-health experts would uncover significant mental-health mitigation since they were "government guys." *Id.* at 237.

**F. THE FAILURE TO MOVE FOR A CONTINUANCE.**

When Mr. Berrigan was scheduled to undergo quintuple bypass surgery in



Appellate Case: 15-3160 Page: 34 Date Filed: 02/29/2016 Entry ID: 4372433

early August 2001, the issue of a continuance came front and center and Mr. Berrigan, Ms. Hunt and Mr. Nelson met to discuss the need for a continuance of the trial date. *Id.* at 66. Ms. Hunt and Mr. Nelson believed a continuance was needed. *Id.* at 67. However, at the end of the discussion, Mr. Berrigan simply announced that no continuance would be requested. *Id.* Mr. Berrigan noted that, looking back, he can see they were not ready for trial. *Id.* at 231. Nonetheless, he felt bound by the fact that he had accepted an appointment in the case with the tacit understanding that he would not seek a further continuance, noting, "That was the basis on which I had agreed to get involved in the case." *Id.* He also did not believe that the court would continue the case, even if a motion to continue was filed. *Id.* at 232. Despite the fact that, as a result of his coronary bypass surgery he did little work in the case in August (*Id.* at 207), he was loathe to use his personal health issues as a reason to continue the date. *Id.* at 233.

That the defense was not ready to proceed to trial in the fall of 2001 is apparent from a review of the record. Mr. Berrigan had assumed sole responsibility for the mitigation aspect of the case, but spoke to the mitigation specialist, Tena Francis, only two or three times between entering the case in February 2001 and Mr. Nelson's sentence of death nine months later. *Id.* at 206. Contrary to what was his usual practice, Mr. Berrigan did not supervise or interact



Appellate Case: 15-3160 Page: 35 Date Filed: 02/29/2016 Entry ID: 4372433

at all with Ms. Francis. *Id.* at 272. Also atypical of Mr. Berrigan's past experience working with mitigation specialists, was that he received no assistance from Ms. Francis or her organization at the penalty-phase itself stating, "[u]niformly in my experience, the mitigation investigator has always been there when the penalty phase of the case is ongoing." *Id.* at 205.

## VI. FACTS ILLUSTRATING PREJUDICE FROM TRIAL COUNSEL'S PERFORMANCE.

Trial counsel's mismanagement of the mitigation investigation and refusal to seek a continuance combined to produce a mitigation case that was superficial and failed to document and present entire areas of crucial mitigation evidence. As detailed below, there was readily available evidence that would have allowed counsel to present a more robust picture of Mr. Nelson's life history of the jury. This evidence–which was presented at the § 2255 hearing–was not merely "a larger quantity of mitigation evidence." *Nelson*, 97 F. Supp. 3d at 1144. Rather, it was qualitatively different than the evidence which the jury heard at trial: it encompassed entire areas which the jury was not previously asked to consider (e.g., brain damage, mental illness, childhood sexual assault), as well as provided necessary and credible details and documents to help the jury genuinely understand Mr. Nelson's life and background. It is these details that make the difference between a compelling mitigation presentation and a merely superficial one. *Gray*

*v. Branker*, 529 F.3d 220, 238 (4th Cir. 2008) (capital sentencing jury must be given "the full picture" of defendant's life history); *Walbey v. Quarterman*, 2007 U.S. Dist. LEXIS 98093, *86 (S.D. Tex. 8/10/07), *aff'd by*, 309 Fed. Appx. 795 (5th Cir. 2009) ("the effectiveness of mitigating evidence is in the 'details' and when only a general overview is set forth, without providing those 'details,' the attorney does not give the jury a proper vehicle for giving effect to the mitigating evidence."). As demonstrated below, the totality of the mitigation evidence–both that adduced at the original trial and at the § 2255 hearing–would have presented a compelling mitigation case such that there is a reasonable probability that at least one juror would have weighed the case differently.

### A. NEUROCOGNITIVE DEFICITS.

Mr. Nelson suffers from serious neurocognitive deficits. This was confirmed by neuroimaging and by every expert who assessed him. Daniel Martell, Ph.D., the Government's rebuttal mental-health expert, described this case as one "absolutely" presenting an example of "convergent validity," *i.e.*, where multiple evaluations, sources of data, and assessments consistently reach the same conclusion. Exh. 7 (TR 4/17/14) at 673-74. All of the experts agreed that Mr. Nelson was cooperative with the testing, that he put forth good effort, that malingering instruments confirmed his honest efforts, and that the results were



Appellate Case: 15-3160 Page: 37 Date Filed: 02/29/2016 Entry ID: 4372433

valid. The "convergent data" in Mr. Nelson's case consists of:

- The neuropsychological examination conducted by Michael Gelbort, Ph.D. in 2005 (Exh. 23);
- The assessment by Natalie Novik Brown, Ph.D. in 2006 in her preliminary investigation of Fetal Alcohol Spectrum Disorder (Exh. 31);
- The PET scan and MRI imaging conducted by a private imaging facility near Mr. Nelson's place of confinement in Terre Haute, Indiana in 2010 (Exh. 32; Exh. 33);
- The findings of clinical psychologist Xavier Amador, Ph.D. (Exh. 36, Exh. 37, Exh. 38, Exh. 39);
- The neuroimaging study by Ruben Gur, Ph.D. (Exh. 34, Exh. 35, Exh. 40);
- The analysis of Mr. Nelson's birth records by neonatologist Carolyn Crawford, M.D. (Exh. 41);
- Dr. Martell's own findings (Exh. 24).

With regard to Mr. Nelson, the Government's own expert, Dr. Martell, identified "brain damage, brain dysfunction and neurological impairments". Exh. 7 (TR 4/17/14) at 657. Dr. Martell acknowledged that his findings–and the identical findings of the other experts–would be mitigating as to penalty. *Id.* at 657-58.

The neuropsychological testing and imaging that Mr. Nelson underwent as part of the § 2255 challenge to his sentence of death reveals that he consistently performs significantly below normal levels on standard testing instruments

designed to assess neurological functioning. The experts all agreed that the damage is primarily in Mr. Nelson's frontal lobe. Dr. Gur's analysis synthesized data from Mr. Nelson's neuropsychological testing, an MRI and a PET scan. As noted, all three sources of data confirmed the findings of Drs. Gelbort and Martell that Mr. Nelson has brain damage. Exh. 6 (TR 4/16/14) at 551-602; Exh. 34, Exh. 35. Mr. Nelson's damage is in regions of the brain "that are very important for regulating behavior," including those regions responsible for moral judgment, regulation of emotions, moderation of arousal, and impulse control (Exh. 34 at 4; Exh. 6 (TR 4/16/14) at 583). Importantly, Mr. Nelson has abnormalities in his basal ganglia, an area of the brain responsible for regulating sexual impulses. Exh. 6 (TR 4/16/14) at 583.

### B. MR. NELSON'S PATERNAL AND MATERNAL BACKGROUND.

Mr. Nelson did not begin life with a clean slate. On both sides of his family, paternal and maternal, "there is an extensive history of mental health problems and inappropriate sexual conduct," as well as drug and alcohol abuse. Exh. 29 at 1. Schizophrenia and suicide are reoccurring conditions and events in the family history. Mr. Nelson has two brothers with schizophrenia–one in prison in Texas for murder, who was found mentally incompetent in those proceedings. *Id.* at 2, 5, 58-59, 62. On his mother's side of the family, there is a significant history of older



Appellate Case: 15-3160 Page: 39 Date Filed: 02/29/2016 Entry ID: 4372433

males sexually molesting their children and violently abusing their spouses. *Id.* at 2-3, 5. Mr. Nelson's maternal grandfather would steal into the bedroom of his female children, pull his penis out, and ask his daughter if she wanted "this big dick." *Id.* at 3. His mother endured this violence which directly affected her ability to parent. Unfortunately, rather than escaping the cycle of violence, Mr. Nelson's mother, Nancy Nelson, repeated it in her own life, having five children back to back, all boys, with Mr. Nelson's abusive father, Kenneth Morse.

Kenneth Morse was called to testify for the Government at the original sentencing. This testimony backfired on the Government. Mr. Morse could not even recognize his own son in the courtroom and upon his exit from the stand, the judge commented "that was entertaining." Exh. 45 (TR 11/27/01) at 1086. One of most apparent failures in the social history investigation was the complete failure to investigate the Morse side of the family and present that information to the jury. *See Williams v. Allen*, 542 F.3d 1326, 1339 (11th Cir. 2008) (noting counsel's duty to investigate the family and social history, especially when, as in that case, counsel possessed documents which indicated the father was an abusive alcoholic). The Morse side of the family is rich with explanatory mitigation. The more that is understood about the obstacles Mr. Nelson was saddled with, from both sides of his genetic and environmental make-up, the more it can be understood how he



Appellate Case: 15-3160 Page: 40 Date Filed: 02/29/2016 Entry ID: 4372433

came to be the adult that he was.

On the Morse side of the family, the pattern of significant mental disorders, violence, alcohol and drug abuse, and sexual molestation, is repeated. Exh. 29 at 5-12. One of thirteen children, Mr. Nelson's father, Kenneth Morse, grew up in extreme poverty and with an alcoholic father who had been injured in an explosion at the dynamite and gun powder plant he worked at. *Id.* at 6-7. Mr. Nelson's father was singled out early on as different from the other children. *Id.* at 7. He was described as "unbalanced, "always strange," and he would have "fits," in which he "would pull his hair and bang his head on the walls, the floor or rocks. He would bite and pinch himself until he bled." *Id.* at 7. These fits included episodes of violence against others, including taking an ax to his brother's foot and chopping off his toe. *Id.* Like Mr. Nelson's mother, his father Kenneth also endured his own abusive childhood. Kenneth was singled out for abuse by his father with beatings and excessive punishment. *Id.* at 8. The violence went so far that Mr. Nelson's grandfather shot a gun at Kenneth several times, narrowly missing his head at least once. *Id.* Family members suspected that Kenneth was singled out for abuse because John Morse believed that another man was the biological father. *Id.*

Mr. Nelson's grandfather was killed in a car accident when he was driving



Appellate Case: 15-3160 Page: 41 Date Filed: 02/29/2016 Entry ID: 4372433

drunk with several children in the car, including Kenneth. *Id.* Everyone was thrown from the truck, escaping serious injury, except for the father, whose body was pinned underneath the truck. *Id.* Left alone with the remaining children to support, Mr. Nelson's grandmother, Pearl, struggled to provide and parent. *Id.* at 9.

Mr. Nelson's father began to get into legal trouble as a young adult. At eighteen, he was charged with the attempted rape of a seven-year-old girl who was staying the night at the Morse home. *Id.* Mr. Nelson's father threatened the young girl by placing his hands around her neck and stating he would kill her if she said anything about it. *Id.* Before that, at age 17, he and a friend raped a thirteen year-old girl but were never caught because the girl did not report the crime. *Id.*

Mr. Nelson's uncle, Milas, also has a history of sexual assault. His ex-wife was physically and sexually assaulted by him, including a rape years after the marriage ended. *Id.* at 10. He was sent to prison for sexually penetrating his four-year old great-granddaughter. *Id.* Mr. Nelson's first cousins, two of Milas's sons, have also been arrested for sexual offenses, including the assault of minors and one allegedly raped three of his own children. *Id.*

Schizophrenia is also present on the Morse side of the family. *Id.* Mr. Nelson's own father, Kenneth, "is generally described as paranoid, delusional, and

possibly schizophrenic." *Id.* at 11. He believes he is being watched all the time, by street sweepers who are actually the FBI, and has claimed that the mafia, including John Gotti, are after him. *Id.*

**C. MR. NELSON'S BIRTH.**

While pregnant with Mr. Nelson and his twin brother, his mother was viciously abused by his father. *Id.* at 13. An emergency room record notes that Nancy was seen in July 1974, four months prior to Mr. Nelson's birth, for a probable premature separation of the placenta. Exh. 41 at 6. A few months later, Mr. Nelson's premature birth was precipitated by a particularly brutal beating in which Nancy was stomped on by Kenneth, Sr. Exh. 29 at 13. Within a few days of the beating, Nancy went into labor with the twin boys. *Id.* Counsel wholly failed to utilize and investigate the birth records, which explain in black and white terms the struggles Mr. Nelson faced from day one, struggles that were unique and more difficult than that of his twin brother.

The second born of the twins, Mr. Nelson was a "blue" baby, requiring oxygen due to severe respiratory distress. Exh. 41 at 2-3. His condition did not improve and he was transferred to a neonatal intensive care unit at Children's Mercy Hospital a few hours after his birth, care his older twin did not require. *Id.* at 3, 6; Exh. 29 at 14. Before he was transferred, Mr. Nelson was baptized,



Appellate Case: 15-3160 Page: 43 Date Filed: 02/29/2016 Entry ID: 4372433

presumably over concerns that he may not survive. Exh. 29 at 13. His breathing stopped twice while in the ambulance on the way to Children's Mercy. *Id.* at 14. In addition to his RDS (premature lung disease), Mr. Nelson also was born with an E. coli infection and hyperbilirubinemia (jaundice due to immaturity of the liver). He also had low blood glucose and blood in his spinal fluid, indicating a possible brain bleed. Exh. 41 at 6, 8. He presented as lethargic, did not feed well initially, and improvement in his coloring and weight gain was slow. Exh. 41 at 3-4, Exh. 29 at 14. The multiple challenges faced by Mr. Nelson at birth are factors which "have been known to lead to frontal lobe dysfunction." Exh. 41 at 8.

A social worker became involved in Mr. Nelson's case because the doctor was concerned about conditions in the home. Exh. 29 at 14. Although Mr. Nelson was in the hospital for almost a month, "[t]here has been no contact, or visitation from his unwed mother." *Id.* at 14. On December 17, 1974, the doctor noted that Mr. Nelson could be discharged, once the social situation was addressed. *Id.* at 14. Mr. Nelson's mother showed up at the hospital on December 19, 1974, and he was released to her, with promises that she would attend follow up visits with her family doctor. *Id.* at 14. However, follow-up services and care were never provided by either social services or by the family physician. *Id.* at 15.



Appellate Case: 15-3160 Page: 44 Date Filed: 02/29/2016 Entry ID: 4372433

### D. MR. NELSON'S EARLY CHILDHOOD

Eighteen years old and caring for premature twins and a nine month old, Nancy Nelson's problems were intensified by the father's continued abusive behavior, intense jealousy, and beatings. *Id.* at 15-16. Confined to the home of Kenneth's mother, Nancy Nelson was depressed and unable to emotionally attach to her new babies. *Id.* at 16. In Mr. Nelson's first year of life, his mother attempted suicide twice, seeing death as the only possible escape from the abuse of Kenneth, Sr. *Id.* Mr. Nelson was a colicky baby who cried a lot, which only angered his disturbed and abusive father. *Id.* Mr. Nelson's father poured beer down his infant's throat, in a perverted attempt to stop the crying. *Id.* Nancy became pregnant with a fourth male child while Mr. Nelson was still in his first year, his brother Paul, who would eventually be diagnosed with schizophrenia, along with his older brother Johnny. *Id.* at 17, 62. Kenneth, Sr. also beat Nancy during her pregnancy with Paul, so severely that her gall bladder and spleen had to be removed, along with the receipt of several stitches to her face. *Id.* at 17. The doctors who treated her advised her to abort the fetus, but Nancy refused. *Id.* By age 20, Nancy had four children by Kenneth, Sr., all under the age of two. *Id.*

When Nancy attempted to leave Kenneth, Sr., her attempts were met with violence. On one occasion, Kenneth, Sr., found where she was staying, bound and



Appellate Case: 15-3160 Page: 45 Date Filed: 02/29/2016 Entry ID: 4372433

gagged her with electrical cord, and took the boys. *Id.* at 17. He would also forcibly rape Nancy while the boys were in her care. *Id.* at 18. Law enforcement were contacted about the violence but nothing ever seem to come of it. *Id.* at 17. Family members theorize that because he was a valuable drug informant, Kenneth enjoyed some level of protection from police intervention. *Id.* The young boys witnessed the abuse of their mother and were victims of their father's abuse. *Id.* at 16-18.

