No. 15-3160

**IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT**

---

Keith D. Nelson,

Appellant,

vs.

United States of America,

Appellees.

---

On Appeal from the United States District Court
District of Arizona
Case No. 4:04-8005-cv-W (FJG)

---

# APPELLANTS EXHIBITS TO MOTION FOR ISSUANCE OF CERTIFICATE OF APPEALABILITY

**Exhibits 1 - 47**

---


*/s/Paula K. Harms*
Jon M. Sands
Federal Public Defender
Paula K. Harms
Assistant Federal Public Defender
Capital Habeas Unit
850 W. Adams Suite 201
Phoenix, Arizona 85007
602-382-2816 telephone
602-889-3960 facsimile

*/s/ David A. Ruhnke*
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
973-744-1000 telephone
973-746-1490 facsimile
dr@ruhnkeandbarrett.com

**Petitioner-Appellant Keith D. Nelson**
**Index of Exhibits**

---

| | |
|---|---|
| Exhibit 1 | Order denying habeas relief, March 31, 2015 (District Court Docket ("Dkt.")) [Dkt. 269] |
| Exhibit 2 | Judgment, October 30, 2008 [Dkt. 89] |
| Exhibit 3 | Judgment denying motion to vacate, set aside or correct sentence, November 21, 2006 [Dkt. 61] |
| Exhibit 4 | Transcript, Evidentiary Hearing, Vol. 1, April 14, 2014 |
| Exhibit 5 | Transcript, Evidentiary Hearing, Vol. 2, April 15, 2014 |
| Exhibit 6 | Transcript, Evidentiary Hearing, Vol. 3, April 16, 2014 |
| Exhibit 7 | Transcript, Evidentiary Hearing, Vol. 4, April 17, 2014 |
| Exhibit 8 | Trial Transcript, Closing Arguments, November 28, 2001 |
| Exhibit 9 | Movant's Exhibit P20, Evidentiary Hearing, April 14, 2014, Pat Berrigan Internal Memo regarding case load |
| Exhibit 10 | Movant's Exhibit P80, Evidentiary Hearing, April 14, 2014, Trial Counsel Billing Summary |
| Exhibit 11 | Movant's Exhibit P11, Evidentiary Hearing, April 14, 2014, Billing records, Dr. Dennis Cowan |
| Exhibit 12 | Affidavit of Patrick J. Berrigan, September 13, 2010 [Dkt. 171] *Ex Parte* |
| Exhibit 13 | Government's Exhibit 112, Evidentiary Hearing, April 14, 2014, Deposition Transcript of Patrick Berrigan, (U.S. v. Nelson), October 19, 2012 |
| Exhibit 14 | Movant's Exhibit P17, Evidentiary Hearing, April 14, 2014, Billing Records, Patrick Berrigan |

| | |
|---|---|
| Exhibit 15 | Movant's Exhibit P17-A, Evidentiary Hearing, April 14, 2014, Additional Billing Records, Patrick Berrigan |
| Exhibit 16 | Movant's Exhibit P17-B, Evidentiary Hearing, April 14, 2014, Berrigan's large calendar, 2001 |
| Exhibit 17 | Movant's Exhibit P17-C, Evidentiary Hearing, April 14, 2014, Berrigan's small calendar, 2001 |
| Exhibit 18 | Movant's Exhibit P69A, Evidentiary Hearing, April 14, 2014, Declaration of Russell Stetler, April 8, 2014 |
| Exhibit 19 | Movant's Exhibit P28, Evidentiary Hearing, April 14, 2014, *Ex Parte* motions and orders |
| Exhibit 20 | Movant's Exhibit P70, Evidentiary Hearing, April 14, 2014, Extended Morse Family Records |
| Exhibit 21 | Movant's Exhibit P9, Evidentiary Hearing, April 14, 2014, N Ninemire's letter, dated September 14, 2000, regarding extent of mitigation work and life history chronology of Nelson |
| Exhibit 22 | Movant's Exhibit P10, Evidentiary Hearing, April 14, 2014, Affidavit of Tena S. Francis, June 30, 2001 and notes from file of Tena Francis |
| Exhibit 23 | Movant's Exhibit P53, Evidentiary Hearing, April 14, 2014, Report of Michael Gelbort, Ph.D., October 5, 2005 |
| Exhibit 24 | Movant's Exhibit P54, Evidentiary Hearing, April 14, 2014, Report of Daniel Martell, October 8, 2010 |
| Exhibit 25 | Movant's Exhibit P79, Evidentiary Hearing, April 14, 2014, Chronology Defense Mental Health Investigation |
| Exhibit 26 | Movant's Exhibit P8, Evidentiary Hearing, April 14, 2014, Report of Daniel Foster, Psy. D., November 2, 2001 |
| Exhibit 27 | Movant's Exhibit P36, Evidentiary Hearing, April 14, 2014, Billing Record, Tena Francis, District Court |

| | |
|---|---|
| Exhibit 28 | Movant's Exhibit P36A, Evidentiary Hearing, April 14, 2014, Billing Records Excerpts, Tena Francis, District Court |
| Exhibit 29 | Movant's Exhibit P38, Evidentiary Hearing, April 14, 2014, Report of Jill Miller on Social History, March 19, 2012 |
| Exhibit 30 | Movant's Exhibit P38A, Evidentiary Hearing, April 14, 2014, Supplemental Report of Jill Miller, March 21, 2014 |
| Exhibit 31 | Movant's Exhibit P48, Evidentiary Hearing, April 14, 2014, Report of Natalie Novick Brown, Ph.D., December 4, 2006 |
| Exhibit 32 | Movant's Exhibit P56, Evidentiary Hearing, April 14, 2014, PET report from MedLab, September 24, 2010 |
| Exhibit 33 | Movant's Exhibit P57, Evidentiary Hearing, April 14, 2014, MRI report from Union Hospital, September 24, 2010 |
| Exhibit 34 | Movant's Exhibit P58, Evidentiary Hearing, April 14, 2014, Report of Ruben G. Gur, Ph.D., April 21, 2011 |
| Exhibit 35 | Movant's Exhibit P59, Evidentiary Hearing, April 14, 2014, Supplemental Report of Ruben G. Gury, Ph.D., July 9, 2012 |
| Exhibit 36 | Movant's Exhibit P60, Evidentiary Hearing, April 14, 2014, Curriculum Vitae of Xavier Amador, Ph.D. |
| Exhibit 37 | Movant's Exhibit P61, Evidentiary Hearing, April 14, 2014, Report of Xavier F. Amador, Ph.D., March 30, 2010 |
| Exhibit 38 | Movant's Exhibit P62, Evidentiary Hearing, April 14, 2014, Report of Xavier F. Amador, Ph.D., July 12, 2010 |
| Exhibit 39 | Movant's Exhibit P63, Evidentiary Hearing, April 14, 2014, Supplemental Report of Xavier F. Amador, Ph.D., April 20, 2012 |
| Exhibit 40 | Movant's Exhibit P81, Evidentiary Hearing, April 14, 2014, PowerPoint presentation of Dr. Gur, April 16, 2014 |

Exhibit 41 Movant's Exhibit P45, Evidentiary Hearing, April 14, 2014, Report of Carolyn Crawford, M.D., November 5, 2012

Exhibit 42 Movant's Exhibit P64, Evidentiary Hearing, April 14, 2014, Report from Naphcare (Bureau of Prisons Health Services), April 29, 2011

Exhibit 43 Trial Transcript, Opening Statements, November 19, 2001

Exhibit 44 Movant's Exhibit P67, Evidentiary Hearing, April 14, 2014, Report of Leslie Lebowitz, Ph.D., October 1, 2012

Exhibit 45 Trial Transcript, November 27, 2001, Excerpt of Kenneth Morse testimony

Exhibit 46 Martell Raw Data

Exhibit 47 Photo of Keith Nelson

Exhibit 48 Report from Daniel a. Martell, Ph.D., regarding examination of Billie Jerome Allen, June 30, 2009,

# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | | |
|---|---|---|
| KEITH D. NELSON, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 04-8005-CV-W-FJG |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

## ORDER

### I. BACKGROUND

On October 14, 1999, Keith Nelson was charged with interstate kidnapping resulting in death and interstate travel with intent to engage in a sexual act with a child under the age of twelve. On October 25, 2001, Nelson entered a plea of guilty to count one and proceeded to the penalty phase of the trial. On November 13, 2001, a jury was selected and trial began the following day. On November 28, 2001, the jury recommended imposition of the death penalty. On December 18, 2001, Nelson filed a Motion for a New Trial. On February 28, 2002, this Court denied Nelson's Motion for New Trial. On March 11, 2002, the Court imposed a sentence of death. Nelson filed a Notice of Appeal to the Eighth Circuit. On October 22, 2003, the Court of Appeals affirmed the conviction and sentence. The United States Supreme Court denied Nelson's petition for certiorari review on November 8, 2004. On November 10, 2004, Nelson filed a motion seeking appointment of counsel to represent him in connection with his post-conviction challenges. Counsel was appointed on December 14, 2004 and Nelson filed a § 2255 motion to set aside his conviction and sentence of death on

November 6, 2005. On August 21, 2006, Nelson filed a motion to disqualify this Court from further participation in the case. On November 21, 2006, this Court determined that no evidentiary hearing was necessary and denied Nelson's motion to disqualify and recuse and also denied Nelson's § 2255 motion to vacate, set aside or correct his sentence. Nelson then appealed the denial to the Eighth Circuit Court of Appeals.

On October 30, 2008, the Eighth Circuit Court of Appeals granted Nelson's motion for a certificate of appealability on six claims of ineffective assistance of trial and appellate counsel and remanded the case to this Court with directions to hold an evidentiary hearing on these claims and to make findings of fact and conclusions of law concerning them. The six claims which the Eighth Circuit remanded were[1]:

A. Allegations of Trial Counsel's Constitutional Ineffectiveness:

(2) & (3) Failure to conduct adequate mitigation investigation including failure to move for a continuance to complete one.

(4) Failure to conduct adequate investigation of defendant's mental health.

(5) Advising or instructing defendant to decline to submit to a mental health examination by a government examiner.

(15) Failure to make objections:

(e) to allegedly inflammatory and improper comments in the Government's closing argument and rebuttal.

B. Allegations of Appellate Counsel's Constitutional Ineffectiveness:

(1) Failure to conduct adequate review of the trial record and the law.

(2)(c) Failure to raise on appeal the Government's allegedly improper comments in closing arguments.

[1] The numbering of these claims reflects the original numbering of claims in the initial §2255 motion.

The Court held an evidentiary hearing on these claims on April 14-17, 2014. The Court now makes the following Findings of Fact and Conclusions of Law.

## II. STANDARD

Our analysis of the ineffectiveness claims is governed by Strickland v. Washington, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to succeed on an ineffectiveness claim, Nelson must show "both deficient performance by counsel and prejudice." Id. at 687-88. In Johnson v. U.S., 860 F.Supp.2d 663 (N.D.Iowa 2012), the Court stated:

> To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." [Strickland], 466 U.S. at 688, 104 S.Ct. 2052. . . . The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id., at 687, 104 S.Ct. 2052. Harrington v. Richter, ___ ,U.S.___, ___, 131 S.Ct. 770, 787, 178 L.Ed.2d 624 (2011); Premo v. Moore, —— U.S. ——, 131 S.Ct. 733, 739, 178 L.Ed.2d 649 (2011) (quoting Richter). Also, the court " 'must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." ' " King, 595 F.3d at 852–53 (quoting Ruff v. Armontrout, 77 F.3d 265, 268 (8th Cir.1996), in turn quoting Strickland, 466 U.S. at 690, 104 S.Ct. 2052). There are two substantial impediments to making the required showing of deficient performance. First, " '[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.' " United States v. Rice, 449 F.3d 887, 897 (8th Cir.2006) (quoting Strickland, 466 U.S. at 690, 104 S.Ct. 2052). Second, "[t]here is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " Id. (quoting Strickland, 466 U.S. at 689, 104 S.Ct. 2052); Davis v. Norris, 423 F.3d 868, 877 (8th Cir.2005) ("To satisfy this prong [the movant] must overcome the strong presumption that his counsel's conduct fell within the wide range of reasonable professional assistance.")

Id. at 741. In United States v. Orr, 636 F.3d 944, 952 (8th Cir. 2011), the Court stated,

"strategic choices made after a thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after a less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." However, as noted in Armstrong v. Kemna, 534 F.3d 857, 864-65 (8th Cir.2008), "[o]n the other hand, strategic choices resulting from lack of diligence in preparation and investigation [are] not protected by the presumption in favor of counsel."

## III. DISCUSSION

### A. Failure to Conduct Adequate Mitigation Investigation Including Failure to Move for a Continuance to Complete One – Claims A(2) & (3)

#### 1. Mitigation Investigation

Susan Hunt and Bill Shull discussed the need for a mitigation investigation to investigate statutory and non-statutory mitigating factors. They also discussed gathering records. Ron Ninemire, at the direction of Larry Pace, lead the mitigation investigation. (Evid. Tr. 26)[2]. The defense team filed a motion on July 20, 2000, in order to receive additional time to prepare the mitigation case and the mental health issues. (Evid. Tr. 31-32). The trial was continued until April 23, 2001. (Evid. Hg. Ex. P26, Evid. Tr. 36). Hunt traveled to Texas and California to conduct mitigation investigation. In California, Hunt attempted to obtain records demonstrating that Nancy Nelson had lived in a battered women's shelter. Ninemire gathered records, and interviewed several people in White Settlement, Texas. (Evid. Tr. 91.) Ninemire chronicled the team's various investigative efforts and after being removed from the case because of a

[2] The Evidentiary Transcripts can be found in Case No. 04-8005 (Docs. 260-263).

conflict, created a detailed letter dated September 12, 2000, which documented a to-do list of what had been done and what needed still to be done. (Evid. Tr. 88.) That letter was passed along to Bill Shull and Hunt as Nelson's remaining counsel. (Evid. Tr. 88-89.). In her testimony at the evidentiary hearing, Susan Hunt said that in his letter, Mr. Ninemire's investigation found that Nelson and his brothers were physically and/or sexually abused during their formative years by their mother and men she brought into the home, that Nelson had been hospitalized immediately after his birth, and that some of his brothers suffered from schizophrenia. Furthermore, Mr. Ninemire suggested that further investigation should include a psychiatric examination of Nelson. (Evid. Tr. 113.) During his testimony, Shull stated that he was familiar with the circumstances of Nelson's birth – being the second born of twins and possibly being a fetal/alcohol baby, as well as Nelson's sudden personality change in the ninth grade, and extended bed wetting. (Evid. Tr. 153.) Shull had knowledge that fetal alcohol syndrome could lead to neurological damage or impairments. (Evid. Tr. 154.). After Ninemire was removed from the case, defense counsel obtained the services of two different investigators, Dan Grothaus and Tim Murphy. (Evid. Tr. 49; Evid. Hrg. Exh. P38 at 79.) Grothaus was a former investigative journalist and documented his progress. (Evid. Hrg. Exh. 10.) By letter dated October 25, 2000, Grothaus kept the defense team informed about his investigation. (Evid. Tr. 89-90.). As the investigation progressed, the defense team secured funding from the court to retain Tena Francis, a seasoned death penalty mitigation investigator. However, despite the fact that it was her usual practice to see her clients as often as possible, she only saw Nelson twice, on consecutive days in February 2001. No one else from her office ever visited with Nelson either. (Evid. Tr.

477). It was Ms. Francis' intention to turn the mitigation investigation over to her associate, Deborah Haddad. (Evid. Tr. 480). However, a dispute arose between Ms. Haddad and defense counsel and she did not continue working on the case. (Evid. Tr. 481-482). After this no one from Ms. Francis' office was working on the case and Ms. Francis could not step back in due to her involvement with other cases. (Evid. Tr. p. 482, Ex. P9A).

In May 2001, Ms. Francis provided a first draft of a chronology and a social history to defense counsel. This draft was not updated or supplemented prior to the start of the penalty phase. (Ex. P9 at 34-57). In an affidavit dated June 30, 2001, Ms. Francis stated that as of May 18, 2001, she and her associates had spent a total of 267 hours on Nelson's case. (Evid. Tr. 495-96). Lisa Murphy, who also worked with Ms. Francis conducted some interviews and facilitated some interviews in White Settlement, Texas in late August or early September 2001. (Evid. Tr. 491). On September 19, 2001, in a sealed motion to this Court, defense counsel and Tena Francis indicated that "extensive mitigation work on the case" had been completed. Correspondingly, in the billing hours of Tena Francis, Patrick Berrigan, and Susan Hunt, it is clear that this statement is true. Ms. Francis admitted that from July 1, 2001 going forward, her firm billed a total of 162 hours on Nelson's case. She stated that this was in addition to the 267 hours already billed. (Evid. Tr. 507). Thus, the total amount of hours billed by Ms. Francis' firm was 429 hours for Nelson's mitigation case. (Plaintiff's Exhibits, P36, 36A). Francis obtained additional records of Nelson's birth, abusive upbringing, lack of educational achievement, and other mitigation issues. She provided the defense team with a binder of this information before trial, and this information was presented to the jury for their

consideration of whether a life or death sentence should be imposed.

**2. Mitigation Evidence Presented to the Jury During the Penalty Phase**

The first witness called to testify during the mitigation phase of the trial was Nancy Nelson, defendant's mother. Ms. Nelson testified in detail regarding Nelson's violent and abusive father, Kenneth Morse. She told the jury that Morse frequently beat her and was also abusive to her boys. She described for the jury in disturbing detail how on one occasion Morse tied her up and shocked her with an electrical cord. Morse would also lock her in closets in their home. Ms. Nelson moved herself and the children, including Keith, to California and Texas to get away from Morse. She also testified that Keith was diagnosed with dyslexia and was a poor student, he frequently had fights and behavior problems in school, and he had a bed-wetting problem well into his teen years. The jury also heard Ms. Nelson admit that she was an alcoholic and that two of her children were schizophrenic. Ms. Nelson told the jury that because she had to work long hours to support her children she was frequently away from the home, which required the boys to take care of themselves. As a result, the boys often got into trouble at school and in the community. (Trial Tr. 598-694.)[3]

Mary Smith, Nelson's aunt (Nancy Nelson's sister), testified that she and Nancy's stepfather were both abusive alcoholics. She told the jury that Kenneth Morse, Nelson's father, regularly beat Nancy and that he would also lock her up in the home. Ms. Smith helped Nancy and the kids get away from Morse when they moved to California and Texas. Ms. Smith also testified about Nelson's disadvantaged and difficult childhood. (Trial Tr. 712-24.)

[3] The Penalty Phase Transcripts can be found in Case No. 99-303, Docs. 459-469).

Georganna Romero, another aunt (also Nancy Nelson's sister), testified that Morse beat and tortured Nancy and related how on one occasion Morse tried to electrocute Nancy. Ms. Romero described the poor living conditions of Nancy Nelson's home in Texas and further described how the house smelled of urine. (Trial Tr. 725-38.).

Irene Wood testified that she helped Nancy Nelson and her five boys get a home, clothing, and personal items when they moved to Texas. She conveyed the poor conditions of Nelson's childhood in Texas. Ms. Wood also insisted that Nancy Nelson use the last name of Smith so that Morse could not locate her in Texas. (Trial Tr. 740-49.)

Melvin Lister, a guard at the Community Corrections of America (CCA) federal holding facility in Leavenworth, Kansas, testified that he worked in the segregation area of CCA when Nelson was housed in that facility. Lister told the jury that Nelson was frequently threatened and harassed by other inmates at the facility. (Trial Tr. 749-57.) Lieutenant Bruce Roberts, another CCA employee, also testified that Nelson was frequently verbally harassed by other inmates. During the 25 months that Nelson had been housed at CCA, he had never tried to escape. Roberts did not consider Nelson to be a threat while he was housed at CCA. (Trial Tr. 767-84.)

Kenneth Nelson, Nelson's twin brother, testified he was a satellite ommunications maintenance operator and installer in the U.S. Army, and described his career in the U.S. Army as a successful career. He graduated from high school with a 3.69 grade point average. Kenneth told the jury about his family's disadvantaged and impoverished childhood, and described an abusive boyfriend of his mother, Nancy Nelson. He and

Keith would frequently burglarize and steal from homes when they lived in Texas. Kenneth also told the jury that his mother seriously neglected him and his brothers. He said that his mother was never around and that she was always at the bar working or drinking alcohol. Kenneth straightened his life out when he moved back to Missouri and lived with his aunt and uncle, where he became involved in high school football, worked at a grocery store as a stocker, and subsequently did well in school. (Trial Tr. 798-839.)

David Cunningham, Nelson's employer, testified he owned a basement waterproofing business. Cunningham described Nelson as a pleasant employee and a good worker. He felt that Nelson was reliable and conscientious when working for his business. (Trial Tr. 849-55.)

The defense also played a recorded conversation to the jury between Nelson and his girlfriend, Kerri Dillon. The phone conversation was recorded when Nelson called his mother who then patched Ms. Dillon into a third-party phone call. The conversation was recorded by CCA officials as a part of a routine practice in which all phone conversations of inmates are recorded. In the conversation, among other things, Ms. Dillon and Nelson discussed her recent pregnancy by Nelson. In the conversation, Nelson also appears to express remorse for his involvement in the murder of ten-year-old Pamela Butler. He tells Ms. Dillon of his intent to tell law enforcement authorities of his involvement in the crime. Nelson states in the conversation as follows: "I'm just gonna do the right thing for once in my life." (Trial Tr. 861.)

Steven Nelson, Keith Nelson's youngest brother, testified that he was employed as an engineer and was successful in his career. Following high school, Steven attended DeVry Institute in Kansas City and had a 3.9 grade point average. He

described his disadvantaged childhood in Texas and further described how his mother Nancy neglected him and his brothers. Steven also described Keith's bed-wetting problem, told the jury his mother was never home and was either working or drinking, and that he and his brothers had to take care of themselves most of the time. (Trial Tr. 863-87.)

Gene Thompson was the landlord for the Nelson family when they lived in Texas. He testified that the Nelson family lived in Section 8 housing, and described the poor, unkempt conditions of the Nelson home. Thompson told the jury that when the Nelson family left the rental property it was in extremely poor condition. (Trial Tr. 895-903.)

Rhonda Monroe, a former babysitter in Texas, testified she was the babysitter for the Nelson children when Nancy Nelson was at work. Nancy Nelson would bring the children to Ms. Monroe's home and leave them when she went to work. Ms. Monroe testified Keith Nelson had a bed-wetting problem, and that her husband would punish Keith by spanking him with a belt. Her husband was an alcoholic, and was very abusive towards Keith and his brothers and that they were scared of her husband. When her husband was home the Nelson boys would be required to stay in one room in her home. If they left the room her husband would spank the boys with a belt. (Trial Tr. 904-16.)

Jennifer Monroe, Rhonda Monroe's daughter, testified that the Nelson boys were always required to stay in one room when her mother was babysitting them. Her stepfather, Billy Reese, was always spanking the boys with a belt. She said that the Nelson boys were extremely afraid of her stepdad. (Trial Tr. 919-27.)

Ellen Crutsinger, a former teacher of several of the Nelson boys in Texas, testified that Keith was in a special education class and that he struggled while in school. She

further described Keith helping a crippled girl in a wheelchair while in elementary school. Keith would push the girl around the school grounds in her wheelchair and that they developed a friendship. Ms. Crutsinger further testified that Nancy Nelson never attended the "meet the teacher" nights at the school. (Trial Tr. 928-36.)

Michael Griffith, a former neighbor of the Nelsons in Texas, testified that Nancy Nelson was never at home and the boys were frequently left alone to fend for themselves. Mr. Griffith did little things to try to help the Nelson family such as doing plumbing repairs at no charge. He testified that the Nelson house was always messy and unclean. He also told the jury that Nelson's brothers would make fun of him because of his bed-wetting problem. (Trial Tr. 940-51.)

Homer Dear, Nelson's former school principal and also a former Texas State Representative, testified that he knew the Nelson family when they were living in Texas and he was their principal at an elementary school. Mr. Dear believed the Nelson boys were physically and mentally abused. He described the Nelson family as a very poor family and further described how he had tried to help them. He described the poor hygiene of the Nelson boys and told the jury how he would require the boys to take showers and would give them clothing at the school. Mr. Dear bought clothes for the boys at a store on at least one occasion. He also visited the Nelson home and described the house as unclean. (Trial Tr. 951-59.)

Finally, Nelson called expert defense witness Dr. Mark Cunningham to testify on his behalf. Dr. Cunningham is a clinical and forensic psychologist who frequently testifies as a mitigation and sentencing expert in capital cases around the United States. He testified concerning the effect of childhood abuse and neglect on Nelson's character

and development. In his lengthy testimony, Dr. Cunningham explained to the jury how the squalid conditions and abusive and violent nature of Keith Nelson's childhood affected the formation of Nelson's character. Dr. Cunningham also told the jury that Nelson would be less violent as he aged. (Trial Tr. 964-1025.).

**3. Mitigation Evidence Which Should Have Been Presented to the Jury**

Jill Miller, MSSW, testified at the evidentiary hearing. She stated that she prepared a social history of Mr. Nelson and discovered a multigenerational history of mental illness, a history of alcoholism, substance abuse on both sides of the family, domestic abuse on both sides of the family, inappropriate sexual behavior and criminal sexual misconduct. She also discovered that there was severe poverty on the Morse side of the family. Ms. Miller testified that she was able to gather additional medical records on Nancy Nelson, evidencing the abuse she suffered as well as medical records for one of Nelson's brothers, showing that he suffered from schizophrenia. (Ev.Tr. 359-361). Ms. Miller also testified that even though the trial team had gathered school records for Nelson, they were never introduced during the penalty phase. (Evid. Tr. 364-365). She also testified that there were additional school records that have been gathered since the penalty hearing, and were available at the time, but were not gathered by Tena Francis or her staff (Evid. Tr. 368). Ms. Miller stated that Tena Francis investigators did not gather any records at all related to the Morse side of the family. (Evid. Tr. P. 372).

On cross-examination, Ms. Miller admitted that she had been actively working on gathering records in this case for over five years. Ms. Miller also admitted that when she prepared her psychosocial history report, she relied on the earlier work that Ms.

Francis and her associates had done, including interviews with 13 or 14 witnesses. She also looked at interview notes prepared by Deborah Haddad, memos written by Dan Grothaus, Ron Ninemire, interview notes of Ron Ninemire and memos of interviews by Lisa Murphy. (Evid. Tr. 381).

Nelson also argues that the mitigation investigation should have included testimony from a psychologist, such as Dr. Lebowitz, to testify regarding the severity of Nelson's history of childhood maltreatment and the effects that this might have had on him. Dr. Lebowitz testified that Nelson's family tree was "absolutely riddled with major psychopathology, substance abuse, and patterns of interpersonal violence and neglect." (Evid. Tr. P. 530). Dr. Lebowitz stated that Nelson was born to a mother who was battered and was unprepared to parent him. She testified that he was severely neglected by his mother, she did not protect him from abuse and later on he was also beaten and emotionally abused by her. (Evid. Tr. P. 532). Dr. Lebowitz testified to the extraordinary violence and neglect that Nelson was exposed to by both his parents and other individuals who cared for him when he was younger and what sort of impact this had on him. (Evid. Tr. 538 – 542). Nelson argues that if the nature and quality of the maltreatment he suffered at the hands of the adults charged with his care, had been properly investigated and presented, it would have weighed heavily on the life side of the balance and there is a reasonable probability that at least one juror, presented with this additional information, might have struck a different balance.

**4. Failure to Move For a Continuance**

In the summer of 2001, Berrigan had health issues that necessitated heart bypass surgery which took place on August 8, 2001. Berrigan and Hunt had a meeting at CCA

with Nelson about Berrigan's surgery. Nelson wanted the trial continued so that Berrigan could have time to recover, but Berrigan decided that he was not going to ask for a continuance. (Evid. Tr. 66-67.) Hunt testified about Berrigan's decision to not file a continuance motion with Nelson, stating that Berrigan assured her that he could get everything done, and Hunt and Nelson accepted Berrigan's decision. (Evid. Tr. 110.) Whether she ultimately agreed with the decision to proceed to trial or not, Hunt never informed this Court that she was concerned about Berrigan's health, nor did she express any concerns about whether or not the defense team was ready to go to trial and, correspondingly, never filed for a continuance on her own. In regards to his surgery, Berrigan said, it "depends on how you look at it." It [the trial] was set for a couple of months after his surgery, and as he "look[s] back on it now, of course, I know I wasn't ready. . . . I wasn't ready, but I guess I didn't particularly assess whether I was ready or not after having bypass surgery." Berrigan testified that he thought "we were going to trial in October, period" – there was "never a promise . . . it will be continued eight months, nine months, a year." (Evid. Tr. 231-32.) Berrigan testified that he just lost a bunch of time, but he is not sure even if he had asked for a continuance he would have used his health as a reason. No motion for a continuance was ever filed. (Evid. Tr. 234.). After his surgery, Berrigan testified that he was able to devote a significant amount of time in terms of getting up to speed for Nelson's case. (Evid. Tr. 263.) Nelson never made the magistrate or district judge aware of his concerns that his case was not going to be ready for trial.

**5. Analysis**

"Evidence of a difficult family history and of emotional disturbance is typically

introduced by defendants in mitigation." Eddings v. Oklahoma, 455 U.S. 104, 115, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). "Before deciding what mitigating evidence, if any, should be presented to the jury during a capital penalty phase, counsel has a duty to conduct a thorough investigation into a defendant's background." Honken v. U.S., 42 F.Supp.3d 937,1089 (N.D.Iowa 2013)(citing Porter v. McCollum,, 558 U.S. 30, 39, 130 S.Ct. 447, 175 L.Ed.2d 398 (2009)). In Honken, the Court noted:

> As a general matter, there is a strong presumption that counsel made all significant decisions while exercising reasonable professional judgment. See Strickland, 466 U.S. at 689, 104 S.Ct. 2052. The deference owed to strategic judgments is defined in terms of the adequacy of the investigation supporting such judgments. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. at 690-91, 104 S.Ct. 2052. . . .The principle concern in deciding whether counsel exercised reasonable professional judgment as to a defendant's mitigation case is whether the investigation was reasonable. See Wiggins [v. Smith], 539 U.S. 510, 522-23,123 S.Ct. 2527,[156 L.Ed.2d 471 (2003)](citing Strickland, 466 U.S.at 691, 104 S.Ct. 2052). . . .The performance of counsel is "measured for 'reasonableness under prevailing professional norms,' which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" Id. (citations omitted)(quoting Strickland, 466 U.S. at 688-89, 104 S.Ct. 2052).

Id. at 1089-90.

In the instant case, Nelson argues that while Tena Francis' organization billed for a substantial number of hours for the work performed, there was no evidence of any continuing effort to gather documents, locate additional witnesses, or update the first draft of the chronology and the social history. It was only toward the end of the summer of 2001, that Lisa Murphy, who had no social work training, assisted in locating witnesses and arranging interviews for counsel. Nelson argues that the testimony of Jill

Miller, outlines how incomplete the mitigation investigation was when the case went to trial, including the complete failure to investigate the paternal side of Nelson's family. Nelson also argues that the "superficial mitigation presentation in this case presents a clear example of the state of affairs described in Wiggins where 'counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources.' Id. at 524. Nelson argues that there is a reasonable probability that one or more jurors if presented with a full and accurate picture of Nelson's life and impairments, would have struck a different balance.

The Court disagrees. This is not a case like Wiggins where counsel completely abandoned the investigation into Nelson's background. In Wiggins, after being convicted of first degree murder, robbery and two counts of theft, Wiggins elected to be sentenced by a jury. Counsel filed a motion for bifurcation of the sentencing proceedings, first intending to prove that Wiggins did not act as a principal in the first degree. If necessary, counsel then intended to present a mitigation case. However, the Court denied the motion and the sentencing proceedings commenced immediately. In the opening statement, counsel told the jurors that they would hear that the defendant had experienced a difficult life and it had not been easy for him. During the proceedings however, counsel introduced no evidence of the defendant's life history. Before closing arguments, counsel made a proffer to the Court to preserve the bifurcation issue and detailed the mitigation case which would have been presented had the court granted the bifurcation motion. The jury sentenced the defendant to death. In his habeas petition, Wiggins alleged that his counsel was ineffective for limiting the scope of the mitigation investigation. The Court noted that counsel's investigation drew from three sources: a

psychologist's report which concluded that Wiggins had an IQ of 79, had difficulty coping with demanding situations and exhibited features of a personality disorder. Counsel also had available a PSI which had a one page account of Wiggins' personal history which described his "misery as a youth" and quoted his description of his background as "disgusting" and noting that he spent much of his life in foster care. Counsel also "tracked down" records kept by the Department of Social Services which documented his various placements. The Supreme Court in Wiggins stated that while counsel's investigation did not meet Strickland's performance standards, "we emphasize that Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does Strickland require defense counsel to present mitigating evidence at sentencing in every case." Id. at 533. The Court found that counsel's investigation did not reflect reasonable professional judgment and was not consistent with professional standards at the time nor reasonable in light of the evidence that counsel uncovered in the social service records. Id. at 534. The Court found that the mitigating evidence that counsel failed to uncover was powerful. For example, the Court noted that "Wiggins experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother. He suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care. The time Wiggins spent homeless, along with this diminished mental capacities, further augment his mitigation case." Id. at 534-35. The Court concluded that there is a reasonable probability that if the jury had heard this evidence, they would have returned a different sentence. Id. at 536.

The Court finds the Wiggins case distinguishable. Nelson's counsel conducted a thorough mitigation investigation and presented a comprehensive mitigation case to the jury. A mitigation specialist was hired and a social history report produced. As acknowledged earlier, the mitigation investigation did not proceed without interruptions. Ms. Francis testified that she only visited with Nelson twice, and she normally likes to see and talk with the client as much as possible. She also testified that once Ms. Haddad stopped working on the case, she should have notified the attorneys that her firm needed to be removed from the case and another person hired. However, she admitted that she "dropped the ball." (Evid. Tr. 495). However, despite "dropping the ball," Ms. Francis testified that she and the individuals working for her spent over 400 hours working on Nelson's case. (Evid. Tr. 507-08). This is not a case where only scant mitigation evidence was presented. Rather, the mitigation case was presented over a period of two days and Nelson's attorneys called seventeen witnesses to testify on his behalf. The witnesses included his mother, aunts, siblings, a former teacher, principal, family friends, a landlord, prison guards, an employer, former babysitter and her daughter and an expert forensic psychologist. Nelson also introduced a recorded conversation with his girlfriend, who is the mother of Nelson's child. The witnesses recounted the abuse suffered by Nelson, his siblings and his mother at the hands of his father, Kenneth Morse. The jury also heard testimony regarding Keith Nelson's chaotic home life including the family's frequent moves. Testimony was also given by the former babysitter who testified to the abuse Keith suffered at the hands of her husband. Nelson's former teacher also testified that Keith Nelson was in special education classes at school and that school was difficult for him. Dr. Mark Cunningham, a clinical

and forensic psychologist also testified concerning the effect of childhood abuse and neglect on Nelson's character and development. Thus, unlike Wiggins, where "no evidence of Wiggins' life history" was presented, in the instant case, the Court finds that although the mitigation case was not perfect, it was more than adequate. Unlike Wiggins, Nelson's habeas counsel has not uncovered any "powerful" new evidence. Rather, habeas counsel has simply discovered a larger quantity of mitigation evidence. It is always possible to discover additional records or new witnesses, the more time that is available. However, with over 400 hours devoted to the case, the Court finds that the mitigation evidence which was discovered and the mitigation case which was initially presented to the jury was sufficient. The Court is unsure why Berrigan did not request a continuance due to his surgery. As noted above, it is possible that more witnesses or evidence could have been uncovered if the case had been continued. However, Nelson has not shown that Berrigan's failure to request a continuance affected the mitigation case which his counsel presented. Thus, the Court finds that Nelson's counsel was not deficient in either the mitigation investigation or presentation of the mitigation case. Accordingly, the Court hereby **DENIES** relief on Claim A(2) - Failure to conduct an adequate mitigation investigation and Claim A(3) – Failure to move for a continuance to complete one.

**B. Failure to Conduct Adequate Investigation of Nelson's Mental Health and Advising or instructing Nelson to Decline to Submit to a Mental Health Examination by a Government Examiner – Claims A (4) & (5)**

**1. Mental Health Investigation**

As early as the spring of 2000, the defense team was aware that mental health would play an important role in the case. Larry Pace testified that mental health is

always an important consideration in a death penalty case. (Evid. Tr. 608). In support of a motion to continue the trial, defense counsel informed this Court that two of Nelson's brothers had been diagnosed with schizophrenia and that further mental health evaluations needed to be completed. (Evid. Tr. 33.) In a note from her files regarding a defense team meeting on November 17, 2000, Ms. Francis chronicled the team's discussion of obtaining a neuropsychologist. (Evid. Tr. 40-41.) As a result, Dr. Dennis Cowan, who was local and highly recommended, was hired. (Evid. Tr. 42.) By December 12, 2000, Dr. Mark Cunningham was hired to review the records that had been collected and to serve as a "teaching witness" on Nelson's traumatic background for the jury. (Evid. Tr. 43-44.) After Berrigan became involved with the case he began handling the bulk of the mitigation responsibilities, including the mental health issues. Berrigan believed that a neuropsychological examination needed to be done and was aware that Dr. Cowan had been approved by this Court. Dr. Cowan was poised to conduct an examination and evaluation of Nelson. (Evid. Tr. 196.) Berrigan's CJA worksheet (Evid. Hrg. Exh. P17A) indicates that he called Dr. Cowan the day before the evaluation was scheduled to occur and canceled it. (Evid. Tr. 198.) Berrigan testified that he canceled Dr. Cowan's evaluation because he had had prior experience with Dr. Cowan and thought that he could obtain someone with more of a national reputation. (Evid. Tr. 199.) Additionally, Berrigan had just been appointed to the case and did not feel the need to use an expert chosen by another attorney. Berrigan admitted that he wanted to wait and do the mental evaluation later in the case, once he knew more about the case and at a time when he had a better handle on the discoverability of what he uncovered. (Evid. Tr. 199-200.). However, Berrigan never commissioned a

neuropsychological evaluation and testified that "we dropped the ball. It should have happened. Other things came up to the forefront, and I never got back to it. There's no excuse, really no excuse at all." (Evid. Tr. 200). Berrigan admitted that in another § 2255 case he handled, he also testified that he had dropped the ball on certain aspects of the client's representation. Berrigan agreed that the death penalty in that case was set aside and the penalty phase was going to be retried. He admitted that he has a philosophical opposition to the death penalty and that when a court sets aside a death sentence, it gives his client another bite at the apple. (Evid. Tr. 259-260). No assessment of Nelson for brain damage, dysfunction or other cognitive impairment was ever conducted. (Evid. Tr. 196).

**2. Advising Nelson To Decline Examination by Government Mental Health Expert Witnesses**

The record clearly establishes that after Berrigan was appointed to the case, he filed a number of motions on how, when, and if the Government would be allowed to conduct a mental health evaluation of Nelson. Once this Court ordered the evaluation, Berrigan systematically objected to the manner in which the evaluation would be conducted and attempted to have the court intervene on what subjects, if any, the Government could question Nelson about. The litigation in this area began in May 2001 and continued until after Nelson pled guilty. Berrigan testified that he had past bad experiences in death penalty cases with mental health evidence and indicated that ". . . the problem with neuropsych testing is certainly if you don't talk about the defendant's history, that's going to be the subject of cross-examination by the government prosecutors. If you had a neurologist, that really isn't part of their job. I mean, somebody

who's just doing, for example, objective medical testing, such as brain imaging, doesn't really have occasion to have any discussion with the client about their history or the events of the alleged crime." (Evid. Tr. 219.) Tena Francis testified and her records confirm that Berrigan was skeptical about a neuropsychological examination and wanted more objective testing, or something along the lines of a neurological evaluation. Finally, Berrigan explained that the discoverability of mental health evidence was not well-settled under federal law at the time of Nelson's trial (2001). While on the witness stand, this Court asked Berrigan to explain his concern with the Government's examination of Nelson's mental health. Berrigan explained that in 2000 in state court, the law was that if the defense put on mental health evidence, the Government would have the opportunity to examine the defendant. In Berrigan's experience, if the Government put on its psychologist in the penalty phase, it "was devastating testimony" and he lost his case. (Evid. Tr. 227.) Consequently, Berrigan wanted to delay any examination, so as to not give the Government additional, damaging evidence. Berrigan was aware that the Government had sent Dr. Dan Martell and Dr. Park Dietz to see Nelson at CCA and that Nelson refused to see Dr. Martell (and would have refused to see Dr. Dietz). (Evid. Tr. 234.). Berrigan testified that he was familiar with Dr. Martell (neuropsychologist) and Dr. Dietz (psychologist) and that both doctors had a national reputation. Berrigan's main concern about these two experts was that they would be biased against his client and would therefore be "pro-government." Berrigan believed they would testify in a way that would effectively refute Nelson's defense and he did not want them to be the last witnesses the jury heard from before beginning deliberations. Berrigan indicated that those fears, in part, were the reason why he engaged in a

protracted litigation to prevent the Government from being able to conduct its own mental health evaluation. (Evid. Tr. 264.). In the end, the Court allowed Nelson to present the testimony of Dr. Cunningham. Dr. Cunningham was able to provide some expert mental health testimony about Nelson, but he did so from a review of the records, rather than an interview with Nelson. Consequently, Berrigan was able to prevent the negative mental health testimony of the Government experts he feared, but he was only able to introduce some limited mental health evidence that discussed Nelson's horrible childhood environment. Berrigan further explained that the advice to not submit to an interview ". . . was the strategic decision I made, and I advocated it very strongly." (Evid. Tr. 265.) Nelson could have gone against that advice, but did not. (Evid. Tr. 265-66.). Berrigan supported this strategy by challenging the Government's ability to conduct its own mental health evaluation at every turn. Only when he was unsuccessful, did he reach the calculated, strategic decision to recommend to Nelson that he not cooperate with the Government's evaluation. Berrigan admitted that this strategy was a product of his professional experience handling a number of death penalty cases. In those cases, Berrigan explained, if the last thing the jury heard before beginning deliberations was the Government's mental health expert, he lost. Berrigan's decision was to have Nelson exposed to less evidence that could result in the jury finding that the aggravating factors outweighed any mitigating factors, resulting in a hope that Nelson would receive a life sentence.

**3. Mental Health Testimony Nelson Claims Should Have Been Presented.**

During the evidentiary hearing, Nelson called several expert witnesses to testify regarding his brain damage. Dr. Carolyn Crawford, a neonatologist, summarized the

myriad problems which were documented in Nelson's birth records, including compromised neurological development. (Evid. Tr. 514-526). However, during the evidentiary hearing, Dr. Crawford testified that information/studies on areas of brain injury and brain damage were not available in 2001 – she could testify in terms of risk factors, but she could not have offered this same testimony (i.e. the lingering effects of prenatal and neonatal insults) based upon her review of the records back in 2001. (Evid. Tr. 525.).

Dr. Reuben Gur, neuropsychologist with a specialty in brain imaging and behavior also testified. Dr. Gur testified that the MRI test, the PET test and the neuropsych testing all showed frontal system damage in Mr. Nelson's brain. (Evid. Tr. 582). Dr. Gur opined that the abnormalities in Mr. Nelson's brain were important for regulating behavior. However, Dr. Gur admitted that he had not actually conducted a neuropsychological evaluation of Mr. Nelson. Dr. Gur also admitted that in his testing there was no comparative value for the lesion found in Nelson's brain imaging by looking at Exhibit P80 at 11. (Evid. Tr. 600-01.) Consequently, with no baseline comparison value, his imaging provides no useful information.

Dr. Dan Martell, a forensic neuropsychologist, who studies the brain and behavior, and particularly the effects of brain damage on human behavior, testified as a government witness. (Evid. Tr. 631.) Government Exhibit 118A is his CV, and Government Exhibit 118 is a copy of his report on Nelson. (Evid. Tr. 634.) He evaluated Nelson on September 9-10, 2010, for 9 1/2 hours at Terre Haute. (Evid. Tr. 635-36.) He previously attempted to evaluate Nelson earlier in the fall of 2001 at the Government's request, but Nelson refused to be evaluated. (Evid. Tr. 636.) Despite the level of brain

impairment from the testing and examination, Dr. Martell testified that looking at Nelson's behavior in the course of committing the crime, there was no finding of impulsivity. Dr. Martell continued by stating that Nelson tried to carry out his fantasy on another victim, and when that did not work, he selected another youthful, more easily controlled victim. Nelson laid in wait, hid himself, brought electrical cords to bind the victim, kidnapped her, he took off at a high rate of speed in such a way that people would not be able to see him or identify him. He took the victim to a secluded area, bound her up so she could not get away – these things, Dr. Martell argued, show planning as opposed to impulsive acting out. For those reasons, Dr. Martell did not believe that Nelson's brain damage played a significant role in him committing this crime. (Evid. Tr. 649.). Dr. Martell also testified that he did not believe that Nelson met the standards with regard to not understanding the wrongfulness of his behavior, because Nelson attempted to avoid being seen and attempted to get rid of incriminating evidence. Dr. Martell testified, "If you didn't know it was wrong, there's no reason to get rid of the truck, to wipe it down for evidence, to try and remove fibers from the crime scene that could identify him." (Evid. Tr. 650). Dr. Martell testified that he had reviewed the reports of Dr. Daniel Foster, Dr. Michael Gelbort, Natalie Novick Brown, Dr. Xavier Amador, Dr. Carolyn Crawford, Dr. Leslie Lebowitz, Dr. Ruben Gur, a social history report prepared by Jill Miller and one of the dermatological reports from Dr. Roger Jones. Dr. Martell testified that none of these reports changed his opinions regarding Nelson. (Evid. Tr. 651,656-659).

#### 4. Standard

> In the context of a claim that relates to the failure to pursue a mitigation strategy based on expert psychological testimony, the focus is on whether counsel conducted an adequate investigation and whether counsel's decision to refrain from further investigation and presentation of mental health mitigation was reasonable. . . .It must be determined whether there was any reasonable justification for counsel's conduct and whether the course of action taken by counsel would not have been taken by any reasonably competent attorney.

Honken v. U.S., 42 F.Supp.3d 1090-91(internal citations omitted).

> The extent of trial counsel's preparation for the mitigation phase does not have to be "ideal," and the court's inquiry must not disregard what trial counsel *did* do. [Worthington v. Roper, 631 F.3d 487, 501 (8th Cir. 2011)]. Deficient performance is established only "'where the record is clear that no reasonable attorney . . .would have failed to pursue further evidence.'" Id. (quoting Link [v. Luebbers], 469 F.3d at 1203).

Johnson v. U.S., 860 F.Supp.2d 663, 878 (N.D.Iowa 2012).

#### 5. Was Counsel's Performance Deficient?

Berrigan testified at the evidentiary hearing that when the case was tried in 2001, the established norms of capital defense representation required an investigation into a defendant's mental health. (Evid. Tr. 193). Berrigan testified that coming into the case, he knew according to the standard of care and practice, "that there should be a psychological examination, evaluation, investigation of Mr. Nelson." (Evid. Tr. 195). Berrigan testified that he had never changed his mind about the need for a neurological or neuropsychological examination of Nelson, he intended to get it done eventually, but it was never scheduled. (Evid. Tr. 200).

Habeas counsel argue that when Berrigan accepted the case he was overworked and over-committed and he was working under an incorrect assumption that he would get only one continuance of the trial date. Habeas counsel argue that during the time he

was appointed on Nelson's case, Berrigan spent six weeks preparing for and trying a capital case in Kansas, he had U.S. Supreme Court deadlines in two or three capital cases where executions were pending, he was involved in another federal capital case in Iowa, he was involved in a complex medical malpractice case until July 2001, he underwent quintuple coronary artery bypass surgery on August 8, 2001 and on the same day he underwent surgery, he accepted an appointment in another demanding capital case in Kansas. When he entered the case, Berrigan informed his co-counsel, Susan Hunt, that he would be solely responsible for the mitigation case and that he would be "calling all the shots on mitigation issues." (Evid. Tr. 100). One of the first things Berrigan did was cancel the neuropsychological assessment that Dr. Cowan was scheduled to conduct, even though he testified that he knew that the issue of "potential neurological impairment and neurological deficits" was something which needed to be explored. (Evid. Tr. 197). When Berrigan was asked at the evidentiary hearing about whether he should have accepted the Nelson case, he testified:

> Looking back, no, no. I have the most -- utmost respect for Judge Hays. In fact, I think she's a brilliant judge, and I've had nothing but wonderful experiences with her. And the same is true of Judge Gaitan, frankly, who I've known almost -- I've known him since the start of my legal career and both as a state court trial judge and appellate judge and a federal district judge. And I think looking back in my desire not to disappoint them in some way and the trust that they had put in me in taking Mr. Nelson's case, somehow blinded me to my responsibilities to Mr. Nelson, and there's no real good excuse for that. It's nothing but pride and conceit, and I regret it now that I ever agreed to get involved in the case. . . . .I was very busy.

(Evid. Tr. 244-45).

Habeas counsel argue that this is "not a case where counsel acted out of ignorance of prevailing professional norms or did not know how to go about investigating potential neurocognitive deficits. Instead, this is a case where counsel

were aware of their obligations but failed to meet them." (Nelson's Proposed Findings of Fact, p. 17).

The Court agrees that this is not a case where counsel acted out of ignorance or did not know how to go about investigating the mental health issues involved in this case. However, the Court does not find the reasons offered by counsel for failing to conduct the necessary mental health investigation to be credible. The reasons advanced by Berrigan that he "just dropped the ball" on finding a replacement neuropsychologist for Dr. Cowan (Evid. Tr. P. 229) or that he was blinded to his responsibilities by pride and conceit (Evid. Tr. 244-45), are simply unbelievable. Rather, the Court sees this as a calculated strategy to act in a manner which is obviously deficient, so that on habeas review the Court will set aside the sentence. This is a strategy which Berrigan recently successfully employed in another capital habeas case. See Johnson v. U.S., 860 F.Supp.2d 663 (2012). In that case, Berrigan initially hired a mental health expert, Dr. Logan and directed him to explore Johnson's mental state at the time of the offenses. However, shortly thereafter, before Dr. Logan's second interview with Johnson, Berrigan directed Dr. Logan not to interview Johnson about or to address in any way, her mental state at the time of the offenses. Johnson argued that even after Dr. Logan identified a number of "red flags" suggesting that she suffered from brain impairment, Berrigan did nothing to follow up on those red flags. Johnson also argued that Berrigan made no effort to keep Dr. Logan working or to initiate investigations by other mental health experts until shortly before her trial. She also argues that her counsel "bungled" their way through the requirements of Fed.R.Crim.P. 12.2. In that case, Berrigan admitted that his decision to preclude mental health

evidence relating to her mental state at the time of the offenses was "a horrible mistake." Id. at 882. The Court further noted that the reason advanced by Berrigan for failing to present mental health evidence – because he had had a bad experience with the disclosure of mental health evidence in a capital case years earlier- a "once burnt, twice shy" excuse was not sufficient. The Court noted:

> Learned Counsel [Berrigan] did not do any real independent analysis-and certainly no consultation with either Johnson's trial experts or the other members of the trial team-of the issues presented by this case before rejecting that line of mitigation. If Learned Counsel's decision to reject such a mitigation defense was in some sense strategic, it was the worst strategic decision by any defense counsel that I have ever seen in my entire career: It effectively doomed Johnson's mitigation case from the start.

Id. at 886. The Court in that case found Berrigan's performance to be deficient. The Court also concluded that Johnson established prejudice because the expert testimony of brain dysfunction and impairment presented at the evidentiary hearing "paints a dramatically different picture of Johnson at the time of the offenses than trial counsel presented and offers a connection between her mental state and her conduct at the time of the offenses that was completely or almost completely missing from the trial presentation." Id. at 890. The Court concluded that Johnson was entitled to relief from the verdicts because there was a "'reasonable probability that a competent attorney, aware of the available mitigating evidence would have introduced it at sentencing, and that had the jury been confronted with this mitigating evidence, there is a reasonable probability that it would have returned with a different sentence.'" Id. 891 (quoting Sinisterra v. United States, 600 F.3d 900, 906 (8th Cir. 2010)).

In the instant case, the Court also finds that Berrigan's performance regarding

investigation and presentation of the mental health testimony to be deficient. As noted above, at the time that Berrigan became involved with the case, the neuropsychologist, Dr. Cowan, had been hired and was ready to conduct his examination. However, the day before the examination, Berrigan cancelled the appointment. Berrigan testified that the evaluation should have taken place, but “we dropped the ball. It should have happened. Other things came up to the forefront, and I never got back to it. There’s no excuse, really no excuse at all.” (Evid. Tr. 200). Likewise, the Court also finds unbelievable Berrigan’s explanation for why he did not have other mental assessments or examinations conducted of Nelson. Berrigan testified that in 2000, the law was unsettled regarding whether the government could examine a defendant if the defendant introduced evidence of mental health issues in the penalty phase. Berrigan testified that “I was hoping, frankly, you [the Court] might make the decision that maybe this evidence shouldn’t come in, but it became very clear to me in the course of litigation and certainly in front of Magistrate Hays, that the government was going to get a mental health evaluation of our client if we went ahead and tried to put in mental health evidence of any form.” (Evid. Tr. 228). “But we did litigate the issue does the government get access to Mr. Nelson, and the question had been resolved unequivocally, yes, if you go ahead, Berrigan, and put on any psych testimony in this case, even in the penalty phase, they get access to Mr. Nelson, and that means they get to testify. And I thought that was a bad idea.” (Evid. Tr. 229).

As early as May 2001, the Government had filed a motion seeking a psychiatric examination of Nelson. (Case No. 99-303, Doc. # 231). Berrigan objected to the scope of the information sought and also asserted that the Court should not compel Nelson to submit to a mental health examination by government experts. Alternatively, the defendant argued that if the Court compelled the defendant to undergo a government examination, it should impose significant safeguards. On August 17, 2001, Magistrate

Hays entered an Order which granted in part the Government's Motion and imposed safeguards to preserve Nelson's rights. One of the safeguards imposed by the Court was that the results of any court-ordered examination as well as the results of any examination initiated by the defendant were to be filed under seal prior to the start of trial. The results were to be released only in the event of a guilty verdict and after the defendant confirmed his intent to offer mental health or mental condition evidence in mitigation. On September 4, 2001, defendant filed his Notice of Intent to Rely on Mental Health Evidence at the Penalty Phase of Trial. Defendant indicated that he intended to rely on the testimony of Dr. Dan Foster. As of the date of that filing, defendant indicated that Dr. Foster had not completed his evaluation of the defendant and no information as to his diagnostic conclusions was currently available. On September 21, 2001, defendant filed an appeal of Magistrate Hays' Order. On October 15, 2001, a government expert attempted to examine and conduct psychological testing of the defendant. However, Nelson refused to participate in such examination. In an Order dated October 26, 2001, the Court affirmed Judge Hay's August 17, 2001 Order, noting that the Eighth Circuit had recently stated in United States v. Allen, 247 F.3d 741 (8th Cir. 2001), "[t]here is no doubt that a district court has the authority to order a defendant who states that he will use evidence from his own psychiatric examination in the penalty phase of a trial to undergo a psychiatric examination by a government-selected psychiatrist before the start of the penalty phase." Id. at 773, citing, United States v. Webster, 162 F.3d 308, 338-40 (5th Cir. 1998), cert. denied, 528 U.S. 829 (1999). "The government must be able to put on a fair rebuttal to a defendant's mitigation evidence during sentencing." Allen, 247 F.3d at 773. The Government then subsequently filed on October 26, 2001, a motion to bar defendant from presenting any mental health testimony. In an Order dated November 15, 2001, the Court asked defendant to submit in camera, an outline of specifically what mental health testimony he intended to present

in mitigation, and to outline which witnesses would be testifying regarding this issue and whether the testimony of these witnesses would be based on a personal examination they conducted of the defendant or whether their testimony would be based on other matters, such as a review of the defendant's medical records. In materials submitted to the Court, Berrigan indicated that he intended to offer the testimony of two psychologists: Dr. Mark Cunningham and Dr. Daniel Foster. These witness would testify in basically three areas: 1) Testimony of Dr. Cunningham related to the defendant's future dangerousness; 2) Testimony of Dr. Cunningham related to risk factors and developmental obstacles which the defendant has exhibited and faced in childhood and adolescence. Berrigan stated that the testimony of Dr. Cunningham, although psychological testimony, is not based on interviews with the defendant and will not attempt to explore Dr. Cunningham's opinions regarding the defendant's mental health, his psychological profile, any mental health diagnoses or any other psychological testimony pertaining specifically to the defendant. 3) Testimony of Dr. Foster. Berrigan stated that Dr. Foster is the forensic psychologist hired by the defense to evaluate the defendant's mental health. Dr. Foster met with Nelson for approximately nine hours and had also reviewed written materials. Berrigan indicated that he was unable to speak with Dr. Foster, but counsel stated he is not at all sure that Dr. Foster could base his mental health testimony regarding the defendant's pervasive developmental disorder on the memorandums and information provided by counsel alone. This Court concluded that the testimony of Dr. Foster would not be allowed, as it appeared that his testimony would be based at least in part on interviews conducted with the defendant. The court allowed the testimony of Dr. Cunningham on 1) future dangerousness and 2) psychological testimony relating to risk factors and developmental obstacles, because this testimony was not based on any interviews with or psychological tests of the defendant. (Case No. 99-303, Doc. # 403). Thus, it should

have been obvious to Berrigan, shortly after his entry into the case that he would only be allowed to present mental health evidence in mitigation if the Government was also allowed an opportunity to conduct its own examination of the defendant. However, without knowing what the results of the examination would be, there is no reasonable basis for directing Nelson to refuse the examination.

As habeas counsel noted, "that litigation took place in a vacuum since the defense had not investigated Mr. Nelson's mental health and had no mental health case to present or protect." (Nelson's Proposed Findings of Fact and Conclusions of Law, p. 26). Habeas counsel also argue that it was unreasonable for Berrigan not to have Nelson examined, because "any defense mental-health evidence could be withdrawn if that evaluation were deemed harmful and the Government's experts would not be permitted to testify since their sole purpose was to rebut any defense case." (Nelson's Proposed Findings, p. 27).

The Court agrees and concludes that Berrigan was strategically deficient in cancelling the neuropsychological examination of Nelson and in failing to reschedule such examination and also in failing to have any other assessments conducted to assess whether Nelson suffered any brain damage, dysfunction or other cognitive impairments. The Court also finds that Berrigan was strategically deficient in advising Nelson not to submit to an examination by government experts, which effectively prevented him from presenting any mental health evidence in the mitigation phase.

**6. Was the Failure to Present Mental Health Evidence and Testimony Prejudicial?**

As discussed above, the Strickland inquiry has two prongs and both prongs must be satisfied before relief is granted. To establish prejudice, petitioner "must establish a 'reasonable probability that a competent attorney, aware of the available mitigating evidence would have introduced it at sentencing, and that had the jury been confronted

with this mitigating evidence, there is a reasonable probability that it would have returned with a different sentence.'" Sinisterra, 600 F.3d at 906 (quoting Wong v.Belmontes, 558 U.S. at __, 130 S.Ct. 383,386, 175 L.Ed.2d 328 (2009)).

> "A claim of ineffective assistance based on the failure to consult and call an expert requires 'evidence of what a scientific expert would have stated' at trial in order to establish Strickland prejudice." Rodela-Aguilar v. United States, 596 F.3d 457,462 (8th Cir.2010)(quoting Day v.Quarterman, 566 F.3d 527,538 (5th Cir. 2009) and also citing Delgado v. United States, 162 F.3d 981,983 (8th Cir.1998)). Even if counsel performed deficiently in failing to present more favorable expert testimony, a petitioner may not be able to prove prejudice, if the prosecution already had in its hands strong contrary expert testimony. See Cole v. Roper, 623 F.3d 1183, 1190 (8th Cir.2010). Similarly, a petitioner cannot show prejudice merely by showing that more documentation could have been offered to support a testifying expert's opinion; the petitioner must show that there is a reasonable probability that the jurors' decision would have been different, had all of the supporting documentation been introduced. Williams, 612 F.3d at 956.

Johnson, 860 F.Supp.2d at 880.

In the instant case, as discussed above, habeas counsel have shown what type of mental health evidence could have been presented during the mitigation phase, had Berrigan and other members of the trial team adequately investigated Nelson's mental health. For example, Dr. Carolyn Crawford identified compromised neurological development Nelson suffered after his birth. The neuropsychological testing and imaging performed as part of the post-conviction challenge, showed that Nelson performed significantly below normal levels on standard testing instruments. Dr. Gur's analysis examined data from the neuropsychological testing, an MRI and a PET scan. This data confirmed that Nelson suffered brain damage.

In Sears v. Upton, 561 U.S. 945, 130 S.Ct. 3259, 177 L.Ed.2d 1025 (2010), the Supreme Court stated:

> "To assess [the] probability [of a different outcome under Strickland], we consider the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding-and reweig[h] it against the evidence in aggravation." [Porter v. McCollum], 558 U.S., at __ [,130 S.Ct., at 453-54](internal quotation marks omitted; third alteration in original).
> That same standard applies – and will necessarily require a court to "speculate" as to the effect of the new evidence- regardless of how much or how little mitigation evidence was presented during the initial penalty phase. . . .In all circumstances, this is the proper prejudice standard for evaluating a claim of ineffective representation in the context of a penalty phase mitigation investigation.

Id. at 956.

In the instant case, the Court is convinced that even when the additional evidence of brain damage is added to the mitigation side of the scale, that the outcome would have been the same. In other words, the Court finds that Nelson has not shown that there is a reasonable probability that even one juror's decision would have been different.

**7. Aggravation Evidence**

The Government presented thirty witnesses over a two day period. James Shannon Robinson testified that on September 29, 1999, Nelson picked him up at a temporary labor service to do construction work. (Trial Tr. 90-91.) During the day they spent working together, Nelson revealed to Mr. Robinson that he wanted to kidnap a female, take her to a remote location where he could torture her, rape her, electrocute her, and then kill and bury her. (Trial Tr. 95.) Nelson bragged that he was going back to the penitentiary anyway, and "wanted to go for something big." (Trial Tr. 96.) Mr. Robinson did not report this to the authorities at the time because he simply did not believe Nelson. (Trial Tr. 99.). Only ten days before the kidnapping of Pamela Butler on

October 2, 1999, in the middle of the night, Nelson, holding a knife to the throat of Michanne Mattson, a medical student, attempted to drag her kicking and struggling from her apartment parking lot to his white Ford pickup. (Trial Tr. 105, 118, 146.) Ms. Mattson testified that she finally dropped limply to the pavement. Despite the fact that Nelson had managed to get handcuffs around one of her wrists, he could drag her no more, and he broke off the attack, warning her over and over, “If you look at me, bitch, I’ll kill you.” (Trial Tr. 115-16.) Nelson fled in his pickup truck.

Around 4:00 p.m., on Tuesday, October 12, 1999, Nelson told a friend of his that he knew where a 14-year-old girl was and that “right now is the time to get her, take her, kill her, rape her.” (Trial Tr. 149.) A little over one hour later in Kansas City, Kansas, ten-year-old Pamela Butler left her home on her roller skates to go one and one-half blocks to the local gas station to buy some cookies and soda. (Trial Tr. 171-75, 188-89.) Her sister, 11-year-old Penny Butler, was playing on the front porch and watched her sister leave. (Trial Tr. 174.)

Meanwhile, a white Ford pickup, with the driver’s door left ajar, had parked along Scott Street, the route Pamela had taken many times before. (Trial Tr. 61-63, 175.) She skated the same route home, and as she neared the pickup, Nelson “came up from out the truck and grabbed her and threw her in the truck and slammed the door.” (Trial Tr. 176.) Seeing this, Penny Butler began screaming. (Trial Tr. 176, 189.) Hearing her screams, her teenage sister Casey Eaton came out of the house and looked to where Penny was pointing and saw a white pickup pulling away. (Trial Tr. 189.) As the pickup drove past the screaming girls, Nelson gestured to them with his middle finger. (Trial Tr. 177, 192.) The sounds of the screams and the squealing of tires attracted the attention

of Paul Wilt who was sitting in his truck visiting a friend nearby. (Trial Tr. 206.) Mr. Wilt gave chase and, although he eventually lost sight of Nelson's truck, he was able to get its license tag number – 177CE2. (Trial Tr. 210.) Between 6:30 p.m. and 7:00 p.m. that same evening, Carl and Shirley Condra drove to their church, the Grain Valley, Missouri, Christian Church, on an errand. Parked behind the church was a white Ford pickup, license plate number 177CE2. The truck was unlocked and empty. Suspicious of the truck, they tried to find a police officer. Finding none, they went home. After seeing the 10:00 p.m. news of the abduction and description of the truck used, they immediately called the police. (Trial Tr. 69-70.) Sometime around 8:00 p.m. or thereafter that same evening, Nelson drove to his mother's house in Kansas City, Missouri. (Trial Tr. 77.) He and his mother drove to the Oasis Bar which was a block and a half away from the victim Pamela Butler's home. (Trial Tr. 77.) While Nancy Nelson drank, her son played a video game. (Trial Tr. 89, 699.) After leaving the bar, they stopped at the gas station where Pamela Butler had bought her cookies and soda. Nelson purchased Pepsi and some cigarettes. (Trial Tr. 700-01.) Nelson and his mother were at his girlfriend's house when the news was broadcast about Pamela Butler's abduction. Nelson registered no anxiety, no remorse, no grief, or other reaction. They left and returned to Nancy Nelson's residence. (Trial Tr. 77, 699-702.) At around 11:00 p.m., Patti Griffith, the next-door neighbor to Nancy Nelson, saw Nelson on the passenger side of the white pickup wiping the dashboard and underneath areas while periodically glancing up and down the street. (Trial Tr. 220-22.) Later that same night, Mrs. Griffith was awakened by a noise. When she looked out of her window, she noticed that the pickup truck was gone and that Nelson was pacing around in his yard. (Trial Tr. 223-24.) Around 2:00

a.m., in the morning of Wednesday, October 13th, Nelson called for a cab. The dispatcher who took the call remembered him as calm, as "real cool" and "cool as a cucumber," even to the point of telling her a joke. (Trial Tr. 226-27.) Around 9:00 a.m., on Wednesday morning, the white Ford pickup truck, license number 177CE2, was found abandoned ten blocks from Nelson's residence. (Trial Tr. 79.) The truck, which appeared to have been recently cleaned, had been left unlocked with the keys lying on the floorboard. (Trial Tr. 79-80, 252-53.) The manhunt for Nelson and the search for 10-year-old Pamela Butler continued throughout Wednesday with no success except for a brief sighting of Nelson in the vicinity of his girlfriend's home. (Trial Tr. 233-36.)

On Thursday, October 14th, Laurie Torrez, a civilian employee of the Kansas City, Kansas Police Department, took lunch to her husband at the Santa Fe rail yards and, taking a detour along the dike road (Trial Tr. 237-39), spotted Nelson under the 18th Street Bridge. She called the police. (Trial Tr. 240-41.) Nelson had injured his leg while attempting to lower himself from the bridge and, being unable to escape, submitted to capture. (Trial Tr. 585-87.) Before a helicopter arrived to extract him from the area, a considerable crowd of watchers had assembled. (Trial Tr. 266-68.) From somewhere in the crowd, a voice yelled out, "What about the girl?" (Trial Tr. 268.) Nelson looked at Officer Keith, the arresting officer, and said, "I know where she's at, but I'm not saying right now." (Trial Tr. 269.) Later that same day, a complaint was filed against Nelson for the kidnapping of 10-year-old Pamela Butler. Her body, however, had not yet been found. The information provided by Mr. and Mrs. Condra had prompted law enforcement to intensify searching efforts on the fields, woods, and ponds in the vicinity of the Grain Valley, Missouri, Christian Church.

On Friday, October 15, law enforcement personnel, searching shoulder to shoulder in the woods and fields east of the church, discovered the white sports bra Pamela had last been wearing. Nearby, they found her underpants, and then ten-year-old Pamela Butler's nude body was found buried under a pile of brush. (Trial Tr. 85, 285-93.) A wire ligature was wrapped around her throat. (Trial Tr. 303, 319.)

Results of the autopsy revealed numerous scrapes and abrasions and blunt trauma injury to Pamela Butler's mouth and head. (Trial Tr. 321-27.) Her hymen had been torn near the time of death and there was evidence of redness and irritation in the genital area consistent with a sexual assault having occurred. (Trial Tr. 327-29.) The cause of her death was strangulation. (Trial Tr. 329.)

Pamela Butler's underpants were submitted to the Federal Bureau of Investigation for DNA analysis. (Trial Tr. 87.) Examination revealed the presence of semen in the crotch area of her underpants. (Trial Tr. 345.) When compared to a sample of Nelson's blood, test results conclusively showed that he was the source of the DNA in the semen stain. (Trial Tr. 346.)

On April 5, 2000, the Government filed a notice of intent to seek the death penalty (amended June 9, 2000), alleging both statutory and non-statutory aggravators. Among the non-statutory aggravators alleged was that the offense was particularly cruel and involved serious mental and physical abuse to this child and that Nelson completely lacked remorse for having killed her. These allegations were most evident from the trial testimonies of inmate Frazier, who described the torture cell Nelson intended to build in order to hold his victims captive before raping and killing them. (Trial Tr. 503-04.) Inmate Bailey testified that he overheard Nelson mimicking the child's "high-pitched

screams . . . cries for mommy. Help me. Don't hurt me. Don't kill me." (Trial Tr. 362.) In obvious disgust, Bailey asked Nelson "[h]ow could [he] do that to that little girl?" Nelson simply responded, "You wouldn't believe it." (Trial Tr. 363.)

In addition to the horrific facts of the case, the jury heard evidence about the uniqueness of victim Pamela Butler and the impact of her death on the lives of her family, and that Nelson had, among other things, three prior Missouri state convictions for stealing and a conviction for attempted escape from custody. (Trial Tr. 475-77.) Other evidence presented included information that while in custody on this offense at CCA, Nelson talked about escaping (Trial Tr. 518-19), he unraveled a section of the prison fencing (Trial Tr. 520-21), and he fashioned two workable handcuff keys. (Trial Tr. 424-26.) Nelson threatened to mace his State probation officer (Trial Tr. 486), and while at CCA, in an unprovoked assault, he beat a correctional officer (Trial Tr. 455) and threatened to kill yet another correctional officer. (Trial Tr. 589.).

**8. Mitigation Evidence**

As detailed above, Nelson presented numerous mitigation witnesses, including his mother, his aunts, siblings, a former teacher and principal, family friends, a landlord, prison guards, an employer, former babysitter and her daughter and a forensic psychologist, Dr. Cunningham. The jury heard the testimony of these witnesses describe Nelson's chaotic home life, the abuse suffered by Nelson and his mother at the hands of his violent father. The jury heard from Nelson's siblings how their mother was often absent and neglected them, the squalid living conditions that the family endured and how they often moved from place to place. There was also evidence presented describing the learning difficulties Nelson suffered throughout his years in school and

how he was placed in special education classes. A former employer testified that while Nelson worked for him he was pleasant and was a good worker. The jury also heard from a prison guard about how Nelson was often threatened and verbally harassed by other inmates while he was housed at CCA. There was also evidence presented describing the physical abuse that Nelson suffered as a child when his mother left him with a babysitter. Dr. Cunningham also testified concerning the effect of the childhood abuse and neglect on Nelson's character and development. In his testimony, Dr. Cunningham explained how the squalid condition and abusive and violent nature of Nelson's upbringing affected the formation of his character. Dr. Cunningham testified that Nelson would be less violent as he aged.

During the Evidentiary Hearing, habeas counsel allege that if Berrigan had adequately investigated and presented evidence of Nelson's mental health, the following additional evidence would have been presented to the jury:

●The neuropsychological examination conducted by Michael Gelbort, Ph.D. in 2005 (P53), which confirmed that Nelson suffered frontal lobe dysfunction.

● The assessment by Natalie Novik Brown, Ph.D. in 2006 in her preliminary investigation of Fetal Alcohol Spectrum Disorder (P48);

● The PET scan and MRI imaging conducted by a private imaging facility near Mr. Nelson's place of confinement in Terre Haute, Indiana in 2010 (P56 PET; P57 MRI);

●The findings of clinical psychologist Xavier Amador, Ph.D. (P60, 61, 62, 63). He testified that Nelson suffered from a cognitive disorder, not otherwise specified, post-traumatic stress disorder, psychotic disorder, not otherwise specified and a personality disorder which would impair his functioning. Dr. Amador also concluded that Nelson's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired. He also concluded that Nelson committed the offense under the influence of severe mental disturbances

that affected his perceptions, judgment, impulses and ability to conform his conduct. (Evid. Tr. 436-440). He also testified that he saw evidence of a frontal lobe disturbance. (Evid. Tr. 441).

● The neuroimaging study by Ruben Gur, Ph.D. (P58, 59, 81). Dr. Gur testified that Nelson had significantly reduced white matter in both the front and occipital lobes of his brain. Dr. Gur testified that the MRI, the PET and the neuropsychological testing all showed that Nelson had structural damage to the frontal lobe of his brain. Dr. Gur opined that Nelson's abnormalities would make it difficult for him to regulate his behavior, including his sexual impulses (Evid. Tr. 582-83).

● The analysis of Mr. Nelson's birth records by neonatologist Carolyn Crawford, M.D. (P45). Dr. Crawford testified that Nelson's mother received almost no pre-natal care, before Nelson was born. Additionally, she testified that Nelson was born prematurely and he suffered several complications after his birth which required him to be hospitalized.

● Dr. Martell's own findings (P54). With regard to Mr. Nelson, Dr. Martell identified "brain damage, brain dysfunction and neurological impairments". (T4.657.) Dr. Martell acknowledged that his findings – and the identical findings of the other experts – would be mitigating as to penalty. (Evid. Tr.657-58.)

In assessing whether Nelson has shown that he was prejudiced by Berrigan's actions and inactions regarding the presentation of his mental health evidence, and whether he has shown that there is a reasonable probability of a different outcome, the Court considered "the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding-and reweig[hed] it against the evidence in aggravation." Sears v. Upton, 561 U.S. at 956. After reweighing the evidence, the Court is convinced that the result would have been the same. While the circumstances surrounding Nelson's birth, childhood and early adulthood are distressing and why they may help to explain why he acted as he did, the Court does not believe that there is a reasonable probability that even one juror would have voted to sentence Nelson to life in prison. This conclusion is bolstered by the fact that only a single juror

found the existence of only one mitigating factor – that "being subjected to physical and emotional abuse as a small child permanently altered Keith Dwayne Nelson's psyche and personality and detracted from his ability to be a successful and insightful adult." No jurors voted in favor of any of the remaining nine mitigating factors[4]. (Case No. 99-303, Jury Verdict, Doc. No. 420). The aggravating evidence of the crime and the victim impact testimony was simply too overwhelming. No amount of mental health evidence or testimony relating to brain damage and a difficult upbringing could overcome the fact that Nelson kidnapped a ten-year old girl who had roller skated to the store to buy cookies, sexually assaulted her, strangled her and left her naked body in the woods. For these reasons the Court **DENIES** Nelson's Claim of Ineffective Assistance of Counsel on Claim A(4) - Failure to conduct adequate investigation of defendant's mental health and Claim A(5) - Advising or instructing defendant to decline to submit to a mental health examination by a government examiner.

[4] The other mitigating factors submitted were:
2. "Many years of gross neglect and a lack of parental supervision contributed greatly to Keith Dwayne Nelson's own sense of self-worthlessness and depression." 3. Despite his own deprived childhood, Keith Dwayne Nelson has shown affection, good judgment and love in caring for the young son of his former girlfriend, Kerri Dillion." 4. "Keith Dwayne Nelson has been a devoted and caring son to his mother, Nancy Nelson." 5. "Keith Dwayne Nelson has been a loyal and faithful brother to his four siblings." 6. "In the past, Keith Dwayne Nelson has been a hardworking and dedicated employee to his boss, and a financially responsible boyfriend to his girlfriend and her son while they all lived together." 7. "Keith Dwayne Nelson has admitted his guilt and pleaded guilty to the murder of Pamela Butler without any promise or expectation of leniency." 8. "Keith Dwayne Nelson will be of low risk of violent behavior in prison and can live the rest of his life peacefully and productively if allowed to die of old age behind bars." 9. "Keith Dwayne Nelson can be a positive influence on the life of his young son, counseling, teaching and caring for the boy as he grows up over the ensuing decades." 10. "If allowed to live, Keith Dwayne Nelson can remember and agonize over the death of Pamela Butler which he caused on October 12, 1999 and in the process of many years of remorse and contrition, he will become a better person that the young man who caused her death."

### C. Failure to Make Objections to Allegedly Inflammatory and Improper Comments in the Government's Closing Argument and Rebuttal – Claim A(15)(e).

The following are the statements which Nelson believes were objectionable from the initial closing argument:

- The Government argued that the jury should vote for death because, "If this crime doesn't call for the death penalty, what crime does?" (Trial Tr. 1113.)

- The Government argued that the jury should vote for death because, "We need to protect our children. We need to send a message to guys like the defendant . . . ." (Trial Tr. 1113.)

- The Government argued that the death penalty should be imposed because, "The community cries out for justice." (Trial Tr. 1114.)

- The Government argued that legally appropriate and relevant mitigating evidence was "all this excuse testimony" and a "guilt trip." (Trial Tr. 1123, 1124.)

- The Government argued that the jury should impose a death penalty simply because the Government recommended it "without reservation." (Trial Tr. 1128.)

The following are the statements which Nelson believes were objectionable from the rebuttal closing argument:

- The Government argued that the case was about the "slaughter" of "our children." (Trial Tr. 1155.)

- The Government argued that legally appropriate and relevant mitigating evidence was "an excuse," "the blame game," "the abuse excuse," and an effort by trial counsel to claim the crime was "somebody else's fault." (Trial Tr. 1156.)

- The Government argued that the mitigating evidence was not worthy of jury consideration since it didn't "explain why" the crime occurred. (Trial Tr. 1158.)

- The Government argued that Movant was "a rotten human being." (Trial Tr. 1158.)

- The Government argued that defense counsel's efforts to persuade the jury of mitigating evidence was "a smoke screen" and an attempt to "divert [the jury] from what this case is really about, the slaughter of an innocent." (Trial Tr. 1158-59.)

• The Government argued that defense counsel's efforts to persuade the jury of mitigating evidence masked counsel's true motive, i.e., "What they want you to do is have him escape justice." (Trial Tr. 1159.)

• The Government argued that mercy was weakness. (Trial Tr. 1159.)

• The Government argued that Appellant was "evil at his core." (Trial Tr. 1161.)

• The Government argued that jurors should rely on the prosecution's experience and expertise, and positioned the case as a referendum on capital punishment by telling the jury, "There is no clearer call for the death penalty than there is in this case," and, later, "If not him, who? If not now, when? If killing and raping a kid isn't enough, then we don't need a death penalty. We don't need a death penalty." (Trial Tr. 1161; 1163.)

• The Government argued that the jury should impose a sentence of death since the jury "represent[ed] the people of the United States in this case . . . ." (Trial Tr. 1162.)

• The Government argued that the jurors should close their eyes and re-live the horrors of the victim's last hours, calling upon the jury to "Think about . . . what that little girl was thinking," and to imagine, "What was she thinking?" and to "Imagine what she experienced in that last part of her life," and to "Close your eyes, and . . . envision [the abduction and murder]." (Trial Tr. 1161-62.)

• The Government argued that a verdict of death was the only just verdict and that the jurors were "the dispensers of justice," and that the victim's mother "Waits for you to give her some justice. And justice in this case can only be had by imposing a sentence of death," essentially suggesting to the jury that a sentence of death should be imposed because that's what the victim's survivors wished. (Trial Tr. 1162.)

• The Government argued that, "[T]he death penalty was enacted for crimes like this." (Trial Tr. 1163.)

Berrigan testified at the Evidentiary Hearing that the comments were all improper and he should have objected to portions of the Government's closing argument, but he did not. He testified that he had no tactical reason for not objecting. (Evid. Tr. 241, 243). "The Eighth Circuit has been reluctant to grant habeas corpus relief to petitioners based solely on objectionable prosecutorial rhetoric in closing arguments. 'A claim of

prosecutor misconduct in closing argument . . . calls for an exceptionally limited review of this issue.'" Evans v. King, No. 10-4045(SRN/SER), 2012 WL 4128682, *20 (D.Minn. July 30, 2012)(quoting James v. Bowersox, 187 F.3d 866, 869 (8th Cir.1999)).

Where there was no contemporaneous objection to statements alleged to be misconduct the appellate court reviews for plain error. U.S. v.Coutentos, 651 F.3d 809, 822 (8th Cir. 2011). Under plain error review, to obtain relief, a defendant must show (1) that there was error; (2) that the error was plain; and (3) that it affected the defendant's substantial rights. Id. The appellate court assesses the prejudicial effect of misconduct by considering: (1) the cumulative effect of the misconduct, (2) the strength of the properly admitted evidence of the defendant's guilt, and (3) the curative actions taken by the trial court. Id.

"[A] prosecutor's improper comments [during argument to the jury] will be held to violate the Constitution only if they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Parker v. Matthews, ___U.S.__, 132 S.Ct. 2148, 2153, 183 L.Ed.2d 32 (2012) (quoting Darden v. Wainwright, 477 U.S. 168,181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)(in turn quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). "Federal habeas relief should only be granted if the prosecutor's . . .argument was so inflammatory and so outrageous that any reasonable trial judge would have *sua sponte* declared a mistrial" and the petitioner established "a reasonable probability that the outcome [of the trial] would have been different but for the improper statements." Kennedy v. Kemma, 666 F.3d 472, 481 (8th Cir.2012)(citations omitted).

> To determine whether a prosecutor's statement infected Petitioner's trial with unfairness, the court examines the totality of the circumstances. Kellogg v. Skon, 176 F.3d 447, 451 (8th Cir.1999), Antwine v. Delo, 54 F.3d 1357,1363 (8th Cir.1995)(listing factors including (1) the type of prejudice that arose from the argument, (2) defense counsel's efforts to minimize the effect in his argument, (3) whether [the] jury was properly instructed in the jury instructions, and (4) whether there is a reasonable probability that the outcome would have been different.)

Robinson v. Dormire, No. 4:10CV01205AGF, 2013 WL 5421963, *6 (E.D.Mo. Sept. 26, 2013).

In analyzing the factors, the court presumes that Nelson was prejudiced by the comments made during the government's initial and rebuttal arguments. However, the Court also finds that Mr. Berrigan mitigated the effects of these statements in his closing argument. Mr. Berrigan stated in his closing argument:

> He didn't have to plead guilty. Didn't have to do it at all.
>
> But accepting responsibility does not automatically mean, as the prosecution suggested, that's the death penalty, that this is such a horrible crime there are no other options. Because if you'll recall when you came in here to be selected to sit, the judge asked you questions about that, is anybody here automatically going to impose the death penalty, and nobody, not one of you raised your hands.
>
> And then I asked you, do you remember, what about a case of the murder of a ten-year-old girl, murder and rape of a ten-year-old girl, in your mind, would the death penalty be the only appropriate penalty in the case? Nobody here raised their hands. The people that raised their hands, they were let go. Every one of you said no, I'm going to follow the instructions of the court. I can consider, even in that case, I can consider a sentence of life without parole, I can do that.
>
> And, indeed, that's what the law requires you to do. It requires that. There's no such thing as what Mr. Whitworth is talking about. There's no such thing as some crime that says you do this, you get the death penalty. That is absolutely in contravention of the law. Absolutely. We need not be here if that's the law. We need not have a hearing. This would have been settled. Death, death penalty for Keith Nelson.
>
> But we obviously are here and we obviously presented evidence and you have been listening very intently. You have to make the determination.

(Trial Tr. p. 1135-36).

Berrigan also told the jury that it was up to each one of them to decide if the death penalty was appropriate in this case. He argued:

> The law says aggravating circumstances have to be proven beyond a reasonable doubt. You all have to agree.
>
> It says mitigating circumstances, you don't have to agree. You each decide in your own heart and conscience what do I think the mitigating circumstances are. What are they to me. And you weigh them yourself. You remember that difference.
>
> The law says if you want to impose the death penalty, all twelve people have to agree. Any one or two or three of you can say no, not for me. You have that power to do that because of the awesome individual responsibility that you take when you sign up as a juror in this kind of case. In your hands, each one of your hands, is the life of Keith Nelson because any one of you can say no, and then it doesn't happen. It doesn't happen at all. The judge has told you you're never required to impose the death penalty. It's never required.

(Trial Tr. p. 1137).

Mr. Berrigan also argued to the jury to refute some of the Government's statements regarding Pamela Butler:

> There has been some discussion by Mr. Whitworth remember Pamela Butler, remember what the end of her life must have been like. And I suspect we'll hear more of that, how horrific her death was. And nobody is disputing that. But ask yourself again why are they putting me through that? Is this to get me so inflamed and so impassioned that I'm not going to make a reasoned, calm, considered determination about what the punishment is going to be. Because that's what the law requires. That's what's in your instructions.

(Trial Tr. P. 1152).

After reviewing these portions of Berrigan's closing argument, the Court finds that Berrigan adequately minimized any prejudicial effect from the Government's initial closing argument or rebuttal argument.

The Court also finds that the jury was properly instructed. In Penalty Phase Instruction No. 4, the jury was told, "[c]ertain things are not evidence. I shall list those things for you now: statements, arguments, questions and comments by lawyers representing the parties in the case are not evidence." (Case No. 99-303, Doc. # 419). Finally, with regard to the last factor, the Court finds that Nelson has not shown that there is a reasonable probability that he would have received a life sentence, if the improper arguments had been objected to. The crime in this case involved the kidnapping, sexual assault and strangulation of a ten-year-old girl. The Court finds that it is more likely that the jury voted for a death sentence based on the heinous facts of the case and was not swayed by the Government's improper closing arguments. Accordingly, the Court hereby **DENIES** Nelson's Motion for Relief on Claim A(15)(e)- Failure to Make Objections to Allegedly Inflammatory and Improper Comments in the Government's Closing Argument and Rebuttal.

### D. Allegations of Appellate Counsel's Constitutional Ineffectiveness: Failure To Conduct Adequate Review of the Trial Record and the Law. Failure To Raise on Appeal the Government's Allegedly Improper Comments in Closing Arguments – Claims B(1) & B(2)(c)

When the case was set on the appeal schedule, Berrigan moved to withdraw and asked that his former co-worker at the State Public Defender System, Jennifer Brewer[5], be appointed to handle the appeal. Brewer handled a number of death eligible cases at the state and federal level and was focusing on appellate work. Consequently, she was appointed. Berrigan stated that he has great admiration for Jennifer Brewer and her appellate work. (Evid. Tr. 247.) He did not meet with her to discuss issues regarding the

[5] Jennifer Herndon was formerly known as Jennifer Brewer.

appeal, but he did hand her his trial notes. (Evid. Tr. 248.) Hunt maintained the appointment and continued to represent Nelson on appeal with Brewer.

Brewer had more capital case experience (trial and appellate) than Hunt and was located in St. Louis, while Hunt was in Kansas City. (Evid. Tr. 80.) Brewer was aware that this was Hunt's first capital trial. After being appointed, Brewer and Berrigan met face-to-face, with Berrigan giving Brewer his transcript and parts of the file to use for appeal preparation. (Evid. Tr. 132.) Hunt talked with Brewer via e-mail or phone. (Evid. Tr. 80-81.) Brewer went through and reviewed the trial transcripts, reading them completely to determine what issues she thought should be argued in the appeal. (Evid. Tr. 133.) Brewer testified that these issues were "sort of, I don't know, complex or technical, capital-specific issues, issues I had drafted before or issues that I had experience with in capital litigation." (Evid. Tr. 138.) Brewer stated that she believed that Hunt was going to draft the "more guilt-phase related issues or issues that didn't require any particular capital experience." (Evid. Tr. 138.) Brewer stated that she was familiar with the ABA guidelines for capital counsel, explaining that every possible issue should be explored that has some merit. (Evid. Tr. 117.) Hunt acknowledged that when page limitations are factored in not all possible issues are raised but your best issues. (Evid. Tr. 86.)

Hunt was handling the change of venue issue, statement of facts as relating to that issue, and some other issues involving jury selection, while Brewer was handling all appeal issues relating to the penalty phase. They communicated mostly via e-mail, sending drafts back and forth to each other. They applied for, and were granted, several extensions by the Eighth Circuit. (Evid. Tr. 81.) During the deposition taken in

anticipation of the § 2255 hearing, Brewer accused Hunt of malfeasance by not handling the other appellate issues that were her responsibility. (Evid. Tr. 83.) Hunt denied the accusations and stated that those responsibilities were in fact Brewer's.

This dispute arose because each attorney believed the other should have raised additional issues on appeal. Hunt believed that Brewer should have prepared the issues because she was the more experienced appellate and capital litigator, while Brewer alleged that the responsibility was Hunt's. Brewer did not keep any documentation or notes with respect to the division of labor with Hunt on the brief. Brewer's account of the responsibilities in this matter is at odds with the fact that she was the editor of the brief. In other words, it was her responsibility to collect the parts each worked on, then put them together in a single coherent document. Consequently, Brewer was the last person to set eyes on the brief. She would have seen it deficient, if indeed it was, and could have simply asked the court of appeals for an extension of time. Given the nature of the case (it being a capital matter), the request would have no doubt been granted. Brewer hides behind a docket entry that indicates that no further extensions will be allowed. The problem with this position is that on one previous occasion, in this very appeal, Brewer had been told that no further extensions would be allowed, but she nonetheless asked for a continuance and received it. (Evid. Hrg. 136.) Additionally, during her testimony, Brewer acknowledged that she was communicating with the appellate court right up until the time the brief was filed. (Brewer Depo. Tr. 81.) The need to do so was driven by the fact that Nelson's brief was overlong and Brewer needed the court's authority to obtain permission to file a longer than anticipated brief. (Brewer Depo. Tr. 79-81.) The

appellate court granted her request. Through these contacts Brewer never chose to ask for additional time to file the brief later, to supplement the brief, or to file a Rule 28(j) letter. (Evid. Tr. 139.)

Nelson argues that Ms. Brewer agreed that the government's closing arguments were improper. (Evid. Tr. 118). She also agreed that these were significant and obvious issues that were stronger than some of those issues actually raised in the brief. (Evid. Tr. 126). Ms. Herndon stated that she had not made a strategic choice to omit these arguments and agrees that they should have been raised on appeal. Nelson argues that had these issues been raised on appeal, there is a reasonable possibility that his sentence of death would have been vacated on appeal.

Ineffective assistance claims cannot be based on counsel's alleged failure to raise a meritless argument. See Gray v. Bowersox, 281 F.3d 749, 756 n. 3 (8th Cir. 2002). Further, when a legal argument has no merit, it follows that a defendant cannot be prejudiced as a consequence of its absence as an appellate issue. See Thompson v. Jones, 870 F.2d 432, 434–35 (8th Cir.1988). "In other words**,** appellate counsel is not ineffective simply because that lawyer fails to raise an issue on appeal that has no substance." Delk v. Smith, No. 13-CV-89 (JRT/SER), 2014 WL 538586,*12 (D.Minn. Feb. 11, 2014). As noted above, the Court finds that there is no merit in Nelson's claim that his counsel was ineffective for failing to object to the Government's closing arguments. Accordingly, because the argument had no merit, Ms. Herndon and Ms. Hunt were not ineffective for failing to raise this issue on appeal. Therefore, the Court hereby **DENIES** Nelson's claims B(1) and B(2)(c).

## IV. CONCLUSION

For the reasons stated above, the Court hereby **DENIES** habeas relief on the six claims which were remanded from the Eighth Circuit Court of Appeals. The Court further denies Nelson a certificate of appealability, in that the issues raised are not debatable among reasonable jurists, nor could a court resolve the issues differently.

Date: March 31, 2015
Kansas City, Missouri

**S/ FERNANDO J. GAITAN, JR.**
Fernando J. Gaitan, Jr.
United States District Judge

# EXHIBIT 2

**UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

---

No: 07-3071

---

Keith D. Nelson,

Movant - Appellant

v.

United States,

Respondent - Appellee

---

Appeal from U.S. District Court for the Western District of Missouri - Springfield
(4:04-cv-08005-FJG)

---

**JUDGMENT**

This appeal from the United States District Court was submitted on the record of the district court and briefs of the parties.

After consideration, it is hereby ordered and adjudged that the judgment of the district court in this cause is affirmed in part, reversed in part, and remanded to the district court for proceedings consistent with the opinion of this court.

October 27, 2008

Order Entered in Accordance with Opinion:
Clerk, U.S. Court of Appeals, Eighth Circuit.

---

/s/ Michael E. Gans

# EXHIBIT 3

# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | | |
|---|---|---|
| Keith D. Nelson, | | ) |
| | Movant, | ) |
| vs. | | ) No. 04-8005-CV-W-FJG |
| | | ) Crim. No. 99-0303-01-CR-W-FJG |
| United States of America, | | ) |
| | Respondent. | ) |

## ORDER

Movant entered a guilty plea on October 25, 2001, and was sentenced to death on March 11, 2002. He timely filed an appeal to the Eighth Circuit Court of Appeals who subsequently issued an opinion and mandate (Doc. #475) affirming the judgement of the District Court.

Now pending before this Court is movant's motion pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence (Doc. #25), filed November 6, 2005, and motion to disqualify and recuse judge (Doc. #53), filed August 21, 2006. The Court finds that it has jurisdiction over this matter.

Movant's motion pursuant to 28 U.S.C. § 2255 (Doc. #25) to vacate the conviction and sentence imposed is hereby denied for the following reasons.

The reasons movant alleges are not meritorious and not supported by the record. The claims of ineffective assistance of trial and appellate counsel fall within the broad perimeters of trial strategy. Lockhart v. Fretwell, 506 U.S. 364 (1993). Movant's decision not to make himself available for examination by the government's mental health experts precluded the use of his mental health experts. That was a decision movant made with knowledge of the consequences. The record is clear on that point and set forth in this Court's order (Doc. #403), filed November 19, 2001. While the government has requested that movant's trial and appellate counsel submit affidavits or to a hearing to further explain their reasons for this strategy, this Court finds no further record is necessary. In all of the other respects, the Court finds the government's legal

analysis provided in opposition to the movant's motion pursuant to 28 U.S.C. § 2255 (Doc. #39) to be a thorough and accurate analysis of movant's argument and adopts it by reference hereto.

Further, the movant's motion to disqualify and recuse (Doc. #53) is hereby denied. The government's response to that motion (Doc. #56) succinctly states this Court's position. The Court adopts the government's legal analysis as its own and incorporates same by reference hereto. Since the movant was unable to raise legally sufficient arguments in this 28 U.S.C. § 2255 motion (Doc. #25), by this recusal argument he seeks an end-run to get a new trial in this matter.

Movant received a fair trial. He had the benefit of trial and appellate counsel, skilled in representing persons charged with capital offenses. I know of no trial which is error free however, there were no errors in movant's trial requiring a reversal or resentence.

**JUDGMENT**

Upon review of movant's 28 U.S.C. § 2255 motion (Doc. # 25) and the government's response (Doc. #39), the Court hereby denies movant's request to vacate, set aside or correct the sentence herein. The Court also denies movant's motion to disqualify (Doc. #53). This Court believes that the arguments set forth by the respondent (Docs. #39, #56) present a thorough legal and factual analysis and adopts respondent's analysis and conclusions as its own by reference hereto.

For the aforesaid reasons movant's motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255 (Doc. #25), filed November 6, 2005, and motion to disqualify (Doc. #53), filed August 21, 2006, are denied.

The Court further finds that the issues presented by movant are resolvable by the record and, therefore, no evidentiary hearing will be granted.

/s/Fernando J. Gaitan, Jr.
Fernando J. Gaitan, Jr.
United States District Judge

Dated: November 21, 2006
Kansas City, Missouri

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

KEITH D. NELSON, )
Movant, )Case No.
vs. )04-8005-CV-W-FJG
UNITED STATES OF AMERICA, )Pages 1-273
Respondent. )

TRIAL TRANSCRIPT - VOLUME I OF IV

On April, 14, 15, 16, and 17, 2014, the above-entitled cause came on before the Honorable Fernando J. Gaitan, Jr., United States District Judge, sitting in Kansas City, Missouri.

APPEARANCES

For the Movant:

MR. DAVID A. RUHNKE
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042

MS. PAULA K. HARMS
Federal Public Defender
850 West Adams, Suite 201
Phoenix, Arizona 85007

MR. GARY E. BROTHERTON
Legal Writes, LLC
503 E. Nifong Blvd., #377
Columbia, Missouri 64201

For the Respondent:

MR. DAVID M. KETCHMARK
MR. JEFFREY E. VALENTI
United States Attorney's Office
400 East 9th Street, Ste. 5510
Kansas City, Missouri 64106





Appellate Case: 15-3160 Page: 66 Date Filed: 02/29/2016 Entry ID: 4372433

# I N D E X

MONDAY, APRIL 14, 2014
VOLUME I OF IV


| | Page |
|---|---|
| **SUSAN HUNT** | |
| Direct Examination by Mr. Ruhnke | 16 |
| Cross-examination by Mr. Ketchmark | 82 |
| Redirect Examination by Mr. Ruhnke | 111 |
| **JENNIFER HERNDON** | |
| Direct Examination by Mr. Ruhnke | 114 |
| Cross-examination by Mr. Ketchmark | 128 |
| **BILL SHULL** | |
| Direct Examination by Mr. Ruhnke | 144 |
| Cross-examination by Mr. Ketchmark | 167 |
| Redirect Examination by Mr. Ruhnke | 172 |
| **PATRICK JOSEPH BERRIGAN** | |
| Direct Examination by Mr. Ruhnke | 173 |
| Cross-examination by Mr. Ketchmark | 245 |
| Redirect Examination by Mr. Ruhnke | 266 |


TUESDAY, APRIL 15, 2014
VOLUME II OF IV


| | Page |
|---|---|
| **RUSSELL STETLER** | |
| Direct Examination by Mr. Ruhnke | 276 |
| Cross-examination by Mr. Valenti | 315 |
| Redirect Examination by Mr. Ruhnke | 329 |
| Recross-examination by Mr. Valenti | 334 |

Q And -- but he was sought to be -- to serve really a dual role, as the caption of the motion indicates, to do mitigation investigation and sort of regular investigation, correct?
A Right. And it was -- my recollection was it was primarily in Kansas City because Ron Ninemire had been going to White Settlement, Fort Worth area where Mr. Nelson grew up. So they didn't -- they didn't hire him to travel down there is what I'm saying. It was to do work in Kansas City.
Q Now, as the matter proceeded, did you also seek to employ a mental health expert; do you recall?
A Yes.
Q Do you remember who that was?
A Dr. Stephen Peterson, I believe.
MR. RUHNKE: If we could display P28 at page 22, and if we could go on just a little further from that. Looking for the Peterson motion. I'll look on the exhibit list. We have to go back a little bit. We're into Dr. Peterson's description of his services. Right there where we come to the motion. Sorry about that. Let's highlight the caption, the filing date of that as well.
Q (BY MR. RUHNKE) Do you see that on June 7th, 2000, there was an ex parte application for funds to hire a psychiatrist and for approval to exceed the general funding limits for -- provided by the then Title 21 death penalty law? That was Dr. Peterson and that's the reference you just made reference

to, correct?

A Correct.

MR. RUHNKE: If we could go into the body of the motion on the second page and highlight the paragraphs 2 and 3.

Q (BY MR. RUHNKE) Again, that -- the standard of care, the standard of practice in the year 2000, reciting Supreme Court cases, that service of experts including psychiatrists may well be critical to the effective presentation of a capital litigant's defense. Expenses may properly be paid by the federal courts.

And, you know, you're looking at that -- you know, at the need for a psychiatrist at that point, correct?

A Correct.

Q And in the course of the motion, do you discuss Keith Nelson in particular?

A Yes.

Q Okay.

MR. RUHNKE: Could we go on to the next paragraph and blow that one up. Again, further Supreme Court supports the idea that experts may well be critical. Next paragraph, please. Relevant issues may be quite broad in Lockett v. Ohio.

Next paragraph. Blow it up, please.

THE COURT: Why are we going into every paragraph of

this? I mean the document speaks for itself.

MR. RUHNKE: It does speak for itself, Your Honor, but I'm trying to highlight the idea that back in --

THE COURT: It's already highlighted by the appeal.

MR. RUHNKE: But back in 2000, that they were actively seeking the assistance of mental health professionals; that they had recognized the --

THE COURT: Well, the document says that, though, doesn't it?

MR. RUHNKE: It does. And I'm trying to get this through the witness to put some life into a --

THE COURT: We only have so much time, Mr. Ruhnke. You spend a lot of time on this, you're going to lose time on the other end.

MR. RUHNKE: We're actually going pretty well, I think.

THE COURT: I don't think so.

MR. RUHNKE: I think we're going to go pretty well. I do. We've tried it out. I think we're going to be faster than anybody anticipated we were going to be.

THE COURT: I'll take that under advisement.

MR. RUHNKE: Maybe I shouldn't have said that. Yeah, I think -- seriously I think respectfully we will be well within the schedule.

THE COURT: I understand you're making your record

for the Court of Appeals and I think with the admission of these exhibits. The questions you're asking are good questions, but I don't think we have to go through each paragraph.

MR. RUHNKE: That's fine, Your Honor. Let me move through it a bit.

Q (BY MR. RUHNKE) And ultimately was Dr. Peterson's services approved?

A Yes.

Q Do you recall how much funding was approved for him?

A I don't right today.

MR. RUHNKE: Could we just show P28 at page 6, I hope. That's page 22. If we could get to page 6 of the exhibit.

Q (BY MR. RUHNKE) Ultimately it was approved. Does the figure $20,000 sound right to you?

A Yes. I just don't remember.

Q All right. Do you know whether the services of Dr. Peterson were ever actually utilized in the sense that he ever saw Mr. Nelson or ever performed an evaluation of Mr. Nelson?

A I don't believe he did.

Q I'm going to take your attention now to July 30 of 2000, and do you recall filing a motion to continue the trial date?

A Yes.

121. Sorry, not 121. 204, docket entry 204.

Q (BY MR. RUHNKE) At some point Mr. Shull withdrew from the case and you believe that was approximately February, late February of 2001. Who came into the case at that point?

A Pat Berrigan.

Q And did you know Mr. Berrigan?

A No. I knew of him. I really didn't know him personally.

Q And what occasioned Mr. Berrigan's appointment into the case, the fact that Mr. Shull was now out of the case?

A Yes. Because I wasn't death qualified.

Q So now it's you and Mr. Berrigan are the attorneys?

A Right.

Q Did you have any initial discussion with Mr. Berrigan about your role in the case versus his role in the case, levels of responsibility, division of responsibilities?

A Shortly after -- I mean, within a day, I think, after he was appointed, he and I met, and I basically brought him up to speed on where we were at, you know, filled him in on the background of the case. And he -- at that point, I mean, I deferred to him, and he said he was going to take over the mitigation part. We had still been working on the change of venue, so I was to continue doing that and any guilt, you know, innocence phase work that was to be done, but he was going to handle the mitigation.





Appellate Case: 15-3160 Page: 72 Date Filed: 02/29/2016 Entry ID: 4372433

Q Okay. And in January obviously Mr. Berrigan would have spent no time on the case, but at least, according to our summary chart, in February, it looks 30, 40 hours; March, it looks like about 45 hours; April, 3 or 4 hours; May, maybe 10, 15 hours; same in June; same in July; same in August. And then September, October, November, the hours increase as you go to trial.

Did you have a sense Mr. Berrigan was working on the case with -- spending a lot of time on the case or not based on your interactions with him?
A Based on the conversations I had with him, I assumed he was spending a lot of time on it.
Q But you didn't know?
A I didn't know, no.
Q And when it came to the mitigation investigation, who had the primary contact with Ms. Francis?
A Pat Berrigan.
Q Did you have any real role in the preparation of the mitigation case?
A No.
Q Do you recall that Ms. Francis had an employee who was working on the case named Deborah Haddad?
A When we hired her, we didn't know that, but we came to learn that later on.
Q Let's stay with that for a second.

I'm going to cancel that appointment, and don't worry about it, I'll figure out somebody else.

Q And to your knowledge, was anybody else ever figured out?

A No.

Q And, again, to your knowledge did Mr. Nelson ever have a neurological assessment?

A No.

Q Okay. Do you recall having a phone conference involving yourself, Mr. Berrigan, and Ms. Francis earlier in the month of June 2001, about the status of the mitigation investigation?

A Probably did.

Q Okay.

MR. RUHNKE: If we could display P9 at page 114. If you highlight just the date and the title of this document.

Q (BY MR. RUHNKE) Do you see there's a caption "Nelson defense team meeting 6/13/01, 4 p.m."? Do you recall having -- do you recall an in-person meeting with Ms. Francis during June, or would this have been a phone call? Or are you not sure?

A I'm not sure. We had one in-person meeting, but I think it was probably earlier than June.

Q If I suggested a meeting that occurred in late February, would that be more like it?

A I've never heard that before until just now.
Q There's a reference to Larry Pace found nothing, probably ran criminal and civil indexes. Do you know what that's a reference to?
A I would assume running criminal and civil indexes, you know, court records in Dallas/Fort Worth, White Settlement.
Q All right. And the final -- the final notation on that page is a reference to an affidavit before June 28th, that Mr. Berrigan wanted Ms. Francis' affidavit before June 28th in support of the motion for additional funding.
Is that your interpretation?
A Yes.
Q You were at that phone conference?
A I'm not sure if I was or not. It might have been a telephone conference. I'm not sure. He had primary contact with her after a period of time in that timeframe.
Q And as the case went forward, do you recall in May receiving a document that Ms. Francis transmitted, which she described as a mitigation binder or a binder of mitigation materials?
A Yes, I do.
MR. RUHNKE: And I'm just going to look for the reference to that. If we look at Exhibit 9 at page 108, and if we could just highlight the first couple of paragraphs of that. First of all, let's look at the date at the top.





Appellate Case: 15-3160 Page: 75 Date Filed: 02/29/2016 Entry ID: 4372433

time was, and I think it was like eight weeks, six weeks. I can't remember.

Q Substantial period?

A Yeah. It was a substantial period of time. And so we agreed to meet at CCA with Keith and explain to him what was going on because Pat -- when I talked to him and said, well, I think we need to continue this case, he said, well, I don't know, I want to think about that. Then we decided to meet with Keith, and he said let's the three of us sit down, talk about this, and make a decision. I said that's fine. So we set a meeting up, I'm not sure when, but in the next day or two after that.

Q This is prior to the surgery?

A Prior to the surgery.

Q How did the meeting go with Mr. Nelson, Mr. Berrigan, and yourself about the possibility of continuing the trial date?

A Well, Pat basically explained to him what the -- the kind of surgery that he needed, that when it was scheduled. We talked about how long it would take for him to recover, and then we talked about the continuance. And Keith was very much in favor of continuing the case so he could have time to recover.

Q And at the conclusion of the meeting, what decision was reached or who decided about whether a continuance would be

granted -- I'm sorry -- would be requested or not?

A Well, both Keith and myself made it very clear to Pat that we both thought we needed to have a continuance. At the end of the meeting he said, well, I've thought about it, I'm not going to ask for one.

Q There was a time when the issue arose regarding Mr. Nelson's examination by government experts. Do you recall that issue?

A Yes.

Q And the issue would arise in some substance as to, one, whether Mr. Berrigan -- I'm sorry, whether Mr. Nelson would submit to an examination by the government's experts and what would the consequences be if he failed to submit to the examination. Do you recall that?

A I do.

Q Do you recall being in court on or about October 18th, 2001, before Judge -- Magistrate Judge Hays when that issue came up?

A Yes.

Q Had there been a prior discussion of whether Mr. Nelson would submit to a mental health examination?

A I think just prior to going into court that day, we'd gone to the lockup and seen Keith and talked about it briefly. Whether he talked to him about it in more detail, I don't know.

Q Do you recall what Mr. Berrigan advised Mr. Nelson to do and how strongly he expressed his opinion?
A Well, his advice was not to submit to a government exam, and he was pretty adamant about it.
Q And based on what you know about Mr. Nelson and your relationship with Mr. Nelson, had his attorneys -- did you have a good relationship with him?
A I always did, yes.
Q And did it appear that Mr. Berrigan had a good relation with him?
A Yes.
Q Based on your assessment and knowledge and the nature of that relation, had the attorneys advised Mr. Nelson to cooperate with a mental health evaluation, do you think he would have?
A I think he would have.
MR. RUHNKE: I'm going to ask that we put on the screen Exhibit 29, which is the transcript, at page 668. If you highlight the last section where Mr. Miller is speaking. This is Mark Miller, former AUSA. In his office he was more of a trial counsel.
Q (BY MR. RUHNKE) Were you there for that court proceeding?
A I was.
Q And there's a discussion that Dr. Martell had come out





Appellate Case: 15-3160 Page: 78 Date Filed: 02/29/2016 Entry ID: 4372433

MR. RUHNKE: And let's go to the next page, please. If you would highlight the court -- what the court has to say.

Q (BY MR. RUHNKE) Magistrate Judge Hays asks, You've probably already made this clear, but let me make sure I understand. This is not something that counsel have directed the defendant to take this position; is that correct?

Based on your knowledge of the circumstances, had counsel in essence directed Mr. Nelson not to cooperate with the evaluation?

A Basically, yes.

Q Or strongly advised him. The decision would always be his, but counsel had strongly advised him not to do it?

A Right.

Q Thank you.

MR. RUHNKE: Would you highlight Mr. Berrigan's answer to that.

Q (BY MR. RUHNKE) Mr. Berrigan begins by noting that the AUSA Miller had asked him basically the same question, but he's not willing to answer it because it involves confidential communications between the defense and the client, advises the court that Mr. Nelson does understand the consequences of a refusal, and, you know, they want to put on -- the defense wants to put on mental health evidence, but that the position is that Mr. Nelson will not cooperate; is that correct?

A Correct.





Appellate Case: 15-3160 Page: 79 Date Filed: 02/29/2016 Entry ID: 4372433

was, or had you had any contact with her prior to going to Texas?

A I think just before going to Texas, we knew that she worked -- was working with Tena, but I'd never talked to her or had no interaction with her.

Q One of the issues that the Eighth Circuit remanded to the court is the issue of no objections made during closing arguments at the penalty phase of this case.

What was your understanding of your role as far as lodging any objections to closing arguments?

A I didn't have any. I mean, it's the court's rule that if they're your witnesses or you do the opening or the closing, you're the one that does the objection, and Pat did both opening and closing. So, you know, I mean, I could have passed him a note to say object, but it was his job or duty to stand up and object at that point.

Q I think if you pull that microphone a little bit towards you, we can hear you a little better.

A It's kind of weird. Okay.

Q Okay. So Mr. Nelson was sentenced to death on, I believe, November 28, 2001. Did you have a role in the appeal?

A Yes.

Q What was your -- were you appointed by the Eighth Circuit to do the appeal?

and met with Pat to get his transcript and parts of his file that she could take back to St. Louis and use for preparation of the appeal. And they met and talked about it. I did not -- I was not part of that meeting, nor did I talk to her. I talked to her by phone or through e-mail.

Q Was there a division of labor when it came to authoring the appellate brief?

A Yes.

Q What was your recollection of the division of labor?

A I was going to handle the appeal of the change-of-venue issue since I did 99 percent of the work on that issue at the trial level and the statement of the facts as it related to that and some other issues. She, as I said, had a lot more appellate capital experience than I did and was going to handle all the appeal issues relating to the penalty phase.

Q And is that how it remained between the two of you?

A That was my understanding, yes.

Q Did -- was there frequent phone conversation during the appellate preparation?

A I don't feel it was phone so much as it was e-mail or e-mailing drafts back and forth to each other.

Q And did you apply for and receive several extensions from the Eighth Circuit on the filing of your briefing?

A Yes, right, yes.

MR. RUHNKE: Can I have just a moment, Your Honor?

My question is this: Would you agree with me, ma'am, that the mental health issues presented themselves early on in the case, and in fact in 2000, you all were aware that there were issues regarding Mr. Nelson's family history of mental illness?
A We were aware of family history, correct.
Q And so it's not like this was an area that was unexplored. In fact, Pat Berrigan heavily litigated the issue of mental health and whether or not the government would be allowed access to your client, correct?
A There were no experts ever hired, no testing ever done, so it wasn't explored.
Q Well --
A It was known it was a potential but it wasn't explored, no.
Q But you're aware that Mr. Berrigan handled a substantial amount of litigation back and forth with the government as to whether or not the government would be allowed access to Mr. Nelson to have him submit to any type of mental health treatment -- or evaluations?
A I was aware of that and I wondered why he was making such a big deal of it since we hadn't done any evaluations. We'd done nothing.
Q Let me ask you this: Were you aware -- you talked a little bit with Mr. Ruhnke about kind of what the standard was

A I may have met him, but that's correct, yes.
Q And you were aware that his work was primarily exclusively in capital litigation, correct?
A Yes.
Q And in fact I think you indicated that you thought highly of him and that he was well regarded with respect to what he did and how he did it. Fair statement?
A Yes. I was glad to have him on the case, yes.
Q In 2001, in February when you're meeting at the Hereford House and it's you and Mr. Berrigan and Ms. Francis, at that time the consensus was that there was an extensive amount of or substantial amount of mitigation evidence that had been collected but there was more to be done. Fair statement?
A Yeah, fair.
Q And with respect to Dr. Cowan, it was Mr. Berrigan's decision to cancel that because he didn't think that Dr. Cowan was the right person and that he was going to handle making the assessment of where to go but it wasn't going to be Cowan, correct?
A Correct.
Q So with respect to the mitigation aspect, Pat was the one who was making the calls in terms of how and in what direction mitigation was going to go, correct?
A He was calling all the shots, yes.
Q And I think you indicated in the deposition that from

the minute Pat got on the case, he took over mitigation?
A He did.
Q Because that was what his expertise was and his experience, correct?
A That's correct.
Q The problem or disagreement that you had with respect to Tena Francis, that blew up in around May of 2001, correct?
A Yeah, yes.
Q And at that point is it correct in going forward, Ms. Hunt, that Mr. Berrigan was the one who had primary contact with Ms. Francis and you kind of took a secondary role at that time?
A Yes.
Q And so what Mrs. Francis or other individuals that might have been working with her were doing, that was all being done -- coordinated through Pat, you weren't the point person on any of that. Is that a fair statement?
A That's fair.
Q You talked about Ms. Haddad and you talked about Ms. Murphy. Do you have any reason to believe that they were incompetent or unqualified to do what they were doing?
A No. I didn't know if -- I still don't know much about them.
Q So you're upset with Ms. Francis was the fact she had these individuals working for her, it wasn't so much their

on in the case and your assumption is that he's focusing on what he needs to focus on?

A Correct.

Q Now, in that meeting at the lockup, at any point in time did you or Mr. Berrigan coerce or compel Mr. Nelson to agree to not submit to that evaluation?

A No. Strongly suggest, strongly advise, is that coercion? No, but --

Q And let me ask you this: Is it accurate that Mr. Berrigan is engaging in extensive litigation with regard to whether or not the government's doctors are going to have access, and if they're going to have access, who the government doctor should be, and there's a multitude of issues that Pat is litigating back and forth on the issue of the mental health?

A Correct.

Q Okay. And so during that meeting with Mr. Nelson, Mr. Berrigan is -- is he voicing concerns that he doesn't like Park Dietz and Dan Martell as the two government doctors who have been selected to do the interviews? Do you remember any discussion about that?

A I do not.

Q Do you remember any discussion about Mr. Berrigan informing the client that these two government doctors have a reputation in the defense community and they do more harm than

good and it could be very damaging if they're allowed access and the government's allowed to present this, it could hurt more than it could help? Do you remember discussions about that?

A I don't remember that. You'd have to ask Pat these questions. I don't remember.

Q That's fair enough.

Let me ask you this: Was it your belief that -- am I correct in my assumption that when you're in this lockup, that Pat's the one that's driving the boat because this is an issue that he would have been focusing on?

A Yes.

Q So you're more or less there, you're observing and listening, but Pat and the client are the ones having this exchange?

A That's correct.

Q Would you agree with me that it's not like Mr. Berrigan pulls this out of thin air that, oh, you know what, today I just decided you shouldn't do this and that's why he's advising the client? There was some reason behind Pat's decision in advising the client, correct?

A I'm sure he had a reason. Frankly, I wasn't aware of what the reason was.

Q Okay.

A And I kind of wondered myself. This all occurred very

fast that day. There wasn't a lot of time to sit down and discuss and rehash all this.

Q At that point in time had Mr. Nelson made the decision to plead guilty yet?

A There might have been conversations that he had with me. That was October 18th and he pled about a week later. Is that pretty accurate?

Q Yes.

A So we may have discussed it. He hadn't made the final decision. He called me at the end and said I want to plead guilty.

Q Let me ask you this, Ms. Hunt: You were the consistent and a constant individual who represented Mr. Nelson more or less from start to finish. Is that a fair statement?

A That's fair.

Q And you had a very good relationship with him?

A I did.

Q And he trusted you?

A I think so.

Q And what I'm curious about is, back to this issue of the continuance and the discussion, even though you didn't voice it to Pat, did you have discussions yourself with Mr. Nelson and advise him whether or not you thought Pat was going to be able to get done what he needed to do on the mitigation side even though you weren't involved in that?

date that the case was sent, the letter was sent, and if you look at the second page header, you see that that's the date or close to it that it was sent.

Q (BY MR. RUHNKE) Mr. Ninemire had been in the case at that point for, what, maybe ten months as an investigator?

A About that time, yes.

Q And do you know if he's trained as a mitigation specialist?

A At the time I thought he was. He represented himself that he was. Subsequently when I was involved in the Lisa Montgomery case, I became very aware of the fact that he wasn't.

Q Didn't have the qualifications to be a mitigation specialist, correct?

A And in fact made numerous statements during that case he didn't believe in mitigation.

Q Okay. And I think we'd all agree that a mitigation specialist who doesn't believe in mitigation isn't going to be much help in a capital case?

A Probably not.

Q All right. Could we go down to the last page of that letter, which is -- it's four pages long.

MR. RUHNKE: Would you highlight and blow up the last -- just blow up the last full paragraph.

Q (BY MR. RUHNKE) And this is the letter that

back then federal capital cases were still kind of new because now in that short a period of time, you wouldn't be under a no-further-extension order. But we basically had to get it filed, and we weren't done with it.

Q When you say you weren't done with it, what do you mean by that?

A Well, I remember the day it was due or the day before it was due trying to put it together and having the realization that we had too many words in it and we didn't have all the issues that should have been in it in it and feeling like it had to be filed despite -- I mean, obviously the word count, we had to slice that down, but with the issues, there really wasn't anything that could be done.

Q So there were additional issues you felt needed to be briefed?

A Yes.

Q And do you have a memory of who was to prepare those issues?

A Susan.

Q What issues did she prepare?

A She prepared the venue issue.

Q So what was your reaction when you saw her section of the brief?

A Well, I was -- when she sent me her portion of it, I was -- my reaction was this is it? I mean I remember specifically

including not every conceivable issue but, you know, every issue that has some merit.

Q In preparation for your testimony, did you review any transcripts from sentencing?

A I did.

Q Did you review the closing arguments of the government in this case?

A Yes.

Q I would like to -- well, first of all, what is your overall opinion of the closing argument of the government in the case?

A That it was improper in several respects.

Q Was there precedent to support the idea that the arguments were improper?

A Well, yeah. My conclusion it was improper would be based on Supreme Court case law as to what's proper and improper in an argument.

Q I would like to have you look at P30 at Bates page 1609, the section that starts, "We submit to you," and that ends with, "ultimate price."

MS. HARMS: Would you blow that up, please?

Q (BY MS. HARMS) Could you take a look at that argument and perhaps read it into the record?

A Sure. It says, "We submit to you that if this crime doesn't warrant the death penalty, then what crime does? We

need to protect our children. We need to send a message to guys like the defendant if they do this, they're going to pay the ultimate price that Congress has provided for this type of" -- and then it goes on.

Q Do you see anything improper about this argument?

A Well, yes. The send-a-message argument is improper.

Q Is there case law supporting that idea?

A Yes. There's case law that says that -- well, first of all, I mean, one of the sort of bedrock principles of death penalty law is individualized sentencing determination, and, you know, there's a hundred cases that go into detail about the individualized sentencing requirement. And so it violates that by saying send a message to guys like the defendant. It violates the individualized sentencing requirement.

And it also violates the case law that talks about how making the jury sort of a consciousness [as spoken] of the community is -- puts too big of a burden on that singular defendant and may make the jury feel like they're, you know, somehow solving the world's problems if they sentence this guy to death.

Q Do you think that you should have raised this argument on appeal?

A Yes.

Q Now, there was no objection when this was argued in closing. Would that have stopped you from raising it on

appeal?

A Not in this instance because there's clearly case law that says that's improper.

Q So this is one example of improper argument in the government's closing?

A Yes.

Q I would like to go now to P30 at Bates page 1621, lines 4 through 6.

MS. HARMS: If you could highlight those for me.

A Okay. The part that says you're not -- that's intended to put a guilt trip on you. You're not killing anybody, you're making a recommendation of the death penalty.

Q (BY MS. HARMS) Do you have any opinion on this argument?

A That would also be improper.

Q How so?

A Well, it takes away the jury's responsibility. The -- I mean, the -- it's contrary to the jury instructions that say it is the -- it's not just a recommendation. If the jury recommends it, the judge is going to impose it.

Q And if you'll go down to P30, Bates page 1621, do you see how Mr. Berrigan reacts to that comment?

A Right. He objected to it and basically, I think, said what I just said, that it's trying to deflect the responsibility for that awesome decision from the jury to somebody else. It's not merely a recommendation. So, yeah,





Appellate Case: 15-3160 Page: 92 Date Filed: 02/29/2016 Entry ID: 4372433

he makes a proper objection to it.

MS. HARMS: If you could go down --

A I'm sorry. Do you want me to read the rest of it?

MS. HARMS: No. I'm actually talking to Ms. Taylor. If you could highlight the paragraph down where the court rules on it. Next page. About lines 10 through 17.

A Yeah. The court sustained the objection, basically agreed with Mr. Berrigan, and then Mr. Berrigan asked him to disregard -- instruct the jury to disregard the prosecutor's comments, and the court refused to do that, which, you know, in my opinion, that's one of the reasons that this is error because it really has no effect sustaining the objection if the court let's the comments stand to the jury.

Q (BY MS. HARMS) Let's see how the prosecutor restated it.

MS. HARMS: Can we go to Bates page 1623, lines 1 through 5, highlight "you're not killing anybody."

A Okay. So this is when the prosecutor tries to go back and comply with the judge's orders that they -- that he not take away the personal responsibility. So he says, quote, You're not killing anybody. The United States government will be the entity responsible for putting the defendant to death, and Congress has said that in a crime, in this kind of a rare crime, the death penalty may be appropriate. We submit to you that it is.

Q (BY MS. HARMS) Do you think that's a fair restatement

that informs the jury of their responsibility?

A No. Because it still takes away -- it's you're not killing anybody and that's not correct.

Q And then, again, on Bates page 1623, lines 9 through 13, look at the court's reaction to the restatement.

A Right. And that's -- Mr. Berrigan didn't even object. The court called him up there and said, I don't think you've gone far enough, Mr. Whitworth. I think the instructions tell them that they are imposing the death penalty, and you can't say it any different than that. And I think you have. Now, I mean, you can correct it or I'll correct it. And then the prosecutor agrees that he'll correct it.

Q Given this exchange and the fact that this argument was repeated, do you agree that you should have raised this on appeal?

A Yes. Because I mean if you go further, he doesn't correct it. He goes back and says something else, but he doesn't correct his statement to the jury that it's not their responsibility. He never corrects that.

Q Perhaps -- would you agree that perhaps this may have been a stronger issue than some of the issues that were raised in the brief?

A Yes. I mean, I -- I've got to tell you I was never a fan of the venue issue, not that it shouldn't have been raised, but it was not going to win.

Q I would like to direct your attention to some of the language in the rebuttal closing, P30 at Bates page 1651, line 17 where it starts, "It's about something evil" and ends with "I want you to think about our children."

Do you see anything wrong with this argument?

A Well, it's improper personalization.

Q So do you agree that this is something you may have raised on appeal as part of the improper closing argument?

A Right. If this had been the only isolated comment, it wouldn't have gone anywhere, but in the context of everything else throughout the argument, it certainly is another instance of something that was objectionable and improper.

Q And just to be clear, I'm not going to belabor every single instance with you on the stand, but I just wanted to go through some examples.

A Sure.

Q And if we can go now to Bates page 1657, lines 11 through 15 where it starts "people who are evil" and ends with "this is the case," do you see anything improper in this argument?

A Yes. It says, And in this case this man, who is evil at his core, can only have justice -- or justice can only be imposed by the death penalty. And the improper -- that's improper. Calling the defendant evil is improper. Again, it goes back to sort of a bedrock principle of death penalty law

which is that the decision has to be based on only the facts, and it has to be free of arbitrariness and capriciousness, and name calling has specifically been identified as something that violates the individualized sentencing based only on the facts.

Q And you agree this is something you could have raised on appeal as part of the argument about improper closing?

A Yes. I mean, there's a -- I can think of examples off the top of my head where cases have been reversed or at least prosecutors have been called out for calling the defendant things such as evil or other --

Q And I just want to bring two more instances to your attention as examples. P30 at Bates page 1654 through 55 starting at line 20 at the bottom of 54. "He committed it because he is" and ending with "escaped justice" on the next page.

A Okay. "He committed it because he is rotten at his core. He's a rotten human being. He is bad." And then, "The mitigating evidence is nothing more than a smokescreen." I mean, it's the same thing as before.

MS. HARMS: And the top of the next page, please.

Q (BY MS. HARMS) Just that very first sentence.

A "What they want you to do is have him escape justice."

Q Okay. Do you see anything improper with this argument, the prior page and this?

A Yeah. It goes back to the same stuff of name calling and of encouraging the jury to decide the sentence based on emotion rather than based on what the facts are, and also there's some improper -- it's not proper to accuse the defense of sort of making up their defense.

Q One final example, Bates 1655 at lines 9 through 15 where it starts, "It was a plea for mercy" and ends with "most vicious members."

A Okay. "It was a plea for mercy. Don't confuse mercy with weakness. Don't confuse the natural tendency of decent persons like yourselves to be kind to other people. You have an obligation to uphold the law and that takes courage. Mercy, mercy. Under what twisted notion of fairness would a society reward its most vicious members?"

Q Do you see anything improper about that argument?

A Well, there's -- I know in Missouri it's improper to equate mercy with weakness, and beyond that, I know that the Supreme Court has said that it's improper to accuse the jury of not doing their job if they don't return a death sentence, and really that's what this is. It's saying if you don't return a death sentence, it's because you're weak and you have no courage and you haven't done your job, and that's -- there's Supreme Court case law that says that's improper.

Q Do you think the closing argument in this case and the statements that we've gone over but not limited to those, were





Appellate Case: 15-3160 Page: 97 Date Filed: 02/29/2016 Entry ID: 4372433

significant issues that could have been raised on appeal?
A Yes.
Q Do you think they were obvious issues?
A Yes.
Q Do you think they were stronger than some of those you presented in your brief?
A Yes.
Q Did you make a strategic choice to omit these arguments?
A No.
Q So you agree that you should have raised these issues on appeal?
A Yes.
Q You're familiar with Pat Berrigan, correct?
A Yes.
Q And you've worked with him in several cases?
A Yes.
Q I would like to go now to P18. This is notes and materials from the Berrigan file at page 26.
MS. HARMS: If you could highlight the circled handwritten thing on the left-hand side. Leave it up for a while.
Q (BY MS. HARMS) If you look at the top, what does this note appear to be about?
A It looks to be Pat's handwritten notes to the rebuttal closing argument given by Mark Miller in the case.

try to figure out what issues you're going to raise, correct?

A Yes.

Q With respect to this particular brief, you indicated that you and Susan had divided the labor up and it was your understanding that she was doing more than the venue issue, correct?

A Correct.

Q Now, you understood, did you not, that Ms. Hunt had no prior capital experience and that she was primarily on the case for the guilt phase and she handled the venue issue at the trial level? Did you know that?

A Yes.

Q I'm trying to figure out from somebody who has extensive capital experience in the appellate arena, why are you under the assumption or belief that Ms. Hunt was going to be the one responsible for briefing the issues on closing argument in the penalty phase of the trial?

A Well, there was only a penalty phase of the trial, so if I had taken the other -- if I had taken all the penalty phase issues, then she wouldn't have written any part of the brief which --

Q She would have written the venue issues, correct, because that was briefed and you didn't think it should have gotten as much attention that it did, but that was in the brief, correct?

MR. RUHNKE: If we could see P28 at page 22, Bates page 22, and just back that up a couple pages to the actual motion. This is -- right.

Q (BY MR. RUHNKE) Do you see that on the screen in front of you, Mr. Shull?

A Yes, sir.

Q Do you see that this is a motion filed on June 7th, 2000, for funds to hire psychiatrist and for approval of funding in excess of the limits of the -- then the drug act, which was the death penalty funding source at the time?

So you filed this motion, prepared this motion?

A Yes. I believe it was in conjunction with Ms. Hunt, but I think I took the lead on it.

Q All right. And without going through the motion, it's in evidence, it speaks for itself, did you discuss in the motion the need for expert assistance in capital cases?

A Yes, sir.

Q The need for, especially in capital cases, for psychiatric examination or mental health examination?

A Yes, sir.

Q Based on your experience at the time, did you think those kinds of inquiries and examinations were important to capital defense?

A Not only important, but I thought that they were very critical.

Q And why? Why did you feel that way?
A Because at that point I'd been practicing law a little more than 20 years, and I believe very firmly that various types of cases, particularly with circumstances that were unusual, just demanded some type of a review by a qualified psychiatrist or psychologist to determine the mental condition of your client, the mental stability, any past history, or factors that might influence the commission of the offense.
Q And during this same period of time, did you also seek court approval for the appointment of essentially a combined mitigation specialist and fact investigator?
A We did.
MR. RUHNKE: If I could have P28 at, I hope, page 7 displayed, and the caption and filing date of that, please, enlarged. Let's go back up to the start of the document. Sorry.
Q (BY MR. RUHNKE) And, again, without going through it paragraph by paragraph by paragraph of the seven or eight-page motion, did you emphasize to the court when you filed this motion the importance of having a mitigation specialist to investigate mitigating evidence in a death penalty case?
A Yes, sir.
Q And that was the kind of thing that was very common in capital cases even back in 1999 and 2000; is that correct?
A Again, I believe that it was just almost mandatory

A Yes.
Q Have you had occasion to review that affidavit?
A I haven't reviewed it recently.
Q Okay. Does it -- was it true and accurate to the best of your ability at the time you completed it?
A Yes.
MR. RUHNKE: I'm also going to display and ask that to display a document that's actually a government's exhibit, 112. Do you see that? We'll blow it up a little bit.
Q (BY MR. RUHNKE) Do you see that to be a transcript of a deposition that was taken in this building on October 19th, 2012, in connection with this case?
A I do.
Q Have you had recent occasion to review the deposition?
A Yes.
Q Do you stand by what is in that deposition?
A I stand by what I have in the affidavit and in the deposition.
MR. RUHNKE: We can take those down now.
Q (BY MR. RUHNKE) Mr. Berrigan, where did you go to law school?
A University of Missouri at Kansas City.
Q And what year did you graduate?
A 1984.
Q And I'm going to direct your attention now to the fall

Q And also mentioned a medical malpractice case, as it turns out, Jimmy Johnson v. Charles Keith Whitaker, MD, that was pending for July 16th, 2001. Did that case actually come to trial?
A That case settled two days before the scheduled trial date on July the 16th. So it settled on the morning -- Saturday morning, July the 14th.
Q Did that case itself involve significant levels of preparation for that trial?
A It did. It was a medical mal case involving a condition called Guillain-Barre syndrome, which frankly I don't even remember how to spell, but there were depositions done in Chicago, Washington DC, all over the country.
Q And depositions done leading up to the trial itself after the filing of this motion?
A Yes, sir.
Q Then you go on to say that you obviously need the time to come up to speed to the Nelson case because there's a lot of information, a lot of witnesses, and obviously you can't go to trial from February, start a capital trial in April?
A That's correct.
Q Cutting to the bottom line of all of this, was that motion granted?
A It was.
Q And do you recall what the trial date was as extended by



Appellate Case: 15-3160 Page: 103 Date Filed: 02/29/2016 Entry ID: 4372433

Judge Gaitan?

A My recollection it was October or November of 2001, roughly six months or so.

Q If I said to you October 23, 2001, would that sound about right?

A That's my birthday. I should remember that.

Q Okay. And after the trial in Kansas, did you begin to deal with issues in the case such as the government's expressed wish to have Mr. Nelson examined by mental health experts of their own choosing if you chose to go forward with a mental health based defense or mitigation?

A Yes, sir.

Q And I'm going to direct your attention to a motion to reply on a mental health issue. This is Government's Exhibit 36.

MR. RUHNKE: Could you display that for us and enlarge it, please, Ms. Welna?

Q (BY MR. RUHNKE) You see that you filed a motion for extension of time to respond to government's motion for discovery of mental health evidence, and we'll get to it on the document. But this was filed, as it turns out, on May 24, 2001.

But just in context, what was going on in the Nelson case at that time is there was some litigation, hot and heavy litigation, about under what circumstances Mr. Nelson would or

would not be examined by a government mental health professional, correct?

A Yes, sir.

Q And if we can look at the bottom part of that motion, and you begin by pointing out that you had just finished a three-week capital murder trial in Kansas. That's the Martis case that you attended. And thereafter it says you attended a death penalty seminar in Hanover, Michigan. Would that be a typo for Ann Arbor?

A Yes. I dictated this motion, and that should have been Ann Arbor, Michigan.

Q And you also point out that you were -- you had been engaged in several other criminal cases, which, I quote, languished, closed quote, during the month and a half that counsel was engaged in the preparation of trial of State v. Martis.

So your best estimate at that time was the Martis case had really engaged you for about six weeks, three weeks before trial and then three weeks in the actual trial itself.

And then if we just look at the next page, I think that's the end of the substance of it, and just we look at the top. The government's not opposed.

Do you recall, and I'm going to ask you to display 37, that shortly after you filed for another extension of time to respond to that mental health motion for discovery of

mental health evidence. And in the body of that motion, if we look down to the next two paragraphs, you point out in paragraph 1 that you had had a coronary angioplasty in recent days, which obviously diverted you from the research necessary, and that you were very much consumed with a preparation of a cert petition to the U.S. Supreme Court in the case of Paul Kreutzer v. Michael Bowersox, and that the cert petition was due June 9th, 2001.

What was the Kreutzer case all about and what was at stake at that point?

A Well, Kreutzer had been convicted of first-degree murder in Boone County, Missouri, and sentenced to death. I had been appointed, along with a fellow Kansas City attorney, Patrick Peters, to represent Mr. Kreutzer on his federal habeas petition.

We had failed in that endeavor. My recollection is that the Eighth Circuit had failed to grant a certificate of appealability, although I could be mistaken about that. In any case we lost the appeal in the Eighth Circuit, and we were in the process of preparing a petition for writ of certiorari in the United States Supreme Court in an effort, which turned out to be a vain effort, to spare Mr. Kreutzer from being executed.

Q And eventually he was executed?

A He was.

Q And were you also engaged in another certiorari case at the point that -- the case that eventually became Roper against Simmons?
A Yes. I represented Christopher Simmons, both in federal court and in -- eventually in the state habeas proceeding, which eventually led to Roper v. Simmons in the United States Supreme Court.
Q That's the case holding that juveniles under the age of 18 cannot be executed?
A That's correct. I represent him currently.
Q Who was working with you on that cert process?
A Jennifer Herndon.
Q It was Ms. Herndon who prepared the certiorari petition that ultimately got the Supreme Court's attention?
A Well, not exactly. We had no success, frankly, in the federal courts, but we filed a successive habeas petition in state court. Ms. Herndon did 90 percent of that work. I take very little credit. And she argued it, and Judge Stith, Laura Stith, who is the Missouri Supreme Court Chief Justice, along with three of the other judges, found merit in that state habeas petition. That is, that they ruled that if the United States Supreme Court had had an opportunity to consider whether or not executing juveniles violated the 8th Amendment, Judge Stith thought that that court would find it a violation of the 8th Amendment, and, therefore, they vacated the death

warrant of Christopher Simmons.

The state of Missouri took an immediate appeal to the United States Supreme Court, and the United States Supreme Court, as we all know, in 2005, affirmed the Missouri Supreme Court holding that the execution of juveniles was in fact a violation of the 8th Amendment.

Q At the time -- at this period of time, and now we're into May, June of 2001, how would you describe in general overall terms the level of your caseload in terms of how many cases you were handling, how many serious cases you were handling, matters of that general nature?

A I was busy. I had these matters in federal court, cert petitions in Mr. Kreutzer's case. We had ongoing litigation in Mr. Simmons' case. In addition to Mr. Nelson's case, I had other capital cases pending, and then I had a very active criminal docket both in state and federal court. And I, as you already made note of, was doing personal injury plaintiff's litigation primarily in state court but also in federal court.

Q At the time were you also involved in another federal capital prosecution in the Northern District of Iowa?

A Yes.

Q What case was that?

A United States v. Angela Johnson, which was in the Northern District of Iowa pending before the Honorable Mark

Bennett, B-e-n-n-e-t-t.

Q During this period of time, was that case active in the sense that it required your attention and required you to travel to Iowa on occasion?

A Yes. It was very active.

Q When you would travel to Iowa, how long a drive is that?

A Well, the case that was in -- Judge Bennett sits in Sioux City, but we were in front of the magistrate at that time. And he's in Cedar Rapids, and that's 202 miles if not more. It was a -- roughly a five-hour drive.

Q I'm going to show you a document. We can switch back over to the defense side and ask that we display P20.

I'll ask you if you recognize P20?

MR. RUHNKE: If we can blow up just the top of P20, the top third or so of P20.

Q (BY MR. RUHNKE) Is that a document that you provided to Mr. Nelson's counsel at some point?

A Yes, sir.

Q And what is P20 in general terms?

A P20 is -- it's an attachment regarding a continuance application that myself and fellow Kansas City attorney Sean O'Brien filed when we were jointly appointed to represent a gentleman named John Robinson in the District Court in Johnson County, Kansas. Mr. Robinson was charged with first-degree murder. The state of Kansas was seeking the death penalty in

six separate murders in his case.

Q Had that case drawn quite a bit of attention at the time?

A I'm sorry, would you repeat that?

Q Had that case drawn quite a bit of attention at the time?

A Yes, sir.

Q If I recall correctly, this involved the murder of women and burying the bodies in barrels and fields?

A Yes. These women -- there were at least eight women that were killed and only six bodies recovered. They were successive, that is, one after the other, over a period of years. When Mr. Robinson was finally arrested, these bodies were recovered in barrels. He had put these barrels in storage lockers in both Missouri and Kansas, so it generated national attention.

Q And in P20 do you summarize what your then, meaning the summer of 2001, caseload responsibilities were as far as major cases that you had responsibility for?

A It looks that -- yes, sir, I did.

Q And I want to look towards the end of the P20. I'm looking for a letter that you had written to the public defender's office in Missouri. Keep going. Right there.

MR. RUHNKE: Can we, first of all, highlight the date and the address.

on the Nelson case.

In May it looks like 20 hours maybe, 20 hours in April, May, 20 hours in June, little less in July, little less in August. It's not until September, according to this chart, that you begin to devote serious hours, what I call serious hours, to the Nelson defense.

Is it fair to say that from the period of February through the end of August, the overwhelming percentage of your practice is devoted to other cases than Nelson?

A Yes, sir.

Q And I want to then talk about the --

MR. RUHNKE: We can take that down now.

Q (BY MR. RUHNKE) Once you came into the Nelson case, who was in charge of developing the mitigation aspects of the case?

A I was.

Q Did you and Susan Hunt, your cocounsel, that -- we haven't established that.

Susan Hunt was your cocounsel in the case?

A She was.

Q She had been in the case from the beginning?

A Yes, that was my understanding.

Q Was there any other attorney who had been in the case from the beginning?

A Not that I know of, no.

Q Again, the record speaks for itself, but she started in initial appointment and went right through the end. But she's the only attorney from start to finish.

Did you have a discussion with her about division of labor in the case?

A I'm sure we did, yes, sir.

Q And what was that discussion?

A Susan, since she had been involved in the case from the beginning and had very limited experience in capital litigation, if any at all, devoted her energies and skills to the development of the first phase of the trial, what we sometimes call the guilt/innocence phase, and that I would be largely responsible for the penalty phase of the trial were we to get to that point.

Q Based on your training and other experience you've had as a capital defense attorney, do you believe that a mental health investigation is an important part or even an indispensable part of preparation for a capital murder trial?

A Yes, sir.

Q Do you believe that investigation of mental health is virtually mandated by the 8th Amendment in every case?

A Yes. And certainly the ABA guidelines make that very clear.

Q The ABA guidelines both as they existed in 2003 and the previous ABA guidelines in 1989; is that correct?

A Yes, sir. I think that's always been the rule as long as the ABA has had guidelines on death penalty representation.
Q You began trying capital cases with the Missouri Public Defender System in what year?
A In 1986.
Q Was it the standard practice to conduct mental health investigations in all of your cases?
A Yes, sir.
Q And --
A I should modify that somewhat. There were occasionally rare examples where cases were resolved very quickly, and mental evaluations may not have been done in those cases because of the short time that had elapsed. But if the case went on for any period of time, then a client would have been evaluated.
Q Certainly in a case where the prosecution announced it was actually seeking the death penalty, it would be the standard of care to have a mental health investigation and eventually evaluation, correct?
A Yes, sir.
MR. RUHNKE: I'm going to ask that we display P21 at page 7. I'm going to ask you whether it's a document -- if you just highlight the top of it and the addressee.
Q (BY MR. RUHNKE) It's a letter dated September 14th from the Federal Public Defender's Office to Susan Hunt. I'll tell

you see a suggestion that Keith Nelson had -- was in a hospital for a long time following his birth, that he has relatives who are schizophrenic, and, finally, Mr. Ninemire's suggestion that it seems prudent that any mitigation investigation must include a psychiatric examination for Keith? Do you recall reading that or --
A No.
Q Okay. But did you have those -- that set of facts at your command based on your knowledge of the case?
A I'd say largely, yes. Yeah, we knew most of this.
Q And coming into the case at that point, did you determine that as is the standard of care and of practice, that there should be a psychological examination, evaluation, investigation of Mr. Nelson?
A Yes, sir.
Q When you came into the case, were you aware or did you come -- become aware at some point of the circumstances of Mr. Nelson's birth?
A I was informed that Mr. Nelson had been born prematurely, and as a result, there were some complications that required hospitalization. I don't recall specifically for how long.
Q And, you know, you were doing medical malpractice at the time. Am I correct about that?
A Yes, sir.

Q Did you ever handle a case involving, say, an infant who had been brain damaged or was injured during the birth process?
A No, sir.
Q Are you aware of such cases?
A Of course, yes.
Q Did it occur to you with that information, that perhaps a neonatologist might be someone you should consult with?
A I can't honestly say that occurred to me at the time.
Q Did it occur to you at the time that you needed a neuropsychological examination to be done?
A Yes, yes.
Q And as we take it to the end of the case, was a neuropsychological evaluation ever conducted of Mr. Nelson?
A No, sir.
Q When you arrived in the case, was there to your knowledge a neuropsychologist who had been approved by the court and who in fact was poised to conduct an examination and evaluation of Mr. Nelson?
A Yes, sir.
MR. RUHNKE: I ask that we display P28 at page 67 and the next page and highlight paragraph 4, please.
Q (BY MR. RUHNKE) I'll represent to you that this is the motion filed by Mr. Shull and Ms. Hunt for Dr. Cowan's services and their representation that the defendant was born

prematurely and this fact raises the suspicion that the defendant may have organic brain defects, which may lead to mitigation evidence in the case.

As part of your getting up to speed on the case and reviewing what went on in the case, do you recall reading this motion, or would you in the due course of your review of the file have come across this motion?

A I'm confident I did not read the motion because I understood it had already been granted by the time I was involved in the case. There was no reason for me to kind of go back over that.

Q Was --

MR. RUHNKE: You can take that down now. Thank you.

Q (BY MR. RUHNKE) Was an issue of potential neurological impairment and neurological defects something you felt should be explored?

A Yes, sir.

Q When you got in the case, as we've established awhile ago, there was an appointment with Dr. Cowan that had been scheduled. When you learned about that, what action did you take?

A I canceled it.

Q All right. And do you recall in relation to when the examination was scheduled when you canceled it?

A I canceled it very shortly, if not the day before the

Q Okay. And did you ever engage the services of a neuropsychologist to examine Mr. Nelson?
A Not after that, no, sir.
Q Why did you cancel the Dr. Cowan appointment?
A I had had experience with Dr. Cowan in other cases. Some of it was good, and some of it was bad. He's unequivocally a very qualified neuropsychologist, but I thought given the seriousness of Mr. Nelson's case, the likelihood it would go to trial, that we could get a better expert than -- by that I mean somebody that had more of a regional and national reputation, might perhaps be a better witness than my experience with Dr. Cowan had revealed. And Dr. Cowan would not have been my first choice, and I saw no reason to stick with him merely because he had already been approved by the court.
Q And how long had you been in the case at this point?
A Less than a month.
Q Two weeks tops?
A Couple weeks.
Q Was part of your thinking is I just need to slow this down a little bit until I can find out more information?
A It wasn't so much that, although that's a factor. I mean, I would have certainly liked to have known a little bit more about the case before employing Dr. Cowan, but it was a concern about who we were hiring just as much as not having

enough time to absorb the information.

Q For any reason, tactical or otherwise, did you ever change your mind about the need for a neurological or neuropsychological examination of Mr. Nelson?

A No, sir.

Q Can you tell us why it never got done?

A We dropped the ball. It should have happened. Other things came up to the forefront, and I never got back to it. There's no good excuse, really no excuse at all.

Q Were you extraordinarily busy at that time?

A Yes, of course, I was busy, but that would not justify not getting another neuropsychologist in the case.

Q You did intend to get it done eventually then?

A Yes, sir.

Q And I want to show you two documents that you handed us on Saturday when we met. I'll hand you the originals which is the form that you gave it to us.

MR. RUHNKE: One is marked P17B, which is -- it's not marked. It's his original document but we have it electronically. But I'm going to ask Mr. Berrigan simply to leaf through these documents and see what they tell him about his practice at the time. The larger document is marked P17 --

THE COURT: I thought we had already gone over all that. We've got more?





Appellate Case: 15-3160 Page: 118 Date Filed: 02/29/2016 Entry ID: 4372433

about this client's life. The lawyers are oftentimes so involved in litigation and legal matters and things of that nature, that we couldn't possibly devote that effort to that part of the investigation, nor are we trained to do it.

In my experience mitigation investigators very frequently have had training in mental health issues and many other significant matters, and they're oftentimes very familiar with the leading mental health experts in the area and in the country. And I've gotten referrals many times for mental health experts from the mitigation investigators I've worked with.

Q And is part of the role of the mitigation specialist in your experience to meet regularly with a client?

A Yes, sir.

Q And when a capital case comes to trial and there's a penalty phase, has it been your experience that the mitigation specialist will often be there assisting witnesses and basically serve as kind of the case agent of the mitigation case?

A I'd say without exception. Uniformly in my experience, the mitigation investigator has always been there when the penalty phase of the case is ongoing, absent illness or injury, and they are the primary person upon whom the attorneys rely to marshal the witnesses, to make sure everybody's there, ready to go, prepared to testify and so on.

Q Did that happen in Keith Nelson's case?
A No, no, sir.
THE COURT: Did what happen?
MR. RUHNKE: I'm sorry.
Q (BY MR. RUHNKE) Was the mitigation specialist, Tena Francis, or any other representative of her office present during the penalty phase of this case?
A No, sir. My secretary handled the marshaling of witnesses in Mr. Nelson's case.
Q How much contact did you personally have with Ms. Francis or representatives who worked in her office or associates?
A I had one or two meetings with Ms. Francis herself when she came to Kansas City early on at least in my role of my experience with Mr. Nelson's case. I don't specifically remember the dates, but she came up to see -- visit with us, us being myself and Susan Hunt, and a visit with Keith and we had a meeting at that time.
Then I made some trips down to Texas to conduct mitigation investigation, and at that time I met with representatives of Ms. Francis' office. But I don't think that I met her in Texas, not that I recollect.
Q And the trips to Texas to interview witnesses, would that have been in September of 2001?
A I don't recall specifically. That sounds about right.

It was in the fall certainly.

Q The month of August you had had the quintuple bypass surgery and weren't doing much on the case. Is that a fair --

A Yes, sir.

Q Okay. I want to show on the screen P18, page 1. If we'd just enlarge the body of that. There's -- with the date and -- at the top.

First of all, do you recognize the handwriting on that?

A Yes, sir. And I think my signature and initials are at the bottom of the page as well.

Q And is this your practice to basically sign your notes as you make them? And I notice there's a checkmark and what appears to be your initials in the top in red. What does that refer to?

A Frankly, that's unusual and I'm going to guess that has something to do with billing. Very few of my notes usually have checkmarks at the top with my initials, but I think it's probably a billing issue where I might have dictated that to my secretary, Becky Walker, for billing, and then checked off so I didn't do that again.

Q All right.

A That's all I can tell you.

Q You see this reference is on February 21, 2001, a conference with Susan, reference to Susan Hunt, I assume?

Q And do you recall sitting down and making notations on your copy of the chronology?
A Yes, sir.
MR. RUHNKE: Could we display 34A? I'm sorry. Government's Exhibit 34A. Can we do that? If the government can do it easier, let's just do it that way.
Q (BY MR. RUHNKE) If we can go to the second -- first of all, if -- you can see generally that this is the life history chronology of Keith Nelson, and can you see in the upper right-hand corner it was last updated May 2, 2001?
A Yes, sir, I see that.
Q To your knowledge was this ever updated after this date?
A Not that I recall.
MR. RUHNKE: Can we go down to the next page, and blow up the two or three paragraphs that have the handwriting in the right margin. All right.
Q (BY MR. RUHNKE) Do you recognize the handwriting?
A I do. That's my handwriting.
Q And I'm going to represent to you and throughout this document you made various handwritten annotations and you were asking rhetorically do we have records, do we have this, do we have that, and it really goes on for 10 or 15 pages. Your annotations saying, all right, this is the chronology, here's a reference to said to have drunk alcohol during pregnancy, and you're asking do we have any of Nancy's medical records,

do we have birth records for Kenneth and Keith.

There's a reference to the fact that Nancy had no prenatal care at all for the twins that she was carrying and delivered literally nine months after giving birth to -- ten months after giving birth to another child. And your annotation is no prenatal care at all, question mark.

Do you know what you did with this handwritten document? Did you send it to Ms. Francis? Did you say, look, these are some of my questions, let's talk, let's get together, let's figure out what to do?

A I have no idea what I did with this document. I mean, it's obvious I was concerned about having supporting documentation of some of the stuff that was in this chronology, and then questions about issues that the chronology raised. But I don't know what I ended up doing with it after I went through and asked these questions or wrote these notes.

Q So you're -- the attorneys involved in the development of the mitigation case and Ms. Francis is the mitigation specialist, are you having any kind of regular communication?

A Myself personally, no. The communication that Ms. Francis had with the defense team was largely through Susan Hunt, not myself.

Q And I want to go back to the mitigation binder, which is P18. Wait. I'm sorry. That's not it. I'm incorrect about

that. It's P9 starting at page 108.

This is the letter, the transmittal letter, the cover letter. We see the next page. I'm not going to pause to read what's contained in it. You see the next page. If we could go all the way towards the end of this document.

Do you recall that Ms. Francis appended to the document research, articles about various issues in mitigation?

A Yes, sir, I do.

Q And the research of those documents included articles about neurological impairment, role of a neuropsychologist in the process, the role of brain damage, neurological impairment, brain damage in the mitigation process. Do you know if you read the articles or just glanced at them? Do you have any recollection at all?

A I did not read the articles because I was familiar with those issues. In other words -- in fact, I'm not exactly sure why Ms. Francis appended those other than perhaps she and I didn't know each other. She may have had no idea what my background was, but those were issues that I was already familiar with as a result of being engaged in this type of capital defense for a number of years.

Q So you came to this case fully aware of the knowledge that brain damage can be a significant mitigating circumstance to investigate?

A Yes, sir.

Q Neurological impairments can be the same?

A Of course.

Q And a neuropsychologist can do things that a clinical psychologist doesn't?

A I've used neuropsychologists many times, and I'm very familiar with what they do.

Q And a neuropsychologist does not need to delve into the facts and circumstances of the crime; is that correct?

A That's exactly correct. Frequently they don't. They're measuring and assessing client's neurological abilities and deficits. They do timed testing. A lot of times it's videotaped. Sometimes they do audiotapes of the testing.

But they're oftentimes not employed to actually speak to the client about the events at the time of the alleged crime. They're there to determine whether or not this client has neurological brain deformities, brain deficits, and to present that information to the attorney that's retained them.

Q And without oversimplifying it because I'm sure the neuropsychologists think it's not as simple as that, they basically administer standard testing. They score the testing. They often score it based on sometimes machine-scored versions, and the testing either indicates the presence of some kind of lobe or brain dysfunction or defect or

objective medical testing of neurologist. That way the expert would not delve into the defendant's past bad history.

Was that a discussion of the pluses and minuses of neuropsychological testing?

A Yes, sir, in part.

Q What do you mean "in part"?

A Well, the problem with the neuropsych testing is certainly if you don't talk about the defendant's history, that's going to be the subject of cross-examination by the government prosecutors. If you had a neurologist, that really isn't part of their job. I mean, somebody who's just doing, for example, objective medical testing, such as brain imaging, doesn't really have occasion to have any discussion with the client about their history or the events of the alleged crime.

So I think that's what I'm referring to or that's what Ms. Francis is --

Q That's what she wrote down?

A Right.

Q Is it still your belief, though, that when you do a neuropsychological exam, there really is no necessity to touch the circumstances of the crime?

A That's right. It's not necessary at all.

Q And is there anything about those thoughts about a neurologist that made you decide for tactical reasons or otherwise, that you would not employ a neuropsychological





Appellate Case: 15-3160 Page: 126 Date Filed: 02/29/2016 Entry ID: 4372433

exam?

A No. Because I didn't. I did not employ a neurologist in lieu of a neuropsych exam. We didn't employ anybody. The plan was to find somebody else, another neuropsychologist, to do the evaluation other than Dr. Cowan and that did not happen.

Q Did you have any concerns about Dr. Cowan's competence to do this kind of an exam?

A Not at all. He's a very, very competent, the most, in my opinion, qualified neuropsychologist in this area.

Q All right. And let's go back to the lower part of this document. Let's highlight the whole thing, blow the whole thing up.

There's a reference to a June 28 hearing, and Ms. Francis writes down in re government's request to use, and she doesn't finish the thought.

Was there litigation going on in the case at that point about using -- the government using mental health experts to evaluate Mr. Nelson?

A That litigation was definitely going on. I think it went on for months.

Q And there's a reference, guilt/innocence phase. "We're not going to argue over unimportant stuff like he did not rape her, only attack the rats." That's a pretty shorthand description of the guilt phase strategy.





Appellate Case: 15-3160 Page: 127 Date Filed: 02/29/2016 Entry ID: 4372433

A I confess I do not, no, sir.

Q Do you know or recall that Timothy McVeigh was executed by the Department of Justice on June 11, 2001, and ten days later the Department of Justice executed Raul Garza, the first two modern federal executions to have taken place, sir?

A I remember Mr. McVeigh's case, I'm sure as we all do. It was a most unique experience in the recent history. Mr. Garza's name, I'm familiar with, but I wouldn't have been able to give you the dates on either one of those now, although at the time I'm sure it was much more familiar.

Q Somebody engaged in capital defense, and this was the first federal execution in 20, 30 years --

A Right.

Q -- you would have been aware of it?

A Yeah, absolutely, yeah.

THE COURT: It appears we're getting a little bit astray from those issues that the circuit asked us to take a look at.

MR. RUHNKE: Well, the circuit did ask about preparation, mental health evaluations.

THE COURT: We've been doing that for quite sometime now. How about some of these other issues you haven't gotten to?

MR. RUHNKE: We're going to get to them, Your Honor, I promise.

THE COURT: Let's get to them now.

MR. RUHNKE: I need to do a little more about the nature of the relationship and what's going on in the mitigation case. There's documents that deal with that. I'd like to do that, if I may.

THE COURT: You have those documents. They're admitted into evidence. Let's move on to the other things.

MR. RUHNKE: I'd like to -- what's not admitted into evidence respectfully is Mr. Berrigan's state of mind, his reaction to the documents, and what they are causing him to do and not do.

I can't do it without --

THE COURT: Mr. Berrigan's already said he dropped the ball. He's already said that he -- the mitigation evidence, the mitigation part of the case is deficient. He's already spoken to the lack of mental health evidence.

MR. RUHNKE: I want to be able to establish that this wasn't just a passing reference here and there. This was a constant theme of the documents that were going to and from Mr. Berrigan. One of the documents I'm going to be referring to is P10, which is an affidavit -- while we're referring to the documents, P10 is an affidavit that Ms. Francis completed at the end of June of 2001, in support of the application for additional fundings, which detailed what had been done and what hadn't been done, what needed to be done.





Appellate Case: 15-3160 Page: 129 Date Filed: 02/29/2016 Entry ID: 4372433

THE COURT: I thought we just saw that document.

MR. RUHNKE: We saw a note from her about a meeting. This is a 10 or 15 paragraph affidavit in which she notes, among other things, there's a reason to suspect that Keith might suffer neurological impairment caused by prenatal damage, birthing problems, head injuries, et cetera, and that's at paragraph 10.

THE COURT: We covered that area as well.

MR. RUHNKE: I recognize that we've covered it in the sense that it was an issue that came up in February. It was an issue that came up in March. It's an issue that now comes up again at the end of June two or three months away from the start of the trial, and I need to know --

THE COURT: What makes it different? It's the same evidence that applies to the same person. It never has been resolved. Why is it -- it's just cumulative.

MR. RUHNKE: It's not cumulative respect -- I don't mean to argue with Your Honor.

THE COURT: We're not arguing. We're discussing.

MR. RUHNKE: Okay. I like that characterization better.

Discussing this issue with you. In fact, I like the Midwest term of visiting with counsel. I'd never heard that before I read the record in this case.

The issue is it's now the end of June 2001.

Mr. Berrigan knows there's an October trial date. The mitigation specialist is saying to him this is an unexplored issue, that there's reason to believe that he may suffer from neurological impairment, we need to investigate that and go after that.

THE COURT: And that was not done?

MR. RUHNKE: That was not done.

THE COURT: Yeah. That's a matter of record.

MR. RUHNKE: It was not done despite repeated reminders that it had to be done.

THE COURT: Yes. You have the documents in. The Court of Appeals can go back and look and read them at their leisure.

MR. RUHNKE: Depending who takes the appeal, I think that's correct. Okay.

Q (BY MR. RUHNKE) Then let me go on. Do you recall at or about --

THE COURT: Let me ask a question, Mr. Berrigan.

THE WITNESS: Yes, sir.

THE COURT: I'm a little bit in the dark on what communications existed between you and Ms. Hunt --

THE WITNESS: Yes.

THE COURT: -- as this time was transpiring.

Was she involved in ongoing discussions with you about your theory of how to proceed with the case?

government's examination of Mr. Nelson's mental health.

THE WITNESS: Yes, sir.

THE COURT: That kind of was not completed at least to my satisfaction. What was that all about?

THE WITNESS: I don't know if you recall from your state practice, Your Honor, but Chapter 552 governs mental health defenses and mental health evidence in state court, and that had largely been my experience even though I'd had one federal case. And what had happened up until 2000, in state court is even though Chapter 552 never explicitly gave the government ever the opportunity to examine my client, if I was putting on mental health evidence in the penalty phase, courts would order that all the time. All the time.

And so I had had this experience of trying capital cases in state court where the last witness to testify in the penalty phase was the government's psychiatrist or psychologist, and I can tell you that was devastating testimony. The cases that I lost, which were fairly few, thankfully, invariably that in my humble opinion was a critical piece of evidence for the government because these guys would come in and say not only did the client confess to the crime but he wasn't the least bit remorseful, seemed to take pleasure in relating the circumstances of the horrible murders that the folks had already convicted him of. It was awful evidence.

surgery in the summer of 2001, a discussion of whether you were ready to go to trial in October?

A I don't recall that discussion, no, sir.

Q Do you think you were ready to go to trial in October, at the end of October?

A Depends on how you look at it. At the end of the bypass surgery, obviously we weren't ready because the trial was still, you know, I guess, a couple of months, 90 days away. Couple of months away.

As I look back on it now, of course, I know I wasn't ready. I felt, frankly, as we were coming up to trial, I wasn't ready, but I guess I didn't particularly assess whether I was ready or not right after having bypass surgery.

Q All right. Did there come a time when you felt that the trial was coming up, you really weren't ready, and did it occur to you that perhaps you should move to continue the trial date?

A I felt that we weren't ready, but I did not make any effort to continue the trial setting.

Q If you weren't ready, why not?

A Because I understood that we were going to trial in October, period. That was the basis upon which I had agreed to get involved in the case.

Admittedly, I did not know there would be a trial date in October when Judge Hays and I spoke. All she





Appellate Case: 15-3160 Page: 133 Date Filed: 02/29/2016 Entry ID: 4372433

suggested to me is she felt strongly Judge Gaitan would, of course, continue the case and not force me to trial in April, given I was just getting involved in February. Of course, I knew Judge Gaitan and I knew that wasn't going to happen, but there was never a promise, well, it will be continued eight months, nine months, a year.

I didn't know when it would be continued, but when I signed up to do it, Judge Hays made it pretty clear, look, this case started back in the fall of 2000, and the judge wants this case to get resolved and this is it, it's going to trial at the next setting. And I agreed to do it.

Q Did you feel to your responsibilities to Mr. Nelson that you should have moved for a continuance?

A Yes, sir.

Q And am I taking away from your answer that you didn't move because you felt you had implicitly agreed to go to trial on the first continued date?

A It's that and I felt the continuance application would have been futile in any case. I felt Judge Gaitan had made it clear he expected the case to go to trial by fall. Judge Hays had made it clear that the expectation was it would be tried at the next setting. Certainly the government, I think, even to the first continuance made objection. I know they certainly spoke at the continuance application. They weren't happy about it, and I didn't think there would be any chance





Appellate Case: 15-3160 Page: 134 Date Filed: 02/29/2016 Entry ID: 4372433

of getting a continuance. But I didn't ask for one.

Q Did you consider not using but pointing out the fact that you were in the recovery period from some very serious heart surgery?

A I didn't consider that. I mean, I've had coronary artery disease for a long time, since I was 30 years old. In the three months preceding that August 8th surgery I had had 12 angioplasties, and so this was an issue that I needed to address obviously and I did. But I've been loathe throughout my career to use health as an excuse for continuing anything, and I'd like to think that I never have.

I've never filed a continuance application that I can recall on the basis of, you know, being in poor health. Now, sometimes these angioplasties would come up on a date where I might have court scheduled or maybe a trial even and I couldn't avoid that. But, you know, I recovered. It took awhile but I recovered from that surgery, and I expected when it was over, I'd be ready for trial, try my very best to be ready for trial in the fall.

Q Even if you felt that you weren't ready to go?

A Yeah. You know, some might call this, I think, pride or conceit, I'm not sure, but we don't -- I don't think trial lawyers like to come up with personal excuses not to be ready to go. It's one of our responsibilities that you're entrusted to get the case prepared and try the case when it's scheduled,





Appellate Case: 15-3160 Page: 135 Date Filed: 02/29/2016 Entry ID: 4372433

and to you use health -- I mean, obviously there are exceptions and folks get cancer and terrible illnesses where they're physically not able to perform. But that wasn't the case here.

I just lost a bunch of time. I had to go through cardiac rehabilitation and all the stuff that happens after surgery. But I -- to this day I'm not sure even if I'd asked for a continuance, I needed a continuance, I'm not sure I would have used my health as the reason for the continuance.

Q So in any event, no motion for continuance was ever filed, correct?

A No, sir, there was no motion for continuance filed.

Q And one of the issues the Eighth Circuit remanded on was the circumstances under which Keith Nelson refused to be evaluated by mental health experts. You're aware of that?

A Yes, I am.

Q And to cut to the chase on that, you knew that Drs. Martell and Dietz were sent by the government to evaluate or going to be sent by the government to evaluate Mr. Nelson, correct?

A Yes.

Q Do you recall that Dr. Martell had been to CCA, had attempted to see Mr. Nelson for the purposes of evaluating him, and Mr. Nelson had refused to see him?

A Yes, I'm aware of that.

Q All right. And did you then become aware -- and had you discussed that with Mr. Nelson?

A Of course, I discussed it with him. That's why he refused to see Dr. Martell and would have refused to see Dr. Dietz as well.

Q In essence nobody can force a client to do anything, but did Mr. Nelson tend to listen to your advice and counsel?

A I thought I had an excellent relationship with Mr. Nelson. I'm sure the court will recall at sentencing maybe coming to a different conclusion but that wasn't true. I know that he had some difficulties with other individuals, Mr. Shull, perhaps Mr. Pace, but my own experience with him was almost uniformly positive. Frankly, I -- even his guilty plea was an idea that I suggested. I thought that he would incur some sympathy or at least some empathy from the public in taking responsibility for what he had done.

That turned out to be a disastrous decision, but this decision regarding not speaking to Dr. Dietz and Dr. Martell was unequivocally my very strong advice to Mr. Nelson based on my experiences I've described, and he followed it, as he did almost everything else I asked him to do.

Q And taking the converse of that, based upon the relationship with Mr. Nelson as you just described it, had you told him to go ahead and cooperate with the examination, is it

your belief that he would have done so?

A He relied on me to plead guilty to capital murder, so my answer to that is yes. Like I said, he did what I asked him to do. The only thing that I was never crazy about is he didn't like to come to court for some of the preliminary hearing matters that we had in front of Judge Hays, and the reason had to do with what would happen back at CCA when he left and people going through his cell and so on.

He never really felt that his presence at these pretrial hearings was very productive, and I would have liked to have had him there. Other than that, frankly, he followed my advice to a T without exception.

Q Do you recall that Dr. Martell or do you know that Dr. Martell is primarily a neuropsychologist?

A Yes. I'm familiar with Dr. Martell and Dietz. They had a national reputation even at that time as being government mental health experts that worked pretty much exclusively for the government in capital cases.

Q And you had no idea what Dr. Martell, for example, might find if he did a neurological examination because he never did it, correct?

A I -- no. I was concerned about what he might decide to testify about, but I had no idea what he would find, no.

Q All right. And you had obviously -- you didn't have your own neuropsychological findings, so you had nothing to

counter anything that he found, correct?
A Right. That's right.
Q Do you know that Dr. Martell did evaluate Keith Nelson in the course of this litigation and determined that he has brain damage and dysfunction?
A I've learned that from you in the course of the habeas proceedings, yes.
Q And that imaging has confirmed the brain damage?
A Yes, sir. I understand that's the case.
Q Did you consider the possibility that the U.S. experts might find significant mental health mitigation?
A To be honest, no, I did not. That had not been what I had heard about them up until that point.
Q Do you recall in your affidavit saying that you really had no information about these experts to justify a finding that they were going to go in there and do, for lack of a better word, a hatchet job?
A Yeah. That's true. I mean, I didn't know anything about their qualifications, their expertise, but I did know the names, and I knew that they were connected with the government, not -- these weren't folks that the defense, at least not that I knew, that any defense lawyers had hired. I understand that's changed since then, but at the time these guys were government guys is what I understood.
Q You mentioned before that you did have a psychologist,

Q And I think the next day or after the verdict had returned, you made this report a part of the record, correct?
A Right. I thought to preserve this issue, obviously we needed to make an offer of proof, and this was the offer of proof, this report.
MR. RUHNKE: Could we go to page 3 of the report, Bates stamped 3, and going down lower on that page, please. Lower, please.
Q (BY MR. RUHNKE) Do you recall a discussion in Dr. Foster's report that his interactions with Mr. Nelson were primarily devoted to, quote, history and trust building?
A Yes, sir.
Q Okay. Did you consider this a complete and a comprehensive mental health examination?
A No, sir.
MR. RUHNKE: Could we go down further down that page, please, and on the next page too. Excuse me. I'll find it sooner or later. Do you see the paragraph that begins "while sexual sadism is strongly suggested"? Could we highlight that paragraph, please?
Q (BY MR. RUHNKE) He states, Dr. Foster, we were unable to complete an evaluation. Our time was primarily spent in trust building and history taking. These conditions, referring to antisocial personality disorder and sexual sadism, are treatable and are manageable in an adult prison.

MR. RUHNKE: Personalizing it to the victim is different.

THE COURT: No, it's not. We talked about that, so let's not waste any more time going over that kind of stuff, Mr. Ruhnke.

MR. RUHNKE: All right. And I have one more.

Q (BY MR. RUHNKE) Do you remember a comment that the jury was the only dispensers of justice and that the victim's mother waits for you to give her some justice?

A I do.

Q Implying that the victim's wishes are something that the jury should take into consideration?

A Yes.

Q Any of those comments objected to?

A No, sir.

Q Do you think you should have objected to them?

A Of course. Suggesting the victims want death is entirely objectionable.

Q And any reason you think of, as you sit here today, why you didn't object?

A Sadly, no.

Q Anything tactical about it?

A No. There's nothing tactical. It was a failure to object to those comments.

Q And I think we've already had displayed, and I won't do

it again, but you and I had looked at a note you had made, parenthetical note, on a -- a handwritten note saying "Should have objected"?

A Yes, sir.

Q When did you make that note, do you think?

A I don't know. Might have been right after the comments. It could have been at the end of the closing. Usually those notes are contemporaneous with what's going on, so I don't go back and sort of fill in information. So the placement of the note would suggest when I wrote it, frankly. But obviously I was asleep at the switch and I guess recognized that I was asleep at the switch when I wrote that comment.

Q So looking back to February of 2001, when you got that phone call asking you to take this case, should you have taken this case on?

A Looking back, no, no. I have the most -- utmost respect for Judge Hays. In fact, I think she's a brilliant judge, and I've had nothing but wonderful experiences with her. And the same is true of Judge Gaitan, frankly, who I've known almost -- I've known him since the start of my legal career and both as a state court trial judge and appellate judge and a federal district judge. And I think looking back in my desire not to disappoint them in some way and the trust that they had put in me in taking Mr. Nelson's case, somehow blinded me to my responsibilities to Mr. Nelson, and there's no real good

excuse for that. It's nothing but pride and conceit, and I regret it now that I ever agreed to get involved in the case.

Q I think you said at your deposition, I never should have taken this case. I was just too damn busy.

A I was very busy.

THE COURT: I think we've established that, Mr. Ruhnke.

MR. RUHNKE: Pardon me?

THE COURT: We've gone over that.

THE WITNESS: Yeah.

Q (BY MR. RUHNKE) And you stand by that?

A I do, yes, sir.

MR. RUHNKE: Can I have a moment? And I don't think I have anything further.

I have nothing further on direct examination, Your Honor.

CROSS-EXAMINATION BY MR. KETCHMARK:

Q So, Mr. Berrigan, if I'm correct in my understanding, starting with the objections or the lack thereof, you just testified that those were clearly objectionable things and you should have objected to them but you were asleep at the switch?

A Yes. I don't mean literally asleep.

Q I understand. You weren't physically asleep in the courtroom?

medical type testimony versus the other one which was the litigated issue which was the issue that was extensively litigated in court back and forth. Am I correct in separating those two separate, distinct issues?

A Well, they're different in my mind certainly. We were undergoing litigation about what evidence would be admissible over on the court side, and then there was the issue about why not replace Dr. Cowan with another competent neuropsychologist. I do view that as a different issue.

Q And that's your testimony as to the Dr. Cowan and the replacement, that's where you, quote, unquote, dropped the ball?

A I definitely dropped the ball on that issue, yes, sir.

Q With respect to the other issue, Mr. Berrigan, about government having access to the mental health and how the government would have access and all of that, that was significant litigation that in fact began in May, May 10th of 2001, and continued up through November the 16th of 2001. Would you agree with me on that?

A If that's what the records reflect, I would agree with you, sir. I don't -- obviously don't remember the dates, but I do remember that we went back and forth on that for quite awhile.

Q I'll show you what's been marked as Government's Exhibit No. 219 and represent that this was a photocopy of a document

that we found when we went to Arizona, and it was a binder purportedly set up by the defense setting forth the history and the chronology of all that back-and-forth litigation.

A Okay.

Q Does that document look familiar to you?

A No, to be perfectly honest. I don't -- I didn't prepare this document, and I don't know that I've ever seen it. But it is what it is. I don't have any qualms about it.

Q In terms of the motions, do you recognize the captions of the motion, the back and forth between you and Mr. Miller on this particular issue?

A Yes, sir, I do.

Q And would you agree with me, Mr. Berrigan, that this, I call it chess match, this is where you initially say they shouldn't have access, Mark Miller says we should, and then the court makes a ruling?

A I think there were, frankly, several rulings is my recollection, but, yes, we were back and forth as we've testified to.

Q But then the issue of, okay, the government's going to have access and then you file a motion saying, well, if the government's going to have access, we shouldn't have to select the doctors of their choosing and you litigate that aspect of it, correct?

A Yes.





Appellate Case: 15-3160 Page: 145 Date Filed: 02/29/2016 Entry ID: 4372433

Q Then it goes through, well, can we present it if we have testimony where we're not basing it on interviews with the client, can we do that, correct?
A There were several issues and I'm sure that was amongst them.
Q So the mental health issue, as it relates to at least this particular side of the mental health, was extensively litigated by you and Mr. Miller before Judge Hays and ultimately before Judge Gaitan, correct?
A Yes. This issue about whether the government would have access to Mr. Nelson and what evidence could be presented, I think was extensively litigated, yes, sir.
Q And in fact the reference to Dr. Foster's report that Mr. Ruhnke had, that was actually a report that you attached as part of your in-camera offer of proof to preserve that issue for the record, correct?
A That's the basis of that report if that's what you're asking me.
Q Yes.
A Yes. That report was my recollection is specifically so that we would have an offer of proof on that issue because I don't think Dr. Foster was available, or perhaps it was going to be too much money to bring him in. I honestly don't remember why we didn't have Dr. Foster himself come back and make a testimonial offer of proof because that's the preferred

at trial.

Q You were well aware of all those options that were available, but it somehow slipped your mind that that's something you needed to do, Pat?

A Yes. I didn't do it. I mean, the record speaks for itself.

Q I guess what I'm a little bit confused about is Mr. Ruhnke presents all this history about all of these other capital cases that you're engaged in and it's almost to the point where you're too overqualified in this area, that you've got yourself spread too thin. Is that what your testimony is?

A No. I don't -- my qualifications and expertise and experience hadn't changed in Mr. Nelson's case. In other words, I'm -- this was an aberration in one respect only and that was time. I've never been involved in a case where I was appointed and tried a case essentially in six or seven months. That's never, ever been my experience.

That Angela Johnson case I was on for five years before trial. Typically there's at least a minimum 18 months, 24 months between my appointment and the case coming to trial. This was very, very quick, and it turned out to be that I had a lot of other obligations, previous obligations that ended up taking up a lot of my time.

Q So Ms. Johnson's case you were on that for four years?

A I think five -- at least five years. I think that case





Appellate Case: 15-3160 Page: 147 Date Filed: 02/29/2016 Entry ID: 4372433

Dr. Cunningham speaking to Mr. Nelson as to the subject of his testimony. If he had testified about psychological or mental health issues regarding Mr. Nelson, that might have been a real problem.

Q In terms of advising Mr. Nelson about whether or not he should submit or not submit to the interview --

A Yes, sir.

Q -- you indicated that you advised him unequivocally in very strong terms what your belief was, correct?

A Yes, sir.

Q That was your belief based on what you deemed to be the most appropriate strategy of whether or not to -- if we present this, then we're going to have to have you subject to being examined and that could be very bad for us?

A Yeah. Based on my experience, that was the strategic decision that I made, and I advocated it very strongly.

Q You didn't coerce or compel him, you didn't twist his arm, you basically gave him the facts and gave him the information and told him what you think very strongly what he should do, but he ultimately made that decision, correct?

A You'd have to ask him that, but it wasn't what do you want to do.

Q Right.

A That wasn't the discussion. It was this is what we're going to do, and he certainly didn't quarrel with me or say,





Appellate Case: 15-3160 Page: 148 Date Filed: 02/29/2016 Entry ID: 4372433

no, Pat, I really want to talk to these guys, please let me do it. But that decision was made. I made that decision. Now, you can say, well, Mr. Nelson could have done it himself, he could have gone against you. That's all true.

Q And, again, those were all -- that part of the mental health was being done for strategic reasons because you thought that there was more damage than good could come if Dietz and Martell had access to your client?

A That decision --

Q Yes.

A -- was made because I didn't want the jurors hearing the last word from the government. I didn't think that was a good idea based on my experience, as I've said several times now.

MR. KETCHMARK: One moment, Your Honor.

That's all I have, Judge.

REDIRECT EXAMINATION BY MR. RUHNKE:

Q Mr. Berrigan, at some point in the mental health litigation, Judge Gaitan issued an order describing what was to take place if Mr. Nelson refused to cooperate with the doctors. Am I correct about that?

A Yes, sir.

Q And the essence and the bottom line of the ruling was that if Mr. Nelson declined to be assessed by the government's choice of mental health professionals, he would not be permitted, the defense would not be permitted to put on a

mental health case. Is that a fair summary?

A Yes, it is.

Q And earlier had conditions under which the mental health evaluation and the decision-making process would be carried out, had also been put in place? Am I correct about that?

A Yes.

Q For example, had the government's mental health individuals evaluated your client and you determined that you didn't want the rebuttal, you would have been able to pull any mental health defense and proceed without a mental health defense and, therefore, not face the rebuttal, correct?

A Right. That's how Rule 12.2 works, and that's how the procedure was even in place at that time.

Q Sure. And 12.2 went into effect, I think, at the end of 2002, but at that point there had been a series of decisions, including within the Eighth Circuit, setting forth very, very similar proceedings to what actually became Federal Criminal Procedure 12.2. Am I correct about that?

A Virtually identical.

Q There was the Beckford decision out of Virginia, for example?

A Right.

Q Preceding Rule 12.2?

A Yes.

Q And at that point -- at the point that Mr. Nelson

refused to be evaluated on -- at your advice and you announced that to the court on October 18, 2001, what mental health case did you have?

A None.

Q So why were you pursuing this issue? Was this an appellate strategy?

A No, of course not.

Q You had no neuropsychological exam or mental health evidence to offer at that point; am I correct?

A At that point, yes, that's true.

Q Even if you had mental health evidence and even if you disclosed it to the government, you understood that their evidence was rebuttal, meaning that it was limited to mental health and it was limited to rebutting what was put forth in the defendant's presentation in the penalty phase; am I correct?

A Yes.

Q Was that your understanding?

A Yes. If we chose to present, let's say, Dr. Foster, for example, as a witness in the penalty phase, then the government's experts come in. If we choose not to do that, then the government's evidence is not permitted because obviously it's rebuttal evidence to whatever Dr. Foster would have offered.

Q Was there -- you had a history with Mr. Nelson of

Dr. Martell had gone ahead with the investigation without your offering mental health, was it your understanding that Dr. Martell would have been permitted to testify at the penalty phase?
A No.
Q Because of the procedures that had been set in place, correct?
A I suppose we could have called Dr. Martell theoretically. It wasn't something I was considering at the time.
Q Was this some kind of appellate strategy?
A No. These cases are to be won in trial, not in appeal. It's way too late in the appellate proceedings.
Q Do you recall -- and I'm going to ask to put up U.S. Exhibit 51, if you don't mind. I'll switch the laptop.
Do you recall in late August, end of August the litigation was still going on about the conditions of mental health and you were seeking an extension of time because of the bypass surgery? It's now the end of August. And you recall putting in a motion, I won't quote it but it's there in the exhibit, that you weren't expected back to work until, quote, after Labor Day?
A Yes. And, I mean, I'm looking at paragraph 3. This is what Mr. Ketchmark was asking me about. I asked for an extension to file a response. I suppose you could -- maybe





Appellate Case: 15-3160 Page: 152 Date Filed: 02/29/2016 Entry ID: 4372433

mitigation specialist and supervise her work and those kinds of things?

A We met with Tena Francis, as you've pointed out, I think, on one or two occasions. That was it.

Q Has that been your typical experience in preparing mitigation cases?

A Not at all.

Q Okay. What is your typical experience?

THE COURT: We've done that. Let's go to another question. Okay.

Q (BY MR. RUHNKE) You mentioned on the cross-examination of Mr. Ketchmark that the issue in this case was time. What do you mean by that?

A Well --

THE COURT: I think he's answered that question too. He said this was a shorter period than he's ever had to respond.

THE WITNESS: Right.

Q (BY MR. RUHNKE) Do you believe that you did not have enough time to get ready for this case?

THE COURT: Yes, yes. Come on, Mr. Ruhnke. Let's not go back over this again.

MR. RUHNKE: I'm not sure he's actually said he didn't --

THE COURT: He did say that. The record will

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

KEITH D. NELSON, )
Movant, )Case No.
vs. )04-8005-CV-W-FJG
UNITED STATES OF AMERICA, )Pages 274-467
Respondent. )

TRIAL TRANSCRIPT - VOLUME II OF IV

On April, 14, 15, 16, and 17, 2014, the above-entitled cause came on before the Honorable Fernando J. Gaitan, Jr., United States District Judge, sitting in Kansas City, Missouri.

APPEARANCES

For the Movant:
MR. DAVID A. RUHNKE
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042

MS. PAULA K. HARMS
Federal Public Defender
850 West Adams, Suite 201
Phoenix, Arizona 85007

MR. GARY E. BROTHERTON
Legal Writes, LLC
503 E. Nifong Blvd., #377
Columbia, Missouri 64201

For the Respondent:
MR. DAVID M. KETCHMARK
MR. JEFFREY E. VALENTI
United States Attorney's Office
400 East 9th Street, Ste. 5510
Kansas City, Missouri 64106





Appellate Case: 15-3160 Page: 155 Date Filed: 02/29/2016 Entry ID: 4372433

I N D E X

TUESDAY, APRIL 15, 2014
VOLUME II OF IV


| | Page |
|---|---|
| **RUSSELL STETLER** | |
| Direct Examination by Mr. Ruhnke | 276 |
| Cross-examination by Mr. Valenti | 315 |
| Redirect Examination by Mr. Ruhnke | 329 |
| Recross-examination by Mr. Valenti | 334 |
| **JILL MILLER** | |
| Direct Examination by Mr. Ruhnke | 335 |
| Cross-examination by Mr. Valenti | 374 |
| Redirect Examination by Mr. Ruhnke | 383 |
| **MICHAEL GELBORT, Ph.D.** | |
| Direct Examination by Mr. Ruhnke | 385 |
| Cross-examination by Mr. Valenti | 403 |
| Redirect Examination by Mr. Ruhnke | 412 |
| Recross-examination by Mr. Valenti | 414 |
| **XAVIER AMADOR** | |
| Direct Examination by Mr. Ruhnke | 415 |
| Cross-examination by Mr. Valenti | 445 |
| Redirect Examination by Mr. Ruhnke | 464 |

Untold Story of a Motherless Child, which kind of tracked the mitigation investigation in a postconviction case and relying particularly on documentary evidence that had not been discovered at the time of trial. And the more recent 2014 article in UMKC Law Review is, again, in a symposium issue on mental health issues, and my article discusses prevailing norms in mental health evaluations in capital cases.

Q And having been qualified --

THE COURT: I've heard enough, heard enough. You got that in the record. Let's move on.

MR. RUHNKE: All right. I offer Mr. Stetler as an expert in the investigation and presentation of mitigation evidence, prevailing capital defense norms.

THE COURT: Absolutely.

MR. VALENTI: No objection.

THE WITNESS: Thank you, Your Honor.

Q (BY MR. RUHNKE) You've already identified copies of the reports. Are you familiar -- and in those reports do you discuss the standard of care for defense representation in capital cases?

A I'm sorry, which reports are you referring to?

Q Both your reports.

A Oh, yes. I'm sorry, yes.

Q Do you discuss the standards of care?

A Yes. And the language is the same in both 69 and 69A.

critical documentary evidence that was available and counsel had failed to find or provide.

Q What is the relationship between the mitigation investigation and any mental health evaluations?

A Well, your mitigation investigation results in what we call a biopsychosocial history. It's multigenerational. It's based on a combination of documentary evidence and interviews, and --

Q Let me stop you there for a second. Why multigenerational? What difference does that make?

A I was going to get to that. Multigenerational investigation is important for identifying genetic predispositions, disorders, and vulnerabilities that may be embedded in the DNA, as well as behaviors that are replicated from one generation to the next. So it's called sometimes intergenerational modeling.

And social history is often referred to as the cornerstone of a sound, reliable mental health evaluation. So the social history does two things. It provides important background information about the client and his family, but it also helps lawyers decide what kind of expert do I need in this case and what sort of issues should they address.

Q And in terms of mitigation specialists, is it sometimes the function or often the function of a mitigation specialist to suggest certain experts that might be appropriate or

back in the 1980s, it starts by saying history is going to be very, very important, and not just history from the person that the psychiatrist is interviewing. Put that in the forensic context and you also have the problem of an expert who relies entirely on self-report.

So self-report is not going to be reliable in any context, but it's going to be particularly viewed in a skeptical lens in the context of any kind of forensic proceeding. So you want to give your experts independently-corroborated information.

Q And before I turn to the Keith Nelson case specifically, one final area which is what is the relationship when you present a case in mitigation between lay testimony, expert testimony, and other evidence, documents?

A Well, you know, they have to be integrated. In other words, your lay witnesses will put out important factual information, but they're not going to provide a framework for jurors to understand. The value of mitigation is often explanatory. When horrible crimes happen, jurors want to know how this came about, you know, who is this person, how was he shaped, and how did this crime occur.

And so, you know, the lay witnesses aren't going to provide that kind of explanation. You're going to need a mental health person to provide that framework.

But in turn the mental health people on their own





Appellate Case: 15-3160 Page: 159 Date Filed: 02/29/2016 Entry ID: 4372433

--

A Yes. And in fact there was also correspondence internally between Ms. Francis and her staff and between them and the lawyers about the need to get authorizations, the need to pursue certain records, but --

Q Let me give you one particular example.

A Sure.

Q Did the mitigation investigation that was conducted really in 2001, because that's when Ms. Francis began to work on the case, develop evidence or had the team already developed evidence -- not team.

Did the representatives of Mr. Nelson already develop evidence that he had been in special education classes in White Settlement?

A Yes.

Q And was the team -- were the representatives advised that regular school records were being disclosed, but if they wanted special ed records, they had to make a different and separate request because they're in a different location?

A Yes. That response from the schools was staring them in the face telling them here are some more records and, you know, since special education was certainly important in a case with cognitive limitations, they should have been pursued.

Q And did, to your knowledge, Ms. Francis or her

A No. It happens all the time, particularly in federal court.

Q And does the fact that Ms. Francis resided or had her offices or her people located in Dallas/Fort Worth mean that the obligation of a mitigation specialist to spend a significant amount of time with a client was somehow no longer in play?

A No, not at all.

Q Prevailing standard norms, prevailing norms of professional responsibility would require the attorney to do what in terms of having the mitigation specialist visit the client, meet with the client?

A To set up some kind of regular schedule and find the funding to enable that.

Q And in this case from both directions did you see any efforts coming from Ms. Francis to ask Mr. Berrigan to do that or efforts on Mr. Berrigan's part on the other end to try to set up a regular visitation schedule with the mitigation specialist?

A No. And, as I pointed out, there was a discussion of possibly getting someone else in who could make observations of the kind that might have formed mental health testimony. In addition, when Ms. Haddad visited Kansas City, she didn't see him.

Q And Mr. Valenti asked you questions about the needs of

you meet with him?

A They were in-person interviews in a room across a table.

Q So you had full-contact visit with Mr. Nelson?

A Yes.

Q And did you, as you developed and investigated Mr. Nelson's social history, discover themes, patterns of familial behavior, information about his home life, general themes and patterns that you uncovered?

MR. RUHNKE: I'm not going to go into them in detail, Your Honor. They're described in her report, but I do want to set out just the general themes and patterns you were able to discover.

Q (BY MR. RUHNKE) So what were they?

A Well, on both sides of the family, there's a multigenerational history of mental illness. Some of it was explored a little bit on the Nelson side pretrial. The Morse side not as much. Alcoholism, substance abuse on both sides of the family. A lot of domestic abuse on both sides of the family, inappropriate sexual behavior, including criminal sexual misconduct.

Q So stay with that for just a moment.

Are there relatives on Mr. Nelson's -- the Morse side of the Nelson family in prison for inappropriate sexual conduct?

A Yes.

A Well, for a number of reasons and not just for visits. A client, particularly one with some of the problems Keith had, does need contact with people and with members of the defense team, but you don't see them just for visits. You're continually gathering information and coming back with the new things you've learned to discuss those things with the client.

You also need to develop the kind of relationship over time that enables people to talk about their private and shameful matters, and that comes with building trust. And then the kind of observational things that Mr. Stetler talked about, observing their behavior over time.

Q For example, were you able to see anything in Ms. Francis' interviews with Mr. Nelson where he discussed being sexually abused?

A He, I believe, told her something about the popsicle -- a babysitter that had him stick popsicle sticks -- and then she sort of noted that this was not a subject she was going to address that day because it was their first meeting and she would talk about it later. But no one did.

Q In your meetings in the approximately 25 hours you spent with Mr. Nelson, did he discuss with you sexual abuse?

A Yes.

Q How would you describe his willingness to discuss that topic?

A It was extraordinarily difficult for him and

Q So you've been on this case almost nine years now?
A Well, there was a period of four years where matters were being litigated and I was not actively involved.
Q Okay. You've been on the case for nine years. Of that, four years were inactive, so you've been actively involved for five --
A Yes.
Q -- fair?
And you heard my questions to Mr. Stetler because you were in the courtroom. You know that time can be an ally to a mitigation investigator, can also be an opponent if the records are destroyed. But the more time you have, the more you can do, correct?
A Correct.
Q And you had a substantial amount of time, at least five years, to actively investigate this matter as recently as working on it in 2014, correct?
A Yes. It was primarily done by the time this report was written in 2012, and then, as you know, there have been a number of delays.
Q Sure. And there have been some supplemental materials recently put out by you in that report that was -- I don't know if it matters --
A Yes.
Q -- Plaintiff's 38A?

paper-and-pencil tests?
A As it pertains to this particular evaluation, yes, it was.
Q And did you administer to Mr. Nelson a set of standard neuropsychological assessments, instruments?
A Test instruments, yes.
Q And what were the particular instruments that you administered to Mr. Nelson in 2005?
Just for the record, according to your report, the date of your evaluation was October 5, 2005.
A Okay.
Q Approximately nine years ago.
And what instruments did you select to assess and test Mr. Nelson with? If you'll refer to the second paragraph on page 2 of your report.
A He was administered -- I'm looking at my data sheet actually.
Q Okay.
A -- the Wechsler Adult Intelligence Scale, Third Edition. He was administered the Category Test from the Halstead-Reitan Battery, the Trail-making test also from that battery, grip strength, lateral dominance testing, the Wide-Range Achievement Test, Third Edition. There were some mental status items which were administered. Some items from the Luria Nebraska were given, aphasia screening. He was given a



Appellate Case: 15-3160 Page: 165 Date Filed: 02/29/2016 Entry ID: 4372433

Q And as you evaluated and assessed his essential strengths and his essential weaknesses, did you reach conclusion about any indication of frontal lobe disturbance slash dysfunction in Mr. Nelson?
A There -- I did.
Q What conclusion did you reach?
A That the frontal lobes were contributing to the areas of weakness shown in his test data.
Q And did that mean in essence that he had areas of dysfunction in the frontal lobe area of his brain?
A This data supports a diagnosis of frontal lobe disturbance or dysfunction.
Q And what role does the frontal lobe play in human behavior, in brain functioning?
A I think the most graphic way to think about it is when people see pictures of the homunculus, when people try to understand the way the brain is working early on and even now in kind of a simplistic way, we think of a little man pulling all the levers. And the little man who's pulling the levers, directing the rest of the brain to do the things that it does, that's the frontal lobe.

Other ways to think about the frontal lobe, it's the part of the brain that starts and stops behavior. The frontal lobes are as such the gas pedal and brake pedal of our behaviors. They allow us to initiate as well as to inhibit.

The frontal lobes are what are different from humans versus all other animals. Our frontal lobes are much more developed. They allow us to have complex language, to anticipate consequences, to appreciate the implications of our behavior, and to change our behavior such that we go in one direction and avoid another. So it's really the part that synthesizes and pulls together all of our thinking and our overactive behavior.

Q And as stated in your report, was it your conclusion that he, because of these dysfunctions and impairments, will demonstrate episodes of impaired reasoning and learning slash memory abilities and is found to have other than normal brain functioning, and, quote, his performance is consistent with and indicative of brain dysfunction?

A Yes.

Q And that was a conclusion you reached in the year 2005, correct?

A Yes.

Q Were you able to determine in any scientific way or to any degree of psychological certainty what the etiology was of this brain dysfunction, where it came from?

A We're not able to, using these types of methods, establish categorically or with 100-percent certainty what the etiology might be, but what we do do and what we can do is compare the data and the person's presentation, two different

Q (BY MR. VALENTI) Thank you. And severe brain dysfunction. Do you have a conclusion as to what level those -- are we're talking about mild?

A This would be categorized as mild.

Q During the testing you have, at least as it relates to intellectual quotient or IQ, you determined that he was in the average range but with some statistical differences based on verbal and full score, correct?

A The overall or the summary scores come out in the average range.

Q The injury you described is it was your opinion, sir, that that brain dysfunction lodged in the frontal lobe of Mr. Nelson's brain, correct?

A I think there's frontal lobe disturbance showing up in the data. I think there's also some left hemisphere disturbance. We haven't spoken of it yet but that's also showing up.

Q When we talk about frontal lobe, I think you described it as the -- what I would call the executive function of a person?

A That's another word that's applied to frontal lobe functioning.

Q I think you described it as the ability to stop and start certain behaviors?

A Those are types of functions that live within the

frontal lobe more or less.

Q Is impulse control one of those type of functions that would be housed in the frontal lobe?

A Largely so, yes.

Q Were you provided any information relative to the underlying offense that Mr. Nelson was convicted -- not convicted, which he pled guilty and was ultimately sentenced to death for regarding whether or not he could exercise impulse control?

A I've been supplied -- I think that was a two-part question. I have been supplied information relevant to the offense, and I don't believe that there was a witness to the offense who could provide information where impulse control could be carefully considered.

Q There was, however, testimony at, what, the penalty phase of the trial about him talking about the abduction of someone to anally rape before he did it, correct?

A That's my understanding, yes.

Q And that there was talk of it a month or so prior to what was an initial attack on a woman named Michanne Mattson on October 2nd, 1999. Do you recall that?

A I do.

Q And that there were coworkers and family members who heard him talking about that attack after October 2nd, 1999, for days leading up to what was then the abduction of Pamela

Butler on October 12th, 1999, where he was talking about abducting someone who was young and doing some unspeakable things to them. Do you recall that testimony?

A I do.

Q And do you recall also that there was testimony regarding people who had seen him in the area where Pamela Butler was abducted days previously driving back and forth they thought in a truck?

A I recall.

Q Okay. Does that sound like information that could inform an analysis of whether or not Mr. Nelson had impaired impulse control?

A It weighs in on some types of impulse control, not on others.

Q What types does it weigh in on?

A It certainly suggests that he had thought about things or he had reflected on this. Obviously judgment and reason wasn't being exercised or not good judgment, not good reason.

Q Well, wouldn't that be true in almost all criminal activity, I mean, that -- when people commit crimes, they're in one way or another exercising poor judgment as you look at it from a clinician's point of view, correct?

A I think self-defense would be an indication of a crime that's committed that may not necessarily conform to what you're talking about.



Appellate Case: 15-3160 Page: 170 Date Filed: 02/29/2016 Entry ID: 4372433

Q Well, but self-defense is a defense to crime. If someone defends themselves, that is a reason to have not committed a crime. It's an absolute or an affirmative defense.

I'm talking about someone steals from someone else, someone harms, someone rapes, someone sells drugs, that's people exercising poor judgment and impulse control relative to societal standards, isn't it?

A Well, first off, to go back, the self-defense I was talking about wasn't a legal term of putting something on in court but rather if someone attacks you and you aggress back, that that's self-defense --

Q Absolutely.

A -- in a more lay sense. And that's a crime or, you know, people can be charged for that, as I understand, but it's one of those things that is -- probably reflects some type of positive impulse.

Q Okay. Let's not talk about self-defense or defense of others. Let's talk about a defendant that acts and commits a robbery at the local QuikTrip. That person has exercised poor impulse control, correct?

A They certainly may have.

Q Okay. Or they've at least done -- created a selfish act or a criminal act where they put their own needs and priorities above that of others or society's?

A I don't think there's any disagreement there.
Q Okay. And so when you say that there is some impulse control that can be analyzed by looking at the evidence of the underlying crime, is that what you're referring to?
A As I said, I don't think anyone was there to see what happened in the moment, to know how well he controlled his own behavior. What you've referred to, though, is that there was some discussion ahead of time in a more controlled setting that, you know, there's still some impulsivity there, and there's not evidently or it sounds like there's not been proper thinking or adaptive thinking to say, okay, you know, people have different impulses, I need to inhibit these.
Q Or an unwillingness to inhibit them?
A Possibility.
MR. VALENTI: That's all I have, Your Honor.
REDIRECT EXAMINATION BY MR. RUHNKE:
Q Dr. Gelbort, you conducted, as the term you used was, essentially a blind analysis of Mr. Nelson when he first saw you, correct?
A Yes.
Q You had no information was he brain damaged, wasn't he brain damaged. You were requested to do it. There was some information saying this is in his background, but you simply conducted your testing, took five or six hours with him, administered standard testing instruments, and reached the

conclusion justified by the data, correct?

A Yes.

Q And if somebody who robbed a local convenience store, Mr. Valenti's example, is everybody who commits a crime going to also show up with brain dysfunction?

A No.

Q And when you talk about frontal lobe, is that the part of us and the piece of us that, you know, we think about doing something, we know we shouldn't be doing it, if our frontal lobe is paying attention, they're saying, hey, don't do that and we listen? Is that a good analogy?

A That's actually a very good analogy, and I think one has to be careful when talking about impulse control and impulsivity to recognize the knee jerk or delayed reaction to those words is that it happens in a moment like a knee jerk, that it's a reflexive sort of thing, and the way behavior unfolds is that you can have impulsive behavior that takes time and develops slowly where there's plenty of time to say, no, I shouldn't do this, but it's still an impulsive behavior even though it happens over time slowly.

Q So if you're planning to do something to hurt somebody a few days down in time and if your frontal lobe is not telling you, hey, don't do that, it may take a couple days to do it, but your frontal lobe doesn't engage and you're not able to access those assets of, I think, executive function that says





Appellate Case: 15-3160 Page: 173 Date Filed: 02/29/2016 Entry ID: 4372433

bad things will happen if you do this and you don't?

A There's two ways to respond. Either the frontal lobes don't do what they're supposed to or they weren't able to do what they were supposed to because they're defective. You know, when you have people with defective frontal lobe functioning, there's a much higher likelihood that they will engage or display aberrant, poorly socialized behavior, and the research over the years has shown that when you look at people who are incarcerated for violent crimes, there's a much higher preponderance of frontal lobe disturbance or dysfunction in that group than there are in the normal population.

MR. RUHNKE: Thank you, sir.

I have no more questions.

MR. VALENTI: Very briefly.

RECROSS-EXAMINATION BY MR. VALENTI:

Q Dr. Gelbort, during your normal psychological testing, did you see any indicia of alogia if I said that correctly?

A There was some anomalies in terms of language function but nothing that rose at least in my interview to that diagnosis.

Q Nothing to the point that you noted it in your report, correct?

A Correct.

Q Similarly, during your neuropsychological testing, did

he'd say no. And I'd ask him to elaborate. I'd have to probe.

I'd say, Do you feel like you're watching this happen, or do you feel like you're a part of this? And his answers frequently, not always, were that he felt he was watching us, it was as if he was watching a movie, as if he was outside himself. That's depersonalization.

Q And at the time you assessed Mr. Nelson initially and over the course of that one year, did you have information that he had been born prematurely?

A Yes.

Q Did you have information that he had been physically abused by a variety of people, including his father?

A Yes.

Q And did that factor into your analysis?

A Yes. His birth records in contrast to his twin brother, he suffered and was described as suffering several episodes of, what was just testified to, hypoxia and anoxia. He was certainly not thriving to the extent that his twin brother was and was observed to stop breathing on at least two occasions during transport from one hospital to another, had other behavioral indices of very low oxygenation to the blood; therefore, to his brain.

So those kinds of complications are things that you do see in histories of people with documented brain

dysfunction. And also psychosis in the schizophrenia spectrum, you see birth complications like that. Not always but frequently at a much higher level than in a normal population.

Q Did you observe during this first three and a half hours symptoms of post-traumatic stress disorder?

A Yes. The first being the derealization -- depersonalization. There wasn't a lot of derealization. But that feeling that he was outside of himself. Also avoidance. He really could not -- I don't think this was a choice on his part -- could not go into what happened to him as a child. This was a very sealed-over area, and it's very similar to what you see in somebody with PTSD. It's avoidance.

Q Do people who are undergoing extremely traumatic experiences, being a victim of sexual assault, being the victim of serious physical abuse as a child, war time, disassociate that way as a way of dealing with the trauma?

A The theory is that's the way, you know -- we're going from description to explanation. The theory is that's why disassociation happens. In terms of description, it is a typical description of somebody with PTSD. The person has frequent episodes of disassociation, feeling outside themselves as if they're observing themselves. The third symptom I saw, which I didn't mention, was also paranoia, which may have multiple causes, multiple etiologies. The





Appellate Case: 15-3160 Page: 176 Date Filed: 02/29/2016 Entry ID: 4372433

he suffered throughout his life, and all of which were corroborated by the testing, the structural imaging, the functional imaging, the neuropsychological testing that was conducted by three different experts and onset of these conditions in childhood.

So that when you have an impulsive child with a history of head trauma, with a history of very severe birth complications that almost certainly caused the damage to his brain or some of the damage to his brain that we see today clearly, you cannot give a --

THE COURT: I think we've covered enough of this. This would be more appropriate for a full-blown hearing if the court wanted to reverse its position.

MR. RUHNKE: The court has the report.

THE COURT: Certainly.

MR. RUHNKE: If there were a jury here, Dr. Amador, we'd be spending a lot more time on the individual findings. There's no jury here and Judge Gaitan is certainly going to have all these materials at his disposal.

Q (BY MR. RUHNKE) When it comes to the final conclusion, you did conclude at the end of this report that based on your analysis, Mr. Nelson had a defense of McNaughton insanity, and I'm using McNaughton as shorthand for the Statute 18, United States Code, Section 17, which you quote in your report correctly as, quote, that he's not responsible, quote, as a

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

KEITH D. NELSON, )

Movant, )Case No.

vs. )04-8005-CV-W-FJG

UNITED STATES OF AMERICA, )Pages 468-628

Respondent. )

TRIAL TRANSCRIPT - VOLUME III OF IV

On April, 14, 15, 16, and 17, 2014, the above-entitled cause came on before the Honorable Fernando J. Gaitan, Jr., United States District Judge, sitting in Kansas City, Missouri.

APPEARANCES

For the Movant: MR. DAVID A. RUHNKE
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042

MS. PAULA K. HARMS
Federal Public Defender
850 West Adams, Suite 201
Phoenix, Arizona 85007

MR. GARY E. BROTHERTON
Legal Writes, LLC
503 E. Nifong Blvd., #377
Columbia, Missouri 64201

For the Respondent: MR. DAVID M. KETCHMARK
MR. JEFFREY E. VALENTI
United States Attorney's Office
400 East 9th Street, Ste. 5510
Kansas City, Missouri 64106





Appellate Case: 15-3160 Page: 179 Date Filed: 02/29/2016 Entry ID: 4372433

# I N D E X

WEDNESDAY, APRIL 16, 2014
VOLUME III OF IV


| | Page |
|---|---|
| TENA FRANCIS | |
| Direct Examination by Mr. Ruhnke | 471 |
| Cross-examination by Mr. Ketchmark | 495 |
| Redirect Examination by Mr. Ruhnke | 510 |
| CAROLYN S. CRAWFORD, MD | |
| Direct Examination by Ms. Harms | 514 |
| Cross-examination by Mr. Valenti | 526 |
| LESLIE LEBOWITZ, Ph.D. | |
| Direct Examination by Ms. Harms | 527 |
| RUBEN GUR, Ph.D. | |
| Direct Examination by Ms. Harms | 551 |
| Cross-examination by Mr. Valenti | 588 |
| Redirect Examination by Ms. Harms | 601 |
| LARRY PACE | |
| Direct Examination by Mr. Ketchmark | 603 |
| Cross-examination by Mr. Ruhnke | 618 |
| Redirect Examination by Mr. Ketchmark | 627 |




Appellate Case: 15-3160 Page: 180 Date Filed: 02/29/2016 Entry ID: 4372433

Q And does that appear to be notes you made during the meeting of a telephone conversation of November 15, 2000?
A Yes.
Q Did there come a time a couple of days later that you met in person in Dallas with Mr. Shull and Ms. Hunt?
A Yes.
MR. RUHNKE: And I'm going to ask we display P10, page 8.
Q (BY MR. RUHNKE) Again, do these appear to be your notes of the meeting that occurred in Dallas on November 17, 2000?
A Yes.
Q And you made notes of discussions that were ongoing during that meeting; is that correct?
A That's correct.
MR. RUHNKE: If you could just go to page 4 of that document. I'm sorry. Page 4 of the document. I meant let's go to page 8 and go four more pages. Okay. That page. Would you highlight just the top.
Q (BY MR. RUHNKE) In the course of that meeting you made a note, "has neuropsych hired," double exclamation point. I gather from that that you were told that the neuropsychologist had been hired and the double exclamation point means that's a good thing?
A Absolutely.
Q Okay. Why in your experience as a mitigation

investigator is having a neuropsych involved in a capital case a good thing?

A Well, especially in a case where you suspect your client may have brain impairment, brain damage.

Q And in Keith Nelson's case based on records, based on history, did you suspect that he may have brain damage?

A Yes.

Q Going now -- let me take that down.

Subsequently, a motion was filed to have your organization appointed and you were appointed to serve as a mitigation -- your firm was appointed to provide mitigation services in Keith Nelson's case; is that correct?

A That's correct.

Q Do you recall when it was that you first met Pat Berrigan roughly?

A Oh, I don't know. Sorry.

MR. RUHNKE: Could we display P18 at page 1 and highlight the top portion of that with the date and the reference.

Q (BY MR. RUHNKE) You see a reference to February 21, 2001, confer with Susan and Tena Francis at Hereford House?

A Yes.

Q Does that refresh your recollection that in, you know, the second or third week of February of 2001, you traveled to Kansas City from Dallas to meet with the defense team in the

Nelson case?
A Yes.
Q Was that the first time you had met Mr. Berrigan?
A Yes.
Q During that trip, did you also have occasion to sit with Mr. Nelson?
A Yes.
Q To interview him at the Leavenworth Correctional -- CCA, Corporation -- Correction Corporation of America facility, private facility in Leavenworth, Kansas?
A Yes.
Q Did you meet with him twice during that trip to Kansas City?
A I did.
Q Now, during those meetings with Mr. Nelson, those two meetings, did the subject of sexual abuse come up?
A It did, though I didn't raise it.
Q Okay. And stop there for a second.
Can you explain -- the fact that you didn't raise it, was it because it's not something that had occurred to you, or was there something else about the topic?
A It's a very sensitive topic that I generally don't raise the first time I sit down with a client.
Q In other words, you don't sit down with someone, say, Hi, I'm Tena Francis, have you ever been sexually abused?

A Right.

Q For obvious reasons.

And was the topic of sexual abuse -- and I believe what Mr. Nelson may have disclosed to you, you tell me, did he discuss an incident with maybe a teenage babysitter who had involved him in some sexual activity when he was maybe ten years old?

A Yes.

Q Did you ever revisit the topic of sexual abuse with Mr. Nelson?

A I did not.

Q Did you ever see Mr. Nelson again after that trip in February of 2001?

A I did not.

Q Did any member of your organization ever see Mr. Nelson again after that visit in February of 2001?

A No.

Q Is that a practice that you follow in every case, not seeing the client?

A No.

Q What is your practice in every case?

A To see the client as often as possible.

Q And you were located in Dallas. Mr. Nelson was located in Leavenworth, Kansas, Kansas City area.

Was the fact that you were in Dallas and he was, you





Appellate Case: 15-3160 Page: 184 Date Filed: 02/29/2016 Entry ID: 4372433

A Yes.
Q Why did you turn over the investigation?
A That was the plan from the beginning. Deborah had an MSW and had worked with kids before. Mr. Nelson, being as young as he was, I thought she was right for it.
Q And did you discuss that plan with Mr. Berrigan and Ms. Hunt?
A Yes. But Deborah was never present for the meeting I had with them.
Q Did they ever meet Deborah Haddad before she came to Kansas City and began working on the case?
A No.
Q But your recollection is you informed both Mr. Berrigan and Ms. Hunt that you would be -- Deborah Haddad would be the principal investigator on the case?
A I believe so, yes.
Q Were you engaged in other cases in other activity throughout this period of time?
A Yes.
Q Now, we've heard some testimony, and I'm not going to dwell on it, in the case that a dispute arose between one of the attorneys, Susan Hunt, and Deborah Haddad over a visit she had made to Kansas City to interview witnesses. You know what I'm talking about?
A Yes.

Q All right. And long story short, Ms. Hunt basically was upset that Ms. Haddad had come to Kansas City, her travel had been funded, and she'd spent a weekend with her parents in St. Louis instead of working on the case. That was the controversy, correct?
A It wasn't her parents. I think it was an uncle.
Q Okay. Relatives?
A And she went to St. Louis not just to see them. She had some records collection to do in St. Louis for the case, but, yes, Susan --
Q In any event whoever is right, whoever is wrong, a dispute arose and Ms. Hunt was quite angry about what had taken place, rightfully or wrongfully, quite angry about what had taken place?
A Yes.
Q And thereafter did Ms. Haddad basically say I will not work on this case any longer?
A Yes.
Q And so she was removed from the case at that point?
A She did some work in Texas after that on the case, but she was not involved with Susan Hunt after that. And there was -- it was more than the travel. There was a controversy involving Mr. Nelson's mom. Susan had accused her of just being really unprofessional.
Q There was a dispute also between Ms. Haddad and Ms. Hunt

that Ms. Hunt seemed to be acting as a gatekeeper to Nancy Nelson, would not let Ms. Haddad have access to her. Is that a fair summary of that disagreement?

A Yes, yes.

Q Hardly matters whose record is wrong in this situation. The reality is there was a disagreement. As a result of that disagreement, Ms. Haddad said basically I won't deal with Susan any longer, I need to be removed from this case; is that correct?

A Yes.

Q At that point who was working on the case?

A No one.

Q And could you then have stepped back into the case as the principal in the mitigation investigation firm and the firm responsible for the mitigation investigation, you yourself?

A Not with the caseload I had and the deadlines I had.

Q Tell us a little more about that if you don't mind.

A About the cases?

Q About the caseload you had and what other -- I don't need you to describe the cases. Maybe I can make it easier this way.

Were you burdened with a lot of other capital cases in a lot of other jurisdictions during this period?

A Yes.





Appellate Case: 15-3160 Page: 187 Date Filed: 02/29/2016 Entry ID: 4372433

Q Were you working on a federal murder case where the death penalty had been withdrawn but still going to trial in Kentucky?

A Yes.

Q And were you working on that case throughout the spring and summer of 2001?

A Yes.

Q Working on other cases that summer?

A Yes.

Q So is it a fair summary that you simply didn't have the time to work on the case during that period of time?

A Not if it -- no. That's correct.

Q And the next item I want to show you is P9 at page 108.

If we look at just the top half of that --

A Uh-huh.

Q -- letter, top half. Okay.

You see this letter dated May 21, 2001, and if we go down a little further and highlight the body of the letter, is this the letter where you enclosed a binder to Ms. Hunt and Mr. Berrigan containing the materials that are in the folder that's sitting in front of you, P9A?

MR. RUHNKE: I believe it's in evidence without objection.

A Yes.

Q (BY MR. RUHNKE) Those are the materials you transmitted

obviously that's not your practice. Am I correct that that's not considered good practice for a mitigation investigation, to see the client once?

A You're correct.

Q Okay. Were you being pressed by the attorneys or contacted by the attorneys to say we'd like you to start seeing Keith more often, please start coming to Kansas City on a regular basis, any contact or any urging on the part of the attorneys to have you see Mr. Nelson more frequently?

A No.

Q On the other side of the coin, were you reaching out to Mr. Berrigan and Ms. Hunt saying, look, I've seen this client only one time, we need to see him on a regular basis, he is a primary source of information in our investigation, and simply we need to start seeing him on a regular basis? Were you reaching out the other direction?

A No.

Q And may I ask why not? I mean you're responsible for this mitigation investigation, your firm. It's standard, absolute mandatory practice to spend significant time with the client. It is not happening.

The attorneys are -- and the attorneys I want to emphasize are the ones ultimately responsible for this, but I'm curious as to why you are, yourself, not contacting the attorney saying I need to do my job, I can't do it if I can't

A Lisa Murphy?
Q I'm sorry, Lisa Murphy.
A She was an investigator in my office. She had been there several years by that time.
Q Her qualifications?
A Experience.
Q Did she have a --
A She didn't have a degree in law enforcement. She had a degree in --
Q No training in social work?
A No, no. Other than attending a few seminars.
Q Would you call her a mitigation specialist?
A No.
Q Mitigation investigator or simply an investigator?
A An investigator.
Q And so she facilitated -- did some interviews and facilitated and I think went around with Mr. Berrigan and Ms. Hunt when they interviewed witnesses in White Settlement; is that correct?
A Yes.
Q Now, in the fall of 2001, what was the status of your personal caseload?
A I had a trial scheduled for early September in western Kentucky, a federal trial. I had a trial that was scheduled in Las Vegas for sometime in October. It pled out but we were





Appellate Case: 15-3160 Page: 190 Date Filed: 02/29/2016 Entry ID: 4372433

weren't hidden underneath the rocks, they weren't in the dark corners that you had to pull out through discussions with the client and family members, these were big red flags that were present. Is that a fair statement?

A There were red flags that mental illness was an issue, but it's not like you just take one line from somebody and that's your case. So, no, I disagree.

Q I understand. There were multiple people and multiple records that suggested that mental illness was something that was a history of both the Nelson and the Morse family and it needed to be explored, correct?

A Yes.

Q So this isn't a situation where you're having an interview with somebody that you've interviewed on five occasions and it finally comes out that there's mental health issues? This wasn't something that was secreted in the records as a little footnote. There was ample evidence of mental health issues, correct?

A Correct.

Q You indicated in your affidavit that was filed on June 28th of 2001, that that was for, I think, two purposes. You said it was to get a continuance. And what was the other purpose?

A More funding.

Q More money?





Appellate Case: 15-3160 Page: 191 Date Filed: 02/29/2016 Entry ID: 4372433

THE COURT: Sorry, Mr. Ketchmark.

MR. KETCHMARK: No, Your Honor. I don't have any follow-up questions.

MR. RUHNKE: Thank you. Nothing further.

THE WITNESS: Should I leave this here?

THE COURT: Yes. Leave it there. They'll sort it out as they need it.

MR. RUHNKE: I'll grab the binder and take custody of the binder when we sign off on the exhibits.

MS. HARMS: Movant calls Dr. Carolyn Crawford.

CAROLYN S. CRAWFORD, MD, being duly sworn by the courtroom deputy, testified:

MR. RUHNKE: Your Honor, Dr. Crawford said she would like some water at the witness stand. I'll walk over and get some for her.

DIRECT EXAMINATION BY MS. HARMS:

Q Good morning.

A Good morning.

Q Could you introduce yourself to the court?

A Yes. Good morning. My name is Dr. Carolyn S. Crawford, MD.

Q And do you have a specialty, Doctor?

A Yes.

Q Could you explain what that is?

A I'm primarily -- I'm, first of all, a pediatrician, and





Appellate Case: 15-3160 Page: 192 Date Filed: 02/29/2016 Entry ID: 4372433

then subspecialized in an area called neonatal-perinatal medicine, which is care of the sick and premature infant and the study and understanding of problems during pregnancy, labor, and delivery that can impact on that patient.
Q And how long have you been a practicing physician?
A Okay. Graduated medical school in 1971, and passed the third part of the national boards in '72. So I was licensed to practice medicine then, but I was also in training to be a pediatrician and then subsequently neonatal-perinatal medicine. So I've been treating patients since, really since 1971, but in a teaching -- in a learning capacity as a student until 1975, when I finished my fellowship in neonatal-perinatal medicine the first year.
Q Could you tell us some about your education?
A Undergraduate was at Dickinson College in Carlisle, Pennsylvania, and got a graduate degree from St. Joseph's University in Philadelphia. Medical school was Jefferson Medical College in Philadelphia, graduated there in 1971. I took two years of pediatric residency at St. Christopher's Hospital for Children in Philadelphia, and then took an elective year in subspecialities, took two years of neonatal-perinatal medicine fellowship at the University of Pennsylvania, first year at Pennsylvania Hospital, and the second year at the Hospital of the University of Pennsylvania.
Subsequently I have 22 hours towards a Ph.D. in

fetal pharmacology, kind of a narrow area, and that's pretty much my educational profile.

Q And what is your current practice?

A I'm a staff neonatologist at Our Lady of Lords Medical Center in Camden, New Jersey.

Q Have you -- sorry, go ahead.

A Our Lady of Lords is a level three regional center for high-risk pregnancies and high-risk newborns.

MR. VALENTI: Your Honor, the government is willing to stipulate that Dr. Crawford is an expert in the field of medical -- a medical doctor in pediatrics, neonatology, and perinatology.

MS. HARMS: We offer her as an expert in neonatology and I'll move on.

Q (BY MS. HARMS) What were you asked to do in this case?

A I was asked to review the records, especially the records relating to the pregnancy that Nancy Nelson had with Keith and Kenneth and to relate -- review the records of Keith's newborn period, the neonatal period, both at Providence Hospital and at Children's Mercy Hospital.

Q And did you review any other records in this case?

A Yes. I reviewed a plethora of other records, reports, social reports of his social background, reports of neuropsychological evaluations of Keith Nelson, reviews of MRIs, PET scans.

Q And Dr. Gur's report also?
A Dr. Gur's report, yes, Dr. Gelbort's report. I reviewed records relating to his school performance and activities and then many records relating to his incarceration and testing and evaluations done at that time.
Q Before we go into specifics, could you just broadly summarize your findings in this case?
A My findings are that Keith Nelson was born prematurely, probably four to six weeks prematurely. He was the second born of twins. So he was premature. He was also low birth weight. He was born to a teenage mother who had just -- who became pregnant again within four to six weeks after delivering her first child. That's a high-risk situation for impaired maternal nutrition and impaired nutrition for the subsequent fetus, so it's also a twin pregnancy, which is more demanding in terms of the nutritional demands of two fetuses rather than one.

His mother was subjected to several episodes of physical abuse, including one two to three days before the twins were born prematurely in which the father of the babies stomped her on the abdomen. She had very limited, essentially no prenatal care, eventually acknowledged that she did not take vitamins and iron during pregnancy.

She had documented hypothyroidism, which is a condition that can impact and frequently does impact on not





Appellate Case: 15-3160 Page: 195 Date Filed: 02/29/2016 Entry ID: 4372433

just the mother but the developing fetus in terms of predisposing the fetus to premature birth, to impaired mental development, to low birth weight.

Q You said quite a bit there, so let's go over some of that.

A Okay. In addition, he was the second born of twins. The second born of twins is usually less -- let me see, what's the word I want to use? They don't adapt as well to extrauterine life because they're subjected to more hypoxia after the first one is born. And he was born by total breech extraction, meaning his buttocks delivered first, and then the last thing to develop was -- to deliver was his head.

Breech babies, especially premature breech babies, have as high as a 25-percent risk of developmental delay and mental retardation because of the breech presentation and are frequently delivered by cesarean section, not an option because his mother didn't get to the hospital until she was fully dilated and delivered very shortly thereafter. So there wasn't an option to optimally deliver the twins.

Q In terms of the twins, do you have any knowledge of the differences in treatment after their birth between Mr. Nelson and Kenneth?

A Yes. That was quite different. Kenneth, who was the first born, did quite well for a premature baby, went home much earlier than Keith. He did not develop complications.





Appellate Case: 15-3160 Page: 196 Date Filed: 02/29/2016 Entry ID: 4372433

He did not have to be transferred to the children's hospital whereas Keith immediately developed breathing problems, lack of oxygen, had blueness or cyanosis. He required oxygen, 100-percent oxygen to be given to him. He had borderline low sugars.

He had a positive urine test for E. coli, which was an infection, was also present in his throat, so he probably acquired that during the delivery process. He had to be transferred to the children's hospital. He had to be given breathing support with tubes in his nose, oxygen under pressure. So he had respiratory distress syndrome, which is common in premature babies, especially male infants whose lungs develop more slowly than girls. They're about two weeks behind in terms of the stage of development.

Q Was there also a notation of blood in his spinal fluid?

A Yes. He had -- at several weeks of age he became lethargic, poor feeding. He had what's called clinical sepsis. He had cultures or samples taken of his urine, his blood, and his spinal fluid, and when the spinal fluid was examined, there were over 2,000 red blood cells and no white blood cells. So this is typical of the spinal fluid in an infant who has had a small brain bleed, which is common in premature babies and more common in second born twins and even more common when they've had respiratory distress syndrome.

Q All of these complications at birth that you just talked

about, would they have implications for the central nervous system?

A Yes, they do. In terms of Keith, you know, when you compare him to his brother, his brother did not have the complications. He was the first born. I believe he was also somewhat bigger in size than Keith. So the implications they have is for an impact on certain areas of the brain.

The white matter -- the brain has basically gray matter and white matter. The white matter is especially sensitive to lack of oxygen, and one of the most sensitive areas in the brain is the hippocampus in terms of the impact of lack of oxygen, low oxygen can have on it. And borderline low sugar combined with low oxygen has a synergistic effect on the impact on brain tissue.

When the brain is compromised or threatened by inadequate oxygen, glucose, et cetera, there's a tendency to shift blood away from the anterior, the frontal part of the brain circulation to the posterior part of the brain's circulation. That would make your frontal part, your frontal lobes more vulnerable.

Low blood sugar in combination with low oxygen has an increased susceptibility in the occipital part of the brain. I believe his studies have shown subsequently that there's impaired function of the brain in the frontal area and in the occipital area.





Appellate Case: 15-3160 Page: 198 Date Filed: 02/29/2016 Entry ID: 4372433

Q I want to return now to your comment about the lack of prenatal care in this case.

MS. HARMS: If you could bring up Exhibit 44 at Bates No. 9018 for me.

Q (BY MS. HARMS) This is a record from Providence Hospital before Keith was transferred.

MS. HARMS: That's okay.

Q (BY MS. HARMS) Did you notice any prenatal visits at all?

A There was a visit to the hospital, I believe, around three to four months of the pregnancy because of bleeding, and there was suspected abruption, which is a pulling away of the placenta from its attachment to the uterus, and she had vaginal bleeding at that time. And I believe there was one notation in Dr. Pretz' records that she was seen at some point in the pregnancy, but it's not clear what she was seen for or any indications.

Q What are the implications of a possible premature separation of the placenta?

A Well, the role of the placenta is to deliver -- to bring oxygen from the mother's circulation through the placenta into the umbilical cord into the fetus. So the placenta acts actually as the fetus' lungs. The lungs in the fetus are filled with fluid and don't serve the usual function that our lungs as a newborns or adults.





Appellate Case: 15-3160 Page: 199 Date Filed: 02/29/2016 Entry ID: 4372433

So if the placenta separates, there's a decreased surface area, decreased area for oxygen to come into the placenta and for carbon dioxide, the waste gas, to be transferred out of the placenta.

Q You mentioned earlier that Ms. Nelson went into premature labor following a beating from the father. Have you done any -- looked at any studies about the effects on the fetus due to maternal stress from physical abuse?

A Yes. There is an increased risk of premature delivery. There's an increased risk of, well, premature labor, premature delivery.

Q Did Ms. Nelson -- was she aware that she was pregnant with twins?

A No. Wasn't known until the time of delivery. This was 1974, and the use of ultrasound and techniques like that were not as well utilized as they are today.

Q You mentioned earlier and I think the birth records show very marked peripheral cyanosis?

A Yes.

Q Could you explain again in more detail what cyanotic means and the significance of it?

A Cyanotic is blue. It's the presence of decreased oxygen in the blood, decreased blood flow. Especially in the periphery, that's something called acrocyanosis. It means that the arms and the legs are quite blue. He also developed





Appellate Case: 15-3160 Page: 200 Date Filed: 02/29/2016 Entry ID: 4372433

what's called central cyanosis, which is blueness throughout the body, which required oxygen up to 100 percent.

Q If Mr. Nelson had been born with RDS now, would he have been treated differently?

A Well, yes. He probably would have been given something called surfactant, which is a substance that's put into the lungs to help the lungs act as if they're more mature and to decrease the amount of oxygen that's needed to decrease the severity of the respiratory distress, and it overall improves outcome.

Q Were there any periods of apnea noted during the transport to Children's Mercy?

A Yes. He had several episodes, I believe, at least two during the transport. Apnea is a condition where you stop breathing. It can be a form of seizure or it can just be because the baby's premature. Apneic episodes are increased in premature babies.

Q Was the respiratory distress syndrome, do the records note the severity of it?

A The transport team that came from children's hospital assessed Keith to have severe respiratory distress syndrome.

Q Did you note anything in the records about social services?

A Yes. Social services were contacted and involved because the mother, I believe, only visited one time and was

unavailable -- was sort of unavailable, partially explained, perhaps, by a letter being sent to a wrong address. But in any case, there was some difficulty getting a hold of Nancy Nelson, even when Keith was ready to be discharged home. And he was supposed to be followed by protective services but that was pretty spotty.

Q If there had been neurological problems in Keith when he was ready to be discharged back in 1974, may they not have noted them in the records or not been aware?

A Certainly. The testing that we would have available to us today is vastly different than what was available in '74. In 1974 we were not doing head ultrasounds. Those came in around '79, '80. And same with CAT scans of the brain, maybe '76, '78, those were starting to be used, and MRIs weren't even available at that time.

Q So that executive dysfunction noted in the other reports, is that a known complication sometimes of premature birth?

A Yes. Of course, there's no way to test that in a newborn or even an infant. It's just those functions aren't developed. You can say, you know, if you see evidence of -- structural evidence of frontal lobe abnormalities, you can prospectively look for evidence of executive function or dysfunction, but there's no way to test a newborn for it.

Q Would it be somewhat misleading to say that Keith had





Appellate Case: 15-3160 Page: 202 Date Filed: 02/29/2016 Entry ID: 4372433

some problems when he was born but recovered well?

A Well, on surface, you know -- on the surface that may have appeared that he did recover. Our ability to identify the lingering effects of intra -- of prenatal and neonatal insults in 1974 was quite limited. So he may have the appearance of normal, but subsequently you can flesh out or define the abnormalities that at least in part have a relationship to the pregnancy, the labor, and the delivery in the newborn period.

So it's like the substrate, the vulnerable substrate upon which genetic factors of the high risk of -- or the high incidence of mental illness in the family, subsequent head injury, et cetera, so that the substrate is there. And then other factors can heap upon that to eventually have an individual that demonstrates executive dysfunction, frontal lobe syndrome.

Q Could you have offered this same testimony based upon your review of the records back in 2001?

A Not -- well, I could offer the -- some of the same testimony in terms of the risk factors, in terms of what happened to him as a newborn, what was going on as a fetus. I think subsequently there have been studies done that I think are very helpful to define his areas of brain injury and brain damage. I didn't have that information in 2001.

MS. HARMS: No further questions.





Appellate Case: 15-3160 Page: 203 Date Filed: 02/29/2016 Entry ID: 4372433

THE COURT: Before you begin, Mr. Valenti, let's take a short break, about ten minutes.

MR. VALENTI: I only have one question if we can get her out of here.

THE COURT: Okay.

CROSS-EXAMINATION BY MR. VALENTI:

Q Doctor, you indicated that Mr. Nelson was subject of a premature birth. As a twin, is that more likely to be the case in general? In other words, a twin birth is more likely to be premature than a single birth?

A In general that often happens, especially when there's lack of prenatal care and you don't know what's going on with the pregnancy. You don't know to tell the woman to, look, you're carrying twins, you know, you need to take some extra care, you're more at risk for delivering early, you know, get more rest, you know, more -- better nutrition. Of course, that was not known.

Q Nutrition and vitamin issues could also exacerbate that heightened risk or lack of --

A Well, the nutrition is a factor -- you know, vitamins -- this was a woman who had just delivered, who had just birthed a child, and within four to six weeks she's pregnant again and with twins. So her nutritional status was kind of compromised.

MR. VALENTI: Thank you. That's all I have, Your

Honor.

MS. HARMS: Nothing further, Your Honor.

THE COURT: All right. Thank you, Dr. Crawford.

Let's take a break.

(A recess was taken.)

MS. HARMS: Movant calls Dr. Leslie Lebowitz.

LESLIE LEBOWITZ, Ph.D., being duly sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MS. HARMS:

Q Good morning.

A Hi.

Q Could you introduce yourself to the court, please?

A My name is Leslie Lebowitz.

Q And what is your profession?

A I'm a clinical psychologist.

Q And how long have you been practicing?

A Since about 1990.

Q And within clinical psychology, do you have an area of specialty?

A I have some expertise in psychological trauma.

Q And what is your educational background?

A I have a BA from Oberlin College and a Ph.D. from Duke University.

Q And do you provide treatment to survivors of trauma?

A I do. I have a broad private practice, but within that

private practice, I also see a lot of trauma survivors.

Q Have you done any other work involving the treatment of trauma?

A Yeah. I teach. I co -- I wrote the psychological portion of the curriculum that the Air Force uses to treat their -- to teach the people who treat the victims of sexual assault within the military, and I do trainings two or three times a year for the military on that.

Q Do you also do any work with vets and PTSD?

A I do. I work for a couple of -- several years actually at the National Center for Posttraumatic Stress Disorders treating combat veterans, and more recently I've been involved in a collaboration to develop, and now we're in the clinical testing stage, a treatment protocol for traumatized, redeploying Iraqi and Afghani Marines.

Q And have you published in peer-reviewed journals on the topic of trauma?

A I have.

MR. VALENTI: Your Honor, the government is willing to stipulate to Dr. Lebowitz's credentials as a clinical psychologist.

MS. HARMS: I'll offer her then as an expert in psychology and psychological trauma.

THE COURT: Okay.

Q (BY MS. HARMS) What were you asked to do in this case?





Appellate Case: 15-3160 Page: 206 Date Filed: 02/29/2016 Entry ID: 4372433

A I was asked to review background material and to assess the severity of Keith Nelson's history of childhood maltreatment and to talk a little bit about some of the effects that that might have had.

Q Were you provided with documents to review regarding Keith Nelson?

A I was.

Q And what kind of documents were those?

A I reviewed a detailed social history and some of the supporting materials for that social history. I read expert reports from both the government and the defense and also looked at medical, educational, and some criminal records.

Q Are these the type of documents that are generally accepted as relevant and appropriate to look at in a clinical setting?

A They are. Well, yeah, they're a little bit unusual in a clinical setting, although they would still be helpful, but they are typical in a forensic setting.

Q Did you also review information related to Keith Nelson's parents, his brothers, and extended family?

A Yes, I did. There was a fair amount of information about that within the social history.

Q And is it important to review information about family members when looking at trauma?

A It is. It's important just when looking at people in

general to try to understand them within their social and familial context to the best of our ability.

Q Did you see any patterns among the Nelson and Morse family that are relevant to his trauma history?

A Very much so actually. His family tree is remarkable for the degree to which it is absolutely riddled with major psychopathology, substance abuse, and patterns of interpersonal violence and neglect. It's a very, very robust and pervasive pattern, and these patterns tell us a lot about the kind of resources and vulnerabilities and socialization experiences that individuals have. Very informative.

Q For the purposes of your testimony here, what do you mean by the term "childhood maltreatment"?

A Childhood maltreatment is a broad term that encompasses, you know, a wide array of experiences that are harmful to children. So it includes neglect, it includes trauma, and it also includes other kinds of adverse experiences such as corruption, isolation, which are relevant here as well.

Q And what do you mean by the term "trauma"?

A Trauma is a term we use to describe any experience that is so overwhelming, so emotionally overwhelming that it exceeds our ability to cope and because of that brings with it the risk of harm.

Q And the term "neglect" as it relates to trauma?

A Well, neglect is actually its own category that



Appellate Case: 15-3160 Page: 208 Date Filed: 02/29/2016 Entry ID: 4372433

describes some kind of deprivation. It could be medical, educational, emotional, or physical, and really neglect is used to describe the absence of certain kinds of resources or experiences that a child requires in order to develop normally or healthfully. And so while neglect can be traumatic and often is traumatic, it's not necessarily traumatic, and trauma can include and often does include elements of neglect but not always, which is why people sometimes just use the term trauma maltreatment -- I mean child maltreatment. But basically trauma refers to the presence of something that is really toxic, and neglect refers to the absence of something that is essential.

Q Is all childhood maltreatment by definition traumatic?

A No. Children can absolutely have experiences that are not traumatic at the time but which nonetheless are harmful. So, for example, if a child is taught to steal, as they were in this case, or if a child is exposed to certain kinds of really inappropriate sexual contact, it may be confusing, but it may not be traumatic at the time. Nonetheless, it may still be injurious to the child. It may still leave them more vulnerable to not making a good adjustment to society.

Q Without going into great detail, could you just give us an overview of what evidence of childhood maltreatment you found in the life of Mr. Nelson?

A Okay. Well, he was born, you know, vulnerable and born

to a mother who was already battered, damaged, and really utterly unprepared to parent. He was neglected -- severely neglected by her. He was not protected from abuse by her, and later on he was also beaten and emotionally abused by her.

At the same time, starting right at the beginning, he was living inside a family that was punctuated by extraordinary levels of violence, and this violence continued throughout his entire development extending to include other people and other kinds of abuse as well.

Q So I want to talk a little bit about how childhood maltreatment causes trauma.

How does that trauma harm the child?

A Trauma harms by so overwhelming -- so exceeding our capacity to cope that it has the possibility of really damaging the fundamental systems of the self.

Q Why aren't normal coping mechanisms sufficient to manage the traumatic experience?

A Because it's too much. It's literally too much of a load. If you think about it this way, if you think about a person kind of like a city where there are, you know, sewers and power grades and aqueducts and dams and all kinds of elaborate mechanisms to deal with things like weather changes or power surges, and those sort of mechanisms work very well. If there's a big storm, they might even work well. If there's the occasional tornado because while some parts of the system





Appellate Case: 15-3160 Page: 210 Date Filed: 02/29/2016 Entry ID: 4372433

may get damaged, the other parts can jump in to repair.

But if you think about what happens when a tsunami hits a city and suddenly the mechanisms for diverting water, for managing this kind of environmental stress are so completely overwhelmed that everything breaks down, and the possibility of for one system to then repair another system is damaged because all the systems are overwhelmed.

The problem with really severe trauma as compared to, you know, single acute trauma or normal stress is that it touches on these fundamental systems of self, and if the trauma is severe enough, chronic enough and overwhelming enough, it has the ability to really overwhelm them and knock them out of commission in a way that can cause enduring harm.

Q Could you explain what you mean by the term "maladaptive responses"?

A Sure. Maladaptive responses is a broad term that's used to describe some of the really harmful ways that people cope with the effect of trauma, and also it's a term that's used to describe just some of the way that the body and the mind and the psyche adapt. So, for example, substance abuse, disregulated behavior that can find expression in self-harm or violence, mood disorders, depression and anxiety, patterns of interpersonal dysfunction, these would all be considered to be maladaptive responses to traumatic stress.

Q Does trauma affect our ability to regulate our emotions?





Appellate Case: 15-3160 Page: 211 Date Filed: 02/29/2016 Entry ID: 4372433

A Yeah. Probably one of the fundamental ways that trauma negatively affects individuals is through its effect on the emotional system. You know, human beings are born with a capacity to have a wide range of emotions, and basically not only do we need all of our emotions, but we need them in the right amounts. We need them in a kind of regulated way.

And one of the things that happens when human beings are hit with the kind of tsunami emotion that is what characterizes trauma, is that those regulatory systems, the capacity to bring nuance and control, to channel, to divert, to modulate our feelings, it can be irreparably damaged by enough trauma. And so the person is left with a system that is not under control, that is not well regulated.

So rather than, you know, being able to feel normal frustration and kind of work with that, they may go from either none to 100 or rather than being able to have impulses and feelings come up but yet be able to divert them and channel them appropriately, they may be faced with a kind of all-or-nothing response where they either don't feel anything appropriate or they feel way too much and they can't manage it. And emotional disregulation is because it's such a fundamental capacity, it underlies a wide swathe of disorders.

Q How about the cognitive system, does trauma affect that at all?

THE COURT: Can we start focusing on Mr. Nelson and

not the general -- the report is in the record. Let's go with Mr. Nelson.

MS. HARMS: Sure.

Q (BY MS. HARMS) I think you talked a little bit earlier about the differences between chronic and acute trauma.

What kind of trauma did Mr. Nelson experience?

A Mr. Nelson experienced the most severe kind of trauma, which is chronic, severe developmental trauma. Perhaps it's worth noting that it is so different to have that kind of traumatic experience, that, you know, when people are talking about trauma, they are often talking about acute trauma or adult trauma, and it's qualitatively very, very different than what happens in the face of chronic developmental trauma.

Q You were talking some about the patterns and themes in the Nelson family that you saw.

A Uh-huh.

Q Were there any patterns involving sexual behavior that you saw?

A Yes, there was. There was a history of sexual violence that I think begins in the generation of the great grandparents and comes down all through the family tree, and, you know, the -- you know, one of the ways in which those patterns are relevant is that they create -- they create a kind of familial cultural norm so that things that should be seen as great problems are not necessarily seen as great

problems. They create a likelihood that people are being parented by people who have been harmed traumatically.

Q What did you learn about Keith's parents in terms of their background and its impact on him?

A Well, both his parents were extremely ill. His mother was, you know -- it sounds like his mother was raised in a home, while not quite as severe, that was similar in many, many ways to the home she subsequently created for her son. Her mother is described as being disengaged, unable to attach, depressed. Her father was very violent. She was frightened in school. It sounded like she was bullied and an insecure child, who dropped out of school very early to take care of her sick mother.

The home sounds like it was adversive enough that three of her sisters were married and I think out of the house at 15, which is -- or at least they were out of the house by 15. So she started out a pretty fragile, depleted person without, you know, adequate developmental experiences or adequate modeling, and then she met Keith Nelson's father early on.

And he also comes from a very violent, poor, disordered household and is described by almost everybody that I looked at in his family as being, you know, flamboyantly sick from very early on. He was always prone to violence. That could be directed at himself or other people. He ate

copious amounts of feces and sugar and is described as being bizarre and paranoid and delusional, and they got together when -- I think they were both teenagers actually and had their first child.

Q Can you tell me a little bit about the early environment in which Mr. Nelson was raised?

A Yeah. You know, he's raised by a mom who is being battered from the get-go so she's terrorized, she's overwhelmed. In her description she sounds dissociative, unable to attach or to nurture, and so there's not any of the positive critical nutrients of early development happening. At the same time he's being exposed to a chronic reign of terror. I mean, she's being beaten and battered. There are not a lot -- but the examples that do exist in the record of when that violence was directed towards the children are so -- they're remarkably --

THE COURT: Let me interrupt. We don't need to go through all these details. We have them in the record. We have the report in the record. Let's get to the consequences if she's going to testify to that.

MS. HARMS: Okay.

Q (BY MS. HARMS) How is Nancy's ability to care for her children impacted?

A Well, you'll have to tell me if I'm -- I don't think this is -- I mean --





Appellate Case: 15-3160 Page: 215 Date Filed: 02/29/2016 Entry ID: 4372433

THE COURT: I think she's already testified to that.

MS. HARMS: Okay.

THE WITNESS: I mean --

THE COURT: Wait. Let's wait for a question.

Q (BY MS. HARMS) What would be the impact of a young child like Mr. Nelson being exposed to this level of violence in the household?

A Okay. Well, there's two things he's being exposed to. One is neglect and the other is violence. So in terms of the violence, what is happening is that every single developing system in his self, his emotional system, his cognitive system, his biological system, his capacity to attach, all of those fundamental systems are under continuous and relentless assault from the violence. So if you just think about it for a moment from any one of the systems, you think about it biologically, for example, you know, this is happening during the period of life in which his brain is under the most rapid period of development in which we are growing more neuro connections than we're losing.

And the brain is shaped by the environment. The brain both reflects what's happening environmentally, and it creates neuro pathways that facilitate you doing more of what the environment is demanding of you.

So if what your brain is doing most of the time is -- what you're doing is cowering in terror and what your brain





Appellate Case: 15-3160 Page: 216 Date Filed: 02/29/2016 Entry ID: 4372433

is doing is responding to this onslaught of horrifying life experiences, then that's what your brain learns to do. And that's how -- that's what you bring to the enterprise of interpreting experience and responding to experience, and it also means that while you're doing that, you're not doing other things.

You know, you're not exploring, you're not developing a sense of safety, you're not learning how to regulate your impulses, you're not doing the things that down the road could give you experiences of mastery or positive social interactions or positive experiences with empathy or self-control or any of the things that are actually going to be necessary.

So the important thing to understand about, you know, a child in that kind of environment is that that environment is being woven into the fabric of the developing self, and there's a term called "developmental cascading," which means that it will cascade forward and construct his experience of the present even when those actual experiences are no longer going on.

Q Now, Keith's father was out of his life primarily by the time he reached four. Does this lessen the impact of the early instances of abuse?

A No. It doesn't make any difference. I mean it would have made a difference if at four his life changed radically

and there was a sudden, you know, environment of safety and nurturance, but, you know, if you -- if you light a fire with a match and you take the match away, the fire still burns unless something puts it out.

And not only did this fire keep burning but there was -- the fuel, you know, that was feeding it never stopped. You know, in fact his father didn't just vanish at four. He actually circled back and terrorized the family again, but even separate from that, there is a long string of extraordinarily abusive caretakers that then keep this terror going.

Q Can you comment on the significance of Mr. Nelson wetting his bed until the age of twenties -- in his twenties?

A Yeah. You know, without more information, it's hard to know exactly what that bedwetting was about, but, you know, wetting your bed into your twenties is unusual and certainly something that requires and kind of demands intervention, which didn't happen.

In the context of the life he was having, though, it was, I think, a pretty important risk factor in the sense that it made him a target. It made him both have to walk around the world smelling horribly and had to have contributed to him feeling like he was the person who smelled like this. But it also made him a social pariah and an outcast, so it contributed to depriving him of subsequent social experiences

that might have been reparative. And there's also evidence in the record that it made him a target for being singled out for extra abuse and beatings and condemnation.

Q Can you talk about mom's functioning once they finally moved to Texas and how it impacted the children?

A Her functioning, as best I can tell from the record, her functioning continued to deteriorate, that at some point in Texas she discovers that alcohol will soothe some of her own post-traumatic symptoms, and the description is that she is either drunk, you know, screaming and hitting them or just absent. So there was absolutely no care, affection, guidance, structure, nurturance, attunement, or protection.

Q Can you talk some more about the impact of the physical abuse that Keith suffered from the babysitters?

A Yeah. I mean, the -- part of what you have in this story is you have the constant compounding of abuse, so it just doesn't ever stop. And what that means is that, you know, as you're building your understanding of people in the world, you know, at every point in time where, you know, there might have been a significant opportunity to have a different experience, in fact the experience is the same.

So, you know, from a child's perspective, this is what the interpersonal world is made of. It's made of victims and perpetrators, and violence is an absolutely normal, everyday, acceptable tool and that you don't deserve to be

protected from it, and there is no way to escape it.

And, you know, one of the things that also happens is as a child is growing up in a world that's saturated with violence, not only do they not get used to it, but they become more sensitized to it. There's a kind of process that happens where you become less and less able to calm yourself, to restore any kind of equilibrium and more and more reactive to stress. So it's a kindling effect. One doesn't get used to it.

Q Your report also talks about corrupted influences in Keith's life. Can you explain that?

A Yeah. Corruption is what -- you know, is a term we use to describe, you know, influences that are harmful but may not be traumatic. So one of the more glaring ones within the record is I think his name was Fred Crabtree, who was one of the many caretakers he had, but who taught the children how to steal and encouraged them to do that. So that's an example of something, while it may not have been traumatic, was not positive or helpful and did not help them make a better adjustment to society.

Q Did Nancy ever attempt to get help in caring for the boys?

A Not in any significant or sustained way. There were a couple very weak efforts. I think about the closest she ever got to actually doing anything was giving them up altogether,

which she didn't do, but which they did find out about. So rather than it being helpful, in all likelihood it was just another frightening and rejecting event. She sounds too overwhelmed to follow through with any kind of resources.

Q At some point the boys went and stayed with George and Aunt Sally. Can you talk about how that experience impacted Keith or how it changed --

A You know, I can't really speak to it at that level of detail. It sounds -- well, there's a couple of things.

First of all, the home, while better than Nancy's, was far from ideal. The -- you know, the boys were whipped, and it sounds like, you know, by the time they got there, it was essentially too little, too late, certainly for Keith. He was already, I think, too damaged, and although it was better in that there was some structure, there was food, you know, there was an effort, I think for him, it was too little, too late.

Q I'd now like to talk a little bit about sexual abuse.

Can you speak generally about the issue of documentation of sexual abuse?

A Yeah. I mean, you know, of all the kinds of terrible things that happen to children, sexual abuse and particularly the sexual abuse of males, but sexual abuse in general is something that tends to happen more in private. And certainly when we're talking about the sexual abuse of males, is so





Appellate Case: 15-3160 Page: 221 Date Filed: 02/29/2016 Entry ID: 4372433

shameful that people are less likely to talk about it, and it tends to be something that happens in private. So you don't have witnesses easily available.

Q What did you learn in regard to Mr. Nelson and sexual abuse?

A Well, there's evidence in the record that like all these other traumas, sexual abuse was a repeated event that punctuated his life. He discloses pretty early on that he was raped as a child. He later retracts that, which is not unusual for survivors of sexual abuse to sort of say something happened and say it didn't happen and go back and forth. That's actually a pretty common pattern.

But he describes that. He -- there's at least -- there's an incident -- there's two incidents with female babysitters that are talked about. There is an incident that his brother talks about with a male caretaker, and then there's the likelihood that he was repeatedly raped in juvenile detention.

Q What would be the impact of sexual abuse upon a child?

A You know, on the one hand it's very similar to the way any trauma affects a child in the sense that it's overwhelming. It disregulates their emotional system. It alters the ways in which they think about themselves and other people, and it harms them at the biological level.

At another level, you know, any time you have things





Appellate Case: 15-3160 Page: 222 Date Filed: 02/29/2016 Entry ID: 4372433

that should be separated stuck together, you're talking about something that has its own kind of potential trajectory of harm, so when you are, for example, being abused by people who you should love and trust, you have a kind of conflation of attachment and terror. In sexual abuse you have something that, you know, should be a way that people are brought together and something that has some tenderness and some affection present except in this case you have it, you know, in ways that are confusing, inappropriate, or violent and terrifying. And so you have the putting together of things that should be separated, and because of that, it has the capacity to really disorder how we understand relationships, how we understand sexuality, and how we think about ourselves.

Q How does childhood maltreatment continue to impact someone like Mr. Nelson as an adult?

A Well, you know, there's a couple of ways. You know, insofar as the fundamental systems of the self are shaped by those experiences, that effect continues to drive and organize your relationship to the world. So, you know, the parts of, for example, the brain that are harmed by this kind of a relentless assault affect how we interpret the things that happen to us.

They affect our ability to inhibit our impulses. They affect our expectations of other people. They shape our beliefs about ourselves and how we will be treated by other





Appellate Case: 15-3160 Page: 223 Date Filed: 02/29/2016 Entry ID: 4372433

people, and all of those things organize our behavior in the world, which is why people who are chronically terrified have very different experiences interacting with the world than people who have developmental experiences that allow them to go forth into the world with some faith and positive expectations.

There's a kind of feedback loop that happens, and also, you know, one of the qualities of trauma is that unless something significant happens to remediate it or to help in some way, these memories are indelible. They don't fade with the passage of time. That's one of the differences between traumatic and normal memories, you know, and so, you know, at every level they continue to drive our experience of the present.

So while the actual traumatic experience may be physically or literally in the past, it is not psychologically or biologically in the past. It continues to be present and to shape our present experience of reality.

Q Is there any event in Mr. Nelson's life that you would single out as the most traumatic?

A No. The problem with Mr. Nelson's life is that it was a continuous, relentless barrage of trauma and neglect, and the ubiquity of what happened, the variety of what happened, the utter lack of rescue or protection and the amount of time, the slough of development over which these experiences happened





Appellate Case: 15-3160 Page: 224 Date Filed: 02/29/2016 Entry ID: 4372433

create a kind of toxic load that is qualitatively unlike other things. The problem here is really everything put together.

Q How would you compare the brothers in terms of the trauma and its impact on them?

A Well, you know, even children being raised in the same home are having different experiences within it. And some of that is a function of who the children are and the resources that they bring, and some of it's a function of, you know, birth order, and some of it's just about opportunity.

So, for example, if I was to think about Keith in relationship to his brother Kenny, they started the world -- even though they started the world in the same family, as best as can be told, they started the world in very different places.

Keith was fragile and cognitively impaired to begin with and a bed wetter, so he is going to both have a different experience of the kinds of traumas that are befalling him. He's going to be less able to cope with them, and he's also going to be more harmed by them.

It sounds like his twin brother, because he was more cognitively intact, had the opportunity to create some alternative kinds of experiences for himself. And then just thinking about the sibling group as a whole, there's a remarkable amount of pathology. I mean, you have two out of the five brothers are schizophrenic. Keith is -- there's some

argument about the diagnosis, but it seems like he's certainly ill.

So you have two people in jail for murder. You have three that are egregiously mentally ill. You're talking -- whatever the balance between genetic loading and environmental toxins, you're talking about something which was clearly very, very toxic.

Q Now, you did not diagnose Keith with PTSD, correct?

A That's right.

Q And you did not personally meet Mr. Nelson?

A That is also correct.

Q Can you talk about the relationship between PTSD and childhood trauma?

A Sure. PTSD is one of many possible sequelae that can, you know, emerge as a result of trauma. It tends to be a more useful diagnosis when talking about adult trauma and acute trauma. It is -- in general tends to be less useful when talking about this kind of broad developmental assault simply because so -- well, for a variety of reasons. One is which so many things, so many negative outcomes emerge from childhood trauma, and because childhood trauma affects these fundamental systems of the self, the reach is broad and diverse, and PTSD is simply one of many possible outcomes.

Q Is there anything else in Keith Nelson's behavior that suggests traumatic impact to you?

A Well, there's a lot. You know, he was hyperactive, impulsive, extraordinarily self-destructive. He is both victim of and the perpetrator of a crime. He -- there's descriptions in the record where he sounds dissociative. All of those are highly associated with childhood trauma, every single one of them.
Q Is there a history of self-harm?
A Yes, very severe one.
Q Suicidal behavior?
A That too, yes, all of which are common in the aftermath of severe trauma.
Q Do you have any criticisms of Dr. Martell's report?
A Well, you know, without knowing exactly what information Dr. Martell had access to, it's a little hard to criticize it from that perspective, but, you know, his -- Mr. Nelson's childhood is dispensed with and minimized so starkly as to constitute, I think, a real distortion. But whether that's a fault of information flow or, you know, that I don't know.

But it is -- you know, psychology is an interpretative science, and part of what allows us to make accurate interpretations is taking into account not only the individual but as much contextual information as possible. And a history such as this can't be sidelined. It's too significant as a determinant of behavior.
Q What about the DAPS test that he gave Keith to determine

PTSD?

A Yeah. DAPS is actually, for a paper-and-pencil measure, is a pretty good measure. In general one doesn't use a paper-and-pencil measure to determine either the presence or the absence of a diagnosis. If you're really trying to diagnose something, you typically want to try to do a structured clinical interview, and the paper-and-pencil measures are usually used as sort of guidance as to what to explore next.

But that's not the real issue. The real problem with the DAPS, which would also be the problem with the clinician-administered PTSD scale or really any PTSD scale, is that the way those scales work is you have to be able to talk about a particular event and the thoughts and feelings and physiological experiences you had connected to that event, and then you have to be able to trace it and talk about how it affected you going forward.

And it's a little bit like saying to somebody, you know, in a dark landscape, can you tell me what something looks at? Unless you have some light, you can't see the darkness. In a life history, which is all bleak and all horrific, there's no way to pop out particular experiences and anchor one's, you know, symptoms to them. And many of these experiences are what he's -- maybe they start when he's not even verbal, so --





Appellate Case: 15-3160 Page: 228 Date Filed: 02/29/2016 Entry ID: 4372433

THE COURT: What was the question?

MS. HARMS: It was about the DAPS test that Dr. Martell gave Mr. Nelson.

THE COURT: With all due respect, Dr. Lebowitz, you're going into such a narrative, it's kind of hard to keep up with these things. I think you got an answer. Let's get another question and move on.

MS. HARMS: Okay. I'm actually done, Your Honor.

THE COURT: Okay.

MR. VALENTI: No questions, Your Honor.

THE COURT: Thank you.

(Witness excused.)

MS. HARMS: Movant calls Dr. Ruben Gur.

RUBEN GUR, Ph.D., being duly sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MS. HARMS:

Q Good morning.
A Good morning.
Q Would you introduce yourself to the court, please?
A My name is Ruben Gur.
Q And what is your profession?
A I am a neuropsychologist. I teach at the University of Pennsylvania.
Q And do you have a specialty?
A Brain imaging and behavior.

Q And do you do clinical work?
A Yes.
Q And do you also do some research?
A Yes.
Q What kind of patients are you normally treating?
A The patients that I normally -- that I'm normally involved with are individuals that have complex behavior abnormalities that could reflect brain damage and there's need to decide whether the brain is damaged and how much brain damage affects the behavior.
Q Could you describe your education for me?
A I received my bachelor's degree in psychology and philosophy from the Hebrew University of Jerusalem in 1970, a master's degree in clinical psychology at Michigan State University in 1971, and a Ph.D. in clinical psychology from Michigan State University in 1973, and I did postdoctoral fellowships at Stanford University and at the University of Pennsylvania.
Q Have you received any honors in your profession?
A Yes.
Q Could you describe some of those?
A Well, I was elected to fellow status in the American Psychological Association, the Association of Psychological Science, the American College of Neuropsychopharmacology, and the American Board of Professional Psychology in the field of

clinical neuropsychology. I received awards from the National Alliance for the Mentally Ill, NAMI, and from the Brain & Behavior Research Society. Most recently the Lieber Prize for contribution to the neuroscience of behavior which I shared with my wife, Raquel.
Q And have you been published in peer-reviewed publications?
A Yes.
Q About how many would you estimate?
A I have over 400 publications in refereed journals.
Q And what percentage of this -- of these publications would you say dealt with brain imaging?
A Almost all of them. I would say about 80 percent.
Q Could you talk a little bit about some work that you're doing right now with NASA?
A Well, right now we have a couple of projects with NASA, mostly surrounding the planned mission to Mars that will require astronauts to stay out in space for a very lengthy period of time, and that never happened before. And there is concern about what will happen to the brain of the astronauts. So there's going to be a mission next April where they will send an astronaut for a whole year, an astronaut and a cosmonaut for a whole year, and we are involved in putting together the battery that will evaluate the brain before the travel and then after he returns.

In this case the astronaut has an identical twin, who will take all those measures without flying, and that gives us an amazing opportunity to really look very closely at all the changes that may occur during space flight that can happen to the genetic system, to the immune system, to the guts, bacteria, to -- importantly to brain function.

Q But basically they're using the methodology that you have developed?

A Yes.

Q And you've testified before as an expert in brain imaging?

A Yes.

Q And you've testified for both the prosecution and the defense?

A Yes.

MS. HARMS: I would like to offer Dr. Gur as an expert in neurobehavioral imaging and neuropsychology.

MR. VALENTI: I don't have an objection about the neuropsychology aspect of it. I do have some questions when I get to my cross-examination about the neurobehavioral imaging. I'm prepared to let them ask the questions. It would just be during cross.

THE COURT: I would say he met that qualification.

Q (BY MS. HARMS) I would like to bring up the PowerPoint that you prepared in this case, Exhibit 81. If you can press

play on the clicker there.

What were you asked to do in this case?

A I'm sorry?

Q What were you asked to do in this case?

A In this case I was asked to evaluate the neuropsychological testing and the brain imaging studies that included structural and functional imaging, and reach a conclusion about whether they indicate normal or abnormal brain.

Q And what would be a broad summary of your findings in regard to Mr. Nelson?

A I found evidence for brain damage.

Q So before we get into specifics, do you want to explain some basics about brain structure from the PowerPoint?

A Yes. I think it will be helpful if I could explain really the basic concepts that are needed to understand neuropsychological testing and the brain imaging methods.

Q So can we go to the first slide, I think, if you could maybe press play and then --

A So what I would like to briefly describe are some basic brain science principles, then the technologies that were used in the case of Keith Nelson, the behavioral imaging method, the magnetic resonance imaging, and the positron emission tomography, and I'll then summarize the findings.

Q So first we can talk about the general anatomy of the

brain as represented in this slide or the neuron, I guess.

A Yes. This is a cartoon of a cell of the brain. The brain cells are called neurons, and they are distinguishable from all other cells in the body by two features. The first is that they are surrounded by those protrusions that look like hair that surround the cell body. And these protrusions are called dendrites, and they swim in a sea of chemicals. And those chemicals get attached to the membrane or the skin of the cell.

When the electrical polarity outside the skin becomes different from that inside the cell, then there is a short. There's an electrical pulse and the electrical pulse travels along the skin of the cell and then shoots down the second unique feature of a brain cell. And that's a long fiber that comes out of the cell, and that fiber is called axon. That fiber can be anywhere from barely visible to several feet long.

So it's a long fiber, and the electrical pulse travels down that fiber until it reaches the axon terminals. When it reaches the axon terminals, it releases chemicals, and those chemicals will become attached to the next cell. If the next cell is another neuron, that will trigger another pulse, and this is how brain cells communicate with each other through electrical pulses that go from one neuron to the next. If on the other hand at the edge of those axon terminals there





Appellate Case: 15-3160 Page: 234 Date Filed: 02/29/2016 Entry ID: 4372433

is a muscle, the muscle will contract.

Now, you note that around -- surrounding the axon are those nodes that are painted in red here in this cartoon. In reality they are white because they are made of fat, and the role of these nodes that surrounds the fiber is to insulate the electrical signal so it doesn't dissipate.

The same way that the electrical company uses rubber around conductors and the rubber is thicker if you need to send electricity to a longer distance, the same way axons are -- the brain doesn't have rubber, it uses fat. And so those axons are surrounded by fat, and the longer the axons, the thicker the fat insulation. Notably we are born without almost any of that fat. This fat in the brain gets a more respectable name. It's called myelin, m-y-e-l-i-n. We are born without almost any myelin in the brain, and that's why if a baby is tickled in the right foot, they will move both arms. They can't direct the signal to where they want it to go. It dissipates in the whole brain.

During the first year of life, the areas that control movement become myelinated, and that's when the kid can get more directed movement. And during the second year, the areas that relate to speech become myelinated, and so on. And it's important that -- to note that not all areas get myelinated at the same time.

The areas related to movement and speech are among

the first to get myelinated, but the frontal lobe, the part of the brain that relates to executive control, for example, that doesn't get fully myelinated until early twenties. So the brain continues to develop until around age 22 or 23 through the process of myelination.

Q I think the next slide is the lobes of the cerebral hemisphere.

A Yes. This is a cartoon of the brain that shows how the brain looks like. On the left it shows how the brain would look like if you took a picture from the top, and on the right if you took a picture from the left side.

What is important to note here is that the brain is divided into lobes, and you can see the lobes from the top picture. The frontal lobe here in sort of violet color, the parietal lobe in blue, and the occipital lobe in red.

And from the side view, you can see how the brain sits on top of what is called a brain stem. That stem that you can see at the bottom comes from the spinal cord, and, as you know, evolution doesn't throw anything away. It takes the brain of a worm and puts on top of it the brain of a reptile, on top of that the brain of a mammal, on top of that the brain of a primate, and on top of that comes the human brain, but none of the older brains are thrown away. They are all still existing inside our brain and functioning pretty much the way they functioned in animals where we find it already.





Appellate Case: 15-3160 Page: 236 Date Filed: 02/29/2016 Entry ID: 4372433

So the brain stem that you can see here looks like the brain of a snake, and it can do everything a snake can do. It gets the information from the spinal cord, and that information includes whether we are warm or cold, whether we are hungry or thirsty, whether we have an urge to have sex. All those sensations come through the spinal cord to the brain stem, and from there they go inside the brain and the brain gets that information and processes it.

Now, from the side you can see the three lobes that I mentioned, the frontal, parietal, and occipital, and you also see the temporal lobe. And an important principle in brain function is that the information is processed in the back of the brain and acted upon in the front of the brain.

So what -- if we look at the world, the visual information first comes to the occipital lobe, to the back of the brain, and the job of the occipital lobe is, first of all, to flip the image because our eyes -- our eye lenses send the picture upside down. So it's the occipital lobe that flips them, and then it analyzes the visual information in very primitive, rudimentary fashion, so it can identify horizontal lines, vertical lines. It can identify light, darkness, movement, but in a very -- just the contours of what happens, and that information moves forward in two streams.

One is called the dorsal stream, and that's the stream that goes on the top of the brain, and one that's





Appellate Case: 15-3160 Page: 237 Date Filed: 02/29/2016 Entry ID: 4372433

called the orbital stream at the bottom of the brain. The top stream generally relates to what we think about, what we see, and the bottom stream relates to what we feel about it.

Q I think you mentioned earlier executive functioning, and I think that's important in this case. I think your next slide addresses that.

A Yeah, if I may just one more because I just mentioned the visual. The auditory information similarly comes to the back of the temporal lobe. The temporal lobe is right behind our ears, and again initially it is a very primitive processing. Is this a human voice or a voice of an engine? And then all that information from the visual, from the auditory, and from inside the body meets exactly where the frontal, temporal, and parietal areas meet, and there that's where it gets integrated. And everything gets forwarded to the front of the brain. And that's where the frontal lobe sits, and the frontal lobe, as I mentioned, is important for executive function. The frontal lobe decides what to do about all this information.

Q And you found frontal lobe damage in this case, correct?

A Yes.

Q And how does that affect behavior then?

A I have a list of symptoms.

I mean, there's -- this one picture in the middle, it shows another very important structure that I didn't





Appellate Case: 15-3160 Page: 238 Date Filed: 02/29/2016 Entry ID: 4372433

mention and that is very important in this case, if I may.

Q Sure.

A What you see here is the brain opened up and you look at it inside, and you can -- that way you can expose several important structures. One important structure is the amygdala. That is indicated with a red arrow. It has the shape of an almond, and hence its name, amygdala. Amygdala is almond in Greek.

And right next to it you see a structure that is literally wrapping the amygdala, and it looks a little like a seahorse, upside down seahorse. And so the Greeks called it hippocampus, h-i-p-p-o-c-a-m-p-u-s, and these are very primitive structures that are fully developed. And they look exactly like they look here in a crocodile.

And they ask very simple questions. The hippocampus asks the question have I experienced this before, is this -- or is this a new experience? But in order to answer that question, it has to have access to all your memories. And indeed the -- much about the role of the hippocampus was discovered from patients with epilepsy that had the seizure -- a lot of times the seizure focuses either in the hippocampus or in the amygdala or in those medial temporal structure.

So a famous patient by the name of -- by the initial of H. M. had both hippocampi removed, and what happened to him is that he remembered everything that happened to him until

that surgery and nothing that happened to him after that surgery. So even though his wife would visit him daily, after 20 years every time she would walk in, he was shocked at how old she got. He always remembered her the way she looked 20 years ago. So the hippocampus is essentially in order to learn new things, to find out what is new and what you already know.

The amygdala asks a different question but also seemingly simple. Am I in danger? Is this experience a threat? And if the amygdala perceives threat, it will send an alarm signal, and the alarm signal goes to the frontal lobe, and the frontal lobe decides what to do about it.

Now, importantly, the amygdala is very primitive. It does not speak. It does not understand language. It really grasps situations, and it has no feel of the context of the events. So if you are in a movie and you see a tiger jumping at you, the amygdala thinks it's a real tiger, and it will be scared and will issue an alarm, run away.

That goes to the frontal lobe and, most importantly, to the orbital frontal area that is tightly linked to the amygdala. And it's the orbital frontal lobe that will tell you, no, this is just a movie, it's not a real tiger, you paid for your seat, you are safe, no reason to do anything, calm down. So this is an important interplay between the amygdala, the emotional brain, and the orbital frontal part that is like

the brakes.

And, finally, an important structure that you see here in yellow is called the corpus callosum, and it's a body of fibers. There is no cells in the corpus callosum. These are only fibers that connect the two hemispheres to each other.

As you may note, as you notice, we don't have one brain. We have two brains. And the only thing that connects them are these fibers, and, of course, there are different functions to the two hemispheres of the brain. The left hemisphere is -- deals more with the world through words, through logical analysis, whereas the right hemisphere is more intuitive. It thinks in pictures and shapes, and when we speak, it's the left hemisphere that talks. It's the right hemisphere that puts the intonation on our speech.

So people who have a lesion, say, the front -- in the front of the left hemisphere, they will have what is called aphasia. They will speak very little. They will have limited vocabulary. They will lose the ability to speak grammatically.

People with the same lesions on the right side, they will speak fine, but they will speak in a flat tone. They will not be able to put the emotional emphasis and, therefore, they can be very often misunderstood. The first case that came to the attention of science was a teacher whose complaint

was that she lost control of her class, and it turned out that that was a stroke that she had in that area and caused her to speak in a monotone voice and she lost control.

So these are the main structures of the brain, and I think I explained the main principles of the brain, which is that the brain perceives in the back, acts in the front. It's more -- deals with information more intellectually at the top and more emotionally at the bottom and is more verbal, analytical on the left and more spatial, pictorialistic on the right side.

Q Just to clarify, you were talking about the hippocampus and the amygdala, and those are parts of the brain that you found to be damaged in Mr. Nelson, correct?

A Yes.

Q And now I'd like to move on to talk about executive functioning.

A Yes. So we discussed the role of the frontal lobe being responsible for executive function, and we know about the role of the frontal lobe both from cases of brain damage and from more recently, which is most of what I -- my work has been on, taking people and placing them in a scanner and finding out which parts of the brain become active when they're faced with different kinds of tasks.

So the frontal lobe is responsible for monitoring and directing behavior. It's the part of you that keeps tab





Appellate Case: 15-3160 Page: 242 Date Filed: 02/29/2016 Entry ID: 4372433

on what you are doing and what you are about to do, and in general the back of the frontal lobe deals with the here and now. And the further front you go, the more it deals with the more distant future.

So the same for planning. There is a -- there is a -- the back of the frontal lobe is called dorsal lateral prefrontal cortex, and that's the part that keeps tab on what you are doing -- what you just did, what you are doing now, and what you are going to do next. So it's literally the part that lights up remembering what was the last word I said and what is the word I'm saying now and what is the word I will be saying next. So that's the back of the brain.

As you move forward, it becomes more of a distance. What have I done last year, what am I about to do next year. Mental flexibility, you need the frontal lobe in order to gauge --

THE COURT: While this is very interesting, and I'm enjoying it, quite frankly, I'd like to get to Mr. Nelson.

MS. HARMS: Okay.

Q (BY MS. HARMS) I think the next slide discusses frontal lobe damage which you found in Mr. Nelson. Can you talk about what are the implications of frontal lobe damage?

A So the symptoms that you see with people who have frontal lobe damage, you see disinhibition. They want something, they'll take it. It's hard to stop them. They are





Appellate Case: 15-3160 Page: 243 Date Filed: 02/29/2016 Entry ID: 4372433

irritable. They can go into a rage attack for no reason. They're emotionally labile. They can go from one emotion to another fairly easily.

They are tactless. The role of the frontal lobe is put your behavior in context. That's one thing that frontal lobe patients have difficulty doing. If an off-color joke worked in the bar, they will use it in good company as well. They can't distinguish.

They are characterized by poor planning. They can plan but their plans are poor. They tend to be manic. Some of the symptoms resemble mania, and that's why psychiatrists sometimes have a hard time making the diagnosis because the brain doesn't behave by DSM criteria.

They tend to be risk taking. Even people who all their lives were living straight and narrow, they get Parkinson's disease, Parkinson's disease affects the frontal lobe, and you find those old people sneaking out of the house and traveling to the nearest casino and gambling the family fortune away. So they are engaged in risk taking. The executive part is -- can't control their impulses.

Perseveration. If they start doing something, they can't stop, so those patients, for example, if you come to a movement disorder clinic, they will stand in front of the elevator. The elevator door opens and they can't initiate a movement. So you have to push them a little bit and then they





Appellate Case: 15-3160 Page: 244 Date Filed: 02/29/2016 Entry ID: 4372433

will walk. But once they start walking, they can't stop. They will walk until they hit the wall of the elevator on the other side. So the frontal lobe is important to make a plan but also to change a plan if things don't work.

They tend to develop obsessive compulsive behaviors. Again, part of the symptom is that they can't stop doing something. If they start washing their hands, they can stand there for an hour just washing their hands.

They have some motor dysfunction, and they are very characterized by antisocial behavior. The famous case of Phineas Gage from Iowa, who was a railroad worker and was hit with a spoke, it went through his right eye and through his frontal lobe. He was miraculously saved but he became deteriorating. He was a good family man, and then he started getting involved in barroom brawls and ended up philandering, leaving his family, and ended up in skid row.

THE COURT: Ms. Harms, I'm going to ask you to take Mr. -- Dr. Gur and get him on point here.

MS. HARMS: Okay.

Q (BY MS. HARMS) How did you go about determining the neurobehavioral deficits in this case?

A So, I mean, there's one more concept that's important to know, and that's the concept of standard deviation, and that's the last one, I swear.

You need to know that because that's how we

determine what is abnormal. So if I take measures of anything, it turns out that most measures will distribute in the shape of this bell curve that you see here.

So, for example, if I measured the height of everybody in the courtroom, if I can calculate the average height, suppose it will be five-ten, I also want to be able to know how many people are at what range of heights, and it turns out that if I take every observation and subtract it from the average and take essentially the average of those differences, it turns out that about two-thirds of the people will be within that value.

So if I do that and find out that the average difference from the average height of people in this courtroom is 2 inches, then I know that two-thirds of the people will be between five-eight and 6 feet.

If I now go another standard deviation, I'll cover 95 percent of the people in this room, and this is how across all the studies I'll describe, this is how we determine what is normal. We have data on the normal, on the sample of healthy people, and we have data on Mr. Nelson, and we can determine for each value how far it deviates from the average.

Now, in general if any of your values deviates by more than one standard deviation from the average, this has clinical significance in the sense that, for example, if you go to a general health checkup and they run a bunch of





Appellate Case: 15-3160 Page: 246 Date Filed: 02/29/2016 Entry ID: 4372433

laboratory tests on you, if any of the -- if everything is within normal but one of your values is more than standard deviations away from normal, the clinician will have to take a look at it.

If you came to your concern that you may have Alzheimer's disease, you notice you are older and your memory's not as it used to be, you will come to a neuropsychologist. They will give you a battery of tests. If any of the tests is more than one standard deviation worse than your average, you will get the diagnosis of mild cognitive impairment, and it turns out that 20 percent of people who get that diagnosis today will have Alzheimer's within a year from now.

So this is the concept of standard deviation, which is roughly the average difference from the average of a sample.

Q Okay. So specifically in this case, how did you go about determining Mr. Nelson's neurobehavioral deficits?

A Okay. So the first thing we did is the behavioral image, which is based entirely on the neuropsychological testing.

Q And did you use the testing of both Dr. Gelbort and Dr. Martell, correct?

A Yes, used both Gelbort and Martell. And the behavioral image is an algorithm we've developed with funding from the

National Institutes of Health back in the 1980s, and what happens is that when you give a neuropsychological battery, a neuropsychologist will attempt to link performance on each test with a particular brain system. So if there is -- if they measure verbal fluency and there is a reduction in verbal fluency, the neuropsychologist will say, well, maybe there's damage in the left frontal temporal area that controls language fluency.

If there is deficit, for example, in recognizing faces, then the neuropsychologist will say there may be a problem in the right parietal area, and so on. And the ability of the neuropsychologist to interpret the results depends a lot on the training and their experience.

So we try to make it more uniform and brought the four top neuropsychologists in the country at the time and sequestered them for a couple of days and had them go over all the neuropsychological tests that were available and essentially give weights for each brain region indicating the probability that the damage in that area will produce a deficit on that particular test. So that gave us the weights of those experts.

We established the reliability of the experts and then waited a year and brought those experts again to do the same exercise. And that way we had their -- within expert reliability and between expert reliability, and these are the

weights that are at the guts of this algorithm. And the algorithm allows you to put in any neuropsychological test of anybody who received a reasonable neuropsychological battery, and it will translate those tests into an image that indicates what parts of your brain are possibly damaged.

Q So to sum up, it helps establish the localization of the brain damage based upon the neuropsychological test scores?

A Exactly.

Q Okay. And what are we seeing in this slide here?

A What we're seeing here from Gelbort's testing is that there is -- the damage is mostly in the front of the brain. The yellow colors indicate the relative sparing. Blue color indicate damage. So you can see that the left side is darker than the right, and most of the damage is in the orbital frontal area that's the part of the frontal lobe that sits right above our eyes.

Q And in terms of functioning, that part of the brain again controls?

A That's the part that essentially will tell you in a movie this is not a real tiger and you paid for your ticket, nothing to worry about. It's the verbal part that controls impulses coming from the amygdala.

Q The next slide I believe shows the results from Dr. Martell's testing?

A Yes. And in terms of -- they point to the same effect.





Appellate Case: 15-3160 Page: 249 Date Filed: 02/29/2016 Entry ID: 4372433

Martell's testing suggests some damage also, more in the back of the brain.

Q And I guess the next slide is a comparison of the two.

A Yes. It shows them one next to the other so you can see that he looks a bit worse from Martell's testing than Gelbort's testing. But both of them localize to very similar regions.

Q In addition to utilizing the neuropsychological test results, did you also employ an MRI that was done at Terre Haute?

A Yes.

Q And you also used an algorithm that you've developed?

A Well, for the -- the behavioral imaging algorithm I developed together with computer scientists. The MRI algorithm was mostly developed by computer scientists. I was part of the team, but I mostly told them what's important to do, you know. But I didn't develop that.

Q Has that algorithm been tested for reliability in this context?

A Yes. I mean, the MRI algorithm, analysis for algorithm was developed by Professor Christos Davatzikos, who is a world-renowned image analysis expert, and his team.

Q I think you can go ahead and advance to the next slide.

So what is the algorithm designed to do?

A Well, the MRI gives us information about the molecular

composition of the brain. You put the brain in a strong field, and then you send a current that is at an angle to it so the molecules will try to align themselves with the new field. But that's there only very briefly, for 20 milliseconds, less than what it takes you to blink.

And so the molecules will rattle back into the original position, and that's -- we call it resonance. That's the resonate. They resonate back. It's the same way if I take a -- if I take a pen and bend it and I stand it back up. It won't just sit there. It will vibrate. That's the resonance.

And that's what we can measure using radio antenna that surround the head. So it's very similar to listening to different radio frequencies.

Now, there's a big principle in biology that big bodies move slowly and small bodies move fast. The smallest and most abundant molecule in the brain is water, and so when we first listen, we hear all the water molecules rattle back. Then we hear the proteins, which are the material that build the cell bodies, and last come the big, fat molecules, which we know by now are the myelin, are the white matter in the brain.

And so by listening to those frequencies, the computer paints the MRI picture literally dot by dot. So it's not like if you take a photograph of the room with a regular

camera, all the information comes in and burns the photographic plate in proportion to the amount of light. Here it's the reverse. The computer has the number of resonances from each region, and he -- it, the computer, makes a dot. And the higher the number, the brighter the dot.

Q And I think the next line talks --

A That's how the MRI is created.

Q The next slide talks about regions of interest, which is how you interpret --

A Yes. So on the left on the next slide you can see what comes out of the MR procedure, and all these bright dots, they are white matter, and the grayer dots are gray matter, and the black dots in the middle are cerebral spinal fluid. The brain doesn't -- the brain actually floats inside our cranium, surrounded by fluid, and the fluid surrounds all around it and is inside it in what we call the ventricles and that fluid is important. It provides some nourishment, but, most importantly, it protects the brain from injury. Otherwise, we will have a head injury every time you sneeze.

So the MR can decompose those parts, the gray matter, which is proteins, the white matter, which is fat, and the fluid, which is fluid, and then what we do is we have an atlas, which is a regular MRI of a regular healthy person. What is distinguished about it is that expert neuroanatomists went over each of those dots. These dots are called, by the

way, voxels. A voxel is a three-dimensional pixel. If you take a regular digital photograph and you blow it up and blow it up, you will see the dots that make that photograph.

These are pixels, two dimensional. The computer -- the MR computer paints the picture in three dimensions, so each -- it gives you slices, and each slice -- each dot on that slice has a known length, a known width, and a known depth, which is the slice thickness. And in this case the MRI was obtained with excellent resolution of 1 by 1 by 1 millimeter voxel size.

So it -- in the atlas each of these voxels is labeled by an expert -- by expert neuroanatomists with agreement among them regarding the region from -- to which it belongs.

Q Okay.

A So what you do with it when you get it --

THE COURT: All right. Let's stop, Doctor. Let's get to the point.

MS. HARMS: Let's go to the next slide, which is the MRI results for Mr. Nelson.

THE COURT: It's fascinating but we could be here all day talking.

THE WITNESS: What I'm saying is we take --

THE COURT: Let her direct the testimony.

Q (BY MS. HARMS) So the next slide then would be

Mr. Nelson's MRI results, and could you talk about the abnormalities that his MRI results showed? There's two more slides.

A So we compared Mr. Nelson's brain to a group of healthy people, and what you see here is the results in standard deviation unit. So these are called Z scores. A Z score of zero means exactly on average. A Z score of minus one means that you are one standard deviation below average. Plus one if you are one standard deviation above average, and so forth.

What we see on the first segment of this graph is the volume of the big lobes, the frontal, parietal, temporal, and occipital. And you can see that overall Mr. Nelson has average to above average brain volume, but you can also see that the left frontal and the left occipital are relatively reduced.

So now we are asking how are the different parts of his brain, how do they look in terms of their deviation from normal? So here we use relative Z scores because simply it is normal, for example, to be 6 foot 2. It is normal to have a size 7 shoe. It's not normal to be 6 foot 2 and have a size 7 shoe. So the different parts of the brain need to be proportionate to each other, and that's calculated using the relative Z scores.

And what is very clear here is that the white matter, both in the frontal and in the occipital lobes, are





Appellate Case: 15-3160 Page: 254 Date Filed: 02/29/2016 Entry ID: 4372433

drastically abnormal, reduced by two to three standard deviations below normal.

Q And what would that mean in terms of functioning?

A Well, the white matter is important for transmissions, transmitting information from one brain region to another, and when the white matter is damaged, you get disruption of that communication. So people with frontal lobe white matter damage will have a difficult time collecting the information that they need in order to make a reasonable decision.

MR. RUHNKE: May I just have a moment with Ms. --

Q (BY MS. HARMS) I'd like to actually move on to the PET analysis. Could you go to the next slide?

A Yeah.

THE COURT: If he touches the screen, it will show up on our screens too.

MS. HARMS: I think I'm ready to move on to the PET. If you could advance the PowerPoint.

THE COURT: I meant for that too. Anything.

Q (BY MS. HARMS) Was a PET scan done in Terre Haute in September 2010?

A Yes.

Q And I would like you to bring up Exhibit 56, please, the second page.

A This?

MS. HARMS: Exhibit 56, the PET scan from Terre





Appellate Case: 15-3160 Page: 255 Date Filed: 02/29/2016 Entry ID: 4372433

Haute.

Q (BY MS. HARMS) So the PET was read independently by a doctor at Terre Haute, correct?

A Yes.

Q Just bear with me for a minute while she brings it up.

Did the doctor who interpreted the PET scan at Terre Haute notice anything?

A The PET scan, unlike the MRI that tells us about the brain structure or anatomy, the PET scan tells us about brain activity or more specifically the rate at which the brain consumes sugar or glucose, and that's proportionate to activity because every time a nerve cell fires, it needs energy in order to fire again. And it gets its energy by burning sugar with using oxygen.

So every time the brain cell fires, it needs more oxygen and needs more glucose, and that gets there through the blood stream. And that's what we are measuring with PET. We measure how much glucose was metabolized in each region.

Q So what are the findings of the doctor at Terre Haute in reading this PET scan?

A So the doctor in Terre Haute who read it described a relative decreased posteriorly compared to anteriorly, somewhat more prominent on the right than the left. It appears to be focal areas of thinning bilaterally at the posterior-inferior portion of the frontal lobe just above the

sylvian fissures bilaterally. These appear to be thinning at the bilateral medial temporal lobes as well. Multiple patchy areas of decrease are seen throughout the cerebral cortex. Deep nuclei are seen, although there appear to be relative decrease in the right-sided caudate and putamen and left-sided thalamus.

Q So translating that for us, does this -- is this consistent with your results, what the doctor at Terre Haute found in the PET scan?

A Yes, highly consistent. I was actually quite amazed because it's not easy to read a PET scan visually. We usually rely also on the quantitative analysis, and as far as I know, she didn't do a quantitative analysis.

Q And so, again, this is referring to activity in the limbic stretches of the brain, the amygdala and hippocampus, that we talked about earlier?

A Yes.

Q Can you give me examples of cases of what happens when someone has a damaged amygdala?

A Well, in general people with amygdala damage have been described in the literature, and it's called the Kluver-Bucy, K-l-u-v-e-r, hyphen, B-u-c-y, syndrome. And, of course, not all of them show all the features of it, and some of them show only some of it.

But in general these people are characterized by

being out -- normally are very placid. They look like they are not interested in much. They are -- they look calm, cool, and collected, and then something unexpected will happen and they will go ballistic. They will attack anything in sight.

So if you stimulate the amygdala in a monkey, the monkey will attack the cellmates without discrimination. So the Kluver-Bucy syndrome includes damage in the amygdala and in some cases frontal lobe. The main feature of it will be very flat affect. If you just talk to them, they seem to be very calm, but they can -- they can go into a rage with very little provocation.

Q And, again, you took the PET results and you expanded upon them. Can you explain to us how you did that?

A So with the PET results, we followed the similar procedure to what we use with the MRI except that the resolution of the PET is not nearly as good as that of the MRI. So the resolution of PET is not 1 by 1 by 1 millimeters but somewhere between 4 and 6 millimeters in each direction.

So we don't really outline the exact features, but we use a system of what we call regions of interest. It's a standard set of regions of interest that you can fit into an individual brain, and you just make sure that each region is in the area that it's supposed to be in and in the middle of it. So it's more like a punch biopsy than like a complete -- a complete characterization.

And we have standard sets of regions of interest that we measure in every subject, and we compared Mr. Nelson to the group of healthy volunteers.

Q And what were your findings?

A So there are several striking findings. The most striking really is the reduced metabolism in both amygdala and hippocampus as well as the parahippocampal gyrus. And we also see reduced metabolism in the corpus callosum and especially the front of the corpus callosum and the cingulate gyrus, and we see also reduced metabolism in the basal ganglia.

So by contrast to that, we see abnormally high metabolism in the cortex, almost out of the cortical area, frontal and parietal. So these are two types of abnormalities. Unlike in MRI where it's always the more the merrier, the larger the volume, the better, with PET you have to pay attention both to hypermetabolism and hypometabolism. Hypometabolism, especially in amygdala and hippocampus, is seen, for example, in seizure disorders, and this is very similar to -- the magnitude of this abnormality in Mr. Nelson's case is close to what we see in seizure disorder patients.

Amygdala that -- and we also know -- I didn't have the chance to comment, but you can see in the exhibit that the amygdala also has lower volume in Mr. Nelson's case. So when there's low volume and low activity, what happens is that





Appellate Case: 15-3160 Page: 259 Date Filed: 02/29/2016 Entry ID: 4372433

amygdala has very large cells, and if one of them begins to fire, the other cells will also begin to fire. And when there is tissue loss, this whole thing will happen very quickly.

It will lead to -- within normal limits, it will lead to intense feeling of fear or anger, which is what the amygdala generates. In extreme cases it can lead to a seizure.

Q Can you tell anything from analyzing the results of these three different sets of tests as a whole, the MRI, the PET, and the neuropsych testing?

A Yes. They all seem to converge in showing that the frontal system in Mr. Nelson is corrupt, is damaged. You can see that from the results of the neuropsychological testing both of Dr. Martell and Dr. Gelbort, and you also see from the structural imaging that there is damage in the frontal lobe that is structural damage.

There is -- the volume is lower than it should be as well as the volume of the amygdala, and when you look at the PET images, the metabolic activity of the amygdala is abnormally low whereas of the frontal and the rest of the thinking brain is abnormally high.

This PET study was done in what we call the default mode state, which is he was just sitting there, eyes open, and no task, was not given any tasks. And what was found over the past couple decades is that those regions that are abnormally





Appellate Case: 15-3160 Page: 260 Date Filed: 02/29/2016 Entry ID: 4372433

high in metabolism during the default mode state are those that will go down when the subject is facing a challenge or a task and vice versa. Those regions where the metabolism is abnormally low, those regions will go -- will shoot up during -- when the person is faced with a challenge.

So someone with a brain like that, if faced with a challenge or a task or a situation that's perceived as dangerous, his emotional brain will become hyperactive, and his thinking brain will become hypoactive.

Q Is it fair to say then that Mr. Nelson has abnormalities in regions that are important for regulating behavior?

A Yes. These are very important regions for regulating behavior.

Q Is there any implication for the ability to regulate your impulses, including sexual impulses, based upon these results?

A Yes. The sexual impulses as well as the impulse to have food or drink are -- relate to the functioning of the reward system, which is the basal ganglia. And he has abnormally -- abnormalities as well in the basal ganglia. So these are the -- these are the parts of the brain that are supposed to tell you what is enjoyable and what is not enjoyable.

If you taste something and it tastes good, the basal ganglia will shoot out some dopamine that will go to your frontal lobe and give you a good feeling. So damage in the





Appellate Case: 15-3160 Page: 261 Date Filed: 02/29/2016 Entry ID: 4372433

basal ganglia can lead to distortions in what experiences is good and what does -- not experience is good. A damaged basal ganglia will issue corrupt messages in those areas, and these include food and sex.

Q You also reviewed a social history report, correct?

A Yes.

Q Did you find anything significant in the family history in terms of Mr. Nelson?

A Well, there is a very high incidence of schizophrenia. In fact, his family would qualify for the definition of a multiplex family, which is defined as two people or more who have schizophrenia. The significance of that is that even if -- even members of the family who do not have schizophrenia, they have -- they show deficits that are not quite as severe as the ill members but are definitely not in the normal range.

If in general the probability of him suffering from schizophrenia is 1 percent in the population, and that's through -- throughout the world. But if you have one sibling with schizophrenia, that probability jumps 20 folds. So you now have 20-percent chance.

If you have two siblings with schizophrenia, that's even higher, and even if you don't have schizophrenia yourself, you likely will have some brain abnormalities or vulnerabilities in the brain that characterize those families.

Q Is there any relationship between prolonged childhood

bedwetting and schizophrenia?

A Yes. Prolonged child bedwetting is a -- is known to be a predictor of eventual schizophrenia. It doesn't happen to all -- everybody who is -- who has prolonged bedwetting, but a lot of people who have prolonged bedwetting, when they grow up, they have some sort of psychosis.

Q How about suicidal behaviors?

A Suicide is an even greater risk in schizophrenia than in depression. More people with schizophrenia commit suicide than people with depression proportionately.

So when you have schizophrenia, when you are in the -- when you have an exacerbation of symptoms, that's not when you are a suicide risk. But when there is some abatement of symptoms and you begin to realize what you are into, then there is a very high risk for suicide.

Q Is there anything about the birth of Mr. Nelson that has consequences for his brain?

A The what?

Q The birth of Mr. Nelson that has consequences for his brain?

A Just being born a twin is a risk factor, and any birth complication adds to the risk. If the mother was drinking during pregnancy, that adds to the risk or if the -- if the prenatal conditions were adverse, that also adds to the risk.

Q Did you review information that indicated Mr. Nelson was

physically abused as an infant?

A Yes.

Q How could that impact the developing brain?

A There are two ways in which physical abuse can impact the brain. One is directly, if the abuse reaches the head, so there was an incident where he was -- he grabbed him and circled him around, and his head hit some hard surfaces. Each one of those can be directly injurious to the brain, and, as you may know, every concussion is worse than the first one.

So if you have a concussion, chances are you'll be okay. If you have another concussion, your chances are much worse than starting, and if you have another concussion, every additional one makes things worse. So multiple small concussions like that could produce brain damage, and almost regardless of where you are hit in the brain, it will affect the frontal lobe because the orbital frontal area sits right on top of those nasty bones that we have, the orbital bones right above our eyes. So if the frontal lobe rubs against those bones, it will be damaged.

The second way which abuse can lead to brain damage is that it prevents the brain from developing normally, and the structure that seems to be most affected is the hippocampus. So if -- in animal studies if you take a mouse growing up and you hang them by the tail for ten minutes every day, which is how we are trying to mimic abuse, those mice

that were raised that way, will have smaller hippocampi than mice that were not treated that way.

THE COURT: Ms. Harms, I think for the purposes of this hearing, we have more than enough information from this witness.

MS. HARMS: Okay. Just one last question.

THE COURT: I've given you considerable latitude. You have one last question.

Q (BY MS. HARMS) Do people with brain damage, do they behave abnormally all of the time?

A No, not at all. They behave normally most of the time, and some people who have frontal lobe damage, we never find out about it. I mean, we all know people who are a little too aggressive, irritated, lack tact. Until it reaches a proportion, proportion that will show up as symptoms, we won't know, and even people who have brain -- bad frontal lobe damage, don't behave all that -- don't walk around drooling. It has to be a combination of events that will produce -- that will show that vulnerability.

The same way we have -- a few years ago there was those Toyotas that would start racing. It didn't happen to all the Toyotas, but under certain circumstances, that defect would show up, and that's -- the same is true for frontal lobe damage or any kind of brain damage. The brain has a remarkable ability to organize, reorganize itself, and act in

a way that is normal.

But when there are -- there is a certain set of conditions, that's when the vulnerability will be exposed.

MS. HARMS: Thank you. That's all I have.

THE COURT: Why don't we take a break, about 35 or so minutes, okay, and then we'll resume.

Thank you.

(A recess was taken.)

RUBEN GUR, Ph.D., previously being sworn, resumed the stand:

MR. VALENTI: May it please the court.

THE COURT: Absolutely.

CROSS-EXAMINATION BY MR. VALENTI:

Q Dr. Gur, as I understand it, you did not perform a neuropsychological evaluation of Mr. Nelson, did you?

A That's correct. I did not.

Q You didn't see him in person?

A That's correct.

Q Instead you have taken data provided to you by other doctors, specifically, Neuropsychologists Gelbort and Martell, and quantitated that data to create the behavioral image picture that you showed earlier of Mr. Nelson's brain, correct?

A Yes.

Q Let's talk a little bit about that. The quantitation approach that you use requires the use of an algorithm that





Appellate Case: 15-3160 Page: 266 Date Filed: 02/29/2016 Entry ID: 4372433

you developed, correct?
A Yes.
Q And it's an algorithm that you developed in the mid 1980s?
A Yes.
Q I believe that that algorithm was then ultimately patented by you and the rights to it were assigned by your university to a company known as Biologic?
A Yes.
Q Secondarily -- and you've written about the algorithm over the years, haven't you?
A Yes.
Q How many times would you estimate you've written about that algorithm?
A Four papers.
Q Okay. Since the 1980s?
A Yes.
Q When was the last paper you wrote about the use of the algorithm since then? What's the most recent article? Let me rephrase.
A I believe it was '92, '93.
Q So some 22 years ago was the last time you wrote an article about the use of this algorithm?
A Yes.
Q You've written hundreds of articles, as I recall, from

your curriculum vitae, however, correct?
A Yes.
Q And of those hundreds, only four deal with the algorithm that we are using as the basis for your testimony today?
A You're talking about the behavioral imaging?
Q Yes.
A That's just one of the algorithms.
Q Yes. That particular algorithm.
A So, yeah, that's all the papers I wrote about it.
Q So to be fair, the behavioral image that we're talking about today really hasn't been updated much in the last 20 or so years?
A Has not been updated, no.
Q Okay. Medical science, however, has advanced greatly over the last 20 years?
A Yes.
Q And the basis upon which you're trying to do your work is as a neuropsychologist because you are one, right?
A Yes.
Q And a neuropsychologist's goal is to try to link behavior to brain function?
A Yes.
Q And in order to do that for purposes of use of this algorithm, you convened a commission of peers in the 1980s?
A Well, there were -- back then they were more than peers.

They were more like mentors.

Q Okay. But experts in the field?

A Yes.

Q Okay. And this commission essentially got together in the 1980s to describe and provide what the papers describe as expert judgments about the weight particular neuropsychological testing should be given relative to brain function?

A Yes.

Q So the foundation upon this is based upon the judgments of experts in the field from over 20 years ago?

A Yes.

Q Not on empirical data since then that could have been added to -- strike. Bad question.

Not empirical data but instead judgments of men in a panel?

A So the algorithm itself, the guts of the algorithm include those weightings, and those weightings reflect the judgment of these experts based on their knowledge, experience, all the data they collected their whole life, but --

Q Ceasing, however, in the 1980s since it's not been updated since then?

A It has not been updated, no.

Q Okay. Some of the tools that are necessary to use are

either a PET scan or an MRI, correct?
A Yes.
Q And those are two of the scans we saw today. Are you qualified to read an MRI?
A I don't read MRIs, no.
Q Nor are you qualified to read a PET scan?
A That's correct.
Q Because in order to read that under the industry standards, it requires someone that is either a neuroradiologist or a nuclear medicine doctor, correct?
A Yes. It's a neuroradiologist for MRI and a nuclear medicine doctor for PET.
Q You're neither of those?
A I'm not, no.
Q And much like the previous neuropsychological testing provided to you by Dr. Gelbort and Dr. Martell, you took the readings of either the MRI or the PET scan and used those men's or women's interpretations in your imaging?
A No, no. I don't -- maybe I misunderstood your question.
Q Okay.
A By reading, what I thought you meant was when the MRI is done and you have the printed pictures of the brain, then typically a neuroradiologist will look at those pictures and see if there is a tumor or stroke or multiple sclerosis or anything that can be visualized, and that is fortunately the





Appellate Case: 15-3160 Page: 270 Date Filed: 02/29/2016 Entry ID: 4372433

case for a lot of illnesses that can kill you. And the purpose of the clinical reading is to make sure that none of those conditions exist.

Q Okay. But you're not licensed to do that?

A No, no, I don't do that.

Q Okay. All right. There's been some writings over the years in the literature about what it takes to quantitate data such as the data you're quantitating, correct? In other words -- let me rephrase.

When you're quantitating the data, you're taking the information about Mr. Nelson's brain scan, whether it be PET or MRI, correct?

A Yes.

Q And you're comparing it then to what is provided to you known as norms, correct?

A Yes.

Q Norms are what?

A Norms are the same kind of data collected from healthy people.

Q Okay. So other people's brain scans?

A Yes.

Q A control group, so to speak?

A Yes.

Q All right. The control group, when you did Mr. Nelson's quantification -- or did your quantitation, excuse me,

originally you did that against how many brains?
A I believe it was eight control subjects.
Q Were the eight control subjects tested by the same machine that did a brain scan of Mr. Nelson?
A Tested by the same generation machine, same type of machine. Of course, he didn't -- he wasn't brought to Philadelphia. He was scanned in Indiana.
Q So your control group of brains, the initial eight, came from Philadelphia?
A Yes.
Q Whereas Mr. Nelson when he was scanned, was scanned in around the Terre Haute area, correct?
A That's correct, yes.
Q So though the machines in your testimony might have been of the same type or generation, the actual -- the machine itself was a different machine, correct?
A That's correct, yes.
Q When you had his brain compared against other normal control group a second time, how many brains were used?
A I believe there were 69.
Q I think 84.
A Eighty-four?
Q And it doesn't matter. Sixty to 80 we'll say; is that fair?
A Yes.





Appellate Case: 15-3160 Page: 272 Date Filed: 02/29/2016 Entry ID: 4372433

Q Were those brains from scans that occurred in the Philadelphia area as well?
A Yes.
Q Again, by a machine, not the same machine Mr. Nelson was scanned by?
A Yeah. It was an older generation machine.
Q Why did you do the second set of brain scans or brain comparisons?
A Counsel asked me to do that because they were concerned that since I'm coming to Kansas City, that issue will be brought up, and they wanted to make sure that if I see -- that I see the abnormalities also on that larger sample.
Q When you did the larger sample, were you able to pick a control group that would have been from the same geographic area that Mr. Nelson grew up in?
A The larger sample is from the Philadelphia area as well.
Q Not Kansas City?
A No.
Q Not White Settlement, Texas?
A No, no. Philadelphia.
Q Okay. Wouldn't you agree that The Society of Nuclear Medicine has indicated that if quantitation is to be attempted, there certainly needs to be more study involved in whether or not that should be done, the control brains and the comparison brains being used -- done on the same machinery?

A No.

Q You don't agree with that?

A No. That's not how things are done.

Q Huh? Are you familiar with the nuclear -- The Society of Nuclear Medicine?

A Yes.

Q Do you recall testifying in November of 2011, in the Commonwealth of Pennsylvania in a case of Commonwealth v. Eichinger? I'm not sure I pronounced that right, E-i-n-c-h-i-n-g-e-r.

A There is no N. E-i-c-h-i-n-g-e-r.

Q Do you recall testifying in that hearing?

A Yes.

Q Do you recall being asked questions about whether The Society of Nuclear Medicine thought that it needed to be studied whether or not the comparison or quantitation could properly occur using two different machines?

A I vaguely recall something like that.

Q If I showed you your previous testimony, would you have any reason to disagree that you acknowledged that the society had recommended that?

A I can believe they recommended that. Which year was that?

Q It was a paper issued by them in 2009.

A So -- well, yeah, I mean, it's a nice recommendation and





Appellate Case: 15-3160 Page: 274 Date Filed: 02/29/2016 Entry ID: 4372433

has been done, and there is no -- much variability among machines, so nobody -- if I were contemplating a study -- well, we are doing -- right now is sitting here, we are doing multiple studies with multiple machines, and they're putting the data together. And, of course, you want to see if there is any variability among machines, and you include that in your data analysis. And I've not heard a study that shows a substantial machine variability. You get some variability because of the machines, and so -- but I'm not aware of a single study that had to be canceled or questioned or in any way rendered invalid because of those small variabilities that exist.

I mean it used to be at the beginning the first phase of the PET, each machine was literally home brewed. In the first PET that was built at Penn, you know, was put together literally by hand, so each machine had different characteristics. But the machines today are highly standardized across manufacturer and across --

Q I think what you're saying, Doctor, is the technology has changed and gotten better over time, correct?

A Yes, yes.

Q Unlike your algorithm that hasn't changed since the 1980s?

A Yes. Because what happens in -- after the '80s, was a whole new generation of studies that used functional imaging,

and the field of looking at brain lesions hasn't really changed much itself. And we are now more interested in doing the behavioral image of the future that will be based on actual data on activation, but that project is still literally in its infancy.

Q In the first control group of brains that you used for a comparative analysis, how many of those brains were left handed?

A I don't know. I don't think any of them.

Q Did you know that Keith Nelson was left handed?

A Sure.

Q You know as a neuropsychologist that left handedness can have an impact on brain function, can't it?

A Yes. I mean, I've been one of those who studied it quite extensively but not in brain structure. I don't know of any study that shows it affects PET or MRI.

Q How many of the original eight had diagnosed personality disorders?

A Probably none. Hopefully none.

Q How many of the original eight had diagnosed or were suffering from, to your knowledge, depression?

A None.

Q In the second group of comparative brains, any idea how many of those were left handed?

A None was left handed.

Q None?
A None.
Q In the second group any idea how many of them were suffering from or diagnosed with personality disorders?
A None.
Q Any idea in the second group how many of them were diagnosed or suffering from depression?
A None.
Q Of course, depression can have an impact on metabolic activity, can't it?
A Yes.
Q And some of the behavioral imaging that you're showing is depicting or claiming to depict metabolic activity in the brain?
A Not a behavioral image.
Q You're trying to track metabolism in the brain to that image, correct?
A Not the behavioral image. The PET image.
Q Okay. I misspoke. I apologize.
In the PET image you are, however, trying to track metabolic activity, correct?
A Yes.
Q And Mr. Nelson has been diagnosed at various times, not surprisingly on death row, as suffering from depression. So could that have an impact upon the metabolic rates you're

finding in the PET scans?
A It could have a small impact but nothing like what we see in his brain.
Q When it comes down to what we've got here, Doctor, if I understand it, is you've taken the data provided by other people and put it together and created a pretty picture; is that right?
A Well, I analyzed his data as well, but with that addition, you're right.
Q Not only that but the most important part of neuropsychology in order to link a deficit to a behavior is to have an idea about the degree of a deficit, correct; in other words, how bad a lesion is or an impact or injury?
A It's good to know. There isn't unfortunately a one-to-one correspondence between the size of the lesion and the effect on behavior. It's not simple.
Q But in a general sense, the more impactful the lesion, the larger the lesion, the more impactful you can assume it would be on the behavior?
A Absolutely.
Q Okay. And as you look at your behavioral image, I've heard you or read that you've described it as a unitless scale, that color scale is unitless, correct?
A Correct.
Q And by unitless, explain to the court what that means.

A It means at least in science, what it means is that you cannot assign to it a physical or biological value, so you cannot say that -- like glucose metabolism is measured as how much -- how many milligrams -- milliliter of glucose were taken by each gram of -- by 100 grams of tissue per minute. That's a unit. Unitless means that it's not assignable to a particular level.

Q And units are important because it's easy to say that two units is twice as much as one unit, correct?

A Exactly, yes.

Q Units create comparative value?

A Correct.

Q And as I look at Plaintiff's Exhibit 81, page 11, the behavioral image created based on Dr. Gelbort's neuropsychological testing, that is a unitless diagram, correct?

A Correct.

Q So there's not relative comparative value by looking at this?

A Correct.

MR. VALENTI: That's all I have, Your Honor.

REDIRECT EXAMINATION BY MS. HARMS:

Q Dr. Gur, although you did not conduct an MRI or PET on Mr. Nelson personally, they were conducted by qualified individuals, correct?

A Oh, yes.
Q Is there any reason to believe that the algorithms that you created are no longer valid?
A No.
Q And you took into account handedness. Does it affect your conclusions at all?
A Which --
Q Keith Nelson's handedness, it does not affect your conclusions?
A No, no.
Q And whether or not the normative group were people in Philadelphia or Kansas City, does that matter in terms of the volume of the brain?
A No. There is no evidence that brains are different in Kansas City than in Philadelphia.
MS. HARMS: Thank you. That's all I have.
MR. VALENTI: Nothing further, Your Honor.
THE COURT: That's good to know, Doc.
Thank you very much.
Other witnesses?
MS. HARMS: We have no further witnesses.
MR. RUHNKE: That completes our presentation. I understand the government has a rebuttal witness this afternoon and its expert neuropsychologist tomorrow morning.
THE COURT: Thank you.





Appellate Case: 15-3160 Page: 280 Date Filed: 02/29/2016 Entry ID: 4372433

medical records. I believe there was some medical records on his mother, which created some issues for us, and some of the criminal records clearly showed that there was probably some mental health issues there. And not being medical doctors, obviously all we could do was identify it and then make a decision down the road how we were going to handle that.

Q Have you heard the term a "mitigation investigator" or "mitigation specialist," those two terms?

A Yes.

Q And did you consider Mr. Ninemire to be filling either or both of those roles in your trial team?

A Initially I would say that he was a mitigation investigator, although over the years I have met and interviewed and had CVs from a number of mitigation -- what they call mitigation experts, people that hold themselves out to be mitigation experts, and, frankly, their training many times was the same as what I found Ron Ninemire had. Ninemire, he had a significant background and good formal education in that field.

And then usually the mitigation experts that I have met and have interviewed simply don't have the experience, you know, and Ron came with 20-plus years of experience interviewing people and documenting issues. So I used him as a mitigation investigator.

Whether or not I would have used him as a mitigation





Appellate Case: 15-3160 Page: 281 Date Filed: 02/29/2016 Entry ID: 4372433

specialist, that decision hadn't been made yet. We weren't nearly to that point. There was just so much material to gather. I don't like to hire people until we actually know that, first, we're going to need them, and then we need to identify what we need first before we go out and just hire someone.

Q And you mentioned Mr. Ninemire's background and education. Are you aware did he have any degrees that --

A I believe he had a master's in sociology or social work, I believe. It's been a long time since I've seen a CV on him. I don't remember. But he's -- you know what, at one time, I mean, I just did that. I mean, I looked at his qualifications versus people that had sent their resumes, you know, wanting to work as a mitigation specialist in a particular case, and Ron had the same, if not better, qualifications of the education. And then, of course, the experience just blew him away.

Q Now, at some point, Mr. Pace, am I correct that a conflict came up that resulted in the federal public defenders, both you and Mr. Ninemire, being conflicted out of representing Mr. Nelson?

A That's my understanding, yes.

Q Would you agree with me, without looking at specific dates, that that conflict would have arose sometime in the summer of 2000, and ultimately, I believe, your -- the federal





Appellate Case: 15-3160 Page: 282 Date Filed: 02/29/2016 Entry ID: 4372433

Q We've talked a few times along the years about the Nelson case, haven't we?
A Yes, we have.
Q And I wanted to be clear on one thing. I wasn't clear when the Ortiz case was tried in relation to your involvement in the Nelson case.
A The Ortiz case was tried in the year 2000.
Q All right. So the year prior to your -- well, let's stay with that for a moment.
A Okay.
Q Assuming that you were appointed to represent Mr. Nelson in the fall of 1999 --
A Yes.
Q -- and were involved in his case through the exact date would be August 21, 2000.
MR. RUHNKE: Your Honor, you would take judicial notice of the docket entry. It's been referred to before.
THE COURT: Absolutely.
Q (BY MR. RUHNKE) Were you involved in both the Ortiz case and Mr. Nelson's case from -- at the same time?
A I was involved with Keith Nelson's case. For the entire time that I was representing Keith, I was also representing Mr. Ortiz.
Q And when did the Ortiz case come to trial?
A I don't remember off the top of my head. It was

sometime in the year 2000.

Q Was it before or after you withdrew from the Nelson case?

A I think it was after. I believe we were still working on that case, and I think the case went to trial shortly after we -- either -- just shortly before or shortly after. I can't remember. Again, it's been 15 years, but --

THE COURT: You can probably stipulate to that, can't you?

MR. RUHNKE: We can probably find out.

MR. VALENTI: April 11th, 2000, before Judge Fenner.

MR. RUHNKE: It started April 11th, 2000?

MR. VALENTI: April 11th.

A So right before then we got off of Keith Nelson's case then.

Q (BY MR. RUHNKE) So I understand this correctly, you were going to trial in a federal capital case in April of 2000 --

A Okay, yes.

Q Based on the stipulation.

So you must have been pretty heavily involved in getting ready to go to trial in the case; am I correct?

A Certainly.

Q And so that by the time -- when you were first appointed in Keith Nelson's case then, you had never tried a federal capital case or state capital case before a jury. Am I taking

Q And why would a mental health evaluation be imperative in a case like Keith Nelson's?
A Well, because I think that, first off, you have to decide whether or not they're competent to proceed. You have to decide if it's going to be a death penalty case. I mean, the standard is you can't execute someone that isn't competent, and you want to be able to make sure that they can work with you, you know, effectively. There's all these --
Q What about in the area of mitigation?
A Well, mitigation, yes, but, again, mitigation to me goes down the road just a little bit. First off, you've got to get the case together, you know, the primary guilt phase case together. And, again, if you can, I guess I would say, cut the legs off of the case early on, knowing that if you have enough mental health problems with the client that he couldn't be executed anyway, then you want to -- you want that up front. So those are -- yeah, there's a lot of factors that go into it.
Q Once you're past the issue of competency -- for example, do you recall whether you ever raised the issue of Mr. Nelson's competency?
A I didn't file any of the motions, no. We were -- again, we were in the information. This is way too early, Counselor. I mean, by the time I got out of it, it was probably time that some of those motions would be filed, and that may be where

you come up with Bill Shull asking for an expert in that field. It takes months to get to that point to determine who you need to hire.

I just don't go out and hire somebody. I want to know a lot of background about an individual before I'm going to spend the money to hire the right individual.

Q You agree, however, that evidence of brain damage, brain dysfunction, neurological impairments, levels of mental health difficulties can be important mitigation themes if the case actually does go to a penalty phase?

A Absolutely, yes.

MR. RUHNKE: I have nothing further, Your Honor.

MR. KETCHMARK: Just briefly.

REDIRECT EXAMINATION BY MR. KETCHMARK:

Q Mr. Pace, if you're working on a case, whether it's two capital cases or whether it's a regular public defender's docket and you realize that you're not ready to go to trial, what do you do?

A File a motion to continue it, and we would continue to investigate and provide enough information to the court to show why we're not ready to go.

MR. KETCHMARK: That's it, Judge.

MR. RUHNKE: And nothing additional, Your Honor.

THE COURT: Thank you, Mr. Pace.

THE WITNESS: Thank you, Your Honor.

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

KEITH D. NELSON, )
Movant, )Case No.
vs. )04-8005-CV-W-FJG
UNITED STATES OF AMERICA, )Pages 629-686
Respondent. )

TRIAL TRANSCRIPT - VOLUME IV OF IV

On April, 14, 15, 16, and 17, 2014, the above-entitled cause came on before the Honorable Fernando J. Gaitan, Jr., United States District Judge, sitting in Kansas City, Missouri.

APPEARANCES

For the Movant: MR. DAVID A. RUHNKE
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042

MS. PAULA K. HARMS
Federal Public Defender
850 West Adams, Suite 201
Phoenix, Arizona 85007

MR. GARY E. BROTHERTON
Legal Writes, LLC
503 E. Nifong Blvd., #377
Columbia, Missouri 64201

For the Respondent: MR. DAVID M. KETCHMARK
MR. JEFFREY E. VALENTI
United States Attorney's Office
400 East 9th Street, Ste. 5510
Kansas City, Missouri 64106





Appellate Case: 15-3160 Page: 288 Date Filed: 02/29/2016 Entry ID: 4372433

# I N D E X

THURSDAY, APRIL 17, 2014
VOLUME IV OF IV


| | Page |
|---|---|
| DAN MARTELL, Ph.D. | |
| Direct Examination by Mr. Valenti | 631 |
| Cross-examination by Mr. Ruhnke | 651 |
| Reporter's Certificate | 686 |

for the defendant's actions in the underlying criminal case?

A I do have an opinion.

Q What is it, sir?

A Well, I would say that, despite the level of brain impairment that's apparent on the testing and examination, when one looks at his behavior during the course of committing the crime, what you would anticipate from these findings is impulsivity, is an inability to control impulses to do things.

But looking at his behavior before, during, and after, we see a different pattern where he fantasized about what he wanted to do. He tried to carry out his fantasy with one victim, and when that didn't work, selected another victim. He laid in wait. He hid himself. He brought electrical cords to bind his victim. He kidnapped her and took off at a high rate of speed in such a way that people wouldn't be able to see him, wouldn't be able to identify him.

He took her to a secluded area. He bound her up he told me so she couldn't get away. These are all things that show planning as opposed to impulsive acting out.

So for those reasons, I don't think that the brain damage played a significant role in causing this crime.

Q Similarly, at the end of Dr. Amador's report he briefly mentions insanity as it relates to McNaughton. Were you aware of that evaluation?

A I was.





Appellate Case: 15-3160 Page: 290 Date Filed: 02/29/2016 Entry ID: 4372433

A I have.
Q Has any of the reports that have been tendered to you changed your opinions that you offer the court today?
A No.
MR. VALENTI: Your Honor, that's all I have.
MR. RUHNKE: Just need a minute to get organized. This went a little bit quicker than I thought it was going to go, as did the whole hearing.
Could we display on the screen -- we have marked a few additional exhibits, which we will get electronically to your clerk by the end of today. I'm not sure we're going to move many of them into evidence, but there's a few additional.
THE COURT: The government is not challenging those exhibits?
MR. RUHNKE: I'm sorry?
THE COURT: There will be no objection?
MR. VALENTI: No.
THE COURT: Okay. Very good.
MR. RUHNKE: Could we see P86 on the screen.
CROSS-EXAMINATION BY MR. RUHNKE:
Q Dr. Martell, can you see that on the screen in front of you?
A Yes, I can.
Q We've been somewhat struggling with the issue of what standard deviations mean, somewhat struggling with how they

translate into population percentages. Can you tell me what you're looking at as P86?

MR. RUHNKE: In fact, let's enlarge the whole thing, get rid of the margin, the white stuff, just highlight the graph part, blow it up.

Q (BY MR. RUHNKE) That's a little larger. Can you tell what we're looking at?

A This is what's commonly called the bell curve that shows the distribution of test scores over the population.

Q And if I'm correct, the zero represents the absolute mean, the average with the mean, the middle of the group. There's -- half the group's on one side, and half the population's on the other side, correct?

A Precisely.

Q And within that range, you find 34 percent of the population on one side, 34 on the other. So 68 percent of the population falls within that average range. Is that a correct interpretation?

A Yes, it is.

Q All right. And when you move one standard deviation away, there's 13.59 percent as it turns out, but a little over 13 1/2 percent of the population are one standard deviation away either direction, correct?

A Correct.

Q When you get to two standard deviations away, it's down

to 2 percent of the population in either direction, correct?
A Yes.
Q And when you get to three standard deviations, you're down to almost a tenth of 1 percent, .13 percent; is that correct?
A Yes.
Q So when you're getting to three standard deviations, you know, 99.8 percent of the population will perform better or worse, depending on which end of the scale they are than the average; is that correct?
A Correct.
Q Okay. So you have a forensic practice exclusively?
A Yes.
Q When was the last time you had a clinical practice? When was the last time you actually treated a patient?
A Well, I consider forensic work to be clinical work, but it's different from treatment. And the last time I treated a patient was 2 -- no, 1992 probably.
Q All right. So it's been two decades plus?
A Yes.
Q And you certainly are not providing therapy when you do a forensic analysis, are you?
A No. But clinical encompasses more than just therapy.
Q And how many times a year do you testify at hearings in front of juries, roughly speaking?

Dr. Daniel Foster, a report of Michael Gelbort, affidavit of Natalie Novick Brown, and a report of Xavier Amador dated March 30, 2010. I gather that since writing this report, you've reviewed the additional reports of Dr. Amador?

A I have.

Q Have you reviewed a social history that was prepared in this case by Jill Miller?

A I have.

Q Have you reviewed -- let me just back up a moment.

At the time you conducted -- at the time you conducted your exam in 2010, did you have available a draft social history report that had been prepared by Tena Francis Associates? Do you recall that?

A I don't recall. If I had it, it would be in the list.

Q And I'll represent to you that it's not on the list.

But you reviewed the neonatology report prepared by Dr. Carolyn Crawford?

A I did.

Q And to just step back from this a minute, you've identified brain damage, brain dysfunction, neurological impairments in Mr. Nelson. In response to Mr. Valenti's questions, you did not see a connection to the underlying offense between the brain dysfunction that you identified, correct?

A Correct.

Q In terms of mitigation evidence, evidence that may be presented to a jury, is such evidence evidence of mitigation in your experience?
A Yes.
Q You also reviewed the trauma report, I call it that, of Dr. Leslie Lebowitz?
A I did.
Q Do you know Dr. Lebowitz or of her?
A I do. We have -- we're actually working on a case together at the moment.
Q Did you also review the MRI and PET results?
A I did.
Q Are the report -- the bioimaging report, neuroimaging report of Ruben Gur, Dr. Ruben Gur?
A I did.
Q Finally, you also mentioned the dermatological reports from Terre Haute, correct?
A I only had one. That would be from Dr. Jones.
Q Okay. Let me put on the screen, I'm jumping ahead here, let me put on the screen first P64, please.
MR. RUHNKE: If we can just blow up the top third of that.
Q (BY MR. RUHNKE) Do you remember looking at this report, and it is by Dr. Jones, Roger Jones, MD?
A No.

Q Is there a term -- let me back up to the next question.
You've talked about mild impairment, mild cognitive or mild deficits showing up on the testing.
A mild case of brain damage is not insignificant, is it?
A No.
Q It's quite significant, correct?
A Yes.
Q And there's also a term in neuropsychology that's called convergent validity. You know what I'm talking about?
A I sure do.
Q And what convergent validity means, if I'm correct, is that if you have several independent sources testing evaluations and they all point in exactly the same direction, you have much more confidence in your particular assessment. Is that a fair summary?
A Yes.
Q Okay. In this case in terms of neurological impairment in memory and frontal lobe functioning, Dr. Gelbort's testing supports that, correct?
A Supports what?
Q Neurological impairments in memory and frontal lobe functioning?
A Yes.
Q Dr. Amador's clinical observations support that

conclusion?
A Yes.
Q Your findings support that conclusion, correct?
A Yes, they do.
Q The PET and the MRI testing that was performed also support that conclusion, correct?
A Correct.
Q Is it fair to say that this is a case of convergent validity where you've got multiple sources all reaching the same conclusion?
A Absolutely.
Q And even Dr. Gur's imaging, which was somewhat disputed in court the other day, captured the fact that your raw data showed signs of slightly more severe brain dysfunction than Dr. Gelbort's, correct? You don't know that?
A I don't know that. But it's true it -- I did.
Q So some of the particular tests that you performed on Mr. Nelson, one of them was the Stroop, S-t-r-o-o-p, and the Stroop test is the one you described with the color and the fact that, you know, you have to inhibit a response, and the way the Stroop works, if I'm correct, I'm asking you, the way the Stroop works is that there is a -- first of all, a list of words that the person is asked to read, correct?
A Yes.
Q And then there's a page that consists of colors, just to

identify colors, correct?
A Correct.
Q Then there's a list of -- not a list but a list of words and colors where the colors themselves correspond with the words? I've actually got an example of it if I can put my hands on it in a second.
Although these tests are copyrighted and protected, it's a reality that they're often quite easily available even on the internet, true?
A Some more than others, but, yes, sometimes they are out there.
Q Let me see if I can just pick up another copy of that test. I had it at my command seconds ago.
In any event when it comes to the Stroop, the hard part of the test is that the defendant looks at a word and the word says "red" but the color is blue?
A Right.
Q And the hard part is that our minds are trained and acquire the word before we acquire the color, correct?
A Yes.
Q And it's a measure of inhibition on some levels, correct?
A Well, the ability to inhibit the impulse to read the word and instead name the color.
Q So that, you know, you look at it and you say red and

say, oh, no, no, no, I take that back, it's blue, and it's that inhibition ability that that document -- that that testing measures, correct?

A     Yes.

Q     Mr. Nelson did not do well on that part of the test, did he?

A     No, he did not.

Q     He was close to two standard deviations away from the norm on that part of the test, correct?

A     I think that's true.

Q     All right.  So that puts him close to that bottom 2 percent of the population, right?

A     Correct.

Q     You also administered a test called Trails A and Trails B; is that correct?

A     Yes.

Q     And Trails A and B, again, test executive functioning in the sense of the ability to get a pattern into your head, organize it, and go ahead and reproduce the pattern, correct?

A     Well, it's a little more complicated.

Q     Explain what it involves.

A     Trails B is more sensitive to executive functioning because you have to be able to divide your attention.  You're shown like a connect-the-dots problem, but you have both numbers and letters and you need to switch back and forth,





Appellate Case: 15-3160     Page: 299     Date Filed: 02/29/2016 Entry ID: 4372433

number, letter, number, letter. And so it requires the ability to keep two things in mind at once and alternate between them effectively and efficiently.

Q And I am going to pick up --

MR. RUHNKE: Can we have P86. I'll give you the page number in a moment. At page 13, P86, page 13.

Q (BY MR. RUHNKE) So you see what's on P86 at page 13? Do you see what that is?

A I do.

Q And that's your raw data -- this is -- you can see from the top you've written K. Nelson. You've written the date, September 9, 2010, and this is his scoring on Trail Making Part A, correct?

A Yes.

Q And Trail Making Part A is a relatively simple test, correct?

A It's just connect the dots.

Q And his T score on that case was 50, which is exactly average, right?

A Yes.

Q Can we just show what Trail Making looks like, the rest of the document, the sample.

So it's -- it couldn't be easier if you're, you know, functioning correctly. You could have 1 to 2 to 3 to 4 to 5 to 6 to 7 to 8 and a picture of a polar bear appears when



Appellate Case: 15-3160 Page: 300 Date Filed: 02/29/2016 Entry ID: 4372433

we were kids.

And in this case he did average, he did not do above average, he did not do below average, correct?

A He did as expected based on his IQ.

Q Is this a timed test?

A It is timed.

Q And it's the amount of time that it takes you to complete this that controls how well you do -- how well you score, correct?

A That's correct.

Q If somebody is staring at this test and can't figure out to get from 1 to 2, you're looking at -- assuming someone's making good efforts, you're looking at somebody who's got some neurological impairments that are quite serious, correct?

A Yes.

MR. RUHNKE: Can we go two pages down on the exhibit.

Q (BY MR. RUHNKE) Part B is Trail Making B, and this is a harder test because it requires you to keep in mind two different principles. I think if we can look at the page before or look at the sample, please, if we may.

And in this one you begin with one, but then you've got to go to the first letter in the alphabet, then you've got to go to the next letter, then the next number, the next letter, next number, next letter, et cetera, and if we could

-- I think the page before it -- pull up the page before.

This is Mr. Nelson's completed Trails B, correct?

A This is Trails A.

Q Right you are. Let's go back to the next page -- next page down.

This is Mr. Nelson's completed Trails B, correct?

A Yes, it is.

Q And, again, it's a timed test, correct?

A Correct.

Q And if we go back to the page before, it reflects your scores on Trails B. If we highlight the upper part of the score, this is his -- he reaches a T score of 32?

A Yes.

Q That's nearly two standard deviations below the mean, correct?

A Correct.

Q So he's down in that -- you know, 98 percent of the country's going to do -- 98 percent of the population, thereabouts, plus or minus, is going to do better on this than he did?

A Maybe 95 percent.

Q Okay. Accept that.

You also administered a test called -- it's usually referred to as the FrSBe. Explain what FrSBe means?

A It's the frontal systems behavior examination, I think.

Q If we can display P86 at page 7 and highlight the top.
Okay. This is the form and this is designed really to testify -- to test and assess, again, executive functioning, right?
A Yes. What it's trying to capture is a little more of everyday functioning. A lot of the tests in the lab, connecting the dots, reading the colors, don't map onto everyday behavior very well, where this test tries to capture things that people do in their everyday life.
Q Okay. If we could go to the score portion of page --
MR. RUHNKE: I'll give you a minute. It's P86 at page 12. If we could highlight just this area where the graphing is all the way to the bottom. Okay. Thank you.
Q (BY MR. RUHNKE) This test differs slightly from other tests in that the higher the score on the test, the more of a problem there is, correct?
A Yes.
Q It doesn't have much below the mean of 50 because people who have higher levels of executive function, you're not really concerned about how high it happens to be, correct?
A Correct.
Q In this case on the bottom of the page we see E. Does E stand for executive?
A Yes.
Q Okay. And he has a score of 52. Am I right about that?

Am I reading that -- oh, 83.

A The T score is 83.

Q T score is 83.

And that's more than three standard deviations from the norm; is that correct?

A Yes.

Q So he is down in terms of this instrument in executive functioning in the .18 percent that we discussed earlier, correct?

A Yes.

Q And if we can look at --

MR. RUHNKE: And this is the last one I'm going to show, Your Honor.

If we can look at P86 at page 1.

Q (BY MR. RUHNKE) What is P86? What are we looking at here?

A This is the California Verbal Learning Test.

Q And this is an example of a testing instrument that you actually don't score yourself but is machine scored, correct?

A It could be done either way but I use the computer.

Q Okay. So you have a computer program, you put in the raw scores that you got, and it produces this nice, printed report?

A Yes, it does.

Q How about the MMPI-2? I noticed that it was a printed

# EXHIBIT 8

GOVERNMENT'S REBUTTAL EVIDENCE


KENNETH MORSE
Direct Examination by Mr. Whitworth 1062
Cross-examination by Mr. Berrigan 1070

RECORD ON INSTRUCTIONS 1087

WEDNESDAY, NOVEMBER 28, 2001 1105

RECORD WITH DEFT. RE TESTIFYING 1105

INSTRUCTIONS READ 1110

GOVERNMENT'S CLOSING ARGUMENT 1110

DEFENDANT'S CLOSING ARGUMENT 1128

GOVERNMENT'S REBUTTAL ARGUMENT 1154

DR. FOSTER'S PROFFERED TESTIMONY RE EX. 136 1165

JURY'S VERDICT 1166

REPORTER'S CERTIFICATE 1171


* * * * * * * *

EXHIBIT INDEX


| GOVERNMENT'S | DESCRIPTION | RECEIVED |
|---|---|---|
| 1 | Aerial photo of church and area | 58 |
| 1A - 1E | Various street maps | 58 |
| 2 - 2K | Aerial photos of church and area | 58 |
| 2A | Photo of search area | 289 |
| 3 | Diagram of measurements at crime scene | 304 |
| 3A - 3D | Photos of search area | 290 |
| 3E | Photo of sports bra | 295 |

No. 10. The previous instructions I have already given to you and I won't repeat them, but you'll have them if you have the need to look back.

(THEREUPON, THE COURT READ INSTRUCTIONS 10 THROUGH 27 TO THE JURY.)

THE COURT: Okay. We're going to now have closing arguments and we'll begin with the prosecution.

GOVERNMENT'S CLOSING ARGUMENT

MR. WHITWORTH: May it please the court, Mr. Berrigan, Ms. Hunt, members of the jury.

On September 29th, 1999, the defendant was working with a man by the name of Shannon Robinson at a job and he told -- the defendant told Mr. Robinson that day about a plan he had, a plan to kidnap, rape, torture and kill a little girl in the woods. He talked about this plan he had to get a piece of property, remote, out in the woods. Mr. Robinson thought he was just weird and acting crazy and didn't believe him.

The defendant acted on that plan on October 2nd, 1999 when he attempted to abduct Michanne Mattson, a medical student at K.U. Med Center. He attempted to kidnap her from her apartment complex in the late night or early morning hours of that day by putting a knife to her throat and putting handcuffs on her and dragging her across the parking lot. Unfortunately he picked a woman, an adult

woman who was too strong, who fought him and got away. Thank God she got away.

The next day he saw Steve Underwood, his friend and coworker, and bragged about the fact that he had tried to kidnap a woman by putting a knife to her throat and putting handcuffs on her. This desire inside the defendant continued and he decided to get a little girl and he began searching for a little girl and he found one the day this happened on October 12th, 1999.

You will recall the evidence that the defendant, came back to his house where he lived with Kerri Dillion, and Steve Underwood is there in the front yard after having picked up the boys from school. It was about 4:05 p.m. on that fateful day, when the defendant excitedly ran up to Mr. Underwood and told him he had found one, he had found a 14-year-old girl, now is the time to kidnap her, to rape her, to torture her, and to kill her in the woods. Underwood unfortunately thought he was just acting weird and crazy. He wasn't.

That day Pamela Butler, a little ten-year-old girl, 5th grade student, a bright, intelligent little girl, on the right in this photograph, went to school. She liked school. She liked her teacher. She liked her friends. She was a typical ten-year-old girl. For those of us who have children, we've seen our kids go through those

We submit to you that if this crime doesn't warrant the death penalty, then what crime does? We need to protect our children. We need to send a message to guys like the defendant if they do this they're going to pay the ultimate price that Congress has provided for this type of -- one of those rare crimes that warrants the death penalty.

Now, I want you to think about today as you're hearing us argue what was that little girl thinking in her last moments on this earth, her innocence ripped from her, begging for the defendant not to hurt her.

As he took her out, he grabbed her up off the street in front of her sisters. Imagine the horror they went through seeing this. The defendant knew he had been caught, because Paul Wilt chased him for a long time. He knew he had been spotted, but yet he was determined to continue with his twisted fantasy to rape and kill a little girl.

And he drove her across the state line to Missouri, over in Grain Valley, where he took her out into the woods and drug her across that field, no doubt, in a remote area in the woods, just as he had talked about earlier.

He took her back there and he ripped her clothes from her body, her little body, her 93-pound four-foot-ten-inch body. And look at him. He's a strong

man, a man who was employed in manual labor, carrying buckets of concrete up out of basements. She didn't have a chance. He ripped her clothes from her body, panties and her sports bra, and then violated her. What was she thinking? Freshly broken hymen the medical examiner said. What was she thinking? He could see as he removed her clothes that she was nothing more than a child. And yet he didn't stop. He didn't stop.

He took this electrical cord, that he had no doubt cut earlier, and he placed it around her neck and he slowly, after having his way with her, twisted the life out of her little body. This is the way he left her, with the cord around her neck and her poor, bruised and damaged body showing injuries that he had beaten her about the face and about the eyes. You heard the medical examiner's testimony that he beat her before he killed her. Imagine what she experienced in that last part of her life.

Now, do these actions warrant the death penalty? We submit to you that it does. We submit to you that there are very few crimes that could be worse than this, and the community cries out for justice in this case.

Now,. how do you get there? The judge has given you the blueprint on how to get there, and you have to consider a lot of things and we want you to consider not only our evidence, but the defendant's evidence. That's

getting out and escaping. He's talked to guards about it. He's talked to inmates about it. Believe me, folks, this defendant, given the opportunity, will try to escape.

Now, (h), Keith Nelson has expressed a desire or intent to escape while incarcerated. Carlos Acevedo, you also recall his testimony, the defendant told him that he would rather die trying to escape than let the government kill him.

The next one is that Keith Nelson has a significant criminal history including felony convictions for burglary second degree, and stealing. There's the certified convictions right there (indicating.)

Now, let's move on to the defendant's defense, the mitigating factors. And I'm going to have to -- I'm not going to be able to cover all this, but I want to talk to you about a few of them.

Dr. Cunningham talked about all these factors that have influenced this defendant's life. And, members of the jury, common sense tells you that the environment that he grew up in was not good and that it did probably contribute to the person he has become. There's no question about that. We don't dispute that.

But you know what, so what? If you go this far and commit this kind of a crime, isn't it time to draw the line? Isn't it time for all this excuse testimony, that

your mom and dad were bad parents, that you wet your bed, that you had this bad childhood, at some point you've got to draw the line and say no more, we're tired of it. If you do something this horrible, this vile, this vicious, you've got to pay the ultimate penalty.

Robert Frost had a poem that talked about how people who -- this man who was going through the woods and the path diverted into two paths, and it talks about how one road was less traveled and one was more traveled and it talks about how the road you select in your life, the important decisions in your life affects what kind of a person you are.

This defendant took the wrong road. His twin brother, who was raised in the same environment, has turned into a productive member of the United States Army. He's made the right decisions.

This defendant decided to live a life of crime and he's going to have to deal with those consequences, just like we all have to deal with the consequences of the decisions we make in our lives.

Now, in a few minutes I think you're going to hear about -- you're going to hear from Mr. Berrigan, who is a fine lawyer. Ms. Hunt and Mr. Berrigan have done a fine job, but I anticipate you're going to hear things that are intended to put a guilt trip on you, things like you

You're going to hear name-calling about snitch witnesses. We don't also get to pick our witnesses. We used some inmates and, you know, members of the jury, sometimes we don't get to pick all our witnesses. That's who the defendant is living with right now. We called them because we thought you would want to hear that testimony. Sometimes -- there is an old phrase that's used, sometimes you have to deal with the sinners to get to the devil, and that's what we did. We are going to give them some consideration for their testimony, and we don't apologize for that.

Finally, I want to say in closing that we need to think about Pamela Butler here. We need to think about her family, her mother and father, her friends. Imagine the horror and the pain that they have suffered over the last two years as a result of losing this beautiful little girl, having her snatched from their lives, and this defendant did it and he needs to pay for it, and we submit to you that in this particular case, and we make this recommendation without reservation, that the death penalty is warranted.

I thank for your attention.

DEFENDANT'S CLOSING ARGUMENT

MR. BERRIGAN: May it please the court.

THE COURT: Mr. Berrigan.

freezers of Dairy Queens to get hamburger patties and frozen food so they can put food on the table. And I suppose that was a crime because they had a choice not to do that, you know, but Steven Nelson told you sometimes the life just chooses you. You don't choose the life. And Steven told you that early on the life chose Keith Nelson and what he became was a thief. He stole. Those are one of the choices that he made.

He chose to kill Pamela Butler. You know that. He pled guilty to it. And let's be crystal clear about this. He has already accepted responsibility for his crime. He will die in the penitentiary. And he made that decision before you ever walked into the courtroom. He made that decision. And there are no excuses for that conduct. Nobody is proffering any excuses. Nobody is laying a guilt trip on you. He chose to do that. He didn't have to pled guilty. Didn't have to do it at all.

But accepting responsibility does not automatically mean, as the prosecution suggested, that's the death penalty, that this is such a horrible crime there are no other options. Because if you'll recall when you came in here to be selected to sit, the judge asked you questions about that, is anybody here automatically going to impose the death penalty, and nobody, not one of you raised your hands.

And then I asked you, do you remember, what about a case of the murder of a ten-year-old girl, murder and rape of a ten-year-old girl, in your mind, would the death penalty be the only appropriate penalty in the case? Nobody here raised their hands. The people that raised their hands, they were let go. Every one of you said no, I'm going to follow the instructions of the court. I can consider, even in that case, I can consider a sentence of life without parole, I can do that.

And, indeed, that's what the law requires you to do. It requires that. There's no such thing as what Mr. Whitworth is talking about. There's no such thing as some crime that says you do this, you get the death penalty. That is absolutely in contravention of the law. Absolutely. We need not be here if that's the law. We need not have a hearing. This would have been settled. Death, death penalty for Keith Nelson.

But we obviously are here and we have obviously presented evidence and you have been listening very intently. You have to make the determination.

There are two punishments here, two of them. And there's no such thing as some crime as horrible as this crime is -- and again, nobody is excusing Keith Nelson's conduct. He came in and admitted this. We're not asking for excuses. That is not what this hearing is about. Not

not -- it's not about this (indicating.) No. It's not. What it is, is about this (indicating.) It's about a ten-year-old girl getting strangled.

And it's not about a photograph of a kid playing baseball because we know she'll never play baseball.

MR. BERRIGAN: I'm sorry. Your Honor, I'm sorry. That's not in evidence.

MR. MILLER: I'm sorry.

It's not about the other photographs that may have been introduced in evidence. It's about tears to a ten-year-old girl's hymen. Right there and right there (indicating.) No ten-year-old girl's hymen should look that way. Never. Never.

And they ask you why I show you these photographs. I will tell you why: Because that's what this case is about. It's about something horrific. It's about something evil. And I want you to go back there and think about that. I want you to think about our children and what he did to one of our children.

It is about this case, the slaughter, the slaughter of Pamela Butler. It is about the slaughter of a ten-year-old. It is about the slaughter of innocence. The slaughter of innocence.

You see, ladies and gentlemen, this case is also about choices. Counsel talked to you about the defendant's

background, and it was not pretty. It was ugly. And they talked to you about his childhood. And regardless of what he said to you, he seeks -- they want you to use it as an excuse, an excuse for the defendant's barbaric choice in this case. He's a bed-wetter. His mother was an alcoholic. His father was absent. The blame game. The abuse excuse. Put your foot down and say no. Say no.

He wants to tell you he's not responsible for his choices. Hold him responsible for his choices. It was somebody else's fault. That's what he wants you to think. It was everybody else's fault. It's not my fault. But, you see, Kenny Morse didn't kill that girl. Billy back in Fort Worth, he didn't kill that girl. He killed that girl.

His brothers and sisters were raised in the same environment -- or his brothers, excuse me, in the same environment as he was. Regardless of what their intellectual capacities were, maybe they were smarter, maybe they were quicker, but they chose, they chose not to kill a ten-year-old girl. Hold him responsible for his actions by imposing the only appropriate sentence in this case, and that is a sentence of death. To not do so not only denigrates the victim Pamela Butler, it denigrates his brothers in the sense they've done right, and it denigrates every other person, you heard the teacher talk, every other

person who had similar circumstances that's chosen to lead a lawful life.

Remember too, ladies and gentlemen, because somebody calls something mitigating doesn't make it mitigating. Wishing doesn't make it so. You see, you have to go through a process here. You have to first believe that he proved the proposition to you and that in fact it's mitigating.

For instance, here we have number nine, Keith Dwayne Nelson can be a positive influence on the life of his young son, counseling, teaching and caring for the boy as he grows up over the ensuing decades. Do you believe that was proven to you? What evidence showed you that that actually could happen. Do you believe somebody who kills a ten-year-old can be a positive influence on anybody?

He talks to you about the electrical cord. Was that proven to you? Did Kenny Morse beat Nancy Nelson? I bet you he did. There's no doubt in my mind and I don't think there's a doubt in any of your minds. Did he attach an electrical cord to her? No, he didn't. No, he didn't. Again, not something that's been proven to you. Moreover, it's not proven that anybody actually knew about it, that it actually occurred.

THE COURT: Let me interrupt you, Mr. Miller. Can I speak to counsel.

(COUNSEL APPROACHED THE BENCH AND THE FOLLOWING PROCEEDINGS WERE HAD:)

THE COURT: I think you've had that displayed --

MR. MILLER: I'm sorry, Judge. I didn't do it on purpose.

(THE PROCEEDINGS RETURNED TO OPEN COURT.)

MR. MILLER: And when you go through the weighing process ask yourself what mitigates against the rape and cold-blooded murder of a child? What mitigates against the utter contempt, the utter contempt he showed for this ten-year-old girl? Nothing. Absolutely nothing mitigates against that kind of an action. See, a lousy childhood may explain why somebody steals. It may explain why somebody drinks. It may actually explain why somebody becomes a drug dealer. But this is a case of the murder of a ten-year-old girl, and it doesn't explain that.

See, ladies and gentlemen, sexual murders of children, as Dr. Cunningham said, are rare. He committed this act not because his parents were abhorrent, and they were. He committed it because he is rotten at his core. He is a rotten human being. He is bad. And sometimes people are bad.

The mitigating evidence in this case is nothing more than a smoke screen. It's an attempt to divert you from what this case is really about, the slaughter of an

innocent.

What they want you to do is have him escape justice. Don't do that. Sometimes the act standing alone, the act, because it is so senseless, because it is so brutal, because it is so savage, that act standing alone, regardless of what else goes on in somebody's life, means that they deserve the death penalty.

Counsel's plea at the end of his argument to you is one for mercy. It was a plea for mercy. Don't confuse mercy with weakness. Don't confuse the natural tendency of decent persons like yourselves to be kind to other people. You have an obligation to uphold the law, and that takes courage.

Mercy. Mercy. Under what twisted notion of fairness would a society reward its most vicious members? Mercy ceases to be a concept worthy of a civilized nation if it is not reserved for those truly unfortunate cases. A mother steals to feed her children. Kenny Nelson steals to feed his brothers. A man commits a robbery to obtain money for his mother's sickness. To those persons you show mercy. You do not excuse their behavior, but you recognize that it is deserving of special treatment.

Do you show mercy for somebody who beat a ten-year-old girl, hit her in the mouth, hit her in the head, left contusions on her brain? Do you show mercy for

a man who dragged a ten-year-old girl, a helpless ten-year-old girl through the woods, sticks ripping into her body, to unleash in that area, that area of the remote woods, to unleash the most savage and vile acts imaginable upon her? Do you show mercy for that person? Do you show mercy for a person who derives some kind of sick pleasure from reliving his brutal acts in his jail cell? Do you show mercy for a man who would violate a ten-year-old girl for some unholy and wanton purpose? My God, a ten-year-old girl.

Would you show mercy for a man who takes an electrical cord and puts it around the neck of that ten-year-old, and as she cries for her mother makes it tighter and tighter and tighter and tighter? Do you want to show mercy for that person? Do you want to show mercy for a man who shows absolutely no remorse, who plays video games within hours, within hours of killing and raping a ten-year-old girl?

Mr. Berrigan argued to you that the tape shows some sort of remorse. It does not show remorse. It shows regret. Regret that he got caught. If you want to know what's really going on in that tape, listen to the very end of it. Listen to the very end, because the minute Kerri Dillion gets off that phone, boom, his demeanor changes immediately and he goes back to the same old Keith Nelson,

the same Keith Nelson that abducted a ten-year-old girl on October 12th, 1999.

Ladies and gentlemen, for all those reasons you do not show mercy for this person.

People who do good, people who are good, they deserve good things to happen to them. Pamela Butler deserved good things. She deserved to grow up. She deserved to go to prom. She deserved to get married. She deserved to have a career, because she was good at her core.

People who are evil, people who do evil, they deserve justice, and in this case, this man who is evil at his core, can only have justice -- or justice can only be imposed by the death penalty. There is no clearer call for the death penalty than there is in this case.

This is how Pamela Butler looked just one day before she died (indicating.) That's how she looked. See the smile on her face. That was one of the last smiles she ever had.

And I'm going to ask you now, please close your eyes. Every one of you, please close your eyes, and I want you to envision her skating. Really think about it. And I want you to envision now the smile on her face. I want you now to envision the horror on her face as she's abducted. I want you to envision the look on her face as she is

dragged across the woods. I want you to envision the look on her face, really think about it, as her clothes are ripped from her, as she is ravished, as he mounts this ten-year-old girl, and she's crying, crying for her mother. Think of the look on her face. My God. My God. Think of the horror on her face as that cord goes around her and he squeezes every ounce of innocence out of her.

Please open your eyes.

But think of those things. When you go back there, this is exactly what the government asks you to think about, because this, ladies and gentlemen, this is no way for a ten-year-old girl to go to heaven. It just ain't right.

As you sit there, you are simply not twelve people. You are the conscience of the community. You represent the people of the United States in this case. You are the dispensers of justice. It's not His Honor. Judge Gaitan has to do what you do. It's not the government. You and you alone are the dispensers of justice, and Cherri West waits for you to at least give her some justice. She can't have all justice because her daughter is gone. But you have the ability to give her some justice. And justice in this case can only be had by imposing a sentence of death.

Ladies and gentlemen, the death penalty was

enacted for crimes like this. Make no mistake. It was meant for the murder of children. Because if not him, who? If not now, when? If killing and raping a kid isn't enough, then we don't need a death penalty. We don't need a death penalty.

In a minute, you will begin your deliberations. Recognize that, unlike the victim, he will not be taken to some remote area in the woods. He will not be abducted. He will not be strangled. He will not be sodomized. He will not be left in some field somewhere. He will have time, he will have time to make amends with his God.

Justice in this case, if you look at the crime and you look at the defendant, justice in this case, ladies and gentlemen, absolutely demands, it absolutely demands the imposition of the death penalty. Do nothing less. And when you do, when you go back into that jury room, remember this face. Remember her name was Pamela Butler and she was ten years old.

Thank you.

THE COURT: Okay, ladies and gentlemen of the jury, in just a moment I will be recessing in order that you may begin your deliberations upon your verdict in this case.

Before doing so, I'm going to excuse the alternates, and I mention the word "excuse" because I'm not

EXHIBIT 9

## [INSERT FOR PATRICK BERRIGAN'S CASELOAD]

6. Pat Berrigan has two clients, Paul Kreutzer and Christopher Simmons, facing lethal injection at the Potosi Correctional Center within the next three to six months, both having fully exhausted their federal habeas appeals and cert. petitions through the Eighth Circuit Court of Appeals and the United States Supreme Court. Berrigan is actively pursuing clemency for these clients and has clemency petitions due, and conferences with the Missouri governor's office expected in the near future.

Berrigan also has an active trial calendar, with the following cases set for trial, almost all specially set, within the next four (4) months:

(a) *State of Missouri v. Felix A. Pacheco*, Jackson County (Mo.) Case No. CR00-00458 (Murder II, Robbery I, 2 counts Armed Criminal Action) beginning on February 25, 2002 (Hon. Charles Atwell, Div. 10, presiding);

(b) *State of Missouri v. Jose Orama-Tavanes*, Jackson County (Mo.) Case No. CR1999-05254 (Robbery I and ACA), beginning on March 11th, 2002 (Hon. Thomas C. Clark, Div. 3, presiding);

(c) *Hung Pham v. Jeffrey J. Simon, et al.*, Federal District Court, Western District of Mo. Case No. 00-0324-CV-W-2-ECF (Wrongful Death case), beginning on March 25th, 2002 (Hon. Fernando J. Gaitan, Jr., presiding);

(d) *Dewberry v. Conseco Finance Servicing Corp., et al.*, Federal District Court, Western District of Mo. Case No. 00-0256-CV-W-4 (Contract Dispute), beginning April 1st, 2002 (Hon. Gary A. Fenner, presiding);

CLERK U.S.DISTRICT COURT
Exhibits:
P 20
Case No. 4:04-CV-08005-FJG

(e) Reid v. Ralle, Inc., Jackson County Case No. 00CV-201461 (Personal Injury lawsuit), beginning on April 15th, 2002, (Hon. Jon R. Gray, Div. 18, presiding);

(f) Moreland v. Davis, Jackson County Case No. CV96-19106 (Personal Injury lawsuit), beginning also on April 15th, 2002 (Hon. Jon R. Gray, Div. 18, presiding); and

(g) State of Missouri v. Rachelle Hernandez, Platte County Case No. 01CR82899 (8 counts statutory rape and sodomy) beginning on June 3rd, 2002 (Hon. Owens Lee Hull, Jr., Div II, presiding).

In addition to the above cases, all set for trial within 120 days, Berrigan is also co-counsel in the defense of United States v. Angela Johnson, Northern District of Iowa Case No. CR00-3034-MWB (5 counts capital murder – death sought) beginning November 4th, 2002 (Hon. Mark W. Bennett, presiding).

Several other cases, not yet set, will be set shortly for May and late June [i.e., State of Missouri v. Jamey Stone, Caldwell County (Mo.) Case No. CR201-104F (6 counts of sexual misconduct and child molestation), likely to be set in late June 2002; State of Missouri v. Christopher Symington, Clinton County Case Nos. CR1001-5123F and 5158F (2 counts statutory sodomy) likely to be set in mid-June to early July.); and State of Missouri v. Rachelle Hernandez, Clay County Case No. 01CR101-4052F, (statutory sodomy), probable trial date in mid-July].

# State of Kansas v. John E. Robinson, Sr.
## Defense Pleadings
## Vol. I

| NO. | ITEM | FILED |
|---|---|---|
| | | |
| 65 | Δ's Brief in Support of Motion for Change of Venue | 1/17/02 |
| 64 | Notice of Hearing | 1/1702 |
| 63 | Motion For Change of Venue (Appendix A filed in Robinson filed separate under Robinson file box | 1/17/02 |
| 62 | Transcripts of Proceedings Motions | 1/16/02 |
| 61 | Notice of Hearing | 12/10/01 |
| 60 | Motion to Compel Discovery | 12/3/01 |
| 59 | Order Appointing Counsel Patrick J. Berrigan | 8/01/01 |
| 58 | Order to Withdraw | 8/01/01 |
| 57 | Public Defender Districts Order Appointing Counsel (Patrick Berrigan) | 8/01/01 |
| 56 | Public Defender Districts Order Appointing Counsel (Sean O'Brien) | 8/01/01 |
| 55 | Subpoenas (30) issued by Defense Atty., Mark A. Manna | 8/01/01 |
| 54 | Amended Entry of Appearance (Bob L. Thomas) | 7/23/01 |
| 53 | Motion to Withdraw | 7/18/01 |
| 52 | Entry of Appearance | 7/18/01 |
| 51 | Motion to Suppress All Evidence Obtained During Search of Linn County Property | 7/12/01 |
| 50 | Motion to Suppress All Evidence Seized From Storage Locker B 18 at Needmore Storage in Jo Cty. | 7/12/01 |
| 49 | Motion to Suppress All Evidence Obtained During Search of Monterey Lane Property | 7/12/01 |
| 48 | Motion to Suppress Evidence (trash taken) | 7/5/01 |
| 47 | Motion to Suppress Evidence (photos of personal property) | 7/5/01 |
| 46 | Subpoenas (17) issued by Defense Atty., Mark A. Manna | 6/11/01 |
| 45 | Motion to Strike Death Penalty Statute for Violation of 5th and 6th Amendment Rights | 5/15/01 |
| 44 | Motion to Strike Sentencing Scheme for Inadequate Notice of Aggravating Circumstances and Evidence in Support, or Alternatively to Set Date by Which State Will Provide Adequate Notice of Evidence in Support of Aggravating Circumstances | 5/15/01 |
| 43 | Motion to Strike Death Penalty Statute for Failure to Prevent the Admission of Irrelevant and Prejudicial Evidence | 5/15/01 |
| 42 | Motion to Strike Death Penalty Statute for Improper Weighing of Aggravating and Mitigating Factors | 5/15/01 |

| | | |
|---|---|---|
| **41** | Motion for Notice of and Pretrial Hearing Re Admissibility of all Hearsay Statements | 5/15/01 |
| **40** | Δ's Motion for Guarantees Against Gov't Interference w/Legal Representation, Assurances Against Obstruction of Atty-Client Privilege and Preservation of Confidentiality | 5/15/01 |
| **39** | Motion to Ensure Courtroom Decorum | 5/15/01 |
| **38** | Motion for Return of Property | 5/15/01 |
| **37** | Motion to Require Motion Responses | 5/15/01 |
| **36** | Motion for Findings of Fact and Conclusions of Law | 5/15/01 |
| **35** | Motion to Prohibit the Admission of Pre-Death Photos of the Decedents | 5/15/01 |
| **34** | Motion for Pretrial Hearing Re Admissibility of Gruesome Photos | 5/15/01 |
| **33** | Motion to Preclude Reliance on Res Gestae Doctrine for Admission of Other Crimes Evidence | 5/15/01 |
| **32** | Motion for Notice of and Hearing Re Other Crimes or Civil Wrongs | 5/15/01 |
| **31** | Motion for Disc. Deadline | 5/15/01 |
| **30** | Motion for Disc. Re Mitigating Evidence | 5/15/01 |
| **29** | Motion for Disc. Re DNA Testing | 5/15/01 |
| **28** | Motion to Bar Direct or Collateral Use of All Info. Obtained During the State's Inquisitions of Christy Shipps and Nancy Robinson | 5/15/01 |
| **27** | Δ's Waiver of His Right to Speedy Trial | 3/2/01 |
| **26** | Motion to Dismiss | 2/19/01 |
| **25** | Subpoenas (7) issued by Defense Atty., Mark A. Manna | 1/30/01 |
| **24** | Subpoenas (10) issued by Defense Atty., Mark A. Manna | 1/16/01 |
| **23** | Motion for Continuance | 10/19/00 |
| **22** | Order for Transcripts | 9/1/00 |
| **21** | Motion for Continuance | 8/25/00 |
| **20** | Ex Parte Order Permitting Expert Access to the Δ at the Jo. Cty. Adult Detention Ctr. | 7/27/00 |
| **19** | Ex Parte Order Permitting Expert Access to the Δ at the Jo. Cty. Adult Detention Ctr. | 7/25/00 |
| **18** | Motion to Record and Transcribe all Proceedings | 7/18/00 |
| **17** | Motion to Prohibit Seizure of Evidence | 7/18/00 |
| **16** | Motion to Require Investigative Officers to Retain Rough Notes | 7/18/00 |
| **15** | Motion for Accused to Appear at All Proceedings w/o Restraints | 7/18/00 |
| **14** | Motion for Disc. | 7/18/00 |
| **13** | Motion for Defense Access to Crime Scenes | 7/18/00 |
| **12** | Motion for Preservation and Production of Alleged Statements of the Accused | 7/18/00 |
| **11** | Motion to Preserve Police Communications | 7/18/00 |

| | | |
|---|---|---|
| **10** | Motion for Accused to Appear in Civilian Clothing | 7/18/00 |
| **9** | Motion to Close the Preliminary Hearing | 7/18/00 |
| **8** | Ex Parte Order Permitting Expert Access to the Δ at the Jo. County Adult Detention Ctr. | 7/14/00 |
| **7** | Motion for Preservation of Physical Evidence | 7/13/00 |
| **6** | Order of Appointment | 6/14/00 |
| **5** | Public Defender Districts Order Appointing Counsel | 6/9/00 |
| **4** | Financial Affidavit of John E. Robinson | 6/9/00 |
| **3** | Ltr. From Jo Cty Public Defender's Office to Jo Cty Dist. Atty's Office | 6/7/00 |
| **2** | Δ's Assertion of His Fifth, Sixth and Fourteenth Amendment Rights | 6/6/00 |
| **1** | Application for Appointed Defense | 6/5/00 |

# State of Kansas v. John E. Robinson, Sr.
## Defense Pleadings
## Vol. II

| NO. | ITEM | FILED |
|---|---|---|
| 1 | Motion to Withdraw as Attorney of Record | 2/21/02 |
| 2 | Motion for Continuance | 2/21/02 |
| 3 | Reply to Motion in Opposition to Continuance | 2/28/02 |
| 4 | Reply to State's Response to Motion to Withdraw | ? |
| 5 | Memorandum Decision as to Δ's Motion for a Change of Venue | 3/12/02 |
| 6 | Motion for Speedy Trial Waiver of Personal Appearance and Request for Video Arraignment | 3/14/02 |
| 7 | Motion to Suppress Evidence Stemming from Illegal Surveillance of Δ's Linn County Property | 3/15/02 |
| 8 | Δ's Brief in Support of Motion to Suppress All Evidence Obtained During Search of Linn County Property, and all Evidentiary Fruits Thereof | ? |
| 9 | Motion to Suppress All Evidence Obtained During Search of Linn County Property, and all Evidentiary Fruits Thereof | ? |
| 10 | Motion to Suppress Evidence Discovered and Seized Pursuant to Various "Follow-Up" Searches | ? |
| 11 | Δ's Motion to Suppress Evidence Discovered and Seized Pursuant to Various "Follow-up" Searches | 3/15/02 |
| 12 | Δ's Reassertion of Certain Previously Withdrawn Suppression Motions (Accused Filings 39 and 40) | 3/15/02 |
| 13 | Reply in Support of Δ's Motion to Suppress Evidence Discovered and Seized in Linn County | 3/20/02 |
| 14 | Order Prohibiting Use of Cameras, Etc. Beginning w/April 1 Evidentiary Suppression Hearing | 3/28/02 |
| 15 | Motion to Suppress Evidence Stemming from Illegal Seizure of Δ's Santa Barbara Mobile Home Property | 4/23/02 |
| 16 | Motion to Extend Motion Deadline | 4/25/02 |
| 17 | Reply to State's Response to Δ's Motion to Suppress Evidence From "Follow Up" Searches | ? |
| 18 | Reply to State's Response to Δ's Motion to Suppress Evidence Stemming from Illegal Surveillance of Δ's Linn County Property | 4/30/02 |
| 19 | Brief in Support of Δ's Motion to Suppress Evidence Obtained Under all Search Warrants and Electronic Surveillance Orders Issued by District Judge McClain | 5/6/02 |
| 20 | Defendant's Brief in Support of Motion to Suppress all Evidence Obtained During Search of Linn County Property, and all Evidentiary Fruits Thereof | ? |
| 21 | Order Continuing Hearing and Oral Argument to June 13, 2002 | 5/13/02 |
| 22 | Notice of Hearing | 5/15/02 |
| 23 | Motion to Prohibit the Admission of Pre-Death Photographs of the Decedents | 5/15/02 |
| 24 | Motion to Strike Sentencing Scheme for Inadequate Notice of Aggravating Circumstances and Evidence in Support, or Alternatively to Set Date by Which State will Provide Adequate Notice of Evidence in Support of Aggravating Circumstances | 5/15/02 |

| | | |
|---|---|---|
| **25** | Motion to Authorize Contact Visits Between Δ, His Family and Counsel | 5/28/02 |
| **26** | Reply to State's Response to Δ's Motion to Suppress Evidence Obtained Under all Search Warrants and Electronic Surveillance Orders Issued by District Judge McClain | 5/29/02 |

WATSON & DAMERON, LLP
TRIAL ATTORNEYS
Henri J. Watson • Russell S. Dameron
Patrick J. Berrigan • Kathleen M. Hagen* • Jesse B. Garcia* • Jason B. Billam**
Of Counsel: Ramón Murguía
*Licensed in MO & KS **Licensed in Kansas only

August 8, 2001

Patrick Lawless
Administrative Counsel
Board of Indigents' Defense Services
Jayhawk Walk
1714 S.W. Jackson, Suite 200
Topeka, KS 66603-3714

***Re: State v. John E. Robinson, Sr.***

Dear Pat:

Please find enclosed a signed contract regarding my representation of Mr. Robinson. I am very much looking forward to working with Sean O'Brien and, having met Bob Thomas, both Sean and I feel that this situation will work out just fine.

Given the voluminous work involved in this representation, I am hoping to make better use of an associate than we have in the past. This will save you money, and me a lot of time. Jason Billam is a sharp young lawyer who used to work for Lisa Dahl before going to law school. I am also entrusting him with the responsibility for monthly billing, a practice I have heretofore shunned as unnecessary. I am sure you will be happy with the results.

I hope your summer is going well, Pat. Please do not hesitate to call me if you have any questions, or if I can be of further assistance.

Sincerely,

Patrick J. Berrigan
Trial Lawyer

PJB: cg

Enclosure

2500 Holmes, Kansas City, MO 64108 • wdlaw@kctriallawyers.com • Fax:(816) 221-1636 • (816)474-3350

Appellate Case: 15-3160 Page: 333 Date Filed: 02/29/2016 Entry ID: 4372433

# EXHIBIT 10

# EXHIBIT 11

Neuropsycholo Cons. ervices

P11-0001

Dennis G. Cowan, Ed.D.
400 E Red Bridge Road, #212
Kansas City, MO 64131
(816)941-3883

| Statement Date | Page |
|---|---|
| 5/1/2001 | 1 |

| Chart Number |
|---|
| BERPA000 |

Mr. Pat Berrigan
Law Firm of Watson & Dameron
2500 Holmes
Kansas City, MO 64055

| Date | Document | Description | Number of Hours | Amount |
|---|---|---|---|---|
| Last Payment Received: 12/30/1899 | | Amount: 0.00 | Previous Balance: | 0.00 |
| Patient: Keith Nelson | | Chart #: NELKE000 | Case Description: Neuropsychological Testing | |
| 2/28/2001 | 2-28-01 | Late or Not Cancelled Appointment | 8 | 500.00 |
| 4/1/2001 | 4-1-01 | Late Fee Charge | 1 | 7.50 |
| 5/1/2001 | 5-1-01 | Late Fee Charge | 1 | 7.61 |

Please Note: Account in over 60 days past due. At 90 days goes to Collections. Please call me if
(5-30-01)

WATSON & DAMERON, LLP / EXPENSE ACCOUNT
Neuropsychology Cons. Services
4091/Nelson,K:expcons

5/11/2001

4703

515.11

Law Office Expense Acc Keith Nelson

CLERK U.S.DISTRICT COURT
Exhibits:
P 11 515.11
Case No. 4:04-CV-08005-FJG

332873 QBB1-01 1301 PROD54 Reorder from BEST CHECKS, 100 Executive Dr., Unit 1, Dulles, VA 20166 • Phone: 1-800-521-9619 • www.bestchecks.com
QB1F-000104

Neuropsycholo[illegible] Cons. [illegible]rvices
Dennis G. Cowan, Ed.D.
400 E Red Bridge Road, #212
Kansas City, MO 64131
(816)941-3883

| Statement Date | Page |
|---|---|
| 5/1/2001 | 1 |

| Chart Number |
|---|
| BERPA000 |

Mr. Pat Berrigan
Law Firm of Watson & Dameron
2500 Holmes
Kansas City, MO 64055

| Date | Document | Description | Number of Hours | Amount |
|---|---|---|---|---|
| Last Payment Received: 12/30/1899 | | Amount: 0.00 | Previous Balance: | 0.00 |
| Patient: Keith Nelson | | Chart #: NELKE000 | Case Description: Neuropsychological Testing | |
| 2/28/2001 | 2-28-01 | Late or Not Cancelled Appointment | 8 | 500.00 |
| 4/1/2001 | 4-1-01 | Late Fee Charge | 1 | 7.50 |
| 5/1/2001 | 5-1-01 | Late Fee Charge | 1 | 7.61 |

Please Note: Account in over 60 days past due. At 90 days goes to Collections. Please call me if any questions. (5-30-01)

[illegible signature]
816-942-6267

| Past Due 30 Days | Past Due 60 Days | Past Due 90 Days | Balance Due |
|---|---|---|---|
| 7.50 | 500.00 | 0.00 | **515.11** |

**Please Note: A 15% Late Fee Charge is added for all accounts over 30 days.**
*Please contact Debra (816) 942-6267 for any questions regarding your account. Thank you.*

Dennis G. Cowan, Ed.D.
NEUROPSYCHOLOGY CONSULTING SERVICES
400 East Red Bridge Road
Suite 212
Kansas City, Missouri 64131-4016
Office: 816-941-3883
Fax: 816-941-3331

February 28, 2001

Invoice for Services Rendered to date
in the matter of
Neuropsychological Consultation of Keith Nelson

United States v. Keith Nelson
USDCWDMO
99-00303-01-CR-W-6

Billing To: Mr. Pat Berrigan
Law Firm of Watson & Dameron
2500 Holmes
Kansas City Missouri 64055

*Charges: (as per attached Payment & Fee Schedule)*

| | | |
|---|---|---|
| 02-28-01: | Failure to provide 24 hour notice of intent to cancel previously scheduled evaluation of Keith Nelson (8.00 hrs @ $62.50 per hour) | $ 500.00 |
| | Total Generated Fees: | $ 500.00 |
| | **TOTAL AMOUNT NOW DUE UPON RECEIPT:** | **$ 500.00** |

**Please submit payment upon receipt. In order to avoid finance charges, payment must be received on/ before 03-28-01 and should be made payable to:**

Dr. Dennis G. Cowan
C/O Neuropsychology Consulting Services
400 East Red Bridge Road, Suite 212
Kansas City Missouri 64131

Federal Tax ID #: 43-1864575

Dennis G. Cowan, Ed.D.
NEUROPSYCHOLOGY CONSULTING SERVICES
400 East Red Bridge Road
Suite 212
Kansas City, Missouri 64131-4016
Office: 816-941-3883
Fax: 816-941-3331

# Payment & Fee Schedule

## Hourly Rates for Service

### Neuropsychological & Psychological Evaluations:

| | |
|---|---|
| Review of Records: | $125.00 per hour |
| Clinical Interview: | $125.00 per hour |
| Test Administration: | $125.00 per hour |
| Scoring/Data Interpretation: | $125.00 per hour |
| Report Writing: | $125.00 per hour |
| Travel Time: | $125.00 per hour |
| Deposition: | $300.00 per hour |
| Court Testimony: | $350.00 per hour |
| Deposition/Testimony Preparation: | $125.00 per hour (Billing to individual/agency requesting testimony) |
| No Show/Cancel w/o 24 hr notice: | $ 62.50 per hour (Per hour of allocated time set aside to conduct evaluation) |

### Counseling/Psychotherapy:

| | |
|---|---|
| Review of Records: | $125.00 per hour |
| Counseling/Psychotherapy Session: | $100.00 per hour |
| Deposition: | $300.00 per hour |
| Court Testimony: | $350.00 per hour |
| No Show/Cancel w/o 24 hour notice: | $ 50.00 per scheduled hour (Billing for no show or no notice will be directly to patient) |

Initial retainer of $300.00 is required for all forensic/legal cases.

Balances are due upon receipt of statement. Any unpaid balance after 30 days from initial statement will be charged a late fee. Collection law firm is utilized following 90 days on any unpaid balance.

09-01-99

# Transaction Report
1/2/98 Through 12/31/01

1/16/02 

| Date | Account | Num | Description | Memo | Category | Cir | Amount |
|---|---|---|---|---|---|---|---|
| 5/11/01 | Law Office ... | 4703 | Neuropsychology Cons... | Keith Nelson | 4092/Nelson,K:exp... | R | -515.11 |
| | | | TOTAL 1/2/98 - 12/31/01 | | | | -515.11 |
| | | | TOTAL INFLOWS | | | | 0.00 |
| | | | TOTAL OUTFLOWS | | | | -515.11 |
| | | | NET TOTAL | | | | -515.11 |

# Hunt hours, Jan.-Nov. 2001







CLERK U.S.DISTRICT COURT
Exhibits:
P 80
Case No. 4:04-CV-08005-FJG



Appellate Case: 15-3160 Page: 341 Date Filed: 02/29/2016 Entry ID: 4372433

## HUNT hours

Jan – Nov, 2001




| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL (per month) | 102.5 | 84.7 | 52.3 | 34.5 | 28.5 | 24.9 | 40.5 | 26.7 | 113.3 | 135.5 | 118.6 | |
| In-Court Hearings | 1 | 4.6 | 0 | 0 | 0 | 1.8 | 0 | 2.3 | 1.1 | 6.9 | 45.4 | 63.1 |
| Interviews and Conferences with Client | 11.4 | 13.6 | 5.7 | 3.3 | 6.5 | 6.7 | 7 | 3.4 | 7 | 14.3 | 18.6 | 97.5 |
| Witness Interviews | 1 | 3.3 | 0 | 0 | 2.5 | 7.4 | 2 | 2.1 | 20 | 3.1 | 12.2 | 53.6 |
| Consultation with Investigators and Experts | 10.4 | 12.4 | 4.2 | 3.4 | 3.7 | 3.5 | 0 | 4.9 | 4.7 | 9.3 | 1.1 | 57.6 |
| Obtaining and Reviewing the Court Record | 2 | 9.5 | 0 | 0.4 | 0.6 | 0.4 | 1.6 | 1.1 | 0.2 | 6 | 0.9 | 22.7 |
| Obtaining and Reviewing Docs and Evidence | 48 | 16.4 | 18 | 9.7 | 4 | 0.8 | 4.2 | 1.9 | 16.2 | 35.6 | 20.9 | 175.7 |
| Consulting with Expert Counsel | 0.5 | 0 | 0 | 0 | 0 | 0 | 11 | 0 | 0 | 0 | 0 | 11.5 |
| Legal Research and Writing | 5.1 | 3.2 | 18.3 | 2.8 | 4.3 | 0 | 8.8 | 3.6 | 20.8 | 13.9 | 6.8 | 87.6 |
| Travel | 1.2 | 3.8 | 1.2 | 14.1 | 1.2 | 1.2 | 1.2 | 0 | 18.4 | 20.6 | 2.4 | 65.3 |
| Other | 21.9 | 17.9 | 4.9 | 0.8 | 5.7 | 3.1 | 4.7 | 7.4 | 24.9 | 25.8 | 10.3 | 127.4 |

## Berrigan hours, Jan.-Nov. 2001









| | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL (per month) | 31.3 | 43.3 | 4.1 | 19.1 | 22.4 | 18.7 | 20.2 | 97.1 | 225.2 | 281.7 | |
| In-Court Hearings | 1.4 | 0 | 0 | 0 | 1.6 | 0 | 0 | 3 | 11.3 | 57 | 74.3 |
| Interviews and Conferences with Client | 4.7 | 3.7 | 0 | 0 | 2.3 | 3.5 | 2.9 | 2.2 | 20.2 | 10 | 49.5 |
| Witness Interviews | 0 | 0 | 0 | 0 | 0.4 | 2 | 0 | 50.6 | 22.5 | 35.6 | 111.1 |
| Consultation with Investigators and Experts | 0.9 | 0 | 0.3 | 0 | 0.4 | 0 | 1.4 | 2 | 18.3 | 10.3 | 33.6 |
| Obtaining and Reviewing the Court Record | 0.5 | 3.5 | 0.6 | 0.4 | 0 | 1.5 | 3.3 | 0.9 | 15.4 | 2.3 | 28.4 |
| Obtaining and Reviewing Docs and Evidence | 12.3 | 28.5 | 0 | 10.1 | 1.8 | 1.8 | 2.8 | 5.7 | 42.5 | 27.6 | 133.1 |
| Consulting with Expert Counsel | 7.3 | 1.5 | 0.2 | 4.6 | 4.2 | 4.2 | 3.4 | 8.1 | 25.7 | 12.8 | 72 |
| Legal Research and Writing | 0 | 2.8 | 3 | 0.5 | 6.3 | 2.9 | 4.1 | 12.8 | 51.6 | 107 | 191 |
| Travel | 2.9 | 3 | 0 | 3.4 | 3.4 | 2.6 | 1.7 | 11.2 | 10.1 | 9 | 47.3 |
| Other | 1.3 | 0.3 | 0 | 0.1 | 2 | 0.2 | 0.6 | 0.6 | 7.6 | 10.1 | 22.8 |


combined HUNT & BERRIGAN hours
Jan – Nov, 2001
hours
300
250
200
150
100
50
0
102.5
0
84.7
31.3
52.3
43.3
34.5
4.1
28.5
19.1
24.9
22.4
40.5
18.7
26.7
20.2
113.3
97.1
135.5
225.2
118.6
281.7
HUNT
BERRIGAN
Jan
Feb
Mar
Apr
May
Jun
Jul
Aug
Sep
Oct
Nov
In-Court Hearings
Interviews and Conferences with Client
Witness Interviews
Consultation with Investigators and Experts
Obtaining and Reviewing the Court Record
Obtaining and Reviewing Documents and Evidence
Consulting with Expert Counsel
Legal Research and Writing
Travel
Other