No. 15-3160

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

Keith D. Nelson,

Appellant,

vs.

United States of America,

Appellees.

On Appeal from the United States District Court
District of Arizona
Case No. 4:04-8005-cv-W (FJG)

**APPELLANTS EXHIBITS**
**TO MOTION FOR ISSUANCE OF**
**CERTIFICATE OF APPEALABILITY**

**Exhibits 12 - 14A**


*/s/Paula K. Harms*
Jon M. Sands
Federal Public Defender
Paula K. Harms
Assistant Federal Public Defender
Capital Habeas Unit
850 W. Adams Suite 201
Phoenix, Arizona 85007
602-382-2816 telephone
602-889-3960 facsimile

*/s/ David A. Ruhnke*
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
973-744-1000 telephone
973-746-1490 facsimile
dr@ruhnkeandbarrett.com

# EXHIBIT 12

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| **KEITH D. NELSON,** | ) | |
| | ) | |
| **Movant,** | ) | |
| | ) | |
| **vs.** | ) | **4:04-CV-8005 (FJG)** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**AFFIDAVIT OF TRIAL COUNSEL PATRICK J. BERRIGAN**

COMES NOW one of Movant's two trial counsel, Patrick J. Berrigan, Watson & Dameron, LLP, and in response to the Court's order of 8-24-10 requiring counsel to submit an affidavit regarding certain habeas claims advanced by Mr. Nelson, counsel does state and solemnly declare under penalty of perjury that the foregoing is true and correct:

***I. The Scope Of The Mitigation Investigation And Failure To Request A Continuance***

Movant alleges in his habeas petition that trial counsel "failed to conduct an adequate mitigation investigation, an investigation that should have, but did not, consist of efforts to discover all reasonably available mitigating evidence and to rebut any aggravating evidence to be introduced by the Government." (Doc. 25). In response to this allegation, counsel avers that, although substantial mitigation investigation was done, undoubtedly more "would have yielded significant evidence in mitigation." Id. Defense counsel simply ran out of time.

Movant also alleges that trial counsel made no effort to postpone the trial, even after realizing that "additional time was required in order to complete an adequate

CLERK U.S.DISTRICT COURT
Exhibits:
P 16
Case No. 4:04-CV-08005-FJG

investigation." Id., at 5. Trial counsel concedes this point. Having failed to recognize the quantity of mitigation available, counsel failed to appreciate the need for additional time to explore it.

### *II. Mr. Nelson's Mental Health Investigation*

Mr. Nelson alleges that trial counsel failed to conduct a timely and adequate mental health investigation and inappropriately instructed Mr. Nelson to "decline to submit to mental health testing by government experts." (Doc. 25, at 5). Trial counsel did retain a psychologist to evaluate Mr. Nelson before trial, but did not otherwise explore a neuropsychological examination or have Mr. Nelson examined by a psychiatrist.

Additionally, trial counsel concedes that he strongly urged Mr. Nelson not to cooperate with government mental health experts. Counsel believed that the government experts were severely predisposed, biased, and prejudiced against Mr. Nelson and would not conduct an impartial evaluation, but would instead seek merely to generate aggravating evidence against Mr. Nelson. Counsel made this determination without any personal experience with these government evaluators, or any objective evidence of this propensity. Furthermore, counsel recognized that Mr. Nelson's noncooperation would undoubtedly result in the trial court barring the presentation of mental health evidence on Mr. Nelson's behalf in the penalty phase of his trial.

### *III. Failure To Object In Closing Argument*

Mr. Nelson alleges that trial counsel "failed to object to numerous inflammatory and improper comments in the government's initial and rebuttal summations." (Doc. 25, at 9-10). Defense counsel has reviewed the transcript of the closing argument, and the

specific references that Mr. Nelson alleges deserved objections. As the record reflects, counsel did not object to these improper arguments, and he offers no reasonable explanation for this failure. Counsel specifically denies that the failure to object was trial strategy given counsel's familiarity with the requirements to preserve alleged error for appeal.

### *IV. Errors In The Appeal*

Trial counsel Berrigan did not participate in the preparation of Mr. Nelson's direct appeal and, therefore, can provide no useful information regarding same.

Further, Affiant sayeth not.

Respectfully Submitted,

Patrick J. Berrigan, Mo # 34321
WATSON & DAMERON, LLP
2500 Holmes
Kansas City, Missouri 64108
(816) 474-3350
(816) 221-1636 (FAX)

STATE OF MISSOURI )
)ss.
COUNTY OF JACKSON )

In witness whereof I have hereunto subscribed my name and affixed my official seal this 13th day of September, 2010.

Sarah Hartenberger
Notary Public

My Commission Expires:

May 27, 2014

SARAH HARTENBERGER
Notary Public, Notary Seal
State of Missouri
Clay County
Commission # 10978643
My Commission Expires May 27, 2014

# EXHIBIT 13

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

--------

| | | |
|---|---|---|
| KEITH D. NELSON, Movant, | ) | |
| vs. | ) | No. 04-8005-01-CV-W-FGJ |
| UNITED STATES OF AMERICA, Respondent. | ) | |

--------

THE DEPOSITION of PATRICK BERRIGAN, produced, sworn and examined on behalf of the Respondent, pursuant to Notice to Take Deposition, on October 19, 2012, beginning at 9:00 a.m. at the offices of the United States Department of Justice, Charles Evans Whitaker Courthouse, 400 East 9th Street, Kansas City, Missouri, 64106, before me,

TRICIA D. TATE
CERTIFIED COURT REPORTER
of
JOHN M. BOWEN & ASSOCIATES

a Certified Court Reporter, in a certain cause now pending In the United States District Court for the Western District of Missouri, Western Division, in re: KEITH D. NELSON VS. UNITED STATES OF AMERICA.

----------

A P P E A R A N C E S:

For the Movant:

Ruhnke & Barrett
2 Wall Street, Third Floor
New York, New York 10005
By Mr. David A. Ruhnke

A P P E A R A N C E S: (Cont'd)

For the Movant:

Legal Writes, LLC
601 W. Nifong Boulevard, Bldg. 1
Columbia, Missouri 65203
By Mr. Gary E. Brotherton

and

Office of the Federal
Public Defender
District of Arizona
850 West Adams Street, Ste. 201
Phoenix, Arizona 85007
By Ms. Paula Harms

For the Respondent:

United States Department of Justice
Charles Evans Whitaker Courthouse
400 East 9th Street, Room 5510
Kansas City, Missouri 64106
By Mr. Jeffrey Valenti
and Mr. David Ketchmark

EXAMINATION INDEX

Direct Examination by Mr. Valenti............. 3

PROCEEDINGS

PATRICK BERRIGAN,

was called as a witness and, having been sworn, testified as follows:

DIRECT EXAMINATION

BY MR. VALENTI:

Q Pat, we're here today for what we are considering a fact deposition or discovery deposition, because, as you well know, none of the parties here other than you had anything really to do with this case. It was over ten years ago.

This has been fairly nonconfrontational. We're really just trying to ask questions about what happened, why things were done.

And as you can see, I have a ton of documents here, some of which are not particularly noteworthy; but I have them to refresh your recollection if need be so any time you need to.

We recognize as part of what's going on here that we're asking about things that are a decade ago and everyone's memory is fuzzy over time. I'm not trying to play got-you.

A Sure.

Q I hope you know me well enough to know that. If you don't know something, that's a perfectly acceptable answer. If you need to speculate, just let me know that's what it is, or if you think there's a record that would be helpful that we may have, we'll try to find it. We've tried to organize it. As you well know, it's a voluminous file.

A Sure.

Q Post-conviction counsel have been really kind and let us look through their files as it relates to the six issues that we have pending, and know that my questions are not designed to get into any matters of privilege that go beyond really those six issues involving essentially the mitigation investigation, mental health issues and some appellate issues which you weren't really even involved in.

I'll probably frequently call you Pat because we've worked together. I'll try to call you Mr. Berrigan out of respect for the record.

A That's fine.

Q As we get started, do you have any questions

about what we're doing?
A No.
Q You've done these a ton so...
A On the other end, I suspect.
Q As we get started, can you please for the record state your name.
A My name is Patrick Joseph Berrigan.
Q How are you employed, sir?
A I am an assistant public defender in the Missouri State Public Defender System.
Q This is not your first time with them, is it?
A No. This is my second stint as an assistant public defender.
Q How long have you been employed, sir, as a lawyer?
A Since September 21st, 1984. That's when I --
Q Got licensed?
A -- was sworn in.
Q So some 28 years?
A Yes.
Q If I do the math correctly.
A Uh-huh.
Q During the course of that time, have you had a particular focus?
A Criminal defense I'd say broadly, and then I

have also done a substantial amount of capital defense work.
Q Okay. When did you first start as a criminal defense attorney? Was it right out of being sworn in?
A I actually clerked for the Public Defender's Office as a law student starting in October of 1983 and that was really probably my first exposure to criminal defense lawyers and working in that capacity.
Q After getting sworn in, you chose to pursue that line of work?
A Yes.
Q How long did you work there initially?
A I worked in the Public Defender's Office from the spring of 1984, after graduating from law school, until I was fired by the Public Defender's Office in June of 1987 -- 1997, so roughly 13 years.
Q During that time, did you progress from one assignment to the other?
A Yes, if you mean --
Q Sure.
A -- case to case.
Q Well, of course case to case. Let's just

start, when you first started there, what were your general responsibilities?
A You know, as a law student I tried two misdemeanor jury trials. I handled all of the probation violations in the office and some were before passing the bar.
And then I started doing felony cases. Had my first felony jury trial in probably October 1984; felony stealing case within a couple years.
By 1986, I had my first capital murder assignment. So there was a progression. The second trial I had, for example, was with now Judge Whitworth, a rape case where my client received 43 years. So it was a quick progression because of turnover in the Public Defender's Office.
Q Attrition in government jobs, in general, used to be higher than what it is now; is that fair to say?
A It was particularly higher in 1984 in the Public Defender's Office. We had 16 lawyers in that office when I started and 11 left in 1984.
Q Okay. You indicated that you stayed there for, at least on the first stint, about 13 years?

A Yes.
Q And you were fired in 1997?
A Right.
Q We've spoken to Ms. Herndon and I kind of similarly recall this, is it fair to characterize that you and she were fired at the same time because of a personality conflict with Cindy Short?
A Yeah. I suppose the reason would depend on who you talked to, but we were certainly fired at the same time. And I think the perception from the Public Defender System is that the personnel in that small office, there were only four lawyers, was not working to the benefit of our clients, and so they decided to make changes and the changes were that Jennifer and I were fired, a third lawyer, Kelly Henry, resigned.
Q Cindy Short endured for some period of time after?
A She did. She also was subsequently terminated.
Q And we'll kind of get back to that, but obviously you didn't burn any bridges in the way they hired you back at some point later?
A Well, I sued them. I was very upset at the

time about my termination. I thought it was unfair and not reflective of my job performance at that time.

We actually reached an agreement that they would rehire me back. And then by the time we reached that agreement, I had been in private practice and enjoying it and so I didn't go back. I stayed in private practice.

Q For some time while in private practice, did you get away from criminal defense work?

A No. I did a lot of criminal defense work. It was probably the majority of my practice. As the years went on, I increasingly did more civil personal injury lawsuits. Sadly, that's a somewhat lucrative aspect of private practice and so there's some pressure to do that. But I maintained a criminal defense practice throughout the 14 years I was in private practice, including capital work.

Q When did you go back to the Public Defender System?

A Just about a year ago, late September of 2011.

Q Is that essentially the same assignment you had in 1997, kind of the same as work for the Public Defender Office?

A Exactly the same job.
Q Okay. During the course of your practice, is it fair to say that you worked on capital cases?
A Yes.
Q And would you have an estimate of how many capital cases you worked on since your career? I don't really care about the number of --
A I can give you an estimate but understanding it's a guess.
Q Yes.
A And I would say probably between 60 and 70 cases.
Q When I refer to "capital defense work," I generally will think of it in three terms, to let you know how I'm thinking of it so we can have a meeting of the minds, I think about it as what I would call trial defense work?
A Sure.
Q Appellate defense work and then post-conviction defense work.
A Okay.
Q Have you worked in those three phases --
A Yes.
Q -- in your career?

A Yes.
Q Of the approximate 60 or 70 that you estimate, how many of those would be as a criminal defense or at the trial level?
A The vast majority. At least 60 of them.
Q And some of those then, a such smaller percentage would be on appeal?
A Yes.
Q And also post-conviction?
A And post-conviction, including federal habeas.
Q So you've looked at those cases from all three perspectives?
A From those three perspectives, yes.
Q Because of the nature of capital work, it's fairly specialized; is that fair to say?
A Yes.
Q Have you gone to any particular trainings or seminars that would help educate you on how to perform your job to the best of your ability?
A Yes.
Q Could you describe those for me, if you can?
A Over the years I've been to many seminars that have focused on capital defense work. There's an annual seminar that is sponsored by the National Legal Aid and Defender Association

called Life in the Balance, I've been to that seminar. It's usually four or five days. Many, many times it's held in different parts of the country.

There's an annual seminar in Ann Arbor, Michigan, called the Clarence Darrow Death Penalty Defense College, I've been there.

Gerry Spence's Trial College has a week long death penalty seminar, usually late spring, early summer, I've been to that once. There's a seminar out in California.

MR. RUHNKE: Death Penalty College, Santa Clara?

A It's the -- I can't remember the name of it. It's not Santa -- Santa Clara, at Santa Clara University there's an annual death penalty college, I've been to that.

MR. RUHNKE: Also a conference in Monterey, is that the one you're thinking of?

A I haven't been to the one in Monterey, that's probably the only one I haven't been to. But I've been to quite a few.

Q (By Mr. Valenti) Over the years, have you transitioned into someone who also teaches at these type of things?

A Occasionally I'm asked to present. It's rare, but it happens now and then.
Q Okay. And I did some online research, the internet being a wonderful tool, and we're talking about things like the -- I noticed that the Third Annual building the Mitigation Case or Advocating for Life at Washington University School of Law.
A I did present at Washington University on I think it was Christopher Simmons' case, if my recollection serves me.
Q Again, you have mentioned the Life in the Balance seminar, you've attended that before; is that correct?
A Yes.
Q And I believe that you have presented at that as well over the years?
A I have. I think so. I'm supposed to present this -- Life in the Balance is coming up again in November and I have a segment on lessor included offenses.
Q I have an indication I think from the record, and I can't tell you where I got it, whether it came from our own research or whether it came from the file here, but I believe in 1997 in

March at Denver, Colorado perhaps?
A That's entirely possible. I don't have a specific recollection to be honest.
Q Okay. Fair to say over time you've spoken on occasion as you have become more experienced in this field?
A On occasion, yes.
Q All right. It may seem obvious, but I want to ask: Do you have a philosophical position on the death penalty?
A Yes.
Q Can you tell me what it is, please?
A I'm opposed to the death penalty.
Q During the practice which you now have as predominantly state, I would assume?
A Yes.
Q You have practiced at the federal level as well?
A Yes.
Q Would your practice been considered a national practice?
A No.
Q Regional?
A I suppose. I've tried cases in Kansas, Iowa, Tennessee and Missouri.

Q Given what you do not just in the death penalty world but in any kind of representation, I assume it's fair to say that allegations have been raised that your trial strategies have been flawed at the appellate level?
A On occasion, yes.
Q I assume that that's also happened at the post-conviction level where you've been alleged to be either constitutionally ineffective or provided some type of representation that was deficient?
A Yes.
Q Has there ever been any court findings that you're aware of in which your representation has been found to be deficient on a constitutional level?
A Yes.
Q Can you run me through those?
A United States versus Angela Johnson, which was a federal death penalty case which was tried in Sioux City, Iowa, in the spring of 2005. It was recently litigated in federal habeas and Judge Mark Bennett found my performance and that of co-counsel to be constitutionally deficient under the 6th Amendment.

Q Who was your co-counsel in that matter?
A There were two fellows, Al Willett from Cedar Rapids, Iowa, and Dean Stowers from Des Moines, Iowa.
Q So they were local?
A Yes.
Q Were you brought in as to what was referred to as learned counsel under the Federal Death Penalty Representation Statute?
A Yes.
Q And by "learned counsel," that means what?
A That ostensibly I have experience trying capital cases.
Q We've gone through that. In 2005, you would have had a number of cases that you've represented defendants on under your belt at that point?
A Yes.
Q If I recall correctly, and that opinion is fairly lengthy, but Judge Bennett wrote I believe there were four issues that he determined that there was deficient performance and prejudice. Does that sound about right?
A To be perfectly honest, that opinion is approximately 200 pages and I've never read it,

but I'm aware of it --
Q 400 something.
A Well, there you go. It was too long to read.
Q Yeah, it's long.
A Right.
Q Is that the only occasion that you're aware in which your performance has been found to be constitutionally ineffective?
A Yes.
Q Has there been any fallout from that regarding the Missouri Bar?
A No.
Q Disciplinary action?
A No.
Q Are you aware of any other Missouri Bar disciplinary actions that have been taken against you?
A When I was a young lawyer, there were a couple of occasions where I had not submitted my Missouri CLE form by the required date and I received a notice from the Bar that I would be suspended if I didn't do that, and that's the only disciplinary action, if you call it an action, that I've been -- that I'm aware of.
Q Any Bar complaints that you're aware of?

A Sure. When I was a public defender, particularly the first 13 years, occasionally clients would file Bar complaints. That happens.

Q Anything that ended up causing you any professional consequences?

A Nothing that was sustained as having merit.

Q And is it uncommon in your experience in having worked in the Public Defender System now on two occasions to have clients once convicted be upset with their counsel?

A It's less common frankly in capital cases for clients to file Bar complaints, but not -- it's much more frequent in general criminal practice.

Q I guess I should have asked this: Are you a member of the Missouri Bar?

A Yes.

Q Are there any other state Bars that you're a member of?

A No.

Q Any professional organizations or associations?

A Yes. I'm a member of the National Association of Criminal Defense Lawyers, the Missouri Association of Criminal Defense Lawyers.

Q Okay. Anything relative to capital defending, is there any particular association that you would be a member of?
A There's not a particular capital defender association I'm aware of, so -- and if there is such an organization that exists, I'm not a member.
Q Are you a member of any federal Bars?
A Yes.
Q Where are those, please?
A The Federal Bar of the Western District of Missouri and Federal Bar in Kansas.
Q During the course of your career, have you ever found yourself in a position where a post-conviction proceeding was unfolding in which you confessed err?
A It depends on what you mean by "confessed err."
Q And I recognize that to be a general term. You believed your -- or you believed your performance was constitutionally proficient or -- excuse me -- ineffective? Wrong word, I apologize.
A I have to say in Angela Johnson's case I think we recognized that our performance was deficient. We leave it to others to determine,

the specific judges to determine whether it's constitutionally deficient. We certainly --
Q That's quite fair.
A I certainly acknowledged, to try and answer your question, I certainly acknowledged during that hearing that deficiencies in my representation had occurred. No question about it.
Q Is that the only case you recall that being the case?
A I had a case some years ago, it was a Missouri state case, it was State of Missouri versus Chad Davis, who Chad Davis was a juvenile, was certified and prosecuted in Jackson County as a death penalty case. There was a post-conviction proceeding in that case, I was deposed.
There were particular areas of inquiry having to do with whether we questioned certain witnesses, which we had not, and I acknowledged that we had not done that.
Mr. Davis' petition was denied. But I certainly acknowledge that we hadn't done everything, I suppose, that we could have done in his case.

Q And that's a fair -- candidly a better answer than my question was. You can always miss something; is that fair to say?
A Sure.
Q And the question of whether or not that something that you missed was something that was ultimately prejudicial is ultimately someone else's decision to make?
A That's right.
Q And I guess I should have asked factually you recall ever having admitting having missed something that was a matter of inquiry?
A Well, Mr. Davis' case is an example that springs to mind. I don't want to pretend to you that's the only one, but it's the only one I can remember right now.
Q Okay. When you progressed through the Public Defender System and find yourself with a capital assignment like you've had now twice, are you trained beyond what a normal public defender is in how to handle those cases?
A Yes.
Q In what way are you trained?
A Well, we're sent by the Public Defender System to seminars such as Life in the Balance and

Clarence Darrow College in Santa Clara, California, Death Penalty College and seminars of that nature.

And then we also have in-house training for the lawyers that are involved in capital cases.

Q How long does that kind of tutelage go on before your training wheels, so to speak, are taken off and you're allowed to work on those very important cases?

MR. RUHNKE: Are we talking about his first job?

MR. VALENTI: Yeah. The first time through, when you're going through.

MR. RUHNKE: The first stint in the Public Defender's Office?

MR. VALENTI: First stint in the '80s.

A That's been an evolving stint, to say the least. For example, my first capital case in 1986, I had virtually no training whatsoever to do capital cases. And I don't recall really having any training through maybe even as far as 1990. In 1990, I was the head public defender in Jackson County, supervising a staff

of 18 years, I personally had 21 murder cases, including three death penalty cases and don't recall having any specific capital training. That's been a long time ago.

Those standards within the system have changed dramatically since that time. There's not any magic period of time where a lawyer is eligible to try death penalty cases. It's a judgment made by the system based on your performance as a public defender and your interest in that area of practice.

Q (By Mr. Valenti) Is it fair to say when you went through it back in the 1980s, it was kind of almost a trial by fire, you just had to stand up and do it?

A Kind of. The capital cases were distributed amongst experienced attorneys in the office, none of which had specific training in capital defense.

Q As we talk now I want to kind of transition into our case here.

A Sure.

Q And specifically talk about Mr. Nelson's representation. You recognize you weren't one of the first lawyers assigned in the defense of

Mr. Nelson at the trial level?
A Yes.
Q How did you get involved in the case?
A Judge Hays called me on the telephone.
Q And told you what?
A She told me that Mr. Nelson was in need of counsel, that I think it was Mr. Pace that might have just been replaced -- no, it was Bill Shoal.
Q Shoal?
A Right. And the case was set for trial at that time, I want to say, you know, April or May. I mean, it was a couple months away. I voiced some concern about the ability to be prepared, and she assured me that I would get one continuance but no promises thereafter.
And then asked me if I was willing to become involved in the representation and I agreed.
Q Do you recall when this was that Judge Hays may have been reaching out to you to see if you would be willing to take on Mr. Nelson's representation?
A I have a specific note about that in my notes and we can look for it. I certainly have it.

I want to say it was February the 12th of 2001.

Q I'll tell you you're exactly right. Good recall. So we're talking in the winter of 2001. Is that about right?

A Yes.

Q After Judge Hays reaches out to you, you indicated a willingness to get on the case?

A I'm sorry?

Q You indicated a willingness to take the case?

A I did. On the telephone call I did.

Q What steps did you take then to become -- get up to speed so that you could determine whether it could be tried in April when it was scheduled or what you needed to do to get ready?

A Well, I knew immediately if it was going to be tried in April, I wasn't going to be part of that process, and Judge Hays agreed that if I accepted representation, the case would not be tried in April, at least to the extent she could tell me that informally.

We had not filed -- there wasn't a continuance application pending, I don't believe. And I suppose at the end of the day, that's Judge Gaitan's decision, not hers. But

perhaps she had spoken to Judge Gaitan, I don't know. She just gave me some assurance if I entered, I wouldn't be trying the case in April or whenever that setting was taking place.

And I think to answer your question, probably I called Susan Hunt and visited with her to sort of get acquainted about the case probably as a first initial step.

Q Okay.

A But I don't specifically recall.

Q So we get the record clear, I'm going to show you some documents that essentially confirm everything we've talked about.

The first I have is Deposition Exhibit 24. Deposition Exhibit 24, I'll hand you and ask if you recognize that? I can represent to you essentially it's the documentation relative to Mr. Shoal orally moving to withdraw from the case and being taken off the case as a consequence of a letter that Mr. Nelson wrote to the Court about his dissatisfaction with Mr. Shoal's representation.

A To answer your question specifically, Mr. Valenti, I do not recognize this document,

but I am familiar with the substance of what it covers. I was made aware of the problem with Mr. Shoal's representation after I agreed to represent Mr. Nelson, so I got that sort of after Mr. Shoal was already discharged.

And I wasn't -- I don't think I was present at this hearing on the 12th of February, because my recollection is that I had a telephone call, not an in-person meeting.

Q I think from a time line standpoint, this references why you would have been called and the aftermath of the hearing --
A Yes.
Q -- that takes place here?
A Right.
Q And I may be putting the cart before the horse a little bit out of time line basis, but you were essentially familiar with Mr. Nelson's dissatisfaction with Mr. Shoal in his mind not working hard enough on his behalf?
A I became aware of that --
Q After?
A -- after the fact. After February the 12th.
Q And you knew that of your client that if he was dissatisfied with representation, he would --

he wasn't afraid to voice his opinion?
A Well, I knew that about his relationship with Mr. Shoal. There may have been factors in that relationship, some personal animosity for reasons that I have no knowledge of.
Q Sure.
A So I don't know that I could generalize and tell you Mr. Nelson would voice his objections freely about everybody, but I know he was unhappy with Mr. Shoal based on what I learned from Ms. Hunt.
Q And though you may not be familiar with the document, itself, but attached to it with a letter, you specifically wrote: He, I refer to Mr. Nelson, references extreme satisfaction with Ms. Hunt and her representation.
Do you recall that?
A I'm not familiar with that letter.
Q Okay.
A I don't think I've ever read that letter and I'm not familiar with the content. But I will say that I do believe that Ms. Hunt did have a particularly good relationship with Mr. Nelson.
Q Do you recall in October of 2001 in a hearing before Judge Hays specifically, you were

talking about mental health issues with her then, but you represented to Judge Hays, and we can get through that document later, that Mr. Nelson was not afraid to voice his opinion if he had an issue with how he was being represented?
A Well, that was my experience, certainly, yeah.
Q That's kind of what I'm getting at.
A Absolutely. He wasn't a shrinking violet in that regard. That's a fair statement.
Q And after you've gotten -- or at least a phone appointment and some basic assurances that you'll be able to get the time you feel necessary, is it fair that about February 15th, or thereabouts, you begin meeting with Ms. Hunt and the investigators in the case to try to get yourself up to speed?
A Yes.
Q Okay. I'll represent to you that I believe those meetings started happening on February 15th, just a few days after your phone call. Does that sound about right?
A I would not dispute that.
Q I'll show you what's been marked as Deposition Exhibit Number 26 and ask if you recognize the

document?

A Yes.

Q What do you recognize that document to be, sir?

A This is my handwritten note dated February the 15th, 2001, regarding a meeting I had with Susan Hunt that started at 5:20 p.m.

Q And in that, what is the substance of the conversations you and Ms. Hunt had on February 15th?

A Ms. Hunt told me that the defense team had employed an investigator, litigation investigator named Tena Francis, I misspelled that; that there was a continuance application perhaps that had already been filed; that it was going to be noticed up or had been noticed up for Friday, February the 23rd; Sherry West was the name of the victim's mother; Neuropysch Dennis Cowan.

I think Ms. Hunt told me that she had retained Dr. Cowan to do a neuropysch of Mr. Nelson.

And then Susan talked about the case, facts, client, progress of mitigation, et cetera. And the meeting ended about an hour later.

