# EXHIBIT 29

**JILL MILLER, MSSW**

Forensic Social Work Services
jillemiller@sbcglobal.net

P.O. Box 44343
Madison, Wisconsin 53744-4343
(608) 271-0227
FAX (608) 271-0491

## CONFIDENTIAL MEMORANDUM

**TO:** Attorneys David Ruhnke, Gary Brotherton & Paula Harms
**RE:** Keith D. Nelson v. U.S.; Case No. 4:04-cv-8005(JFG)
Preliminary Social History
**DATE:** March 19, 2012

[This is a preliminary report of the results of the social history investigation in this case, incorporating the product of the pre-trial social history investigation and results of the expanded post-conviction investigation. Work is ongoing, and the report will be supplemented as additional information is obtained.]

On October 25, 2001, Keith Nelson entered a plea of guilty to the kidnap and murder of ten-year-old Pamela Butler on October 12, 1999, in Jackson County, in the Western District of Missouri. On November 28, 2001, a jury empaneled for the purpose of determining punishment returned a verdict recommending a sentence of death, which the Court subsequently imposed. The conviction and sentence were appealed. On October 22, 2003, the conviction and sentence were affirmed in the Eighth Circuit Court of Appeals. On November 8, 2004, the Supreme Court of the United States denied certiorari review. Counsel for the defendant then filed a post-conviction motion to vacate the conviction and sentence in the US District Court for the Western Division of Missouri. Pursuant to various legal motions and proceedings, the matter was set for an evidentiary hearing in the District Court on several claims, including the failure of trial counsel to conduct an adequate mitigation investigation and failure to conduct an adequate investigation of defendant's mental health. This report is prepared for consideration of these two claims.

## SOCIAL HISTORY

### Early Nelson/Bowdre Family History: 1920-1972

Within the Nelson/Bowdre extended family there is an extensive history of mental health problems and inappropriate sexual conduct. There is also a history of alcohol and drug abuse. In addition, there is a family history of

CLERK U.S.DISTRICT COURT
Exhibits:
P 38
Case No. 4:04-CV-08005-FJG

thyroid disorders, specifically hypothyroidism, which untreated can produce physical and mental health symptoms. These factors may be significant in that some can be hereditary. To the extent they are present in parent figures, they can have an effect on child-rearing and development, and may, therefore, be significant in understanding the development and behavior of Keith Nelson.

Keith Nelson is the third of five sons born to Nancy Nelson and Kenneth Morse. Nancy Nelson is the fourth of six children born of the marriage of Wilma Bowdre Nelson and George Melvin Nelson. Wilma Bowdre, Keith's maternal grandmother, was born on November 5, 1928, to Charles and Mary Elizabeth Bowdre (nee Koch). She was one of eight children born of the marriage. Her full siblings were: Della, Edna, Evelyn, Donald, Elmer, Bob and Max. Charles Bowdre had a son Charles by a previous relationship. Elizabeth Bowdre had a daughter Velma prior to the marriage. This child was the product of a rape. Della Bowdre was reportedly schizophrenic as was one of her sons. Edna Bowdre reportedly suffered from depression and may have been schizophrenic. She had three sons, all of whom suffered from schizophrenia, and two of whom committed suicide. The living son has been treated for schizophrenia. Max Bowdre was alcoholic and may have suffered from mental illness.

Charles Bowdre, Keith's great grandfather, was an alcoholic. Wilma has told at least two of her daughters that she was sexually molested by her father. She may also have been sexually molested by her half-brother, Charles. Mary Smith reported that after Wilma was molested by her father, she moved in with her half brother Charles and his wife. Wilma was married as a teen to Roy Gilbert. He was in the military and left for service in World War II. He reportedly abused alcohol. During his absence she became involved with a man named Kenneth Martin. He was also described as alcoholic and abusive. Wilma had her first child, a daughter named Mary, on December 9, 1945. Though her last name is listed as Gilbert on her birth certificate, Mary said that she was told by Wilma that Kenny Martin was her father. Wilma had a second daughter, Donna, by Martin on February 3, 1947. Her birth certificate lists Martin as the father, though Wilma remained married to Gilbert at the time, whom she divorced later in the year. Stating that Donna looks like Martin and she doesn't, Mary implied that her biological father could actually be her grandfather or uncle. She said she really doesn't know.

Wilma married George Melvin Nelson in 1948. George Nelson was born on December 23, 1921, and was one of seven children born of the marriage of Burt and Ginnie Mae Nelson (nee Springs). His siblings were: Charles, Winford, Floyd, Ginny Mae, Rose and Wesley. Winford was reportedly a paranoid schizophrenic. Wesley is described as having mental health problems of an unknown nature. Family members reported that Wesley sexually molested all three of his children - a daughter and two sons. His son, Wesley, Jr., sexually molested Nancy's brother George. He also reportedly sexually molested his

sister Gloria. Winford Nelson had a seizure disorder. Floyd Nelson also was said to have molested his children and was described as being an alcoholic. Family members said that all of the Nelson brothers abused alcohol. George Nelson was married to Mary Ellen Whelan in 1945, and they had a daughter, Linda. George and Mary Ellen then divorced, and Linda had no contact with George after that. George then married Wilma Bowdre.

Wilma and George Nelson had six children of their own. Their names and dates of birth are:

| | |
|---|---|
| Wilma Katherine "Kathy" Nelson (now Henre) | DOB: 7–19-1951 |
| Georgeann Nelson (now Romero) | DOB: 3-15-1953 |
| George Nelson | DOB: 5-30-1954 |
| Nancy Nelson | DOB: 1-29-1956 |
| Cherylynn Nelson (now Swift) | DOB: 10-5-1968 |
| Mark Nelson | DOB: 10-1-1971 |

The marriage of Wilma and George Nelson was a stormy one. George abused alcohol. He primarily drank whisky. Nancy told investigator Ron Ninemire that her father was an alcoholic. George and Wilma argued frequently, and arguments became physical, with Wilma hitting George with her fists and other objects, including a broom stick. George would accuse Wilma of having affairs and of withholding sex. Mary described an incident in which Wilma chased George with a knife. On another occasion, Donna was asleep in her bed when she heard her step-father screaming for her to come to his bedroom. When she went in, George was on the floor naked, and Wilma was holding his penis with one hand and a knife with the other. Mary Smith noted that they could often hear their parents fighting during the night, and there were times when they had to call the police. Mary also reported an incident in which her father came into her bedroom during the night and tried to molest her. Donna described this incident, as well - she was sleeping in the same room - George had his penis out and asked Mary if she wanted "this big dick." Mary threatened to tell Wilma, and George left without touching her.

George worked in maintenance and security at Memorial Park Cemetery for many years. His earnings were barely adequate to support the large family, which struggled financially. At times, there was little food in the house. George was forced to retire early due to health problems, including emphysema. The family moved numerous times during Nancy's childhood, but always lived in the Kansas City area.

The Nelson daughters described their father as being verbally and emotionally abusive. He singled Mary and Donna, his step-daughters, out for the worst treatment but was also cruel and demeaning to Nancy. He would often come home drunk, and curse and call his children names. He called Mary

and Donna "whore" and "bitch." If his children didn't do what he wanted, he would slap them and call them names.

Wilma Nelson is described as having been depressed throughout her life. Kathy Henre said that when the children were young, Wilma stayed in her room and slept a lot. She would "sit on the couch for days", and seemed depressed all the time. Kathy said that the children had to do everything around the house, and had to fend for themselves much of the time. She added that Wilma never bonded with any of her children. Donna said that Wilma was not affectionate or loving towards her children, and didn't pay much attention to them.

As a child, Nancy is described as quiet and withdrawn. Nancy, stating that she has been depressed her whole life, said that she did not have friends as a child, and kept to herself. She was always overweight and was teased and picked on by other students at school. She never felt good about herself. Mary noted that Nancy always wanted everything clean and neat, as well as organized. Georgeann said the same thing, noting that Nancy always kept her part of the bedroom neat and clean. Kathy agreed that Nancy seemed depressed from a very young age.

The older Nelson daughters left home at an early age, in their mid teens. Mary, Donna and Kathy all married at age fifteen. They report that they married young to get out of the house. They were all gone by the time Wilma had her last two children, Cherylynn and Mark, which Kathy called Wilma's "change-of-life" babies. Wilma developed serious health problems during her pregnancy with Cherylynn. She was in and out of the hospital over the next few years, and was even sent to the Mayo Clinic at one time. She reportedly had liver problems and gallstones. She underwent several surgeries. Wilma was unable to care for her two youngest children, so Nancy left school after the eighth grade to stay home and take care of her young siblings.

Nancy reported that she had been unhappy in school and didn't mind leaving early. In addition to being made fun of by other students, she was exposed to a great deal of violence at school. She attended Prescott Elementary and Northwest Middle School. The schools were in a rough neighborhood. There were a lot of fights and riots in and around the schools. Nancy witnessed stabbings in the hallways, and noted that a girl was raped in the stairwell. In the neighborhood, she would often hear sirens and gunshots. She remembers being scared most of the time. Nancy was in regular classes when in school, and reportedly earned satisfactory grades. She never returned to school. At age sixteen she started working at Paul's Drive-in Restaurant, which was owned by her sister Mary and Mary's husband. It was there that she met Kenneth "Kenny" Morse.

Most of Nancy's siblings and many of their children have experienced mental health problems. There is also some history of sexually inappropriate behavior in the family. Mary Smith's first husband, Donald Harris, sexually molested Mary's younger sister Georgeann. He also tried to molest Kathy Henre. Mary's youngest son, Charlie, is described as paranoid. He has delusions about being followed. He has abused drugs. Donna is described as suffering from anxiety. Kathy Henre reported that she has been diagnosed with depression, and that she takes medication for the condition. Her son Melvin is a diagnosed paranoid schizophrenic. Kathy had Melvin prior to her marriage to Charles Henre. His father was Tony Quinn. Georgeann is described as having bipolar disorder, for which she takes medication at times; she was also described as being paranoid. She is estranged from the family. Her second husband, Del Romero, sexually assaulted her daughter from her first marriage, Judy, when she was a teen. Judy became pregnant as a result. Romero divorced Georgeann and subsequently married Judy. George Nelson has suffered from mental health problems. As a child, he was sexually molested by his older Nelson cousin, Wesley. The abuse involved oral sex. George told Deborah Haddad that he was six years old at the time, and that he was devastated by the experience. He has heard that his cousin Wesley had been molested by his own father. As stated above, Nancy reports a long history of depression; she has also had symptoms of Post Traumatic Stress Disorder (see below). Cherylynn Nelson Swift may be bipolar. She has also abused drugs. She has four children, three of whom were removed from her custody by the state. Her son Aaron has been diagnosed as bipolar with psychotic tendencies. Nancy said that another son, Christopher, may also be bipolar. Mark Nelson has been married twice. He has two children from his second marriage who are described as being "slow" learners. There has reportedly been sexually inappropriate behavior between his current wife and his daughter from his first marriage.

There is a strong history of thyroid problems in the Nelson family, specifically hypothyroidism. Wilma, Mary, Donna, Kathy, Georgeann and Nancy have all been diagnosed with hypothyroidism, as has Kathy's son Melvin. Nancy was diagnosed at age eleven, and began taking synthroid at that time. She discontinued medication at age sixteen for about twenty years. She is currently taking medication. Among the signs and symptoms of untreated hypothyroidism are: lethargy, weight gain, dull facial expression, sparse hair, forgetfulness, depression and personality change. Maternal hypothyroidism during pregnancy can affect the developing fetus, including brain development, and can cause intellectual impairment.

**Early Morse/Smith Family History: 1904-1972**

Within the extended Morse family, there is a significant history of mental disorders, and alcohol and drug abuse. There is an extensive history of abusive

treatment of women by men in the family. There is also an extensive history of criminal conduct, including sexual misconduct.

Keith Nelson's biological father is Kenneth Morse, the ninth of fourteen children (who lived past infancy) born of the marriage of John Morse and Pearl Smith Morse. John Henry Morse was born in southern Illinois on July 4, 1904 to Sylvester Morse and Alice Hill Morse. He had several siblings, including: Sylvester, Luther, and George. Little is known about them. One relative reported that John was a full-blooded Native American; he was one half Cherokee and one half Sioux. John's father died in 1909, when John was only five years old. Milas Morse reported that he thought John only went to school until the third or fourth grade. According to the Illinois State Archives, John Morse went to prison at age twenty-two. He was incarcerated on a sentence of 1 to 20 years on November 22, 1926 on charges of Burglary and Larceny, and paroled on December 24, 1929. He was listed as having been a farm hand prior to his incarceration.

Pearl Smith was born in southern Illinois on August 11, 1920. Her father's name was Walter Smith, and her mother was Annie Coryell Smith. Her family had a farm in the Wolf Lake area. She had several siblings, including: Clyde, Floyd, Claude, Grover, Leo, Wally, and Ethel. She attended school until the tenth or eleventh grade. Pearl met John Morse as a young teen. Family members report that she became pregnant by Morse, sixteen years her senior, at age thirteen. She was placed in a home and forced to give up the baby or babies - one relative reported that she gave birth to twins on this occasion. According to records, Pearl married John Morse in Cape Girardeau, Missouri on August 11, 1937, when she was seventeen years old and he was thirty three. Her father had to consent to the marriage, as she was underage. She gave birth to the first child of the marriage, Raymond, two and a half months later, on October 31, 1937. Over the next thirty years, Pearl gave birth to thirteen more children who survived past infancy. She reportedly had several other stillbirths or babies that died in infancy. She was forty-seven years old at the time she had her last child, Beverly, who is described by family members as always having been "slow." The children of the Morse marriage are:

| | |
|---|---|
| Raymond Morse (deceased) | DOB: 10-31-37 |
| Charlie Morse | DOB: 03-17-40 |
| Milas Ray Morse | DOB: 01-30-41 |
| Alice Morse (now Brin) | DOB: 02-21-43 |
| Evelyn Morse (now Rumfelt) | DOB: 02-13-46 |
| Gladys Sue Morse (now Richardson) | DOB: 03-24-48 |
| Robert Morse (deceased) | DOB: 09-22-50 |
| Betty Morse (now Sutton) | DOB: 02-13-52 |
| Kenneth Morse | DOB: 01-27-53 |
| Fred Morse | DOB: 11-06-54 |

| | |
|---|---|
| Karen Morse (now Gentry) | DOB: 02-21-56 |
| Bobby Morse | DOB: 06-24-57 |
| Cindy Morse (now Scharshell) | DOB: 10-03-58 |
| Beverly Morse | DOB: 04-10-67 |

During the early years of the marriage, Pearl and John Morse lived in rural Pine Hills, Union County, Illinois. This is in the southern tip of the state. After a few years they moved to a two bedroom home in Wolf Lake. Family members described this home as a "shack", without electricity or running water. They had a gas cook stove, a wood burner for heat, a pump for water and an outdoor toilet. John built a large room onto the house and placed several beds in it. One family member reported that Pearl and John never slept in the same bedroom, but another said that each had a bed on either end of the large room. John had various jobs over the years, including as a farm hand, driving a log truck, in a sawmill, and finally at the Trojan Powder Company, which made dynamite and gun powder. He was injured in an explosion at the plant in 1961. He worked there until his death in 1967. The large family was very poor. Milas, the third oldest child, reported that the older sons would help feed the family by hunting and fishing. He added that Raymond and Charles did this until "they got old enough to hit the bottle", adding that both abused alcohol starting at an early age.

John Morse was described as a quiet man and a workaholic. He was a stern disciplinarian and used physical punishment, including hitting his sons with a board, for infractions. John abused alcohol for a period of time, but reportedly quit in about the mid 1950's. Pearl was described as a small, stern woman who also used physical punishment, though she was not viewed as abusive. She did not drink. When John would come home drunk, the two would argue. There are conflicting reports as to whether John was abusive to Pearl. Nancy told defense investigator Ron Ninemire that John was abusive to Pearl, and that on one occasions, when Kenny Morse, tried to intervene, John tried to shoot Kenny. Pearl was not an affectionate or nurturing parent. Karen (who went by the name Carolyn during periods of her life) noted that "it wasn't a huggable, loveable family."

Kenneth Morse's siblings described him as having been "unbalanced", "always strange", and always in trouble as a child. A couple of the siblings reported that Kenneth would have "fits", during which he would pull his hair, and bang his head on the walls, the floor or rocks. He would bite and pinch himself until he bled. He was also described as having been always violent and cruel to animals. One sister reported that on one occasion, when Kenneth was ten and Fred was seven, Kenneth became enraged at his younger brother and went after him with an ax. He swung the ax and caught Fred's foot. Fred was taken to the hospital and lost part of a toe. Milas said that when Kenneth had fits, "he went off....in no man's land, in his head." He would beat his head with

his hands. Milas described Kenneth as "a rascal", adding that from an early age he would be out fighting and stealing. Alice noted that Kenneth would crawl out the window of the house and go to the chicken house, where "he ate chicken poop." Several siblings said that Kenneth always ate very large amounts of sugar. Alice and Milas did this, as well. A sister said that Kenneth had "worms" in his stomach. She added that he ate aspirin like it was candy. He got into a lot of fights at school. He often hid in a closet and refused to go to school. Karen Morse Gentry did say that Kenneth was always good with mechanical things, and could fix cars. When she didn't want to go to school, he would make her go.

John Morse was particularly hard on Kenneth, according to family members. Alice said that Kenneth would cuss at his father, and John would "beat him hard." Karen believes that their father singled Kenneth out for excessive punishment. On several occasions, he even shot a gun at Kenneth. One time, Karen said, the bullet "parted his hair." Other family members confirmed that John shot at Kenneth on more than one occasion. Stating that John beat Kenneth "when he could", Karen said that Kenneth was afraid to come in the house. He would stay outside all night, and have to sneak in at times for food. Karen stated that she felt her father "hated Kenny." She believes that John thought Kenneth wasn't his child. Noting that Kenneth had black hair, Karen said that a man with black hair would come to the house when John wasn't there. She remembers her parents arguing about Kenneth at times.

Kenneth was only fourteen years old when his father was killed in a motor vehicle accident. While all family members who have described the accident stated that the driver of the other vehicle was drunk and caused the accident, the traffic accident report prepared by the Illinois State Highway Police contradicts that version. The accident occurred on Union Forest Road in Union County at 1:15 p.m. on September 18, 1967. According to the report, John Morse was driving a pickup truck with Pearl and their son Robert in the front seat. Several children and the wife of Kenneth's brother Charlie were in the back of the pickup truck. The children were Kenneth, Freddie, Carolyn (Karen), Bobby and Beverly, then five months old. Cindy was the only Morse child who went to school that day. The driver of the second vehicle, Katherine Boyd, age 48, as well as a passenger in the Morse vehicle, reported that John Morse rounded a curve in the wrong lane and collided with the second vehicle. The truck toppled over on its side. Pearl was pushed from the vehicle. Kenneth and Fred pulled Robert, who was paralyzed from polio, from the front seat. The others in the back of the truck were thrown from the vehicle and were not seriously injured. The truck reportedly landed on John Morse, killing him.

By the time of the accident, several of the older Morse children were already grown and out of the home. Some had moved to the Kansas City area.

Following the death of John Morse, Pearl Morse moved the rest of her family to Kansas City, Kansas. They lived in a section of town called Argentine. For the first time, Pearl had electricity and running water. Over the years, she lived in various houses in generally poor or working class neighborhoods of Kansas City. One cousin said she believed that John's death had a significant effect on the younger children. She noted that most of the Morse children never finished high school. Several never made it out of grade school. Karen thought that Kenneth finished the tenth grade. Pearl had to manage the household and the children alone. There was little supervision or control of the children. Robert, the seventh of the Morse children, who had contracted polio as an infant, and who required a wheelchair, died in the mid 1970's. One sister reported that as a teen in Kansas City, Kenneth was a Golden Gloves boxer.

Kenneth began to get into legal trouble when the family moved to Kansas City. The trial transcript indicates he had a conviction for burglary in 1972, for which he received probation. The offense occurred on November 3, 1971. Records from the Office of the District Attorney in Wyandotte County, Kansas, indicate that he was arrested and charged with the attempted rape of a child in 1971. According to the records, the offense occurred at the Morse family home on 1017 Calvin, Kansas City, on July 7, 1971, when Morse was eighteen years old. It was alleged that he had tried to rape a seven year old girl, who was a friend of his sister's and who was spending the night. The description in the prosecution report states that he told the victim to come to his room, then pulled her clothes off and laid on her. It states that he "tried to rape her", and "upon completion he placed his hands around her neck and told her not to say anything or he would kill her." The complaint charged Morse with fondling and touching the girl. The charge was subsequently dismissed. Family members implied that the girl's mother or teen age sisters put her up to the story. Milas Morse hired a lawyer for his younger brother, who was able to get the case dismissed. Milas did, however, report other sexual assaults or attempts, including ones of underage girls (see below), committed by Kenneth Morse.

Milas reported that in about 1970, Kenneth Morse and a friend named Jerry raped Diana Sims, who was thirteen years old at the time. Milas arrived on the scene just after the rape and described Diana as being "a mess." He took her home. She didn't report the rape. Kenneth stalked her for some time after this, until she married her first husband. Later, Milas said, after Sims divorced her first husband and when she was nineteen years old, Kenneth tried to rape her again. This occurred in about 1976. Milas then married her, and claimed that he remained married to her for twenty-nine years, until her death in 2005. Orders of Protection filed by Diana Morse against Milas Morse in Union County, Illinois, in 1997 and 1999 contradict this, referring to her as his ex-wife. They were living apart on both occasions. She was Milas's fourth wife. He married the first time at age twenty-one and has eight children by four wives. In court documents from 1997, Diana Morse alleged that Milas came to

her house and made sexual advances. He called her names. She reported that he had been physically abusive to her in the past, and had threatened to kill her. In the 1999 court documents, Diana Morse reported that Milas had come to her home and began fondling her against her will. He again threatened to kill her. She stated that he owned a gun and that in the past, during beatings, he "almost shot" her. She reported that he had forced her to have sex with him. She further stated that they had been divorced for years.

The Morse extended family has a history of inappropriate sexual conduct, some incidents resulting in criminal arrests and/or convictions. Milas is currently serving an eighteen year sentence in Illinois for Predatory Sexual Assault. The offense involved the sexual penetration of his then four year old great-granddaughter. Though he claims he has been wrongfully convicted of this offense, he admits that he gave a statement and pled guilty. Milas reported an incident in which his brother Raymond tried to rape a woman. Milas was with him at the time. He said that Raymond wanted him to help rape the woman, but he refused. Stating that Raymond "couldn't get it done", Milas said he took both Raymond and the woman home. Milas has two sons named Milas - Milas Morse, Jr., DOB 3-9-64, and Milas William Morse, DOB 2-9-74. Both have been arrested for sexual offenses. Milas, Jr. was arrested and charged with Aggravated Criminal Sexual Abuse, Victim age 13 to 16, on July 10, 1994. The victim was a thirteen year old girl. Records indicate the girl had sex with both Milas, Jr., age thirty, and Chester Morse, the seventeen year old son of Fred Morse. She admitted having sex with Chester several times. Milas, Jr. was also charged with making harassing and threatening phone calls to the girl's parents following his arrest. A warrant for the arrest of Chester Morse for Criminal Sexual Abuse was requested at the same time. The charges against Milas were subsequently dropped at the request of the girl's father, who stated that he wanted his daughter to put the matter behind her, and didn't want her disrespected on the witness stand. Family members have reported that Milas, Jr. "raped" all three of his children, and was placed on 10 years probation in Jackson or Johnson County, Illinois in 2000 or 2001. This has not yet been verified by records.

Family members report other instances of sexually inappropriate behavior in the family. Karen Gentry said that her sister Betty had an affair with her (Karen's) husband during the months preceding the death of Pearl Morse, which occurred in 1992. Karen had gone to Kansas City to help care for her mother. Following Pearl's death, after Karen learned about the involvement between her husband and sister, she divorced her husband. Another relative reported that Milas's daughter Peggy had sexual relations with Alice Morse's son, who is Peggy's first cousin.

According to several Morse family members, mental illness, especially depression and schizophrenia, runs in the family. Felicia Morse, Fred's

daughter, stated that there was a lot of mental illness on the Morse side of the family, but most was undiagnosed and untreated. Milas admitted that he has suffered from periods of depression over the years, for which he has never sought treatment. He described symptoms including wanting to be alone, spending time in his room, excessive sleep and lack of energy. He added that his son Charlie has depression as well. Other family members reported that Charlie is also a diagnosed paranoid schizophrenic. He has been hospitalized for mental health treatment in the past, and currently lives in a community based residential facility for mentally ill adults. He receives SSI for his mental disability. Betty Morse Sutton admitted to having suffered from depression. Karen Morse Gentry said she has had periods of depression. Felicia and Karen Gentry reported that Fred has had episodes of delusions, which have primarily involved seeing and hearing his dead brother Charlie. On one occasion, he was found in the woods with a gun, claiming to have seen and heard Charlie. He was taken into custody and hospitalized. Authorities wanted to commit him but his daughter Felicia insisted she could care for him and took him home. Karen said that while Fred is delusional, he is not paranoid. She said that her sister Sue Morse Richardson is paranoid. Several of the Morse siblings reported that their sister Evelyn has mental health problems. Several also reported that Milas's daughter Peggy is mentally ill and described her as "psychotic." Felicia has suffered from periods of depression and sought treatment for mental health problems, following a suicide attempt. She has been diagnosed with depression and obsessive compulsive disorder. Felicia believes her father (Fred) and brothers also have suffered from depression.

Virtually all Morse family members interviewed have stated that they believe that Kenneth Morse suffers from mental illness. He is generally described as paranoid, delusional and possibly schizophrenic. Fred noted that Kenneth thinks people are watching him all the time. Betty described her brother as exhibiting bizarre behavior, including paranoia, delusions and "fits." He has claimed to be in the mafia, and that John Gotti is after him. He peeks out windows and under doors. He has said that street sweepers are the FBI and are watching him. It does not appear that he has ever been diagnosed, though he did undergo a court ordered mental health evaluation in 2004 at the request of his attorney.

Other factors that are prevalent in the Morse family include substance abuse, abusive treatment of women, and criminal behavior. Raymond and Charles Morse, who are both deceased, were described as alcoholics. Kenneth and Fred abused drugs and alcohol. Both injected at times. Kenneth's primary drugs of choice were speed and cocaine. Fred no longer abuses drugs. Bobby Morse abused drugs when young, though not heavily. Karen admitted that she used to abuse alcohol and reported that Betty drinks. Betty is reported to have been a marijuana user as well. Karen said that a lot of the maternal cousins in the family are alcoholic. Felicia stated that her brothers Fred, Chester and

Johnny (sons of Fred) are all alcoholic. Court records indicate that Milas was abusive to his wife Diana Sims Morse, who sought Orders of Protection against him. Charles' second wife, Starr, sought orders of protections against him. Karen reported that Raymond had four wives, a couple of them common-law. They were Carolyn, Nancy, Donna and Sandy. She said he was abusive to Carolyn and Nancy. His third wife, Donna, is now married to Fred. Felicia reported that her father, Fred, was abusive to her mother, Pam Bennett, who is now deceased. She said that her brothers, Chester, Sylvester and John, have all beat their women. Kenneth Morse has been abusive to women throughout his adult years, as will be described below.

**Nancy Nelson and Kenneth Morse: Kansas City 1972-78**

Nancy Nelson met Kenneth "Kenny" Morse when she was sixteen years old and he was nineteen. He was working at a steel plant at the time. Nancy was working in the diner owned by her sister Mary and Mary's husband. Kenneth was a customer at the diner. The two began dating and Nancy said that he was good to her in the beginning, though a little jealous. Nancy moved out of her parents' home at age seventeen and got her own apartment. Kenny soon moved in with her. He quickly began exhibiting possessive and controlling behavior, and also began to physically abuse her. Nancy said that he "smacked me around a few times." After a few months Nancy broke up with Morse and moved back in with her parents.

Medical records indicate that Nancy was seen in the office of Dr. James Pretz on July 27, 1973. She reported that she had her last menstrual period in April, 1973, and Pretz determined that she was pregnant. Nancy lived with her parents during the pregnancy. She had regular prenatal appointments with Dr. Pretz. During that pregnancy, Kenny Morse stalked and harassed her. He fired a gunshot over her car one day, and she believes that he firebombed a relative's car. When she left the house, she would have her sister follow her to see if Morse was following her. Nancy's first child, John Ray (known as Johnny) was born at Providence Hospital on February 20, 1974. It was a breech birth with forceps delivery; Johnny weighed eight pounds, two and half ounces. Following Johnny's birth Nancy was back together with Kenny Morse. Though she said she was "terrified" of Morse, she felt that it was less stressful to be with him than to try to hide from him. They moved into an apartment. Nancy said that Morse became increasingly violent towards her.

In April, 1974, Nancy took Johnny for an appointment with Dr. Pretz. She reported to Pretz that she had a menstrual period on April 4th. She saw Pretz again on May 28th. It was determined that she was pregnant. She had no other prenatal visits during the pregnancy. She states that she did not take prenatal vitamins, though she told hospital personnel that she did. She was also not taking medication for her hypothyroidism. Nancy left Morse not long

after learning she was pregnant, but was soon back with him. The abuse by Kenny Morse continued. Nancy described it to defense investigator Ron Ninemire as being ongoing and daily. On July 11, 1974, according to Pretz's records, Nancy was seen in the Emergency Room at Providence Hospital. Records indicate possible premature separated placenta. Nancy states that she had either fainted at a thrift store or on the 10th Street Bridge. She thought that she was found to be anemic when at the hospital, and was given iron.

Nancy describes the pregnancy as emotionally very difficult. Kenny Morse was frequently physically abusive to her. He would accuse her of being with other men. Morse beat Nancy if she even looked at another man. She was depressed. She said that she had difficulty sleeping, adding that "I was afraid to sleep." She had little appetite and didn't eat much. Stating that she would go for days without eating, Nancy reported that she lost weight during this pregnancy, which turned out to be twins. She said that she went from 210 pounds to 140 pounds. Dr. Pretz's records indicate that she weighed 200 ½ pounds on June 28, 1974. No records are available for her weight at the time of the birth. Nancy said that she was always tired, and couldn't think straight. She couldn't see a way out of her situation. Nancy recalls feeling that she just "wanted to die." In November, 1974, Kenny Morse inflicted a particularly brutal beating on Nancy, which included stomping on her with his feet. Within two or three days of this beating, she went into premature labor.

Nancy has reported that due to her lack of prenatal care during this pregnancy she was unaware that she was having twins. She went into labor on November 23, 1974, and was admitted to Providence Hospital in Kansas City, Kansas. Medical records reveal that Kenneth Wayne Nelson was born at 6:16 p.m., weighing five pounds, one ounce. The presentation was breech. Ten minutes later, at 6:26 p.m., Keith Dwayne Nelson was born, and was also a breech birth. He weighed four pounds, five ounces. Records indicate that the babies were premature, and were about thirty-two to thirty-four weeks gestation. Full gestation is forty weeks. Nancy's expected due date was January 7, 1975. Though no records are available, Kenneth Nelson was reportedly a generally healthy baby; he remained in the hospital for less than two weeks.

