No. 15-3160

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

---

Keith D. Nelson,

Appellant,

vs.

United States of America,

Appellees.

---

On Appeal from the United States District Court
District of Arizona
Case No. 4:04-8005-cv-W (FJG)

---

**APPELLANTS EXHIBITS**
**TO MOTION FOR ISSUANCE OF**
**CERTIFICATE OF APPEALABILITY**

**Exhibits 41-48**

---


*/s/Paula K. Harms*
Jon M. Sands
Federal Public Defender
Paula K. Harms
Assistant Federal Public Defender
Capital Habeas Unit
850 W. Adams Suite 201
Phoenix, Arizona 85007
602-382-2816 telephone
602-889-3960 facsimile

*/s/ David A. Ruhnke*
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
973-744-1000 telephone
973-746-1490 facsimile
dr@ruhnkeandbarrett.com

# EXHIBIT 41

CAROLYN CRAWFORD, M.D.
5616 SOUNDS AVENUE N
SEA ISLE CITY, NEW JERSEY 08243

November 5, 2012

Paula Harms, Esquire
Federal Public Defender
District of Arizona
Capital Habeas Unit
850 West Adams Street
Suite 201
Phoenix, AZ 85007-2730

RE: Keith D. Nelson

Dear Attorney Harms,

At your kind request I have reviewed the following records for the purpose of addressing mitigating evidence in the case of Keith Nelson:

1. Mental Health Evaluations by Dr. Michael Gelbort and Dr. Xavier Amador
2. Medical records for Keith Nelson (Baby Boy Nelson, Twin B) from the Children's Mercy Hospital (Volumes 1-3)
3. Delivery records for Nancy Nelson for birth of Keith and Kenneth at Providence St.
Margaret Health Center
4. Medical records from Providence St. Margaret Health Center for B.B. Nelson, Twin "B"
5. Medical records for Nancy Nelson from Dr. Pretz (Family practice obstetrician)
6. Report of neurobehavioral evaluation of Keith by Reuben Gur, PhD, dated 04/21/2011
7. Social history report of Jill Miller, 03/19/2012
8. MRI with Brain scan imaging performed 09/24/2010
9. PET scan performed 09/24/2010 at Union Hospital to assess metabolic imaging following I.V. tracer

PRENATAL HISTORY

Numerous conditions existed during Nancy Nelson's pregnancy with twins

CLERK U.S.DISTRICT COURT
Exhibits:
P 45
Case No. 4:04-CV-08005-FJG



Appellate Case: 15-3160 Page: 3 Date Filed: 02/29/2016 Entry ID: 4372476

Kenneth and
Keith. These included:

- Impaired Nutrition-Nancy Nelson lost weight during her pregnancy with Kenneth and Keith due to inadequate nutrition and the demands of a twin gestation
- Teen pregnancy
- Lack of prenatal care: Nancy Nelson was seen in the ER of Providence Hospital on 07/11/1974 because of suspected premature separation of the placenta. That is the only entry in the records submitted for review that documents care/evaluation during the pregnancy. Nancy was seen by Dr. Pretz on 5/28/74, but it is unclear from the records if any prenatal care was received during this visit.
- No prenatal iron or vitamins
- Untreated maternal hypothyroidism. This condition is known to be associated with preterm labor and preterm births, lower birth weight placental abruption and infants with lower IQ's
- Pregnancy occurred within 4- 6 weeks of the birth of her first infant (John). Nancy Nelson's nutritional status was impaired at the onset of her pregnancy with Kenneth and Keith because she had just given birth to John 4-6 weeks prior to becoming pregnant again.
- Mother suffered extensive physical abuse during the pregnancy. Two to three days before she went into premature labor, the mother reportedly suffered a particularly brutal beating, in which Kenneth Morse stomped her with his feet.
- Preterm labor and delivery. The twin gestation (undiagnosed) increased the risk of preterm labor and delivery and low birth weight

Keith Nelson was born at Providence Hospital (Kansas City, KS) on 11/23/1974 at 34 weeks gestation, weighing 4 lb 5 ounces, measuring 18 inches in length with a head circ of 12 ½ inches and was appropriate for gestational age. His Apgar scores were 7 at 1minute and 8 at 5 minutes, He was the second born of twins and was delivered from a complete breech presentation. He was cyanotic at birth requiring oxygen and he had a weak cry.

He was born to an 18 year old G2P, female who had just delivered her first baby 8 months previously. Nancy Nelson had nutritional issues during to her pregnancy with Keith and his brother and lost weight. She lived with Kenneth Morse during this pregnancy and also, at times, with her parents. She did not take vitamins and iron during this pregnancy and did not have prenatal care. The only reference to prenatal care was a 07/11/1974 visit to Providence ER for suspected premature separation of the placenta.

## LABOR AND DELIVERY

Nancy Nelson arrived at Providence Hospital on 11/23/1974 in labor and fully dilated at
05:45. Twin A was delivered at 06:04 and Twin B (Keith) was born at 06:06, 21minutes after arrival. He was admitted to the nursery where he was noted to



Appellate Case: 15-3160 Page: 4 Date Filed: 02/29/2016 Entry ID: 4372476

have a respiratory rate 60, Pulse = 185, T = 98.4. Both twins were born by complete breech extraction.

He was placed on oxygen at 3-4 Lby mask and was noted to have grunting, flaring and retractions which worsened and he was transferred to Children's Mercy Hospital (CMH) for treatment of his respiratory distress syndrome (RDS). His color had somewhat improved at the time that he was transferred to CMH when he was receiving continuous oxygen at 3 L/minute via mask. Discharge physical exam noted dusky color and irregular respirations. He had no congenital anomalies noted at the time of transfer. He did have glucose of 45 (borderline low). Repeat glucose checks were 45 and no intervention occurred.

COMMENT: Keith Nelson had several risk factors for compromised/impaired neurological development:

1. Risk of impaired/suboptimal nutrition including brain growth, due to:
   - Maternal weight loss
   - Second pregnancy beginning within 4-6 weeks after birth of first child
2. Teenage pregnancy is associated with both social and medical problems especially prematurity.
3. Twin B. It is generally accepted the second twin, especially when delivered vaginally is subjected to more asphyxia and hypoxia and tends to be sicker if premature. This was the case with Keith.
4. Respiratory distress syndrome (ROS) with hypoxia (cyanosis), premature infants with RDS have an increased risk of neurodevelopment problems related to alterations in cerebral blood flow from impaired auto regulation.
5. Premature birth at 34-36 weeks gestation. Ref. Clinics in Perinatology.
6. Reduced educational level of his mother (8th grade).
7. Clinical sepsis with lethargy, poor feeding, urine culture positive for E. Coli and jaundice.
8. Low birth weight.
9. Borderline hypoglycemia which, when combined with hypoxia, leads to global CNS insult at a higher level of glucose. This is usually a ssociated with damage resulting in his developmental delay and mild mental retardation, This is the most common sequelae of hypoglycemia.
10. Genetic predisposition to behavioral problems/mental illness and substance abuse.

KEITH NELSON: CHILDRENS MERCY HOSPITAL

At CMH Keith was treated for:

1. RDS-(premature lung disease). This required respiratory support with Nasal Continuous Positive Airway Pressure and up to 100% oxygen with up to +8 cm pressure. His condition was described as "fair" at the time of transfer. The transport team noted "severe" respiratory distress.
2. E. Coli Urinary Track Infection (UTI). On admission his blood, stool, umbilicus



Appellate Case: 15-3160 Page: 5 Date Filed: 02/29/2016 Entry ID: 4372476

and
throat cultures were "no growth". He had a +" E. Coli urine culture which was treated with Gentamicin based on a "+" suprapubic bladder tap. His blood and spinal fluid cultures showed no growth. He was lethargic at this time, The CSF glucose was normal (41) but the CSF protein was elevated (175) and there was an increased number of RBC's present. He had jaundice (Peak bili = 11.9) and received phototherapy. A subsequent urine culture had no growth.

An umbilical catheter was placed to monitor blood gases and he was placed on nasal CPAP to support his breathing. He had poor feeding initially and required I.V. Hyper-alimentation and weight gain was slow, He was discharged on 12/20/1974 at 27 days of age, weighing 2.26 Kg.

Keith was not consistently followed by Welfare and Protective Services after discharge because there had been difficulty in contacting his mother to pick him up at discharge which resulted in a social service consultation. As of 12/18/1974 there had been no contact from Keith's mother (28 days). Apparently a letter was sent to Nancy Wilson but it was sent to the wrong address (14 Splitlog, Kansas City, KS rather than 1014 Splitlog) and was returned. Subsequently, Keith was lost to follow up.

At the time of his discharge, Keith's weight had dropped from the 25-50th percentile at birth to the <10th percentile as did his length. His head circumference, however, increased from the 25th percentile to the 25-50th percentile, a typical pattern with growth restriction that occurs during the third trimester.

EARLY CHILDHOOD

Keith Nelson had a difficult and abusive childhood which included neglect, physical and emotional abuse, especially by his father and by babysitters. He was also reportedly sexually abused.

Mental illness is prevalent in Keith's immediate family, a factor that increased the likelihood that he would also experience mental illness.

Two of his brothers have been diagnosed with Schizophrenia including one brother who is in jail in Texas serving a 30 year sentence for murder.

Keith was developmentally delayed as a child and did not receive therapeutic intervention, protection or the necessary guidance from social, medical or family services.

COMMENT: As a juvenile, Keith reportedly had a lack of self control and uninhibited behavior which is seen in individuals with “Frontal Lobe Syndrome” where lack of impulse control is a specific feature. Keith displayed such lack of impulse control on numerous occasions prior to Dr. Gur's evaluation and


Appellate Case: 15-3160 Page: 6 Date Filed: 02/29/2016 Entry ID: 4372476

subsequently culminating in the event of when he kidnapped, sexually abused and murdered a young girl.

DISCUSSION

Multiple factors that have had an impact on Keith Nelson's developmental delay, psychosocial dysfunction and mental impairment began in utero and were additive during his neonatal period, early childhood, adolescence, early adulthood and adulthood.

Among other problems Keith suffers from an important type of cognitive dysfunction termed: EXECUTIVE DYSFUNCTION. This has also been termed FRONTAL LOBE SYNDROME because the frontal lobe is the part of the brain responsible for executive function.

Executive function is the ability to and organize activities, to control impulses, to assess and evaluate progress during a task and to adapt to a changing situation. Testing by Dr. Gelbort showed frontal lobe disturbance/dysfunction affecting everyday functioning and reasoning capacities, as detailed in his 10/15/2008 report.

IMPACT OF PREMATURITY ON EXECUTIVE FUNCTION

Testing of individuals born preterm vs. those born at term has revealed problems with information processing speed, mental flexibility, working memory, sustained attention and verbal fluency that collectively are referred to as execution dysfunction.

These problems with executive dysfunction persisted throughout childhood and continue into adolescence and adulthood. Many tests that demonstrate the circuit dysfunction in preterm Infants also correlate with maternal education. (See Ref: Clinics in Perinatology)

Executive dysfunction in preterm individuals has also been associated with abnormalities in neuroimaging. NOTE: Keith Nelson has ABNORMAL FRONTAL LOBE FINDINGS ON NEUROIMAGING.

Keith Nelson and his twin Kenneth Nelson were born prematurely at 34-36 weeks gestation. While many factors may contribute to premature births, among the well known ones are the following, all of which were present with Keith:

- Teenage Mother
- Multiple gestation
- Low socioeconomic status
- Maternal Nutritional impairment (weight loss) (weight 232 ½ lbs on 02/08/1974 decreasing to 200 pounds on 04/22/1974 and 200 ½ pounds on 05/28/1974)
- Short interval between pregnancies (Johnny born 02/08/1974, twins born 11/23/1974)

- Maternal Stress - Nancy Nelson had multiple and significant stressors during her pregnancy with Keith and Kenneth. She was an unwed teenage mother with a new infant when she became pregnant again. She was abused and had 5 children in 4 years
- Probable premature separation of the placenta according to a 07/11/1974 ER visit. Abruption placenta has a known association with trauma and often results in preterm birth and oxygen deprivation.

ABNORMAL NEONATAL PERIOD

Keith was a sick newborn who required transfer to Mercy Children's Hospital for Intensive Neonatal Care. His fraternal twin, Kenneth did not require neonatal intensive care. Keith had breathing problems that resulted in cyanosis (decreased oxygen) and required supplemental oxygen and respiratory support from Nasal Continuous Positive Airway Pressure. He had borderline low blood sugar, jaundice requiring phototherapy, lethargy, poor feeding and was treated for an E. Coli urinary tract infection. There was blood in his spinal fluid, indicating that he may have had a small brain bleed.

His mother never visited him after her discharge which impaired maternal infant bonding. Social and protective services were activated because of his at risk social situation and risks associated with his prematurity.

ABNORMAL EARLY CHILDHOOD

Keith was abused by his father and subsequently by his older brother, Johnny. He often suffered head trauma. His mother was abused and depressed and frequently moved her family to escape Kenneth Morse's abuse. She began to abuse alcohol and neglected her children, leaving them to fend for themselves. They resorted to stealing, which was started by Johnny but also included Keith. Keith was also reportedly sexually abused.

Keith's school experiences were often negative. He was teased and tormented by his peers because he often came to school dirty and smelling of urine. He had no clean clothes to change into after he wet his bed and no ability to bathe,

ADOLESENCE

He did not do well in school and had to repeat several grades. He displayed early evidence of learning impairments and psychological problems. At age 13 he was in the 5th grade when he should have been in the 7th or 8th grade.

Special neurological imaging studies were performed in an effort to define structural and/or metabolic cranial abnormalities.

MRI WITHOUT CONTRAST

The MRI report of the study done on 09/24/2010 did not define any


Appellate Case: 15-3160 Page: 8 Date Filed: 02/29/2016 Entry ID: 4372476

structural abnormality of Keith's brain or brain stem per the standard neuroradiological imaging report from Union Hospital.

PET SCAN METABOLIC IMAGING

The PET scan showed multiple patchy areas of decreased activity. There was relatively decreased activity posteriorly compared to anteriorly and somewhat more prominent on the right than the left. There were focal areas of thinning bilaterally at the posterior-inferior portion of the frontal lobe, just above the sylvian fissures bilaterally. There was also thinning bilaterally at the medial temporal lobes. Multiple patchy areas of decreased function were seen throughout the cerebral cortex.

The deep nuclei showed relatively decreased function it the right caudate and putamen and the left thalamus.

Dr. Ruben Gur (PhD) utilized the imaging findings from the MRI (structure) and PET Scan (function) to prepare a comprehensive neurobehavioral assessment for Keith Nelson. To this end he also utilized the quantitative analysis of behavioral findings based on the results of the neuropsychological evaluations performed by Michael Gelbort, PhD on 10/05/2005 and Daniel Martell on 09/09/2010. This technique allowed Dr. Gur to further establish the localization of brain damage based on Keith Nelson's neuropsychological test scores.

Dr. Gur was then able to construct a "behavioral images" of Keith Nelson's brain, which were included in this report of 04/21/2011. He noted that the neuropsychological tests used were not specifically sensitive to occipital lobe and sub cortical-damage which includes the limbic and some straital functioning.

MRI: VOLUMETRIC STRUCTURAL ANALYSIS

Christos Davatzikos examined the MRI images and delineated 92 regions of interest (ROI) assisted by a semi-automated template warping algorithm as described by Shen and Davatzokos. (IEEE Trans on Med. Imaging, 2002, 21(11) p. 1421-1439.)

- Total brain volume in the average range but:
- Left frontal and occipital lobes relatively reduced in volume
- Marked reduction in left-sided frontal and occipital white m8tter: nearly 2 standard deviations below normal for the frontal lobe and 3 SO's below normal for the occipital lobes
- Additional left-sided areas of reduced volume included:

1. Inferior frontal
2. Lateral frontal
3. Superior-occipital
4. Inferior occipital
5. Inferior occipital
6. Amygdal



Appellate Case: 15-3160 Page: 9 Date Filed: 02/29/2016 Entry ID: 4372476

The PET study showed abnormal metabolic activity in multiple patchy areas of decreased function throughout the cortex surrounding the frontal lobes. There were focal areas of thinning bilaterally at the posterior-inferior portion of the frontal lobes.

Keith Nelson's amygdale and hippocampus had severely reduced metabolic function, showed abnormal and reduced volume (atrophy) resulting in abnormal function. The hippocampus is very sensitive to lack of oxygen in the newborn period when the baby's brain is still developing and fragile. Keith Nelson's newborn history indicated that he had episodes of inadequate oxygenation and was cyanotic at times due to respiratory distress. He was a sick premature infant compared to his twin brother.

The abnormal function and atrophy involving his frontal lobes resulted in his inability to control his behavior and to organize his efforts, thoughts and activities.

