No. 15-3160

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

---

Keith D. Nelson,

Appellant,

vs.

United States of America,

Appellees.

---

On Appeal from the United States District Court
District of Arizona
Case No. 4:04-8005-cv-W (FJG)

---

**APPELLANTS EXHIBITS**
**TO MOTION FOR ISSUANCE OF**
**CERTIFICATE OF APPEALABILITY**

**Exhibits 24-26**

---


*/s/Paula K. Harms*
Jon M. Sands
Federal Public Defender
Paula K. Harms
Assistant Federal Public
Defender
Capital Habeas Unit
850 W. Adams Suite 201
Phoenix, Arizona 85007
602-382-2816 telephone
602-889-3960 facsimile

*/s/ David A. Ruhnke*
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
973-744-1000 telephone
973-746-1490 facsimile
dr@ruhnkeandbarrett.com

# EXHIBIT 24

# PARK DIETZ & ASSOCIATES, INC.

Forensic Consultants in Medicine and the Behavioral Sciences

**Administrative Offices**

2906 Lafayette
Newport Beach, CA 92663
Tel: 949-723-2211
Fax: 949-723-2212
Email: expert@parkdietzassociates.com
Website: www.parkdietzassociates.com

**Daniel A. Martell, Ph.D., ABPP**

537 Newport Center Drive, #200
Newport Beach, CA 92660
Tel: 949-760-0422
Fax: 949-786-7478
Email: damartell@aol.com



**Forensic Psychiatry**

Park Dietz, MD, MPH, PhD
President
Eugene Beresin, MD
Bennett Blum, MD
John Bradford, MB, ChB
Andre Derdeyn, MD
Graham Glancy, MB, ChB
Bruce Harry, MD
Mark J. Hauser, MD
Joseph Kenan, MD
Stuart Kleinman, MD
Daryl Matthews, MD, PhD
Steven Pitt, DO
Richard T. Rada, MD
Gregory Saathoff, MD

**Forensic Pathology**

Tracey S. Corey, MD
George R. Nichols II, MD

**Forensic Neurology**

David Griesemer, MD
Helen Mayberg, MD

**Forensic Psychology**

Joel Dvoskin, PhD
Stephen D. Hart, PhD
Kirk Heilbrun, PhD
Elizabeth Loftus, PhD
Daniel A. Martell, PhD
Ronald Roesch, PhD
Erin Spiers, PsyD

**Forensic Social Work**

Cheryl Regehr, PhD
Janet I. Warren, DSW

**Criminology**

Larry Ankrom, MS (FBI ret.)
Kenneth Lanning, MS (FBI ret.)
Gregg McCrary, MA (FBI ret.)
Ronald Walker, MA (FBI ret.)
James Wright, MPA (FBI ret.)
John Yarbrough (LASD ret.)

**Security**

Bernard Banahan
Robert Hayes, CPP, CFE


BY ELECTRONIC MAIL

October 8, 2010

Jeffrey Valenti
Assistant United States Attorney
US Attorney's Office for the Western District of Missouri
5510 Charles Evans Whittaker Courthouse
400 East 9th Street
Kansas City, MO 61406

**RE: United States v. Keith Dwayne Nelson**

Dear Mr. Valenti,

I write today to convey my findings and opinions regarding Mr. Nelson pursuant to the above captioned matter.

## Reason for Referral

You have asked that I examine and test Mr. Nelson in order to provide the Court with a second opinion regarding the findings of Dr. Amador and the other experts retained by Mr. Nelson's defense.

## Basis for Opinions

## Scope of Examination and Informed Consent

I examined and tested Mr. Nelson in a quiet, private conference room at the United States Penitentiary in Terre Haute, IN for a total of approximately nine-and-a-half (9.5) hours; including approximately five (5) hours on 09/09/2010, and an additional four-and-a-half (4.5) hours on 09/10/2010. Mr. Nelson's attorney, David Runke, observed the entire examination via video-conference in a separate room with Mr. Nelson's knowledge and consent; and breaks were taken around noon each day to permit time for Mr. Nelson to consult with his attorney.


CLERK U.S.DISTRICT COURT
Exhibits:
P 54
Case No. 4:04-CV-08005-FJG

Mr. Nelson was advised that I was a forensic psychologist; that I had been retained jointly by the United States Attorney's Office; of the general nature and purpose of my examination; and of the limits on his confidentiality in this forensic situation. He was also advised that there would be no treating relationship between us, as my sole purpose was to conduct an evaluation for possible use in Court. He was able to provide his informed consent to participate in the examination with this understanding. Comfort breaks were taken as needed, as well as a breaks for lunch on each day of the examination.

## Tests Administered

The following battery of tests and procedures was administered to Mr. Nelson during the present examination:

Structured Neuropsychological Interview
Mental Status Examination
Test of Memory Malingering (TOMM)
Validity Indicator Profile (VIP)
– Verbal and Nonverbal Subtests
Wechsler Memory Scale – II
- Faces I
- Verbal Paired Associates I
- Letter-Number Sequencing
- Faces II
- Verbal Paired Associates II
California Verbal Learning Test – II
Wisconsin Card Sort
Stroop Color-Word Test
Trail Making Test, Parts A & B
Boston Naming Test
Tests of Verbal Fluency (F-A-S)
Animal Naming Test
Smell Identification Test
Frontal Systems Behavior Scale (FrSBe)
Detailed Assessment of Posttraumatic Stress (DAPS)
Personality Assessment Inventory (API)
Minnesota Multiphasic Personality Inventory – II (MMPI-2)
Clinical Forensic Interview

## Materials Reviewed

In addition to my examination and testing of Mr. Nelson, a summary of the following background materials, prepared by Ron Walker (FBI, ret.) has been reviewed and relied upon in the formation of the opinions expressed herein, and is incorporated into the background information provided below:

[1] Case Summary, U.S. Department of Justice, United States Attorney, Western District of Missouri, October 1999

[2] Investigative Addendum, Kansas City, Kansas, Police Department, 10/13/99

[3] Local Area Maps (5 pages), annotated with locations relevant to the investigation

[4] FBI FD-302 of Casey Eaton, SA Thomas R. Crawford, 10/12/99

[5] FBI Crime Scene Photographs (56), Case ID 7C-KC-81928, 10/15/99

[6] Medical Examiner's Report, Jackson County, Missouri, 11/4/99

[7] FBI Laboratory Report, DNA Analysis Unit 1, March 17, 2000

[8] FBI FD-302, Autopsy of Pamela Butler, SA Cullen A. Scott, 10/18/99

[9] FBI FD-302 of Julian J. Blanchette, by SA Thomas Dalton, 10/14/99

[10] FBI FD-302 of Officer Richard Keith, by SA Cullen A. Scott, 4/18/00

[11] FBI FD-302 of Carl Condra, by SAs Joel Sealer and Michael Mracheck, 10/14/99

[12] Missouri Department of Corrections, Board of Probation and Parole, Chronological Data Sheet for Keith Nelson, 8/19/93

[13] FBI FD-302 of Kenneth Wayne Morse, by SAs Alan Jennerich and Walter Schaefer, 10/25/99

[14] FBI FD-302 of Leta Jean Carlton, by SAs Daniel Batchelor and Julia Jensen, 10/14/99

[15] FBI FD-302 of Stephen Wayne Nelson, by SA David Fitzgerald, 10/23/99

[16] FBI FD-302, Interview of Kerri Dillon by Detective Keith Wright, 10/15/99

[17] FBI FD-302 of Kathy Henre, by SAs Philip Andrew and Ben McIntosh, 10/16/99

[18] FBI FD-302 of John Ray Nelson, by SA Jon Brody, 11/17/99

[19] Tarrant County Sheriff's Department, Case Summary, Murder of James Harlen Ashley

[20] Taped Interview of John Ray Nelson, by Investigators Attebery and Treadway, 5/9/94

[21] FBI FD-302 of Mary Bassett, by SA Kenneth Bersano, 1/17/01

[22] FBI FD-302 of Paul Joiner, by SA Cullen Scott, 10/10/00

[23] White Settlement Independent School District Records for Keith Nelson

[24] FBI FD-302 of Donald Derry, by SA Bryan Underwood, 10/14/99

[25] FBI FD-302s(2) of David Cunningham, by SAs John Brunell and Dirk Tarpley, 10/13/99

[26] Southwest Missouri Psychiatric Rehabilitation Center, Medical Record of Keith Nelson

[27] Corrections Corporation of America (CCA), Leavenworth Detention Center, Records for Keith Nelson

[28] FBI FD-302 of Robert Eugene Cone, by SAs Michael Mrachek and John Brunell, 10/19/99

[29] FBI FD-302 (with attachments) of Diana Rich, by SA Cullen Scott, 7/14/00

[30] FBI FD-302 (with attachments) of Janice Sloan, by SA Cullen Scott, 7/10/00

[31] FBI FD-302 (with attachments) of Mary Long, by SA Cullen Scott, 8/10/00

[32] FBI FD-302 (with attachments) of Lieutenant Jim Garnett, by SA Cullen Scott, 8/24/00

[33] FBI FD-302 (with attachments) of Kandi Davis, by SA Michael Mrachek, 12/22/99

[34] FBI FD-302 of Michanne Mattson, by SAs John Brunell and Michael Mrachek, 10/19/99

[35] Statement of Probable Cause, by Detective Thomas Prudden, Kansas City, Kansas Police Department, Case 99-110129

[36] FBI FD-302 of Don Harris, by SAs Michael Mrachek and Joel Sealer, 10/14/99

[37] FBI FD-302 of Bob Morse, by SAs Parnell Miles and Craig Watz, 10/14/99

[38] FBI FD-302 of James J. Shannon Robinson, by SAs John Brunell and Dirk Tarpley, 10/14/99

[39] FBI FD-302 of Mark Nelson, by SAs Bryan Underwood and Alan Jennerich, 10/13/99

[40] FBI FD-302 of Cindy Wyman, by SA Cullen Scott, 7/25/00

[41] FBI FD-302 of Lon Wicklund, by Detective William Johnson and SA Jeffrey Harris, 10/16/99

[42] FBI Investigative Insert, Interviews of John L. Rand, Kenneth R. Grolisch, and Gary C. Calhoun, 10/14/99

[43] FBI FD-302 of Gary Calhoun, by SA Thomas Crawford, 10/13/99

[44] FBI FD-302 of Harvey Talley, by SA Cullen Scott, 4/5/00

[45] FBI FD-302 of Patty Griffith, by SA Cullen Scott, 3/31/00

[46] FBI FD-302 of Officer Heath Casselman, by SA Cullen Scott, 6/2-5/00

[47] FBI FD-302 of Nancy Nelson, by SAs Alan Jennerich and Walter Schaefer, 10/14/99

[48] FBI FD-302 of Don Harris, by SAs Michael Mrachek and Joel Sealer, 10/14/99

[49] FBI FD-302 of Melvin Henre, by SAs Joel Sealer and Michael Mrachek, 10/16/99

[50] Bates County Sheriff's Department Records for Keith Nelson

[51] Missouri Department of Corrections Records for Keith Nelson

[52] Kansas Department of Corrections Records for Keith Nelson

[53] Community Corrections Corporation, Leavenworth Detention Center Records for Keith Nelson

[54] FBI FD-302s of Steven M. Underwood, by SAs Dean Yannac and Paul Wackes, 11/8/99 and 11/10/99

[55] FBI FD-302 of Steven M. Underwood, by SA Cullen Scott, 3/28/00

[56] FBI FD-302 of Timothy Bernard Riggans, by SA Cullen Scott, 2/3/00

[57] FBI FD-302 of Steven Joe Bailey, by SA Cullen Scott, 6/23/00

[58] FBI FD-302 of Edward Eugene Frazier, by SAs Joanne Madden and Cullen Scott, 4/10/01

[59] FBI FD-302 of Clarence Duane Burnett, by SAs Douglas Fencl and Cullen Scott, 5/18/01

[60] Report of Daniel V. Foster, Psy.D., 11/23/01

[61] Report of Michael M. Gelbort, Ph.D., 10/05/05

[62] Affidavit of Natalie Novick Brown, Ph.D., 12/04/06

[63] Report of Xavier F. Amador, Ph.D., 03/30/10

## Background Information

### Family History

Keith Nelson was born on November 23, 1974, in Kansas City, KS. He has a twin brother, Kenneth, and three other brothers. He and his four brothers were raised in Fort Worth, TX, by their mother. According to Mr. Nelson's twin brother, their parents (Kenneth Wayne Morse and Nancy Nelson) met approximately four times. It was his belief that his mother was impregnated by his father during each of these visits. Morse and Nancy Nelson never married [1, 12].

