No. 15-3160

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

Keith D. Nelson,

Appellant,

vs.

United States of America,

Appellees.

On Appeal from the United States District Court
District of Arizona
Case No. 4:04-8005-cv-W (FJG)

# APPELLANTS EXHIBITS TO MOTION FOR ISSUANCE OF CERTIFICATE OF APPEALABILITY

**Exhibits 17-18**


*/s/Paula K. Harms*
Jon M. Sands
Federal Public Defender
Paula K. Harms
Assistant Federal Public Defender
Capital Habeas Unit
850 W. Adams Suite 201
Phoenix, Arizona 85007
602-382-2816 telephone
602-889-3960 facsimile

*/s/ David A. Ruhnke*
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
973-744-1000 telephone
973-746-1490 facsimile
dr@ruhnkeandbarrett.com

# EXHIBIT 17

Printed in U.S.A.

2002

JANUARY, FEBRUARY, MARCH, APRIL, MAY, JUNE, JULY, AUGUST, SEPTEMBER, OCTOBER, NOVEMBER, DECEMBER

# POCKET PAL™ 2001

## IDENTIFICATION

PAT BERRIGAN
7401 WYOMING ST.
KC MO 64114
444-7298 474-3350
pberrigan@kctriallawyers.com

WATSON + DAMERON
2500 Holmes, KCMO 64108
474-3350
221-1636

## IN CASE OF ILLNESS OR ACCIDENT, NOTIFY

JUSTINE BERRIGAN
444-7298 881-3722

## SPECIAL EMERGENCY INSTRUCTIONS

Lee Giorgi

POCKET PAL™ DIARY
Copyright © MYRON MANUFACTURING CORP. 2000
All rights reserved. Reproduction of product formats or descriptions in part or whole is prohibited by law.
205 Maywood Avenue, Maywood, New Jersey 07607
Phone: (201) 843-6796 Fax: (201) 843-6390
Website: www.myrononline.com

CLERK U.S.DISTRICT COURT
Exhibits:
P 17C
Case No. 4:04-CV-08005-FJG

# JANUARY '01

JANUARY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | | | |

15 MONDAY
Martin Luther King, Jr. Day

16 TUESDAY

17 WEDNESDAY

FEBRUARY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | | | |

"Go the extra mile. It's never crowded."
— *Executive Speedwriter Newsletter*

THURSDAY 18
10:30 a.m. Gordon Martis pretrial hrg.

FRIDAY 19
John Sexton's APPELLATE BRIEF due 8th Circuit Today !!
10:00 Meet w/ Al Willet & Tom Frerichs in Bob Rigg's office at Drake Univ. Law School in Des Moines, IOWA

SATURDAY 20
2:00 pm Deanna Field's Wedding @ Metropolitan Church at Linwood near Prospect

SUNDAY 21

# JANUARY '01

JANUARY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | | | |

FEBRUARY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | | | |

"When we seek to discover the best in others, we somehow bring out the best in ourselves."
— WILLIAM ARTHUR WARD

22 MONDAY

(660-826-5890)
8:15 a.m. Call Dr. Kiburz re: Angela Brown

St. Louis TRIP! re: Chris Simmons
SW# 258 @ 4pm

23 TUESDAY

DR. LEE GIORGI off. appt.

24 WEDNESDAY

Jan Thompson PSI Response due today!!

ANGIOPLASTY TODAY?

THURSDAY 25

FRIDAY 26

Briefs due in Angela Johnson care today; Re: Atty-Client Conflict, Proc. for 1/30 hrg.

SATURDAY 27

5:30pm Joe's soccer game

SUNDAY 28

# JANUARY '01

FEBRUARY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | | | |

29 MONDAY

Craig Rider Motions due today!!

7pm Boy Scouts

30 TUESDAY

CHRIS SIMMONS RHRG MOT. due TODAY!

1:00 p.m Rule 26 Meeting at Roy True's off. re: D.J. Coyle

1:30 p.m. Hrg. Cedar Rapids Re. Angie Johnson.

31 WEDNESDAY

9:20am PTC Luis Padilla-Moreno / J. Hays

11:45am Lunch w/J. Speck at Sharnet

3:00 p.m. Cardiovascular Consultants Home Exer. Appt. (Anna or Natalie at 303-3344 $150.00

MARCH

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

"Enjoy the little things, for one day you may look back and realize they were the big things."
— ROBERT BRAULT

# FEBRUARY

THURSDAY 1

See Luis Padilla-Moreno today;

*CHRIS SIMMONS call from POTOSI.

3pm Ernie + Linda Bauba off. appt. #993-1003

FRIDAY 2

SATURDAY 3

SUNDAY 4

9am JOE'S SOCCER

P17C-0005

FEBRUARY '01

"Happiness is a very small desk and a very big wastebasket."
— ROBERT ORBEN

5 MONDAY 9AM Div. 9 James Johnson cont APP.
11 Am Joe Morettina off. appt
H# 734-9002 pgr # 913-473-4083
3p-5pm GORDON MARTIS team meeting.
7pm Boy Scouts

6 TUESDAY
9AM Mellisa Hazlett depo
10:30AM Heather Mills "
BERUBE depos

6:30pm Joe's soccer

7 WEDNESDAY

11:30AM CCA Visit w/ LUIS PADILLA and HECTOR DANIEL VASQUEZ-TORREZ

THURSDAY 8

1:30pm US Atty's off. re: PADILLA disc. review
3pm Ernie Berube Hrg. Div. 15

FRIDAY 9

NOON - Lunch w/ Chuck Gordon

SATURDAY 10

SUNDAY 11

3pm Joe's Soccer

P17C-0006

FEBRUARY '01

"It's easy to get good players. Gettin' em to play together, that's the hard part."
— CASEY STENGEL

12 MONDAY
Lincoln's Birthday

1:30 p.m. Craig Rider PTH
J. Lungstrom
Rm. #427 KC KS
Fed Ct.

13 TUESDAY 7pm Boy Scouts

9AM Mellissa Hazlett depos
10AM Heather Mills

14 WEDNESDAY
St. Valentine's Day

THURSDAY 15

MARTIS Mitigation Invest.

FRIDAY 16

10:30 a.m. Gordon Martis pretrial hrg.

CCA Visit w/ LUIS PADILLO!
Call Ernie Berube to confirm SAT. appt.
# 943-1003
1:30-4:30pm Meet w/ Kathy res Jamie Johnson

SATURDAY 17

10AM Meet w/ Ernie, practice test.
7:30pm JOE'S SOCCER

SUNDAY 18

P17C-0007

FEBRUARY '01

| FEBRUARY | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | | | |

19 MONDAY
Presidents Day

TRIP TO DES MOINES ?

7pm Boy Scouts ?

20 TUESDAY

6:30pm Joe's soccer

21 WEDNESDAY

| MARCH | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

"A good plan executed right now is far better than a perfect plan executed next week."
— GEORGE S. PATTON

THURSDAY 22
Washington's Birthday

MARTIS Mitigation Investigation

FRIDAY 23

Wolftones Concert w/ D. Herrington

SATURDAY 24

TRIP TO MARYLAND / WASH. D.C.

SUNDAY 25

P17C-0008

# FEBRUARY '01

MARCH

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

APRIL

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | | | | | |

"... skate to where the puck is going to be, not where it has been."

— WAYNE GRETZKY

## 26 MONDAY

Orthodox Lent Begins

WASH. D.C./ MARYLAND

re: Jamie Johnson

physical exam

1:30pm Physical Exam w/ Dr. Sheldon Marguiles

7pm Boy SCOUTS

## 27 TUESDAY

10AM Depo of Dr. Sheldon Marguiles.

## 28 WEDNESDAY

Ash Wednesday

## MARCH

## THURSDAY 1

## FRIDAY 2

Life in BALANCE

Alburquerke, New Mexico

## SATURDAY 3

## SUNDAY 4

P17C-0009

# MARCH '01

MARCH

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

APRIL

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | | | | | |

"I'm opposed to millionaires, but it would be dangerous to offer me the position."

— MARK TWAIN

## 5 MONDAY

LIFE IN BALANCE

(Cont.)

## 6 TUESDAY

## 7 WEDNESDAY

3pm Depo of Dr. Yorke re: Jamie Johnson

8AM Dan Reid in office.

## THURSDAY 8

10AM DAN REID deposition

2:30pm JANICE THOMPSON sentencing – J. FENNER

## FRIDAY 9

9AM CCA Visit

James Lovell calling you!

## SATURDAY 10

6pm Blue + Gold Banquet St. Ann's Parish Hall

NOON – DES MOINES re: Angela Johnson mtg.

## SUNDAY 11

P17C-0010

# MARCH '01

MARCH

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

APRIL

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | | | | | |

"When I go to the beauty parlor, I always use the emergency entrance. Sometimes I just go for the estimate."
— PHYLLIS DILLER

12 MONDAY

9am Depo of Dr. Harold Bursztajn re: Jamie Johnson case.

7pm Boy Scouts

13 TUESDAY

14 WEDNESDAY

THURSDAY 15

9:00 a.m. Angela Johson Messiah HRG. in Sioux City (Not cedar R) (2 days)

FRIDAY 16

SATURDAY 17
St. Patrick's Day

SUNDAY 18

P17C-0011

# MARCH '01

MARCH

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

APRIL

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | | | | | |

"In the future, everyone will be famous for fifteen minutes."
— ANDY WARHOL

**19 MONDAY**

9AM Div. 10 Felix Pacheco for special setting
10AM Alfredo Avitia off. appt.
11 AM DR. LOGAN

U.S. v. LUIS PADILLA TRIAL J. WHIPPLE

OFF THIS AFTERNOON
7pm BOY SCOUTS

**20 TUESDAY**

7:30 am Meet Bronwyn Werner in your off.
9AM Dr. Logan's Depo re: JAMIE JOHNSON

2 pm Meeting w/ Nick Tomasic re: Gordon Martis
3:30pm Meet w/ Jessie for trial prep. re: Israel Zamora.

**21 WEDNESDAY**

10:00 Alfredo Avitia Muni. Ct. fee = $800.00

OFF THIS AFTERNOON.

**THURSDAY 22**

9AM Luis Padilla - Moreno guilty plea.

OFF THIS AFTERNOON

**FRIDAY 23**

10:30 a.m. Gordon Martis pretrial conf.

OFF THIS AFTERNOON.

**SATURDAY 24**

**SUNDAY 25**

# MARCH '01

MARCH

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

APRIL

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | | | | | |

"There is more to life than increasing its speed."
— MOHANDAS K. GANDHI

26 MONDAY

7pm Boy Scouts

27 TUESDAY

28 WEDNESDAY

2pm Call from Paul Kreutzer.

THURSDAY 29

FRIDAY 30

3:30pm Mrs. Fitzmorris off. appt. w/Russ

SATURDAY 31

APRIL SUNDAY 1
Daylight Savings Time Begins

# APRIL '01

APRIL

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | | | | | |

MAY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

"April prepares her green traffic light, and the world thinks GO!" — CHRISTOPHER MORLEY

2 MONDAY WASH. D.C. Trip
re: JAMIE JOHNSON

7 pm BOY SCOUTS

3 TUESDAY

10AM Depo of Dr. Rosenthal re: Jamie Johnson

4 WEDNESDAY

THURSDAY 5
9am Depo of Dan REID in our office.

3:00 p.m. Gordon Martis pretrial

FRIDAY 6
POTOSI TRIP TODAY

SATURDAY 7

SUNDAY 8
First Day of Passover / Palm Sunday

P17C-0014

APRIL '01

| APRIL | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | | | | | |

| MAY | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

"A clown is like aspirin, only he works twice as fast."
— GROUCHO MARX

9 MONDAY

GORDON MARTIS trial prep.
this week

2pm Israel Zamora Trial w/ Jessica
in JUV. CT.

7pm Boy Scouts

10 TUESDAY

11 WEDNESDAY

THURSDAY 12

MARTIS
TRIAL PREP. (Cont.)

FRIDAY 13
Good Friday

SATURDAY 14

SUNDAY 15
Easter Sunday / Orthodox Easter

# APRIL '01

APRIL

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | | | | | |

MAY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

"Start every day with a smile and get it over with."
— W. C. FIELDS

16 MONDAY
Patriots Day (MA, ME)

TRIAL PREP WEEK:

Gordon Martis TRIAL

7pm Boy Scouts

17 TUESDAY

18 WEDNESDAY

THURSDAY 19

Gordon Martis Trial Prep.

FRIDAY 20

SATURDAY 21

SUNDAY 22

P17C-0016

# APRIL '01

| APRIL | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | | | | | |

| MAY | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

"Never ruin an apology with an excuse."
— KIMBERLY JOHNSON

23 MONDAY

GORDON MARTIS TRIAL

24 TUESDAY

25 WEDNESDAY
Secretaries Day

THURSDAY 26

GORDON MARTIS TRIAL (CONT.)

FRIDAY 27

SATURDAY 28

SUNDAY 29

# APRIL '01

MAY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

JUNE

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |

"The reason grandparents and grandchildren get along so well is that they have a common enemy."

— SAM LEVENSON

30 MONDAY

GORDON MARTIS

1 TUESDAY — MAY

2 WEDNESDAY

THURSDAY 3

TRIAL

FRIDAY 4

SATURDAY 5

SUNDAY 6

# MAY '01

| MAY | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

| JUNE | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |

"It is better to know some of the questions than all of the answers."
— JAMES THURBER

7 MONDAY

GORDON MARTIS

trial (CONT.)

8 TUESDAY

9 WEDNESDAY

THURSDAY 10

FRIDAY 11

SATURDAY 12

SUNDAY 13
Mother's Day

P17C-0019

MAY '01

| MAY | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

| JUNE | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |

"Sometimes the road less traveled is less traveled for a reason."

— JERRY SEINFELD

14 MONDAY

CLARENCE DARROW
D.P. COLLEGE in
ANN ARBOR, MICH.

7pm BOY SCOUTS

15 TUESDAY

16 WEDNESDAY

THURSDAY 17

FRIDAY 18

9:30AM Meet w/Al Willett, Bob Rigg, + Dean Flowers re:
Angela Johnson - Drake Legal Clinic

SATURDAY 19

SUNDAY 20

P17C-0020

# MAY '01

My interest is in the future ... because I'm going to spend the rest of my life there." — CHARLES KETTERING

## 21 MONDAY
Victoria Day (Canada)

Call Al Willott today!

3:30pm MRS. Orama off. appt. w/ son, Jose Orama - Tabares

8 pm Meet Rochelle Hernandez's family at Village of Oakwood

7pm BOY SCOUTS 620 NW Barnee KCMO

## 22 TUESDAY

9AM Rachelle Hernandez initial app. Div. 4 Platte Cty.

## 23 WEDNESDAY

11AM Athena Curry L.S. App.

2pm Andrew Barker L.S. App

## THURSDAY 24

8AM D.J. Coyle meeting

9AM Depo of DR. FREIDLANDER in Thai Pham case

11:30 am MAPHAS lunch w/ Tom Bath + Jason Billam

1pm JAMES BARRETT invest. w/ Jason

## FRIDAY 25

9AM Dr. Bill Logan depo re: JAMIE JOHNSON. (Logan's off.)

10:15 am Hector Daniel Vasquez - Torrez sentencing - J. GAITAN

3pm Casey McDonald - law st. S.J.

Jamie Johnson - deadline for motions.

4pm Wayne Williams, law student

## SATURDAY 26

KREUTZER CERT. PET. due in 2 weeks!!

## SUNDAY 27

MAY '01

| MAY | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

| JUNE | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |

"You never know when you're making a memory."
— RICKIE LEE JONES

28 MONDAY
Memorial Day

29 TUESDAY

30 WEDNESDAY

10AM Depo Prep w/ Dr. Friedlander
re: Pham Case

2pm CCA Visit w/ Susan Hunt
re: Keith Nelson

THURSDAY 31

JUNE

FRIDAY 1

9:30am State v. Barrett Supp. Hrg.
Div. 13

SATURDAY 2

SUNDAY 3

# JUNE '01

| JUNE | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |

| JULY | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

"A genius is a talented person who does his homework."
— THOMAS EDISON

4 MONDAY

9AM DR. FRIEDLANDER depo re: Pham case.

5 TUESDAY

6 WEDNESDAY

THURSDAY 7

9:30am Prelim.. Alfredo Avitia

1pm CROSSROADS CC TRIP

FRIDAY 8

9AM at our office Depos in D.J. COYLE case

9AM MRS. DEWBERRY

10:30am MR. CORY

1:00 pm MR. DJ COYLE

SATURDAY 9

KREUTZER CERT. PET. due TODAY!!

SUNDAY 10

P17C-0023

JUNE '01

| JUNE | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |

**11 MONDAY**

LARRY BAGSBY coming to KC today.

10am Golf Academy w/ boys. - NOON

3:30 pm Conf Call: Tena Francis + Susan Hunt.

**12 TUESDAY**

9AM CCA Trip: Keith Nelson ~~[illegible]~~ Tyree Player

Joe has Dr.'s appt. today.

5:30pm Meet Gerald Scott at his off.

6pm Meeting w/ Angie Brown in Sedalia

**13 WEDNESDAY**

- DIV. 13

10AM Oral Argument on James Barrett

2:30pm Ozzie Pozo P/V Hrg J. Laughery.

| JULY | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

"It goes without saying that you should never have more children than you have car windows."

— ERMA BOMBECK

**THURSDAY 14**

Flag Day

9AM Pat Eng meeting } in Columbia
10am Wally Bly " } re: Jim Johnson.

**FRIDAY 15**

CHICAGO → Depo of Dr. Arnason, MD re: Jamie Johnson

**SATURDAY 16**

**SUNDAY 17**

Father's Day

P17C-0024

JUNE '01

18 MONDAY

10AM - NOON Golf Academy w/ Boys

19 TUESDAY

20 WEDNESDAY

"When I was a kid my parents moved a lot — but I always found them."
— RODNEY DANGERFIELD

THURSDAY 21

(Dr. Logan seeing Angela Johnson at 1:30 pm today).

FRIDAY 22

STOCKTON LAKE SAILING TRIP w/ BOY SCOUTS

SATURDAY 23

SUNDAY 24
St. Jean Baptiste Day (Que.)

P17C-0025

# JUNE '01

JUNE

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |

JULY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

"Some are born great, some achieve greatness, and some hire public relations writers."
— DANIEL J. BOORSTIN

## 25 MONDAY

10AM – NOON: Golf Academy w/ Boys

2pm ISRAEL ZAMORA trial JUV CT

## 26 TUESDAY

## 27 WEDNESDAY

## THURSDAY 28

## FRIDAY 29

2:30pm GORDON MARTIN sentencing

## SATURDAY 30

## JULY SUNDAY 1

Canada Day (Canada)

JULY '01

"Happiness is good health and a bad memory."
— INGRID BERGMAN

2 MONDAY

10AM - NOON Golf Academy w/ Boys

3 TUESDAY

4 WEDNESDAY
Independence Day

THURSDAY 5

FRIDAY 6

JAMIE JOHNSON - Motions in Limine due today.
Experts depos to Ct. Rptr. on ASCI discs today.

SATURDAY 7

SUNDAY 8

JULY '01

| JULY | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

| AUGUST | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | |

Those who bring sunshine to the lives of others cannot keep it from themselves.
— JAMES MATTHEW BARRIE

9 MONDAY

10AM-NOON Golf Academy w/Boys

10 TUESDAY

10A Rachelle Hernandez Prelim. - Platte Cty.

11 WEDNESDAY

Osceola BOY SCOUT Camp

Jamie Johnson — I-s due today.

THURSDAY 12

Camp

Cont.

FRIDAY 13

Jamie Johnson final pretrial conference.

3pm Alfredo Avitia Docket Call - Div. 25 J. Hendridge

4pm MACDL Bd. Meeting - Columbia

SATURDAY 14

SUNDAY 15

P17C-0028

JULY '01

Today's greatest labor-saving device is tomorrow.
— TOM WILSON

16 MONDAY

Osceola BOY SCOUT Camp Cont.

10am - NOON: GOLF ACADEMY w/ boys.

JAMIE JOHNSON TRIAL DIV.

17 TUESDAY

18 WEDNESDAY

THURSDAY 19

Camp. (Cont.)

JAMIE JOHNSON TRIAL (CONT.)

FRIDAY 20

SATURDAY 21

SUNDAY 22

P17C-0029

# JULY '01

JULY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

AUGUST

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | |

"It's not whether you get knocked down. It's whether you get up again."

— VINCE LOMBARDI

23 MONDAY

JAMIE JOHNSON
TRIAL (CONT.)

24 TUESDAY

25 WEDNESDAY

11:30am PEET CTR. @
ST. LUKE'S —
Surgery Prep + Blood
Work

THURSDAY 26

FRIDAY 27

SATURDAY 28

IRELAND

SUNDAY 29

P17C-0030

JULY '01

AUGUST

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | |

SEPTEMBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23/30 | 24 | 25 | 26 | 27 | 28 | 29 |

"The most called-upon prerequisite of a friend is an accessible ear."
— MAYA ANGELOU

30 MONDAY

VACATION

31 TUESDAY

1 WEDNESDAY AUGUST

Noon — Lunch w/ Bob Thomas + Sean O'Brien re: John Robinson, Jr.

1:45pm Dr. Howether's off. — carpt cleaning.

THURSDAY 2

SEE CALENDAR ENTRIES FOR 8/9/01

FRIDAY 3

and 8/10/01

SATURDAY 4

SUNDAY 5

P17C-0031

AUGUST '01

| AUGUST | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | |

| SEPTEMBER | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |

"Too much of a good thing is wonderful."

