**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

| | | |
|---|---|---|
| KEITH D. NELSON, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | No. 15-3160 |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Appellee. | ) | |

**GOVERNMENT'S RESPONSE TO APPELLANT'S REQUEST FOR AN ISSUANCE OF A CERTIFICATE OF APPEALABILITY**

The United States of America, by Tammy Dickinson, United States Attorney, and the undersigned Assistant United States Attorneys, all for the Western District of Missouri, files the following response to appellant Keith D. Nelson's request for an issuance of a certificate of appealability from the district court's denial of his 28 U.S.C. § 2255 motion, and denial of a certificate of appealability on the six issues this Court remanded for consideration by the district court.

## I. Summary

This Court remanded this case to the district court so that an evidentiary hearing could be held, and findings of fact and conclusions of law could be made regarding *only six* of the sixty-odd specific allegations of ineffective assistance of



Appellate Case: 15-3160 Page: 1 Date Filed: 06/27/2016 Entry ID: 4418240

trial and appellate counsel Nelson raised in his § 2255 motion. To be entitled to relief on the six remanded claims of ineffective assistance of trial counsel, Nelson had to prove that defense counsels' performance was (1) unreasonably deficient, and (2) that he suffered such prejudice from the deficient performance that there is a reasonable probability the result would have been different – he would have received a life sentence rather than death. *See Roundtree v. United States*, 751 F.3d 923, 925 (8th Cir. 2014) (citing *United States v. Taylor*, 258 F.3d 815, 818 (8th Cir. 2001)). Failure to establish either prong would be fatal to Nelson's claims. *Worthington v. Roper*, 631 F.3d 487, 498 (8th Cir. 2011) (citing *Strickland v. Washington*, 466 U.S. 668, 697 (1984)).

The six issues the district court considered were four allegations of trial counsel's constitutional ineffectiveness (1) failure to conduct adequate mitigation investigation, including failure to move for a continuance to complete one, (2) failure to conduct adequate investigation of Nelson's mental health, (3) advising or instructing Nelson to decline to submit to a mental health examination by a government examiner, and (4) failure to make an objection to allegedly inflammatory and improper comments in the Government's closing argument and rebuttal argument; and two allegations of appellate counsels' constitutional ineffectiveness included (5) failure to conduct adequate review of the trial record



Appellate Case: 15-3160 Page: 2 Date Filed: 06/27/2016 Entry ID: 4418240

and the law, and (6) failure to raise on appeal the Government's allegedly improper comments in closing argument.

The district court found and ruled, in a 53-page detailed order, that Nelson did not meet his burden regarding any of these six allegations. *Nelson v. United States*, 97 F.Supp.3d 1131 (W.D. Mo Mar. 31, 2015); DCD 269.) Contrary to testimony from defense counsel that he and the defense team simply "dropped the ball" (DCD 269 at 21), the record reflects, and the district court found, that defense counsels' actions were quite thorough and based on trial tactics designed to achieve the best outcome possible for Nelson. (DCD 269 at 18-19.) The district court ruled, based on testimony and exhibits from the evidentiary hearing, that trial counsel (and the trial team) obtained records and had numerous family members and other witnesses testify about Nelson's upbringing (abusive caretakers and a lack of educational achievements) and the significant issues he had from birth. This information, presented to the jury during the death penalty phase, showed, the district court ruled, that there was adequate mitigation investigation and no need for a motion to continue the penalty phase to complete more investigation. (DCD 269 at 4-19.) The court further specifically ruled that in regards to the mental health of their client (Nelson), that any failure to investigate by defense counsel was done "as a calculated strategy to act in a manner which is obviously deficient, so that on habeas review the Court will set aside the sentence." (DCD 269 at 28.)



Appellate Case: 15-3160 Page: 3 Date Filed: 06/27/2016 Entry ID: 4418240

The court also found that defense counsel was volitionally "strategically deficient" in advising Nelson to not submit to examination by Government mental health experts based on their reasoned belief and experience that such evidence would be very harmful to the presentation of Nelson's defense. (DCD 269 at 23, 33.) Counsel furthermore chose to not utilize the monies approved for a neuropsychologist and to move forward with the trial as scheduled, believing that ample mitigation evidence had been collected which would provide the jury with the evidence needed to convince them to return a verdict imposing a life, not death, sentence. Even with trial counsel's deficient representation on the mental health investigation, if additional evidence of Nelson's brain damage been presented, the court found that Nelson had "not shown that there is a reasonable probability that even one juror's decision would have been different," and therefore, Nelson failed to meet the prejudice prong and his ineffective assistance of counsel claim on this allegation was denied. (DCD 269 at 35, 43.) Finally, even assuming, arguendo, that the Government's initial and rebuttal closing arguments were prejudicial, the court found that defense counsel Patrick Berrigan "adequately minimized any prejudicial effect" from the Government's arguments. (DCD 269 at 48.) The jury was properly instructed and "it is more likely that the jury voted for a death sentence based on the heinous facts of the case and was not swayed by the Government's improper closing arguments." (DCD 269 at 49.)



Appellate Case: 15-3160 Page: 4 Date Filed: 06/27/2016 Entry ID: 4418240

In regard to appellate counsel, the court likewise found the two allegations of error that were the basis of the remand to be lacking in merit. Appellate counsel was accused of failing to conduct adequate review of the trial record and law, and failing to raise the Government's allegedly improper comments in closing arguments on appeal. The district court found both allegations meritless, ruling that neither appellate counsel was ineffective, as counsel testified that she read through and reviewed the trial transcripts completely to determine which issues should be raised on appeal. (DCD 269 at 50.) In this vein, counsel acknowledged that it was her responsibility to use the precious space she had available to her in the appellate brief, to advance those arguments she thought most likely to succeed and the closing argument points, she concluded, were not such arguments. Regardless of the strength of the this argument, appellate counsel reviewed the brief before filing it and did not believe that additional time or space was required and, therefore, never asked for a further extension. Consequently, the closing arguments issue had no merit, and thus, "it follows that a defendant cannot be prejudiced as a consequence of its absence as an appellate issue." (DCD 269 at 52.)

The district court's rulings on all of the specific six issues this Court remanded for an evidentiary hearing are not debatable among reasonable jurists, nor could a court resolve the issues differently, and therefore, this Court should



Appellate Case: 15-3160 Page: 5 Date Filed: 06/27/2016 Entry ID: 4418240

likewise deny Nelson's request for an issuance of a certificate of appealability. *See Slack v. McDaniel*, 529 U.S. 473 (2000).

Additionally, Nelson asks this Court to reconsider its ruling denying and finding no merit on all of the other allegations Nelson raised in his original § 2255 motion. This Court previously reviewed those allegations and properly concluded that they were not viable for a remand to the district court for an evidentiary hearing. That decision should not be changed now; instead, Nelson's request should be rejected. Indeed,"[u]nder the 'law of the case' doctrine 'a decision in a prior appeal is followed in later proceedings unless a party introduces substantially different evidence, or the prior decision is clearly erroneous and works a manifest injustice.'" *United States v. Stuckey*, 255 F.3d 528, 530-31 (8th Cir. 2001); *Davis v. United States*, 673 F.3d 849, 852 (8th Cir. 2012). This Court has already ruled that there was no merit to the remaining allegations, and the law-of-the-case doctrine should apply, and thus if the original COA remains in effect, so does this Court's order rejecting all of the other allegations not remanded. Nelson's request for any further consideration of the other allegations should therefore be denied.

## II. Discussion

### *A. Procedural History*

On October 12, 1999, ten-year-old Pamela Butler was kidnapped by the movant, Keith D. Nelson, in broad daylight from near her Kansas City, Kansas,

home while she was roller skating. Two days later, a complaint was filed charging Nelson with kidnapping. On October 15, 1999, Pamela Butler's dead body was recovered from the woods near a church in Grain Valley, Missouri.

One week later, on October 21, 1999, a federal grand jury in the Western District of Missouri returned a two-count indictment charging Nelson with kidnapping resulting in death, in violation of 18 U.S.C. § 1201, and transportation of a minor for sexual relations resulting in death, in violation of 18 U.S.C. § 2241. The Government subsequently filed a "Notice of Intent to Seek the Death Penalty." Nelson pleaded not guilty to both charges.

Nelson was represented at trial by Patrick Berrigan and Susan Hunt, two highly-experienced litigators who specialize in the field of criminal defense.[1] Patrick Berrigan was then and is now, an experienced death penalty litigator. He previously worked for the State Public Defender System and was assigned to the

[1]When Nelson was first charged, he was represented by Dan Franco, who entered his appearance as retained counsel on October 20, 1999. By all accounts, Mr. Franco provided companionship, but no legal representation. On October 21, 1999, Larry Pace with the Federal Public Defender's Office was appointed as learned counsel. Mr. Pace took over primary case responsibility and used his investigator, Ron Ninemire, to assist him with his investigation. On November 2, 1999, Bill Shull and Susan Hunt were also appointed to represent Nelson under the C.J.A. Mr. Pace developed a conflict in the case and on July 28, 2000, filed a motion to the Court to be removed. Ron Ninemire collected the investigative file materials and provided them to Mr. Shull and Ms. Hunt sometime around September 12, 2000. By November of 2000, Nelson began losing confidence in Mr. Shull, who was eventually removed from the case in February 2001. On February 20, 2001, Patrick Berrigan was appointed to be learned counsel.



Appellate Case: 15-3160 Page: 7 Date Filed: 06/27/2016 Entry ID: 4418240

Capital Crimes Section. Though he was in private practice when he represented Nelson in this matter, Berrigan has since returned to the State Public Defender System and is assigned, once again, to the Capital Crimes Section. On appeal, Nelson was represented by Ms. Hunt and Jennifer Brewer, both experienced appellate counsel.

On May 10, 2001, the Government filed a motion for the discovery of mental health evidence to be used in the penalty phase of the capital trial and seeking a court-ordered mental health evaluation. Thus, protracted litigation commenced on the manner, means, and identity of any Government-sponsored mental health evaluation. Nelson, through counsel, fought a delaying action on when, if, and how such a mental health evaluation would be conducted. (Depo. Exh. 219.)[2] Eventually, after losing the battle regarding whether the Government would be able to conduct its own mental health evaluation, Nelson, upon advice of counsel, refused to meet with the Government's experts. On October 18, 2001, Magistrate Judge Sarah W. Hays held a status conference and discussed with Nelson the consequences of failing to submit to the Government mental health evaluation. Nelson acknowledged his refusal to cooperate and indicated on the record that he understood that the decision was his, and his alone to make, and that he knew the district court may preclude him from adducing

[2]"Depo. Exh." refers to an exhibit used during the deposition of Patrick Berrigan taken on October 19, 2012.