In 1977, Nancy became pregnant with her fifth male child, Steven. *Id.* at 18. On valium for her "nerves," a doctor again recommended an abortion, noting that a continued pregnancy would impair the mental health of the mother. *Id.* Nancy consented to the procedure, but the abortion never happened. *Id.* In 1978, Nancy was arrested for stealing baby aspirin for Paul. *Id.* at 19. Nancy explained that Kenneth, Sr. had sent her to the grocery store for steak and she did not have enough money to buy the aspirin. *Id.* In that same time, Kenneth, Sr. got in the habit of taking the oldest son, Johnny, with him wherever he went, as insurance against Nancy leaving. Kenneth, Sr. knew that Nancy would not leave him if one of her children was still with him. *Id.* However, after an incident in which Kenneth, Sr., threatened to beat the infant Steven, Nancy made up her mind to leave. One day, Kenneth, Sr., left the house without taking Johnny with him and



Appellate Case: 15-3160 Page: 46 Date Filed: 02/29/2016 Entry ID: 4372433

Nancy seized the opportunity to run away with all five boys, with nothing but the clothes on their backs. *Id.* With the help of her sister, Nancy fled to California. *Id.*

While living in California, it was reported by more than one family member that a young Mr. Nelson was anally raped and forced to perform oral sex by a stranger in the neighborhood. *Id.* at 21, 42. Shortly thereafter, in the spring or summer of 1980, when Mr. Nelson was five, his father reappeared on the scene in California, having tracked them down. *Id.* at 21. The beatings began again and at one point, Kenneth, Sr., held Nancy and the five boys' hostage for approximately a week. *Id.* at 22. When Nancy finally got away, she called the police and she again fled Kenneth, Sr. *Id.* After several weeks in a women's shelter, she and the boys escaped to Texas, again with the help of Nancy's sister. *Id.*

**E. LIFE IN TEXAS**

Arriving in Texas, all of the boys had visible scars. *Id.* at 23. For the first year there, Nancy did not work, but when Mr. Nelson was around age seven, she began working at a bar, six days a week from 6 p.m. to 2 a.m. *Id.* Nancy drank heavily and left the five boys, from age's three to eight, with a babysitter while she was bartending. *Id.* The babysitter would lock the five boys in a room, letting them out briefly to go to the bathroom and on occasion, the back yard. *Id.* at 24.



Appellate Case: 15-3160 Page: 47 Date Filed: 02/29/2016 Entry ID: 4372433

Mr. Nelson wet the bed and his pants, so the room reeked of urine, soaking the bed and the couch. *Id.* Because of this, the babysitter threw the urine-soaked furniture out and made the boys sleep on mats on the floor instead. *Id.* The babysitter's husband was an alcoholic who physically abused the boys, beating Mr. Nelson for wetting the bed. *Id.* at 23-24.

Mr. Nelson was singled out for special education in first grade, and he continued to be placed in special education throughout his school years. *Id.* at 25, 33. Mr. Nelson was held behind and had to repeat first, fifth, and sixth grades. *Id.* at 25, 35, 42. None of the other four brothers struggled in school to the extent Mr. Nelson did, although two did receive speech therapy. *Id.* at 25. Because of his failings, Mr. Nelson ended up being placed in the same grade as his younger brother, Paul, with teachers describing Paul as functioning at a higher level than Mr. Nelson, although both were in the "lower-achiever" group. *Id.* at 28, 34.

The boys continued to be shuffled around to various babysitters while their mother continued to work nights at the bar. *Id.* at 26. One of these babysitters allowed the boys to watch pornography and another allowed the boys to be molested by older females. *Id.* at 26. Mr. Nelson's bedwetting continued for many years, without treatment. *Id.* Providing any kind of medical care for the boys was simply beyond Nancy's reach. *Id.* The house was filthy and Nancy, an alcoholic,



Appellate Case: 15-3160 Page: 48 Date Filed: 02/29/2016 Entry ID: 4372433

simply let the boys run wild. *Id.* at 27. The boys were forced to knock on neighbors' doors for food because there was none in the house. *Id.* at 27, 32. Later, the boys turned to stealing in order to have food to eat. *Id.* at 31-32.

In addition to neglecting the boys' basic needs, Nancy also physically abused her children. *Id.* at 30-31. Some of this abuse was at the hands of the many men who came in and out of Nancy's life. *Id.* at 30. An example of the brutal treatment of the children, including Mr. Nelson, was being handcuffed to a bed and beaten with a weightlifting belt. *Id.* The visible injuries sometimes required the boys to stay home from school, to keep the beatings a secret. *Id.* Another boyfriend taught the older boys to steal for him by breaking into houses and businesses. *Id.* at 34. This was the type of moral compass the boys were given to navigate through life. Overwhelmed by her circumstances, at one point Nancy obtained paperwork requesting that the boys be placed in foster homes. *Id.* at 35. The boys found the paperwork and tore it up. *Id.* One can only imagine the sense of rejection and utter abandonment this act would have engendered in the boys.

As an adolescent, Mr. Nelson began self-mutilating, cutting himself on his arms, burning himself with cigarettes or a lighter, and banging his head on walls. *Id.* Around the same time, in accordance with his training by the boyfriend, Mr. Nelson began to get into trouble with juvenile authorities for stealing. *Id.* While



Appellate Case: 15-3160 Page: 49 Date Filed: 02/29/2016 Entry ID: 4372433

under juvenile supervision, Nancy contacted the probation officer and let him know that Mr. Nelson was threatening suicide. *Id.* Although referred as a crisis situation, no follow-up was done and no counseling occurred. *Id.* After one bike theft, Mr. Nelson was held in detention because the authorities felt that Nancy was not providing "suitable supervision, care or protection of the child." *Id.* at 36. Mr. Nelson was placed in isolation, where he was again noted as being suicidal, at age 14. *Id.* He had additional incidents of self-mutilation and suicide while in detention for other stealing incidents and sometimes mechanical restraints were used to prevent self-harm. *Id.* at 36, 38. One of the incidents was so serious that Mr. Nelson was transported to a local hospital. *Id.* at 36. In spite of this, he was returned to detention in the morning and no mental health assessment or treatment plan was implemented. *Id.* at 36-37. A court record noted that during his detention, Mr. Nelson received no visits from his family. *Id.* at 37. During one placement in detention, Mr. Nelson came into the facility with a bullet injury in his abdomen, the result of his brother shooting a bullet that ricocheted into Mr. Nelson. *Id.* at 38. The wound was infected by the time he got to detention, because apparently no medical care had been sought. *Id.*

Despite these issues, Mr. Nelson was not approved for placement in any of the facilities or programs available in the county, such as group homes, boys'



Appellate Case: 15-3160 Page: 50 Date Filed: 02/29/2016 Entry ID: 4372433

ranches, and residential treatment centers. *Id.* at 37, 39, 46. The juvenile probation officer involved in one of these denials indicated that financial reasons were probably the driving force in assuring that Mr. Nelson did not get the help he needed, despite the recognition that Mr. Nelson was "clearly emotionally disturbed and in need of intensive services." *Id.* at 39.

### F. MR. NELSON'S TIME IN MISSOURI

At her wit's end, Nancy sent four of the boys, including Mr. Nelson, to live with her brother in Kansas City, who already had three children of his own. *Id.* at 39. Johnny stayed in Texas with a local couple. *Id.* The uncle noted that when the boys arrived, they were in dirty clothes and smelled. *Id.* George blamed his sister for the behavioral problems of Mr. Nelson, noting that all her time was spent in bars and no supervision or structure was given. *Id.* While at George's home for several months, Mr. Nelson's grades improved and he no longer got into trouble with the law. *Id.* at 40. However, the boys' presence created chaos and Mr. Nelson and Kenny both came home to their mother in Texas. *Id.* at 40-41. Paul and Steven remained behind with their aunt and uncle in Kansas City. *Id.* at 41. It is unclear what lead to the return but shortly before Mr. Nelson and Kenny returned to their mother's home, a child support order was entered in Kansas, requiring Nancy to pay child support to her brother for the care of the boys. *Id.*



Appellate Case: 15-3160 Page: 51 Date Filed: 02/29/2016 Entry ID: 4372433

Back at home, Nancy told a probation officer that she would take Mr. Nelson to a psychologist that had been recommended by a police officer. *Id.* However, once told by the psychologist that she needed to be home more in the evenings, Nancy stopped taking Mr. Nelson. *Id.* Despite this, Mr. Nelson showed some improvement in his behavior in the months following his return home, which Nancy attributed to the absence of his brother Johnny, who was still staying with the neighbors. *Id.* However, Mr. Nelson still struggled in school and was held back in sixth grade that year. *Id.* at 42. Achievement testing showed that Mr. Nelson, at age 14, had scores ranging from the 2.5 grade equivalent level to the 5.5 grade level. *Id.*

Trouble began again when Mr. Nelson, at 15, was reported as a runaway and picked up for stealing. *Id.* Before Mr. Nelson could appear in court, Nancy informed the probation officer that Mr. Nelson had gone to live with his father in Kansas City. *Id.* Mr. Nelson's father lived with his mother, Pearl Morse. Her house had no running water and Mr. Nelson's father sold and used drugs, including heroin, at the house. *Id.* Mr. Nelson would seek refuge with various relatives. *Id.* At one point, Mr. Nelson and his father got into a physical altercation over Kenneth, Sr.'s physical and financial abuse of his elderly mother. *Id.* at 42-43. Not long after, Mr. Nelson returned home to his mother in Texas. *Id.* at 43.



Appellate Case: 15-3160 Page: 52 Date Filed: 02/29/2016 Entry ID: 4372433

### G. PLACEMENT IN THE TEXAS YOUTH COMMISSION

Upon his return, the juvenile proceedings that were suspended while Mr. Nelson was in Kansas with his father were reinstituted in Texas. Placement was again denied for a third time, even though Nancy told a member of the placement committee that she was unable to supervise Mr. Nelson and that he needed more structure. *Id*. at 43. Mr. Nelson got into trouble for stealing and was again placed in detention. *Id.* at 44. Although there were bright spots of behavior while in detention this time, Mr. Nelson was again self-abusive and suicidal. *Id.* On one occasion, Mr. Nelson hit himself, caused a nosebleed, and then wrote on the walls or floor in his own blood. *Id.* Placement was denied for a fourth time and Mr. Nelson was committed to the Texas Youth Commission (TYC), the state juvenile correctional agency. *Id.* at 45. Shortly before he was placed in TYC custody, Mr. Nelson was placed on an antidepressant, but the medication was stopped a few months later. *Id.* An educational assessment showed Mr. Nelson, at almost 15 years of age, performing at the fourth grade level in all subjects but math, where he performed at the sixth grade level. *Id.*

At 14, Mr. Nelson was among the younger boys at the Gainesville facility he was placed at and small for his age. *Id.* at 46. The facility was a frightening and chaotic place. *Id.* at 46-47. Mr. Nelson was sexually assaulted while there, an

extremely important fact that was never emphasized at the original sentencing. *Id.* at 47. The self-mutilation and suicidal behavior continued. *Id.* Mr. Nelson also obtained injuries, including a head injury, while involved in fights there. *Id. at* 47-48. At one point, Mr. Nelson asked to be placed in a more secure setting because he was frightened of his peers. *Id.* at 47. The request was granted and Mr. Nelson again self-mutilated, cutting his wrist with a coke can. *Id.* at 47.

At Gainesville, a community re-entry plan was developed, which noted that Mr. Nelson would need to be in a support group for abuse victims. *Id.* at 48. Mr. Nelson was approved to return to home to Nancy and Gainesville school staff noted that Mr. Nelson had not been a behavior problem. *Id.* A photo of Mr. Nelson taken on the day Nancy picked up him from Gainesville shows him in the back of the car with an injury to his face and eye. *Id.* at 48; Exh. 47.

Five days after being returned to his mother, Mr. Nelson was again placed in detention following a fight with his brother. Exh. 29 at 48. Records indicate that Johnny started the fight and Nancy called the police when she was unable to break it up. *Id.* Records describe Johnny as "quite violent and unstable." *Id.* Mr. Nelson was being seen for individual and family counseling, but Nancy failed to show up for some of the sessions. *Id.* When informed of her need to be involved, Nancy told the therapist that she and the boys would be moving, as they had been



Appellate Case: 15-3160 Page: 54 Date Filed: 02/29/2016 Entry ID: 4372433

evicted. *Id.* Although Johnny's schizophrenia had not yet been diagnosed, he was exhibiting symptoms, and this was causing problems with other residents. *Id.* at 49.

Mr. Nelson again got into trouble for stealing and was placed in detention. *Id.* Although he behaved markedly better this time around, his parole was revoked and he was ordered to return to Gainesville. *Id.* Back at Gainesville, Mr. Nelson also did better the second time around. *Id.* Although a need for mental health treatment was noted, there is no indication it was provided. *Id.* After a few months in Gainesville, Mr. Nelson returned home, at age 15. Suicidal statements were made at school and although the need for a psychological evaluation was noted, it does not seem to have occurred. *Id.* at 51. The juvenile parole officer noted that Nancy was overwhelmed, abused alcohol, and had a lot of men in and out of the home. *Id.* On home visits, "he usually found Nancy on the couch smoking cigarettes with beer cans all around. The home reeked of alcohol." *Id.* The officer always found Mr. Nelson to be respectful and courteous. *Id.*

Shortly thereafter, Nancy's brother George was called up to serve in the military and the other boys, Paul and Steven, were returned to their mother in Texas. *Id.* For several months, Mr. Nelson appears to remain out of trouble. *Id.* A special education teacher that Mr. Nelson particularly liked recalled that Mr.



Appellate Case: 15-3160 Page: 55 Date Filed: 02/29/2016 Entry ID: 4372433

Nelson's home life was "one of the worst." *Id.* at 52. The Parks and Recreation staff felt so bad for the boys that they let them pick up trash in the park in exchange for food from the concession stand. *Id.* The teacher felt Nancy was mean to the boys and observed bruises on Mr. Nelson that he would try to explain away with a brave face. *Id.* She saw depression and anxiety in Mr. Nelson and noticed that he had a knee jerk reaction when confronted, scared, or startled. *Id.* However, the consensus at school was that it was a waste of time to call Child Protective Services because they would take no action, especially once the boys were in high school. *Id.*

In April 1991, when Mr. Nelson was 16, his mother left the five boys at home alone for several weeks, so she could be with her ill father in Missouri. *Id.* During this time, Johnny was arrested for assaulting the twins, causing injury. *Id.* at 53. Kenny's concussion was severe enough that he was taken to the hospital in an ambulance. *Id.* Mr. Nelson continued to get into trouble with the law in the following months. *Id.* He went back to Kansas for a few months to stay with his father, fearful that if he remained in Texas, he would be sent back to Gainesville. *Id.* at 54. Mr. Nelson again witnessed his father verbally and physically abusing his elderly grandmother, and stepped in to try and protect her. His paternal aunt noticed his loving attitude towards his grandmother and his help around the house.



Appellate Case: 15-3160 Page: 56 Date Filed: 02/29/2016 Entry ID: 4372433

*Id.* However, Mr. Nelson again attempted suicide while staying there. *Id.* A railroad detective had seen him in the train yards, preparing to step in front of a moving train. *Id*.

### H. THE RETURN TO MISSOURI

Mr. Nelson phoned his parole officer back in Texas, wanting to return and turn himself in. *Id.* He said his mother had promised that if he would clear up his legal problems in Texas, she would move back to Missouri, to be near her family. *Id.* Mr. Nelson returned, was placed into TYC custody, and released two weeks later. Nancy held good on her promise and she and the boys, save Johnny, moved to Amsterdam, Missouri, a small rural town. *Id.* Mr. Nelson was again placed in special education and was teased because of his learning disability. *Id.* at 55.

Nancy again left the four boys alone to fend for themselves while she went back to Texas, with a friend, to visit Johnny. *Id.* Either the friend or Nancy called authorities around this time to report a belief that there was stolen property at the house. *Id.* A search by police did not reveal stolen property, but marijuana was found and the twins were arrested. *Id.* Aged 17, both plead guilty to a drug violation. Mr. Nelson did not finish out the school year and he began to work at a bait shop. *Id.* Later that same year his grandmother Pearl would die of complications from diabetes. *Id.* at 56. Now 18, Mr. Nelson was arrested



Appellate Case: 15-3160 Page: 57 Date Filed: 02/29/2016 Entry ID: 4372433

approximately one month later, on Christmas Eve, for stealing cigarettes, candy and other items from a gas station. *Id.* He was given a suspended sentence and placed on probation. In the spring of the next year, Mr. Nelson violated his probation and was sentenced to three years in the Missouri Department of Corrections. *Id.* at 56-57. While at Boonville, he was seen for head injuries and reported frequent headaches. *Id.* at 57. Fighting, sexual assaults, and racial tension were common there. *Id.* Being young and small in comparison to the rest of the population, Mr. Nelson at one point requested placement in protective custody. *Id.* at 58.