Q Two things: One, from the parties' perspective, thank you for having good handwriting.
A You're welcome.
Q It's made it a little easier. We would be in trouble.
But as we go through the note, and I have some of these, I'll show you of various times, but you were notified pretty early on that the mitigation investigation had at least commenced prior to your coming into the case?
A Yes.
Q And that a mitigation investigator out of Dallas, Tena Francis, had been hired?
A Yes.
Q Did you schedule a meeting thereafter to meet with Ms. Francis to discuss the status of the mitigation investigation?
A I scheduled it, but I do know we did meet with her.
Q You had a meeting with her?
A Yes.
Q To get up to speed on the mitigation?
A That's true.
Q You were told as early as February 15th that

Dennis Cowan was a neuropsychological expert that had been retained?
A Yes.
Q Did you know whether or not an examination by Dr. Cowan was planned to occur?
A I believe so, yes.
Q And the application for continuance I believe, was that an application that you, yourself, prepared or do you recall? I think we can get to that.
A I don't remember.
Q All right. Thank you. After meeting with Ms. Hunt, I'm going to show you -- strike that.
I'll show you Deposition Exhibit 27 and ask if you recognize the document there, Mr. Berrigan?
A I do. It's an application for continuance that was filed on behalf of Mr. Nelson on or about February the 16th of 2001.
Q So it would be essentially the day after you met with Ms. Hunt?
A Apparently so.
Q Did you prepare this motion, it appears?
A I believe so, yes. I'm going to say I think we did, and the only reason I say that is because

I signed for myself and Ms. Hunt which suggests that I probably did this in my office.
Q And if you don't recall, that's fine. I will tell you that, based upon the fonts, you and Ms. Hunt used different ones at the time. It appears that this is the font, the mechanism by which you prepare motions.
A This looks very familiar to me. I don't have Ms. Hunt's to compare it to so I would not dispute that. I think we prepared this.
Q At the time that you prepared this, you asked for the case to be continued until when?
A It looks like November of 2001.
Q Is that a date that you believe in your conversation with Ms. Hunt would give you sufficient time to prepare yourself to try that case?
A It's a date I thought we could get. In other words, I thought we could get at least six months out of Judge Gaitan and we were going to do our very best to prepare by then.
Q It's fair to say in criminal defense work, generally it's a an advantage the more time you have the better?
A Usually, yes.

Q And that's a generally, I recognize. In capital litigation, is that probably more so?
A Well, certainly more time is required to prepare the case; so yes, I think that's a fair statement.
Q When you met with Ms. Hunt the day before filing this application for continuance, did you and she discuss what roles you would each play in the defense of Mr. Nelson?
A I'm sure we did.
Q Do you recall what your role was to be?
A Well, I was learned counsel so I was going to be involved in all aspects of the case and I think probably particularly focusing on the appellate defense.
Q Ultimately we know that Mr. Nelson pled in October of 2001, but you certainly didn't know that was an outcome at that point, did you?
A I certainly didn't know that back in February, no.
Q So you're essentially trying to comprehensively trying to get ready with perhaps a focus on the mitigation portion of the case?
A Yes.
Q Thank you, sir. I'll show you what's been

marked as Deposition Exhibit 28 and ask if you recognize that document, Mr. Berrigan?

A This appears to be an order signed by Judge Gaitan, dated March the 8th of 2001, wherein he granted the continuance application we had just referred to.

Q And though you didn't get the November 1st date you were asking for in your request, it did get continued to October 29th which is a couple days away?

A Yes.

Q In that order it recites some of the facts that you had recited to the Court in your application for continuance, that being that there was a voluminous amount of documents that had been collected to that point and you needed the opportunity to wade through them and make an assessment of what they were, correct?

A It does say that. I don't want to represent that was the only thing. The continuance application references other cases that I was involved in.

Q That's fair.

A Judge Gaitan doesn't say anything about that.

Q Not only were you involved in other cases at

the time you took this on, you were involved in other capital cases; is that correct?
A I was involved in three other capital trials and three other post-conviction capital cases.
Q And ultimately, over time we'll kind of go through these as we work our way through, but I want to say State versus Martis was one such case?
A Yes.
Q And there was a cert petition that you had on Kruetzer?
A Paul Kruetzer.
Q Can you spell that?
A Sure. It's K-r-e -- I'm sorry -- K-r-u-e-t-z-e-r.
Q Those were both different cases that you had commitments to because, obviously, you can't come in and devote one hundred percent of your time because you had other responsibilities?
A I had three federal capitals pending in addition to Gordon Martis.

I was representing a fellow by the name of John Robinson, State of Kansas versus John Robinson. It was a multi-count case pending in Johnson County.

And I also had Angela Johnson, United States versus Angela Johnson, which was then pending in the Northern District of Iowa, a federal capital case, murder case as well.
Q And we're talking 2001. I think you said earlier, and I could be wrong, you tried that in '05; is that right?
A We tried Ms. Johnson's case in '05. We tried Mr. Martis' case in '01, and we tried in December of 2002.
Q Thank you, sir. So on February 16th, you've made application for continuance subsequent to your meeting with Ms. Hunt to kind of, as I call it, get up to speed on the case and what it is.
Shortly thereafter, you then begin meeting with Ms. Hunt, the mitigation investigator, and meeting your client for the first time?
A Yes.
Q Let me show you what's been marked as Government's Deposition Exhibit 30 and ask if you recognize the document I've handed you?
A Yes. But I want to represent that these are two -- they are two separate notes that have

been stapled together. Actually I guess three.
Q I think that's right. I think we just stapled the day's notes.
A Oh, I see. Yes, these are three -- I get your point. These are three notes that I prepared regarding work or meetings that I participated in in Mr. Nelson's case on February the 21st of 2001.
Q That's kind of the first -- I don't want to say day of work, I don't mean it that way, but the first day of investigative work getting beyond just talking about it, you're actually going to CCA on that day, correct?
A Yes.
Q And I believe on that day you're going to meet your client for the first time?
A I believe so. I want to make this representation about my notes. I believe that I provided -- well, I know I provided all of the notes that I had and all the files that I had to Mr. Ruhnke and the Nelson habeas team; that is, I don't have any notes in my office or anywhere else that I'm aware of pertaining to Mr. Nelson's case that haven't been turned over to Mr. Ruhnke.

Having said that, I'm not entirely a hundred percent confident that those are all the notes I ever prepared in Mr. Nelson's case; and by that I mean that sometimes, particularly when I'm working on, for example, three capital cases at the same time, I had other cases coming up, sometimes notes are interspersed. For example, in one day I may work on several different cases.

There may be things that were done in Mr. Nelson's case that ended up in somebody else's file, quite honestly, because of just the way these notes end up getting filed with the files.

So I believe that these notes accurately reflect the work that I did on Mr. Nelson's case, but I don't want to represent to you that that's -- I'm a hundred percent confident in that.

And there are things that I even sort of remember as I reviewed the notes occurring that I didn't see in the notes and certainly vice versa. There's very little I remembered about this until I looked at the notes. As you point out, it's 11 years ago. I just wanted to

say that upfront.
Q I appreciate the clarification. And that's one of the reasons I want to show them to you because I don't want to presume simply from reading the notes, one of the reasons why we want to do this, that I know exactly what happened. I think I know what happened. And if your memory is different, please let me know that.
A Sure.
Q Because, as I look through, and we'll start on page 1, it looks like there you were talking with Susan and Tena Francis?
A Yes.
Q And at one point in the evening there, these may not be in chronological order of the day, you had gone -- had had your meeting earlier and you're meeting at the Hereford House for dinner?
A That's exactly right.
Q And even on that meeting at the Hereford House, we've heard referred to us as pretty dark hard to take notes, you indicated that it wouldn't be a bad idea to see if we could get a social worker, a psychologist or somebody to visit

with Keith, your client?
A Yes.
Q It was pretty obvious even at that early date that he didn't really like meeting with institutional doctors or anybody associated with CCA or what he would consider his captors; is that fair?
A He did specifically say that he didn't like the doctors at CCA.
Q I believe one of them was a Dr. Fadare, if I pronounced his name correctly?
A That sounds right. That sounds like the guy's name. He didn't like him; exactly why I couldn't tell you as I sit here.
Q And throughout the representation, he ultimately didn't really meet with much in the way of mental health professionals until after he attempted suicide or unless it was a doctor that you had proffered to him; is that fair to say?
A Well, he didn't meet with people at CCA certainly. The only doctor that I think I sent to him was Dr. Logan -- not Dr. Logan, Dan Foster. He did meet with Dr. Logan of course after the suicide attempt. It wasn't a

situation where we sent psychologists in there and he wouldn't meet with them.
Q That's fair. There were resources available to him that were institutionally provided that he didn't want to take advantage of?
A I don't know that to be true, to be honest. I'm not sure what exactly the purpose of the psychologists or psychiatrists that work at CCA are, frankly. I don't know that they're there to provide treatment. It's not a treatment sort of modality up there.
They essentially deal, as far as I can determine, with requests from the institution to deal with inmates that may be suffering from depression or potential suicide risks, things of that nature. They're not there to sign up, Hey, would you like to see a psychologist or psychiatrist today. It doesn't work that way.
Q Fair enough. He did meet with Dr. Logan when the Court sent him up?
A Yes, he did.
Q And Dr. Logan was someone that you, yourself, had a relationship with and you knew who he was and what his skill set was?

A I've known Dr. Logan for many years.
Q Ultimately he met with Dr. Foster which is someone you sent to him?
A Yes.
Q But I believe when Dr. Martell was there in October, ultimately though you met with your client beforehand, he declined to meet with Dr. Martell?
A Well, yeah, that's true, what you said is true; the context might be a little bit misleading.
Q Please.
A Dr. Martell wasn't there to treat Keith Nelson. He wasn't there to help him. He was there as a government evaluator which is an entirely different situation than the other mental health professionals you're speaking of.
So we had had discussions about Dr. Martell and Dr. Dietz, Park Dietz, and I was very much opposed to Mr. Nelson participating in that evaluation. And so it would be a little bit unfair to suggest that was sort of a sua sponte decision on his part, that Dan Martell or Park Dietz showed up and he decided not to see them. We had had discussions about that issue.

Q And I understand and we'll talk about that in a little bit.
A Okay.
Q And you fairly early on when the mental health motion was filed by the Government in May, it became a protracted litigation on how, if, when and by whom would conduct mental evaluations of your client; is that fair?
A Yes.
Q And we'll be more specific as we get through it because I do not want to misstate it for the record.
A Sure.
Q And I believe you said it, and again we may be doing a little preamble to what we'll talk about later, but you advised your client not to meet with the people because they weren't, in your mind, treatment folks, they were evaluators?
A No.
Q Is that a fair way to say it?
A Are we talking about Dr. Martell and --
Q Dr. Martell or Dietz.
A No, it wasn't just that they were evaluators. It was that they were Government evaluators and

had a reputation as being biased, unfair, prejudiced and extremely harmful and so that's why I didn't think he should meet with them. It was them in particular, not the fact that they were merely evaluators, for the Government.

Q Okay. You thought -- is it fair to say you thought that they were there specifically looking to drudge up only the dark side of the mental health evidence that would be harmful to your client?

A I think they had a bias in that regard. No, I can't say that was their only goal. I believe that within the context of their views of mental health, they were operating in a fair manner.

As an analogy, we can look at the presidential raise. What mitt Romney's idea of what fair taxes might be and Barack Obama's idea may be entirely different; it doesn't mean that each man isn't within his own sort of sphere of view of being fair.

Dr. Martell, and I'm sure Dr. Dietz as well, think they're being entirely fair. But the perception in the defense community was

quite different.
Q Also during your dinner meeting at Hereford House, is it fair to say that you documented that you and Susan and Tena discussed Mr. Nelson's family background extensively and you noted that there had already been a lot of work done in that area?
A Yes, that's in my notes.
Q As you go to page 2 of the exhibit, there is an indication you met with the Warden Bruno Stolc at that institution?
A Yes.
Q And actually had him lay out what the administration segregation unit, in which your client was housed, looked like, if I recall, on the next page?
A That's my writing, not the warden's, but I'm sure I got that information from him.
Q You were concerned of course where your client was housed and the conditions of his confinement; is that fair?
A It was of particular concern really that transcended with that sort of generality. He was having a particular problem with an inmate named Burnett.

Q Kenny Burnett?
A Kenny Burnett. And we were hoping to alleviate that situation and that's one of the reasons we were talking to the warden about his housing situation.
Q Okay. Finally on the last page of those notes, there is yet another discussion of your meeting and this is probably earlier in the day with Ms. Francis and discusses your meeting with your client?
A Yes.
Q Okay. Thank you. Going to Exhibit Number 31, can you identify that for the record, please?
A Yes, sir. This is a handwritten note that I prepared on February the 22nd, 2001, regarding my second visit with Mr. Nelson at the Correctional Corporation of America in Leavenworth, Kansas.
Q Essentially the next day?
A Yes.
Q On that occasion, you began to talk a little bit about the penalty phase to Mr. Nelson, kind of what the purpose of that was, how the mechanics of trial worked?
A Yes.

Q And he was able to engage and help you with that; is that fair?
A No.
Q Okay.
A No. He knew nothing about how the penalty phase worked. He had no experience in capital cases so this would be something I would typically do with any client.
Q I apologize, I misspoke. You indicate in your notes that Dan Grothaus, the former investigator is now gone and Tim Murphy is now on?
A Yes.
Q Were you part of that transition from Grothaus to Murphy?
A No. I think Dan Grothaus is one of the best investigators I've ever know, and I like Tim Murphy a lot, I know them both well, but I would never voluntarily get rid of Dan Grothaus if I had the opportunity to keep him so I doubt I had anything to do with that.
Q And my recollection is the motions to do that occurred about a month before you were in the case.
A Yes. Probably.

Q You note in there that there is a psychiatrist at CCA, I think you wrote down Fadori, but I think I would submit his name is Fadare, F-a-d-a-r-e, if I'm not incorrect --
A I have a question mark indicating I'm entirely unsure about his name so you're probably right.
Q And you had mentioned there that Keith declined invitation to speak with the doctor and you were hoping to get him some type of counseling from a therapeutic standpoint I would think?
A I am -- if you may just give me just a second.
Q Sure.
A To be perfectly candid, I don't recall talking about, at least at this meeting, him seeing a psychiatrist or a psychologist from a therapeutic standpoint.

My note does reflect we had neuropysch testing scheduled for March the 1st with Dr. Cowan. And as you point out, the note also says: Keith declines invitation to talk to him. But I don't recollect what that discussion was about, whether this was from a treatment perspective or some other problem.
Q And you indicate in there, sir, that you need to kind of look into the neuropysch testing; is

that fair?
A Yes.
Q What does that mean, you're going to look into it?
A I know Dr. Cowan. I had some experience with him in the past, he's a very well qualified doctor. In my experience, he might not be the best neuropysch, neuropsychologist available for testing in a capital case. I didn't think he had much experience in that regard and I had sort of mixed results with him in the past so I didn't choose him.
He was already picked, but I did have some concerns as to whether he would be the person to go forward with.
Q Is it true, then, as I look at the time line, that ultimately you did not have Mr. Nelson examined by Dr. Cowan?
A That's true.
Q You had authority to do that, but I believe -- well, it was originally scheduled March 1st but he didn't make that appointment?
A I canceled that appointment. I did it personally.
Q Okay. Ultimately I believe that Dr. Cowan

tries to bill in May for the missed appointment or something like that and I imagine CJA probably did pay him for that, that's how things go, but --
A I was told that my firm paid him. I think we had to pay him because I was responsible for the late cancellation.
Q Let me show you Deposition Exhibit 35 -- it's a series of documents, 35-A.
MR. VALENTI: I do not have a copy of this. I'll have to get you a copy of that.
MR. RUHNKE: Can I take a quick look at it? I'll probably recognize it when I see it.
Q (By Mr. Valenti) Do you recognize those documents?
A I believe so.
Q And is it fair to say that they are essentially documents related, some of those are billing, more detailed billing records and are only there because there's a brief mention in it, but the documents in total deal with a missed appointment that Dr. Cowan is asking for payment for a total of $515?
A $515.11, yes, sir.

Q Okay. And in short, when you met with Mr. Nelson here in February, you knew that Dr. Cowan's visit was going to come up and you need to reschedule, ultimately you end up having to foot the bill for him not showing up, but that was not an appointment that Dr. Cowan ever had with your client?
A We did not comply with the March 1st appointment.
Q Did you ever have Dr. Cowan evaluate your client in a neuropsychological capacity or any capacity?
A No.
Q And is that a function of the mixed results you say you had with him in the past and thought you would have a different way to go?
A It was a result of my lack of confidence in Dr. Cowan as the best person for that particular function.
Q All right. Is it fair to say, Mr. Berrigan, based upon the experience you had when you came into this case, you knew that in most capital cases mental health evidence is very important?
A Yes.
Q Oftentimes can be kind of the cornerstone of an

appropriate mitigation defense or even in the guilt phase portion of the case to at least educate the jury about it in that setting before you get to the penalty phase?
A I don't know that I would say oftentimes.  Not to quibble, but since we're on the record, I would be certainly willing to say sometimes.
Q Okay.  You knew that it was something you needed to have kind of in the toolbox to evaluate whether this could be something that could be useful to you during your defense of Mr. Nelson?
A Yes.
Q And you had been educated, at least from your initial meetings, that there were mental health professionals in place that could have evaluated your client?
A I knew there were mental health professionals available, not just locally but regionally, across the country that were available to evaluate Mr. Nelson, sure.
Q Though you didn't go with Dr. Cowan, what was your ultimate decisions relative to the best way to proceed with Mr. Nelson's mental health inventory, for lack of a better term?

A I don't know if it was the best way to proceed, but what I did was retain Dr. Foster to conduct the psychological evaluation of Mr. Nelson.
Q Why Dr. Foster?
A I had had some experience with Dr. Foster in the past, although I've been racking my brain to try to remember, I think I had. I don't think that was the first case we had worked on together, I could be wrong. I know I've worked on other cases with him.

MR. KETCHMARK: I would represent that you used Dr. Foster in the Harless Cook trial in Platte County which would have preceded that.

A That's funny. Perfectly honest, Mr. Ketchmark reminded me of that. I wouldn't have been able to tell you anything about Harless Cook if he hadn't said that. So I absolutely remember that now.

I had a very high regard for Dr. Foster, in particular because he had worked in the Bureau of Prisons and really brought with him additional credibility. And this is an area where jurors can sometimes be skeptical and this is a fellow that had worked in the

Bureau of Prisons for some time. He had done a lot of work with inmates. He was extraordinarily competent in my opinion, capable, an excellent witness, and I just thought he would do a good job.

And I thank you, Mr. Ketchmark, for reminding me that he had worked on another case for us, turns out unsuccessfully. But State of Missouri versus Harless Cook which was a murder case in Platte County, Missouri.

Q Dr. Foster is a clinical psychologist there; is that correct?

A Yes.

Q So it was your position, based upon your previous relationship with him, that he would be the way that you wanted to proceed with Mr. Nelson's mental health evaluation?

A And I really don't mean to parse words, Mr. Valenti --

Q That's okay.

A -- but I know from being on the opposite side of the table that this deposition will be typed up and I don't want it to be misread.

Q Please.

A When you suggest that that was the best way to

go, that isn't true. This is a gentleman that I have a lot of confidence in, I thought he would do a good job.

Did I choose him over, for example, neuropysch testing or other options? No. That would be misleading. But I did think that he would potentially provide some very valuable information. So he might not have been the best choice and I wasn't comparing him to other options.

Q That's fair. And again, he was the choice you made?

A Yes, that's right.

Q And you would have assumed at the time thought it was your best alternative based on an evaluation of pros and cons available to you at the time?

A Let me put it this way, I think this is at least fair, in terms of a psychological evaluation of Mr. Nelson, I thought Dan Foster was a very good choice. He wouldn't be competent to do a neuropysch. He wouldn't be competent to do a lot of other things. But for a psychologist, he's very competent.

But again, I don't want to suggest

that that meant I was picking him to the exclusion of other areas of mental health investigation.
Q Did you choose any other areas of mental health investigation?
A No.
Q You had Dr. Cowan available or at least funding for a neuropsychological evaluation which you ultimately did not choose to go forward with?
A We did not go forward with it, yeah. To suggest sort of that's a choice that we made is, I think, maybe a little misleading.
Q What would you call it then if you didn't do it if you had the opportunity?
A A failure to come back to it, is what I would call it.
Q So you didn't come back to it?
A I did not come back to it.
Q Okay. When you were done with your meetings in February, you kind of had the foundation I would assume to start preparing for the case?
A Well, I had what I had.
Q Yeah. And what I mean by that is you met with Tena Francis?
A Yes.

Q What was her role to be as you went forward?
A She was the principal mitigation investigator in Mr. Nelson's case.
Q Was she going to have any geographic limitation on that, in other words where was she supposed to investigate?
A Well, Mr. Nelson's family had been living in different areas of the country, in Texas and California. She happened to be in Texas. He had lived there for a substantial period of time. So, you know, I hadn't hired her, had no experience with her, but that did seem to make some sense to me.
Q Were you getting along with her when you got in the case?
A Yes. I had, I'll be honest, I had very limited contact with her. What it is is reflected in the notes, I haven't added those up. I think Ms. Hunt probably had more contact, quite a bit more with Ms. Francis than I did.
But I certainly got along with her, liked her, easy to talk to, seemed competent.
Q Would you recall a situation where Ms. Francis and Ms. Hunt essentially got cross with one another?

A Yes.
Q Would that be relative to a trip that was taken in May of 2001 by Deborah Haddad, an investigator employed by Ms. Francis?
A I think that was one of the number of issues that arose while Ms. Francis was working on the case that were particularly troublesome to Ms. Hunt, and frankly to me.
Q Can you tell me what they were from your perspective?
A Apparently there was some issue regarding the availability of staff in Ms. Francis' office, and so there were tasks, and I can't tell you specifically what they were, but there were tasks that were requested or expected that weren't being performed. We also weren't getting reports.
And I do recall the situation that you're talking about where there was sort of a drive-by investigation here in Missouri and a fairly substantial billing as a result and not a whole lot of work, and I know Susan was particularly upset about that.
Q I'll go through some of those in a little bit, but a refresher one would be Deposition Exhibit

32. If you would look at that, you would see it's in a different font. Well, this is more -- I apologize. But on the back of it is a motion and you'll see the font I was saying that --
A Yes.
Q -- looks distinctly different from what you produced?
A Yes, sir.
Q What do you recognize Deposition Exhibit 32 to be?
A The front page is an order signed by Judge Hays apparently authorizes Government travel rates in connection with a trip from Dallas, Texas to Kansas City, from May 2nd to May 6th.
And the two pages thereafter appear to be an ex parte motion that Ms. Hunt filed in connection with that trip.
Q Okay. If I submit to you, I'm pretty confident in saying that the ultimate trip on that was Ms. Haddad coming to Missouri in the first of May that year and then going to St. Louis for a portion of the time before coming back to Kansas City and that ultimately Ms. Hunt and she never quite saw the same eye to eye again?

A I would agree with that, yes.
Q Okay. After they didn't get along particularly well, do you recall getting a letter from Ms. Francis kind of just detailing her end -- of the -- that end of the argument?
A I don't recall it specifically, but I wouldn't article with that. We probably did get a letter from her.
Q I'm going to show you, chronologically anyway, Government's Deposition Exhibit 33-A and 33-B. First I'm going to show you 33-B and ask if you recognize the short version of what I have there?
MR. VALENTI: I'm going to step out two seconds.
(Off the record.)
Q (By Mr. Valenti) Do you recognize what's in governments Exhibit 33 --
A Yes, sir.
Q I gave you B, correct? Yes. What do you recognize that to be?
A It's an investigative memorandum from Tena Francis to Deborah, CC Susan Hunt and Keith Nelson.
Q And it's written on April 30th, correct?

A It's dated April 30th, 2001. It's titled, "Witnesses in Missouri and Kansas."
Q Okay. It looks like this might be the thing that was the subject of the trial order we just looked at in the last deposition exhibit most likely?
A I presume so. It's very close in time to that trip.
Q Let me show you what's been marked as Government's Exhibit 33-A. I'm going to show you what's been marked as Exhibits 34-A and 34-B, I've got these messed up, and ask if you recognize those?
A Yes.
Q What do you recognize those to be?
A They appear to be a chronology, I believe it was prepared by Tena Francis or somebody in her employ, regarding Keith Nelson's life history.
Q On the A portion of the document, if I'm not mistaken -- the B portion --
A B.
Q -- there are significant handwritten notes taken on that document?
A Yes.
Q Do you recognize the writing on that?

A I do.
Q Whose do you recognize it to be?
A It's mine.
Q This is essentially a life history chronology that's been provided to you with some various results of mitigation investigation they had conducted?
A Yes.
Q The notes on the side that are there, what are you essentially annotating when you're taking those notes?
A As I was reading the document, I apparently made a couple of what I thought should be corrections and then questions about the material that was written.
Q Okay. The front of this report I believe indicates that it was last updated on May 2nd of 2001?
A That's what it says.
Q Do you recall or would it be fair for me to describe this as kind of a draft of the life history chronology that you were asking Ms. Francis to create?
A It says "draft" so I think that's probably fair. I didn't prepare this document, but it

says "draft" on every single page.
Q Since you took notes on it, do you recall ever getting a final version of this document?
A No, I don't recall that. If you showed me one, I could maybe say it was final version. But I don't as I sit here, no.
Q Okay. We discussed a little bit earlier, and I think you acknowledged, that once the Government filed a motion for mental health evaluation, there was some protracted litigation on the mechanics of what, if any, is going to happen, correct?
A Yes.
Q I'm going to show you what's been marked as Government's 35 and ask if you recognize that document, sir?
A This is a document I undoubtedly recognized it at the time it was filed. It was a motion for discovery of mental health evidence to be offered in the penalty phase and for court-ordered mental evaluation of Defendant Keith D. Nelson apparently filed on May the 10th of 2001.
Q This was filed by Mr. Miller in our office back then. You knew Mark back then?

A Yes, I did.
Q Of course he's moved on to work elsewhere in the country.
A Right.
Q But he was the primary person that you engaged in motion practice with on these issues?
A Yeah. Specifically this one, yes.
Q After receiving this motion, did you develop an idea of what you wanted to have happen as it relates to mental health evidence needed in the guilt or penalty phase?
A I'm not sure what you mean by that question.
Q Well, you were going to oppose the motion, I assume?
A I think I knew about the Government's efforts to have an evaluation of Mr. Nelson before this motion was filed.
Q That's fair.
A Yeah.
Q This was probably just the formal notification to the Court that this is what the Government wanted to do as it relates to mental health evidence?
A Right. So I already had an idea about how I felt about the Government's efforts to get a

mental evaluation of Mr. Nelson before they actually filed this document.
Q What were your ideas and what you wanted to have done?
A Well, for the reasons that I had mentioned before, I was concerned about the impact of such an evaluation on Mr. Nelson's penalty phase in large measure because of the particular doctors that were involved and their representation in the capital defense arena as being fellows who were hired specifically by the Government because they were effective in providing damaging evidence against capital defendants.
Q You were going to oppose the Government's efforts to do that if you could?
A Yes.
Q You did in fact?
A Right. Well, this is also, at least in my view, somewhat of an unsettled area of the law. At this point, Rule 12.2 did not specifically provide the Government the opportunity to engage in a mental health evaluation merely because the defendant was presenting mental health evidence in the mitigation phase. That

obviously is the rule now but it wasn't then.
Q Sure. And the guilt phase mental health evaluation versus penalty phase mental health evaluation were considerably different, one was governed fairly stringently by rules, that being the guilt phase, correct?
A Rule 12.2 specifically related to the guilt phase, that's right.
Q And there was no similar clarification, at least at that time, for penalty phase?
A Not in the rule.
Q Okay. I'll show you what's been marked as Government's Deposition Exhibit 36 and ask if you recognize that?
A Yes.
Q And what do you recognize it to be, sir?
A A motion that I prepared and filed and signed by Jason Gillam on my behalf. Jason is a lawyer in Johnson County, Kansas now, but at the time he was working in the same office I was in Watson & Dameron, and it's a motion for extension to respond to the Government's motion for discovery of mental health evidence.
Q In addition to simply asking for time, you indicate to the Court some of the other

responsibilities we talked about earlier, the
State of Kansas versus Martis case that was
pending, correct?
A That case was just about to come up for trial,
I believe. Yes, that's mentioned in paragraph
number 1.
Q Okay. This motion was filed --
A Well, it just -- I apologize. I want to
clarify something. I see I just tried the case
it looks like, April 23rd to May 10th. So
anyway, I had been busy and I hadn't had a
chance to respond to the Government's motion.
Q You filed this on May 24th of 2001?
A Yes.
Q Thank you, sir. I'll show you what's been
marked as Deposition Exhibit 37 and ask if you
recognize that?
A Yes, sir.
Q What do you recognize it to be?
A For what it's titled, it's just a second motion
for an extension and respond to Government's
motion of discovery of mental health evidence
that I prepared and signed and it was filed on
June the 8th of 2001.
Q And yet again asking for just a little more

time to respond to the Government's motion for mental health, correct?

A I was preparing a cert petition in United States versus -- I'm sorry -- in Paul Kreutzer versus Michael Bowersox, which, at that point, was a federal habeas and we were preparing a cert petition to the United States Supreme Court. Mr. Kreutzer was under a sentence of death.