Keith was in respiratory distress following delivery, and was described as having an irregular response (breathing) with poor color. Records noted that he was exhibiting "very marked peripheral cyanosis" (discoloration due to oxygen deprivation in his blood). He was further described as making a grunting sound, which indicates an increased effort to breathe. Keith was placed in an isolette, but within a few hours, due to continued severe respiratory distress, he was transferred by ambulance to Children's Mercy Hospital in Kansas City, Missouri. Providence records indicate that the infant was baptized prior to being transported. While in the ambulance, Keith had two

periods of apnea (stopped breathing); oxygen was administered through bagging. Upon admission to Children's Mercy, he was described as a premature infant with hyperbilirubinemia (jaundice due to immaturity of the liver), and tachypnea (rapid breathing indicating respiratory distress). Risk factors for respiratory distress in newborns include premature birth and multiple birth. Cyanosis and retractions ( inward movement of the muscles below the sternum, indicative of breathing difficulty) were noted. Records state that the mother was eighteen years old, anemic, living alone with an eight month old child, unemployed and on welfare. The pregnancy was unplanned. The records include a note stating, "this infant has a strangely old looking face for a newborn." Nancy has said that medical staff described Keith as "looking like an Ethiopian baby", with an old-looking face, a thin body and a protruding stomach. Keith was admitted to the NICU (neonatal intensive care unit).

During his initial days in the NICU, Keith remained jaundiced with peripheral cyanosis. He had difficulty with feeding. Feedings through the umbilical cord were used until he began taking formula orally. The feeding issue gradually resolved. Phototherapy was used to resolve the jaundice. Elsie McCroskey, the hospital social worker sent a letter to Nancy dated November 27, 1974, informing her that the doctor had referred her to Social Services. She asked Nancy to get in touch. The letter was returned as it had been sent to the wrong address. Records indicate that McCroskey made efforts to contact Nancy to no avail. Nurses notes indicate that the parents were at the hospital on November 28 and November 30th. The latter date may have just been Kenneth, who was there for five minutes. It should be noted that Keith's birth certificate listed the name of the father as "withheld."

On December 2, 1974, Keith was described as being lethargic. Cultures were taken and a spinal tap done. He was found to be positive for E Coli, and antibiotics were administered. As the time for discharge approached, medical staff expressed concern about Nancy's ability to care for Keith, and efforts by social services to contact her continued. A Social Service note, written by Elsie McCroskey, dated December 11, 1974, stated, "There has been no contact, or visitation from his unwed mother....since mother is coded as receiving welfare - Wyandotte County Welfare was contacted for some information of mother's whereabouts and some assessment of her home environment. Mother is assigned a "Special Services" worker who will make inquiries for us...I shall request very close supervision of this child in his home..." Staff continued to have difficulty reaching Nancy. A doctor's note dated 12-17-74, stated that Keith could be discharged when the social situation was addressed. Nancy apparently went to the hospital on December 19, 1974, at which time she signed a consent for circumcision, which was done that day. Hospital staff recommended follow-up with Keith, either at their neonatal clinic or with Nancy's family doctor. Nancy told them she would have Keith followed by Dr. Pretz. Keith was discharged to Nancy on December 20, 1974. Nancy reports

Appellate Case: 15-3160 Page: 15 Date Filed: 02/29/2016 Entry ID: 4372476

that when she went to the hospital to get Keith she was confronted by social workers who tried to persuade her to give him up. She refused. Records indicate that she was to be followed by Welfare and Protective Services in Wyandotte County, but this does not appear to have happened. Though she told hospital staff that Keith would be followed by Dr. Pretz, records indicate that Keith was not seen in Pretz's office a single time. Nancy admits that she did not take Keith to the neonatal clinic, nor did she receive any services or visits from Wyandotte County Protective Services.

Nancy stated that following Keith's discharge from Children's Mercy, Kenny took her and their three children to live with his mother, Pearl. Nancy was eighteen years old, and caring for premature twins and a nine month old baby. Kenny's behavior became increasingly worse. He would accuse Nancy of being with or looking at other men, including his own brothers. He claimed that Keith wasn't his child, though he reportedly believed that Kenneth was his child. He would punch and hit Nancy all over her body, including on her face. She said that she tried to hide the abuse from her own family, which wasn't too difficult as Kenny wouldn't let her spend time with her family. There were occasions when she was able to visit her mother or sisters. Wilma reported that Nancy would come to her home with black eyes and bruises all over her body. Mary Smith said that, though Kenny tried to isolate Nancy from her family, there were times that she saw Nancy with black eyes or swollen lips. Donna McQueen said that every time she saw Nancy, she was battered and bruised. She described Nancy as always nervous and shaky. Nancy told Deborah Haddad, who did some mitigation investigation prior to trial, that she stayed with Kenny Morse because he threatened her and her family, adding that she was terrified of him. Nancy's brother George told Haddad that he had observed many injuries to Nancy as a result of Kenneth Morse's abuse. Wilma said that Morse told her that he had dated another girl before Nancy whose parents disapproved of her relationship with him. He beat the parents. After that they were afraid to prevent their daughter from seeing him. Nancy told a similar story, stating that Morse told her that he had beaten the parents of a woman he had dated because they were trying to keep her from seeing him.

Even Morse family members admitted that Kenneth beat Nancy. Calling his brother jealous and controlling, Bobby Morse said Kenny was abusive to Nancy. Milas Morse described his brother as always violent. Milas, as well as Fred Morse and Karen Gentry, all said that Kenny wouldn't let Nancy look at anyone. Milas stated that Kenny never trusted Nancy and "beat the hell out of her." He was always accusing her of being with other men. Karen said Nancy "pretty much kept her head down"; she would look at the floor if anyone came in the room. Karen recalled that in the beginning of their relationship, Nancy had a mind of her own and would speak up to Kenny, but that soon changed. Karen said that Nancy "got so tired of being beaten, she just withdrew." Nancy

stated that if a family member - hers or Kenny's - confronted Kenny about his treatment of Nancy, it just made things worse for her.

Nancy, Kenny and the three boys remained with Pearl Morse through 1975 and into the spring of 1976. When Kenny was away from the home, he would have his mother or a sister watch Nancy, so that she was never alone. Nancy pretty much stayed in the house and cared for the babies. Nancy reports that she believes she never bonded with, or attached to, Keith. Her sister Kathy does not believe she bonded with any of her boys, except possibly Johnny. Nancy said she was depressed most of the time. She was unable to emotionally attach to her children. In 1975, she made two suicide attempts. On one occasion, she cut her wrist with a broken light bulb. Kenny Morse wrapped up her arm and took her to his sister Evelyn's in Indiana. On another occasion, she tried to swallow a bottle of Excedrin. She said she thought about suicide at other times during the period she was with Morse. She recalls feeling that she wanted out of the situation and saw dying as the only way out.

In early April of 1975, Nancy took Kenneth, then just over four months old, to Dr. Pretz. Records indicate that Kenneth had an upper respiratory infection. Less than two weeks later, she was back at Pretz's office with Johnny. Records indicate he was seen for first and second degree burns on his face, shoulders and arms. Regarding this, Nancy said that she was at her mother's with the three babies. She was caring for the twins, and her sister was supposed to be watching Johnny. Johnny pulled the coffee pot off the counter and was scalded by the hot coffee. She did not have any further appointments with Pretz for herself or any of her children for almost one year. In fact, she never took Keith to see Pretz. Nancy reported that sometime during 1975, when the twins were still infants, she, Kenny and the three boys were in the car, with the boys in the back seat. Young Kenny began breathing funny. They took the boys to Providence Hospital where they were told that they were suffering from carbon monoxide poisoning. No records are available regarding this incident.

Nancy described Keith as being a colicky baby; he cried a lot. This disturbed Kenny Morse who would threaten to beat him. Nancy said that she would start an argument with Morse to distract him, so he would leave Keith alone. She would then be beaten. All four of Nancy's sisters reported a particular incident in which Morse abused Keith when he was about a year or so old. They said they were told about this incident by Nancy shortly after it happened. Nancy said that she can't remember it, adding "maybe I don't want to remember." Upset with Keith due to his crying, Morse reportedly tied a belt around Keith's legs and swung him around the room, striking his head on furniture and the walls. On another occasion, when Keith was crying, Morse poured beer down his throat to quiet him. Nancy reported an incident in which Kenneth placed matches between Keith's toes. While some persons were told

by Nancy that he actually lit the matches before she could intervene, Nancy reported stopping Morse from lighting them, and being beaten as a result.

Nancy reported that when she was about three months pregnant with Paul, in the fall of 1975, Kenny Morse took her out to a field and inflicted a particularly brutal beating on her, which included stomping on her torso. She was in great pain following this beating. The following day, Pearl Morse convinced her son to take Nancy to the hospital. He took her to Bethany Hospital, where she was subsequently admitted under the name of Morse's sister, Karen. Nancy underwent surgery for removal of her gall bladder and spleen. She told Ron Ninemire that she also had several stitches to a cut under one eye. Morse told hospital officials that Nancy was injured when she fell from a moving car. Nancy said that Morse threatened to take the boys from her if she reported the truth. She said that the doctors advised her to abort the fetus at that time, but she refused. Dr. Pretz's records indicate that this surgery occurred in October, 1975. Nancy saw Pretz on March 31, 1976. This was her first and only prenatal visit prior to the birth of Paul Anthony on April, 16, 1976. Paul was delivered at Providence Hospital and weighed nine pounds, ten and a half ounces. As with her other babies, his was a breech birth. Nancy, then twenty years old, had four children ages two and under. She was living on welfare, and in a violent and chaotic environment.

By the time of Paul's birth, Nancy said that she became aware of the fact that Kenny Morse was using drugs. He was using marijuana and sniffing turpentine. Others have said he was using stronger drugs, including heroin or cocaine. He was also drinking. Nancy was on welfare and had little money to feed her children. After Paul was born, Nancy left Kenny Morse; she and the boys moved to a house on 13th Street. Morse found out where she was, and one day he went to the house, tied Nancy up with electrical cords, gagged her and took the boys. He returned later with the boys, and untied her. After that incident, she said she was afraid to leave the house, afraid that Morse was out there. She said that Wilma came to get her and the boys, and they stayed with her parents for a while. Kenny Morse continued to harass and threaten her, as well as her family. There was an incident, in which Nancy was getting into her car, and Morse jumped on it. Her sister ran him over, and the police were called.

Nancy said that the police would never do anything about Morse's behavior. She believed that this was because he was an informant for the Kansas City Police Department. Milas Morse confirmed this, stating that Kenny was a snitch and informed on drug dealers. Nancy said that she was so desperate to get away from Morse that she called the Kansas City Police and reported herself for welfare fraud. They did nothing. She made another attempt to move where he couldn't find her. She rented a house on Highland Crest and lived there for several months before Kenny Morse found her. He

moved right in and resumed his abuse. He nailed the windows shut and marked the doors so that he could tell if she left the house. He would sometimes have his mother or a sister stay with her, so he could be sure she didn't leave. He would hide in the woods near the house and watch her. Morse would also threaten Nancy, telling her if she left him he would burn her parents' house down with them in it.

Nancy reports that she continued to be depressed. She began having nightmares and flashbacks about the abuse. She said she had eating problems - she either didn't eat at all or she overate. She trusted no one. She said that she had to maintain a flat affect, and couldn't show any emotion at all, especially in the presence of any men. The violence was unpredictable and she never knew what might set Morse off. There was no place that she could feel safe. Nancy has stated that living with Kenny Morse was like being outside herself and looking down. It felt like it was happening to someone else. Her sister Mary recalls that Nancy told her at the time that when Kenny Morse was beating her, she would have an out-of-body experience. It felt like he was beating someone else. Kenneth Nelson's only memory of his early childhood in Kansas City is of his father holding his mother down, pouring water in her face and beating her. Keith would probably have witnessed this, as well. Johnny Nelson has stated that he witnessed assaults on his mother by Kenneth Morse. Usually Morse would hit her with his fists. Nancy said that her children witnessed Morse's abuse of her on a daily basis. They also witnessed him forcing her into the bedroom to rape her, though they didn't witness the actual rapes. Morse's violent behavior caused Nancy to lose the house on Highland Crest. She and the boys moved back in with Pearl Morse. After that she was back and forth between Pearl's and apartments she rented.

University of Kansas Medical Center records indicate that Nancy tried to obtain birth control there in the fall of 1976. She said she didn't want to take the pill, but requested an IUD. This was apparently not done. Nancy cannot remember why she didn't follow through. By late summer of 1977, she was pregnant again. She was seen in the Gynecology Department of University of Kansas Medical Center again in September, 1977. Medical records indicate that she was taking valium for nerves at the time. The doctor recommended a therapeutic abortion, and signed a form stating that continuing the pregnancy would impair the mental health of the mother. Nancy signed a consent for a therapeutic abortion on September 6, 1977, but it was not done. Again, Nancy can't remember this and doesn't know why the abortion was not done or why the doctor recommended it. She thought Kenny Morse might have found out. Her fifth son, Steven Wayne, was born at Providence Hospital on April 22, 1978. He weighed nine pounds, three and a half ounces. Nancy reported that despite continuous physical abuse at the hands of Kenny Morse, Steven was a healthy baby. Nancy and the boys, along with Kenny Morse, were living with Pearl Morse at the time.

In March, 1978, Nancy was cited in Municipal Court in Kansas City on a charge of petty theft. The offense occurred on March 11, 1978. Nancy states that Kenneth had sent her to the Safeway store to get him a steak. Paul was sick at the time. She had only enough money for the steak, so she stole some baby aspirin for Paul. She was fined $100 and apparently placed on probation or supervision for a time, with the condition that she stay out of Safeway stores.

During the spring of 1978, Kenny Morse took his oldest son Johnny with him wherever he went. This was his insurance to be sure that Nancy wouldn't leave him, as he knew she wouldn't leave without her children. When he was away from the home he had his mother or his younger sister Beverly stay there to watch Nancy. In May, 1978, an incident occurred which led to Nancy's decision to get away from Kenny Morse for good. Steven was less than two months old. Morse was beating Nancy with a chain. She tried to run out the door, and he then threatened to beat the baby, who was lying on the couch. Nancy threw herself across Steven just as Morse swung the chain, striking her in the head. She states that she told Morse that he better kill her because she was going to leave him. In early June, Morse left the house one day, leaving all of the boys with Nancy, including Johnny. He left his eleven year old sister Beverly there to watch Nancy. Beverly wanted to do something with her friends, so she left. Nancy then took the five boys and began walking down the street. She said that she was "hysterical", afraid that Morse would come back and see her. They had nothing but the clothes that they wore. A woman saw them and offered to help. She drove them to the police station. From there Nancy phoned her sister Kathy, who picked them up and took them to her home. Within a couple weeks, Kathy drove Nancy and the boys to Sacramento, California, where an aunt was living.

**<u>California: 1978-1980</u>**

Kathy Henre drove her sister Nancy and the five boys to California in her Gremlin. The trip took two days. Nancy recalled that they had car trouble on the way and a man who ran a garage let them spend the night there until he could fix the car. Kathy said that during the trip, Nancy was clearly depressed and exhibiting symptoms of PTSD. She slept most of the time. She was jumpy and hypervigilant. She had flat affect and seemed emotionally numb. When they arrived in California, they went first to the home of their paternal Aunt Rosie, who wasn't home. They then wet to another paternal aunt's, Jennie Mae McDaniels, who lived in Rancho Cordova, east of Sacramento. Nancy and the boys stayed there a couple weeks before going to a women's shelter in Sacramento. Nancy applied for welfare and Section 8 housing benefits, and within a few weeks, she and the boys moved in to Buena Vista Apartments in Rancho Cordova. They remained there for several months.

During the first few weeks in California, Nancy was having severe headaches. They were focused in the back of her head where she had been hit with a chain by Kenny Morse. She saw a doctor who prescribed Dilantin, which she said helped. She said that she took Dilantin for a long time. Nancy said that the doctor told her that her brain wasn't getting enough oxygen. Mary Smith reported that Nancy was told that she had old, healed fractures in her head from beatings over time. Nancy and the boys received WIC (Women, Infants and Children) benefits in California. She noted that as part of the program, the boys were tested for lead, and had elevated levels. She thought this could be from some of the housing in which they lived in Kansas City, which was old and had peeling paint. Records are not available.

In addition to experiencing headaches during those first weeks in California, Nancy reported that she was having problems eating. She saw a doctor and learned that she was pregnant. Steven was only a few months old. Nancy had been pregnant when she left Kansas City, but didn't know it. When the fetus was at about five months, Nancy saw a doctor in California and was told that the fetus had no heartbeat. The baby was taken by dilation and curettage. Nancy said "it was my girl." Though she had not planned or wanted to be pregnant by Morse again, there was a sadness in her voice about the loss of her daughter.

Some time in early to mid 1979, Nancy ran into a woman she had known in Kansas City, and who was the sister of a man she had dated prior to meeting Kenneth Morse. The man's name was Tim Bennett. He soon went to California and re-connected with Nancy. His sister was living in Hanford, California. After a short time, Nancy and the boys moved to Hanford, and lived in a duplex at 1202 Fernot Way with Tim Bennett.

In the fall of 1979, Nancy enrolled Johnny in kindergarten in Hanford. She tried to enroll Keith and Kenny, as well, but after they were tested by the school she was told they were not ready for kindergarten. She then placed them in a pre-school program. In December, 1979, Nancy was terminated from Section 8 housing and had to move from the duplex into the projects in Hanford. They moved to 571 S. Phillips Street. According to Hanford School District records, Johnny was withdrawn from his first school on December 10, 1979, and enrolled at Sierra View School on December 20, 1979. Keith remembers the projects in Hanford. He said it was an L-shaped one-story building. He remembers a man living with them for a time, and thought it could've been Tim Bennett. He remembered that the man had a motorcycle.

Nancy said that she liked living in California. Life was quiet and peaceful. She made friends with some neighbors, the Shoals, and went out with them from time to time. Johnny said that life in California was good. He liked the weather and the "easy living." Kenny and Keith have only vague memories of

California. Keith remembers that a family lived in a house behind their apartment, and they used to play with their children. He remembers a fire in a nearby building in their apartment complex. He also has memories of his mother getting into a physical fight with another woman at the complex. He recalled that the argument had something to do with the laundry, and his mother beat the other woman up. He remembers a man outside their building getting his throat cut, and another man hiding from the police in a storage shed behind the building. Paul, in an interview conducted prior to trial, reported some memories of California. He remembered being hungry at times. He recalled that there were several times when all five boys waited in the car alone for a while. He wasn't sure if Nancy was in a bar when she left them in the car. He remembered his father being in California, and said that when his father came, there was a lot of chaos. He recalled feeling scared.

Later, as a teen, Keith told a maternal aunt, Betty Sutton, that he had been sexually assaulted by a black man in California. Sutton said that Keith told her that he was raped, and that the man penetrated him anally and forced him to perform oral sex. Fred Morse and Karen Gentry heard this story, as well, and thought Nancy knew about it. Nancy denies any knowledge of the assault, but did recall that one day, when they were living in the projects in Hanford, Keith came running into the house. She looked out and saw a black man in her neighbor's garage. She said Keith didn't say anything to her at the time. Keith now denies that this happened. In spite of these memories, life was generally considered good in California until Kenny Morse showed up in late spring or early summer of 1980.

There are different stories or theories about how Kenny Morse found Nancy and the boys in Hanford. Nancy said she thought Tim Bennett, with whom she had broken up, might have told Morse where they were. Johnny has reported that he phoned his father. Nancy testified that Morse phoned her and she called him back. She did this because Johnny wanted to contact his father. Morse claims that Nancy called him and invited him out. He apparently told this to his sisters and brothers, as several said that they thought that's what happened. Both Bobby Morse and his then wife, Diane Morse, told defense investigator Dan Grothaus that Kenny Morse tried everything that he could to find Nancy and the boys. They knew that he eventually found them in California. Kenny Morse said that he found Nancy living in the projects in Hanford, adding that it was a bad environment.

When Morse first arrived in Hanford, he stayed in a motel and visited the boys. Nancy said that he behaved himself for a time. Keith said that his father shaved all the boys' heads when he arrived. Morse did get into a fight with a man outside the apartment one day. Kenny Nelson said that the man had sprayed something in his (young Kenny's) face. Morse confronted him, and he was beaten badly by the man. Morse stated that he had cuts to his face which

Nancy sewed up with a needle and thread. Nancy confirms this, stating that Morse forced her to do it. Keith remembers the incident, as well, and thought that Johnny had called the police to break up the fight. He also remembers that his mother stitched his father's cuts with a needle and thread. Kenneth Morse told Deborah Haddad that Nancy lived in a run-down neighborhood in California and that she "ran around with low lifes." He added that Nancy "whored around" there and took the boys with her from bar to bar.

One day after he had been there at least a few days, Nancy said, Kenny Morse climbed in the window of her apartment and began beating her. She said that she fought him at first, then "just became a zombie...did whatever he wanted." He held her and the boys hostage for about a week, though he did allow Johnny to go to school. Nancy said that he threatened to take all the boys back to Kansas City, and to leave her there. She told Ron Ninemire that Morse threatened to kill her, telling her that he was going to take the boys back to Kansas City and leave her in the desert. The twins' pre-school began calling the apartment wondering where Kenny and Keith were. Nancy told Morse that if the boys didn't show up at the pre-school, staff might come to the apartment. Morse decided to let Nancy take the twins to school. He drove them there, and stayed in the car with Paul and Steven. Nancy went in with Kenny and Keith and told one of the staff members - a woman named Sarah - to send the police to her apartment. The police arrived at the apartment, and after Nancy told them what was going on, they held Morse there until she and the boys could get away. They didn't arrest him because they didn't see any noticeable bruises or injuries on Nancy. The police transported Nancy and the boys to an area community center. From there, they were taken to a women's shelter in Visalia where they remained for several weeks. Nancy's sister Mary and Mary's husband, Harry Smith, then helped Nancy and the boys relocate to Texas.

**<u>White Settlement, Texas: 1980 - 1991</u>**

Mary Smith reported that she received a phone call from a detective in California informing her of Nancy's situation. It appears this was during the summer of 1980. She and her husband flew to California and went to Visalia. Nancy and the boys had left all their belongings in the apartment in Hanford, and had nothing but the clothes on their backs. They flew out of Anaheim to the Dallas - Ft. Worth area. Mary noted that Nancy flew under a different name - Smith - hoping to prevent Morse from knowing where she went. When they arrived in Texas, they went to the home of Irene Wood, the sister of Harry Smith, Mary's husband. They stayed with Wood and her husband Lewis for a few weeks until Nancy could find housing and apply for assistance. Irene Wood was acquainted with Gene Thompson, who did maintenance for Section 8 Housing. Through Thompson, Nancy obtained Section 8 housing at 8513 Pemberton Court in White Settlement, a suburb of Fort Worth. Nancy went on welfare.

Irene Wood said that when the Nelsons arrived at her home they had only one trash bag of clothes for the whole family. Nancy appeared scared and traumatized by the abuse she had suffered at the hands of Kenneth Morse. Wood noted that Nancy used the last name of Smith during the first months in Texas. She didn't want Morse to find her. Wood observed that Steven Nelson did not talk. She said that there were scars on all the children, but she didn't know what they were from. Wood said that during the time that Nancy and the boys stayed with her, Nancy was not drinking. Once Nancy obtained housing, Irene and Lewis Wood helped her by buying a refrigerator and other things for the home, and providing some food. At some point, during this early period in Texas, Nancy said she was visited by a Child Protective Services Worker. She thought a neighbor, Goldie Hawk, might have made a complaint. Nancy said the issue was that she didn't have a refrigerator, which she soon obtained, with the assistance of Irene Wood. She doesn't recall any other visits from social services or protective services workers. Goldie Hawk, a neighbor on Pemberton, told Lisa Murphy, who did some mitigation investigation prior to trial, that when Nancy first moved to White Settlement, she wasn't working and was on welfare. Noting that the boys were young, Hawk said that Nancy would leave them alone and go out partying at night.

For the first year or so, Nancy didn't work. She said that things were fine at first, and that Johnny, age six, helped her care for the younger boys. Nancy enrolled the older three boys in school at West Elementary School in White Settlement - Johnny in first grade and the twins in kindergarten. Records from the Lake Worth - White settlement Public Schools indicate that Keith was enrolled in kindergarten during the 1980-81 academic year. He attended regularly, missing only two days. He received grades of N (Needs Improvement) in Reading and Math, and an S (Satisfactory) in Handwriting. No other grades were given to kindergarten students. Testing was done during the second semester, in March, 1981. Scores were provided in stanines (a scale of one to nine, on a curve, with nine being the highest score). Keith's stanine scores were 3 in Reading and Composite (below average) and 4 in Math (low average).

At some point in 1981 or early 1982, Nancy began working at a bar called Cookie's. The hours were 6:00 p.m. to 2:00 a.m., six days a week. She stated that she hired "a good babysitter" at the time, Rhonda Reese. She paid her $15 per night to watch the five boys. Nancy would drop the boys off before going to work, and pick them up at about 2:30 a.m. or later. Reese would leave the door unlocked so Nancy could come in and get the boys without disturbing her and her sleeping family. Rhonda further said that she had the boys go to sleep at 11:00 p.m. The boys, ranging in age from three to about eight, apparently had very little sleep, especially considering that the older boys were in school. Nancy acknowledges that she began drinking heavily at this time.

Contrary to Nancy's depiction of Rhonda Reese (later Monroe) being a "good" babysitter, conditions for the boys in the Reese home were quite difficult. Rhonda's husband, Billy Reese was an alcoholic who died of cirrhosis of the liver. Rhonda had three daughters who were also in the home. Rhonda testified that after Nancy dropped the boys off, she would put the five of them in a room and lock the door. She would let them out briefly to use the bathroom. She did feed them, and said that Nancy usually brought food for them. At times, she would let the boys go out to the yard, but most of their time was spent in the room. Reese noted that the boys were sometimes unclean and dressed inappropriately when they arrived. The room in which they were kept usually smelled bad because Keith would wet the bed or his pants. Stating that the room reeked of urine, Rhonda said the boys destroyed the bed and couch, and she had to throw them out. She then had the boys sleep on mats on the floor.

Billy Reese was abusive to the Nelson boys. If the boys misbehaved he went into the room and beat them with a belt. He was verbally abusive, as well, yelling at and threatening them. He used obscenities when talking to them. Billy would beat Keith for wetting the bed. Jennifer Monroe, Rhonda's daughter, said that the Nelson boys were afraid of Billy Reese, and would cry as soon as he came home. Billy and Rhonda Reese also had physical fights during this period, which the boys witnessed. Rhonda said that she was unaware of what Nancy knew regarding what was going on in the home, adding that Nancy never said anything to her about it.

Rhonda reported that Nancy was not affectionate towards her children. She also said that Nancy had no control over them. Stating that the boys had no structure or guidance in their lives, Rhonda noted that they were poor and other kids made fun of them. Both Rhonda and her daughter visited the Nelson home at times. They said that the boys ran wild and the home was a mess. Jennifer described the home as dark, smelly, cluttered and dirty. She said that Nancy yelled at her boys a lot. The boys were described as appearing withdrawn. Rhonda stated that Johnny was abusive to the other boys. The four younger boys seemed afraid of Johnny. Keith was described as being sweet, though hyperactive. Steven still didn't talk. Rhonda told one interviewer that she did observe bruises on the boys, but wasn't sure if it was just from normal playing. Rhonda thought that she watched the Nelson boys for about eight months to a year. Nancy said that the Reese family moved away at some point, and that was the reason she no longer babysat for the boys.

Following this period, Nancy had a number of different babysitters, off and on, over the years, but much of the time the boys were left to fend for themselves. Nancy, calling Rhonda the "best babysitter" she ever had, said that she had trouble finding and keeping babysitters. Sometimes she would

just ask a neighbor to look in on the boys from time to time. One of the persons who watched the boys was a neighbor on Pemberton Court, Anita Taylor. Taylor said that she watched the boys for a few weeks, but had to stop because Nancy wasn't able to pay her. She said that Nancy had to work to support her children, and just left them alone much of the time. She recalled that Johnny, who was about eight or nine at the time, took care of his younger brothers. Taylor said that the boys ran the streets when Nancy wasn't home. Nancy did generally make sure the boys went to school. Taylor recalled that one time she received a phone call from the school looking for Nancy. Keith had gone to school wearing clothes that smelled of urine and the school wanted Nancy to bring clean clothes. Taylor found Nancy, and Nancy took care of the problem. She described the Nelson home as "messy", but said that each boy had a bed, and she thought they had clothes and food. She knew that local churches and organizations helped them out at times. Taylor knew that Nancy was drinking, and witnessed her drink at home. She said that Nancy would sometimes ask Taylor to watch the boys when she went out drinking.

Keith was enrolled in the first grade at West Elementary School during the 1981-82 school year. Records indicate he was performing below average in Language Arts, and was in the Resource Room for Reading. His mark for Spelling was Needs Improvement. His best performance was in Math. He earned a Satisfactory grade for Citizenship. At the end of the school year, he was retained in first grade with a recommendation for the Resource Room. It was apparently at that time that he was evaluated and found eligible for special education services. He remained in Special Education throughout his school years. Though special education records appear to have been available at the time of trial, they were not obtained. They have since been destroyed. Therefore, the testing and psychological evaluation are no longer available. Nancy reported that Keith was placed in a program for Learning Disabilities (LD). She stated that she felt he had emotional problems and should have been in classes/services for the Emotionally Disturbed (ED). She said she tried to talk to school officials about this, but they kept him in the LD program. She was told that Keith had dyslexia.

Standardized testing was done in April, 1982, and Keith's scores were below average to low average. Elementary school records for his twin and younger brothers are no longer available. Johnny's elementary school transcript was obtained. His performance was above average through the fourth grade, after which it deteriorated. Testing in October, 1983 revealed that Johnny's IQ was 121, in the 90th percentile. None of Keith's brothers were in special education, though Steven and Kenneth received speech therapy services. All of Keith's brothers reportedly earned average to above average grades throughout elementary school. During the 1982-83 school year, Keith repeated the first grade with special education services. His performance was average to below average, in resource classes, with his best grade again being

in Math. He continued to earn Satisfactory for Citizenship. Testing in April, 1983, yielded below average scores in all areas except Math, where he was low average.