Finally, frontal lobe function has been shown to be sub-optimal in premature infants compared to term infants. Keith Nelson was born prematurely and was sick with respiratory distress, two factors that have been known to lead to frontal lobe dysfunction. Additionally he had prolonged periods of slightly low blood glucose levels that had been associated with brain dysfunction.

CONCLUSION

It is my opinion, with a reasonable degree of medical certainly, that a plethora of adverse events occurred to Keith Nelson beginning in utero and extending through adulthood that resulted in brain injury, especially to his frontal lobes, These insults also acted upon the substrate of a brain that was genetically vulnerable and predisposed to mental illness.

As a result of injury to his frontal lobes as evidenced by brain neuro-imaging abnormalities, Keith developed Frontal Lobe Syndrome with impaired inhibition, ultimately resulting in a horrific crime of kidnapping and murder. There are multiple mitigating factors that have led to his brain injury and Frontal Lobe Syndrome. These should be considered as modifiers of the death sentence pronounced upon Keith Nelson.

Thank you for the opportunity to review these records and to submit my opinions.

Sincerely,

Carolyn S. Crawford, M.D.

Carolyn s. Crawford, M.D.



Appellate Case: 15-3160 Page: 10 Date Filed: 02/29/2016 Entry ID: 4372476

# EXHIBIT 42

# Bureau of Prisons
# Health Services
# Clinical Encounter

Inmate Name: NELSON, KEITH DWAYNE
Date of Birth: 11/23/1974
Encounter Date: 05/06/2011 12:52
Sex: M Race: WHITE
Provider: Jones, Roger MD
Reg #: 07440-031
Facility: THP
Unit: X02

Chronic Care Visit (Not Assigned) encounter performed at Health Services.

**SUBJECTIVE:**

**COMPLAINT 1** **Provider:** Jones, Roger MD

**Chief Complaint:** Skin Problem

**Subjective:** CCC--Inmates a vague hx about an uncertain condition to his back. No specific lesions reported. Inmate denies any skin complaints of any time. Reports that a skin biopsy was requested for medicolegal reasons.
ROS otherwise negative.

**Pain Location:**

**Pain Scale:** 0

**Pain Qualities:**

**History of Trauma:**

**Onset:**

**Duration:**

**Exacerbating Factors:**

**Relieving Factors:**

**Comments:**

**OBJECTIVE:**

**Pulse:**

| Date | Time | Rate Per Minute | Location | Rhythm | Provider |
|---|---|---|---|---|---|
| 05/06/2011 | 12:54 THX | 94 | | | Jones, Roger MD |

**Blood Pressure:**

| Date | Time | Value | Location | Position | Cuff Size | Provider |
|---|---|---|---|---|---|---|
| 05/06/2011 | 12:54 THX | 126/84 | | | | Jones, Roger MD |

**Height:**

| Date | Time | Inches | Cm | Provider |
|---|---|---|---|---|
| 05/06/2011 | 12:54 THX | 68.0 | 172.7 | Jones, Roger MD |

**Weight:**

| Date | Time | Lbs | Kg | Waist Circum. | Provider |
|---|---|---|---|---|---|
| 05/06/2011 | 12:54 THX | 308.0 | 139.7 | | Jones, Roger MD |

**Exam:**

**General**

**Appearance/Nutrition**

Yes: Appears Well, NAD, Alert and Oriented x 3, Obese

**Affect**

Yes: Pleasant, Cooperative

**Skin**

**General**

Yes: Dry, Warmth

CLERK U.S.DISTRICT COURT
Exhibits:
P 64
Case No. 4:04-CV-08005-FJG

Inmate Name: NELSON, KEITH DWAYNE
Date of Birth: 11/23/1974
Encounter Date: 05/06/2011 12:52

Sex: M Race: WHITE
Provider: Jones, Roger MD

Reg #: 07440-031
Facility: THP
Unit: X02

**Exam:**

no skin lesions anywhere on body except for mild dyshydrotic eczema to bilateral hands. Inmate has numerous freckles but no areas os suspicious pigmentation problems. Skin is smooth. No sign s of trauma. A skin biopsy is not indicated.

**Head**

**General**

Yes: Symmetry of Motor Function, Atraumatic/Normocephalic

**Eyes**

**General**

Yes: PERRLA, Extraocular Movements Intact

**Mouth**

normal ENT exam

**Neck**

**General**

Yes: Supple, Symmetric

**Thyroid**

No: Diffuse Enlargement, Multinodular, Nodule, Tenderness

**Musculoskeletal**

Yes: Full ROM

**Vascular**

Yes: Carotid Pulse Normal

No: Jugular Venous Distension, Carotid Bruits

**Pulmonary**

**Observation/Inspection**

Yes: Normal

**Auscultation**

Yes: Clear to Auscultation Bilaterally

**Cardiovascular**

**Observation**

Yes: Normal Rate, Regular Rhythm

**Auscultation**

Yes: Regular Rate and Rhythm (RRR), Normal S1 and S2

No: M/R/G

**Peripheral Vascular**

**General**

No: Varicosities, Pitting Edema

**Abdomen**

**Inspection**

Yes: Normal, Obese

**Auscultation**

Yes: Normo-Active Bowel Sounds

**Palpation**

Yes: Soft, Non-tender on Palpation

No: Guarding

**Neurologic**

**Cranial Nerves (CN)**

Yes: CN 2-12 Intact Grossly

**Mental Health**



Appellate Case: 15-3160 Page: 13 Date Filed: 02/29/2016 Entry ID: 4372476

Inmate Name: NELSON, KEITH DWAYNE
Date of Birth: 11/23/1974
Encounter Date: 05/06/2011 12:52
Sex: M Race: WHITE
Provider: Jones, Roger MD
Reg #: 07440-031
Facility: THP
Unit: X02

**Exam:**

**Affect**

Yes: Normal

**ASSESSMENT:**

| Description | ICD9 | Status | Status Date | Progress | Type |
|---|---|---|---|---|---|
| Morbid obesity | 278.01 | Current | 02/18/2009 | Not Improved/Same | Chronic |
| Dyshidrosis | 705.81 | Current | 05/06/2011 | Not Assessed | Temporary/Acute |

**PLAN:**

**New Laboratory Requests:**

| Details | Frequency | End Date | Due Date | Priority |
|---|---|---|---|---|
| Profile tests-General-Lipid Profile<br>Profile tests-General-Urinalysis<br>Profile tests-General-Comprehensive Metabolic Profile (CMP)<br>Blood tests-o-p-Prolactin<br>Blood tests-t-Testosterone group, free/total<br>Blood tests-t-Thyroid Stimulating Hormone (TSH)<br>Profile tests-General-CBC (Complete Blood Count) | One Time | | 05/17/2011 00:00 | Routine |

**Disposition:**

Follow-up at Sick Call as Needed

Follow-up at Chronic Care Clinic as Needed

**Other:**

Skin--mild dysdrosis bilateral hands--no skin lesions noted to back. Morbid obesity--check labs--body habitus is concerning for hypogonadism.

**Patient Education Topics:**

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 05/06/2011 | Counseling | Plan of Care | Jones, Roger | Verbalizes Understanding |

**Copay Required:** No **Cosign Required:** Yes
**Telephone/Verbal Order:** No

Completed by Jones, Roger MD on 05/06/2011 13:05
Requested to be cosigned by Harvey, Paul MD, RMD.
Cosign documentation will be displayed on the following page.
Requested to be reviewed by Jastillano, Alex MLP.
Review documentation will be displayed on the following page.



Appellate Case: 15-3160 Page: 14 Date Filed: 02/29/2016 Entry ID: 4372476

# Bureau of Prisons
# Health Services
# Cosign/Review

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | NELSON, KEITH DWAYNE | | | Reg #: | 07440-031 |
| Date of Birth: | 11/23/1974 | Sex: | M | Race: | WHITE |
| Encounter Date: | 05/06/2011 12:52 | Provider: | Jones, Roger MD | Facility: | THP |

**Cosigned by Harvey, Paul MD, RMD on 05/06/2011 13:37.**



Appellate Case: 15-3160 Page: 15 Date Filed: 02/29/2016 Entry ID: 4372476

# Bureau of Prisons
# Health Services
# Cosign/Review

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | NELSON, KEITH DWAYNE | | | Reg #: | 07440-031 |
| Date of Birth: | 11/23/1974 | Sex: | M | Race: | WHITE |
| Encounter Date: | 05/06/2011 12:52 | Provider: | Jones, Roger MD | Facility: | THP |

**Reviewed by Jastillano, Alex MLP on 05/16/2011 08:25.**

# Bureau of Prisons
# Health Services
# Clinical Encounter - Administrative Note

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | NELSON, KEITH DWAYNE | | | Reg #: | 07440-031 |
| Date of Birth: | 11/23/1974 | Sex: M | Race: WHITE | Facility: | THP |
| Note Date: | 05/04/2011 10:46 | Provider: | Ndife, Z. MLP | Unit: | X02 |

Medication Renewal/Review encounter performed at Health Services.

**Administrative Notes:**

**ADMINISTRATIVE NOTE 1** **Provider:** Ndife, Z. MLP

NF request for Pramosone 2.5 lotion disapproved. Recommended:
Combination product of anesthetic and corticosteroid. recommend trial with formulary alternatives.

**New Medication Orders:**

| Rx# | Medication | Order Date | Prescriber Order |
|---|---|---|---|
| | Hydrocortisone Cream 1% | 05/04/2011 10:46 | apply thin layer Topically each morning x 30 day(s) -- mixed with the Lidocaine cream |
| | **Indication:** Oth symp involving skin and integumentary tissue | | |
| | Lidocaine HCl External Cream 3 % | 05/04/2011 10:46 | apply to affected area Topically each morning x 30 day(s) -- mixed with the hydrocortisone cream |
| | **Indication:** Oth symp involving skin and integumentary tissue | | |

**Copay Required:** No **Cosign Required:** No
**Telephone/Verbal Order:** No

Completed by Ndife, Z. MLP on 05/04/2011 10:53



Appellate Case: 15-3160 Page: 17 Date Filed: 02/29/2016 Entry ID: 4372476

# Bureau of Prisons
# Health Services
# Clinical Encounter - Administrative Note

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | NELSON, KEITH DWAYNE | | | Reg #: | 07440-031 |
| Date of Birth: | 11/23/1974 | Sex: | M Race: WHITE | Facility: | THP |
| Note Date: | 04/29/2011 12:49 | Provider: | Ndife, Z. MLP | Unit: | X02 |

Consultation Review encounter performed at Health Services.

**Administrative Notes:**

**ADMINISTRATIVE NOTE 1** **Provider:** Ndife, Z. MLP

Schedule Tele derm consult to evaluate inmate for
Notalgia Paresthetica on his back.
Dermatology evaluation consult report:

"Agree with your findings and Notalgia would be a possibility. Also rule out Macular amyloid via punch biopsy and Congo red special stain. He has significant sun damage(extensive lentigos), so would avoid future sun exposure to his back.
Differential Diagnosis.

Recommendations Try Pramasone lotion or a steroid cream with 0.5% menthol or Pramasone 2.5% cream in AM and Zonolon(5% doxipin) for one month. If positive for amyloid, use a strong topical steroid."

Will submit prescription and schedule with Dr. Jones to evaluate for biopsy.

**ASSESSMENTS:**

| Description | ICD9 | Status | Status Date | Progress | Type |
|---|---|---|---|---|---|
| Oth symp involving skin and integumentary tissue | 782.9 | Current | 04/29/2011 | Not Assessed | Chronic |

**Health Problem Comments:**

Possible Notalgia Paresthetica
Possible Macular amyloid
Extensive lentigos

**New Medication Orders:**

| Rx# | Medication | Order Date | Prescriber Order |
|---|---|---|---|
| | Hydrocortisone/Pramoxine 60 GM Lotion 2.5-1% | 04/29/2011 12:49 | apply thin layer Topically each morning x 30 day(s) |

**Indication:** Oth symp involving skin and integumentary tissue

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | NELSON, KEITH DWAYNE | | | Reg #: | 07440-031 |
| Date of Birth: | 11/23/1974 | Sex: M | Race: WHITE | Facility: | THP |
| Note Date: | 04/29/2011 12:49 | Provider: | Ndife, Z. MLP | Unit: | X02 |

**New Medication Orders:**

| **Rx#** | **Medication** | **Order Date** | **Prescriber Order** |
|---|---|---|---|
| | Doxepin Cream 5% | 04/29/2011 12:49 | apply thin layer Topically each morning x 30 day(s) Pill Line Only |

**Indication:** Oth symp involving skin and integumentary tissue

**Schedule:**

| **Activity** | **Date Scheduled** | **Scheduled Provider** |
|---|---|---|
| Clinical Encounter | 04/29/2011 00:00 | Physician 01 |

Schedule for punch biopsy and Congo red special stain to rule out:
Notalgia Paresthetica on his back.
Macular amyloid on back
Has extensive Lentigos

**Copay Required:** No **Cosign Required:** Yes
**Telephone/Verbal Order:** No

Completed by Ndife, Z. MLP on 04/29/2011 13:47
Requested to be cosigned by Jones, Roger MD.
Cosign documentation will be displayed on the following page.



Appellate Case: 15-3160 Page: 19 Date Filed: 02/29/2016 Entry ID: 4372476

# Bureau of Prisons
# Health Services
# Cosign/Review

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | NELSON, KEITH DWAYNE | | | Reg #: | 07440-031 |
| Date of Birth: | 11/23/1974 | Sex: | M | Race: | WHITE |
| Encounter Date: | 04/29/2011 12:49 | Provider: | Ndife, Z. MLP | Facility: | THP |

**Cosigned by Jones, Roger MD on 04/29/2011 13:48.**

# EXHIBIT 43

MONDAY, NOVEMBER 19, 2001


PRETRIAL RECORD 2

JURY SWORN 11

COURT'S OPENING INSTRUCTIONS 11

GOVERNMENT'S OPENING STATEMENT 24

DEFENDANT'S OPENING STATEMENT 36

GOVERNMENT'S EVIDENCE

CULLEN SCOTT
Direct Examination by Ms. Jeans 50
Cross-examination by Ms. Hunt 88
Redirect Examination by Ms. Jeans 89

JAMES SHANNON ROBINSON
Direct Examination by Mr. Whitworth 89
Cross-examination by Ms. Hunt 100

MICHANNE MATTSON
Direct Examination by Mr. Miller 102

TOM PRUDDEN
Direct Examination by Mr. Miller 126

ROBERT CONE
Direct Examination by Mr. Miller 132

STEVEN UNDERWOOD
Direct Examination by Mr. Whitworth 138
Cross-examination by Ms. Hunt 153
Redirect Examination by Mr. Whitworth 163
Recross-examination by Ms. Hunt 165

PORTIONS OF DEFT'S GUILTY PLEA READ 167

PENNY BUTLER
Direct Examination by Ms. Jeans 169

CASEY EATON
Direct Examination by Ms. Jeans 185

PAUL WILT
Direct Examination by Ms. Jeans 204


Appellate Case: 15-3160 Page: 22 Date Filed: 02/29/2016 Entry ID: 4372476

school, having completed the 8th grade. She was working at a hamburger joint. This man was three years older. They started dating, and in January -- excuse me, February of 1974, she had her first child with this man. The boy's name was Johnny Nelson. He was born in Providence Hospital over in Kansas City, Kansas.

Nine months later, nine months later, on November 24th, 1974 -- November 21st, excuse me, she had twins by the same man, Kenneth Nelson and Keith Nelson. They were a month early and Keith Nelson was four pounds five ounces when he was born. He was in respiratory distress and they took him to Children's Mercy Hospital and he spent a month in the hospital and he recovered just fine. But what is most interesting about that is during that four weeks at Children's Mercy Hospital Nancy Nelson saw him twice, the second time when she came to pick him up.

Now, in fairness to her, Nancy Nelson couldn't go see her children in the hospital because by that time this man, Kenneth Morse, was dominating and controlling her life, every aspect of it. And he did it by beating her. He beat her consistently and religiously, for no reason or for any reason at all. And he didn't want to have children. He locked her in the house. He nailed shut the windows. Put tape on the doors. Hide in trees outside to see if she left.

# EXHIBIT 44

*Leslie Lebowitz, PhD*
*Clinical Psychologist*
*34 Jane Rd., Newton MA 02459*

*10/1/12*

---

**Referral Question**

I have been asked by attorneys for Keith Nelson to identify the nature and severity of the child maltreatment he experienced and to describe the kinds of long-term impact this kind of maltreatment is likely to have upon an individual. I have not examined Mr. Nelson, however, research and clinical knowledge about child maltreatment, and the documents I have reviewed, permit the assertion of general conclusions about these types of experiences and the kinds of consequences typically associated with them.