Nancy Nelson contacted Kenneth Morse in approximately 1980 to report having problems with Keith; Morse agreed to allow Keith to stay with him in Kansas City, KS. Mr. Nelson remained with Morse for about two weeks, when Morse discovered that Mr. Nelson had assaulted an adult male. Morse called the police; thereafter, Mr. Nelson assaulted Morse, kicking him in the face and breaking his nose. Morse then demanded that Mr. Nelson's mother, Nancy, pick him up as he was no longer welcome to stay with Morse. Keith Nelson was taken back to Amsterdam, MO, by his mother and brothers. According to Morse, Keith Nelson regularly stated that he disliked his mother, Nancy. Morse believed that Mr. Nelson's hatred toward his mother stems from her neglect of Keith during his childhood. Morse reported that Nancy took Keith and the other children to bars, leaving them in the car in bar parking lots, late into the night [13].

Keith and Kenny Nelson lived with their uncle in Amsterdam, MO, for about three to four years. Another brother, Stephen Nelson, also reported living with an aunt and uncle when he was in 5th grade, then moving back to Texas to live with his mother and other brothers. When Stephen was in 9th grade, the family relocated to Missouri. Stephen remained with his aunt and uncle, and another brother, John, remained in Texas. Stephen remained with his aunt and uncle because they provided more stability. It was reported that the boys' mother, Nancy, "drank a lot" while they were growing up and that she regularly left Keith at home with babysitters, aunts, and uncles while drinking at bars. Keith's girlfriend reported to investigators that Keith told her that he had been molested on one occasion when female friends babysat him. According to Keith, they made him "touch them in a sexual way" [14, 15, 16].

As of 1999, Keith's fraternal twin, Kenneth, was on active duty with the U.S. Army. His brother Stephen lived in Wisconsin, where he was gainfully employed as an electronic technician. Paul, the fourth oldest brother has been diagnosed with schizophrenia and has periodically been under psychiatric care. Paul reported hearing voices telling him that he was a child molester and that "everyone thought he was gay and molested children." Paul's aunt reported that Paul told her "the voices were telling him to molest little children." Paul told her that he did not want to do that because he knew it was wrong. Paul resided with his mother, Nancy, and her brother, Mark, in Kansas City, KS [1, 14, 15, 17].

The eldest of the five brothers, John, is in prison in Texas for murder. He received a 30-year sentence for the stabbing death of an associate in 1994. John Nelson is housed in the Administrative Segregation Unit due to repeated fighting. On May 9, 1994, driving a stolen car, John arrived at the home of an associate. He asked the associate for a plastic tarp to cover the top of the car. When asked by his friend to remove his shoes to avoid tracking mud into the house, John, without provocation, repeatedly stabbed the victim, stopping only when the blade of the kitchen knife broke into two pieces. He then fled the scene. During an interview with police investigators after his arrest, John made rambling comments about the victim having plotted to burn down a friend's mother's house and killing her. John also said that the victim had poisoned him and was involved in a conspiracy to commit arson. John also claimed that he had been visited by George Bush

when he (John) was younger, that he (John) was involved in Watergate, and that movies starring Arnold Schwarzenegger "warn me about multiple things that were fixing to happen to me . . . my life has been saved many times by the CIA." John Nelson last had contact with his brother, Keith, in approximately 1997-1998, when Keith was at a halfway house in Kansas City, MO [18, 19, 20].

Mr. Nelson's cousin, Don Harris, during an interview with the FBI on 10/14/99, stated that Keith Nelson and his brothers Kenny and Paul were physically abused by their father as children. Harris believed that Keith "may have been treated the worst" [36].

During a neuropsychological evaluation in 2005, Keith Nelson reported his father was "abusive" and that he observed his father strike his grandmother in the face on one occasion. Mr. Nelson stated "I went after him" [61].

## Educational History

Available educational records for Keith Nelson reflect numerous school transfers and withdrawals. He attended elementary school through 5th grade near Fort Worth, TX, withdrawing from 5th grade in April 1988. He next enrolled in 6th grade at Oak Grove Elementary School in Kansas City, KS, then transferred to the Miami R-1 school district in White Settlement, TX, where records reflect "social promotion" to 6th grade. He was enrolled as a "special services student." He attended 7th and 8th grade at Brewer Middle School, White Settlement, TX, but withdrew from the 8th grade during August 1989. From 1989-1990, Mr. Nelson attended Gainesville State School in Gainesville, TX, then enrolled in the 10th grade at C.F. Brewer High School, Fort Worth, TX. He entered the 11th grade at Brewer High School on 8/21/91, but withdrew on 9/6/91 due to non-attendance. Mr. Nelson did complete 10th grade, with school records reflecting a cumulative grade point average of 3.2857 while in high school. A member of the White Settlement school district staff reported that Mr. Nelson had either a learning disability or emotional disability and that he "carried a grudge against several other teachers." Mr. Nelson indicated to her that a number of windows had been broken at school, but that since he respected her, none of her classroom windows had been broken [21, 22, 23].

Mr. Nelson reportedly has a "demonstrated history of diagnosis of dyslexia and special education while in school," and reportedly failed the 5th grade twice. During a neuropsychological evaluation conducted in October 2005, Mr. Nelson reported he was unaware he was dyslexic until age 13, saying, "I saw everything backwards" [61].

Subject's application for employment with KC Waterproofing, dated 9/8/98, indicates that he attained a GED (no date provided) [24].

## Employment History

At the time of his arrest, Mr. Nelson was employed as a construction laborer by David Cunningham, the owner of the white Ford pickup truck used by Mr. Nelson during the abduction of Pamela Butler. Mr. Nelson first applied for a job with Cunningham during October 1997 and was hired sometime thereafter as a full-time employee engaged in manual construction labor. While working for Cunningham, Mr. Nelson "got into trouble" in the Kansas City area and was placed on probation. Shortly thereafter, Mr. Nelson informed Cunningham he wanted to operate his own business, but he returned in about one month, asking to work for Cunningham again. Cunningham agreed to employ Mr. Nelson in a part-time capacity. Approximately 3-4 weeks prior to the abduction of Pamela Butler, Cunningham allowed Mr. Nelson to use a company truck, the white Ford pickup, because Mr. Nelson's personal vehicle needed repair. During the month prior to the kidnapping, Mr. Nelson worked almost full-time for Cunningham [25].

Prior to working for Cunningham, Mr. Nelson was employed by Donald Derry, owner of PermaDry/KC Waterproofing. Mr. Nelson worked for Derry for approximately 6-9 months. He did not get along with other employees and "scared" some of the customers (no further details provided). Mr. Nelson was believed to have stolen approximately $2,000 in tools from one of Derry's work vans. Derry was ready to terminate Mr. Nelson approximately one year prior to Pamela Butler's abduction when Mr. Nelson resigned his position and began working for Cunningham [24].

Before working for Derry, Mr. Nelson was employed as a laborer at May Development, engaged in foundation repair and waterproofing [25].

Specific information regarding other employment was not reported. During a mental health evaluation of Mr. Nelson conducted in August 1995, he reported that after his release from prison, he lived with a brother, doing factory work and odd jobs in construction. During a mental health evaluation conducted in October 1999, Mr. Nelson reported that he was incarcerated for about five years from the ages of 17-23; he was therefore unlikely to have been employed during that time [26, 27].

**Medical History**

During a 2005 neuropsychological evaluation, Mr. Nelson related he and his brother were born prematurely at eight months gestation, and he was hospitalized approximately two months after birth due to breathing complications. He also had an inpatient hospitalization with a 104 degree fever as a juvenile. While denying any loss of consciousness, Mr. Nelson reported he has hit his head many times. He denied a history of syncope, hypoglycemia, or diabetes. He denied a history of seizure, stroke, or thyroid dysfunction, but acknowledged having possible hypoxic episodes as an adult when he was "choked out in prison." He also described being a heavy sleeper and suffering with nighttime enuresis until approximately 20 years of age [61].

During a mental health evaluation conducted in October 1999, Mr. Nelson denied a prior history of significant illness. CCA medical records reflect treatment for a leg injury sustained by Mr. Nelson prior to his capture. Mr. Nelson stated that he broke his leg and spent approximately 24 hours under the bridge where he was eventually discovered and arrested. Mr. Nelson spent 2-3 days at Kansas University Medical Center for treatment. Treatment for the leg injury included medications (Cipro, ibuprofen, Tylenol, Advil, and aspirin) and application of an immobilizer for the injured limb. He was also given Synthroid and Nitro. Records reflect post-operative x-rays were taken on 11/3/99, but no records pertaining to the referenced operation were provided. Medical records also reflected persistent requests, which were denied, by Mr. Nelson for administration of Keflex for a claimed "stomach infection" on 10/14/00 [27].

**<u>Mental Health History</u>**

During a mental health evaluation of Mr. Nelson conducted on 10/18/99, he denied previous psychiatric problems, but admitted having been seen by psychiatrists and psychologists in the past due to his prior incarcerations [27].

On 8/23/95, while jailed in the Bates County Jail, Butler, MO, on a misdemeanor vandalism charge, Mr. Nelson was involuntarily committed to the Southwest Missouri Mental Health Center (SWMMHC) for evaluation. The Bates County Sheriff's Department reported that Mr. Nelson told a deputy "he would do anything to get out of jail." The deputy believed that Mr. Nelson intended to harm himself, since he was sitting on the top bunk in his cell, preparing to fall off backwards. Intake notes prepared on Mr. Nelson's admission to SWMMHC report that he was "rude and short" with intake staff and stated he had never intended to harm himself, boasting that he did, in fact, get out of jail just as he had intended. He also threatened to "ruin" the individual responsible for his arrest on the vandalism charge. SWMMHC progress notes further report, "even though client is 20 yrs. old, this worker discovered that most of his friends are high-school age" [26].