— MAE WEST

VACATION

6 MONDAY

2pm Mom arrives from Boston at 2:45pm on MidWest Express #44

7 TUESDAY

1:30pm Meet w/ J. Gaitan re: Nelson questionnaire.

8 WEDNESDAY

BYPASS SURGERY TODAY — ST. LUKE'S

THURSDAY 9

See Greg Breeden at Municipal Farm

1:30pm KCMO v. Greg Breeden — J. Williams

Drive to Cedar Rapids > meeting Dean Stowers in Des Moines

FRIDAY 10

TODAY in CEDAR RAPIDS re: ANGELA JOHNSON

WRONG DATES SEE 8/2 + 8/3

SATURDAY 11

SUNDAY 12

P17C-0032

# AUGUST '01

AUGUST

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | |

**13 MONDAY**
Victory Day (RI)

BYPASS RECOVERY

**14 TUESDAY**

**15 WEDNESDAY**

SEPTEMBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |

"Experience is the name everyone gives to his mistakes."
— WOODROW WILSON

**THURSDAY 16**

**FRIDAY 17**
Admission Day (HI)

**SATURDAY 18**

**SUNDAY 19**

# AUGUST '01

AUGUST

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | |

SEPTEMBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| [illegible] | 24 | 25 | 26 | 27 | 28 | 29 |

"Probably nothing in the world arouses more false hopes than the first four hours of a diet."
— DAN BENNETT

20 MONDAY BYPASS

RECOVERY (CONT.)

21 TUESDAY

22 WEDNESDAY

THURSDAY 23

FRIDAY 24

SATURDAY 25

SUNDAY 26

AUGUST

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | |

# AUGUST '01

27 MONDAY

28 TUESDAY

29 WEDNESDAY

SEPTEMBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| [illegible] | 24 | 25 | 26 | 27 | 28 | 29 |

"Age does not diminish the extreme disappointment of having a scoop of ice cream fall from the cone."

— JIM FIEBIG

THURSDAY 30

FRIDAY 31

SEPTEMBER SATURDAY 1

SUNDAY 2

P17C-0035



SEPTEMBER '01

SE TEMBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 6 | 17 | 18 | 9 | 20 | 21 | 22 |
| | 24 | 25 | 6 | 27 | 28 | 29 |

3 MONDAY
Labor Day

4 TUESDAY

5 WEDNESDAY

OCTOBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | | | |

"I can live for two months on a good compliment."
— MARK TWAIN

THURSDAY 6

FRIDAY 7

1:30pm Felix PACHECO
Pretrial — Div. 10

SATURDAY 8

MS 150 BIKE RIDE

SUNDAY 9

TRIP TO NEVADA / CARTHAGE
today → Golf Trip

P17C-0036

# SEPTEMBER '01

SEPTEMBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23/30 | 24 | 25 | 26 | 27 | 28 | 29 |

MISD. JURY TRIAL - STATE V. ALFREDO AVITIA

10 MONDAY

GOLF TRIP 9-10-01

11 TUESDAY

12 WEDNESDAY

OCTOBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | | | |

"Failure is the opportunity to begin again, more intelligently."
— HENRY FORD

THURSDAY 13

FRIDAY 14

SATURDAY 15

SUNDAY 16

P17C-0037

# SEPTEMBER '01

SEPTEMBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23/30 | 24 | 25 | 26 | 27 | 28 | 29 |

**17 MONDAY**

FELIX PACHECO

**18 TUESDAY**

First Day of Rosh Hashanah

**19 WEDNESDAY**

OCTOBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | | | |

"The most important thing in communication is to hear what isn't being said."

— PETER F. DRUCKER

**THURSDAY 20**

TRIAL

DIV. 10

**FRIDAY 21**

**SATURDAY 22**

**SUNDAY 23**

# SEPTEMBER '01

SEPTEMBER

| S | M | T | W | T | F | S |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23/30 | 24 | 25 | 26 | 27 | 28 | 29 |

24 MONDAY

25 TUESDAY

26 WEDNESDAY

OCTOBER

| S | M | T | W | T | F | S |
| --- | --- | --- | --- | --- | --- | --- |
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | | | |

"A man who doesn't stand for something will fall for anything."
— PETER MARSHALL

THURSDAY 27
Yom Kippur

FRIDAY 28

SATURDAY 29

SUNDAY 30

P17C-0039

# OCTOBER '01

OCTOBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | | | |

1 MONDAY

2 TUESDAY

3 WEDNESDAY

NOVEMBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | |

"We make a living by what we get; we make a life by what we give."

— W. A. NANCE

THURSDAY 4

FRIDAY 5

SATURDAY 6

SUNDAY 7

P17C-0040

# OCTOBER '01

OCTOBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | | | |

8 MONDAY

Columbus Day / Thanksgiving Day (Canada)

9 TUESDAY

10 WEDNESDAY

NOVEMBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | |

"Imagination is the true magic carpet."
— NORMAN VINCENT PEALE

THURSDAY 11

FRIDAY 12

SATURDAY 13

SUNDAY 14

P17C-0041

# OCTOBER '01

| OCTOBER | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | | | |

15 MONDAY

16 TUESDAY

9:30am Div. 4 Clay

17 WEDNESDAY

9am McIntire v. Hodson Auto Sales
Div. 3 Clay Cty.
Kenneth Nelson arrives today —
call 913-486-1626

Lunch w/ Chuck + Chris at Sharaze

| NOVEMBER | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | |

"The moment may be temporary, but the memory is forever."
— BUD MEYER

THURSDAY 18

4pm MACDL Bd. Meeting - Wyrsch-Hobbs off.
6pm " Fundraiser

FRIDAY 19

9:30am P/V hrg. - Eddie Kennedy Div. 17

SATURDAY 20

SUNDAY 21

P17C-0042

# OCTOBER '01

OCTOBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | | | |

22 MONDAY

23 TUESDAY

24 WEDNESDAY

NOVEMBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | |

"A loyal friend laughs at your jokes when they're not so good, and sympathizes with your problems when they're not so bad."
— ARNOLD H. GLASOW

THURSDAY 25

FRIDAY 26

SATURDAY 27

SUNDAY 28
Daylight Savings Time Ends

# OCTOBER '01

NOVEMBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | |

DECEMBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23/30 | 24/31 | 25 | 26 | 27 | 28 | 29 |

"The fragrance always stays in the hand that gives the rose."
— HADA BEJAR

29 MONDAY

KEITH NELSON

30 TUESDAY

31 WEDNESDAY
Halloween

NOVEMBER

THURSDAY 1

TRIAL

FRIDAY 2

SATURDAY 3

SUNDAY 4

P17C-0044

# NOVEMBER '01

NOVEMBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | |

**5 MONDAY**

KEITH NELSON

**6 TUESDAY**
Election Day

**7 WEDNESDAY**

DECEMBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23/30 | 24/31 | 25 | 26 | 27 | 28 | 29 |

"Top cats often begin as underdogs."
— BERNARD MELTZER

**THURSDAY 8**

TRIAL

**FRIDAY 9**

**SATURDAY 10**

**SUNDAY 11**
Veterans Day/Remembrance Day (Canada)

P17C-0045

## NOVEMBER '01

NOVEMBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | |

DECEMBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23/30 | 24/31 | 25 | 26 | 27 | 28 | 29 |

"One thought driven home is better than three left on base."
— JAMES LITER

12 MONDAY

KEITH NELSON

13 TUESDAY

14 WEDNESDAY

THURSDAY 15

TRIAL

FRIDAY 16

SATURDAY 17

SUNDAY 18

P17C-0046

## NOVEMBER '01

NOVEMBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | |

DECEMBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23/30 | 24/31 | 25 | 26 | 27 | 28 | 29 |

"Just when you think you've graduated from the school of experience, someone thinks up a new course."
— MARY H. WALDRIP

**19 MONDAY**

KEITH NELSON

ANGELA JOHNSON DOJ
TRIAL
Conference 1pm ?
in Cedar Rapids, Iowa

**20 TUESDAY**

Call Chuck to set up appt. re:
JIM JOHNSON

**21 WEDNESDAY**

RACHELLE HERNANDEZ
PRELIM. HRG.
DIV. 6

10AM Instruction Conf. w/ J.
GAITAN re: K. Nelson

**THURSDAY 22**
Thanksgiving Day

**FRIDAY 23**

**SATURDAY 24**

**SUNDAY 25**

# NOVEMBER '01

| NOVEMBER | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | |

26 MONDAY

Depos in
JAMEY
STONE?

27 TUESDAY

28 WEDNESDAY

| DECEMBER | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23/30 | 24/31 | 25 | 26 | 27 | 28 | 29 |

"Change starts when someone sees the next step."
— WILLIAM DRAYTON

THURSDAY 29

9AM Rachelle Hernandez
Div. 1 ARR.
Clay Cty..

FRIDAY 30

DECEMBER

SATURDAY 1

SUNDAY 2

P17C-0048

DECEMBER '01

| DECEMBER | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23/30 | 24/31 | 25 | 26 | 27 | 28 | 29 |

3 MONDAY

4 TUESDAY

POTOSI TRIP TODAY

11am Kreutzer + Charlie Moreland

6:30pm Joe's Indoor Soccer

5 WEDNESDAY

FELIX PACHECO

DEPOS

| JANUARY '02 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

"Life is like riding a bicycle. You don't fall off unless you stop pedaling."
— CLAUDE PEPPER

THURSDAY 6

FELIX PACHECO

DEPOS

5pm

Al Willet in KCMO

FRIDAY 7

re: Angela Johnson

SATURDAY 8

SUNDAY 9

DRIVE to Cedar Rapids tonite.

# DECEMBER '01

| DECEMBER | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23/30 | 24/31 | 25 | 26 | 27 | 28 | 29 |

| JANUARY '02 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

"To be a champ you have to believe in yourself when nobody else will."
— SUGAR RAY ROBINSON

**10 MONDAY** CEDAR RAPIDS
First Day of Hanukkah
today
11AM Angela Johnson
DOJ presentation – video
1:30pm Emily Black docket call in Cty. (Pros. – Mitch Elliott)

**11 TUESDAY** ~~CEDAR RAPIDS~~
(cont.)

**12 WEDNESDAY**
JAMEY STONE DEPOS

**THURSDAY 13**
JAMEY STONE DEPOS

**FRIDAY 14**
5pm Troop 9 Camping Trip @ Blue + Gray Campground and GAGE

**SATURDAY 15**

**SUNDAY 16**

# DECEMBER '01

DECEMBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23/30 | 24/31 | 25 | 26 | 27 | 28 | 29 |

**17 MONDAY** JURY TRIAL: STATE of MO. v. FELIX PACHECO, Div. 10 J. Atwell

**18 TUESDAY**

**19 WEDNESDAY**

JANUARY '02

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

"Your expression is the most important thing you can wear."
— SID ASCHER

**THURSDAY 20**

FELIX PACHECO TRIAL (cont.)

**FRIDAY 21**

**SATURDAY 22**

7:30am JOE'S INDOOR SOCCER

**SUNDAY 23**

P17C-0051

# DECEMBER '01

DECEMBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23/30 | 24/31 | 25 | 26 | 27 | 28 | 29 |

JANUARY '02

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

"Kindness can become its own motive. We are made kind by being kind."

— ERIC HOFFER

24 MONDAY

25 TUESDAY
Christmas Day

7:00pm FLY TO BOSTON/ MANCHESTER

26 WEDNESDAY
Boxing Day (Canada)

XMAS VACATION

THURSDAY 27

XMAS VACATION

FRIDAY 28

SATURDAY 29

SUNDAY 30

# DECEMBER '01

JANUARY '02

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

31 MONDAY 6:05am SW# 2189
Manchester to KC, Mo..
arr. KC @ 9:30AM

1 TUESDAY JANUARY '02
New Year's Day

2 WEDNESDAY

FEBRUARY '02

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | | |

"Exhilaration is that feeling you get just after a great idea hits you, and just before you realize what's wrong with it."
— UNKNOWN

THURSDAY 3
Admission Day (AK)

FRIDAY 4

SATURDAY 5

SUNDAY 6

# EXHIBIT 18

**DECLARATION OF RUSSELL STETLER**

I, RUSSELL STETLER, declare as follows:

***Summary of Opinions***

1. I was asked by federal habeas counsel for Keith Nelson in his 28 U.S.C. § 2255 proceedings to summarize the prevailing professional norms regarding the investigation and preparation of the penalty phase of capital cases at the time of Mr. Nelson's trial in 2001 and to assess trial counsel's investigation and presentation of mitigation evidence in light of those norms.

2. These questions are addressed in detail in this declaration, but the critical points can be summed up succinctly. The need for thorough investigation to prepare for the penalty phase of capital cases was well established at the time of Mr. Nelson's trial in 2001. *See Williams v. Taylor*, 529 U.S. 362, 396 (2000) (ineffective assistance where capital counsel "did not fulfill their obligation to conduct a thorough investigation of the defendant's background"). The need to investigate mental illness and brain damage in the context of mitigating evidence was also well established at that time. (*See*, for example, Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?* 98 COLUM. L. REV. 1538 (1998) and *The Emotional Economy of Capital Sentencing,* 75 N.Y.U. L. REV. 26 (2000) (concluding that mitigation does matter, especially mental impairment and mental illness).) The Eighth Amendment jurisprudence of the United States Supreme Court has mandated individualized sentencing in death penalty cases since 1976. *See Gregg v. Georgia*, 428 U.S. 153 (1976) (finding Georgia's death penalty statute Constitutional in part because it allowed for mercy based on individualized consideration) and *Woodson v. North Carolina*, 428 U.S. 280 (1976) (finding mandatory statute



CLERK U.S.DISTRICT COURT
Exhibits:
P 69A
Case No. 4:04-CV-08005-FJG

unconstitutional because it would allow the blind infliction of the death penalty on members of a faceless undifferentiated mass). Effective capital defense throughout the post-*Furman* era has required counsel to conduct a thorough investigation of the client's life. This investigation generally involves a multigenerational inquiry into the biological, psychological, and social influences on the development and adult functioning of the accused. Mitigation investigation involves parallel tracks of collecting and analyzing life-history records, and conducting multiple, in-person, face-to-face interviews. The purpose of this thorough investigation is to develop evidence that will humanize the defendant, help the jurors to understand why he may have committed the capital offense, and to evoke compassion and empathy by identifying the client's individual frailties that at once establish human kinship and expose vulnerabilities and disadvantage. The fruits of a thorough mitigation investigation not only provide capital defendants with the effective representation to which they are entitled under the Sixth Amendment, but assure the jurors of the opportunity to consider all the evidence relevant to the reasoned moral judgment they are asked to render, thereby also assuring the courts of an outcome that is reliable and just. In my professional opinion, trial counsel's investigation and presentation of mitigating evidence in Mr. Nelson's case fell below the prevailing professional norms of 2001.

***Background and Qualifications***

3. I am the National Mitigation Coordinator for the federal death penalty projects, which are described more fully at their web site, www.capdefnet.org.[1] This national position was

[1]The Federal Death Penalty Resource Counsel and Habeas Assistance and Training Counsel Projects are programs of the Office of Defender Services of the Administrative Office of the United States Courts designed to assist the federal courts, federal defenders, and appointed



Appellate Case: 15-3160 Page: 57 Date Filed: 02/29/2016 Entry ID: 4372488

created in 2005 in response to the increased demand for effective mitigation preparation in death penalty cases following the U.S. Supreme Court's decision in *Wiggins v. Smith*, 539 U.S. 510 (2003), and the February 2003 revision of the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases. In this capacity, I consult with lawyers, investigators, mitigation specialists, and experts in connection with death penalty cases that are pending in the federal courts at trial or on habeas corpus (under 28 U.S.C. §§ 2254 and 2255). The history of my position was summarized as follows in the September 2010 Update of the Spencer Report on the Cost and Quality of Defense Representation in Federal Death Penalty Cases:

> In 2004 the Defender Services Committee authorized a position for a National Mitigation Coordinator in a federal defender office to assist in expanding the availability and quality of mitigation work in death penalty cases in the federal courts. In addition to leveraging his own significant knowledge and skills through case consultations, the National Mitigation Coordinator has enhanced defense representation and contributed to cost containment efforts by recruiting more mitigation specialists to work on federal capital cases, matching mitigation specialists with counsel, and providing expanded training opportunities both for defender staff and for private mitigation specialists who are authorized to work on federal cases. This training enhances the skills and availability of such professionals.[2]

---

counsel in connection with matters relating to the defense function in capital cases in the federal courts.

[2] JON B. GOULD & LISA GREENMAN, REPORT TO THE COMMITTEE ON DEFENDER SERVICES, JUDICIAL CONFERENCE OF THE UNITED STATES, UPDATE ON THE COST AND QUALITY OF DEFENSE REPRESENTATION IN FEDERAL DEATH PENALTY CASES 111-12 (September 2010), *available at* www.uscourts.gov/FederalCourts/AppointmentOfCounsel/Publications/UpdateFederalDeathPenaltyCases.aspx. This report updates FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May 1998), produced by the Subcommittee on Federal Death Penalty Cases of the Judicial Conference Committee on Defender Services, discussed *infra* at ¶ 15. The subcommittee chair was the Hon. James R. Spencer, so the report (and its update) are commonly known as the Spencer Report and Spencer Update.



Appellate Case: 15-3160 Page: 58 Date Filed: 02/29/2016 Entry ID: 4372488

4. From 1995 to 2005, I served as the Director of Investigation and Mitigation at the New York Capital Defender Office, which was established under New York State's death penalty statute with a mandate to ensure that indigent defendants in capital cases received effective assistance of counsel. The Capital Defender Office was charged with creating an effective system of capital defense throughout New York State by providing direct representation and offering assistance to private counsel assigned by the courts to represent indigent capital defendants. I supervised a statewide staff of investigators and mitigation specialists, and I consulted with lawyers, investigators, mitigation specialists, and experts who were retained or employed by the Capital Defender Office or the private bar in connection with death penalty cases.

5. From 1990 to 1995, I served as Chief Investigator at the California Appellate Project, a nonprofit law office in San Francisco which coordinated appellate and postconviction representation of all the prisoners under sentence of death in California. In that capacity, I also supervised an in-house staff and consulted with staff attorneys and court-appointed counsel, as well as investigators, mitigation specialists, and experts outside the office who were retained to assist counsel representing death-sentenced prisoners.

6. I have investigated all aspects of death-penalty cases since 1980, first working in a private office in California and later in institutional offices. Since 1980, I have regularly attended seminars and conferences relating to the defense of capital cases at trial, on appeal, and in postconviction. Most of these conferences were organized and attended by attorneys specializing in capital work. I investigated mitigation evidence in over two dozen death penalty cases in California in the 1980s.

7. Since 1990, I have lectured extensively on capital case investigation, particularly the investigation of mitigation evidence. I have lectured on these subjects not only in New York and California, but in many other death-penalty jurisdictions, including Alabama, Arizona, Arkansas, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, and Wyoming, as well as in Puerto Rico, a jurisdiction where only federal death penalty cases are prosecuted. I have also lectured on numerous occasions under the auspices of the Administrative Offices of the United States Courts (in connection with federal death-penalty cases and habeas corpus litigation) and at the Fourth Capital Litigation Workshop of the U.S. Army Trial Defense Service. Over the past two and a half decades, I have lectured at over three hundred fifty continuing education programs around the country, including eight in the state of Missouri.[3]

8. Since the 1990s, I have lectured on mitigation investigation in death penalty cases at multiple national training conferences sponsored by the following organizations: the NAACP Legal Defense Fund (annual Airlie conferences), the National Legal Aid and Defender Association ("Life in the Balance"), and the National Association of Criminal Defense Lawyers ("Making the Case for Life"). At various times over the past two and a half decades, I have

---

[3]Since January 2000, I have lectured at eight capital defense seminars in Missouri, including four in Kansas City, two in St. Louis, and others in Chesterfield and Lake Ozark. These continuing legal education programs were sponsored by the Missouri State Public Defender, the Federal Death Penalty Resource Counsel Project, the Habeas Assistance and Training Counsel Project, the National Institute of Trial Advocacy, the National Legal Aid and Defender Association, and the University of Missouri Kansas City School of Law.

served on the planning committees for these national conferences, as well as the annual Capital Case Defense Seminar sponsored by California Attorneys for Criminal Justice (CACJ) and the California Public Defenders Association (CPDA), which is attended by over a thousand practitioners. I was a co-chair of the planning committee for this seminar in 2009 and from 2011 to 2014, and I am returning as a co-chair for the 2015 seminar. I have also taught at the death penalty colleges at the Santa Clara University School of Law in California and the DePaul University College of Law in Illinois.