Appellate Case: 15-3160 Page: 8 Date Filed: 06/27/2016 Entry ID: 4418240

mental health evidence if he continued to refuse participation. (Evid. Hrg. Exh. 64.) On October 23, 2001, the district court held a hearing to discuss whether Nelson would be able to use mental health evidence at trial in light of his refusal to cooperate with the Government's mental health evaluation. The district court indicated that exclusion of evidence was likely. (Evid. Hrg. Exh. 66.) On October 26, 2001, this Court excluded mental health evidence. (Evid. Hrg. Exh. 68.)

Trial dates were set and continued several times. On February 16, 2001, Patrick Berrigan filed a motion to continue the trial from the April 2001 docket until the October/November 2001 docket to conduct further investigation on the mitigation phase. (DCD 193.) The trial date was moved to October 29, 2001. On October 25, 2001, Nelson pleaded guilty to Count One of the indictment, which charged him with kidnapping resulting in death. During his guilty plea, Nelson agreed that at the time he committed this crime he was not suffering from a mental disease or defect that would exclude his criminal responsibility, nor make him incompetent to enter into his guilty plea. (Plea Tr. 21.) Under the terms of the plea agreement, the case would proceed to a penalty phase trial to begin on November 5, 2001. (*See* Plea Agreement dated October 25, 2001, DCD 338.)

On October 28, 2001, Nelson ingested a non-fatal quantity of pills. He was taken from his place of confinement at CCA to a hospital for treatment and



Appellate Case: 15-3160 Page: 9 Date Filed: 06/27/2016 Entry ID: 4418240

observation. On October 31, 2001, defense counsel filed both a motion for a continuance and a motion for a competency examination.

On November 7, 2001, the district court heard evidence from Assistant Warden Moore, CCA, that Nelson told Assistant Shift Supervisor Allen that he had no intention of killing himself, but "that in a case like his, the name of the game, or the idea is to postpone, postpone, postpone." Assistant Warden Moore testified that Nelson had made a similar statement to Correctional Officer Taylor. (Nov. 7 Hrg. Tr. 12-13.)[3]

The district court hired psychiatrist Dr. William Logan to examine Nelson for purposes of assisting the court in determining whether there existed sufficient doubt about Nelson's competency. Dr. Logan reported that Nelson had both a rational and a factual understanding of the charges and could assist his attorneys in preparation of his defense. He further reported that Nelson suffered from depression, but was not currently suicidal. (Logan Hrg. Tr. 5.)[4] Defense counsel, acquainted with Dr. Logan's qualifications, recommended that (1) Dr. Logan be appointed as a mental health treatment professional for Nelson; (2) that he be allowed to prescribe any medications for him that he adjudged necessary (Logan

[3]"Hrg. Tr." refers to the hearing held before Judge Gaitan on November 7, 2001.

[4]"Logan Hrg. Tr." refers to the testimony of Dr. William Logan, held November 7, 2001, before Judge Gaitan.



Appellate Case: 15-3160 Page: 10 Date Filed: 06/27/2016 Entry ID: 4418240

Hrg. Tr. 11, 15-16); and (3) that the trial proceed on schedule, barring any delays attributable to medication and assuming no further issue of competency. (Logan Hrg. Tr. 16.)

On November 13, 2001, a jury was selected to hear the penalty proceedings of the case, which began on November 19. On November 28, the jury returned a verdict of death against Nelson for the kidnapping and subsequent murder of Pamela Butler. Judgment was imposed by the district court in accordance with the jury's verdict, and on March 12, 2002, Nelson was sentenced to death.

Nelson appealed his conviction and sentence to the Eighth Circuit Court of Appeals in Case No. 02-1757. He raised the following issues on direct appeal:

1. Whether Nelson received a fair trial by an impartial jury when the district court properly denied Nelson's: (a) motion for change of venue; (b) motion for sequestered jury; and (c) motion for additional peremptory strikes;

2. Whether the district court conducted a constitutionally effective voir dire that reasonably assured Nelson's right to a fair and impartial jury;

3. Whether the district court properly denied Nelson's challenges for cause and properly granted the Government's challenges for cause;

4. Whether the district court properly instructed the jury on the correct legal standards that it was to use in deliberating on a just verdict; and

5. Whether the district court properly admitted victim impact evidence.



Appellate Case: 15-3160 Page: 11 Date Filed: 06/27/2016 Entry ID: 4418240

On October 22, 2003, Nelson's conviction and sentence were affirmed in *United States v. Nelson*, 347 F.3d 701 (8th Cir. 2003).

On November 8, 2004, the United States Supreme Court denied Nelson's petition for a writ of certiorari in Case No. 03-10620. *See Nelson v. United States*, 543 U.S. 978 (2004).

Nelson then filed a motion to vacate his sentence under 28 U.S.C. § 2255. He alleged a multitude of issues and sub-issues (nearly 60 in total) that he claimed warranted an order vacating his sentence. He alleged his rights guaranteed by the Fifth and Sixth Amendments of the United States Constitution and the laws of the United States were violated because the performance of both his trial and appellate counsel fell below an objective standard of reasonableness under prevailing professional norms, and there was a reasonable probability that, but for counsels' unprofessional errors, the result of the proceedings at trial and on appeal would have been different. The district court denied Nelson's claim without holding a hearing.

Nelson filed a certificate of appealability, which the Eighth Circuit granted in part, remanding the case to district court with directions to hold an evidentiary hearing and make findings of fact and conclusions of law solely on six of the approximately 60 issues regarding trial and appellate counsels' representation. The allegations of trial counsel's constitutional ineffectiveness were (1) failure to



Appellate Case: 15-3160 Page: 12 Date Filed: 06/27/2016 Entry ID: 4418240

conduct adequate mitigation investigation including failure to move for a continuance to complete one; (2) failure to conduct adequate investigation of Nelson's mental health; (3) advising or instructing Nelson to decline to submit to a mental health examination by a government examiner; and (4) failure to make an objection to allegedly inflammatory and improper comments in the Government's closing argument and rebuttal. The allegations of appellate counsels' constitutional ineffectiveness included (5) failure to conduct adequate review of the trial record and the law; and (6) failure to raise on appeal the Government's allegedly improper comments in closing argument. *Nelson v. United States*, 297 Fed.Appx. 563, 565-66, 2008 WL 4697018, *2 (8th Cir. 2008).

The district court, on April 14-17, 2014, held an evidentiary hearing to address the six issues this Court remanded for an evidentiary hearing. On March 31, 2015, the court issued its Order denying habeas relief on each of the six issues, and also denying Nelson a certificate of appealability. Nelson has now filed a request for an issuance of a certificate of appealability from this Court on those six issues the district court ruled on as directed by this Court. In addition, Nelson, in a misguided notion, claims that this Court should revisit its own ruling that denied the other voluminous issues he attempted to raise – those not remanded for an evidentiary hearing.



Appellate Case: 15-3160 Page: 13 Date Filed: 06/27/2016 Entry ID: 4418240

## *B. The District Court Properly Denied Nelson's Claim that Defense Counsel Failed to Adequately Conduct a Mitigation Investigation, and Failed to Ask for a Continuance to Complete One. Furthermore, any Mitigation Evidence that Should Have Been Presented to the Jury Was Not "New" Evidence. (Allegation One)*

Two of Nelson's claims remanded to the district court for an evidentiary hearing revolve around the mitigation investigation conducted by defense counsel and the evidence heard by the jury during the penalty phase. Nelson claims that his defense team provided ineffective assistance of counsel in the mitigating evidence presented, alleging that more should have been done, and that defense counsel should have asked for a continuance in order to conduct further mitigation investigation to include some of the testimony and exhibits submitted during the subsequent § 2255 evidentiary hearing. However, after holding the evidentiary hearing, Judge Gaitan found, and correctly so, that much, if not all of this "new" mitigating evidence, had actually been presented to the jury for its consideration of whether to impose a life or death sentence on Nelson for his kidnapping and murder of 10-year-old Pamela Butler.

### *1. Mitigation Evidence and Aggravating Evidence*[5]

Nelson called numerous mitigation witnesses to testify during the sentencing phase of his trial. The witnesses included his mother, aunts, siblings, former

[5] All of this testimony given during Nelson's penalty phase is reflected and reiterated in the district court's order rejecting Nelson's claim that defense counsel was ineffective in obtaining and presenting mitigating evidence at trial. (*See* DCD 269 at 7-12.)

teacher, principal, family, friends, a landlord, prison guards, an employer, a former babysitter and her daughter, and an expert forensic psychologist who specializes in mitigation defense in capital cases. Nelson also introduced a recorded conversation with a girlfriend who is the mother of Nelson's child. These witnesses each testified about the difficult circumstances of Nelson's childhood and his neglectful, alcoholic mother, and abusive, absent father.

The first witness was Nelson's mother, Nancy Nelson, who testified in detail concerning Nelson's violent and abusive father, Kenneth Morse. She told the jury that that Morse frequently beat her and was also abusive to her boys. She described for the jury, in disturbing detail, how on one occasion Morse tied her up and shocked her with an electrical cord. Morse would also lock her in closets in their home. Ms. Nelson moved her and the children, including Keith, to California and Texas to get away from Morse. She also testified that Nelson was diagnosed with dyslexia and was a poor student, he frequently had fights and behavior problems in school, and he had a bed-wetting problem well into his teen years. The jury also heard Ms. Nelson admit that she was an alcoholic and that two of her children were schizophrenic. Ms. Nelson told the jury that because she had to work long hours to support her children she was frequently away from the home,

which required the boys to take care of themselves. As a result, the boys often got into trouble at school and in the community. (Trial Tr. 598-694.)[6]

Mary Smith, Nelson's aunt (Nancy Nelson's sister), testified that she and Nancy's stepfather were both abusive alcoholics. She told the jury that Kenneth Morse, Nelson's father, regularly beat Nancy and that he would also lock her up in the home. Ms. Smith helped Nancy and the kids get away from Morse when they moved to California and Texas. Ms. Smith also testified about Nelson's disadvantaged and difficult childhood. (Trial Tr. 712-24.)