While Mr. Nelson was at Boonville, Johnny was deteriorating back in Texas, with the symptoms of schizophrenia worsening. *Id.* At one point, he was investigated by the Secret Service because of delusional statements he made about President Clinton. *Id.* at 58-59. In May 1994, Johnny was arrested for murdering his friend and employer. *Id.* at 59. He was initially found incompetent to proceed to trial and one psychologist found the murder was motivated by psychotic delusion. *Id.* After a mistrial, Johnny pled guilty and was sentenced to thirty years. *Id.*

Returning home to his mother's house in 1995 after release from prison, Mr. Nelson would again get in trouble later that year. *Id.* at 59-60. He was transferred

from the Butler County jail to a mental health center in Nevada, Missouri because the Sheriff was concerned over Mr. Nelson's suicidal threats. *Id.* at 60. After his release, Mr. Nelson again got into trouble, stealing cigars and cigarettes from the same gas station that got him sent him to prison the first time. *Id.* at 61. In 1996, he was sentenced to four years in prison and ended up back at Boonville, at age 21. *Id.*

In September 1997, Mr. Nelson was released to the Kansas City Community Release Center (KCCRC). *Id.* at 62. Soon thereafter, his brother Paul was taken to the emergency room by his mother because he was hearing voices telling him that he was a child molester and to kill himself, among other forms of hallucinations. *Id.* Paul's hospital records note the family history of schizophrenia, including a brother, aunt and three cousins. *Id.* Paul was diagnosed with psychosis, probable schizophrenia. *Id.*

Mr. Nelson was released from KCCRC in February 1998 and continued to maintain employment. *Id.* at 62-63. While still at KCCRC, Mr. Nelson met Kerri Dillon. Kerri was widowed with a six year old child; the father had committed suicide. *Id.* at 63. She and Mr. Nelson dated and Kerri describes Mr. Nelson as treating her son like his own and that he contributed financially to the home. *Id.* Mr. Nelson noticed how good Kerri was to her son, contrasting it with his own



Appellate Case: 15-3160 Page: 59 Date Filed: 02/29/2016 Entry ID: 4372433

childhood and realizing for the first time just how bad it had been. *Id.*

Throughout the next year, Mr. Nelson seemed to be doing relatively well and he was seen as a reliable and conscientious employee. *Id.* at 65. While living in Kansas City, Mr. Nelson spent time with a cousin on his father's side, Mike Morse. The cousin told him how he and his wife took in the child of a neighbor because the mother was an alcoholic. *Id.* After Mike told Mr. Nelson this story, Mr. Nelson responded sadly, "why didn't you adopt me? I needed someone to take care of me." *Id.*

### I. THE TIME PERIOD PRECEDING THE CRIME

In the winter of 1999, Mr. Nelson's brother Paul was struggling. His mental condition deteriorated when he stopped taking his medication. *Id.* at 65. He was involuntarily hospitalized in a psychiatric ward in the early spring, still hearing voices that told him he was a child molester. *Id.* at 66. Paul left the hospital against medical advice, with a diagnosis of chronic paranoid schizophrenia. *Id.*

Around that same time, Mr. Nelson was jailed for a couple of months over an alleged parole violation involving the theft of tools. *Id.* at 66-67. No charges were filed but his parole was transferred to Missouri where the parole officer required him to live in Bates County, sixty mile southeast of Mr. Nelson's job in Kansas City. *Id.* at 67.



Appellate Case: 15-3160 Page: 60 Date Filed: 02/29/2016 Entry ID: 4372433

That summer, Paul was again seen at the emergency room, hearing voices which told him to kill himself and he was again not compliant with his medication. *Id.* Paul was committed to a psychiatric hospital and upon discharge, told staff that he planned to live with Mr. Nelson. *Id.* Just prior to his release, Nancy moved to Kansas City with a new boyfriend and Paul was released to her custody. *Id.* Paul continued to refuse medication while living with Nancy and Nancy asked Mr. Nelson and Kerri to take him in at times. *Id.* at 69. Kerri did not appreciate having Paul around and when Mr. Nelson refused to watch Paul one weekend, Nancy left a drunk message telling Mr. Nelson that he was "a no good brother." *Id.*

People began to notice changes in Mr. Nelson around this time. *Id.* Mr. Nelson seemed anxious, extremely talkative, talking rapidly and just plain "weird," exhibiting signs of paranoia. *Id.* at 69-70. He was not sleeping, working all day and then staying out all night. *Id.* at 70. Drugs did not seem to be the problem. *Id.* Nancy, still drinking at this time and depressed, became involved with a man who used crack and cocaine. *Id.* He and Mr. Nelson argued and at one point, the boyfriend put his fist through the wall. *Id.* Mr. Nelson and Kerri also began to have problems. *Id.* A cousin noticed that Mr. Nelson seemed stressed out and acted strange, mumbling and talking to himself frequently. *Id.* at 71.

Paul was again taken to the emergency room in September 1999 for being

noncompliant with medication. *Id.* However, Nancy refused to sign an affidavit for commitment and Paul left the hospital. *Id.* Nancy continued to have problems dealing with Paul's schizophrenia and Mr. Nelson attempted to help by taking Paul to work with him. *Id.* Paul would call Mr. Nelson to come get him from the hospital to avoid commitment. Mr. Nelson felt very conflicted because Kerri did not want Paul at the house. *Id.* The voices continued to tell Paul that he was a child molester. *Id.* Paul's Aunt Kathy, who also had a son who was schizophrenic, agreed to take Paul in. *Id*. At this time, Mr. Nelson told his aunt that he also heard voices telling him to do bad things, but that he didn't listen to them. *Id.*

Also in September 1999, Nancy's boyfriend killed himself by hanging. *Id*. at 72. Nancy discovered the body. *Id.* Mr. Nelson attempted to comfort his mother about Paul and the boyfriend, often at the local bar that Nancy frequented. *Id*. at 72. Mr. Nelson began spending time with his father's side of the family, sometimes hanging out at the junkyard his father worked at in an attempt to try and have a relationship. *Id.* Relatives noticed Mr. Nelson's strange behavior and paranoia. *Id.* In the days leading up to the crime, people stated that Mr. Nelson had begun making odd and threatening remarks about abducting a girl to have sex with. *Id*. at 73. Kerri repeatedly told Nancy that fall that Mr. Nelson was hearing voices. *Id.* When Kerri confronted Mr. Nelson and told him he needed help,



Appellate Case: 15-3160 Page: 62 Date Filed: 02/29/2016 Entry ID: 4372433

including medication, Mr. Nelson said that he would not be believed, that his parole would be revoked, and he would end up in prison. *Id.* Mr. Nelson's strange behavior continued, acting childlike at times and asking that Kerri pick out his clothes for him, as she did for her child. *Id.* at 74.

Paul was again taken to the emergency room in October 1999 for suicidal comments, hallucinations, and again, not taking his medications. *Id.* at 75. Paul called Mr. Nelson, telling him that he did not want to be committed. *Id*. One week later, the abduction and murder of Pamela Butler occurred, which would lead to Mr. Nelson's guilty plea and sentence of death.

Shortly after his arrest, Kerri learned that she was pregnant with Mr. Nelson's child. *Id.* at 78. Three days after his guilty plea but before sentencing, Mr. Nelson attempted suicide by overdosing on approximately 40 anti-depressant pills that he had been hoarding. *Id*. at 81. The treating physician described Mr. Nelson as "very depressed, probably more so than any inmate I've seen in the past." *Id.* If Mr. Nelson were a civilian, the doctor would have sought to have him committed for further evaluation and treatment. *Id.* After truncated competency proceedings, Mr. Nelson was eventually found competent and the penalty phase began on November 19, 2001. *Id.* at 82.

## VII. A COA SHOULD ISSUE ON WHETHER THE FACTS OF THE CRIME NECESSARILY PRECLUDED, AS A MATTER OF LAW, A FINDING OF *STRICKLAND* PREJUDICE.

Among the issues which this Court remanded to the district court for an evidentiary hearing were the following claims of ineffective assistance of counsel:

- Failure to conduct adequate investigations of defendant's mental health

- Advising or instructing defendant to decline to submit to a mental health examination by a Government examiner.

*See Nelson v. United States*, 297 Fed. Appx. 563, 565 (8th Cir. 2008).

Although unequivocally finding that trial counsel's performance was deficient with respect to these two claims,[2] thus satisfying the first prong of *Strickland*, the district court denied relief on the basis of the second prong of *Strickland*, *i.e.*, whether trial counsel's deficient performance was prejudicial. Specifically, the district court held that Mr. Nelson had failed to prove that there was a reasonable probability that at least one juror would have voted for a sentence

[2] *See* 97 F. Supp. 3d at 1149 ("In the instant case, the Court also finds that Berrigan's performance regarding investigation and presentation of the mental health testimony to be deficient."); *id*. at 1151 ("The Court agrees and concludes that Berrigan was strategically deficient in cancelling the neuropsychological examination of Nelson and in failing to reschedule such examination and also in failing to have any other assessments conducted to assess whether Nelson suffered any brain damage, dysfunction or other cognitive impairments. The Court also finds that Berrigan was strategically deficient in advising Nelson not to submit to an examination by Government experts, which effectively prevented him from presenting any mental health evidence in the mitigation phase.")



Appellate Case: 15-3160 Page: 64 Date Filed: 02/29/2016 Entry ID: 4372433

of less than death because:

> The aggravating evidence of the crime and the victim impact evidence was simply too overwhelming. *No amount of mental health evidence or testimony relating to brain damage and a difficult upbringing could overcome* the fact that Nelson kidnapped a ten-year old girl who had roller skated to the store to buy cookies, sexually assaulted her, strangled her and left her naked body in the woods. For these reasons, the Court denies Nelson's [remanded ineffective assistance claims regarding failure to conduct an adequate mental health investigation and advising or instructing the defendant to decline to submit to a mental health examination by a government examiner].

97 F. Supp. 3d at 1157 (emphasis added). The district court held that given the facts of the crime itself, *no amount of mitigation evidence about Mr. Nelson's mental health, brain damage, or background and upbringing could legally meet the standard for establishing* Strickland *prejudice.* In the district court's estimation, Mr. Nelson's death sentence was a foregone conclusion given the nature of the crime, such that there was literally *no possibility* of a different sentencing outcome, *regardless of any mitigation that could have been presented to the jury*.

The district court's *Strickland* prejudice analysis fundamentally contravened this Court's order remanding Mr. Nelson's case for an evidentiary hearing. As this Court noted in its remand Order, the prior denial of Mr. Nelson's § 2255 motion



Appellate Case: 15-3160 Page: 65 Date Filed: 02/29/2016 Entry ID: 4372433

without an evidentiary hearing was erroneous because "the motion and the files and the records of the case [did not] conclusively show that the prisoner [was] entitled to no relief." 297 Fed. Appx. at 565. Rather, this Court held that while "[i]n some cases, the clarity of the existing record on appeal makes an evidentiary hearing unnecessary," the Court's independent "examination of the claims asserted in [Mr. Nelson's] case convinces us that a fair and just determination of some of them required an evidentiary hearing to be held." *Id*. Simply put, the facts of the case on the extant record were insufficient to permit a "fair and just determination" of Mr. Nelson's claims of ineffective assistance of counsel.

The district court's *Strickland* prejudice analysis turned the remand ordered by this Court into a hollow judicial act. The district court's approach to *Strickland* basically obviated the need for a hearing in the first place because it treated the extant record concerning the facts of the crime as legally dispositive of the remanded claims; "no amount" of extra-record evidence regarding Mr. Nelson's severe mental health issues, significant brain damage and cognitive impairments, and tragic background and upbringing would have altered the *Strickland* prejudice analysis, rendering the very purpose of an evidentiary hearing moot.

As is explained in more detail below, the district court's resolution of Mr. Nelson's IAC claims concerning mental health and brain damage mitigating



Appellate Case: 15-3160 Page: 66 Date Filed: 02/29/2016 Entry ID: 4372433

evidence suffered from at least four significant legal errors:

1. The district court erroneously held that the facts of the crime necessarily precluded a finding of *Strickland* prejudice.

2. The district court improperly failed to consider or unreasonably discounted mitigation evidence presented at the evidentiary hearing.

3. The district court failed to properly consider how the evidence of Mr. Nelson's brain damage and mental illness might have affected the jury's sentencing deliberations.

4. The district court improperly considered mitigation evidence based on whether it had a nexus to the crime.

The district court's resolution of Mr. Nelson's claims was legally erroneous. At the very least, and as will be demonstrated below, jurists of reason could disagree with the district court's resolution of these claims, and the issues presented are adequate to deserve encouragement to proceed further with full merits briefing before this Court.

### A. THE DISTRICT COURT ERRONEOUSLY HELD THAT THE FACTS OF THE CRIME NECESSARILY PRECLUDED A FINDING OF *STRICKLAND* PREJUDICE.

The district court did not rule that Mr. Nelson failed to prove the *Strickland* prejudice prong on a basis that he did not present sufficient mitigating evidence at the hearing to meet the relevant standard. Rather, the district court held that "[*n*]*o amount of mental health evidence or testimony relating to brain damage and a difficult upbringing could overcome*" the facts of the crime. 97 F. Supp. 3d at



Appellate Case: 15-3160 Page: 67 Date Filed: 02/29/2016 Entry ID: 4372433

1157. In the district court's view, there was literally no amount of mitigating evidence that Mr. Nelson could have presented that would have made a difference, because as a matter of law, the nature of the crime made trial counsel's deficient performance *Strickland*-proof and immune to any prejudice analysis. Stated differently, it appeared to be the district court's view that this was an automatic death sentence.

This type of *Strickland* prejudice analysis–which emphasizes the aggravating facts of the crime to the exclusion of all mitigating evidence–has been repeatedly rejected by courts as legally erroneous. As the Fifth Circuit has noted, the horrific nature of any given capital murder does not obviate the constitutional analysis required by *Strickland*. *See Walbey v. Quarterman*, 309 Fed. Appx. 795, 804 (5th Cir. 2009). In *Walbey*, the Fifth Circuit rejected as a "non-starter" the prosecution's argument that there was no *Strickland* prejudice because "the brutality of [the] crime eclipses any mitigating evidence." 309 Fed. Appx. at 804. The Fifth Circuit noted that such "brutality trumps" types of approaches to *Strickland* prejudice analysis are legally erroneous:

> The State's stereotypical fall-back argument–that the heinous and egregious nature of the crime would have ensured assessment of the death penalty even absent [the error]–cannot carry the day here. … [O]ur decades of experience with scores of § 2254 cases from the death row of Texas teach an obvious lesson that is frequently

> overlooked: Almost without exception, the cases we see in which conviction of a capital crime has produced a death sentence arise from extremely egregious, heinous, and shocking facts. But, if that were all that is required to offset prejudicial legal error and convert it to harmless error, habeas relief based on evidentiary error in the punishment phase would virtually never be available, so testing for it would amount to a hollow judicial act.

309 Fed. Appx. at 804 (quoting *Gardner v. Johnson*, 247 F. 3d 551 (5th Cir. 2001)).

Moreover, numerous courts have specifically rejected the contention that evidence of organic brain damage and mental illness carries no weight in the context of a *Strickland* prejudice analysis. As the Tenth Circuit recently held in a capital § 2255 case,

> evidence of mental impairments "is exactly the sort of evidence that garners the most sympathy from jurors," *Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir. 2004), and that this is especially true of evidence of organic brain damage, *see Littlejohn* [*v. Trammell*, 704 F.3d 817, 864 (10th Cir. 2013)] ("Evidence of organic mental deficits ranks among the most powerful types of mitigation evidence available."). Organic brain damage is so compelling . . . because "the involuntary physical alteration of brain structures, with its attendant effects on behavior, tends to diminish moral culpability, altering the causal relationship between impulse and action." *Hooks* [*v. Workman*, 689 F.3d 1148, 1205 (10th Cir. 32012)].

*United States v. Barrett*, 797 F.3d 1207, 1231 (10th Cir. 2015) (reversing death sentence and remanding for an evidentiary hearing on whether the performance of



Appellate Case: 15-3160 Page: 69 Date Filed: 02/29/2016 Entry ID: 4372433

trial counsel was deficient in not investigating defendant's background and mental health and whether defendant suffered prejudice from any deficiency during the penalty phase of his trial).