Q Were you able to complete Mr. Kreutzer's documentation on time?

A Yes.

Q The result of that was what?

A We failed and Mr. Kreutzer was subsequently executed.

Q I want to show you what's been marked as Government's Exhibit 38, and you may not recognize this, but if you can reference it and see if it rings a bell to you about anything.

A To be perfectly honest, I don't recognize this document. I mean, I could interpret it probably no better than you can. TC presumably is telephone call, Patrick and Susan, so I'm presuming this is Tena.

Q Yes. I'll submit to you that Ms. Francis has

identified this as some notes she took on June 11th of 2001, after having a conversation with you and Susan. And to be fair, she thought Susan may not have been on this or the next phone call we may talk about.

But essentially you're talking to your mitigation investigator in June. Does that sound about right to you?

A Yes, it's entirely possible. It should be reflected in my time sheets.

Q It might. There's so much of that, it's difficult when you -- this is easier with the day and smaller to digest.

And you'll note in the bottom of the note, Ms. Francis has written: The Government wants Defendant subjected to mental health evaluation so we may not want to use a mental health person.

Does that seem consistent with conversations you may have had while the Government's mental health motion to the Court was pending that you might have with the defense team?

A To be perfectly honest, no. The Government wanting Defendant subjected to mental health

evaluation did not affect my decision at all on whether we should have a mental health person.
Q Would it affect the timing of that decision when to subject Mr. Nelson to an evaluation?
A Not really. I mean, the truth is we could have a mental health evaluation and never even use it and it wouldn't have any affect whatsoever on the Government.
The idea -- you know, at this point, the Government had already filed a motion, as you point out, and so I'm not sure what Ms. Francis is referring to, quite honestly.
Q Okay. You didn't -- we've talked about it, I don't want to belabor the point, I don't want to beat a dead horse here, but you were uncomfortable with the Government having access to their own experts having an evaluation of Mr. Nelson?
A Yeah, I was uncomfortable both from a general perspective, that I thought that was wrong, and from the specific perspective of the individuals that were involved on behalf of the Government, specifically Dr. Martell and Dr. Dietz.
Q Though there had been no hearing by the Court

yet, because your response at this point is not even yet in so the hearing is not yet ripe, were you thinking of what would happen if the Court ordered Mr. Nelson to be subjected to a mental health evaluation by Government experts?

A Of course.

Q Were you thinking how you would respond to that?

A Yes.

Q Is it fair to say that there's been -- once the Court ultimately does order this, there's more protracted litigation on how that evaluation should be allowed to progress?

A I believe that's true.

Q You know, things like should the Government get to even pick the expert they use?

A Right.

Q The timing of when they get to do it?

A Yes.

Q Or who you would get to do it I guess, because they --

A Right.

Q The manner in which those materials would be disclosed to trial counsel were issues that you were very concerned about?

A There were a number of issues regarding not only whether this would be done but if it was done, how it would be done and who would do it.
Q Okay. We'll go through that. So these were issues that were foremost in your mind as you were defending against your concerns that this rule did not provide the Government that right at this time?
A This is one of many issues that I dealt with with Mr. Nelson's defense and, you know, it's frankly not uncommon.
Q I'll show you what's been marked as s Government's Exhibit 39, Deposition Exhibit Number 39, excuse me, and ask if you recognize that document?
A Yes, sir.
Q What do you recognize it to be, sir?
A It appears to be an investigative memorandum from Tena Francis directed to myself and Susan Hunt, dated June 13, 2001, which she has titled as, "Update to Punishment Phase Investigation."
Q And then this particular document, there is kind of a status of where they're at; is that fair to say?
A Yes.

Q And one of the things that kind of -- I think is illustrated potentially of Ms. Francis and Ms. Hunt's -- I don't know if acrimony is the right word, I don't want to put words in your mouth, but they're not getting along, is the Steve Nelson and Kenny Nelson section where Ms. Francis writes that she disagrees with Susan that interviewing these relatives is a waste of time and Ms. Francis advocates that they need to be interviewed and potentially used as potential witnesses in the case, correct?
A She wrote what she wrote. Whether that's indicative that they were having difficulties at that time, I honestly can't say. They obviously disagreed, I'm not disputing that.
Q Sure.
A I do think it's -- this section issue, I've spent a career convincing witnesses who do not want to be involved to provide information and ultimately they testify, obviously Ms. Francis felt that she would be able to get these witnesses to speak even if they were initially reluctant and perhaps Ms. Hunt had a different view.

Q Were you familiar with Ms. Francis even though you weren't there at her hiring, you were there shortly thereafter in regards to her credentials, so to speak?
A No. This is my very first -- this case was my first experience working with Ms. Francis and so I was not at all familiar with her.
Q And you knew -- of course at the time of the penalty phase hearing of this case, both Steven and Kenny Nelson were called as witnesses by you?
A Yes.
Q They were two of Mr. Nelson's, your client's brothers that had been particularly successful despite the hardship of the upbringing they had?
A You know, I remember Kenny a little better than Steven only because they were twins, and it's fair to say they were certainly more successful in life than Keith, that's indisputably true.
Q I think that -- is it fair to say that from a strategy, and I don't mean this in the 2255 strategy that you're familiar with, but you were trying to show that Steven had essentially been raised by another family?

A Right.
Q And because of that had been given the opportunity for success and you contrast through Dr. Cunningham with Keith's situation and his learning disabilities and things of that nature?
A Yes, that's a very fair assessment.
Q Also in the report from Ms. Francis, there's a discussion of basic records that still needed to be obtained on page 2. Those of course were records that as a group in Mr. Nelson's defense you thought you still needed; is that fair?
A Yes.
Q One of the headings is listed about California?
A Right.
Q You knew from your investigation that Ms. Nelson had claimed to have been in a women's shelter in California?
A Yes.
Q And there were some incidents involving Kenny Morris --
A Right.
Q -- in California, something you would want to present if you could?
A Well, you certainly wanted to present

documentation. It's always very helpful to have written documentation of incidents of abuse.

Q Were you ever able to find the women's shelter that Nancy Nelson and the boys stayed at during her time in California?

A I personally never went to California and participated in that part of the investigation obviously. But the date of this report, June the 13th, Ms. Francis specifically says they haven't been able to find the shelter. I don't know that that ever changed.

Q Do you have any recollection of Susan herself going to Fresno, California and making an effort to find that?

A She may have, but I don't specifically recall.

Q Thank you, sir. I'll show you what's been marked as Deposition Exhibit 40. And I would put to you, like the last set of notes, these are notes that Tena Francis has acknowledged writing on June 13th, 2001, in conversations with you where she indicates that: I'm going to ask for more money, I assume so she can continue her mitigation investigation.

Does that sound about right?

A Yes.
Q She indicates "skeptic" and it's under your name so I'm going to ask you, she's written that you're skeptic about the neuropysch testing?
A Yes.
Q Do you know what that is in reference to?
A You know, I'm not sure if we're still talking about Dr. Cowan. I suspect that's what it must be, but I don't -- I don't have a specific recollection about this conversation obviously.
Q Okay. And as I move down the note, it talks about: Need more objective slash medical testing of a neurologist, that way the expert would not delve into Defendant's bad -- or excuse me, past bad history?
A I see that note.
Q Does that mean anything to you?
A Well, yeah. It means that she obviously thought this was part of the discussion.
Q Okay.
A Yeah.
Q And finally, the thing that seems interesting to me is: An expert in regarding spinal fluid looking for low serotonin.

A Yes.
Q I believe in talking to Ms. Hunt about this, she seems to recall that you had recently been to a seminar where they had talked about spinal fluid and serotonin levels and what use that might may have in litigation. Does that ring a bell to you?
A That's entirely possible. In 2001, I had attended two death penalty seminars, a Life in the Balance seminar that we spoke about earlier was in Albuquerque, New Mexico, and then I also had attended the Clarence Darrow Death Penalty College in Ann Arbor, Michigan, and that subject may have come up in one or both of those seminars.
Q Is that something that you ever -- had anything ever really happened in this case regarding --
A I don't think -- well, I know I didn't -- I didn't do that. We didn't hire or look for an expert, as far as I know, to check Keith's serotonin level.
Q Maybe just amusing perhaps at some point?
A I don't -- you know, we're having a discussion with the mitigation investigator so it's more than amusing. I don't know why I didn't follow

up with that.

You know, I knew that there was evidence, actually some pretty substantial evidence that Nancy, his mother, had been drinking, seriously drinking during his pregnancy and that there could have been evidence of Fetal Alcohol Syndrome.

And then serotonin, as you probably undoubtedly know, affects brain functioning substantially. And so there had been some, I think some recent developments in that area where examination of spinal fluid could reveal low serotonin levels and perhaps provide objective evidence of brain dysfunction.

So I wouldn't characterize it as amusing; but having said that, I obviously didn't do anything about it.

Q Thank you, sir. Government's Exhibit, Deposition Exhibit 41, I'll hand to you and ask if you recognize that?

A Yes, sir.

Q And what do you recognize it to be?

A This is the response that I prepared and filed in response to the Government's motion to discovery of mental health evidence to be

offered in the penalty phase. And it was filed -- I can't quite read that date.
Q I can't either.
A But obviously it was in response to the Government's motion.
MR. RUHNKE: June 22.
Q (By Mr. Valenti) I think it's stamped then but I think you probably got it in earlier.
A Well, I'm fairly confident there's only one such document so whatever the date is it is.
Q It doesn't matter. I think it got stamped in, but I think you signed it and sent it off on June 14th. But the point of the matter is this is your motion on your position on where you're at?
A Yes.
Q And if you go to the top of page 5, you have created a summary of kind of the Defendant's position and the kind of introductory sentence there reads: It is not the defense's intention to make Mr. Nelson a witness through expert testimony.
Is that, and boil it down into a simple sentence, kind of your position on all of this, that you don't want to make your own

client a witness against himself through the
Government experts in violation of the 5th
Amendment or any other right he may be
guaranteed?
A No.
Q Okay.
A That's not my position. I don't dispute that I
wrote that. But to characterize that as a
summary of this --
Q This is a large document.
A Forty-page document.
Q The cliff notes, the dummy's version, but it's
kind of a theme --
A Sure.
Q -- I think fairly that you are on from this
point until you're -- really until the case is
over that you don't want to make your client a
witness against himself through the mental
evaluation of the Government and there are many
legal reasons for it.
I'm not trying to suggest that
they're meritorious, non-meritorious or
otherwise. I just think that you are engaged
in protracted litigation, correct?
A Well, yes, I've said that many times. This was

a seriously litigated issue throughout Mr. Nelson's case.

Q And in many cases in which mental health evaluations or testimony will be used in similar cases?

A Well, at that time, Mr. Valenti.

Q That's true.

A The context of Mr. Nelson's case is little bit unique in that regard. Now, as you know, the law specifically provides that the Government is entitled by operation of rule to have a mental evaluation if the defense is going to present evidence in the penalty phase of mental health. That wasn't true in 2001.

So there was a legal argument to be had that this is impermissible. Part of that legal argument did concern whether or not Mr. Nelson could be compelled in a fashion to testify against himself through experts.

But as I've stated repeatedly, one of my primary concerns was not only did the Government get to do this, which I thought was improper legally, from a legal perspective, but the individuals that were going to be involved in behalf of the Government were not

individuals that I would trust to do an objective and fair evaluation.

And that this evidence can be, because the Government gets to go last, this is the last evidence the jurors hear before they retire usually, it's damning evidence. It's evidence that can have a substantial impact in the case, particularly if it's unfair.

So I had a number of concerns and making Mr. Nelson a witness through expert testimony is one of those.

Q Okay.

MR. RUHNKE: Just for the record, that was filed on June 22, 2001, and it's docket entry 238.

MR. VALENTI: Great.

Q (By Mr. Valenti) So the second half of that is the Government's selection of experts was particularly troubling to you because you did not believe them to be unbiased?

A That's right.

Q And again, I'm not trying to discount that. I'm just trying to get it into a nutshell that's imaginable for the purpose of what we're doing here today.

A I understand.
Q Thank you very much. Let me show you what's been marked as Deposition Exhibit 42 and I'm going to ask if you recognize that, sir?
A This document appears to be a letter from Tena Francis addressed to me, dated June the 28th of 2001, with an attached affidavit.
Q In an earlier deposition exhibit we saw that Tena Francis had written a note which indicated they were going to ask for money, whenever that's done, from your perspective, in one of these cases with the Government CJA, you need to make application to the Court because they write the checks?
A That's right.
Q In order to do so with regard to unusual expenses like mitigation investigation expert witnesses, you generally need to get an affidavit to the Court to fund those requests?
A It's certainly helpful.
Q You did that and that's what Ms. Francis is doing here at your request; is that correct?
A Yes.
Q And then that affidavit ultimately is attached to a motion for funding that either you or

Susan would file on Mr. Nelson's behalf?
A Yeah. It's not signed, but I suspect she signed one at some point.
Q Yeah. There will be a motion, we'll get to that later. If you look through the document, there was an original version of the draft that had some notes on it that say: Do we need this, and I assume those are edits that you had asked her to make? A little bit farther down there.
A No.
Q No?
A That's not my handwriting.
Q Someone asked her: Do we need this material, and ultimately the version you go with is --
A To be honest, it kind of looks like her writing to me, but I don't pretend to be an expert. I don't know whose writing that is.
Q Do you recall having a version of the affidavit once it was edited to everyone's satisfaction filed in court?
A Well, I presumably filed an affidavit in court, yeah.
Q You also recognize the first part of the letter essentially being Tena's entry to you about

maybe the issues she had with Susan in trying to give you her perspective and asking that you keep her on the case?

A Can I have just a minute?

Q Sure. Certainly.

A Okay. I may have just missed it. I don't see here where Ms. Francis is basically asking my permission to stay on the case.

She specifically says she's voicing some concern she's had about her relationship with Susan, and probably more specifically Susan's concerns about Deborah Haddad and the incident we've already discussed with Ms. Haddad visiting her own family during ostensibly was a mitigation trip. And so Ms. Francis is talking about that in this letter letting me know about her position about that.

Q Okay.

A But I don't personally recall a situation where we were threatening to get rid of her.

Q And I don't mean to imply that if I did but my question. I think if you look at the very last paragraph, the last -- second to last sentence before the parenthetical: I hope you'll keep

me on the team.
A Yeah.
Q And so I may be ascribing too much importance to that. And in speaking to her, I think that she has indicated a desire to continue to work on Mr. Nelson's behalf.
A Perhaps she perceived from Susan's unhappiness about portions of the investigation that maybe their continued participation in Mr. Nelson's defense was in jeopardy, but that wasn't my perspective.
Q You didn't consider taking her off at that point?
A No. We were way too far down the road, this is the end of June, to change horses now.
Q And you're getting ready for what you believe is a trial beginning October 29th at that point?
A Right. Exactly.
Q In the affidavit that's attached to this, Ms. Francis, I assume, based upon the request, has essentially documented their work up to May 18th of '01, and that's essentially 267 hours and then she breaks it down a little more in detail in paragraph 5. Do you recall

obtaining that or does that refresh your recollection as the amount of work they put in at that point?
A Well, I mean, I obviously got this document and I've read it, reviewed it at some point, and I have no way of knowing whether or not that's accurate.
And I certainly presume Ms. Francis is being honest, I have no reason to doubt it. So these numbers that she has in paragraph 5 presumably are completely accurate.
Q Thank you. I'll show you Government's Exhibit 43 and see if you recognize those notations?
A Yes, sir. These are notes that I prepared on June the 28th of 2001.
Q And you're getting ready for a hearing, it appears, in front of the magistrate judge relative to the mental health issues that have been involved in the motion practice so far?
A Yes, that's what the notes seem to reflect.
Q And consistent with what we've said, and no need to beat a dead horse, this is kind of outlining your position on why you don't want Mr. Nelson to participate in a mental health evaluation and if so, why not these men?

A These are certainly the legal issues, right.
Q I'll show you Deposition Exhibit 44 and I'll maintain and represent to you that these documents reference the hearing on the mental health issues pending before the court at the magistrate level before Judge Hays, and there is an attached transcript wherein the evidence and arguments occur.
Do you recall participating in that consistent with your notes we just looked at in the last exhibit?
A I haven't read this transcript, but I have no doubt it's an accurate representation of what transpired on June 28th of 2001, so it should speak for itself.
Q To help the parties a little bit, the opening page kind of has notes, so to speak, of the hearing, kind of a summary of what occurred on that day because there were other issues that took place as well, like a motion to quash, a subpoena relative to CCA?
A Yeah, I think that is a essentially a docket entry by Judge Hays as to what transpired.
Q All right. Thank you. I'm not sure why I only have one copy of this in here but I do. I'll

show you Government's Exhibit 47 and ask you, Mr. Berrigan, if you recognize that?
A Yes, sir.
Q What do you recognize that to be?
A It's a document that I prepared entitled: Defendant's Response to Court Order for Criteria for Government's Mental Health Evaluation of Defendant if ordered. It was filed on August the 7th of 2001.
Q As I look at this, essentially, so the record is clear, I want -- chronologically what's happened is the parties have motioned the Court and replied on whether such a thing should happen. And the Court has essentially, on that hearing we just looked at, said, Okay, if I order one, I want to know the conditions of how the mechanics essentially of how this is going to go forward.
And is this a pleading on your part essentially trying to outline for the magistrate court how you think this should happen should the Court order one despite your objection to having one ordered?
A I think this is in response to the Court ordering us to advise the Court as to what

criteria we thought should be in place if the Court ordered a Government mental health evaluation of Mr. Nelson.
Q Okay. Which you still didn't want to have happen; but if that ended up happening, you go on the criteria you would like to lay the framework for?
A I thought these would be appropriate criteria for an evaluation ordered.
Q Thank you, sir. Deposition Exhibit 48, do you recognize that?
A Yes, sir.
Q What do you recognize that to be?
A An order signed by Judge Hays that was filed on August the 17th of 2001, concerning the Government's motion for discovery of mental health evidence to be offered in the penalty phase for a Court-ordered mental evaluation of Mr. Nelson.
Q Obviously it's not the position you wanted the Court to take, not pleased with that outcome?
A We were opposed to an evaluation from the start; so yes, that's a fair assessment.
Q I want to direct your attention, if I may, Mr. Berrigan, to page 6.

A Uh-huh.
Q Subparagraph 6, entitled, "Consequences of Noncompliance." Do you see that page?
A Yes.
Q And it reads: Failure of Defendant Nelson to provide notice or to participate in a Court-ordered examination or to confirm his first notice shall result in forfeiture of the right to present mental health testimony at trial.
A Yes.
Q Do you recall why that portion of the order was in there at such an early date? Had there been some discussion whether Mr. Nelson would or wouldn't submit to a mental evaluation that the Court might have been aware of?
A I'm sure there was some discussion; as to whether or not it took place August the 17th of 2001, I'm not confident. But I would imagine that the Government would have to anticipate the possibility at least that Mr. Nelson might not participate. That has happened on occasion and want to know what the results of that were. Perhaps even Judge Hays. I don't remember whose idea that was to include in the order.

Q When you got this order, did you meet with your client or your team to discuss how to go forward?
A You mean as a result of the order?
Q As a result of the order.
A I honestly don't know.
Q Did you ever meet with your client to explain the order to him?
A I don't think I met with Mr. Nelson specifically for that purpose. We did discuss this issue, that is a Government mental health evaluation; whether that was before or during this order, I can't tell you as we sit here.
Q And I recognize putting together a time line ten years later is very difficult. Can you estimate for us the number of times you would have spoken to Mr. Nelson about the mental health evaluation the Government was proposing to have conducted?
A No. I mean, I'm sure I would have spoken to him at least once or twice about it.
Q Okay.
A But no.
Q As I try to piece the record together these years later, this is the first time I see in

the record, and I could be wrong having not spent as much time as I ultimately will spend, that this is the first indication of what could be a potential sanction for failure to comply.

And there's fairly two different types of noncompliance here, the one is part of lawyers not providing the notice of intent to do something, which you did; and the other is the noncompliance for failing to participate in the process; is that fair?

A Yes.

Q Okay. And do you recall there being any other citation in the record that we have prior to this where noncompliance or sanctions were discussed other than potential the motion --

A No, I mean, I trust your review of the record. I have not reviewed the record in preparation for this deposition.

Q But you don't have any recollection that before the Court would have ordered this, that there would have been any need to discuss that?

A In the record?

Q Yeah, or any -- well, I mean, you may have discussed it with your client but there's no way I can piece that together now and you can't

remember, I don't think --
A I'm sure it was discussed with Mr. Nelson. We're just talking about the dates?
Q Yes.
A Yeah, I don't recall specifically. I think I have a note about it somewhere in there, but I don't know right now as I sit here where.
Q I'll show you what's been marked Deposition Exhibit 50 and ask if you can recognize that document?
A Yes, sir.
Q What do you recognize that to be?
A It's an ex parte motion that Susan Hunt filed on August the 20th of 2001, to procure the attendance of Mark Cunningham in Kansas City.
Q Do you recall what the purpose of that was for?
A I believe it was to meet with Mr. Nelson and with us.
Q Do you recall Dr. Cunningham traveling to Kansas City to meet with you?
A Vaguely.
Q Do you recall whether your client submitted to an evaluation or met with Dr. Cunningham for purposes of --
A I believe that Dr. Cunningham met with Keith.

Now, whether it was -- whether it was this trip, he may not have had any other trips to Kansas City, so I don't -- I guess I should say I don't know. Without a note, I'm not sure.

THE COURT REPORTER: Could we take a quick bathroom break?

MR. VALENTI: Sure.

(Brief recess.)

Q (By Mr. Valenti) There's been a short break. We're all a little refreshed. I want to go through some more of these exhibits, if I may, and I'll start with Deposition Exhibit Number 51 and ask, Mr. Berrigan, if you recognize that, sir?

A I believe it's a document that I prepared and filed on August the -- I think that says August the 29th. Yes, August the 29th of 2001. It's a motion to extend the time to file an appeal and the magistrate's order regarding the Government mental health evaluation of Mr. Nelson.

Q Thank you.

A Can I look at that just a second?

Q Yes.

A I know you don't have any other questions but

I'm just curious.

Q It's lengthy because the order ultimately comes attached to it.

A It has my bypass date and I had forgotten that date, so thanks.

Q And it's important I guess to say for the record that while you were representing Mr. Nelson, you had some health issues; is that fair?

A Yes.

Q Can you tell us what those issues are?

A I have a long history of coronary artery disease and it was particularly acute in the first eight months of 2001 so there were a number of cardiology visits and I think two angioplasties and then a coronary bypass procedure on August the 8th of 2001.

Q Were you kind of taken out of the equation for a while where you were unable to work during your convalescence?

A I think for a week after the surgery I did not work, and I'm fairly confident about that being about a week or so.

Q In the motion that we just described, you are simply asking the Court for a little more time

to respond to a pleading relative to the conditions of the mental health evaluation to be conducted?

A Yes.

Q Did you -- at this point, was it a concern for you that the trial date was coming up at the end of October given your health situation that you would be able to prepare yourself to make that trial date?

A None of us like to blame concerns like trials or work situations on our health. The concern I had about the trial date wasn't specifically related to my health, although it wasn't helpful to miss a week.

And then there are associated problems with this condition that it causes chest pain periodically. It can be a very distracting situation, particularly at this time because my arteries were sort of building up to a point where I needed surgery.

I had a bypass in 1989 when I was 31 and for some period after that I had no real physical discomfort. But at this particular junction in '01, I was having a lot of physical discomfort, angioplasties, balloon

angioplasties every three or four months. I had had at least a dozen in the preceding four years.

So that's a little probably more distracting than the actual surgery itself, to be perfectly honest.

But to answer your question more specifically, concern about the trial date had less to do with my health than it did about sort of where we were in the preparation of the case.

Q Let's talk about that. It's a natural point to do that. You didn't feel the need, and obviously I don't believe you did, ask for a continuance relative to your health concerns?

A That's right.

Q Did you consider whether you needed to ask the Court for a continuance of the trial setting from October as a consequence of where you were at on either the guilt or mitigation phase of your preparation?

A You know, I didn't -- I don't want to say it didn't cross my mind. But part of the deal -- it wasn't in writing, but part of this conversation I had had with Judge Hays way back

on February the 12th was: You're going to get one continuance, and she made it pretty clear to me that that was it.

Judge Gaitan wanted the case tried. The Government objected even to the continuance that we wanted from the April setting. Marco objected to that and asked for a date in June.

The case had been pending at that point for a year and-a-half and the Government's position was it was going to get tried and I knew Judge Gaitan and I had known Judge Gaitan at that point for 17 years. I knew him well when he was a state court judge in Jackson County and he likes to dispose of these cases, at least at the trial level, habeas not withstanding, in an expeditious fashion and we weren't going to get a continuance.

And I felt that I had agreed to that with the conversation with Judge Hays. I felt like this is what you signed up for; and if you weren't going to do it, you shouldn't have signed up for it.

So I had committed to the trial date with Judge Hays. I certainly felt that way. I

expect she did as well. And I don't want to speak for Judge Gaitan, but I don't think he would have entertained a continuance application. I really don't think he would have so I didn't ask for one. Certainly would have been beneficial.

But as you pointed out earlier, we discussed these cases shouldn't be a rush to get to the courthouse. And I've never been on a case, frankly, a capital case, for as short a period of time than this case before it went to trial. This is an extraordinary event.

Having said all of that, I did not request a continuance.

Q I'm going to show you what's been marked as Deposition Exhibit 52 and ask if you can identify those documents, please?

A This is a fax from Tena Francis to Susan Hunt and myself and it's dated August the 31st of 2001. It includes a letter dated that same date. And then attached to it are investigative memorandums regarding witness interviews that have been conducted by Lisa Murphy, it looks like Deborah Haddad as well, pertaining to the mitigation investigation.

Q Okay. Essentially she's updating you where they are at -- where she's at with mitigation through her firm, correct?
A It looks like recent investigation that had been conducted.
Q And I'll submit to you it looks like you and Susan were about to travel back down to the Fort Worth or White Settlement, Texas area and she was specifically letting you know that Lisa Murphy was trying to schedule some specific interviews of people like Rhonda Reese, Jenny Monroe, Irene Woods, some of the teachers who may have had the Nelson boys?
A That's exactly what it looks like.
Q Do you recall that you eventually did travel for that, does that sound about right?
A Yes, sir.
Q And that's kind some of the kind of hands-on mitigation stuff that you were preparing for should you be forced to go to that portion of the trial?
A Yes.
Q Thank you. Correspondingly, I'll show you Deposition Exhibit Number 53 and ask if you recognize that?

A Yes, sir.
Q What is it, sir?
A It's an ex parte motion for travel expenses that was filed by Susan Hunt on August the 13th of 2001, pertaining to a trip to Dallas, Texas, between September the 4th and September the 7th.
Q And that's for travel for you and Ms. Hunt?
A Yes.
Q And ultimately you did travel September 4th to September 7th to kind of interview the folks that we just outlined in the previous e-mail from Tena, Tena Francis rather, who is essentially kind of showing you the potential itinerary you can follow when you're down there?
A Susan and I went down there to interview mitigation witnesses.
Q Deposition Exhibit 54. Mr. Berrigan, do you recognize that?
A Yes, sir.
Q What is it?
A It's a document that I prepared titled, "Notice to Rely on Mental Health Evidence at the Penalty Phase of Trial," dated September the

4th of 2001.
Q And also you endorse Dr. Foster, clinical psychologist, for the purposes of providing that testimony; is that correct?
A Yes.
Q Had Dr. Foster evaluated Mr. Nelson at that point or was this kind of prophylactically filed in the event that you did and you used him?
A My recollection is he didn't see Keith until the first weekend in October and this is filed in September, so I do not believe that Dr. Foster had -- certainly hadn't prepared a report and I don't think really had spoken to Keith at all at this point.
Q Okay. And this is a notice to rely on mental health at the penalty phase. Was a corresponding motion filed for the guilt phase?
A No, not that I'm aware.
Q Were you intending to put on mental health evidence in the guilt phase should one go forward?
A We were not planning on presenting mental health evidence as a defense to the crime.
Q And though we're getting late in September I

guess, well late, in September and the trial was looming in October, were you on the path of potentially heading to a plea or is that something that came up much later?
A The short answer is I'm not sure. I will tell you that I discussed with Mr. Nelson before he pled guilty that I thought that would be potentially a helpful thing to do, and that his acceptance and responsibility in that fashion would be a compelling mitigating circumstance.
The lesson in this case is that's not true and I would never ever do that again. And I, frankly, regret that decision tremendously. It was my urging, not Ms. Hunt's, that he do that and my idea.
Q Sure. And I think --
A When it first came, up to answer your question, I don't know.
Q Okay. And you've noted in your notes throughout, I'm sure we might see them or we might not, but it's not particularly important that you thought, as you just testified, that the acceptance of responsibility would be a compelling mitigating factor on which you could base a request for life?