During this period (1981-83), Nancy continued to work nights in the bar and to drink heavily. She had a variety of people watch her children from time to time, and had various boyfriends, some of whom stayed at the house for periods of time. At other times, the boys were left alone. One of the early boyfriends was a man named Gene, whom she allowed to watch the boys for a few nights while she worked. Nancy said that she met Gene at Cookie's, the bar where she worked. Later, Johnny told her that Gene had done something to him and his brothers. He abused them in some way. Nancy was vague as to what Gene might have done but there is the implication that it was sexual. Nancy broke up with Gene. Some time after that, Nancy took the boys to a licensed babysitter whose name was Mary. Mary would put the boys in a bedroom and let them watch pornography. This arrangement lasted only a few weeks. Another person who occasionally watched the boys was the daughter of Pam Copeland, a woman who lived across the street. Copeland was a drinking buddy of Nancy's. The daughter, who was about eighteen at the time, would "play doctor" with the boys. She had them fondle her and put popsicle sticks in her vagina. Keith said that when he was about seven or eight, another neighborhood girl who was about thirteen, had him fondle her vagina. In about 1983, Nancy became involved with an older man, Bob Bryant. He would stay at the house at times. Keith said that Nancy and Bryant used to fight a lot, but it didn't get physical. Nancy said that Bryant didn't mistreat the boys, and she thought her sons liked Bryant.

During the first years in Texas, Nancy received some welfare assistance, including Medicaid and surplus foods/food stamps. The boys, however, seldom received medical care. Keith continued to have a bedwetting problem. Nancy said that she took him to a doctor who told her that he would just outgrow it. No treatment was provided. Keith continued to have this problem for many years. When asked if there were other times that Keith required medical care for illness or injury, Nancy said that Keith would never tell her if he wasn't feeling well or was hurt because he knew she couldn't afford to take him to the doctor. Keith, Kenny and Steven have all reported that they didn't receive regular medical or dental care, and could not even remember having a toothbrush when they were young. Nancy required medical care at one point. Two of her sisters, Mary and Kathy, were visiting from Kansas. When they arrived, Nancy was clearly not well. They took her to the emergency room at the local hospital. Mary said that Nancy had not been taking medication related to the loss of her spleen and gall bladder, and had to be given a shot. She hadn't taken the medicine because she said she couldn't afford it. Nancy thought she was ill due to the fact that she hadn't been taking synthroid for her

hypothyroidism. She said she was given a shot and some pills, but couldn't continue to buy the medication, so discontinued it when the bottle ran out.

Kathy Henre reported that while she was visiting she noticed that Nancy was drinking heavily. When she and Mary arrived, Nancy wasn't home, but the door to the house was open, so they went in. Kathy said the house was a total mess. There was mold on things. The boys were "running wild." Nancy was working at the bar. Kathy and Mary went to the bar and found Nancy drinking. Kathy said she was drunk. Mary recalled that conditions at the home were very bad. The house was "filthy and smelled horrible." Mary noted that she and Kathy took the boys to Six Flags, which they enjoyed.

Keith was described by virtually everyone as being an active and energetic child. Some described him as hyperactive. Keith agreed with this description, adding that he was easily distracted. Nancy said that Keith "was wired all the time." He was always climbing up things, e.g. trees and the roof, and jumping off. Keith acknowledged that he did jump off the roof a lot, starting at around age ten. One time, he said, he injured his foot and had to go to the Emergency Room. He has a scar on the side of his forehead which he said he got when he hit his head on a table while playing with Paul. He didn't receive medical treatment for that injury. Another time, he fell off the upper bunk bed and landed on his bike, bruising his ribs. He had no medical treatment for that injury as well. Keith was also described as small in size for his age." He and Kenny are fraternal twins. Kenny was larger in stature than Keith. Kathy Henre said that Kenny was chubby and Keith was skinny. Mike Griffin, a neighbor on Pemberton Court, said that Keith was a more active child than his brothers.

Keith was asked about what he ate as a child. He said there wasn't ever much food in the house. They ate a lot of cereal, spaghetti or pizza. He remembered having syrup sandwiches (bread with syrup poured on it) and beef or chicken bouillon cubes in water for soup. Kenny said that they ate a lot of beans, and gravy on bread. For a time they got surplus foods, including cheese and peanut butter. Keith said his mother was never home to cook and they never had regular mealtimes. When asked about fruit and vegetables, he replied, "what's that?" He said it was very rare to have fruit or vegetables. They drank a lot of soda, but didn't have much milk. When they did have milk, Keith said it went fast "with five boys and cereal." He did note that they received free lunches at school. In response to a question about vitamins, Keith said, "poor families don't take vitamins." Goldie Hawk reported that the Nelson boys would knock on neighbors' doors asking for food because they were hungry. She recalled that she gave them a box of cereal and a gallon of milk on one occasion.

In about late 1983 or early 1984, Nancy's boss at Cookie's Bar put her on the day shift. This meant that she would earn a lot less money, as most of her income was from tips, which were much better at night. She quit working at the bar and got a job at Quik Sak, a convenience store, working 3:00 p.m. to midnight. She was paid $4 an hour, which was enough to make her ineligible for welfare, including food stamps, surplus foods and medicaid. She worked at Quik Sak for several years, until she left Texas. She claimed that she continued to try to find babysitters for her sons, but admits that Johnny had to carry the load for watching his younger brothers. Both Keith and Kenny described Johnny as being violent and especially cruel to his brothers. He beat them regularly when the boys were home alone, which was much of the time. Kenny said that his older brother beat on them "all the time." He said that Nancy knew that Johnny was doing this, and did nothing about it. Nancy said that Kenny would tell her that Johnny was beating them. She did not claim she did anything to stop it.

Keith remained in special education at West Elementary throughout his elementary school years. He spent the better part of each day in the Resource Room. He was in second grade during the 1983-84 school year. His special education grades were average, with his best performance again being in Math. He again earned a Satisfactory mark in Citizenship. Testing in April, 1984, when he was nine and half years old, revealed that he performed at the 26th percentile rank in Reading, the 10th percentile in Language Arts, and the 35th percentile in Math. He was in the third grade during the 1984-85 school year. His grades were average in all areas and Satisfactory in Citizenship. Testing in April, 1985, at age ten and a half, placed him at the 1.5 grade level in Reading, the 2.3 grade level in Language, and the 2.9 grade level in Composite. Testing information in the copies of records provided is not complete, and doesn't show all scores.

Ellen Crutsinger was Keith's 4th grade teacher. She said that Keith struggled in school. He was in the same grade as Paul, so she had both boys in her room. Crutsinger told Ninemire that Keith was in the lowest ability group. Paul was in a higher group. Nancy was not involved as a parent, and never attended any school functions. She recalled that Keith was helpful to a disabled student, Renessa Grey, who was confined to a wheelchair. He would spend time each day helping her get to her classes. Stating that there were no ramps at the school, Keith said he would carry her up and down the steps. Crutsinger described Keith as a child who wanted to please and to get positive attention. He was always trying to help the teacher. During this time, Keith's brothers were reportedly average to above average students, except for Johnny, whose performance deteriorated markedly during the 1984-85 school year. By that time, Nancy was working second shift and leaving him to care for his younger siblings.

Keith said that he had very few friends as a child. The boys often went to school with dirty, torn or inappropriate clothing. His clothing often smelled of urine, as he continued to be a bedwetter, and laundry was not done often. They all had poor hygiene. They were teased and taunted by other students at school. Keith said that he became distant from other children at school because of his condition and the teasing and taunting he suffered. School staff would have them take showers in the gym locker room at times. Eileen Pink, one of Keith's teachers, said that Keith and his brothers came to school so dirty that she would complain to the principal about the odor. The principal, Homer Dean, would take them shopping and buy clothes for them, then have them take a shower at school and put on the clean clothes. Dear said that Keith appeared appreciative of his efforts. Dear talked about the problems the Nelson boys had at school, particularly with being teased and antagonized by other students, due their poor clothing, hygiene and odor. When Keith was taunted by other students, he would sometimes react verbally. Dear noted that the Nelson boys received free lunch, adding that, despite getting food at school, they were seen scrounging through the leftovers at the lunch bar, indicating that they were hungry. Dear said the boys sometimes were not at school, and he felt that it was because of their lack of clothing and the teasing they received from other students. He talked to Nancy about these problems and she would say she would do something about their clothing and hygiene, but she never did.

Homer Dear said that he visited the Nelson home, adding that it was filthy and Nancy appeared to be illiterate. He knew that Nancy was not home a lot, and the boys were left to fend for themselves. Dear knew that the family was poor. He and his wife gave the family a turkey or a ham at Christmas, so that the boys would have a good meal on the holiday. Another way that he helped out was by asking the boys to catch crawdads, for which he would pay them.

Keith's Speech and Language teacher, Cora Latta, remembered him, as well as Paul, who also received Speech Therapy. Kenneth reported being in Speech Therapy as well, but may have had a different teacher. Latta said that she met with Keith twice a week for thirty minute sessions. She couldn't remember a lot about him. When asked about the school policy if abuse or neglect of a student was suspected, Latta said that they were required to report it to the school nurse, who then filed a formal report. Joann Hansen was the school nurse. She said if any staff member reported abuse or neglect to her, she filled out the required form and made a report to Child Protective Services. During the 1980's, Hansen said, there were a lot of students at West Elementary that were neglected. She couldn't specifically remember making any reports on the Nelson children. Randy Dunsmoor of the White Settlement Police Department described Child Protective Services as being very ineffective. He could not recall any incident that they investigated.

Texas, like every other state, had a mandatory reporting requirement for persons suspecting that a child had been abused or neglected. Agencies receiving such reports had an obligation to investigate. The Texas Family Code in effect during the 1980's codified this requirement. The provisions were in Chapter 34, which stated: "Any person having cause to believe that a child's physical or mental health or welfare has been or may be adversely affected by abuse or neglect (emphasis added) shall report in accordance with...this code." The Texas Department of Human Resources developed forms for reporting which were furnished to hospitals, schools and other agencies. Reports were to be made to the Texas Department of Human Resources or an agency designated by the Court to be responsible for the protection of children. Reports could be received by law enforcement, as well. The statute required that oral reports be made immediately and a formal written report as soon as possible. The receiving agency was required to make a thorough investigation of all reports, and the scope of the investigation was described in the statute. It was to include an investigation of the home, the person responsible for the abuse/neglect/care of the children, a physical examination of all children in the home, and interview(s) of the child/children. Children could be removed from the home immediately if conditions warranted. The penalty for failure to report was a Class B misdemeanor.

In addition to the neglect of the Nelson children that was evident to school personnel, there was physical abuse of the children in the home. Nancy had many different boyfriends and male friends over the years in Texas. Keith commented that his mother had sex with different men, but didn't have too many actual boyfriends. He said that there would be men in her room at times, and he assumed they were having sex. Kenny said that his mother was "targeted by men who took advantage of her", and that she was easily taken advantage of. One of these men that Nancy had in her home was EJ. He was called EJ Hendricks by some, but is most probably Eric Redden. Nancy said that she met Redden at Cookie's bar, which she continued to frequent after she stopped working there. She referred to him as an ex-boyfriend, who she allowed to live in her home. He needed a place to live so she let him stay with her in exchange for watching the boys when she was at work. All of the boys described EJ's abusive behavior. Kenny, describing EJ's treatment as "torture", said that EJ "beat the crap out of us." Keith, calling EJ "evil", said that he beat the boys every time he was alone with them. He was particularly brutal to Johnny and Keith. His favorite punishment was to have the boys fill five gallon buckets with water and then hold their arms out, one bucket in each hand. If they dropped the bucket, he would whip them with a belt or paddle. Paul said he made them hold the buckets for long periods of time. Steven, the youngest, was made to watch. He handcuffed Keith and Johnny to the bed with a belt and whipped them with a weightlifting belt. Keith said the beatings left bruises on them. There were times, Keith said, when he and Johnny couldn't go to school because they were black and blue. Paul said the when they tried to tell Nancy

about the abuse, which went on for months, she didn't believe them. He said that the abuse was very hard on them, and he has never forgotten how scared they were of EJ.

Nancy said that EJ stole from her during this period and ran up a large phone bill. She admitted that the boys told her about EJ's abuse of them, and she did nothing at the time. She wanted to get the money from him for the phone bill, so she sent the boys to stay with a friend until she could get the money he owed her, then kick him out. One night, after she confronted him, EJ took off with some of her belongings, so she called the police. He was later arrested. Keith was upset that his mother seemed more interested in getting her money back than protecting her children. Nancy admits that Johnny was upset that she didn't call the police when she first knew of the abuse.

Nancy inflicted harsh physical punishment on the boys, as well. Keith recalled that if one of the boys had done something, and she didn't know which one, she would beat all of them until one admitted it. She used belts, switches from a tree or whatever she could get her hands on. She would make them go out to get the switches. Keith said that she beat them on the buttocks and the backs of their legs, and that beatings left welts and bruises. Paul said that, in addition to these physical punishments, his mother was verbally abusive. She would demean them and call them names, such as "stupid" or "no good brats." Nancy admits to using physical discipline with the boys, but denies leaving bruises or marks.

The predominant memories of their mother for all five boys are of her drinking, being gone much of the time, and sleeping when at home. She was basically not there, physically or emotionally. Stating that his mother "was never capable of mothering", Keith said that she worked, went to the bars, then came home and slept. He did feel that she may have been depressed, and that she was overwhelmed by her situation. Keith said that they rarely saw their mother, and had to fend for themselves most of the time. He recalled that one time, when he was about twelve, he went out of the house, and came back at 2:00 a.m. Stating that she was with a man, he said he was surprised that she noticed he was missing. Kenny said that his mother "was a drunk the whole time we were in Texas...she spent all her time at the bars." He felt that she was more interested in drinking than taking care of her children. When she was home, Kenny said, she was always sleeping or tired, adding, "we did what we could to survive." They were lucky to get free lunches and breakfasts at school, because there was little to eat in the house. Kenny admitted that he and Keith would sometimes steal food so that they had something to eat. Paul reported that they were all pretty young when they were left home alone. He described his mother as distant and not loving. Both he and Steve also said that the older boys would steal food in the neighborhood and bring it home.

For her part, Nancy admits that she was abusing alcohol, that alcohol impaired her ability to care for her children, and that she left them alone too much of the time. She said that she continued to be depressed, and now sees that she used alcohol to self-medicate. Nancy said, "the only time I was happy was when I was drunk." Nancy was also experiencing other symptoms, which she now realizes were the consequences of the trauma she had suffered. She said that she had nightmares constantly of the abuse she suffered at the hands of Kenneth Morse. In her dreams, she would be running and running (away from Morse), and then would wake up in a sweat. She had sleep disturbance, difficulty sleeping. She remembers seeing the television movie "Burning Bed", about domestic violence, and thinking at the time that her abuse had been much worse than what the character in the movie suffered. Another time, she saw a commercial on television of a woman out partying and dancing, who went home and curled up in a corner, biting her nails.... "I was like that...could be out drinking....go home, and be like a zombie...just sit there...I was there and I wasn't there." She felt like she "was always on the outside, looking in...like I didn't belong anywhere...the only time I felt I belonged was when I was drinking."

Neighbors and co-workers of Nancy's were aware of the situation in the Nelson home. Goldie Hawk, an elderly lady in the neighborhood, noted that Nancy was not home most of the time, leaving the boys home alone. She said that Nancy, when she was there, had a bad temper and yelled at the boys a lot. She could hear her from across the street. Nancy never showed any affection to her children. Hawk said the children were unsupervised and ran wild in the neighborhood. They would steal from homes in the neighborhood. At times, the children would go to neighbors and ask for food. She thought they all had emotional problems. Hawk knew that Nancy spent a lot of time in bars. Nancy had different men in the home at times. She described the Nelson home as a total wreck, and said the smell of urine in the house was bad. The Nelson children were often dressed inappropriately. Hawk said that some of the neighbors tried to help the family by giving them furniture and household goods. Another neighbor, Henry Caldwell, also commented about the children being home alone, and said they were often in the streets. He observed a lot of people going in and out of the home, and wasn't sure what they were doing there. Stating that the children had no supervision or guidance, Caldwell said that he knew that Goldie Hawk called social services about the situation, but he didn't know if Child Protective Services ever investigated.

Janet Taylor, a co-worker of Nancy's at Quik Sak, also talked about Nancy spending time in bars and leaving her children unsupervised. She did say that Nancy was a hard worker at the store, and was honest and dependable. She thought Nancy cared about her children, but also said Nancy didn't show affection to them. Taylor described the Nelson boys as active and a bit on the wild side. She knew that the home was a mess, and said that it was hard for

Nancy to work and keep up the house. Mike and Lori Griffin moved to Pemberton Court in the mid 1980's and became acquainted with the family. They commented on the conditions in the home and Nancy's absence much of the time. They tried to help the boys a bit. They invited them to their home to watch movies and play games from time to time. Their family bought bikes for the boys one Christmas. They did say that the Nelson boys were always polite to them, and thankful for their help. They described the home as filthy and unsanitary, noting that Keith's bed was urine-soaked. There were dirty clothes everywhere in the house and the bedding was unwashed. The Nelson boys complained about being hungry all the time.

While the Griffins weren't aware of Nancy having many boyfriends, others commented on the number of different men she was with. Janet Walker said that her brother, Kenneth Walker, lived with Nancy for a time. He abused alcohol in the home, and Nancy finally kicked him out. She said that Joe Taylor, the brother of a friend of Nancy's, also lived with Nancy. Other boyfriends that Walker could remember were Frank Teri, a man called "Pops", and Randy Vines. Nancy said she went with Vines off and on for a period of time. Vines was married during this period. Vines met Nancy at Quik Sak. He was a customer at first, then started working there. He admitted to having a sexual relationship with Nancy, and said he sometimes spent the night. He thought the affair lasted for about a year and a half, until he decided to work things out with his wife. Vines was sympathetic to Nancy, stating that she had a good heart and worked hard. He acknowledged that she drank and left her children alone much of the time. Nancy admitted to this involvement and said that her sons didn't like Vines.

During the 1985-86 school year, Keith was in the fourth grade at West Elementary. He remained in resource classes as a special education student. His academic performance deteriorated somewhat that year. He earned average to below average grades, though he continued to receive a Satisfactory grade in Citizenship. An Otis Lennon IQ test in October, 1985, revealed an IQ of 84, in the 16th percentile. Testing in February, 1986, indicated that he was in the 1.5 grade level in language, the 2.7 grade level in reading, with a composite score of 2.6, in the 1st percentile of national rankings. Keith was in the fifth grade during the 1986-87 school year. Number grades were given that year, and his grades were poor - primarily in the 40's, 50's, and 60's. Citizenship deteriorated that year, as well. Testing in April, 1987, placed him at the third grade level, and in the 2nd percentile. He performed below grade level in all areas, which is more significant in that he was older than his grade level peers. Keith was retained in the fifth grade at the end of the year. He was then two grades below his age peers. Kenny noted that Keith was still in elementary school while he was in middle school. He thought it was hard for Keith to be older than the other students in his class. Noting that Keith had a

learning disability, Kenny said that Keith had problems with reading and comprehension.

One of Keith's teachers in the 1985-86 school year was Gloria Welch. Welch reported that she taught in an "open concept" room in which children were grouped based on their individual abilities. She had both Keith and Paul in her class, and said both were in the "lower-achiever" group, though Paul functioned higher than Keith. Welch said that she got along with Keith and never had serious discipline problems with him. She noted that he was always polite. Welch recalled that Keith usually had worn clothing, and didn't dress as well as other students. She commented on a picture in the 1986 yearbook in which Keith is standing alone outside the school while other children are playing, adding that this was a common sight when Keith was in school. The children organized themselves into group activities, and Keith did not participate. Welch noted that Keith took care of Renessa Gray, the girl in the wheelchair. She said Keith just took her "under his wing", and was always there for her.

In 1987, Nancy was terminated from the Section 8 housing program and had to move. She said she lost the house because she couldn't make the repairs necessary to pass inspection. She then moved to 8505 Sussex Street. Gene Thompson, who maintained the Section 8 housing on Pemberton Court, said that he had to make yearly inspections to the home. If repairs were needed, the renter was responsible for getting them done. He did some of the repairs himself. He thought he made about twenty visits to the Nelson home over the years. Thompson said that the Nelson boys did a lot of damage to the home. Stating that the home reeked of urine, he said that it appeared that no housecleaning was done. On most of the occasions when he visited, Nancy was sleeping. The boys were home at times that they should've been in school. One time he noticed that a man was living there. Thompson said that Nancy appeared to be overwhelmed. When she was terminated from the program and had to move out, there was a lot of damage to the home and substantial repairs were necessary.

It was in 1987 that Nancy met and became involved with Fred Crabtree. She said that she met Crabtree at Cookie's Bar, and soon let him move in with her and the boys. She thought he could watch the boys in the evenings when she was at work. She later learned that Crabtree taught her older sons to steal for him. He taught Johnny, Keith and Kenny, and possibly Paul, to break into houses and businesses to steal things that he could sell. This is a form of child maltreatment called corrupting. At some point, Johnny tried to tell Nancy what Crabtree was doing, but she didn't believe him. Nancy said that she was at her "wit's end" by this time. She had serious financial problems and felt that she was hated by her children. She escaped her situation by spending time in the bars and drinking heavily. Stating that she just couldn't manage her children,

she said she didn't want to go home. At some point she thought of placing the boys in foster homes, and even obtained some papers to request it. The boys found the papers and tore them up.

In the fall of 1987, Keith was repeating the fifth grade at West Elementary School. He was absent or truant from school frequently. He remained in Speech Therapy at school, as well as in resource classes. Cora Latta, the speech therapist, noted that Keith did try when working with her, but didn't seem to carry over his techniques at other times. Keith's grades that fall were poor. Nancy was feeling increasingly overwhelmed with the five boys. Johnny was getting into trouble. He had been retained in sixth grade the previous year, and at the end of the 1986-87 school year, he was given an alternative placement. Records don't indicate what that was. Keith and Kenny were stealing in the neighborhood. Paul and Steven were better students, and did not get into trouble. One of Keith's friends at the time was Adam Nowlin. Another was Chris Stines. Nowlin said that he thought all of the Nelson boys had mental health issues. He described Keith as hyper and "not the smartest kid." He commented that he saw Keith burn himself with cigarettes and/or a cigarette lighter at times. Keith, pointing to scars on his arms, admits to doing this, adding that he doesn't know why he did it or what he felt at the time. Nancy said that Keith cut himself on his arms, including with a pen. She said it went on for quite a while. He would also bang his head on the walls or the floor. She thought he had emotional problems, but did nothing about it.

In December, 1987, just after he had turned thirteen, Keith had his first referral to juvenile authorities. Nancy said that Keith had begun wandering off and getting into trouble. On December 14, 1987, authorities received a report of a burglary of a home on Pemberton Court. Christmas gifts had been stolen. Nancy found the items in Keith's room and called authorities. She said that she turned Keith in hoping that he would be scared straight. Officer Gaddy, the juvenile officer with the White Settlement Police Department, questioned Keith, who admitted committing the burglary. Keith was taken into custody on December 16,1987, and released to his mother following a detention hearing. The matter was referred to the district attorney, and an intake investigation was conducted by Jim Spellings, a Juvenile Probation Officer. Keith was in custody again on January 6, 1988, on suspicion of arson. He was released to his mother. No charge was filed. Keith appeared for his intake interview on the burglary and again admitted to his actions. The worker noted that Keith was in special education and had been retained in two grades. Records indicate he "counseled Keith." On January 11, 1988, Nancy contacted Spellings stating that Keith was threatening suicide. The worker referred her to Mental Health Mental Retardation (MHMR) as a crisis situation. No follow-up appears to have been done regarding this referral. Nancy did not take Keith for crisis counseling.

On February 9, 1988, Keith received his second referral to juvenile authorities on a charge of bicycle theft. Records indicate that the complainant actually named Kenny Nelson and a friend of his as youths who had been seen in the yard where the bike was and who had also been seen riding the bike. Parts of the bike were later found in Keith's room. Keith was questioned by Officer Gaddy and said that he got the parts from another person whom he refused to name. It appears that the bike was actually taken by Kenny, and not Keith. The matter was referred to the DA. Keith was held in detention pending adjudication, with the reason given that suitable supervision, care or protection of the child was not provided by the parent. An intake physical examination was done. Records indicate that Keith, age thirteen, weighed 110 pounds and was four feet eleven inches tall. Keith was placed in the isolation room on February 10, 1988, and restrained due to his acting out. He remained in the room for several days and was listed on detention forms as "security risk", "suicidal." On February 12, 1988, Keith engaged in self-abusive behavior by sticking a lead pencil tip in his arm. He was out of the room and on carpet restriction on the 14th when he asked to be returned to isolation to keep himself from having further problems. Staff complied with the request, noting that the isolation in this case would not count against him. Keith was released to his mother on February 17, 1988 pending a court hearing. A detention evaluation covering this period noted Keith's acting out behavior and the need for extra supervision due to the possibility of self abuse.

On March 4, 1988, Keith was again detained following an incident of shoplifting tennis shoes at Walmart. He was placed in the isolation room on that same date. Detention records indicate that Keith was exhibiting self-abusive behavior on March 5th, which included choking himself with his pillow case and shirt, and banging his head on the window. He continued to be confined to isolation as a suicide risk and for acting out behavior. Cuffs and shackles were used on him on March 6th. The restraints were applied after he was observed to have blood on his hand from self-abusive behavior. At the detention hearing, Keith asked that he remain in detention rather than be released home. On March 7, 1988, Keith was restrained with handcuffs, leg restraints and a helmet to prevent self harm. He had been observed banging his head and arms against the walls and floor. Later that same day he was transported to John Peter Smith hospital for mental health assessment due to self-abusive and suicidal behavior.

John Peter Smith Hospital records indicate that Keith was taken to the hospital due to self-abusive behavior and suicidal gestures. He spent the night at the hospital, was seen the following morning, and discharged back to detention. Records state that staff viewed Keith as having a conduct disorder. Problems noted in the records were: suicidal ideation, knowledge deficits, and alteration of sleep pattern. Records state that Keith was "well known" to authorities due to "numerous stays in detention" (this was his third stay). Keith

reported that he had been trying to kill himself at home as well. He tried to hang himself but his brother let go of the rope. He also told staff that both he and a brother had tried to hang themselves at home. After he told staff that he no longer intended to harm himself, they discharged him. It does not appear that a thorough mental health assessment was done, nor was any treatment implemented. It also does not appear that the home situation, including the mental state of the brother, was investigated.

A psychological evaluation was performed in the seclusion room at detention by Roger Burns, Ph.D.. His report, dated March 9, 1988, indicates that Keith was in isolation after bloodying his nose and tracking blood on the floor. He was described as "quite physically active" in the room, and as engaging in a lot of bragging behavior. He continued to engage in self-abusive behavior. Dr. Burns' impression, without testing, was that Keith was in the average to low average range of intellectual function, without neurological deficits. Burns had no social history information about Keith, but concluded that he would not be suitable for placement in one of the typical facilities used by Juvenile Probation. His diagnosis was conduct disorder, undersocialized. Burns opined that Keith would continue to behave in similar fashion and offered no specific treatment recommendations.

On March 10, 1988, Keith appeared in Juvenile Court and was adjudicated delinquent. He was released from detention to his mother's custody pending a disposition hearing. A detention evaluation was prepared for the court which described Keith's behavioral problems and self-abusive behavior. Due to being in room isolation much of the time, he had limited participation in the school program. The report noted that he had no visits from family. He was described as very immature and in need of extra supervision due to attempts to commit self abuse. A social history was prepared by Jim Spellings for the disposition hearing. Spellings reported that he had presented Keith's case to the Tarrant County Juvenile Probation Placement Committee, which disapproved him for placement in any of the facilities or programs available to the county. Services available included group homes, boys and girls ranches, and residential treatment centers. Spellings provided some information regarding the makeup of the family, Nancy's work situation, and Keith's school situation, including his placement in special education and his retention in two grades. He did not appear to be aware of Nancy's drinking, or the extent to which all Nelson children were left unsupervised. He described conditions in the home as cluttered, dirty and in need of structural repairs. Nancy did report to him that she and her children had been subjected to physical abuse by Kenneth Morse in the past, but no details appear to have been obtained. At the hearing on March 16, 1988, the Court placed Keith on probation in his mother's home for one year. No other services were ordered. According to the order, the purpose of probation was to afford the juvenile the opportunity for rehabilitation under supervision.

Keith was detained again on March 28, 1988, on a charge of burglary of a building. He and some other youths had broken into the White Settlement city garage and stolen some bikes. Keith went to Officer Gaddy's office that same day with the stolen bike. When confronted about it, he admitted to taking it. He was transported to detention, where he remained until he was released home on April 4, 1988. He spent most of his time in detention in the isolation room due to disruptive, self-abusive and suicidal behavior. Mechanical restraints were applied at times to prevent self harm. A petition to revoke probation was filed by juvenile probation officer Bruce Smith on March 30th. The matter was set for a hearing. On April 7, 1988, three days following his release from detention, a complaint was made that Keith and his brothers were harassing a couple of neighborhood boys, and were threatening to steal their bicycles and beat them up. When an officer approached him, Keith started running. He was caught, taken to detention and charged with evading police. He was again placed in the isolation room. He was released to his mother the following day. On that same date, a complaint was made against Keith for disorderly conduct "language." This matter was not prosecuted.

Keith was once again detained on April 22nd, at which time a new complaint for burglary of a building had been received. Keith had been seen on April 18th leaving a house on Pemberton Court with items from the house. A petition to revoke probation was filed with the Court. Keith was ordered to be held in detention pending court action. Once again, he spent much of his time in isolation due to self-abusive, suicidal and disruptive behavior. At times, he was restrained with handcuffs, leg restraints and a helmet to prevent harm to self. Keith acknowledged that he had a lot of problems in detention. He said that he "was a small, scared kid." He reported that there were times when he was attacked in his detention cell at night by two night shift guards. When asked about the self-abusive behavior, he said he didn't really know why he did it, but added, "I wasn't a happy kid." Records note that Keith had an injury to his abdomen when he came to detention. It was reportedly the result of an incident in which his brother Johnny had shot a bullet at a brick and it ricocheted off, striking Keith. The wound had become infected, and required medical attention.

Bruce Smith, the Juvenile Probation Officer for Keith, filed a "Supplemental Social History for Revocation/Re-Adjudication" on April 28, 1988. He detailed Keith's actions since the preceding hearing. Keith had attended school for only five days since mid-March, though he had been in detention much of the time that he was absent. Nancy told Smith that Keith remained difficult to manage, but said that he was frequently confused with his brothers and accused of things he hadn't done. She also reported to Smith that Keith had been the object of Johnny's abusive and intimidating behavior. She further confirmed that Keith had been abused by his father when younger. Nancy told Smith that she had taken three of her sons - Kenny, Paul and Steven - to the

home of her brother in Kansas City, in order to get them away from Johnny's abusive behavior. She expressed the desire to take Keith there, as well. Smith reported that Nancy's brother, George Nelson, expressed a desire to have all four boys live with him.

Smith presented Keith's case to the Placement Screening Committee for a second time and the committee again denied placement. Smith, who is now an Assistant Principal at Casatta Learning Center in Fort Worth, stated that he would have presented a form to the committee indicating what services had previously been provided, which in Keith's case were none, other than supervision. They could make recommendations regarding placement or other services. He could not recall what he might have recommended in Keith's case. Smith made reference in his court report to Keith's "bizarre and unusual behavior" in detention, but made no treatment recommendations. Regarding the committee, Smith stated that placement was expensive and the committee was pretty stingy with money when it came to placements. The county had no group homes of their own, and rarely sent children to residential treatment, due to the expense. They wanted to place children who had a good chance of success, children with a good home base and parents who tried, as opposed to children like Keith, who were clearly emotionally disturbed and in need of intensive services. Smith added that budget was always a factor in placement decisions.