**Qualifications**

My qualifications for this task are as follows. I am a licensed clinical psychologist in the state of Massachusetts. For more than two decades, my clinical and research focus has been the assessment and treatment of traumatic life experiences and child maltreatment.

I received a B.A. degree from Oberlin College in 1979, an M.A. in psychology in 1985, and a Ph.D. in 1990, both from Duke University. In 1990, I completed my clinical internship at Beth Israel Medical Center in New York City.

In 1990, I became an assistant professor at the University of Massachusetts/Boston. There I taught general psychology classes to undergraduate and graduate students as well as developed courses in psychological trauma and supervised research in the area of interpersonal violence. In 1994, I began to work with veterans at

CLERK U.S.DISTRICT COURT
Exhibits:
**P** 67 1
Case No. 4:04-CV-08005-FJG

the National Center for Posttraumatic Stress Disorders, where I did research, psychological assessments, trained and supervised psychology interns, and provided individual psychotherapy.

I have been an independent practitioner of psychotherapy since 1992. In the past I have provided consultation to the Victims of Violence Program about the development of research protocols with which to evaluate their treatment interventions, taught graduate courses in trauma at Simmons School of Social Work, lectured to colleges and universities in the Boston and New York area on psychological trauma, provided supervision for clinicians at the Trauma Center of the Justice Research Institute and worked with the Department of Health and Human Services to develop curricula and training for mental health professionals treating refugees from Bosnia-Herzegovina. Since 1993 I have functioned as an expert witness in the area of trauma and child abuse in forensic and civil cases.

In 2005 I developed the psychological portion of the curriculum used by the United States Air Force to educate their Sexual Assault Response Coordinators and I continue to do several trainings a year for the Air Force on this issue. I am currently a co-investigator, working with researchers and clinicians at the National Center for Posttraumatic Stress Disorder at the Boston VA Medical Center and at Boston University to develop and implement a treatment protocol for psychologically injured re-deploying United States Marines. In this role I also supervise the treatment of traumatized combat veterans.

Throughout, my work has focused on the long-term effects of exposure to trauma. My findings have been published in The Journal of Traumatic Stress, Psychotherapy, The

Journal of Interpersonal Violence, Cognitive and Behavioral Practice, Clinical Psychology Review and other professional journals.

I am a member of the American Psychological Association and The International Society for Traumatic Stress Studies.

In preparation for this report I reviewed records made available to me by Mr. Nelson's attorneys. These included a social history, medical and school records, selected portions of trial transcript as well as expert reports prepared by Drs. Amador, Gelbort, Gur and Martell.

The following report will rely on these materials to offer an opinion as to the nature and severity of Mr. Nelson's childhood experiences. I will also offer a description of some of the ways that experiences such as these would be likely to affect an individual. In order to offer these opinions I will briefly reference salient features of his family and identify some of the kinds of adversity to which he was subjected. For a fuller description, please see Jill Miller's social history.

THE NELSON FAMILY

The records I have reviewed reveal that Mr. Nelson endured a childhood of extraordinary violence, chaos and neglect. Mr. Nelson's childhood occurred within the context of an extended family permeated, on both sides, with severe mental illness and behavioral dysfunction. There is evidence of mood disorders, schizophrenia, paranoia, domestic violence, disordered sexual behavior including incest and rape, physical abuse, substance abuse, self-destructive behavior and chronic medical illnesses. This family context informs our understanding of the interpersonal resources available to Mr. Nelson and it reveals likely genetic vulnerabilities. In order to do an accurate assessment of Mr.



Appellate Case: 15-3160 Page: 27 Date Filed: 02/29/2016 Entry ID: 4372476

Nelson, it would be necessary to take into account his traumatic and neglectful childhood as well as the psychological and behavioral impairments that permeate his extended family.

Kenneth Morse

Mr. Nelson's father, Kenneth Morse, is described as mentally ill, paranoid and violent. His own father (Keith Nelson's grandfather) reportedly singled out Kenneth Morse for particularly brutal beatings and verbal abuse. He is even reported to have shot at him on more than one occasion. There is evidence that Kenneth Morse manifested extreme disturbances with emotional regulation and impulse control throughout his life. As a child, Kenneth Morse had self-destructive "fits" in which he would bite and punch himself until he bled, or bang his head on the walls. He reportedly ate large quantities of chicken feces and sugar, was cruel to animals and when he was 10 attacked his younger brother with an ax. Over the course of his life he manifested a pattern of sexual predation and violence. His violence was not limited to his family: he was known to have beaten the parents of a girl he wanted to be involved with (and who did not want their daughter to date him), firebombed a car, repeatedly assaulted his elderly mother, and was repeatedly accused of raping and sexually abusing girls and women.

Nancy Nelson

Mr. Nelson's mother, Nancy, is described as being depressed her whole life, just as her mother was before her. She was teased and bullied in a school environment that was described as violent and frightening. She had little childhood or opportunities for development and she left school in the 8th grade to take care of her ill mother and younger siblings. At sixteen she became involved with Kenneth Morse and by seventeen she was



Appellate Case: 15-3160 Page: 28 Date Filed: 02/29/2016 Entry ID: 4372476

pregnant. Kenneth Morse's violence and controlling behavior began immediately, and she struggled to get away from him. She reports that he stalked her, firebombed a relatives' car and shot at her. In spite of efforts to get away, Kenneth Morse was an extremely threatening and violent presence in her and her children's lives until 1978.

Siblings

Keith Nelson is the third of five sons born to Nancy Nelson and Kenneth Morse. The eldest brother, John Ray Nelson (Johnny), is 9 months older than Keith. He has a history of extreme violence and was physically abusive to Keith and the other children who were routinely left in his care. Johnny Nelson has been diagnosed as psychotic and delusional and is currently serving a prison term for murder. Kenneth, Keith's fraternal twin, was significantly healthier at birth, less impaired and more successful than Keith. He is currently living in Germany and serving in the armed services. Paul, who is 2 years younger than Keith, is currently living at home with his mother, and has been diagnosed with schizophrenia. Steven, who is younger than Keith by 4 years, is currently living and working in Maryland. Of all the siblings, Steven spent the most time living out of his home, with his aunt and uncle, George and Sally Nelson.

THE NELSON HOUSEHOLD

Domestic Violence

Keith Nelson's mother (Nancy), was chronically and severely abused by her the father of her children, Kenneth Morse. She was held hostage, shot at, tied to objects, locked in closets, held under water while being beaten, repeatedly raped, tied up and left for long periods of time (once for a week), as well as stalked and terrorized whenever she tried to get away. On one occasion Kenneth Morse tried to electrocute her by putting an

electric cord in her vagina. Nancy Nelson's efforts to get away were thwarted by his extreme violence. Among other things, he nailed windows and doors shut, never left her alone with all her children (so she could not flee without leaving one child behind), and firebombed a car that was used to try and help her get away.

She suffered concussions, broken ribs and was visibly battered, bruised and injured throughout Mr. Nelson's young life. She lost her gall bladder and spleen soon after a severe beating and gave birth prematurely, also after a severe beating. Consistent with the kinds of psychological damage known to follow severe domestic battery she appears to have suffered from dissociation, depression, suicidality, anxiety, fear, hyper-vigilance and a heightened startle response, sleep and eating disturbances, intrusions, emotional numbness, and substance abuse. Her impairments were so severe that although she worked much of her life, she was unable to take care of herself or to provide adequately for her children. She had chronic medical problems she did not attend to, her relationships and her emotional life were volatile and unstable, she became an alcoholic and she was unable to provide adequate food, care, guidance or structure for her children.

Keith Nelson spent his earliest years in a family in which his mother's life was repeatedly threatened by the torture and beatings inflicted by his father. Exposure to this kind of violence during these critical developmental years, particularly violence that threatens one's primary attachment figure, is terrorizing and damaging to children. The fear, dread, helplessness and insecurity that it engenders deprives the child of a basic sense of safety, which undermines a host of developmental tasks that are predicated on this basic sense of safety.

Our brains, sense of self, and early understandings of the social world are formed

in the context of our relationship with our primary caretaker. This relationship defines our basic sense of safety and guides our patterns of connection to others and it provides the experiences necessary for learning emotional and behavioral self-regulation. If this relationship is profoundly impaired, and if there are no opportunities for significant and sustained reparative relationships, then, in all likelihood, the child will be harmed.

Domestic violence is particularly toxic because the harm emanates from the family itself. A child is neurologically primed to feel intense feelings of love and emotional attachment towards their primary caretakers and to be uniquely permeable to their influence. Harm that comes from the family is, therefore, particularly penetrating, indelible and influential. Among the many injuries bequeathed by familial violence is that it presents the developing child with a model of human and intimate relationships that is bifurcated into perpetrators and victims, thereby distorting the child's understanding of the interpersonal world and their options within it.

The terror a child experiences in conditions of severe domestic violence also affects the body and the brain. Terror activates a flood of stress hormones, altering the neurophysiology of the brain. Chronic terror tends to dysregulate the regulatory systems of the body, particularly the fear response and the emotional system of which it is a part. An adequately regulated emotional system is a pre-requisite for the accomplishment of myriad developmental tasks including the modulation of feelings, impulse control, mastery and normal brain development. Dysregulation, on the other hand, engenders a broad array of emotional and behavioral pathologies.

Not surprisingly, research has amply documented that exposure to domestic violence is traumatic and injurious to children. Pre-school and school age children who

witness domestic violence have more behavioral and social problems, including self-blame, withdrawal, depression, anxiety, somatic complaints, increased aggressive behavior, higher rates of posttraumatic stress symptoms, poor self-esteem, and greater difficulties developing empathy than do children who have not been exposed to domestic violence**.**

Adolescents who have been exposed to domestic violence during childhood are more likely to have trouble forming close relationships with peers. Adolescent boys who are exposed to domestic violence are more likely to be suicidal, abuse drugs and alcohol, bully other children, and have more psychiatric emergency room visits and juvenile court appearances than teenagers that have not been exposed.

Clearly not all children growing up in violent households manifest one or more of these negative outcomes. Researchers have examined what factors are most likely to mitigate against the development of dysfunction and pathology. The most significant protective factors are a close loving relationship with the mother, the presence of other significant attachment figures who provide consistent support, and a cessation of the violence and the achievement of safety.

Unfortunately, none of these protective factors were present for Keith Nelson. The violence went on for years and neither Nancy Nelson nor her extended family were able to offer sustained meaningful support or nurturance.

<u>Neglect</u>

Neglect is the absence of care and opportunity that is required for normal development. Neglect is likely to effect brain development, which in turn damages our ability to engage adequately with our environment. As a category of child maltreatment,



Appellate Case: 15-3160 Page: 32 Date Filed: 02/29/2016 Entry ID: 4372476

neglect is distinct from trauma. However, the harm it causes can be just as damaging if not moreso.

Keith Nelson's mother was unable to provide minimally necessary care and nurturance for him and as a result, he was neglected throughout his entire developmental years. Nancy Nelson came to the task of parenting already impaired by a difficult childhood, and her own psychiatric and medical problems. At the time of Keith's birth she was eighteen, trapped in a violent abusive relationship, uneducated, and functionally the sole caretaker for an eight month old infant and two premature sons, one of whom (Keith) had serious health problems. Not surprising, there is evidence that hospital staff and social services were concerned about Nancy's ability to care for Keith.

The savage and protracted domestic battering that Nancy Nelson endured and the immediate and long term psychological consequences of it, as well as her prior impairments and vulnerabilities, make it extraordinarily unlikely that she could have provided adequate stimulation, comfort or care for Keith during his earliest years of childhood. This impression is further substantiated by her descriptions of her mental state as well as the observations of other people. She is consistently described as depressed, suicidal and emotionally shut down. As a result she was unable to engage normally with her children, to express affection or to protect them from the terror of the household. Thus, in addition to the horror and helplessness of watching his mother be brutalized, Nancy's situation and her own physical and emotional injury meant that Keith was parented by a depressed, shut down, traumatized, anxious and abusive parent who was unable to attend to his basic developmental needs.

Further, as the children developed, the neglect and chaos continued. Keith was three and a half when his mother finally managed to get away from his father by fleeing to California. After a respite, however, Kenneth Morse found and terrorized them again. Again, Nancy managed to flee, this time to Texas. Tragically, rather than inaugurating an extended period of much needed repair, after a brief respite, the years after Kenneth Morse were characterized by further neglect and chaos. By the time Keith was seven or eight years old, Nancy Nelson had begun work nights at a bar and to drink heavily. When she was not at work she was often asleep or out at a bar. She reports that the only time she felt happy was when she was drunk and apparently she stayed intoxicated as much as possible. She did not provide regular meals or even adequate food. The children lived in filth and disorder and were chronically hungry. Keith wet the bed throughout his childhood and this was neither addressed medically, nor cleaned up, and so he smelled of urine, which in turn made him a social pariah. Nancy Nelson provided no structure, guidance or order and the children were known to "run wild" without supervision.

Even being cared for by other people did not provide a respite. When Keith was eight Nancy would take the children to a babysitter's house in the evening and pick them up at 2 AM. In addition to the sleep disruption, the babysitter (Rhonda Reese) locked the five children in a room until their mother came to get them in the middle of the night. Like their own home, their babysitter's home was characterized by alcoholism and domestic violence. Instead of having a reparative experience with other caretakers, the neglect and terror of their own home was reinforced and exacerbated.

Neglect is uniquely harmful because it deprives children of the opportunity to develop the basic skills they need to meet the demands of life. These skills begin to

develop within the hundreds of interactions infants have with their primary caretaker (typically the mother) and they continue to develop within the environment parents make available to their children.

Adequate child development relies on what psychologists call "attunement," which is the mother's responsiveness to the needs of the infant levels (feeding and holding as well as smiling, talking, comforting and engaging with the baby). The responsiveness of the mother to the infant generates the experiences and patterns that shape the baby's brain, which is the foundation for the child's developing capacity for social engagement and the management of arousal and emotion. Without the emotional regulation that a normal mother provides, the infant has no experience upon which to pattern his own emerging efforts to regulate his emotions, and this interferes with the development of stress tolerance and impulse control, among many other functions. Without a minimal level of emotional attunement and nurturance from a caregiver, the child cannot form a positive and secure attachment. The chronic anxiety that emerges in the absence of a secure attachment is likely to interfere with normal exploration and the social, cognitive and emotional development that is predicated upon it.

The capacities that begin to emerge within the context of adequate interactions with the mother lay the groundwork for later, developmental accomplishments such as a sense of competence and worthiness, the ability to trust other people, and the capacity to regulate ones emotions and behaviors. Clearly a mother as profoundly impaired, terrorized and under siege as was Nancy Nelson would be unlikely to provide the kind of care that fosters healthy, normal development.



Appellate Case: 15-3160 Page: 35 Date Filed: 02/29/2016 Entry ID: 4372476

Without a minimal level of emotional attunement and nurturance from a caregiver, the child cannot form a positive and secure attachment and without this anchor, normal exploration and its resulting social and cognitive development are diminished. Similarly, without some sense of structure and predictability, a sense of mastery and safety cannot develop. Without the emotional regulation that adequate parenting provides for the infant and later the child, there is an insufficient basis for the child's own emotional regulation and without adequate emotional regulation a host of pathologies and diminished capabilities are likely to emerge.

The absence of positive developmental experiences also diminishes the child's ability to feel positive emotions and to access an internal sense of calm and comfort. Children need positive experiences in order to have the capacity to have normal relationships and to feel joy, hope and the motivation to delay gratification.

Research has demonstrated that protracted childhood neglect is associated with a host of serious deleterious, enduring effects, including disordered attachment, developmental delays in cognitive and social functioning, difficulties with frustration tolerance and aggression modulation, impulse control, hyperactivity, withdrawal, impaired attention and increased distractibility, a diminished ability to learn and develop a sense of mastery and competence, depression and other mood disorders, lack of empathy, a diminished ability to create positive relationships and utilize social supports and a greater probability of being the victim or perpetrator of crime.

Physical Abuse

Sadly, witnessing domestic violence and being neglected were not the only sources of child maltreatment that Keith Nelson endured. He was also beaten by his

father, and later, by his older brother and other caretakers. Some family members believe he was singled out for more egregious abuse because of his visible vulnerabilities – he cried a lot, seemed "slow" and wet his bed throughout childhood and adolescence.

The abuse he endured during his early years from his father was severe and sadistic. There are reports that when Keith was an infant, Kenneth Morse tied a belt around Keith's legs and swung him around the room, hitting his head on the wall and furniture. There are also reports that Kenneth Morse put lit cigarettes between Keith's toes and let them burn down, poured beer down his infant son's throat and beat and terrorized him repeatedly.

Johnny, Keith's emotionally disturbed older brother was left to care for his younger siblings. He physically and psychologically abused them, threatening to kill them, and backing up these threats with beatings.