A medical and psychiatric assessment of Mr. Nelson was conducted by B.U. Sreenarasimhaiah, M.D., on 8/23/95. The report indicates that Mr. Nelson denied any thought of harming himself or others but was attempting to get out of jail and transfer to a different facility, claiming that the sheriff was mistreating him. The report describes Mr. Nelson as cheerful, denying depression or suicidal thoughts. No evidence of delusional thinking was noted, and Mr. Nelson did not manifest symptoms of hallucinatory experiences. No evidence of psychosis was noted, and Mr. Nelson's intelligence was described as average. The report further states: "His background history indicates that he had been a delinquent and a conduct disorder child and adolescent, which continued, resulting in his becoming an antisocial person as an adult." The following diagnosis is reported:

Axis I: No Mental Disorder, V71.09
Axis II: Antisocial Personality Disorder, 301.7
Axis III: No Diagnosis
Axis IV: Stress of being incarcerated in jail
Axis V: G.A.F.: 20 to 30 before admission was reported;

Appellate Case: 15-3160 Page: 14 Date Filed: 02/29/2016 Entry ID: 4372484

70 to 80 on discharge [26]

Mr. Nelson was not considered suicidal or homicidal and was returned to the custody of the Bates County Sheriff's Department [26].

CCA records reveal that Mr. Nelson entered the Leavenworth Detention Center on 10/18/99 and was placed on suicide watch. He was referred to Dr. Samuel Fadore for evaluation of suicidality. Although no written report was located, Dr. Fadore's handwritten notes indicate that Mr. Nelson denied a prior history of psychiatric problems or a history of mood or anxiety symptoms. Mr. Nelson acknowledged a prior history of alcohol and drug problems, but refused to state what they were. Dr. Fadore noted that Mr. Nelson "is oriented to time, place, person, and situation," but that he declined to answer questions exploring perceptual symptoms without his lawyer's presence. Dr. Fadore's diagnostic impressions were noted:

Axis I: Polysubstance Dependency
Axis II: Antisocial Personality Disorder
Axis III: Traumatic injury of knee and left leg
Axis IV: Severe
Axis V: 20 – 70 [27]

Dr. Fadore further noted that because Mr. Nelson had answered questions "very selectively, very skillfully," the data were incomplete at best [27].

On 12/2/99, a 30-day segregation mental health evaluation was conducted. Mr. Nelson provided barely audible responses to questions regarding a history of sex offenses, history of victimization due to criminal violence, and history of expressively violent behavior. He was not deemed oriented x4, being unable to correctly state the date. He responded, "I can't answer," to questions about auditory, visual, or other hallucinations, and to questions regarding delusional thought content. His judgment and insight were reported to be impaired [26].

## Substance Abuse History

During a mental health evaluation conducted on 10/18/99, Mr. Nelson admitted to a prior history of alcohol and drug problems, but refused to elaborate [27].

Robert Cone, father of an acquaintance of Mr. Nelson, reported that he met Mr. Nelson during June 1999, and that Mr. Nelson had assisted Cone's son in finding work during June or July 1999. Cone stated that his son and Mr. Nelson routinely sat on the porch of his residence with cases of beer and would "drink and raise hell" on a daily basis. They also obtained and smoked marijuana on at least one occasion [28].

During a mental health evaluation conducted at the SWMMHC on 8/23/95, Mr. Nelson denied having a problem with alcohol or drug addiction. He admitted to drinking beer on weekends and stated that he smoked marijuana only occasionally [26].

During a neuropsychological evaluation conducted in October 2005, Mr. Nelson reported he rarely used alcohol but acknowledged having smoked marijuana on occasion, noting it makes him ill. He also reported "huffing" approximately ten times. Mr. Nelson reported he prefers to remain drug free because his father was a drug addict [61].

**<u>Military History</u>**

None.

**<u>Criminal History</u>**

A report prepared pursuant to a mental health evaluation of Mr. Nelson on 8/23/95 references a history of delinquent behavior since the age of nine. Since that time, Mr. Nelson has "been under juvenile authorities, in juvenile detention, and later in jails and prisons." As a juvenile, Mr. Nelson spent six months at Gainesville State School for receiving stolen property. He was released, but later spent another four months at Gainesville for theft of a radar detector from a vehicle. No other information regarding his juvenile criminal history is available [26, 51].

Mr. Nelson's criminal history includes a variety of offenses, for which documentation pertaining to the issue of arrest warrants and/or convictions exists. The following criminal offenses were identified:

- Conviction on 4/22/92 for a misdemeanor drug violation in Missouri. No further disposition noted [1]. Mr. Nelson was 17 at the time of this conviction.
- Conviction on 2/16/93 for 2nd Degree Burglary (2 counts) and Stealing (2 counts) in Bates County, MO. Offenses were committed on 11/19/92 and 12/22/92 (when Mr. Nelson was 17 and 18, respectively). Mr. Nelson was sentenced to three years on each of the four counts, with the sentences suspended in lieu of three years probation. The Sentence and Judgment order also reflects a violation of probation by Mr. Nelson for aiding and assisting another inmate in escaping from the Bates County Jail, resulting in a revocation of probation and sentencing Mr. Nelson to three years in the Missouri Department of Corrections [1, 29].
- Between 3/29/93 and 4/1/93, while on probation in Bates County, Mr. Nelson was arrested for a theft of firearms, receiving stolen property, and violation of probation (weapon – firearm in possession). No disposition is noted [51].
- Conviction on 10/25/95 for 2nd Degree Property Damage (Misdemeanor) in Henry County, MO. Offense date was 8/22/95. Mr. Nelson was sentenced to 180 days in jail and placed on two years unsupervised probation [31].
- Conviction on 10/25/95 for False Report (Misdemeanor) in Henry County, MO. Offense date was 8/13/95. Mr. Nelson was sentenced to 180 days in jail and placed on two years unsupervised probation [31].
- Conviction on 10/25/95 for Attempted Escape (Misdemeanor) in Henry County, MO. Offense date was 9/20/95. Mr. Nelson was sentenced to 180 days in jail and placed on two years unsupervised probation [31].
- Arrest of Mr. Nelson on 11/5/95 by the Butler, MO, Police Department for a variety of motor vehicle offenses committed on 11/4/95, including: Operating a Motor Vehicle Without a License; Minor in Possession of Alcohol; Operating a Motor Vehicle While Intoxicated (BAC .125%); Fleeing and Eluding a Police Officer [32].
- Conviction on 4/11/96 for 2nd Degree Burglary and Stealing in Henry County, MO. Offenses were committed

on 11/3/95. Mr. Nelson was sentenced to 4 years in the Missouri Department of Corrections [1, 30].

- Conviction on 2/18/98 in Kansas for 2nd Degree Burglary and Stealing; sentenced to four years on each offense [52].
- Arrest Warrant issued on 7/23/99 in Bates County, MO, charging Mr. Nelson with Tampering with a Judicial Officer, a Class C Felony. The underlying offense was committed on 7/6/99, during a meeting between Mr. Nelson and his parole officer. Mr. Nelson had not been attending substance abuse treatment as required and was called in by his parole officer to discuss the matter. During the meeting, Mr. Nelson stated that he expected to be arrested at the meeting and had brought mace with him in case the parole officer and her partner attempted to arrest him. This warrant was still outstanding when Mr. Nelson was arrested for the abduction, rape, and murder of Pamela Butler on 10/14/99 [33].

**Other Offenses Attributed to the Defendant**

(A) Property Crimes Attributed to Keith Nelson

- Mr. Nelson was identified as a suspect in a Theft from Motor Vehicle report prepared by the Butler, MO, Police Department. He was suspected of removing a car stereo from a truck on 11/5/95; the stereo was later located in Mr. Nelson's vehicle. No disposition was noted [32].

- Subsequent to Mr. Nelson's release from prison during February 1998, his parole was transferred from Missouri to Kansas due to his employment there. While on supervision in Kansas, Mr. Nelson was charged with another burglary and spent approximately one month in a Kansas City, KS, jail. No additional details were noted regarding this offense [33].

- Mr. Nelson was suspected in two burglaries occurring in Butler, MO, on 7/15/99. His red Ford Ranger pickup truck was recovered during the investigation of these burglaries. No charges were ever filed in this case [33].

(B) Attempted Kidnapping and Armed Robbery of Michanne Mattson on October 2, 1999

On 10/2/99, at approximately 4:00 am, the victim, a third-year medical student, was en route to her residence when she noticed a late model white pickup truck following her. After parking her vehicle in her apartment complex lot, she began to walk toward the entrance; the driver of the white pickup approached her, asking if a security guard still worked at the complex and stating that he was a friend of the security guard's son. Mattson continued toward the apartment entrance, hoping she could reach it prior to the subject reaching her. As she neared the entrance, the subject began to run after her. She then felt the subject grab her from behind, placing a knife to her throat. He told her not to do anything or he would cut her throat. He pulled Mattson back toward the parking lot. Mattson noticed that he wore black cotton gloves and camouflage pants. As the subject pulled Mattson toward the parking lot, he produced black handcuffs and told her to put them on. Mattson resisted, and the subject eventually was able to affix only one of the cuffs to her left wrist. He also placed a hand over her mouth as she began to scream. Mattson continued to resist, eventually "going limp" and letting herself fall to the ground. The subject then dragged her by the handcuffs for a short distance. He finally let go, telling Mattson: "If you turn around, I'll kill you." The subject then took her purse and was last seen by Mattson running toward the white pickup truck. On 10/19/99, Mattson positively identified Keith Nelson as her assailant [1, 34, 35].

**Other Information Reflecting Reported Behavior of the Defendant**

Mr. Nelson's mother stated that Mr. Nelson has had problems with law enforcement authorities his entire life. Keith Nelson always had a very antagonistic relationship with the police. When he was younger, he deliberately engaged in actions to antagonize law enforcement officers. Other relatives have reported statements by Keith Nelson claiming that he has killed two people, that he and his brother, Paul, raped a black female at a party, and that Mr. Nelson frequently talked about his brother, Paul, wanting to kidnap and rape a little girl or boy. Mr. Nelson's cousin, Don Harris, believed that it was Keith Nelson, not Paul, who had these "unusual fantasies" [17, 47, 48, 49].

Mr. Nelson has an extensive history of documented disciplinary violations and other infractions while incarcerated. Probation, parole, and other institutional records document the following behaviors of the defendant:

Bates County, Missouri, Sheriff's Department [50]

01/05/93 Failed to remove hand from locking device
08/19/95 Throwing food tray and threatening deputies
08/22/95 Refused to be fingerprinted
08/28/95 Squirted urine from a shampoo bottle

Missouri Department of Corrections [51]

08/20/96 Disobeying an Order
09/03/96 Creating a Disturbance
01/08/97 Insulting Behavior
01/08/97 Creating a Disturbance
03/26/97 Creating a Disturbance
03/28/97 Creating a Disturbance

These violations resulted in a variety of punitive actions, including extra duty and disciplinary segregation.

Between 6/1/93 and 1/31/95, Mr. Nelson received 22 minor conduct violations, and on 4/2/94, received a conduct violation for Inciting to Riot. His conduct violations included: Creating a Disturbance, Disobeying an Order, Fraud, Insulting Behavior, Fighting, and Interfering with Count.