9. Since 1993, I have contributed extensively to the California Death Penalty Defense Manual published by the California defense bar (CACJ and CPDA). This four-volume reference has a volume devoted to the investigation and presentation of mitigation evidence which I helped to shape in the 1990s. In 1999, I published articles on *Mitigation Evidence in Death Penalty Cases* and *Mental Disabilities and Mitigation* in THE CHAMPION, the monthly magazine of the National Association of Criminal Defense Lawyers, as well as an article entitled *Why Capital Cases Require Mitigation Specialists* in INDIGENT DEFENSE, published by the National Legal Aid and Defender Association. These and other articles of mine have been cited in the Commentary to the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, rev. 2003, 31 HOFSTRA L. REV. 913 (Summer 2003), available at www.ambar.org/2003guidelines. At the request of HOFSTRA LAW REVIEW, I wrote an article for their symposium issue on the revised ABA Guidelines, entitled *Commentary on Counsel's Duty to Seek and Negotiate a Disposition in Capital Cases (ABA Guideline 10.9.1),* 31 HOFSTRA LAW REVIEW 1157 (Summer 2003). At the request of HOFSTRA LAW REVIEW, I also wrote an article for their symposium issue on the Supplementary Guidelines for the Mitigation Function of

Defense Teams in Death Penalty Cases, 36 HOFSTRA L. REV. 1067 (Spring 2008). At the request of UMKC LAW REVIEW, I contributed an article to their symposium issue devoted to "Death Penalty Stories," *The Unknown Story of a Motherless Child*, 77 UMKC L. REV. 947 (Summer 2009). I have recently written three additional articles on prevailing norms in the development of mitigation and mental health evidence. One was written in collaboration with Professor W. Bradley Wendel, *The ABA Guidelines and the Norms of Capital Defense Representation*, 41 HOFSTRA LAW REVIEW 635 (2013). Another appeared in a recent symposium on mental health, psychology, and the law: *Mental Health Evidence and the Capital Defense Function: Prevailing Norms*, 82 UMKC LAW REVIEW 407. The other article is forthcoming: *The ABA Guidelines: A Historical Perspective* (written with Aurélie Tabuteau), accepted for publication in HOFSTRA LAW REVIEW 43:3.

10. I am the coauthor of chapters on psychiatric issues in death penalty cases in two books: *Dead Men Talking: Mental Illness and Capital Punishment*, in FORENSIC MENTAL HEALTH: WORKING WITH OFFENDERS WITH MENTAL ILLNESS (Gerald Landsberg, D.S.W., and Amy Smiley, Ph.D., eds.; Kingston, New Jersey: Civic Research Institute, Inc., 2001) and *Punishment*, in PRINCIPLES AND PRACTICE OF FORENSIC PSYCHIATRY, 2nd ed. (Richard Rosner, M.D., ed.; London: Arnold Medical Publishing, 2003; U.S. distribution by Oxford University Press). I am also a coauthor of A PRACTITIONER'S GUIDE TO REPRESENTING CAPITAL CLIENTS WITH MENTAL DISORDERS AND IMPAIRMENTS (Bishop Auckland, U.K.: International Justice Project, 2008)

11. As an expert witness, I have provided evidence on standard of care issues in capital cases (especially in the investigation and presentation of mitigation evidence) by live testimony



Appellate Case: 15-3160 Page: 62 Date Filed: 02/29/2016 Entry ID: 4372488

or affidavit over one hundred times in numerous jurisdictions, including Alabama, Arizona, Arkansas, California, Colorado, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Nevada, New York, North Carolina, Oklahoma, Pennsylvania, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, and Wyoming. I have testified as an expert witness twenty times, including testimony in capital habeas corpus cases in the District of Arizona, the Eastern District of California, the Northern District of Iowa, the Western District of Missouri, and the District of Wyoming. In the fall of 2001, I testified about the prevailing norms in mitigation preparation in a federal death penalty case at a pretrial hearing in the Middle District of Tennessee (*United States v. Eben Payne et al.*, Case No. 3:98-00038, before the Hon. John T. Nixon, September 26, 2001). Over the years, I have been directly involved in hundreds of capital cases in California and New York, including scores of trials and postconviction hearings. I have also been consulted in various capacities on capital cases in numerous other jurisdictions around the country.

***Prevailing Norms in the Development of Mitigating Evidence in Capital Cases in 2001***

12. Investigation of a client's background, character, life experiences, and mental health is axiomatic in the defense of a capital case, and has been for as long as I have been involved in capital cases. In every seminar in which I have participated since 1980, instructors have emphasized the importance of conducting a "mitigation investigation" in preparation for the penalty phase of a capital trial and developing a unified strategy for the guilt-innocence and sentencing phases. Investigation was already firmly established as an integral part of the criminal defense function generally. When the American Bar Association published the second edition of



Appellate Case: 15-3160 Page: 63 Date Filed: 02/29/2016 Entry ID: 4372488

its STANDARDS FOR CRIMINAL JUSTICE (2nd edition 1980), Standard 4.4-1 of the Defenses Function described the duty to investigate as follows: "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case *and the penalty in the event of conviction*." (Emphasis added.) *Id*. at 4:53. The Commentary to this Standard noted concisely, "Facts form the basis of effective representation." *Id*. at 4:54. In discussing mitigation, the Commentary continued, "Information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant, as will mitigating circumstances surrounding the commission of the offense itself." *Id*. at 4:55.[4] These ABA Standards were cited by Justice Stevens in reference to counsel's obligation to conduct a thorough investigation of a capital defendant's background. *Williams v. Taylor*, 529 U.S. at 396 (2000).

13. These ABA Standards covered criminal defense generally. Discussions of *capital* defense provided more specific detail about counsel's duties in investigating mitigating evidence. As early as 1979, Dennis Balske (a capital-defense litigator then practicing in the South) emphasized, "Importantly, the life story must be complete." Dennis N. Balske, *New Strategies for the Defense of Capital Cases,* 13 AKRON L. REV. 331, 358 (1979). In 1983, Professor Gary Goodpaster discussed trial counsel's "duty to investigate the client's life history, and emotional and psychological make-up" in capital cases. He wrote, "There must be inquiry into the client's

---

[4]*See also* Joseph B. Cheshire V, *Ethics and the Criminal Lawyer: The Perils of Obstruction of Justice*, THE CHAMPION (Jan./Feb. 1989) at 12 ("Defense counsel have a right and a duty to approach and interview every witness that might have any information regarding the particular issue involved in their client's case."); and Robert R. Bryan, *Death Penalty Trials: Lawyers Need Help*, THE CHAMPION (August 1988) at 32 ("There is a requirement in every case for a comprehensive investigation not only of the facts but also the entire life history of the client.").

childhood, upbringing, education, relationships, friendships, formative and traumatic experiences, personal psychology and present feelings. The affirmative case for sparing the defendant's life will be composed in part of information uncovered in the course of this investigation. The importance of this investigation, and the care with which it is conducted, cannot be overemphasized." Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. REV. 299, 323-324 (1983). Writing in 1984, Mr. Balske advised capital defense counsel that they "must conduct the most extensive background investigation imaginable. You should look at every aspect of your client's life from birth to present. Talk to everyone that you can find who has ever had any contact with the defendant." Dennis Balske, *The Penalty Phase Trial: A Practical Guide*, THE CHAMPION (March 1984), at 40, 42. *See also* David C. Stebbins and Scott P. Kenney, *Zen and the Art of Mitigation Presentation, or, the Use of Psycho-Social Experts in the Penalty Phase of a Capital Trial*, THE CHAMPION, (August 1986) at 14, 18 ("capital defense attorney must recognize that the profession demands a higher standard of practice in capital cases").

14. At the beginning of the 1980s, a capital defense lawyer in California hired a former *New York Times* reporter to investigate the life history of his client. The reporter, the late Lacey Fosburgh, had previously written a best-selling book about a murder case she had covered for the newspaper, CLOSING TIME: THE TRUE STORY OF THE "GOODBAR" MURDER (1977). After her successful work in developing the capital client's mitigation evidence, Ms. Fosburgh wrote about the critical role she had played:

> A significant legal blind spot existed between the roles played by the private investigator and the psychiatrist, the two standard information-getters in the trial process. Neither one was suited to the task at hand here – namely discovering and then communicating the



Appellate Case: 15-3160 Page: 65 Date Filed: 02/29/2016 Entry ID: 4372488

> complex human reality of the defendant's personality in a sympathetic way.
>
> Significantly, the defendant's personal history and family life, his obsessions, aspirations, hopes, and flaws, are rarely a matter of physical evidence. Instead they are both discovered and portrayed through narrative, incident, scene, memory, language, style, and even a whole array of intangibles like eye contact, body movement, patterns of speech – things that to a jury convey as much information, if not more, as any set of facts. But all of this is hard to recognize or develop, understand or systematize without someone on the defense team having it as his specific function. *This person should have nothing else to do* but work with the defendant, his family, friends, enemies, business associates and casual acquaintances, perhaps even duplicating some of what the private detective does, but going beyond that and looking for more. This takes a lot of time and patience. (Emphasis added.)[5]

15. Since the early 1980s, it has also been standard practice for competent defense counsel to determine whether their capital client suffers from organic brain injury, psychiatric disorders, or trauma outside the realm of ordinary human experience. Whenever brain-behavior relationships are at issue, a thorough investigation of the etiology of brain damage is needed to determine the interplay of genetics, intra-uterine exposure to trauma and toxins, environmental exposures, head injuries, etc. In a capital case, such investigation is particularly important because of the additional mitigating factors that may be disclosed beyond the fact of psychiatric disorder or organicity. *See*, for example, John Hill and Mike Healy, *The Death Penalty and the Handicapped*, FORUM (May-June 1986) at 18-20 (discussing implications of childhood disorders affecting the brain and other disabilities for penalty phases in capital cases); and David C. Stebbins, *Psychologists and Mitigation: Diagnosis to Explanation*, THE CHAMPION (April 1988)

---

[5]Lacey Fosburgh, *The Nelson Case: A Model for a New Approach to Capital Trials*, in CALIFORNIA STATE PUBLIC DEFENDER, CALIFORNIA DEATH PENALTY MANUAL, 1982 supplement, N6-N10, N7 (July 1982). This article also appeared in the magazine of the California defense bar, FORUM (September-October 1982). *See also* Report by the Team Defense Project, *Team Defense in Capital Cases*, FORUM (May-June 1978), and Michael G. Millman, *Interview: Millard Farmer*, FORUM (November-December 1984) at 31-33.



Appellate Case: 15-3160 Page: 66 Date Filed: 02/29/2016 Entry ID: 4372488

at 34, 36 (discussing need for adequate time to overcome clients' distrust and the value of a neuropsychologist or neurologist in cases with head trauma).

16. Since the year 2000, the U.S. Supreme Court has found trial counsel ineffective in five cases for failing to investigate potential mitigation evidence: *Williams v. Taylor*, 529 U.S. 362 (2000), *Wiggins v. Smith*, 539 U.S. 510 (2003), *Rompilla v. Beard*, 545 U.S. 374 (2005), *Porter v. McCollum*, 558 U.S. 30 (2009), and *Sears v. Upton*, 561 U.S. ____, 130 S. Ct. 3259 (2010). Every case but *Sears* was tried in the 1980s, and all five were tried prior to 2001. In *Williams,* the Court reaffirmed an all-encompassing view of mitigation and found trial counsel ineffective for failing to prepare the mitigation case until a week before trial in 1986 and failing to conduct an investigation of the readily available mitigating evidence (nightmarish childhood, borderline retardation, model prisoner status, etc.) In *Wiggins*, a case tried in 1989, trial counsel were found deficient in their performance, even though they had had their client examined by one mental health expert, because they failed to conduct a complete social history investigation in accordance with the ABA Guidelines. "Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." 539 U.S. at 524. In *Rompilla*, tried in 1988, counsel were found deficient "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available" and despite consulting three mental health experts. Similarly, in *Porter*, also tried in 1988, counsel were found deficient despite a "fatalistic and uncooperative" client because "that does not obviate the need for defense counsel" to conduct mitigation investigation. 558 U.S. at 40. Quoting *Williams*, the Court in *Porter* reaffirmed this duty: "It is unquestioned that under the prevailing



Appellate Case: 15-3160 Page: 67 Date Filed: 02/29/2016 Entry ID: 4372488

professional norms at the time of Porter's trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background.'" (Citation omitted.) *Id*. at 39. Among the mitigation that Porter's counsel failed to present was "brain damage that could manifest in impulsive, violent behavior." *Id*. at 36[6] In *Sears*, the Court found trial counsel ineffective in a 1993 trial even though they had presented seven witnesses in the penalty proceedings. The Court noted, "We have never limited the prejudice inquiry under *Strickland* to cases in which there was only 'little or no mitigation evidence' presented . . ." (130 S. Ct. at 3266.) Postconviction evidence emphasized significant frontal lobe brain damage causing deficiencies in cognitive functioning and reasoning. (130 S. Ct. at 3261.) Four of these five individuals subsequently received sentences of less than death, and one case is pending as of this writing. Terry Williams received a life sentence by negotiated disposition in Danville, Virginia in 2000.[7] On October 15, 2004, the State of Maryland agreed to a disposition sending Kevin Wiggins to a state facility for mental health treatment and rehabilitation services, but making him eligible for parole immediately based on time already served.[8] On August 13, 2007, the Lehigh County (Pennsylvania) District Attorney's Office stipulated to a life sentence for Ronald Rompilla.[9] On

---

[6]In *Porter*, the High Court also noted that when new mental health evidence is introduced in postconviction, it is essential to assess the effect it might have had on the sentencer as nonstatutory mitigation, even if it disputed by the Government: "While the State's experts identified perceived problems with the tests that [the postconviction expert] used and the conclusions he drew from them, it was not reasonable to discount entirely the effect that his testimony might have had on the jury or the sentencing judge." 558 U.S. at 43.

[7]*See* Frank Green, *Death Penalty Cases Scrutinized: More Hearings Are Being Ordered in Virginia*, RICHMOND TIMES-DISPATCH, Apr. 9, 2001, at A1, *available at* http://truthinjustice.org/va-dpreview.htm.

[8]*See* Jenner & Block, *12 Year Battle for Kevin Wiggins Comes to an End* (Oct. 15, 2004), http://www.jenner.com/news/news_item.asp?id=12759624.

[9]*See* Associated Press, *Death Row Inmate Gets New Life Term*, USA Today, http://www.usatoday.com/news/topstories/2007-08-13-477084247_x.htm (last visited Apr. 8,



Appellate Case: 15-3160 Page: 68 Date Filed: 02/29/2016 Entry ID: 4372488

July 21, 2010, the Brevard-Seminole (Florida) State Attorney's Office announced that it would allow George Porter, Jr., to be resentenced to life because of his age (78), stating "if we were to seek and obtain [the death penalty], it would never be executed."[10] All five cases involved brain damage and/or cognitive impairments.

17. In a capital case, competent defense counsel have a duty to conduct life-history investigations, but generally lack the skill to conduct the investigations themselves. Thus, competent capital counsel retain a "mitigation specialist" to complete a detailed, multigenerational social history to highlight the complexity of the client's life and identify multiple risk factors and mitigation themes. The Subcommittee on Federal Death Penalty Cases, Committee on Defender Services for the Judicial Conference of the United States, commonly known as the Spencer Report (*see* n. 2, *supra*), discussed mitigation specialists in detail:

> Mitigation specialists typically have graduate degrees, such as a Ph.D. or masters degree in social work, and have extensive training and experience in the defense of capital cases. They are generally hired to coordinate an investigation of the defendant's life history, identify issues requiring evaluation by psychologists, psychiatrists, or other medical professionals, and assist attorneys in locating experts and providing documentary materials for them to review. Although most often they assist attorneys in assembling and interpreting the information needed in the penalty phase of a capital case, in some cases mitigation specialists are also called to testify about their findings.

FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION, Federal Judicial Conference, May 1998, *available at* www.uscourts.gov/FederalCourts/AppointmentOfCounsel/Publications/RecommendationsAndCommentary.aspx The report also noted that investigators are no substitute for true mitigation

---

2008).

[10]Kaustuv Basu, *Aging Killer May Get Reprieve from Death Row*, FLA. TODAY, July 21, 2010.



Appellate Case: 15-3160 Page: 69 Date Filed: 02/29/2016 Entry ID: 4372488

specialists:

> The work performed by mitigation specialists is work which otherwise would have to be done by a lawyer, rather than an investigator or a paralegal. Because the hourly rates approved for mitigation specialists are substantially lower than those authorized for attorneys, the appointment of a mitigation specialist or penalty phase investigator generally produces a substantial reduction in the overall costs of representation. *Id.*

The 1998 report pointed out that these specialized experts play an important early role in the process "[b]ecause the first job of the defense is to convince the Department of Justice not to certify the case as a capital case." *Id*. The Commentary also stated that the work of mitigation specialists "is part of the existing 'standard of care' in a federal death penalty case." *Id.*, Commentary to 7. Experts, Sec. II, Recommendations and Commentary.

18. As revised in 2003, the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (*hereinafter*, ABA Guidelines (rev. 2003), *available at* www.ambar.org/2003guidelines) state unequivocally that lead counsel at any stage of capital representation (trial or postconviction) should assemble a defense team as soon as possible after designation with at least one mitigation specialist and at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments (Guideline 10.4), in order to conduct a thorough and independent investigation relating to penalty (Guideline 10.7 and Guideline 10.11). The original edition of the ABA Guidelines, adopted in 1989 (*available at* www.ambar.org/1989guidelines), similarly required counsel to begin investigation immediately upon counsel's entry into the case and to "discover all reasonably available mitigating evidence." (1989 Guideline 11.4.1.C.) The 1989 Guidelines also required counsel to retain experts for investigation and "preparation of mitigation" (1989 Guideline 11.4.1.D.(7).) Notably, the 1989 Guidelines specifically stated that "the investigation



Appellate Case: 15-3160 Page: 70 Date Filed: 02/29/2016 Entry ID: 4372488

for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered." (1989 Guideline 11.4.1.C.)

19. The 1989 edition of the ABA Guidelines reflected a national consensus among capital defense practitioners based on their practices in the 1980s. These Guidelines were the result of years of work by the National Legal Aid and Defender Association (NLADA) to develop standards to reflect the prevailing norms in indigent capital defense. NLADA published its Standards for the the Appointment of Defense Counsel in Death Penalty Cases (available at www.americanbar.org/content/dam/aba/migrated/DeathPenalty/RepresentationProject/PublicDocuments/NLADA_Counsel_Standards_1985.authcheckdam.pdf) in 1985. With initial support from the ABA's Standing Committee on Legal Aid and Indigent Defendants (SCLAID), NLADA developed its expanded Standards for the Appointment *and Performance* of Defense Counsel in Death Penalty Cases (emphasis added) over the course of several years. In February 1988, NLADA referred the Standards to SCLAID, which reviewed them and circulated them to appropriate ABA sections and committees. SCLAID incorporated the only substantive concerns expressed (by the Criminal Justice Section) and changed the nomenclature to "Guidelines" as more appropriate than "Standards." Each black-letter guideline is explained by a commentary, with references to supporting authorities. (*See* Introduction to ABA Guidelines, 1989 ed.)

20. Courts have found the various editions of the ABA Criminal Justice Standards and Death Penalty Guidelines useful in assessing the reasonableness of counsel performance. As Justice Stevens noted in writing for the Court's majority in *Padilla v. Kentucky*, 559 U.S. 356, 366-367 (2010): "We long have recognized that 'prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is

reasonable . . .'" Justice Stevens cited *Strickland*, 466 U.S. 668, 688 (1984), *Bobby v. Van Hook*, 558 U.S. 4 (2009) (*per curiam*); *Florida v. Nixon*, 543 U.S. 175, 191, and n.6 (2004); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); and *Williams v. Taylor*, 529 U.S. 362, 396 (2000). Justice Stevens concluded: "Although they are 'only guides,' *Strickland*, 466 U.S., at 688, and not 'inexorable commands,' *Bobby*, 558 U.S. at 8, these standards may be valuable measures of the prevailing norms of effective representation . . ." Justice Stevens also cited law review articles and the publications of criminal defense and public defender organizations (the National Association of Criminal Defense Lawyers and the National Legal Aid and Defender Association) as guides to prevailing professional norms.

21. Without a thorough social history investigation, it is impossible to ascertain the existence of previous head injuries, childhood trauma, and a host of other life experiences that may provide a compelling reason for the jury to vote for a life sentence. Moreover, without a social history, counsel cannot make an informed and thoughtful decision about which experts to retain, in order to gauge the nature and extent of a client's possible mental disorders and impairments. Mental health experts, in turn, require social history information to conduct a complete and reliable evaluation. *See* Richard G. Dudley, Jr., and Pamela Blume Leonard, *Getting It Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment*, 36 HOFSTRA L. REV. 963 (2008); and Douglas Liebert and David Foster, *The Mental Health Evaluation in Capital Cases: Standards of Practice*, 15:4 AM. J. FORENSIC PSYCHIATRY 43 (1994).

22. The social history investigation should include a thorough collection of objective, reliable documentation about the client and his family, typically including medical, educational,

employment, social service, and court records. Such contemporaneous records are intrinsically credible and may document events which the client and other family members were too young to remember, too impaired to understand and record in memory, or too traumatized, ashamed, or biased to articulate. The collection of records and analysis of this documentation involve a slow and time-intensive process. Many government record repositories routinely take months to comply with appropriately authorized requests. Great diligence is required to ensure compliance. Careful review of records often discloses the existence of collateral documentation which, in turn, needs to be pursued.

23. A social history cannot be completed in a matter of hours or days. In addition to the bureaucratic obstacles to the acquisition of essential documentation, it takes time to establish rapport with the client, his family, and others who may have important information to share about the client's history. It is quite typical, in the first interview with clients or their family members, to obtain incomplete, superficial, and defensive responses to questions about family dynamics, socio-economic status, religious and cultural practices, the existence of intra-familial abuse, and mentally ill family members. These inquiries invade the darkest, and most shameful secrets of the client's family, expose raw nerves, and often re-traumatize those being interviewed. Barriers to disclosure of sensitive information may include race, nationality, ethnicity, culture, language, accent, class, education, age, religion, politics, social values, gender, and sexual orientation.