Georganna Romero, another aunt (also Nancy Nelson's sister), testified that Morse beat and tortured Nancy and related how on one occasion Morse tried to electrocute Nancy. Ms. Romero described the poor living conditions of Nancy Nelson's home in Texas and further described how the house smelled of urine. (Trial Tr. 725-38.)

Irene Wood testified that she helped Nancy Nelson and her five boys get a home, clothing, and personal items when they moved to Texas. She conveyed the poor conditions of Nelson's childhood in Texas. Ms. Wood also insisted that Nancy Nelson use the last name of Smith so that Morse could not locate her in Texas. (Trial Tr. 740-49.)

---

[6] "Trial Tr." refers to the evidence presented during the death penalty phase trial held before the Honorable Fernando J. Gaitan, Jr. on November 19-28, 2001.



Appellate Case: 15-3160 Page: 16 Date Filed: 06/27/2016 Entry ID: 4418240

Melvin Lister, a guard at the Community Corrections of America (CCA) federal holding facility in Leavenworth, Kansas, testified that he worked in the segregation area of CCA when Nelson was housed in that facility. Lister told the jury that Nelson was frequently threatened and harassed by other inmates at the facility. (Trial Tr. 749-57.) Lieutenant Bruce Roberts, another CCA employee, also testified that Nelson was frequently verbally harassed by other inmates. During the 25 months that Nelson had been housed at CCA, he had never tried to escape. Roberts did not consider Nelson to be a threat while he was housed at CCA. (Trial Tr. 767-84.)

Kenneth Nelson, Nelson's twin brother, testified he was a satellite communications maintenance operator and installer in the United States Army, and described his career in the United States Army as a successful career. He graduated from high school with a 3.69 grade point average. Kenneth told the jury about his family's disadvantaged and impoverished childhood, and described an abusive boyfriend of his mother, Nancy Nelson. He and Nelson would frequently burglarize and steal from homes when they lived in Texas. Kenneth also told the jury that his mother seriously neglected him and his brothers. He said that his mother was never around and that she was always at the bar working or drinking alcohol. Kenneth straightened his life out when he moved back to Missouri and lived with his aunt and uncle, where he became involved in high school football,



Appellate Case: 15-3160 Page: 17 Date Filed: 06/27/2016 Entry ID: 4418240

worked at a grocery store as a stocker, and subsequently did well in school. (Trial Tr. 798-839.)

David Cunningham, Nelson's employer, testified he owned a basement waterproofing business. Cunningham described Nelson as a pleasant employee and a good worker. He felt that Nelson was reliable and conscientious when working for his business. (Trial Tr. 849-55.)

The defense also played a recorded conversation to the jury between Nelson and his girlfriend, Kerri Dillon. The phone conversation was recorded when Nelson called his mother who then patched Ms. Dillon into a third-party phone call. The conversation was recorded by CCA officials as a part of a routine practice in which all phone conversations of inmates are recorded. In the conversation, among other things, Ms. Dillon and Nelson discussed her recent pregnancy by Nelson. In the conversation, Nelson also appears to express remorse for his involvement in the murder of ten-year-old Pamela Butler. He tells Ms. Dillon of his intent to tell law enforcement authorities of his involvement in the crime. Nelson states in the conversation as follows: "I'm just gonna do the right thing for once in my life." (Trial Tr. 861.)[7]

Steven Nelson, Nelson's youngest brother, testified that he was employed as an engineer and was successful in his career. Following high school, Steven

[7]The recorded conversation was played for the jury's consideration of mitigation evidence.



Appellate Case: 15-3160 Page: 18 Date Filed: 06/27/2016 Entry ID: 4418240

attended DeVry Institute in Kansas City and had a 3.9 grade point average. He described his disadvantaged childhood in Texas and further described how his mother neglected him and his brothers. Steven also described Nelson's bed-wetting problem, told the jury his mother was never home and was either working or drinking, and that he and his brothers had to take care of themselves most of the time. (Trial Tr. 863-87.)

Gene Thompson was the landlord for the Nelson family when they lived in Texas. He testified that the Nelson family lived in Section 8 housing, and described the poor, unkempt conditions of the Nelson home. Thompson told the jury that when the Nelson family left the rental property it was in extremely poor condition. (Trial Tr. 895-903.)

Rhonda Monroe, a former babysitter in Texas, testified she was the babysitter for the Nelson children when Nancy Nelson was at work. Nancy Nelson would bring the children to Ms. Monroe's home and leave them when she went to work. Ms. Monroe testified Nelson had a bed-wetting problem, and that her husband would punish Nelson by spanking him with a belt. Her husband was an alcoholic, and was very abusive towards Nelson and his brothers and that they were scared of her husband. When her husband was home the Nelson boys would be required to stay in one room in her home. If they left the room her husband would spank the boys with a belt. (Trial Tr. 904-16.)



Appellate Case: 15-3160 Page: 19 Date Filed: 06/27/2016 Entry ID: 4418240

Jennifer Monroe, Rhonda Monroe's daughter, testified that the Nelson boys were always required to stay in one room when her mother was babysitting them. Her stepfather, Billy Reese, was always spanking the boys with a belt. She said that the Nelson boys were extremely afraid of her stepdad. (Trial Tr. 919-27.)

Ellen Crutsinger, a former teacher of several of the Nelson boys in Texas, testified that Nelson was in a special education class and that he struggled while in school. She further described Nelson helping a crippled girl in a wheelchair while in elementary school. Nelson would push the girl around the school grounds in her wheelchair and that they developed a friendship. Ms. Crutsinger further testified that Nancy Nelson never attended the "meet the teacher" nights at the school. (Trial Tr. 928-36.)

Michael Griffith, a former neighbor of the Nelsons in Texas, testified that Nancy Nelson was never at home and the boys were frequently left alone to fend for themselves. Mr. Griffith did little things to try to help the Nelson family such as doing plumbing repairs at no charge. He testified that the Nelson house was always messy and unclean. He also told the jury that Nelson's brothers would make fun of Nelson because of his bed-wetting problem. (Trial Tr. 940-51.)

Homer Dear, Nelson's former school principal and also a former Texas State Representative, testified that he knew the Nelson family when they were living in Texas and he was their principal at an elementary school. Mr. Dear believed the

Nelson boys were physically and mentally abused. He described the Nelson family as a very poor family and further described how he had tried to help them. He described the poor hygiene of the Nelson boys and told the jury how he would require the boys to take showers and would give them clothing at the school. Mr. Dear bought clothes for the boys at a store on at least one occasion. He also visited the Nelson home and described the house as unclean. (Trial Tr. 951-59.)

Finally, Nelson called expert defense witness Dr. Mark Cunningham to testify on his behalf. Dr. Cunningham is a clinical and forensic psychologist who frequently testifies as a mitigation and sentencing expert in capital cases around the United States. He testified concerning the effect of childhood abuse and neglect on Nelson's character and development. In his lengthy testimony, Dr. Cunningham explained to the jury how the squalid conditions and abusive and violent nature of Nelson's childhood affected the formation of his character. Dr. Cunningham also told the jury that Nelson would be less violent as he aged. (Trial Tr. 964-1025.)

The district court, in its order, discusses the mitigating work done by the defense team and evidence presented at trial as compared to the "new" evidence presented for the evidentiary hearing. In fact, the defense team, in a sealed document to the court dated September 19, 2001, stated that "'extensive mitigation work on the case' had been completed," with the corresponding billing hours demonstrating this statement to be accurate. (DCD 269 at 6.)

Mitigation investigator Tena Francis testified that her firm had billed a total of 429 hours for Nelson's mitigation case. (DCD 269 at 6, citing Evid. Tr. 507 and Plaintiff's Exhs. P36, P36A.) Ms. Francis provided a binder to the defense team with mitigation evidence on Nelson's traumatic birth, abusive upbringing, troubled educational issues, among other things, and this was presented to the jury for their consideration of whether to impose a life sentence or the death penalty.

On remand, Nelson alleges that additional mitigation evidence should have been presented. Nelson points to the evidence offered by Jill Miller, MSSW (Master of Science in Social Work), during the evidentiary hearing. This evidence included a social history of Nelson on both sides of his family, which included "a multigenerational history of mental illness, a history of alcoholism, substance abuse on both sides of the family domestic abuse on both sides of the family, inappropriate sexual behavior and criminal sexual misconduct." (DCD 269 at 12.) But, Ms. Miller admitted that she relied on the earlier work Nelson's original defense team, including the report of Tena Francis and the interview notes from Dan Grothaus, Ron Ninemire, and Deborah Haddad. Miller testified that she used these materials, available to the original defense team, to prepare her psychosocial history report on Nelson. Perhaps most significantly, Miller stated that given the slower pace of post-conviction work, she had been afforded over five years to gather her records. (DCD 269 at 12-13, citing Evid. Tr. 381.) Nelson further

argued that information that his original defense team, at the mitigation phase trial, should have presented testimony from Dr. Lebowitz about the severity of the maltreatment Nelson endured during childhood, and the effects it had on him. Though Dr. Lebowitz did not testify at the penalty phase trial, the type of information that she testified to at the evidentiary hearing was generally submitted to the jury for their consideration during the penalty trial phase.

As the district court found, "Nelson's habeas counsel has not uncovered any 'powerful' new evidence. Rather, habeas counsel has simply discovered a larger quantity of mitigation evidence." (DCD 269 at 19.) Indeed, as the record makes clear, the evidence produced at the evidentiary hearing was of the same type and tenor as that produced years earlier in the penalty phase trial. On habeas review, counsel simply had more time and therefore uncovered a greater volume of evidence, but nothing truly new, or powerful. The court made this finding even though defense counsel Pat Berrigan did not ask for the penalty phase to be continued. The court concluded that while it was "possible" for more witnesses and evidence to be uncovered, Nelson had not shown here that "Berrigan's failure to request a continuance affected the mitigation case which his counsel presented." (DCD 269 at 19.) "This is not a case where only scant mitigation evidence was presented. Rather, the mitigation case was presented over a period of two days and



Appellate Case: 15-3160 Page: 23 Date Filed: 06/27/2016 Entry ID: 4418240

Nelson's attorneys called seventeen witnesses to testify on his behalf." (DCD 269 at 18.)