Indeed, in *Kenley v. Armontrout*, 937 F.2d 1298 (8th Cir. 1991), this Court specifically rejected the argument that trial counsel's failure to present readily available mitigation evidence about the defendant's mental health problems was not prejudicial because the facts of the case were too aggravating. As this Court noted, mental health evidence is unique in that it can often help a jury "put the aggravating evidence in context" and that "evidence of conditions, disorders and disturbances are precisely the kinds of facts which may be considered by a jury as mitigating evidence." *Id.* at 1307-08. *See also Hill v. Lockhart*, 28 F.3d 832 (8th Cir. 1994) (finding reasonable probability that jury would not have given death penalty if counsel had discovered and presented mitigating circumstances of defendant's schizophrenia); *Antwine v. Delo*, 54 F.3d 1357 (8th Cir. 1995) (*Strickland* prejudice found where trial counsel unreasonably failed to present evidence of defendant's mental impairment); *cf. Simmons v. Luebbers*, 299 F.3d 929 (8th Cir. 2002) (finding reasonable probability that at least one juror would have voted against the imposition of a death sentence if trial counsel had presented evidence of defendant's abusive and traumatic childhood).



Appellate Case: 15-3160 Page: 70 Date Filed: 02/29/2016 Entry ID: 4372433

As the Sixth Circuit noted in *Glenn v. Tate*, 71 F.3d 1204, 1211 (6th Cir. 1995), there is broad acknowledgment across the circuit courts that evidence of mental impairments has long been recognized as the type of mitigating evidence that is particularly compelling in the context of a *Strickland* prejudice analysis:

> Our sister circuits have had no difficulty in finding prejudice in sentencing proceedings where counsel failed to present pertinent evidence of mental history and mental capacity. In addition to *Brewer v. Aiken*, [935 F.2d 850 (7th Cir. 1991)], *see, e.g., Stephens v. Kemp*, [846 F.2d 642, 652-55 (11th Cir.)(1988)] ("the resulting prejudice is clear"); *Blanco v. Singletary*, [943 F.2d 1477, 1505 (11th Cir. 1991)] (prejudice requirement "clearly met" by counsel's failure to present evidence of epileptic seizures and organic brain damage); *Loyd v. Whitley*, [977 F.2d 149, 159-60 (5th Cir. 1992)], (failure to present mitigating evidence of substantial mental defects "undermines our confidence in the outcome"). We would be badly out of step with the other circuits were we to conclude that there was no prejudice in the case at bar.

The fact that so many other courts have taken a contrary view as to how a *Strickland* prejudice analysis should be conducted, particularly in the context of a claim that trial counsel unreasonably failed to present mitigating evidence regarding mental illness and brain damage, is sufficient to meet the relevant COA standard that "jurists of reason could disagree with the district court's resolution" of the claims. Here, however, there is also *empirical* evidence that refutes the district court's reasoning. That is, while the facts of Mr. Nelson's crime are



Appellate Case: 15-3160 Page: 71 Date Filed: 02/29/2016 Entry ID: 4372433

certainly tragic and evoke sympathy for the victim, there are numerous examples of federal capital juries returning a life sentence in cases at least as aggravated as the instant case:

- *United States v. Naeem Williams*, D. HI No. 06-00079:[3] The defendant was convicted of beating to death his 5-year old daughter. The testimony at trial established that the defendant routinely assaulted and tortured the 5-year old for many months leading up to her death, frequently beating her with his fists and his belt, often after she soiled herself.

- *United States v. Larry Lujan*, D. NM No. 05-924: The defendant was convicted of the 2005 kidnapping murder of a 16 year old potential federal witness in a drug prosecution. The boy was beaten, forced to perform oral sex, and nearly decapitated with a meat cleaver. His body was found 3 weeks later. The defendant was also linked by DNA to a 1993 murder of another couple.

- *United States v. Steven Northington*, E.D. PA No. 2:07-CR-00550-RBS: The defendant was convicted of a 2004 arson fire that killed six people, including four children–ages 15, 12, 10 and 1. The fire was set to retaliate against a federal informant.

- *United States v. Coleman Johnson*. W.D. VA No. 3:00CR00026: The defendant was convicted of using a pipe bomb to kill his ex-girlfriend, who was eight months pregnant, to avoid the child support he would have to pay. DNA testing performed after the murder confirmed that the defendant was the father of the child that the victim was carrying.

---

[3] See Cynthia Johnston, "Hawaii sentences ex-soldier to life for killing daughter: report," Reuters, Jun. 27, 2014 (available online at http://www.reuters.com/article /us-usa-deathpenalty-hawaii-idUSKBN0F22CD20140627) (last visited 1/15/16).

- *United States v. Steven Green*, W.D. KY No. 5:06-CR-00019-TBR: The defendant was convicted of the 2006 murders of a family of four, including two children, and the rape and murder of their daughter.

- *United States v. Oscar Grande and Israel Cisneros*, E.D. VA No. 04-CR-83: The defendants, who were members of the MS-13 street gang, were convicted of the stabbing murder of a pregnant teenager in 2003. The victim was 17 years old, and she was targeted because she was a former member of the gang who had become a federal informant. Shortly after she left the witness protection program, the defendants repeatedly stabbed her.

- *United States v. Chevy Kehoe*, E.D. AR No. 97-243: The defendant was convicted of the murder of a family of three–an Arkansas gun dealer, his wife, and their 8 year old daughter–in furtherance of a white supremacist racketeering enterprise. Along with her parents, the defendant disposed of the 8 year old girl's body by dumping her in a swamp.

- *United States v. Alexis Candelario-Santana*, D. PR No. 3:09-CR-00427-JAF: The defendant, who already had 13 prior murder convictions, was convicted of 20 murders, including the October 17, 2009 "Tombola Massacre," where eight people were killed and twenty wounded in a shooting at a bar, including an unborn child.

- *United States v. Thomas Pitera*, E.D. NY No. 90-0424 (RR): The defendant was a contract killer for the Mafia who was convicted of six murders. Several of the murders involved torturing the victims, dismembering their bodies and burying them in a deserted marsh on Staten Island.[4]

---

[4] See Arnold H. Lubasch, Reputed Mobster Guilty In Six Narcotics Murders," New York Times, June 26, 1992 (available online at: http://www.nytimes.com/ 1992/06/26/nyregion/reputed-mobster-guilty-in-six-narcotics-murders.html) (last



Appellate Case: 15-3160 Page: 73 Date Filed: 02/29/2016 Entry ID: 4372433

- *United States v. Mohamed Rashed Daoud Al-'Owhali*, S.D. NY No. S6-98-cr-1023: The defendant, an accomplice of Osama Bin Laden, was convicted of organizing two bombings of American embassies in Africa. The 1998 bombings in Kenya and Tanzania collectively killed 224 people, including 12 Americans, and more than 5,000 people were injured.

- *United States v. Tommy Edelin*, D. D.C. No. 98-264: The defendant was convicted of four murders that he ordered as the so-called "drug kingpin" of DC-area gang known as the "1-5 Mob." Two of those murders involved ordering the killing of a 14-year old boy and a 19-year old.

- *United States v. Kenneth A. Tatum*, E.D. TX No. 2:99-CR-5: The defendant, a member of the "Crips" gang, was convicted of murdering three people, one of whom was a 63-year old retired minister that the defendant kidnapped and murdered.

- *United States v. Samuel Stephen Ealy*, W.D. VA No. 00-CR-104: The defendant was convicted of the 1989 murder of a family of three–a husband, wife, and son. The husband and wife were found shot to death outside their home; their son was later found shot to death in a closet inside the home. 363 F.3d 292, 295 (4th Cir. 2004).

- *United States v. Tyrone Williams*, S.D. TX No. 03-CR-221: The defendant was convicted for his participation in an alien smuggling operation that led to 19 peoples' deaths by dehydration, overheating and suffocation in the back of a truck trailer driven by the defendant.

- *United States v. Zacarias Moussaoui*, E.D. VA No. 01-CR-455: The defendant was convicted of being a co-conspirator in the September 11, 2001, terrorist attack on the World Trade Center and Pentagon, which killed over 3,000 people and resulted in

---

visited on 1/15/16).

four airline crashes in New York, Pennsylvania, and Washington, D.C.

- *United States v. John Richard Mayhew*, S.D. OH CR No. 02 03-165: The defendant was convicted of murdering his ex-wife, her boyfriend, and the defendant's own 18-year old daughter, with whom the defendant had an incestuous relationship.

- *United States v. Michael Antonio Natson*, M.D. GA No. 4:05-CR-00021-CDL-GMF: The defendant was convicted of the 2003 murder of a pregnant 23 year old Georgia Southern University student. The defendant was a U.S. Air Force military police officer, and the victim's skeletal remains were found by hunters on a remote part of Fort Benning, Georgia.

Each of the above federal capital cases was tried to a jury, and despite the horrific and brutal facts surrounding these murders–many of which involved, as in Mr. Nelson's case, the murder of a child–the juries did not return death sentences. The outcome in these cases specifically rebuts the premise of the district court's *Strickland* prejudice analysis, *i.e.*, that cases involving the murder of a child are "too overwhelming" to be mitigated, and therefore will always result in a death sentence, regardless of any mitigating evidence presented to the jury.

In addition, numerous Supreme Court cases also involve cases with highly aggravating facts, yet capital counsel were found to have performed deficiently, to the prejudice of the petitioner. The whole point of mitigation is that bad crime facts can be overcome. In *William v. Taylor*, 529 U.S. 362 (2000), the defendant was sentenced to death for the brutal murder of a defenseless man in order to steal



Appellate Case: 15-3160 Page: 75 Date Filed: 02/29/2016 Entry ID: 4372433

three dollars. *Williams*, 529 U.S. at 368. In dissent, Chief Justice Rehnquist quoted the following summary of the aggravating evidence from the Fourth Circuit's opinion:

> The murder . . . was just one act in a crime spree that lasted most of Williams' life. Indeed, the jury heard evidence that, in the months following the murder . . ., Williams savagely beat an elderly woman, stole two cars, set fire to a home, stabbed a man during the robbery, set fire to the city jail, and confessed to having strong urges to choke other inmates and to break a fellow prisoner's jaw.

529 U.S. at 418 (Rehnquist, C.J., dissenting) (citation omitted).

The victim in *Wiggins v. Smith*, 539 U.S. 510 (2003), was "a 77-year-old woman [who] was found drowned in the bathtub of her apartment, clothed but missing her underwear, and sprayed with Black Flag Ant and Roach Killer." 539 U.S. at 554 (Scalia, J., dissenting). Wiggins had stolen the victim's ring, used her credit cards, and lied to the police about where he had obtained this property. *Id.* at 555-556.

In *Rompilla v, Beard*, 545 U.S. 374 (2005), the defendant committed capital murder "a mere three months" after his release from prison for a brutal rape and assault in which he had held the victim at knife point, slashed her breast, and raped her for more than an hour. 545 U.S. at 394 (O'Connor, J., majority opinion) and 401 (Kennedy, J., dissenting).



Appellate Case: 15-3160 Page: 76 Date Filed: 02/29/2016 Entry ID: 4372433

In *Porter v. McCollum*, 558 U.S. 30 (2009), the defendant had threatened to kill the capital murder victim and her teenage daughter three months before the actual capital offense. *Porter v. Attorney General*, 552 F.3d 1260, 1263 (11th Cir. 2008). After killing the mother in the daughter's presence, he pointed a gun to the daughter's head and said, "boom, boom, you're going to die." *Id*. Although he did not kill the daughter, he was also convicted of a second murder. *Porter v. McCollum*, 558 U.S. at 31-32.

In *Sears v. Upton*, 561 U.S. 945 (2010), the defendant kidnapped, raped, and murdered a 59-year-old wife and mother. He punched the victim in the face with brass knuckles, shoved her into her car, handcuffed her, and drove her across state lines from Georgia to Tennessee where he raped her. The victim's interstate ordeal then continued into Kentucky where Sears murdered her as she pleaded for her life. "After throwing her on the ground, he stabbed her in the neck. In his confession he showed no regret or remorse for his heinous crimes." 561 U.S. 945, 130 S. Ct. 3259, 3271 (Scalia, J., dissenting).

The outcome in these cases rebuts the premise of the district court, *i.e.*, that some crimes are "too overwhelming" to be mitigated, and therefore *Strickland* prejudice can never be met. Here, the district court's legal ruling that the facts of Mr. Nelson's crime *per se* precluded a finding of *Strickland* prejudice was clearly



Appellate Case: 15-3160 Page: 77 Date Filed: 02/29/2016 Entry ID: 4372433

erroneous; at the very least, jurists of reason could disagree with the district court's resolution of the prejudice inquiry, and therefore a COA should issue.

### B. THE DISTRICT COURT IMPROPERLY FAILED TO CONSIDER OR UNREASONABLY DISCOUNTED MITIGATION EVIDENCE PRESENTED AT THE EVIDENTIARY HEARING.

As measured against the decision of the Supreme Court in *Porter v. McCollum*, 558 U.S. 30 (2009) (*per curiam*), the district court unreasonably applied *Strickland* to decide the issue of prejudice when it failed to consider or discounted entirely the mental health evidence that Mr. Nelson presented in the evidentiary hearing. In *Porter*, the Supreme Court of the United States ruled that the Supreme Court of Florida had unreasonably applied clearly established federal law when it "either did not consider or unreasonably discounted the [mental health] mitigation evidence [that Porter] adduced in the postconviction hearing." 558 U.S. at 42. The Supreme Court ruled that it was unreasonable for the state habeas court to "discount entirely" the impact that the testimony of Porter's neuropsychologist might have had on the sentencing judge and jury based on the fact that the experts offered by the state disagreed with the conclusions of Porter's expert. *Id*. at 43. As the Supreme Court explained, "[w]hile the state's experts identified perceived problems with the tests that [Porter's neuropsychologist] used and the conclusions he drew from them, it was not reasonable to discount entirely the effect that this



Appellate Case: 15-3160 Page: 78 Date Filed: 02/29/2016 Entry ID: 4372433

testimony might have had on the jury or the sentencing judge." *Id.*

Here, the district court made the same *Porter* error of unreasonably looking for ways to discount mitigating evidence rather than considering how that evidence may have weighed in favor of a recommendation for life in the minds of the jurors. Mr. Nelson presented extensive evidence about his mental impairments at the evidentiary hearing–almost all of which was not only unrebutted, but was actually supported in key respects by the Government's own expert witness–yet this evidence is barely mentioned in the district court's opinion denying Mr. Nelson's claims. Instead, the district court selectively cited the portions of the post-conviction record that supported its denial of relief, and simply ignored any detailed discussion of the contrary evidence that established the robustness of Mr. Nelson's organic brain damage.

#### 1. DR. MICHAEL GELBORT

Dr. Gelbort conducted a neuropsychological evaluation of Mr. Nelson in 2005 and testified at the evidentiary hearing about his results. The district court's decision devotes exactly one sentence to his testimony: that Dr. Gelbort's results "confirmed that Nelson suffered [from] frontal lobe dysfunction." 97 F. Supp. 3d at 1155. Of particular significance is the fact that the district court omitted any mention of Dr. Gelbort's testimony about what frontal lobe dysfunction is, the

extent of Mr. Nelson's frontal lobe damage, and how this dysfunction impaired Mr. Nelson's behavior.

As Dr. Gelbort explained, the frontal lobes of the brain are like "the gas pedal and brake pedal of our behaviors. They allow us to initiate as well as to inhibit [behavior]." Exh. 5 (TR 04/15/14) at 395. Damage or dysfunction in these areas of the brain correspondingly affect a person's ability to exercise appropriate judgment and effectively control one's impulses or inhibit behavior. *Id.* at 396, 408-09. Of particular significance was Dr. Gelbort's testimony regarding the nature of "impulsive behavior." *Id.* at 412. As he explained, when someone is unable to effectively control one's behavior due to frontal lobe damage, that does not mean that one simply behaves in a "reflexive" or "knee-jerk" manner; "the way behavior unfolds is that you can have impulsive behavior that takes time and develops slowly where there's plenty of time to say, no, I shouldn't do this, but it's still an impulsive behavior even though it happens over time slowly." *Id.* at 413. As Dr. Gelbort further explained, frontal lobe dysfunction also impairs one's ability to *inhibit* one's behavior over an extended period of time; thus, what might appear on the surface to be planned or premeditated "aberrant" behavior is actually entirely consistent with frontal lobe dysfunction because it is precisely that type of brain damage which impairs one's ability to apply the brakes and inhibit that



Appellate Case: 15-3160 Page: 80 Date Filed: 02/29/2016 Entry ID: 4372433

behavior. *Id.* at 414.