A Well, certainly I was hopeful it would be compelling. It was far from compelling.
Q I'll show you Government's Deposition Exhibit Number 55.
A Thank you.
Q Ask if you recognize that?
A It is -- yes is the answer.
Q And what do you recognize it to be?
A It's an ex parte motion for expert services, specifically for forensic psychological evaluation, in the amount of $7,500 for Dr. Foster to conduct a forensic exam of Keith Nelson.
Q And that essentially follows up the notice you previously provided seeking the funding with the CV for Dr. Foster?
A Yes.
Q Deposition Exhibit 56. Do you recognize that; and if so, what do you recognize it to be?
A It appears to be an ex parte motion of the travel expenses for myself and Ms. Hunt to travel to Dallas, Texas, September the 25th through the 27th of 2001, to interview mitigation -- potential mitigation witnesses.
Q I recognize that this was not authored by you

given the font and the signature, but in paragraph 3, the motion indicates that counsel has hired a mitigation investigator in Dallas, Texas who has completed extensive mitigation work on this case.

I assume we're referring to Tena Francis there?

A Yes.

Q Would you agree or disagree with the statement about her having completed extensive mitigation?

A I think that's a difficult question to answer in this regard, not -- again, trying not to quibble with the question, but these things are all sort of relative.

Certainly Ms. Francis had done a substantial amount of work on the case. You already referenced that affidavit, 267 hours, her or her team, to include those; whether that was extensive and whether it was completed, this kind of could be read to suggest that the mitigation work was completed and I don't think that's what Susan meant to discuss.

And there's still, in the same paragraph, paragraph number 3, there's a

reference to future investigation that needs to be accomplished. So Ms. Francis had done a good amount of work. I just don't want to suggest that that meant there wasn't still a lot to do.
Q And that's fair. I don't mean to read it as saying it is completed. I mean, there has been completed substantial work and I will acknowledge the motion to continue is saying there is more to do?
A Right.
Q It's fair to say in these cases there's almost always more to do?
A Well, you hope not.
Q No, but with social histories --
A Yeah. I get your point.
Q One thing leads to another and can always lead -- leaves a lot of bread crumbs, so to speak?
A I think individuals who, hopefully like ourselves, including all of us lawyers at this table, like to think that by the time we get up to trial, we've done all of the work that we need to do to be prepared to represent our clients effectively, the United States as well

as our individual defendants.

And we also recognize because, you know, we're just human, that oftentimes we would like to do more. We're sitting there at the beginning of jury selection thinking, What else might we have done, or What else could we have done.

So I don't know that you ever feel like you're completely finished in preparation, but, again, that's all relative.

Q Sure. I think you even mentioned in one of your notes that you've written relative to -- I want to say Dr. Cunningham, that there were some Gainesville, Florida records of your client that you did not suspect, and I think we maintained we did not have, and you were concerned about us obtaining them.

A Yeah.

Q I don't know that we didn't have them then. I'm sure we will have them at some point.

A I was quite confident that the Government had records that the Defense did not have. And I know specifically with regard to CCA, that was an ongoing issue.

Q And there have been motion to quash that we've

talked about and things like that?
A Yes.
Q I'll show you Government's Exhibit 58 and ask if you can recognize the document; and if so, tell us what it is?
A This was Defendant's appeal of Judge Hays' order granting the Government's motion to discovery of mental health evidence to be offered in the penalty phase that I prepared and filed on or about September the 21st.
And then it looks like there's, attached to that motion, an extension to file appeal that was dated August the 20th.
And then there's an order dated August the 26th of 2001 regarding several issues -- well, two issues, Defendant's motion for additional peremptory challenges, and Defendant's appeal for the magistrate's order granting in part, denying in part the Government's motion for discovery of mental health evidence to be offered at the penalty phase.
Q And when you took this appeal, this is an appeal of the magistrate judge's report and recommendation on those issues, correct?

A Yes, sir.
Q You took that appeal to the district court or trial court level, which, in this case, was Judge Gaitan?
A Exactly.
Q Once you got the order from him, that's essentially the universe of law that you're operating under; there's no ability really to take it up to interlocutory appeal at that point, is there?
A No, there is not.
Q And we've talked about this, and I don't want to belabor the point, this was essentially one more battleground, so to speak, in the mental health evidence and what you wanted to see happen versus what the Government wanted and ultimately what the Court ordered?
A This is a necessary step in the process of preserving this issue for subsequent appeal.
Q Government's Exhibit, Deposition Exhibit 59, ask if you recognize that document; if so, what is it?
A It appears to be an investigative memorandum from Tena Francis -- I'm sorry -- to Tena Francis from Lisa Murphy, dated September the

25th, regarding an interview with Gloria Welch.
Q I believe the record is clear, but Lisa Murphy was one of Tena Francis' associates who helped her in her investigative steps?
A Yes.
Q Thank you. I think Gloria Welch was ultimately an individual that you used as a mitigation witness you used in your presentation?
A I don't recall.
Q One of the former teachers I think.
A There were teachers that testified. That may be one. I do not have access to the trial transcript and I didn't particularly review my trial notes because I didn't think that was relevant to the issues that we were dealing with in the habeas.
Q Deposition Exhibit 60, can you identify that, please, and let me know what it is?
A Yes, sir. This is an ex parte motion that was filed for travel expenses for Dr. Foster to come to Kansas City from Montana where he lives on October the 5th through October the 7th of 72001.
Q I believe your earlier memory was that Dr. Foster had seen him in the early parts of

October and I think this kind of documentary proof that your memory was correct in that regard?

A Yes.

Q And Dr. Foster was able to meet with your client, Mr. Nelson, correct?

A Yes.

Q Mr. Nelson and he were able to meet, it is my recollection, somewhere around nine hours?

A I do remember this pretty well because I was involved directly with it. I picked up Dr. Foster from the airport and took him to CCA, picked him up and took him back to his hotel. The first day he got here, I think he only had a chance to meet with Keith maybe an hour or so and that was I want to say Friday.

And I think he met with him for a good part of the day on Saturday. Perhaps you're right. I believe I have notes that reflect the times. Probably about seven or eight hours and then I took him back to the airport.

Q I'll show you what I have marked as Deposition Exhibit Number 61 and ask if you recognize and can describe that document?

A Yes, sir. It's Defendant's disclosure of penalty phase expert witnesses. It's a disclosure I prepared and filed on the 5th day of October 2001.
Q And we're kind of getting to it at this point. We're within a few weeks of the trial starting three or four weeks. These are the two expert witnesses, Dr. Cunningham is a mitigation expert or specialist, whatever you would like to call it, and Dr. Foster, the clinical psychologist that you've asked to do a forensic psychological interview?
A Evaluation.
Q Evaluation, thank you. I'll show you what has been marked as Government's Exhibit 62-A. Do you recognize that, Mr. Berrigan; and if so, what is it?
A Yes. It's an order signed by Judge Hays. It was filed on October the 10th of 2001, providing $15,000 in funds for mitigation investigator, $7500 for expert services, presumably Dr. Foster for the expert services and the 15,000 for Ms. Francis and her associates.
Q Thank you. I'm going to show you what's been

marked as 62-B. I only have one copy of this. And ask if you can identify that?
A This is a time sheet that I prepared dated Wednesday, October the 10th of 2001, regarding two telephone calls that I made between 11:10 and 11:30 with the independent examiner regarding mental defense and Lisa Dahl who is a jury consultant regarding strikes and Judge Gaitan's ten questions.
And I have a vague recollection that we had at least one or maybe more meetings with Judge Gaitan in preparation for the voir dire, that's probably what this refers to.
Q He conducts his voir dire in a fairly regimented fashion?
A I would agree.
Q Having gone through it. And he has his list of questions and you were potentially discussing whether those questions were appropriate or not or how to supplement them?
A I think the Judge may have even entertained submissions from the parties as to questions, but that's my recollection. The record, again, will probably speak for itself.
But anyway, we had discussions with

Judge Gaitan about the voir dire and I think I was talking to Lisa Dahl about that.

Q And also it indicates in this, there's a discussion in the Independence Examiner of the mental health defense. I assume that there was some significant litigation that Ms. Hunt kind of spearheaded in this case about pretrial publicity, the new changes, things of that nature?

A There was at least as much litigation on the issue regarding the change of venue as there was on the mental health evidence. Ms. Hunt absolutely spearheaded that, to use your term, yes.

MR. RUHNKE: This is your copy.

MR. VALENTI: I need the copy of that.

Q (By Mr. Valenti) Was this kind of emblematic or potentially the kind of calls you would receive from the press wanting to know what was going on in the case since it was coming to trial?

A I'll be perfectly honest, Mr. Valenti, not only do I not remember that call, I'm trying to envision in my mind why I would be speaking to

the Independence Examiner about that subject. So I can't -- I don't think I can answer that.

Usually we don't talk to the press pretrial that often. There are certainly exceptions and I am not one to take a rule that you never talk to them, but I don't recall that discussion at all.

Q I want to show you Deposition Exhibit 63 and ask if you recognize those notes?

A Yes, sir.

Q What do you recognize that?

A These are my handwritten notes regarding a visit with Keith Nelson at CCA on Monday, October the 15th of 2001, and what basically transpired during that visit. And then subsequently going to see Keith's girlfriend Kerri Dillon and interviewing her in her home in Kansas City, Kansas.

Q In the 8:25 to 8:35 section of your notation, Mr. Berrigan, you indicated that you also discussed today Government mental evaluation?

A Yes.

Q Is that correct?

A Yes.

Q Is it fair for me to conclude that what we're

talking about here is Dr. Dan Martell who I think was in Kansas City and was scheduled to do the neuropsychological portion of the evaluation that the Government had noticed up?
A I believe so. You will know better than I, but the Government I think was doing this evaluation in two steps, Dr. Martell and then Dr. Dietz, is my recollection, is how that was going to work.
Q Yes.
A I think this is the first one.
Q I don't believe Dr. Dietz ultimately ever traveled.
A No.
Q My piecing together of this could be wrong, but I think Dr. Martell came; ultimately Mr. Nelson did not meet with him and Dr. Dietz was supposed to come back, just didn't travel, no sense in paying a guy to travel to do nothing?
A Exactly. Yeah.
Q You indicate, then, at least on October 15th, on that day, that you and Mr. Nelson talked about what was to transpire?
A Right.
Q Did you instruct him, consistent with your

earlier stated position, that you didn't think he should participate in that evaluation?

A Yes.

Q Did Mr. Nelson understand that it was his decision to make that call?

A I don't know. I don't know this now. I mean, as you know from the record, the record will bare this out and we discussed it already a little bit with regard to Mr. Shoal, for example. Mr. Nelson didn't always get along with his lawyers and I mentioned that I thought he had a particularly good relationship with Ms. Hunt.

I also thought I had a very good relationship with Mr. Nelson and that's really not only a valuable thing to have in representing clients such as Mr. Nelson, but it's really a necessity; because if the client cannot trust you to make informed judgments about the path of their case when their life is literally on the line, then it's very difficult to represent them effectively.

And I felt like Mr. Nelson and I had that kind of relationship even though -- even at this point. You know, this is October the

15th so I had been representing him about eight months. I had a number of visits to visit him up at CCA and we had spent a good deal of time together. I liked him personally.

And, you know, this is just not an area the clients you would expect would have any knowledge about. They don't know what the repercussions are of participating or not participating in a government mental health evaluation. It's not within the sphere of their day-to-day experiences.

So how Mr. Nelson took my advice, I can't tell you. But what I can tell you without equivocation is it was very strong advice. I didn't -- I wasn't equivocal about this. This wasn't a close call in my mind.

I can't order Mr. Nelson to do anything, and I didn't order him to not participate in the evaluation. But I am confident that I made my feelings very clear to him.

Q And you took your representation very seriously?

A Yes.

Q This is what you do?

A That's right.
Q You're a professional, you've made it a significant portion of your life that these type of cases are important to you, because if they're not, there's no reason to put yourself through this given anybody's health conditions, right?
A That's why I'm doing this now.
Q Because you've gone back later in your career to a public defender position when you don't have to?
A No, not at all.
Q And it's not --
A It's --
Q -- the best paying job you've ever had?
A -- substantially better in the private practice, frankly, financially. But this is important work to me and I wouldn't minimize that.
Q And so you took your responsibility, as it pertains to representing, very seriously and you -- because you very strongly believe this was the wrong thing for him to do, advised him not to meet with Dr. Martell or Dr. Dietz or whomever was there?

A Right.
Q You knew the potential consequence of that failure?
A Yes.
Q The court had notified it up in Judge Hays' initial order, as we've talked about in that previous exhibit, about lack of compliance and what the potential sanction could be?
A Right.
Q And we'll go through it because there's subsequent conversations just three days later that you were before Judge Hays again and she was asking you about these issues and ultimately lead to more litigation and hearings before Judge Gaitan and whether you would or would not be able to present mitigation mental health evidence given Mr. Nelson's refusal to -- I won't submit -- but to comply I guess with the mental health evaluation the Government was trying to conduct?
A That's accurate.
Q Thank you. I'm going to show you what's been marked as Government's 64-A and 64-B. There is 64-A.
MR. VALENTI: And again, I apologize,

I only have one copy of 64-B, but I'll give it to you later. I think they're contextually related one to the other.

MR. RUHNKE: Sure.

Q (By Mr. Valenti) Can you identify the documents?

A Sure. If I could have just a minute.

Q Absolutely.

MR. RUHNKE: For the record, give us a date of this transcript.

MR. VALENTI: I apologize. Make sure I have it right. October 18th, 2001. And I'll represent it's a record of Judge Hays', subsequent to the mental health evaluation.

A Okay.

Q (By Mr. Valenti) Thank you.

A Sure.

Q What do you recognize -- first we'll talk about the transcript that I represent is on October 18th. Do you recall ten years later --

A Yes.

Q -- those kind of conversations you would have had before Magistrate Judge Hays?

A I do recall this conversation, yes.

Q And without reading it line for line, the

exhibit will speak for itself. What was this about?

A This is about Dr. Martell having appeared at the CCA to engage in psychological testing of Mr. Nelson and Mr. Nelson refusing to proceed with that.

Q Also there's a discussion of whether or not it would be worth anyone's while to have Dr. Dietz travel from California to kind of conduct the psychiatric side of the investigation?

A Yeah, the practical aspect of this is whether the Government would have to spend money flying Martell out essentially going through the same process.

MR. RUHNKE: You meant to say Dr. Dietz?

THE WITNESS: I'm sorry, Dr. Dietz, yes.

A Whether, you know, essentially taxpayer dollars would be wasted in flying Dr. Dietz out to Kansas City to go through the same experience Dr. Martell had at CCA.

So the Government is certainly interested in saving some time and money, and the Court is interested here obviously in

telling Mr. Nelson what the potential consequences of that decision are.

Q (By Mr. Valenti) Okay. And it's important, from my perspective, to make sure I understand that the Court then being Judge Hays is asking whether this is a position that Defendant has taken at your direction?

A Right.

Q At that point we're not in the post-conviction setting so you want to be certain circumspect about the conversations you've had or haven't had with your client, I certainly understand that.

As we look at it now, you've essentially said, Well, I don't really want to talk about strategic decisions or what conversations we've had, but he's not going to participate in the evaluation and we've discussed the potential consequences for failing to do so?

A Yeah. You know, this is fairly common thing that happens, judges want to make sure that lawyers aren't directing clients to do things that lawyers aren't supposed to do. It most frequently comes up in the context of

testifying at trial.

But Judge Hays understandably is concerned that there are consequences adverse to Mr. Nelson as a result of not participating in the examination and she wants to make sure he's aware of it.

Q And you recognize that those consequences -- your client was there in the courtroom when this discussion about what could happen to his mental health evidence was discussed?

A Yes, of course.

Q Ultimately the litigation that ensues is I think the Government and Mr. Miller just assumed that sanctions are automatic, whereas your position, Well, you said it may happen, you haven't said it will happen; and there is some more litigation that requires the Government to file a motion to say, Hey, the sanction should be that you can't do this, and that gets litigated before Judge Gaitan. Is that fair?

A Yeah. It's not automatic, we all know that.

Q Correct.

A Judge Gaitan makes the final decision, not Judge Hays. But I think it's also fair to say

that the expectation would be that Judge Gaitan would sustain Judge Hays' ruling in that regard.
Q And we'll go through it. But before he did that, he actually asked for you and your team to make an in-camera presentation on what material you intended to present and what the bases of the individual doctor's opinions were?
A I believe that's true. I don't have a specific recollection about it.
Q Take that one from you. Do you recognize the B part of that exhibit?
A It's a time sheet that I prepared concerning a 15-minute telephone conference with Susan Hunt on October the 17th of 2001. The subjects I noted are Keith avoiding court hearings, to mental issue three witness list.
Q What we're probably talking about here is in preparation for the hearing that we just talked about in the transcript on the A portion of the exhibit, most likely?
A You know, actually not. Keith avoiding court hearings. Mr. Nelson did not like to come to court and leave CCA. And I think there were more than one occasion he asked to be permitted

not to attend pretrial hearings in front of
both Hays and Judge Gaitan.
Q And Judge Gaitan is someone who will take that
up as well, make sure that your client
understands what it means to intentionally
absent himself from these hearings?
A Yes.
Q I think that's the position he maintains to
this day, he doesn't like coming to hearings?
A Right. And that's not -- I've had other
clients take the same position. The mental
issue -- if that's what you're referring to?
Q I was referring mostly to the mental issue.
A -- my answer would be probably that's what we
were talking about.
Q Okay.
A I don't know.
Q Government's Exhibit 65, very briefly, look at
those deposition exhibits and see if you can
identify that for me, please?
A Yes, sir. This is a document I prepared
titled, "Supplemental Response Regarding
Defendant's Mental Health Evidence," that was
filed with the court I believe on about October
the 18th of 2001, supplementing an earlier

pleading that the defense had filed.
Q This indicates that the Defendant -- an expert will allege that Defendant suffers from pervasive developmental disorder, not otherwise specified as that, a consequence of the evaluation Dr. Foster had done in early October?
A Presumably because there wasn't any other evaluation so I would suspect that's true.
Q Deposition Exhibit 66, I'll represent to you is the transcript of the proceedings that occurred on October 23rd before Judge Gaitan on a variety of issues and getting ready for trial which is about a week away at this point.
If you look at page 7, rather than have you read the whole thing, I'm kind of referring you to Judge Gaitan addressing, as far as I can tell, the mental health sanction if there should be one and where we're at on that issue.
A That comes up at the bottom of page 7.
Q On page 7, and contains the next few pages wherein you say kind of what we said here: Well, it's correct that there's an appeal of that pending; it's incorrect that the sanction

automatically ensues. We need -- the
Government has to ask before you actually do
it?
A That's right.
Q The Government of course agrees, it will file a
motion and ultimately does file a motion to
have that sanction imposed?
A Yes.
Q Thank you very much. Deposition Exhibit 67
very quickly. Do you recognize that document,
sir; if so, what is it?
A Yes, this is the plea agreement pursuant to
which Keith Nelson enters his guilt plea in
this case.
Q That occurred on October 25th of 2001?
A Yes, sir.
Q Which was a few days after that last hearing
but a few days before this trial was scheduled
to commence?
A That's right.
Q And he ultimately pled get to one of the two
counts; is that correct?
A Right.
Q That was to Count I, whereas Count II was
dismissed?

A Right.
Q Deposition Exhibit 68. What do you recognize that to be, Mr. Berrigan?
A This is an appeal.
Q You know what --
A I think we've covered this, haven't we?
Q Yes, we did. The order is attached if you go two pages, will be --
A I see it.
Q I apologize.
A That's all right. It's about halfway through.
Q Halfway through document 340 portion of the exhibit is where the order actually comes through.
A Yes. This was attached to the other exhibit as well. But specifically this is Judge Gaitan's order upholding essentially Judge Hays' position regarding the additional peremptory challenges which was denied at the appeal of the order from Judge Hays granting in part, denying in part the Government's motion for discovery of mental health evidence.
Q Some of the case law that the Court relied upon, and continues to rely upon because it's a fairly small body of law in these issues as

they mature, was that Allen case out of St. Louis; is that correct?
A Yes, I believe so.
Q I think you were fairly familiar with it. I mean, we've cited it recently, you and I, before the Court?
A Yes.
Q Did you work on that Allen case?
A No, but I am familiar. I believe that decision was from Judge Webber, Richard Webber, and I'm very familiar with Judge Webber.
Q Okay. And I believe that Ms. Herndon had some involvement in that; is that correct?
A In the Allen case?
Q Yes.
A That may be true. I honestly don't know.
Q We didn't cover this but we did with her, you and Ms. Herndon are friends?
A Yes.
Q And ultimately she is the attorney that takes over for you in the appellate portion of this case; is that right?
A That's right.
Q Did you ask her to get involved or did you have anything to do with it or how did that happen;

do you know?
A I honestly don't recall.
Q She's someone you have regard for?
A High regard.
Q And friendship for?
A Yes.
Q Okay.
A I mean, just not to mislead you --
Q Yeah.
A -- we're good friends and I have a very high regard for her legal abilities as well.
Q Okay. Exhibit 69, and you'll have to forgive me this has been copied with a couple of notes on it, but there's nothing in there other than correspondence file where it came from.
Do you recognize that exhibit?
A Yes. This is a letter I sent to -- a copy of a letter that I sent to Dr. Cunningham. I'm not sure why it's not signed, but it's dated October the 26th of 2001.
Q So this has taken place after Mr. Nelson has pled guilt?
A Yes.
Q And it's in anticipation of the penalty phase presentation that is scheduled to commence --

at this point, you're probably going to start on the trial date of the 29th; is that correct?
A I honestly don't know. It was a change in the schedule. I know there was a change in the schedule after Keith's suicide attempt, but I don't -- at this point I'm not sure what the schedule was.
Q Well, and, you know what, I'm going to represent to you it has to have changed, now that I read your notes, because you wouldn't be asking him to fly in on the 13th --
A Right.
Q -- for a presentation if there was no way it was going to --
A Yeah.
Q So clearly you did get some time --
A Yes.
Q -- as a consequence of the plea of guilty?
A There was apparently a change in the schedule.
Q This is before Mr. Nelson has attempted suicide which also altered the schedule somewhat also?
A Yes. And I don't remember the specific date of the suicide attempt, but I think --
Q I believe it was the 28th.
A 28th.

MR. RUHNKE: Just maybe for clarification, the date would make sense even if you're starting on the 29th because the Government doesn't --

MR. VALENTI: I think, to be clear, I think that once the plea of guilty occurred, we only went three days.

THE WITNESS: Well, part -- I do recall this, that Judge Gaitan had other matters in his schedule that prevented us from you know, sort of a traditional practice which is start the trial and continue thereon until finished so we had this kind of unusual schedule where we went two or three days and then there was time off and we resumed, and I don't remember if that was the result of --

Q (By Mr. Valenti) That's true, Veteran's holiday, not that it doesn't, but for our purposes it doesn't candidly matter and ultimately the schedule is altered as a consequence of other factors?

A Right.

Q And then Thanksgiving?

A Right.

Q But we'll cut to Deposition Exhibit 71 and ask

if you recognize that document; and if so, what do you recognize it to be?
A This is an ex parte motion that Ms. Hunt prepared or filed October the 29th, requesting funds for Dr. Cunningham to travel from Texas to Kansas City to testify in Mr. Nelson's case.
Q Of course he ultimately is your penultimate mitigation or penalty phase witness in this case, correct?
A He was the only expert witness to testify on behalf of the defense.
Q Deposition Exhibit 74 is a transcript from October 29th, 2001, before Judge Gaitan and this is essentially, as I would relate, when you start dealing with how you're going to progress forward on the penalty phase now that Mr. Nelson has attempted suicide.
A It appears we're asking for a continuance for 60 days so that Mr. Nelson who has just attempted suicide the preceding day can be evaluated and receive appropriate mental health treatment before any effort to resume the trial.
Q I'll go through these documents pretty quickly, but I think it might be more useful for us to

have a conversation about it.

Once it became known to the parties through I think a letter from CCA or a note from CCA that Mr. Nelson attempted suicide, a whole lot is happening in a fairly compressed time frame; would that be fair?

A Yes.

Q And a lot of which, we don't have a lot of information before us. So at the time you're before Judge Gaitan, literally you think you're showing up for a hearing that morning and then instead you find this out from CCA; am I right in that?

A You know, I wish I could tell you exactly how I found out, but I don't remember.

Q But you immediately then ask for a 60-day request to continue the case so you can try to determine what the heck is going on?

A Right.

Q And also to have a mental competency evaluation conducted of your client as it relates to can he assist the defense going forward, does he know what's going on around him, can he be a meaningful -- I guess it's under 4241, or whatever the statute is, whether he can

progress forward?
A Right. The usual criteria for competency to proceed.
Q As this goes on while your motions are pending, the motions are here and we'll talk about them, the court kind of comes up with its own policy where it reaches out to probation and parole and finds Dr. Logan --
A Right.
Q -- who is a local individual that is someone you hold in regard professionally?
A Yes. Dr. William Logan.
Q Dr. Bill Logan. And determines whether or not Dr. Logan can ultimately meet with the client kind of in a jury room setting to determine whether or not Mr. Nelson does suffer from a mental disease or defect sufficient to not allow him to proceed to the penalty phase portion of the trial?
A That's what the Judge decided.
Q You know Dr. Logan?
A Yes.
Q And you've indicated before that you held him professionally in regard locally?
A Yes.

Q And if this was going to happen in this particular way, you would prefer time, quite frankly, based upon the motions you filed. But if the Judge was going to employ this, at least he was someone that you felt strongly about juxtaposed to the situation where the Government's mental health witnesses, Dr. Martell and Dr. Dietz, whom you did not hold in high professional regard?

A To the extent you're suggesting I didn't have a problem with Dr. Logan, that's true.

Q Okay.

A I had a serious problem with the manner in which this evaluation took place which was a little drive-by evaluation that took place in the courthouse. It was ridiculous. And not, in my view, sufficient to the purpose.

But having said that, I have no qualms about Dr. Logan's qualifications. He's one of only three, at that time at least, board certified forensic psychiatrists in the State of Missouri. I've used him on a number of different occasions. I have a very high regard for him.

Q To your knowledge, did Mr. Nelson agree to meet

with Dr. Logan at the Court's request?
A I'm sure he spoke to him. He didn't refuse to meet him. What Mr. Nelson's condition was at that time, I can't honestly tell you. I had met with his doctors up in Leavenworth. It was a real debate.
The Government was alleging, contrary to your questions here, that this was not a suicide attempt at all. That this was a feigned attempt that Mr. Nelson was engaging in to somehow attempt to escape. That was the official Government position.
Q And I understand, and I'm not trying to quibble with my previous bosses who are no longer here whether it was or it wasn't. And if I'm the trial counsel, I might have a different position.
A Right.
Q It is what it is. Nonetheless, a significant -- something happened at CCA?
A Right.
Q You wanted time to try to get to the bottom of it?
A I only mention that, Mr. Valenti, because I wasn't privy with the discussions Mr. Nelson

had with Dr. Logan. I don't know what Mr. Nelson's physical or mental condition was during the meetings and what kind of exchange they really had.

I mean, that -- obviously Dr. Logan filed a report with the Court and came to his determination that Mr. Nelson was competent, but I really wasn't privilege to that evaluation while it was going on.

Q And fairly, Dr. Logan ultimately gave an oral report I think in a courtroom setting on what he thought was going on with Mr. Nelson's mental condition with the caveat that there were some records that he would have preferred to have had before he was asked to do this, but since the Court had put him on the spot, this is what he would say?