Keith was released from detention to his mother's custody on May 5, 1988. School records indicate that he was withdrawn from West Elementary School that spring. On May 2, 1988, Keith signed an application to have his probation transferred to Kansas under the interstate compact, stating that he wished to live with his uncle, George Nelson, in Kansas City. Nancy drove him to the home of George and Sally Nelson, who were living at 2905 51st Street, in Kansas City, Kansas. At that time, Johnny began staying with Mike and Lori Griffin.

George Nelson reported that he and his wife, who had three children of their own, took on the responsibility for the four Nelson boys because Nancy couldn't handle them. George blamed Nancy for Keith's behavioral problems. Stating that Nancy spent her time in bars, he said that she wasn't there for her children and didn't provide supervision or structure for them. All of the boys, according to George, looked as though they hadn't been cared for. He said that when the boys arrived in Kansas City, they were wearing dirty clothes and smelled bad.

Keith arrived in Kansas City just a few weeks before the end of the school year. He was enrolled in the fifth grade at Oak Grove Elementary School, and was in resource classes. Though he never completed the fifth grade, he was apparently given a social promotion to the sixth grade at the end of the

semester. He remained with his aunt and uncle for several months. While in Kansas, Keith was supervised by Mark Frey of the Kansas Department of Social and Rehabilitation Services. Frey investigated the home of George and Sally Nelson. His report noted that they lived in a three bedroom home, and that George worked nights, while Sally worked days, so 24 hour supervision was provided. George and Sally received AFDC payments for their care of the Nelson brothers. Frey's report noted the history of physical and mental abuse, neglect and chemical dependency (Nancy) in Keith's family, as well as past physical abuse by Kenny Morse. He stated that Kenny Morse did not know where the boys were, and that the boys were afraid of him. Frey maintained regular contact with Keith. In the fall of 1988, Keith was enrolled in the sixth grade at Oak Grove, where he again remained in resource classes. He earned good grades at the school, including A's and B's, with Satisfactory marks for conduct and effort. Keith reported that George took him to a counselor when they were living in Kansas City. He couldn't remember the name, and no records were ever obtained.

The Nelson boys all had mixed feelings about their experiences with George and Sally. On the one hand, they appreciated having parental figures at home and having regular meals. They went to school, did their homework and had chores. They reported having some difficulty adjusting to the structure and supervision in the home. Keith had a particularly difficult time, though he didn't get into trouble in the community while with George and Sally. Keith said that when he was with his uncle and aunt, he didn't run the streets and he didn't steal. He attended school regularly, and his grades improved. Paul reported that George and Sally blamed him and his brothers for everything that went wrong. George used a switch to discipline them. He would make them pull down their pants and take the whippings on the bare buttocks. Paul described his aunt Sally as "crazy" and said she yelled for no reason and was mean to them. He noted that George and Sally would take their own children to places, such as amusement parks, and leave Nancy's boys home. He said that living with George and Sally was not such a good experience.

Donna McQueen, Nancy's sister, described the boys' lives with George and Sally as "a whole new world", with structure and discipline. Stating that the boys weren't used to that, she said that it was difficult for George to deal with the four boys in addition to his own children. Donna said that Sally wasn't happy about the situation. George admitted that Sally and the boys had disagreements, and that the home was becoming chaotic.

In the fall of 1988, George and Sally Nelson decided to move their family out of Kansas City to a more rural area. Keith was withdrawn from Oak Grove School on October 25, 1988, and enrolled at the Miami R-1 School in Amsterdam, Missouri on October 28, 1988. He did not remain at the school for very long. In mid November, Keith returned to his mother's home in Texas.

Kenny followed a short time later, while Paul and Steven remained with George and Sally. It is not clear what led to Keith's return to Texas. There is the suggestion that he had some dispute with either George or one of his children, or that Sally was not happy with his being there. At some point, either George asked him to leave or he asked to return to his mother's home. A memo written by defense investigator Dan Grothaus in May, 2000, indicated that a Wyandotte County Court in Kansas ordered Nancy to pay $200 per month in child support for the care of her children by her brother. The support order was filed on October 14, 1988, shortly before Keith and then Kenny returned to their mother's home. Stating that she couldn't afford to make the payments, Nancy said she never made any. Records indicate that Keith returned to Texas on November 8, 1988, with the reason given that his uncle had a change in work schedule making it difficult to supervise him properly. Nancy was living at 205 N. Las Vegas Trail, Ft. Worth at the time.

Nancy told Juvenile Probation Officer Bruce Smith that she was going to get Keith into counseling and that she had been referred to a counselor by a police officer. Nancy said that Officer Dunsmoor of White Settlement referred her to a psychologist in Ft. Worth. She claims that the psychologist told her she needed to be home more in the evenings. She did not take Keith back to counseling after that. He was enrolled in the sixth grade at Brewer Middle School in White Settlement on November 15, 1988. He remained in the special education program, primarily in resource classes. Smith's records indicate that Nancy told him she had been referred for counseling to a first offender program, which Smith did not feel was the appropriate program for Keith. He encouraged her to take Keith to MHMR or Family Services, but apparently didn't require counseling and didn't follow up on this recommendation. Reverend Mike Redd, a former MHMR counselor, reported that the agency was understaffed during the late 1980's. It was a gateway program to local mental hospitals, and had the ability to hospitalize suicidal youth.

Chronological entries in Smith's records indicate that Keith's behavior improved over the next few months and he had few problems at school or in the community. Smith initially placed Keith on medium supervision, but by early 1989, he was on minimum supervision. Nancy told Smith that the Police Officers Association had brought them a Christmas tree and food for Thanksgiving, and had apologized for accusing Keith of things he hadn't done. An entry in January, 1989, indicated that Keith was attending school regularly, doing his school work, avoiding disciplinary problems, keeping his curfew and helping out around the house. Stating that Johnny was staying with friends, Nancy said that the absence of Johnny's negative influence had been the biggest factor in keeping Keith out of trouble. Keith remained on minimum supervision and Smith's chronological entries indicate he continued to do well. Smith decided not to extend Keith's supervision, and to allow probation to expire. Probation expired and the case was closed on March 16, 1989.

Keith was in the sixth grade at Brewer Middle School during the 1988-89 school year, two years behind his age peers. School records do not contain a transcript of grades for that period. Achievement testing was conducted in March, 1989. Keith's scores at age fourteen range from the 2.5 grade equivalent level to the 5.5 grade level. Chronologically, he should have been in the eighth grade. Records indicate that he would be repeating the sixth grade during the 1989-90 school year.

Within a short time of being discharged from probation, Keith began acting out again. Nancy told PO Smith that he had begun associating with undesirable peers. He was not doing his chores at home, and would sometimes stay away overnight. Keith was reported as a runaway on April 1, 1989. He had reportedly last been seen by his mother at 6:00 p.m. the previous evening. He was picked up by authorities and released to his mother. On May 24, 1989, Keith was referred on a charge of burglary of a building. Some older teens told authorities that he had broken in to Auto Locators and stolen keys. A couple of the teens claimed that they caught Keith and turned him over to the police. Officer Gaddy was contacted and Keith was transported home. The matter was referred to the DA and a petition was filed. The matter was set for hearing in July. On June 14, 1989, Nancy contacted Bruce Smith and informed him that Keith had gone to live with his father in Kansas City and would remain there. Action on the petition was suspended pending Keith's return to Texas. Records indicate that Kenneth Morse was residing at 306 S. Valley in Kansas City, Kansas.

Keith said that when he went to his father's in Kansas City, he really didn't stay with Morse much. Kenny lived with his mother, Pearl Morse. Keith described the house as being "in worse condition than ours", adding that there was no running water. He said that Morse was using and selling drugs at the time, including heroin and crack. He was both shooting and snorting the drugs. Keith would stay with various relatives for periods of time, including his paternal aunt, Betty Sutton. In about early July, Keith got into a dispute with his father over his father's treatment of Keith's grandmother, Pearl Morse. Kenny Morse had been physically abusing Pearl and taking her Social Security money for drugs. One day, Betty saw bruises on Pearl. Keith confronted Morse over his treatment of Pearl, and the two fought. Keith beat his father. Nancy was aware of this incident as were several Morse relatives. Betty said that Keith stayed with her for a couple weeks following the incident. This is when he confided in her that he had been raped by a black man in California. Milas Morse said that he witnessed Kenny Morse's mistreatment of their mother, and knew that Keith fought with his father about it. He confirmed that Kenny Morse was a long-term, heavy alcohol and drug abuser. Felicia Morse, Fred Morse and Karen Gentry all confirmed the story about Kenny Morse beating Pearl, and Keith beating Morse for his treatment of Pearl. Laura Luttrell, a paternal cousin and the daughter of Betty Sutton, also knew about the situation. She said that

she had called the police one time when Kenny Morse was beating Pearl. She knew that Keith had stepped in to protect his grandmother.

Not long after this incident Keith decided to return to his mother's home. Nancy advised Bruce Smith that Keith was back, and juvenile court proceedings were reinitiated. Keith told Smith that while he was with his father, Morse was involved in the distribution of drugs. He also told Smith that he decided to return to Texas after having a fight with his father. Smith prepared a report to the court titled "Social History for Second Adjudication." He presented Keith's case to the Placement Screening Committee again. This was the third time. Records include a placement decision scoring sheet which lists several categories of information considered. It includes such things as: type of offender, legal status, previous referrals, prior placements, school behavior, detention behavior and drug/substance use/abuse. There is no category for emotional or mental health problems or need for treatment. Placement was denied. There is no indication of what information was considered by the committee and why it continued to deny Keith placement. Debbie Spoonts, who has been on the placement committee since 1990, said that if a child was suicidal that would be an issue. She reviewed Keith's file and said he probably needed hospitalization at John Peter Smith. Smith's report included updated social history information from the previous report. He noted that Nancy was the Assistant Manager at Quik Sak, where she earned $10,000. Johnny, Kenny and Keith were living in the home with her. Keith had worked some during the summer mowing lawns. Nancy told Smith that she felt she was unable to supervise Keith and that he needed a more structured environment. The allegations of delinquency related to the charge of burglary of Auto Locators were contested. Following a hearing on August 23, 1989, the judge denied the petition and it was dismissed.

Keith was again enrolled in the sixth grade at Brewer Middle School in the fall of 1989. He was then three years older than his grade peers. At some point, Johnny moved to a shed behind the house in which Nancy lived. He was in the ninth grade at Brewer High School, as was Kenny. His grades were very poor and he earned only ½ credit in English, with no credit for any other classes that year. Kenny joined the football team. He said that participating in athletics helped him stay out of trouble. His coaches and teachers were positive influences in his life. Kenny added that his mother "was drunk the whole time we were in Texas." Nancy admits she was drinking heavily during this period and that she was having trouble paying her bills. In about October, Nancy, behind on her rent, moved to an apartment at 105B Pemberton Square.

On September 29, 1989, a referral was made to Tarrant County Juvenile Court regarding Keith, alleging that he was delinquent in that he had stolen a bicycle. Records indicate that the incident had been reported on September 16, 1989. According to the report, Keith had been at the home of a friend. He left

on a bicycle, which turned out to be stolen. The friend's parent reported that her husband had bought the bicycle from a neighbor and that they had loaned the bicycle to Keith. Nancy reported that Keith had come home on a bicycle that wasn't his. When Keith was questioned, his friend's parent contacted the police about the incident. This appears to be a case in which Keith was loaned a bicycle by a friend, and didn't know it was stolen. However, within a short time, Keith was referred to authorities on charges of burglary of buildings, including the City of White Settlement Recreation Department and Pete's Tire and Battery. Pete's had been broken into on October 5, 1989. Fifteen dollars had been taken from the cash register, and two Pioneer speakers were missing. The recreation building was broken into on October 6, 1989. A key box had been taken, the coke machine was pried open but no money taken, and some change had been taken from the candy machine. On October 10, 1989, there was a burglary of a city concession stand at a park, in which a microwave oven and baseball equipment had been taken. Nancy found some of the stolen items in her home and contacted the police.

Keith was picked up at home by Officer Dunsmoor and transported to meet with Sgt. Gaddy, who admitted Keith to detention. Regarding Sgt. Gaddy, the juvenile police officer, Keith said that he felt that Gaddy was "all right" and was generally fair with him. He said that at some point Gaddy told him that he thought he had made the wrong decisions regarding his handling of Keith. Gaddy noted that he would continue to put Keith in detention every time, then let him be released to Nancy. He told Keith he thought there were other things that could've been done to help Keith. Gaddy is deceased. Keith added that "no one was ever a father figure for me....no one stepped in to guide me in a different direction."

On admission to detention, Keith was described as cooperative. There were scars and cuts on his left hand and forearm. He was placed in the isolation room due to disruptive behavior. At the detention hearing the following day, Keith was ordered held in detention pending court action. A petition alleging that he was delinquent on three counts of burglary/breaking and entering and theft was filed by the DA on October 13th. Keith remained in detention for just over two weeks. His behavior was similar to previous times, in that he engaged in self-abusive and disruptive behavior, though there were days when he was described as cooperative and "outstanding" in behavior, including comments that he participated in school and did extra chores. Keith was listed as suicidal on several special room observation reports. He again had incidents in which he would hit himself in the face, causing a nosebleed, and then write on the walls or floor in his own blood. On one occasion he had a self-inflicted wound to his right wrist. On October 20, 1989, Keith signed a waiver to his right to a hearing on the allegations of delinquency, and stipulated to the evidence. He was adjudicated delinquent on the basis of possession of stolen property.

A "Social History for Second Adjudication" report, dated October 20, 1989, was prepared by Don Dalton of Juvenile Probation, and submitted for the court hearing on October 24th. Dalton included information from previous reports and updated some information. He noted that Nancy reported that Keith's behavior went downhill after he was discharged from probation in the spring. He had not been attending school that fall and was often absent from home. Keith was described as being 5'2" in height and of stocky build. He was repeating the sixth grade and was in special education. His case was presented to the Placement Committee for a fourth time and he was again rejected for placement. PO Michael Warren filed a Progress Report on October 23, 1989. In it he noted that Nancy told him that Keith had emotional problems. The school reported that Keith had been withdrawn for non-attendance. At a hearing on October 24, 1989, the Juvenile Referee committed Keith to the Texas Youth Commission (TYC), the state juvenile correctional agency. He was transported to their reception and diagnostic center at Brownwood the following day.

A physical examination was conducted upon admission, revealing no significant health issues. Keith was listed as being five feet, three inches tall and weighing 155 pounds. He entered Brownwood with a prescription for Imipramine, a trycyclic antidepressant that had been started on October 13, 1989, while he was in detention. The drug was continued until mid-December. Intake medical records also include a "Suicide Alert" form noting his history of past suicide attempt (trying to hang self). He was not referred for evaluation by mental health staff at that time. A psychological evaluation was conducted by Ken Murray, MS, in early November. It included intelligence testing (WISC-R), which revealed a full scale IQ of 98, verbal score of 91 and performance score of 106. The fifteen point spread between verbal and performance scores is indicative of learning disability. Murray opined that Keith was reacting to personal/social distress and did not suffer from psychosis or serious mental disturbance. It is not clear what social history information he had or the extent of his examination of Keith. He concluded that Keith had a conduct disorder and was in need of a high degree of structure.

An educational assessment was performed upon admission. The Woodcock-Johnson achievement test was administered. Keith was a month short of his fifteenth birthday, and would have been in the ninth grade if he had not been retained three times. His highest score was in math, which was at the 6.3 grade equivalent level. Scores in other areas were low: 4.2 grade level in reading, 4.7 grade level in written language and 4.3 grade level in general knowledge. Reference was made to a psychological evaluation in 1988 which indicated that he was in the average to low average range. Keith qualified for Chapter 1 remedial assistance. It was noted that he had been in resource classes, and that he required extra supervision in class.

A TYC Commitment Summary was prepared upon Keith's admission. It contained basic information regarding Keith, including the reason for commitment to TYC, which was listed as misdemeanor theft. The form indicated that no weapon was used, and it was not gang-related. There is a section for listing prior placements, which noted that Keith had none. The types of prior placements listed were: state training school, psychiatric hospital, residential treatment center, therapeutic camp, group home, foster home, substance abuse program, or other type of residential program. Keith had not been in any of these types of placements. The form indicated that Keith had completed the fifth grade, and was failing in his second year in sixth grade. Characteristics of the family checked on the form were: chronic poverty, chaotic home environment, physical and emotional abuse, and neglect. The line for suicide was checked "no" despite Keith's history of suicidal gestures and ideation, and history of self-abusive behavior, and despite the "suicide alert" on medical intake.

The Initial Placement Form indicated that Keith was committed for theft; that he had no prior placements; he had never been referred for runaway or escape; and that he had been disruptive in detention, including engaging in self-abusive behavior. His risk level was determined to be medium. The form indicated that Keith had low mental health needs, low educational needs, and medium needs for substance abuse treatment. The placement decision was to send him to the training school at Gainesville. Other placements available within TYC included: residential treatment center - high or medium, halfway house, group care, foster care, or special needs program (substance abuse treatment, psychiatric hospital or wilderness camping). The Individual Care Plan noted his immaturity, impulsivity, self-abusive behavior and special education needs, as well as lack of coping and problem-solving skills. It concluded that he could benefit from a highly structured environment that provided counseling, guidance and supervision. Stating that he was one of the younger boys at Gainesville, Keith said that most boys had not come directly from detention, but had been in several other placements before Gainesville. He described the other residents at Gainesville as "out of control", and said that the staff had no control over the facility. Residents ranged in age from early teens to eighteen. He was fourteen, and small in stature for his age.

Keith arrived at Gainesville on November 8, 1989. He stated that he was placed in a unit with older residents. There were forty-eight residents and two staff. He said that staff beat the residents regularly. There were fights between residents all the time. He said there were riots on the unit at times. Keith described it as a pretty frightening place. He noted that there had been a couple suicides by females in the 1980's, when Gainesville was coed. They moved the girls out and constructed a fence in 1989, not long before he was sent there. Elsie McKinney, a staff member at Gainesville at the time, told Lisa Murphy that after the construction of the fence, more violent offenders were

sent to Gainesville. There were more behavioral problems with residents after that.

Keith said that he was exposed to sexual relationships between residents and sexual assaults at Gainesville. He admitted that he was sexually assaulted repeatedly by an older resident while at Gainesville. It is extremely difficult for Keith to talk about his victimization and he declines to describe specifics, though he did acknowledge that the youth who assaulted him had sucked his penis and "was always trying to get me to f... him....I tried to....I went along with it....I was a kid." This was all he was willing to say on the subject, which is clearly a very emotional topic for him. He said that he tries to avoid remembering things that happened there.

Keith participated in the school program at Gainesville. He remained in special education but was given a social promotion to the ninth grade, in spite of the fact that he had never completed either the fifth or sixth grades, and had never been enrolled in the seventh or eighth grades. He participated in groups, including chemical abuse treatment groups and AA/NA meetings, and had individual counseling sessions with Beatrice Sager. In those sessions they discussed his immature behavior, hyperactivity, past use of alcohol, and incidents of self-harm. Keith continued to engage in behaviors similar to that which he had exhibited in detention, including hitting his fists against the wall or door, and cutting his wrists with a coke can, the teeth from a comb, and his fingernails. In an early session, Keith told Sager he was going to kill himself. He later denied or minimized such thoughts. Keith engaged in some disruptive behavior in the halls and dorm, and was occasionally put in the secure room. Keith said that he had only one visit while he was at Gainesville. Nancy and Johnny visited one time.

Medical records indicate that Keith was struck on the back of the head and kicked on his hand on December 23, 1989. He told medical staff he had also been hit on the same place on his head the previous day. Redness and edema were noted and an ice pack applied. On January 6, 1990 Keith was seen by medical staff after he had been in a fight in the dorm, then had tried to make his wrists bleed. He had to be restrained to prevent injury to self. Staff felt he was suicidal and placed him on suicide precautions. On January 19, 1990, Keith was seen by medical staff after he had been in a fight. He had swelling and bruising on his face, around the left eye, and on his knuckles. On January 22, 1990, Keith reported that other residents were spitting on him and threatening him. He asked to be put in security. The following day, he again self-referred to security, stating he was being threatened by peers and feared for his safety. He was admitted to the security room for his safety and at his request. A few days later, on January 28th, he tried to cut his wrist with a coke can. On February 2, 1990, Keith was treated for a small superficial cut to his

right wrist. On February 28, 1990, Keith was hit in the nose and upper cheek, near the eye. He suffered edema and discoloration.

An Individual Case Plan was developed for Keith in December, 1989. It included individual counseling, participation in special education, and participation in chemical dependency treatment. The goal was to place him in the Phase III community re-entry program, with intensive supervision in his home. The plan indicated that he would need to be in a support group for abuse victims. A home evaluation was conducted by phone with Nancy on January 16, 1990, and the home was approved for Keith's return. The release staffing, conducted on February 7, 1990, indicated that Keith had participated in school, done his work and was not a behavior problem in school. He participated in group and individual counseling. Goals for Phase III included developing hobbies and activities to satisfy his desire for excitement, and participation in a support group for abuse victims. On February 9, 1990, TYC notified the Juvenile Probation Office in Tarrant County that Keith was scheduled to be discharged home on March 2, 1990, with placement in the Phase III program for ten weeks. He would then be released on parole status on May 12, 1990. A psychiatric evaluation was conducted by Harold Grant, MD on February 22, 1990, due to Keith's history of suicidal tendencies and his suicidal gestures at Gainesville. Grant had little social history information about Keith. Keith, as usual, minimized his suicidal intent. Grant noted that Keith's tendency to self-mutilation reflected his psychopathology, but concluded there was no need for suicide precautions. Keith was discharged to his mother on March 2, 1990. Nancy has a photo she took of him in the car that day which clearly shows the injury to his face and eye sustained on February 28th. She recalled that Keith was very upset when she picked him up at Gainesville.

Keith returned to his mother's home at Pemberton Square. Johnny and Kenny were in the home, as well. He enrolled at Brewer High School and was placed in the ninth grade, in resource classes. This grade placement appears to be based on age, as he hadn't completed grade five. TYC Gainesville had transferred three high school credits to Brewer High School, based on the work that he had one in their school. On March 7, 1990, Keith was admitted to detention following a fight with his brother Johnny. He was released home the following day. Records indicate that Johnny had instigated the fight. When Nancy was unable to break it up, she called the police. Johnny was described in counseling records as being "quite violent and unstable." Keith reported to his TYC parole officer, T. Hunter, as required during the next couple months. He was seen for individual and family counseling, as well as group counseling, by Cindy Phillips, of Williams/Phillips Associates, beginning March 12, 1990. Nancy failed to appear for a couple of the family sessions, and Phillips noted that she really needed to be involved. In April, Nancy informed Phillips that they would be moving. Nancy states that they were evicted from the Pemberton Square Apartments, and had moved to an apartment at 718 S.

Appellate Case: 15-3160 Page: 49 Date Filed: 02/29/2016 Entry ID: 4372476

Cherry Lane, #13. Both Johnny and Keith were causing problems at the Pemberton Square apartment. Nancy said that Johnny was exhibiting symptoms of mental illness. His schizophrenia was not diagnosed for some time, but the symptoms were emerging.

TYC parole records indicate that Keith was complying with the requirements of the Phase III program. He was scheduled for discharge on May 12, 1990. Nancy told Counselor Phillips in early May that Keith had begun skipping school. In late May, Phillips signed a form stating that Keith had completed the Phase III program, and the case was closed. She was apparently unaware that, following discharge from Phase III to regular TYC parole on May 12th, Keith was referred on a charge of burglary. According to TYC parole records White Settlement police referred Keith on a charge of burglary of a vehicle and criminal trespass on May 17, 1990. Records indicate that Keith entered West Elementary School on April 20, 1990, without consent of the owner with the intent of committing theft (criminal trespass charge). On May 17, Keith, along with another youth, was alleged to have broken into a vehicle.

Keith was admitted to detention on May 17, 1990, and ordered held pending a TYC revocation hearing. Keith remained in detention until his revocation hearing in early June. This appears to have been a markedly different stay than his previous ones, as detention observation reports are pretty positive. He participated in school and recreation, and was described as having a positive attitude and generally good behavior, with some staff noting "excellent" and "outstanding" conduct at times. At the hearing on June 6, 1990, Keith's parole was revoked and he was ordered returned to TYC Gainesville. He was transported to Gainesville on June 7, 1990. Records include a letter written to TYC by Jerry Wood, Assistant Director of Tarrant County Juvenile Services in which Wood stated that he wished to convey the "very positive efforts" by Keith observed by himself and his staff in detention. He reported that Keith made a concerted effort to direct his behavior towards positive goals, and that this had been Keith's best effort during the time they had known him.

It appears that Keith did better during his second stay at Gainesville. He attended school during the summer and earned two and a half credits. He remained in special education. His grades were below grade average in all subjects. It was noted that he was not a behavior problem in the dorm. The Level of Care Assessment form indicated his need for special education for a learning disability, and also indicated a need for mental health treatment. There is no indication that it was provided. Other records from this stay contain notations that Nancy reported that she and Keith had been physically abused by Keith's father, that Kenneth Morse abused drugs, and that Keith had experimented with marijuana and alcohol in the past. The records contain a

statement that Keith's "parents attempted to provide for his emotional and financial needs", which reveals a complete lack of accurate social history information about Keith's childhood and family situation.

On August 22, 1990, Keith was transported to the Tarrant County Detention center so that he could testify at his brother's hearing. It is believed that this was a hearing for Kenny, whose school records were sent to Tarrant County Juvenile Services in June, 1990; no details are provided. Following that, Keith was transferred to the Challenge Program of TYC, a boot camp program. He successfully completed the Challenge program. Records include a Notification to Chief Juvenile Probation Officer from TYC, notifying them that Keith would be discharged home on September 15, 1990, and would participate in the Texas Key Program, an intensive supervision program. Keith was supervised by two workers from the Texas Key program and Parole Officer Faustino "Tino" Castillo. Castillo had begun working for TYC in February, 1990. He is currently working for Tarrant County as an intake worker in detention. Castillo remembers Keith. He said that when he received Keith on supervision he had little background information on him. He had not done a home evaluation prior to receiving Keith on parole. When asked if Keith had ever told him about being sexually assaulted at Gainesville, Castillo said he had not. He added that he had personal experience with such abuse in his own childhood, and didn't tell anyone until he was thirty years old, so he understood that it was difficult for males to admit being assaulted.

Keith registered in the tenth grade at Brewer High School on October 8, 1990 and began classes the following day. He was mainstreamed for physical education and a vocational class and was in the Resource Room for other classes. Kenneth Williams was the physical education teacher. He remembered Keith and said he participated willingly in the class and was always respectful. He recalled that Keith's appearance was unkempt and it was obvious that he was from a low socio-economic status. Yvonne Cordova was Keith's resource teacher for history and math. She said that Keith kept to himself and didn't interact with other students. She knew he had come to the school from Gainesville but couldn't remember if he was a learning disability or emotional disability student (he was learning disabled). Cordova said that Keith was somewhat of a disciplinary problem in that he was hyper and couldn't sit still. Deborah Miller, the head of Special Education at Brewer High School, noted that Nancy never attended any of the ARD meetings (Admission, Review and Dismissal Committee which develops the Individual Education Plan for special education students). California Achievement Testing was done in October. Keith's scores, a few weeks prior to his sixteenth birthday, ranged from the 3.2 grade equivalent level to the 8.0 grade level. He was below average in most subjects and had not mastered most.

Keith was placed in detention on September 20, 1990, on a charge of criminal trespass. He was released the following day. No details are in the records and no petition was filed. On October 30, 1990, Keith met with Tino Castillo. Parole chronological notes indicate that Keith had made many suicidal comments to school and Texas Key Staff. Castillo indicated he would refer Keith for psychological evaluation, but there is no indication that he did. That same day, Castillo had Keith picked up and taken to detention for his own safety, due to his suicide threats. He was released to home the following day, and there does not appear to have been any follow-up with regard to the psychological evaluation or suicide threats. Castillo stated that Nancy appeared to be overwhelmed with her situation. He knew that she abused alcohol, and that she had a lot of boyfriends in and out of the home. Castillo told Lisa Murphy that when he made home visits he usually found Nancy on the couch smoking cigarettes with beer cans all around. The home reeked of alcohol. Stating that Keith had no positive male in his life, Castillo said that Keith was always respectful and courteous to him.

On November 2, 1990, Keith requested a travel permit from PO Castillo to travel to Kansas with his mother to visit maternal grandparents, both of whom had recently had heart attacks. Nancy and Keith picked up the travel permit on November 16, 1990, and they traveled to the home of her parents. At about that same time, Nancy's brother George was called up to active duty military service due to the building tensions in the middle east. Nancy took Paul and Steven, who had been living with George and Sally, back to Texas. Nancy and the five boys were then living in the two bedroom apartment on Cherry Lane. Nancy continued to work at Quik Sak and to abuse alcohol. Johnny had earned no credits in school during the second semester of the 1989-90 year and did not attend in the fall of 1990. He was working and becoming increasingly mentally ill. Kenny was attending school, doing well in school, working, and participating in sports. Upon return to Texas, Paul enrolled in the ninth grade at Brewer High School where he earned above average grades. Steven was enrolled at Brewer Middle School. No records are available for him, but he was reportedly a good student.

Other than a staffing meeting between Castillo and the Texas Key Program workers, there are no other entries regarding Keith in the parole or juvenile detention records until March, 1991. During that period, he remained in school and out of trouble for several months. He missed only eleven days of school during the first semester and twelve days in the second semester, which was an improvement for him. Keith spoke about a teacher he particularly liked, Ms. Lambert. Her name is now Rene Floyd. She was Keith's special education teacher in self-contained classes, and worked with him one on one. Floyd noted that Keith did better when working one on one with a teacher who had clear rules and consequences. He had difficulty with concentration. She said he couldn't manage change very well and couldn't cope with stress. Her aide,

Appellate Case: 15-3160 Page: 52 Date Filed: 02/29/2016 Entry ID: 4372476

Phillip Burris, remembered Keith, as well, and recalled a time that another student was antagonizing Keith. Keith refused to be drawn into a fight with the student. Burris said that Keith was polite and he never had any problems with him.