Many babysitters and boyfriends of Nancy Nelson also abused the children. For example, Rhonda Reese's husband terrorized the children and beat Keith "hard" with a belt for wetting the bed. Another babysitter, "EJ," seems to stand out for his particularly egregious abuse. Both Keith and his twin describe various tortures such as being forced to stand holding 5-gallon buckets filled with water at arm's length with the threat of a beating if they dropped the water. This same babysitter also tied the children, particularly Johnny and Keith (arguably the two most impaired children) to a bed and beat them with a weightlifting belt.

Later, during his incarcerations in the Tarrant County Juvenile Detention Center from thirteen to fourteen, Keith reported being beaten by adult guards. Some of the self-destructive behavior he was manifesting at that time, such as trying to strangle himself, or



Appellate Case: 15-3160 Page: 37 Date Filed: 02/29/2016 Entry ID: 4372476

banging his head, may have been, in part, an effort to get into protective custody and greater safety.

Physical abuse of the types described above, is harmful to children. Experiences such as these, can be expected to flood the child with overwhelming feelings of terror, dread, helplessness and horror. Feelings of this intensity cannot be metabolized through normal coping mechanisms and, as a result, other psychological processes are activated, which are physically and psychologically costly and toxic. Chronic feelings of this kind harm the brain, creating lasting impairments in the child's response to stress, pain and the management of impulse and emotion.

Being frightened all the time leads to the chronic activation of the stress-response system, which is deeply detrimental to immediate and long-term physical and psychological health. Children who are chronically terrorized experience a dysregulation of their emotional system in general, and their stress-response system in particular. Chronic activation of the stress-response system alters brain development: neural connections are reinforced through usage; what is not used dies out, and what is highly practiced becomes automatic and stronger. Once sufficiently terrorized, the brain becomes more sensitized to danger and develops a bias towards perceiving threat. In general, a child who is constantly frightened will be conditioned to over- perceive danger and this is true even when the danger is not currently present. As a result, the child is less likely to notice information that is not danger related, thereby reducing their attention to learning and exploration. The child's (and later the adult's) capacity to perceive and access alternative perspectives, options and behavioral response patterns that are not danger related is consequently reduced. A heightened attention to danger will also lead



Appellate Case: 15-3160 Page: 38 Date Filed: 02/29/2016 Entry ID: 4372476

the child to have a more rapid and a more extreme threat response – he will feel more frightened more quickly and more intensely than other children and will be more likely to respond accordingly, even when danger is not actually present.

As a result of this dysregulation, children who are chronically frightened -- either because the danger, while over, remains psychologically unresolved; or because the danger is extant, as was true throughout Keith's developmental years -- are more likely to suffer from a range of symptoms and behaviors, including hyperactivity, impulsivity, proneness to physical injury, aggression, inability to plan effectively or thoughtfully consider alternative behaviors and options, decreased ability to sustain positive cognitive exploration and forge positive relationships, and increased incidence of depression, irritability, sleep disorders, anxiety, substance abuse, re-victimization and criminality, among other problems.

Sexual Abuse

Material documenting Keith Nelson's sexual victimization is somewhat scarcer than the documentation of the other kinds of abuse he endured. Sexual abuse tends to occur more privately than other kinds of maltreatment and as a result, documentation is often more difficult to obtain. Sexual abuse carries a heavy burden of shame and victims, particularly male victims, are often reluctant to disclose. Nonetheless, there is evidence that Keith Nelson was repeatedly sexually victimized. The first indication we have is a disclosure he made to his aunt, that when he was living in California, he was raped by a man. There are also disclosures that one of his babysitters had him put popsicle sticks into her vagina and another exposed him to pornography before the age of 9. His older brother Johnny also told his mother that one of her boyfriends had done something sexual

to him and his little brothers. Finally, Keith has reported being repeatedly raped during his first juvenile incarceration.

Sexual abuse is a particularly toxic trauma. Like the other abuses detailed here, it floods the child with overwhelming feelings of confusion, fear, helplessness, self-blame, anger, self-hatred and a sense of being damaged. Over time, if these painful feelings and confusing meanings are not remediated they shape how children and later adults think and feel about themselves and they distort the expectations and reactions that they have to subsequent life experiences, which in turn engender a host of psychological, medical and interpersonal problems. Research has documented that a children and teenagers with a history of sexual abuse are more likely to have problems that include depression, self-destructive behavior, substance abuse, anxiety disorders, feelings of isolation and stigma, poor self-esteem, difficulty in trusting others, dissociative symptoms and sexual dysfunction. They are also more likely to be the victim and/or the perpetrator of a sexual crime.

In addition to the other damage sexual trauma causes, it is a particularly confusing trauma and has the capacity to disorder sexual functioning. For example, sexual abuse that is not violent (which seems to have been the case with several of Keith's babysitters), but which occurs in a context of neglect and physical victimization, can create deeply distorted associations between inappropriate sexual activity and much needed (albeit distorted and harmful) attention and stimulation. This is corrupting and damaging to the developing sexuality of the child.

DEVELOPMENTAL CHILD MALTREATMENT

The evidence we have about Keith Nelson's childhood documents a childhood of relentless violence, neglect, chaos and abuse. The evidence available is sufficient to conclude that he experienced a level of child maltreatment that would likely be damaging to any child. Harm manifests differently in different people and clearly some children are more resilient than others. Even within a family, children have different experiences because of their own inborn vulnerabilities and resources, the timing of their birth, different exposure to abusive parents, and different relationships with those and other adults and this was true within the Nelson family. Within his sibling group, Keith seems particularly disadvantaged. His birth order insured that he was exposed to abuse from both his father and his disturbed older brother, as well as myriad babysitters. Further, his vulnerabilities and impairments increased the probability that within his family he would be targeted for higher levels of abuse. At the same time, these same impairments reduced the likelihood of finding success outside the home, (as compared to his twin, Kenneth, who was not cognitively impaired and more able to function successfully in school and later, in work). Keith was sickly and developmentally delayed from the outset, reducing the possibility of developing a more functional adaptation.

Developmental child maltreatment of the type detailed here alters the foundations of the self. The adult who emerges from a childhood such as this is not the same as he would have been, had he not been beset with this kind of adversity. Child maltreatment is uniquely harmful because it is occurring when the self is undergoing its greatest period of development. While change and growth occur over the course of the lifecycle, the foundations of the self are constructed in childhood and adolescence and this period is our most permeable and vulnerable time of life. Harm that occurs here affects everything

that comes after. The type of maltreatment detailed here affects all aspects of experience and functioning, from the basic biology and reactivity of the body, to feeling, to higher order thinking and to all aspects of behavior.

Psychological Trauma

Traumatic experiences are, by definition, too intense to be managed through our normal processes. Normal regulatory and coping mechanisms are overwhelmed by trauma and pathological processes (such as fragmentation and dissociation) are activated to cope with the onslaught. Traumatic life experiences also impose meanings that are maladaptive (i.e., thoughts, perceptions, and conclusions such as the self is unworthy, people cannot be trusted) which shape the ways people perceive and respond to their lives; even long after the trauma is over. If traumatic experiences are sufficiently severe, or the individual sufficiently vulnerable, the damage ensuing from trauma will be reflected in all the systems of the self (e.g., feelings, thoughts, biology). The systems of the self are intertwined and influence each other in synergistic ways: emotions demand a cognitive explanation, perceptions and beliefs give rise to feelings, and everything that happens is a biological event which in turn shapes our emotional experience. The systems of the self are most permeable and readily influenced during childhood.

Emotion. The hallmark of a traumatic experience is the experience of overwhelming aversive emotions such as terror, horror, helplessness at a level of intensity that defies our ability to cope adaptively. In trauma, our normal mechanisms for coping -- e.g., crying, re-establishing safety, self-soothing, taking a break, getting perspective, making sense of things -- are defeated by the circumstances and the sheer intensity of the emotions. When normal coping mechanisms cannot meet the demand, pathological ones -



Appellate Case: 15-3160 Page: 42 Date Filed: 02/29/2016 Entry ID: 4372476

- such as fragmentation, dissociation, distorted reasoning -- step into the breach to manage the emotional onslaught. If remediation does not occur (for example, when the trauma is too overwhelming or if it is chronic) the emotional system becomes dysregulated and damaged, leading to problems – e.g., numbness, all or nothing emotional responses, impulsivity, self-mutilation, mood disorders, fragmentation and dissociation – leading to a cascade of psychological and behavioral pathologies.

Cognition. The role of the cognitive system is to facilitate an adaptive response to what reality confronts us with and to house our beliefs, expectations and understandings of self and other people and society in general. A consistently cruel or negative set of experiences will be reflected in these organizing models, expectations and response patterns. Our perceptions and our behaviors then flow from these internal working models creating a reinforcing feedback loop. At the simplest level, a child who is treated as though they have no value is likely to internalize that belief about themselves and to behave in a way that engenders experiences which in turn reinforce that belief.

There is a close relationship between cognition and emotion. Emotions, especially intense ones, demand that meaning be attributed, i.e., they require some explanation. Conversely, how an experience is interpreted, and the meaning that it is given (which occurs at least in part in response to prior experience and extant schemas) bequeath an important part of the emotional impact of any event. Internal working models rooted in repetitive or emotionally charged negative experiences are likely to be more entrenched, more readily activated and less easily changed. In other words, traumatic life events create a cognitive filter through which subsequent experience is perceived and often distorted.



Appellate Case: 15-3160 Page: 43 Date Filed: 02/29/2016 Entry ID: 4372476

The types of experiences detailed here create a cruel world view that is bereft of the expectation of care, kindness or decency. Children raised in these types of circumstances grow to hate themselves and to be at a loss as to how to connect positively to other people and they often perceive there to be two choices in the world, victim or perpetrator. Moreover, they often assume, correctly as research has demonstrated, that their lives will be foreshortened. Typically, they cannot imagine a non-traumatic world that they could participate in and realistically, they are likely to lack the skills and abilities to do so.

Biology. Everything we experience (i.e., our thoughts and feelings) is a biological event and experiences that are unbearably intense or that threaten survival have the potential to become indelibly etched in the brain. Our brains are malleable and are shaped (neuro-anatomically and physiologically) by our experiences. Pathways in the brain that are highly practiced and used are reinforced, growing more robust and dominant, and connections that are not used are pruned over time and diminish.

Our survival depends on our ability to stay as safe as possible. Our brains are exquisitely sensitive to anything that threatens survival and they are highly prepared to perceive, encode, remember and react -- automatically and self protectively -- to threat. The response to threat trumps other functions, particularly higher order cognitive processes. When people are very frightened, less essential activities (which includes higher order thinking) are de-emphasized in favor of purely self-protective actions. In the throes of the stress response (also called flight, fight or freeze) there is a narrowing of awareness, a heightened sensitivity to potentially threatening cues, and a sharply increased physical reactivity and readiness for action.



Appellate Case: 15-3160 Page: 44 Date Filed: 02/29/2016 Entry ID: 4372476

Under acute conditions, this is an extraordinarily effective system for self-protection. However, if the fear is not resolved, (which can occur with a single, unresolved trauma and is the case with chronic trauma), this system can become chronically activated with deleterious consequences. Chronic arousal prioritizes the perception of and response to threat, at the expense of other functions. Thus, chronically stressed people tend to over perceive threat and respond as if they are threatened when they are not. Chronic stress in the first years of life causes changes in attention, memory, impulse control, sleep, fine motor functioning and executive functioning.

Memory. The kinds of hormones activated in response to trauma interfere with the consolidation and retrieval of memory. All traumatic events have the potential to effect memory but chronic severe developmental trauma almost always causes alterations in memory functioning. Traumatized people are likely to be unable to remember portions of what happened to them. Sometimes entire years or feelings are inaccessible or only periodically accessible. They are also very likely to access fragments of memories, often without any real understanding of what they are accessing (this is the mechanism of flashbacks). For example, they may feel suddenly flooded by emotions directly derived from an experience many years old, but not realize that it is the past that accounts for the intensity of what they are feeling. Conversely, they are likely to over-remember some parts of their experience and to be unable not to feel it or think about it even when they wish to avoid it.

Traumatic memories are different than normal memories. The most important distinctions have to do with the potentially fragmented and indelible quality of traumatic memories. Experiences that are emotionally overwhelming can remain in the brain in



Appellate Case: 15-3160 Page: 45 Date Filed: 02/29/2016 Entry ID: 4372476

their original sensory, fragmented form – not integrated into a coherent narrative whole. Further, unlike normal memory, they do not fade with the passage of time. They may be consciously inaccessible but if something triggers them, the thoughts, feelings and perceptions of the original trauma can revivify and feel as intense as when it first occurred.

Severe, chronic childhood trauma has a high probability of giving rise to disorders of memory and consciousness, such as dissociation, which can endure long after the actual trauma has ended. Dissociation is the disconnection of aspects of experience that should be and normally are connected. This disconnection, which is a response to life experiences that are unbearable, exists on a continuum from the subtle (for example, a disconnection between feeling and content) or overt (such as when people 'lose time' or the conscious awareness of what they are doing).

Chronic abuse engenders dissociation. When it is not possible to be safe, the mind finds ways to separate from this reality so that some level of functioning can occur. In other words, when safety cannot be achieved and helplessness is a defining characteristic of a life, dissociative processes will emerge. It is a pathological response to untenable, pathological life circumstances.

Indelible Imprint.

Particularly important is the indelible impact of developmental child maltreatment. When maltreatment is severe, chronic and pervasive, as it was in this case, it is almost inevitable that it will leave an indelible imprint. Without significant remediation, the thoughts and feelings associated with the maltreatment, and the memories and biological reactivity that reflects these experiences, remain present long

after the events have ended. In this way, the past remains present, shaping our current thoughts, feelings and reactions and functioning as a lens through which present-day experience is filtered. In addition, traumatic aspects of the past which are dissociated tend to revivify and people can become flooded with thoughts, feelings or memories of the past, distorting their adaptation to the present.

Trauma and neglect that occur in childhood are uniquely harmful because the systems of the self are under their most rapid period of construction. As a result the unbearable feelings, consequent emotional dysregulation, and the distorted perceptions and understandings emerging from the child maltreatment become woven into the very fabric of the child's self, such that their emerging personality is shaped and defined by the pathology of the environment.

Exacerbating Factors

Decades of clinical and epidemiological work have amply demonstrated that child maltreatment has enduring, long-term harmful effects. While individual responses to adverse events manifest differently from individual to individual, research has ascertained that there are certain conditions and certain types of adversity that are inevitably more harmful. In general, anything that renders the emotional impact of the trauma more intense and/or the meanings more difficult to resolve positively will worsen the impact of the trauma. Traumatic events which occur in childhood, are repetitive, are perpetrated by caretakers or people one should be able to trust, include violence or life threat, and which threaten the well being of significant attachment figures (most importantly, a child's mother) are the most toxic and damaging.

Further, adversity is cumulative -- more is worse. One does not acclimate to

trauma or neglect. Difference kinds of maltreatment (i.e., witnessing violence, physical assault, sexual abuse, neglect) are all independently harmful and when they co-occur, they each exacerbate the damaging impact of the other. Neglect of basic developmental needs represents its own category of harm and, in addition to enacting its own legacy of damage, renders the child more susceptible to the negative impact of other adverse events. Moreover, Keith's other vulnerabilities (cognitive impairments, bed wetting, strong family history of major mental illness) would likely intensify his susceptibility to developing the most negative outcomes.

Finally, it is not only the presence of adversity that is harmful but also, the absence of positive experiences. Children, who have significant and consistent sources of support and nurturance, in particular a warm and secure attachment to one parent, are likely to be more resilient and cope better than children who do not have a positive primary attachment. Moreover, without positive life experience there is no template for positive attachment, motivation, joy, and contentment. One lacks both the capacity to achieve such things, but also, even the idea of such an experience.

By all the criteria used to evaluate childhood adversity, Keith Nelson's childhood experiences were egregious and can be expected to have harmed all aspects of his self.

SUMMARY

The record I reviewed presents evidence of a childhood history defined by severe, trauma and neglect. The trauma Keith Nelson grew up with was interpersonal, intimate, violent, and chronic. He endured several different kinds of trauma and all of it occurred within a context of ongoing neglect and vulnerability. Not surprisingly the record gives evidence of the kinds of patterns of damage we would expect to follow in the wake of

these experiences, including withdrawal, hyperactivity, variability in his symptom presentation, self-injury, suicidality, difficulties with attention and concentration, memory problems, executive functioning abnormalities, impulsivity, emotional dysregulation (diminished control over emotions and impulses), dissociation, and being both the victim and the perpetrator of crime. Keith Nelson’s symptoms and dysfunctions, as they are revealed by the record, are severe and consistent with the type and severity of child maltreatment that is documented.