Kansas Department of Corrections [52]

On 3/11/99, the Kansas Department of Corrections issued a Violation Report charging Mr. Nelson with the following violations of release conditions:

- Failing to obey all federal and state laws by being in possession of stolen property on or about 2/26/99
- Making threats of violence on or about 3/8/99
- Associating with persons engaged in illegal activity on or about 2/26/99

Community Corrections Corporation (CCA), Leavenworth Detention Center [53]

After his arrest for the kidnapping, rape, and murder of Pamela Butler, Mr. Nelson was incarcerated at the Leavenworth Detention Center. Between October 1999 and February 2001, he was the subject of numerous incident and disciplinary reports. CCA records for Mr. Nelson were provided on February 23, 2001; consequently, no records past that date are available for review. The available incident and disciplinary reports reflect a variety of offenses, including assault, threats, destruction of property, failure to obey orders, and other infractions.

- 12/19/99, Disciplinary Report: Failure to obey order. Mr. Nelson refused to stop throwing material out of his cell.
- 12/19/99, Disciplinary Report: Attempting to damage property. Mr. Nelson attempted to damage and activate the sprinkler system in his cell.
- 12/20/99, Disciplinary Report: Destruction of property. Mr. Nelson threw a chair at a light fixture, breaking it.
- 03/23/00, Disciplinary Report: Disorderly Conduct; Hindering; Destruction of Property; Failure to follow order. Mr. Nelson was loud and disruptive, kicking and attempting to damage his door. He refused orders to stop.
- 04/06/00, Disciplinary Report: Destruction of property; Hindering; Possession of contraband. Mr. Nelson refused to open his lock box, damaged his light plate, and was found in possession of hidden rubber gloves and a razor blade.
- 05/06/00, Incident Statement: Mr. Nelson threatened staff after books had been removed from his cell.
- 05/15/00, Disciplinary Report: Assault. Mr. Nelson assaulted a staff member with his closed fist as he was retrieving cleaning supplies from Mr. Nelson.
- 05/25/00, Incident Statement: Confronted a staff member, telling her that the psychiatric nurse could “suck his dick.”
- 10/18/00, Disciplinary Report: Failure to follow a verbal order. Mr. Nelson refused to comply with an order to cease screaming and pounding on his desk in his cell. Mr.

Nelson also attempted to incite other inmates in the segregation unit.

- 02/05/01, Incident Report: Assault. Mr. Nelson squirted urine onto another inmate during a verbal altercation.
- 02/06/01, Incident Report: Assault. Mr. Nelson assaulted a corrections officer as the officer attempted to cuff Mr. Nelson during an altercation. Mr. Nelson bit the officer on the hand, drawing blood.
- 02/07/01, Incident Statement: Mr. Nelson was provided with a copy of a disciplinary report, which he tore into pieces and flushed in his toilet.
- 02/08/01, Disciplinary Report: Destruction of property. Mr. Nelson removed the bolts from the light switch cover in his cell, shorted the wires, and caused the circuit breaker to trip, rendering the lights inoperative.
- 02/12/01, Disciplinary Report: Destruction of property. Mr. Nelson attempted to destroy metal plates placed on the walls of his cell.
- 02/12/01, Disciplinary Report: Disorderly and unsanitary conditions. Mr. Nelson threw feces and urine onto the floor of his cell.

## Instant Offense

### Kidnapping of Pamela Butler

On October 12, 1999, at approximately 5:45 pm, Pamela Butler, a 10-year-old white female, living at 564 S. 11th Street, Kansas City, KS, was rollerblading near her residence. Pamela's sister, Penny, noticed a white truck parked nearby, occupied by a white male wearing a red T-shirt, approximately 20-30 years of age, heavy set; the subject was lying down in the front seat, with the driver's door of the truck partially open. As Pamela Butler approached the truck, the subject jumped out, grabbed Pamela around the waist, and threw her into the cab of the pickup. Penny could see that Pamela was struggling with the subject while in the front seat of the truck. Penny called to her half-sister, Casey Eaton, who ran out of the house and witnessed the truck and Pamela's abduction. The truck sped away, nearly striking Eaton, who was holding her baby. Eaton saw her sister inside, curled up on the seat, with the driver holding her down with one hand. The truck continued down 11th Street. Eaton ran after the truck for as long

as she could, then stopped to call her mother, who instructed her to call police [1, 2, 4].

The white pickup truck and abduction were seen by Paul Wilt, who was visiting a friend nearby. Wilt saw the truck speeding away from the abduction site, chased on foot by Eaton. Wilt gave chase in his own vehicle, but lost the truck in traffic near the Missouri/Kansas state line. During the chase, Wilt could see the driver of the pickup pushing or holding something down on the passenger seat of the truck, while maintaining a high rate of speed. Wilt was able to record the truck license plate number – Missouri tag 177CE2 [1,2].

Police investigation identified the truck as being registered to B/Dry Systems of Independence, MO. The owner of the truck, David Cunningham, was located, and he stated that the pickup was used in his business and was in the possession of Keith Nelson, an employee [1, 2].

## Kidnap Location

Pamela Butler was abducted from the vicinity of her residence on 11th Street. This location is approximately one block from the Oasis Bar, 1011 Kansas Avenue, regularly frequented by Keith Nelson and his mother, Nancy Nelson. Mr. Nelson was seen at the Oasis on 10/12/99, well before and after Butler's abduction. The kidnap site is approximately 0.6 mile from Mr. Nelson's girlfriend's residence and three blocks from a salvage yard where Mr. Nelson was seen just prior to the abduction [1, 3].

## Discovery of Victim's Body

On October 12, 1999, between 7:00 pm-7:30 pm, Carl and Shirley Condra arrived at the Grain Valley Christian Church in Grain Valley, MO. The church abuts heavily wooded land, cultivated fields, and farm ponds; it is approximately 45 minutes drive in traffic (33 miles) from the location of Pamela Butler's abduction. When they arrived at the church, the Condras saw a white Ford pickup, Missouri license 177CE2, parked behind the church. The truck was unoccupied and the doors unlocked. Carl Condra noted the license tag because he thought the truck's presence to be suspicious. It was not until 10:00 pm that evening when Condra saw the news report about the kidnapping that

he called the police. When police arrived at the church, the truck was gone [1, 3, 11].

On October 15, 1999, the body of Pamela Butler was discovered in a wooded area abutting the grain field adjacent to the Grain Valley Christian Church. The victim had been covered with branches, leaves, and other vegetation; she was nude, with her halter-top and underpants located near her body. The body appeared to have been at that location since her abduction. From the leaf depressions evident at the body recovery location, it appeared that she had been raped at the scene. The outer pants and rollerblades belonging to the victim were not found. Although she was found shoeless, the victim's feet were clean, indicating that the subject may have carried her to this spot, where he then raped and killed her. An electrical cord was found tightly encircling her neck [1, 5].

**Report of the Medical Examiner**

On October 15, 1999, Thomas W. Young, M.D., performed an autopsy on the remains of Pamela Butler at the Office of the Jackson County Medical Examiner. Oral, vaginal, and rectal smears and swabs and blood for serology were submitted to the FBI. The autopsy revealed multiple external abrasions, a perforated hymenal membrane, surface redness along the posterior fourchette and vestibule, and evidence of ligature strangulation by means of a brown speaker wire tightly encircling the neck and tied with a square knot [6].

Preliminary findings by the medical examiner revealed seminal deposits in the vagina and possibly in the anus. Preliminary findings by the FBI laboratory were negative for semen in the vagina and anus, but positive for semen on the victim's underpants. DNA analysis performed by the FBI laboratory confirmed that the source of the semen identified on the underpants was Keith Nelson [1, 7].

The cause of death was strangulation by use of an electrical cord, and the rape appeared to be pre- or peri-mortem. Scrapes and abrasions located on the victim's chest and abdomen indicated that the victim had been placed in a prone position on the bare ground and that the sexual assault occurred from the rear. Examination of the anal area revealed no noticeable injury. However, there was significant fecal smearing, consistent with anal penetration [1, 8].

**<u>Proximal Behavior of the Defendant</u>**

Approximately three weeks prior to the abduction of Pamela Butler, Mr. Nelson stated to his uncle, Bob Morse, that he (Nelson) "could kill Morse and his entire family before Morse could stop him." Morse did not know why Mr. Nelson made this statement [37].

A friend and coworker of Mr. Nelson stated that Mr. Nelson told him that he "would like to fuck a girl up the ass" and that, on one occasion, Mr. Nelson remarked that he would like to take a prostitute working near their construction site and "rape her, fuck her in the ass, and kill her." On approximately 9/18/99, Mr. Nelson told him that he had killed a girl and claimed that he "tied her up, fucked her in the ass, cut off her fingers, took her to a wooded area, and dumped her body." On another occasion, prior to 9/18/99, Mr. Nelson stated that he had killed four women and that he always used condoms during sexual assaults to avoid leaving behind DNA evidence. Mr. Nelson almost always had a box of condoms on the floor of his work truck [54, 55].

On 9/29/99, Mr. Nelson approached James J. Shannon Robinson with an offer of work on a construction project. While at the work site, Mr. Nelson told Robinson that he would like to kidnap a girl to rape, torture, electrocute, and kill, and then bury her remains. He also told Robinson that he would like to kidnap a girl and create a relationship with her so that she would assist him with future abductions. Mr. Nelson and Robinson saw a young girl that Robinson thought was about 13 or 14 years old. Mr. Nelson stated: "I'd like to get her into bed." When Robinson commented on the girl's age, Mr. Nelson replied: "I don't care, I'm going to the pen anyway" [1, 38].

On 10/2/99, Mr. Nelson attacked Michanne Mattson (see below).

On 10/3/99, Mr. Nelson told a coworker about an attack on a girl in Kansas City, MO. Mr. Nelson stated: "In Kansas City, I had a girl handcuffed, and put a knife to her throat." Mr. Nelson further stated that he planned to "take her, rape her, fuck her in the ass, and kill her," but that she fought him and was able to get away [1, 54].

For one week preceding the abduction, William Wenzel, owner of Wenzel Steel, had seen a white truck cruising past his business. The

business is near the abduction site, and Pamela Butler and her friend often played there, visible from the street [1].

On 10/10/99, Nancy Nelson's brother, Mark, assisted her in moving furniture into her house. Keith Nelson was also present. Mark heard Keith "mumble something about taking a girl and living out in the woods" [39].

On 10/12/99, the date of Pamela Butler's abduction, Mr. Nelson was in the Oasis Bar between 9:30 am and 12:30 pm. He was in and out of the bar approximately two or three times, finally leaving at about 12:30 pm. While there, he spoke with the bartender about his mother's boyfriend's recent suicide. Mr. Nelson commented that he would never commit suicide, but would "go out in a dramatic style." He said that he would "take out" the police and take hostages. He further said that he would rob a bank, shooting tellers if they refused to "open the vault" [1, 40].

On 10/12/99, at approximately 3:30 pm, Mr. Nelson was at his girlfriend's residence. A coworker, Steve Underwood, was also there. Mr. Nelson told Underwood: "Right now is the time to go get a 14-year-old girl. I've been watching her and everything is cool. Now is the time to do it." Mr. Nelson told Underwood that he had been watching a girl and that he wanted to "take her, rape her, and kill her." Underwood was shocked by the conversation and walked away. He told his girlfriend and her mother about the conversation, but did not tell authorities because he had outstanding warrants for his arrest. Underwood also noted that, on several occasions, Mr. Nelson commented to him that he would like to abduct, have anal sex with, and choke a female. Mr. Nelson left his girlfriend's residence, driving a white pickup truck. According to witnesses, Mr. Nelson and his girlfriend had a fight, and Mr. Nelson left "with his tires smoking" [1, 54].