24. Only with time can an experienced mitigation specialist break down these barriers, and obtain accurate and meaningful responses to these sorts of questions. In my professional opinion, an experienced mitigation specialist requires, at minimum, hundreds of hours to complete an adequate social history – even working under intense time pressure. One nationally



Appellate Case: 15-3160 Page: 73 Date Filed: 02/29/2016 Entry ID: 4372488

recognized authority in mitigation investigation, Lee Norton, writing in 1992, stressed the cyclical nature of the work and estimated that hundreds of hours will typically be required. *See* Lee Norton, *Capital Cases: Mitigation Investigation*, THE CHAMPION (May 1992) at 43-45.

25. Mitigation evidence is not developed to provide a defense to the crime. Instead, it provides evidence of a disability, condition, or set of life experiences that can inspire compassion, empathy, mercy and understanding. Unlike insanity and competency, both of which are strictly defined by statute, mitigation need not involve a mental disease or defect. Nevertheless, in many cases, defendants suffer mental impairments that do not meet the legal definition of insanity or incompetency, but are powerfully mitigating disabilities that are given great weight when juries are charged with assessing individualized culpability.

26. For clients who are psychiatrically disordered or brain damaged, mitigation evidence may explain the succession of facts and circumstances that led to the crime, and how that client's disabilities distorted his judgment and reactions. Of all the diverse frailties of humankind, brain damage is singularly powerful in its ability to explain why individuals from the same family growing up in the same setting turn out differently. It is an objective scientific fact. It does not reflect a bad choice made by the client.

27. Over the years, as stated earlier, I have been involved in hundreds of capital cases, including dozens of trials and postconviction hearings. As I also stated earlier, I have provided evidence as an expert on the standard of care in investigating capital cases and mitigation by live testimony or affidavit in dozens of cases around the country. *(See* ¶ 11, *supra.)* My personal experience of the effectiveness of mitigation evidence accords with the empirical research of social scientists who have studied the decision-making processes of actual jurors in death-penalty

cases. *See*, for example, Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?* 98 COLUM. L. REV. 1538 (1998) and *The Emotional Economy of Capital Sentencing,* 75 N.Y.U. L. REV. 26 (2000) (concluding that mitigation does matter, especially mental impairment and mental illness). *See also* John H. Blume, Sheri Lynn Johnson & Scott E. Sundby, *Competent Capital Representation: The Necessity of Knowing and Heeding What Jurors Tell Us About Mitigation*, 36 HOFSTRA L. REV. 1035, at 1038 (2008) ("The [Capital Jury Project] studies reveal that many different types of mitigation resonate with jurors. Low intelligence, mental illness, child abuse, extreme poverty, remorse, lack of a significant prior record, and lesser culpability are just some of the categories of mitigation that, in a particular case, can lead jurors to choose life over death."); *Id*. at 1051 ("evidence that the defendant was under the influence of extreme emotional disturbance or mentally ill at the time of the crime is also mitigating to almost half of all jurors. Almost a third of jurors found exposure to serious child abuse mitigating, and a like number found childhood poverty mitigating.").

***Standard of Care in Capital Mental Health Evaluations***

28. Both anecdotal reports from capital defense practitioners and social science research indicate that defense experts are viewed with great skepticism and often regarded as "hired guns" unless their conclusions are supported by abundant, credible evidence from lay witnesses and historical experts (i.e., the professionals who encountered the capital client long before the alleged offense).[11] (*See*, for example, Scott Sundby, *The Jury as Critic: An Empirical Look at*

---

[11]During the operative years of the New York death penalty statute (1995 to 2004), for example, the Capital Defender Office offered the testimony of historical experts in several cases. A school psychologist who had tested a client routinely as part of mandated triennial review for



Appellate Case: 15-3160 Page: 75 Date Filed: 02/29/2016 Entry ID: 4372488

*How Capital Juries Perceive Expert and Lay Testimony*, 83 VA. L. REV. 1109 (1997), finding that two-thirds of the witnesses jurors thought "backfired" were defense experts.) Thus, if only for pragmatic reasons, capital defense counsel are well advised not to rely on expert testimony without the corroborative lay witnesses whose identity and potential evidence can only be discovered through life-history investigation. However, it is equally important to offer well-prepared expert testimony to explain the effects of life experiences on an individual's functioning and behavior. Lay witnesses on their own are unlikely to understand the significance of the symptoms and behaviors they describe, and only an expert is likely to be able to provide an overview of the factors that shaped the client over the course of his life and to be able to offer an empathic framework for understanding the resultant disorders and disabilities.[12] Expert

---

Special Education explained the significance of his borderline intellectual functioning (FS IQ 76-81). People v. George Davis Bell (Ind. 128-97, Judge Cooperman, Queens County, N.Y., 1999). In another case, a different school psychologist explained the impact of learning disabilities (at age 11, reading just above a second grade level; at 14, just above fourth grade; and at 17, just above fifth grade). People v. José J. Santiago (Ind. 1210/99, Judge Bristol, Monroe County, N.Y., 2000). In a third case, a psychiatrist had treated the client's mother after her suicide attempt when the client was nine – 30 years before the capital trial. From the records, the psychiatrist testified to the history of mood disorders and suicidality in the maternal lineage, as well as family dysfunction, including fights over promiscuity, gambling, and drinking. From her current perspective, the psychiatrist opined about the devastating impact on the children of the mother's mood disorder, suicidality, and psychiatric removal from the family. People v. John F. Owen (Ind. 547-99 cons. with 414-99, Judge Egan, Monroe County, N.Y., 2001). *See* Russell Stetler, *The Mystery of Mitigation : What Jurors Need to Make a Reasoned Moral Response in Capital Sentencing*, 11 U. PA. J. L. & SOC. CHANGE 237, 258 (n. 92) (2007-08).

[12]It has long been recognized that lay and expert testimony must be harmonized to be credible to the trier of fact. As one capital defense lawyer pointed out in 1988, "[T]estimony about the psycho-social development of the defendant explains the psychological diagnosis in human terms that the jury can understand." He continued, "Typical psychological testimony on sanity, competency, or diminished capacity sounds like it comes out of a textbook. Despite the best efforts of the mental health professional and the attorneys, most of this type of testimony is incomprehensible to a lay juror. There is also an unfortunate tendency to get caught up in technical terms that bore the jurors and do nothing to humanize the client. It makes little sense to spend several days putting on the testimony of relatives and friends of the defendant about the



Appellate Case: 15-3160 Page: 76 Date Filed: 02/29/2016 Entry ID: 4372488

testimony is essential for placing the factual details elicited from lay witnesses into an interpretive context that explains how various life events shaped the capital client's brain and behavior.

29. The proper standard of care for a competent mental health evaluation also requires an accurate medical and social history as its foundation. Because psychiatrically disordered or cognitively impaired individuals are by definition likely to be poor historians, a reliable evaluation requires historical data from sources independent of the client (for clinical, not simply forensic, reasons). Additional components of a reliable evaluation will include a thorough physical examination (including neurological examination) and appropriate diagnostic testing. The standard mental status examination cannot be relied upon in isolation for reliable clinical assessments any more than the expert can be relied upon in isolation in the courtroom context.

30. Except when clients exhibit such florid symptomatology that immediate clinical intervention is patently warranted, capital defense counsel are well advised to conduct a thorough social history investigation before retaining mental health experts. Only after the social history data have been meticulously digested and the multiple risk factors in the client's biography have been identified will counsel be in a position to determine what kind of culturally competent expert is appropriate to the needs of the case, what role that expert will play, and what referral questions will be asked of the expert. Psychiatrists and psychologists have different training and expertise, and within each profession are numerous subspecialties including neuropsychology,

---

human characteristics of the defendant, and then put on a psychologist or psychiatrist who immediately turns this around by making the person sound like a casebook study out of some obscure and arcane psychology textbook." David C. Stebbins, *Psychologists and Mitigation: Diagnosis to Explanation*, THE CHAMPION (April 1988), at 34, 38.

psychopharmacology, and the disciplines which study the effects of trauma on human development. The potential roles of experts include consultants; fact gatherers needed to elicit, or assess the credibility of, client disclosures; and testifying witnesses, to name but a few. To make informed decisions about the kind of experts that may be needed and the referral questions they will address, counsel first needs a reliable social history investigation.

31. The importance of independently corroborated social history data was also well recognized among mental health practitioners as early as the 1980s. A leading psychiatric text in that period described an accurate and complete medical and social history as the "single most valuable element to help the clinician reach an accurate diagnosis." H. KAPLAN & B. SADOCK, COMPREHENSIVE TEXTBOOK OF PSYCHIATRY 837 (4th ed. 1985). The same text noted that the individuals being evaluated are often poor historians: "The past personal history is somewhat distorted by the patient's memory of events and by knowledge that the patient obtained from family members." *Id*. at 488. Thus, "retrospective falsification, in which the patient changes the reporting of past events or is selective in what is able to be remembered, is a constant hazard of which the psychiatrist must be aware." *Id*. This problem is particularly acute in the forensic context, as two other leading authorities pointed out in 1980:

> The thorough forensic clinician seeks out additional information on the alleged offense and data on the subject's previous antisocial behavior, together with general "historical" information on the defendant, relevant medical and psychiatric history, and pertinent information in the clinical and criminological literature. To verify what the defendant tells him about these subjects and to obtain information unknown to the defendant, the clinician must consult, and rely upon, sources other than the defendant.

Richard J. Bonnie & Christopher Slobogin, *The Role of Mental Health Professionals in the Criminal Process: The Case for Informed Speculation*, 66 VA. L. REV. 427 (1980). Capital



Appellate Case: 15-3160 Page: 78 Date Filed: 02/29/2016 Entry ID: 4372488

defense lawyers also appreciated this need: "A psychologist armed with all of the records of the client's history is much better equipped to present a sympathetic and truthful explanation of the client's psychological make-up and of how the crime occurred." David C. Stebbins, *Psychologists and Mitigation: Diagnosis to Explanation*, THE CHAMPION (April 1988) at 34, 37.

***Review of the Keith Nelson Case***

32. I was asked by federal habeas counsel for Keith Nelson to summarize the prevailing professional norms regarding the investigation and preparation of the penalty phase of capital cases at the time of Mr. Nelson's trial in 2001 and to assess trial counsel's investigation and presentation of mitigation evidence in that light. I have described the prevailing norms in detail in ¶¶ 12 through 31, *supra*. In assessing trial counsel's investigation and presentation of mitigation evidence, I have reviewed the direct appeal opinion, *United States of America v. Keith D. Nelson*, 347 F.3d 701 (8th Cir. 2003), and the documentary record relevant to mitigation investigation at the time of trial, including the following: the Criminal Docket for *USA v. Nelson*, Case #4:99-cr-00303-FJG-1 (*hereinafter*, "Cr. Docket"), various pleadings and orders identified in the docket, the transcript of the penalty phase testimony (Trial Transcript, Volume III, November 19, 2001, through Volume XI, November 28, 2001), and portions of the pretrial proceedings; defense team correspondence and investigative work product, including reports of interviews by attorney Susan Hunt, investigators Ronald K. Ninemire and Daniel Grothaus, and the Dallas-based Capital Punishment Investigation & Educational Services through its director, Tena Francis, and contract employees Deborah Haddad and Lisa Murphy; handwritten notes and other records of Ms. Hunt and attorney Patrick J. Berrigan; declarations of Ms. Hunt and Mr.



Appellate Case: 15-3160 Page: 79 Date Filed: 02/29/2016 Entry ID: 4372488

Berrigan (filed September 13, 2010); transcripts of the depositions of attorney Jennifer Herndon (October 17, 2013), Ms. Hunt (October 17, 2012), Ms. Francis (October 18, 2012), and Mr. Berrigan (October 18, 2012); the report of Daniel V. Foster, Psy.D.; CJA billing records of counsel and defense experts and investigators; and all the records obtained by trial counsel relating to Mr. Nelson and the Texas court file of his brother, Johnny Nelson. Relevant portions of the source material that I reviewed have been appended to this declaration and designated by tab numbers. (The majority of these attachments have been numbered chronologically, rather than in order of appearance.) I have also been briefed orally by federal habeas counsel about the procedural history of the case and other details.

33. Based on the material I have reviewed and the information provided by federal habeas counsel, it is my opinion that trial counsel's performance in both the investigation and presentation of mitigation evidence fell below the prevailing professional norms at the time of Mr. Nelson's trial in 2001. The deficiencies are in six broad substantive areas:

(1) failure to investigate Mr. Nelson's mental illness and the multigenerational history of mental illness on both sides of Mr. Nelson's family;

(2) failure to investigate potential brain damage and dysfunction;

(3) failure to investigate Mr. Nelson's cognitive impairments;

(4) failure to investigate the impact of trauma on Mr. Nelson's development;

(5) failure to obtain relevant multigenerational social history records; and

(6) failure to utilize the records that were obtained.

The mitigation investigation was fragmented and poorly supervised. The deficiencies in mitigation preparation were compounded by counsel's failure to retain appropriate experts in the

fields of mental health and neuropsychology. The result was a sentencing phase presentation that was a catastrophic failure: Nine of the ten mitigating factors listed on the verdict sheet were dismissed by every juror. Only a single juror found that any mitigating factor had been proved. Eleven of the twelve jurors found that the defense had proved no mitigation whatsoever.

*Failure to investigate mental illness*

34. At the time of Mr. Nelson's arrest in October 1999, the prevailing norms of capital defense representation established a duty to explore potential mental health evidence as part of any investigation of mitigating evidence. Earlier that year I had published two widely read articles in this area: *Mitigation Evidence in Death-Penalty Cases*, 28:1 THE CHAMPION 35 (January-February 1999) and *Mental Disabilities and Mitigation*, 28:3 THE CHAMPION 49 (April 1999). These articles reflected the thinking of experienced capital defense practitioners in the 1990s and were reprinted as handouts in numerous continuing education programs in the months and years that followed. Moreover, the very nature of the capital offense in Mr. Nelson's case was sufficient to alert counsel to the need to explore mental health issues. Apparently, there were sufficient signs of psychiatric issues to raise both competency and sanity concerns in the early months of representation. A retained local attorney, Daniel L. Franco,[13] appeared at Mr.

---

[13]Mr. Franco was disbarred on October 15, 2002, a year after Mr. Nelson's trial. *See State v. Murillo*, 149 S.W.3d 930 (Court of Appeals of Missouri, Western District, December 7, 2004) appended hereto at Tab 151. According to the brief filed in the Missouri Supreme Court (*In Re: Daniel L. Franco*, Missouri Supreme Court #SC83356) by Mr. Franco's counsel, in the period from December 1999 through February 2000 he "had a very heavy trial docket, including jury trials, and was working on at least one death penalty case," such that he "worked many long hours including working through the night on numerous days and resuming work the next day without sleep." In addition, Mr. Franco "was very ill from an undiagnosed and untreated, severe case of diabetes which caused fatigue and hallucinations." Respondent's Brief, appended hereto

Nelson's arraignment on October 20, 1999 (Cr. Docket, appended hereto at Tab 69, Document #4), but he immediately sought appointment of counsel learned in the law of capital cases. The Federal Public Defender's Office was appointed the next day (*Id*., Document # 8), and attorney Larry C. Pace of that office was assigned to the case. Two other local lawyers, William E. Shull and Susan M. Hunt,[14] were appointed under the Criminal Justice Act on November 2, 1999 (*Id*., Documents #15 and #16, respectively).

35. On December 22, 1999, Magistrate Judge Sarah W. Hays issued an order stating that any request for a determination of Mr. Nelson's competency should be filed no later than January 3, 2000 (*Id*., Document #33). On December 27, 1999, counsel filed a motion requesting funds to hire an "investigator/Mitigation specialist" and seeking approval to exceed 21 USC 848(q)(10)(B) funding limits (*Id*., Document #35). Two days later another motion was filed asking that "the court dispense with holdback of 1/3 of compensation for mitigation specialists, and other experts appointed by the court" (*Id*., Document #36). On February 17, 2000, counsel filed a motion to extend time to file notice of their intent to rely on an insanity defense and to offer mental health testimony at trial. (*Id*., Document #52.) Magistrate Judge Hays granted the motion on February 28, 2000 (*Id*., Document #59).

36. The defense initially utilized the services of an investigator at the Federal Public Defender's office, Ronald K. Ninemire, and a private investigator, Daniel J. Grothaus, for

---

at Tab 152, at 6.

[14]Ms. Hunt had never previously represented anyone in a death penalty prosecution. She was assigned to examine the change of venue issue and DNA evidence because she has "a degree in biology, taught high school biology and worked as a forensic chemist for the Kansas City Police Department Crime Laboratory" before becoming a lawyer. (Affidavit of Susan Hunt, September 13, 2010, appended hereto at Tab 145, at ¶¶ 3, 5.)



Appellate Case: 15-3160 Page: 82 Date Filed: 02/29/2016 Entry ID: 4372488

targeted assignments. (RKN Memo, January 6, 2000, appended hereto at Tab 70.) Ms. Hunt also interviewed Mr. Nelson, his mother, and his twin brother early in 2000. (Nancy Nelson Interview, January 7, 2000, appended hereto at Tab 71.) These preliminary contacts with the family immediately provided counsel with red flags signaling the need to explore mental health issues, since they learned that Mr. Nelson had two full siblings (Johnny and Paul) who had been diagnosed with schizophrenia.[15] The mother also disclosed information about Mr. Nelson's exposure to *in utero* trauma and possible anoxia at birth, raising the additional likelihood of organic brain damage. (Nancy and Paul Nelson Interview, May 22, 2000, appended hereto at Tab 73 at 2-3.) Thus, from a very early time, counsel were on notice that the mitigation investigation should carefully explore mental health issues and brain abnormality.

37. On April 20, 2000, the Government filed its Notice of Intent to Seek the Death Penalty (Cr. Docket, appended hereto at Tab 69, Document #67). On June 2, 2000, Assistant U.S. Attorney Sheryle Jeans noted on the record that if the defense decided that it wanted to do a mental examination of the defendant, that issue will need to be discussed. The Court indicated that the issue had been discussed the previous December or January, when the defense had indicated it did not intend to seek a mental examination. Ms. Hunt stated that the defense did not plan to offer a mental state defense at the guilt-innocence phase, but Mr. Shull said they were

---

[15]THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 4th ed., published by the American Psychiatric Association in 1994 (excerpt appended hereto at Tab 147), noted at 283, under the heading "Familial Pattern," "The first-degree biological relatives of individuals with Schizophrenia have a risk for Schizophrenia that is about 10 times greater than that of the general population." The DSM-IV-Text Revision in 2000 (also appended hereto at Tab 147), at 309, contains the same sentence, but adds, "Some relatives of individuals with Schizophrenia may also have an increased risk for a group of mental disorders, termed the *schizophrenia spectrum*." The spectrum may include "[o]ther psychotic disorders."

planning to file a motion to use related information in a penalty phase as mitigating evidence. (Transcript Suppression Hearing, 34-38, June 2, 2000, appended hereto at Tab 74.) On June 7, defense counsel filed an *ex parte* motion for appointment of psychiatrist Stephen Peterson, M.D. (Motion for Psychiatrist, appended hereto at Tab 75.) After supplemental briefing in support of a psychiatric examination in August, the Court granted the defense motion for appointment of the psychiatrist on September 25, 2000. (Order: Funds for Psychiatrist, appended hereto at Tab 79.) Meanwhile, most of the investigation that was under way focused on guilt issues or general background information. Neither Mr. Ninemire nor Mr. Grothaus conducted interviews focusing on mental health issues. On August 21, 2000, the Court granted the Federal Public Defender's motion to withdraw from the case because of a conflict (Cr. Docket, appended hereto at Tab 69, Documents #75 and #121), leaving Mr. Shull and Ms. Hunt as active counsel.

38. A few weeks before the Federal Public Defender's office was removed, the defense filed *ex parte* and under seal its supplemental suggestions in support of a continuance motion, discussing in detail the need for "extensive mitigation investigation," including "several more trips" to Texas and California. The motion provided this summary of the red flags signaling the need for extensive investigation, including investigation of trauma, familial mental illness, potential brain damage, and potential Fetal Alcohol Syndrome:

> Defendant was born in Kansas City and spent his first two months of life hospitalized with breathing difficulties. Records of that hospitalization need to be gathered and the services of a neurologist may be needed to determine if the lack of oxygen caused organic brain damage. There is also an indication that fetal alcohol syndrome may be an issue in this case. More time is needed to investigate this issue.
>
> Defendant's mother fled to California when he was 2-3 years old, to escape from his abusive father. Investigation to date has revealed that defendant's father found them in California and held them hostage for a week. In addition, defendant's mother was severely beaten in California and the family lived for a period of time in two different

> battered women's shelters. Defendant needs time to find those shelters and obtain any records which may still exist. Counsel may also be requesting funds to hire an expert to discuss the effects of domestic violence and abuse on a young child.
>
> Counsel also has information which indicates that defendant or his siblings may have been hospitalized in California as a result of abuse. All of this information needs to be investigated which will require several trips to California to gather records and interview potential mitigation witnesses.
>
> After the defendant's father found the family in California, they fled to Texas. Defendant lived for many years in Texas and attended grade school, junior high and part of high school. To date, the defense has located one of his teachers and the grade school principal who have provided information about the family and leads to other potential mitigation witnesses. Further, the investigation to date has revealed that defendant may have been sexually abused as a young child by a boyfriend of the mother. The defense is purs[u]ing leads on that issue and more time is required to determine if that information is true and to obtain expert assistance in presenting that issue at trial.
>
> Defendant also spent time in various juvenile institutions while residing in Texas. Counsel has obtained voluminous records of these juvenile proceedings which need to [be] indexed and reviewed. Once that review is complete counsel needs time to contact several juvenile officers and interview them as potential mitigation witnesses.
>
> There is a family history of schizophrenia. Two of defendant's brothers suffer from the illness and are under constant medication. Because that illness is genetic, counsel has requested funds for a psychiatrist to do a complete mental evaluation of defendant. That request is currently pending and once it is approved these evaluations will occur. In addition to a mental evaluation the defense is in the process of preparing a complete social history of the defendant for the psychiatrists [sic] use. That social history is not yet complete and will require additional time and trips out of town to gather the relevant records and information. (Ex Parte Under Seal Supplemental Suggestions for Continuance Motion, appended hereto at Tab 77, ~~June 2,~~ July 30, 2000, at 3-5.)