Susan Hunt and Bill Shull talked about the need for a mitigation investigation to investigate statutory and non-statutory mitigating factors, and noted that records must necessarily be gathered. Ron Ninemire, at the direction of Larry Pace, was leading the mitigation investigation. (Evid. Tr. 26.) After assessing where they were in the preparation of their case, the defense team filed a continuance motion on July 20, 2000, in order to receive additional time to get the mitigation case, including the mental health issues, ready. (Evid. Tr. 31-32.) The trial was continued to April 23, 2001. (*See* Evid. Hrg. Exh. P26; DCD 119, 121; Evid. Tr. 36.)

Hunt traveled to Texas and California to conduct mitigation investigation. In California, Hunt attempted to obtain records demonstrating that Nancy Nelson had lived in a battered women's shelter back in Sacramento (Visalia), California. When Larry Pace and Ron Ninemire were still on the case, Ninemire was the chief investigator in connection with the mitigation investigation. Ninemire was gathering records, and interviewed several people in White Settlement, Texas. (Evid. Tr. 91.) Ninemire chronicled the team's various investigative efforts and after being removed from the case because of a conflict, created a detailed letter dated September 12, 2000, which documented a to-do list of what had been done

and what needed still to be done. (Evid. Tr. 88.) That letter was passed along to Bill Shull and Hunt as Nelson's remaining counsel. (Evid. Tr. 88-89.)

During his testimony, Shull stated that he was familiar with the circumstances of Nelson's birth – him being the second born of twins and possibly being a fetal/alcohol baby, as well as Nelson's sudden personality change in the 9th grade, and extended bed wetting. (Evid. Tr. 153.) Shull had knowledge that fetal alcohol syndrome could lead to neurological damage or impairments. (Evid. Tr. 154.)

After Ninemire was removed from the case, defense counsel obtained the services of two different investigators, Dan Grothaus and Tim Murphy. (Evid. Tr. 49; Evid. Hrg. Exh. P38 at 79.) Grothaus was a former investigation journalist and documented his progress. (Evid. Hrg. Exh. 10.) By letter dated October 25, 2000, Grothaus kept the defense team informed about his investigation. (Evid. Tr. 89-90.) As the investigation progressed, the defense team secured funding from the court to retain Tena Francis, a seasoned death penalty mitigation investigator. On September 19, 2001, in a sealed motion to this Court, defense counsel and Tena Francis indicated that "extensive mitigation work on the case" had been completed. Correspondingly, in the billing hours of Tena Francis, Patrick Berrigan, and Susan Hunt, it is clear that this statement is true.

As early as the spring of 2000, the defense team was aware that mental health would play a significant role in this case. Larry Pace testified that mental health is always an important consideration in a death penalty case. (Evid. Tr. 608.) In support of a motion to continue the trial, defense counsel informed the district court that two of Nelson's brothers had been diagnosed with schizophrenia and that further mental health evaluations needed to be completed. (Evid. Tr. 33.) In a note from her files regarding a defense team meeting on November 17, 2000, Ms. Francis chronicled the team's discussion of obtaining a neuropsychologist. (Evid. Tr. 40-41.) Consequently, Dr. Dennis Cowan, who was local and highly recommended, was hired. (Evid. Tr. 42.) By December 12, 2000, Dr. Mark Cunningham was hired to review the records that had been collected and to serve as a "teaching witness" on Nelson's traumatic background for the jury. (Evid. Tr. 43-44.)

The aggravating evidence of Nelson's kidnapping and murder of Pamela Butler, however, outweighed the mitigating evidence (even with the larger quantity of mitigation evidence discovered by habeas counsel), and surely supported the jury imposing the death penalty. That trial testimony of the details of what happened included:

> On September 29, 1999, Nelson picked up James Shannon Robinson at a temporary labor service to do construction work. (Trial Tr. 90-91.) During the day they spent working together, Nelson revealed to Mr. Robinson that he wanted to kidnap a female, take her



Appellate Case: 15-3160 Page: 26 Date Filed: 06/27/2016 Entry ID: 4418240

to a remote location where he could torture her, rape her, electrocute her, and then kill and bury her. (Trial Tr. 95.) Nelson bragged that he was going back to the penitentiary anyway, and "wanted to go for something big." (Trial Tr. 96.) Mr. Robinson did not report this to the authorities at the time because he simply did not believe Nelson. (Trial Tr. 99.)

Only ten days before the kidnapping of Pamela Butler on October 2, 1999, in the middle of the night, Nelson, holding a knife to the throat of Michanne Mattson, a medical student, attempted to drag her kicking and struggling from her apartment parking lot to his white Ford pickup. (Trial Tr. 105, 118, 146.) Ms. Mattson testified that she finally dropped limply to the pavement. Despite the fact that Nelson had managed to get handcuffs around one of her wrists, he could drag her no more, and he broke off the attack, warning her over and over, "If you look at me, bitch, I'll kill you." (Trial Tr. 115-16.) Nelson fled in his pickup truck.

Around 4:00 p.m., on Tuesday, October 12, 1999, Nelson told a friend of his that he knew where a 14-year-old girl was and that "right now is the time to get her, take her, kill her, rape her." (Trial Tr. 149.) A little over one hour later in Kansas City, Kansas, ten-year-old Pamela Butler left her home on her roller skates to go one and one-half blocks to the local gas station to buy some cookies and soda. (Trial Tr. 171-75, 188-89.) Her sister, 11-year-old Penny Butler, was playing on the front porch and watched her sister leave. (Trial Tr. 174.)

Meanwhile, a white Ford pickup, with the driver's door left ajar, had parked along Scott Street, the route Pamela had taken many times before. (Trial Tr. 61-63, 175.) She skated the same route home, and as she neared the pickup, Nelson "came up from out the truck and grabbed her and threw her in the truck and slammed the door." (Trial Tr. 176.) Seeing this, Penny Butler began screaming. (Trial Tr. 176, 189.) Hearing her screams, her teenage sister Casey Eaton came out of the house and looked to where Penny was pointing and saw a white pickup pulling away. (Trial Tr. 189.) As the pickup drove past the screaming girls, Nelson gestured to them with his middle finger. (Trial Tr. 177, 192.)

The sounds of the screams and the squealing of tires attracted the attention of Paul Wilt who was sitting in his truck visiting a friend nearby. (Trial Tr. 206.) Mr. Wilt gave chase and, although he eventually lost sight of Nelson's truck, he was able to get its license tag number – 177CE2. (Trial Tr. 210.)

Between 6:30 p.m. and 7:00 p.m. that same evening, Carl and Shirley Condra drove to their church, the Grain Valley, Missouri, Christian Church, on an errand. Parked behind the church was a white Ford pickup, license plate number 177CE2. The truck was unlocked and empty. Suspicious of the truck, they tried to find a police officer. Finding none, they went home. After seeing the 10:00 p.m. news of the abduction and description of the truck used, they immediately called the police. (Trial Tr. 69-70.)

Sometime around 8:00 p.m. or thereafter that same evening, Nelson drove to his mother's house in Kansas City, Missouri. (Trial Tr. 77.) He and his mother drove to the Oasis Bar which was a block and a half away from the victim Pamela Butler's home. (Trial Tr. 77.) While Nancy Nelson drank, her son played a video game. (Trial Tr. 89, 699.) After leaving the bar, they stopped at the gas station where Pamela Butler had bought her cookies and soda. Nelson purchased Pepsi and some cigarettes. (Trial Tr. 700-01.)

Nelson and his mother were at his girlfriend's house when the news was broadcast about Pamela Butler's abduction. Nelson registered no anxiety, no remorse, no grief, or other reaction. They left and returned to Nancy Nelson's residence. (Trial Tr. 77, 699-702.)

At around 11:00 p.m., Patti Griffith, the next-door neighbor to Nancy Nelson, saw Nelson on the passenger side of the white pickup wiping the dashboard and underneath areas while periodically glancing up and down the street. (Trial Tr. 220-22.) Later that same night, Mrs. Griffith was awakened by a noise. When she looked out of her window, she noticed that the pickup truck was gone and that Nelson was pacing around in his yard. (Trial Tr. 223-24.)

Around 2:00 a.m., in the morning of Wednesday, October 13th, Nelson called for a cab. The dispatcher who took the call

remembered him as calm, as "real cool" and "cool as a cucumber," even to the point of telling her a joke. (Trial Tr. 226-27.)

Around 9:00 a.m., on Wednesday morning, the white Ford pickup truck, license number 177CE2, was found abandoned ten blocks from Nelson's residence. (Trial Tr. 79.) The truck, which appeared to have been recently cleaned, had been left unlocked with the keys lying on the floorboard. (Trial Tr. 79-80, 252-53.) The manhunt for Nelson and the search for 10-year-old Pamela Butler continued throughout Wednesday with no success except for a brief sighting of Nelson in the vicinity of his girlfriend's home. (Trial Tr. 233-36.)

On Thursday, October 14th, Laurie Torrez, a civilian employee of the Kansas City, Kansas Police Department, took lunch to her husband at the Santa Fe rail yards and, taking a detour along the dike road (Trial Tr. 237-39), spotted Nelson under the 18th Street Bridge. She called the police. (Trial Tr. 240-41.)

Nelson had injured his leg while attempting to lower himself from the bridge and, being unable to escape, submitted to capture. (Trial Tr. 585-87.) Before a helicopter arrived to extract him from the area, a considerable crowd of watchers had assembled. (Trial Tr. 266-68.) From somewhere in the crowd, a voice yelled out, "What about the girl?" (Trial Tr. 268.) Nelson looked at Officer Keith, the arresting officer, and said, "I know where she's at, but I'm not saying right now." (Trial Tr. 269.) Nelson was airlifted to KU Medical Center for treatment for his injured knee. (Trial Tr. 270.)

Later that same day, a complaint was filed against Nelson for the kidnapping of 10-year-old Pamela Butler. Her body, however, had not yet been found. The information provided by Mr. and Mrs. Condra had prompted law enforcement to intensify searching efforts on the fields, woods, and ponds in the vicinity of the Grain Valley, Missouri, Christian Church.