This testimony was especially critical because it rebutted the opinion of the Government's expert, Dr. Daniel Martell, that despite the level of brain impairment established by the neuropsychological testing, Mr. Nelson's behavior demonstrated planning as opposed to impulsivity. *Id.* at 649. While the district court's opinion extensively discusses Dr. Martell's opinion in that regard, *see* 97 F. Supp. 3d at 1146-47, there is literally no mention of Dr. Gelbort's contrary testimony on this topic. Similarly, the district court makes no mention of the fact that in a different case where Dr. Martell was retained as a defense expert in which the defendant displayed the same frontal lobe dysfunction as Mr. Nelson–but with weaker results on the neuropsychological testing than in Mr. Nelson's case–Dr. Martell opined that the defendant's behavior was the product of brain-impaired impulsivity, rather than planning and premeditation. Exh. 48 at 31-32. 35-37. Indeed, as is explained in more detail below, Dr. Martell's findings regarding Mr. Nelson's frontal lobe deficits were even more robust than Dr. Gelbort's. A jury hearing this might have reasonably relied upon it as a basis for finding that Mr. Nelson had reduced moral culpability warranting a sentence less than death, especially considering that *every other expert* besides Dr. Martell opined that Mr. Nelson's frontal lobe dysfunction was severe enough to impair his decision-making and regulation of his behavior



Appellate Case: 15-3160 Page: 81 Date Filed: 02/29/2016 Entry ID: 4372433

and impulses. The district court's decision to simply credit Dr. Martell's contrary opinion was precisely the type of selective reliance on evidence that the Supreme Court rejected in *Porter*.

### 2. DR. RUEBEN GUR

Dr. Gur is a neuropsychologist, with a specialty in brain imaging and behavior. He is Chief of the Brain Behavior Laboratory and Director of Neuropsychology at the University of Pennsylvania. Dr. Gur provided extensive testimony at the evidentiary hearing regarding the results of three types of neuroimaging of Mr. Nelson's brain: an MRI, a PET scan, and behavioral neuroimaging. As Dr. Gur explained, the neuroimaging confirmed that there was significant damage to several areas of Mr. Nelson's brain, including the frontal lobes, amygdala, hippocampus, and basal ganglia. Exh. 6 (TR 04/16/14) at 579-85. When these areas of the brain are damaged, an individual is unable to effectively engage in rational planning, control one's impulses (especially sexual impulses), and inhibit risky or aberrant behavior. *Id.* at 560-66, 577, 583-84. Dr. Gur's testimony thus corroborated Dr. Gelbort's findings regarding Mr. Nelson's brain damage and expanded upon the manner in which this damage would have made Mr. Nelson unable to regulate his behavior in the way that a person with an undamaged brain would.

The district court appears to have entirely discounted Dr. Gur's testimony. Specifically, the district court wrote:

> Dr. Gur opined that the abnormalities in Mr. Nelson's brain were important for regulating behavior. However, Dr. Gur admitted that he had not actually conducted a neuropsychological evaluation of Mr. Nelson. Dr. Gur also admitted that in his testing there was no comparative value for the lesion found in Nelson's brain imaging by looking at Exhibit P81 at 11 (Evid. Tr. 600-01.). Consequently, with no baseline comparison value, his imaging provides no useful information.

97 F. Supp. 3d at 1146. The district court's discounting of Dr. Gur's testimony on these grounds is plainly unreasonable. First, the district court's statement that Dr. Gur "admitted" that he had not conducted a neuropsychological evaluation is an admission without any relevance; Dr. Gur was not retained to conduct a neuropsychological evaluation, but rather to consider the evaluations performed by Dr. Gelbort and Dr. Martell in concert with the neuroimaging data. As all three experts agreed, the neuroimaging results were entirely consistent with results of the neuropsychological examinations in that they established evidence of brain dysfunction and damage. Both Dr. Gelbort and Dr. Martell testified that their neuropsychological testing results were valid, so the fact that Dr. Gur relied on them, rather than perform his own evaluation, does not undermine his opinion in the least.



Appellate Case: 15-3160 Page: 83 Date Filed: 02/29/2016 Entry ID: 4372433

With respect to the district court's other criticism of Dr. Gur's opinion–that the imaging provides no useful information because there is no "baseline comparison value"–there is no evidence in the record that supports that statement. Indeed, it appears that what the district court did was simply "cut and paste" those relevant sentences almost verbatim from the Government's post-hearing brief, where the Government similarly put its own spin on Dr. Gur's testimony, but never actually provided factual support for its assertion regarding "baseline comparison values." *Compare* Government's Proposed Findings of Fact and Conclusions of Law (ECF Doc. No. 268 at 32) ("Dr. Reuben Gur, neuropsychologist with a specialty in brain imaging and behavior, testified that in his testing there is no comparative value for the lesion found in Nelson's brain imaging by looking at Exhibit P81 at 11. (Evid. Tr. at 600-01.) Consequently, with no baseline comparison value, his imaging looks nice, but really provides no useful information.").

At best, what the district court is referring to is only one of the three neuroimaging tests upon which Dr. Gur based his expert opinion: the neurobehavioral imaging. There is no evidence in the record that supports the notion that the neurobehavioral imaging provides no useful information because of an alleged lack of "baseline comparison value." Dr. Gur certainly never made such



Appellate Case: 15-3160 Page: 84 Date Filed: 02/29/2016 Entry ID: 4372433

a statement, nor did the Government put on any such evidence. There is no factual basis for the district court entirely discounting Dr. Gur's testimony regarding the results of the neurobehavioral imaging. However, even if one were to discount those particular imaging results, there were still two other imaging results that independently corroborated Mr. Nelson's brain damage: the MRI results and the PET scan. This evidence went unrebutted at the hearing, and yet the district court apparently discounted it in its entirety in its opinion. This clearly ran afoul of the dictates of *Porter*.

#### 3. DR. XAVIER AMADOR

Dr. Amador is a clinical and forensic psychologist. In addition to corroborating Dr. Gelbort's finding that Mr. Nelson suffered from frontal lobe dysfunction, Dr. Amador testified that Mr. Nelson's mental health was also impaired by a cognitive disorder, post-traumatic stress disorder, and psychosis. Although Dr. Amador's testimony was directly relevant to constitutionally recognized mitigating factors and shed significant light on the way in which the variety of mental impairments from which Mr. Nelson suffered negatively affected his ability to regulate his behavior and otherwise reduced his culpability, the district court appears to have entirely discounted this testimony. Indeed, of particular significance is that during Dr. Amador's testimony about Mr. Nelson's



Appellate Case: 15-3160 Page: 85 Date Filed: 02/29/2016 Entry ID: 4372433

impairments, the district court interjected with the following:

> THE COURT: I think we've covered enough of this. This would be more appropriate for a full-blown hearing *if the court wanted to reverse its position.*

Exh. 5 (TR 4/15/14) at 443 (emphasis added).

The district court's statement on the record is telling in a number of respects. On its face, it appears to indicate that the district court was conducting the evidentiary hearing simply because it was ordered to do so, rather than for the purpose of conducting a "full-blown hearing" on the extra-record facts necessary to provide Mr. Nelson with a fair and just determination of his claims. Moreover, the statement rather baldly expresses the fact that the district court had pre-judged Mr. Nelson's case and was simply going through the motions in order to re-affirm its previous denial, rather than "reverse its position."[5] Ultimately, the fact that the district court hardly mentions Dr. Amador's testimony and makes no attempt to

---

[5]Similarly, at various points during the hearing, the district court attempted to truncate the testimony and informed Mr. Nelson's counsel that he need not dwell on certain areas because he had already made a sufficient record for the this Court's review, implying that the district court had already decided that it would be denying Mr. Nelson's claims, and thus Mr. Nelson's counsel simply needed to make a sufficient record for the ensuing appeal from the denial of relief. *See, e.g.*, Exh. 4 (TR 04/14/14) at 30-31 ("I understand you're making your record for the Court of Appeals and I think with the admission of these exhibits."); *id*. at 225 ("You have the documents in. The Court of Appeals can go back and look and read them at their leisure.").

consider the manner in which it might have affected the jury's sentencing determination confirms that the district court engaged in precisely the type of error that the *Porter* court warned against.

#### 4. DR. LESLIE LEBOWITZ

Dr. Lebowitz is a clinical psychologist with a particular expertise in the effects of complex trauma on psychological development and behavior. Although Dr. Lebowitz provided extensive testimony regarding the sustained abuse and neglect inflicted on Mr. Nelson and the manner in which it impacted him, the district court ignored her testimony in its analysis.

Dr. Lebowitz testified that Mr. Nelson "experienced the most severe kind of trauma, which is chronic, severe developmental trauma." Exh. 6 (TR 04/16/14) at 535. As a result of the "onslaught of horrifying life experiences" inflicted upon Mr. Nelson, "every single developing system in his self, his emotional system, his cognitive system, his biological system, his capacity to attach, all of those fundamental systems [were] under continuous and relentless assault from the violence." *Id.* at 538. As Dr. Lebowtiz explained, "[t]he problem with Mr. Nelson's life is that it was a continuous, relentless barrage of trauma and neglect, and the ubiquity of what happened, the variety of what happened, the utter lack of rescue or protection and the amount of time, the slough of development over which

these experiences happened create a kind of toxic load that is qualitatively unlike other things." *Id.* at 546-47. This was happening "during the period of life in which his brain [was] under the most rapid period of development in which [he was] growing more neuro connections than [he was] losing." *Id.* at 538. As a result, the parts of the brain and of the psychological developmental process that are involved in inhibiting impulses and regulating behavior were damaged. *Id.* at 545-46.

Dr. Lebowitz's testimony was significant precisely because it highlighted the fact that much of the psychological damage that was done to Mr. Nelson occurred at a time when he was utterly defenseless; he did not choose to be beaten as an infant or sexually assaulted as a child. And yet, as Dr. Lebowitz explained, the relentless assault of abuse and neglect that Mr. Nelson experienced in his formative developmental years had far-reaching impacts into Mr. Nelson's ability to regulate his behavior and control his impulses as an adult. The district court, however, made no attempt to discuss this evidence in its opinion or consider the manner in which it might have affected the sentencing deliberations of the jury. It simply ignored it, in direct contravention of *Porter*.

#### 5. DR. DANIEL MARTELL

The district court's discussion of Dr. Martell's testimony was almost



Appellate Case: 15-3160 Page: 88 Date Filed: 02/29/2016 Entry ID: 4372433

singularly focused on his opinion that Mr. Nelson's brain damage did not "play[] a significant role in him committing the crime." 97 F. Supp. 3d at 1146. As noted above, the district court discussed none of the extensive evidence adduced at the hearing that rebutted Dr. Martell's opinion. Indeed, the district court's opinion made no mention of the fact that the results of Dr. Martell's neuropsychological examination were even more robust with respect to establishing Mr. Nelson's brain damage than even those of Dr. Gelbort's.

For example, one of the tests which Dr. Martell administered was the Stroop Test, which is a neuropsychological instrument that measures frontal lobe performance, and specifically tests for impairments in impulsivity and inhibition. Exh. 7 (TR 4/17/14) at 674-76. Mr. Nelson's performance on that test was almost three standard deviations below the norm, placing him in the bottom one percent of the population in terms of his functioning.[6] Dr. Martell also administered the Trail-Making B Test to Mr. Nelson, which similarly tests for frontal lobe

---

[6]Although Dr. Martell adopted the questioner's assertion at the hearing that the test results on the Color-Word portion of the Stroop was two standard deviations from the norm (Exh. 7 (TR 4/17/14) at 676), the actual test results (Exh. 46) establish that Mr. Nelson's T-Score was 22, nearly three standard deviations from the norm. *Id.* As Dr. Martell noted, a T-Score of 50 is the mean and scores of 40, 30, and 20 respectively represent one, two or three standard deviations from the mean. (*See, e.g.,* Exh. 7 (TR 4/17/14) at 677, 679.) *See also* Muriel D. Lezak et al., Neuropsychological Assessment 166-67 (5th ed. 2012). With regard to the Stroop test in particular, *see id.* at 674-76.



Appellate Case: 15-3160 Page: 89 Date Filed: 02/29/2016 Entry ID: 4372433

dysfunction. *Id.* at 678-79. On that test, Mr. Nelson's score was nearly two standard deviations below the norm, placing him at about the bottom two percent of the population in terms of his functioning. *Id.* No less than the Supreme Court has recognized that results such as these on the Stroop Test and Trail-Making B Test constitute powerful mitigation in a capital case. *See Sears v. Upton*, 561 U.S. 945, 950 (2010) (*per curiam*) (noting that capital petitioner's scores on Stroop Test and Trail-Making B Test, placing him in the bottom first percentile, was "clear and compelling evidence" of "pronounced frontal lobe pathology"). Moreover, Dr. Martell testified that he also administered the FrSBe (Frontal System Behavior Examination), which is designed to assess the frontal lobes and executive functioning. Mr. Nelson's results were more than three standard deviations below the norm, placing him in the bottom percentile of the population in terms of his functioning. Exh. 7 (TR 4/17/14) at 679-81. In sum, every test which Dr. Martell administered to assess Mr. Nelson's frontal lobe functioning–that is, the part of the brain that regulates behavior and controls impulses and inhibition–showed significantly pronounced dysfunction that placed Mr. Nelson at the very bottom of the population.

As Dr. Martell conceded at the evidentiary hearing, Mr. Nelson's case was one of a "convergent validity"–that is, all of the neuropsychological testing, brain

imaging, medical records, and social history of Mr. Nelson came to the same conclusion: Mr. Nelson has significant frontal lobe damage. *Id.* at 673-74. In other words, the overwhelming weight of the evidence adduced at the hearing proved that Mr. Nelson had pronounced damage to the area of the brain responsible for planning, decision-making, impulsivity and regulation of behavior. And yet, the district court barely discussed this evidence in its opinion and instead summarily concluded that none of the evidence presented at the hearing would have made a difference to the jury that sentenced Mr. Nelson to death. It is clear that the district court merely looked for ways to discount the evidence by selectively relying on Dr. Martell's ultimate–and frankly unsupported−opinion that Mr. Nelson's brain damage had no effect on his behavior, rather than consider how that evidence may have weighed in favor of a recommendation for life in the minds of the jurors. The district court committed clear *Porter* error.

### C. THE DISTRICT COURT FAILED TO PROPERLY CONSIDER HOW THE EVIDENCE OF MR. NELSON'S BRAIN DAMAGE AND MENTAL ILLNESS MIGHT HAVE AFFECTED THE JURY'S SENTENCING DELIBERATIONS.

The prejudice in Mr. Nelson's case in this regard is demonstrable; not only did trial counsel fail to present readily available evidence about Mr. Nelson's severe mental health impairments, trial counsel affirmatively *misled* the jury into believing that Mr. Nelson did not suffer from brain damage, and that his criminal



Appellate Case: 15-3160 Page: 91 Date Filed: 02/29/2016 Entry ID: 4372433

conduct was the result of "choices" that he made, rather than the actions of a man suffering from psychosis and severe damage in the parts of his brain responsible for regulating his impulses and behavior. For example, in his opening statement, trial counsel told the jury:

> Keith Nelson was four pounds five ounces when he was born. He was in respiratory distress and they took him to Children's Mercy Hospital and he spent a month in the hospital *and he recovered just fine.*

Exh. 43 (TR 11/19/01) at 38. In fact, Mr. Nelson did *not* recover just fine. As the evidence adduced at evidentiary hearing established, the contemporaneous medical records of Mr. Nelson's birth indicated that he had bleeding in his brain. Exh. 6 (TR 04/16/14) at 519. During his emergency transport to Children's Mercy Hospital immediately after his birth, Mr. Nelson stopped breathing several times, and he suffered such a severe deprivation of oxygen that his infant body and limbs were blue in color because of the lack of oxygen in his blood. *Id.* at 522-23. Far from "recovering just fine," the tremendous amount of stress placed on his infant brain by the bleeding and lack of oxygen had lasting effects on the organic structures of Mr. Nelson's brain−in particular the frontal lobes, which are key to regulating behavior and impulse control. Exh. 5 (TR 04/15/14) at 434-35; Exh. 6 (TR 04/16/14) at 520, 583. The jury, however, never learned this crucial information, and trial counsel's statement undoubtedly left it with the false

impression that Mr. Nelson was not a person who suffered from any brain damage or mental health problems.

Trial counsel compounded this problem in closing arguments, when he suggested that Mr. Nelson "chose to kill Pamela Butler." Exh. 8 (TR 11/28/01) at 1135. Trial counsel's decision to make the case about Mr. Nelson's "choices" was something that the Government immediately seized upon and exploited in closing arguments. *See id*. at 1155-56 ("This case is about choices.") As the Government compellingly argued to the jury, what Mr. Nelson's "choice" revealed was that he was a "rotten human being" who was "evil at his core." *Id*. at 1158, 1161.