A Yes, that's right.

Q And for almost like a match, meaning almost like a meatball surgery type thing, this was not what you wanted, you wanted more time; in fact, you asked for more time and that was the 60 days?

A Dr. Logan acceded to the demands of the Court that this be conducted, as much as I had

acceded to Judge Hays' requirement that we get one continuance and no more. I thought it was a mistake then, I think it's a mistake now. But that's exactly what happened. You've got it exactly right.

Q Thank you. Let me show you a number of exhibits that are kind of documentary of what we've talked about and I'm going to go shortly through them.

This is Deposition Exhibit 75, ask if you recognize it and identify it for the record?

A It looks like an e-mail from Dick Burr to myself and Susan Hunt. And if I could just look at this because I haven't seen this in a long time.

Q This looks to me that this was some research and efforts made when you're trying to litigate the sanction that should be imposed for the failure to submit to the Government mental compaction. Does that seem correct?

A You know, it looks to me at first blush, and you may know who Dick Burr is, but Richard Burr is one of the preeminent death penalty attorneys in the country, along with these

other individuals that are mentioned in the e-mail, Kevin McNally, Margaret O'Donnell, Judy Clark, and so I think there was maybe a phone call, maybe even an e-mail that we sent to Dick asking for some advice and it looks like he then spoke to some other individuals in the death penalty community and then responded to us. That's what it looks like to me.

MR. RUHNKE: Just an observation, the stuff attached to it does not seem to be all relevant, it has Ted Kaczynski and the handwritten note doesn't seem to relate at all to the --

MR. VALENTI: No. And I can't tell you why it's there at this time other than it is and I didn't want to take it off, but I think it had something to do with some research.

A Yeah. And I was only referring to the cover page, but I guess I should -- I don't -- I don't remember the second page at all. I mean, we're all aware of who Ted Kaczynski. Ted Kaczynski is the unabomer.

And then this last thing is a note I believe from a law clerk Andrew, probably in

response to something I asked him to do.
Q (By Mr. Valenti) Deposition Exhibit 76. Do you recognize that, Mr. Berrigan?
A It's an application for a continuance that I prepared on behalf of Mr. Nelson and was filed.
Q This request for continuance is in direct response to the would-be suicide attempt?
A Right.
Q Not because of your health condition or because of the mitigation investigation --
A No.
Q -- needing more time, but simply because of that condition, correct, your client's situation?
A That's right.
Q Okay. Thank you. Deposition Exhibit 77 I believe is the corresponding motion filed by your client's suicide attempt?
A It's titled, "Motion to Determine Mental Competency to Proceed to Trial," and is my signature and it was filed on August the 31st. So yes, this is also part of the litigation that was going on after Mr. Nelson's suicide.
Q Fair for me to say, then, that these two motions essentially laid out your preferred

method of proceeding in light of that suicide attempt rather than what the Court ultimately chose to do?
A Yes.
Q Deposition Exhibit 78, I'll submit to you is a transcript of a teleconference that occurred on October 31st, with the parties again in response to the suicide attempt of your client and how to proceed?
A It appears this is what this is about.
Q And I'll direct your attention to page 11 of that transcript, if I may. Mr. Miller has argued on our part that your client's unwillingness to cooperate is kind of indicative of his essential position to absent himself from the proceedings, and he kind of looked at the suicide attempt as another effort along that line, I believe.
Your response was: Well, that's just not true. He has been active in his participation and preparation to the point that the suicide attempt occurred.
And then you acknowledge that he has complained ferociously when his lawyers have not lived up to the expectations. We've kind

of seen that in the record with Mr. Shoal's situation before; is that right?
A Yeah. And to be fair to Mr. Nelson, I think that was the last time you saw it. I don't know of any complaints that he filed with the court during the time I was on the case with -- at least not that I became aware of.
Q Later on in the proceedings, or the Court is talking about what, if any, type of doctor we can get in to talk to him and the Court asks you at the bottom of the page at 14: Are you suggesting that he would talk to someone who is not affiliated with CCA?
And I believe you say: Well, there's at least a possibility of that.
And I think you're acknowledging what we've talked about previously that he is circumspect regardless of what the motive may be or not be of the people at CCA, he didn't want to meet with those medical professionals?
A Could I just read this very quickly --
Q You certainly may. Of course.
A -- to answer your question?
Okay. My recollection of this situation was that after Mr. Nelson attempted

suicide, he was taken to the local hospital in Leavenworth, and part of his treatment was that he saw a psychiatrist there.

Now, my recollection is that there were two psychiatrists involved, one from the hospital and then there was also a psychiatrist at CCA that may have been Dr. Fadare or somebody associated with the institution, had a contract with the institution.

And so Judge Gaitan apparently, consistent with his goal of getting this case going, had ordered unbeknownst to me until this hearing, a psychiatrist to speak to Mr. Nelson that very afternoon, and this discussion has to do with who that psychiatrist is.

Q Okay.

A If it's somebody from CCA, particularly people we've already complained about, and, keep in mind, at least my recollection is that CCA, at least some individuals at CCA were buying into this theory the Government was propounding, that this was not a genuine suicide attempt but an attempt to escape, which was ludicrous, but that was their position.

And there was people at CCA that was

willing to testify about that, presented that account. We had a great deal of skepticism about an honest psychiatric evaluation of Mr. Nelson with anybody connected with that institution. So that's one of the concerns I think that's being expressed here. It wasn't likely that Mr. Nelson was going to be talking to a psychiatrist or psychologist from CCA after having attempted suicide.
Q Okay. And the reason I ask is that's kind of consistent with some of the position that he had, he felt adversarial to the folks at CCA given the number of witnesses that were going to come in.
And I think you correctly say that, and I want to -- maybe I'm wrong, but my recollection is Dr. Park, Senior, perhaps is one of the people you spoke to and Dr. Hucke and Dr. Whitlow were two doctors that I think were ultimately --
A Dr. Whitlow, it's my recollection, was associated with the hospital, whatever that hospital was in Leavenworth. And, you know, I spoke to Dr. Whitlow personally. I think I saw him up at the hospital and the account that he

gave was entirely inconsistent with a fake suicide attempt. He genuinely thought that Keith had tried to kill himself and was extremely depressed.

But, you know, I don't know who the judge was talking about here regarding who was supposed to do this evaluation of Mr. Nelson. We had no input on that whatsoever.

I don't think I even knew that was happening until he tells us after the fact that he's already ordered someone over to do it.

Q And it seems like you're explaining to the Court on the record: He has no fond regard for these people.

I think your words are --

A At CCA?

Q Yeah, CCA.

A There were a half a dozen witnesses from CCA testifying against him. And there were people that testified for him as well, but I don't particularly -- you know, these are prison psychiatrists and psychologists and generally consistent with the experience here, they're not well thought of as a general rule by the inmates that are in these institutions because

they know who's paying them.
Q And I'm extrapolating here, but tell me if I'm doing this correctly, that though you may have objected and did so object, you were filing motions to the Court's proposed procedure, ultimately settles on Dr. Logan, at least he had settled on an individual with whom you had regard and you weren't dealing with the CCA or the Government-sponsored doctor?
A Yeah. But I think we should both acknowledge, I don't think the Judge -- the Judge picked Dr. Logan without input from me.
Q Absolutely. You didn't have input.
A None at all.
Q The record is clear, this was the Judge pursuing this doctor through a recommendation he got from the United States Probation and Parole. And somewhat fortuitously from your perspective, at least if this was going to be on this path, it was a doctor with whom you had at least professional trust?
A Yes. That's true.
Q Deposition Exhibit 79, I'll show you that. It is an order I believe from October 31st which the Court sets hearings on how to proceed.

Does that seem right?
A Yes.
Q Thank you. Deposition Exhibit 80, ask if you can recognize and identify that document, please.
A This is a letter that I prepared and faxed to Dr. Sam Hucke, in Independence, Missouri.
Q Who is Dr. Hucke?
A That's a good question. Let me take a look at this and I'll see if I can answer that. Short answer is that I don't know Dr. Hucke and I'm not sure how I got his name to be sending him a letter other than apparently he had spoken to Dr. Whitlow so he may have been a consultant when Keith was taken to the hospital in Leavenworth.
If that's not the case, I can't honestly tell you anything about the guy.
Q At this point you don't have any real independent recollection other than it's obvious from the letter that somehow he observed your client?
A I don't know if he has observed him or if he's going to. I don't recollect that at all. I have a complete lack of memory regarding

Dr. Hucke.
Q He either has had contact or is planning something?
A Something. He's connected with Dr. Whitlow somehow, is all I can tell you.
Q Show you Government's Exhibit 81 and ask if you can identify that series of documents?
A This is a letter -- the first two -- the first page is a fax cover sheet that I'm sending Susan Hunt a copy of the letter that follows from Dr. Whitlow that we've already spoken about briefly. He treated Keith Nelson at St. John Hospital in Leavenworth, Kansas, and he's the gentleman that I met with at St. John's after Keith's suicide attempt.
And I did, after speaking with him, ask him to write a letter to Judge Gaitan regarding his treatment and observations regarding Keith.
It looks like I also faxed this letter to Dr. Hucke, or had it faxed to him by my secretary, presumably to Dr. Hucke that his evaluation of Keith, that that was to take place.
Q Thank you. To your knowledge, did Dr. Hucke

ever evaluate Mr. Nelson?
A I honestly don't know.
Q Can't say that we've seen in the records that he has. Maybe we just haven't got through them all.
A Yeah.
Q Maybe Dr. Logan preempted that.
A I don't know.
Q Deposition Exhibit 82, very briefly, I'll represent to you is the Government's and opposition to determine competency in this case. Does that sound correct to you?
A That's what it looks like.
Q Deposition Exhibit 83, can you identify that for me, sir?
A This is a document titled, "Motion to File Medical Records under Seal," and it's a document I prepared. It's dated November the 1st, 2001, so presumably this had something to do with medical records obtained after Mr. Nelson's suicide attempt.
Q I believe in your earlier letter to Dr. Hucke, you've indicated that whatever was provided you want it under seal to comply with patient confidentiality?

A That would be normal procedure.
Q Deposition Exhibit 84, similarly, if you can identify that, please? To shorten things up, if I can, I believe this is a letter that you had previously provided to Judge Gaitan, rather a fax provided by Dr. Whitlow via mail with corresponding medical records that you're attempting to seal the previous motion.
A I think these are all medical records with the possible exception of what would be the third page of the document, Dr. Fadare's one-page report. I suspect that he saw Keith at CCA as opposed to in the hospital setting, although I can't be sure of that. Dr. Fadare says they spoke for a brief period of time.
And then you can see that Mr. Nelson tells Dr. Fadare, My lawyer says not to talk to any shrink. I'm sure he was talking about me as opposed to Ms. Hunt.
Dr. Fadare apparently thought it was a genuine suicide as well, and I say that only because of his note at the bottom of the page that he is of the opinion that Mr. Nelson make another suicide attempt soon.
Q Deposition Exhibit 85, I'll represent to you

that that is a transcript of a phone conference wherein I believe Judge Gaitan is kind of laying out what I'm referring to as the Logan procedure in determining -- or getting some advice on how to determine Mr. Nelson's competency to proceed?
A That's what it appears to be.
Q Would that be, sir, the first time you learned of the Judge Gaitan's plan with Dr. Logan?
A I believe so, yes, sir.
Q Thank you. Deposition Exhibit 86, can you identify those notes, please?
A These are my handwritten notes, at least the first five pages are. And then there's a two-page memo, typewritten memo that I prepared regarding a telephone conversation with Dr. Logan on November the 6th.
And then there's a two-page memo that I prepared, typed memo regarding a telephone call with Roger Moore, also dated November the 6th of 2001.
Q It seems that these are notes and transcriptions of notes in preparation for the hearing on the Court's order previously regarding the competency. Does that sound

about right?
A That looks about right.
Q And I believe Assistant Warden Moore was going to be a Government witness taking the position that he was feigning a suicide attempt or trying to delay the court proceedings?
A If I could just look at this briefly, I'll try to answer your question.
Yes. Assistant Warden Moore claimed that Mr. Nelson essentially was fine, that he had been joking around and that he perhaps attempted to commit suicide but he did that for purposes of delaying the trial.
Q Correct. As I look at the notes, it appears that the other portion that is contained therein is you're talking to Dr. Logan in anticipation of a hearing to try to provide him whatever information you can to make the assessment he's doing, limited as you think it may be, as meaningful as possible; is that correct?
A If I could just have a second to look at these notes. I don't recall these. It's been so long ago.
To answer your question, that's part

of the memo. This memo actually deals with a couple of different subjects, but part of it is providing information to Dr. Logan to aid him in his evaluation of Mr. Nelson.
Q In paragraph 3 of the typed portion of the memorandum, you indicate that you weren't pleased with the two-hour procedure that the Court had proposed, or however long it was going to take, correct?
A Yes.
Q We've talked about that's why you filed a request for an additional 60 days?
A Yes.
Q You indicated that you thought that he would probably be found competent, at least that was your opinion?
A Yes, that's right.
Q You were hopeful that the Court would take more time to at least give you another week; is that right?
A At a minimum.
Q Do you recall why you were looking for a week?
A Well, I didn't think Judge Gaitan would realistically give us more time. He was going to get this case going come hell or high water.

A week would be the best we could get.
Q You also indicate that you didn't want him to go off to Springfield, which is somewhere that he could go for an evaluation. And I assume that that would present some of the similar problems with him submitting to those evaluations because it's still going to be a Government facility?
A No. Actually, and as I read this, I think to the uneducated reader this could be a little misleading and I want to explain it to you.
Q Okay.
A What I wrote was: We do not want Keith going off to Springfield for a month long evaluation which would result in the trial date being pushed back to January.
I didn't want him going off to Springfield because I didn't want him going off to Springfield. It didn't have anything to do with your Government doctors down there or anything like that.
We needed him to be close for a number of reasons. And frankly, this wasn't a situation where we thought he was going to receive any quote/unquote treatment. He didn't

get any treatment as a result of his suicide attempt. None at all. And that wasn't at this point the goal.

So my concern was I didn't really want him to leave town, not so much whether it was Springfield or anywhere else.

Q Okay. And the only reason I ask that is because there's been a history with CCA and, understandably, I'm not trying to quibble with that, that he had wanted to meet with the institution provided medical professionals in whatever role they may have. He didn't want to meet with the mental health professionals the Government presented, and you've explained that ad nauseam, I don't need to go through that, and I just assumed that maybe Springfield would have been a similar concern?

A No. And to be candid, I think that sort of misstates our position.

Q Okay.

A He had problems with the CCA people for a specific reason. He didn't like them. He knew who they were. It was not like he had never met these guys.

They had a reputation in the

facility, it wasn't good. None of these guys were fond of Dr. Fadare or his colleagues. They were Government guys, they weren't objective, they weren't pretending to be objective. They work for the Government, or CCA which is essentially an arm of the Government.

And that was the position, not just of Mr. Nelson, but largely the position of any inmate at CCA. You can take a poll. He didn't want to have an evaluation by the folks Martell and Dietz because I didn't want him to have an evaluation by Park Dietz or Dan Martell, so that was specific to them as well --

Q Okay.

A -- and the legal consequences of that and what would happen at the trial.

So this is not -- this idea that, you know, we don't want to go to Springfield because there are Government guys down there, that's not true.

Q I'm not trying to suggest your note says that.

A No, I know that.

Q I'm just asking if that would have been a concern.

A Yeah, right.
Q If that was one of the reasons you say that, because the next part of the sentence is: Which would result in the trial being pushed back to January.
Was there a concern about the trial being pushed back to January?
A The notes don't suggest that. The question suggested that which is why I can't answer it.
No. If the trial is pushed back to January, that's my, you know, 60 days. I mean, I was asking -- I only asked for 60 days.
Q Okay.
A So if it got pushed back to January, I'm fine with that. I don't know why I put: Which would result in the trial -- I'm not worried about the trial being pushed back to January. I want it pushed back to January, but I don't want him in Springfield. I didn't want that at all.
Q You want time, but you want time with him accessible to you?
A We need him there, yeah. That's the only way this works with Keith is if he's close by.
Q I understand. Thank you. Deposition Exhibit

87, what do you recognize that to be?
A Well, this is an order from the District Court Judge Gaitan, signed December 7, 2001, concerning the competency assessment of Keith Nelson that's going to be conducted by Dr. Logan and the specific questions the Court is asking Dr. Logan to answer.
Q Essentially this is the Court's documentation of how he intends to proceed consistent with the earlier telephone conference you had on this matter?
A Yes, sir.
MR. RUHNKE: I see you reaching for that last folder.
Q (By Mr. Valenti) Deposition Exhibit 88, transcription of a hearing that occurred on November 7th, 2001, I believe the mental competency evaluation proceedings involving Dr. Logan where he gives kind of his oral report?
A Yes, sir. It looks like there are additional witnesses.
Q Roger Moore being one we discussed earlier from your notes; is that correct?
A Yes, sir.

Q Thank you. I would say Government's Exhibit 89 is a companion to that hearing which was one that occurred in the courtroom and this is one that instead occurred in Judge Gaitan's jury room where Dr. Logan kind of made the -- I would assume the more official report and he was subjected to examination in the courtroom later?
A Yes. I think that's the procedure. You know, these aren't -- they're not timed and I don't really have a specific recollection of that, but that sounds right to me.
Q Okay. Thank you. Deposition Exhibit 90, do you recognize that document; if so, what do you recognize it to be?
A It's titled "Order." It concerns the Defendant's motion to determine mental competency and application for continuance. It's filed November the 8th of 2001. It's 13 pages and it's signed by Judge Gaitan. In that he denied both the motion by the defense to determine competency to proceed to trial and the application for continuance sets the jury selection to commence on Tuesday, November the 13th, at 8:00 o'clock.

Q That order is some 13 pages and Dr. Logan's assessment is one of the factors that he considers; is that correct?
A Yes.
Q And there were others as well, no need to go through them at this point, but the Court considered other factors?
A Undoubtedly.
Q Deposition Exhibit 91, ask you if you recognize those documents?
A This is -- the first page is a letter dated November the 8th that I sent to Dr. Logan by fax, sending him an authorization to speak to Dr. Fadare, F-a-d-a-r-e, the CCA psychiatrist. This has to do with an attempt to get Mr. Nelson off of suicide watch.
Q What was the significance of that, if I may ask?
A Well, suicide watch at CCA, like many institutions, involves the institution taking away from the inmate any object, any object they could use to hurt themselves. And so they're put in paper gowns instead of regular clothes. Frequently mattresses are taken away or certainly not provided a normal bed.

They're isolated from all other inmates and it's a very bleak, sterile environment.

It's tantamount to punishment, frankly, but ostensibly the concern is that the inmate not have the means to hurt themselves.

So it's not a situation most inmates would like to be in and Mr. Nelson was no exception to that. He wanted to get off of suicide watch. We were asking for Dr. Logan's assistance. That would be Dr. Fadare's decision as to whether or not Mr. Nelson needed to be kept there.

Q Essentially the quality of life effort on your part on your client's behalf?

A Yes, that's right.

Q Deposition Exhibit 92, ask you to identify that document, please?

A This is a letter that I mailed and faxed to Lisa Murphy and Tena Francis. It's dated November the 9th of 2001, and it concerns efforts to contact some of our potential mitigation witnesses so that these ladies can be interviewed.

In particular I think this is regarding videotaped interviews that might be

available for trial if the witnesses aren't going to be able to personally appear and testify.

Q These were former -- or going to be mitigation witnesses?

A I have a vague recollection that those ladies, one or more of them, were very elderly and either unable or unwilling to travel, and so we were trying to have a back-up plan if they weren't able to come to court.

Q Deposition Exhibit 93, ask you if you can identify that, please?

A This is a letter that I mailed to Tim Murphy who is the private investigator regarding the CCA guards that I wanted Mr. Murphy to interview to see whether that might be potentially mitigation witnesses.

Q Kind of the opposite side of the Government witnesses that were presented, any future danger concern, how he maintained himself while in custody?

A Right. I think, it's my recollection is we did call some -- we call them skipper evidence witnesses that evidence of a client's good behavior while in prison is a mitigating

circumstance that a jury is eligible to consider.
Q At least an Officer Lister, off the top of my head, testified. I can't recall the other ones.
A That actually -- you know, I know the Government called Fred Lawrence, but I really thought he provided some helpful testimony I think in cross-examination for Mr. Nelson.
Q Deposition Exhibit 94, please identify that.
A This is a letter to Judge Gaitan that I signed and faxed, dated November the 9th of 2001, and it looks like I'm asking the Court to have an extension to file a response to the Government's motion to strike mental health testimony which probably was due on November the 9th. I'm asking for an extension to November the 12th. So this is on a Friday and I'm asking for an extension until Monday to file a pleading.
Q And we've talked about it, but essentially what we're talking about here now is before the Court has ruled on whether there is any sanction to be imposed for Mr. Nelson's failure to comply with the Government examination,

we're getting to the point where the Court is asking you to make an in-camera presentation to help guide its decision on that basis?
A Yeah, that letter itself doesn't suggest it's in-camera, and I honestly don't know.
Q I don't think that's happened yet. We're coming to that.
A I think he's asking for a pleading.
Q Correct. He's asking for a pleading that ultimately matures into --
A The Government has asked to strike the testimony and he wants a response in writing.
Q Deposition Exhibit 95, what is that, sir?
A This is a five-page document titled, "Defendant's Response to Government's Motion to Bar Defendant from Presenting Mental Health Evidence." So this is the document or the pleading that was referenced in the earlier exhibit that looks like he must have given me until the 13th instead of the 12th because that's the date I signed it.
Q Okay. Deposition Exhibit Number 96, what do you recognize that to be?
A This is a three-page document titled, "Second Amended Notice of Defendant's Mitigation

Witnesses," that I signed, it was probably filed on November the 14th of 2001.
Q One of the witnesses you had listed there was Dr. Mark Bennett?
A Yes.
Q Or excuse me, Thomas Bennett. What was Dr. Bennett's role?
A I don't remember.
MR. RUHNKE: Would it help you if you saw "forensic pathologist" on it?
A Oh, sure. It was -- there was an issue regarding whether or not Pamela Butler had been raped and the condition of her hymen, and I think I had not spoken to Dr. Bennett but I know Susan had extensive discussions with him and I think he was available to provide testimony in that regard.
Sorry about that. I had forgotten about that.
Q (By Mr. Valenti) That's okay. Deposition Exhibit 97, do you recognize that document, sir; if so, what is it?
A It's titled, "Government's Reply to Defendant's Response to Government's Motion to Bar Defendant from Presenting Mental Health

Evidence," so this is a continuation of the pleadings regarding what's going to happen as a result of the failure of the defense to comply with the Government's mental health evaluation.
Q Thank you, sir. Deposition Exhibit 98, what is that?
A This document is about four pages long. It's an order from Judge Gaitan, signed November the 15th of 2001, wherein he sustains the -- no, I'm sorry, I withdraw that response.
Apparently he is asking now for an in-camera inspection of what mental health testimony the defense intends to present if permitted to do that. And he indicates that should be done by noon on Friday, November the 16th so essentially the next day.
And there's also a ruling on a couple of other issues, motion for disclosure of exculpatory evidence and change of venue. Those were denied.
Q Deposition Exhibit Number 99, do you recognize that letter?
A Yes, sir.
Q What do you recognize it to be?
A Exhibit 99 is a two-page letter, dated November

the 16th of 2001, to Judge Gaitan that I prepared and submitted, and it appears to be the outline of the mental health evidence that Mr. Nelson's defense team would present in the penalty phase of his trial if permitted to do so by the Court.

Q And essentially lines out the two mitigation expert witnesses that are remaining in the case; at this point that being Dr. Cunningham and Dr. Foster, correct?

A It does. And I see that looking at this letter that I may have misspoke earlier regarding Dr. Cunningham visiting with Mr. Nelson because I specifically mentioned in italics that Dr. Cunningham's testimony is not based on interviews with Mr. Nelson. So perhaps I misspoke earlier if I suggested that he had. I don't see --

Q And I'm not trying to play tricks. I think Dr. Cunningham, from what I can tell, has probably met Mr. Nelson, but I don't think he interviewed him in a clinical or forensic setting. I think he's simply background.

A I don't recall. I apologize.

Q It's not --

A Okay.
Q I'm not going down that path.
MR. RUHNKE: There may be other aspects to it, but just --
Q (By Mr. Valenti) There may be other aspects to it. But for right now, I'm not concerned about that.
A Okay.
Q For that purpose, Dr. Foster's testimony, you said you had -- it essentially was going to be the foundation of what was going to be his interview with Mr. Nelson?
A Yes. A substantial portion of that evaluation was the interview with Mr. Nelson.
Q Deposition Exhibit Number 100, ask if you recognize that, please?
A This is a letter to Mr. Sean, S-e-a-n, O'Brien, O-B-r-i-e-n, at that time who was the director of the Public Interest Litigation Clinic which is a group of lawyers that did death penalty post-conviction work.
Q Essentially looking for some help on some issues as it relates to jurors and their views on the death penalty?
A Yeah, that's what it looks like. I guess that

speaks for itself.

Q Deposition Exhibit Number 101, ask if you can identify that document, please?

A Yes, sir. This is an order from Judge Gaitan. It's five pages having to do with the Government's -- I think this is a misprint. It says, "Defendant's Motion to Bar Defendant from Presenting Mental Health Evidence," but I'm confident we didn't file such a motion.

So I think this is a ruling on the Government's motion to bar defendant from presenting mental health evidence and Judge Gaitan granted it in part and denied it in part.

Q Take home point being Dr. Cunningham was going to be allowed to testify given the foundation of his testimony was kind of a social background of the Nelson family, whereas Dr. Foster was not going to be allowed to testify given the foundation of his opinion was through an interview?

A That appears to be accurate.

Q I believe Dr. Foster, though not allowed to testify by this order, did present a report that you ultimately prepared and gave to the

Court in an offer of proof; is that correct?
A That's right.
Q Deposition Exhibit 102, can you identify that document, if you could?
A This is a Defense Notice of Mitigating Circumstances that was filed November 19th of 2001.
Q And of course it would be the circumstances that you would try to prove by preponderance of the evidence in support of your position that a sentence to death was not appropriate and instead a sentence of life was?
A Yeah. As you know, that list is not exclusive. In other words, the jurors are allowed to consider any aspect of the Defendant's background and character is mitigation evidence, but those are the ones that we provided specific note of.
Q Deposition Exhibit 103, ask if you can identify that letter?
A This is a letter to Dr. Mark Cunningham, forensic psychologist, dated November the 19th of 2001, that I dictated and my secretary signed for me.
Q This is essentially communications with your

mitigation specialist on some issues that he might need to factor into his evaluation -- or not evaluation, but his testimony?
A At least in part updating Dr. Cunningham on the recent events concerning Mr. Nelson's suicide. It looks like there's a discussion about Bill Logan's evaluation and some other matters.
Q Okay. Thank you, sir. Deposition Exhibit 104, do you recognize that; and if so, what do you recognize it to be?
A It's titled, "Third Amended Notice of Defendant's Mitigation Witnesses," and this was filed November 19th.
Q Kind of defining the witnesses you plan to present, correct?
A Yes, apparently so.
Q Thank you. And corresponding document Deposition Exhibit 105, do you recognize that filing?
A This is titled, "Defendant's Exhibit List." It was also filed on November the 19th of 2001. It looks like it pertains to the Defendant's exhibits.
Q And I have mismarked apparently Dr. Foster's report, but you will acknowledge that he

prepared a report that was ultimately an offer of proof that was filed with the appellate court to determine that Judge Gaitan had ruled inappropriately as it relates to Dr. Foster's availability to testify?

A Yes. As we all know, it's incumbent upon defense counsel to make some offer of proof when evidence is excluded so that the appellate court will have some idea what it is the trial court decided to exclude.

So yes, to answer your question, that's what Dr. Foster's report is, an offer of proof.

Q I'll show you a few other things that should go fairly quickly but they're large documents. One is Government's Exhibit 219 that's been marked and previously talked about and ask if you recognize that?