Calling Keith's story "one of the worst" she had heard, Floyd recalled that the Parks and Recreation staff felt so bad for the Nelson boys that they let them pick up trash at the park in exchange for food from the concession stand. Floyd described Nancy as "mean" and said Nancy never had anything nice to say about her children. Keith respected Rene Floyd and confided in her somewhat. He told her that Nancy always had strange men in the house. Floyd observed bruises on Keith, but when she asked about them he "put on a brave face" and said they were from playing with his brothers. Floyd reported that she observed symptoms of depression and anxiety in Keith. She noted that he always assumed the worst, and had a "knee jerk reaction" when confronted, adding that you didn't want to scare or startle Keith. Floyd also stated that everyone at the school said not to bother to call Child Protective Services if abuse or neglect was suspected because they wouldn't do anything. Dale Brock was the principal at Brewer High School at the time. He recalled that some of the Nelson boys had attendance problems, but said they weren't a behavior problem at school. He, too, noted that Child Protective Services would not intervene once children were in high school. Jack Clay, the assistance principal said Keith's main problems during school were non-attendance and poor peer relationships. He was not disrespectful to staff. On May 9, 1991, the ARD committee met at Brewer High School and developed an Individualized Education Plan for Keith for the following year. He would be in 11th grade, and would be in resource classes for some subjects and self-contained for others. He was exempted from ninth grade and from exit level testing. Counseling was recommended.

On March 19, 1991, Keith was taken to detention for an alleged burglary of a building. No details were provided in the records. He was released home on March 26, 1991. No charges were filed. Detention records indicate generally positive behavior, with a comment that he responded to counseling and made an effort to control his emotions and behavior. PO Castillo developed a case plan for Keith on March 26, 1991, which included going to school, getting a job and referral to Family Services for counseling. Again, this counseling was never set up. On March 28, 1991, Keith was detained on suspicion of arson. He was released the following day, with no charges filed and no details in the records.

In about early April, Nancy left for Missouri to be with her father, who was gravely ill. She left the five boys, ranging in age from thirteen to seventeen, at home alone for several weeks. Johnny was apparently getting into trouble at that time as his school records indicate that his records were sent to Tarrant

County Juvenile Services on 3-28-91. Johnny was arrested on April 19, 1991, for an assault on his brother Kenny. White Settlement Police Department records indicate that police responded to a call in reference to family violence, assault with bodily injury. Johnny reportedly struck Kenny in the nose, causing a bloody nose. Records further indicate that the curtains had been pulled down in the kitchen and dishes were strewn over the floor. Both Kenny and Keith remember the incident. Kenny said that Johnny was beating on Keith. He jumped in to try to stop the fight, and Johnny started beating Kenny. Keith ran out and called the police. Johnny gave Kenny a concussion, and he was taken to the hospital by ambulance. Johnny was taken to jail. Nancy, who was in Missouri at the time of this incident, claims that Sgt. Gaddy later persuaded her to drop the charges against Johnny. Records indicate that the matter was disposed of with a citation. Johnny was withdrawn from Brewer High School on April 29, 1991, with the reason given that he had moved out of the district, and was living with Otis Anderson.

Nancy's father, George Nelson, died on May 20, 1991. Nancy returned to Texas following the funeral. On May 30, 1991, Keith was again in detention, but was soon released. Records are unclear as to the reason, but at some point there was an allegation of terrorist threats, which turns out to have been an incident in which Keith had a BB gun. Late in the summer, the wife of the complainant told PO Castillo that she knew nothing about any incident and that her husband, who was supposedly the victim, was not even home at the time it was supposed to have happened. Castillo said that the charge was subsequently reduced to disorderly conduct - ordinance violation, but was not prosecuted. Castillo commented that Nancy was an alcoholic and the Nelson home was always in shambles. He described Keith as "slow." In May, 1991, Keith began working at Sack & Save, a grocery store in Fort Worth. Those his employment file had been destroyed, Ron Ninemire was able to verify dates of employment at the store. Keith worked there from May 22 to August 18 of 1991. Keith was placed in detention on June 8th, and released a short time later, with no reason provided in the records. On June 28th, he was again in detention, on a TYC hold and for trying to elude the police. He was released the following day.

Keith was detained on August 19, 1991, on charges of interfering with public service (no details provided) and an allegation of breaking into a coin-operated machine. The latter charge was later changed to criminal mischief, but PO Castillo's chronological notes indicate that the charge could not be substantiated. He had been taken into custody by White Settlement Police Office Randy Dunsmoor. Dunsmoor had a very negative view of Keith, describing him as a thief. He said he knew Nancy drank heavily and often left Johnny in charge. He said that if Keith had stayed in White Settlement much longer, he would've been shot by a store owner. Keith was released from detention on August 21, 1991. Castillo was continuing to investigate these

Appellate Case: 15-3160 Page: 54 Date Filed: 02/29/2016 Entry ID: 4372476

various allegations and indicated that he would be requesting a hearing. Keith was enrolled at Brewer High School on August 21st, but did not attend, and was withdrawn on September 6, 1991. Keith contacted Castillo by phone twice on August 23rd. He was told to report into the office that day. When he called in a second time, Castillo told him that he was listed as being on escape status for failure to report. Apparently, shortly after that Keith left Texas and went to stay with paternal relatives in Kansas.

Keith remained in Kansas until November. He stayed at times with his father and Pearl Morse, and other times with his Aunt Betty or other relatives. He said that he went to Kansas because he feared that he was going to be revoked and sent back to Gainesville. Things with his father and grandmother were much the same as they had been before. Kenny Morse was abusing drugs as well as physically and verbally abusing his mother. Pearl was in poor health at the time from complications of diabetes. Karen Gentry spent some time in Kansas City that fall to help her ailing mother. She saw Keith at Pearl's and described him as very loving towards his grandmother. He helped her by doing such chores as sweeping the floors, cleaning, and taking the trash out. Kenny Morse would cuss at his mother and hit her, which upset Keith. There was an occasion in which Keith saw his father beating his grandmother, and stepped in again, as he had done previously. His aunt Cindy came in during the altercation and witnessed it.

Karen Gentry reported that Keith had attempted suicide during this stay in Kansas City. She was at her mother's home when a railroad detective brought Keith home. The detective reported that he had seen Keith down at the train yards preparing to jump in front of a moving train. Noting that Keith was depressed at the time, she said that nothing was done to get help for him. When asked about this, Keith, as usual, denies that he was going to commit suicide.

On October 17, 1991, Keith phoned PO Castillo and told him he was ready to come back and turn himself in. He said that he had spoken with his mother, and she had told him that if he came back and cleared things up, she would quit her job and move to Missouri, near her mother. Nancy states that everything was "going crazy" in Texas. She was drinking too much and the police were threatening to shoot Keith. Johnny was in trouble. She just couldn't cope anymore and felt it was time to leave Texas. Keith turned himself in to authorities in Texas on November 1, 1991. He was returned to the custody of TYC. On November 4, 1991, he was placed at McFadden Shelter, which he describes as being a halfway house. He was discharged to his mother's home on November 14, 1991. Nancy stated that she and four of her sons, including Keith, moved to Amsterdam, Missouri on November 22, 1991. Johnny did not want to move with them, so he stayed behind and lived with friends.

**Missouri: 1991-1999**

When Nancy and the boys arrived in Missouri, they stayed with Wilma Nelson for a few weeks. Then Nancy rented a house at Route 1, Amsterdam, Missouri, about sixty miles southeast of Kansas City. In addition to her mother, her brother George and his family lived in the area, as did her sister Georgeann and her family. Nancy enrolled the four boys in the Miami R-1 Schools. Keith was again in special education. On December 3, 1991, Nancy signed a consent for him to be evaluated for placement and for the development of an individualized education plan. It is not clear what grade Keith was placed in as no academic records are available. Kenneth was in a program in which he attended regular high school classes for a half day and vocational training for a half day. Paul was in regular high school classes. Steven was in middle school. Keith's cousin, Billy Colston (son of Georgeann) was in the same grade as Paul. Colston noted that Paul was on the football team. He said that Keith had problems with reading and learning, and was in special education. Keith admits that he did not attend school regularly. Nancy said that other kids at school teased Keith because of his learning disability and hyperactivity. Steven told the FBI that he spent much of his time with George and Sally, rather than at his mother's home. He said that it was a more stable home and he liked it better there.

When Nancy settled in Missouri, she worked initially at Casey's, a convenience store. She then got a job at Country Mart in nearby Butler. Keith reported that Nancy's alcoholic friend, Pam Copeland, came to Missouri and stayed with them for a while in late 1991/early 1992. In about February, 1992, Nancy and Pam went back to Texas to visit Johnny. Nancy left the boys at home to fend for themselves. She stayed in Texas for a few weeks. Around the time Nancy and Pam Copeland left for Texas, either Copeland or Nancy told authorities she thought there was stolen property at the house. Keith reported that the police raided the house looking for stolen property, which was not found. A lockbox containing some marijuana was found in Kenneth's room. Both Kenneth and Keith were arrested on March 29, 1992, and charged. On April 22, 1992, both appeared in Bates County court and pled guilty to a misdemeanor drug violation. At age seventeen, they were both sentenced to six months in jail, suspended, and two years unsupervised probation. Keith was discharged by the Texas Youth Commission on September 17, 1992.

Keith did not finish the school year at Miami R-1 High School. On July 1, 1992, he began working at Griff's Bait Shop. He said that he saw paternal relatives, including his grandmother, from time to time. He also said he saw Kenneth Morse on occasion, stating that Morse would come by their house trying to sell things that he had stolen. Keith added that Morse was not welcome at their house. Kenny recalled that the last time he saw his father was at an aunt's house in Kansas City. Morse came by, bringing pizza, gave them

some money and said "have a nice day." He was there for a half hour or so, then left. Pearl's health was declining at that time. She had diabetes. Karen Gentry reported that Pearl's serious health problems came on suddenly. Karen went to Kansas City to help take care of her mother. She said that Kenny Morse had continued to live with his mother much of the time, and also continued to physically abuse her and steal her money. He was a heavy drug user. Pearl Morse died of complications of diabetes on November 19, 1992.

On December 24, 1992, Keith was arrested and charged with burglary and stealing for an incident that occurred at an area gas station on December 19, 1992. Seventeen cartons of cigarettes, a box of candy, a flashlight and a lock had been taken. He was held in the Bates County Jail. Later, additional charges of burglary and stealing were filed for an incident that occurred December 22/23 at the Amsterdam Fire Department. A coin box with change in it had been taken. Keith appeared in Bates County Court on February 16, 1993, and entered pleas of guilty to two counts of burglary and two counts of stealing. He was sentenced to three years on each count, concurrent, which was suspended, and placed on three years supervised probation. Keith returned to his mother's home in Amsterdam.

In about February or March, 1993, Nancy received a tearful call from Johnny, who was struggling in Texas. She told him to come to Missouri, which he did. He spent a few weeks there. That is when he confided in Nancy that something had happened to him with the babysitter named Gene when he was a child. He implied it was sexual but wouldn't discuss the details. She wondered if Gene had abused any other of her boys. After a few weeks, Johnny decided to return to Texas. He worked at various jobs in Texas, and stayed at times with Mike and Lori Griffin, or in apartments with roommates. Nancy sent money to him from time to time. This was the last time Keith saw his brother Johnny.

Keith was arrested in connection with an alleged theft of firearms in Amsterdam on March 29, 1993. He was questioned and released. Keith told authorities that the guns were taken by others, possibly relatives of his, and that he had them in his possession because Officer Morland had told him to return them to the owner. Probation recommended delaying any action for revocation pending the outcome of the case. He was arrested again on April 1, 1993, on a charge of receiving stolen property. He was held in the Bates County Jail. Keith's probation officer filed violation reports on April 15, 1993 and May 19, 1993. The violations were for having a firearm in his possession and conspiracy to commit armed robbery. He was not charged in the latter matter. Keith's probation was revoked on June 1, 1993, and he was ordered to serve the three year sentence which had been suspended.

Keith was received by the Missouri Department of Corrections at the Fulton Reception and Diagnostic Center on June 1, 1993. He had no significant health problems on admission. He underwent assessment for classification and placement. Vocational assessment listed him as unskilled. Psychometric testing revealed a full scale IQ of 97, with a verbal score of 87 and a performance score of 110. The 23 point gap between verbal and performance scores is indicative of learning disability. Keith, at age eighteen, was reading at the 7th grade level, spelling at the 5th grade level, and performing math at the 6th grade level. His receptive vocabulary was at the 12 years, 10 months age level. Following the reception and classification period, Keith was transferred to the Boonville Correctional Center, where he was received on July 15, 1993.

Keith remained at Boonville until his conditional release on January 31, 1995. He had work assignments in food service - dining room and kitchen, and was enrolled in the GED program. His placement in special education was noted. Keith took the GED test on January 18, 1994, and failed. He took it again on June 21, 1994, and passed. He successfully completed a Basic Alternatives to Violence workshop in September, 1994. Keith had 22 conduct violations during his first stay at Boonville for such things as: interfering with count, fighting, disobeying an order, creating a disturbance, destroying state property, insulting behavior and out of bounds. He spent time in disciplinary segregation for some of these. There was one violation written for inciting a riot, but following a hearing, and the testimony of several others that Keith was not involved, the violation was reduced to creating a disturbance. While he did not have significant health issues at Boonville, Keith did report to medical staff that he had frequent headaches. He was seen on June 18, 1994 for injuries to his head. There was an abrasion on the hairline with bleeding and an abrasion to his nose sustained in a fight.

Stating that "I wasn't as tough as I thought", Keith described Boonville as a violent place with frequent assaults. He said that it was "a war zone" and that during this first period of incarceration "I got my ass whupped." He was beaten at times. He admitted that he felt overwhelmed there. Stating that there was a great deal of racial tension at Boonville, Keith noted that black inmates greatly outnumbered white inmates, and staff pitted the races against each other. He acknowledged that his own negative feelings about blacks stemmed from his experiences at Boonville where he witnessed black inmates prey upon young, small white inmates. There were 1200 inmates at Boonville, mostly younger men, including a lot of gang members. Keith said "all they wanted to do was fight." He noted that the facility was broken down into units of 200 men each, with only two correctional officers per shift for each unit.

Keith said he witnessed inmate on inmate sexual assaults at Boonville, then said "there is stuff that happened", implying he had been assaulted. He has consistently declined to discuss being sexually victimized at Boonville, but

there are indications that he was. He refused to even answer any "yes" or "no" questions regarding his being sexually assaulted, and when told that not responding would indicate that the answer would be yes, he remains silent. He just states, "you have to learn to fight to survive." He is able to describe the physical environment at Boonville. He can draw a diagram of the unit and point out the blind spots where inmates were commonly assaulted. He stated that the likelihood that a young, small white offender coming to Boonville for the first time would be sexually victimized was high. Keith recalled the names of several inmates who were sexually assaulted and was able to describe some specific assaults. Records indicate that Keith requested placement in Protective Custody on June 29, 1994. He was released to population a couple days later. Dr. William Logan, a forensic psychiatrist who conducted an independent evaluation of Keith in fall, 2001 at the request of the court, and following Keith's suicide attempt on the eve of trial, opined that it seemed likely that Keith had been sexually victimized at Boonville. He based this belief on Keith's emotional reactions when discussing sexual victimization of young inmates at the facility. In general, it is difficult for men who have been sexually victimized to acknowledge it. It is particularly difficult for men who were victimized in prison and/or who are in prison to admit such victimization as they fear that they will be vulnerable if it becomes known.

On January 31, 1995, Keith was conditionally released to a community placement program, CP-Harbor, at the Salvation Army in St. Louis. Parole records indicate that his parole plan was to live with his mother and brother Kenny in Amsterdam. Kenny had graduated from high school in 1993, and completed a six month program of training as a diesel mechanic in Wyoming. He returned to his mother's home and was working for Tiona Trucking. Keith recalled that when he arrived at the Salvation Army, he had no clothes, not even a coat. It was winter. Finally his brother Kenny sent him a coat. While he was in the community program, Keith worked as a factory laborer at TDL in St. Louis. He maintained full employment beginning February 3, 1995. He attended weekly groups and AA meetings. He had no program violations and was described in parole records as adjusting to the program without difficulties. He was scheduled for release on April 9, 1995. Keith returned to his mother's home in Butler, Missouri. He reports that he worked for a time for the window company in Butler, a job he obtained through a temporary service agency.

During Keith's incarceration at Boonville, Johnny's situation in Texas had deteriorated. His symptoms of schizophrenia had emerged and were getting worse. In early 1994, Nancy was receiving reports from people she knew in Texas that Johnny was behaving strangely and talking in a delusional manner. Johnny was arrested by the Benbrook Police Department on January 8, 1994 and March 17, 1994. Each time he was released. Records note that he had a history of substance abuse. At some point, he began claiming that he was Bill Clinton. On April 9, 1994, Johnny phoned the police and claimed to be Clinton.

He made a lot of delusional statements. He was picked up and taken to John Peter Smith Hospital for psychiatric assessment. The Secret Service became involved and conducted an investigation. They concluded that he was not a threat to the President. He was released from the hospital on April 11, 1994. Hospital records described him as having paranoid delusions and diagnosed him with a delusional disorder. Secret Service records indicate that the psychiatrist at John Peter Smith Hospital did not feel that Johnny presented an imminent threat to himself or others. Hospital staff declined to commit him and he refused to commit himself.

Johnny Nelson was arrested in Dallas, Texas and charged with the murder of James Ashley in Ft. Worth, which occurred on May 9, 1994. Ashley and his common-law wife, June Maxey, were friends of Johnny's, and Johnny had worked for Ashley for a time in his roofing business. Johnny's statements regarding the offense were quite delusional. Nancy moved back to Texas on May 20, 1994, to be a support for Johnny. She remained there for about a year and a half. Due to Johnny's condition, court-ordered mental health evaluations were conducted over the summer by Wm. Barry Norman, Ph.D. and Ann Turbeville, M.D. While Barry opined that Johnny was competent to proceed, Dr. Turbeville concluded that he was not competent. The court subsequently found Johnny not competent to proceed and committed him to Vernon State Hospital. He was admitted on October 20, 1994, and remained there until March 7, 1995, at which time he was returned to the Tarrant County Jail. Evaluations were conducted and furnished to the court by Arthur Kranz, M.D. of Vernon State Hospital and Barry Mills, M.D. Mary Ross, Ph.D., a psychologist at Vernon State Hospital, also provided information to the court. Kranz concluded that Johnny had been psychotic and delusional since at least April 11, 1994, if not earlier, and that the murder was motivated by a psychotic delusion. Ross also thought he was psychotic. Mills concluded that Johnny did not have a mental defense to the case. There was a mistrial in Johnny's trial. He subsequently pled guilty and was sentenced to thirty years in prison. Nancy returned to Missouri in early 1996. She went back to work part-time at Country Mart and worked full-time at Bass Busters. Later in 1996, she took at job at Quik Trip Kitchen in Belton, Missouri, where she remains employed at this time.

In 1995, Kenneth and Steven Nelson moved to Kansas City and shared an apartment. Steven had graduated from high school. He went on to college. Keith was in his mother's home with Paul. He had a girlfriend at that time named Jennie Pajula . On August 21, 1995, Keith was arrested on a charge of misdemeanor property damage and held initially in the Butler Jail. He was transferred to the Bates County Jail on August 22nd. Parole and jail records indicate that the offense occurred on August 15, and involved vandalism at the Butler swimming pool. Keith had reportedly poured an oil-based substance into the water. A violation report was completed by his parole officer on September 8, 1995. Keith had reportedly said he vandalized the pool because he was

upset that his girlfriend would go to the pool and flirt with other guys. A charge of making a false report to a law enforcement officer was subsequently filed. Keith had allegedly reported that his 1980 Chrysler LeBaron automobile had been stolen.

On August 23, 1995, Keith was transported from the jail to Southwest Missouri Mental Health Center, in Nevada, Missouri. Butler County Sheriff Duane Diehl had Keith admitted for a 96 hour evaluation due to his threats to hurt himself or commit suicide. He was admitted to the Crisis Stabilization Unit and seen by mental health staff, who had him returned to the jail the following day. He denied wanting to harm himself and told staff he just wanted to get out of the jail. He was described in hospital records as cooperative and pleasant, as well as alert and oriented. Keith reported that he had difficulty sleeping and didn't sleep much. He was described as having ineffective coping skills, inability to handle stressors and poor impulse control. He denied depression or suicidal thoughts. Staff concluded that there was no evidence of psychosis. Diehl transported Keith back to the jail. He had left a pair of pliers on the floor of the back seat of his car, which Keith was able to reach. Diehl found the pliers and took them from Keith. Keith engaged in disruptive behavior in the jail and was in isolation at times. On a couple occasions, Keith asked to be put in protective custody.

A new charge of attempting to commit the offense of escape from confinement, a Class A misdemeanor, was filed in September, 1995. Parole and jail records indicate the incident occurred on September 20th. Keith had reportedly tried to use electrical current to cut his jail cell door lock. The offense was reported to the Sheriff by other inmates who said that another inmate was directing Keith on how to do it. On September, 27, 1995, the Bates County Court transferred Keith's case to Henry County on a change of venue. On October 25, 1995, Keith appeared in Henry County Court and entered pleas of guilty to the three pending misdemeanor offenses. He was placed on two years unsupervised probation upon recommendation of the prosecutor.

Parole records indicate that on November 4, 1995, an employee of Tiona reported to the police that the stereo had been removed from a tractor on the lot. That same day, authorities received information that Keith had put a stereo in his car. Keith was stopped in his vehicle that day, after the authorities received phone calls about him being intoxicated and driving in a reckless manner. He was arrested on several violations, including: operating a motor vehicle without a driver's license; being a minor in possession of alcohol by consumption; driving while intoxicated - BAC .125; and fleeing to elude police. He was processed into the Bates County Jail on November 4, 1995. On November 27, 1995, Keith's parole officer filed a violation report alleging the above offenses, and, in addition that he had committed the offense of possession of stolen property, and had failed to notify his parole officer of his

arrest. Revocation was recommended, but action was delayed pending disposition of the charges. On January 31, 1996, while the matter was pending, Keith was discharged from parole on his 1993 case.

On January 12, 1996, new charges were filed in Bates County Court alleging that Keith had committed the offenses of burglary and stealing on November 3, 1995. He had reportedly entered the same gas station that he had burglarized in late 1992, and had taken 20 cartons of cigars and cigarettes. A change of venue motion was filed in Bates County Court, and the case was transferred to Henry County on March 29, 1995. Keith remained in the Bates County Jail while the case was pending. Records indicate that he had been living in Amsterdam with his brothers prior to his arrest. Nancy was still in Texas at the time. Keith appeared in Henry County Court on April 11, 1996. He had pled to burglary and stealing for the incident at the gas station. He was sentenced to four years in prison.

Keith was received at Fulton Reception & Diagnostic Center on April 23, 1996. Educational Assessment indicated that at age twenty-one, he was reading at the 10th grade level and doing math at the 7th grade level. He was listed as unskilled. He had no medical needs and was physically healthy. DOC records regarding his period of assessment and classification reported no prior escape, no inmate assaults, and the fact that he had a detainer on misdemeanors. He was approved for full work duty, and counseling as needed. His GED was verified and vocational training and/or supervised job assignment were recommended. Keith was transferred to the Boonville Correctional Center on May 10, 1996. He was classified at Level 3.

Keith stated that by the time of his second stint at Boonville, at age twenty-one, he had learned how to handle himself. Stating that "prison changes you...prisons are not a safe place", Keith noted that people were getting beaten and raped, and he had to learn how to take care of himself. Missouri DOC records indicate that he did make a better adjustment this time. A "Community Placement Assessment Report" was prepared by the institution parole officer on July 1, 1996. It noted that Keith worked in the kitchen, and staff reported he posed no problems in the housing unit. There were no conduct reports as of that date. He was referred to the Substance Abuse Intervention Education group. The report stated that Keith had demonstrated appropriate institutional adjustment and had accepted responsibility for the instant offense. Release on September 10, 1998 was recommended. Keith signed a waiver of his parole hearing which was scheduled for July 23, 1996, and requested that his case be closed to parole consideration.

On November 6, 1996, Keith was re-classified to Level 2 due to his good adjustment for six months. He was placed in Temporary Administrative Segregation on November 23, 1996 when he was discovered injured in the

housing unit. There are no details of this incident. It was not a disciplinary segregation. Records note that Keith had work assignments in food service, as a laundry clerk, and as a student worker. On April 17, 1997, he was denied time credit due to a number of conduct violations, all minor, and lack of involvement in programs. However, a few months later, he was re-classified at Level 1, up from Level 2, again due to 90 days good adjustment. On September 11, 1997, Keith requested placement at the Kansas City Community Release Center. Records indicate that he met the criteria for placement. Though he had eight conduct violations during this confinement, they were all minor. Staff continued to view past use of alcohol and drugs as an issue for Keith, though there is no documentation of this problem in the records. Keith acknowledges limited past use of marijuana and limited alcohol use, but denies chronic abuse. Keith was released to the Kansas City Community Release Center (KCCRC) on September 24, 1997. This was done once it was determined that there was no detainer for the 1995 misdemeanors that were not prosecuted.

Shortly after Keith went to KCCRC, his brother Paul was taken to the emergency room at the University of Kansas Medical Center by his mother. Nancy reported that Paul was hearing voices, and the voices were telling him bad things and telling him to commit suicide. This had apparently started about one month previous. The voices told him he was a child molester. They woke him up during the night. He was having auditory, olfactory and gustatory hallucinations; and delusions of persecution, reference and influence. Records indicate that Paul was so frightened by the voices that he bought himself a gun for protection. Nancy talked him in to giving the gun to an uncle. He was persuaded to admit himself to the Crisis Stabilization Center (CSC) at the hospital. Records noted the family history of schizophrenia, including a brother, an aunt and three cousins, all with chronic paranoid schizophrenia. He was started on medication, including Zyprexa, Haldol and Cogentin, and improved. The diagnosis was psychosis, probable schizophrenia. Paul was discharged from the hospital the following day with a referral for outpatient care.

Upon arrival at KCCRC, Keith initially worked in food service. A certain number of hours of work inside the center were required before a resident could go out to work. On October 8, 1997, Keith was released to begin job seeking. He obtained a full-time job the following day at May Foundation and Development, at $6 an hour. He had two minor violations at the center, one for stepping on a cigarette and one for being one hour late for work. Toxicology screens were done on two occasions and both were negative. In February, 1998, Keith was approved for an advance parole release date as soon as possible due to his satisfactory adjustment. The parole plan was to return to his mother's home and seek employment. An Order of Release on Parole was signed on February 18, 1998, and Keith was released home from KCCRC that same day. He was to report to Parole Officer Kandra Davis in Bates County,

southeast of Kansas City. He continued his job at May Foundation until late April.

While he was still at KCCRC, Keith met Kerri Dillon. Kerri said that she met Keith in about October, 1997, through his cousin, Laura Luttrell, who was married to Kerri's brother. The Luttrells and Kerri Dillon lived next door to each on Boeke Street in Kansas City, Kansas. Keith was allowed to have some release for social time from KCCRC, which he used to visit family and relatives. Kerri Dillon was a widow with a six year old child, Brian, Jr., at the time. Her husband, Brian Dillon, Sr. had committed suicide by hanging himself six years previous, when she was nine months pregnant. Kerri said that Keith was very nice to her, and never displayed an unreasonable temper. He was good to her son and treated him like his own. She described him as being attentive and a good listener. Keith and Kerri developed a romantic relationship, and he began staying with her, off and on, at her home at 351 S. Boeke. Kerri was unemployed and received Social Security benefits. She said that Keith contributed financially to the household, and was a surrogate father for her son. Stating that he was very patient with Brian, she noted that Keith helped her son with his homework. Keith enjoyed the normal family life he had with Kerri and Brian. He said he never knew how bad his own childhood was until he was with Kerri and saw how she treated her son. She kept him clean, got him to school, and dressed him neatly. Keith said it was "one hundred times different than my life."

Just prior to Keith's release from KCCRC, his twin brother Kenny enlisted in the Army. He did his basic and advanced training in Georgia. Steven, who had lived with George and Sally, then in an apartment with Kenny for a time, went to college at DeVry, and subsequently obtained a job in Milwaukee, Wisconsin. Kenny helped Steven with his college expenses. Paul worked at times, and was on medication for schizophrenia. Johnny remained in prison in Texas. Keith, who had never had many friends outside his family, spent some time with cousins, including paternal cousins, the Luttrells. He also spent time with a maternal cousin, Billy Colston. Colston reported that Keith was with Kerri at the time, and was working. The two sometimes went out to bars at night, but Colston said Keith didn't drink. Keith also did not do drugs, according to Colston, who added that Keith would turn them down if offered. Kerri told the FBI that Keith didn't drink or do drugs.

Keith made his initial report to his Missouri Parole Officer, Kandra Davis, on March 5, 1998. He requested at that time to have his parole transferred to Kansas because his work was there. Davis began the process of transfer and gave Keith travel permits to go to Kansas for work. He reported again on April 2, 1998, and was still working at May Development at that time. Records indicate he was waiting for reporting instructions to Kansas. The actual transfer didn't happen for several months. Later in April, Keith quit his job at May

Development for a similar, better-paying job at Perma Dry. Both businesses did basement waterproofing and repair. The owner of Perma Dry was Don Derry. Parole records indicate that Keith began work at Perma Dry on April 22, 1998. Derry's records indicate that Keith worked there until sometime in October, 1998, at which time he quit and went to work for a competitor, Dry Basement, Inc. This apparently violated an agreement not to work for someone in the same business for some period of time. Keith continued to report monthly to Kandra Davis. On July 9, 1998, a UA was done and was tested for drugs. It came back negative.

On August 20, 1998, Davis completed a DOC report form with new rules for Keith. He was required to report to the Sheriff's Office and sign in every night. He was required to live in Bates County, with his mother, and this reporting rule was added to make sure that he did. Keith said that Davis had learned that he was staying with Kerri most nights, rather than in Amsterdam. Keith was working in Kansas City, and had to make the long drive every night after work. The transfer of supervision to Kansas was in process at the time. On September 9, 1998, Davis added a requirement for weekly reporting to her office, as opposed to the monthly reports he had been doing. On October 1, 1998, Missouri sent the application for transfer of supervision to Kansas via the interstate compact. The plan was for Keith to live with his aunt, Mary Smith in Bonner Springs, a suburb of Kansas City. A case summary report was prepared by Kandra Davis for Kansas parole. In it, she reported that Keith was working at Perma Dry; had positive office visits and calls to the parole officer; and two negative UAs. She reported that he had maintained steady employment; had no problems; and reported as directed. She did say she knew he was staying in Kansas when he was supposed to be in Missouri. The Kansas Department of Corrections, Division of Community and Field Supervision, did their own investigation and accepted supervision on November 12, 1998. Not long after that, Keith began working for Dynatech, another foundation waterproofing and repair business, owned by David Cunningham. Cunningham told the FBI that Keith called him looking for a better job, and he hired him full-time. Cunningham said that he knew Keith had some past legal problems and was on probation, but he didn't know the details.

Steven Nelson told the FBI that he saw Keith at Thanksgiving of 1998. Steve visited family for the holiday, but stayed with George and Sally rather than his mother. He saw Keith during the visit, and commented that Keith was with Kerri and things seemed normal for them at the time. He did keep in contact with family through phone calls, but said he just talked with Keith a couple times. Kenny Nelson completed his training in Georgia and went home for the Christmas and New Years holidays. He had leave from December 15, 1998 to January 10, 1999, and stayed with maternal cousins, Scott and Leta Carlton, during his leave. Leta is the daughter of Kathy Henre, Nancy Nelson's sister. Kenny visited with Keith and Kerri during that time. He was aware of

Paul's mental health problems at the time. Kenny was stationed at Camp Casey in South Korea beginning January 11, 1999, for about a year.