Appellate Case: 15-3160 Page: 49 Date Filed: 02/29/2016 Entry ID: 4372476

# EXHIBIT 45

| | |
|---|---|
| TUESDAY, NOVEMBER 27, 2001 | 863 |
| STEVEN NELSON | |
| Direct Examination by Mr. Berrigan | 863 |
| Cross-examination by Mr. Whitworth | 887 |
| Redirect Examination by Mr. Berrigan | 891 |
| Recross-examination by Mr. Whitworth | 893 |
| Further Redirect Examination | 894 |
| GENE THOMPSON | |
| Direct Examination by Mr. Berrigan | 895 |
| Cross-examination by Mr. Miller | 903 |
| RHONDA MONROE | |
| Direct Examination by Mr. Berrigan | 904 |
| Cross-examination by Mr. Whitworth | 916 |
| Redirect Examination by Mr. Berrigan | 918 |
| JENNIFER MONROE | |
| Direct Examination by Mr. Berrigan | 919 |
| Cross-examination by Mr. Whitworth | 927 |
| ELLEN CRUTSINGER | |
| Direct Examination by Mr. Berrigan | 928 |
| Cross-examination by Mr. Miller | 936 |
| Redirect Examination by Mr. Berrigan | 937 |
| MICHAEL GRIFFITH | |
| Direct Examination by Mr. Berrigan | 940 |
| HOMER DEAR | |
| Direct Examination by Mr. Berrigan | 951 |
| MICHAEL GRIFFITH (Offer of Proof) | |
| Examination by Mr. Berrigan | 959 |
| MARK CUNNINGHAM, Ph.D | |
| Direct Examination by Mr. Berrigan | 964 |
| Cross-examination by Mr. Miller | 1025 |
| Redirect Examination by Mr. Berrigan | 1044 |
| Recross-examination by Mr. Miller | 1050 |
| DEFENDANT'S MOTION FOR MISTRIAL | 1053 |
| DEFENDANT RESTS | 1054 |
| RECORD RE KENNETH MORSE' TESTIMONY | 1054 |

not saying. That's your determination, buddy. But I thought we was here for something different, you know.

Q You're here to give the honest truth.

A Yeah.

MR. BERRIGAN: Thank you.

MR. WHITWORTH: No further questions, Your Honor.

That's all the evidence we have.

THE COURT: May I speak to counsel.

(COUNSEL APPROACHED THE BENCH AND THE FOLLOWING PROCEEDINGS WERE HAD:)

THE COURT: That was entertaining.

MR. BERRIGAN: If nothing else.

THE COURT: So we've got all the evidence in?

MR. BERRIGAN: Yes.

THE COURT: I'm going to go ahead and let the jury go. We'll run through the instructions this evening and I'm going to have the jury report back tomorrow at 10.

MR. BERRIGAN: Great.

(THE PROCEEDINGS RETURNED TO OPEN COURT.)

THE COURT: Ladies and gentlemen, we're going to recess for the day. I fully expect tomorrow the case to be argued and submitted to you.

Again, I will instruct you as I have before, that you're not to discuss this case among yourselves or with

# EXHIBIT 46

Stroop

| | Raw | T |
|---|---|---|
| Word | 83* | 37 |
| Color | 48 | 29 |
| C-W | 17 | 22 |
| Int. | -13 | 37 |

$$\frac{C \times W}{C + W} = \frac{48 \times 83}{48 + 83} = \frac{3984}{131} = 30.4$$

Raw CW - Pred. CW = 17 - 30 = -13

# EXHIBIT 47



Appellate Case: 15-3160 Page: 56 Date Filed: 02/29/2016 Entry ID: 4372476

# EXHIBIT 48

# PARK DIETZ & ASSOCIATES, INC.

Forensic Consultants in Medicine and the Behavioral Sciences

**Administrative Offices**

2906 Lafayette
Newport Beach, CA 92663
Tel: 949-723-2211
Fax: 949-723-2212
Email: expert@parkdietzassociates.com
Website: www.parkdietzassociates.com

**Daniel A. Martell, Ph.D., ABPP**

2906 Lafayette
Newport Beach, CA 92663
Tel: 949-760-0422
Fax: 949-786-7478
Email: damartell@aol.com

**Forensic Psychiatry**
Park Dietz, MD, MPH, PhD
President
Eugene Beresin, MD
Bennett Blum, MD
John Bradford, MB, ChB
Graham Glancy, MB, ChB
Bruce Harry, MD
Mark J. Hauser, MD
Joseph Kenan, MD
Stuart Kleinman, MD
Daryl Matthews, MD, PhD
Steven Pitt, DO
Gregory Saathoff, MD
Esperanza Salinas, MD
Rene Sorrentino, MD
Sheila Wendler, MD

**Forensic Pathology**
Tracey S. Corey, MD
Judy Melinek, MD
George R. Nichols II, MD

**Forensic Neurology**
David Griesemer, MD
Helen Mayberg, MD

**Forensic Psychology**
Joel Dvoskin, PhD
Stephen D. Hart, PhD
Kirk Heilbrun, PhD
Elizabeth Loftus, PhD
Daniel A. Martell, PhD
Ronald Roesch, PhD
Erin Spiers, PsyD

**Forensic Social Work**
Cheryl Regehr, PhD
Janet I. Warren, DSW

**Criminology**
Larry Ankrom, MS (FBI ret.)
Kenneth Lanning, MS (FBI ret.)
Gregg McCrary, MA (FBI ret.)
Ronald Walker, MA (FBI ret.)
James Wright, MPA (FBI ret.)

**Security**
Bernard Banahan
Robert Hayes, CPP, CFE
Steve Howell

**Medical Strategist**
Steven Ainbinder, MD

June 30, 2009

Michael Wiseman, Esq.
Chief, Capital Habeas Corpus Unit
Federal Community Defender for the
Eastern District of Pennsylvania
Suite 545 West -- The Curtis Center
Philadelphia, PA 19106

**RE: *USA v. Billie Jerome Allen* (E.D. Missouri)**

Dear Mr. Wiseman,

I am writing today to convey the findings and opinions arising from my examination of Mr. Allen pursuant to the above captioned matter.

## Referral Questions

(1) Please review the psychological testing of Mr. Allen conducted by Dr. Michael Gelbort at the time of trial in 1998, and provide the Court with an opinion regarding the scope and adequacy of the testing he performed relative to the forensic circumstances of the case, with attention to the extent of the testing conducted, the norms applied to the obtained test data, and the resulting opinions offered.

(2) To the extent that Dr. Gelbort's psychological examination of Mr. Allen fell short of the standard of care in place at the time of Mr. Allen's trial, please conduct your own examination of him, employing tests, norms, and procedures that were in use and generally accepted at that time, in order to provide the Court with opinions regarding what should have been presented by Mr. Allen's defense.

CLERK U.S.DISTRICT COURT
Exhibits:
P P85
Case No. 4:04-CV-08005-FJG

(3) Please provide the Court with opinions regarding any mitigating evidence identified in the course of your forensic examination that was either not presented, or not fully addressed at the time of his capital sentencing proceedings.

## Basis for Opinions

### Scope of Examination and Informed Consent

I personally examined and tested Mr. Allen at the Federal Correctional Institution in Terre Haute, IN on 02/05/09, 02/06/09, and 04/01/09 for a total of approximately 13.5 hours. The examinations were conducted in a quiet, private interview room in the attorney visiting area. Mr. Allen's hands were not restrained during any of the neuropsychological or psychodiagnostic testing, although he was handcuffed to a belly chain during the 04/01/09 interview-only portion of the examination.

Mr. Allen was informed that I had been retained by the Federal Community Defender's office; of the nature and purpose of the examination; of the limits of confidentiality in this forensic context; and of the lack of any treating relationship between us. He provided his informed consent to participate in the examination.

### Tests Administered

Structured Neuropsychological Interview
Neuropsychological History Questionnaire
Mental Status Examination
Validity Indicator Profile
  -Nonverbal Test
Rey's 15 Item Memory Test
Test of Memory Malingering
Wechsler Adult Intelligence Scale-III
Wechsler Memory Scale – III
California Verbal Learning Test
Halstead-Reitan Neuropsychological Test Battery
  -Booklet Category Test
  -Seashore Rhythm Test
  -Speech Sounds Perception Test

-Portable Tactual Performance Test
-Finger Oscillation Test
-Strength of Grip (Smedley Hand Dynamometer)
-Reitan-Klove Sensory-Perceptual Examination
-Tactile Form Recognition
-Aphasia Screening Test
-Trail Making Test, Parts A & B
-Lateral Dominance Examination
Grooved Pegboard Test
Tests of Motor Sequencing and Control
Wisconsin Card Sorting Test
Stroop Test
Controlled Oral Word Association Test (F-A-S)
Animal Naming
Boston Naming Test
Benton Facial Recognition Test
Hooper Visual Organization Test
Interview Schedule for the Psychopathy Checklist - Revised
Personality Assessment Inventory

**Materials Reviewed**

I have reviewed and considered the following background materials:

(1) Direct Appeal Opinion.
(2) Transcripts of Penalty Phase testimony from the following dates:
- 03/02/98
- 03/03/98
- 03/04/98
- 03/05/98
- 03/06/98
- 03/09/98
- 03/10/98

(3) Mr. Allen's Birth Certificate.
(4) Report of Daniel Cuneo, Ph.D.
(5) Neuropsychological Evaluation report of Michael Gelbort, Ph.D.
(6) Notes and raw test data from Dr. Gelbort's examination.
(7) Report of Dean Yutzy, M.D.
(8) Raw data and C.V. from Richard Wetzel, Ph.D.

(9) Mr. Allen's Clayton School records.
(10) Mr., Allen's Sumner School records.
(11) Mr. Allen's medical records from Metropolitan St. Louis Psychiatric Center.
(12) Mr. Allen's medical records from St. Louis Children's Hospital.
(13) Mr. Allen's pediatric medical records from Eugene Grabau, M.D.
(14) Mr. Allen's medical records from St. Louis City Hospital.
(15) Mr. Allen's Franklin County Prison records.
(16) Mr. Allen's Probation and Parole records.
(17) School records for Mr. Allen's sister, Nicole Petty.
(18) School records of Angela Allen.
(19) School records of Yvette Allen.
(20) Declarations of:
    (a) Juanita Petty Allen
    (b) Nicole Petty
    (c) Angela Allen
    (d) Billy Wayne Allen
    (e) Cathy Toliver
    (f) Brady Toliver
    (g) Claude McClemore
    (h) Raymond Petty
    (i) Darletta Tabb
    (j) Tyrone Jones
    (k) Samuel Moore
    (l) Antonio Rycraw
    (m) Johnnie Grant
    (n) Shirlene Grant

## BACKGROUND INFORMATION

Billie Allen was convicted of armed robbery by force in which a killing occurred, and carrying or using a firearm during a crime of violence and committing murder, and was sentenced to the death penalty. He is appealing that sentence.

The sections below will review important historical findings, both from my examination of Mr. Allen and from the available records listed above.

## Medical History

Mr. Allen's medical history is notable for numerous disorders and conditions that placed him at risk for the development of mental illness and central nervous system damage.

### In-Utero Exposure to Teratogens

According to numerous witnesses, Mr. Allen's mother Juanita smoked cigarettes and drank alcohol during pregnancy, placing him at significant risk for a wide range of well known physical and mental defects. Maternal cigarette smoking during pregnancy has been clearly linked to Learning Disabilities, Attention Deficit-Hyperactivity Disorder, and other behavioral disorders.[1] Alcohol abuse during pregnancy significantly increases the risk of fetal alcohol spectrum disorders.[2]

---

[1] Centers for Disease Control and Prevention. (2001, April). *Women and smoking: A report of the Surgeon General – 2001*. Retrieved from http://www.cdc.gov/tobacco/sgr/sgr_forwomen/index.htm

Butler, N. & Goldstein, H. (1973). Smoking in Pregnancy and Subsequent Child Development. *British Medical Journal*, 4, 573-575.

Huestis, M. A., & Choo, R. E. (2002). Drug abuse's smallest victims: In utero drug exposure. *Forensic Science International*, 128 (1–2), 20–30.

Makin, J., Fried, P. A., & Watkinson, B. (1991). A comparison of active and passive smoking during pregnancy: Long term effects. *Neurotoxicology and Teratology, 13*, 5-12.

McCartney, J. S., Fried, P. A., & Watkinson, B. (1994). Central auditory processing in school-age children prenatally exposed to cigarette smoke. *Neurotoxicology and Teratology, 16*, 269-276.

Streissguth, A.P.; et al . (1984). Intrauterine alcohol and nicotine exposure: Attention and reaction time in 4-year-old children. *Developmental Psychology*. 20(4), 533-541.

Wakschlag. L.S., Lahey, B.B. Loeber, R. et al. (1997). Maternal Smoking During Pregnancy and the Risk of Conduct Disorder in Boys. *Archives of General Psychiatry,* 54(7): 670-676.

U.S. Department of Health and Human Services. *The Health Consequences of Smoking: A Report of the Surgeon General, 2004.* Centers for Disease Control and Prevention, Office on Smoking and Health, Atlanta Georgia, May 2004.

The *Surgeon General's Advisory on Alcohol Use in Pregnancy* states, in significant part:

> Thirty-two years ago, United States researchers first recognized fetal alcohol syndrome (FAS). FAS is characterized by growth deficiencies (or, decreased growth), abnormal facial features (specific facial features), and central nervous system (or, brain) abnormalities. FAS falls under the spectrum of adverse outcomes caused by prenatal alcohol exposure called Fetal Alcohol Spectrum Disorders (FASD). The discovery of FAS led to considerable public education and awareness initiatives informing women to limit the amount of alcohol they consume while pregnant. But since that time, more has been learned about the effects of alcohol on a fetus. It is now clear that no amount of alcohol can be considered safe.
>
> Based on the current, best science available we now know the following:
>
> - Alcohol consumed during pregnancy increases the risk of alcohol related birth defects, including growth deficiencies, facial abnormalities, central nervous system impairment, behavioral disorders, and impaired intellectual development.
> - No amount of alcohol consumption can be considered safe during pregnancy.

---

Centers for Disease Control and Prevention (CDC). *What Do We Know About Tobacco Use and Pregnancy*. June 11, 2007.

[2] National Institute on Alcohol Abuse and Alcoholism (2000, December). *Fetal alcohol exposure and the brain* (Alcohol Alert No. 50). Retrieved from http://www.niaaa.nih.gov/publications/aa50.htm

Cornelius, M. D., Day, N. L., Richardson, G. A., & Taylor, P. M. (1999). Epidemiology of substance abuse during pregnancy. In P. J. Ott & R. E. Tarter (Eds.), *Sourcebook on substance abuse: Etiology, epidemiology, assessment, and treatment* (pp. 1–13). Needham Heights, MA: Allyn & Bacon, Inc.

• Alcohol can damage a fetus at any stage of pregnancy. Damage can occur in the earliest weeks of pregnancy, even before a woman knows that she is pregnant.
• The cognitive deficits and behavioral problems resulting from prenatal alcohol exposure are lifelong.
• Alcohol-related birth defects are completely preventable.

* * * *

In the United States, FAS is the leading preventable birth defect with associated mental and behavioral impairment. There are many individuals exposed to prenatal alcohol who, while not exhibiting all of the characteristic features of FAS, do manifest lifelong neurocognitive and behavioral problems arising from this early alcohol exposure. In the United States, the prevalence of FAS is between 0.5 to 2 cases per 1,000 births. It is estimated that for every child born with FAS, three additional children are born who may not have the physical characteristics of FAS but still experience neurobehavioral deficits resulting from prenatal alcohol exposure that affect learning and behavior.

The outcomes attributable to prenatal alcohol exposure for the children of women whose alcohol consumption averages seven to 14 drinks per week include deficits in growth, behavior, and neurocognition such as problems in arithmetic, language and memory; visual-spatial abilities; attention; and deficits in speed of information processing. Patterns of exposure known to place a fetus at greatest risk include binge drinking, defined as having five or more drinks at one time, and drinking seven or more drinks per week.