On 10/12/99, between approximately 3:45 pm and 5:00 pm, Mr. Nelson was seen at an auto salvage yard owned by his uncle. The salvage yard is located several blocks from the victim's abduction site. Mr. Nelson was driving a late model white Ford F-250 pickup truck. Mr. Nelson attempted to engage a salvage yard worker in conversation, but left after about 10 minutes [1, 3, 41].

On 10/12/99, at approximately 5:20 pm – 5:30 pm, two workers at an auto repair shop located at the rear of a salvage yard on South 14th Street observed an unknown white male standing next to a white pickup truck parked near the entrance to Mike Morse's section of the junk yard. The white male appeared to be red-faced and sweating. They later identified the individual as Keith Nelson from photographs shown on television [1, 42].

On 10/12/99, at approximately 5:45 pm, a worker at a salvage yard located on South 14th Street, approximately three blocks from the residence of Pamela Butler, saw Keith Nelson parked outside the gate of the salvage yard. Mr. Nelson said that he was there to purchase a car from his uncle and offered to lock the gate for him at least three times as he was leaving. The worker refused, telling Mr. Nelson he had to leave [1, 43].

At approximately 5:45 pm on 10/12/99, Mr. Nelson abducted Pamela Butler from the vicinity of her residence, approximately three blocks from where he was last seen at the salvage yard.

On 10/12/99, at approximately 7:30 pm – 8:00 pm, Nancy Nelson and Paul Nelson saw Keith Nelson at his mother's residence. The bartender at the Oasis Bar stated that Nancy and Keith Nelson came in to the bar later that same evening, but could not recall the time or how long they remained. At approximately 10:00 pm that evening, Nancy and Keith Nelson and Keith's girlfriend, Kerri Dillon, watched the news at the Dillon residence. The news reported the abduction of Pamela Butler and aired a description of the abductor and the pickup truck. Keith Nelson had "none, or almost no comments" about the news [1, 40].

On 10/12/99, at approximately 11:30 pm, a neighbor living next door to the Nelson residence saw an individual whom she later identified as Keith Nelson wiping down the interior of a white pickup truck. Mr. Nelson appeared nervous and was constantly looking up and down the street. Other neighbors saw Mr. Nelson wiping down the passenger door of the white pickup late in the evening [1, 44, 45].

On 10/13/99, after 12:01 am, the white Ford pickup was left abandoned and unlocked with the keys in it at a location only a few

blocks from the Nelson residence. An area resident called the police to report the location of the truck [1, 46].

In the early morning hours of 10/13/99, two cabs were dispatched to a location adjacent to Nancy Nelson's residence. The first cab did not pick up a fare, but the second cab took an individual to a location near David Cunningham's house (Keith Nelson's employer and owner of the white pickup truck). At this point, Mr. Nelson became a fugitive and dropped from sight [1].

## Arrest

On October 14, 1999, a Kansas City, Kansas, Police Department employee, while taking lunch to her husband who was working on the Burlington Northern Santa Fe Railroad, saw Mr. Nelson hiding under a bridge along the Kaw River levy. She alerted several railroad employees, who responded to the river and spotted Mr. Nelson in the water. Mr. Nelson was talked into returning to the riverbank; he pulled himself out of the water and complained that he had a severely injured leg. A police officer arrived at the scene and placed Mr. Nelson in custody. One of the group of railroad workers who had gathered at the scene said: "What about the little girl?" Mr. Nelson responded: "I know where she is, but I'm not saying right now" [1, 9, 10].

## Statements Attributed to Keith Nelson While Incarcerated at Leavenworth Detention Center

While incarcerated at CCA, Leavenworth Detention Center, Mr. Nelson reportedly had conversations with several inmates, during which he made statements about the abduction, rape, and murder of Pamela Butler.

- Timothy Riggans, a CCA inmate housed in the Segregation Unit after his arrest in July 1999 for bank robbery, was in a cell next to Mr. Nelson. Riggans reported that during a conversation after approximately 11/5/99, Mr. Nelson told Riggans that he killed Pamela Butler because "she wouldn't stop crying" and because he "was all fucked up." Mr. Nelson stated that he was drunk and had been taking "crystal meth." He claimed that he had not been looking

for anyone, but happened to see Pamela Butler roller-skating "and snatched her" [56].

- Steven Bailey was incarcerated at CCA on the day prior to Thanksgiving 1999. He was housed in the Segregation Unit, in a cell next to Mr. Nelson, from approximately March 2000 to May 2000. On one occasion, Bailey heard "quiet screams sounding like those of a little girl" coming from Mr. Nelson's cell. He also heard several words, such as "Mommy," "it hurts," and "please don't kill me" coming from the cell. Bailey asked Mr. Nelson: "How could you do that to a little girl?" Mr. Nelson replied: "You would be surprised." Bailey described the sounds and words coming from Mr. Nelson's cell as "very creepy," stating that he believed Mr. Nelson was reliving what he had done to the victim [57].

- Edward Frazier was arrested for federal firearms violations during August 2000 and was assigned to perform janitorial work at the CCA Segregation Unit. While there, he developed a friendly relationship with Mr. Nelson. Mr. Nelson, during a conversation about bite marks on Pamela Butler's body, stated that he (Nelson) said he had bitten her "all over, but that there weren't as many as the cops claimed." Mr. Nelson also spoke with Frazier about Mr. Nelson's fantasy regarding constructing a cell in which to confine abduction victims. Mr. Nelson became very graphic and animated when talking about the configuration of the cell, discussing the arrangement of the cell itself. He also talked about the use of restraining devices and specifically mentioned the use of belts to bind and manipulate the victim. Mr. Nelson also spoke about having masturbated while watching "young girls" from his car. Mr. Nelson stated that he used to daydream about committing rape, stating that it is a "sick kind of love, but that's how it feels."

  Mr. Nelson spoke with Frazier about the Pamela Butler case in some detail. Mr. Nelson admitted that he killed Pamela, but said that "it wasn't supposed to happen." He told Frazier that he had been spotted by "a couple of

people at stop lights" and that, to control Pamela, he told her he was not going to hurt her and would release her "if her mom and dad gave him some money." Mr. Nelson also told Frazier that he was "born to kill" and that his only regret regarding the Pamela Butler kidnapping was that he had injured his leg. He stated that he had to kill her because she would be able to identify him. Mr. Nelson also stated that he would look for Pamela Butler's mother in court, saying that she should look like her daughter, and to see her would give him a feeling of reliving the days before he abducted the girl [58].

- Clarence Burnett was incarcerated at the CCA, Segregation Unit, at four different times between January 1999 and March 2001. He became acquainted with Mr. Nelson and loaned him a magazine containing an article about DNA evidence. Mr. Nelson, after reading the article, stated that the DNA evidence in his case would "match up," but that his defense team had an expert who would rebut the evidence. On another occasion, Mr. Nelson said that the rape charge against him could be proven by DNA evidence, but the prosecution could not prove the murder because they had no witnesses. On yet another occasion, Mr. Nelson told Burnett that he (Nelson) and another inmate had raped a boy in prison. Burnett believed this happened when Mr. Nelson was serving time in the Missouri Correctional Facility [59].

**<u>Evaluation of Keith Nelson by Daniel V. Foster, Ph.D., October 2001</u>**

On 10/05/01 and 10/06/01, Dr. Foster met with Mr. Nelson for a total of approximately 9 hours. On 10/28/01, having secreted multiple doses of two antidepressant medications, Mr. Nelson attempted suicide by overdose. In addition to interviewing Mr. Nelson, Dr. Foster reviewed his history and background information specific to his crime. Dr. Foster reports "our time was primarily spent in trust building and history taking" [60].

Dr. Foster found Mr. Nelson to be "somewhat of an enigma for competent, intelligent professionals," noting, "Mr. Nelson is able to

present different signs and symptoms of his psychological status to persons viewing him over the same period of time." Dr. Foster opined that had he been allowed to further evaluate Mr. Nelson and testify "numerous additional factors clarifying Mr. Nelson's current mental status could have been presented" to the triers and determiners of fact and of sentence [60].

Dr. Foster pointed to a history of mental health and family services intervention dating to Mr. Nelson's early childhood, as well as being raised under conditions of "severe abuse, neglect, and deprivation." Mr. Nelson was repeatedly removed from his home only to be returned, and moved among his mother, foster homes, group homes, juvenile facilities and finally, at a young age, to prison. Dr. Foster noted Mr. Nelson "witnessed, experienced, and was personally victimized by rapes, assaults, and riots." He "found sanctuary in the idealized world of his own private thoughts and dreams" and had psychotic breaks by his late teens [60].

Dr. Foster opined that Mr. Nelson meets the criteria for Antisocial Personality Disorder, that as a child he met current criteria for Pervasive Developmental Disorder, NOS, and that at the time of his 2001 evaluation met *DSM-IV-TR* criteria for Post Traumatic Stress Disorder-Chronic, Severe, and Major Depressive Disorder-Recurrent. Dr. Foster noted that "While Sexual Sadism is strongly suggested by the facts of his crime, we were unable to complete an evaluation" [60].

Dr. Foster opined that Mr. Nelson "has remorse, he has a conscience," and that these findings "could have been presented in greater detail, giving a context to his heinous act." Dr. Foster also reported Mr. Nelson's history of trauma, abuse, and neglect "are among the most severe." He opined that Mr. Nelson's "current competency is unstable at best and questionable at worst" [60].

**<u>Neuropsychological Evaluation of Keith Nelson by Michael M. Gelbort, Ph.D., 10/05/05</u>**

Keith Nelson was referred to Dr. Gelbort for neuropsychological evaluation by his attorney, David Ruhnke, and was seen in full contact visitation at the federal penitentiary in Terre Haute, IN, on 10/05/05. Mr. Nelson was administered a neuropsychological battery including

the Wechsler Adult Intelligence Scale-III, Wechsler Memory Scale-III, Trail-making Test, Category Test, Lateral Dominance Exam, Strength of Grip, partial Sensory Exam, Wide Range Achievement Test-III, Aphasia Screening, Items from the Luria Nebraska, and Diagnostic Interview with Mental Status Testing [61].

Mr. Nelson earned Verbal, Performance, and Full Scale IQ scores of 93, 107, and 99 respectively. Dr. Gelbort noted the 14 point difference between verbal and nonverbal abilities "approaches statistical significance." Academic achievement testing found sight reading at the high school level with spelling and math at the sixth and seventh grade levels respectively [61].

Dr. Gelbort reported tests of learning and memory revealed that working memory was mildly suppressed and somewhat variable in both auditory and visual modalities, with inconsistent performance demonstrated. Short term verbal memory for meaningful, paragraph length material was also found to be flawed due to inconsistent initial encoding. Short term visual memory for meaningful information was also significantly affected, with mild impairment seen overall. Transfer from short to long term memory also reflected mild impairment in both verbal and visual modalities. Rote memorization showed borderline deficient performance overall. Dr. Gelbort reported Mr. Nelson "has difficulty focusing his attention and concentration in an effective manner in order to encode and take in new information with normal efficiency and reliability" [61].