When the Federal Public Defender's office withdrew, investigator Ronald K. Ninemire sent Ms. Hunt a four-page To Do list of necessary mitigation investigation reiterating the importance of investigating sexual abuse, long-term consequences of Keith's perinatal hospitalization, and mental illness, ending as follows:

> During my investigation, information suggested that the boys were abused both physicially and sexually in White Settlement, Texas. This abuse came from men who were brought home by Nancy. This has not been confirmed as yet. Also, it was interesting that Keith was placed in a hospital for a long period of time at the time of his birth. This needs to be explored more fully. It would appear that all of the boys with the exception of Steven and Kenny, suffer from a form of mental illness (schizophrenia). It



Appellate Case: 15-3160 Page: 85 Date Filed: 02/29/2016 Entry ID: 4372488

seems prudent that any mitigation investigation must include a psychiatric examination of Keith. (Ninemire Memo to Hunt, September 14, 2000, appended here to at Tab 78, at 4.)

39. In November 2000, Mr. Shull and Ms. Hunt traveled to Dallas and met with Tena Francis, then the director of Capital Punishment Investigation & Educational Services, and forensic psychologist Mark A. Cunningham, Ph.D. (Francis Meeting Notes, November 17, 2000, appended hereto at Tab 80.) On December 12, 2000, counsel filed motions seeking funding for Ms. Francis to work as a mitigation investigator and for Dr. Cunningham to serve as a "mitigation specialist" (*not* as a mental health expert). (Motions for Appointment of Tena Francis and Mark Cunningham, appended hereto at Tabs 82 and 83.) On January 4, 2001, counsel sought additional funding for neuropsychologist Dennis Cowan.[16] (Motion for Appointment of Neuropsychologist, appended hereto at Tab 84.) On January 24, 2001, the Court granted funding for Ms. Francis, Dr. Cunningham, and the neuropsychologist, while rescinding the prior order previously approving funding for a psychiatrist. (Order Approving Funding for Francis, Cunningham, and Cowan, appended hereto at Tab 85.) On February 12, 2001, the Government again raised the issue of whether the defense intended to have Mr. Nelson examined by a psychiatrist or psychologist. The Government had the impression that the defense was electing not to have him evaluated since they had provided no notice to the Government. The Government urged the Court to set deadlines for notice to avoid delays. (Transcript Change of Venue, February 12, 2001, appended hereto at Tab 88, at 321-24.) Meanwhile, the defense team itself was changing counsel, and new counsel abruptly terminated the plan to have a

[16]At their initial meeting, both Ms. Francis and Dr. Cunningham had urged counsel to obtain a neuropsychological assessment. Hunt Aff., September 13, 2010, appended hereto at Tab 145, at ¶ 5. (Ms. Hunt refers to the neuropsychologist who was retained as "Dr. Cowden.")

neuropsychologist see Mr. Nelson. On February 13, 2001, Attorney Patrick J. Berrigan was appointed to replace Mr. Shull (Cr. Docket, appended hereto at Tab 69, Document #194), and on February 28, 2001, he promptly canceled the neuropsychological assessment that had been scheduled. (Cowan Billing Records, May 1, 2001, appended hereto at Tab 99.)

40. On May 10, 2001, the Government filed a motion for discovery of mental health evidence to be offered in the penalty phase of Mr. Nelson's trial and for a psychiatric examination of Mr. Nelson. (Cr. Docket, appended hereto at Tab 69, Document #231.) The parties filed submissions concerning the criteria for any Governmental mental health evaluation that the Court might order. On August 17, Magistrate Judge Hays issued an order granting in part and denying in part the Government's motion for discovery of mental health evidence and psychiatric examination. Six specific procedures were ordered:

(1) **Notice**. The defense was ordered to provide psychiatric notice by September 5, 2001, including the name and professional qualifications of any testifying expert.

(2) **Examination**. If the defense elected to introduce mental health evidence in the penalty phase, the Government would be allowed to have Mr. Nelson examined by an expert of its choosing.

.

(3) **Filing of results**. The results of both sides' examinations were to be filed with the Court prior to commencement of trial.

(4) **Release of results**. Nothing would be released to the Government until the jury reached a guilty verdict and the defense confirmed its intention to offer mental health evidence: "If defendant confirms his intent to introduce mental health testimony, the reports of any examinations (whether by the Government or defense expert) shall be released to the Government. At the same time, the report of the Government's expert shall be released to counsel for defendant."

(5) **Limitations**. Nothing learned from any mental examination would be admissible against the defendant unless the defense actually introduces mental health evidence. The defense would be able to withdraw its notice at any time.



Appellate Case: 15-3160 Page: 87 Date Filed: 02/29/2016 Entry ID: 4372488

(6) **Consequences of noncompliance**. "Failure of defendant Nelson to provide notice or to participate in a Court-ordered examination or to confirm his first notice shall result in forfeiture of the right to present mental health testimony at trial." (Cr. Docket, appended hereto at Tab 69, Document 253; Order re Government Psychiatric Examination, August 17, 2001, appended hereto at Tab 113, at 5-6.)

41. The parties continued to litigate the issue as the defense hastened to prepare for the penalty phase of Mr. Nelson's trial.[17] The defense belatedly had Dr. Cunningham meet with Mr. Nelson on August 29, 2001 (for "228 minutes"), but his focus was on life-history events and recent adjustment to jail and prison, not brain damage or mental illness or trauma in the developmental period. (Cunningham Capital Sentencing Evaluation, August 29, 2001, appended hereto at Tab 114.) On September 4, 2001, the defense filed its notice of intent to rely on mental health evidence in the penalty phase and specified psychologist Daniel Foster, Psy.D., as its expert – without having any idea of what he might offer in testimony. (Cr. Docket, appended hereto at Tab 69, Document #262; Notice to Rely on Mental Health Evidence & Foster CV, September 4, 2001, appended hereto at Tab 117.) Dr. Foster's CV was attached to the defense notice, which disingenuously indicated that Dr. Foster "had not completed" his evaluation when in fact he had not even started. Indeed, the motion seeking his appointment was not filed until nearly two weeks later, on September 17, 2001. (Cr. Docket, appended hereto at Tab 69,

[17]From the time of his appointment in on February 13, 2001, it was understood that Mr. Berrigan would be responsible for the penalty phase of Mr. Nelson's trial, but he met only one potential mitigation witness prior to September. An analysis of his Out of Court Hourly Worksheet (form CJA-30) discloses that Mr. Berrigan spent twenty-five minutes talking with Mr. Nelson's mother (apparently by telephone) with Ms. Hunt on June 22. He spoke to her again by telephone for nine minutes on July 1, spoke to her and Mr. Nelson's brother Kenneth by telephone on July 3 for twenty-five minutes, and then met with Kenneth at the office for an hour and a half on July 6. Those billings – totaling 2.6 hours – represent the only time Mr. Berrigan spent interviewing potential mitigation witnesses between his appointment and the end of August 2001. (Berrigan Out of Court Hours, appended hereto at Tab 96.)



Appellate Case: 15-3160 Page: 88 Date Filed: 02/29/2016 Entry ID: 4372488

Document #274; Ex Parte Motion for Expert Services, September 17, 2001, appended hereto at Tab 118.) The defense filed its appeal of Judge Hays's order on September 21 (Cr. Docket, appended hereto at Tab 69, Document #287), and the Government filed its response on October 16 (*Id*., Document #316). Trial preparation proceeded all the while. Dr. Foster finally met with Mr. Nelson for approximately one hour on October 5, 2001, and for approximately eight hours the following day. (Foster Evaluation, November 23, 2001, appended hereto at Tab 132, at 1.) Funding for Dr. Foster's services was not formally approved until October 10. (Order: Funds for Francis and Foster, October 10, 2001, appended hereto at Tab 122.)

42. The Government's expert attempted to meet with Mr. Nelson on October 15, but Mr. Nelson, at the strong urging of counsel, refused to cooperate.[18] At a hearing before Judge Hays on October 18, 2001, Mr. Nelson indicated that he would not submit to a mental examination by a Government expert under any circumstance. (Transcript Pretrial Conference, October 18, 2001, appended hereto at Tab 123, at 14-15.) The Court had ordered another Government examination to occur on October 22. Magistrate Judge Hays therefore ruled that if Mr. Nelson did not cooperate with the Government's examination, "the mental illness would not be a defense he could present." (Cr. Docket, appended hereto at Tab 69, Document #333.) Trial counsel Patrick Berrigan "concedes that he strongly urged Mr. Nelson not to cooperate with Government mental health experts." He "believed that the Government experts were severely predisposed,

---

[18]The crux of the defense argument against cooperation was that "an accused facing the death penalty has an absolute right under the Eighth Amendment to present evidence in mitigation of his sentence at a capital sentencing hearing," so a defendant's refusal of a compelled examination should not preclude his presenting mental health evidence. (Cr. Docket, appended hereto at Tab 69, Document 287; Defendant's Appeal of Magistrate's Mental Health Order, September 21, 2001, appended hereto at Tab 119, at 3.)



Appellate Case: 15-3160 Page: 89 Date Filed: 02/29/2016 Entry ID: 4372488

biased, and prejudiced against Mr. Nelson and would not conduct an impartial evaluation, but would instead seek merely to generate aggravating evidence against Mr. Nelson. Counsel made this determination without any personal experience with these Government evaluators, or any objective evidence of this propensity. Furthermore, counsel recognized that Mr. Nelson's noncooperation would undoubtedly result in the trial court barring the presentation of mental health evidence on Mr. Nelson's behalf in the penalty phase of his trial." (Declaration of Patrick J. Berrigan, September 13, 2010, appended hereto at Tab 146, at 2.)

43. On October 23, 2001, the parties appeared before the trial court and discussed a variety of issues, including the magistrate judge's rulings on mental health evidence, which were on appeal. In the course of this pretrial hearing, Mr. Nelson interrupted and asked to be excused. Trial counsel did not object, and the Court examined Mr. Nelson to be sure he understood the importance of the hearing and to advise him that he would not be permitted to use his exclusion from the hearing in any future appeal. Mr. Nelson told the Court that it was a waste of time for him to be present and, in fact, the whole trial was a waste of time. He was then removed from the courtroom. (Transcript Pretrial Conference, October 23, 2001, appended hereto at Tab 124, at 15-17.)

44. Two days later, on October 25, 2001, Mr. Nelson came before the Court to change his plea to guilty on Count 1 of the indictment. Ms. Hunt outlined the charge. Mr. Nelson admitted that he forcibly seized Pamela Butler from the street outside her home in Kansas and transported her to Missouri for the purpose of killing her. He also admitted taking the girl behind a church in Grain Valley and intentionally killing her by strangling her with an electrical wire. The Court examined Mr. Nelson in connection with his desire to plead guilty and all the rights he



Appellate Case: 15-3160 Page: 90 Date Filed: 02/29/2016 Entry ID: 4372488

was waiving. Ms. Hunt then reviewed the details of the plea agreement, in which the U.S. Attorney agreed not to file any additional charges arising out of the present offenses or the investigation in the Western District of Missouri of other offenses and also to dismiss Count 2 of the indictment at the time of sentencing. The Court confirmed with Mr. Nelson that he had signed the document and had read and understood it. After examining Mr. Nelson on the factual basis of the plea, Ms. Hunt asked Mr. Nelson whether he agreed that at the time the crime was committed and at the time of the change of plea he was not suffering from a mental disease or defect that would exclude criminal responsibility. Finally, Mr. Nelson agreed not to be present on October 26 at the pretrial conference, but to be present for jury selection after that. (Transcript Change of Plea Hearing, October 25, 2001, appended hereto at Tab 125, at 2-24.) On Friday October 26, the District Court confirmed Magistrate Judge Hays's rulings on mental health evidence, and the Government accordingly filed a motion to bar the defense from presenting mental health evidence at the penalty phase. (Cr. Docket, appended hereto at Tab 69, Documents #340 and #341.)

45. On Sunday October 28, Mr. Nelson tried to kill himself by taking approximately forty pills of antidepressant medication, including Elavil and Trazadone. (Logan Psychiatric Evaluation, appended hereto at Tab 127.) On Monday, October 29, the defense sought a sixty-day continuance to allow for mental health counseling or other intervention that would enable Mr. Nelson to assist counsel in his defense. The Government opposed a continuance and urged the Court to begin jury selection as soon as Mr. Nelson was released from the hospital. (Transcript Continuance, October 29, 2001, appended hereto at Tab 126.) Defense counsel had just learned about the suicide attempt immediately prior to the hearing. They had not spoken to



Appellate Case: 15-3160 Page: 91 Date Filed: 02/29/2016 Entry ID: 4372488

Mr. Nelson and did not know his medical or physical condition. They had no defense expert available to assess Mr. Nelson's competency to proceed or capacity to assist counsel. The Court proceeded to the penalty phase without conducting a formal competency assessment.

46. On November 15, the Court ordered the defense to submit *in camera* an outline of the specific mental health testimony it intended to present in the penalty phase and whether the testimony would be based on a personal examination of Mr. Nelson. In its Order of November 19, 2001 (Cr. Docket, appended hereto at Tab 69, Document 403; Order: Mental Health Evidence, November 19, 2001, appended hereto at Tab 131), the Court offered this summary of the submission concerning Drs. Cunningham and Foster:

> These witnesses would testify in basically three areas: 1) Testimony of Dr. Cunningham related to the defendant's future dangerousness; 2) Testimony of Dr. Cunningham related to risk factors and developmental obstacles which the defendant has exhibited and faced in childhood and adolescence. Defendant's counsel states that this testimony of Dr. Cunningham, although psychological testimony, is not based on interviews with the defendant and will not attempt to explore Dr. Cunningham's opinions regarding the defendant's mental health, his psychological profile, any mental health diagnoses or any other psychological testimony pertaining specifically to the defendant. 3) Testimony of Dr. Foster. Defendant's counsel states that Dr. Foster is the forensic psychologist hired by the defense to evaluate the defendant's mental health. Dr. Foster has met with the defendant for approximately nine hours and has also reviewed written materials. Defendant's counsel indicates that he was unable to speak with Dr. Foster, but counsel states he is not at all sure that Dr. Foster could base his mental health testimony regarding defendant's pervasive developmental disorder on the memorandums and information provided by counsel alone.

Based on this submission, the Court ruled that it would be unfair to allow the testimony of Dr. Foster when the Government expert was denied access to Mr. Nelson. However, the Court allowed Dr. Cunningham's two categories of testimony "as it does not appear that they are based on any interviews with or psychological tests of the defendant."



Appellate Case: 15-3160 Page: 92 Date Filed: 02/29/2016 Entry ID: 4372488

47. The defense psychologist, Dr. Foster, prepared a report on November 23, 2001. (Foster Evaluation, November 23, 2001, Defendant's Trial Exhibit 136, appended hereto at Tab 132.) On November 28, 2001 – while the jury was deliberating on whether to sentence Mr. Nelson to death or life without the possibility of release – the defense offered Dr. Foster's report as a proffer of what his testimony would have been if the Court had permitted him to testify. (Excerpt Foster Proffer, November 28, 2001, appended hereto at Tab 139.) The defense had offered the testimony of Dr. Cunningham only as a "teaching witness" – that is, a forensic psychologist who would merely provide a theoretical framework describing the risk and protective factors that influence human development and that increase the likelihood of negative outcomes when risk factors outweigh protective factors. This witness had almost nothing to say about Mr. Nelson personally. In roughly one page of testimony, Dr. Cunningham recited a checklist of "factors that would have been damaging" to Mr. Nelson's development, including "multigenerational distress," "serious mental illness on both sides of his family," teenage mother ("only 19 when he was born"), "alcoholism and drug addiction of his father," "alcoholism of his mother," abandonment by father or "functional abandonment" when mother fled father, emotional abandonment, "emotional neglect," "inadequate supervision and guidance," "physical abuse," "seeing domestic violence," "household instability," "learning disability," "probable attention deficit hyperactivity disorder," "peer isolation and alienation," and "being incarcerated in adult prison as a late adolescent when he was 18." (Excerpt Mark Cunningham Testimony, November 27, 2001, appended hereto at Tab 137, at 994-995.) Dr. Cunningham's isolated and unsubstantiated reference to "mental illness on both sides of his family" was the only hint before the sentencing jury of the psychiatric issues which had in fact haunted Mr. Nelson since

childhood.[19] Two of the witnesses who had provided information about familial mental illness in pretrial interviews testified (*see* ¶ 49, *infra*), but neither was asked any questions about mental illness when they were in front of the jury beyond Nancy's terse allusion to the schizophrenia diagnosis of her son Paul.[20]

48. The jurors (and the Court) never knew that Mr. Nelson's suicide attempt in October 2001 was but one more example of the self-harming behavior that had been documented since he was twelve or thirteen years old. (Suicide Alert re 1987 suicide attempt, October 25, 1989, appended hereto at Tab 48.) Multiple records from the Tarrant County Detention Center and later the Texas Youth Commission provided counsel with ample evidence of Mr. Nelson's longstanding suicidality, but these records were not provided to Dr. Cunningham for his review or offered as exhibits in the trial. They indicate that Mr. Nelson tried to hang himself in 1987.

---

[19]Dr. Cunningham's assertion of these various factors – even though the defense had called no witnesses and introduced no documentary evidence to corroborate them – is reminiscent of the similarly unsupported references that the Supreme Court noted in the *Porter* case. "Although his lawyer told the jury that Porter 'has other handicaps that weren't apparent during the trial' and Porter was not 'mentally healthy,' he did not put on any evidence related to Porter's mental health." *Porter v. McCollum*, 558 U.S. at 32 (2009) (citation omitted).

[20]The entire discussion occupied ten lines of Nancy Nelson's testimony:

Q . . . Does Paul have a particular disability?
A Yes, he's schizophrenic.
Q He's schizophrenic. How do you know that?
A Because I have fought and kicked and screamed to try to get him help and finally I did, and now he's on medication.
Q Does he work, your son Paul?
A No, he's not able to.
Q Because of his schizophrenia?
A He can't concentrate good enough to do a job.

(Excerpt Nancy Nelson Testimony, November 26, 2001, appended hereto at Tab 135, at 599-600.)

(*Id.*) His mother reported his suicide threats (at age thirteen) on January 11, 1988, but did not follow through with the referral made by mental health authorities. (Spellings Social History, March 11, 1988, appended hereto at Tab 30 at 2.) He jammed the lead end of a pencil into his forearm on February 12, 1988 (Daily Observation, February 12, 1988, appended hereto at Tab 22), and was closely observed through February 16 as a suicide risk (Special Room Observations, February 12-16, 1988, appended hereto at Tab 23). When returned to detention on March 4, 1988, he was observed to be harming himself by running head first into the wall and diving off the bed head first. (Detention Evaluation, March 10, 1988, appended hereto at Tab 29.) He was again closely observed through March 9 as a suicide risk. (Special Room Observations, March 4-9, 1988, appended hereto at Tab 24.) He was mechanically restrained three times (Records of Mechanical Restraint, March 6-7, and April 3, 1988, appended hereto at Tabs 26 and 33) and briefly hospitalized (Request for Completed Adjudication and Dispositional Hearing, March 8, 1988, appended hereto as Tab 27) during this interval to prevent self-harm. On March 5, he put a pillow case over his head and tried to tie it in a knot and also tried using his shirt to choke himself. (Daily Observation Log, March 5, 1988, appended hereto at Tab 25.) He was on suicide watch again from March 28 through April 3 (Special Room Observations, March 28 to April 3, 1988, appended hereto at Tab 32) and from October 10 to 16 and 20 to 21, 1989 (Special Room Observations, October 10, 12-16 and 20-21, 1989, appended hereto at Tabs 40, 42, and 44). During the October episodes, he wrote graffiti on the floor and walls in his own blood. (Room Observations/Injury/Mechanical Restraint, October 12, 18-21, 1989, appended hereto at Tab 42.) Mr. Nelson was again placed in mechanical and physical restraints to stop his self-inflicted bleeding. (Detainee Report of Injury, October 21, 1989, appended hereto at Tab 45.)



Appellate Case: 15-3160 Page: 95 Date Filed: 02/29/2016 Entry ID: 4372488

He was placed on suicide precaution again on January 6, 1990, until he could be evaluated.[21] (Individual Counseling Record, January 6, 1990, appended hereto as Tab 52.)