On Friday, October 15, law enforcement personnel, searching shoulder to shoulder in the woods and fields east of the church, discovered the white sports bra Pamela had last been wearing. Nearby, they found her underpants, and then ten-year-old Pamela



Appellate Case: 15-3160 Page: 29 Date Filed: 06/27/2016 Entry ID: 4418240

> Butler's nude body was found buried under a pile of brush. (Trial Tr. 85, 285-93.) A wire ligature was wrapped around her throat. (Trial Tr. 303, 319.)
>
> Results of the autopsy revealed numerous scrapes and abrasions and blunt trauma injury to Pamela Butler's mouth and head. (Trial Tr. 321-27.) Her hymen had been torn near the time of death and there was evidence of redness and irritation in the genital area consistent with a sexual assault having occurred. (Trial Tr. 327-29.) The cause of her death was strangulation. (Trial Tr. 329.)
>
> Pamela Butler's underpants were submitted to the Federal Bureau of Investigation for DNA analysis. (Trial Tr. 87.) Examination revealed the presence of semen in the crotch area of her underpants. (Trial Tr. 345.) When compared to a sample of Nelson's blood, test results conclusively showed that he was the source of the DNA in the semen stain. (Trial Tr. 346.)

Among the non-statutory aggravators alleged in the Government's notice to seek the death penalty, was that the offense was particularly cruel and involved serious mental and physical abuse to this child and that Nelson completely lacked remorse for having killed her. These allegations were most evident from the trial testimonies of inmate Frazier, who described the torture cell Nelson intended to build in order to hold his victims captive before raping and killing them. (Trial Tr. 503-04.) Inmate Bailey testified that he overheard Nelson mimicking the child's "high-pitched screams . . . cries for mommy. Help me. Don't hurt me. Don't kill me." (Trial Tr. 362.) In obvious disgust, Bailey asked Nelson "[h]ow could [he] do that to that little girl?" Nelson simply responded, "You wouldn't believe it." (Trial Tr. 363.)



Appellate Case: 15-3160 Page: 30 Date Filed: 06/27/2016 Entry ID: 4418240

In addition to the horrific facts of the case, the jury heard evidence about the uniqueness of victim Pamela Butler and the impact of her death on the lives of her family, and that Nelson had, among other things, three prior Missouri state convictions for stealing and a conviction for attempted escape from custody. (Trial Tr. 475-77.) Other evidence presented included information that while in custody on this offense at CCA, Nelson talked about escaping (Trial Tr. 518-19), he unraveled a section of the prison fencing (Trial Tr. 520-21), and he fashioned two workable handcuff keys. (Trial Tr. 424-26.) Nelson threatened to mace his State probation officer (Trial Tr. 486), and while at CCA, in an unprovoked assault, he beat a correctional officer (Trial Tr. 455) and threatened to kill yet another correctional officer. (Trial Tr. 589.)

The district court was correct in its ruling that trial counsel "was not deficient in either the mitigation investigation or presentation of the mitigation case." (DCD 269 at 19.) There were 17 witness that testified during the penalty phase in support of mitigating factors that the jury should consider in deciding whether or not to impose the death penalty for Nelson's killing of Pamela Butler. Those witnesses included close family, friends, neighbors, employers, educators, experts and others, who painted a vivid picture of Nelson's life – his social history and "red flags" in his background. The testimony spoke to who Nelson was as a person - mentally, physically, and emotionally. As the district court found,

"Nelson's habeas counsel *has not uncovered any 'powerful' new evidence*. Rather, habeas counsel has simply *discovered a larger quantity* of mitigation evidence." (DCD 269 at 19.) (Emphasis added.)

2. *Decision to Not Ask For a Trial Continuance*

In the summer of 2001, Berrigan had health issues that necessitated heart bypass surgery which took place on August 8, 2001. Berrigan and Hunt had a meeting at CCA with Nelson about Berrigan's surgery. Nelson wanted the trial continued so that Berrigan could have time to recover, but Berrigan decided that he was not going to ask for a continuance. (Evid. Tr. 66-67.) Hunt testified about Berrigan's decision to not file a continuance motion with Nelson, stating that Berrigan assured her that he could get everything done, and Hunt and Nelson accepted Berrigan's decision. (Evid. Tr. 110.) Whether she ultimately agreed with the decision to proceed to trial or not, Hunt never informed the district court that she was concerned about Berrigan's health, nor did she express any concerns about whether or not the defense team was ready to go to trial and, correspondingly, never filed for a continuance on her own.

In regards to his surgery, Berrigan said, it "depends on how you look at it." It [the trial] was set for a couple of months after his surgery, and as he "look[s] back on it now, of course, I know I wasn't ready. . . . I wasn't ready, but I guess I didn't particularly assess whether I was ready or not after having bypass surgery."

Berrigan testified that he thought "we were going to trial in October, period" – there was "never a promise . . . it will be continued eight months, nine months, a year." (Evid. Tr. 231-32.) Berrigan testified that he just lost a bunch of time, but he is not sure even if he had asked for a continuance he would have used his health as a reason. No continuance was ever filed. (Evid. Tr. 234.) After his surgery, Berrigan testified that he was able to devote a significant amount of time in terms of getting up to speed for Nelson's case. (Evid. Tr. 263.)

Nelson argues in his petition that it was "apparent from a review of the record" that Berrigan was not ready to proceed to trial in the fall of 2001. (Nelson COA at 31.) However, the record does not show that it was "apparent." The mitigation evidence presented was not scant, but was rather comprehensive, even considering the additional evidence now presented. As already argued and found by the district court, habeas counsel has not uncovered any "powerful" new evidence, and while "not perfect," the mitigation evidence was "more than adequate." (DCD 269 at 19.) Consequently, defense counsel's performance was not ineffective, and the district court was correct in denying Nelson's claim.

As the district court found after the evidentiary hearing, defense counsel in Nelson's case is distinguishable from *Wiggins v. Smith*, 539 U.S. 510 (2003), where defense counsel completely abandoned the investigation into that defendant's background when sentencing proceedings commenced immediately

after the court denied defense counsel's motion for a bifurcated sentencing proceeding. The Supreme Court in *Strickland v. Washington*, 466 U.S. 688 (1984), does not require defense counsel to investigate every conceivable piece of mitigation evidence, and that did not change with the decision in *Wiggins*. *Wiggins*, *id*. at 533. And here in Nelson's case the defense team uncovered a significant amount of mitigation evidence and presented it to the jury. The aggravating evidence, even with this other mitigating evidence that is not "new," was simple so heinous, that any jury would find that a sentence of death was warranted.[8]

### C. ***The District Court Properly Found that Defense Counsel's Failure to Investigate and Present Mental Health Evidence and Testimony, and advise Nelson to Decline a Mental Health Examination, while Ineffective, Did Not Meet the Prejudice Prong under Strickland v. Washington, Because There was No Reasonable Probability that Even One Juror Would Have Voted to Sentence Nelson to Life in Prison. (Allegations Two and Three).***

In evaluating Nelson's allegations of ineffective assistance of counsel when defense counsel Berrigan did not present mental health evidence or testimony during the penalty phase, the district court found that counsel's performance was deficient, but further found that Nelson could not establish the prejudice prong.

[8] On November 28, 2001, the jury received the case, deliberated, and returned a unanimous verdict that death should be imposed, finding unanimously that all aggravating factors submitted had been established, with only one juror finding the existence of but a single mitigating factor. (*See* Special Verdict Form, DCD 420.)



Appellate Case: 15-3160 Page: 34 Date Filed: 06/27/2016 Entry ID: 4418240

(DCD 269 at 43.) In the court's ultimate finding that Nelson was not entitled to relief, it not only assessed what actions and steps Berrigan made to investigate Nelson's mental health, but the court also made an independent examination of the expert witnesses' testimony at the evidentiary hearing. (DCD 269 at 23-25.) While the court found that Berrigan's failure to further investigate Nelson's mental health and to advise him to decline to submit to a mental health examination by a government's expert was "strategically deficient," the court nevertheless properly concluded that even if these additional experts had testified during the penalty phase and Nelson cooperated, there was not a reasonable probability that any jury would have come to a different conclusion than imposing the death penalty. (DCD 269 at 43.)

*1. Defense Counsel's Mental Health Strategy*

During the representation, Hunt spent the majority of her time litigating a request to change venue and, based on her scientific background, obtaining an expert to review the Government's forensic evidence (since Nelson was adamant that he did not rape the victim). To advance Nelson's position on this issue, Hunt ultimately sought and obtained a forensic pathologist to examine DNA seminal stains and who reviewed the autopsy reports. (Evid. Tr. 51.) Berrigan, however, began handling the bulk of the mitigation responsibilities, including the mental health issues. Berrigan believed that a neuropsychological examination needed to

be done and was aware that Dr. Cowan had been approved by the district court. Dr. Cowan was poised to conduct an examination and evaluation of Nelson. (Evid. Tr. 196.) Berrigan's CJA worksheet (Evid. Hrg. Exh. P17A) indicates that he called Dr. Cowan the day before the evaluation was scheduled to occur and canceled it. (Evid. Tr. 198.) Berrigan testified that he canceled Dr. Cowan's evaluation because he had had prior experience with Dr. Cowan (good and bad) and thought that he could obtain someone with more of a national reputation. (Evid. Tr. 199.) Additionally, Berrigan had just been appointed to the case (within two weeks) and did not feel the need to use an expert chosen by another attorney. Berrigan admitted that he wanted to wait and do the mental evaluation later in the case, once he knew more about the case and at a time when he had a better handle on the discoverability of what he uncovered. (Evid. Tr. 199-200.)