A recurring theme of the Government in the original penalty phase was that Mr. Nelson's twin brother, Kenneth, had lived a normal life despite growing up in the same destructive environment as Mr. Nelson. Again it was suggested that Mr. Nelson's problems were simply a matter of choice. *See, e.g*., Exh. 8 (TR 11/28/01) at 1124 (during closing argument, the prosecutor argued that "His twin brother, who was raised in the same environment, has turned into a productive member of the United States Army. He's made the right decisions. This defendant decided to live a life of crime and he's going to have to deal with those consequences.") However, starting at his birth, Mr. Nelson faced significant problems not experienced by his twin brother. Exh. 43 (TR 11/19/01) at 8. Counsel's failure to



Appellate Case: 15-3160 Page: 93 Date Filed: 02/29/2016 Entry ID: 4372433

investigate the birth records, and brain damage, led the jury to believe there was nothing to stop Mr. Nelson from overcoming his background, like his brother had appeared to.

The mitigation now presented by Mr. Nelson could directly address the most damaging elements of the Government's case at penalty. Although Mr. Nelson's mitigation is certainly not an excuse for this crime, it does offer explanations that help place his behavior in a more understandable light. In closing argument, the Government focused heavily on Mr. Nelson's deviant sexual desires, an issue which went completely unexplained at the original proceeding. Exh. 8 (TR 11/28/01) at 1110-11. However, the social history investigation reveals that molestation and violence against women and children were the norm on both sides of the Nelson family. Exh. 29 at 1, 2-3, 5, 9-10. In addition, as noted previously, Mr. Nelson's brain damage affects his ability to regulate his behavior and includes an area of the brain that is directly responsible for regulating sexual impulses. Exh. 5 (TR 4/15/14) at 583. Finally, the jury was never informed of the full extent of the sexual molestations and rapes that Mr. Nelson endured–both as a young child and while incarcerated as a juvenile offender. Exh. 29 at 21, 42, 47. These early sexual traumas undoubtedly skewered Mr. Nelson's own sexual development. *See, e.g.*, Exh. 6 (TR 4/16/14) at 545. This mitigation does what

mitigation should do–it takes some of the power away from the State's aggravating evidence by shedding some light on otherwise unexplainable behavior. Without expert testimony and a complete social history investigation, trial counsel was powerless to explain this crime.

Had trial counsel presented the jury with the readily available evidence of Mr. Nelson's brain damage and mental illness, it would have been able to marshal powerful and compelling expert evidence that Mr. Nelson suffered from profound mental impairments over which he had no control, and that these impairments directly affected his ability to engage in rational decision-making and regulate his impulses. Mr. Nelson was not a person who "chose" to do evil; he was someone with significant cognitive and mental deficits that directly affected his ability to control his behavior. While this evidence would not have legally excused Mr. Nelson's conduct, there is a reasonable probability that at least one juror might have found such evidence sufficiently reduced his moral culpability such that it warranted a sentence of life imprisonment without possibility of release, rather than death.

The district court stated that its ruling–that no amount of additional mitigating evidence about Mr. Nelson's mental impairments and upbringing would have made a difference to the sentence–was "bolstered" by the jury's special



Appellate Case: 15-3160 Page: 95 Date Filed: 02/29/2016 Entry ID: 4372433

verdict form at trial. Specifically, the district court highlighted that "only a single juror found the existence of only one mitigating factor–that 'being subjected to physical and emotional abuse as a small child permanently altered Keith Dwayne Nelson's psyche and personality and detracted from his ability to be a successful and insightful adult," and "[n]o jurors voted for any of the remaining nine mitigating factors." 97 F. Supp. 3d at 1156. The district court's interpretation of the jury's findings, however, is confusing. As the district court itself recognized, Mr. Nelson's trial counsel unreasonably failed to conduct a mental health investigation of their client and never presented *any* evidence of Mr. Nelson's brain damage, cognitive impairments, or mental illness to the jury. It is hardly remarkable, then, that the jury's findings at trial reflect a failure to prove any such mitigation; the jury did not have the benefit of any of the compelling–and uncontroverted–evidence presented at the evidentiary hearing which established the mitigating facts concerning Mr. Nelson's brain damage and mental illness, and the manner in which the abuse, neglect, and trauma of his upbringing impaired his brain functioning and cognitive abilities.

If anything, the fact that at least one juror found that Mr. Nelson's abusive childhood had a lasting detrimental impact on his "psyche and personality" *undermines* the district court's *Strickland* prejudice analysis because it

demonstrates that there was at least one juror who–*even in the absence of any evidence of Mr. Nelson's brain damage and mental illness*–was able to accept the mitigating circumstance centered on the impact that Mr. Nelson's traumatic upbringing had on his mental health.[7] Unfortunately, trial counsel never presented the jury with concrete evidence that Mr. Nelson suffered from any such mental health problems or brain damage, much less explained to the jury how the repeated abuse and neglect to which Mr. Nelson was subjected throughout his life exacerbated his organic brain damage and impaired his ability to function properly.

Indeed, much of the evidence that was presented at the evidentiary hearing would have not only established the aforementioned mitigating factor alleged at trial–*i.e.*, that the trauma that Mr. Nelson suffered in childhood had lasting psychological effects on him as an adult–but would have also supported entirely *new* mitigating factors which were never presented to the jury for its consideration in the first place–for example, mitigating factors pertaining to evidence of organic brain damage, psychosis, and trauma. Considering the "convergent validity" of the

---

[7] Indeed, each juror that served in Mr. Nelson's case was asked during voir dire whether he or she would automatically vote for the death penalty in a case involving the murder of a child, and each answered that they would not. *See* Exh. 8 (TR 11/28/01) at 1136. Unlike the district court, the jury was not composed of persons who believed that this was the type of crime for which a death sentence should be "automatic."

evidence adduced at the evidentiary hearing establishing these mental impairments, there is a reasonable probability that at least one juror would have voted to spare Mr. Nelson's life based on this evidence.

**D. THE DISTRICT COURT IMPROPERLY CONSIDERED MITIGATION EVIDENCE BASED ON WHETHER IT HAD A NEXUS TO THE CRIME.**

In discounting the countervailing effect of Mr. Nelson's proposed mitigating evidence, the district court misunderstood the purpose of such evidence. The district court seemed to reason that Mr. Nelson's mitigation evidence might have altered the jury's sentencing determination only if it "explained why he acted as he did," "played a role in him committing the crime," or otherwise provided a rationale for his conduct. 97 F. Supp. 3d at 1146-47, 1156.

The Supreme Court has made clear for over 30 years, however, that mitigation does not play so limited a role. In *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), the Court held that the sentence in capital case must be given a full opportunity to consider, as a mitigating factor" "*any* aspect of a defendant's character or record," in addition to the circumstances of the crime. The *Lockett* court emphasized the "need for treating each defendant in a capital case with that degree of respect due the uniqueness of the individual." *Id.* at 605. This rule "recognizes that justice … requires … that there be taken into account the circumstances of the offense together with the character and propensities of the



Appellate Case: 15-3160 Page: 98 Date Filed: 02/29/2016 Entry ID: 4372433

offender" as part of deciding whether the defendant is to live or die. *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) (internal citation and quotation marks omitted). And it ensures that "the sentence imposed at the penalty stage … reflect[s] a reasoned *moral* response to the defendant's background, character, and crime." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 252 (2007) (internal citation and quotation marks omitted).

Indeed, the Supreme Court has consistently rejected attempts to limit as irrelevant evidence of a defendant's background or character that he wishes to offer in mitigation. In *Skipper v. South Carolina*, 476 U.S. 1 (1986), for example, the Court held that the exclusion of evidence regarding the defendant's good behavior in jail while awaiting trial deprived him of "his right to place before the sentence relevant evidence in mitigation of punishment." *Id.* at 4. The Court explained that the jury "could have drawn favorable inferences … regarding [the defendant's] character," and despite the fact that "any such inferences would not relate specifically to [the defendant's] culpability for the crime he committed, … such inferences would be 'mitigating' in the sense that they might serve 'as a basis for a sentence less than death.'" *Id.* at 4-5 (quoting *Lockett*, 438 U.S. at 604).

Particularly instructive is *Smith v. Texas*, 543 U.S. 37 (2004) (*per curiam*). In *Smith*, the Texas court withheld a mitigation instruction concerning the



Appellate Case: 15-3160 Page: 99 Date Filed: 02/29/2016 Entry ID: 4372433

defendant's background, on the ground that he had offered "no evidence of any link or nexus between his troubled childhood or his limited mental abilities and this capital murder." *Ex parte Smith*, 132 S.W.3d 407, 414 (Tex. Crim. App. 2004). The Supreme Court rejected this "nexus" requirement as one it had "never countenanced," and it reiterated that the only relevant question is whether the proposed mitigation evidence would give a jury "a reason to impose a sentence more lenient than death." *Smith*, 543 U.S. at 44-45. *See also Tennard v. Dretke*, 542 U.S. 274, 287 (2004) (noting that no prior Supreme Court case had ever suggested that a capital defendant "must establish a nexus between her mental capacity and her crime before the Eighth Amendment prohibition on executing her is triggered" and holding that the jury must be allowed the opportunity to consider evidence of the defendant's character and background even if the defendant cannot establish "a nexus to the crime").

The district court's opinion in Mr. Nelson's case is plainly contrary to these precedents. The evidence of Mr. Nelson's brain damage, cognitive impairments, mental illness, and brutal upbringing need not have offered any explanation for why he committed the offense or have been proven to have a played a role in his criminal conduct in order for the jury to have considered it as weighty mitigation. It would be enough if there was a "reasonable probability" that, because of Mr.

Nelson's mental impairments and tragic past, the jury's "reasoned moral response" would instead have been to spare his life and sentence him to life imprisonment instead of death. *See Simmons v. Luebbers,* 299 F.3d 929, 939 (8th Cir. 2002) ("a vivid description of [the defendant's] poverty stricken childhood, particularly the physical abuse, and the assault…, may have influenced the jury's assessment of his moral culpability.")

Here, the district court did not even admit such a possibility because it only recognized the mitigating value of any of the mental health evidence insofar as it had some bearing on the facts and circumstances of the crime itself. This was a plainly erroneous application of the law, and thus a COA is warranted.

### E. THE LOW THRESHOLD FOR THE ISSUANCE OF A COA HAS BEEN MET.

When making the assessment of whether Nelson has presented a colorable claim of prejudice, this Court must consider the totality of the mitigating evidence; *i.e.*, the evidence introduced at the original sentencing and the new mitigation evidence. *Williams (Terry) v. Taylor*, 529 U.S. 362, 397-98 (2000). This Court must then consider whether there is a reasonable probability the mitigation evidence now proffered might have invoked sympathy from at least one juror. It is not for this Court to sit as the sentencer: "although we suppose it is possible that [the sentencer] could have heard it all and still have decided on the death penalty,



Appellate Case: 15-3160 Page: 101 Date Filed: 02/29/2016 Entry ID: 4372433

that is not the test." *Rompilla v. Beard*, 545 U.S. 374, 393 (2005).

At this stage, however, Mr. Nelson is not required to prove that he would prevail on the merits of his claim; he need only meet the low threshold of demonstrating that jurists of reason could disagree with the district court's resolution of the *Strickland* prejudice inquiry. The district court's brief discussion of the weight and impact of Mr. Nelson's mitigation evidence reasonably suggests that its prejudice determination flowed from its legal errors. If the court had afforded proper consideration to the mental health evidence, it would have concluded that given the breadth and depth of evidence presented at the evidentiary hearing regarding Mr. Nelson's brain damage, cognitive impairments, mental illness and the impact of his chronic exposure to trauma throughout his life, "there is a reasonable probability that at least one juror would have struck a different balance" had the jury known of this evidence. *Wiggins v. Smith,* 539 U.S. 510, 537 (2003); *see also Porter,* 558 U.S. at 42.

## VIII. A COA SHOULD ISSUE ON WHETHER TRIAL COUNSEL'S PERFORMANCE IN INVESTIGATING AND PRESENTING CONSTITUTIONALLY RELEVANT MITIGATION EVIDENCE WAS DEFICIENT.

This Court initially remanded for an evidentiary hearing on the following issue:

> Whether trial counsel were ineffective for failing to conduct an adequate mitigation investigation including a failure to move for a continuance.

*Nelson*, 297 Fed. Appx. at 565.

In addition, to evidence of brain damage, Mr. Nelson was also able to present expert testimony on the effect of the severe neglect and abuse he suffered as a child. The level of abuse and neglect he experienced was traumatic. This type of background is precisely the kind the United States Supreme Court has recognized as significant. *See Wiggins,* 539 U.S. at 535 ("[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background may be less culpable than defendants who have no such excuse."). The district court in fact agreed that "the circumstances surrounding Nelson's birth, childhood and early adulthood are distressing" and even found that they "may help to explain why he acted as he did." Exh. 1 at 42. In spite of the sympathetic nature of Mr. Nelson's background, the district court still found there was no reasonable "probability that even one juror would have voted to sentence Nelson to life in prison." *Id.* When judged cumulatively, as mitigation should be when assessing these claims, reasonable jurists could debate the validity of this reasoning.



Appellate Case: 15-3160 Page: 103 Date Filed: 02/29/2016 Entry ID: 4372433

In resolving this issue, the district court did not reach the prejudice prong of *Strickland*, and therefore did not determine whether Mr. Nelson was prejudiced by trial counsel's failure to present the additional mitigation evidence that was proffered at the § 2255 hearing. Rather, the district court denied the claim based solely on *Strickland*'s performance prong. *See Nelson*, 97 F. Supp. at 1145 ("Thus, the Court finds that Nelson's counsel was not deficient in either the mitigation investigation or presentation of the mitigation case. Accordingly, the Court hereby DENIES relief on Claim A(2)–Failure to conduct an adequate mitigation investigation and Claim A(3)–Failure to move for a continuance to complete one.") In reaching that conclusion, the district court reasoned that the fact that trial counsel presented *some* mitigation at trial foreclosed an inquiry into whether Mr. Nelson was prejudiced by counsel's failure to investigate and present the other readily available mitigation evidence that was proffered at the § 2255 hearing. *See Nelson*, 97 F. Supp. 3d at 1143. The district court also stated that the evidence presented at the § 2255 hearing was not "new," but merely cumulative to what was previously presented at trial. *Id*. at 1144.

As is explained in more detail below, the district court's resolution of Mr. Nelson's IAC claims concerning failure to investigate and present constitutionally relevant mitigating evidence suffered from at least two significant legal errors:



Appellate Case: 15-3160 Page: 104 Date Filed: 02/29/2016 Entry ID: 4372433

1. The district court's holding applied the wrong legal standard in assessing trial counsel's performance under *Strickland* because it erroneously focused on whether trial counsel put on some mitigating evidence at trial, rather than on whether trial counsel's failure to investigate and present additional readily available evidence was objectively reasonable.

2. The district court's committed clearly erroneous factual errors in finding that the mitigation evidence presented at the §2255 hearing was merely cumulative of the trial evidence.

The district court's resolution of Mr. Nelson's claims was legally erroneous. At the very least, and as will be demonstrated below, jurists of reason could disagree with the district court's resolution of these claims, and the issues presented are adequate to deserve encouragement to proceed further with full merits briefing before this Court.

### A. THE DISTRICT COURT APPLIED THE WRONG LEGAL STANDARD IN ASSESSING TRIAL COUNSEL'S PERFORMANCE UNDER *STRICKLAND* BECAUSE IT ERRONEOUSLY FOCUSED ON WHETHER TRIAL COUNSEL PUT ON "SUFFICIENT" MITIGATION EVIDENCE AT TRIAL, RATHER THAN ON WHETHER TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT ADDITIONAL READILY AVAILABLE EVIDENCE WAS OBJECTIVELY REASONABLE.

#### 1. THE PROPER STANDARD FOR ASSESSING COUNSEL'S PERFORMANCE.

As the Supreme Court stated in *Strickland* and reemphasized in *Wiggins*, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the



Appellate Case: 15-3160 Page: 105 Date Filed: 02/29/2016 Entry ID: 4372433

limitations on investigation." *Wiggins*, 539 U.S. at 521 (internal quotation marks omitted). In this case, the factual record fully exposes trial counsel's failure to conduct an adequate mitigation investigation of Mr. Nelson's social history and background, and thus trial counsel was completely unaware of critical mitigating information, including Mr. Nelson's brain damage and childhood sexual abuse. Trial counsel's failure to pursue this additional evidence cannot be characterized as the product of a reasonable strategic decision. Counsel uncovered nothing in their limited inquiry into Mr. Nelson's background to suggest that "further investigation would have been fruitless." *Id.* at 525. To the contrary, the many red flags in Mr. Nelson's case would have a prompted a reasonable attorney to conduct additional investigation. See Section VI, *infra.* Moreover, acquiring additional mitigating evidence would have been consistent with the penalty phase strategy that counsel ultimately adopted. Given that counsel's sentencing case focused on establishing that Mr. Nelson had a troubled background, they had every incentive to develop the strongest mitigation case possible. *Cf. id.* at 526. It thus is apparent that counsel's failure to expand their investigation "resulted from inattention, not reasoned strategic judgment." *Id.* at 526.