A Well, without going through it page by page, I'll take it for what it purports to be which is a cover sheet that purports to list all of the pleadings that were filed regarding mental health issues, pretrial in Mr. Nelson's case and there's 18 documents listed. And if you would like me to go through it, I'm certainly

willing to trust that the Government has accurately enclosed the documents that are on the face sheet.
Q And I will submit that we got that out of the defense file in a visit to Phoenix and just got it in that capacity, and it appears to be something that a paralegal or someone would have organized one aspect of the case, that being the mental health portion of the case.
A Well, if the defense team prepared it, I'm confident that it's totally accurate.
Q Is that something that you would have worked with during your case or did you work another way with those materials?
A I would not have put them in sort of a grouping like that, to be perfectly candid. Things were moving so quickly. We were just handling fires as they came up including matters that needed to be briefed.
That's entirely too well organized of something that I might have done in Mr. Nelson's case.
Q Say that again. I'm sorry.
A That's entirely too well organized. I would not have had the time or taken the time, I

suspect, to do that, to put all the pleadings together pertaining to a single subject matter is a good idea, but I'm sure I didn't do it.
Q There is a case that I've looked at in doing some research in preparing that I want to ask you about. It's United States of America versus Allen Nicklasson.
A Nicklasson.
Q I'm not sure if I'm pronouncing that correctly.
A Yes.
Q What do you know about that case?
A I represented Allen Nicklasson at trial. I won't be able to tell you when that was, but I remember basically the facts of the case pretty well. He had a co-defendant Dennis Skillicorn, they both went to trial.

MR. RUHNKE: Can we get a spelling or cite, whatever?

MR. VALENTI: Yeah. I'm sorry. There's a million cites because it's been through everything in the world, but this particular one at the tope is 491 F.3d 830. And is Allen is A-l-l-e-n, Nicklasson, N-i-c-k-l-a-s-s-o-n. Actually it's Nicklasson versus Don Roper.

THE WITNESS: So that's a habeas proceeding that you're referring to.

MR. RUHNKE: 8th Circuit.

MR. VALENTI: It started as a state case, I believe.

A It was a death penalty prosecution in Lafayette County, Missouri, which Mr. Nicklasson's case got a change of venue to St. Louis County. It was tried before the Honorable Kenneth Romines who at that time was the circuit court judge in the 22nd Judicial Circuit, I guess just recently retired I want to say from the Court of Appeals for the Eastern District Missouri Court of Appeals.

I don't know how much you want to know about it but I'm certainly familiar with the case.

Q And you represented Mr. Nicklasson at what level?

A The trial level.

Q Did you follow through with that at the appellate level or did that go on to someone else?

A No.

Q Do you recall who would have handled the

appeal?
A The direct appeal was handled by trial counsel. My co-counsel was a fellow named John Bailey, B-a-i-l-e-y, and I believe Kelly Henry who's a federal public defender in Nashville now but at that time was working in our office as an assistant public defender in the capital defense unit, and I think the two of them did the direct appeal to the Missouri Supreme Court.
Thereafter I'm not sure who did that federal habeas. I don't recall. It might have been Ms. Herndon.
Q I think it might have been Susan Hunt.
A Might have been Susan Hunt, yeah, that's entirely possible. But I was not involved with it after the trial.
Q Okay. During the course of our going through the file, we find miscellaneous things that I don't know how they got to be in the file so I'm just simply going to show them to you and ask you if you know what they are or if you put them in the file.
And I will start with Government's Exhibit 301 which I'll represent to you is a

resource guide for managing capital cases, and ask if that's something you're familiar with that you might have put in the defense file or something you would have referenced while over the years preparing these cases or this one in particular?
A I'll tell you, Jeff, I just don't -- I just don't remember. It's entirely possible I could have put it in there. Susan could have put it in there. I suppose Larry Pace could have put it in there. I don't recall this document specifically.
MR. RUHNKE: Can I quickly see it?
Q (By Mr. Valenti) Is that the kind of thing you've looked at over the years, I assume?
A Of course, yeah. As we've discussed, part of the training regiment for capital defense lawyers when we attend these seminars, there are often written materials that are prepared --
MR. RUHNKE: Just another quick look at that.
A -- prepared in advance and submitted to the participants. That's possibly what that was. I honestly don't know. But we have access to

documents such as that and make reference to them and use them.
Q (By Mr. Valenti) Educational materials?
A Yes.
Q For lack of a better term. At least this is dated 2001 which would be consistent with the time frame that someone on the trial team maybe would be looking at these types of things?
A That's entirely possible.
MR. RUHNKE: Although the document speaks for itself, it appears to be a guide to judges on how to manage cases.
MR. VALENTI: It might very well be.
MR. RUHNKE: It is.
MR. VALENTI: I trust your assessment. I just got it out of the file. I had no idea --
Q (By Mr. Valenti) I want to show you next then Government's Exhibit 302 and ask if that document means anything to you?
A No. The short answer is no.
Q Okay. And it's basically, so the record is clear, titled, Murder in the EEGs Granulated Electroencephalograph Brain Wave --
A That's what it looks like, but I don't

recollect.
Q You didn't use that or anything, did you?
A You know, as we've pointed out, it's 11 years ago. I may have. I don't remember.
Q Okay.
A And if I did use it, it's been 11 years since I've looked at it so...
Q Deposition Exhibit 303, this is case law regarding mental competency determination that was from the defense file. Is that something you probably looked at in preparing for the various hearings subsequent to the suicide attempt?
A If I didn't look at this document, I was familiar with the governing standards at the time.
Q There was litigation that ensued about why a continuance was a good way to go that you filed, as well as to get to the competency determined in a more in depth manner than was ultimately done in this case.
And one of the cases that was cited was this Supreme Court Drope versus Missouri case. Do you recall that?
A Yes.

Q I'll show you what's been marked as Government's Exhibit 304, I'll hand that to you. And do you recognize that, sir?
A Yes.
Q What do you recognize that to be?
A A copy of Drope versus Missouri.
Q And that's a case that you cited hopefully for the proposition that the Court would grant more time?
A That's a similar case on competency to proceed.
Q I have some more cases here. Is it fair to say you've looked at other case law as would be necessary to defend or push a position you thought was appropriate in a motion to the Court?
A Yes. Well, if we're talking specifically about competency to proceed, I'm not sure we are, but if we are --
Q Any legal issue, you're going to want to look at the case law. I don't want to go through all of the case --
A No, I don't want you to either. But I do know somehow in our practice as we -- it's just the nature of our practice that we become more familiar with some issues than others as a

result of litigation. Competency was an issue I was pretty familiar with so I know that case law.

There may be other areas that you have in front of you that I'm not as familiar with, but you would never get up to speed in all of the pertinent legal issues in the case. Sometimes we do and sometimes we don't.

Q This is Government's Exhibit 305, some loose materials that we recovered from the defense file that appear to simply be mental health records that were ultimately provided by the Government I think in the normal course of discovery and ask if that looks familiar to you.

A You know, it doesn't look familiar, but there were thousands of pages of documents; and if this was discovery in the case, then I've got to believe that I probably would have seen it.

But if you ask me as I'm looking at it does it sort of come back to me, I guess I would have to say no.

Q From our perspective on these exhibits, I'm going to loosely show you the last one, which is Deposition Exhibit 306. There's notes on

mine so I know where I got it from, indicates I got these from box 26 which was their file. And ask if you recognize what that is?

I can tell you that to me it looks to be some type of pleading that shows the various people on death row and/or significant life sentences.

A Yeah. I would suggest that this is a document that was prepared by the defense team and put in the file, not by us, not by Ms. Hunt and myself. This doesn't look familiar to me at all.

MR. RUHNKE: Can I take a quick look at it?

THE WITNESS: Sure.

MR. VALENTI: We're going to step out a quick second. I think we're winding up.

(Brief recess.)

Q (By Mr. Valenti) Go through these real quick and I think these will be kind of nonsecretors in some way.

A Sure.

Q One is --

A Can I interrupt you? We were looking at this exhibit --

Q Yeah, I thought I heard a date.
A I was looking at it over the break and I can just tell you what I said earlier is I don't recognize it. And I see the date on there, I mean 6-29-2000 and it looks like it's information from maybe a capital website, but it isn't anything I recognize.
Q Okay.
MR. RUHNKE: It's also nothing that we would have ever prepared in stating --
MR. VALENTI: And when I see the date, every time I see that it reminds me, it's probably something that was created in the death certification process that someone wanted to look at, whether it was you, I don't know.
Q (By Mr. Valenti) That aside. As we get into the issues -- not surprisingly I've got a couple of more questions more.
A Sure.
Q And one of them is you made it pretty clear, Mr. Berrigan, that one of the issues, a significant issue to be litigated on your behalf was the mental health and whether or not because the law was unsettled at the time of this trial, relative to what, if any, access

the Government should have to Mr. Nelson during -- as it relates to mental health evaluation, correct?
A Uh-huh.
Q Were you concerned because of your stringent litigation that if Mr. Nelson capitulate in any way and submitted to an evaluation, that you would moot and not preserve your issue properly for appeal?
A Well, I mean, you can't have it both ways, if I'm understanding you correctly.
Q I think we're talking.
A If he submits to an evaluation, then obviously it's not an issue. But the -- I want to be clear, I didn't advise him not to do the evaluation merely to have an issue.
The sad truth of the matter is the reality is, you know, most appeals fail, as did Mr. Nelson's frankly. And so trial lawyers, in my view, are foolish to identify issues that they think are going to be successful on appeal and then take the position that's contrary to the best interest of their client merely to preserve the issue for appeal. These cases have to be won at trial, period, or before by

way of a plea, but not on appeal.

So the fact that I preserved the issue for appeal is just that's normal practice, that's standard practice. All of us would do the same.

But I did not identify this ahead of time as an issue that we want to preserve for appeal merely because it wasn't settled in Rule 12.2, that was in the my reasoning at all and I don't want to pretend that it was.

Q In regards to Dr. Cowan, you knew that he was a neuropsychologist, correct?

A Yes.

Q You were familiar with neuropsychology and the importance it can have in capital litigation; is that fair?

A It has importance in a lot of litigation, civil and criminal.

Q You've used neuropsychologists before?

A Yes.

Q Would you have an estimation of the number of times you may or may not -- or you may have used a neuropsychologist either for an evaluation or for any other reason?

A I would say at least a dozen times.

Q You also indicated that you knew Dr. Cowan and you had some less-than-satisfactory interaction with him or results; is that a fair way to say it?

A I think what I said was I didn't think he would be the best choice. He's a qualified neuropsychologist, no question about that. And I had been involved, and I can't tell you specifically, but I know that I had had clients with him before Mr. Nelson's case.

And the fact that I had mixed results is only sort of part of the equation. I don't -- my recollection at least was this wasn't really a special area for Dr. Cowan. I didn't know what his death penalty capital litigation experience was. I thought there might have been a better selection available. It seemed to me we were picking him or he had been selected because he's close by, and that's a relevant consideration but it certainly shouldn't be the primary consideration.

So I thought we could do -- I don't want to say -- I don't mean to disparage Dr. Cowan by saying I thought we could do better, but I thought we could do better. And

unfortunately I just -- I didn't get back to that.
Q There was not any particular problem other than you just thought you could do better? I mean, in other words, you didn't have something in the past you thought because of that experience in light of this case, that's not right?
A With Dr. Cowan you mean?
Q Yes.
A No. I had had experience with him in the past, we knew each other. Frankly, I like the guy. He's very, very bright. And I think he's a good witness.
But, you know, as we discussed regarding Dr. Logan, he's a preeminent psychiatrist in his field. There are lots of psychiatrists in Kansas City, not many do forensic work at the level Bill Logan does. In my mind, Dr. Cowan's situation was like that. I just thought we could do better than Dr. Cowan or should be able to do better.
Q All right. In regards to the neuropsychological evaluations, it's fair to say then that you're at least familiar with it?
A Yes.

Q Okay. We've heard Tena Francis say that in occasion she's worked with trial attorneys that are fearful of neuropyschological evaluations and what it can and cannot uncover.
A Sure.
Q Is that your experience, are you fearful of that type of evaluation?
A I wouldn't use the term "fearful" but I recognize its limitations. It's certainly valuable. But oftentimes there are other mechanisms, objective tests, MRIs, PET scans, SPECT scans, that are perhaps better in describing to a jury particular areas of brain dysfunction because they can see it. They can look in an MRI or SPECT scan or a PET scan.
Neuropysch testing, as you know, there's some subjectivity to doctors and the evaluator that's there. They employ very objective criteria. The tests are timed, sometimes even videotaped. But it's just a little different than some of the objective testing that's possible.
So it's -- you know, it has limitations. It's not the be all and end all of neurological damage assessment.

Q Okay. In regards to mental health evaluations, particularly on the guilt phase under Rule 12 as it existed then, you were free to have conducted a mental health examination and chose not to use it if you wanted?
A Yes, that's right.
Q And that would have different discovery obligations if you chose to go that path; is that right?
A I don't think we had any discovery obligations.
Q Correct.
A Not that I --
Q They're different if you may have none?
A Right.
Q But it's different from what were -- if you were going to use that information, correct?
A Yes.
Q And so you could have had Mr. Nelson evaluated under that capacity and ultimately made the decision not to use those materials and that would be material that would not have been provided to the trial team if it existed to the Government back then?
A I agree.
Q And you knew that?

A Yeah.
Q I finally want to go back to the continuance or whether there was one. You indicated that essentially you never did file a continuance beyond the initial one after you got into the case other than after the suicide attempt which of course changes the equation quite a bit.
My question is this: You have indicated, and if I say it wrong, please correct me, that you had kind of a deal, for lack of a better word, with Judge Hays that if you got in the case, you certainly could get it continued off of that April trial setting, but you would get one and I think you said you would be taking your chances for anything else?
A Yeah, that's -- listen, that was my perception of it. That was my understanding of the conversation.
Q Okay.
A I don't want to suggest to you that I sort of negotiated with Judge Hays. But she, Judge Hays, is a brilliant woman, I think one of the smartest judges on the bench here, and she knew there's no way that she's going to call me on the phone on February the 12th and I'm going to

be in capital trial in April. That's not going to happen, we all know that.
And I just wanted to make that clear on that telephone conversation that it wasn't going to happen. But that was it. I mean, she was willing to say, Hey, you're going to get by April but that's all.
Q Okay.
A It was made very clear to me that Judge Gaitan intended this case to go forward as expeditiously as possible and I'm sure the Government did.
Q Okay.
A And so that was sort of the understanding that I had.
Q And I think that word you just used "understanding" is probably better, or expectation. A deal probably means some negotiated thing and I don't mean it that way.
A Right.
Q There was an expectation or understanding between the parties that this would get off April; but how far it went, we just don't know and knowing Judge Gaitan, it may not be a long time?

A Yeah. As a matter of fact, I don't -- there wasn't any deal that I remember at all.
Q Okay.
A I think that Judge Gaitan gave us that but the Government, as you know --
Q Objected.
A -- wanted an earlier date.
Q Did Susan know the circumstances under which you were taking the representation of Mr. Nelson?
A I don't know.
Q You don't recall ever speaking to her about it?
A I don't recall specifically. Well, I'm going to take that back. Susan knew we would get a continuance from April. Beyond that, I don't think either -- I don't want to speak for her, you've deposed her. But I would be very surprised if Susan thought we would get a continuance either.
You know, the case at that point by November is two years old, and as far as Judge Gaitan is concerned, that's old enough.
Q Did you -- did your client know that the expectation was that once you got it continued one time, after you got in it, most likely it

would not be continued again?
A I don't know.
Q Did you, Susan and the client or you and Susan or any combination of the three of you ever talk about the need to try to continue this for any reason?
A We may have. You know, the dynamic in this case was I was lead counsel. And Susan, at least to my recollection, had not had any death penalty experience at that point. I could be mistaken, but I don't think I am.
To be perfectly honest, I don't think she had very much trial experience either, federal or state court. That was my perception and understanding.
So some of these decisions about such as this, Are we going to go in November, I don't want to say that's exclusively my call, but that's largely my call.
And if Susan voiced some concerns or skepticism, certainly I would listen to that, I wouldn't completely discount it; but at the end of the day, I'm going to be responsible for that determination. That's how I view it.
Q Okay. You don't -- she may have had such a

concern, but you don't recall specifically?
A She may have. Now, she was very upset about the situation going on in Texas with the mitigation investigation more than I was. Maybe I should have been more upset. But that was a big concern.
And you see in Tena Francis' memo that things aren't going well with Susan and Tena Francis.
Q Correct.
A And I think Susan may have wanted to change courses and maybe even wanted to get a new mitigation -- continue the case. I don't remember as I'm sitting here 11 years later, but that's entirely possible. I didn't think that was possible.
As I've mentioned to you earlier, we had a trial date, we're not going to change mitigators, mitigator investigators in July with trial coming up, so that was the reality of this situation.
Q Did Mr. Nelson ever make a request of you to file a continuance to get more prepared as relates to either the guilt phase or the penalty phase investigation?

A Did Mr. Nelson specifically ask me to file a continuance application? No.

Mr. Nelson, and we've pointed out, he might not have been a shrinking violet, but he never told me basically how to do my job. And he never told me to file anything specifically on his behalf other than early on he wanted to look at the discovery about he should be able to come to the courthouse and look at it and wanted some kind of a motion. That's about the only thing I remember him specifically requesting in terms of a legal pleading, and then to absent himself from some of the hearings. As you know, we did do that. We asked on his behalf that he not be there.

Q Did Ms. Francis ever indicate to you she needed more time to accomplish what needed to be done?

A It's in the memo so I mean, she said that we had this additional work to do and so on. But most of the conversation with Tena Francis was had with Susan Hunt, not me. On rare occasions I spoke to her without Susan being involved.

Q The motions from her we're talking about are in May, June and July and then there are supplemental reports that come in. But I think

the last request for additional timing or resources was in June of '01. Do you recall her asking for more time subsequent to that?
A Not in writing, and I don't remember oral discussions. You know, I mean, as far as I was concerned, we were going forward and so, you know, I may have conveyed that to her --
Q Sure.
A -- either implicitly or explicitly, I don't know. But I don't recall her specifically asking me to file a continuance application.
Q And not to hit a painful subject, but did any of the trial team other than you express a concern because of your health; did they say, Pat, you know, dog-gone it, your health is bad, we need to get this continued to give you more time, did they ever ask you to do that?
A Based on my health?
Q Yes.
A No. They may have talked amongst themselves, I don't know, but no. I think the time we needed was not because of my health. I mean, again, there were issues of my health before the surgery that were actually probably more severe than actually the surgery. I lost a week,

maybe a little bit more, not much more than that. And I wasn't going to rely on my health situation for a continuance.

I think the continuance involved issues concerning the trial, preparation for trial, not Pat Berrigan's coronary situation.

Q And you ultimately never did ask for a continuance -- put the suicide attempt aside, you never asked for a continuance of the trial setting because you indicated to the Court at least that you were not prepared?

A I did not ask for a continuance for lack of preparation, that's true.

Q Did you feel like you were prepared for trial?

A I thought I was as prepared as I could be where we were.

Q Were there things that you thought needed to be done that were hindering your ability to be prepared?

A I thought there were other things we could have done. I just didn't think we were going to get a continuance so I didn't ask.

Q Well, and the reason I say this is you take your job very soberly and seriously as its relates to Mr. Nelson?

A Right.
Q You recognize that your first obligation is to him and not to any understanding or agreement you may have with the magistrate judge or the district --
A Absolutely. That's right.
Q And you have been an experienced practitioner at the time this is going on in the fall of 2001?
A Yes.
Q If you are taking your job as seriously as I know you do, if there's something that certainly could be done -- that's always, in my opinion, going to be the case, there's always something that could be done -- the question is: Did you feel that there was anything that needed to be done that was was standing in the way of you trying that case October 29th of 2001?
A I tried the case so I guess my answer would have to be no. I mean, it wasn't a situation where -- I guess I have had this happen once at least, where I was completely unprepared, I couldn't go forward, and I didn't go forward.
It wasn't that at all. We had done

work. I think the records reflect that. Whether or not that was enough, whether or not we should have done more, we went forward.
Q And I think we all would recognize, honestly, if we looked at it, that in hindsight we can always say should I have turned left when I turned right, should I have done this, should have done that.
A Right.
Q The question isn't that, because you have to be looking at a time frame in October, September, August of 2001. In your professional judgment, were you in your mitigation investigation sufficiently advanced for you to take that case to trial while respecting your rights in representing Mr. Nelson to the best of your ability and the rights that he deserved to be represented at that level?
A I can answer that question, not to be evasive, but two ways. At the time I felt we were as ready as we were going to be. Looking back on it, no, of course not.
I mean, when I hear that there's objective mental health testing that's been done to show that Mr. Nelson has brain damage

that we didn't do, I would have to be an idiot to think that we didn't need to do that or that shouldn't have been done. The neuropysch testing is a perfect example. Well, why didn't we do neuropysch testing? I mean, the thing was scheduled, for crying out loud. It wasn't like nobody thought it was a good idea.

And I don't -- I'm not trying to -- it's hard to go back and say, Hey, why didn't this happen and why didn't that happen.

And all I can tell you is, you know, I had three active capital cases in addition to Mr. Nelson's trial and three others that were in cert petitions to the U.S. Supreme Court and I had a regular docket and I was trying civil cases and maybe I shouldn't have taken Mr. Nelson's case because I was too damn busy to do what I should have done.

Looking back, that's kind of how I feel about it now. I shouldn't have agreed to do it. And I think Judge Gaitan, he wasn't going to give us a continuance after that first one, it's completely unrealistic to be ready to try a case in nine months after you just got on, and it had never happened in my entire

career up to this point.

And having committed to it, you know, I felt bound to do it which is sort of a ridiculous reason to go forward just basically out of pride and conceit.

Q You didn't ask for the continuance, though?

A You're right. That's my point.

Q An example of that would be is you've dealt with appeals of the 8th Circuit and they'll say, No further continuances.

A Yes.

Q You know that's not true?

A Right.

Q You can make many applications for further continuances. And that happens at the trial court level as well, doesn't it?

A Sometimes.

Q And every judge is their own unique little chemistry laboratory as to what they will and won't allow. But if you can demonstrate cause, you can get continuances.

And if you had told the judge that you weren't prepared at the mitigation level, he's said on the record numerous times during your various conferences that he didn't want to

deal with this thing more than once, himself; isn't that true?
A That's -- yeah, I don't know if he said that, but I believe that. I don't dispute your testimony.
Q I could find it if I had to.
A Right.
Q And I'll represent to you as an Officer of the Court that it's in there and it's probably in and around the time of the suicide attempt on how to proceed, whether he's doing the right thing or not?
A I don't dispute that. I would -- again, not to quibble. I'm sure you know Judge Gaitan every bit as well, if not better, than I do. But there were things that were done that would suggest to me that the -- Judge Gaitan has some preconceived ideas about how things are going to go, right or wrong, and that's how they go.
And Judge Gaitan is not one to really worry about what's going to happen on appeal. I've never in my life, for example, before or since, had a jury picked in a single day in a capital case. Nobody does that. Nobody says you've got 20 minutes for a panel. I've taken

five months to pick a jury in a federal capital case. We had one day.

Was Judge Gaitan worried about what was going to happen in the 8th Circuit? I don't think so. I don't think so at all.

Same thing with the mental competency. We have a drive-by evaluation for two hours by Bill Logan. Is Judge Gaitan worried whether that stands up in the Court of Appeals? I don't think so. And he sure as heck isn't worried about Pat Berrigan thinking he needs to do additional mitigation evidence when he's got the bills from people like Tena Francis for hundreds of hours of work.

So to suggest, you know, I ask for it, it's going to happen, in my view, that's really not true. Judge Gaitan, and I have the highest respect for him, I really do, we have a great personal and professional relationship, but to think that just because I file a motion for continuance it's going to be granted after they've told me repeatedly, This case is going, going, going, going in the fall of 2000, it wasn't going to happen. I still believe that.

I could have said anything I wanted

in that continuance application, he wasn't going to grant it. But the failure is not recognizing that I needed it. I think that's the failure. Okay, if I want to admit to something that I should have done today, that's what I'm going to admit to when I look now and I see that these things have been done.

And you're thinking, Well, why didn't you do that, I don't really have a good excuse for that other than I'm telling you I'm busy, which is a pretty damn poor excuse. But the truth is what it is and so that's what it is.

MR. VALENTI: That's all I have. I appreciate your time.

(Deposition concluded.)

I, PATRICK BERRIGAN, read the foregoing deposition and hereby affix my signature that same is true and correct except as noted above.

_______________

PATRICK BERRIGAN

THE STATE OF______________________:

COUNTY OF_________________________:

Before me,____________________, on this day personally PATRICK BERRIGAN, shown to me (or proved to me on the oath of ____________________or through (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this_____day of              2012.

___________________________________

Notary Public in and for the State of____________________.

My Commission expires________________________.)

In Re: Keith D. Nelson v. United States of America

CERTIFICATE

STATE OF MISSOURI )
) SS.
COUNTY OF JACKSON )

I, TRICIA D. TATE, a Certified Court Reporter, do certify that pursuant to Notice to Take Deposition, at the United States Department of Justice, 400 East 9th Street, in the City of Kansas City, State of Missouri, 64106,

PATRICK BERRIGAN

came before me, was by me duly sworn to testify the whole truth of his knowledge of the matters in controversy aforesaid, was examined and his examination then written in shorthand by me and afterwards typed, the reading and the signing of the deposition being expressly requested by witness, and said deposition is herewith returned.

I further certify that I am not counsel, attorney, or relative of either party, or clerk or stenographer of either party, or otherwise interested in the event of this suit.

IN TESTIMONY WHEREOF, I have hereunto set my hand and seal this 8th day of November, 2012.

______________________________

Tricia D. Tate
Missouri C.C.R. 1240(T)
Kansas C.C.R. 1609

# EXHIBIT 14
# Part A

citi E+O 10/4/01

ROE 10/4/01

01MOW 380

| | | | |
|---|---|---|---|
| ACCOUNT NUMBER: | [redacted] | AGENCY NAME: US DISTRICT COURT | |
| CREDIT LIMIT: | [redacted] | CASH ADVANCE BALANCE: | .00 |
| CURRENT BALANCE: | [redacted] | MINIMUM PAYMENT DUE: | [redacted] |
| AVAILABLE CREDIT: | [redacted] | PAYMENT DUE DATE: | 10-23-01 |

842.50

## ACCOUNT ACTIVITY

WMOCJA CLK GTA
[redacted]

AGENCY/ORG ID:

CREDITS $0.00 | PURCHASES $842.50 | CASH ADV. $0.00 | TOTAL ACTIVITY $842.50

BILLING OFFICE ID:
SINGLE PURCHASE LIMIT: $0.00
ACCOUNTING CODE:

DISCRETIONARY CODE:

TAX EXEMPT #:
CYCLE PURCHASE LIMIT: $0.00

| Post Date | Trans Date | MCC Code | Reference Number | | Description | Amount |
|---|---|---|---|---|---|---|
| 09/03 | 08/30 | 3001 | 3661941154442 | 1 | AMERICAN AIR0017093671561 CHARLESTON WV<br>HUNT/S DEPARTURE: 09/04/01<br>MCI AA Y DFW AA Y MCI | 409.50 |
| 09/03 | 08/30 | 3001 | 3661941154467 | 2 | AMERICAN AIR0017093671563 CHARLESTON WV<br>BERRIGAN/P DEPARTURE: 09/04/01<br>MCI AA Y DFW AA Y MCI | 409.50 |
| 09/03 | 08/30 | 4511 | 3582431637199 | 3 | AGENT FEE 8908142234352 CHARLESTON WV<br>HUNT/S DEPARTURE: 08/30/01<br>XAA XD Y XAO | 11.75 |
| 09/03 | 08/30 | 4511 | 3582431637215 | 4 | AGENT FEE 8908142234354 CHARLESTON WV<br>BERRIGAN/P DEPARTURE: 08/30/01<br>XAA XD Y XAO | 11.75 |

99-303-01
Keith Nelson

CLERK U.S.DISTRICT COURT
Exhibits:
P 17
Case No. 4:04-CV-08005-FJG



A member of citigroup

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CHARLES E. WHITTAKER COURTHOUSE
OFFICE OF THE CLERK

421 25 km

PATRICIA L. BRUNE
CLERK OF COURT

REPLY TO:
( ) ROOM 1510 U.S. COURTHOUSE
KANSAS CITY, MO. 64106
( ) ROOM 2710 U.S. COURTHOUSE
KANSAS CITY, MO. 64106
( ) ROOM 310 U.S. COURTHOUSE
JEFFERSON CITY, MO. 65101
( ) ROOM 1400 U.S. COURTHOUSE
SPRINGFIELD, MO. 65806

# TRAVEL AUTHORIZATION

**Authorized Traveler:** **Susan M. Hunt and Patrick Berrigan**

**Voucher Number:** SH/PB081301

**Authorized Travel Dates:** **September 4, 2001 - September 7, 2001**

Purpose of Travel **Travel from Kansas City, MO to Dallas, Texas and return for the purpose of meeting with possible mitigation witnesses and mitigation investigator regarding U. S. v. Keith W. Nelson, 99-303-01-CR-W-3.**

Pursuant to Section 702 of the Federal Courts Administration Act of 1992, Public Law 102-572, 106 Stat. 4506, you are hereby authorized to obtain government travel rates for the above-described trip in connection with your providing representation under the Criminal Justice Act (CJA).