During the end of 1998 and into the spring of 1999, Keith was working, staying with Kerri most of the time, and reporting to his Kansas parole officer. Keith said that the parole officer made home visits to Keith at Kerri's home on Boeke. Kerri Dillon confirmed this, noting that she met with the parole officer at her home. Things appeared to be going well for him. In his interview with the FBI, David Cunningham described Keith as a reliable and conscientious employee who did good work. Keith occasionally visited Cunningham's home, as did other employees of the company. The men would drink beer, but Cunningham said that Keith didn't drink and was opposed to drugs. Mary Smith said that Keith would sometimes come to her diner, Paul's Drive-in, with Kerri and Brian. He was working and seemed to be doing all right. Keith spent some time with Michael Morse, a third cousin on the paternal side, his wife Rosa and their children. Michael and Rosa lived at 361 S. Boeke at that time. Mike Morse said Keith seemed to be doing well; he worked every day and was with Kerri. He said that Keith did everything he could to make Kerri happy. Rosa Morse noted that Keith and Kerri lived two doors away. She said that Keith worked hard every day, and used his money to support Kerri and Brian. Rosa noted that Keith bought furniture and appliances for her and helped pay the household bills. Kerri reported that Keith paid half the household bills and helped her out financially. She handled the bills and did the shopping.

Rosa Morse said that Keith seemed to enjoy spending time with their family. She thought Keith wanted a normal family life, which he had never had, and that he was trying to build with Kerri and Brian. Rosa added that Keith was very protective of all the children on the block, and nobody in the neighborhood had trouble with Keith. Rosa said that Keith would try to help people out. If she was working in the yard, he would come over and help her. She, like others, commented that Keith didn't drink. He usually liked Dr. Pepper or Mountain Dew soda. Mike Morse said that Keith would sometimes come to him for advice and attention. If Keith and Kerri had an argument, Keith would go to Mike's house to talk things over. He always took Mike's advice. Mike said that he never saw Keith get angry over an argument with Kerri. Stating that he has four children, one of whom is adopted, Mike told a particular story about an exchange he had with Keith one day. The "adopted" child is the son of a neighbor. The mother was an alcoholic, and Mike and Rosa took him into their home and raised him. When he was telling Keith about this, Keith just looked at him and said, "why didn't you adopt me? I needed someone to take care of me." Mike was quite emotional in telling this story. Noting that Keith seemed sad, Mike said that he told Keith that he didn't know Keith needed him.

In the early winter of 1999, Paul Nelson stopped taking his medication and his mental condition deteriorated. Records from Royal Oaks Hospital in

Windsor, Missouri, indicate that he was admitted to the psychiatric ward at the hospital on March 8, 1999 on a 96 hour involuntary hold. He was taken to the hospital by Department of Mental Health staff. Records note that he had been non-compliant with medications, and that he was hearing voices that told him he was gay and a child molester. Paul was described as being uncooperative and very paranoid. He had reportedly been following his mother around with a camera and taking pictures of her to prove that she was an imposter. When asked by staff if he had been physically or sexually abused as a child, he responded, "it has been a long time ago." Staff at the hospital recommended continued hospitalization, but Paul left the hospital on March 12, 1999 AMA (against medical advice). His discharge diagnosis was chronic paranoid schizophrenia.

In March, 1999, Keith's seemingly good life began to unravel. He had been spending time with his cousin, Billy Colston. Colston was living with Mable Carr, the sister of Colston's one-time stepfather, Del Romero (Romero was married to Georgeann Romero, Colston's mother, when he sexually assaulted her teenage daughter from a prior marriage, and got her pregnant, later marrying her). Colston worked for a carpet business. Carr's boyfriend was a police officer. Colston said that he owed Carr some money. He and Carr had a dispute about the money. Carr then alleged that Colston and Keith had broken into a carpet store and stolen tools. On March 11, 1999, Keith's Kansas parole officer wrote up a violation report and issued a warrant for Keith's arrest. He was taken into custody and booked at the Wyandotte County Detention Center, pending revocation proceedings, that same date. The violation report indicates that the parole officer received a call from an acquaintance of Keith's who claimed that Keith was in possession of stolen property. Keith admitted to having knowledge about the tools, but denied involvement. The witness, Carr, also claimed that Keith had threatened her.

A preliminary hearing on the violations was held at the jail on March 19, 1999. Keith denied the charges. The only evidence presented was the statement of Mable Carr. Carr stated that Colston had lived in her home, and that she had kicked him out. She said she believed that Colston and Keith took the tools. She did not report the matter to the police. The hearing officer found probable cause. Kansas advised Missouri Probation and Parole about the matter. Missouri delayed any action pending disposition of the charges. A memo in their file, dated April 13, 1999, indicated that no charges were filed. However, Kansas requested that supervision be returned to Missouri. According to jail records, the case was dismissed, the order to detain was withdrawn, and Keith was released from the jail on May 11, 1999. He was told to report to Parole Officer Kandra Davis in Missouri. Davis told the FBI that both she and another parole officer, Steve Ryan, had visits with Keith after that time.

Keith stated that this incident, for which he was jailed for a couple months and had his supervision transferred back to Missouri, was when things really began to go downhill for him. Kansas parole had allowed him to live with Kerri. Kandra Davis required him to live in Bates County, Missouri, which was about sixty miles south/southeast of Kansas City. His work was in Kansas City. When Keith reported to Davis on May 12,1999, she added requirements to his supervision, including that he successfully complete substance abuse and anger management treatment. A UA done that day was again negative. There is no evidence in any of the probation and parole records that Keith had a problem with drugs and/or alcohol. Keith said he hardly drank at all and didn't use drugs. Persons who knew him then have confirmed that. It is unclear why this requirement was added to his supervision. Keith reported again on May 20th. Records indicate he was looking for work. Within a short time, he went back to work for David Cunningham at Dynatech. He reported to Davis on May 25, 1999. A memo in the parole records, dated June 1, 1999, indicates that Keith missed his scheduled substance abuse treatment appointment which had been scheduled for May 27, 1999. Keith reported on June 3, 1999, at which time he told Davis that his mother was moving from Amsterdam to Kansas City. Davis told Keith to find an address in Kansas City, Missouri at which time his reporting could be transferred there. Keith acknowledges that he was staying with Kerri and Brian most of the time.

On June 23, 1999, Paul Nelson was seen in the emergency room at Bates County Hospital. He was described as paranoid and extremely agitated. He reported hearing voices which told him to kill himself. He was transported from the hospital by a Bates County Sheriff's Deputy to Southwest Missouri Psychiatric Rehabilitation Center, where he was admitted on a 96 hour hold. Paul had been receiving outpatient services but had been non-compliant with medication. On admission to Southwest, he was described as mute and paranoid. He told staff that the voices had been bothering him for two years, and had been asking him to do things he didn't want to do. He was placed on medication. Following the 96 hour hold, the hospital petitioned the court for a 21 day commitment, which was granted. The diagnosis was schizophrenia, paranoid type. Symptoms persisted throughout the hospitalization, though they diminished in intensity. Records noted that Paul had been living with his mother and brother outside Amsterdam. He told staff that, upon discharge, he planned to live with his brother, meaning Keith. Nancy told staff that she had been staying in Kansas City during the week, and couldn't continue to support Paul. Just prior to the end of this hospitalization, Nancy moved to Kansas City to be with a new boyfriend. Paul was discharged to her on July 27, 1999.

On July 6, 1999, Keith again reported to Parole Officer Kandra Davis. Keith fully expected to be taken into custody on a parole violation at the time as he hadn't attended the required substance abuse treatment appointment. Stating that he knew that Davis kept a gun in her briefcase and a can of mace

on her table, Keith admitted that he had a small can of mace with him. Davis told the FBI that Keith said to her that he expected to be arrested, and that he had the mace in case Steve Ryan tried to take him into custody. Davis acknowledged in her testimony that Keith never threatened her personally during this visit. He even brought a friend along with him so there would be someone to drive his truck home if he was taken into custody. Keith had purchased a red Ford pick-up truck from his brother Kenneth, who was stationed in Korea at the time. Davis told Keith that he was not being arrested. She also pointed out to him that she had her own can of mace. They talked for a bit, then Keith left the office. Records indicate that Keith was working at two places at the time. He brought in pay stubs from Dynatech for $387 and from Booth Properties for $760. The latter job was at an apartment complex. Keith worked there on weekends doing basement waterproofing and repairs.

According to parole records, Officer Davis forwarded Keith's file to the District #4 office in mid July for investigation, as Keith had submitted a plan to reside with a friend, Tammy Gordon, in Independence, Missouri. Gordon is the niece of Rosa Morse, wife of Keith's third cousin Mike. Davis indicated that Keith had made arrangements to attend substance abuse classes in Independence. Davis told the FBI that Parole Officer Steve Ryan met with Keith at the Bates County Courthouse on July 15, 1999, as she was out of town that day. The meeting went fine. On July 23, 1999, a warrant was issued for Keith's arrest on a charge of Tampering with a Judicial Officer. Davis had filed a complaint following the July 6th meeting at which Keith had the mace with him. She indicated in her statement to authorities that she did it to prevent similar incidents in the future. It should be noted that, though Davis knew that Keith was working at Dynatech, the forms submitted for investigation and transfer of supervision still listed an old employer, Perma Dry, as his place of employment. Davis told the FBI that she received two telephone calls from Nelson following Ryan's July 15th meeting with him. That was the last contact she had with him.

On August 6, 1999, Kandra Davis made a phone call to Keith's employer at Dynatech, David Cunningham, but it does not appear the call was returned. When she tried to call Keith several times in August, she was connected to an answering machine in which Keith indicated he was not available. Records indicate that on August 10, 1999, Tammy Gordon was contacted at her home, which was actually in Kansas City, not Independence, at which time she confirmed that Keith was living with her. A little over a week later, Gordon advised that Keith was no longer at her residence. Parole personnel investigating for the transfer of supervision to Kansas contacted the wrong employer - Perma Dry rather than Dynatech - for employment verification, and were told that he hadn't worked there for several months. The same parole personnel knew there was an active warrant out for Nelson, but apparently didn't communicate with Davis to get correct employment information or

possible addresses where he might be residing. On August 25, 1999, Keith was listed as an absconder by Missouri Probation and Parole. Records indicated his whereabouts were unknown, though they knew where he worked and knew Kerri's address. Keith knew he had violated parole and worried constantly about being picked up and returned to prison.

During this period - the summer of 1999 - Keith was experiencing stress in other areas of his life. His employer, David Cunningham, was having marital problems and was going through a divorce. Cunningham said that he had to lay off several employees, but he kept Keith on, though he couldn't always offer full-time hours. This led Keith to obtain the second job, at Booth Properties. Cunningham told the FBI that Keith was a reliable and conscientious employee who did good work. He described Keith as very talkative, but always punctual and pleasant. If Cunningham needed extra labor on a project, Keith would bring people to help, including his brother Paul and various friends or acquaintances. Cunningham said that Paul was a reliable worker, and would come to work with Keith two or three days a week. Though Paul's mental health problems were evident during this period, Keith tried to help by taking him to work, where he seemed to do all right. If there was extra work, Keith always tried to give it to Paul first, before asking other friends. Cunningham also told the FBI that he never heard Keith make any strange comments about women. He said that Keith projected an image of a tough guy, but was easy to get along with.

Paul was again not taking his medication regularly during this period. Nancy was having difficulty managing Paul and was stressed out over the situation. She would ask Keith to take Paul at times, including having Paul stay with Keith and Kerri. Kerri wasn't comfortable having Paul there. She said that Paul gave her "the creeps." Kerri noted that Nancy occasionally dropped Paul off at her house, and left him there at times when Keith wasn't home. On one occasion, she told Keith that they "weren't babysitting Paul for the weekend." Keith relayed this to Nancy. Stating that Nancy was drunk, Kerri said Nancy left a message on their answering machine calling Keith "a no good brother." Kerri reported that Nancy was still drinking heavily during this period. Kerri pressured Keith about the situation with Paul. Keith felt caught in the middle. Keith wanted to help his brother, but he knew that Kerri didn't want Paul at her house. Keith said that Paul was hearing voices during this period and was acting paranoid. He didn't give Keith problems, though, and Keith said that Paul trusted him.

Billy Colston, Keith's cousin, said that he began to see changes in Keith around this time, and decided not to spend so much time with him. He stated that Keith "always seemed anxious" and was always very talkative, but during that summer Keith had gotten "weirder and weirder." He seemed anxious all the time, and would be checking everyone out, scanning the area around him.

It seemed as though Keith never slept. He worked all day and then wanted to be out all night. Colston noticed that Keith talked constantly and very fast, exhibiting rapid flow of speech. He would tell stories, one after the other, like he was making them up, and couldn't stop talking. Colston said that Keith also seemed to have to be on the move all the time, as though he couldn't sit still, couldn't stop. He described Keith as "always hyper, wound...wanting to do something every night." Colston added that drugs were not the cause of Keith's behavior. He said Keith didn't do drugs and would turn them down, if offered. Stating that Keith was getting worse and worse, Billy Colston said he didn't see much of Keith after that summer.

Nancy Nelson was still spending a lot of time at bars during this period. The bar she frequented the most was the Oasis. Nancy said that she continued to feel depressed and drinking helped her cope. Sometime during the summer, she met a man named Mark Nicholson at the Oasis, and became involved with him. Keith described Nicholson as a tall, skinny man and "a crackhead." Nancy acknowledged that Nicholson used cocaine, then start using crack. She said he struggled to get off drugs, but couldn't. She recalled an incident that happened not long after she started seeing Nicholson. Keith had come over to her house, and Nicholson was there. The two were living together. Nancy and Nicholson got into an argument, and Nicholson put his fist through a wall. Stating that Mark had never hit her, Nancy said the incident still upset Keith, who had witnessed his father abusing his mother. Keith stood up for Nancy at the time.

There were also problems in Keith's relationship with Kerri during this period. Keith noted that Kerri was only nineteen and was pregnant when her first husband committed suicide. He said that Kerri "had issues" with what had happened and was prone to periods of depression. Keith said that he really cared about Kerri a lot, adding that his relationship with her was the only real one he had experienced. Stating that he had never felt close to anyone enough to trust them with his feelings, he said he thought he felt that way with Kerri. Others who lived on the same street and knew the couple said that Kerri was hard on Keith. Mike Morse, Keith's cousin, who lived two doors away, said that Kerri would scream and yell at Keith. She did it on the street in front of people. Keith wouldn't react. Rosa Morse, his wife, said that Kerri yelled at Keith all the time. Keith would just walk away at these times. Rosa said he couldn't seem to do anything right in Kerri's eyes, adding that Keith took his paycheck home to Kerri, and supported her and Brian. In spite of this, according to Rosa, Keith could never seem to do enough to please Kerri. She always wanted more. Rosa added that Keith loved Kerri.

Laura Luttrell, Keith's maternal cousin, who lived next door to Keith and Kerri, said that Kerri was "one of those people who needed attention all the time." She would argue with Keith out in the street. She, too, said that when Kerri yelled at Keith, he would just walk away. Luttrell said that Keith was

working hard at his job, and was trying to get his life together with Kerri and Brian. He would work all day and come home tired. Kerri would start yelling at him right away. She thought that Keith seemed stressed out. She noticed that Keith started acting strange. He would mumble and talk to himself a lot, or just talk "weird." Luttrell couldn't remember any specific things he said that were weird, but said that he was just strange, "off". Nancy acknowledged that Kerri did give Keith a hard time. She said that Keith was working long hours, and Kerri complained because she didn't get to go out any place. She also complained that he wasn't making enough money. Nancy said that Keith and Kerri were arguing a lot during this period.

On September 6, 1999, Nancy took Paul to the emergency room at the University of Kansas Medical Center. She told medical staff that he had gone off his medication more than one month previous. Paul told staff that he felt like he had been drugged and that someone had violated him anally. He refused to be admitted to the Crisis Stabilization Center, and Nancy refused to sign an affidavit for commitment. Paul was given medication and left the hospital with an appointment for follow-up mental health services. Nancy said that she was having a lot of problems with Paul during this period. She frequently called the crisis line about Paul. She said that Keith was trying to help her deal with Paul. He would take Paul to work with him and sometimes let Paul spend the night with him and Kerri, though Kerri didn't like it. Nancy said that Keith was stressed out about Paul. Keith said that Paul was hearing voices and was paranoid. He was doing things when he was with Nancy to get her to take him to the hospital. Paul would then call Keith to come to the hospital. He didn't want to be committed; he wanted Keith to take him home. Keith said he hated it when Paul asked that. He said he couldn't let Paul stay at his house because Kerri wouldn't allow it. Steve Nelson, who was living and working in Wisconsin at the time, told the FBI that he spoke to Paul on the phone quite often during this period. Paul would talk about hearing voices. The voices were telling him that he was a child molester. Steve would try to persuade Paul to go to the hospital. Steve said he only talked to Keith on the phone a couple times.

Following this trip to the hospital, Nancy asked her sister Kathy Henre if Paul could stay with her for a while. Kathy, whose son Melvin was a diagnosed schizophrenic, agreed to let Paul stay with her for a few weeks. She recalled that Paul told her he was hearing voices that told him to do bad things to children. He was having a lot of delusional thoughts. Kathy said that Keith told her on the phone that he (Keith) heard voices, as well, and that they told him to do bad things, but he didn't listen to them. Kathy said that Keith also told her that something bad had happened to him in prison. Both Kathy and her son Melvin later reported that Keith claimed to have done worse things than his brother Johnny. Melvin, who is a chronic schizophrenic and who is in prison, claimed that Keith said he had killed before. He added that Keith frequently

said these kinds of things to get attention. Keith recalls telling this to Melvin, adding that he said it to various people. He said that it was just "b...s..., not true... I was just talking stupid." He said that he doesn't know why he said these things to people. It should be noted that there has been no corroboration supporting these statements. The Judge excluded any testimony in reference to such statements at trial.

On September 20, 1999, Nancy's boyfriend, Mark Nicholson, committed suicide by hanging himself. Nancy said that Mark had problems with depression and was always writing suicide notes. At some point, shortly before the suicide, Nancy and Mark had an argument and she moved out. On the 20th of September, she went back to the house to check the mail. She found a suicide note on the table. She phoned Mark's mother, who came right over, and the two walked over to the vacant house next door, which was owned by Mark's father, where they discovered his body. Nancy said that she was in shock. She went to the Oasis bar and got drunk. She phoned Keith and told him what happened. He went right to the bar, and sat with his mother. Keith said that Nancy was upset. She had cared about Mark Nicholson. She was also struggling with Paul's illness. He tried to be a support to her. Persons who worked at or frequented the Oasis bar told the FBI that Keith was there often with his mother. The owner, Cindy Wyman, said that Keith was a regular with Nancy, but that he didn't drink. She said he would sometimes ramble on in conversations, and that he was hyper. She mistakenly thought Keith was on medication, and that he wasn't taking it. She may have had him confused with Paul.

During September and early October, 1999, Keith spent some time with paternal relatives. He would see them at Bobby's Morse's car lot, the salvage yard owned by Mike Morse, or on Boeke Street, where Keith lived with Kerri. Bobby Morse said that he saw Keith a bit. He said Keith was working and added that he didn't see any problems, though he did tell the FBI that Keith made odd threatening comments to him in about late September. Keith said the last time he saw his father was at Bobby's junkyard that fall. He said that Kenny Morse was talking about the mafia. Kerri stated that Keith would go to the junkyard, where Kenny Morse was working, because he was trying to have a relationship with his father. Fred Morse visited Kansas City in the fall of 1999, as did some of his children. Fred recalled visiting Bobby at the car lot when Keith was there. He said that Keith acted real paranoid. He would stand back and look around, not saying anything. John Morse, Fred's son, was also there and described Keith as acting "like a nut job." He couldn't be specific. Felicia Morse, Fred's daughter, visited her cousin, Laura Luttrell, on Boeke, that fall. She didn't notice anything unusual and described Keith as being protective of her and Laura. Leah O'Connell, a daughter of Betty Morse Sutton and sister of Laura Luttrelll, saw Keith on occasion and said that she felt he had mental problems. She could not be specific about her reasons, either. She did say that when she

had seen Keith on Boeke earlier that year, she thought he "was getting it together." She said he was working and was with Kerri. Later, Kerri would tell her that Keith was saying weird things. She didn't remember anything specific. She thought Kerri might have said that Keith was hearing voices, but she wasn't sure anymore.

Subsequent to the offense in this case, persons who saw Keith in the days and weeks preceding it reported that he had been making odd and threatening remarks, including statements about abducting a girl and having sex with her. One of these persons was Steve Underwood, the boyfriend of Keith's cousin Tanya Middaugh. Underwood, who had prior criminal convictions for aggravated assault and possession of methamphetamines, met Keith during the summer on Boeke Street. He asked Keith to help him find work. At the end of August or in early September, Keith did take Underwood to work with him for a few days. Keith said that Paul wasn't working then, so he took Underwood. Underwood described Keith to the FBI as "out there" and "off the wall." He said that Keith would say strange things including things about having sex with a girl. Underwood told Tim Luttrell that he thought Keith was joking. He told the FBI that he thought Keith was just making these things up. Another person who reported these kinds of statements was James Robinson, who worked with Keith for a day at the end of September. Robinson testified that Keith had said things about wanting to kidnap a female, rape her and kill her. He had made similar remarks to maternal relatives. Nancy commented that Keith was "talking stupid stuff...talking in ways that were out of character." She noticed that he seemed to be acting different. At the time, she thought he might be using drugs, but there is no evidence that he was. Nancy thought that Keith was stressed out because he expected his parole to be revoked.

Kerri Dillon did tell Nancy Nelson on more than one occasion that fall that Keith was hearing voices. She said Kerri wanted her to know that Keith was hearing voices. She felt that Kerri believed Keith when he said this. Kerri told the FBI that Paul Nelson had mental problems and that he talked to Keith about the voices he would hear in his head. Keith told Paul that everyone hears voices, but you shouldn't listen to them. Kerri reported an exchange she heard between Keith and Paul, in which Paul asked Keith if he'd rather be a pedophile or a homosexual, and Keith responded that he'd rather be homosexual. Nancy reported that she confronted Keith about the voices after hearing about it from Kerri. She told Keith that he needed help, including medication. Keith said that if he sought help, he wouldn't be believed, and then his parole would be revoked and he would end up in prison. Nancy knew that Keith was really worried about the parole issue. He was always having arguments with Kerri. Nancy was having problems with Paul. She felt that Keith was afraid to go to the doctor because of the parole issue. Kerri said that she saw signs of paranoia in Keith during that time. He would run to the door and look out. He was afraid to go to the store. He accused her of cheating on him. She noted

Appellate Case: 15-3160 Page: 74 Date Filed: 02/29/2016 Entry ID: 4372476

that Keith talked a lot, and talked very fast. He had trouble sleeping at night, and would be out all night at times. Kerri added that Keith acted childlike at times. One example is that he would want her to pick out his clothes for him, like she did for her child.

Kerri also talked to the FBI about some of the things Keith had told her about his childhood. He told her about Nancy's drinking and Johnny's abusive treatment of him and his brothers. He told her that Nancy left him and his brothers home alone a lot. He talked about being poor. He also told her about Nancy's boyfriend, Eric Redden (also known as EJ) and his abusive treatment of Keith and his brothers. Keith told Kerri about being touched inappropriately by a female babysitter. Though he said nothing else about being molested as a child, she suspected that he had been. She recalled that on one occasion, after talking about his childhood, Keith said to her that if there was a God, why would God do that to a child....let that happen to a child. Kerri said that she also suspected that Keith had been assaulted in prison. If she asked, Keith would minimize or deny such experiences. Kerri did say that Keith was a hard worker, that he worked long hours to make a better life for them as a family, and that he never mistreated her son. Kerri noted that she had known Kenneth Morse before meeting Keith, and described him as "violent and crazy", and a drug abuser, adding that she was afraid of Morse.

Kerri Dillon told the FBI that on the evening of October 1, 1999, she and Keith had an argument. She left the home with her son and returned at about 3:00 a.m. Keith was not there. He came in at 6:30 a.m., and she noticed that he had changed his clothes and had a cut on his arm. Michanne Mattson testified that in the early morning hours of October 2nd, at about 3:00 or 3:30 a.m., she was returning home after spending the evening at a friend's house. As she turned into the parking lot of her building she noticed a white truck pulling in behind her. She parked on one end of the lot and the truck parked on the other. David Cunningham stated that Keith had some problems with his red pick-up truck, which needed repairs, so Cunningham had loaned Keith the white pick-up that was used at work. Mattson got out of her car and walked towards her building. A man, later identified as Keith, approached her and asked a question about the security guard who worked at the building. She was walking towards the building, when the man ran up and grabbed her, holding a knife to her throat. He threatened to cut her throat if she said anything; then pulled out a pair of handcuffs and told her to put them on. Mattson fumbled around with the cuffs a bit; then Keith put a cuff on her left wrist. The two struggled a bit, and her purse kept falling off her shoulder. Keith pushed the purse back up and didn't ask for money. As he pulled her forward, Mattson kicked a vehicle in the lot, hoping to set off the alarm. She knocked Keith off balance, pulled the knife away from her throat and yelled. He continued to try to drag her. She dropped and rolled away from him. Keith then ran to the white truck and drove off. He took her purse, but did not use the phone or

credit cards. Mattson reported the incident to the police. Later, when she saw a photo of Keith on the television in relation to the Pamela Butler abduction, she called the police and identified Keith as the person who had attacked her. Steve Underwood testified that the following day, October 3rd, Keith told him that he had tried to kidnap a girl the previous day, but she got away.

A couple days later, on October 5, 1999, Nancy took Paul to the emergency room at the University of Kansas Medical Center. She reported that he had been making suicidal comments. He hadn't been taking his medication and was experiencing auditory hallucinations and paranoid delusions. He was described as agitated with pressured speech and poor hygiene. Paul reported that he thought he had lost his job with his brother (Keith) that day. Nancy told staff that she was worried about Paul's suicidal comments since her boyfriend had recently committed suicide. Records note that Paul had sustained a head injury in a motor vehicle accident in 1996. Paul was admitted to the Crisis Stabilization Center at the hospital for observation, but was discharged home to his mother the following day. Keith would get calls from Paul at these times. Paul would tell Keith that he didn't want to be committed.

During the following week, Keith worked full time for David Cunningham. He stayed with Kerri on Boeke Street. The two continued to have arguments. She was pressing him to look for a better paying job. He continued to worry about being taken into custody on the parole warrant. He also worried about Paul's increasingly paranoid and delusional behavior. On the afternoon of October 12, 1999, Kerri told the FBI that Keith came home at about 4:00 p.m., then left again. At about 5:30 p.m. in the area of 11th Street in Kansas City, Kansas, ten year old Pamela Butler was roller-skating near her home. Keith drove up in the white Ford pick-up belonging to David Cunningham. He grabbed Pamela Butler, pulled her into the truck and drove off. He drove into Missouri to an area called Grain Valley. The abduction was reported to authorities and a search for both Keith and Pamela Butler began. Keith was arrested on October 14, 1999 under the 18th Street Bridge in Kansas City. He had fallen from the bridge, injuring his leg. The body of Pamela Butler was found the following day, October 15, 1999, in a wooded area behind a church in Grain Valley. Keith was transported to the University of Kansas Medical Center for medical treatment, then released into custody. During the pre-trial period he was held at the Leavenworth Detention Center operated by CCA (Corrections Corporation of America).

## Pre-trial Confinement: 1999-2001

Keith was admitted by med flight to the University of Kansas Hospital on October 14, 1999. Records noted a fracture of the left tibia, pain in the right knee and swollen left ankle sustained in a 30 foot fall the previous day. On

October 15, 1999, surgery was performed on his left leg. It involved open reduction and internal fixation of the tibia. CT scan revealed an old fracture of the talus as well as abnormalities in the lumbar spine. Toxicology screen was positive for opiates. It is not clear when the test was done or whether the opiates were pain relievers administered by medical staff. Neurological assessment on admission described him as "confused", though oriented times three (person, place and time). Keith developed a fever post-surgery, but it resolved with treatment. He was discharged from the hospital on October 17, 1999, with crutches, instructions for caring for his surgical wound, and prescriptions for anti-biotic and pain medications.

Upon discharge, Keith was initially transported to the Wyandotte County Detention Center, where he was booked and placed into the infirmary. He was released to the US Marshall's Service the following day, and transported to CCA Leavenworth, where he remained during the pendency of the case. Keith was admitted to CCA on October 18, 1999. According to CCA records, an "Initial Prisoner Needs Assessment" form was completed on admission. It included several categories of assessment. For "Health", the form indicated limited physical capacity/acute, which was due to Keith's leg injury. Under "Emotional", the form indicated "severe impairment; danger to self or others; needs hospital environment." "Education" noted that Keith had a GED. The "Vocational skills" category listed marketable skills or trade - construction. In the space for substance abuse, the form indicated occasional abuse causing disruption of functioning. The final category of assessment was "Mental Health", which indicated serious disability; limited ability to function.

The "Initial Custody Assessment" rated Keith as high on severity of offense. He was rated as a maximum custody inmate. A custody re-assessment was done on October 20, 1999. Keith was placed in protective custody at that time and assigned to the Administrative Segregation Unit. While several reasons were noted, including mental deficiency, escape threat, serious violence threat, medical problems and high profile nature of the case, CCA officials have stated that Keith was placed in Administrative Segregation primarily for his own protection. It was felt that, due to the nature of the case, he would not be safe in population. A "Prison Custody Alert Notice" in his records, dated October 18, 1999, stated that he should be isolated from other inmates, as he "may be a target for attack." Keith remained in Administrative Segregation for the rest of his time at CCA. At some point, a plexiglas shield was placed over the mesh opening in his door. Staff testified that this was done primarily for Keith's protection, as other inmates had thrown things on him, e.g. water, urine and food. At times, Keith had thrown things out, as well.

On admission, Keith was initially placed on suicide watch with constant observation. He received continuing medical care for his leg. The leg was x-rayed in November, 1999; the fracture had healed. During the admission

medical and mental health screening, Keith denied past psychiatric history as well as alcohol or drug addiction, though he acknowledged some alcohol use in the week prior to the offense and marijuana use during the previous year. Dr. Samuel Fadore, a psychiatrist at CCA, was asked to evaluate Keith for suicide risk. During the interview, Keith declined to answer many questions, most due to his legal circumstances. Dr. Fadore reported that Keith was oriented times three. Stating that he found it difficult to assess Keith or to corroborate information, Fadore recommended continued observation. Keith remained on constant watch from October 18, 1999 to December 19, 1999. Records contain a "Mental Health Evaluation" form completed by a psychiatric nurse on December 2, 1999. Keith denied a history of suicide attempts or ideation and any history of special education. His answers to questions on the form were described as "mumbling" and "barely audible", with soft speech. He provided little information. He was not oriented times 4 (time, place, person and common things), as he couldn't accurately state the date. His affect was described as "blunted" and his mood as "depressed." In response to questions about past history of psychiatric treatment and about experiencing hallucinations or delusions, Keith said that he could not answer.