Mr. Allen's mother states that she began drinking alcohol at age 16, and that she drank alcohol and smoked cigarettes while she was pregnant with all of her children, including Mr. Allen. [Declaration of Juanita Petty Allen, p. 2]

This is corroborated by several witnesses. Mr. Allen's uncle, Billy Wayne Allen, states, "Juanita could drink alcohol like a man. She drank for as long as I knew her, including when she was pregnant with Billie and her other kids." [Declaration of Billy Wayne Allen, p. 3]

Cathy Toliver, a life-long friend of Juanita's reports, "Even when she was pregnant with her kids, Juanita got herself drunk almost every day." [Declaration of Cathy Toliver, p. 2] This was also described by another friend, Darletta Tabb, who observed, "Juanita drank frequently as an adult. She didn't stop drinking when she was pregnant with Billie. Back then, people didn't know that drinking while you were pregnant could cause any harm to the baby." [Declaration of Darletta Tabb, p. 1]

**Early Childhood Behavioral Disorders**

**Pica.** Mr. Allen was diagnosed with Pica in early childhood, and he reported that he continues to engage in this behavior to the present day. Pica is a psychiatric disorder characterized by an appetite for substances that are largely non-nutritive (e.g., paint, plaster, string, hair, or cloth) or an abnormal appetite for some things that may be considered foods, such as food ingredients (e.g., flour, raw potato, raw rice, starch, ice cubes, salt, blood). In order for these actions to be considered pica, they must persist for more than one month at an age where eating such objects is considered developmentally inappropriate. Poverty, neglect, lack of parental supervision, and developmental delay increase the risk for the condition. [See DSM-IV-TR, p. 103-105]

Psychosocial factors associated with the development of pica include:

- Stress: Maternal deprivation, parental separation, parental neglect, child abuse, and insufficient amounts of parent/child interactions
- Low socioeconomic status

    -The ingestion of paint is most common in children from low socioeconomic families and is associated with lack of parental supervision.

    -Malnutrition and hunger also may result in pica.

- Other risk factors

    -Parent/child psychopathology

    -Family disorganization

-Environmental deprivation

-Brain damage

-Mental retardation

-Developmental disorders

Mr. Allen's early childhood medical records make frequent mention of his problem with Pica, with an onset well before age 3. Dr. Grabau's notes indicate that he was treated for Pica with cobalt chloride. [10/25/1982 treatment note]

Pica is also reflected in his treatment notes from St. Louis Children's Hospital at age 3, which indicate that he suffered from the disorder, together with his history of lead poisoning and febrile convulsions:

> It is interesting that a history of pica was obtained and patient has been treated in the past for lead poisoning and seizures, probably febrile. [St. Louis Children's Hospital progress notes, 09/08/1980; age 3]

This is notable because there is a clear association between pica and lead poisoning, with the later development of neurobehavioral, psychoeducational, socio-emotional, medical, and neuropsychological consequences,[3] and it was undoubtedly the case with Mr. Allen that pica resulted in lead poisoning (see below).

Although Dr. Grabau's notes indicate that Mr. Allen's Pica had diminished and had been replaced by mouthing items without swallowing around age 3, [Dr. Grabau's treatment notes] Mr. Allen recalled continuing to engage in this behavior when he was, "young,

---

[3] Donovick, P.J., & Burright, R.G. (1992). Lead poisoning, toxocariasis, and pica: Links to neurobehavioral disorders. In Isaacson, Robert L. and Jensen, Karl F. (Eds), *The vulnerable brain and environmental risks, Vol. 1: Malnutrition and hazard assessment; Vol. 2: Toxins in food*. New York, NY, US: Plenum Press, p. 127-146.

Motta, R.W., & Basile, D.M. (1988). Pica. In L. Phelps (Ed). (1998). *Health-related disorders in children and adolescents: A guidebook for understanding and educating*. Washington, DC, US: American Psychological Association, p. 524-527.

between ages eight and eleven," indicating an exacerbation of the disorder.

We discussed his history of this behavior in some detail. He described ingesting a wide variety of materials, including:

- Drywall
- Crayons
- Pencils
- Pennies
- Glue
- Paper
- Dirt
- Tree branches
- Paint (both peeling and liquid)
- Motor oil
- "Goop" hand cleaner
- Cotton batting from a couch
- Bug spray "with a skull and crossbones on the can"
- Sticks of butter
- Frying grease

He described eating peeling paint and plaster off of the wall in his room. He also remembered eating gold paint chips from a radiator in his room, reflecting that at the time, "it made me feel rich because I was eating gold."

He was unable to explain why he engaged in this behavior, other than to say, "I stopped caring at an early age." He stated that he "experimented with it, I'd see characters eat stuff with a skull and crossbones in cartoons, and they don't die, so I wanted to try it."

He also reported that this condition continues to the present day. He stated that he still eats his paint in prison, as well as paper and fingernails.

**Enuresis.** By 1983 (at age 6) Mr. Allen was still a bed wetter, and also had diurnal (daytime) enuresis. [Dr. Grabau's Progress notes, 10/13/1983]

This behavior is often reflective of neurodevelopmental delays, as well as situational psychological stress in childhood.[4]

**Early Childhood Medical Disorders**

**Lead poisoning.** Mr. Allen has a documented history of lead poisoning at a very early age, beginning when he was approximately one year old, and tied by medical staff to his history of pica:

> First admission. HGP Fever and convulsion [illegible] 1 yr old … & found to have lead poisoning.
> Second admission HGP convulsion and fever and ^ lead.
> [Largely illegible/ poor photocopy of Doctors note, undated, St. Louis City Hospital Records]
>
> PMH [pre-morbid history] Pb poisoning, asthma, hosp at 1 ½ yrs … febrile convulsions at 1 ½ yrs , on phenobarb X 6 mos – discovered Pb poisoning, had second convulsion w/ high fever at 2 y/o on phenobarb x 2 mos Mom d/c'd phenobarb c/o "acting crazy" + PICA – prescribed clear liquid "cobalt."
> [St. Louis Children's Hospital admission note, 09/07/1980]
>
> It is interesting that a history of pica was obtained and patient has been treated in the past for lead poisoning and seizures, probably febrile. [St. Louis Children's Hospital progress notes, 09/08/1980; age 3]
>
> + Pb poisoning Rx'd in the past, 2 previous febrile seizures.
> [St. Louis Children's Hospital Discharge Summary, 09/18/1980]
>
> History of ^ lead level. [Doctor's note, undated, St. Louis City Hospital Records]

There is an extensive literature on the long-term neuropsychological consequences of lead-induced neurotoxicity,[5] including:

---

[4] Robson, L.M. (1997). Diurnal Enuresis. *Pediatrics in Review,* 18: 407-412.

[5] Boivin, M.J. & Giordani, B. (1995). A risk evaluation of the neuropsychological effects of childhood lead toxicity. *Developmental Neuropsychology,* 11(2), 157-180.
(con't.)

- cognitive impairment specifically involving executive (frontal lobe) functioning;
- impaired neurobehavioral development, attentional ability, and academic performance;
- impairment of reading skills, and deficits in vocabulary, fine motor skills, reaction time, and hand-eye coordination;
- disturbed social behavior and antisocial acts; and
- future failure to graduate from high school, lower class standing, and greater absenteeism.

It is also notable that there is evidence of increased risk for problems with educational achievement and vulnerability to cognitive deficits for lead-exposed youth from more disadvantaged backgrounds such as Mr. Allen grew up in.

**Febrile seizures.** Whether the direct result of lead poisoning, or an occult infectious process resulting in fevers possibly related to pica, Mr. Allen has a documented history of febrile convulsions, apparently beginning at 1 ½ years of age, and continuing for several months, requiring multiple hospital emergency room visits, diagnostic work-ups, and prophylactic treatment with anticonvulsant medication:

---

Needleman, H.L., Schell, A., Bellinger, D., Leviton, A., et al. (1990). The long-term effects of exposure to low doses of lead in childhood: An 11-year follow-up report. *New England Journal of Medicine*, 322(2), 83-88.

Canfield, R.L., Gendle, M.H., & Cory-Slechta, D.A. (2004). Impaired neuropsychological functioning in lead-exposed children. *Developmental Neuropsychology*, 26(1), 2004, 513-540.

Needleman, H,L., Riess, J.A., Tobin, M.J., Biesecker, G.E., & Greenhouse, J.B. (1996). Bone lead levels and delinquent behavior. *JAMA: Journal of the American Medical Association*, 275(5), 363-369.

Ris, M.D., Dietrich, K.N.; Succop, P.A., et al. (2004). Early exposure to lead and neuropsychological outcome in adolescence. *Journal of the International Neuropsychological Society*, 10(2), 261-270.

> PMH [pre-morbid history] Pb poisoning, asthma, hosp at 1 ½ yrs … febrile convulsions at 1 ½ yrs , on phenobarb X 6 mos – discovered Pb poisoning, had second convulsion w/ high fever at 2 y/o on phenobarb x 2 mos Mom d/c'd phenobarb c/o "acting crazy" + PICA – prescribed clear liquid "cobalt."
> [St. Louis Children's Hospital admission note, 09/07/1980]

He was seen in the Pediatric Intensive Care Unit at St. Louis City Hospital after transfer from another facility with fever of 105 degrees, treated with aspirin and alcohol sponging. The next day his fever went up again, and penicillin was given. That afternoon, he developed "generalized tonic & clonic type of activity of both arms accompanied with frothing saliva followed by sleepiness. The seizure lasted for about 5 min." There was a concern that the condition could be related to his high lead levels. [Admission note, undated but he was noted to be "age 2," St. Louis City Hospital Records]

> Fever and seizure of 1 day duration. He had a seizure earlier. Now the child seen at the ER and had been staff[ed]. Temp. 103 degrees … Diagnosis: Febrile Convulsion. [Emergency Room Note, 09/28/79]

His condition at this time was serious enough that the attending physician ordered both a sleep-deprived EEG that was performed on 9/30/79, and a Lumbar Puncture. [St. Louis City Hospital Records]

> Since this is the third febrile convulsion that he would be treated with Phenobarbital for two years then d/c. [Neurology Consultation Note, 10/4/79]

> Treated with Phenobarbital 10/5/79, 2 tsp bid x 1 month. [St. Louis City Hospital Records]

Febrile convulsions, although usually relatively benign, can be associated with a range of adverse neurological outcomes and neurobehavioral complications, particularly when there are multiple recurrences, as was the case with Mr. Allen.[6]

---

[6] Kölfen, W.; Pehle, K.; König, S. (1998). Is the long-term outcome of children following febrile convulsions favorable? *Developmental Medicine & Child Neurology*, 40(10), 667-671.

Appellate Case: 15-3160 Page: 70 Date Filed: 02/29/2016 Entry ID: 4372476

**Asthma.** Mr. Allen reported that he was diagnosed with asthma in childhood, that he had been under a doctor's care and prescribed an inhaler, and that he had been hospitalized for severe attacks. This account is well supported by his contemporaneous medical records.

A Nursing Assessment completed when he was three years old indicates a history of asthma since he was one-and-a-half. [St. Louis Children's Hospital records, 09/07/1980]

Elsewhere, the records indicate that he was diagnosed with asthma at age 5. Medical records from the Ambulatory Care department of St. Louis Children's Hospital note that he was treated at the hospital for asthma on 02/12/82: "5 y/o boy with history of asthma began wheezing this afternoon."

He was also seen for same problem on 10/24/82 after having been taken to the hospital and given an injection the night before. [St. Louis Children's Hospital notes]

By age 6 he had had five emergency room visits for asthma attacks, and was seen in the ER for the sixth time on October 2, 1983 after an attack lasting five hours. [St. Louis Children's Hospital notes]

On 11/10/1984 he was seen in the ER again after an attack lasting 12 hours. [St. Louis Children's Hospital notes]

This asthma history is notable for its potential neuropsychological consequences. Hypoxia (insufficient oxygen supply to the brain), as well as the medications used to treat the condition have documented effects on neurobehavioral and cognitive functioning of the developing brain, and poorly controlled asthma is related to school learning problems (which are known to have been present in Mr. Allen).[7]

---

MacDonald, B.K., Johnson, A.L., et al. (1999). Febrile convulsions in 220 children - neurological sequelae at 12 years follow-up. *European Neurology*, 41(4), 179-186.

[7] Annett, R.D., & Bender, B.G. (1994). Neuropsychological dysfunction in asthmatic children. *Neuropsychology Review,* 4(2), 91-115.

Dunleavy, R. A. & Baade, L.E. (1980). Neuropsychological correlates of severe asthma in children 9-14 years old. *Journal of Consulting and Clinical Psychology*, 48(2), 214-19.

**Learning problems.** Dr. Grabau noted that Mr. Allen was seen for, "doing poorly in school – poor reader," on 05/27/88, and prescribed imipramine 10 mg., an antidepressant medication that is also used to treat attention deficit disorders in pediatric patients.
[Dr. Grabau's Progress notes, 05/27/1988]

During the present examination, Mr. Allen reported a history of delay in learning to read; behavioral problems at school (fighting); nail biting; difficulty paying attention; nightmares (recurrent dreams of being shot and killed while sitting in the dark in his backyard) with onset at age 10-11 and continuing to the present; poor self-esteem and "insecurity" due to being skinny and having an obvious skin condition; and difficulty focusing attention (mind wanders, "zone out" or trance-like episodes).

This is also reported by his mother:

> He was picked on in school and in the neighborhood. He was also a sickly child, which made it even more difficult for him to be accepted. .. He was always fidgety and jumping, and had lots of trouble paying attention to things." [Declaration of Juanita Allen, p. 3]

His basketball coach, Tyrone Jones, also noted that Mr. Allen was "mentally slow and that despite having, "the heart to be a better player:"

> He had a very hard time learning the basketball plays that we would run during the games, In fact, I would say that he wasn't able to learn many of the plays. I had to modify the plays for Billie and make it real simple so he could participate in the games. Billie always has a goofy look about him, like he didn't quite get what was happening. [Declaration of Tyrone Jones, p. 1-2]

---

(con't.)

Hopkins, R.O. & Bigler, E.D. (2008). Hypoxic and anoxic conditions of the CNS. In J. Morgan & J. Ricker (Eds), *Textbook of clinical neuropsychology. Studies on neuropsychology, neurology and cognition*. New York, NY: Psychology Press, pp. 521-535.

Similar behavioral observations were described by another childhood acquaintance, Johnnie Grant:

> He came to play softball in the games that Sam Moore set up in our neighborhood. Billy couldn't play at all. He would do things like hit a ball and then run straight to second base. All the kids laughed at him and made fun of him. [Declaration of Johnnie Grant, p. 1]

**Eczema.** Mr. Allen reported that he has had a life-long problem with eczema, a skin condition involving in his case the upper arms and entire legs. This disorder was obvious to others, and the source of name-calling a ridicule for him while in school:

> He was a funny looking little kid because of this bad skin condition he had. Other kids made fun of him, and it seemed like he didn't have many friends." [Declaration of Billy Wayne Allen, p. 4]

Medical records from the Ambulatory Care department of St. Louis Children's Hospital note that his skin condition was also observed by clinic staff on 05/03/81.

**Mild closed head injuries.** Mr. Allen reported a history of head injuries, including: (1) slipping on ice on the way to school at age 13 and hitting his head, resulting in being sent home by the school nurse; (2) "busting my head on a fence in the front yard" when he was 15 [in reviewing the record, this actually appears to be a reference to abuse by his Uncle Jerome when he was 7, as documented below]; (3) being knocked unconscious "for a few minutes" by a blow to the right frontal area of his head while, "sticking up for a kid who was getting bullied" at age 14 or 15 – however he stated that he did not seek treatment; and (4) being hit in the right frontal area with a gun during a robbery when he refused to give up his money at age 16 or 17 (but with no loss of consciousness).

Of these injuries, there appear to be two with witnesses and/or contemporaneous documentation. The most well documented involved an episode of abuse by his uncle Jerome at age 7 that resulted in an Emergency Room visit and follow-up with his pediatrician:

> He was a bully toward everyone, but he was especially rough on Billie. Once Jerome was picking on Billie and he threw Billie into a gate outside the house. Billie's head was badly injured and he had to go to the hospital. [Declaration of Nicole Petty, p. 1-2]

> 7 y.o. B/M who fell on gate circa 1 hour ago. No LOC. 2cm lac in back of head. [Emergency Room Medical Record, 4/18/1985]

> Head injury to rt. occipit from fall on April 18, 1985, requiring sutures. [Dr. Grabau's Progress notes, 04/25/1985]

Closed head injuries like this one, even without loss of consciousness, can be associated with significant neurobehavioral deficits.[8]

In addition, childhood acquaintance Antonio Rycraw describes Mr. Allen's history of being beaten by members of street gangs in his neighborhood, including an episode of pistol whipping him in the head:

> As we got older, he got beat up a lot on the street. The 6-0 gang, which hung out up by Garfield, was always jumping him, a group of them surrounding him and punching and stomping on him. One time I even saw them pistol whip him in the head up on Cote Brillante. [Declaration of Antonio Rycraw, p. 1]

## **Family Environment**

In discussing his family dynamics, Mr. Allen related that, "emotions weren't shared. My family didn't talk about emotions and feelings." He reported that he was raised by his mother, as "I saw what drugs did to my father and uncle … they declined from respected community members to junkies – it kept me away from using [heroin]." He said, "I learned the 'rules of the game' early from my father and uncle. All I knew was the street life."