Dr. Gelbort noted that tests of higher cognitive functions found a similar pattern. Easier to process information resulted in slightly above average performance, while more complex tasks resulted in performance in the mildly impaired range. Dr. Gelbort's interpretation of his findings was that Mr. Nelson's "encoding slowness, difficulty in recognizing what is salient in many situations, and overall cognitive efficiency suggests the presence of frontal lobe dysfunction" [61].

Dr. Gelbort concluded that "the overall battery shows indications of frontal lobe disturbance/dysfunction and this has an effect on his everyday thinking and reasoning capacities. While his scores oftentimes are in the normal range the pattern does not conform with what is seen in individuals with normal functioning brains. Mr. Nelson will demonstrate episodes of impaired reasoning and learning/memory

abilities and is found to have other than normal brain functioning. His performance is consistent with and indicative of brain dysfunction" [61].

**<u>Opinion of Natalie Novick Brown, Ph.D., Regarding Fetal Alcohol Spectrum Disorder, 12/04/06</u>**

Dr. Brown was retained by Mr. Nelson's court-appointed counsel, David A. Ruhnke, to complete an evaluation and provide an opinion concerning whether or not Mr. Nelson suffers from Fetal Alcohol Spectrum Disorder (FASD) due to prenatal alcohol exposure [62].

Dr. Brown wrote that the most serious and pervasive damage from maternal consumption of alcohol during pregnancy occurs in the central nervous system and causes significant malformation in structures within the brain that are necessary for normal development and functioning. Prenatal alcohol exposure causes structural brain damage that affects functioning in the prefrontal cortex and is associated with patterns of deficit in executive functioning in persons diagnosed with FASD [62].

Based on her initial review of source documents provided by Mr. Ruhnke and an interview with the birth mother, Nancy Nelson, Dr. Brown opined she believes there is "substantial possibility that Keith Nelson may suffer from a Fetal Alcohol Spectrum Disorder" despite Ms. Nelson's denial that she used alcohol and drugs during her pregnancy with Keith Nelson. Dr. Brown noted Ms. Nelson reported multiple developmental and behavioral problems in her son that are consistent with FASD and inconsistent with any explanation other than brain damage [62].

Dr. Brown found evidence supporting FASD Criterion 1 (growth deficiency), Criterion 2 (facial dysmorphology), and Criterion 3 (neurodevelopmental problems) in her review of Mr. Nelson's birth and early childhood records. Dr. Brown noted Mr. Nelson was born at least one month premature, that early childhood photographs reveal features sufficient to satisfy Criterion 2, and records indicate "significant problems across multiple domains including emotional modulation, activity level, developmental progress, learning, and executive functioning." Dr. Brown reported a next step in the

sequential diagnosis of FASD "is analysis of expert information pertaining to actual brain damage . . ." [62].

**Evaluation of Keith Nelson by Xavier F. Amador, Ph.D. on 02/09/09**

In a report to defense counsel dated 03/30/10, Dr. Amador noted he evaluated the defendant at the United States Penitentiary in Terre Haute, IN, on 02/09/09 for 3 ½ hours, and also reviewed records material to the case. Among them are a report and an investigative memorandum prepared by Tena S. Francis, identified as a mitigation specialist. Dr. Amador, while making reference in his report to opinions rendered previously by Michael M. Gelbort, Ph.D., and Natalie Novick Brown, Ph.D., noted he did not conduct neuropsychological testing of the defendant and that he has "not yet reviewed the majority of the aforementioned records [reports by Drs. Gelbort and Brown]" [63].

Dr. Amador opined the defendant has the following DSM-IV-TR disorders: Cognitive Disorder NOS; Post Traumatic Stress Disorder (PTSD); Psychotic Disorder NOS. Dr. Amador wrote, "Symptoms of these disorders are present now, were present at the time of the homicide he was convicted of, and during his trial" [63].

In support of his opinion that the defendant has Cognitive Disorder NOS, Dr. Amador pointed to birth complications "that very likely resulted in damage to his brain" and to numerous head injuries reported by the defendant and others. Dr. Amador also relied on the opinion of Dr. Gelbort to support his conclusion the defendant "has multiple deficits in brain function and most obviously in the frontal lobes of his brain." The deficits revealed by neuropsychological testing and by Dr. Amador's own clinical interview "paint a picture of an individual who is likely to be highly impulsive, have difficulty with memory and limited in his ability to control angry feelings." Dr. Amador also noted the defendant evidenced several signs of frontal lobe syndrome including difficulty forming abstractions, alogia, and time distortions. Dr. Amador does not believe the defendant malingered mental illness [63].

By Dr. Amador's report, the defendant also exhibited numerous instances of dissociation during the interview "and in his account of

past events including his account of the homicide." The defendant also has exhibited dissociative amnesia. Dr. Amador concluded the defendant's dissociative symptoms "may stem from brain impairment and/or Post Traumatic Stress Disorder" [63].

To support his conclusion that Keith Nelson suffers from PTSD, Dr. Amador pointed to a reported history of physical, psychological, and sexual abuse noted by Daniel V. Foster, Psy.D., in the latter's 11/23/01 report. Dr. Amador reported the defendant told him during interview only that his mother "made me go to school with urine soaked clothes" and that he was "beaten a lot and some sexual stuff." Dr. Amador also relied on Tena Francis' preliminary report that the defendant's father, Kenneth Morse, subjected him to physical abuse and that the defendant reported he was "raped by a black man" while living with his aunt Betty in California. The defendant reportedly told Ms. Francis, he was anally penetrated by this man, who also forced him to perform oral sex. Dr. Amador asserted such abuses frequently result in dissociative states and amnesia as well as in suppressed anger, "which I believe is the case here." According to Dr. Amador, the defendant "has a great deal of anger but very little conscious access to it
. . ." [63].

During his interview by Dr. Amador, the defendant reported ongoing tactile hallucinations regarding his back, as well as paranoia "to the point that he is delusional at times." Dr. Amador also noted a history of psychotic symptoms was reported by Dr. Foster. Dr. Amador concluded the psychotic symptoms "are likely stemming from both PTSD and the numerous head injuries he suffered" [63].

Regarding the issue of insanity, Dr. Amador concluded, to a reasonable degree of psychological certainty, "that at the time of the offense his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirement of the law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charges." Dr. Amador opined the defendant committed the offenses "under the influence of severe mental disturbances . . . that affected his perceptions, judgment, impulses, and ability to conform his conduct to the requirements of the law." Finally, Dr. Amador opined the defendant committed the offenses "under severe mental and emotional disturbance" [63].

## Examination Findings

### Behavioral Observations and Mental Status Examination

Keith Nelson is a short, heavy set, left-handed 35-year-old Caucasian man who presented for testing wearing grey-green prison-issued scrubs. He was clean shaven with mild acne, a short blonde crew cut, and a goatee. He was blasé only begrudgingly cooperative at first, but became more comfortable and engaged as the examination progressed. He worked hard on all the tasks placed before him.

He reported being on no medications.

He was generally well oriented to person, place, time, and situation, although as he has done for previous examiners, he stated that his age was "34 or 35."

His motor behavior was well coordinated, with no observable abnormalities of posture or gait. His speech was produced at a normal rate and volume, but with occasionally poor articulation characterized by mumbling, and intermittent paraphasias (for example saying "diraffe" instead of giraffe, and "ack-iz-dents" for accidents). He was also noted to curse frequently. There was no evidence of alogia as described by Dr. Amador.

His thoughts were expressed in a logical, coherent, and goal-directed fashion with no evidence of formal thought disorder. There was no evidence of fixed, false beliefs (delusions), however he did describe some abnormal sensory experiences. He denied any history of frank visual hallucinations. However, he did report unusual auditory experiences that he described as, "not voices or conversations – but sometimes I hear a scratching sound – in my cell. Don't hear it a lot any more." He stated that this does not occur everyday, and is, "not consistent." He stated, "I don't know if it's real or not." He reported, "I never heard it when I was not here." When asked to describe this experience in greater detail, he replied, "I can't describe it. It's been a while since I've heard it." He did state that he experiences the noise as coming from, "outside my head, in the room."

He also reported two unusual somatosensory experiences. The first he described as a muscle twitch that occurs once a day, and has persisted

Appellate Case: 15-3160 Page: 36 Date Filed: 02/29/2016 Entry ID: 4372484

for "more than 10 years." He said that this occurs in his, "arms and legs – dit-dit-dit-dit." He also described a burning sensation in his back in the shoulder blade area. "It feels like somebody's burning you." He stated that always occurs in the shoulder blade area, but could not say of it was on the left or right side. He reported that this first occurred, "when I was a kid. Can't tell you exactly how old I was." He reported that last experiences as occurring, "about a week ago," and stated his follows a "random" pattern and lasts for "minutes." When asked if there was anything he could do to control or stop it he replied, "it stops on its own." He reported that it does not leave a mark on his skin. He stated that there was, "no rhyme or reason" to when this would occur, and denied any linkage to stressful life events. When asked about unusual olfactory or gustatory experiences, Mr. Nelson said, "I never smell nothing, don't really taste either."

Emotionally, his observable affect was dysphoric and irritable, but brightened somewhat as the examination progressed. The range of affect he expressed was broad and appropriately related to his mood and the content of his thoughts. He described his appetite as, "normal," but stated that he has recently lost 50 pounds as a result of, "not eating as much" and switching to Kosher meals, "to get the vegetables." He described sleeping, "when I get tired – the beds are rock hard." He stated he gets along fine socially in the prison environment and boasted that he has had, "no write-ups in 10 years." He described no loss of interest in pleasurable activities, and described his emotional experience as "the same as yesterday – I'm just here." He did state that he gets depressed, "everyday is the same." He related some problems with memory, stating that dates and names are difficult for him to remember (although he was able to recall this examiner's name spontaneously). He also acknowledged that he has problems with articulation that makes his speech difficult to understand, resulting in comments from others in his environment. His underlying mood was inferred to be depressed. His level of insight was good.

## Psychodiagnostic Test Results

**Data validity**. All of the psychodiagnostic instruments administered to Mr. Nelson have scales built-in to detect response bias. The validity scales from the PAI and the DAPS were completely within normal

limits, and the resulting test profile provides a valid and reliable indication of his current clinical picture.

On the MMPI-2, he left 18 (out of 567) items blank because he felt they did not apply to him in light of his current life circumstances, and the resulting profile needs to be interpreted with some caution as a result. He also endorsed an elevated number of infrequent symptoms, particularly on the latter portion of the test. While not rendering the test invalid, his exaggerated response style is probably best characterized as a "cry for help" from a person who is experiencing significant psychological distress.

**Test findings**. Both the MMPI-2 and the PAI are multi-scale inventories that indicate that Mr. Nelson is depressed, and experiencing significant suicidal ideation. His depression is characterized by cognitive and affective symptoms, more than physiological "vegetative" symptoms. He is dysphoric and pessimistic, with a significant potential for impulsive acting-out that places him at an elevated risk for self-harm.

Others with his profile are characterized as angry, resentful, and argumentative individuals who are suspicious of the motives of others. This is consistent with Mr. Nelson's clinical presentation. He was deeply resentful of what he perceived as the presentation of misleading evidence against him by the government at trial, and highly concerned that the present examiner would be biased against him due to the fact that I had been retained by the prosecution. "I think the government hires biased experts who will say what the government wants said. You're here to help the government kill me." He made comments in response to some test items that were particularly poignant, for example, "There are people who want to hurt me …. That's true!" Clearly, some test items that might reflect paranoid ideation in more typical clinical situations instead reflect difficult realities for Mr. Nelson.