49. In a pretrial interview, Mr. Nelson's mother, Nancy, reported that she had also attempted suicide by cutting her wrists (when Keith was no more than a year old). (Nancy Nelson Interview, April 30, 2001, appended hereto as Tab 98, at 7.) At trial, she mentioned cutting her wrists and taking "pills" in suicide attempts. (Excerpt Nancy Nelson Testimony, November 26, 2001, appended hereto at Tab 135, at 623.) Nancy's mother, Wilma Nelson, reported that her sister Dela (Nancy's aunt) had seizures. (Wilma Nelson Interview, May 13, 2001, appended hereto as Tab 107, at 4.) In addition, Nancy's sister, Mary Smith, reported that their maternal aunt Dela had a son (Nancy's cousin David Jerish) who had schizophrenia. Mary Smith also reported that their mother's other sister, Edna (now deceased), suffered from depression and may have had schizophrenia. Two of Edna's sons committed suicide. A third son was treated for mental illness. (Mary Smith Interview, May 13, 2001, appended hereto at Tab 103, at 3.) Nancy said her sister Georganna Nelson Romero has bipolar disorder.[22] (Nancy Nelson Interview, April 30, 2001, appended hereto as Tab 98, at 3.) Nancy also indicated that her sister Cherlynn has a son (Aaron) with bipolar disorder and another son (Christopher) who may also be bipolar. *Id*. at 4. Neither Nancy Nelson nor Mary Smith discussed mental health evidence when they testified. An interview with paternal aunt Betty Sutton concerning the

[21]The defense did not interview anyone about Mr. Nelson's suicidality in the juvenile settings, so no witnesses were ever called to testify to his self-harming behaviors as a youth.

[22]Ms. Romero was interviewed and later testified at the trial, but it appears that no one ever asked her about her mental illness or sought to obtain any of her psychiatric records. (Georganna Romero Interview, May 13, 2001, appended hereto at Tab 101; Excerpt Georgann Romero Testimony, November 26, 2001, appended hereto at Tab 133.)



Appellate Case: 15-3160 Page: 96 Date Filed: 02/29/2016 Entry ID: 4372488

paternal lineage also suggested mental disorders were rampant on that side of the family. She described Keith's father, Kenneth Morse, as having delusions, fits, bizarre behavior, and paranoia. Kenneth's sister Evelyn was described as "crazy," having shot herself and attempted to kill her daughter by sticking the child in the oven. Betty described herself as having depression. (Betty Sutton Interview, May 13, 2001, appended hereto as Tab 100, at 1-3.) Keith's third cousin, Mike Morse, described Kenneth Morse, as a "Looney Toon" with "multiple personalities, undiagnosed." (Mike Morse Interview, May 13, 2001, appended hereto at Tab 104, at 1.) Despite these red flags, there was no attempt to corroborate these reports or further explore familial patterns of mental illness.[23]

*Failure to investigate brain damage*

50. As noted in ¶ 15, *supra*, the need to investigate potential brain damage in death penalty cases has been well recognized since the 1980s. Some brain disorders arise *in utero* during the extended developmental process that begins not long after conception. The

[23]Substance abuse is an additional mental disorder with a strong genetic component, and there is evidence of alcohol and substance abuse on both sides of Mr. Nelson's family. Kenneth Morse reportedly sniffed turpentine, smoked marijuana, and abused alcohol and heroin. Nancy Nelson was an alcoholic during Mr. Nelson's developmental years, if not before. (Nancy Nelson Interview, April 30, 2001, appended hereto at Tab 98, at 10-11.) Paul Nelson's problems with alcohol are reflected in his driving record. (Paul Nelson Missouri DMV Record, January 10, 2000, appended hereto at Tab 72.) The DSM-IV (1994) (cited *supra* in n. 9), excerpt appended hereto at Tab 148, noted at 203, "Alcohol Dependence often has a familial pattern, and at least some of the transmission can be traced to genetic factors. The risk for Alcohol Dependence is three to four times higher in close relatives of people with Alcohol Dependence. Higher risk is associated with a greater number of affected relatives, closer genetic relationships, and the severity of the alcohol-related problems in the affected relative." The Text Revision (2000), also appended hereto at Tab 148, at 221, has similar language but estimates that "40%-60% of the variance of risk is explained by genetic influences."



Appellate Case: 15-3160 Page: 97 Date Filed: 02/29/2016 Entry ID: 4372488

vulnerability of the developing brain has been eloquently summarized by two leading authorities on neurotoxicity:

> The developing brain is inherently much more susceptible to injury caused by toxic agents than is the brain of an adult. This susceptibility stems from the fact that during the nine months of prenatal life, the human brain must develop from a strip of cells along the dorsal ectoderm of the fetus into a complex organ consisting of billions of precisely located, highly interconnected, and specialized cells. Optimum brain development requires that neurons move along precise pathways from their points of origin to their assigned locations, that they establish connections with other cells, both nearby and distant, and that they learn to communicate with other cells via such connections. All these processes have to take place within a tightly controlled time frame, in which each developmental stage has to be reached on schedule and in the correct sequence.
>
> Because of the extraordinary complexity of human brain development, windows of unique susceptibility to toxic interference arise that have no counterpart in the mature brain, or in any other organ. If a developmental process in the brain is halted or inhibited, there is little potential for later repair, and the consequences can therefore be permanent. . . .
>
> The human brain continues to develop postnatally, and the period of heightened vulnerability therefore extends over many months, through infancy and into early childhood. Although most neurons have been formed by the time of birth, growth of glial cells and myelinization of axons continues for several years.[24]

51. Numerous red flags should have prompted trial counsel to investigate potential brain damage *in utero*. In pretrial interviews, Nancy Nelson reported that Kenneth Morse beat her regularly while she was pregnant with Keith and his twin, Kenneth. (Nancy and Paul Nelson Interview, May 22, 2000, appended hereto at Tab 73, at 2-3.) She said Morse beat her severely and in the stomach, and even kicked her in the abdomen. *Id*. Nancy went into labor early, following a beating. (*Id*. at 3.) She described Keith as looking "like an Ethiopian baby" at birth and reported that he was then hospitalized because of breathing problems. *Id*. Nancy reported that she had starved herself during the pregnancy with the twins, dropping from 210 to 130 pounds, and she did not know she was pregnant with twins until the day they were born. She

[24]Philippe Grandjean & Philip Landrigan, *Developmental Neurotoxicity of Industrial Chemicals*, LANCET, November 8, 2006, at 1-2 (citations omitted).



Appellate Case: 15-3160 Page: 98 Date Filed: 02/29/2016 Entry ID: 4372488

said that Keith weighed only four and a half pounds at birth. (Nancy Nelson Interview, April 30, 2001, appended hereto as Tab 98, at 6-7.)

52. These red flags – potential *in utero* exposure to alcohol, fetal malnourishment, physical trauma, low birth weight – all cried out for a thorough investigation. The local doctor who delivered Keith Nelson, James D. Pretz, was identified on his birth certificate, and a Fort Worth doctor, W. V. Bradshaw, Jr., on his immunization records. (Hospital Worksheet for Birth Registration, November 23, 1974, appended hereto as Tab 1; Newborn Examination, appended hereto as Tab 2; Newborn Nurses' Notes, appended hereto as Tab 3; Certificate of Live Birth/Certificate of Immunizations, appended hereto at Tab 6.) There was no attempt to interview either physician (or any nurse) or to obtain whatever records they maintained for Keith, his mother, or his siblings.[25] At the time of Mr. Nelson's trial, there was an abundant literature on Fetal Alcohol Spectrum Disorders, and there had been numerous lectures on this subject at capital defense training seminars. But even absent reliable evidence of fetal alcohol exposure, traumatic injury *in utero* and anoxia in the birth canal at the time of delivery provided additional risk factors for brain damage. Hospital records indicated dysmorphology: "This infant has a strangely old looking face for a new born and in spite of the fact that he was the second born twin and a breech . . . molding of the head." (Children's Mercy Hospital Progress Notes, November

[25]The importance of obtaining all the available objective medical records on these events is underscored by the limited education and uncertain reliability of Nancy Nelson as an historian. In addition to her alcoholism, she quit school at age thirteen, having finished the eighth grade. (Excerpt Nancy Nelson Testimony, November 26, 2001, appended hereto at Tab 135, at 601-2.) Moreover, three weeks after Keith's birth, he was still in the hospital without parental contact. The hospital noted on December 13, "There has been no contact or visitation from his unwed mother. Letter sent to initiate response was returned. . . . no phone for mother." (Children's Mercy Hospital Progress Sheet, December 13, 1974, appended hereto as Tab 7.) The hospital noted involvement of Welfare and Protective Services, but there is no evidence that welfare records were ever obtained pretrial.



Appellate Case: 15-3160 Page: 99 Date Filed: 02/29/2016 Entry ID: 4372488

23-24, 1974, appended hereto as Tab 4.) As a newborn, Mr. Nelson was placed in intensive care because of his respiratory difficulties. (Intensive Care Sheet, November 24, 1974 appended hereto as Tab 5; Problem List, December 15, 1974, appended hereto as Tab 8; and Clinical Resume, July 21, 1975, appended hereto as Tab 9.)

53. Environmental exposure to neurotoxins – both *in utero* and in early childhood – could also have been investigated, particularly in light of the impoverished neighborhoods in which Nancy lived with her sons when they were small. Typical environmental neurotoxins include not only pesticides, but also heavy metals (such as lead and cadmium) and organic solvents. The various neighborhoods where Keith Nelson lived in Kansas, Missouri, California, and Texas in his developmental years could have been evaluated for toxic exposures. *See*, for example, the Environmental Protection Agency's ongoing efforts to decontaminate the drinking water in White Settlement, Texas. (EPA Air Force Plant 4, August 10, 2010, appended hereto as Tab 150.) Even without specific evidence of neighborhood neurotoxins, the mere risk of such exposure was another reason to explore potential brain damage through neuropsychological assessment. Mr. Nelson was also exposed to alcohol use and street drugs at an early age in the neglectful household of his alcoholic mother. A Texas Youth Commission record dated November 25, 1989 reported that he had "[s]tarted drinking beer at age 6; currently drinks 'maddog' about a bottle per day, 5 days per week, does speed once per week, & pot once a week." (Individual Counseling Record, November 25, 1989, appended hereto as Tab 51.) Alcohol and substance abuse are additional risk factors for brain damage.

54. Many of the suicide attempts and self-harming behaviors in Mr. Nelson's childhood, described in ¶ 48, *supra*, also risked damaging his brain, either from anoxia (when he tried to



Appellate Case: 15-3160 Page: 100 Date Filed: 02/29/2016 Entry ID: 4372488

hang or choke himself) or from traumatic brain injury (when he beat his head against concrete walls and floors). These events were described at length in the records of the Tarrant County Detention Center and Texas Youth Commission obtained by trial counsel, but there was no attempt to investigate brain damage or even to interview TYC staff about the behaviors they had witnessed and documented in the records. As noted in ¶ 39, n. 10, *supra*, the two outside consultants on mitigation both urged trial counsel to obtain a neuropsychological assessment, and the Court granted funding for such an assessment. However, when Mr. Berrigan replaced Mr. Shull and assumed responsibility for penalty phase preparation, he abruptly canceled the scheduled neuropsychological assessment and never utilized the services of anyone else with expertise in this area.

*Failure to investigate cognitive impairment*

55. Although the United States Supreme Court has recognized that "impaired intellectual functioning is inherently mitigating" (*Tennard v. Dretke*, 542 U.S. 274, 287 (2004)), the jurors who sentenced Keith Nelson to death knew almost nothing of his limitations and impairments. It should also be noted that undiscovered cognitive impairment is the common factor in every case in which the Supreme Court has found trial counsel ineffective for failure to conduct thorough mitigation investigation, as discussed in ¶ 16, *supra*. In *Williams v. Taylor*, the Court noted that Mr. Williams was "borderline mentally retarded" with "mental impairments" that might be organic in origin. 529 U.S. 362, 370 (2000). In *Wiggins v. Smith*, the Court noted an IQ score of 79 and social service records documenting "borderline retardation." 539 U.S. 510, 518, 523 (2003). In *Rompilla v. Beard*, the Court identified test scores showing a "third grade level of

cognition after nine years of schooling," organic brain damage, and impairments in several cognitive functions. 545 U.S. 374, 391-93 (2005). In *Porter v. McCollum*, the Court noted "cognitive defects" affecting reading, writing, and memory and an inability to rule out brain abnormality. 558 U.S. 30, 36 (2009). In *Sears v. Upton*, the Court found that Mr. Sears "performs at or below the first percentile in several measures of cognitive functioning and reasoning," making him among the most impaired individuals in the population in suppressing competing impulses and conforming behavior only to relevant stimuli. 130 S. Ct. 3259, 3263 (2010).

56. Although the defense offered the testimony of one of Mr. Nelson's elementary school teachers, her testimony was conclusory, rather than concrete. One of his fourth grade teachers, Ellen Crutsinger, testified that she taught three of the Nelson boys (Excerpt Ellen Crutsinger Testimony, November 27, 2001, appended hereto at Tab 136, at 929), and Keith was the only one in Special Education (*Id*. at 930). Ms. Crutsinger did not teach Special Education classes herself, but taught Keith in social studies in the regular classroom (*Id*. at 931). She said he "struggled" in school (*Id*. at 932) and had a "learning disability," but she did not know what kind (*Id*. at 931). He was always in the lowest ability group (*Id.* at 940). Although trial counsel had some (but by no means all) of Mr. Nelson's school and juvenile records,[26] there was no investigation of his

[26]For example, counsel failed to obtain Special Education records from the White Settlement School District even though the school district twice explicitly advised that there were such records in the Department of Special Education. An undated form from the Lake Worth-White Settlement Public Schools stated that Mr. Nelson had "additional records located in the Department of Special Education. Handwritten notations added, "More records" and "Please request." (Notice of Additional Student Records, appended hereto as Tab 144.) A second undated form from the White Settlement Independent School District similarly advised of additional records and added, "If a student has been referred and tested, these records are also on file." (*Id*.) Both forms indicated that the Special Education records would be released "upon receipt of written consent" of the student if eighteen years of age.



Appellate Case: 15-3160 Page: 102 Date Filed: 02/29/2016 Entry ID: 4372488

intellectual disabilities despite repeated academic failure and abundant documentation of poor functioning from his earliest encounters with the educational system. No school records were offered in evidence or offered to any testifying witnesses for their review. In a pretrial interview, Nancy Nelson indicated that when Keith was tested for kindergarten, she was told that he was not ready and should remain in preschool. She also reported that he was diagnosed with dyslexia. He failed first grade (Nancy and Paul Nelson Interview, May 22, 2000, appended hereto at Tab 73, at 3). In the spring of 1981, he could not read, or recognize the value of coins, or repeat five digits forward and backward. (Checklist of Characteristics, May 21, 1981, appended hereto at Tab 10.) Two years later, he had achieved only three of the ten skill sets for first-grade pupils. (Checklist of Characteristics, May 20, 1983, appended hereto at Tab 12.) On October 11, 1983 (when he was eight years and eleven months old), he received an IQ score of 86 on the Otis-Lennon Mental Ability Test. (Otis-Lennon Test, October 11, 1983, appended hereto as Tab 13.) Two years later, while in the fourth grade at West Elementary (where Ms. Crutsinger taught him), Keith again took the Otis-Lennon Test and received an IQ score of 84. (Cumulative Record of Results from Intelligence Tests, October 30, 1985, appended hereto at Tab 17.) In the spring of 1985, at age ten, Mr. Nelson scored in the 7th percentile in reading (a grade equivalent of 1-5). (SRA Skill Profile, April 1985, appended hereto at Tab 15.) Two years later, his scores had dropped to the 2nd percentile in reading and the 3rd in language arts on SRA testing. (SRA Profile, April 9, 1987, appended hereto at Tab 19.) A teacher evaluation checked off none of the ten skill sets identified for grades two to five. (Checklist of Characteristics, May 14, 1987, appended hereto at Tab 20.) In 1987, he failed the fifth grade. (Spelling Social History, March 11, 1988, appended hereto at Tab 30, at 5.) That school year, he remained in Special Education



Appellate Case: 15-3160 Page: 103 Date Filed: 02/29/2016 Entry ID: 4372488

and received Speech and Language Therapy. (Speech and Language Therapy Progress Report, 1987 to 1988, appended hereto at Tab 36.) In 1989-90, he was repeating sixth grade (Smith Social History, August 4, 1989, appended hereto at Tab 38, at 5) at the Brewer Middle School, where he was already three years older than the rest of the children in his class. (At the time, his twin brother was in *ninth* grade at Brewer High School.) On a Wechsler Intelligence Scale for Children-Revised, administered by a master's level psychologist in 1989, Mr. Nelson obtained a Full Scale IQ of 98, but a verbal of 91. (Psychological Evaluation, November 3, 1989, appended hereto at Tab 49.)

57. Language and learning problems are often the first signs of neurological deficits, so these red flags in Mr. Nelson's early school records should also have signaled the need to investigate brain dysfunction (as discussed *supra*, ¶¶ 50 to 54) and neuropsychological integrity. Problems with receptive language (how words are heard and understood), expressive language (how concepts are formed and words are articulated), and language processing in the brain (cognition and comprehension) all suggest possible brain damage or abnormality. Investigation of the details of Mr. Nelson's childhood learning disabilities might have disclosed a brain-based explanation, such as a sensory processing disorder (difficulty integrating different types of sensory information, such as images, sounds, tastes, and smells). The results can be social, emotional, and behavioral problems that reflect hypersensitivity to sensory stimuli, or an inability to integrate these stimuli properly. The need to investigate the impact of Mr. Nelson's deficits was especially clear in this case because of the inevitable comparison between Mr. Nelson's adult functioning and that of his two brothers, Kenneth and Steven, who are neither incarcerated nor psychiatrically disabled. At the time of trial, Kenneth had been in the army for four years and



Appellate Case: 15-3160 Page: 104 Date Filed: 02/29/2016 Entry ID: 4372488

worked in satellite communications (Excerpt Kenneth Nelson Testimony, November 26, 2001, appended hereto at Tab 134), and Steven had attended a two-year college and was working as a systems engineer for a computer company (Excerpt Steven Nelson Testimony, November 27, 2001, appended hereto at Tab 138). It was important to anticipate the prosecutorial argument that Kenneth[27] and Steven came from the same parents and grew up in the same disadvantaged background but nonetheless were successful adults. Trial counsel were left with no response to this argument, although the evidence of Keith's well-documented cognitive and academic deficits was staring them in the face.

*Failure to investigate trauma in Mr. Nelson's developmental years*

58. In an article published in 1999, I discussed how confidentiality issues preclude a death row census that would disclose precise information on the psychiatric demographics of the population. However, based on my own experience, I reported,

> Abuse and trauma histories are virtually universal. The overwhelming majority of capital clients have suffered trauma outside the realm of ordinary human experience, whether it occurs within the home, as in incest and sexual abuse, or in the wider social setting, where growing up as an inner-city person of color means witnessing violent death of peers and loved ones. Whether they have suffered violence or helplessly witnessed violence to others, they live with the intrusive memories and remain hypervigilant in the expectation that random violence may visit them again at any moment. Maltreatment may involve trauma in the form of psychological battering (i.e., rejecting, terrorizing, ignoring, isolating, and corrupting) as well as physical abuse.[28]

---

[27] Indeed, as Keith's twin, Kenneth invited the most obvious comparison in terms of developmental exposures and quite different adult outcomes.

[28] Russell Stetler, *Mitigation Evidence in Death Penalty Cases,* THE CHAMPION (Jan.-Feb. 1999) at 35, 36-37. For the many varieties of trauma affecting emotional, intellectual, and social development, see the work of Professor James Garbarino, including JAMES GARBARINO AND GWEN GILLIAM, UNDERSTANDING ABUSIVE FAMILIES (1980); JAMES GARBARINO, EDNA GUTTMANN, AND JANIS WILSON SEELEY, THE PSYCHOLOGICALLY BATTERED CHILD (1988); JAMES GARBARINO, KATHLEEN KOSTELNY, AND NANCY DUBROW, NO PLACE TO BE A CHILD:



Appellate Case: 15-3160 Page: 105 Date Filed: 02/29/2016 Entry ID: 4372488

A trauma specialist with extensive experience in capital litigation has more recently stated bluntly, "Psychological trauma lies at the heart of death penalty cases."[29] These issues were widely discussed at capital defense seminars where I have taught over the past two and a half decades.[30] In Mr. Nelson's case, there were abundant red flags that should have alerted counsel to explore the impact of trauma in his developmental years.

59. Trial counsel were on notice from multiple sources that Mr. Nelson had experienced and witnessed extreme physical violence and terror in his childhood. Mitigation investigator Tena Francis proposed childhood trauma as the top priority when she outlined her preliminary investigation plan to trial counsel on February 14, 2001. (Preliminary Investigation Plan, February 14, 2001, appended hereto at Tab 89.) Nancy Nelson described the physical violence inflicted by Kenneth Morse even when she was pregnant. During one pregnancy, Kenneth reportedly took Nancy to a field and stomped her, requiring surgery to remove her spleen and gall bladder. (Nancy Nelson Interview, April 30, 2001, appended hereto at Tab 98, at 7.) Keith and his brothers described the physical violence inflicted on them by Nancy's later boyfriends, such as E. J. Hendricks (who also handcuffed them to their beds during beatings), and other caretakers, such as Billy Reese. (Keith Nelson Interview, March 5, 2001, appended hereto at Tab

---

GROWING UP IN A WAR ZONE (1991); and JAMES GARBARINO, LOST BOYS: WHY OUR SONS TURN VIOLENT AND HOW WE CAN SAVE THEM (1999).

[29] Kathleen Wayland, Ph.D., *The Importance of Recognizing Trauma Throughout Capital Mitigation Investigations and Presentations*, 36 HOFSTRA L. REV. 923 (2008).

[30] The Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases, which have synthesized what was taught at national seminars for capital defense, note the importance of exploring trauma history (Guideline 5.1.B), having a team member with expertise in identifying "the presence, severity, and consequences of exposure to trauma" (Guideline 5.1.E), and potentially involving experts with specialized expertise in trauma (Guideline 10.11.E.1.A). 36 HOFSTRA L. REV. 677, 681, 683, 690 (2008).