Berrigan never commissioned a neuropsychological evaluation and testified that "we dropped the ball. It should have happened. Other things came up to the forefront, and I never got back to it. There's no excuse, really no excuse at all." (Evid. Tr. 200.) The record clearly establishes that after Berrigan was appointed to the case, he filed a number of motions on how, when, and if the Government would be allowed to conduct a mental health evaluation of Nelson. Once the district court ordered the evaluation, Berrigan systematically objected to the manner in which the evaluation would be conducted and attempted to have the

court intervene on what subjects, if any, the Government could question Nelson about. The litigation in this area began in May 2001 and continued until after Nelson pled guilty. Berrigan testified that he had past bad experiences in death penalty cases with mental health evidence and indicated that ". . . the problem with neuropsych testing is certainly if you don't talk about the defendant's history, that's going to be the subject of cross-examination by the government prosecutors. If you had a neurologist, that really isn't part of their job. I mean, somebody who's just doing, for example, objective medical testing, such as brain imaging, doesn't really have occasion to have any discussion with the client about their history or the events of the alleged crime." (Evid. Tr. 219.) Tena Francis testified and her records confirm that Berrigan was skeptical about a neuropsychological examination and wanted more objective testing, or something along the lines of a neurological evaluation. Finally, Berrigan explained that the discoverability of mental health evidence was not well-settled under federal law at the time of Nelson's trial (2001). While on the witness stand, the district court asked Berrigan to explain his concern with the Government's investigation of Nelson's mental health. Berrigan explained that in 2000 in state court, the law was that if defense put on mental health evidence, the Government would have the opportunity to examine the defendant. In Berrigan's experience, if the Government put on its psychologist in the penalty phase, it "was devastating testimony" and he lost his



Appellate Case: 15-3160 Page: 37 Date Filed: 06/27/2016 Entry ID: 4418240

case. (Evid. Tr. 227.) Consequently, Berrigan wanted to delay any examination, so as to not give the Government additional, damaging evidence.

2. *Mental Health Experts Presented During the Evidentiary Hearing*

During the evidentiary hearing, defense expert witness Dr. Carolyn S. Crawford, a neonatologist, testified that information/studies on areas of brain injury and brain damage was not available in 2001 – she could testify in terms of risk factors, but she could not have offered this same testimony (i.e. the lingering effects of prenatal and neonatal insults) based upon her review of the records back in 2001. (Evid. Tr. 525.) Dr. Reuben Gur, neuropsychologist with a specialty in brain imaging and behavior, testified that in his testing there is no comparative value for the lesion found in Nelson's brain imaging by looking at Exhibit P80 at 11. (Evid. Tr. 600-01.) Consequently, with no baseline comparison value, his imaging looks nice, but really provides no useful information.

During the evidentiary hearing on the § 2255, Nelson suggested that additional mental health evidence regarding Nelson's brain damage through Dr. Crawford and Dr. Gur should have been presented to the jury for its consideration. The district court recognized in its order that Dr. Crawford summarized Nelson's compromised neurological development based on his birth records, but she also confirmed that some of the information and studies in this

area were not available in 2001. (DCD 269 at 24.) Significantly, the court concluded based on Dr. Crawford's testimony, that "she could testify in terms of risk factors, but she could not have offered this same testimony (*i.e.* the lingering effects of prenatal and neonatal insults) based upon her review of the records back in 2001." (DCD 269 at 24, citing Evid. Tr. 525.)

Dr. Gur, likewise, testified about the MRI, PET, and neuropsychological testing he conducted on Nelson's brain showing frontal system damage, but that he had "no comparative value for the lesion found in Nelson's brain imaging" and that with no baseline comparison value, "his imaging provides no useful information. (DCD 269 at 24.)

Dr. Dan Martell, a forensic neuropsychologist – one that studies the brain and behavior, particularly the effects of brain damage on human behavior – testified as a Government witness. (Evid. Tr. 631.) Dr. Martell has published in the field of psychology and neuropsychology between 25 to 30 times in peer-reviewed journals, and testified hundreds of times in state and federal court in approximately 150 cases, of which half, or 75, were federal cases. (Evid. Tr. 633.) Government Exhibit 118A is his CV, and Government Exhibit 118 is a copy of his report on Nelson. (Evid. Tr. 634.) He evaluated Nelson on September 9-10, 2010, for 91/2 hours at Terre Haute in a private, quiet room with only a steel table separating him from Nelson. (Evid. Tr. 635-36.) He previously attempted to



Appellate Case: 15-3160 Page: 39 Date Filed: 06/27/2016 Entry ID: 4418240

evaluate Nelson earlier in the fall of 2001 at the Government's request, but Nelson refused to be evaluated. (Evid. Tr. 636.) Dr. Martell determined from his testing and examination that Nelson exhibited a level of brain impairment, or brain damage; however, he concluded that the brain impairment did not account for uncontrollable impulsivity. Dr. Martell continued by testifying that Nelson tried to carry out his fantasy on another victim, and when that did not work, he selected another youthful, more easily controlled victim. Nelson laid in wait, hid himself, brought electrical cords to bind the victim, kidnapped her, he took off at a high rate of speed in such a way that people would not be able to see him or identify him. He took the victim to a secluded area, bound her up so she could not get away – these things, Dr. Martell argued, show planning as opposed to impulsive acting out. For those reasons, Dr. Martell did not believe that Nelson's brain damage played a significant role in him committing this crime. (Evid. Tr. 649.)

Contrary to Dr. Amador's report regarding Nelson's sanity as it relates to the McNaughton standards, Dr. Martell's opinion was that Nelson did not meet the standards with regard to knowing the wrongfulness of his behavior. Dr. Martell's opinion was based on the facts that Nelson laid down in the seat prior to the kidnapping, which showed that Nelson had the knowledge that he was planning to do something wrong and he did not want to get caught. (Evid. Tr. 650.) Additionally, Dr. Martell was persuaded by Nelson's efforts to get rid of



Appellate Case: 15-3160 Page: 40 Date Filed: 06/27/2016 Entry ID: 4418240

incriminating evidence, such as wiping down the truck, throwing the victim's clothes into the lake in order to get rid of forensic evidence (trace fiber evidence that could link him to the crime), and scrubbing his fingerprints off. Dr. Martell testified that, "If you didn't know it was wrong, there's no reason to get rid of the truck, to wipe it down for evidence, to try and remove fibers from the crime scene that could identify him." (Evid. Tr. 650.)

Nothing in the evaluations from the other experts employed by Nelson subsequent to Dr. Martell's 2010 examination (by Drs. Daniel Foster, Michael Gelbort, Natalia Novick Brown, and Xavier Amador, as well as the social history prepared by Jill Miller, the neonatology report prepared by Dr. Carolyn Crawford, the trauma report by Dr. Leslie Lebowitz, the MRI and PET results, the bio-imaging report of Dr. Reuben Gur, and the dermatological report (but not the one dated May 6, 2011, from Terre Haute done by Dr. Roger Jones)) would have changed Dr. Martell's evaluation or opinions. (Evid. Tr. 651, 656-58.) When forming his opinion, Dr. Martell was aware that Nelson had two first degree relatives (brothers) who are diagnosed schizophrenics. (Evid. Tr. 662.)

The Government still asserts that even if defense counsel had employed these additional mental health experts to testify during the penalty phase, Dr. Martell's testimony would have strongly countered their testimony, and there is a reasonable probability that the jury would have come to the same conclusion –



Appellate Case: 15-3160 Page: 41 Date Filed: 06/27/2016 Entry ID: 4418240

that Nelson's kidnapping and murder of Pamela Butler warranted a death sentence. The district court made the same finding in its order in concluding that Nelson had not shown prejudice, where the additional mitigating evidence discovered by habeas counsel would not have changed the outcome – the jury imposing the death penalty, thus, rejecting Nelson's ineffective assistance counsel claim.

*3. <u>Advising or Instructing Nelson to Decline to Submit to a Mental Health Examination by a Government Examiner</u>*

Another issue on remand was the circumstances under which Nelson refused to be evaluated by mental health experts. Berrigan was aware that the Government had sent Dr. Dan Martell and Dr. Park Dietz to see Nelson at CCA and that Nelson refused to see Dr. Martell (and would have refused to see Dr. Dietz). (Evid. Tr. 234.) Berrigan testified that he was familiar with Dr. Martell (neuropsychologist) and Dr. Dietz (psychologist) and that both doctors had a national reputation. Berrigan's main concern about these two experts was that they would be biased against his client and would therefore be "pro-government." Berrigan believed they would testify in a way that would effectively refute Nelson's defense and he did not want them to be the last witnesses the jury heard from before beginning deliberations. Berrigan indicated that those fears, in part, were the reason why he engaged in protracted litigation to prevent the Government from being able to conduct its own mental health evaluation. (Evid. Tr. 264.) In the end, Dr. Cunningham was able to provide some expert mental health testimony about



Appellate Case: 15-3160 Page: 42 Date Filed: 06/27/2016 Entry ID: 4418240

Nelson, but did so from a review of the records, rather than an interview with Nelson. Consequently, Nelson was able to prevent the mental health testimony he feared, but was able to introduce some mental health evidence that discussed his horrible childhood environment.

Berrigan admitted that he had an "excellent" relationship with Nelson. Berrigan recommended that Nelson plead guilty to the charge and then proceed to trial on the penalty phase of the case. Berrigan hoped that in so pleading, Nelson would incur some empathy or sympathy from the public by taking responsibility for what he had done and, hopefully, obtain a better result on the sentence. That strategy, ". . . turned out to be a disastrous decision, but this decision regarding not speaking to Dr. Dietz and Dr. Martell was unequivocally my very strong advice to Mr. Nelson based on my experience, . . . and he followed it, as he did almost everything else I asked him to do." (Evid. Tr. 235.) Berrigan further explained that the advice to not submit to an interview ". . . was the strategic decision I made, and I advocated it very strongly." (Evid. Tr. 265.) Nelson could have gone against that advice, but did not. (Evid. Tr. 265-66.)

The record shows that at the time of the trial, defense counsel made a conscious and strategic decision to not have Nelson submit to a mental health evaluation by a government expert. Berrigan testified that the reason behind that decision to advise Nelson to not consent to a mental evaluation was because he

was concerned that Dr. Martell might testify about his neurological examination of Nelson, and thought that was a "bad idea." (Evid. Tr. 236.) Berrigan testified that he believed at the time that this decision regarding not speaking to Dr. Dietz and Dr. Martell was unequivocally his strong advice to Nelson based on his experience and Nelson followed it as he usually did. (Evid. Tr. 235.) Berrigan supported this strategy by challenging the Government's ability to conduct its own mental health evaluation at every turn. Only when he was unsuccessful, did he reach the calculated, strategic decision to recommend to Nelson that he not cooperate with the Government's evaluation. Berrigan admitted that this strategy was a product of his professional experience handling a number of death penalty cases. In those cases, Berrigan explained, if the last thing the jury heard before beginning deliberations was the Government's mental health expert, he lost.