Here, the district court failed to conduct the requisite legal analysis into whether counsel's failure to investigate and present the additional and readily

available mitigation evidence was objectively reasonable. Instead, the district court turned the relevant *Strickland* analysis on its head: it looked at the trial mitigation evidence in a vacuum and deemed it "sufficient" and "more than adequate," 97 F. Supp. 3d at 1144, without ever inquiring as to the reasonableness of counsel's limited investigation and presentation of mitigation evidence. *See Wiggins*, 539 U.S. at 527 ("In assessing the reasonableness of an attorney's investigation … a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."); *Harris v. Dugger*, 874 F.2d 756, 763 (11th Cir. 1989) (the decision to limit an investigation "must flow from an informed judgment.").

The district court pointed out that unlike counsel in *Wiggins*, counsel in this case did not "completely abandon[]" the mitigation investigation and did present some mitigation. Exh. 1 at 16-18. The district court's analysis, however, clearly ran afoul of Supreme Court precedent. The relevant threshold that trial counsel must exceed is not the low bar of "something more than complete abandonment"; indeed, according to the Supreme Court, it was a "well-defined norm[]" at the time of Mr. Nelson's trial that "investigations into mitigating evidence 'should comprise efforts to discover all reasonably available mitigating evidence.'" *Wiggins*, 539



Appellate Case: 15-3160 Page: 107 Date Filed: 02/29/2016 Entry ID: 4372433

U.S. at 524 (quoting American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1.C (1989).

Moreover, as the Supreme Court has made abundantly clear, the fact that trial counsel put on some mitigation does not end the relevant *Strickland* inquiry:

> We certainly have never held that counsel's effort to present some mitigation evidence should foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant. To the contrary, we have consistently explained that the *Strickland* inquiry requires precisely the type of probing and fact-specific analysis that the state trial court failed to undertake below. In the *Williams* decision, for instance, we categorically rejected the type of truncated prejudice inquiry undertaken by the state court in this case. 529 U.S., at 397-398, 120 S. Ct. 1495.

*Sears v. Upton*, 130 S. Ct. 3259, 3266 (2010) (*per curiam*).

In *Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court also granted relief on an ineffective assistance of counsel claim, despite the fact that trial counsel presented several mitigation witnesses, including expert psychiatric testimony. *Williams*, 529 U.S. at 369. *Williams* thus stands for the proposition that counsel can be prejudicially ineffective even if some of the available mitigation evidence is presented. The fact that the presentation of some mitigation evidence does not necessarily defeat a prejudice showing is also clear from the test that *Williams* establishes. There, the Court held that it is an unreasonable application of

Supreme Court precedents for a state court not to "evaluate the totality of the available mitigation evidence–both that adduced at trial, and the evidence adduced in the habeas proceeding." *Id*. at 397. This standard clearly contemplates that even when some mitigating evidence is presented at trial, prejudice is still possible if that evidence is substantially incomplete.

Here, there is no question that trial counsel's mitigation investigation was "facially deficient" and substantially incomplete: trial counsel failed entirely to investigate and present evidence of Mr. Nelson's brain damage, mental illness, and childhood sexual abuse. The fact that trial counsel presented some mitigating evidence of a different nature and quality is largely beside the point, given the significance of the evidence that was omitted and the reasonable likelihood that the totality of the available mitigating evidence (presented at trial and at the § 2255 hearing) might have led to a different result. *See Williams*, 529 U.S. at 397-98. The defendant in a capital case has an Eighth Amendment right to present "as a mitigating factor, any aspect of [the] defendant's character or record . . . as a basis for a sentence less than death." *Eddings v. Oklahoma*, 455 U.S. 104, 110, (1982)). Here, Mr. Nelson was denied that opportunity due to trial counsel's ineffectiveness, and was prejudiced thereby.

As the foregoing demonstrates, the district court's legal analysis of the

"deficient performance" prong of *Strickland* was fundamentally incorrect. At a minimum, the district court's resolution of the *Strickland* inquiry is debatable by jurists of reason and warrants the issuance of a COA.

### 2. THE DISTRICT COURT UNREASONABLY RELIED ON THE NUMBER OF HOURS THAT THE MITIGATION SPECIALISTS BILLED RATHER THAN ON THE ACTUAL PREPARATION CONDUCTED BY TRIAL COUNSEL TO ASSESS COUNSEL'S PERFORMANCE.

The district court relied on an unreasonable quantitative approach in assessing of trial counsel's mitigation investigation. The district court repeatedly cited to the fact that the mitigation specialists that were retained by trial counsel billed for over 400 hours of work on the case, as if that was somehow dispositive of the *quality* of the work that was performed. *See Nelson*, 97 F. Supp. 3d at 1143-44 ("Ms. Francis testified that she and the individuals working for her spent over 400 hours working on Nelson's case."; "However, with over 400 hours devoted to the case, the Court finds that the mitigation evidence which was discovered and the mitigation case which was initially presented to the jury was sufficient.") The evidence developed at the § 2255 hearing, however, clearly demonstrated that despite the number of hours billed by Ms. Francis and her workers, the mitigation investigation was woefully deficient.

First, there were entire categories of mitigation that the trial team simply failed to investigate. As is explained in more detail below in Section B, these

included such powerful mitigating evidence as childhood sexual abuse, brain damage, mental illness, and the entire social history on the paternal side of Mr. Nelson's family. There was *no* evidence presented at the § 2255 hearing that established any strategic reason for trial counsel's failure to investigate and present any of this evidence at trial. Indeed, the testimony at the § 2255 hearing established the opposite; the mitigation specialist, Tena Francis, testified that she "dropped the ball" and conceded that she failed to conduct a thorough and competent mitigation investigation. *Nelson*, 97 F. Supp. 3d at 1143. The fact that she and her employees failed to investigate such crucial and obvious areas of mitigation as childhood sexual abuse and mental impairments is an objective indicator of how deficient and superficial the mitigation investigation was, despite the number of hours billed.

Moreover, additional testimony received at the hearing established that the mitigation team was "dysfunctional" and that the constant turnover in employees resulted in a lack of continuity that impacted the team's ability to perform its work adequately. Exh. 5 (TR 04/15/14) at 284. The mitigation team failed to perform such basic tasks as obtaining Mr. Nelson's various institutional records, *id.* at 311, conduct a multi-generational social history of Mr. Nelson's family, *id.* at 290, and even visit with Mr. Nelson in order to interview him about his life. *Id.* at 332.

More importantly, however, is that the district court's reliance on the mitigation specialist's billing records in conducting its *Strickland* analysis was fundamentally flawed because ultimately the relevant assessment is of *trial counsel's* performance. The record established at the § 2255 hearing was unequivocal: trial counsel did not adequately investigate and prepare its mitigation case.

**B. THE DISTRICT COURT COMMITTED CLEARLY ERRONEOUS FACTUAL ERRORS IN FINDING THAT THE MITIGATION EVIDENCE PRESENTED AT THE § 2255 HEARING WAS MERELY CUMULATIVE OF THE TRIAL EVIDENCE.**

One of the critical reasons that the district court gave for why trial counsel's performance was not "deficient" was the fact that the evidence presented at the § 2255 hearing was no different than what trial counsel had presented to the jury at the original trial. *See Nelson*, 97 F. Supp. 3d at 1144 ("Unlike Wiggins, Nelson's habeas counsel has not uncovered any 'powerful' new evidence. Rather, habeas counsel has simply discovered a larger quantity of mitigation evidence.") The district court's legal analysis, however, was rooted in a clear factual error and is contradicted by the record developed at the § 2255 hearing. Mr. Nelson did, in fact, present new evidence–evidence that was readily available to trial counsel, but which had *never* been presented for the jury's consideration at trial. This evidence consists of roughly four categories:

1. Evidence that Mr. Nelson was raped as a child.

2. Expert evidence that Mr. Nelson is brain damaged.

3. Expert evidence that Mr. Nelson is mentally ill and suffers from the effects of chronic exposure to trauma.

4. Social history evidence regarding the paternal side of Mr. Nelson's family.

The district court's conclusion that Mr. Nelson failed to present "new" evidence at the § 2255 hearing is incorrect. This evidence, briefly summarized below, demonstrates that there were fundamental omissions in trial counsel's investigation and presentation of mitigation at trial. Given that such categories of evidence have long been recognized by courts as constituting "powerful" mitigation evidence, the district court's failure to account for this evidence at all in its resolution of Mr. Nelson's claim demonstrates that the district court's ruling is debatable by jurists of reason.

#### 1. EVIDENCE THAT MR. NELSON WAS RAPED AS A CHILD.

The district court's opinion makes no mention of the fact that Mr. Nelson presented *unrebutted* evidence at the § 2255 hearing that he was raped as a child on multiple occasions. He was raped as a small child, and then again when he was institutionalized in a juvenile detention facility. Such evidence was unquestionably "new" as it was not presented at trial. Moreover, there is no question that such



Appellate Case: 15-3160 Page: 113 Date Filed: 02/29/2016 Entry ID: 4372433

evidence would have been "powerful." *See Wiggins v. Smith*, 539 U.S. 510, 534-35 (2003) (describing as "powerful" the mitigating evidence that counsel failed to find, which included "repeated rape during his . . . years in foster care"); *Wharton v. Chappell*, 765 F.3d 953, 977 (9th Cir. 2014) ("Childhood sexual abuse can be powerful evidence in mitigation, particularly when it is not an isolated event.") . As the Supreme Court has noted, "[r]ape has a permanent psychological, emotional, and sometimes physical impact on the child. We cannot dismiss the years of long anguish that must be endured by the victim." *Kennedy v. Louisiana*, 554 U.S. 407, 435 (2008) (internal citation omitted). Indeed, courts have long held that a failure to investigate and present evidence of childhood sexual assault constitutes deficient performance because such evidence is uniquely compelling to capital sentencing juries. *See*, *e.g.*, *Wiggins*, *supra* at 534-35; *Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005) (holding that "the family history of sexual abuse [the petitioner] had known about growing up[] is the sort of evidence that could persuade a jury to be lenient").

One of the most tragic consequences of a child being sexually abused is that it inappropriately shapes the child's sexual development. Finkelhor, D. and Browne, A., *The Traumatic Impact of Child Sexual Abuse: A Conceptualization*, American Journal of Orthopsychiatry, 55: 530-541 (1985). Child victims of sexual



Appellate Case: 15-3160 Page: 114 Date Filed: 02/29/2016 Entry ID: 4372433

abuse are at a much higher risk of committing sex crimes and engaging in other self-destructive and dangerous behavior:

> The deep problems that afflict child-rape victims often become society's problems as well. Commentators have noted correlations between childhood sexual abuse and later problems such as substance abuse, dangerous sexual behaviors or dysfunction, inability to relate to others on an interpersonal level, and psychiatric illness. Victims of child rape are nearly 5 times more likely than nonvictims to be arrested for sex crimes and nearly 30 times more likely to be arrested for prostitution.

*Kennedy*, 544 U.S. at 468-69 (Alito, J., dissenting). Childhood sexual trauma, in particular, can cause "out-of-place sexual behaviors that are not expected in a child . . . Children, especially boys, might 'act out' with behavior problems. This could include being cruel to others." National Center for PTSD, "Child Sexual Abuse," accessed at www.ptsd.va.gov/public/types/violence/child-sexual-abuse.asp, on Jan. 28, 2016.

While such evidence certainly would not have excused Mr. Nelson's conduct in this case, there is no question that it was constitutionally relevant mitigating evidence which the jury was entitled to consider. Mr. Nelson did not "choose" to be raped as a child. But he was, and the effects of these extremely traumatic childhood experiences had lifelong consequences for his mental health and behavior. Moreover, such mitigation evidence was particularly critical in Mr.



Appellate Case: 15-3160 Page: 115 Date Filed: 02/29/2016 Entry ID: 4372433

Nelson's case because it would have helped put in context behavior that the Government otherwise characterized as evidence of sexual deviance that aggravated the crime. *See Wharton*, 765 F.3d at 978-79 (mitigating evidence of childhood sexual abuse is particularly compelling in cases where the "crimes before the jury" involve sexual abuse because it explains defendant's psychological development and may "cast those … crimes in a different light"; "missing sexual-abuse testimony could have mitigated" the "[strong] aggravating factors against Petitioner" and altered the outcome of the sentencing proceeding).

This is powerful new evidence that the original jury was deprived of and which, when considered cumulatively with all the other evidence, would have created a reasonable probability of a life sentence. At the very least, the district court's failure to account for this evidence in its decision renders its conclusion debatable by jurists of reason, and thus a COA is warranted.

### 2. EXPERT EVIDENCE THAT MR. NELSON IS BRAIN DAMAGED.

As noted in Section V, *supra*, Mr. Nelson presented robust and unrebutted evidence at his § 2255 hearing that he is brain damaged. The authority cited above establishes that such evidence constitutes relevant and powerful mitigation evidence. None of the extensive evidence of Mr. Nelson's brain damage proffered at the § 2255 hearing was ever presented to the jury; it simply was not

"cumulative" of anything that trial counsel presented in its mitigation case. The district court's conclusion that "Nelson's habeas counsel has not uncovered any 'powerful' new evidence" is indefensible on the extant record.

Moreover, the district court's discussion of Mr. Nelson's mental health claim fundamentally contradicts its finding here that trial counsel's performance was "not deficient." As the district court noted in its opinion, trial counsel's "performance regarding investigation and presentation of the mental health testimony [was] deficient." *Nelson*, 97 F. Supp. 3d at 1149. *See also id*. at 1151 (trial counsel "was strategically deficient in cancelling the neuropsychological examination of Nelson and in failing to reschedule such examination and also in failing to have any other assessments conducted to assess whether Nelson suffered any brain damage, dysfunction or other cognitive impairments. The Court also finds that [trial counsel] was strategically deficient in advising Nelson not to submit to an examination by Government experts, which effectively prevented him from presenting any mental health evidence in the mitigation phase.") This inherent tension in the district court's opinion–on the one hand, holding that trial counsel's mitigation investigation and presentation was not deficient, and on the other, holding that Mr. Nelson was "effectively prevented from presenting any mental health evidence in the mitigation phase" due to counsel's deficient

investigation–demonstrates that, at the very least, that trial counsel's performance is debatable by jurists of reason.

### 3. EXPERT EVIDENCE THAT MR. NELSON IS MENTALLY ILL AND SUFFERS FROM THE EFFECTS OF CHRONIC EXPOSURE TO TRAUMA.

Similarly, the district court did not take into account any of the extensive evidence presented at Mr. Nelson's § 2255 hearing regarding his mental illness and the psychological and developmental impacts of his chronic exposure to trauma throughout his life. This evidence is summarized in Section VII, *supra*, including the testimony of Dr. Amador that Mr. Nelson suffers from cognitive disorder, post-traumatic stress disorder, and psychosis, as well as the testimony of Dr. Lebowitz regarding the sustained abuse and neglect inflicted on Mr. Nelson and the manner in which it impacted him. This evidence was unquestionably "new"–none of it was presented to the jury at Mr. Nelson's trial.

The district court made no findings that excused trial counsel's failure to investigate and present this mitigating evidence. Indeed, considering that trial counsel sought to introduce evidence of Mr. Nelson's abuse and neglect through lay testimony, there was no conceivable strategic reason to preclude the jury from hearing expert evidence on these matters. Indeed, such expert evidence would not have simply constituted a "larger quantity of mitigation evidence" that the jury had



Appellate Case: 15-3160 Page: 118 Date Filed: 02/29/2016 Entry ID: 4372433

already heard. Rather, such evidence would have been *materially* different because it would have provided the jury with an expert assessment that could explain how these critical events in Mr. Nelson's life history shaped his psychological and emotional development, and what kind of impact these events had on his mental health and ability to regulate his emotions, control his impulses, and inhibit his behaviors. As Russell Stetler, an expert in the investigation and presentation of mitigation evidence testified at the § 2255 hearing:

> [Lay testimony and expert testimony] have to be integrated. In other words, your lay witnesses will put out important factual information, but they're not going to provide a framework for jurors to understand. The value of mitigation is often explanatory. When horrible crimes happen, jurors want to know how this came about, … who is this person, how was he shaped, and how did this crime occur. … [T]he lay witnesses aren't going to provide that kind of explanation. You're going to need a mental health person to provide that framework.