You are authorized to contact National Travel Service (NTS) at 1-800-445-0668 to request reservations and airline tickets. You must provide NTS with your **Voucher Number SH/PB081301 The Western District of Missouri** and advise NTS that your tickets are to be charged to that court's account. You may instruct NTS where to deliver your tickets.

Reimbursement for subsistence will be limited to the government per diem rate of $135.00.

A copy of this Travel Authorization, as well as a copy of the airline tickets which were provided by NTS, must be submitted upon completion of travel. All other travel expense should be claimed on, and receipts should be attached to, the voucher on which you were appointed in case. Our internal accounting control number for this trip is: **01MOW0007** .

Sarah W. Hays
Judicial Officer

August 14, 2001
Date

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

FILED AUG 13 2001 R. L. BRUNE, CLK. U.S. DISTRICT COURT WEST DISTRICT OF MISSOURI

UNITED STATES OF AMERICA, )
Plaintiff, )
) No. 99-00303-01-CR-W-2
KEITH DWAYNE NELSON, )
Defendant. )

ORDER

For good cause shown, IT IS HEREBY ORDERED that Susan M. Hunt and Patrick Berrigan may travel to Dallas, Texas, on Tuesday September 4, 2001 and return on Friday September 7, 2001 for the purpose of meeting with possible mitigation witnesses and their mitigation investigator. IT IS FURTHER ORDERED that pursuant to Section 702 of the Federal Courts Administration Act of 1992, Public Law 102-572, 106 Stat. 4506, Susan M. Hunt and Patrick Berrigan are authorized to obtain government travel rates for the above described trip in connection with their providing representation to defendant under the Criminal Justice Act.

Sarah W. Hays
SARAH W. HAYS
United States Magistrate Judge

Dated: August 13, 2001
Kansas City, Missouri

NATIONAL TRAVEL
707 VIRGINIA ST E STE 100

CLIENT: HUNT/SUSAN
DO8MOWH-092300

04 SEP TU — AMERICAN FLIGHT: 2049 CLASS: Y
KANSAS CITY M DEPART: 950A
DALLAS/FT WOR ARRIVE: 1127A

4 SEP TU — DOLLAR PICK-UP: 4SEP 972 574-7800
DROP-OFF: 7SEP INTERMED 2/4 DR
CONFO: R8748626

4 SEP TU — RADISSON HOTEL AND S RADISSON HOTELS 214 351-4477
2330 WEST NORTHWEST HIGHWAY DALLAS TX 75220
IN: 4SEP OUT: 7SEP CONFO: OR61DP7

DOCUMENT NUMBER 8908142234352/ BILLED $11.75
AIRLINE REPORTING CORP SERVICE FEE BILLED SEPARATELY

TICKET: 0017093671561
FARE: USD409.50

CLIENT: HUNT/SUSAN

FR — DALLAS/FT WOR DEPART: 350P
KANSAS CITY M ARRIVE: 524P

01 2903 8443
PASSENGER TICKET AND BAGGAGE CHECK
SUBJECT TO CONDITIONS OF CONTRACT
NOT TRANSFERABLE

ETKT

ARC FLIGHT COUPON

PASSENGER RECEIPT

BOARDING PASS

ISSUED BY: AMERICAN AIRLINES
NAME OF ISSUING AGENT: NATIONAL TRAVEL
NAME OF PASSENGER: HUNT/SUSAN

PNR/CARRIER CODE: W1KMN4/1V
FARE BASIS/TICKET DESIGNATOR: YCADFW
PLACE OF ISSUE: CHARLESTON WVUS
DATE OF ISSUE: 30AUG01
AGENT CODE: A5163826
FCI: 6 SERV CARR. ID: 5880

**NOT VALID FOR**
**TRANSPORTATION**

THIS IS YOUR RECEIPT
ISSUING AGENT ID: DIASY

NAME OF PASSENGER: HUNT/SUSAN
FROM: MCIDFWAA2049 Y04SEP
DFWMCIAA1918 Y07SEP

ENDORSEMENTS/RESTRICTIONS:
FP BA4486000000004668/ 35867 FC 4SEP MCI AA DFW 1
85.12 AA MCI 185.12 USD370.24 END ZPMCIDFW XT 5.5
0ZP 6.00XFMCI3DFW3

FARE: USD370.24
TAX/FEE/CHARGE: US27.76
TAX/FEE/CHARGE: XT11.50
TOTAL: USD409.50

STOCK CONTROL NO.: 22579001351

DOCUMENT NUMBER: 0 001 7093671561 1

NOT VALID FOR TRAVEL
0 001 7093671561 1

National Travel, Inc.
Information • Technology • Service
Service Plus
BANK ONE CENTER • SUITE 100 • CHARLESTON, WV 25301
304-357-0808 OR 800-624-8283
Fax: (304) 343-5059
www.nationaltravel.com

1063 TOWN CENTER MALL
CHARLESTON, WV 25389
304-357-0800 OR 800-642-3603
Fax: (304) 345-8980

BARBOURSVILLE MALL
SUITE 302
HUNTINGTON, WV 25504
304-736-0625 OR 800-523-9304
Fax: (304) 736-1445

#3 SUBURBAN COURT
MORGANTOWN, WV 26505
304-598-0160 OR 800-359-0160
Fax: (304) 598-0163

P17-0005

ORIGINAL INVOICE

US COURTS*60000 HUNT/SUSAN*DO8MOWH-092300
ELECTRONIC TICKET RECEIPT*LESLIE

SUSAN HUNT
819 WALNUT
KANSAS CITY MO 64106

AUG 30 2001 108304078 W1KMN4

04 SEP 01 - TUESDAY
AMERICAN 2049 COACH CLASS
LV: KANSAS CITY MO 950A NONSTOP CONFIRMED
AR: DALLAS/FT WOR 1127A AIR MILES FLOWN- 460
EQUIP: MD-80 JET FLYING TIME: 1:37
SEAT-24A

DOLLAR 1 INTERMED 2/4 DR CONFIRMED
PICKUP-DALLAS/FT WOR 3809 S. 26TH AVE.? DALLAS
DROP-07SEP
RATE-GUARANTEED 31.00 DAILY
MILEAGE-UNL/MI RATE CODE-GOVT
CONFIRMATION-R8748626
PHONE-972 574-7800

RADISSON HOTELS 03 NT/S - OUT 07SEP CONFIRMED
RADISSON HOTEL AND S 2 ROOM/S GUARANTEE-CREDIT CARD
2330 WEST NORTHWEST HIGHW PHONE-214 351-4477 RATE- 89.00
DALLAS TX 75220 FAX-214 351-2364 RATESTATUS-GUARANTEED
CONFIRMATION-OR61DP7
RESERVATION IS GUARANTEED FOR LATE ARRIVAL.
PLEASE CANCEL 24 HOURS PRIOR TO ARRIVAL TO AVOID BILLING

07 SEP 01 - FRIDAY
AMERICAN 1918 COACH CLASS
LV: DALLAS/FT WOR 350P NONSTOP CONFIRMED
AR: KANSAS CITY MO 524P AIR MILES FLOWN- 460
EQUIP: MD-80 JET FLYING TIME: 1:34
SEAT-10F

04 OCT 01 - THURSDAY
TOUR KANSAS CITY MO
ELECTRONIC TICKET REQUESTED/I

DOCUMENT NUMBER 8908142234352/ BILLED $11.75
AIRLINE REPORTING CORP SERVICE FEE BILLED SEPARATELY
NO FREQUENT FLYER DATA AVAILABLE
THIS IS AN ELECTRONIC TICKET TRANSACTION
AN ELECTRONIC TICKET CANNOT BE TRANSFERRED TO ANOTHER CARRIER
PLEASE ADVISE NATIONAL TRAVEL IF YOU DO NOT TRAVEL
FOR ASSISTANCE IN OBTAINING A REFUND
WHEN CHECKING IN FOR YOUR FLIGHTS PLEASE PROVIDE
THE FOLLOWING CONFIRMATION NUMBER: AA JPDEKO
YOU MUST PRESENT POSITIVE IDENTIFICATION AT THE CHECK IN

**NOTICE:** TICKETS MAY HAVE VALUE. IF UNUSED, PLEASE RETURN FOR CREDIT OR REFUND.

National Travel, Inc.
Information • Technology • Service
**Service** *Plus*
BANK ONE CENTER • SUITE 100 • CHARLESTON, WV 25301
304-357-0808 OR 800-624-8283
Fax: (304) 343-5059
www.nationaltravel.com

1063 TOWN CENTER MALL
CHARLESTON, WV 25389
304-357-0800 OR 800-642-3603
Fax: (304) 345-8980

BARBOURSVILLE MALL
SUITE 302
HUNTINGTON, WV 25504
304-736-0625 OR 800-523-9304
Fax: (304) 736-1445

#3 SUBURBAN COURT
MORGANTOWN, WV 26505
304-598-0160 OR 800-359-0160
Fax: (304) 598-0163

**P17-0006**

ORIGINAL INVOICE

US COURTS#60000
ELECTRONIC TICKET RECEIPT*LESLIE

HUNT/SUSAN*DO8MOWH-092300

SUSAN HUNT
819 WALNUT
KANSAS CITY MO 64106

AUG 30 2001 108304078 W1KMN4

FOR 24 HOUR NATIONWIDE ENROUTE ASSISTANCE PLEASE CALL:
800-445-0668 AND GIVE CODE C5A
FOR AIRLINE TRAVEL WITHIN THE U.S. THE DEPT OF TRANSPORTATION
REQUIRES ALL PASSENGERS OVER 18YEARS TO PRESENT PHOTO ID AT CHECK IN.
GOVERNMENT TRAVEL ARE THE PROPERTY OF THE US GOVERNMENT.
SAVE EXCHANGE NOTICE FOR REIMBURSEMENT OF AIRLINE IMPOSED FEE.
NO CAR OR HOTEL REQUESTED.
COMPARED TO THE FULL FARE THIS REPRESENTS A SAVINGS OF $ 419.50

TICKET NUMBER/S:
HUNT/SUSAN 7093671561 409.50
BA CARD 4486000000004668

| | | | | | |
|---|---|---|---|---|---|
| AIR TRANSPORTATION | 370.24 | TAX | 39.26 | TTL | 409.50 |
| | | SERVICE PLUS | | | 11.75 |
| | | SUB TOTAL | | | 421.25 |
| | | CREDIT CARD PAYMENT | | | 421.25- |
| | | AMOUNT DUE | | | 0.00 |

**NOTICE:** TICKETS MAY HAVE VALUE. IF UNUSED, PLEASE RETURN FOR CREDIT OR REFUND.

NATIONAL TRAVEL
707 VIRGINIA ST E STE 100

CLIENT: BERRIGAN/PATRICK
DO8MOWH 092300

| | | | | |
|---|---|---|---|---|
| 04 SEP TH | AMERICAN KANSAS CITY M DALLAS/FT WOR | FLIGHT: 2049 DEPART: 950A ARRIVE: 1127A | CLASS: Y |
| 07 SEP FR | AMERICAN DALLAS/FT WOR KANSAS CITY M | FLIGHT: 1918 DEPART: 350P ARRIVE: 524P | CLASS: Y |

DOCUMENT NUMBER 8908142234354/ BILLED $11.75
AIRLINE REPORTING CORP SERVICE FEE BILLED SEPARATELY

TICKET: 0017093671563
FARE: USD409.50

01 2903 8443
PASSENGER TICKET AND BAGGAGE CHECK
SUBJECT TO CONDITIONS OF CONTRACT
NOT TRANSFERABLE

ETKT
ARC
PASSENGER RECEIPT SITI
BOARDING PASS

ISSUED BY AMERICAN AIRLINES
NAME OF ISSUING AGENT NATIONAL TRAVEL
NAME OF PASSENGER BERRIGAN/PATRICK
PNR/CARRIER CODE W2S2RU/1V
FARE BASIS/TICKET DESIGNATOR YCADFW
PLACE OF ISSUE CHARLESTON
AGENT CODE A5163826
DATE OF ISSUE WVUS30AUG01
6 5880
NOT VALID FOR TRANSPORTATION
THIS IS YOUR RECEIPT
ISSUING AGENT ID DIASY

NAME OF PASSENGER BERRIGAN/PATRICK
FROM MCIDFWAA2049 Y04SEP
DFWMCIAA1918 Y07SEP

FP BA4486000000004668/ 65619 FC 4SEP MCI AA DFW 185.12 AA MCI 185.12 USD370.24 END ZPMCIDFW XT 5.50 ZP 6.00XFMCI3DFW3

FARE USD370.24
TAX/FEE/CHARGE US27.76
TAX/FEE/CHARGE XT11.50 22579001395
TOTAL USD409.50

0 001 7093671563 3

NOT VALID FOR TRAVEL
0 001 7093671563 3

National Travel, Inc.
Information • Technology • Service
Service Plus
BANK ONE CENTER • SUITE 100 • CHARLESTON, WV 25301
304-357-0808 OR 800-624-8283
Fax: (304) 343-5059
www.nationaltravel.com

1063 TOWN CENTER MALL
CHARLESTON, WV 25389
304-357-0800 OR 800-642-3603
Fax: (304) 345-8980

BARBOURSVILLE MALL
SUITE 302
HUNTINGTON, WV 25504
304-736-0625 OR 800-523-9304
Fax: (304) 736-1445

#3 SUBURBAN COURT
MORGANTOWN, WV 26505
304-598-0160 OR 800-359-0160
Fax: (304) 598-0163

P17-0008

ORIGINAL INVOICE

US COURTS*60000 BERRIGAN/PATRICK*DO8MOWH-092300
ELECTRONIC TICKET RECEIPT*LESLIE

SUSAN HUNT
819 WALNUT
KANSAS CITY MO 64106

AUG 30 2001 108304080 W2S2RU

04 SEP 01 - TUESDAY
AMERICAN 2049 COACH CLASS
LV: KANSAS CITY MO 950A NONSTOP CONFIRMED
AR: DALLAS/FT WOR 1127A AIR MILES FLOWN- 460
EQUIP: MD-80 JET FLYING TIME: 1:37
SEAT-10F

07 SEP 01 - FRIDAY
AMERICAN 1918 COACH CLASS
LV: DALLAS/FT WOR 350P NONSTOP CONFIRMED
AR: KANSAS CITY MO 524P AIR MILES FLOWN- 460
EQUIP: MD-80 JET FLYING TIME: 1:34

04 OCT 01 - THURSDAY
TOUR KANSAS CITY MO
ELECTRONIC TICKET REQUESTED/I

DOCUMENT NUMBER 8908142234354/ BILLED $11.75
AIRLINE REPORTING CORP SERVICE FEE BILLED SEPARATELY
THIS IS AN ELECTRONIC TICKET TRANSACTION
AN ELECTRONIC TICKET CANNOT BE TRANSFERRED TO ANOTHER CARRIER
PLEASE ADVISE NATIONAL TRAVEL IF YOU DO NOT TRAVEL
FOR ASSISTANCE IN OBTAINING A REFUND
WHEN CHECKING IN FOR YOUR FLIGHTS PLEASE PROVIDE
THE FOLLOWING CONFIRMATION NUMBER: AA CVDMAE
YOU MUST PRESENT POSITIVE IDENTIFICATION AT THE CHECK IN
NO FREQUENT FLYER DATA AVAILABLE
FOR 24 HOUR NATIONWIDE ENROUTE ASSISTANCE PLEASE CALL:
800-445-0668 AND GIVE CODE C5A
FOR AIRLINE TRAVEL WITHIN THE U.S. THE DEPT OF TRANSPORTATION
REQUIRES ALL PASSENGERS OVER 18YEARS TO PRESENT PHOTO ID AT CHECK IN.
GOVERNMENT TRAVEL ARE THE PROPERTY OF THE US GOVERNMENT.
SAVE EXCHANGE NOTICE FOR REIMBURSEMENT OF AIRLINE IMPOSED FEE.
NO CAR OR HOTEL REQUESTED.
COMPARED TO THE FULL FARE THIS REPRESENTS A SAVINGS OF $ 419.50

TICKET NUMBER/S:
BERRIGAN/PATRICK 7093671563 409.50
BA CARD 4486000000004668

AIR TRANSPORTATION 370.24 TAX 39.26 TTL 409.50
SERVICE PLUS 11.75
SUB TOTAL 421.25

**NOTICE:** TICKETS MAY HAVE VALUE. IF UNUSED, PLEASE RETURN FOR CREDIT OR REFUND.

National Travel, Inc.
Information • Technology • Service
**Service** *Plus*

BANK ONE CENTER • SUITE 100 • CHARLESTON, WV 25301
304-357-0808 OR 800-624-8283
Fax: (304) 343-5059
www.nationaltravel.com

1063 TOWN CENTER MALL
CHARLESTON, WV 25389
304-357-0800 OR 800-642-3603
Fax: (304) 345-8980

BARBOURSVILLE MALL
SUITE 302
HUNTINGTON, WV 25504
304-736-0625 OR 800-523-9304
Fax: (304) 736-1445

#3 SUBURBAN COURT
MORGANTOWN, WV 26505
304-598-0160 OR 800-359-0160
Fax: (304) 598-0163

P17-0009

ORIGINAL INVOICE

US COURTS*60000
ELECTRONIC TICKET RECEIPT*LESLIE

BERRIGAN/PATRICK*DO8MOWH-092300

SUSAN HUNT
819 WALNUT
KANSAS CITY MO 64106

AUG 30 2001 108304080 W252RU

| | |
|---|---|
| CREDIT CARD PAYMENT | 421.25- |
| AMOUNT DUE | 0.00 |

NOTICE: TICKETS MAY HAVE VALUE. IF UNUSED, PLEASE RETURN FOR CREDIT OR REFUND.

citi

02MDW 009
Proc 1/9/02

P17-0010

E&U 1/9/02

| | | | |
|---|---|---|---|
| ACCOUNT NUMBER: | [redacted] | AGENCY NAME: US DISTRICT COURT | |
| CREDIT LIMIT: | [redacted] | CASH ADVANCE BALANCE: | .00 |
| CURRENT BALANCE: | [redacted] | MINIMUM PAYMENT DUE: | 2,256.25 |
| AVAILABLE CREDIT: | [redacted] | PAYMENT DUE DATE: | 01-22-02 |

## ACCOUNT ACTIVITY

WMOCJA CLK GTA
[redacted]

| AGENCY/ORG ID: | CREDITS | PURCHASES | CASH ADV. | TOTAL ACTIVITY |
|---|---|---|---|---|
| | $0.00 | $2,256.25 | $0.00 | $2,256.25 |

BILLING OFFICE ID:
SINGLE PURCHASE LIMIT: $0.00
ACCOUNTING CODE:
DISCRETIONARY CODE:
TAX EXEMPT #:
CYCLE PURCHASE LIMIT: $0.00

| Post Date | Trans Date | MCC Code | Reference Number | | Description | Amount |
|---|---|---|---|---|---|---|
| 11/29 | 11/27 | 3001 | 2661900208561 | 1 | AMERICAN AIR0017200986562 CHARLESTON WV CUNNINGHAM/M DEPARTURE: 12/01/01 MIA AA Y DFW AA Y ABI 99-303-01 | 398.75 |
| 11/29 | 11/27 | 3058 | 2360685330532 | 2 | DELTA AIR 0067200986456 CHARLESTON WV BENNETT/T DEPARTURE: 11/29/01 MCI DL H SLC DL H BIL 99-303-01 | 260.00 |
| 11/29 | 11/27 | 3058 | 2360685330706 | 3 | DELTA AIR 0067200986561 CHARLESTON WV CUNNINGHAM/M DEPARTURE: 11/27/01 MCI DL Q ATL DL Q MIA | 173.00 |
| 11/29 | 11/27 | 4511 | 2583320693568 | 4 | AGENT FEE 8908143448323 CHARLESTON WV CUNNINGHAM/M DEPARTURE: 11/27/01 XAA XD Y XAO | 14.75 |
| 12/12 | 12/11 | 4722 | 5142895600029 | 5 | NATIONAL TRAVEL 304-357-0872 WV 1 | 976.75 |
| 12/12 | 12/11 | 4722 | 5142895600037 | 6 | NATIONAL TRAVEL 304-357-0872 WV | 421.25 |
| 12/12 | 12/11 | 4722 | 5142895600045 | 7 | NATIONAL TRAVEL 304-357-0872 WV | 11.75 |

1823.25 Expert
433.00 Atty
2256.25

1. Dan Foster 10/5 99-303-01 Nelson
2. Barringer ~~8/5/02~~ 9/25/01 99-303-01 Nelson


A member of citigroup

P17-0011

# National Travel, Inc.

Information · Technology · Service

BANK ONE CENTER, SUITE 100
707 VIRGINIA STREET, EAST
CHARLESTON, WEST VIRGINIA 25301

1063 TOWN CENTER MALL
CHARLESTON, WEST VIRGINIA 25389

#3 SUBURON COURT
MORGANTOWN, WEST VIRGINIA 26505

BARBOURSVILLE MALL, SUITE 302
HUNTINGTON, WEST VIRGINIA 25504

INVOICE #: 109244090
Date: 09/24/2001
Account: 61000
Page #: 1

Us Courts Criminal Justice
One Columbus Circle
Washington Dc
20544

Us Courts Criminal Justice
One Columbus Circle
Washington Dc
20544

| Traveler | Tkt#/Cf# | Tvl Dt | Itinerary | Pymt Due | By | Amount |
|---|---|---|---|---|---|---|
| BERRIGAN/PATRICK | 7093676491 | 09/25/01 | MCI-DFW-MCI<br>American Airlines | 09/24/01 | P | 409.50 |
| BERRIGAN/PATRICK | 8142800049 | 09/24/01 | ARC Processed Fee<br>TRAVEL AGENT FEE DOCUM | 09/24/01 | P | 11.75 |

| | |
|---|---|
| Total Amount of Invoice | 421.25 |
| Less CC Payments or Payments not yet due | 421.25 |
| Less Cash Payments Received | 0.00 |
| Net Amount Due | 0.00 |



Appellate Case: 15-3160 Page: 229 Date Filed: 02/29/2016 Entry ID: 4372451

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CHARLES E. WHITTAKER COURTHOUSE
OFFICE OF THE CLERK

PATRICIA L. BRUNE
CLERK OF COURT

REPLY TO:
( ) ROOM 1510 U.S. COURTHOUSE KANSAS CITY, MO. 64106
( ) ROOM 2710 U.S. COURTHOUSE KANSAS CITY, MO. 64106
( ) ROOM 310 U.S. COURTHOUSE JEFFERSON CITY, MO. 65101
( ) ROOM 1400 U.S. COURTHOUSE SPRINGFIELD, MO. 65806

# TRAVEL AUTHORIZATION

**Authorized Traveler:** Susan Hunt & Patrick Berrigan

**Voucher Number:** S/B092101

**Authorized Travel Dates:** September 25, 2001 - September 27, 2001

**Purpose of Travel** Travel to Dallas, TX and return for the purpose of meeting with migitation investigator and interviewing witnesses in U. S. v. Keith Nelson, case # 99-303-01-CR-W-2.

Pursuant to Section 702 of the Federal Courts Administration Act of 1992, Public Law 102-572, 106 Stat. 4506, you are hereby authorized to obtain government travel rates for the above-described trip in connection with your providing representation under the Criminal Justice Act (CJA).

You are authorized to contact National Travel Service (NTS) at 1-800-445-0668 to request reservations and airline tickets. You must provide NTS with your **Voucher Number SB 092101 Western District of Missouri** and advise NTS that your tickets are to be charged to that court's account. You may instruct NTS where to deliver your tickets.

Reimbursement will be limited to per diem rate ($127.00) as provided by government employee travel regulations.

A copy of this Travel Authorization, as well as a copy of the airline tickets which were provided by NTS, must be submitted upon completion of travel. All other travel expense should be claimed on, and receipts should be attached to, the voucher on which you were appointed in case. Our internal accounting control number for this trip is: 01MOW0007 .

Sarah W. Hays
Judicial Officer

September 21, 2001
Date

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

FILED SEP 20 2001 R L BRUNE CLK U.S. DISTRICT COURT WEST DISTRICT OF MISSOURI

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff, | ) | |
| | ) | No. 99-00303-01-CR-W-2 |
| KEITH DWAYNE NELSON,<br>Defendant. | ) | |

## ORDER

For good cause shown, IT IS HEREBY ORDERED that Susan M. Hunt and Patrick Berrigan may travel to Dallas, Texas, on September 25, 2001 and return on September 27, 2001 for the purpose of meeting with their mitigation investigator and interviewing mitigation witnesses. IT IS FURTHER ORDERED that pursuant to Section 702 of the Federal Courts Administration Act of 1992, Public Law 102-572, 106 Stat. 4506, Susan M. Hunt and Patrick Berrigan are authorized to obtain government travel rates for the above described trip in connection with their providing representation to defendant under the Criminal Justice Act.

Sarah W. Hays
SARAH W. HAYS
United States Magistrate Judge

Dated: September 20, 2001
Kansas City, Missouri

9.20.01

I HEREBY ATTEST AND CERTIFY ... THAT THE FOREGOING ... IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE AND IN MY LEGAL CUSTODY.
R. L. BRUNE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
BY ... Deputy



Appellate Case: 15-3160 Page: 231 Date Filed: 02/29/2016 Entry ID: 4372451

National Travel, Inc.
Information • Technology • Service

BANK ONE CENTER, SUITE 100
707 VIRGINIA STREET, EAST
CHARLESTON, WEST VIRGINIA 25301

1063 TOWN CENTER MALL
CHARLESTON, WEST VIRGINIA 25389

#3 SUBURON COURT
MORGANTOWN, WEST VIRGINIA 26505

BARBOURSVILLE MALL, SUITE 302
HUNTINGTON, WEST VIRGINIA 25504

INVOICE #: 110044130
Date: 10/04/2001
Account: 60000
Page #: 1

Us Courts
NA TRAVEL

Us Courts
NA TRAVEL

| Traveler | Tkt#/Cf# | Tvl Dt | Itinerary | Pymt Due | By | Amount |
|---|---|---|---|---|---|---|
| FOSTER/DANIEL | 7097016067 | 10/05/01 | GTF-SLC-MCI-SLC-GTF<br>Delta Airlines | 10/04/01 | P | 962.00 |
| FOSTER/DANIEL | 8142915832 | 10/04/01 | ARC Processed Fee<br>TRAVEL AGENT FEE DOCUM | 10/04/01 | P | 14.75 |
| FOSTER/DANIEL | 3133129341 | 10/05/01 | HILTON KANSAS CITY A<br>Hilton | 10/04/01 | P | 139.98 |

| | |
|---|---|
| Total Amount of Invoice | 1116.73 |
| Less CC Payments or Payments not yet due | 1116.73 |
| Less Cash Payments Received | 0.00 |
| Net Amount Due | 0.00 |

WE APPRECIATE HAVING YOU AS A CUSTOMER

member American Society of Travel Agents

IF YOU HAVE ANY QUESTIONS CALL 357-0872

Attn: Ann

National Travel, Inc.
Information • Technology • Service

**INVOICE 110044130**
**Record Locator : LJS8QA**
**10/04/2001**
**for**
**FOSTER/DANIEL**

This Invoice was charged to a **VISA** card ending with **'18'**.