CCA records contain an incident report dated December 9, 1999, relating to Keith (Note: incident reports should be distinguished from discipline reports, which are formal write-ups for rules violations. Incident reports are written for any event deemed significant enough and are often not related to any discipline report). The report indicates that Keith was crying and that he requested to speak to the Captain. He said that he "wanted to do the right thing.... everybody had suffered enough." Captain William Criss was called to Keith's cell. Criss told the FBI that Keith asked to speak to the FBI, his lawyer and the U.S. Marshalls. Criss described Keith as emotionally upset and crying. Keith told Criss that he "wanted to make a statement and do something right for the first time in his life." The FBI was contacted. They informed Captain Criss that they would not talk to Keith without permission from his attorney. Keith was allowed to make a phone call. He called his mother, asking her to get in touch with his attorney. Keith spoke to his mother for between twenty and thirty minutes. Nancy told Keith to say nothing until he spoke with his attorney. She contacted the attorney who went to see Keith at CCA. One correctional officer reported that Keith said he "was ready to give it up... was tired of causing problems for his family." Others heard him say that there was no reason for anyone else to suffer, and that he wanted to do something right for the first time in his life. Another officer reported that Keith had talked with his girlfriend earlier in the evening and that his mood changed after that call. Keith met with his attorney, and, following that meeting, there was no further contact with the FBI.

Another incident involving Keith occurred on December 29, 1999. According to records, Keith was sitting at a table in the common area talking to

staff. Another inmate, who was also at CCA pending capital charges, had stuffed material in the lock of his cell so that he could get out. He exited his cell and rushed at Keith with an object in his hand, which turned out to be a sock with a heavy lock in it. In an effort to defend himself, Keith picked up a plastic chair and pushed it towards the inmate. The inmate swung at Keith, striking him in the head. The other inmate was restrained and taken to disciplinary segregation. He received a conduct report for his assault on Keith. Keith was taken to the medical unit with a deep laceration to the back of his head. He was then transported to the hospital for sutures.

Several CCA staff members testified during Keith's penalty phase that he was subjected to constant verbal and mental abuse by other inmates during his more than two year stay there. At times, other inmates would throw things at him. This was primarily due to the nature of the case. Keith would sometimes respond in kind. One officer testified that he observed that the constant harassment bothered Keith. Staff described Keith as very talkative. He would sometimes say things about his case to staff. He reportedly made comments to other inmates about the case, as well. Staff reported that he often didn't sleep at night, and staff would sit with him and talk, so that he wouldn't keep others awake. At times, he would yell and scream, and bang his cell door at night. While he had difficulty sleeping at night, Keith would want to sleep during the day.

Medical records from CCA contain several notations from the fall of 2000 indicating that Keith was suffering from depression. He made a health care request on September 20, 2000, with complaints of "absolute depression 24 hours a day...suffering from intense emotional depression." Keith wrote that he wanted to "keep in reality as much as possible." He said that he didn't want to talk with a doctor, but also didn't "want to be in a paper gown." On September, 24, 2000, he wrote another request stating that he was "constantly depressed." Again, he didn't want to take any tests with doctors, adding, "because I can't, but I need to not loose (sic) my mind." Medical records contain a notation dated October 14, 2000, describing Keith as "acting different." He showed staff a photo of his new son, and talked about religion. Kerri Dillon had learned she was pregnant by Keith shortly after his arrest, and had given birth during the summer. He said that he had no faith in God, adding that one can pray to God, but he lets you down. A psych note in the records, dated October 29, 2000, noted that he was "constantly depressed." A mental health evaluation form in the records indicates that Keith declined to talk with medical or mental health staff at CCA on advice of counsel.

Keith received some visits from family while at CCA. His mother was the most frequent visitor and saw him about a dozen times. His brother Paul visited a few times. Keith's twin, Kenneth, was in the Army at the time, and stationed in Korea. He visited Keith twice when home on leave. Though

records do not indicate it, it has been reported that Kerry Dillon visited on at least one occasion with Keith's son. Prisoner Information Request forms completed by Keith were primarily requests to call his mother, his attorneys, or other relatives. Keith made use of the CCA grievance process on occasion. Records include grievance forms that he filed. For the most part, they were pretty routine, and related to such things as recreation, food, and library books. In December, 1999, he filed grievances related to verbal abuse and threatening remarks by staff, things being thrown at him, and threatening comments made to him by the inmate who later assaulted him. He also filed a request to have a camera placed in his cell due to threatening and sexual comments made to him by staff. This request was denied. The assistant warden at CCA testified that one officer was disciplined for verbally abusing Keith.

Keith received fifteen disciplinary reports for violations of rules between October 30, 1999 and February 12, 2001 (period for which records have been furnished; request for complete records is pending), six of which resulted in placement in disciplinary segregation for periods ranging from five to thirty days. Those would be considered major violations, while other dispositions are for minor violations. Minor violations included such things as disobeying orders; destruction, alteration or damage to property; disorderly conduct; hindering an employee; and unsanitary or disorderly housing conditions. For these types of violations, dispositions included pod restriction, activity restriction, restitution, and loss of commissary.

The first three discipline reports resulting in placement in disciplinary segregation occurred in December, 1999 and March, 2000. No testimony relating to these was presented at trial. On December 19, 1999, Keith received a write-up for failure to obey an order and attempt to damage property. Records indicate that he threw paper and cereal out of his cell, then tried to break the sprinkler in the cell. He received five days disciplinary segregation for this infraction. On December 21, 1999, he was written up for destruction, alteration or damage to property, and disorderly conduct. According to records, he threw his chair at a light bulb and broke it. He received seven days disciplinary segregation and restitution for this violation. On March 23, 2000, Keith received a write-up for hindering an employee, failure to follow orders and destruction of property. Records indicate that he was banging on his door, kicking it and whistling. He refused orders to stop. Pepper spray was used. He received seven days disciplinary segregation for this infraction.

Keith received a major conduct report on May 15, 2000, for assault of an officer. According to records and the transcript, Keith had cleaning supplies in his cell. When CO Roger Moore, Jr. requested that he give back the supplies, Keith refused. Moore then entered Keith's cell to retrieve the supplies. Both Moore and Keith grabbed the broom and struggled with it. Keith then struck Moore on his right cheek. Other officers arrived and restrained Keith. He

received thirty days disciplinary segregation for this incident. Moore testified that prior to his entering Keith's cell, Keith requested a rubber glove so that he could clean his toilet. Moore refused, so Keith asked to speak to the Captain. Moore entered the cell alone in violation of CCA policies, and was suspended for two days without pay for the violation. He testified that had no problems with Keith prior to this incident and no problems with him following the incident.

Keith had two major write-ups in February, 2001 that resulted in placement in disciplinary segregation. The first occurred on February 5, 2001, when Keith threw urine on another inmate. Reports indicate that the inmate had been taunting and threatening Keith. Keith gave a statement in which he reported that he had been attacked three times at CCA and took the inmate's threats seriously. He received ten days in disciplinary segregation for this incident. On February 6, 2001, Keith received a disciplinary report for assault, destruction of property and failure to follow orders. He had been ordered to cuff up and refused. Records indicate that he became agitated. Officers entered his cell and a struggle ensued in which Keith bit the thumb and ring finger of an officer. Pepper spray was used to subdue him, and he received medical treatment for scratches and bruises. Keith received thirty days disciplinary segregation for this incident.

There was testimony at trial about another incident that occurred in October, 2001, after the period for which records have been furnished. Warden Fred Lawrence testified that Keith's cell was searched when he was preparing to go to court on October 18, 2001. A small piece of metal was found. They couldn't tell what it was from, but Lawrence noted that it wasn't sharp. When someone opined that it might be used as a handcuff key, Keith volunteered that he could show staff a handcuff key. He brought out an object made from a toothbrush. He demonstrated how it could be used. Lawrence further testified that CCA did not stop selling the toothbrushes in their commissary after this, and that Keith had never made any attempt to get out of his cuffs or to escape. Others testified, as well, that Keith had never attempted escape. Staff said that Keith was considered an escape risk only because of the nature of his case.

CCA staff at trial testified that Keith was no greater disciplinary problem than most inmates. He generally responded to requests from staff. While he could be disruptive at times, by yelling and banging in his cell, other inmates engaged in similar behavior. Warden Lawrence testified that Keith had made suggestions regarding policies and practices at the facility, some of which Lawrence had enacted. He described Keith's suggestions as "valid and helpful." As stated above, incident reports are written by staff for many occurrences not linked to discipline reports. There are nine incident reports related to Keith, one of which was linked to a discipline report. These include incidents in which Keith had things thrown at him. CCA records include sixty-eight incident reports not related to Keith for the period of October 6, 1999 to August 1,

2001. They use a numbering system, which would indicate that these constitute a fraction of actual reports written. The sixty-eight reports cover the whole facility and include many fights between inmates, inmate on inmate assaults, use of force by staff, and throwing of things on staff or other inmates. It appears that these kinds of incidents were not uncommon at CCA.

As stated above, Keith appeared in court on October 25, 2001, and entered pleas of guilty to charges related to the kidnap and murder of Pamela Butler. Court transcripts and reports from CCA staff indicate that on the night of October 28, 2001, Keith attempted suicide by overdosing on anti-depressant pills that he had been saving for some time. A memo to the Court, dated October 31, 2001, from Andre Ford, Chief of Security at CCA, indicates that at about 11:45 p.m. the night of the 28th, Keith asked to see him. He had been giving his personal property away, throwing up and acting strangely. Keith had made a phone call to a brother that same evening, telling him he "had done it", and saying goodbye to various family members. Keith admitted to Ford that he had taken Trazadone and Elavil, which he said he had been saving for two years. He had planned to kill himself, but told Ford he changed his mind. Keith was transported to St. John's Medical Plaza hospital in Leavenworth, Kansas, where he was admitted to the ICU (Intensive Care Unit) during the early morning hours of October 29, 2001. A memo to Roger Moore at CCA from Dr. Richard Whitlow, the treating physician at the hospital, indicated that the plan was to monitor Keith for seventy-two hours and have him evaluated by the resident psychiatrist. Whitlow reported that Keith had taken about forty pills.

Dr. Whitlow wrote a letter to the Court, dated November 1, 2001. He reported that Keith had been discharged back to CCA on October 31st. Whitlow stated that Keith "took a significant overdose" of trycyclic anti-depressants, and described it as "a very deliberate act" planned over time. While in the hospital Keith was described as very angry, depressed and withdrawn with flat affect. Whitlow, noting that he had treated many inmates over the years, opined that Keith was "very depressed, probably more-so than any inmate I've seen in the past." He told the Court that if Keith were a civilian, he would seek to have him voluntarily committed for further evaluation and treatment. If he didn't consent, Whitlow would've sought involuntary commitment. He recommended further evaluation by a trained psychiatrist with a team approach.

The Judge and attorneys for both sides of the case had several in chambers and teleconference meetings about the situation. On November 6, 2001, the Court indicated that it planned to have Keith seen by Dr. William Logan, a psychiatrist. A hearing relating to competency was held on November 7, 2001. Medical records were provided by St. John's Medical Center, along with the letter from Dr. Whitlow. Assistant Warden Roger Moore, Sr., of CCA testified regarding the suicide attempt. He had spoken to the psychiatrist at CCA, Dr. Fadore. Fadore had placed Keith on suicide watch upon his return to

CAA. Dr. Fadore placed a note in the medical records at CCA indicating that he had seen Keith on October 31, 2001, upon his return to CCA from the hospital. He was unable to reach any conclusion regarding Keith's mental state at that time as Keith declined to answer most questions, based on advice from his lawyer. Despite Keith's statement that he had used the attempt to postpone the trial, Dr. Fadore wrote in the records that he was of the opinion that Keith would make another suicide attempt soon. He recommended that Keith be placed on suicide watch, and that a comprehensive psychiatric assessment be done when Keith's cooperation could be enlisted.

Dr. Logan testified that Keith had suffered from chronic depression for some time, and that he had difficulty with trust, making him resistant to help. He stated that Keith had been saving pills for some time, and had a real plan to kill himself before the penalty phase of his trial. Logan reported that Keith was no longer suicidal and, though still depressed, was competent to proceed. In response to a request by the Court, Dr. Logan indicated a willingness to meet with Keith a few times a week during the trial. This does not appear to have happened. Logan concluded that the overdose was "a very serious and genuine suicide attempt." Keith was found competent, and the penalty phase of his trial began on November 19, 2001.

**SOURCES**

Keith Nelson (10-11-05) (6-25-09) (10-12-10) (12-7-11) (12-8-11)
Nancy Nelson, mother (7-13-09) (1-20-10) (9-16-10) (10+ phone interviews)
Kenneth Nelson, twin brother (Phone interviews: 7-25-10; 6-23-11)
Mary Smith, maternal aunt (1-20-10)
Kathy Henre, maternal aunt (1-19-10)
Billy Colston, maternal cousin (9-15-10)
Kenneth Morse, father (3-29-10)
Milas Morse, paternal uncle (8-17-10)
Karen Morse Gentry, paternal aunt (8-18-10) (Phone interview: 11-2-10)
Alice Morse Brin, paternal aunt (Phone interview: 8-18-10)
Fred Morse, paternal uncle (8-18-10)
Bobby Morse, paternal uncle (1-21-10)
Felicia Morse, paternal cousin (8-18-10)
John Morse, paternal cousin (8-18-10)
Leah O'Connell, paternal cousin (9-15-10)
Laura Luttrell, paternal cousin (Phone interview: 9-16-10)
Mike Morse, paternal third cousin (1-19-10)
Rosa Morse, wife of Mike Morse (1-21-10)
Kerri Dillon, former girlfriend (Phone interview: 12-3-10)
Bruce Smith, former Tarrant County Juvenile Probation Officer (2-28-12) (Phone interview: 1-20-11)
Faustino Castillo, former Texas Youth Commission parole agent (2-28-12) (Phone interview: 1-19-11)
Deborah Spoonts, Tarrant County Juvenile Probation (2-29-12)

Memos of interviews by Tena Francis with:
Keith Nelson (3-5-01)
Nancy Nelson (4-30-01) (Phone call 2-1-01)

Memos of interviews by Deborah Haddad with:
Wilma Nelson, maternal grandmother (5-13-01)
Nancy Nelson, mother (Phone call 2-06-01) (5-13-01)
Paul Nelson, brother (5-13-01)
Kenneth Morse, father (5-13-01)
Mary Smith, maternal aunt (5-13-01)
Georgeann Romero, maternal aunt (5-13-01)
Donna McQueen, maternal aunt (5-13-01)
George Nelson, maternal uncle (5-13-01)
Betty Sutton, paternal aunt (5-13-01)
Janet Walker, family friend/co-worker of mother (2-21-01)
Irene Wood, sister-in-law of Mary Smith (6-29-01)
Goldie Hawk, neighbor in Texas (Phone call 2-26-01)

Anita Taylor, babysitter in Texas (6-1-01)
Rhonda Reese Monroe, babysitter in Texas (2-21-01)
Gladys Reese, mother of Rhonda Monroe (2-19-01)
Ginnie Monroe, daughter of Rhonda Monroe (2-28-01)
Mike and Lori Griffin, neighbors in Texas (2-19-01)
Kerri Dillon, former girlfriend (5-13-01)
Randy Vines, former boyfriend of Nancy Nelson (2-28-01)
Henry Caldwell, neighbor in Texas (6-1-01)
Theodore Shortie, former Director of TYC Challenge Program (Phone call 2-26-01)
Mike Morse, paternal third cousin (5-13-01)
Rosa Morse, wife of Mike Morse (5-13-01)

Memos by Dan Grothaus, Grothaus Investigations:
Memo re: court order for child support payments by Nancy Nelson to George Nelson; 10-14-88 (5-11-00)
Interview with Diane Morse, wife of Bobby Morse (5-18-00)
Interview with Bobby Morse (5-18-00)
Phone conversation with Kenneth Morse (5-18-00)
Interview with Kerri Dillon (10-25-00)

Memos of interviews by Ron Ninemire with:
Nancy Nelson, mother (5-22-00) (6-8-00)
Kenneth Nelson, brother (6-8-00)
Johnny Ray Nelson, brother (6-15-00)
Paul Nelson, brother (5-22-00)
Captain Randy Dunsmoor, White Settlement Police Department (6-13-00)
Janet Walker, friend/co-worker of mother (6-13-00)
Kerri Dillon, former girlfriend (1-26-00)
Laura Luttrell, paternal cousin (1-26-00)

Handwritten interview notes by Ron Ninemire with:
Nancy Nelson (2-16-00)
Keith Nelson (2-17-00)
George Berry, Sack & Save (2-24-00)
Anita Taylor (6-14-00)
Ellen Crutsinger (6-14-00)

Memos of interviews by Lisa Murphy with:
Gene Thompson, landlord in Texas (9-25-01)
Rhonda Reese Monroe, former babysitter (9-26-01)
Jenny Monroe, daughter of former babysitter (undated)
Lori and Mike Griffith, neighbors (10-09-01)
Goldie Hawk, neighbor (10-12-01)
Janet Walker, co-worker at Quik Sak (10-12-01)

Randy Vines (10-12-01)
Homer Dear, former principal, West Elementary School (8-31-01)
Ellen Crutsinger, former teacher at West Elementary School (9-25-01)
Eileen Pink, former teacher at West Elementary School (8-31-01)
Gloria Welch, former teacher at West Elementary School (09-25-01)
Dale Brock, former principal at Brewer High School (9-25-01)
Jack Clay, former vice principal at Brewer High School (8-31-01) (9-25-01)
Philip Burris, former special education aide at Brewer High School (8-31-01)
Yvonne Cordova, former special education teacher at Brewer High School (9-25-01)
Kenneth Williams, former physical education teacher at Brewer High School (8-31-01)
Deborah Miller, former head of the special education program at Brewer High School (8-31-01)
Faustino Castillo, parole officer, Texas Youth Commission (10-9-01)
Staff at TYC- Gainesville State School, including: Ora Jean Phillips, Elsie McKinney (10-26-01)

Memos of interviews by Sandra Zahirieh with:

Carol Patterson, former vice principal at Brewer Middle School (8-27-10)
Rene Lambert Floyd, former special education teacher at Brewer High School (8-23-10)
Cora Latta, former speech therapist at Brewer High School (8-25-10)
Nancy Brown, former West Elementary School teacher (8-25-10)
Joann Hansen, former West Elementary School nurse (8-25-10)
Bruce Smith, former Tarrant County Juvenile Probation Officer (8-26-10)
Debbie Spoonts, supervisor of Tarrant County Juvenile Placement Committee (8-24-10)
Don Dalton, Tarrant County Juvenile Probation (8-24-10)
Carol Presnell, former supervisor of Tarrant County Juvenile Placement Committee (8-24-10)
Jerry Wood, former Assistant Director of Tarrant County Juvenile Services (8-23-10)
Reverend Mike Redd, former Mental Health Mental Retardation worker in Tarrant County (8-25-10)
Faustino Castillo, former TYC parole officer (8-24-10)
Mike Warren, former juvenile probation officer in Tarrant County (8-24-10)
Charles Vermersch, former Tarrant County Juvenile Probation supervisor
Ora Jean Phillips, former counselor at TYC Gainesville (8-25-10)
Pam Copeland, neighbor and family friend in White Settlement (8-26-10)
Adam Nowlin, childhood friend in White Settlement (8-26-10)
Bill McCollum, childhood friend in White Settlement (9-26-10)

Joe Taylor, former neighbor and son of Anita Taylor (8-24-10)

FBI 302 interview memos with:

Kenneth Nelson
Kenneth Morse
Kathy Henre
Melvin Henre
Tim Luttrell, former husband of paternal cousin
Steven Underwood, former boyfriend of paternal cousin
Kerri Dillon
Kenneth Williams
Mary Bassett, special education, White Settlement Schools
Yvonne Cordova
Paul Joiner, former principal at Miami R-1 School in Amoret, Missouri
David Cunningham, former employer
Donald Derry, former employer
Kandra Davis, former parole officer
Michanne Mattson, victim of attempted assault
Cindy Wyman, owner of Oasis Bar in Kansas City, KS
Sami Stern, patron of Oasis Bar
Carlos Acevedo, CCA
William Criss, CCA
Brad Vincent, CCA
Robert Wright, CCA
Bruce Roberts, CCA

**Records, Reports and Documents (unless indicated otherwise, records pertain to Keith Nelson)**

Trial transcript
FBI investigation reports (302s)
Birth certificate, Keith Dwayne Nelson
Birth records, Providence St. Margaret Health Center; Kansas City, KS
Post-natal hospital records, Children's Mercy Hospital; Kansas City, MO
Medical records re: Keith Nelson and brothers; Dr. James Pretz; Kansas City, KS
White Settlement School District, Texas; school records of Keith Nelson
Tarrant County, Texas; Juvenile Court records
Tarrant County Juvenile Detention records
Tarrant County Juvenile Probation records
Turner Unified School District records; Kansas City, KS
Miami R-1 Schools records; Amoret, MO
John Peter Smith Hospital records; Ft. Worth, TX
Texas Youth Commission records

Cindy Phillips counseling records, (1990)
Missouri State Highway Patrol, criminal history record
Bates County, Missouri court files
Bates County Jail records
Bates County Sheriff's Department records
Henry County, Missouri court files
Southwest Missouri Mental Health Center records
Missouri Department of Corrections (DOC), adult institution records
Missouri DOC, Board of Probation and Parole
Kansas Department of Corrections, Division of Community & Field Supervision records
Wyandotte County (Kansas) Detention Center records
Perma Dry employment records
Corrections Corporation of America (CCA) - Leavenworth, pre-trial detention records
University of Kansas Medical Center records
Memos to CCA by Richard Whitlow, MD, St. John's Medical Plaza
Memo to Court by Andre Ford, Chief of Security, CCA
Report to Court by Richard Whitlow, MD, St. John's Medical Plaza
Marriage license of John Morse and Pearl Smith (1937)
Illinois State Highway Police, Traffic Accident Report re: the death of John Morse (1967)
Illinois State Archives report re: criminal history of John Morse
Office of the District Attorney, Wyandotte County, Kansas; prosecution report complaint and warrant re: Kenneth Morse, charge of attempted rape/ indecent liberties with a child (1971)
Kansas Bureau of Investigation, criminal history report re: Kenneth Morse
University of Kansas Medical Center, records re: Nancy Nelson
Municipal Court of Kansas City, KS, report re: Nancy Nelson charged with petty larceny (1978)
Illinois criminal history reports, court records and DOC records related to:
    Milas Morse, Sr.
    Milas Morse, Jr.
    Milas William Morse
    Freddy Leon Morse
Hanford Elementary School; Hanford, CA; enrollment card for Johnny Nelson
White Settlement School District; TX; school records re:
    Johnny Ray Nelson
    Kenneth Nelson
    Paul Nelson
Texas Child Abuse Reporting Statute (1979)(1983)(1987)
Texas Family Code (1988) (1990)
Tarrant County, Texas Sheriff's Department investigation reports re: Johnny Nelson, charged with murder (1994)
White Settlement Police Department records re: Johnny Nelson

Department of Homeland Security, U.S. Secret Service, Intelligence Division, records re: investigation of Johnny Nelson (1994)
Benbrook Police Department records, TX; re: Johnny Nelson
Grapevine Police Department records, TX; re; Johnny Nelson
Tarrant County Jail Records, re: Johnny Nelson
John Peter Smith Hospital, psychiatric records re: Johnny Nelson
Vernon County Hospital, mental health records re: Johnny Nelson
Tarrant County Court documents re: Johnny Nelson, including reports of mental evaluations
Handwritten social history information prepared by Nancy Nelson for Johnny Nelson's attorney
University of Kansas Medical Center, Kansas City, KS; mental health records re: Paul Nelson
Royal Oaks Hospital; Windsor, MO; mental health records re: Paul Nelson
Southwest Missouri Psychiatric Rehabilitation Center; mental health records re: Paul Nelson

# EXHIBIT 30

**JILL Miller, MSSW, LCSW**

**Forensic Social Work Services**
**jillemiller@sbcglobal.net**

**P.O. Box 44343**
**Madison, Wisconsin 53744-4343**
**Phone: (608) 271-0227**

# CONFIDENTIAL MEMORANDUM

**TO:** Attorneys David Ruhnke, Gary Brotherton & Paula Harms
**RE:** Keith Nelson vs. U.S.; Case No 4:04-cv-8005(JRG)
Supplementary Social History Memorandum
**DATE:** March 21, 2014

Following the completion of the "Preliminary Social History" report completed in early 2012, I conducted additional interviews of persons who were staff of the Tarrant County Juvenile Probation Office and the Texas Youth Commission. These persons had previously been interviewed in person by Sandra Zahirieh and by myself by phone. This memo provides additional information obtained in my in person interviews. The subjects of the interviews were furnished with materials from the Tarrant County juvenile file and/or the Texas Youth Commission file regarding the involvement of their agency with Keith Nelson, including their own reports and recordings, as well as with portions of the social history report covering Keith Nelson's childhood and adolescence. The period of time during which Keith Nelson was involved with the juvenile justice system in Texas is covered on pages 35 through 54 of the social history.

In preparation for my interviews I reviewed relevant sections of the Texas Family Code in effect at the time of Keith's involvement in the juvenile justice system. These sections governed juvenile proceedings at the time. The specific relevant sections are:

51.01 Purpose and Interpretation: public purpose of Title 3 on Delinquent Children and Children in Need of Supervision - 1) to provide for the care, protection and the wholesome moral, mental and physical development of children coming within its provisions; 2) to protect the welfare of the community and to control the commission of unlawful acts by children; 3) consistent with the protection of the public interest, to remove from children committing unlawful acts the taint of criminality and the consequences of criminal behavior and to substitute a program of treatment, training and rehabilitation; 4) to achieve the foregoing purposes in a family environment whenever possible, separating the child from his parents only when necessary for his welfare or in the interest of public safely and when a child is removed from his family, to give him the care that should be provided by parents.

54.01 Disposition: ( c ) No disposition may be made under this section unless the child is in need of rehabilitation or the protection of the public or the child requires that disposition be made; (d) (1) the court may....place the child on probation on such terms

CLERK U.S.DISTRICT COURT
Exhibits:
P 38A
Case No. 4:04-CV-08005-FJG

as the court may determine...

( A ) in his own home or the custody of a relative or other fit person;

( B ) in a suitable foster home, or

( C ) in a suitable public or private institution or agency, except the Texas Youth Commission

(2) if the court...found...that the child engaged in delinquent conduct...the court may commit the child to the Texas Youth Commission

(3) ( i ) If the court places the child on probation outside his home or commits the child to the Texas Youth Commission, the court shall include in it determination order whether (1) it is in the child's best interests to be placed outside his home; and (2) reasonable efforts were made to prevent or eliminate the need for the child's removal from the home and to make it possible for the child to return to the home.

Note: the court had the authority to issue orders affecting parents, including to do any act that the court determined was reasonable and necessary for the welfare of the child, or to refrain from doing any act that the court determined to be injurious to the welfare of the child. The court could order the parent to participate in counseling and/or attend classes.

**Bruce Smith**

Bruce Smith was a juvenile probation officer for Tarrant County, Texas, from 1976 to 2008. At the time of the interview, he was the Assistant Principal at Cassata Learning Center, an alternative high school in Fort Worth, Texas. Smith was Keith's juvenile probation officer from March, 1988 through August, 1989. Smith said that he took the case over from Jim Spellings, who was an intake officer for the county. Keith was thirteen years old and in the fifth grade when Smith began supervising him. He knew that Keith was in special education. He also knew that prior to his taking the case over from Spellings, Nancy Nelson contacted Spellings because Keith was threatening suicide. Spellings referred Nancy to MHMR (Mental Health Mental Retardation - an agency that provided counseling services). Nancy did not follow through with this referral. Nothing was done by the county to facilitate this.

Just before Smith received Keith's case, Keith was taken to John Peter Smith Hospital following a suicide attempt in detention. Smith knew that Spellings had presented Keith's case to the Juvenile Probation Placement Committee, which declined to place him out of his home in one of the facilities available to the county.

Bruce Smith made a scheduled visit to the Nelson home in March, 1988. Despite the fact that Nancy knew he was coming, the home was dirty, cluttered and in need of repairs. Nancy told Smith that her older son Johnny was abusive to Keith. In April, 1988, Bruce Smith presented Keith's case to the Placement Committee. This was a second request for placement. He was again denied. Not long after this, Keith went to stay with a paternal uncle and his family in Missouri. Smith resumed supervision of Keith when he returned to Tarrant County in the fall of 1988. He told Nancy to take Keith for

counseling at either MHMR or Family Services. She did not do this. He said there was nothing he could do if she didn't follow through. The Texas Family Code appears to provide that courts can order parents to participate in counseling or take their child for required counseling.

Keith did well on probation for several months and was discharged from supervision in March, 1989. He was again referred to the Juvenile Court in June, 1989, and Smith resumed supervision of him. He again presented Keith's case to the Placement Committee - this was a third request for placement - and the committee again denied him placement. Records provide no reasons for the committee's decisions. Bruce Smith stated that the Tarrant County Juvenile Placement Committee was comprised of various members from Juvenile Probation, Child Protection Services and MHMR. If a probation officer felt a child needed resources, including placement, he or she could present the case to the committee, who would ultimately decide if the county would place the child. The types of placements available for placement by the county included foster homes, boys ranches, and residential treatment centers. Though the statute also lists group homes, Smith said that Tarrant County didn't have any group homes at the time, Smith said that he sometimes felt frustrated by the committee's refusal to provide services, including placement. He felt that budget was a factor in the committee's decisions. The county had limited funds to place children. They tended to place children who had support at home and a chance for success in placement, as well as when they returned home. The facilities that the county used didn't include long-term mental health care, which is what Smith felt Keith needed. Families that had money could afford to get mental health treatment for their children. This was not the case for Keith.

Bruce Smith said that he felt that Keith had a very difficult home situation. He was abused by Johnny. Though Smith would be a mandated reporter of child abuse, he did not report this abuse to Child Protective Services. He did recall that there was an incident in the home in which Johnny fired a gun and Keith was struck by a ricocheting bullet. Smith said that Nancy was always working or was gone, and didn't supervise her children. He felt that Keith needed help, including mental health treatment. Nancy was unwilling to get help for Keith. Smith appeared to believe that if she didn't get the help there was nothing he could do. He felt that it was Nancy's responsibility to follow through with suggestions for treatment. Smith was aware of Nancy's limitations as a parent and said that he didn't feel Keith had a chance in that home. It appears that juvenile probation officers did not seek the assistance of the court in enforcing treatment recommendations.