This report is supported by his uncle:

---

[8] Binder, L.M. (1986). Persisting symptoms after mild head injury: A review of the postconcussive syndrome. *Journal of Clinical and Experimental Neuropsychology*, *8*(4), 323 – 346.

> But worse than the act of selling drugs, we introduced Billie to the "easy" life. We taught him all the wrong stuff. Instead of teaching him hard work we taught Billie about crime and drugs. We did not teach him the value of people, but only taught him about getting things. We taught him about jewelry and liquor, but not about hard work. To say that we were a bad influence on him would not even begin to tell the story. He was with us when we were surrounded by the illegal activities of drug dealers, drug users, and prostitutes. He was still a little kid, but oh we thought this was cool. [Declaration of Billy Wayne Allen, p. 5]

With regard to strictness and discipline, he stated that early in his life the community in which his family lived was good, "before drugs hit, it was like a big family. However, as drugs became more prevalent in the neighborhood, he reported that "things had to be strict" as the community deteriorated.

He indicated that his mother had also developed problems with alcohol and drugs, which got worse after her boyfriend committed suicide: "When she gave up, I gave up."

**Child abuse and neglect.** Witnesses to Mr. Allen's infancy and early childhood describe severe neglect and abuse:

> Juanita is a dear friend, but the truth is that she was a terrible mother. She was too wrapped up in her own depression, alcoholism, confusion and in her own survival and happiness. When Billie and her other kids were babies, Juanita would not change their diapers for days at a time. They were just left to lie in their own filth. When Billie began to cry, she would stand over him in his crib and just look at him, smoking her cigarettes, dropping ashes right on him. She would not pick up and comfort him. [Declaration of Cathy Toliver, p. 2]

When asked if he has ever been abused, physically, sexually, or emotionally, Mr. Allen replied that he felt "traumatized" by his neighborhood environment, and that at home he received "whoopin's," which he described as including being sent to "pick a switch", being hit with a belt, hit with an extension cord, slapped, and "punched in the

mouth one time." He stated that these "whoopin's" would occur weekly, "for little provocation."

During a subsequent interview, he stated that the, "whoopin's made me hate my Mom, my sisters, my life. … If you're going to beat me for nothing, then I'll do something really bad so at least I deserve it."

His mother Juanita Allen admits beating him:

> I'm sorry to say that I would take my anger and frustration out on him physically. I would use a belt, an extension cord, or any object within reach to hit Billie. Sometimes I slapped him across the mouth. When I was drinking, I was a mean drunk.
>
> * * *
>
> I did not only abuse Billie physically, but I would treat him differently from my three daughters. There was just something about Billie, about his problems and about the difficulties with his behavior that just lit my fuse. I could not control myself. So, sometimes I just wanted him out of my sight. There were periods of time when I would throw him out of the house and not let him back in for days. … I did this even while he was a young boy." [Declaration of Juanita Petty Allen, p. 2-3]

Juanita Allen's abusiveness is also described by Cathy Toliver who states:

> Juanita was especially hard on Billie. From the time he was a toddler when she would shake him until he was a full grown teenager, she physically abused him. She whipped Billie with belts. She threw shoes and knives at him. She beat him with broomsticks and even with the back of a butcher knife. She verbally abused him, calling him a "motherfucker," calling him stupid, telling him she wished he wasn't her son. … She took her anger out on the boy his whole life." [Declaration of Cathy Toliver, p. 3-4]

This was also observed by her son Brady Toliver, who was the same age as Billie growing up:

> She used to call him names and cuss at him. She called him stupid. Sometimes Juanita would lose her mind and go crazy on

> Billie. She would scream at him and hit him or throw any object that was close to her at him. She threw shoes, an iron, and I even saw her throw a pan off the stove at Billie. It was never a regular whooping. There was never an explanation after the beatings." [Declaration of Brady Toliver, p. 1]

Similar observations are provided by Mr. Allen's sister Angela, who states:

> Juanita was not a loving mother. She was cruel to the children in the family and especially to my brother Billie and myself. … My mother became more and more cruel toward Billie. She would yell at him and call him terrible names. She locked him out of the house all the time. I'm not sure where he stayed when this happened. This happened often. One night when she had locked the door on him, he started banging on the door for her to let him in. Billie kept pounding on the door until my mother got a knife, opened the door, and threatened to kill him with it if he didn't stop. … I was so afraid that I called the police … Each time she locked him out, he would come back and be even more disturbed and out of control." [Declaration of Angela Allen, p. 2]

Mrs. Allen's abuse is also described by her daughter Nicole, who describes her mother as getting:

> …angry at frustrated at Billie for any little thing. She would yell and scream at Billie and beat him with a shoe, a cord, or anything else within her reach. She also started locking Billie out of the house whenever he came home after dark. [Declaration of Nicole Petty, p. 1]

She also described physical abuse of Mr. Allen by his uncle Jerome:

> He was a bully toward everyone, but he was especially rough on Billie. Once Jerome was picking on Billie and he threw Billie into a gate outside the house. Billie's head was badly injured and he had to go to the hospital. … Both the beatings and the verbal abuse were unprovoked and definitely not what anybody would consider legitimate discipline." [Declaration of Nicole Petty, p. 1-2]

Mr. Allen's cousin Claude McClemore also witnessed his mother's abusive behavior, stating:

> Billie liked to stay out of the house because he got whooped there a lot. When he was young, Juanita grab Billie [sic], rough him up, and beat him with thick belts, extension cords, high-heeled shoes, whatever she could put her hands on. When I stayed over for a weekend, Juanita usually beat Billie at least one or twice, even though we weren't in the house most of the time. Billie got beaten for pretty much anything. Juanita beat him if he slammed a door, if he talked back, if he didn't do what she said right away, if he broke something. Sometimes, Juanita was just drunk and angry and beat Billie for no real reason." [Declaration of Claude McClemore,
> p. 2]

Similar accounts of Juanita Allen's alcoholism and concomitant child neglect and abuse are also provided by other witnesses, including Shirlee Grant, and her son Johnnie Grant, who was a childhood friend of Mr. Allen's. [Declarations of Shirlee and Johnnie Grant]

There is a substantial scientific literature showing that the abuse and violence Mr. Allen experienced in the home (coupled with the violence he encountered and witnessed in his surrounding community, described below) placed him at significant risk for the development of psychiatric disorders, including Depression and Posttraumatic Stress Disorder.[9]

---

[9] Famularo, M., Kinscherff, R., & Fenton, T. (1992). Psychiatric diagnoses of maltreated children: Preliminary findings. *Journal of the American Academy of Child & Adolescent Psychiatry*, *31*(5), 863-897. [ADHD, ODD, & PTSD]

McCloskey, L.A., & Walker, M. (2000). Posttraumatic stress in children exposed to family violence and single-event trauma. *Journal of the American Academy of Child & Adolescent Psychiatry*, *39*(1), 108-115.

Kaplan, S.J., Pelcovitz, D., Salzinger, S., Weiner, M., Mandel, F. et al. (1998). Adolescent physical abuse: Risk for adolescent psychiatric disorders. *American Journal of Psychiatry, 155*, 954–959.

Margolin, G., & Gordis, E.B. (2000). The effects of family and community violence on children. *Annual Review of Psychology, 51*, 445-479.

## **Traumatic Life Events**

As a child Mr. Allen suffered both violent abuse in the home, as well as life-threatening traumatic experiences from living in a community best characterized as an urban war zone; life conditions that transform the "developmental challenge" of violence into developmental harm as the accumulation of risk factors associated with violence in the community exceeds the capacity of the child's resilience.[10] In Mr. Allen's case, his reservoir of resilience was already significantly attenuated by the host of physical and neurobiological risk factors he experienced or was exposed to, as well as the violent and unstable family environment in which he was raised.

The burden of these life stressors was profoundly intensified by the emotional suffering associated with the repeated loss of close friends and family members to gun violence as his neighborhood descended into drugs and crime. When he was just four or five years old he is reported to have witnessed a man getting shot in front of him in a liquor store that Cathy Toliver's family ran. [Declaration of Cathy Toliver, p. 3] There is a substantial literature on the harmful effects that simply witnessing violence has on children, including increased risks of psychopathology,[11] and future violent criminal behavior.[12]

---

[10] Garbarino, J. (2001). An ecological perspective on the effects of violence on children. *Journal of Community Psychology, 29*(3), 361-378.

Berton, M., & Stabb, S. (1996). Exposure to violence and Post-Traumatic Stress Disorder in urban adolescents. *Adolescence, 31*, 489-498.

Schwartz, A., Bradley, R., Sexton, M., Sherry, A., & Ressler, K. (2005). Posttraumatic stress disorder among African Americans in an inner city mental health clinic. *Psychiatric Services, 56*, 212-215.

Parson, Erwin A., (1994). Inner city children of trauma: Urban violence traumatic stress response syndrome (U-VTS) and therapists' responses. In J.P. Wilson & J.D. Lindy (Eds.) . *Countertransference in the Treatment of PTSD*. New York: Guilford Publications, Inc., (pp 157-178).

[11] Augustyn, M.,& Groves, B.M. (2005). Training clinicians to identify the hidden victims; Children and adolescents who witness violence. *American Journal of Preventive Medicine, 29*(5, Suppl2), 272-278.

Pelcovitz, D., Kaplan, S., DeRosa, R., Mandel, F., & Salzizner, S. (2000). Psychiatric disorders in adolescents exposed to violence and physical abuse. *American Journal of Orthopsychiatry, 70*, 360-369.

When he was 15 years old, he suffered the killing of his friend Dennis Noble and the shooting of his cousin Cory Roy, both of whom were shot on the streets in his neighborhood during that year. Two years later, his best friend Marquis Taylor was shot and killed in front of him while they were coming home from basketball practice on May 3, 1995, when he was 17 years old. The cumulative impact of these life traumas on Mr. Allen was psychologically devastating, particularly when considered in conjunction with his family history of neglect, physical abuse, and abandonment.

With regard to Marquis, he stated, "I only had one friend I talked to, and he got killed." He describing feeling "devastated." He said that they, "Had a dream to get out together and escape" from the environment around them. He described Marquis as his best friend, stating, "He treated people right. We used to tell people we were brothers." He said, "I took my first adult case for him" indicating that he took the rap to spare his friend.

---

Stacey Nofziger, S. (2004). *Correlates and Consequences of Juvenile Exposure to Violence: A Replication and Extension of Major Findings from the National Survey of Adolescents, Executive Summary*. Washington, D.C.: U.S. Department of Justice, National Criminal Justice Reference Service.

Howard, D.E., Feigelman, S., Li, X., Cross, S., & Rachuba, L. (2002). The relationship among violence victimization, witnessing violence, and youth distress. *Journal of Adolescent Health*., *31*(6), Dec 2002, 455-462.

Osofsky, J.D., & Scheeringa, M.S. (1997). Community and domestic violence exposure: Effects on development and psychopathology. In Cicchetti, D, & Toth, S.L. (Eds.), *Developmental perspectives on trauma: Theory, research, and intervention. Rochester symposium on developmental psychology, Vol. 8*. Rochester, NY, US: University of Rochester Press, pp. 155-180.

Widom, C.S. (1997). Child abuse, neglect, and witnessing violence. In Stoff, D.M., Breiling, J, & Maser, J,D. (Eds), *Handbook of antisocial behavior*. (Hoboken, NJ, US: John Wiley & Sons Inc., pp. 159-170.

[12] Eitle, D., & Turner, R.J. (2002). Exposure to community violence and young adult crime: The effects of witnessing violence, traumatic victimization, and other stressful life events. *Journal of Research in Crime and Delinquency*, *39*(2), 214-237.

He described problems that he experienced as a result of his abusive home environment and the traumas he experienced in the community, with symptoms including:

- Shutting down emotionally
- Psychic Numbing
- Disengaging from the environment
- Not wanting to be attached to anything emotionally

He stated that he continues to have intrusive memories and obsessive thoughts regarding these events, and reported thinking to himself, "Why? What if… How?" "I wish it would have been me." "We both had a lot to offer but he had more." "The neighborhood took my peace of mind, I had no peace."

He also described a sense of a foreshortened future: "I never thought I'd make it to 21. It changed my world view. … I always thought my next day was going to be my last." He described living in the moment, "I wanted to enjoy it as much as I could."

He described attempting suicide by playing Russian Roulette twice when he was 17. When the gun did not go off, he stated, "I took it was a sign to try to do good."

Others describe additional behavioral symptoms of PTSD, particularly an exaggerated startle response:

> I remember Billie in those times being incredibly frightened. I remember watching him walk down Taylor Avenue and I could see how stressed out he was. It was like his head was on a swivel; he was so scared that someone was going to kill him. In our neighborhood, we described Billy as "scarey," which means that he was frightened easily; it does not mean that Billie would frighten people. For example, if kids were standing in a group, someone would stomp their foot suddenly and Billie would jump and start running away. Then everyone would laugh at Billie and he would try to play it off. Billie had a lot of pent up stress when he was a teenager. [Declaration of Samuel Moore, p. 3]

Long-term exposure to serious, potentially lethal violence, particularly exposure to firearm violence, places teenagers at risk for a host of

adverse behavioral outcomes, including impulsivity, substance abuse, truancy, and risk for violence and criminal activity later in life.[13] "[W]e estimate that being exposed to firearm violence approximately doubles the probability that an adolescent will perpetrate serious violence over the two subsequent years" (Bingenheimer, et al., 2006).

## Psychiatric History

Mr. Allen stated, "I was depressed from 17-21." He reported that his first psychiatric contact was at age 18 or 19 at a psychiatric walk-in clinic. "I didn't go in – don't know how to ask for help – that's the way my family is – just keep it balled up – just keep it in." He described feeling a sense of panic, "I felt trapped in the lobby."

He reported that he had a second contact, "I came back on my own again, just couldn't go in – couldn't admit I had a problem. I wanted to feel normal. Admitting I had a problem meant that I wouldn't feel normal no more." Mr. Allen's difficulty in pursing psychiatric treatment has been shown to be a common phenomenon among low-income, urban African Americans experiencing symptoms of posttraumatic stress disorder.[14]

His history is positive for suicidal ideation and behavior. He stated that he tried to hurt himself "a few times," the first being Marquis Taylor got killed. He reported thinking, "If I'm going to die anyway…."

---

[13] Bingenheimer, J., Brennan, R., & Earls, F. (2005) Firearm violence exposure and serious violent behavior. *Science, 308,* 1323-1326.

Patchin, J., Huebner, B., McCluskey, S.V., & Bynum, T. (2006). Exposure to community violence and childhood delinquency. *Crime and Delinquency, 52*, 307-322.

Chaiken, M.R. (2000). *Violent Neighborhoods, Violent Kids.* Washington, D.C.: U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention.

Shafer, J.N., & Ruback, R.B. (2002). *Violent Victimization as a Risk Factor for Violent Offending Among Juveniles.* Washington, D.C.: U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention.

[14] Davis, R., Ressler, K., Schwartz, A., Stevens, K., & Bradley, R. (2008). Treatment barriers for low-income, urban African Americans with undiagnosed posttraumatic stress disorder. *Journal of Traumatic Stress, 21,* 218-222.

and stated that he took pills. "I didn't want to live, but I couldn't take my life." He also related the Russian Roulette episodes described above.

**Diagnosis of depression.** Records from Metropolitan St. Louis Medical Center indicate that Mr. Allen presented at the hospital at age 21 with suicidal ideation related to "psychosocial stressors" including being kicked out of his house and the "death of friends." He was diagnosed with a depressive disorder by Dr. C. Wuertz, who offered him an inpatient evaluation that he refused. Because he did not meet criteria for involuntary commitment, he was discharged. [Metropolitan St. Louis Medical Center records, 02/11/1997]

**Substance abuse.** Mr. Allen reported that he started to drink alcohol and smoke marijuana "heavily, heavily," "after my first few friends died." He stated that he would, "drink and smoke weed all day." His drink of choice was "Everclear 180 proof."
He denied using other drugs.

## School History

Mr. Allen reported that his early experiences in school were good, but that his behavior and attendance fell off as he got older, to the point that he was expelled in the 10th grade for having "words" with the vice-principle.[15]

When asked if he liked school, he stated, "Early on, yeah. But when I got to the city school I hated it. [The school environment] made you feel worthless – like anything you did was a waste of time."

He related that his teachers would have characterized him as "calm, easy going" and that if he was challenged, he would "step up," but that if he was bored he didn't seem to care.