Although he does endorse a history of traumatic stressors (particularly repeated sexual abuse over six months by another inmate while in the Gainsville State School as a juvenile) and significant cognitive or emotional distress at the time of the traumatic events, he does not manifest symptoms of Posttraumatic Stress Disorder. His scores on the DAPS indicate that he does not meet diagnostic criteria for either

Posttraumatic Stress Disorder or Acute Stress Disorder, and this is consistent with his self report and clinical presentation. His test scores reveal no significant elevations for peri-traumatic dissociation; re-experiencing; avoidance; hyperarousal; post-traumatic stress impairment; trauma-specific dissociation; or substance abuse.

## Neuropsychological Test Results

**Data validity.** Multiple tests were administered to Mr. Nelson to probe his level of effort and motivation during the neuropsychological testing. His scores on all of these measures (TOMM, VIP Verbal and Von-Verbal scales, CVLT-II Forced-Choice Recognition) indicated that he was compliant and putting forth a good effort, and that the resulting test data are valid indications of his current neurobehavioral strengths and weaknesses.

**Test findings.** The results from the neuropsychological test battery indicate that Mr. Nelson has impairments in memory and executive functioning. He displayed moderate to severe impairment in his verbal learning ability as measured by the CVLT-2. He had significant difficulty learning new verbally-presented information despite repeated exposures, due in part to a failure to recruit frontal lobe skills to organize the material for effective recall.

He also demonstrated mild impairments on several measures of frontal lobe / executive functioning. These included:

- Mild difficulty inhibiting an familiar response in favor of an unfamiliar one (Stroop);
- Mild difficulty shifting his attention effectively between competing stimuli (Trails B);
- Mildly reduced verbal fluency (Animal naming);
- Mild difficulty clustering similar items to enhance effective recall (CVLT clustering);
- Total loss of his sense of smell, a condition known as Anosmia (UPSIT); and

- Mild behavioral impairment in everyday settings, including apathy, disinhibition, and executive dysfunction (FrSBe).

Notably, other tests of frontal lobe functions were within normal limits, including speed of information processing (Trails A) and his ability to solve abstract problems and learn from feedback about his mistakes (WCST).

**Forensic Opinions**

Dr. Amador has posited three diagnoses that he implicates in Mr. Nelson's behavior proximal to the instant offense: (1) Posttraumatic Stress Disorder; (2) Psychosis NOS; and (3) Cognitive Disorder.

First, I agree with Dr. Amador (and by extension, Dr. Gelbort) that Mr. Nelson does have a Cognitive Disorder, characterized by neuropsychological impairment in memory and frontal lobe functioning as described above. However, I find no persuasive evidence that he suffers from PTSD or a Psychotic Disorder NOS.

The psychodiagnostic testing, together with my clinical examination, does not support a diagnosis of PTSDo despite reports that Mr. Nelson was exposed to several stressors, the most significant being his reported sexual abuse at the Gainsville State School. In exploring his sexual history, Mr. Nelson did report experiencing abuse there, but he also emphatically denied reports by others that he has been "raped by a black man" while living with his Aunt Betty in California. He did state that a babysitter who was 4-5 years older exposed him to pornographic videos when he was seven or eight years old, and had him touch her vaginal area when he was nine.

Dr. Amador's diagnosis of Psychosis NOS appears to be based predominantly on what he describes as Mr. Nelson's report of a poking sensation in his back. During the present examination, Mr. Nelson described this in detail, but characterized it as a burning sensation, not a poking sensation. There is a medical condition that is completely consistent with Mr. Nelson's description, and that does not involve psychosis. Notalgia paresthetica is a sensory neuropathic syndrome of the back skin, the classic location of which is the unilateral infrascapular area. Notalgia paresthetica can present as a localized

burning sensation, and follows a chronic, intermittent course that is consistent with Mr. Nelson's description. A follow-up examination by a dermatologist is warranted, because if this is indeed a skin condition that would indicate that the symptoms are not the product of a psychotic experience.

Although Mr. Nelson did describe hearing a scratching noise in his cell, he was careful to distinguish this from hearing voices, and indicated that it did not occur prior to his incarceration in Terre Haute, that he has net experienced it recently, and that he does not know if it was "real" or not.

Dr. Amador also refers to Mr. Nelson's strong beliefs about the government and the prosecution experts as paranoid and delusional. However, in discussing this with Mr. Nelson these do not appear to be paranoid delusional ideas as much as they reflect his reality and the cynical attitude and beliefs he has developed about how the evidence in his case was presented, and what he perceives as the government's agenda to see that he gets the death penalty. Mr. Nelson was open about admitting that he is guilty of killing Pamela Butler. However, he denied having sexually assaulted her, and felt that the government's expert testimony regarding the sexual assault based on the condition of her body at autopsy was inconsistent with the evidence. He expressed his belief that the expert in that situation simply said what the government wanted to have said, and was dishonest with respect to the actual physical evidence. In my opinion this is not delusional thinking, although it probably does underlie his cynicism and distrust of "government doctors" and what their opinions about him will be.

Given the general absence of other clinical signs and symptoms of psychosis, and the findings from the psychodiagnostic testing, it is my opinion that Mr. Nelson does not suffer from Psychosis NOS.

Finally, Dr. Amador offers the opinion that at the time of the instant offense, Mr. Nelson's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired. In my opinion, the evidence in this case indicates that this opinion is incorrect.

Mr. Nelson's behavior before, during, and after the offense show that he did know that what he was doing was wrong, and that he was able

to conform his conduct to the requirements of the law when it served his purposes.

Mr. Nelson admitted during the present examination that his statements about taking, raping, a killing a 14-year-old girl to Steve Underwood prior to the offense were "partly true," although he characterized them as fantasies rather than actual plans. The fact that he allegedly stated, "I've been watching her and everything is cool. Now is the time to do it," indicates that he had planned the crime, and was able to control his behavior until the time was right, in order to maximize his chances of doing what he fantasized, while minimizing his risk of getting caught.

During the present examination, Mr. Nelson stated that he had just driven past the victim when he pulled over, got out, and opened the door in anticipation of taking her. He stated, "She was just in the wrong place at the wrong time." The fact that he positioned his truck, opened the door, and reportedly hid on the front seat indicate that he was able to control his behavior, plan ahead, lay in wait, and kidnap the victim in a manner that was likely to reduce his risk of being identified and maximize his chances of successfully abducting her. The fact the he hid himself reflects his awareness that what he was doing was wrong, and that he did not want to be identified easily.

The fact that he then drove away at a high rate of speed also suggests his awareness that what he was doing was wrong, and the need to reduce his risk by getting away quickly while restraining the victim to prevent her escape.

Although he denied the sexual assault during the present examination, he did state that he undressed her, and opened his pants before learning that she was 10. He then described obtaining the electrical cord from his truck and putting it around her neck, "Originally I grabbed it to put it around her neck – not choking her – just so she couldn't run off. That was the original reason I had it – it was in the back of the truck or something." The fact that he brought the electrical cord, and placed it around her neck to prevent her escape reflects his knowledge that what he was doing was wrong, and his capacity to think ahead and control his behavior so as reduce his risk of getting caught.

After the homicide, Mr. Nelson told me that he removed her clothes and threw them in the pond, "because I had seen where fibers stick to clothes," indicating that he was attempting to get rid of forensic evidence that might tie him to the crime, again reflecting his knowledge that what he had done was wrong. The fact that he covered her body with leaves and branches also reflects knowledge of the wrongfulness of his behavior, and an attempt to hide the body to reduce his risk of getting caught.

The fact that he was seen wiping down the truck after the crime, and later abandoned it is additional evidence that he appreciated the wrongfulness of his conduct, and was attempting to reduce his risk of apprehension by getting rid of forensic evidence that might link him to the crime. The fact that he then went on the lam, and ran from the police when he was found is further evidence that he appreciated the wrongfulness of his conduct.

If I can be of further assistance in this matter, please feel free to contact me directly at (949) 723-2211.

Sincerely,

Daniel A. Martell, Ph.D., A.B.P.P. [Forensic]
Clinical Assistant Professor of Psychiatry and Biobehavioral Sciences
Semel Neuropsychiatric Institute
David Geffen School of Medicine at U.C.L.A.

# EXHIBIT 25

**CHRONOLOGY - DEFENSE MENTAL HEALTH INVESTIGATION**

| | |
|---|---|
| 08/21/2000 | Trial continued to April 2001. |
| 08/25/2000 | Court authorizes $20,000 to retain psychiatrist, Stephen Peterson, M.D. (Funds never utilized.) |
| 01/24/2001 | Court authorizes $2,500 for neuropsychological evaluation by Dennis Cowan, Ph.D. (Funds never utilized.) |
| 02/13/2001 | Patrick Berrigan appointed as Learned Counsel in place of William Shull. |
| 02/28/2001: | Berrigan cancels neuropsychological examination of Nelson that had been scheduled for following day. |
| 03/08/2001 | Trial continued to October 29, 2001 |
| 08/08/2001 | Berrigan undergoes quintuple bypass surgery. |
| 09/04/2001 | Defense files notice of intent to present mental-health mitigation at penalty; attaches CV of expert, Daniel Foster, Psy.D. |
| 09/17/2001: | Defense files *ex parte* motion to authorize Dr. Foster's services up to $7,500. |
| 10/05/2001 | Dr. Foster interviews Nelson for one hour. |
| 10/06/2001 | Dr. Foster interviews Nelson for 8 hours. Describes meetings as primarily "history-taking and trust-building." |
| 10/10/2001 | Dr. Foster's services authorized up to $7,500. |
| 10/18/2001 | USMJ Hays advised by defense counsel Berrigan that Nelson will not cooperate with government experts' interview. |
| 10/23/2001 | Defendant's position reiterated before Judge Gaitan. |
| 10/25/2001 | Defendant enters guilty plea to count one of indictment. |
| 10/26/2013 | Court rules defendant's refusal to cooperate means he may not present expert evidence on mental health issues. |

CLERK U.S.DISTRICT COURT
Exhibits:
P 79
Case No. 4:04-CV-08005-FJG

| | |
|---|---|
| 10/28/2001 | Nelson attempts suicide. |
| 10/31/2001 | Nelson's competency challenged by defense. |
| 11/07/2001 | Court orders William Logan, MD, to assess Nelson's competency that same day. |
| 11/08/2001 | Court finds Nelson competent and further examination unnecessary. |
| 11/13/2001 | Jury-selection begins. |


Aug 21, 2000
Trial continued to April 2001.
Aug 20, 2000
Jan 20, 2001
Jan 25, 2001
Feb 1, 2001
Feb 5, 2001
Feb
Aug 25, 2000
Court authorizes $20,000 to retain psychiatrist Stephen Peterson, M.D. (Funds never utilized.)
Jan 24, 2001
Court authorizes $2,500 for neuropsychological evaluation by Dennis Cowan, Ph.D. (Funds never utilized.)