Appellate Case: 15-3160 Page: 106 Date Filed: 02/29/2016 Entry ID: 4372488

97, at 2 (referring to Hendricks as "Kendricks"); Paul Nelson Interview, May 13, 2001, appended hereto at 106, at 2.) Irene Wood, a family friend and neighbor in White Settlement, Texas, reported that all the Nelson boys had scars. (Irene Wood Interview, June 29, 2001, appended hereto at Tab 112, at 2.) Rhonda Reese Monroe, a former babysitter in Texas, described how Johnny Nelson was abusive toward his younger brothers and how her late husband Billy Reese beat Keith with a belt. (Rhonda Monroe Interview, September 26, 2001, appended hereto at Tab 92, at 1, 3.)

60. The capital charges were in themselves a reason for trial counsel to explore potential sexual abuse in Mr. Nelson's own background, but there were other more specific indicators that cried out for thorough investigation focused on this point. (*See*, for example, the suspicion, based on preliminary investigation, that Mr. Nelson "may have been sexually abused by a boyfriend of the mother." ¶ 38, *supra*.) The importance of exploring potential childhood sexual abuse cannot be overstated, and Mr. Nelson's early childhood was spent in multiple environments whose lack of sexual boundaries and protection placed him at extreme risk. His mother had multiple casual male sexual partners and often left her sons in the care of these men. Mr. Nelson told Ms. Hunt and Ms. Francis that his mother had sex with men, but did not actually have many boyfriends. (Keith Nelson Interview, March 5, 2001, appended hereto at Tab 97, at 2.) One White Settlement resident whose church helped the Nelson family at Christmas one year reported that she had heard that Nancy Nelson prostituted herself to make ends meet. (Glades Reese Interview, February 19, 2001, appended hereto at Tab 90.) Both Keith and his brother Paul reported that a female babysitter had the boys insert popsicle sticks in her vagina. (Keith Nelson Interview, March 5, 2001, appended hereto at Tab 97, at 2; Paul Nelson Interview, May

13, 2001, appended hereto at Tab 106, at 2.) A paternal aunt reported that at age eight Keith had confided in her that a black man in California had anally penetrated him and forced him to perform oral copulation. (Betty Sutton Interview, May 13, 2001, appended hereto at Tab 100, at 3.) Neighbors, babysitters, and teachers consistently reported that Mr. Nelson wet the bed and came to school in clothing reeking of urine. (Anita Taylor Interview, June 1, 2001, appended hereto at Tab 109, at 1; Rhonda Monroe Interview, September 26, 2001, appended hereto at Tab 120, at 2; Ginny Monroe Interview, February 28, 2001, appended hereto at Tab 95, at 1; Mike and Lori Griffith Interview, Feburary 19, 2001, appended hereto at Tab 91, at 1; Goldie Hawk Interview, February 26, 2001, appended hereto at Tab 93, at 1; Eileen Pink Interview, August 31, 2001, appended hereto at Tab 115; and Homer Dear Interview, August 31, 2001, appended hereto at Tab 116, at 1.) Bedwetting has long been recognized as one of the warning signs of sexual abuse. *See*, for example, the United States Department of Health and Human Services, Administration for Children & Families, "Child Welfare Information Gateway," *available at* http://www.childwelfare.gov/pubs/factsheets/signs.cfm, appended hereto at Tab 149 at 3.

61. The singular impact of rape on children was noted in both the majority and dissenting opinions in *Kennedy v. Louisiana*, 554 U.S. 407, 128 S. Ct. 2641 (2008). Writing for the majority, Justice Kennedy noted, "Rape has a permanent psychological, emotional and sometimes physical impact on the child. *See* C. Bagley & K. King, Child Sexual Abuse: THE SEARCH FOR HEALING 2-24, 111-112 (1990); FINKELHOR & BROWNE, ASSESSING THE LONG-TERM IMPACT OF CHILD SEXUAL ABUSE: A REVIEW AND CONCEPTUALIZATION in HANDBOOK ON SEXUAL ABUSE OF CHILDREN 55-60 (L. Walker ed. 1988). We cannot dismiss the years of long anguish that must be endured by the victim of child rape." 554 U.S. at 435, 128 S. Ct. at 2658.

Justice Alito, in dissent, added, "Long-term studies show that sexual abuse is 'grossly intrusive in the lives of children and is harmful to their normal psychological, emotional and sexual development in ways which no just or humane society can tolerate.' C. BAGLEY & K. KING, CHILD SEXUAL ABUSE: THE SEARCH FOR HEALING 2 (1990). . . . Psychological problems include sudden school failure, unprovoked crying, dissociation, depression, insomnia, sleep disturbances, nightmares, feelings of guilt and inferiority, and self-destructive behavior, including an increased incidence of suicide. Meister, *supra*, at 209; Broughton, *supra*, at 38; Glazer, *Child Rapists Beware! The Death Penalty and Louisiana's Amended Aggravated Rape Statute*, 25 AM. J. CRIM. L. 79, 88 (1997). The deep problems that afflict child-rape victims often become society's problems as well. Commentators have noted correlations between childhood sexual abuse and later problems such as substance abuse, dangerous sexual behaviors or dysfunction, inability to relate to others on an interpersonal level, and psychiatric illness. Broughton, *supra*, at 38; Glazer, *supra*, at 89; Handbook on Sexual Abuse of Children 7 (L. Walker ed. 1988). Victims of child rape are nearly 5 times more likely than nonvictims to be arrested for sex crimes and nearly 30 times more likely to be arrested for prostitution. *Ibid*." 554 U.S. at 468-69, 128 S. Ct. at 2676-77.

62. The babysitter who reportedly invited the Nelson boys to insert popsicle sticks into her vagina suggests a different kind of sexual abuse, described by Dr. Kathleen Wayland as the "illusion of participation": "For example, a sexually abused child may be forced to 'participate' in sexual acts, creating the illusion that he or she is complicit. This can systematically undermine a child's ability to accurately assess issues of responsibility and lead him/her to confuse the role of victim and perpetrator. This dynamic can also fundamentally undermine a victim's capacity to

assess accurately the motivations of others, and may lead to inordinate interpersonal difficulties in accurately perceiving and relating to people in a position of authority." Kathleen Wayland, *The Importance of Recognizing Trauma Throughout Capital Mitigation Investigations and Presentations*, 36 HOFSTRA L. REV. 923, 952-53 (2008).

63. Mr. Nelson was also at high risk for traumatic exposure at the many institutions where he was incarcerated as a youth. Beginning at age thirteen, Keith Nelson spent much of his life behind bars. In 1988, he was detained in Tarrant County, Texas, at the Juvenile Detention Center in the first of multiple encounters with the local juvenile courts. For over a year, he shuttled back and forth between the Juvenile Detention Center and his mother, Nancy Nelson. (Tarrant County Juvenile Services, October 10, 1989, appended hereto at Tab 41.) On March 7, 1988, Keith and Nancy appeared for a Detention Hearing. Keith told the referee that he wanted to stay in detention. (Spellings Social History, March 11, 1988, appended hereto at Tab 30 at 2; and Spellings Report, January 13, 1988, appended hereto at Tab 21, at 2.) In October 1989, a month before his fifteenth birthday, he was sent to the Texas Youth Commission. (Order of Commitment, October 25, 1989, appended hereto at Tab 47.) He went first to the reception and diagnostic center at Brownwood and then to Gainesville State School. (Detention Center Release Form, October 25, 1989, appended hereto at Tab 46; Youth Movement, February 9, 1990, appended hereto at Tab 54.) He paroled to Nancy's custody in March 1990. His parole was revoked on May 31 and he was returned to Gainesville. (Hearing Examiner's Report, May 31, 1990, appended hereto at Tab 59.) In September, he was released to participate in the Texas Key Intensive Supervision program. (Youth Movement, August 22, 1990, appended hereto at Tab 60.) In March 1991, Mr. Nelson was back at the Tarrant County Juvenile Detention Center.



Appellate Case: 15-3160 Page: 110 Date Filed: 02/29/2016 Entry ID: 4372488

(Receipt for Child, March 19, 1991, appended hereto at Tab 61.) After several months of being in and out of custody, he was back to TYC Gainesville. (Tarrant County Juvenile Probation, June 29, 1991, attached hereto at Tab 62; Receipt for Child, August 19, 1991, appended hereto at Tab 63.) In January 1992, he was transferred to Missouri (Youth Movement, January 10, 1992, appended hereto at Tab 64), and in June 1993 he entered adult prison at age eighteen (Chronological Data Sheet, Missouri Department of Corrections, June 18, 1993, appended hereto at Tab 65). The Missouri Department of Corrections sent him to Booneville State Prison. He was released in 1995 (Missouri Department of Corrections Face Sheet, June 19, 2000, appended hereto at Tab 76), but soon returned to county jails in Bates and Henry Counties, Missouri. (Missouri Department of Correction, Diagnostic Center Report, May 1,1996, appended hereto at Tab 66.) He returned to Booneville in May 1996 and was released to KCCRC in September 1997 and paroled in February 1998. (Missouri Department of Corrections, Chronological Data Sheets, May 10, 1996, and April 22, 1998, appended hereto at Tab 67 and 68; Missouri Department of Corrections, Face Sheet, June 19, 2000, appended hereto at Tab 76.) Mr. Nelson told his trial team that Booneville was a “war zone” and he had witnessed men getting raped there. (Keith Nelson Interview, March 5, 2001, appended hereto at Tab 97, at 6.) Thus, for nearly a decade of his life from early adolescence to young adulthood, Keith Nelson was socialized by institutions of incarceration. Mr. Nelson’s trial team contacted a few individuals from the Texas institutions and no one at all from the Missouri Department of Corrections. (Theodore Shorty Interview, February 26, 2001, appended hereto at Tab 94; Investigative Memorandum, May 13, 2001, appended hereto at Tab 102; and Tino Castillo Interview, October 9, 2001, appended hereto at Tab 121.)

64. The Texas Youth Commission (previously known as the Texas Youth Council) had a notorious history long before Keith Nelson was placed there.[31] This history was another red flag that should have prompted trial counsel to investigate traumatic experiences in the facilities where Mr. Nelson was placed. Prior civil rights litigation – *see*, for example, *Morales v. Turman*, 364 F. Supp. 166 (1973) (detailing abuses and violations), 383 F. Supp. 53 (1974) (mandating closing of some facilities as quickly as possible), and 569 F. Supp. 332 (1983) (describing settlement agreement) – had found numerous abuses in TYC facilities, including the physical abuse of juvenile inmates absent exigent circumstances, use of tear gas and chemical crowd-control devices without limitation and at discretion of correctional officers, racial segregation, segregation by staff who had no professional training based on suspected homosexuality, withholding or neglecting to provide psychiatric services, and employment of staff whose personalities, backgrounds, or lack of qualifications made them likely to harm the individuals in their care. The law suits describe the physical abuse of new boys (called "fresh fish"), uninformed assignments to homosexual (called "punk") dormitories, incident reports deliberately falsified to protect correctional officers, and the jargon used to describe specific forms of brutality (such as the "peel," in which boys were forced to bend over and then struck hard on the back with a fist or open hand). The abuses did not end with the settlement agreement and name change (to Texas Youth *Commission*) in 1983. In fact, reports of sexual abuse and employee physical abuse continued well into the twenty-first century. Retired TYC Inspector

[31]The psychologist who belatedly examined Mr. Nelson for trial counsel noted in his report, "It was his misfortune to be confined as a juvenile in Texas facilities. The Texas Department of Corrections was performing experimental frontal lobotomies on Conduct Disordered (Antisocial) teenagers as recently as the late 1960's as an experimental form of 'treatment.'" (Foster Evaluation, November 23, 2001, Defendant's Trial Exhibit 136, appended hereto at Tab 132, at 3.)



Appellate Case: 15-3160 Page: 112 Date Filed: 02/29/2016 Entry ID: 4372488

General Randal Chance published his account of these abuses under the provocative title *Raped by the State* (2004) after serving in the TYC for over twenty years, beginning in 1982. In the Texas legislature, Senate Bill 103 filed in February 2007 stated that "[r]esearch has shown that many of the youth incarcerated within the Texas Youth Commission were physically abused by employees"[32] and cited turnover rates, inadequate training, and lack of a criminal investigation division within TYC as contributing to the violence "both to youth and staff."

*Failure to obtain relevant multigenerational social history records*

65. Trial counsel obtained some records relating directly to Mr. Nelson and a file containing police, jail, and medical records relating to his schizophrenic brother, Johnny, who was incarcerated in Texas at the time of Mr. Nelson's trial. (Johnny Nelson Records Obtained by Trial Counsel, appended hereto at Tab 142; Keith Nelson Records, appended hereto at Tab 143.) Their private investigator Daniel Grothaus reviewed and summarized Wyandotte County public records on a number of potential witnesses, including property records for half a dozen members of the Morse and Nelson families. (Daniel Grothuas Records Reviewed, appended hereto at Tab 141.) However, trial counsel obtained no educational, social service or welfare, juvenile dependency or family court, medical, employment, criminal or correctional, birth, marriage, death, alcohol and drug abuse assessment or treatment records on any other family members. As

[32]It should be noted that *witnessing* rapes and physical violence in the TYC might constitute important mitigation, whether Mr. Nelson suffered such abuse himself or not. *See*, for example, *Bobby v. Van Hook*, 558 U.S. 4, 10 (2009), where the Supreme Court summarized the "traumatic childhood experience" that was presented as mitigating evidence at Mr. Van Hook's trial: "He watched his father beat his mother weekly, saw him hold her up at gun- and knife-point, 'observed' episodes of 'sexual violence' while sleeping in his parents' bedroom, and was beaten himself at least once."



Appellate Case: 15-3160 Page: 113 Date Filed: 02/29/2016 Entry ID: 4372488

noted in ¶¶ 2 and 22, *supra*, life-history records are a long-established and critical part of mitigation investigation. Records invariably provide valuable background information on clients and their families. *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (court file – a readily available public document – contained "a range of mitigation leads that no other source had opened up"). In an earlier ineffectiveness case, *Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court found the life-history records such powerful mitigating evidence that the opinion quoted a caseworker report verbatim:

> The home was a complete wreck. . . . There were several places on the floor where someone had had a bowel movement. Urine was standing in several places in the bedrooms. There were dirty dishes scattered over the kitchen, and it was impossible to step any place on the kitchen floor where there was no trash. . . . The children were all dirty and none of them had on under-pants. Noah and Lula were so intoxicated, they could not find any clothes for the children, nor were they able to put the clothes on them. . . . The children had to be put in Winslow Hospital, as four of them, by that time, were definitely under the influence of whiskey. 529 U.S. at 395, n.19.

This excerpt provides a lucid example of a vivid illustration of family dysfunction – and a story which even the most skilled interviewer could never have elicited simply by talking with family members. The records documented an event which Terry Williams and his siblings were too young to remember, and his parents were too intoxicated to register in memory. Given Nancy Nelson's history of alcoholism and the report of Keith's drinking beer at age six (*see* ¶ 53, *supra*; and Nancy and Paul Nelson Interview, May 22, 2000, appended hereto at Tab 73, at 3), there is a great likelihood that comparable records existed that might have revealed the dysfunction of the Nelson family through events that no one even recalls any longer. In any event, records have no inherent bias, and contemporaneous records are more credible anyway than witnesses sharing previously undisclosed memories.



Appellate Case: 15-3160 Page: 114 Date Filed: 02/29/2016 Entry ID: 4372488

66. There were numerous red flags in this case identifying specific, relevant records that any reasonable attorney would have tried to obtain. Nancy Nelson reported that she had little or no contact with Keith for one to two months after his birth and that social workers asked her to give him up for adoption. (Nancy Nelson Interview, April 30, 2001, appended hereto at Tab 98, at 7; Clinical Resume, July 21, 1975, appended hereto at Tab 9.) A reasonable attorney would have tried to obtain all the records relevant to Mr. Nelson's medical infirmities (and potential neurological damage) throughout his childhood, as well as any social service records from his early childhood. Trial counsel were on notice concerning the legal files prepared by the attorneys and legal guardians appointed for Mr. Nelson as a youth in Texas; the preschool records from Mr. Nelson's early years in California; the special education records from the various school districts in which Mr. Nelson was enrolled in Texas and Missouri; any records available from Oak Grove Elementary School and Miami School in Amoret, Missouri; any police reports that documented Kenneth Morse's criminal history and domestic violence; any mental health records documenting the extensive psychiatric histories of Keith's two full siblings, John and Paul; Social Security detailed earnings reports that would have shown the modest income on which Nancy Nelson attempted to raise her children; etc.

67. The Commentary to ABA Guideline 10.7 notes, "Records should be requested concerning not only the client, but also his parents, grandparents, siblings, cousins, and children. A multi-generational investigation extending as far as possible vertically and horizontally frequently discloses significant patterns of family dysfunction and may help strengthen a diagnosis or underscore the hereditary nature of a particular impairment. The collection of corroborating information from multiple sources – a time-consuming task – is important



Appellate Case: 15-3160 Page: 115 Date Filed: 02/29/2016 Entry ID: 4372488

wherever possible to ensure the reliability and thus the persuasiveness of the evidence. Counsel should use all appropriate avenues including signed releases, subpoenas, court orders, and requests or litigation pursuant to applicable open records statutes . . ." 31 HOFSTRA L. REV. at 1024-25 (2003).

68. An e-mail between staff at the Capital Punishment Investigation & Educational Services on December 1, 2000, immediately acknowledged the need "to collect the many records that should be collected in Texas, California, and Missouri." (E-mail from Deborah Haddad to Tena Francis, December 1, 2000, appended hereto at Tab 81.) However, six months later, a memo from this group to trial counsel addressed the need for "[a]ll educational, medical, and mental health records for each of Keith's brothers," but noted, "We do not have releases signed by any of the brothers. These records need to be collected." They also had no authorization for the records of Nancy Nelson. (Update Penalty Phase Investigation, June 13, 2001, appended hereto at Tab 110, at 2.)[33] What was missing was the guiding hand of counsel to direct the mitigation investigation and ensure that all the relevant records were obtained.

*Failure to utilize the records that were obtained*

69. At the penalty phase of Mr. Nelson's trial, trial counsel did not introduce a single record. In preparing for the presentation of mitigation evidence at the penalty phase of Mr. Nelson's trial, trial counsel made almost no use of the records that had been obtained. The

[33] Ms. Hunt apparently finally obtained a release from Nancy Nelson and faxed a letter on July 25, 2001, requesting records from the Texas Department of Protective and Regulatory Services. (Hunt Dep. 93-94.) There is no evidence of any investigation resulting from this belated effort – or that Ms. Hunt even shared any records received with the people in Texas who were supposed to be conducting the mitigation investigation.



Appellate Case: 15-3160 Page: 116 Date Filed: 02/29/2016 Entry ID: 4372488

available records identified numerous medical and mental health professionals, teachers and Special Education staff, guardians ad litem, juvenile probation officers, correctional staff, mental health specialists, and juvenile caseworkers who could have been interviewed. For example, there were five lawyers who either represented Mr. Nelson in juvenile proceedings or were appointed his guardian ad litem in connection with juvenile adjudications: George Mackey (his attorney and guardian ad litem in March 1988) (Adjudicatory Hearing, March 15, 1988, appended hereto at Tab 31); Tom Zachry (his attorney in August 1989) (Letter from Zachry, August 16, 1989, appended hereto at Tab 39); Harry Ward (his attorney in October 1989) (Tarrant County Chronological Notes, November 7, 1989, appended hereto at Tab 50); Jim Culbertson (his attorney and guardian ad litem as of October 20, 1989) (Social History for Second Adjudication, October 20, 1989, appended hereto at Tab 43); and Ron Couch (his attorney in May 1990) (Revocation/Reclassification Hearing Request, May 22, 1990, appended hereto at Tab 58). The records also identified at least ten teachers (from the period 1981 to 1989) who were never interviewed: Pam Reeves (resource teacher in 1981) (Letter to Resource Center, October 25, 1981, appended hereto at Tab 34); Diane Allgood (first grade teacher 1982) (Checklist of Characteristics, May 2, 1982, appended hereto at Tab 11); Karen Wright (first grade teacher 1983) (Checklist of Characteristics, May 20, 1983, appended hereto at Tab 12); Karlann Buell (Checklist of Characteristics, May 9 [1985], appended hereto at Tab 16) and Shirley Hopkins (1984) (Checklist of Characteristics, May 25, 1984, appended hereto at Tab 14); C. Latta (speech and language therapy teacher from 1987-88) (Speech and Language Therapy Progress Report, 1987-88, appended hereto at Tab 36; Kimberly Feeler (fifth grade teacher 1987-88) (Report to Parents, 1987-88, appended hereto at Tab 37); Damon Roberts (1988-89) (Notice



Appellate Case: 15-3160 Page: 117 Date Filed: 02/29/2016 Entry ID: 4372488

of Transfer, October 25, 1988, appended hereto at Tab 35); and Lynne S. Rowe (teacher at West Elementary for Chapter 1 Reading Program) (Basic Skills Lab, September 1986, appended hereto at Tab 18). Several medical and mental health professionals were identified in the records obtained by the defense team: James Pretz, M.D. (who delivered Mr. Nelson and apparently served as the Nelson family physician) (Hospital Work Sheet, November 23, 1974, appended hereto at Tab 1); Roger G. Burns, Ph.D. (now deceased) (Psychological Report, March 9, 1988, appended hereto at Tab 28), and Ken Murray, M.S. (Psychological Evaluation, November 3, 1989, appended hereto at Tab 49), who did psychological evaluations of Mr. Nelson in 1988 and 1989 respectively; Harold G. Grant, M.D. (now deceased), who provided services in 1990 (Psychiatric Examination, February 22, 1990, appended hereto at Tab 55); and counselors Brad Mitchell (February 1990) (Individual Counseling Record, February 7, 1990, appended hereto at Tab 53), Levi Williams (Letter from Williams, May 11, 1990, appended hereto at Tab 57) and Cindy Phillips (Letter from Phillips, March 19, 1990, appended hereto at Tab 56). The Tarrant County Juvenile and TYC records identified over twenty probation officers, caseworkers, intake officers, correctional staff, and others who witnessed Mr. Nelson's suicide attempts and self-harm in the facilities. In addition to these twenty individuals who served on placement committees, witnessed suicide attempts, did site visits to Nancy Nelson's dysfunctional household, and oversaw Mr. Nelson's juvenile assessments, there are over two dozen names mentioned in the records – in short, a list of over fifty potential witnesses from Mr. Nelson's turbulent adolescent years. The mitigation investigators made attempts to interview a handful of these individuals, with almost no success.