Although Berrigan advised Nelson not to cooperate, it was ultimately Nelson's decision alone whether or not he took the advice. Magistrate Judge Hays explained to Nelson, on the record, that by failing to cooperate with the Government's evaluation, he ran the risk of having his own mental health evidence excluded from trial. Only days later, the district court told Nelson the same thing. In the face of these warnings, though, Nelson persisted in his decision to not participate.



Appellate Case: 15-3160 Page: 44 Date Filed: 06/27/2016 Entry ID: 4418240

In looking at the record in this case, Nelson's failure to participate is not surprising. During the original trial, Nelson petitioned the district court to be allowed to not come to court when hearings and status conferences were held. During the § 2255 hearing in this matter, he similarly asked for leave of the court to absent himself from the proceedings. It is convenient now for post-conviction counsel to allege deficient performance against Berrigan for recommending that Nelson not participate, when lack of participation is exactly what Nelson wants to do. Moreover, in prosecuting this § 2255 motion, current counsel similarly litigated the number of mental health evaluators the Government could use, whether video equipment would be allowed to be used, and what diagnostic tools would be allowed to be used.

Fighting to keep Nelson from mental health experts was, as the district court found, an ingrained "calculated strategy to act in a manner which is obviously deficient, so that on habeas review the Court will set aside the sentence." (DCD 269 at 28, citing *Johnson v. United States*, 860 F.Supp.2d 663 (N.D. Iowa 2012).) The court found Berrigan's testimony that he failed to conduct a mental health investigation out of "ignorance" to be incredible and "simply unbelievable." (DCD 269 at 28.)

Contrary to his testimony at the evidentiary hearing that he "dropped the ball," Berrigan's decision was a thought-out strategic move to have Nelson

exposed to less evidence that could result in the jury finding that the aggravating factors outweighed any mitigating factors, resulting in a hope that Nelson would receive a life sentence. The district court reached the conclusion that Berrigan had exercised a well-thought strategy in regards to Nelson's mental health evidence based on the following facts: (1) that Dr. Cowan had already been hired and was ready to conduct an examination of Nelson when Berrigan was appointed to this case, with Berrigan cancelling the examination a day before it was to take place (DCD 269 at 30); (2) that Berrigan did not have other mental assessments done in order to prevent the Government from being able to conduct its own mental health examination of Nelson even though the court had imposed safeguards to preserve Nelson's rights by only ordering the release of any government examination "in the event of a guilty verdict and after [Nelson] confirmed his intent to offer mental health or mental condition evidence in mitigation" (DCD 269 at 31); (3) that Nelson, in September 2001, filed a notice of intent to rely on mental health evidence at the penalty phase of trial through testimony of Dr. Dan Foster (DCD 269 at 31); (4) when a Government expert attempted to examine Nelson in October 2001, he refused to participate, even though the Eighth Circuit had issued an opinion in *United States v. Allen*, 247 F.3d 741 (8th Cir. 2001), that if a defendant indicated an intent to use his own psychiatric examination in the penalty phase, the defendant must undergo an examination by a government-selected psychiatrist

before the start of the penalty phase (DCD 269 at 31); and (5) that when defense counsel submitted an outline of witnesses that would be testifying on this issue, Berrigan indicated that Dr. Mark Cunningham and Dr. Foster would testify and present evidence on Nelson's future dangerousness, risk factors, and developmental obstacles he faced in childhood and adolescence. (DCD 269 at 32.) Based on this analysis, Berrigan was, according to the district court, "strategically deficient" in the areas of Nelson's mental health issues. (DCD 269 at 33.)

In denying Nelson's mental health claims of ineffective assistance of counsel, the district court made credibility findings as to Berrigan's testimony. There is no doubt that Berrigan knew the standard of care and practice for psychological examinations and evaluations. The court rejected, and found incredible, Berrigan's testimony that he just did not get the mental health investigation and evaluation done. Specifically, the court found it "simply unbelievable" that Berrigan "'just dropped the ball' on finding a replacement neuropsychologist for Dr. Cowan . . . or that he was blinded to his responsibilities by pride and conceit. . . . Rather, the district court saw Berrigan's behavior as a calculated strategy to act in a manner which is obviously deficient, so that on habeas review that Court will set aside the sentence." (DCD 269 at 28.) This strong finding by the district court was anchored by the court's knowledge that Berrigan had used this strategy in another capital habeas case out of the Northern

District of Iowa. (DCD 269 at 28-29.) Consequently, the court found that Berrigan's actions were strategically deficient, so the question then became whether Nelson suffered any prejudice as a result. To obtain relief from ineffective assistance of counsel, Nelson must show that he suffered prejudice, that is, that "there was a reasonable probability that a competent attorney, aware of the available mitigating evidence would have introduced it at sentencing, and that had the jury been confronted with this mitigating evidence, there is a reasonable probability that it would have returned with a different sentence." *Sinisterra v. United States*, 600 F.3d 900, 906 (8th Cir. 2010) (quoting *Wong v. Belmontes*, 558 U.S. —, 130 S.Ct. 383, 386 (2009)).

Here, the district court found that Nelson's habeas counsel established that certain mental health evidence could have been presented during the penalty phase, and had Berrigan and the trial team presented this evidence, experts would have testified that Nelson had "compromised neurological development" that he suffered during birth, that he "performed significantly below normal levels on standard testing instruments," and that neuropsychological testing confirmed that he "suffered brain damage." (DCD 269 at 34.) However, in considering the aggravating evidence presented at trial and Dr. Martell's testimony presented at the evidentiary hearing, Nelson failed to show "that there is a reasonable probability that even one juror's decision would have been different. (DCD 269 at 35.)

In reaching this conclusion, the district court painstakingly reviewed the trial testimony that was presented as aggravating evidence to the jury (DCD 269 at 35-40), as well as the mitigating evidence that was presented at penalty phase and during the evidentiary hearing by habeas counsel. (DCD 269 at 41-42.) The additional mental health evidence presented during the evidentiary hearing included the neurological examination by Dr. Michael Gelbort, the assessment by Dr. Natalie Novik Brown, the PET scan and MRI conducted by a private imaging facility near Terre Haute, Indiana in 2010, the findings of clinical psychologist Xavier Amador which showed frontal lobe disturbance, the neuroimaging study by Dr. Gur, the analysis of Nelson's birth records by Dr. Crawford, and the findings of Dr. Martell that identified brain damage, brain dysfunction and neurological impairments (but not impulsivity). (DCD 269 at 41-42.)

The district court utilized the proper prejudice review standard in evaluating Nelson's claim of ineffective assistance of counsel representation in the context of the penalty phase mitigation investigation, as outlined in *Sears v. Upton*, 561 U.S. 945 (2010). In *Sears*, the Supreme Court explained that in assessing the probability of a different outcome under *Strickland*, the trial court is to "consider the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding – and reweig[h] it against the evidence in aggravation." *Id*. at 955-56 (quoting *Porter v. McCollum*, 558 U.S. 30, 130



Appellate Case: 15-3160 Page: 49 Date Filed: 06/27/2016 Entry ID: 4418240

S.Ct. 447, 453-54 (2009) (per curiam)). After reweighing both the mitigation evidence presented at trial and the evidence submitted and presented by habeas counsel, the district court concluded that it was "convinced that the result would have been the same" (DCD 269 at 42), that is, that jury would have imposed the death penalty had all of the now available mitigation evidence had been presented during trial. The court found it significant that only one juror found the existence of only one of the nine mitigating factors, and that the aggravating factors were "simply too overwhelming" to come to any other conclusion than imposing the death penalty. (DCD 269 at 42-43.) This Court should come to the same conclusion, and deny Nelson's certificate of appealability.

### *D. The District Court Properly Denied Nelson's Claim that Counsel's Failure to Object to the Government's Allegedly Inflammatory and Improper Closing and Rebuttal Arguments, Where Defense Counsel Mitigated the Effects of Those Arguments in His Closing Arguments. (Allegation Four).*

A trial court is vested with broad discretion in controlling closing arguments and this Court will reverse a conviction only on a showing of abuse of discretion. *United States v. Coutentos*, 651 F.3d 809, 821 (8th Cir. 2011). "To obtain a reversal based on prosecutorial misconduct to which there was proper objection, a defendant must show that (1) the prosecutor's remarks or conduct were improper, and (2) the remarks or conduct affected the defendant's substantial rights so as to deprive him of a fair trial." *Id*. (quotes and citations omitted). Where there was no contemporaneous objection to statements alleged to be misconduct the appellate



Appellate Case: 15-3160 Page: 50 Date Filed: 06/27/2016 Entry ID: 4418240

court reviews for plain error. *Coutentos*, 651 F.3d at 822. Under plain error review, to obtain relief, a defendant must show (1) that there was error; (2) that the error was plain; and (3) that it affected the defendant's substantial rights. *Id*. The appellate court assesses the prejudicial effect of misconduct by considering: (1) the cumulative effect of the misconduct, (2) the strength of the properly admitted evidence of the defendant's guilt, and (3) the curative actions taken by the trial court. *Id*.

Prosecutorial misconduct claims are generally subject to the standard set forth in *Darden v. Wainwright*, 477 U.S. 168 (1986), and *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974). Under *Darden*, a prosecutor's conduct amounts to constitutional error only if it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 643). The quantum or weight of the evidence is crucial to determining whether the prosecutor's statements before the jury were so prejudicial as to result in a denial of due process. *Darden*, 477 U.S. at 182; *Donnelly*, 416 U.S. at 644. The Supreme Court instructs that "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context." *United States v. Young*, 470 U.S. 1, 11 (1985). "So long as prosecutors do not stray from the evidence and the reasonable inferences that may be drawn from it, they, no less

than defense counsel, are free to use colorful and forceful language in their arguments to the jury." *United States v. Robinson*, 110 F.3d 1320, 1327 (8th Cir. 1997); *United States v. Shoff*, 151 F.3d 889, 893 (8th Cir. 1998) (the prosecutor may use "colorful pejoratives" and argue his interpretation of the evidence). In addition, in closing argument, a prosecutor is entitled to make a fair response and rebuttal when the defense attacks the Government's case. *See United States v. Ziesman*, 409 F.3d 941, 954 (8th Cir. 2005). "Unless calculated to inflame, an appeal to the jury to act as the conscience of the community is not impermissible." *United States v. Sanchez-Garcia*, 685 F.3d 745, 753 (8th Cir. 2012) (quotation omitted) (The concluding statement that the trial had compelled the jury "to see terrible things, disgusting things," was fair comment on the trial evidence.).