Exh. 5 (TR 04/15/14) at 293. As Mr. Stetler further testified, and as he set out in his sworn declaration submitted to the district court, *see* Exh. 18, trial counsel's failure to investigate and develop such expert evidence in that regard failed to comply with the standard of care for the representation of capital clients that was in effect at the time of Mr. Nelson's trial. *See also Jermyn v. Horn*, 266 F.3d 257, 310-11 (3d Cir. 2001) (finding deficient performance where trial counsel presented lay testimony regarding petitioner's background but no expert testimony because

the expert testimony "would have provided the jury with an entirely different view of [the petitioner's] life and childhood which would have … aided in understanding the seriousness and origin of his mental illness and provided an understanding of Jermyn's relationship with the deceased. Moreover, it is clear that there was no psychiatric testimony discussing the effect of the childhood abuse on [petitioner's] adult functioning, and how his mental illness mitigated against the imposition of death.")

The district court's failure to account for any of this evidence developed at the § 2255 hearing renders its ruling on Mr. Nelson's claim legally erroneous. At the very least, it establishes that the ruling is debatable by jurists of reason, and that a COA should issue.

#### 4. SOCIAL HISTORY EVIDENCE REGARDING THE PATERNAL SIDE OF MR. NELSON'S FAMILY.

The testimony of Jill Miller, MSSW, and her comprehensive social history and mitigation findings (Exh. 29; Exh. 30), illustrate just how incomplete the mitigation investigation was when the case came to trial. In fact, the investigation in this case barely scratched the surface and ignored important and obvious areas of investigation, including a complete failure to investigate the paternal (Morse) side of Mr. Nelson's family. As Ms. Miller noted, Mr. Nelson is the product of multiple generations on both sides of a family (Morse and Nelson) where mental



Appellate Case: 15-3160 Page: 120 Date Filed: 02/29/2016 Entry ID: 4372433

illness, substance abuse, domestic violence, criminality, mistreatment of women and inappropriate and criminal sexual behavior were common. Exh. 5 (TR 04/15/14) at 345.

At the penalty trial in 2001, trial counsel did present the jury with some testimony about Mr. Nelson's childhood. The focus, however, was more on Nancy Nelson's difficulties than her son's. Without a fully-developed social history and a mental health expert to explain the impact of the type of abuse suffered by Mr. Nelson, counsel ran the unacceptable and unnecessary risk that the jury would dismiss this kind of evidence as amounting to the "abuse excuse," as the prosecutors in fact argued. (See discussion of closing arguments *infra*.)

The district court characterized the mitigation case as "comprehensive." Exh. 1 at 18. However, a mitigation case can hardly be considered "comprehensive" when half of the client's biological and environmental influences are completely left out of the social history presentation to the jury.

### 5. THE DISTRICT COURT'S CUMULATIVENESS ANALYSIS WAS FUNDAMENTALLY ERRONEOUS.

The district court fundamentally erred in its characterization of the evidence developed at the § 2255 hearing as merely cumulative of the evidence originally presented at Mr. Nelson's trial. Not only was the §2255 evidence qualitatively different, it also encompassed entire categories of mitigation evidence that were



Appellate Case: 15-3160 Page: 121 Date Filed: 02/29/2016 Entry ID: 4372433

previously unpresented to the jury that sentenced Mr. Nelson to death.

Under similar circumstances, courts have found that a failure to find that trial counsel's performance was deficient constitutes reversible error. *See*, *e.g.*, *Outten v. Kearney*, 464 F.3d 401, 421 (3d Cir. 2006) (reversing denial of habeas relief and holding that despite the fact that the trial testimony covered some of the same topic areas, it did not excuse counsel's failure to investigate and develop the mitigation evidence uncovered in the habeas proceedings because there were qualitative differences in the evidence regarding the petitioner's childhood abuse, as well as whole categories of evidence that were never presented to the jury; "Simply because some mitigating evidence regarding [petitioner's] abusive childhood was introduced to the jury… it does not follow that the jury was provided a comprehensive understanding of [petitioner's] abusive relationship with his father or other aspects of his troubled childhood. … In any event, the jury heard nothing regarding [petitioner's] sexual abuse in foster care, possible neurological damage, learning disabilities, or low IQ.")

Similarly, courts have refused to treat habeas evidence as cumulative when it: (1)corrects or rebuts an assumption of which the jury was inaccurately led to believe during sentencing, *see Griffin v. Pierce*, 622 F.3d 831, 845 (7th Cir. 2010); *Johnson v. Bagley*, 544 F.3d 592, 603-04 (6th Cir. 2008); (2)provides details of a



Appellate Case: 15-3160 Page: 122 Date Filed: 02/29/2016 Entry ID: 4372433

period of a petitioner's life referenced only in passing during trial, *see Sowell v. Anderson*, 663 F.3d 783, 789 (6th Cir. 2011); *Neal v. Puckett*, 286 F.3d 230, 243-44 (5th Cir. 2002) (*en banc*); and (3)demonstrates mitigating factors not presented at trial or not known to the fact-finder, *see Foust v. Houk*, 655 F.3d 524, 524 (6th Cir. 2011); *Williams v. Allen*, 458 F.3d 1233, 1245 (11th Cir. 2006); *Robinson v. Moore*, 300 F.3d 1320, 1347 (11th Cir. 2002).

Here, the evidence presented at the § 2255 hearing had all of the hallmarks which courts have held preclude a finding of "cumulativeness." For example, the § 2255 evidence: rebutted the false assumption presented to the jury that Mr. Nelson suffered no lasting impairments from his medical complications at birth that deprived his infant brain of oxygen; provided rich details of both the nature of the abuse and neglect that Mr. Nelson suffered, as well as the effect that his chronic exposure to trauma had on his emotional, social, and psychological development; and established entire categories of mitigation–childhood sexual assault, brain damage, and mental illness–that were never presented at trial. The district court's holding that § 2255 evidence was merely cumulative, and its consequent conclusion that trial counsel's performance was thus "not deficient," was legally erroneous and warrants reversal. At a minimum, however, the district court's ruling is debatable by jurists of reason and, accordingly, a COA is merited

on Mr. Nelson's IAC claim.

## IX. THE GOVERNMENT'S IMPROPER CLOSING ARGUMENTS: INEFFECTIVE ASSISTANCE OF TRIAL AND APPELLATE COUNSEL.

### A. THE IMPROPER ARGUMENTS AND TRIAL COUNSEL'S FAILURE TO OBJECT.

In this case, the prosecutors–without a word of objection from the trial attorneys or subsequent appellate challenge–unleashed upon the jury an emotional and incendiary closing presentation that incited the jury to act out of emotion, anger, hatred, and vengeance. The improper arguments included, but are not limited to, the following:

INITIAL CLOSING ARGUMENT
FROM TRANSCRIPT OF 11/28/2001:

- The Government argued that the jury should vote for death because, "If this crime doesn't call for the death penalty, then what crime does?" (Exh. 8 (TR 11/28/01) at 1113.)

- The Government argued that the jury should vote for death because, "We need to protect our children. We need to send a message to guys like the defendant . . . ." (*Id.*)

- The Government argued that the death penalty should be imposed because, "The community cries out for justice." (*Id.* at 1114.)

- The Government argued that legally appropriate and relevant mitigating evidence was "all this excuse testimony" and a "guilt trip." (*Id.* at 1123-24.)



Appellate Case: 15-3160 Page: 124 Date Filed: 02/29/2016 Entry ID: 4372433

- The Government argued that the jury should impose a death penalty simply because the Government recommended it "without reservation." (*Id.* at 1128.)

REBUTTAL ARGUMENT
FROM TRANSCRIPT OF 11/28/2001:

- The Government argued that the case was about the "slaughter" of "our children." *Id.* at 1155.

- The Government argued that legally appropriate and relevant mitigating evidence was "an excuse," "the blame game," "the abuse excuse," and an effort by trial counsel to claim the crime was "somebody else's fault." *Id.* at 1156.

- The Government argued that the mitigating evidence was not worthy of jury consideration since it didn't "explain why" the crime occurred. *Id.* at 1158.

- The Government argued that Mr. Nelson was "a rotten human being." *Id.*

- The Government argued that defense counsel's efforts to persuade the jury of mitigating evidence was "a smoke screen" and an attempt to "divert [the jury] from what this case is really about, the slaughter of an innocent." *Id.* at 1158-59.

- The Government argued that defense counsel's efforts to persuade the jury of mitigating evidence masked counsel's true motive, *i.e.*, "What they want you to do is have him escape justice." *Id.* at 1159.

- The Government argued that mercy was weakness. *Id.*

- The Government argued that Appellant was "evil at his core." *Id.* at 1161.

- The Government argued that jurors should rely on the prosecution's experience and expertise, and positioned the case as a referendum on capital punishment by telling the jury, "There is no clearer call for the death penalty than there is in this case," and, later, "If not him, who? If not now,

when? If killing and raping a kid isn't enough, then we don't need a death penalty. We don't need a death penalty." *Id.* at 1161; 1163.

- The Government argued that the jury should impose a sentence of death since the jury "represent[ed] the people of the United States in this case . . . ." *Id.* at 1162.

- The Government argued that the jurors should close their eyes and re-live the horrors of the victim's last hours, calling upon the jury to "Think about . . . what that little girl was thinking," and to imagine, "What was she thinking?" and to "Imagine what she experienced in that last part of her life," and to "Close your eyes, and . . . envision [the abduction and murder]." *Id.* at 1161-62.

- The Government argued that a verdict of death was the only just verdict and that the jurors were "the dispensers of justice," and that the victim's mother "Waits for you to give her some justice. And justice in this case can only be had by imposing a sentence of death," essentially suggesting to the jury that a sentence of death should be imposed because that's what the victim's survivors wished. *Id.* at 1162.

- The Government argued that, "[T]he death penalty was enacted for crimes like this." *Id.* at 1163.

Trial counsel objected to none of these egregious excesses. For Ms. Hunt's part, she did not view this as her responsibility since Mr. Berrigan presented the defense summation. She testified, "I mean I could have passed him a note to say object, but it was his job or duty to stand up and object at that point." Exh. 4 (TR 4/14/14) at 79. Mr. Berrigan agreed that the arguments were improper, but offered no reason, tactical or otherwise, for not objecting. *Id.* at 243.

The arguments were without a doubt improper. At the time of Mr. Nelson 's



Appellate Case: 15-3160 Page: 126 Date Filed: 02/29/2016 Entry ID: 4372433

trial, remarks such as those quoted above had been repeatedly condemned. *See, e.g., Caldwell v. Mississippi*, 472 U.S. 340 n.7 (1985) (death sentence vacated because prosecutor's improper closing argument during penalty phase made it appear to jury that responsibility for the death penalty would be borne by appellate court rather than by jury itself); *United States v. Johnson*, 968 F.2d 768 (8th Cir. 1992) (Improper to ask jury to send a message); *United States v. Lee*, 743 F.2d 1240 (8th Cir. 1984); *United States v. Solivan*, 937 F.2d 1146 (6th Cir. 1991); *United States v. Arrieta-Agressot*, 3 F.3d 525 (1st Cir. 1993) (Improper to enlist jury in "war on drugs"). Moreover, this was a capital case and, as the Eighth Circuit recognized in *Copeland v. Washington*, 232 F.3d 969, 974 n. 2 (8th Cir. 2000), "[i]f there is any distinction between guilt and penalty-phase arguments, it would seem that there should be a more searching review of the penalty phase as the Eighth Amendment is implicated." More recently in *Weaver v. Bowersox*, 438 F.3d 832 (8th Cir. 2006), the Circuit noted that "send a message" arguments are particularly prejudicial when made in the penalty phase of a capital case because they violate the defendant's Eighth Amendment right to an individualized sentencing determination. It is improper to argue that a death sentence should be imposed because that is what the surviving victims wish. *Payne v. Tennessee*, 501 U.S. 808 (1991).

At a minimum, defense counsel should have objected to the comments as they were being made and sought a mistrial or a strong cautionary instruction that directed the jury to disregard the improper exhortations that they return a verdict of death for reasons grounded in emotion, anger, hatred and vengeance. Instead, nothing was done and the jury went into the jury room with the memory of the prosecutors' improper arguments.

It should be noted that the prosecutor who gave the rebuttal closing in this case also gave the rebuttal closing in *United States v. Johnson*, 713 F.Supp.2d 595 (E.D. La. 2010). *See United States v. Johnson*, No. 04-17, (E.D. La. May 27, 2009), TR 5/27/09 at 53 (identifying the prosecutor). In that case, the capital defendant was granted a new penalty phase based upon improper arguments made in the rebuttal closing, arguments that closely mirror the ones given in Mr. Nelson's case. *See Johnson*, 713 F.Supp.2d at 626, 630-38. In granting a new trial, the trial judge noted that particularly persuasive power of this prosecutor:

> [R]eading the transcript of the rebuttal alone does not convey the emotional impact this argument had upon the jury. This particular prosecutor has extensive capital experience and is very talented and capable. He also has a very powerful voice and a commanding presence with a demeanor of extreme self-confidence. During his summation, the Court observed the jurors and they were, literally, riveted in their seats by his oration, utterly attentive and motionless.

*Id.* at 638. Although the delivery was highly effective it was also improper: "throughout the final rebuttal argument, he repeatedly crossed the line marking the defendant's right to a constitutionally fair trial." *Id.* So too with Mr. Nelson.

### B. INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL FOR FAILING TO RAISE THIS ISSUE.

As a matter of Fifth Amendment Due Process, a defendant is entitled to the effective assistance of counsel on the direct appeal of a criminal conviction. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985); *Carter v. Bowersox*, 265 F.3d 705, 715-16 (8th Cir. 2001). A defendant prevails on such a claim where there is "'a reasonable probability that the result of the direct appeal would have been different if the argument had been made.'" *Carter*, 265 F.3d at 715-16, quoting *Chambers v. Bowersox*, 157 F.3d 560, 566 (8th Cir. 1993).

The failure of the appellate representation in this case can be explained by a virtual complete lack of communication between Mr. Nelson's appellate counsel. Jennifer Herndon testified that she believed her co-counsel, Susan Hunt, was handling several issues that would have included the improper closing arguments. Exh. 4 (TR 4/14/14) at 116; 134. Ms. Hunt testified that she believed her role was limited to a change-of-venue argument. *Id.* at 81. Neither testified that there was any conscious decision to exclude any particular argument.



Appellate Case: 15-3160 Page: 129 Date Filed: 02/29/2016 Entry ID: 4372433

Appellate counsel, particularly Ms. Herndon, agreed that the Government's closing argument was improper in several different respects (*Id.* at 118) and that these instances were not isolated but occurred throughout the Government's closing argument. *Id.* at 123. Appellate counsel agreed that examples of this improper argument included "send a message" arguments (*Id.* at 119), misleading the jury into believing they did not have responsibility for sentencing the defendant to death (*Id.* at 120-22), calling the defendant evil (*Id.* at 123-24.) and equating the return of a life sentence with weakness (*Id.* at 125). Appellate counsel also agreed that these were significant and obvious issues that were stronger than some of those actually raised in the brief. *Id.* at 126. Appellate counsel did not make a strategic choice to omit these arguments and agrees that they should have been raised on appeal. *Id.* Had the issue been raised there is a reasonable probability that Mr. Nelson's sentence of death would have been vacated on appeal.

The failure of trial counsel to object in the first instance, and the failure of appellate counsel to raise this issue on appeal, were each instances of ineffective assistance of counsel that prejudiced Mr. Nelson. These are colorable claims which deserve a COA.



Appellate Case: 15-3160 Page: 130 Date Filed: 02/29/2016 Entry ID: 4372433

## CONCLUSION

This Court's original COA remains in effect and a briefing schedule should be set on the claims of ineffective assistance of sentencing and appellate counsel. In the alternative, this Court should grant a COA on these claims.

Respectfully submitted this 29th day of February, 2016.

*/s/Paula K. Harms*
Jon M. Sands
Federal Public Defender
Paula K. Harms
Assistant Federal Public Defender
Capital Habeas Unit
850 W. Adams Suite 201
Phoenix, Arizona 85007
602-382-2816 telephone
602-889-3960 facsimile

*/s/ David A. Ruhnke*
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
973-744-1000 telephone
973-746-1490 facsimile
dr@ruhnkeandbarrett.com



Appellate Case: 15-3160 Page: 131 Date Filed: 02/29/2016 Entry ID: 4372433

**CERTIFICATE OF SERVICE**

This will certify that, on today's date, February 29, 2016, Appellant's counsel served this motion upon the United States by filing the documents via this Court's ECF system.

By Robin Stoltze
Legal Assistant
Capital Habeas Unit