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | **Delta Airlines** | | **7097016067** | **$962.00** |
| TRAVEL INFO | | | | | | | | | | |
| | **DATE** | **A/L FLT** | **ORIG** | **DEPT TIME** | **DEST** | **ARRV TIME** | **FREQ FLYER NUM** | **AIR MILES** | | |
| AIR | 10/05/2001 | DL 1626 | GTF | 0630A | SLC | 0756A | | 464 | | |
| AIR | 10/05/2001 | DL 3914 | SLC | 0839A | MCI | 1205P | | 919 | | |
| AIR | 10/07/2001 | DL 1147 | MCI | 0600A | SLC | 0737A | | 919 | | |
| AIR | 10/07/2001 | DL 0473 | SLC | 1105A | GTF | 1235P | | 464 | | |
| HOTEL INFO | | | | | | | **HILTON KANSAS CITY A** | | **3133129341** | **$139.98** |
| FEE INFO | | | | | | | **ARC Processed Fee** | | **8142915832** | **$14.75** |

** Hotel and Car 'amount' is not charged by National Travel.*

Search for another ticket number

Need further assistance click here to email NTS Accounting
or call 304-357-0872.

Have a great evening..
Thanks,
April



Appellate Case: 15-3160 Page: 233 Date Filed: 02/29/2016 Entry ID: 4372451

P17-0016

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | ) | |
| v. | ) | Case No.: 99-00303-01-CR-W-2 |
| KEITH D. NELSON, Defendant. | ) | |

**ORDER**

For good cause shown, IT IS HEREBY ORDERED that Dan Foster, Ph.D. may travel from Browning, Montana to Kansas City, Missouri on Friday, October 5, 2001 and return Sunday, October 7, 2001 for the purpose of meeting and evaluating the defendant. IT IS FURTHER ORDERED that pursuant to Section 702 of the Federal Courts Administration Act of 1992, Public Law 102-572, 106 Stat. 4506, Dan Foster, Ph.D. is authorized to obtain government travel rates for the above described trip in connection with him providing representation to defendant Keith D. Nelson under the Criminal Justice Act.

Sarah W. Hays
SARAH W. HAYS
United States Magistrate Judge

Dated: October 2, 2001
Kansas City, MO

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CHARLES E. WHITTAKER COURTHOUSE
OFFICE OF THE CLERK

PATRICIA L. BRUNE
CLERK OF COURT

REPLY TO:
( ) ROOM 1510 U.S. COURTHOUSE KANSAS CITY, MO. 64106
( ) ROOM 2710 U.S. COURTHOUSE KANSAS CITY, MO. 64106
( ) ROOM 310 U.S. COURTHOUSE JEFFERSON CITY, MO. 65101
( ) ROOM 1400 U.S. COURTHOUSE SPRINGFIELD, MO. 65806

# TRAVEL AUTHORIZATION

**Authorized Traveler:** **Dan Foster, Ph.D.**

**Voucher Number:** **DF100301**

**Authorized Travel Dates:** **October 5, 2001 - October 7, 2001**

**Purpose of Travel** **Travel from Browning, Montana and return for the purpose of meeting and evaluating the defendant in U. S. v. Keith Nelson, case # 99-303-01-CR-W-2.**

Pursuant to Section 702 of the Federal Courts Administration Act of 1992, Public Law 102-572, 106 Stat. 4506, you are hereby authorized to obtain government travel rates for the above-described trip in connection with your providing representation under the Criminal Justice Act (CJA).

You are authorized to contact National Travel Service (NTS) at 1-800-445-0668 to request reservations and airline tickets. You must provide NTS with your **Voucher Number DF100301 Western District of Missouri** and advise NTS that your tickets are to be charged to that court's account. You may instruct NTS where to deliver your tickets.

Reimbursement will be limited to per diem rate ($127.00) as provided by government employee travel regulations.

A copy of this Travel Authorization, as well as a copy of the airline tickets which were provided by NTS, must be submitted upon completion of travel. All other travel expense should be claimed on, and receipts should be attached to, the voucher on which you were appointed in case. Our internal accounting control number for this trip is: 01MOW0007 .

Sarah W. Hays
Judicial Officer

October 3, 2001
Date

**P17-0018**

# National Travel, Inc.

Information • Technology • Service

**INVOICE 111274153**
**Record Locator : K5ZWVI**
**11/27/2001**
**for**
**CUNNINGHAM/MARK**

This Invoice was charged to a **VISA** card ending with **'68'**.

TRAVEL INFO — **Delta Airlines** — **7200986561** — **$173.00**

| | DATE | A/L FLT | ORIG | DEPT TIME | DEST | ARRV TIME | FREQ FLYER NUM | AIR MILES |
|---|---|---|---|---|---|---|---|---|
| AIR | 11/27/2001 | DL 1545 | MCI | 0550P | ATL | 0848P | | 693 |
| AIR | 11/27/2001 | DL 1434 | ATL | 0955P | MIA | 1142P | | 595 |

FEE INFO — **ARC Processed Fee** — **8143448323** — **$14.75**

** Hotel and Car 'amount' is not charged by National Travel.*

Search for another ticket number

Need further assistance click here to email NTS Accounting
or call 304-357-0872.



Appellate Case: 15-3160 Page: 236 Date Filed: 02/29/2016 Entry ID: 4372451

12/03/01 14:34 FAX 304 343 5059 NATIONAL TRAVEL INC. 002

# National Travel, Inc.
Information • Technology • Service

**INVOICE 111274154**
**Record Locator : K5ZWVI**
**11/27/2001**
**for**
**CUNNINGHAM/MARK**

This Invoice was charged to a **VISA** card ending with **'68'**.

TRAVEL INFO

**American Airlines** **7200986562** **$398.75**

| | DATE | A/L FLT | ORIG | DEPT TIME | DEST | ARRV TIME | FREQ FLYER NUM | AIR MILES |
|---|---|---|---|---|---|---|---|---|
| AIR | 12/01/2001 | AA 0807 | MIA | 0205P | DFW | 0412P | | 1,121 |
| AIR | 12/01/2001 | AA 3517 | DFW | 0528P | ABI | 0622P | | 158 |

** Hotel and Car 'amount' is not charged by National Travel.*

Search for another ticket number

Need further assistance click here to email NTS Accounting
or call 304-357-0872.

http://www.nationaltravel.com/cgi-bin/invoice_search.pl?tktnum=7200986562 12/3/2001

Appellate Case: 15-3160 Page: 237 Date Filed: 02/29/2016 Entry ID: 4372451

12/03/01 14:33 FAX 304 343 5059 NATIONAL TRAVEL INC. 001

Delta
CUNNINGHAM/MARK

ETKT PASSENGER ITINERARY
DATE/PLACE OF ISSUE 27NOV01 CRUP

NOT TRANSFERABLE

| DAY/DATE | FLIGHT | STATUS | CARRIER/VENDOR | CITY | TIME | SEAT | CLASS | MEAL | REMARK |
|---|---|---|---|---|---|---|---|---|---|
| TUE 27NOV01 | 1545 | OK | DELTA AIR LINES INC | LV KANSAS CITY | 0550P | 240 | COACH | BEVERAGE | |
| | | | | AR ATLANTA | 848P | | | | |
| TUE 27NOV01 | 1434 | OK | DELTA AIR LINES INC | LV ATLANTA | 0955P | 39C | COACH | BEVERAGE | |
| | | | | AR MIAMI | 1142P | | | | |

173.00

CONTINUED . . .

DUPLICATE

0 0067200986561 2

PAGE 01 OF 02
DUPLICATE

Delta
CUNNINGHAM/MARK

ETKT PASSENGER RECEIPT
DATE/PLACE OF ISSUE 27NOV01 CRUP

NOT TRANSFERABLE

THIS TICKET SHALL EXPIRE ONE YEAR FROM DATE OF ISSUE

FARE CALCULATION 27NOV MCI DL X/ATL DL MIA 148.84 USD148.84 END ZPMCIATL XT 5.50ZP7.50XFMCI3ATL4.5

ISS AGT ID 1V/ZDIAG

FORM OF PAYMENT VI4486000000004668

USD 148.84
US 11.16
XT 13.00

RECORD LOCATOR V72LNJ
IATA 51638263

USD173.00 DUPLICATE

0 0067200986561 2

PAGE 02 OF 02
DUPLICATE

PASSENGER TICKET AND BAGGAGE CHECK
SUBJECT TO CONDITIONS OF CONTRACT

ISSUED BY *** ELECTRONIC TICKET *** AmericanAirlines

7200986562 6

PASSENGER RECEIPT 1 OF 1

DATE OF ISSUE 27NOV01 ISSUING OFFICE CODE 00000000 SITI US

ISS. AGENT ID. CRU AGP PLACE OF ISSUE CHARLESTON WV

NAME 1638263 (NOT TRANSFERABLE)

X/O CUNNINGHAM/MARK

X/O TO **NOT VALID FOR****** RETAIN THIS RECEIPT***
**TRANSPORTATION***THROUGHOUT YOUR JOURNEY*

ENDORSEMENTS/RESTRICTIONS

PNR CODE DALSHR/AA

ORIGINAL ISSUE

ISSUED IN EXCHANGE FOR

FARE CALCULATION
P BA4486000000004668/ 6257 FC 1DEC MIA AA DFW 255.81 AA ABI 106.98 USD362.79 END ZPMIADFW0 XT 2.75ZP 6.00XFMIA3DFW3

FARE
TAX USD 362.79
TAX JS 27.21
TAX XT 8.75
TOTAL USD 398.75

FORM OF PAYMENT *VI4486000000004668

************************************************

00106448033325

001 7200986562 0
*****DUPLICATE*****

AmericanAirlines 1

NAME OF PASSENGER
CUNNINGHAM/MARK

X/O FROM
MIAMI INTERNTNL
AA 69 Y 30NOV YCADFW
DALLAS FT WORTH
AA 3775 Y 30NOV YCADFW
ABILENE

********************
********************
********************
********************
********************

NOT VALID FOR TRAVEL
001 7200986562 0

P17-0021

National Travel, Inc.
Information • Technology • Service

National Travel Service
Suite 100 Bank One Center Charleston WV
(304) 357-0808
Fax:(304) 343-5059

Prepared on 11/23/01 16:34:51, PNR PJ4F7G
Passenger: BENNETT/THOMAS

27NOV TUE

**AIR** United flight no: 1176 class: Y seat: 03C
depart: Billings, MT(BIL) 855A
arrive: Denver, CO(DEN) 1018A
equipment: 735 flight time: 1:23
AUDIO PROGRAMMING/NON-SMOKING

---

**AIR** United flight no: 1524 class: Y seat: 03F
depart: Denver, CO(DEN) 1115A
arrive: Kansas City, MO(MCI) 140P
equipment: 733 flight time: 1:25
AUDIO PROGRAMMING/NON-SMOKING
ARRIVES MCI TERMINAL C

---

**CAR** Pickup at Kansas City, MO dropoff 29NOV THU
Budget Rent A Car type: Compact Car Auto Ac confirmation no: 05662010US4
rate guaranteed $ 36.00 per day, .00 per mile unlimited free miles

---

**HOTEL** Marriott Hotels in Kansas City, MO check out: 29NOV THU
MARRIOTT KANSAS CITY DOWNTOWN 200 WEST 12TH STREET KANSAS CITY MO 64105
Voice: 816 421-6800 Fax: 816 855-4418
confirmation no: 82352593 Room guaranteed to credit card
rate: $ 85.00 Rate guaranteed
- SOUTH ON I-29 TO 169 S EXIT FOLLOW BROADWAY S TO 12TH ST AND TURN LEFT ON 12TH ST. GO ONE BLOCK.
RESERVATION IS GUARANTEED FOR LATE ARRIVAL.
PLEASE CANCEL 5PM PRIOR TO ARRIVAL TO AVOID BILLING
RESERVATION IS GUARANTEED FOR LATE ARRIVAL.
PLEASE CANCEL 5P PRIOR TO ARRIVAL TO AVOID BILLING

NTS Billed 1/2 of Reservation to Steve's Card and 1/2 to CJA Card. Will rebill 1/2 on CJA next mo to correct

---

29NOV THU

**AIR** Delta Airlines flight no: 1222 class: H seat: 21F
depart: Kansas City, MO(MCI) 645P
arrive: Salt Lake City, UT(SLC) 820P
equipment: 733 flight time: 2:35
NON-SMOKING
DEPARTS MCI TERMINAL B - ARRIVES SLC TERMINAL 2

---

**AIR** Delta Airlines flight no: 1440 class: H seat: 30B
depart: Salt Lake City, UT(SLC) 1000P
arrive: Billings, MT(BIL) 1117P
equipment: M90 flight time: 1:17
NON-SMOKING
DEPARTS SLC TERMINAL 2

---

27DEC THU

**OTHER** Billings, MT
ELECTRONIC TICKET REQUESTED/I

---

**Ticket Information**

| Air Transportation (Total) | Base Fare | US Taxes | Other Taxes | Agent | Ticketing Date | Reservation # |
|---|---|---|---|---|---|---|
| USD 520.00 | USD 459.54 | USD 34.46 | USD 26.00 | BP | 26NOV | PJ4F7G |

Additional service fee of $14.75 applies to each ticket.

549.50

**Airfares are not guaranteed until ticketed.**

NO FREQUENT FLIER DATA ON FILE.
THIS IS AN ELECTRONIC TICKET TRANSACTION
AN ELECTRONIC TICKET CANNOT BE TRANSFERRED TO ANOTHERCARRIER
PLEASE ADVISE NATIONAL TRAVEL IF YOU DO NOT TRAVEL
FOR ASSISTANCE IN OBTAINING A REFUND
WHEN CHECKING IN FOR YOUR FLIGHTS PLEASE PROVIDE
THE FOLLOWING CONFIRMATION NUMBER: UA PJ4F7G
............ CONFIRMATION NUMBER: DL SIY9PB
YOU MUST PRESENT POSITIVE IDENTIFICATION AT THE CHECKIN

THANK YOU. BECKY

Due to increased security screenings at all airports
Passengers should arrive at the airport a minimum of 2 hours prior
to departure for all domestic flights
For Nationwide Assistance call 1-800 445-0668 Mon-Fri 8:00am-9:00pm
After 9pm call 1-800-624-8283 and give code C5A
No car or hotel requested
For airline travel within the U.S. the Department of Transportation
Requires all passengers over 18 to present photo ID at check-in.
Note-Frequent flyer benefits earned while on official
Government travel are the property of the US Government

Please review the itinerary carefully
and notify National Travel immediately
with any changes.........BP

P17-0023

CJA 30 DEATH PENALTY PROCEEDINGS: APPOINTMENT OF AND AUTHORITY TO PAY COURT APPOINTED COUNSEL (Rev. 5/99)

1. CIR./DIST./DIV. CODE: MOW
2. PERSON REPRESENTED: Keith Nelson
VOUCHER NUMBER: 03MOW323
3. MAG. DKT./DEF. NUMBER
4. DIST. DKT./DEF. NUMBER: 4:99-000303:001
5. APPEALS DKT./DEF. NUMBER
6. OTHER DKT. NUMBER
7. IN CASE/MATTER OF (Case Name): U.S. v Nelson
8. TYPE PERSON REPRESENTED: ■ Adult Defendant ☐ Appellant ☐ Other ☐ Habeas Petitioner ☐ Appellee
9. REPRESENTATION TYPE: ☐ D1 28 U.S.C. § 2254 Habeas (Capital) ☐ D3 28 U.S.C. § 2255 (Capital) ■ D2 Federal Capital ☐ D4 Other (Specify)
10. OFFENSE(S) CHARGED (Cite U.S. Code, Title & Section) *If more than one offense, list (up to five) major offenses charged, according to severity of offense.*
18 2241.F--ACOMMIT RAPE W/IN SPEC MARITIME OR TERR SEXUAL ABUSE

11. ATTORNEY'S NAME (*First Name, M.I., Last Name, including any suffix*), AND MAILING ADDRESS

BERRIGAN, PATRICK
2500 HOLMES
KANSAS CITY MO 64108

Telephone Number: (816) 474-3350

13. NAME AND MAILING ADDRESS OF LAW FIRM (*Only provide per instructions*)

Watson and Dameron
2500 Holmes
Kansas City MO 64108

12. COURT ORDER:
■ O Appointing Counsel ☐ C Co-Counsel
☐ F Subs For Federal Defender ☐ R Subs For Retained Attorney
☐ P Subs For Panel ☐ Y Standby Counsel

Prior ... Appointment Date:
(A) B... (1) is ...ified under oath or has otherwise satisfied this Court that he or she ... not wish to waive counsel, and because the interests of justice so requir... is app... has been determined to possess the specific qualifications by law,
(B) Th... as: ☐ LEAD COUNSEL ☐ CO-COUNSEL
Nam... or L... Appointment Date:
(C) If ...prior proceeding related to this matter, attach to your initial claim a listi...ach (e.g., lead in counsel or co-counsel).
☐ (D) ...ticipated hardship on counsel in undertaking representation full-time, ...yments of compensation and expenses are approved pursuant to the att...

[Sticky note, handwritten: 3 Vouchers — Nelson]

Signature of Presiding Judicial Officer or By Order of the Court

02/13/01
Date of Order

Nunc Pro Tunc Date

(E) Repayment or partial repayment ordered from the person represented for this service at time of appointment. ☐ YES ☐ NO

CLAIM FOR SERVICES AND EXPENSES

14. STAGE OF PROCEEDING Check the box which corresponds to the stage of the proceeding during which the work claimed at Item 15 was performed even if the work is intended to be used in connection with a later stage of the proceeding. CHECK NO MORE THAN ONE BOX. Submit a separate voucher for each stage of the proceeding.

CAPITAL PROSECUTION: a. ■ Pre-Trial b. ☐ Trial c. ☐ Sentencing d. ☐ Other Post Trial e. ☐ Appeal f. ☐ Petition for the U.S. Supreme Court Writ of Certiorari

HABEAS CORPUS: g. ☐ Habeas Petition h. ☐ Evidentiary Hearing i. ☐ Dispositive Motions j. ☐ Appeal k. ☐ Petition for the U.S. Supreme Writ of Certiorari

OTHER PROCEEDING: l. ☐ Stay of Execution m. ☐ Appeal of Denial of Stay n. ☐ Petition for Writ of Certiorari to the U.S. Supreme Court Regarding Denial of Stay o. ☐ Other

HOURS AND COMPENSATION CLAIMED — FOR COURT USE ONLY

| 15. CATEGORIES (*Attach itemization of services with dates*) | HOURS CLAIMED | TOTAL AMOUNT CLAIMED | MATH/TECH. ADJUSTED HOURS | MATH/TECH. ADJUSTED AMOUNT | ADDITIONAL REVIEW |
|---|---|---|---|---|---|
| a. In-Court Hearings (RATE PER HOUR = $ ) | 35.9 | 4,487.50 | | IN COURT TOTAL *Category a* | IN COURT TOTAL *Category a* |
| b. Interviews and Conferences with Client | 51.3 | | | | |
| c. Witness Interviews | 84.1 | | | | |
| d. Consultation with Investigators & Experts | 32.3 | | | | |
| e. Obtaining & Reviewing the Court Record | 26.3 | | | | |
| f. Obtaining & Reviewing Documents and Evidence | 142.1 | | | OUT OF COURT TOTAL *Categories b-j* | OUT OF COURT TOTAL *Categories b-j* |
| g. Consulting with Expert Counsel | 78.3 | | | | |
| h. Legal Research and Writing | 141.9 | | | | |
| i. Travel | 48.8 | | | | |
| j. Other (*Specify on additional sheets*) | 19.7 | | | | |
| TOTALS: Categories b thru j (RATE PER HOUR = ) | 624.8 | 78,100.00 | | | |
| 16. Travel Expenses (*lodging, parking, meals, mileage, etc.*) | | 1,275.62 | | | |
| 17. Other Expenses (*other than expert, transcripts, etc.*) | | 10,573.01 | | | |
| GRAND TOTALS (CLAIMED AND ADJUSTED) | | 94,436.13 | | | |

18. CERTIFICATION OF ATTORNEY/PAYEE FOR THE PERIOD OF SERVICE 02/13/01 TO: 11/18/01

19. APPOINTMENT TERMINATION DATE IF OTHER THAN CASE COMPLETION

20. CASE DISPOSITION

21. CLAIM STATUS ☐ Final Payment ■ Interim Payment Number 1 ☐ Supplemental Payment

Have you previously applied to the court for compensation and/or reimbursement for this ☐ YES ■ NO If yes, were you paid? ☐ YES ☐ NO
Other than from the Court, have you, or to your knowledge has anyone else, received payment (*compensation or anything of value*) from any other source in connection with this representation? ☐ YES ■ NO If yes, give details on additional sheets.
I swear or affirm the truth or correctness of the above statements.

Signature of Attorney [signature] Date 4/28/03

APPROVED FOR PAYMENT — COURT USE ONLY

| 22. IN COURT COMP. | 23. OUT OF COURT COMP. | 24. TRAVEL EXPENSES | 25. OTHER EXPENSES | 26. TOTAL AMT. APPROVED |
|---|---|---|---|---|
| | | | | |

27. SIGNATURE OF THE PRESIDING JUDICIAL OFFICER [signature] DATE 5-2-03 27a. JUDGE CODE

CJA 30 DEATH PENALTY PROCEEDINGS: APPOINTMENT OF AND AUTHORITY TO PAY COURT APPOINTED COUNSEL (Rev. 5/99)

1. CIR./DIST./DIV. CODE: MOW
2. PERSON REPRESENTED: Keith Nelson
VOUCHER NUMBER: 03MOW324
3. MAG. DKT./DEF. NUMBER:
4. DIST. DKT./DEF. NUMBER: 4:99-000303-001
5. APPEALS DKT./DEF. NUMBER:
6. OTHER DKT. NUMBER:
7. IN CASE/MATTER OF (Case Name): U.S. v Nelson
8. TYPE PERSON REPRESENTED: ■ Adult Defendant ☐ Appellant ☐ Other ☐ Habeas Petitioner ☐ Appellee
9. REPRESENTATION TYPE: ☐ D1 28 U.S.C. § 2254 Habeas (Capital) ☐ D3 28 U.S.C. § 2255 (Capital) ■ D2 Federal Capital ☐ D4 Other (Specify)
10. OFFENSE(S) CHARGED (Cite U.S. Code, Title & Section) *If more than one offense, list (up to five) major offenses charged, according to severity of offense.*
18 2241.F--ACOMMIT RAPE W/IN SPEC MARITIME OR TERR SEXUAL ABUSE

11. ATTORNEY'S NAME (*First Name, M.I., Last Name, including any suffix*), AND MAILING ADDRESS
BERRIGAN, PATRICK
2500 HOLMES
KANSAS CITY MO 64108
Telephone Number: (816) 474-3350

12. COURT ORDER:
■ O Appointing Counsel ☐ C Co-Counsel
☐ F Subs For Federal Defender ☐ R Subs For Retained Attorney
☐ P Subs For Panel ☐ Y Standby Counsel
Prior Attorney's Name: ____ Appointment Date: ____
(A) Because the above-named person represented has testified under oath or has otherwise satisfied this Court that he or sh (1) is financially unable to employ counsel and (2) does not wish to waive counsel, and because the interests of justice s require, the attorney whose name appears in Item 11, who has been determined to possess the specific qualifications by law, is appointed to represent the person in this case.
(B) The attorney named in Item 11 is appointed to serve as: ☐ LEAD COUNSEL ☐ CO-COUNSEL
Name of Co-Counsel or Lead Counsel: ____ Appointment Date: ____
(C) If you represented the defendant or petitioner in any prior proceeding related to this matter, attach to your initial clai a listing of those proceedings and describe your role in each (e.g., lead in counsel or co-counsel).
☐ (D) Due to the expected length of this case, and the anticipated hardship on counsel in undertaking representation full-time, for such a period without compensation, interim payments of compensation and expenses are approved pursuant to the attached order.

Signature of Presiding Judicial Officer or By Order of the Court
02/13/01
Date of Order — Nunc Pro Tunc Date
(E) Repayment or partial repayment ordered from the person represented for this service at time of appointment. ☐ YES ☐ NO

13. NAME AND MAILING ADDRESS OF LAW FIRM (*Only provide per instructions*)
Watson and Dameron
2500 Holmes
Kansas City MO 64108

CLAIM FOR SERVICES AND EXPENSES

14. STAGE OF PROCEEDING Check the box which corresponds to the stage of the proceeding during which the work claimed at Item 15 was performed even if the work is intended to be used in connection with a later stage of the proceeding. CHECK NO MORE THAN ONE BOX. Submit a separate voucher for each stage of the

CAPITAL PROSECUTION: a. ☐ Pre-Trial b. ■ Trial c. ☐ Sentencing d. ☐ Other Post Trial e. ☐ Appeal f. ☐ Petition for the U.S. Supreme Court Writ of Certiorari

HABEAS CORPUS: g. ☐ Habeas Petition h. ☐ Evidentiary Hearing i. ☐ Dispositive Motions j. ☐ Appeal k. ☐ Petition for the U.S. Supreme Writ of Certiorari

OTHER PROCEEDING: l. ☐ Stay of Execution m. ☐ Appeal of Denial of Stay n. ☐ Petition for Writ of Certiorari to the U.S. Supreme Court Regarding Denial of Stay o. ☐ Other

15. HOURS AND COMPENSATION CLAIMED — FOR COURT USE ONLY

| CATEGORIES (*Attach itemization of services with dates*) | HOURS CLAIMED | TOTAL AMOUNT CLAIMED | MATH/TECH. ADJUSTED HOURS | MATH/TECH. ADJUSTED AMOUNT | ADDITIONAL REVIEW |
|---|---|---|---|---|---|
| a. In-Court Hearings (RATE PER HOUR = $ ) | 42.7 | 5,337.50 | | IN COURT TOTAL *Category a* | IN COURT TOTAL *Category a* |
| b. Interviews and Conferences with Client | 2.6 | | | | |
| c. Witness Interviews | 26.1 | | | | |
| d. Consultation with Investigators & Experts | 1.6 | | | | |
| e. Obtaining & Reviewing the Court Record | | | | | |
| f. Obtaining & Reviewing Documents and Evidence | 2.0 | | | OUT OF COURT TOTAL *Categories b-j* | OUT OF COURT TOTAL *Categories b-j* |
| g. Consulting with Expert Counsel | 3.5 | | | | |
| h. Legal Research and Writing | 41.6 | | | | |
| i. Travel | 3.9 | | | | |
| j. Other (*Specify on additional sheets*) | 3.8 | | | | |
| TOTALS: Categories b thru j (RATE | 85.1 | 10,637.50 | | | |
| TRAVEL EXPENSES AND OTHER EXPENSES (*attach itemization of expenses with dates*) | | | | | |
| 16. Travel Expenses (*lodging, parking, meals, mileage*) | | 60.61 | | | |
| 17. Other Expenses (*other than expert, transcripts, etc.*) | | 61.23 | | | |
| GRAND TOTALS (CLAIMED AND ADJUSTED) | | 16,096.84 | | | |

18. CERTIFICATION OF ATTORNEY/PAYEE FOR THE PERIOD OF SERVICE 11/19/01 TO: 11/28/01
19. APPOINTMENT TERMINATION DATE IF OTHER THAN CASE COMPLETION
20. CASE DISPOSITION
21. CLAIM STATUS ☐ Final Payment ■ Interim Payment Number 2 ☐ Supplemental Payment
Have you previously applied to the court for compensation and/or reimbursement for this ☐ YES ■ NO If yes, were you paid? ☐ YES ☐ NO
Other than from the Court, have you, or to your knowledge has anyone else, received payment (*compensation or anything of value*) from any other source in connection with this representation? ☐ YES ■ NO If yes, give details on additional sheets.
I swear or affirm the truth or correctness of the above statements.
Signature of Attorney: [signature] Date: 4-28-03

APPROVED FOR PAYMENT — COURT USE ONLY
22. IN COURT COMP. 23. OUT OF COURT COMP. 24. TRAVEL EXPENSES 25. OTHER EXPENSES 26. TOTAL AMT. APPROVED
27. SIGNATURE OF THE PRESIDING JUDICIAL OFFICER [signature] DATE 5-2-03 27a. JUDGE CODE