## Deborah Spoonts

Deborah Spoonts began working for Tarrant County Juvenile Probation in 1988, and was still working there at the time of my interview in 2012. She became a member of the Tarrant County Juvenile Placement Committee in 1990 and was the supervisor of the committee when we met. She was not Keith's probation officer nor did she staff his case as a member of the committee, but she knew who he was. Spoonts noted that the work of the Tarrant County Juvenile Probation Office was governed by the Texas Family Code.

The duty of the placement committee was to review cases presented to it by juvenile probation officers, and to determine whether and where a child would be placed. The decision to present a case to the committee was up to the individual probation officers. They would complete a form providing information about the juvenile and could appear before the committee to advocate for placement. The committee was limited to using placements with which the county had contracts. Those contracts limited the rates that the county could pay. Spoonts said she believed that the county did not have psychiatric placements at the time.

Ms. Spoonts reviewed Keith Nelson's juvenile file and noted that his case had been presented to the placement committee four times (one additional time after Bruce Smith's involvement), and each time he was denied placement. She didn't know what information the committee had about Keith, but opined that his chronic self-abusive and suicidal behavior may have been a concern for he committee. The committee may have relied on an evaluation conducted by Dr. Burns at John Peter Smith Hospital in which he cited Keith's self-abusive and suicidal behavior in concluding that Keith was not suitable for placement in the typical facilities available. It was not clear what the alternative for providing appropriate care and treatment was.

Upon review of Keith Nelson's file and social history, Deborah Spoonts stated that Keith was a chronically neglected child. She felt that his exposure to domestic violence would have had a negative impact on him. Spoonts said that based on the information she reviewed she would have reported Keith's case to Child Protective Services. She is a mandated reported and noted that she had reported families to CPS on numerous occasions. Spoonts said that she felt that Keith would have been an appropriate referral to MHMR for assessment, medication management and treatment. Probation Officers can make referrals to MHMR. As Keith's mental health problems progressed, he appeared to be in need of further psychiatric evaluation and possible psychiatric hospitalization. When Keith was committed to the Texas Youth Commission, the commission should have been provided information about Keith's background and circumstances. She didn't know what information TYC was given. Spoonts said that TYC would do an initial assessment and determine the client's needs and which facilities they have available to meet those needs. Once the juvenile is committed to TYC, Tarrant County Juvenile Services had no further involvement.

**<u>Faustino Castillo</u>**

Faustino "Tino" Castillo was working as an intake officer for the Tarrant County Juvenile Probation Department at the time of our interview. He previously worked as a Juvenile Parole Officer for the Texas Youth Commission from February, 1990 until 1998. He supervised Keith during periods that he was on parole between September, 1990 and November, 1991. Castillo noted that he received Keith for supervision during his first year as a parole officer. He couldn't recall ever seeing the home evaluation or psychological evaluation performed by TYC staff prior to Keith's release on parole in September, 1990. Castillo remembered Keith clearly and recalled that he had been

involved in "mischief" and minor property offenses. It was his impression that Keith was a slow learner. Castillo noted that Keith was always respectful to him, adding that he didn't have problems with Keith. He made home visits to the Nelson house and said that conditions were always bad. He usually found Nancy, if she was home, sitting on the couch smoking cigarettes with empty beer cans all around. Often when he visited, Nancy wasn't home. He believed that she was an alcoholic, and that she drank because she was overwhelmed with her situation. Castillo didn't feel that Nancy was able to provide the care and supervision that her children, including Keith, needed. Castillo said that Keith suffered from the neglect that he experienced.

Castillo reviewed the records from TYC as well as the portions of the social history provided. He recalled that shortly after he began supervising Keith he had him taken into custody and placed in detention due to suicide threats he had been making. He felt that Keith had to be detained for his own safety. Castillo's records indicate that he planned to refer Keith for psychological evaluation. Though the records don't reflect a referral, Castillo thought that he tied to set up an appointment but was told that there were no openings for two weeks. Keith was released home from detention with no follow-up for this evaluation or for mental health services. Castillo reported that Keith did relatively well for a few months, though he was in detention on occasion for minor trouble. Castillo formulated a case plan for Keith in March, 1991, that involved attending school, getting a job and counseling at Family Services. His school attendance improved that academic year. Keith did work at Sak and Save during the summer. Though the records again don't reflect it, Castillo thought he made a referral to Family Services, but that the appointment was not kept. He was unaware of the fact that Nancy Nelson had left for Missouri in the spring of 1991, leaving all five boys alone for several weeks. Castillo said that if he had known that he would have intervened.

Tino Castillo reported that Keith left for Kansas in late summer, 1991, in violation of his parole. Keith contacted him a few weeks later and said he wanted to turn himself in, which he did. He returned to Texas and spent two weeks in a TYC shelter, after which he was released to his mother and returned with her and all of his brothers except Johnny to Missouri.

Castillo was asked about the types of boys who were committed to a TYC correctional facility. He said that most had a history of serious felony offenses and often had prior out-of-home placements. Keith had a history of property offenses. Castillo noted that there was a financial incentive for counties to commit youth to TYC as then the state would pay the costs, whereas if the county placed a child in another type of facility, the county had to pay the costs. It was his understanding that most counties, including Tarrant County, didn't have a lot of money to pay for placements. In Castillo's opinion, poor children, regardless of race or ethnic background, were not usually placed in residential settings, despite their needs. Families with financial means could hire attorneys to advocate for services for their children, or could pay for services themselves. This was not the case for Keith. Castillo believed that Keith should have been placed outside his home in a more appropriate setting long before he was committed to TYC.

When asked about the types of facilities available for youth committed to TYC, Castillo responded that, in addition to correctional institutions, such as the one Keith was sent to at Gainesville, they had foster homes, group homes, ranches, substance abuse programs, and supervised independent living. He did not know what information was provided to TYC at the time of Keith's commitment or why they placed him at Gainesville. He believed that TYC should have placed Keith in a setting or program that would have offered services more appropriate to his needs, particularly mental health services. Castillo said that when Keith was discharged from Gainesville to his supervision he should have been placed in supervised living with supportive services rather than being sent home. He stated that he felt that TYC had failed Keith. In Castillo's experience Child Protective Services was not very involved with families, particularly families of adolescents. He felt that the schools should have done more to report the situation in the Nelson home to CPS. Castillo stated that he felt that Keith needed structure, a positive male role model and mental health services. In his opinion both the social services and juvenile justice systems failed Keith.

Appellate Case: 15-3160 Page: 96 Date Filed: 02/29/2016 Entry ID: 4372476

# EXHIBIT 31

**AFFIDAVIT OF NATALIE NOVICK BROWN, Ph.D.**

I, Natalie Novick Brown, declare under penalty of perjury as follows:

1. I practice as a psychologist and am licensed in Washington State and Florida. I also am a Certified Evaluator for the Department of Corrections and Division of Developmental Disabilities in Washington State. I completed a year of postdoctoral training in the University of Washington's Fetal Alcohol and Drug Unit in 1995 and currently hold a faculty position at the University of Washington as Clinical Assistant Professor, Department of Psychiatry and Behavioral Medicine, where I consult with research staff in the Fetal Alcohol and Drug Unit. In this position, I am currently participating in a grant project where I screen individuals for fetal alcohol impairment who are referred by the Drug and Mental Health Courts in King County (Seattle), Washington. I also evaluate, diagnose, and treat individuals referred by the Division of Developmental Disabilities who are diagnosed with Fetal Alcohol Spectrum Disorders (FASD), which includes Fetal Alcohol Syndrome (FAS) and Fetal Alcohol Effects (FAE). In 1994/95, I received post-doctoral training in FASD at the University of Washington's Fetal Alcohol and Drug Unit in Seattle, Washington. Since then, I have published articles and lectured on the behavioral and developmental effects of prenatal alcohol exposure and have evaluated many individuals suffering from FASD. I also have treated a number of youth with FASD in an effort to prevent adverse life outcomes ("secondary disabilities"). In the course of this work, I have attended diagnostic trainings and reviewed many medical evaluations involving FASD diagnoses, and I am quite familiar with the diagnostic criteria and process of evaluation. Thus, I have developed expertise in FAS/FAE through a combination of study, practice, and research.

2. I have been retained by Keith Nelson's court-appointed counsel David A. Ruhnke to complete an evaluation and provide an opinion concerning whether or not Keith Nelson suffers from a Fetal Alcohol Spectrum Disorder (FASD) due to prenatal alcohol exposure. The current affidavit summarizes my preliminary review of records provided to me by Mr. Nelson's counsel.



CLERK U.S.DISTRICT COURT
Exhibits:
P 48
Case No. 4:04-CV-08005-FJG

Appellate Case: 15-3160 Page: 98 Date Filed: 02/29/2016 Entry ID: 4372476

3. FASD is an umbrella term that includes Fetal Alcohol Syndrome, Fetal Alcohol Effects, Alcohol-related Neurodevelopmental Disorder, and Alcohol-related Birth Defects. FASD is a permanent birth defect caused by maternal consumption of alcohol during pregnancy. Alcohol is a teratogen that inhibits and disrupts fetal development by causing structural and functional damage to developing organs and systems, including the brain and central nervous system. The damage starts at the cellular level, where ethanol may induce excessive cell death and disrupt cell responses to molecules that regulate neuron proliferation, migration, and differentiation. Because alcohol causes widespread damage throughout the fetus, there is a broad array of physical anomalies and neurobehavioral defects. Hence, the condition is often referred to as a "syndrome." The most serious and pervasive damage occurs in the central nervous system (CNS). Brain imaging studies over the last decade have shown that prenatal alcohol exposure causes significant malformation in structures within the brain (e.g., corpus collosum, basal ganglia, cerebellum) that are necessary for normal development and functioning (e.g., Bookstein et al., 2001, 2002a, 2002b).

4. Research has shown that prenatal alcohol exposure causes structural brain damage that affects functioning in the frontal lobe of the brain, particularly the prefrontal cortex, an area that is especially sensitive to the teratogenic effects of ethanol (e.g., Bookstein et al., 2002). Brain imaging research has found that prenatal alcohol exposure seems to target the corpus collosum in particular and is associated with a pattern of deficits in executive functioning in individuals diagnosed with FASD (Bookstein et al., 2001). Executive functions, which control impulses and channel them into pro-social rather than antisocial behavior, involve cognitive skills such as perception, social awareness, organization, planning, internal ordering, working memory, self-monitoring, inhibition, motor control, regulation of emotion, and motivation. Appropriate socialization depends on intact basic cognitive functioning (Connor et al., 2000). When executive functions are compromised by prenatal alcohol exposure or other sources of brain damage, an individual will:

- have difficulty perceiving, prioritizing, and storing information,
- have difficulty processing and retrieving that information,
- be unable to generalize and apply consequences from past actions to potential future actions,
- lack motivation and initiative,
- need external motivators such as frequent cues or guidance from others,
- be unable to perceive the effect of his/her actions on others or the social inappropriateness of those actions,
- display exaggerated emotions,
- be unable to control behaviors that stem from emotion-evoked urges, and, consequently, and
- engage in a wide range of socially (and often legally) inappropriate behaviors.

5. As noted in my previous affidavit, FASD evaluation and diagnosis involve a three-step process. The first step is analysis of original source documents (i.e., birth and early medical records, early school records, childhood photographs) and results of any neurological and/or neuropsychological testing on the subject that document his physical size and growth (Criterion 1 for an FASD diagnosis), facial characteristics (Criterion 2), and neuro-behavioral functioning (Criterion 3). Based on the initial review of original source documents sent to me by Mr. Ruhnke as well as an interview with birth mother Nancy Nelson, I believe there is a substantial possibility that Keith Nelson may suffer from a Fetal Alcohol Spectrum Disorder. When I interviewed her, Ms. Nelson denied the use of alcohol or drugs during her pregnancy with Keith Nelson. However, such denial is quite common among mothers of children diagnosed with FASD who are unable to acknowledge that their own behavior may have harmed their children. Despite her denial, she nonetheless reported multiple developmental and behavioral problems in her son Keith that are consistent with FASD and inconsistent with any explanation other than brain damage.

6. Analysis of Keith Nelson's birth and early childhood records provides evidence in support of FASD Criterion 1 (growth deficiency), Criterion 2 (facial dysmorphology), and Criterion 3, neurodevelopmental problems. These three criteria are required for a full diagnosis of Fetal Alcohol Syndrome, With respect to growth deficiency, medical records indicate that Mr. Nelson was born at least a month premature, which is sufficient to satisfy the requirement under Criterion 1. With respect to facial features, review of early childhood photographs reveals small palpebral fissures, epicantahl folds, smooth philtrum, and small upper lip. These features are sufficient to fully satisfy diagnostic requirements for Criterion 2. Regarding neurodevelopmental deficits, records indicate significant problems across multiple domains including emotion modulation, activity level, developmental progress, learning, and executive functioning (e.g., planning, initiating, organizing, and sequencing behavior; attention; inhibition; socialization; judgment; and abstract thinking).

7. The next step in the sequential diagnosis of FASD is analysis of expert information pertaining to actual brain damage (e.g., MRI or SPECT scan reports, neuropsychological evaluation reports). I estimate that this phase of my analysis could be accomplished for no more than 15 hours, which would include a full diagnostic report. My hourly rate for conducting such an analysis is $250. Thus, my fee for analyzing the data to determine whether evidence from a brain scan and/or neuropsychological testing support an FASD diagnosis would not exceed $3750.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed in King County, Washington, on December 4, 2006.

[signature]

Natalie Novick Brown, Ph.D.

P48-0005

References

Bookstein, F.L., Sampson, P.D., Streissguth, A.P., & Connor, P.D. (2001). Geometric morphometrics of corpus callosum and sub-cortical structures in the fetal-alcohol-affected brain. *Teratology, 64,* 4-32.

Bookstein, F.L., Streissguth, A.P., Sampson, P.D., Connor, P.D., & Barr, H.M. (2002a). Corpus callosum shape and neuropsychological deficits in adult males with heavy fetal alcohol exposure. *NeuroImage, 15,* 233-251.

Bookstein, F.L., Sampson, P.D., Connor, P.D., & Streissguth, A.P. (2002b). Midline corpus callosum is a neuroanatomical focus of fetal alcohol damage. *The Anatomical Record, 269,* 162-174.

Connor, P.D., Sampson, P.D., Bookstein, F.L., Barr, H.M., & Streissguth, A.P. (2000). Direct and indirect effects of prenatal alcohol damage on executive function. *Developmental Neuropsychology, 18,* 331-354.



Appellate Case: 15-3160 Page: 102 Date Filed: 02/29/2016 Entry ID: 4372476

# EXHIBIT 32

MEDLAB 1606 N 7th St., Terre Haute, IN 47804 PATH

Accession Number: NM10-2349 Patient Name: NELSON, KEITH

Requesting: WILLIAM (ERIC) WILSON

Location: UH Diagnostic Testing
ADM

Age: 35 Y, M
MR#: U386756
Admission #: U20725388
Chart #: 383637

DOB: 11/23/1974
Registration Date: 09/24/2010
Scan Performed Date: 09/24/2010
Reported Date: 09/27/2010

# NUCLEAR MEDICINE REPORT

**ADDITIONAL COPIES:** NAPHCARE

**RADIONUCLIDE:** F-18 FDG (IV) Rx: 446668
**DOSE:** 14.9 mCi

**PROCEDURE:** PET BRAIN METAB. IMAGING

## CONCLUSION:

**THERE ARE MULTIPLE PATCHY AREAS OF DECREASED ACTIVITY. THIS PATTERN HAS AN EXTENSIVE DIFFERENTIAL DIAGNOSIS, INCLUDING DRUG ABUSE, HIV/AIDS, VASCULAR DISEASE, AUTOIMMUNE DISORDERS, METABOLIC ABNORMALITIES, WITH TRAUMATIC BRAIN INJURY POSSIBLE, BUT CERTAINLY NOT DEFINITIVELY IDENTIFIED.**

**BJM/luemi**

**CPT CODE: 78608, A9552**

Electronically signed by **BETTY JO MILLS, MD. 800.423.8977 x262**

## CLINICAL HISTORY:

This is a 35-year-old gentleman resident at the Federal Penitentiary. The request reads rule out TBI. No other information is given.



CLERK U.S.DISTRICT COURT
Exhibits:
P 56
Case No. 4:04-CV-08005-FJG

MEDLAB 1606 N 7th St., Terre Haute, IN 47804 PATH

Accession Number: **NM10-2349** Patient Name: **NELSON, KEITH**

**FINDINGS:**

At 30 minutes following intravenous injection of tracer, images were obtained of the brain and reviewed in coronal, sagittal, and transaxial planes. Three dimensional images were also reviewed. No previous such study is available for comparison.

Today's images show relative decrease posteriorly compared to anteriorly. This is somewhat more prominent on the right than the left. There appears to be focal areas of thinning bilaterally at the postero-inferior portion of the frontal lobe, just above the Sylvian fissures bilaterally. There appears to be thinning at the bilateral medial temporal lobes as well. Multiple patchy areas of decrease are seen throughout the cerebral cortex.

Deep nuclei are seen, although there appears to be relative decrease at the right sided caudate and putamen and the left sided thalamus.

EXHIBIT 33

# UNION HOSPITAL

1606 N. 7th Street
Terre Haute, Indiana 47804

**Patient Name:**
NELSON, KEITH

**Hospital:** 20725388 -O
**Med Rec#:** 386756
**Room#:**

**DOB:** 11/23/1974
**SEX:** M

**Age:** 35Y
**Race:** W

**Adm Dr.:** WILSON, WILLIAM ERIC
**Atn Dr.:** WILSON, WILLIAM ERIC
**Ref Dr:** NAPHCARE,
**DICTATING DOCTOR:** BERKEY, M.D., AARON J
**ORDERING DOCTOR:** WILSON, WILLIAM ERIC
**CC:** WILSON, WILLIAM ERIC

**Adm Date:** Sep 24 2010 8:19AM
**Dis Date:**

CPT4 for Procedure: 70551 **mr brain w/stem w/o contrast**

## UH MRI RESULT

**REASON FOR EXAM:** 70551-MR BRAIN W/STEM W/O CONT
/78608 PET SCAN--R/O TBI

Comments: -
RMS#: 90001 ACCESSION #: 7620718 INV: 3948115
**PROCEDURE:**
0011 MR BRAIN W/STEM W/O CONTRAST 09/24/2010 10:13

INDICATIONS: \

FINDINGS: Multiplanar images of the brain were performed without contrast.

Sagital T-1 weighted images show satisfactory midline structures.

T2 axial and coronal images reveal a grossly unremarkable posterior fossa

The orbits and intracranial flow voids appear unremarkable.

Flair images reveal no abnormal signal.

Diffusion weighted images show no increased restrictive diffusion to suggest acute infarct.

IMPRESSION: Negative

*****ELECTRONICALLY SIGNED BY*****



CLERK U.S.DISTRICT COURT
Exhibits:
**P** 57
Case No. 4:04-CV-08005-FJG

# EXHIBIT 34

Penn Medicine
University of Pennsylvania School of Medicine

P58-0001
Neuropsychiatry Section
Ruben C. Gur, PhD
*Professor, Departments of Psychiatry, Neurology, and Radiology*
*Director, Brain Behavior Laboratory*

PATIENT'S NAME: Keith Nelson
DATE OF BIRTH: 11/23/1974
DATE OF REPORT: 4/21/2011
INTEGRATION BY: Ruben C. Gur, PhD
REFERRED BY: David A. Ruhnke, Attorney At Law

## RE: NEUROBEHAVIORAL ASSESSMENT OF MR. NELSON

## Background

Mr. Nelson was referred for a comprehensive neurobehavioral assessment. To this end the following studies were performed on Mr. Nelson, have been reviewed by me and will be summarized in this report: quantitative analysis of behavioral findings ("behavioral imaging"), magnetic resonance imaging (MRI) and positron emission tomography (PET).

## QUANTITATIVE ANALYSIS OF BEHAVIORAL FINDINGS

We have applied the "Behavioral Imaging" algorithm[1] to the results of the neuropsychological evaluations performed by Michael Gelbort, PhD on October 5, 2005 and by Daniel Martell on September 9, 2010. This procedure can help to further establish the localization of brain damage based on the neuropsychological test scores. The process for this schematic representation of clinical data has been clinically reliable and stable in defining and localizing affected areas of neurological impairment. The image is a true topographic display of the neuropsychological data in reference to the dysfunctional areas and severity of impairment implicated by the performance.




**Figure 1.** Behavioral image of Mr. Nelson's brain

The algorithm has produced the BI shown in **Figure 1**. The image depicts three views of Mr. Nelson's brain from the left (top left panel),

[1] Gur RC, Trivedi SS, Saykin AJ, Gur RE. "Behavioral imaging" - a procedure for analysis and display of neuropsychological test scores: I. Construction of algorithm and initial clinical evaluation. Neuropsychiatry, Neuropsychology and Behavioral Neurology, 1988, 1, 53-60; Gur RC, Saykin AJ, Blonder LX, Gur RE. "Behavioral imaging": II. Application of the quantitative algorithm to hypothesis testing in a population of hemiparkinsonian patients. Neuropsychiatry, Neuropsychology and Behavioral Neurology, 1988, 1, 87-96; Gur RC, Saykin AJ, Benton A, Kaplan E, Levin H, Kester DB, Gur RE. "Behavioral imaging": III. Inter-rater agreement and reliability of weightings. Neuropsychiatry, Neuropsychology, and Behavioral Neurology, 1990, 3, 113-124; Blonder LX, Gur RE, Gur RC, Saykin AJ, Hurtig HI. "Neuropsychological functioning in hemiparkinsonism." Brain and Cognition, 1989, 9, 177-190.

CLERK U.S.DISTRICT COURT
Exhibits:
P 58
Case No. 4:04-CV-08005-FJG

10th Floor Gates Pavilion | 3400 Spruce Street | Philadelphia, PA 19104 | 215-615-3604 | Fax: 215-662-7903 | gur@upenn.edu

Appellate Case: 15-3160 Page: 109 Date Filed: 02/29/2016 Entry ID: 4372476

the right (lower left panel) and the top (right panel, with the front of the brain oriented toward the top of the panel). The scale in the lower right of the image represents functional capacity relative to the most intact ability. It is expressed as deviations away from normal regional variability, with the result that the behavioral image of a normal, intact brain would produce a fairly uniform orange-pink color.

As can be seen in the behavioral image, Mr. Nelson's left hemisphere is impaired relative to his right hemisphere. The locus of impairment is centered on the inferior aspect of the left frontal lobe and extends inferiorly and posteriorly to the left temporal and parietal lobes. The occipital lobe appears relatively spared on the left side, but it should be noted that the neuropsychological tests upon which the BI is based are not specifically sensitive to occipital lobe damage. These tests are likewise insensitive to subcortical damage, including limbic and some striatal functioning

## Results of Magnetic Resonance Imaging (MRI): Volumetric structural analysis

MRI of the brain was performed on Mr. Nelson at Union Hospital (Terre Haute, IN) on September 24, 2010. These images were examined by Christos Davatzikos, PhD via delineation of 92 regions of interest (ROI) assisted by a semi-automated template-warping algorithm.[2] **(Figure 2)**




**Figure 2. Volumetric analysis of Mr. Nelson's MRI. Volumes are expressed as z-scores (standard deviations from the mean) relative to healthy individuals.**

The volume of Mr. Nelson's brain is generally in the average range, although left frontal and occipital lobes seem relatively reduced in volume. Most regional volumes are also in the normal range, although abnormalities in the relative volume of several brain structures were observed. Most notable is a marked reduction in left-sided frontal and occipital white matter (nearly 2 standard deviations [SD] below normal for the former and 3 SDs below normal for the latter). Additional areas of reduced volume on the left side include inferior frontal, lateral frontal-orbital, superior occipital, inferior occipital regions and the amygdala (all more than one SD below

[2] Shen, D. and C. Davatzikos, "HAMMER: Hierarchical attribute matching mechanism for elastic registration". IEEE Trans on Med. Imaging, 2002. 21(11): p. 1421-1439.



Appellate Case: 15-3160 Page: 110 Date Filed: 02/29/2016 Entry ID: 4372476

normal). The cuneus and thalamus show reduced volume bilaterally.

## Results of Positron Emission Tomography (PET)

The PET study was performed at UH Diagnostic Testing (Terre Haute, IN) on September 24, 2010. The study examined the regional distribution of cerebral glucose metabolic activity using fluorine-18 labeled deoxyglucose (FDG). The technical quality of the scan was excellent. The study was read clinically by Dr. Andrew Newberg: "There is increased metabolic activity in the anterior cingulate and parts of the parietal lobe. The areas of greatest decrease in metabolic activity are the limbic structures such as the amygdala and hippocampus, the midbrain/brainstem, and white matter areas." (Dr. Newberg's report of October 15, 2010). These PET scans are displayed in **Figure 3** below.



**Figure 3.** The PET images of Mr. Nelson's brain

The PET study was subjected to a quantitative analysis using a standard regions of interest (ROI) approach.[3] The quantitative analysis of count rates relative to whole brain **(Figure 4, left panel)** support Dr. Newberg's clinical reading and point to more specific sets of regions that show abnormal glucose uptake. The analysis indicated relative *decreases* in 11 regions (see key for region abbreviations at bottom of document): PH, HI, AM, CG, CP, C1, CN, LM, LL, MI and PO. Ten (10) areas show relative *increase* in metabolism: SF, DM, MF, IF, SM, SP, SG, IN, CA and HY. The laterality index **(Figure 4, right panel)** showed abnormal asymmetries in 15 regions, with *higher* than normal relative left activity in OL, LM and PO and *lower* than normal left activity in most regions including IF, SM, OM, OT, ST, HI AM, IN, CA, C1, TH and HY.

The pattern is of hyper-activation in cortical regions, especially frontal and parietal areas, as well as insula and anterior cingulate gyrus, and abnormally low activity in the limbic areas including hippocampus and amygdala, as well as posterior cingulate gyrus, anterior corpus callosum, and striatal and midbrain regions. Notably, hypothalamus is hyper-metabolic. The laterality measure indicates relatively lower left hemispheric activity in 12 of 15 regions that show significantly

[3] Gur RC, Mozley LH, Mozley PD, Resnick SM, Karp JS, Alavi A, Arnold SE, and Gur RE. (1995). Sex differences in regional cerebral glucose metabolism during a resting state. *Science*. *267*:528-531.



Appellate Case: 15-3160 Page: 111 Date Filed: 02/29/2016 Entry ID: 4372476

abnormal laterality, and this is consistent with greater left hemispheric dysfunction.




**Figure 4. PET region-whole brain ratio (R/WB, left panel) and laterality (right panel) results for MEAN+SD of cerebral metabolic rates for glucose (CMRgl) in healthy people and Mr. Keith Nelson**

## Summary and Conclusions

Results of neuropsychological testing as well as structural and functional imaging of Mr. Nelson's brain converge to show abnormalities indicating brain damage. These abnormalities are in regions that are very important for regulating behavior. Specifically, the greater damage in the left hemisphere would indicate diminished capacity for verbal-analytic processing. The structural abnormalities observed in the frontal regions of Mr. Nelson's brain would indicate diminished executive functions such as abstraction and mental flexibility, planning, moral judgment, and emotion regulation, moderating limbic arousal and impulse control. The abnormally low metabolic activity in the corpus callosum would lead to deficits in integrating verbal reasoning and analytic processing modes of the left hemisphere with intuitive, integrative and affect-related processing modes of the right hemisphere. Such white matter dysfunction would impair speed of processing. Striking white matter structural damage is also seen in Mr. Nelson's frontal and occipital lobes. This damage would reduce the effective connectivity among brain regions involved in processing sensory information with those required for decision-making and consideration of societal demands.

A most relevant finding is the tissue loss and severely reduced metabolism in the amygdala and hippocampus, combined with tissue loss and hyper-metabolism in cortical regions. Abnormally high metabolism in cortical fronto-parietal regions most likely indicates compensatory hyper-vigilance of the "default brain" state. Reduced activity in limbic regions is often seen in seizure disorders, and could result in "kindling" or sudden hyper-excitability. Abnormally low volume and metabolism in the temporo-limbic system, including amygdala, would lead to severe emotional dysregulation. A damaged amygdala will misinterpret danger signals and when excited it will issue false alarms that require intact frontal components of the limbic system. In Mr. Nelson's case, there is reduced volume in frontal regions and the cortex is already at a hyper-activated state. When Mr. Nelson's amygdala becomes activated, his frontal lobe would be unable to exercise control as a normal one would, because his frontal lobe is not only damaged but is already operating at full capacity in its hyper-vigilant state. The situation is analogous to a car with weak brakes that are already engaged when it begins to race. The frontal lobe is unable to do its job and act as the brakes on the primitive emotional impulses emanating from the amygdala when the limbic system reaches its activated stage (the Klüver-Bucy syndrome).

The abnormalities in basal ganglia could further impair rational performance under stress because they supply the neurotransmitter dopamine, which is necessary for intact frontal lobe functioning. The resulting behavior of someone with such brain damage would be disorganized, erratic and failing to adjust to situational demands. Notably, such individuals do respond well to structured



Appellate Case: 15-3160 Page: 112 Date Filed: 02/29/2016 Entry ID: 4372476

environments, where the complexity of the surrounding and need for decision-making is reduced.

The etiology of these abnormalities is difficult to determine and requires clinical evaluation and integration with history. Low volume and metabolic activity in white matter have been associated with fetal alcohol or solvent exposure, although the lateralized effects would be more consistent with traumatic brain injury that included both impact and rotational effects on midline structures.

Thank you for the opportunity to participate in Mr. Nelson's evaluation. While I am unable to offer a diagnosis without an interview and incorporation with history, the opinions I express with regard to the neuropsychological and neuroimaging findings meet standards of scientific certainty. Please let me know if you have questions or need further elaboration or analysis.

Sincerely,

Ruben C. Gur, PhD

Abbreviations in PET Figures:

SF = Superior Frontal; DL = Dorsal Prefrontal – Lateral; DM = Dorsal Prefrontal – Medial; MF = Mid–Frontal; IF = Inferior Frontal; SM = Sensorimotor; SP = Superior Parietal; SG = Supramarginal Gyrus; OL = Occipital cortex, Lateral; OM = Occipital cortex, Medial; LI = Lingual Gyrus; FG = Fusiform Gyrus; OT = Occipital Temporal; ST = Superior Temporal; MT = Mid–Temporal; IT = Inferior Temporal; TP = Temporal Pole; PH = Parahippocampal Gyrus; HI = Hippocampus; AM = Amygdala; IN = Insula; OF = Orbital Frontal; RG = Rectal Gyrus; CA = Cingulate Gyrus – Anterior; CG = Cingulate Gyrus - genu; CP = Cingulate Gyrus – Posterior; C1 = Corpus Callosum – Anterior; C2 = Corpus Callosum – Posterior; CN = Caudate Nucleus; LM = Lenticular – Medial [Globus Pallidus]; LL = Lenticular – Lateral [Putamen]; TH = Thalamus; HY=Hypothalamus; MI = Midbrain; PO = Pons; CE = Cerebellum.



Appellate Case: 15-3160 Page: 113 Date Filed: 02/29/2016 Entry ID: 4372476