---

[15] School records indicate that he "trespassed on Sumner School premises and committed a Type III Offense (Insubordination/Disrespect) that was prejudicial to good order and discipline in the school and violated the Uniform Code of Student Conduct [Expulsion letter, St. Louis Public Schools, 05/05/1994] ." It appears that he called two school officials "motherfuckers." [Expulsion Recommendation Form, 04/25/1994]

He described his behavior at school as generally good. "I was always known as an artist." He stated that was involved in a couple of fights during school, including one in the county school when another boy called him a "nigger" and he hit him, resulting in his being suspended for one day. The also reported being involved in "a couple" of fights in the city school, and getting into trouble for skipping school when he got older. He described his social adjustment at school as "OK," and stated that he had "a few" close friends.

Mr. Allen's older sister Nicole Petty states that Mr. Allen was unable to keep up with the other kids in the Clayton County schools, and that he experienced a "complete shock" when he transferred to Turner Middle School in the city, were drugs and other illegal activities were rampant. [Declaration of Nicole Petty, p. 1]

His mother noted:

> He was picked on in school and in the neighborhood. He was also a sickly child, which made it even more difficult for him to be accepted. .. He was always fidgety and jumping, and had lots of trouble paying attention to things. [Declaration of Juanita Allen, p. 3]

As noted above, it appears that Mr. Allen had a history of learning problems that were treated with medication.

**<u>Employment History</u>**

Mr. Allen reported that after leaving school he did odd jobs, and joined the Job Corps, but, "didn't feel like I belonged." He recalled that he has had seven or eight jobs, mostly in the fast food industry. "Inside, I always knew I was better that what I was doing, but I couldn't shake the doubt." "Why try when someone can shoot you in the back at any second?"

## Examination Findings

### Behavioral Observations and Mental Status Examination

Billie Allen is a 31-year-old, right-handed African American man who presented for testing neatly dressed in tan prison-issued scrubs with a grey long-sleeved t-shirt underneath. He was friendly, engaging, and cooperative thought out all three days of examination, and worked diligently on the testing.

He arrived on crutches and walked with a limp due to an injury to his right knee while playing basketball, although his motor behavior was otherwise well coordinated and graceful.

His speech was produced at a normal rate and volume, with a normal quantity of output in February, but slightly pressured speech in April. His thoughts were free from fixed, false beliefs (delusions), although on all occasions he complained of obsessive and racing thoughts, and having "too many thoughts in my head." There was no evidence of abnormal sensory experiences, including auditory, visual, tactile, olfactory, or somatic hallucinations. However, he did complain of occasionally experiencing visual phosphenes (brief spots of light in the visual fields brought on by eye movement).

Emotionally, his observable affect was "stressed," sad, and anxious. This presentation was stable through out all three days I spent with him, although he was more acutely distressed and symptomatic during my second examination in April. He stated, "I don't care anymore. I just work all day. [Q: What do you do?] 15 different projects; plays, novels, comic strips, drawings, help others." "I'm the guy who mediates things. I can have a good conversation with anybody."

He initially stated that he has difficulty falling to sleep, and trouble sustaining sleep due to obsessive thoughts, reporting that he gets about five hours of sleep per night. He reported a long history of nightmares that he described as recurrent dreams of being shot and killed while sitting in the dark in his backyard, with an onset at age 10-11 and continuing to the present. In April he said that his sleep had decreased, "I give up my sleep time to help others. I can't sleep all day, my mind will eat me alive."

He used an analogy, stating, "If you don't milk a cow, it will die," as a way of describing the internal pressure he is experiencing to get his racing thoughts out of himself. "I'm tired of fighting … at least when your dead you don't have to worry about trying anymore."

He began the second interview by producing a number of his drawing and artwork, much of which reflected both a significant talent in their technique, and significant emotional turmoil in their content.

He described experiencing obsessive, ruminative thoughts, consistent with persistent re-experiencing of the traumas in his life. He described these as intrusive thoughts with an internal sense of psychic discomfort and feelings of pressure to express or discharge this negative affect, "These thoughts, get 'em out, get 'em out: failures; thing I want to achieve; things I want to correct; things I want to say; things I should have said; relationships; look for things I succeeded at or not; life; death; Basically, 'what does my life mean – what is my purpose in life?' Am I a good person or am I a bad person?'"

He reported feeling compelled to get his thoughts and feelings down on paper via writing, drawing, and painting. He described grappling with how to, "let this rage out." "What would I do? What would people think?" "I just want to slow down. I want just for a month for it to slow down – not think about anything. I just can't slow down."

He also discussed depressive ideation, including thoughts about using the death penalty as a form of assisted suicide. "I'm tired. For me, I'm just tired." While he endorsed suicidal ideation, he also stated, "self-preservation will stop me from doing it, but the thought is still there. … I want to live, but I don't care if I do or don't." He described "hopelessness" stating, "I just want to stick a knife in my neck and kill myself," but then stating that he channels that feeling into, "working and drawing."

He said that intrusive thoughts interfere with his sleep, and that he experiences periods of increased activity ("painting, drawing, writing poetry, journal, stories, novels, screenplays, books.") interspersed with periods of decreased activity. There was evidence of increased production of speech and ideas. There also appears to be hypergraphia, although he did not bring any of his writings to the examination. He described becoming "irritated a lot quicker now,"

stating, I'm tired of the 'bullshit' – when you try to grow – that's when the B.S. comes your way – just put the damn needle in and get it over with, man."

He described using his artwork to express feelings he can't verbalize or write. "I put me in my art. … With what I saw at such a young age, it's like I lock myself up mentally – like I know what's out there, I know there's a better way, but I just can't get there." He described a "fear of success" that seemed to more accurately reflect a paralyzing fear of failure, and uncertainty with regard to his own abilities and the responses he could anticipate from his environment.

## Psychodiagnostic Test Results

**Test validity.** All of the validity indicators built into the PAI were within normal limits, indicating that the resulting profile provides a valid picture of Mr. Allen's current level of psychological functioning. Due to his circumstances however, he could not answer a number of questions regarding drug and alcohol use, rending the scales based on those items uninterpretable.

**Test findings.** The psychodiagnostic testing (PAI) reveals depression, and enduring symptoms of PTSD. With regard to depression, there is evidence of elevated cognitive, affective, and physiological signs and symptoms as well as suicidal ideation. Evidence of PTSD includes reexperiencing the trauma, recurrent distressing dreams, feelings of guilt, hypervigilance, diminished interest in significant activities, and feelings of detachment or estrangement from others

A computerized interpretive report provided the following description based on his goodness-of-fit index for PAI Cluster 2 psychopathology:

> This pattern suggests a person who is severely depressed and withdrawn. These individuals are unhappy with their life circumstances and report experiencing the effects of major stressors in both the past and present. They see little hope for improvement in these circumstances and they think about suicide as a solution to their problems. They feel cut off from the people around them, whom they see as unsupportive and uncaring; they probably harbor a fair degree of resentment toward the few people in their lives who are close to them. Their

> self-esteem is quite low, and they view themselves as ineffectual and powerless to change the direction of their lives. They are having difficulty concentrating and making decisions, and their preoccupations and anxiety are likely to impair their ability to think clearly. They are also experiencing what appear to be a number of somatic manifestations of their current stress. The most common diagnoses for these patients involve Major Depressive Disorder, Dysthymic Disorder, or an anxiety disorder (most likely Posttraumatic Stress Disorder). [PAI Interpretative Explorer Report]

## Neuropsychological Test Results

**Data validity.** Mr. Allen's level of effort during the neuropsychological testing was evaluated with multiple measures (Rey's 15 Items, Validity Indicator Profile, Test of Memory Malingering), all of which indicated that he was compliant with the testing and put forth a good effort. There was no indication of exaggeration or malingering. Hence the neuropsychological test data obtained during the present examination are believed to provide an accurate indication of his current level of neurobehavioral functioning.

**Test findings.** A comprehensive neuropsychological assessment was administered to Mr. Allen, including the full Halstead-Reitan test battery and allied procedures as listed above. In order to interpret Mr. Allen's test performances properly, all the raw test scores have been converted to standardized scores on the basis of published norms available at the time of his trial and sentencing. This means comparing Mr. Allen's performance to that of his peers, i.e., comparing his scores wherever possible to norms for other persons of his age, sex, and education. I was guided in this process by the American Psychological Association's Standards for Educational and Psychological Testing and the Specialty Guidelines for Forensic Psychologists.

Mr. Allen is functioning within the average range intellectually, with a Full Scale I.Q. score of 100, although his visual-spatial problem solving skills are operating at a significantly higher level than his verbal skills (PIQ = 110 >VIQ = 92). However, in the context of overall average intellectual functioning, he demonstrated a number of deficit areas consistent with his history of exposure to neurotoxins, febrile convulsions, asthma, and mild head injuries.

His score on the Working Memory Index of the WAIS-III was impaired relative to his overall level of intellectual functioning, in part due to a significant weakness in Arithmetic skills.

Mr. Allen's WMS-III General Memory, Immediate Memory, and Auditory Delayed Memory indexes were all significantly lower than expectation based on his Full Scale I.Q. He also displayed substantial impairment in verbal learning, with scores on the major CVLT measures falling two to three standard deviations below the mean, together with significant intrusions of erroneous material and a mild degree of perseveration.

On tests of executive functioning, although he performed within normal limits on some measures, his scores on both the Color-Word and Interference trials of the Stroop Test were moderately impaired (two standard deviations below the mean); an indication of frontal lobe impairment involving impulse control (which was observed behaviorally during testing as well.) His score on a test of verbal fluency (F-A-S) was also mildly impaired, again indicating a deficit in executive functioning.

In addition, there was evidence of significant aphasia on the Boston Naming Test, where his score was in the range of severe impairment, falling four standard deviations below normal for his age and education (Heaton norms).

His score on the Neuropsychological Deficit Scale, a composite measure based largely on the Halstead-Reitan Neuropsychological Test Battery, was in the range of mild brain damage (NDS score = 29, cutoff for normal = 25). There was evidence of left-sided impairments in both motor strength and manual dexterity, with scores on both the hand dynamometer and grooved pegboard tests falling in excess of one standard deviation below the mean. Tactual form recognition was mildly impaired bilaterally. In addition, mild impairment in auditory attention was observed on the Speech Sounds Perception Test.

On the basis of these test results, he clearly meets criteria for a diagnosis of Dementia due to Multiple Etiologies (maternal cigarette smoking; maternal alcohol abuse; lead poisoning; recurrent febrile convulsions; uncontrolled asthma; and one or more mild head injuries).

I base this opinion on his history and the fact that Mr. Allen's test performance revealed significant impairments in memory, together with impairments in language, motor skills, and executive functioning, consistent with frontotemporal dementia.

## Summary and Forensic Opinions

This evaluation was requested in order to address three main referral questions. I will turn to these below, and summarize my findings and opinions for each.

**(1) Please review the psychological testing of Mr. Allen conducted by Dr. Michael Gelbort at the time of trial in 1998, and provide the Court with an opinion regarding the scope and adequacy of the testing he performed relative to the forensic circumstances of the case, with attention to the extent of the testing conducted, the norms applied to the obtained test data, and the resulting opinions offered.**

Dr. Gelbort's evaluation was informed by an inadequate and incomplete set of background materials, and therefore fell short of the standard of care expected in forensic practice due to a failure to recognize the full extent of Mr. Allen's neurobehavioral history, particularly in view of the fact that this was a capital case.

It appears that he undertook a brief "screening" battery of neuropsychological tests, rather than the comprehensive examination that a full appreciation of Mr. Allen's history would have clearly indicated. Unfortunately, he also relied on outdated test materials, ignored normative databases, and did not integrate his findings with the extant research literature, largely because he was not made aware of the full extent of Mr. Allen's neuropsychiatric history by defense counsel at that time.

He chose not to administer a full Halstead-Reitan Battery, neglecting to administer five out of 11 tests including: the Tactual Performance Test, the Speech Sounds Perception Test, the Seashore Rhythm Test, the Finger Oscillation Test, and the Tactile Form Recognition Test. Further, he mis-administered some of the parts he did give such as grip strength, where it appears he did not use the Hand Dynamometer

apparatus, and did not record any obtained scores, yet reported findings as if he had done so. Failing to administer the complete H-R battery severely undermines its diagnostic utility for accurately detecting brain damage.

Next, he relied on versions of the Wechsler Adult Intelligence Scale and the Wechsler Memory Scale that were out of date. Worse, he failed to administer the complete Wechsler Memory Scale-Revised, and neglected even to score the portions that he did administer, rendering accurate interpretation impossible.

He did not rely on available up-to-date norms for the interpretation of the test data, relying instead on his own unreliable, impressionistic, and idiosyncratic interpretations of test performances that in many cases he did not actually score.

Because he was not provided with a complete neurobehavioral history, and decided to administer a brief and incomplete examination and test battery, Dr. Gelbort failed to identify all of Mr. Allen's neurobehavioral deficits; failed to reach the proper diagnosis; and therefore was unable to tie together Mr. Allen's history and test performances appropriately and completely for the trier of fact.

Further, Dr. Gelbort failed to test for psychopathology, which was standard practice in neuropsychology at that time, and serves to place neuropsychological test findings into their overall proper context.

Dr. Gelbort also failed to administer any standardized tests of effort or malingering that could have been used to support the veracity of his test findings when confronted on cross-examination by Mr. Holtzhauser; or, had they shown a lack of effort by Mr. Allen at that time, could have served as the basis for a re-examination and acquisition of a valid data set.

Finally, Dr. Gelbort failed to investigate the extant research literature adequately in order to tie Mr. Allen's history to his neurobehavioral deficits and psychosocial outcomes.

**(2) To the extent that Dr. Gelbort's psychological examination of Mr. Allen fell short of the standard of care in place at the time of Mr. Allen's trial, please conduct your own examination of him, employing tests, norms, and procedures that were available and in use at that time, in order to provide the Court with opinions regarding what should have been presented by Mr. Allen's defense at that time.**

The findings from my examination and testing of Mr. Allen are described in detail above, and will be summarized briefly here. I administered a comprehensive test battery, including tests of psychopathology and malingering, and interpreted those data on the basis of norms comparing Mr. Allen to others of his age, sex, and education.

Based on that examination and my review of his history and records, I was able to reach a number of opinions about his psychiatric and neuropsychological functioning that should have been presented to the jury at the time of his capital sentencing, including:

- That Mr. Allen's complicated history of risk factors for brain damage and psychiatric disorder; including his abusive and dysfunctional family environment, fetal and early childhood exposure to neurotoxins, febrile seizures, uncontrolled asthma, head injuries, learning disability, and community exposure to trauma and gun violence all had direct implications for his neuropsychological status, mental state, and behavior.

- That Mr. Allen had brain damage that impacted his neurobehavioral functioning in multiple areas, including memory, language, motor skills, and executive functioning including impulse control.

- That the neuropsychological testing supports a diagnosis of Dementia due to Multiple Etiologies, a neuropsychiatric disorder that influenced his behavior.

- That psychodiagnostic testing indicates that Mr. Allen suffers from symptoms of an Affective disorder (Major Depression or Bipolar II Disorder) together with Post Traumatic Stress Disorder.

- That Mr. Allen was effortful and not malingering during testing.

**(3) Please provide the Court with opinions regarding any mitigating evidence identified in the course of your forensic examination that was either not presented, or not fully addressed at the time of his capital sentencing proceedings.**

As detailed in the body of this report above, Mr. Allen was exposed to multiple neurotoxic substances, both in-utero and in very early childhood, that resulted in a complicated cascade of medical and neurobehavioral disorders that then interacted synergistically with a family environment of neglect and abuse to produce both brain damage and psychiatric disorders; all in the larger social context of a deteriorating community environment plagued by violence, drugs and crime.

The additive burden of each of these factors exacted a significant toll on Mr. Allen's neuropsychological and psychosocial development, yet there was in the testimony a lack of any synthesis or "connecting the dots" for the jury to present this evidence in a complete and integrated fashion.

Many people from Mr. Allen's background experience stressful life experiences. However, even in that context, his life experiences were not only excessive but psychiatrically devastating, resulting in life-long psychiatric distress and neurobehavioral abnormalities.

Although some of his significant biopsychosocial life stressors were touched on in testimony at the time of his sentencing, a full exploration of those stressors and their linkages to his subsequent psychiatric damages was not carefully or completely presented. Strikingly, absolutely no expert testimony was presented at trial about his physical abuse, neglect, and abandonment in the home. There was a wealth of scientific literature available at that time connecting

Mr. Allen's maladies and life experiences to the very outcomes that he had experienced in life up to and including the instant offense itself, that was not put before the jury but should have been.

Thank you for the opportunity to consult on this complicated and challenging case. If you have any questions regarding my findings or opinions, I will be happy to discuss them with you, and I can be reached directly at (949) 732-2211.

Sincerely,

Daniel A. Martell, Ph.D. A.B.P.P. (Forensic)
Assistant Clinical Professor of Psychiatry and Biobehavioral Sciences
Semel Neuropsychiatric Institute
David Geffen School of Medicine at U.C.L.A.