P79-0004


Feb 13, 2001
Patrick Berrigan appointed as Learned Counsel in place of William Shull.
Feb 28, 2001
Berrigan cancels neuropsychological evaluation by Dr. Cowan that had been scheduled for March 1, 2001.
Jun 11, 2001
Execution of Timothy McVeigh.
Mar 8, 2001
Trial continued to October 29, 2001.
10, 2001
Feb 15, 2001
Feb 20, 2001
Feb 25, 2001
Mar 1, 2001
Mar 5, 2001
Jun 10, 2


Jun 17, 2001
Execution of Juan Garza.
Aug 8, 2001
Berrigan undergoes quintuple bypass surgery.
Jun 15, 2001
Aug 5, 2001
Aug 10, 2001
Aug 15, 2001
Aug 20, 2001


Sep 4, 2001
Defense files notice of intent to present mental-health mitigation at penalty; attaches CV of expert, Daniel Foster, Psy.D.
Sep 17, 2001
Defense files ex parte motion to authorize Dr. Foster's services up to $7,500.e
001
Sep 1, 2001
Sep 5, 2001
Sep 10, 2001
Sep 15, 2001
Sep 20, 2001

P79-0007


Oct 6, 2001
Dr. Foster interviews Nelson for eight hours. Describes meeting as primarily "history-taking and trust-building."
Oct 23, 2001
Defendant's position reiterated before Judge Gaitan.
Oct 5, 2001
Dr. Foster interviews Nelson for one hour.
Oct 18, 2001
USMJ Hays advised by defense counsel Berrigan that Nelson will not cooperate with government experts' interview.
Sep 25, 2001
Oct 1, 2001
Oct 5, 2001
Oct 10, 2001
Oct 15, 2001
Oct 20, 2001
Oct 10, 2001
Dr. Foster's services authorized up to $7,500.


Oct 25, 2001
Defendant enters guilty plea to court one of indictment.
Oct 26, 2001
Court rules defendant's refusal to cooperate means he may not present expert evidence on mental health issues.
Nov 13, 2001
Jury selection begins.
Oct 25, 2001
Nov 1, 2001
Nov 5, 2001
Nov 10, 2001
Oct 31, 2001
Nelson's competency challenged by defense.
Nov 8, 2001
Court finds Nelson competent and further examination unnecessary.
Oct 28, 2001
Nelson attempts suicide.
Nov 7, 2001
Court orders psychiatrist William Logan, M.D., to assess Nelson's competency that same day.

# EXHIBIT 26

Daniel V. Foster, Psy.D.
Clinical and Forensic Psychologist
P.O. Box 1429
Browning, MT. 59417

Exhibits: (D) 136
Case No. 99-00303

Consultant for the Defendant

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

United States of America,
Plaintiff

vs. CASE NO. 99-00303-01-CR-W-2

Keith Dwayne Nelson
Defendant

I, Daniel V. Foster, Psy.D., Clinical Psychologist and Forensic Psychologist, being duly sworn upon my oath deposes and states as follows:

BACKGROUND: Keith Nelson was charged by Indictment on October 21, 1999 with two counts: Kidnapping Resulting in Death and Sexual Abuse Resulting in Death. On October 25, 2001, Mr. Nelson pled guilty to the first count, Kidnapping Resulting in Death. This psychologist met with Mr. Nelson for approximately one hour the afternoon of October 5, 2001, and for approximately eight hours on Saturday, October 6, 2001. In addition to the interviews, background information specific to his crime and his formative history was reviewed. Since our meeting, Mr. Nelson secreted multiple dosages of two antidepressants medications, Trazadone and Elavil, and attempted suicide by overdose on October 28, 2001.

CLERK U.S.DISTRICT COURT
Exhibits:
P 8
Case No. 4:04-CV-08005-FJG

The Court then addressed the issue of competency. William Logan, M.D. reviewed some materials, met with Mr. Nelson for three hours and opined that he was chronically depressed, probably as long as a year before his incarceration, and was depressed as of November 7, 2001. In the absence of psychological testing (Mr. Nelson has been reported as refusing testing or assessment in the past), Dr. Logan found him to be presently competent, though recommended supportive psychiatric counseling and monitoring to assist his sentencing. The Court concurred with Dr. Logan, found Mr. Nelsen to be presently competent, and took Dr. Logan's recommendation for supportive counseling and professional monitoring throughout the penalty phase under advisement.

Of note is Dr Logan's concern that Mr. Nelsen could quickly deteriorate without observable clear signs, lose concentration, and/or become suicidal. Mr. Nelson is able to present different signs and symptoms of his psychological status to persons viewing him over the same period of time. On October 30, 2001, Dr. Hucke noted Mr. Nelson resisted self-disclosure but seemed "depressed, angry and impulsive." Both he and Dr. Logan suggested psychotropic medications to reduce anxiety and depression. His treating Internist (following his suicide attempt, October 29th-31st, 2001), Dr. Whitlow, found him to be "...very depressed, probably more than any inmate I've seen in the past." Dr. Whitlow shares extensive experience treating inmates since 1990 through the present. He goes on to state " If he were a civilian patient, I would seek to have him voluntarily incarcerated in an institution for further evaluation and treatment. If he did not consent to voluntary treatment, I would seek to involuntarily commit him..." On October 31, 2001, Dr. Fodare noted " There may be some depressive symptoms at this time but they are not overt." (Dr. Fodare had interviewed him for the purposes of a mental status evaluation at least once previously, on October 18, 1999).

FINDINGS: Mr. Nelson is somewhat of an enigma for competent, intelligent professionals. The Court, at his Competency Hearing, appeared to dismiss or discount multiple inconsistencies on the part of Mr. Nelson's self-report ("no prior psychiatric/psychological assessment, care or treatment," checked off on a screening form", psychiatric treatment all the time- Admission intake form, Crisis Stabilization Unit, SW Missouri Mental Health Center, August of 1995). Mr. Nelson's not self-disclosing or trusting of prison staff, and perhaps of most authority figures. The Court further satisfied its obligation for determining his competency by asking questions which required a "yes" or " no" response and observing his social appropriateness and interaction with his attorney during formal hearings.

By way of brief background, this psychologist worked with the McClennan County Adult Probation Office (State of Texas) while a doctoral student in Clinical Psychology at Baylor University in Waco, Texas from 1976-1978. I was later employed in various capacities as a psychologist for the federal Bureau of Prisons. These positions included Director, Drug abuse Program, U.S. Penitentiary, Lompoc, California; Forensic

Psychologist, U.S. Medical Center, Springfield, Missouri, Chief of Psychology, Federal Medical Center, Rochester, Minnesota; and Director, Drug Abuse Programs, Bureau of Prisons, Washington, D.C. I have provided and supervised assessment, forensic evaluations, treatment and care for hundreds of felons over a period of many years.

Had I been allowed to further evaluate and subsequently testify, numerous additional factors clarifying Mr. Nelson's current mental status could have been presented to the triers of fact and determiners of fact and determiners of sentence. For instance, Mr. Nelson has an extensive history of mental health intervention and family services intervention dating back to his early childhood. He was raised under conditions of severe abuse, neglect and deprivation. He struggled in school, repeating early elementary grades, and displayed multiple signs and symptoms of both learning impairments and psychological problems. He lacked nocturnal bladder control past the age of ten, sleeping in a maggot infested bed and was forced to attend class without bathing or clean clothing-having to bear the taunts of his peers and distain/concern of his teachers. Multiple other instances of trauma, abuse, neglect and their psychological impact would have been presented. He was taken from his home repeatedly, only to be returned. He was shuttled from Foster homes, to his mother, to Group Homes, back to his mother, to Juvenile Facilities and at a young age, to prison. The abuse, neglect and and violent conditions he experienced in his mother's home was matched and exceeded as he was sent from place to place. He witnessed, experienced and was personally victimized by rapes, assaults and riots. That this affected him through the present time is documented and supported by the reports of many who witnessed and attempted to lessen some of the effect of the trauma to which he was subjected throughout his formative years.

His subsequent acting out and intermittent psychological instability were at times met with treatment though on most occasions with indifference or confinement. At an early age he found sanctuary in the idealized world of his own private thoughts and dreams. It was his misfortune to be confined as a juvenile in Texas facilities. The Texas Department of Corrections was performing experimental frontal lobotomies on Conduct Disordered (Antisocial) teenagers as recently as the late 1960's as an experimental form of "treatment".

He had psychotic breaks by his late teens and has had at least one since his confinement at the pre-trial facility in Leavenworth. He long ago learned to not trust adults or authority and continues to avoid assistance and intervention, however well intended and competently provided, through the present time. That he would prefer death to the life he has known and anticipates is no surprise to the Court or this writer, though we interpret this through different perspectives, each with facts and evidence to support our views.

That he meets the criteria for Antisocial Personality Disorder is something we agree on. As a child he was delayed developmentally in multiple ways. Had his mother stayed in one location long enough for the social and family services system to gather sufficient information, the intervention and protection he needed possibly would have occurred. As

a child he met current criteria for Pervasive Developmental Disorder, Not Otherwise Specified and currently he meets DSM-IV-TR criteria for Post Traumatic Stress Disorder- Chronic, Severe, Major Depressive Disorder-Recurrent, as well as the personality disorder already identified.

While Sexual Sadism is strongly suggested by the facts of his crime, we were unable to complete an evaluation. Our time was primarily spent in trust building and history taking. These conditions are treatable, and the latter manageable in an adult prison.

He has remorse. He has a conscience, despite often functioning emotionally as the child he was never allowed to be. These findings could have been presented in greater detail, giving a context to his heinous act. Had the Court taken the opportunity to pursue a more thorough evaluation of competency and responsibility at a facility such as the Federal Medical Center in Rochester, Minnesota, where he would have received compassionate care as well as a thorough psychiatric and psychological forensic evaluation, it is likely that this recent and future suicide attempts would not occur.

For the last seven years, this writer has been seeking to modify the present and future of young men and women raised similarly to Mr. Nelson in the difficult conditions prevalent on the Blackfeet Reservation in Montana. Of the twenty five plus years of forensic experience and training this examiner has, Mr. Nelson's history of trauma, abuse and neglect are among the most severe. It is believed that the presentation of this history, the residual strengths and values that he nevertheless possesses, and the availability of a facility where he could heal and make what amends a life lived incarcerated could offer, would be factors relevant for a jury of his peers.

Given the irreversibility of a death penalty, it would seem essential that the jury hear of the formative stressors, lifelong impairment and psychiatric care facilities available where a life sentence could be served. His current competency is unstable at best and questionable at worst. Given the potential irreversibility of the sentencing outcome and the availability of secure federal psychiatric facilities (USFMCFP, Springfield, Missouri; FMC, Rochester, Minnesota and FMC, Butner, North Carolina) it is surprising that the Court did not choose to "err on the side of caution" and send Mr. Nelson for evaluation and treatment as indicated to assure his appropriate participation in this critical hearing. With or without such treatment, his sentencing jury would surely have welcomed consideration of these essential psychological components of Mr. Nelson.

Respectfully submitted the 23rd day of November, 2001.

Daniel V. Foster Psy. D

Daniel V. Foster, Psy.D.
Clinical and Forensic Psychologist

On this 23rd day of November, 2001, before me a Notary Public for the State of Montana, personally appeared Daniel V. Foster, Psy.D., known to me to be the person whose name is subscribed to this instrument and acknowledged to me that he executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal the day and year first above written.

Notary Public for the State of Montana
Residing at Browning, Montana
My Commission expires on 05 31 2004

NOTARIAL SEAL STATE OF MONTANA