Appellate Case: 15-3160 Page: 118 Date Filed: 02/29/2016 Entry ID: 4372488

70. Life-history records enable capital defense teams to interview all witnesses more effectively – not only the witnesses who created the records in the first place (like the teachers who produced report cards) but also family members and friends who can organize their memories more accurately if there is hard documentation of dates and places. The frailty of human memory obliges us all to rely on records, and they provide the essential skeletal framework for the social history investigation. They are helpful in preparing witnesses to testify. In Mr. Nelson's case, trial counsel had only a fraction of the records that might have been useful, but they did not use the records in hand to conduct more probing interviews of the witnesses whom they did contact.

71. The two mental health experts who were ultimately retained by Mr. Nelson's trial counsel, Dr. Foster and Dr. Cunningham, were not provided with the reliable documentation that is necessary for an accurate mental health assessment. (Foster Evaluation, November 23, 2001, appended hereto at Tab 132, at 1; Cunningham Documents Reviewed, August 29, 2000, appended hereto at Tab 114.) Only Dr. Foster assessed Mr. Nelson. His report of November 23, 2001 stated that he reviewed "background information specific to the crime and his formative history" (apparently referring to Mr. Nelson's TYC records), but he appears to have relied mainly on what he learned from Mr. Nelson in approximately nine hours of interviews on October 5 and 6, 2001. (For example, his brief report reflects no knowledge of the schizophrenia with which two of Mr. Nelson's brothers had been diagnosed.) Dr. Cunningham's testimony as a "teaching witness," discussed at ¶ 47, *supra*, was vague about what he had reviewed, but his report indicates that he was mainly provided incarceration records from Missouri and Kansas, and summaries of witness interviews. (Cunningham Capital Sentencing Evaluation, August 29,



Appellate Case: 15-3160 Page: 119 Date Filed: 02/29/2016 Entry ID: 4372488

2001, appended hereto at Tab 114.) He reviewed some interviews from family members who had mentioned familial mental illness, but none of these witnesses mentioned mental illness when they testified. (*See* ¶49, *supra*.) Instead of identifying any evidence of the risk factors that he enumerated, Dr. Cunningham simply stated, "It's my understanding . . ." that these factors existed. (Excerpt Mark Cunningham Testimony, November 27, 2001, at 994, appended hereto at Tab 137 .) Neither of the defense psychologists had detailed, corroborated evidence of the family history of mental illness and Mr. Nelson's traumatic experiences. Neither was provided evidence of potential brain damage and dysfunction. Neither was provided with the details of Mr. Nelson's cognitive impairments.

***Conclusion***

72. In addition to the specific areas where Mr. Nelson's trial counsel failed to respond to the red flags indicating the need for further investigation and failed to obtain and utilize all the records that are reasonably necessary in a thorough mitigation investigation, I have two final observations about deficiencies in the preparation for the sentencing phase of Mr. Nelson's case. The first is the simple point that the various personnel involved in the case never really functioned as a team. The second is that the mitigating factors on the verdict sheet presented to the jurors were so poorly drafted as to prevent the jurors from giving meaningful consideration and effect to the mitigating evidence that was presented. Even when there was evidentiary support for mitigation, the mitigating factors as drafted interfered with the jurors' ability to consider the evidence and give it effect.

*Team dysfunction*

73. On paper, the Court had provided Mr. Nelson with multiple attorneys, including a learned counsel with experience in capital defense. Funding had been provided for mitigation investigation and various mental health experts (at various points, a psychiatrist, a neuropsychologist, and two psychologists). Behind this appearance, however, was the reality that the individuals did not function as a team. There were no team meetings or even regular telephone calls. The relations between the mitigation investigators and the lawyers broke down to the point where Deborah Haddad, the social worker who had done most of the interviewing, would not work on the case any longer, and Tena Francis asked Mr. Berrigan, "Why do I feel as if I am butting heads with Susan [Hunt] at every turn? She's come to distrust most everything I say and has little or no regard for my opinion on matters pertaining to the investigation." (Letter Tena Francis to Patrick Berrigan, June 28, 2001, appended hereto at Tab 111.)[34] The remaining investigation in the months immediately preceding trial had to be undertaken by someone who had never met the client, his mother, or even the lawyers. On the eve of trial, Mr. Berrigan had to fax and mail a letter to Ms. Murphy and Ms. Francis because neither had returned his phone

[34] *See also* Ms. Hunt's affidavit, in which she details her complaints about Ms. Haddad's spending time with her own family when she had traveled to Missouri at Court expense: "I communicated that anger to Tina [sic] Francis and demanded all reports she had prepared on witness interviews. She refused to provide those saying I would get them closer to trial when she presents the mitigation case to us." (Hunt Aff., September 13, 2010, appended hereto at Tab 145, at ¶ 5.) Ms. Haddad had previously documented Ms. Hunt's failure to assist the mitigation investigators in obtaining and reviewing records they deemed important, including CPS records and hospitalization records for Nancy Nelson and mental health records of Paul Nelson. (Letter Haddad to Hunt, May 30, 2001, appended hereto at Tab 108; Memo re Phone Meeting, February 1, 2001, appended hereto at Tab 86.)



Appellate Case: 15-3160 Page: 121 Date Filed: 02/29/2016 Entry ID: 4372488

messages. (Letter Berrigan to Murphy and Francis, November 9, 2001, appended hereto at Tab 128.)

74. Mitigation investigator Tena Francis met Mr. Nelson on her one visit to Missouri. Neither Deborah Haddad nor Lisa Murphy met him at all. Dr. Cunningham met him once (for 228 minutes) but was not permitted to testify about anything he learned in the interview. Dr. Foster met him on two consecutive days but was not permitted to testify at all. In short, none of the individuals with insight into mental disorders, mental impairment, trauma, and brain damage spent significant time with Mr. Nelson in order to have the longitudinal observation that informs a reliable assessment of these issues.

75. In Mr. Nelson's case, a few potential mitigation witnesses were interviewed by more than one member of the defense team, but neither Mr. Nelson himself nor any of his family members or other potential witnesses were interviewed multiple times by the mitigation investigators in an effort to build trust and rapport and to explore in depth the most sensitive areas of his life experiences. Tena Francis was the only member of the mitigation investigation group who met Mr. Nelson – and she met him on a single visit to Kansas City. She talked to his mother twice. A different staff member, Deborah Haddad, also talked to Nancy Nelson twice (once in person and once by phone).[35] (Nancy Nelson Interviews, February 6 and May 13, 2001,

[35]The only time Ms. Haddad spoke with Nancy Nelson in person, there was no privacy. Her report of the interview notes, "There were several people in the home as the interview took place. Nancy informed me that her brother was living in her home temporarily. Mark Nelson, Heather Nelson, and their three children were present during the interview. Paul Nelson arrived about thirty minutes into the interview. Nancy and I sat at the kitchen table, and there were household members passing through the kitchen area as Nancy and I spoke. *This did not appear to hinder Nancy's willingness to speak openly*." [Emphasis added.] Ms. Haddad's assertion that the lack of privacy had no effect is belied by the concluding sentences of the paragraph: "She appeared to minimize incidents of abuse and neglect. She had no recollection of events she previously reported to other investigators." (Nancy Nelson Interview, May 13, 2001, appended hereto at Tab 105.)



Appellate Case: 15-3160 Page: 122 Date Filed: 02/29/2016 Entry ID: 4372488

appended hereto at Tabs 87 and 105.) A third staff member, Lisa Murphy, abruptly took over all the interviewing in the summer of 2001. Most of the mitigation witnesses who were called to testify had been interviewed only once by the mitigation investigators. The result is that the information they provided – both in interviews and in court – is superficial and typical of the limited quantity and quality of information disclosed in the absence of trust and rapport.

*Verdict sheet deficiencies*

76. The crucial importance of clear, simple, well-drafted verdict sheets was discussed in the District Court's Memorandum Opinion and Order in *Angela Johnson v. United States of America*, No. 3:09-cv-3064-MWB, United States District Court for the Northern District of Iowa, Central Division, Document 377, *slip. opinion,* filed March 22, 2012, a case which coincidentally also involved Patrick J. Berrigan as learned counsel responsible for the penalty phase. The case was tried in 2005. The Court in *Johnson* found "the mitigating factors were remarkably poorly drafted, considering how important they are in a capital case." *Id*. at 356.[36] The *Johnson* Court quoted a U.S. Supreme Court decision at length to make the point that "'sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future.' *Abdul-Kabir v.*

[36]Drafting mitigating factors for the verdict sheet should be a team effort, and it will often benefit from consultation with the Federal Death Penalty Resource Counsel Project, which maintains a library of the mitigating factors proffered in all past federal death penalty cases. Mr. Berrigan's out-of-court billing records demonstrate that consultation with Federal Death Penalty Resource Counsel was conspicuously absent in Mr. Nelson's case. (Berrigan Out of Court Hourly Worksheet & Charts, appended hereto at Tab 96, at 3, 22.)



Appellate Case: 15-3160 Page: 123 Date Filed: 02/29/2016 Entry ID: 4372488

*Quarterman*, 550 U.S. 33, 246 (2007). As the Court also explained in *Abdul-Kabir*, '[T]he jury must be permitted to "consider fully" such mitigating evidence and . . . such consideration "would be meaningless" unless the jury not only had such evidence available to it, but also was permitted to give that evidence meaningful, mitigating effect in imposing the death sentence.' 550 U. S. at 260 (quoting *Penry I*, 492 U.S. at 321)." *Id*. at 358.

77. The *Johnson* Court concluded from its analysis of *Abdul-Kabir* that "it follows that counsel in a capital case performs deficiently, even if counsel presents mitigating evidence, if counsel fails to formulate mitigating factors in a way that allows jurors to give meaningful consideration and effect to that mitigating evidence . . ., and that a petitioner may be prejudiced by that deficiency, if there is a reasonable probability that, had counsel properly formulated mitigating factors, jurors would have been able to give meaningful consideration and effect to all mitigating evidence." *Id*. at 358- 59. After citing to *Strickland*, 466 U.S. at 688, 691-92, the *Johnson* Court, quoted from the ABA Guidelines (rev. 2003), Guideline 10.11.K (The Defense Case Concerning Penalty), "Trial counsel should request jury instructions and verdict forms that ensure that jurors will be able to consider and give effect to all relevant mitigating evidence. Trial counsel should object to instructions or verdict forms that are constitutionally flawed, or are inaccurate, or confusing and should offer alternative instructions. Post-conviction counsel should pursue these issues through factual investigation and legal argument." *Id.* at 359.

78. The *Johnson* Court used one particular mitigating factor from the verdict sheet to illustrate the problem of multifaceted ("group"), overly complicated factors that "resulted in" additional conditions, rather than simple, straightforward facts. Mitigating factor (9) in *Johnson* stated, "Angela Johnson was raised in a single-parent household by an emotionally unstable



Appellate Case: 15-3160 Page: 124 Date Filed: 02/29/2016 Entry ID: 4372488

mother who subjected her children to unusual fasting procedures, long periods of abandonment and physical detachment, and occasional physical abuse, resulting in Angela Johnson being far more susceptible to escape through illicit drug use, a series of unhealthy relationships with men, and chronic feelings of abandonment and poor self-esteem." *Id*. at 359. In the Court's analysis, "this single mitigating factor included many facts (at least eight) that jurors were asked to consider as a group . . . Furthermore, it required the jurors to reach the specific conclusion that the first five of these facts actually caused (that is, 'resulted in') the remaining three, thereby restricting the jurors' ability to give each fact its full mitigating effect. At a minimum, this mitigating factor, as formulated by Johnson's trial counsel, would have confused jurors as to their ability to consider the potential mitigating effect of any particular fact, standing alone, or in conjunction with all the other facts with which it appeared." *Id*. at 360. The Court found that this convoluted mitigating factor "precluded jurors from finding that the occasional physical abuse suffered by Johnson was mitigating, standing alone, because it resulted in Johnson being far more susceptible to escape through illicit drug use, a series of unhealthy relationships with men, and chronic feelings of abandonment and poor self-esteem, or resulted in any one of those things, *or* had some other result not listed, such as inuring her to physical violence against others, even children, which reasonable jurors might find mitigating." *Id*. at 362.

79. In Nelson, the list of mitigating factors was provided to the Court and the Government prior to commencement of trial. The Court did not read the list of mitigating factors to jurors before opening statements. (Excerpt Trial Transcript, November 19, 2001, appended hereto at Tab 129, at 7-10.) The ten factors on the list (Verdict Sheet, November 28, 2001, appended hereto at Tab 140) were poorly drafted and exhibited many of the same problems found



Appellate Case: 15-3160 Page: 125 Date Filed: 02/29/2016 Entry ID: 4372488

by the District Court in *Johnson*, such as compound or multifaceted groupings and causative inferences. In addition, the language repeatedly contains needless adjectives and adverbs that make it more difficult for jurors to affirm the accuracy of the statement. Finally, the factors contain speculative predictions of what would happen if Mr. Nelson were to be sentenced to life in prison without the possibility of release when it might have been appropriate just to indicate the opportunities and possibilities that would then arise. In the outline that follows, I have listed each of the factors on the verdict sheet in bold face, then noted the kinds of problem contained in each specific wording, and restated in italics the simple, straighforward facts that might have been presented instead:

**1. Being subjected to physical and emotion abuse as a small child permanently altered Keith Dwayne Nelson's psyche and personality and detracted from his ability to be a successful and insightful adult.**

Compound: physical **and** emotional abuse; altered psyche **and** detracted from ability

Unnecessary hyperbolic modifier: **small** child, **permanently** altered

Causation: altered his psyche and personality, detracted from his ability to be a successful and insightful adult

Vague: altered **psyche**

Alternative straightforward factors:

*Keith Dwayne Nelson was physically abused as a child.*

*Keith Dwayne Nelson was emotionally abused as a child.*

**2. Many years of gross neglect and a lack of parental supervision contributed greatly to Keith Dwayne Nelson's own sense of self-worthlessness and depression.**

Compound: gross neglect **and** lack of parental supervision, self-worthlessness **and** depression

Unnecessary hyperbolic modifier: **many** years, contributed **greatly**, **gross** neglect



Appellate Case: 15-3160 Page: 126 Date Filed: 02/29/2016 Entry ID: 4372488

Causation: contributed greatly to self-worthlessness and depression

Alternative straightforward factors:

*Keith Dwayne Nelson was neglected in childhood.*

*Nancy Nelson was a single parent.*

*Nancy Nelson neglected Keith when he was a child.*

*Nancy Nelson failed to provide Keith with parental supervision.*

*Keith Dwayne Nelson suffers from depression.*

**3. Despite his own deprived childhood, Keith Dwayne Nelson has shown affection, good judgment and love in caring for the young son of his former girlfriend, Kerri Dillon.**

Compound: affection, good judgment **and** love

Unnecessary link: despite his childhood, Keith Dwayne Nelson has shown good qualities

Alternative straightforward factors:

*Keith Dwayne Nelson had a childhood of deprivation.*

*Keith Dwayne Nelson cared for his girlfriend's young son.*

**4. Keith Dwayne Nelson has been a devoted and caring son to his mother, Nancy Nelson.**

Redundant: devoted and caring

Alternative straightforward factors:

*Keith Dwayne Nelson loves his mother.*

*Keith Dwayne Nelson has been a devoted son to his mother.*

**5. Keith Dwayne Nelson has been a loyal and faithful brother to his four siblings.**

Redundant: loyal and faithful

Compound: to his four siblings

Alternative straightforward factors:

*Keith Dwayne Nelson has been loyal to his brother Johnny.*

*Keith Dwayne Nelson has been loyal to his brother Paul.*

*Keith Dwayne Nelson has been loyal to his brother Kevin.*

*Keith Dwayne Nelson has been loyal to his brother Kenneth.*

**6. In the past, Keith Dwayne Nelson has been a hardworking and dedicated employee to his boss, and a financially responsible boyfriend to his girlfriend and her son while they all lived together.**

Redundant: in the past, while they all lived together

Compound: hardworking **and** dedicated **and** financially responsible boyfriend

Alternative straightforward factors:

*Keith Dwayne Nelson was a hardworking employee.*

*Keith Dwayne Nelson contributed financial support to his girlfriend.*

**7. Keith Dwayne Nelson has admitted his guilt and pleaded guilty to the murder of Pamela Butler without any promise or expectation of leniency.**

Redundant: admitted his guilt and pleaded guilty

Self-canceling argument: proffering this as a mitigating factor invites the inference that he did so because he hoped it would result in a more lenient sentence!

Alternative straightforward factors:

*Keith Dwayne Nelson has admitted that he alone was responsible for the murder of Pamela Butler.*

**8. Keith Dwayne Nelson will be of low risk of violent behavior in prison and can live the rest of his life peacefully and productively if allowed to die of old age behind bars.**



Appellate Case: 15-3160 Page: 128 Date Filed: 02/29/2016 Entry ID: 4372488

Compound: low risk of violent behavior **and** peaceful **and** productive

Prediction: will be of low risk of violent behavior, can live peacefully and productively

Alternative straightforward factors:

*The Bureau of Prisons can manage prisoners convicted of violent offenses to minimize the risk of violence in prison.*

*Keith Dwayne Nelson can be a productive inmate if sentenced to life without possibility of release.*

**9. Keith Dwayne Nelson can be a positive influence of the life of his young son, counseling, teaching and caring for the boy as he grows up over the ensuing decades.**

Compound: positive influence **and** counseling **and** teaching **and** caring

Prediction: implication that Keith Dwayne Nelson already has the capacity to be positive influence, with the cooperation of the baby's mother

Alternative straightforward factors:

*Keith Dwayne Nelson loves his son.*

**10. If allowed to live, Keith Dwayne Nelson can remember and agonize over the death of Pamela Butler which he caused on October 12, 1999 and in the process of many years of remorse and contrition, he will become a better person than the young man who caused her death.**

Compound: remember **and** agonize, remorse **and** contrition

Prediction: **will** become a better person

Alternative straightforward factors:

*If allowed to live, Keith Dwayne Nelson will have to think about his crime for the rest of his life.*

*If allowed to live, Keith Dwayne Nelson has the potential to become a better person as he grows older.*

80. Having failed to investigate Mr. Nelson's mental disorders and impairments, brain damage, and trauma history, trial counsel offered the jurors ten confusing, convoluted, nonstatutory mitigating factors on the verdict sheet. Only one juror found that the defense had proved physical and emotional abuse when Mr. Nelson was a child. No juror found that the defense had proved any of the other nine factors by a preponderance of the evidence : gross neglect, affection for his former girlfriend's son, devotion to his mother, loyalty to his brothers, hardworking employee, admission of guilt, low risk of violent behavior in prison, capacity to be a positive influence as a father, and capacity to become a better person from reflection on the capital crime. There was no coherence to the list of mitigating factors. In fact, most of the items on the list simply suggested that Mr. Nelson was a "good guy" who had turned out fine in spite of the abuse he suffered in childhood.[37] The jurors had been given no means to understand how Mr. Nelson's disorders and impairments affected his day-to-day functioning, no basis for feeling empathy for his disabilities, and no capacity to "engage with what [he] went through"[38] as he grew to adulthood with a broken brain that compromised both his moods and his thinking.[39] It is my considered opinion that the deficiencies in penalty phase presentation were a direct result of

[37]There was a similar disconnect in Mr. Berrigan's penalty phase opening statement, in which he noted that Mr. Nelson was born a month early, weighed only five pounds and four ounces, and spent a month in the hospital because of respiratory distress. Having done nothing to investigate Mr. Nelson's brain damage, Mr. Berrigan simply claimed to the jury that "he recovered just fine." Excerpt Berrigan Opening Statement, November 19, 2001, appended hereto at Tab 130, at 38.

[38]*See Porter v. McCollum*, 558 U.S. 30, 44 (2009) (to deny that certain evidence was consistent with his mitigation theory "reflects a failure to engage with what Porter actually went through" during his military service).

[39]Instead, the verdict sheet simply asserted that "[b]eing subject to physical and emotional abuse as a young child permanently altered Keith Dwayne Nelson's psyche and personality . . ." and gross neglect contributed to his sense of "self-worthlessness and depression."



Appellate Case: 15-3160 Page: 130 Date Filed: 02/29/2016 Entry ID: 4372488

the failure to undertake a thorough mitigation investigation as required by the prevailing professional norms of 2001.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746, and under the laws of the States of California and Missouri, that the foregoing is true and correct and that this declaration was executed this 8th day of April 2014 in Oakland, California.

RUSSELL STETLER



Appellate Case: 15-3160 Page: 131 Date Filed: 02/29/2016 Entry ID: 4372488