Here, having the jury close its eyes to visualize the crime was not for the purpose of diverting it from deciding the case based on the relevant evidence concerning Pamela Butler's kidnaping and murder. Rather, the prosecutor's closing argument was for the purpose of the jury having a complete and clear picture of the heinousness of the crime as told by the evidence as instructed in Special Verdict Form under number 3 in Section III, the "Statutory Aggravating Factors." There was no error, plain or otherwise, in the district court's control of the closing arguments in this hard-fought trial.



Appellate Case: 15-3160 Page: 52 Date Filed: 06/27/2016 Entry ID: 4418240

In *United States v. Mullings*, 446 F.3d 750 (8th Cir. 2006), the Eighth Circuit concluded that "We bear in mind that fleeting comments that passed without objection during the rough-and-tumble of closing argument in the trial court should not be unduly magnified when the printed transcript is subjected to painstaking review in the reflective quiet of an appellate judge's chambers. *Id*. at 758. Consequently, "[i]f an arguably improper statement made during closing argument is not objected to by defense counsel, we will only reverse under exceptional circumstances." *United States v. Eldridge*, 984 F.2d 943, 947 (8th Cir. 1993) (internal quotation omitted). Even if the prosecutors in Nelson's case made improper inflammatory statements, while some of these remarks may have been phrased colorfully, and a few straddle or cross the line of propriety, the appellate court could have concluded that when the comments are considered cumulatively and in the context of the trial, there is no plain error warranting relief. *See Mullins*, 446 F.3d at 758.

### *E.* ***The District Court Properly Found that Nelson's Claim that Appellate Counsel's Failure to Conduct Adequate Review of the Trial Record and the Law and Raise On Appeal the Government's Allegedly Improper Comments in Closing Arguments was Unfounded, Where the Issue Nelson Complains About Has No Merit. (Allegations Five and Six).***

Lastly, the district court properly denied Nelson's claims of ineffective assistance of trial counsel for not objecting to some remarks made during the Government's closing arguments, and appellate counsel for not raising that issue



Appellate Case: 15-3160 Page: 53 Date Filed: 06/27/2016 Entry ID: 4418240

on appeal. Nelson noted five objectionable statements made during closing argument, and thirteen during rebuttal argument:

Closing Argument:

- The Government argued that the jury should vote for death because, "If this crime doesn't call for the death penalty, what crime does?"

- The Government argued that the jury should vote for death because, "We need to protect our children. We need to send a message to guys like the defendant . . . ."

- The Government argued that the death penalty should be imposed because, "The community cries out for justice."

- The Government argued that legally appropriate and relevant mitigating evidence was "all this excuse testimony" and a "guilt trip."

- The Government argued that the jury should impose a death penalty because the Government recommended it "without reservation."

(Trial Tr. 1113-28.)

Rebuttal Argument:

- The Government argued that the case was about the "slaughter" of "our children."

- The Government argued that legally appropriate and relevant mitigating evidence as "an excuse," "the blame game," "the abuse excuse," and an attempt to claim the crime was "somebody else's fault."

- The Government argued that the mitigating evidence was not worthy of jury consideration since it didn't "explain why" the crime occurred.

- The Government argued that Nelson was "a rotten human being."

• The Government argued that defense counsels' efforts to persuade the jury of mitigating evidence was "a smoke screen" and an attempt to "divert [the jury] from what this case is really about, the slaughter of an innocent."

• The Government argued that defense counsels' efforts to persuade the jury of mitigating evidence was masking counsels' true motive, *i.e.*, "What they want you to do is have him escape justice."

• The Government argued that mercy was weakness.

• The Government argued that Nelson was "evil at his core."

• The Government argued that jurors should rely on the prosecution's experience and expertise, and positioned the case as a referendum on capital punishment by telling the jury that, "There is no clearer call for the death penalty than there is in this case," and, later, "If not him, who? If not now, when? If killing and raping a kid isn't enough, then we don't need a death penalty. We don't need a death penalty."

• The Government argued that the jury should impose a sentence of death since the jury "represented] the people of the United States in this case . . . . ."

• The Government argued that the jurors to close their eyes and re-live the horrors of the victim's last hours, calling upon the jury to "Think about . . . what that little girl was thinking," and to imagine ,"What was she thinking?," and to "Imagine what she experienced in that last part of her life," and to "close your eyes, and . . . envision [the abduction and murder]."

• The Government argued that a verdict of death was the only just verdict and that the jury was "the dispensers of justice" and that the victim's mother "waits for you to give her some justice. And justice in this case can only be had by imposing a sentence of death," essentially suggesting to the jury that a sentence of death should be imposed because that's what the victim's survivors wished.

• The Government argued that, "[T]he death penalty was enacted for crimes like this."

(Trial Tr. 1155-63.)

During the evidentiary hearing, the court heard testimony from trial counsel Berrigan, who testified that those comments were objectionable, but he did not object, and it was not for tactical reasons. (Evid. Tr. 241, 243.) The district court "presume[d] that Nelson was prejudiced by the comments made by the government's initial and rebuttal arguments." (DCD 269 at 47.) But even with that presumption, because there was no objection to the comments at trial, any review would be for plain error. Under plain error review, as the district court noted, the reviewing court considers whether a defendant has shown that there was an error, that the error was plain, and that it affected the defendant's substantial rights. *United States v. Coutentos*, 651 F.3d 809, 822 (8th Cir. 2011). And, in order to assess the prejudicial effect of the alleged improper comments, the reviewing court considers the cumulative effect of the comment, the strength of the properly admitted evidence of the defendant's guilt, and the curative actions taken by the trial court. *Id*.

Here, the district court evaluated whether defense counsel's own closing argument mitigated the effects of the Government's statements. In finding that defense counsel's closing argument "adequately minimized any prejudicial effect from the Government's initial closing and rebuttal argument," the court cited several areas of Berrigan's closing argument that addressed the presumed improper



Appellate Case: 15-3160 Page: 56 Date Filed: 06/27/2016 Entry ID: 4418240

comments. Those comments address the Government's comments suggesting that the death penalty should automatically be imposed because this was a horrible and heinous crime. (DCD 269 at 47-48, citing Trial Tr. 1135-36.) Also, Berrigan told the jury that they would decide if the death penalty was appropriate base on the mitigating (not have to be unanimous) and aggravating (unanimous) factors. (DCD 269 at 48, citing Trial Tr. 1137.) The district court reviewed Berrigan's closing argument that refuted the Government's "inflamed" and "impassioned" arguments about the victim Pamela Butler, reminding the jury that the law requires them to make a "reasoned, calm, considered determination about what the punishment is going to be." (DCD 269 at 48, citing Trial Tr. 1152.) And, for the Government's comments during rebuttal argument, the district court found that Jury Instruction No. 4, which advised the jury of what did not constitute evidence, mitigated those comments. (DCD 269 at 49.)

In the end, the district court found that the totality of the closing arguments from both sides resulted in the jurors following the jury instructions and being able to put aside their impressions or opinions to render a verdict that was based on the evidence. *See Murphy v. Florida*, 421 U.S. 794, 799, 800 (1975) (if the juror "can lay aside his impressions or opinions and render a verdict based on the evidence presented in court[,]" the constitutional standard of fairness and impartiality is met.); and *Jones v. United States*, 527 U.S. 373, 391, 394 (1999) (Jury instructions



Appellate Case: 15-3160 Page: 57 Date Filed: 06/27/2016 Entry ID: 4418240

are evaluated in the context of the entire charge and a jury is presumed to follow all instructions.) Thus, the district court properly denied Nelson's ineffective assistance of counsel claim on counsel failing to object to the Government's closing and rebuttal arguments.

Likewise, the district court properly denied Nelson's allegations that appellate counsel was ineffective failing to review the trial record and law, and in not raising the Government's allegedly improper closing argument comments on appeal. Appellate counsel Jennifer Brewer and Susan Hunt were to split up the issues, and they communicated with each other via telephone and e-mail. (Evid. Tr. 80-81.) There was tension, clearly, between appellate counsel (Brewer and Hunt) based upon the testimony each counsel provided at the evidentiary hearing. That tension existed over who was to handle which issues on appeal. (Evid. Tr. 83, 138.) Regardless of that tension, appellate counsel worked together and timely filed their appeal on Nelson's behalf. The district court found that the issue regarding the propriety of closing arguments need not have been raised on appeal, as it lacked merit and that appellate counsel were not ineffective for not raising it. Consequently, since there is no reasonable probability that the result on Nelson's direct appeal would have been different had appellate counsel raised the closing and rebuttal arguments on appeal, this Court should not issue a certificate of appealability on this issue.



Appellate Case: 15-3160 Page: 58 Date Filed: 06/27/2016 Entry ID: 4418240

## III. Conclusion

Since this Court has already ruled on the issues Nelson initially raised in his certificate of appealability, the law-of-the-case doctrine applies and those issues should not be revisited. Furthermore, the issues remanded to the district court for an evidentiary hearing were properly denied, with the court finding that it was not probable that the outcome of the penalty phase trial would have been different had trial and appellate counsel performed differently. This Court should likewise deny a certificate of appealability.

Respectfully submitted,

TAMMY DICKINSON
United States Attorney

By /s/ *Jeffrey Valenti*


JEFFREY VALENTI
DAVID M. KETCHMARK
LAJUANA M. COUNTS
Assistant United States Attorneys

Charles Evans Whittaker Courthouse
400 East 9th Street, 5th Floor
Kansas City, Missouri 64106
Telephone: (816) 426-3122

*Attorneys for Respondent*

## CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2016, the foregoing was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. A copy will be served on participants in the case by the CM/ECF system or by U.S. Mail, postage prepaid.

Paula Kay Harms
Assistant Federal Public Defender
850 W. Adams Street, Suite 201
Phoenix, Arizona 85007-2730

David A. Ruhnke
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042

*Attorneys for Appellant*

/s/ *Jeffrey Valenti*
Jeffrey Valenti
Assistant United States Attorney



Appellate Case: 15-3160 Page: 60 Date Filed: 06/27/2016 Entry ID: 4418240