No. 15-3160
IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

Keith D. Nelson,
Appellant,

vs.

United States of America,
Appellees.

---

On Appeal from the United States District Court
for the Western District of Missouri
Case No. 4:04-8005-cv-W (FJG)

---

# OPENING BRIEF OF APPELLANT

---

Jon M. Sands
Federal Public Defender
Paula K. Harms
Assistant Federal Public
Defender
Capital Habeas Unit
850 W. Adams Suite 201
Phoenix, Arizona 85007
602-382-2816 telephone
602-889-3960 facsimile
Paula_Harms@fd.org

David A. Ruhnke
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey
07042
973-744-1000 telephone
dr@ruhnkeandbarrett.com

Counsel for Appellant Keith D. Nelson

Appellate Case: 15-3160 Page: 1 Date Filed: 11/17/2017 Entry ID: 4602011

## Summary of the Case and Request for Oral Argument

In 2001, Keith Nelson ("Appellant" or "Nelson") pleaded guilty to interstate kidnapping resulting in death. A federal jury sentenced him to death.

In post-conviction, Nelson raised claims that trial counsel failed to investigate and present readily available mitigating evidence, and was also ineffective for advising him to plead guilty to capital murder. Pursuant to this Court's order, a hearing was held on the former claim. Evidence presented at the hearing—which the jury never heard—showed that Nelson has brain damage, severe mental illness, and impaired psychological, emotional, and neurobiological development from chronic exposure to trauma, including being raped as a child. The district court denied relief, employing a flawed application of the *Strickland* standard. Nelson appeals that denial.

While this appeal was pending, the Supreme Court issued a decision establishing that the district court erroneously denied his claim that counsel was ineffective for advising him to plead guilty. This Court then granted Nelson's motion to certify this additional claim for appeal.

Appellant respectfully requests 30 minutes of oral argument.



Appellate Case: 15-3160 Page: 2 Date Filed: 11/17/2017 Entry ID: 4602011

TABLE OF CONTENTS

SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT....................i

TABLE OF CONTENTS.................................................................ii

TABLE OF AUTHORITIES............................................................vi

JURISDICTIONAL STATEMENT.......................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW.............................2

STANDARD OF REVIEW.................................................................3

STATEMENT OF THE CASE............................................................4

I. The Capital Trial Proceeding.................................................4

II. The § 2255 Proceeding..........................................................5

SUMMARY OF THE ARGUMENT.......................................................8

ARGUMENT..............................................................................13

I. Trial counsel failed to provide effective representation at the penalty phase..........................................................................13

A. The evidence presented at the § 2255 hearing established that, due to inattention and neglect, trial counsel failed to conduct an adequate mitigation investigation..................14

1. Lead counsel Patrick Berrigan entered the case only months before trial and, because of existing commitments, could not devote the requisite time to this case..........................................................15

2. Trial counsel failed to conduct an adequate social history investigation............................................20

3. Trial counsel failed to investigate numerous "red flags" in Nelson's background……………………………………23

4. Despite having the funding to do so, and understanding the importance of the issue, trial counsel failed to conduct any meaningful mental health evaluation of Nelson……………………………………………27

5. Trial counsel's instruction to Nelson to refuse to participate in a court-ordered mental health evaluation by Government experts was not an informed decision……………………………………………………………32

6. Despite recognizing that the defense was not ready to proceed, trial counsel unreasonably failed to seek a continuance, believing himself bound by an unspoken agreement with the court that a continuance would not be requested……………………………………………………34

7. The resulting trial presentation was superficial and omitted readily available mitigating evidence concerning Nelson's childhood sexual assault, mental illness, and brain damage……………………………………36

a. The trial presentation…………………………………36

b. The § 2255 presentation………………………………40

B. The district court's application of *Strickland* was fundamentally erroneous…………………………………………42

1. The district court's holding that counsel's investigation and presentation of mitigation evidence was not deficient is contradicted by its simultaneous holding that counsel was deficient in failing to investigate and present mental health evidence……………………………44



Appellate Case: 15-3160 Page: 4 Date Filed: 11/17/2017 Entry ID: 4602011

2. The district court erroneously held that evidence of childhood sexual abuse, organic brain damage, and mental illness was cumulative to the trial evidence..........................................................46

3. The district court erroneously focused on whether the trial mitigation evidence was "sufficient" rather than whether it was reasonable for trial counsel to omit readily available evidence about childhood sexual abuse, organic brain damage, and mental illness......47

4. The district court erroneously held that, as a matter of law, the facts of the crime precluded a showing of *Strickland* prejudice...........................................53

5. The court improperly assessed the mental health evidence based on its nexus to the offense................63

6. The court failed to consider or unreasonably discounted mitigation evidence presented at the hearing...........66

a. Ruben Gur, Ph.D.........................................68
b. Michael Gelbort, Ph.D..................................78
c. Xavier Amador, Ph.D..................................81
d. Leslie Lebowitz, Ph.D..................................83
e. Daniel Martell, Ph.D....................................86

C. Had the jury heard the mitigation evidence presented at the § 2255 hearing, there is a reasonable probability that at least one juror would have struck a different balance........96

1. Inaccurate assumptions.......................................98

a. Brain damage............................................98
b. Twin brother............................................101
c. Domestic abuse.........................................103

d. Rebutting aggravators……………………………105

2. Mitigation that was only superficially mentioned….107

a. Juvenile incarceration……………………………107
b. Morse side of family………………………………112

3. Mitigating factors not presented at trial……………..115

a. Childhood rape………………………………………115
b. Brain damage and mental illness………………118

4. Conclusion…………………………………………………...120

II. The district court erred in denying Appellant's claim that trial counsel was ineffective for advising him to plead guilty………...123

A. Relevant procedural background……………………………125

B. Trial counsel unreasonably failed to conduct an adequate investigation prior to advising Appellant to plead guilty……………………………………………………………...127

C. Appellant was prejudiced by counsel's omission…………..130

CONCLUSION……………………………………………………………...134

CERTIFICATE OF COMPLIANCE…………………………………………….135

CERTIFICATE OF SERVICE………………………………………………….136

## Table of Authorities

### Cases

*Allen v. United States*, 2014 WL 2882495 (E.D. Mo. 6/25/14)...87, 93, 96

*Antwine v. Delo*, 54 F.3d 1357 (8th Cir. 1995)......................13, 57, 120

*Bemore v. Chappell*, 788 F.3d 1151 (9th Cir. 2015)...........................52

*Bouchillon v. Collins*, 907 F.2d 589 (5th Cir. 1990)...........................43

*Boyde v. Brown*, 404 F.3d 1159 (9th Cir. 2005)...............................116

*Brewer v. Quarterman*, 550 U.S. 286 (2007)....................................45

*Dickerson v. Bagley*, 453 F.3d 690 (6th Cir. 2006).............................48

*Doe v. Ayers*, 782 F.3d 425 (9th Cir. 2015)....................................116

*Ex parte Smith*, 132 S.W.3d 407 (Tex. Crim. App. 2004)....................64

*Ferrell v. Hall*, 640 F.3d 1199 (11th Cir. 2011).....................10, 42, 121

*Foust v. Houk*, 655 F.3d 524 (6th Cir. 2011)...............................54, 97

*Gardner v. Johnson*, 247 F.3d 551 (5th Cir. 2002)........................53, 54

*Glenn v. Tate*, 71 F.3d 1204 (6th Cir. 1995)....................................58

*Griffin v. Pierce*, 622 F.3d 831 (7th Cir. 2010)............................82, 97

*Hodge v. Hurley*, 426 F.3d 368 (6th Cir. 2005)................................43

*Hill v. Lockhart*, 28 F.3d 832 (8th Cir. 1994)..............................56, 57

*Hill v. State*, 628 S.W.2d 284 (Ark. 1982).......................................57



Appellate Case: 15-3160 Page: 7 Date Filed: 11/17/2017 Entry ID: 4602011

*Jermyn v. Horn*, 266 F.3d 257 (3d Cir. 2001)....................................51, 52

*Johnson v. Bagley*, 544 F.3d 592 (6th Cir. 2008)......................50, 97, 122

*Kenley v. Armontrout*, 937 F.2d 1298 (8th Cir. 1991)....................*passim*

*Kennedy v. Louisiana*, 554 U.S. 407 (2008)...................................116, 117

*Lafler v. Cooper,* 556 U.S. 156 (2012)................................................127

*Lee v. United States*, 137 U.S. 1958 (2017)........................130, 131, 132

*Littlejohn v. Trammell*, 704 F.3d 817 (10th Cir. 2013).........................119

*Mason v. Mitchell*, 543 F.3d 766 (6th Cir. 2008)......................................49

*Neal v. Puckett*, 286 F.3d 230 (5th Cir. 2002) (*en banc*).........................97

*Nelson v. United States*, 297 Fed. Appx. 563 (8th Cir. 2008)...................6

*Nelson v. United States*, 97 F. Supp. 3d 1131 (W.D. Mo. 2015).....*passim*

*Padilla v. Kentucky*, 559 U.S. 356 (2010)..........................................127

*Porter v. McCollum*, 558 U.S. 30 (2009) (*per curiam*)...................*passim*

*Raygoza v. Hulick*, 474 F.3d 958 (7th Cir. 2007)....................................82

*Robinson v. Moore*, 300 F.3d 1320 (11th Cir. 2002)..............................97

*Rompilla v. Beard*, 545 U.S. 374 (2005)...............................................106

*Sears v. Upton*, 561 U.S. 945 (2010) (*per curiam*)..........................*passim*

*Simmons v. Luebbers*, 299 F.3d 929 (8th Cir. 2002).......................*passim*

*Skipper v. South Carolina*, 476 U.S. 1 (1986)...................................63, 64



Appellate Case: 15-3160 Page: 8 Date Filed: 11/17/2017 Entry ID: 4602011

*Smith v. Mullin*, 379 F.3d 919 (10th Cir. 2004)........................55, 119

*Smith v. Texas*, 543 U.S. 37 (2004) (*per curiam*)........................64, 65

*Sowell v. Anderson,* 663 F.3d 783 (6th Cir. 2011)......................97, 129

*State v. Simmons*, 955 S.W.2d 729 (Mo. 1997)............................55, 56

*State v. Simmons*, 815 S.W.2d 426 (Mo. 1991)............................55, 56

*Stevens v. McBride*, 489 F.3d 883 (7th Cir. 2007)............................51

*Strickland v. Washington*, 466 U.S. 668 (1984)..........................*passim*

*Tennard v. Dretke*, 542 U.S. 274 (2004)....................................64, 65

*Thomas v. Lockhart*, 738 F.2d 304 (8th Cir. 1984)..........................127

*United States v. Allen*, 247 F.3d 741 (8th Cir. 2001)........................95

*United States v. Barrett*, 797 F.3d 1207 (10th Cir. 2015)..................100

*United States v. Davis*, 406 F.3d 505 (8th Cir. 2005)..........................3

*United States v. Fields*, 516 F.3d 923 (10th Cir. 2008)......................94

*United States v. Kauffman,* 109 F.3d 186 (3d Cir. 1997)...........127, 128

*United States v. Mooney*, 497 F.3d 397 (4th Cir. 2007)....................127

*United States v. Nelson*, 347 F.3d 701 (8th Cir. 2003)..........................5

*Walbey v. Quarterman*, 309 Fed. Appx. 795 (5th Cir. 2009)...............54

*Wharton v. Chappell*, 765 F.3d 953 (9th Cir. 2014)..........................115

*Wiggins v. Smith*, 539 U.S. 510 (2003)......................................*passim*

*Williams v. Allen*, 458 F.3d 1233 (11th Cir. 2006)..............................97

*Williams v. Taylor*, 529 U.S. 362 (2000).....................................13, 97

*Wilson v. Simmons*, 536 F.3d 1064 (10th Cir. 2008).........................119

## Statutes

18 U.S.C. § 17..................................................................123

18 U.S.C. § 3591(a)(2)........................................................105

28 U.S.C. § 2253.................................................................1

28 U.S.C. § 2255.........................................................*passim*

## JURISDICTIONAL STATEMENT

This is an appeal from a final order in the district court denying relief under 28 U.S.C. § 2255. After filing a timely notice of appeal, Appellant sought a certificate of appealability ("COA") from this Court, which was initially denied. On July 19, 2017, this Court granted rehearing and issued a COA on three claims concerning trial counsel's failure to investigate and present mitigating evidence. Later, this Court granted Appellant's motion to modify the COA to include the claim that trial counsel was ineffective in advising Appellant to plead guilty. This Court has jurisdiction to hear these claims under 28 U.S.C. § 2253.



Appellate Case: 15-3160 Page: 11 Date Filed: 11/17/2017 Entry ID: 4602011

## Statement of the Issues Presented for Review

1. Whether the district court fundamentally misapplied the two-pronged test for claims of ineffective assistance of counsel under *Strickland v. Washington* to Appellant's claim that trial counsel failed to provide effective representation at the penalty phase, given that the court:

   - held that trial counsel's investigation and presentation of mitigating evidence was not deficient despite ruling in the same order that counsel was deficient for failing to investigate and present mitigating mental health evidence;

   - erroneously held that evidence of childhood sexual assault, organic brain damage, and mental illness was cumulative to the trial evidence, even though no such evidence was ever presented to the jury which sentenced Appellant to death;

   - improperly assessed counsel's performance based on whether the trial evidence was "sufficient" rather than on whether counsel's omission of readily available evidence of sexual assault and mental impairments was reasonable;

   - erroneously held that, as a matter of law, the facts of the crime precluded a showing of *Strickland* prejudice;

   - improperly assessed the mental health evidence based on its nexus to the offense; and

   - failed to consider or unreasonably discounted mitigation evidence presented at the § 2255 hearing.

Cases: *Wiggins v. Smith*, 539 U.S. 510 (2003)
*Rompilla v. Beard*, 545 U.S. 374 (2005)
*Tennard v. Dretke*, 542 U.S. 274 (2004)
*Porter v. McCollum*, 558 U.S. 30 (2009) (*per curiam*)

2. Whether the district court erred in denying Appellant's claim that trial counsel was ineffective for advising him to plead guilty, given that the court found that counsel's pre-trial mental health investigation was deficient; but for that error, Appellant would have learned he had a viable affirmative defense of insanity, and would have gone to trial rather than plead guilty.

Cases: *Lee v. United States*, 582 U.S. 1958 (2017)
*United States v. Kauffman,* 109 F.3d 186 (3d Cir. 1997)
*Thomas v. Lockhart*, 738 F.2d 304 (8th Cir. 1984)
*United States v. Mooney*, 497 F.3d 397 (4th Cir. 2007)

## Standard of Review

Appellant's ineffective assistance of counsel claims are mixed questions of law and fact that are subject to de novo review. *United States v. Davis*, 406 F.3d 505, 508 (8th Cir. 2005). Any underlying fact-findings are reviewed for clear error. *Id.*



Appellate Case: 15-3160 Page: 13 Date Filed: 11/17/2017 Entry ID: 4602011

## Statement of the Case

I. <u>The Capital Trial Proceeding</u>.

On October 14, 1999, Appellant was charged with interstate kidnapping resulting in death and sexual assault. In February 2001, approximately eight months before trial, after several substitutions of counsel, Patrick Berrigan was appointed as death-qualified counsel. On October 25, 2001, on the advice of counsel, Appellant pleaded guilty to the kidnapping charge and proceeded to the penalty phase. A jury was selected on November 13, 2001, and the penalty trial began the following day.

The focus of Appellant's mitigation case was that he had a disadvantaged upbringing. The jury heard about Nelson growing up in poverty, being raised by a neglectful single mother, several instances of domestic violence in the home, spankings by babysitters, academic struggles, and his commission of petty crimes as a juvenile. In response, the Government argued that Nelson's hardships were greatly exaggerated, and that even if true, they hardly accounted for his criminal behavior. It elicited evidence that Nelson's siblings grew up in the same environment, yet chose to lead productive lives. The Government argued Appellant's actions were not a consequence of his

upbringing, but rather evidence that he was a "rotten human being" who was "evil at his core." TT[1] 1155-56, 1158, 1161.

On November 28, 2001, the jury returned a death verdict, which was formally imposed by the court on March 11, 2002. Appellant's conviction and sentence were upheld on direct appeal. *United States v. Nelson*, 347 F.3d 701 (8th Cir. 2003). A petition for certiorari was denied by the United States Supreme Court on November 8, 2004.

II. <u>The § 2255 Proceeding.</u>

Appellant filed a post-conviction motion to set aside his death sentence on November 6, 2005, alleging, *inter alia*, that trial counsel was ineffective in advising him to plead guilty and for failing to adequately investigate and present readily available mitigating evidence. In a two-page order, the district court summarily denied the § 2255 motion without a hearing. It also denied a COA as to all claims.

This Court granted a COA on six ineffective assistance of counsel ("IAC") claims and remanded for an evidentiary hearing on trial counsel's failure to investigate and present mitigating evidence at the

---

[1] Citations to the consecutively-paginated trial transcript are designated as "TT"; to the consecutively-paginated § 2255 hearing transcript as "HT"; to the defense § 2255 exhibits as "P#"; to the Government's § 2255 exhibits as "G#"; and to the Appendix as "A#."



Appellate Case: 15-3160 Page: 15 Date Filed: 11/17/2017 Entry ID: 4602011

penalty phase proceedings. *Nelson v. United States*, 297 Fed. Appx. 563, 565-66 (8th Cir. 2008).[2] A COA was not granted, however, on Appellant's claim that counsel was ineffective for advising him to plead guilty.

The hearing went forward on April 14-17, 2014. Fourteen witnesses testified and thousands of pages of exhibits were admitted. The evidence developed at the hearing, discussed in detail *infra*, chronicled the dysfunction of the defense team, its lack of readiness for trial, and the available mitigation evidence that the defense could have presented to the jury, but for deficient performance. This evidence—which was essentially unrebutted at the hearing—included expert evidence that Nelson had suffered severe birth complications that resulted in lasting effects on his brain development; has identifiable damage in the regions of his brain responsible for planning, decision-making, impulse control, and emotional regulation; suffered from years of chronic exposure to trauma, including being raped as a child, that

---

[2] The remand concerned counsel's "failure to conduct adequate mitigation investigation including failure to move for a continuance to complete one;" "failure to conduct adequate investigation of defendant's mental health; and "advising or instructing defendant to decline to submit to a mental health examination by a government examiner." 297 Fed. Appx. at 565.



Appellate Case: 15-3160 Page: 16 Date Filed: 11/17/2017 Entry ID: 4602011

affected his psychological, emotional, and neurobiological development; is severely mentally ill and suffers from psychosis, cognitive disorder, post-traumatic stress disorder, and is prone to episodes of dissociation and paranoia; and that at the time of the offense, his capacity to appreciate the wrongfulness of his conduct was impaired to the extent of an insanity defense.

The district court denied the remanded § 2255 claims, as well as a COA. *Nelson v. United States*, 97 F. Supp. 3d 1131 (W.D. Mo. 2015). After initially declining to issue a COA on the remanded claims, this Court granted a petition for rehearing and issued a COA on claims concerning trial counsel's failure to investigate and present mitigating evidence. This Court subsequently granted a motion to modify the COA and certified Appellant's previously denied claim that trial counsel was ineffective in advising Appellant to plead guilty.

## SUMMARY OF THE ARGUMENT

The jury that sentenced Keith Nelson to death never knew that he has organic brain damage, was mentally ill, and had suffered unspeakable trauma including childhood rape. Instead, all the jury learned was that Nelson was raised by a neglectful single mother in an impoverished environment, and therefore had limited opportunities in life. This was hardly a satisfying insight into Appellant's life and background. Nor was it an accurate one. As the Government repeatedly pointed out, Nelson's brothers grew up in the very same environment, and yet they made the choice to lead productive lives; why couldn't Nelson have made the same choice?

The jury was given no indication that there was anything wrong with Nelson in terms of his mental or physical health. In fact, it was told the opposite: despite some initial birth complications, counsel informed the jury that Nelson had "recovered just fine," and a psychologist who had reviewed Nelson's records testified that except for a diagnosis of Attention Deficit/Hyperactivity Disorder, Nelson knew right from wrong and was capable of making rational choices.

The truth, however, was far different.



Appellate Case: 15-3160 Page: 18 Date Filed: 11/17/2017 Entry ID: 4602011

As was established during the § 2255 proceedings, Keith Nelson has profound mental deficiencies. Starting at birth, when he suffered intra-cranial bleeding and a severe loss of oxygen to his infant brain, his brain was irreparably damaged, particularly his frontal lobes, the part of the brain responsible for executive functioning—i.e., monitoring and directing behavior, planning, mental flexibility, impulsivity, inhibition, and judgment. His severe cognitive deficits, as confirmed by the Government's own testing, shows that Appellant functions in the *bottom 1%* of the population. Neuropsychological findings were corroborated by MRI and PET scans, which showed structural and functional abnormalities in Appellant's frontal lobes, as well as in other regions of his brain (amygdala, basal ganglia, hippocampus) responsible for regulating emotion and behavior.

Keith Nelson is also mentally ill. In addition to his genetic predisposition towards mental illness—evidenced by the multiple generations of family members suffering from schizophrenia, psychosis, paranoia, bipolar disorder, and depression—his untreated exposure to chronic abuse (including being raped as a child) impaired his emotional and psychological development. He suffers from psychosis, cognitive



Appellate Case: 15-3160 Page: 19 Date Filed: 11/17/2017 Entry ID: 4602011

disorder, and post-traumatic stress disorder, and a clinical and forensic psychologist has further opined that Nelson dissociated at the time of the offense, was unable to appreciate the wrongfulness of his conduct, and committed the offense under severe mental and emotional disturbance.

This mitigating mental health evidence was readily available at the time of trial. Had it been presented to the jury, it "would have served to reduce the volitional nature of the crime, as well as [Nelson's] ability to plan and act rationally, and as a result, undercut the senselessness and cold-blooded nature of the crime as stressed by the prosecutor[.]" *Ferrell v. Hall*, 640 F.3d 1199, 1235 (11th Cir. 2011).

Trial counsel's deficient performance, and the resulting prejudice to Nelson, is evident; yet the district court consistently failed to analyze the merits of Nelson's IAC claim objectively. Initially, the district court denied the § 2255 motion in a two-page order, despite clear circuit law requiring that a record be developed on IAC claims involving facts outside the original trial record. The Government had conceded the need for a hearing. After this Court reversed and ordered a hearing, the district court early on telegraphed its intention to deny the claims

again, regardless of the evidence presented.[3] Indeed, its post-hearing denial of Nelson's IAC claim was premised on a conclusion that obviated

---

[3] During the direct examination of one of Nelson's experts, for example, the court cut off the testimony mid-sentence and stated: "I think we've covered enough of this. This would be more appropriate for a full blown hearing *if the court wanted to reverse its position*." HT 443. Similarly, the court repeatedly truncated witness testimony and made comments implying that it had already decided it would be denying Nelson's claims, and thus § 2255 counsel simply needed to make a sufficient record for the ensuing appeal from the denial of relief. *See, e.g.,* HT 30-31 ("I understand you're making your record for the Court of Appeals and I think with the admission of these exhibits."); HT 225 ("You have the documents in. The Court of Appeals can go back and look and read them at their leisure."). HT 29-30, 75-77 (truncating Hunt testimony regarding trial mental health investigation); HT 141-43 (complaining that defense evidence is taking too long and attempting to restrict defense presentation to only two days of testimony, even though four days were set aside for the § 2255 hearing); HT 154-55 (truncating Shull testimony regarding the trial mitigation investigation); HT 200-01, 217-18, 222-25, 229-30, 241-43, 245, 272 (truncating Berrigan testimony regarding his lack of time devoted to the Nelson case, failure to investigate mitigation and mental health, and failing to object to improper arguments); HT 307-8 (truncating Stetler testimony regarding deficiencies of trial mental health investigation); HT 352-353, 359, 367, 370 (truncating Miller testimony regarding childhood rape, domestic violence, and educational records); HT 443, 462 (truncating Amador testimony regarding his diagnoses and how he determined Nelson suffered from psychosis); HT 511-12 (truncating Francis testimony regarding failure to gather records); HT 534-35, 537-38, 551 (truncating Lebowitz testimony regarding the effect of trauma on cognitive functioning, effects of domestic violence on Nancy's parenting, and the deficiencies of the DAPS instrument in measuring childhood trauma); HT 565, 567, 575, 586-87 (truncating Gur testimony regarding operation of frontal lobes and executive functions, the relationship between brain damage and abnormal behavior, how MRIs detect brain

the need for a hearing in the first place: "*No amount* of mental health evidence or testimony relating to brain damage and a difficult upbringing could overcome the fact that Nelson kidnapped a ten-year old girl who had roller skated to the store to buy cookies, sexually assaulted her, strangled her and left her naked body in the woods." 97 F. Supp. 3d at 1157 (emphasis added).

Rather than objectively assess the effect that the mitigating mental health evidence might have had on the jury's assessment of Nelson's moral culpability, the district court appears to have simply prejudged this case solely on the facts of the crime. In so doing, the court made basic errors in its application of the *Strickland* standard. These errors suggest efforts to support a pre-determined outcome, rather than allow its decision to be guided by the facts and the law. A proper analysis free of these errors demonstrates that Appellant is entitled to § 2255 relief.

---

abnormalities, and the two ways abuse can lead to brain damage).



Appellate Case: 15-3160 Page: 22 Date Filed: 11/17/2017 Entry ID: 4602011

## ARGUMENT

## POINT ONE

### TRIAL COUNSEL FAILED TO PROVIDE EFFECTIVE REPRESENTATION AT THE PENALTY PHASE.

The law is settled that defense counsel must conduct a reasonable investigation in order to satisfy the Sixth Amendment's guarantee of the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984). In capital cases, counsel's duties include the responsibility to investigate mitigating evidence. *Wiggins v. Smith*, 539 U.S. 510 (2003) (counsel must undertake "efforts to discover all reasonably available mitigating evidence"); *Williams v. Taylor*, 529 U.S. 362, 396-97 (2000) (counsel must "conduct a thorough investigation of the defendant's background"); *Antwine v. Delo*, 54 F.3d 1357, 1367 (8th Cir. 1995) ("Given the severity of the potential sentence and the reality that the life of the defendant was at stake, we believe that it was counsel's duty to collect as much information as possible about the defendant for use at the penalty phase[.]") (internal quotation marks and citation omitted). Counsel's failure to present mitigating evidence "may be ineffective assistance if, due to inadequate trial preparation and investigation, counsel has through neglect failed to discover such



Appellate Case: 15-3160 Page: 23 Date Filed: 11/17/2017 Entry ID: 4602011

evidence." *Kenley v. Armontrout*, 937 F.2d 1298, 1304 (8th Cir. 1991). "Counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made." *Id.* (internal quotation marks and citation omitted).

Here, trial counsel failed to investigate and present readily available mitigating evidence.

### A. The evidence presented at the § 2255 hearing established that, due to inattention and neglect, trial counsel failed to conduct an adequate mitigation investigation.

The evidence below overwhelmingly demonstrated that trial counsel conducted an inadequate investigation and therefore failed to uncover reasonably available mitigating evidence. This was not a function of tactical decision-making, but of inattention and neglect. The attorney responsible for the penalty-phase investigation, preparation, and trial was Patrick Berrigan. He came into the case approximately eight months before trial. The unrebutted evidence below established that when he accepted the appointment in Appellant's case, Mr. Berrigan was consumed by other work obligations, as well as personal health problems, that prevented him from devoting any meaningful attention



Appellate Case: 15-3160 Page: 24 Date Filed: 11/17/2017 Entry ID: 4602011

to Appellant's case until the eve of trial. He also labored under what he viewed as an unspoken yet binding agreement with the trial judge that he would get one, and only one, continuance of the trial date. Despite knowing the defense was not ready, he placed that unspoken agreement over the interests of a client facing the death penalty, and did not move for a continuance. Thus, his failure to conduct an adequate mitigation investigation and presentation was not the product of strategy, but of inattention and neglect.

1. Lead counsel Patrick Berrigan entered the case only months before trial and, because of existing commitments, could not devote the requisite time to this case.

When he accepted the appointment in this case, just eight months before a firm October 2001 trial date, Mr. Berrigan was over-committed. Mr. Berrigan:

- Spent the six weeks following his appointment preparing for and trying a capital case in Kansas, during which time his other cases—Appellant's included—"languished." HT 183, 186-187.

- Faced U.S. Supreme Court deadlines in two or three capital cases where death verdicts had been returned and executions were imminent. HT 183-86.

- Was involved in another "very active" and demanding federal capital case in Iowa. HT 186-87. There, his client's

death sentence was later set aside on a § 2255 claim that Mr. Berrigan rendered ineffective assistance in part, as here, because he devoted too little time to trial preparation. *See Johnson v. United States*, 860 F. Supp. 2d 663, 884 (N.D. Iowa 2012).

- Was heavily involved in a complex medical malpractice case that required careful attention and trial preparation including travel "all over the country" until the case settled on the eve of trial in July 2001. HT 181.

- On August 8, 2001, just weeks before Appellant's trial was scheduled to begin, he underwent quintuple coronary artery bypass surgery. HT 207, 233.

- On the same day he underwent the quintuple heart bypass surgery, he accepted an appointment in another demanding capital case in Kansas. HT 187-89; P20.

Mr. Berrigan's billing records and an internal file memorandum (P20, P17, P17-A) reflect that in the months leading to Appellant's trial date he was primarily occupied with other matters.[4] From the time Mr. Berrigan accepted the case in late February 2001, until a few weeks before the trial commenced, "the overwhelming percentage" of his time was devoted to other cases. HT 191. As stated in his deposition:

> And all I can tell you is, you know, I had three active capital cases in addition to Mr. Nelson's trial and three others that were in cert petitions to the U.S. Supreme Court and I had a regular

[4] This is also confirmed by his contemporaneous large and small diaries (P17-B, P17-C).

> docket and I was trying civil cases and maybe I shouldn't have taken Mr. Nelson's case because I was too damn busy to do what I should have done.
>
> Looking back, that's kind of how I feel about it now. I shouldn't have agreed to it. And I think Judge Gaitan he wasn't going to give us a continuance after that first one, it's completely unrealistic to be ready to try a case in nine months after you just got on, and it had never happened in my entire career up to this point.
>
> And having committed to it, you know, I felt bound to do it which is sort of a ridiculous reason to go forward just basically out of pride and conceit.

G112 at 205-06. At the hearing, he was again asked whether he should have accepted the Nelson case:

> Looking back, no, no. I have the most—utmost respect for Judge Hays. In fact, I think she is a brilliant judge, and I've had nothing but wonderful experiences with her. And the same is true of Judge Gaitan, frankly, who I've known almost—I've known him since the start of my legal career and both as a state court trial judge and appellate judge and a federal judge. And I think looking back in my desire not to disappoint them in some way and the trust that they had put in me in taking Mr. Nelson's case, somehow blinded me to my responsibilities to Mr. Nelson, and there's no real good excuse for that. It's nothing but pride and conceit, and I regret it now that I ever agreed to get involved in the case. . . . . I was very busy.

HT 244-45. On cross-examination, the Government returned to the issue:

> Q: I guess what I'm a little bit confused about is [defense counsel] presents all this history about all these other capital cases that you're engaged in and it's almost to the point where you're too overqualified in this area, that you've got yourself spread too thin. Is that what your testimony is?
>
> A: No. I don't—my qualifications and expertise hadn't changed in Mr. Nelson's case. In other words, I'm—this was an aberration in one respect only and that was time. I've never been involved in a case where I was appointed and tried a case essentially in six or seven months. That's never, ever been my experience.
>
> That Angela Johnson case I was on for five years before trial. Typically there's at least a minimum 18 months, 24 months between my appointment and the case coming to trial. This was very, very quick and it turned out to be that I had a lot of other obligations, previous obligations that ended up taking up a lot of my time.

HT 258.

The record establishes that Mr. Berrigan took complete charge of the penalty-phase preparation and trial. Upon his appointment, he advised his co-counsel, Susan Hunt, that he would be responsible for the mitigation case. HT 50. Ms. Hunt, who had no capital experience,



Appellate Case: 15-3160 Page: 28 Date Filed: 11/17/2017 Entry ID: 4602011

accepted that division of labor. Mr. Berrigan was, in her words, "calling all the shots" on mitigation issues. HT 100. The reality, however, was that Mr. Berrigan's existing commitments—as reflected in part by the summary of his CJA billing records in this case (P80)—did not allow him to fulfill that responsibility:




**EXH. P80**

Because he was preoccupied with other matters, Mr. Berrigan had virtually no contact with the mitigation investigator, Tena Francis, or her organization. HT 272. Despite having assumed sole responsibility for the mitigation case, he believed that Ms. Hunt—who had never been given any responsibility for that phase of the case and, as noted, had no



Appellate Case: 15-3160 Page: 29 Date Filed: 11/17/2017 Entry ID: 4602011

capital trial experience—was the trial team member in primary contact with Ms. Francis. HT 214. Ms. Hunt thought the opposite; she assumed that Mr. Berrigan was not only in contact with Ms. Francis, but was also spending significant time preparing a penalty phase. HT 54, 63, 101. Neither assumption was valid. With the exception of one interview of Appellant's mother, Nancy Nelson, and one or two other local family members, Mr. Berrigan interviewed no penalty-phase witnesses until shortly before trial. A330.

2. Trial counsel failed to conduct an adequate social history investigation.

Ms. Francis—the first and only mitigation specialist to become associated with the Nelson case—was first contacted in late November 2000 by predecessor counsel and was not actually appointed until February 2001. Prior to her appointment, the Federal Public Defender ("FPD"), which initially represented Appellant, had assumed sole responsibility for the mitigation investigation until that office withdrew, due to a conflict, in August 2000. The FPD's mitigation investigation was conducted by Ron Ninemire, a former federal probation officer, working as an FPD staff investigator. Before the FPD withdrew, Mr. Ninemire prepared a four-page letter for successor counsel detailing a



Appellate Case: 15-3160 Page: 30 Date Filed: 11/17/2017 Entry ID: 4602011

list of mitigation areas requiring further investigation, specifically flagging the need to investigate childhood sexual assault and Nelson's mental health. A51-54.

While Ms. Francis's normal practice was to see the client "as often as possible" because the client is the most important single source of information, she visited Appellant only twice, on consecutive days in February 2001, shortly after Mr. Berrigan's entry into the case. HT 477-78. Neither she nor any member of her staff ever saw Appellant again. HT 478. Although Appellant, in his first interview with Ms. Francis, intimated that he had been sexually abused, that important issue was never revisited. HT 351, 477.

By the summer of 2001, it was obvious that the mitigation "team" was such in name only. Ms. Francis testified that, other than her one visit to Kansas City in February 2001 to meet with counsel and Appellant, she was too busy on other matters to do anything but play a supervisory and administrative role in the investigation. HT 482. Apparently unknown to either of Appellant's counsel, it had been Ms. Francis's intention all along to turn the investigation over to her employee, Deborah Haddad. HT 480. However, even that arrangement

dissolved; Ms. Hunt and Ms. Haddad had a dispute which led Ms. Haddad to cease working on the case after July 2001. HT 481-82. At that point, no one from Ms. Francis's office was investigating the mitigation case, and Ms. Francis herself could not take up the work because of her other outstanding commitments. HT 482. Mr. Berrigan, who had assumed sole responsibility for the mitigation case, seemed unaware that no one was working on developing the mitigation case and he never pushed Ms. Francis, for example, to engage with the client. HT 490.

In May 2001, Ms. Francis provided a first draft of a chronology and social history, neither of which was ever updated or supplemented. P9 at 34-57. Mr. Berrigan acknowledged reviewing the documents and then putting them aside without apparent further action. HT 213-14. Virtually no investigation was conducted of the paternal side of Appellant's family and the jury never learned of the extensive mental and social pathology that formed 50% of Appellant's genetic makeup.[5]

[5] The district court erroneously found that the jury was presented with a binder of records of "Nelson's birth, abusive upbringing, lack of educational achievement, and other mitigation issues." 97 F. Supp. 3d at 1137. That is incorrect; counsel presented no such records at trial. The district court apparently copied this "fact" verbatim from the

While Ms. Francis's organization billed for a substantial number of hours for work performed in the summer of 2001, an analysis of her billing records shows that little substantive work was being accomplished. *See* A312, A317-19. There is no evidence of any ongoing effort to gather documents, locate additional witnesses, make contact with the paternal side of Appellant's family, or to update the first draft of the chronology and social history. There was no contact between the defense team and the mitigation investigator or her employees for nearly the entire summer leading up to the trial. HT 490. By the end of the summer of 2001, a third person, Lisa Murphy, had come onboard. Ms. Murphy had no training in social work or mitigation and her role was limited to setting up Texas interviews for trial counsel in the immediate run-up to trial. HT 492

3. Trial counsel failed to investigate numerous "red flags" in Nelson's background.

Prior to Mr. Berrigan's entry into the case, Appellant's previous counsel, William Shull, had recognized that an investigation of Appellant's mental health was required. Specific information had been

---

Government's post-hearing briefing. *Compare Nelson*, 97 F. Supp. 3d at 1137, *with* Government's Proposed Findings of Fact And Conclusions of Law, ECF Doc. No. 268 at 31.



Appellate Case: 15-3160 Page: 33 Date Filed: 11/17/2017 Entry ID: 4602011

gathered about Appellant's background that suggested a genetic predisposition to mental illness and obvious indicators of potential brain damage or other cognitive impairments. These red flags included:

- The vicious domestic assault on Appellant's mother, Nancy Nelson, that sent her into premature labor with her twins, Appellant and Kenneth Nelson;

- Nancy Nelson's lack of proper prenatal care while carrying twins;

- Difficulties experienced by Appellant, the second-born twin, whose brain was deprived of oxygen in the birthing process and who was then hospitalized for the first month of his life;

- A history of traumatic brain injuries throughout his childhood, adolescence, and early adult years;

- Two of Appellant's four brothers were diagnosed as schizophrenics, one of whom was serving a life sentence for murder.

In an *ex parte* motion filed in June of 2000, Attorney Shull sought $20,000 for the appointment of a psychiatrist, Steven Peterson, M.D. In the motion, Mr. Shull noted:

> The United States Supreme Court has clearly indicated that, since the services of experts, including psychiatrists, may well be critical to effective presentation of a capital litigant's defense, such expenses may properly be paid by the Federal Courts
>
> . . . .



Appellate Case: 15-3160 Page: 34 Date Filed: 11/17/2017 Entry ID: 4602011

> Many capital cases, including this one, involve extensive issues that deal with a defendant's mental and emotional condition at the time of the offense and subsequent times that must be presented to the jury during the penalty phase. . .

(P28 at 18-19; citations omitted.) The motion was granted, but counsel never utilized the funds, and Dr. Peterson never evaluated Appellant. In a subsequent motion (*id.* at 67), also granted by the Court, Attorney Shull sought and received funding for the appointment of neuropsychologist Dennis Cowan, Ph.D. In support of the motion, counsel summarized specific aspects of Appellant's history that necessitated an investigation for the presence of cognitive impairments:

> Investigation to date has revealed that Defendant was born prematurely and spent the first four months of his life hospitalized with breathing difficulties. This fact combined with other factors raise the suspicion that defendant may have organic brain defects which may lead to mitigation evidence in this case.

*Id.* at 68.

Internal defense memoranda further acknowledged the need to investigate Appellant's mental health. When the FPD withdrew from the case in August of 2000, investigator Ninemire prepared a detailed close-out memorandum of tasks to be accomplished that noted the



Appellate Case: 15-3160 Page: 35 Date Filed: 11/17/2017 Entry ID: 4602011

following:

> [I]t was interesting that Keith was placed in a hospital for a long period of time at the time of his birth. This needs to be explored more fully. It would appear that all of the boys, with the exception of Steven and Kenny, suffer from a form of mental illness (schizophrenia). It seems prudent that any mitigation investigation must include a psychiatric examination for Keith.

A54. In June 2001, Mr. Berrigan asked mitigation investigator Tena Francis to prepare an affidavit in support of what she thought was a request for additional funding and a continuance of the trial date. HT 502. In that affidavit, Ms. Francis described the work remaining:

> There is a significant amount of mental illness on both sides of Keith's family. There is reason to suspect Keith might suffer neurological impairment, caused by hereditary factors, prenatal damage, birthing problems, head injuries suffered as a child, and a possible exposure to neuro-toxins. Those issues need further development in order to make an adequate presentation to the jury.

P10 at 5, 6. Indeed, Ms. Francis, from her earliest entry into the case suspected that Appellant had brain damage, which is why her notes of one of her initial conversations with Mr. Shull and Ms. Hunt included the following reference, "has neuropsych hired!!" HT 475-76; P10 at 11.



Appellate Case: 15-3160 Page: 36 Date Filed: 11/17/2017 Entry ID: 4602011

Although the court twice allocated funds for mental health experts, trial counsel never used the funds or conducted a mental health investigation. As a result, evidence of Appellant's significant mental impairments was never presented to or considered by the jury that condemned him to death.

4. Despite having the funding to do so, and understanding the importance of the issue, trial counsel failed to conduct any meaningful mental health evaluation of Nelson.

The district court found, "at the time that Berrigan became involved with the case, the neuropsychologist, Dr. Cowan, had been hired and was ready to conduct the examination. However, the day before the examination, Berrigan cancelled the appointment." 97 F. Supp. 3d at 1149. That decision was objectively unreasonable.

When this case was tried in 2001, well-established norms of capital defense required an investigation of a capital defendant's mental health. A262-63, A271-75. Each of the trial attorneys who testified—Susan Hunt, William Shull, Patrick Berrigan and Larry Pace—agreed that this was the standard of practice at the time of Appellant's trial. HT 28-29, 151-52, 192-93, 626-27. Mr. Berrigan further noted that in any case where the prosecution was actually seeking the death penalty,



Appellate Case: 15-3160 Page: 37 Date Filed: 11/17/2017 Entry ID: 4602011

"it would be the standard of care to have a mental health investigation and eventually evaluation . . . ." HT 193. In Appellant's case, Mr. Berrigan determined, "as is the standard of care and practice, that there should be a psychological examination, evaluation, investigation of Mr. Nelson." HT 195. Mr. Berrigan was aware, from past capital experience, that brain damage and neurological impairment "can be a significant mitigating circumstance." HT 215-16. He believed, further, that an investigation of Appellant's potential neurological impairments was needed. HT 197. He never changed his mind about the need for such an examination. HT 200.

Mr. Berrigan was also familiar generally with the work of neuropsychologists and had employed such experts in his cases many times. HT 216. Mr. Berrigan understood that a neuropsychological assessment did not require the need "to delve into the facts and circumstances of the crime," and that neuropsychologists are "not employed to speak to the client about the events at the time of the alleged crime." *Id.*

Despite recognizing the need for a neuropsychological assessment of his client (HT 196-97), and having the funding for it, Mr. Berrigan



Appellate Case: 15-3160 Page: 38 Date Filed: 11/17/2017 Entry ID: 4602011

unreasonably failed to do so. HT 197; P11. At the time he told his co-counsel, Ms. Hunt, "'I'm going to cancel the appointment and don't worry about it, I'll figure out somebody else.'" HT 59. As the record demonstrates, Mr. Berrigan never did "figure out somebody else" and, in his own words, "never got back to it." HT 200. Counsel never conducted an assessment of Appellant for brain damage, dysfunction, or other cognitive impairments. HT 196.

Although he believed Dr. Cowan was "unequivocally a very qualified neuropsychologist," Mr. Berrigan cancelled the initial appointment because Dr. Cowan would not have been his first choice and Mr. Berrigan saw no reason to continue with him simply because he had already been approved by the court. HT 199. Mr. Berrigan's intention was to look for a neuropsychologist with more of a national or regional reputation than Dr. Cowan had. *Id.* Describing his failure to follow through on this issue, Mr. Berrigan testified as follows:

> Q: For any reason, tactical or otherwise, did you ever change your mind about the need for a neurological or neuropsychological examination of Mr. Nelson?
>
> A: No, sir.
>
> Q: Can you tell us why it never got done?

A: We dropped the ball. It should have happened. Other things came to the forefront and I never got back to it. There's no good excuse, really no excuse at all.

HT 200. When asked if his failure to utilize a neuropsychologist was related to a preference for a neurologist, Mr. Berrigan was, again, clear:

Q: And is there anything about those thoughts about a neurologist that made you decide for tactical reasons or otherwise, that you would not employ a neuropsychological exam?

A: No. Because I didn't. I did not employ a neurologist in lieu of a neuropsych exam. We didn't employ anyone. The plan was to find someone else, another neuropsychologist, to do the evaluation other than Dr. Cowan, and that did not happen.

HT 219-20. *See also* ECF Doc. No. 171 at ¶2; G112 at 30, 32, 49-52, 56-57, 78, 119, 190-93, 205.

A chronology of the mental health investigation, introduced at the hearing, helps illustrate how rushed and neglected this essential area of investigation was (P79):

| | |
|---|---|
| 08/21/2000 | Trial continued to April 2001. |
| 08/25/2000 | Court authorizes $20,000 to retain psychiatrist, Stephen Peterson, M.D. (Funds never utilized.) |
| 01/24/2001 | Court authorizes $2,500 for neuropsychological |

| | |
|---|---|
| | evaluation by Dennis Cowan, Ph.D. (Funds never utilized.) |
| 02/13/2001 | Patrick Berrigan is appointed as Learned Counsel in place of William Shull. |
| 02/28/2001 | Berrigan cancels neuropsychological examination of Appellant that had been scheduled for following day. |
| 03/08/2001 | Trial continued to October 29, 2001. |
| 08/08/2001 | Berrigan undergoes quintuple bypass surgery. |
| 09/04/2001 | Defense files notice of intent to present mental health mitigation at penalty; attaches CV of expert, Daniel Foster, Psy.D. |
| 09/17/2001 | Defense files ex parte motion to authorize Dr. Foster's services up to $7,500. |
| 10/05/2001 | Dr. Foster interviews Nelson for one hour. |
| 10/06/2001 | Dr. Foster interviews Nelson for 8 hours. Describes meetings as primarily "history-taking and trust-building." |
| 10/10/2001 | Dr. Foster's services authorized up to $7,500. |
| 10/18/2001 | USMJ Hays advised by defense counsel Berrigan that Nelson will not cooperate with Government experts' interview. |
| 10/23/2001 | Defendant's position reiterated before Judge Gaitan. |
| 10/25/2001 | Defendant enters guilty plea to count one of indictment. |



Appellate Case: 15-3160 Page: 41 Date Filed: 11/17/2017 Entry ID: 4602011

| | |
|---|---|
| 10/26/2001 | Court rules defendant's refusal to cooperate means he may not present expert evidence on mental health issues. |
| 10/28/2001 | Nelson attempts suicide. |
| 10/31/2001 | Nelson's competency challenged by defense. |
| 11/07/2001 | Court orders William Logan, MD, to assess Nelson's competency that same day. |
| 11/08/2001 | Court finds Nelson competent and further examination unnecessary. |
| 11/13/2001 | Jury-selection begins. |

5. Trial counsel's instruction to Nelson to refuse to participate in a court-ordered mental health evaluation by Government experts was not an informed decision.

The district court found that Appellant refused to participate in a Government mental-health examination on the advice of counsel. 97 F. Supp. 3d at 1151. As the court further found, this advice had no discernable tactical end, stating "there is no reasonable basis for directing Nelson to refuse the examination." 97 F. Supp. 3d at 1151. Indeed, had counsel advised Appellant to cooperate in the examination, both Mr. Berrigan and Ms. Hunt believed he would have done so. HT 68, 236.



Appellate Case: 15-3160 Page: 42 Date Filed: 11/17/2017 Entry ID: 4602011

As the district court noted, counsel's advice was not an informed decision. Although Mr. Berrigan litigated the propriety and conditions of a Government evaluation of Appellant, the reality is that the "litigation took place in a vacuum since the defense had not investigated Mr. Nelson's mental health and had no mental health case to present or protect." 97 F. Supp. 3d at 1151 (adopting Nelson's proposed fact-finding). At the § 2255 hearing, Mr. Berrigan conceded that at the time he advised Appellant not to cooperate in the Government's mental health examination, the defense "had no neuropsychological exam or mental health evidence to offer . . . ." *Id.* at 268. Ms. Hunt, in fact, could not understand why Mr. Berrigan was "making such a big deal of it since we hadn't done any evaluations. We'd done nothing." *Id.* at 94. For his part, Mr. Berrigan rejected any suggestion that he was attempting to create an appellate issue, stating, "No. These cases are to be won in trial, not in appeal. It's way too late in the appellate proceedings." HT 270.

Moreover, there was no downside to allowing Nelson to be examined by the Government's expert.[6] As the district court found, "it

---

[6] Ironically, Nelson would have been examined by the same expert

was unreasonable for Berrigan not to have Nelson examined, because any defense mental-health evidence could be withdrawn if that evaluation were deemed harmful and the Government's experts would not be permitted to testify since their sole purpose was to rebut any defense case." 97 F. Supp. 3d at 1151 (adopting Nelson's proposed fact-finding). The only concrete effect of counsel's advice was to guarantee that the jury would never hear any mitigating mental health evidence. As the district court found, "Berrigan was strategically deficient in advising Nelson not to submit to an examination by government experts, which effectively prevented him from presenting any mental health evidence in the mitigating phase." 97 F. Supp. 3d at 1151.

6. Despite recognizing that the defense was not ready to proceed, trial counsel unreasonably failed to seek a continuance, believing himself bound by an unspoken agreement with the court that a continuance would not be requested.

When Mr. Berrigan was scheduled to undergo quintuple bypass surgery in early August 2001, the issue of a continuance came front and center, and Mr. Berrigan, Ms. Hunt and Appellant met to discuss the

---

who examined him during the § 2255 proceedings, Dr. Daniel Martell, who, as is explained *infra*, found that Nelson has significant frontal lobe impairments that placed him in the bottom 1% of the population.



Appellate Case: 15-3160 Page: 44 Date Filed: 11/17/2017 Entry ID: 4602011

need for a continuance of the trial date. HT 66. Although Ms. Hunt and Appellant believed a continuance was needed, Mr. Berrigan announced at the end of the meeting that he would not request one. HT 67. Despite not being ready for trial, Mr. Berrigan felt bound by the fact that he had accepted an appointment in the case with the tacit understanding that he would be granted only one continuance, noting, "That was the basis on which I had agreed to get involved in the case."[7] HT 231. Although, as a result of his coronary bypass surgery he did little work on the case in August (HT 207), Mr. Berrigan explained he was loath to use his personal health issues as a reason to continue the date. HT 233.

Mr. Berrigan had assumed sole responsibility for the mitigation aspect of the case, but spoke to the mitigation specialist, Tena Francis, only two or three times from the time he entered the case in February 2001 to Appellant's sentence of death nine months later. HT 206. Contrary to what was his usual practice, Mr. Berrigan did not supervise

---

[7] When he accepted the appointment in February 2001, the case was scheduled for trial in May 2001. The "one continuance" he had been promised was granted in March 2001, continuing the trial to October 2001.



Appellate Case: 15-3160 Page: 45 Date Filed: 11/17/2017 Entry ID: 4602011

or interact at all with Ms. Francis. HT 272.[8] The decision not to request a continuance thus cannot be characterized as a reasoned decision because it was not informed by any working knowledge of the status of the mitigation investigation.

7. The resulting trial presentation was superficial and omitted readily available mitigating evidence concerning Nelson's childhood sexual assault, mental illness, and brain damage.

Evidence adduced at the § 2255 hearing established a significant, qualitative difference between the superficial mitigation presentation that the jury heard at trial, and the presentation it *could have heard*, but for trial counsel's deficient performance.

a. The trial presentation

The thrust of trial counsel's mitigation case was that Nelson was raised in poverty, neglected by his mother, and lacked opportunities in life to succeed. His mother, Nancy, was in an abusive relationship with her ex-husband, Kenneth Morse, who regularly beat her and occasionally beat their children. TT 603-35. By the time Keith was in

[8] Mr. Berrigan received no assistance from Ms. Francis or her organization at the penalty-phase, an unusual circumstance since "[u]niformly in my experience, the mitigation investigator has always been there when the penalty phase of the case is ongoing." HT 205.



Appellate Case: 15-3160 Page: 46 Date Filed: 11/17/2017 Entry ID: 4602011

kindergarten, Nancy had left Morse and was raising her five sons alone. TT 635. She relied on a series of babysitters to watch the boys while she worked nights. TT 643-54. A couple of the babysitters occasionally disciplined the boys by hitting them with a belt when they misbehaved. TT 807, 909-12. As the boys got older, Nancy often left them at home alone to take care of themselves. TT 668-69. The Nelson home was often messy and unclean, and the boys frequently showed up to school hungry and wearing dirty clothes. TT 900, 945, 953-55. Nelson struggled in school, and by the time he reached his teenage years, he was in and out of juvenile detention centers for committing petty crimes. TT 932, 842. A psychologist, Mark Cunningham, testified that although he had not conducted a clinical examination and diagnosis of Nelson, he had identified several "risk factors" in Nelson's upbringing, such as poverty and neglect, that were consistent with psychological research about the types of factors commonly found among individuals who commit crimes.[9] TT 977-1024.

In response, the Government argued that the defense had greatly

[9] Two correctional officers also testified that while incarcerated pending trial, Nelson's behavior had been no better or worse than the average prisoner. TT 749-84.



Appellate Case: 15-3160 Page: 47 Date Filed: 11/17/2017 Entry ID: 4602011

exaggerated the extent of Nelson's disadvantaged background, and that regardless, his childhood hardships hardly accounted for his criminal behavior as an adult. Kenneth Morse took the stand and testified that despite having a "bad relationship" with Nancy, he never hit her or his children. TT 1062-85. Indeed, under cross-examination, Nancy admitted that she had allowed Nelson to go live with Kenneth after they had separated, and that she had told FBI agents that nothing in Nelson's background could explain his subsequent criminal behavior. TT 706-07. The Government underscored this point in its cross-examination of Nelson's brothers, Steven and Kenneth, highlighting that despite having grown up in the same circumstances and being given the same limited opportunities, they managed to turn their lives around, make good choices, and grow up to lead productive lives; Steven became a computer software technician, and Kenneth became a satellite communications installer operator in the Army. TT 839-45, 889-94. Under cross-examination, the defense expert, Dr. Cunningham, admitted that the "risk factors" he identified did not prevent Nelson's brothers from achieving success. TT 1037-38. He also testified that Nelson knew the difference between right and wrong, and that he chose



Appellate Case: 15-3160 Page: 48 Date Filed: 11/17/2017 Entry ID: 4602011

to behave the way he did. TT 1041-42.

In closing arguments, trial counsel argued that Nelson's life of poverty, abuse, and neglect limited his opportunities in life, but ultimately conceded that Nelson "chose to kill Pamela Butler." TT 1135. The Government emphasized this theme of "choice" to the jury. TT 1155-56 ("This case is about choices."). It highlighted that Nelson's siblings grew up in the "same environment," yet they made the choice to lead productive lives. TT 1124, 1156. The Government argued that Nelson could have made the same choices; his failure to do so was not a consequence of his upbringing, but rather evidence that he was a "rotten human being" who was "evil at his core." TT 1155-56, 1158, 1161.

The essence of defense counsel's case, that Nelson's crime should be viewed through the lens of his disadvantaged background, was puzzlingly and woefully incomplete. It failed to answer the central question posed to the jury by the Government: if Nelson made the choice to kill, why should that choice be judged less harshly simply because he had a difficult childhood? Plenty of children–including Nelson's own brothers—grow up under similar circumstances without



Appellate Case: 15-3160 Page: 49 Date Filed: 11/17/2017 Entry ID: 4602011

committing murder; wasn't Nelson's crime simply a reflection of his evil nature?

b. The § 2255 presentation

There was, in fact, powerful mitigating evidence that trial counsel could have presented to answer these questions. Specifically, Appellant suffered from profound mental limitations that diminished his capacity for rational planning and thought, and impaired his ability to control his impulses and inhibit his behavior. This evidence, which was adduced at the § 2255 hearing and is discussed in more detail *infra* at 66-120, included the following:

- Nelson suffered severe birth complications that had lasting effects on his brain development and cognitive abilities. Contemporaneous records established that he was rushed to a special children's hospital after his birth because he was bleeding in his brain, had stopped breathing on his own, and was suffering from hypoxia (reduced oxygen to the brain). The oxygen deprivation was so severe that his infant limbs and body turned blue from the lack of oxygen in his blood, and he was baptized during the ambulance ride to the hospital for fear that he would not survive. The bleeding and hypoxia damaged Nelson's brain — in particular the frontal lobes, which are key to regulating cognition and behavior.

- Neuropsychological testing confirmed that Nelson's frontal lobes are severely impaired. The Government's own expert confirmed that Nelson's test results put him in the *bottom 1%* of the population in terms of his executive functions, which are

responsible for monitoring and directing behavior, planning, mental flexibility, inhibition of impulses, and judgment.

- MRI and PET scans of Nelson's brain confirmed both structural and functional abnormalities in the frontal lobes, as well as in other regions (amygdala, basal ganglia, hippocampus) responsible for impulse control, inhibition of risky behavior, and rational planning.

- Nelson's mental impairments and small physical size made him more vulnerable to abuse than his brothers. He was often targeted by his caregivers and peers because he was "slow" and had a bedwetting problem. Although his brothers also committed petty crimes as kids, Nelson was less savvy about how to evade authorities and he ended up in and out of various juvenile detention facilities. At age 14, he was sent to a notorious Texas Youth Commission facility, where he was surrounded by older and bigger residents who repeatedly raped and beat him. These assaults were so severe that Nelson made numerous attempts to take his own life while in custody, and his suicidal behavior continued even after he was released.

- A detailed, multi-generational social history documented widespread mental illness throughout both sides of Nelson's family, including multiple family members with schizophrenia. A clinical psychologist determined that Nelson's genetic predisposition towards mental illness was compounded by his years of extensive physical, emotional, and sexual abuse; he was diagnosed as suffering from profound mental illness, including psychosis, cognitive disorder, and post-traumatic stress disorder. Additionally, his chronic and untreated exposure to trauma made him uniquely susceptible to entering dissociative states during high-stress situations. Nelson's illness was so severe that he dissociated at the time of the offense and was unable to appreciate the wrongfulness of his conduct.

Simply put, this was not "a case about choices." Nelson did not

choose to be brain damaged at birth; to have a genetic predisposition towards mental illness; or to be raped as a child and suffer other trauma that impaired his psychological, emotional, neurobiological development. Yet these indelible facts about his life had deep and long-lasting impacts on his capacity for rational thought and his ability to properly regulate his behavior. Had the evidence adduced at the § 2255 hearing been presented to the jury, it "would have served to reduce the volitional nature of the crime, as well as [Nelson's] ability to plan and act rationally, and as a result, undercut the senselessness and cold-blooded nature of the crime as stressed by the prosecutor[.]" *Ferrell v. Hall*, 640 F.3d 1199, 1235 (11th Cir. 2011).

B. The district court's application of *Strickland* was fundamentally erroneous.

Under *Strickland*'s two-pronged test for ineffective assistance claims, a movant first "must show that counsel's representation fell below an objective standard of reasonableness," which must be judged against the "prevailing professional norms." *Strickland*, 466 U.S. at 694. Second, the petitioner must demonstrate prejudice by showing a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable

probability is a probability sufficient to undermine confidence in the outcome." *Id.* In examining prejudice, the *Strickland* Court expressly rejected an "outcome determinative standard" and instead noted that "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id.* Thus, the "reasonable probability" standard—a probability sufficient to undermine confidence in the outcome—is a less onerous burden than even the preponderance of the evidence standard. *See Bouchillon v. Collins*, 907 F.2d 589, 595 (5th Cir. 1990) (prejudice prong imposes "a lower burden of proof than the preponderance standard."); *see also id.* (even when "the evidence arguably supports a different result under a preponderance standard," a reviewing court still can be "confident that it meets the 'reasonable probability' standard."); *Hodge v. Hurley*, 426 F.3d 368, 376 n.18 (6th Cir. 2005) (*Strickland* standard "is a lesser standard than preponderance of the evidence").

Here, the district court applied both prongs incorrectly. Its legal reasoning was not only compromised by clear factual errors, it also approached each prong using modes of analysis that have been



Appellate Case: 15-3160 Page: 53 Date Filed: 11/17/2017 Entry ID: 4602011

specifically rejected by the Supreme Court. Under a proper application of *Strickland* to the facts adduced at the § 2255 hearing, Appellant is entitled to relief on his claim that trial counsel failed to provide effective representation at the penalty phase.

1. The district court's holding that counsel's investigation and presentation of mitigation evidence was not deficient is contradicted by its simultaneous holding that counsel was deficient in failing to investigate and present mental health evidence.

The district court's resolution of Nelson's IAC claim contains an irreconcilable contradiction. On the one hand, the court held that trial counsel was "not deficient in either the mitigation investigation or presentation of the mitigation case." *Nelson*, 97 F. Supp. 3d at 1144. *See also id*. at 1143 ("Nelson's counsel conducted a thorough mitigation investigation and presented a comprehensive mitigation case to the jury."). But in the very same opinion, the court unambiguously held that counsel's "performance regarding investigation and presentation of the mental health testimony [was] deficient." *Id.* at 1149. Indeed, it found counsel was "deficient" in: (1) "cancelling the neuropsychological examination of Nelson"; (2) "failing to reschedule such examination"; (3) "failing to have any other assessments conducted to assess whether

Nelson suffered any brain damage, dysfunction or other cognitive impairments"; and (4) "advising Nelson not to submit to an examination by Government experts, which effectively prevented him from presenting any mental health evidence in the mitigation phase." *Id.* at 1151.

Given that mental health evidence is "constitutionally relevant mitigating evidence," *Brewer v. Quarterman*, 550 U.S. 286, 288 (2007),[10] a finding that Nelson was "effectively prevented from presenting any mental health evidence in the mitigation phase" due to counsel's deficient performance necessarily proves, as a matter of law, that the investigation and presentation of the mitigation case was deficient, too. A mitigation case which entirely omits the investigation and presentation of any mitigating mental health information cannot be deemed "thorough" or "comprehensive." The district court's prong one analysis was thus fundamentally erroneous.

[10] *See also Kenley*, 937 F.2d at 1307 ("evidence of [mental] conditions, disorders and disturbances are precisely the kinds of facts which may be considered by a jury as mitigating evidence").



Appellate Case: 15-3160 Page: 55 Date Filed: 11/17/2017 Entry ID: 4602011

2. The district court erroneously held that evidence of childhood sexual abuse, organic brain damage, and mental illness was cumulative to the trial evidence.

The district court held that trial counsel's mitigation investigation was not deficient because the mitigation evidence presented at the § 2255 hearing was cumulative to the trial evidence. *See Nelson*, 97 F. Supp. 3d at 1144 ("Nelson's habeas counsel has not uncovered any 'powerful' new evidence. Rather, habeas counsel has simply discovered a larger quantity of mitigation evidence."). Its prong one analysis relied on a clearly erroneous factual premise.

The evidence presented at the § 2255 hearing was not just "a larger quantity of mitigation," but rather encompassed entirely new categories of mitigation never presented at trial that would have painted a dramatically different picture of Nelson and offered insight into his conduct and moral culpability that was otherwise missing from the trial presentation. This included:

- Unrebutted evidence that Appellant was raped as a child on multiple occasions, including when he was incarcerated in juvenile detention facilities.
- Expert neuropsychological evidence that he has organic brain damage so severe that even the Government's expert testified that Appellant is in the bottom 1% of the population in terms of his executive functioning.

- Expert psychological evidence that Appellant is mentally ill and suffers from cognitive disorder, post-traumatic stress disorder, and psychosis.

- Expert psychological evidence that as result of chronic exposure to trauma, Appellant suffered both psychological and neurological deficits that damaged his psychological, emotional and sexual development, and impaired the parts of his brain involved in inhibiting impulses and regulating behavior.

These categories of "new" mitigation are discussed in greater detail *infra*. Suffice it to say, however, that any claim that this evidence was previously presented to the jury is incorrect and belied by the record. Indeed, the district court essentially acknowledged that the § 2255 evidence was new in holding that trial counsel was *deficient* for failing to present *any* evidence to the jury about Nelson's mental impairments. 97 F. Supp. 3d at 1149.

3. The district court erroneously focused on whether the trial mitigation evidence was "sufficient" rather than whether it was reasonable for trial counsel to omit readily available evidence about childhood sexual abuse, organic brain damage, and mental illness.

Appellant's ineffectiveness claim concerns *omissions* by trial counsel in the investigation and presentation of mitigation evidence. Under *Strickland* and its progeny, a court must look at each alleged



Appellate Case: 15-3160 Page: 57 Date Filed: 11/17/2017 Entry ID: 4602011

omission by trial counsel and inquire whether the failure to investigate particular mitigating evidence is reasonable; the decision to limit an investigation must flow from a "reasoned strategic judgment" rather than "inattention" or ignorance. *Wiggins*, 538 U.S. at 526. As the Supreme Court stressed in *Wiggins*, it is "not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further" that is the appropriate inquiry under *Strickland*. 538 U.S. at 527. "It is not reasonable to refuse to investigate when the investigator does not know the relevant facts the investigation will uncover." *Dickerson v. Bagley*, 453 F.3d 690, 696 (6th Cir. 2006).

Here, the district court failed to inquire whether counsel's omissions were reasonable. For example, Mr. Ninemire specifically alerted trial counsel to reasonably available evidence that Appellant was sexually abused as a child and urged him to conduct further investigation into this issue. A54. Counsel, however, did not do so. The district court made no findings as to whether trial counsel's failure to pursue such an investigation was reasonable, and if so, what evidence in the record demonstrated that counsel's omission was based on an

informed strategic judgment, rather than inattention or ignorance.

Instead, the district court turned the relevant *Strickland* analysis on its head: rather than inquire whether it was reasonable for counsel to forego an investigation into Nelson's childhood sexual assault after the issue had been flagged by predecessor counsel, the court focused on whether the mitigation theory presented at trial constituted a "sufficient" or "more than adequate" mitigation case. *Nelson*, 97 F. Supp. 3d at 1144. The district court reasoned backwards that if the mitigation case presented at trial was "sufficient," then trial counsel's investigation necessarily satisfied *Strickland*.

This was a fundamental misapplication of *Strickland*. *See Mason v. Mitchell*, 543 F.3d 766, 784 (6th Cir. 2008) (lower court "unreasonably applied the *Strickland* standard" because it ignored the *Strickland* principle that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgment support the limitations on investigation") (quoting *Strickland*, 466 U.S. at 690-91). The Supreme Court has never sanctioned the type of backwards-looking approach to the prong one inquiry that the district court adopted. Indeed, it has

specifically rejected the notion that the adequacy of the trial presentation is dispositive of whether the pre-trial investigation was reasonable. *See Sears v. Upton*, 561 U.S. 945, 954 n.10 (2010) (*per curiam*) ("[T]he reasonableness of the [mitigation] theory is not relevant when evaluating the impact of evidence that would have been available and likely introduced, had counsel completed a constitutionally adequate investigation before settling on a particular mitigation theory."); *id.* at 955 ("We have certainly never held that counsel's effort to present *some* mitigation evidence should foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant.") (emphasis added). *See also Johnson v. Bagley*, 544 F.3d 592, 602 (6th Cir. 2008) ("an unreasonably truncated mitigation investigation is not cured simply because some steps were taken prior to the penalty-phase hearing and because some evidence was placed before the jury.").

Given that counsel introduced some evidence of Nelson's abuse and neglect through lay testimony, there was no justifiable strategic reason to omit the type of readily available *expert* evidence on these matters that was presented at the § 2255 hearing, either. Such expert

evidence would not have simply constituted a "larger quantity of mitigation evidence"; it would have been *materially* different because it would have provided the jury with a concrete understanding of how critical events in Nelson's childhood shaped his psychological and emotional development, and impaired his mental health and ability to regulate his emotions, control his impulses, and inhibit his behaviors as an adult.[11] *See Stevens v. McBride*, 489 F.3d 883, 897 (7th Cir. 2007) (expert mental health testimony "would have strengthened the general mitigation evidence presented by defense counsel … by focusing the jury on the concrete results of years of abuse on [the defendant's] psyche."); *Jermyn v. Horn*, 266 F.3d 257, 310-11 (3d Cir. 2001)

---

[11] As Russell Stetler, an expert in the investigation and presentation of mitigation evidence, testified at the § 2255 hearing:

> [Lay testimony and expert testimony] have to be integrated. In other words, your lay witnesses will put out important factual information, but they're not going to provide a framework for jurors to understand. The value of mitigation is often explanatory. When horrible crimes happen, jurors want to know how this came about, … who is this person, how was he shaped, and how did this crime occur. … [T]he lay witnesses aren't going to provide that kind of explanation. You're going to need a mental health person to provide that framework.

HT 293.



Appellate Case: 15-3160 Page: 61 Date Filed: 11/17/2017 Entry ID: 4602011

(ineffective assistance found where trial counsel presented lay testimony regarding petitioner's background but no expert testimony because the expert testimony "would have provided the jury with an entirely different view of [the petitioner's] life and childhood which would have … aided in understanding the seriousness and origin of his mental illness[.] Moreover, it is clear that there was no psychiatric testimony discussing the effect of the childhood abuse on [petitioner's] adult functioning, and how his mental illness mitigated against the imposition of death."); *Bemore v. Chappell*, 788 F.3d 1151, 1172 (9th Cir. 2015) (although some lay witnesses mentioned defendant's "tumultuous upbringing," this was "not enough" because "particularly persuasive evidence—especially evidence in the form of expert testimony—was omitted.")

The district court's failure to assess the reasonableness of counsel's specific omissions concerning Nelson's childhood sexual abuse, mental illness, brain damage, and supporting expert testimony about these issues was erroneous. Under a proper *Strickland* analysis, counsel's "actions cannot be considered a product of a reasonable trial strategy because there was no justifiable reason to prevent the jury



Appellate Case: 15-3160 Page: 62 Date Filed: 11/17/2017 Entry ID: 4602011

from learning about" any of this evidence. *Simmons v. Luebbers*, 299 F.3d 929, 938 (8th Cir. 2002).

4. The district court erroneously held that, as a matter of law, the facts of the crime precluded a showing of *Strickland* prejudice.

Despite finding that trial counsel was deficient for failing to investigate and present mitigating evidence of Nelson's brain damage, cognitive impairments, and mental illness, the district court denied his IAC claim because "*[n]o amount* of mental health evidence or testimony relating to brain damage and difficult upbringing *could* overcome the fact that Nelson kidnapped a ten-year old girl who had roller skated to the store to buy cookies, sexually assaulted her, strangled her and left her naked body in the woods." 97 F. Supp. 3d at 1157 (emphasis added). The court did not merely weigh the mitigating evidence proffered at the § 2255 hearing against the aggravating evidence and conclude the former was insufficient to outweigh the latter; rather, it held that *no amount* of mitigation *could ever* be sufficient.[12] Stated differently, the

[12] Although the district court paid lip service to the notion that its conclusion was reached after reweighing the evidence, 97 F. Supp. 3d at 1152, 1156, its explicit statement that "no amount" of mitigation could have altered its prejudice analysis converted its application of *Strickland* into a "hollow judicial act." *Gardner v. Johnson*, 247 F.3d



Appellate Case: 15-3160 Page: 63 Date Filed: 11/17/2017 Entry ID: 4602011

court held that the nature of the crime necessarily precluded a finding of *Strickland* prejudice and that a sentence of death was inevitable under any conceivable circumstance.

This mode of legal analysis—what the Fifth Circuit has derisively referred to as the "brutality trumps" approach to assessing *Strickland* prejudice[13] —has been rejected by numerous courts,[14] including this

---

551, 563 (5th Cir. 2002).

[13] *See Gardner*, 247 F.3d at 563:

> The State's stereotypical fall-back argument–that the heinous and egregious nature of the crime would have ensured assessment of the death penalty even absent [the error]–cannot carry the day here. … [O]ur decades of experience with scores of § 2254 cases from the death row of Texas teach an obvious lesson that is frequently overlooked: Almost without exception, the cases we see in which conviction of a capital crime has produced a death sentence arise from extremely egregious, heinous, and shocking facts. But, if that were all that is required to offset prejudicial legal error and convert it to harmless error, habeas relief based on evidentiary error in the punishment phase would virtually never be available, so testing for it would amount to a hollow judicial act.

[14] *See Walbey v. Quarterman*, 309 Fed. Appx. 795, 804 (5th Cir. 2009) ("[Prosecution's] argument—that [defendant] suffered no prejudice because the brutality of his crime eclipses any mitigating evidence—is a non-starter."); *Foust v. Houk*, 655 F.3d 524, 545-46 (6th Cir. 2011) (while the aggravating circumstances were "overwhelming" and the "crime was heinous" and "gruesome," "[p]owerful aggravating



Appellate Case: 15-3160 Page: 64 Date Filed: 11/17/2017 Entry ID: 4602011

one. In *Simmons v. Luebbers*, 299 F.3d 929 (8th Cir. 2002), this Court explained that the very premise of mitigating evidence is that even in cases with an "overwhelming amount of aggravating evidence," a "vivid description" of a defendant's troubled background can "provide some sort of explanation for [a defendant's] abhorrent behavior" and "influence[] the jury's assessment of [a defendant's] moral culpability" and persuade individual jury members to "vote[ ] against the imposition of the death penalty." *Id.* at 938-39. Absent such "essential" evidence, a jury will be "allowed to conclude that [a defendant's] violent behavior was simply the result of his wicked and aggressive nature." *Id.* at 936, 938. Indeed, the *Simmons* court found *Strickland* prejudice despite the fact that the defendant committed two disturbing murders that the jury deemed "outrageously and wantonly vile, horrible, and inhuman." *State v. Simmons*, 955 S.W.2d 729, 752 (Mo. 1997).[15]

---

circumstances . . . do not preclude a finding of prejudice."); *Smith v. Mullin*, 379 F.3d 919 (10th Cir. 2004) (finding prejudice even though "case in favor of the death penalty was strong" and crime, which involved stabbing death of defendant's wife and two stepsons and asphyxiation of two stepdaughter, was "horrendous").

[15] The defendant "savagely beat[] and strangled [one of them] for four to five minutes before" she died. *Simmons*, 955 S.W.2d at 752. He bound the other's ankles and hands, forced a cloth gag down her throat,



Appellate Case: 15-3160 Page: 65 Date Filed: 11/17/2017 Entry ID: 4602011

In *Kenley v. Armontrout*, 937 F.2d 1298 (8th Cir. 1991), this Court specifically rejected the argument that trial counsel's failure to present readily available mitigation evidence about the defendant's mental health problems was not prejudicial because the facts of the case were too aggravating. As this Court noted, mental health evidence is unique in that it can often help a jury "put the aggravating evidence in context" and that "evidence of conditions, disorders and disturbances are precisely the kinds of facts which may be considered by a jury as mitigating evidence." *Id.* at 1307-08. *See also Hill v. Lockhart*, 28 F.3d 832 (8th Cir. 1994) (defendant abducted two men at gunpoint, ordered them into a car, and forced one of the men to drive them to a gravel road where he marched both men into some weeds, forced them to lie down with their hands behind them, and shot both men multiple times; one of the men played dead until the defendant left and then crawled back to the road, where he was found later that afternoon by a

---

and then tied a cloth over her mouth. *Id.* at 758. He left each woman's body to decompose in her apartment and pawned the jewelry he had stolen from them. *State v. Simmons*, 815 S.W.2d 426, 427-428 (Mo. 1991).



Appellate Case: 15-3160 Page: 66 Date Filed: 11/17/2017 Entry ID: 4602011

pulpwood driver;[16] finding reasonable probability that jury would not have given death penalty if counsel had discovered and presented mitigating circumstances of defendant's schizophrenia); *Antwine v. Delo*, 54 F.3d 1357 (8th Cir. 1995) (while defendant searched for his employer in a drug-dealing business, he robbed several individuals, shot and killed another, and eventually was arrested while struggling over a gun with his employer, the intended victim; while in a holding cell with the victim, officers heard yelling and saw the victim face down on the floor, bleeding from his nose and mouth, and then saw defendant in midair, coming down with both feet on the victim's head, who died from head injuries days later; *Strickland* prejudice found because counsel unreasonably failed to present evidence of defendant's mental impairment).

There is broad acknowledgment across the circuit courts that evidence of mental impairments is particularly compelling in the context of a *Strickland* prejudice analysis; courts have thus repeatedly rejected arguments that a defendant is not prejudiced by the complete omission of such evidence. As the Sixth Circuit noted:

---

[16] Facts of the case taken from *Hill v. State*, 628 S.W.2d 284 (Ark. 1982).



Appellate Case: 15-3160 Page: 67 Date Filed: 11/17/2017 Entry ID: 4602011

> Our sister circuits have had no difficulty in finding prejudice in sentencing proceedings where counsel failed to present pertinent evidence of mental history and mental capacity. In addition to *Brewer v. Aiken*, [935 F.2d 850 (7th Cir. 1991)], *see, e.g., Stephens v. Kemp*, [846 F.2d 642, 652-55 (11th Cir.)(1988)] ("the resulting prejudice is clear"); *Blanco v. Singletary*, [943 F.2d 1477, 1505 (11th Cir. 1991)] (prejudice requirement "clearly met" by counsel's failure to present evidence of epileptic seizures and organic brain damage); *Loyd v. Whitley*, [977 F.2d 149, 159-60 (5th Cir. 1992)], (failure to present mitigating evidence of substantial mental defects "undermines our confidence in the outcome"). We would be badly out of step with the other circuits were we to conclude that there was no prejudice in the case at bar.

*Glenn v. Tate*, 71 F.3d 1204, 1211 (6th Cir. 1995).

Empirical evidence also refutes the district court's prejudice analysis. While the facts of the crime here are certainly shocking and evoke sympathy for the victim, there are numerous examples of federal capital juries returning life sentences in cases at least as aggravated as the instant case:

- *United States v. Naeem Williams*, D. HI No. 06-00079:[17] Defendant was convicted of beating to death his 5-year old daughter. Trial evidence established that defendant routinely assaulted and tortured the 5-year old for many months leading up to her death, frequently beating her with his fists and his belt, often after she soiled herself.

---

[17] *See* Cynthia Johnston, "Hawaii sentences ex-soldier to life for killing daughter:report," Reuters, Jun. 27, 2014 (http://www.reuters.com/article/us-usa-deathpenalty-hawaii-idUSKBN0F22CD20140627) (last visited 9/22/17).

- *United States v. Larry Lujan*, D. NM No. 05-924: Defendant was convicted of the 2005 kidnapping murder of a 16 year old potential federal witness in a drug prosecution. The boy was beaten, forced to perform oral sex, and nearly decapitated with a meat cleaver. His body was found 3 weeks later. Defendant was also linked by DNA to a 1993 murder of another couple.

- *United States v. Steven Northington*, E.D. PA No. 2:07-CR-00550-RBS: Defendant was convicted of a 2004 arson fire that killed six people, including four children–ages 1, 10, 12 and 15. The fire was set to retaliate against a federal informant.

- *United States v. Coleman Johnson*. W.D. VA No. 3:00CR00026: Defendant was convicted of using a pipe bomb to kill his ex-girlfriend, who was eight months pregnant, to avoid having to pay child support. DNA testing performed after the murder confirmed that defendant was the father of the child that the victim was carrying.

- *United States v. Steven Green*, W.D. KY No. 5:06-CR-00019-TBR: Defendant was convicted of the 2006 murders of a family of four, including two children, and the rape and murder of their daughter.

- *United States v. Oscar Grande and Israel Cisneros*, E.D. VA No. 04-CR-83: Defendants, who were members of the MS- 13 street gang, were convicted of the stabbing murder of a pregnant teenager in 2003. The victim was 17 years old and was targeted because she was a former member of the gang and had become a federal informant. Shortly after she left the witness protection program, defendants repeatedly stabbed her.

- *United States v. Chevie Kehoe*, E.D. AR No. 97-243: Defendant was convicted of the murder of a family of three–



Appellate Case: 15-3160 Page: 69 Date Filed: 11/17/2017 Entry ID: 4602011

an Arkansas gun dealer, his wife, and their 8-year old daughter–in furtherance of a white supremacist racketeering enterprise. Along with her parents, defendant disposed of the 8-year old girl's body by dumping her in a swamp.

- *United States v. Alexis Candelario-Santana*, D. PR No. 3:09-CR-00427-JAF: Defendant, who already had 13 prior murder convictions, was convicted of 20 murders, including the October 17, 2009 "Tombola Massacre," where eight people were killed and twenty wounded in a shooting at a bar, including an unborn child.

- *United States v. Thomas Pitera*, E.D. NY No. 90-0424 (RR): Defendant was a contract killer for the Mafia who was convicted of six murders. Several of the murders involved torturing the victims, dismembering their bodies and burying them in a deserted marsh on Staten Island.[18]

- *United States v. Mohamed Rashed Daoud Al-'Owhali*, S.D. NY No. S6-98-cr-1023: Defendant, an accomplice of Osama Bin Laden, was convicted of organizing two bombings of American embassies in Africa. The 1998 bombings in Kenya and Tanzania collectively killed 224 people, including 12 Americans, and injured more than 5,000 people.

- *United States v. Tommy Edelin*, D. D.C. No. 98-264: Defendant was convicted of four murders that he ordered as the so-called "drug kingpin" of DC-area gang known as the "1-5 Mob." Two of those murders involved ordering the killing of a 14-year old boy and a 19-year old.

- *United States v. Kenneth A. Tatum*, E.D. TX No. 2:99-CR-5: Defendant, a member of the "Crips" gang, was convicted of

---

[18] *See* Arnold H. Lubasch, Reputed Mobster Guilty In Six Narcotics Murders," NewYork Times, Jun. 26, 1992 (http://www.nytimes.com/1992/06/26/nyregion/reputed-mobster-guilty-in-six-narcotics-murders.html) (last visited on 9/22/17).



Appellate Case: 15-3160 Page: 70 Date Filed: 11/17/2017 Entry ID: 4602011

murdering three people, one of whom was a 63-year old retired minister that defendant kidnapped and murdered.

- *United States v. Samuel Stephen Ealy*, W.D. VA No. 00-CR-104: Defendant was convicted of the 1989 murder of a family of three–a husband, wife, and son. The husband and wife were found shot to death outside their home; their son was found shot to death in a closet inside the home. 363 F.3d 292, 295 (4th Cir. 2004).

- *United States v. Tyrone Williams*, S.D. TX No. 03-CR-221: Defendant was convicted for his participation in an alien smuggling operation that led to 19 people's deaths by dehydration, overheating and suffocation in the back of a truck trailer driven by defendant.

- *United States v. Zacarias Moussaoui*, E.D. VA No. 01-CR-455: Defendant was convicted of being a co-conspirator in the September 11, 2001, terrorist attack on the World Trade Center and Pentagon, which killed over 3,000 people and resulted in four airline crashes in New York, Pennsylvania, and Washington, D.C.

- *United States v. John Richard Mayhew*, S.D. OH CR No. 02 03-165: Defendant was convicted of murdering his ex-wife, her boyfriend, and defendant's own 18-year old daughter, with whom defendant had an incestuous relationship.

- *United States v. Michael Antonio Natson*, M.D. GA No. 4:05-CR-00021-CDL-GMF: Defendant was convicted of the 2003 murder of a pregnant 23-year old Georgia Southern University student. Defendant was a U.S. Air Force military police officer, and the victim's skeletal remains were found by hunters on a remote part of Fort Benning, Georgia.

- *United States v. Jessie Con-Ui*, M.D. Pa. 13-cr-00123: Defendant, serving a life term for another murder, killed a federal correctional officer at the United States Penitentiary



Appellate Case: 15-3160 Page: 71 Date Filed: 11/17/2017 Entry ID: 4602011

at Canaan, inflicting stomps and kicks to the head and over 200 stab wounds in an attack lasting nine minutes and captured on video-tape.

- *United States v. Ulysses Jones,* W.D. Mo. 10-cr-3090: Defendant on trial for murder of federal inmate at FMCP/Springfield and contemporaneous near fatal stabbing of a second inmate. This was defendant's second murder while in federal custody and his fourth overall, including the murder in Washington, D.C. of a Secret Service agent.

Each of the above federal capital cases was tried to a jury, and despite the horrific and brutal facts surrounding these murders—some of which involved, as in this case, the murder of a child—the juries did not return death sentences. These verdicts specifically rebut the premise of the district court's *Strickland* prejudice analysis, i.e., that cases involving the murder of a child are "too overwhelming" to be mitigated, and therefore "no amount" of mitigating evidence can avoid a death sentence. [19]

---

[19] Indeed, each juror that served in Appellant's case affirmed during *voir dire* that he or she would not automatically vote for the death penalty in a case involving the murder of a child. *See* TT 1136. Unlike the district court, the jury was not composed of persons who believed that this was the type of crime for which a death sentence would be "automatic."

5. The court improperly assessed the mental health evidence based on its nexus to the offense.

The district court weighed the potential mitigating value of the mental health evidence presented at the § 2255 hearing based on whether a nexus to the underlying crime had been demonstrated. *See* 97 F. Supp. 3d at 1146-47, 1156 (assessing whether expert evidence "explained why [Appellant] acted as he did," "played a role in him committing the crime," or otherwise provided a rationale for Appellant's criminal conduct). This is a plainly erroneous application of the prejudice prong: the Supreme Court has long recognized that a capital defendant need not establish a nexus between his mental capacity and the crime in order for it to be given mitigating effect, and that imposing any such "nexus requirement" in the context of a *Strickland* prejudice inquiry violates the Eighth Amendment.[20]

In *Skipper v. South Carolina*, 476 U.S. 1 (1986), for example, the Court held that exclusion of evidence regarding the defendant's good behavior in jail while awaiting trial deprived him of "his right to place before the sentence relevant evidence in mitigation of punishment." *Id.*

[20] The Government's own expert neuropsychologist, Dr. Martell, acknowledged that evidence of brain damage is mitigating, even if it has no connection to the offense. HT 657-58.



Appellate Case: 15-3160 Page: 73 Date Filed: 11/17/2017 Entry ID: 4602011

at 4. The Court explained that the jury "could have drawn favorable inferences … regarding [the defendant's] character," and despite the fact that "any such inferences would not relate specifically to [the defendant's] culpability for the crime he committed, … such inferences would be mitigating in the sense that they might serve as a basis for a sentence less than death." *Id.* at 4-5 (internal citation and quotation marks omitted).

Particularly instructive is *Smith v. Texas*, 543 U.S. 37 (2004) (*per curiam*). There, the Texas court withheld a mitigation instruction concerning the defendant's background and intellectual failings because he offered "no evidence of any link or nexus between his troubled childhood or his limited mental abilities and this capital murder." *Ex parte Smith*, 132 S.W.3d 407, 414 (Tex. Crim. App. 2004). The Supreme Court rejected this "nexus" requirement as one it had "never countenanced," and it reiterated that the only relevant question is whether the proposed mitigation evidence would give a jury "a reason to impose a sentence more lenient than death." *Smith*, 543 U.S. at 44-45. *See also Tennard v. Dretke*, 542 U.S. 274, 287 (2004) (noting that no prior Supreme Court case had ever suggested that a capital defendant



Appellate Case: 15-3160 Page: 74 Date Filed: 11/17/2017 Entry ID: 4602011

"must establish a nexus between her mental capacity and her crime before the Eighth Amendment prohibition on executing her is triggered" and holding that the jury must be allowed to consider evidence of the defendant's character and background even if the defendant cannot establish "a nexus to the crime").

The district court's analysis plainly violates these precedents. Evidence of Appellant's brain damage, cognitive impairments, mental illness, and brutal upbringing need not have offered any explanation for why he committed the offense or have been proven to have a played a role in his criminal conduct in order for the jury to have considered it as weighty mitigation. Even absent a nexus to the crime, evidence of mental frailties can present the defendant in a more sympathetic light and independently form the basis of a "reasoned moral response" that a person with such characteristics is not deserving of a death sentence. *See Tennard*, 542 U.S. at 288 ("Evidence of significantly impaired intellectual functioning is obviously evidence that might serve as a basis for a sentence less than death.") (internal quotation marks and citation omitted); *Smith*, 543 U.S. at 44 ("There is no question that jury might well have considered petitioner's IQ scores and history of

participation in special-education classes as a reason to impose a sentence more lenient than death.").

### 6. The court failed to consider or unreasonably discounted mitigation evidence presented at the hearing.

In *Porter v. McCollum*, 558 U.S. 30 (2009) (*per curiam*), the Supreme Court held that under a proper *Strickland* prejudice analysis, a habeas court cannot simply credit the conclusion of the prosecution's experts and "discount entirely" the impact that the testimony of the defense experts might have had on the jury. There, the state habeas court unreasonably applied clearly established federal law when it "either did not consider or unreasonably discounted the [mental health] mitigation evidence [that Porter] adduced in the postconviction hearing." 558 U.S. at 42. The Court ruled that it was unreasonable for the state habeas court to "discount entirely" the impact that the testimony of Porter's neuropsychologist might have had on the sentencing judge and jury based on the fact that the experts offered by the state disagreed with the conclusions of Porter's expert. *Id.* at 43. As it explained, "[w]hile the state's experts identified perceived problems with the tests that [Porter's neuropsychologist] used and the conclusions he drew from them, it was not reasonable to discount

entirely the effect that this testimony might have had on the jury or the sentencing judge." *Id.*

Here, the district court made the same *Porter* error: its prejudice analysis focused almost exclusively on the opinion of the Government's expert, Dr. Daniel Martell, who testified that Nelson's brain damage did not play a significant role in the commission of the crime. The court thus failed to consider the effect that the defense expert testimony might have had on the jury. The court treated as dispositive the fact that "Dr. Martell testified that none of these reports [from nine different experts that examined Nelson at the time of trial or during the § 2255 proceeding and whose opinions were contrary to Dr. Martell's] changed his opinions regarding Nelson." 97 F. Supp. 3d at 1147. The relevant legal question under *Porter*, however, is not what effect the contrary evidence had on *Dr. Martell's* opinion, but rather what effect that evidence would have had on the sentencing jury. The court's selective reliance on the § 2255 record unreasonably failed to consider the impact that the following evidence might have had on the jury:



Appellate Case: 15-3160 Page: 77 Date Filed: 11/17/2017 Entry ID: 4602011

a. Ruben Gur, Ph.D.

Dr. Gur is a neuropsychologist with a specialty in brain imaging and behavior. He testified that the "executive functions" of the brain are responsible for monitoring and directing behavior, planning, mental flexibility, inhibition of impulses, and judgment. HT 564-67. Damage to the frontal lobes impairs executive functioning:

## Frontal Lobe damage

- Dysfunction of the frontal lobe may result in:
  - – disinhibition
  - – irritability
  - – lability
  - – tactlessness
  - – poor planning
  - – mania
  - – risk-taking
  - – perseveration
  - – obsessive compulsive behaviors
  - – motor dysfunction
  - – antisocial behavior




7

**EXH. P81 at 7**

Three different types of neuroimaging were used to analyze Nelson's brain: (1) magnetic resonance imaging ("MRI"), (2) positron emission topography ("PET"), and (3) behavioral neuroimaging. HT 579-

85.

Both the MRI and PET neuroimaging confirmed that there was significant damage to several areas of Appellant's brain, including the frontal lobes, the amygdala, the hippocampus, and the basal ganglia. HT 579-85. When these areas of the brain are damaged, an individual is unable to effectively engage in rational planning, control one's impulses (especially sexual impulses), and inhibit risky or aberrant thoughts and behaviors. HT 560-66, 577, 583-84.

The MRI, which is used to detect abnormalities in the structures of the brain, HT 578, revealed abnormally reduced volume in several regions on the left side of Nelson's brain, which is depicted in the lack of symmetry between the two hemispheres of Nelson's brain in the imaging results:



Appellate Case: 15-3160 Page: 79 Date Filed: 11/17/2017 Entry ID: 4602011




**EXH. P81 at 16**

An analysis of the MRI data showed that the reduced volume in the frontal and occipital lobes on the left side of the brain, as well as the amygdala, was clinically significant. The following chart illustrates these findings. The bottom of the chart notes the various regions of the



Appellate Case: 15-3160 Page: 80 Date Filed: 11/17/2017 Entry ID: 4602011

brain that are of interest, and the blue line depicts the volume of those regions in the left side of Nelson's brain. As noted by the blue line, a variety of regions on the left side of his brain are outside the normal range:




Figure 2. Volumetric analysis of Mr. Nelson's MRI. Volumes are expressed as z-scores (standard deviations from the mean) relative to healthy individuals.

**EXH. P58 at 2**

A PET scan is used to detect abnormalities in the activity of the brain. HT 578. Nelson's PET revealed some regions with abnormally low activity (blue) and some with abnormally high activity (red):



Figure 3. The PET images of Mr. Nelson's brain

**EXH. P58 at 3**

An analysis of the PET data showed abnormally low activity in the amygdala, hippocampus, and basal ganglia regions of the brain, and abnormally high activity in the frontal and parietal cortex. This is illustrated in the following chart; the red line represents normal ranges of activity in various regions of the brain, and the blue line represents Nelson's activity:




Figure 1: ["First Analysis"] Region to Whole Brain Ratios of Cerebral Glucose Metabolism (Left Panel) and Laterality Index (Right Panel) of Mr. Nelson vs. N=8 Healthy Controls

SF = Superior Frontal; DL = Dorsal Prefrontal – Lateral; DM = Dorsal Prefrontal – Medial; MF = Mid–Frontal; IF = Inferior Frontal; SM = Sensorimotor; SP = Superior Parietal; SG = Supramarginal Gyrus; OL = Occipital cortex, Lateral; OM = Occipital cortex, Medial; LI = Lingual Gyrus; FG = Fusiform Gyrus; OT = Occipital Temporal; ST = Superior Temporal; MT = Mid–Temporal; IT = Inferior Temporal; TP = Temporal Pole; PH = Parahippocampal Gyrus; HI = Hippocampus; AM = Amygdala; IN = Insula; OF = Orbital Frontal; RG = Rectal Gyrus; CA = Cingulate Gyrus – Anterior; CG = Cingulate Gyrus - genu; CP = Cingulate Gyrus – Posterior; C1 = Corpus Callosum – Anterior; C2 = Corpus Callosum – Posterior; CN = Caudate Nucleus; LM = Lenticular – Medial [Globus Pallidus]; LL = Lenticular – Lateral [Putamen]; TH = Thalamus; HY=Hypothalamus; MI = Midbrain; PO = Pons; CE = Cerebellum.

**EXH. P81 at 21** 21

In addition to the MRI and PET neuroimaging, Dr. Gur took the raw data from the neuropsychological testing[21] conducted by Drs. Gelbort and Martell and converted it into visual data that displays the dysfunctional areas and severity of impairment indicated by Nelson's neuropsychological test scores:[22]

---

[21] Neuropsychological tests are "paper and pencil" tests that measure psychological functions known to be linked to a particular brain structure or pathway. Different neuropsychological tests measure different functions and are used to diagnose deficits in particular brain systems. HT 570.

[22] Unlike the MRI and PET, which are actual images of Nelson's

Gelbort testing Martell testing




**EXH. 81 at 13**

This "neurobehavioral imaging" visually demonstrates what was confirmed by the neuropsychological testing: Nelson's left hemisphere is impaired relative to his right hemisphere, and the impairment on the left side of the brain is largely present in the frontal lobes, and extends to the temporal and parietal lobes. A143-44.

Dr. Gur's testimony thus corroborated the neuropsychological findings regarding Nelson's brain damage and the implications for his impaired behavior. The structural damage detected by the MRI in the frontal regions of Nelson's brain "would indicate diminished executive functions such as abstraction and mental flexibility, planning, moral

---

brain, this third type of imaging ("behavioral neuroimaging") is just an illustration whose regions are color-coded according to the neuropsychological testing results.

judgment, and emotion regulation, moderating limbic arousal and impulse control." A146. Similarly, the abnormal activity detected in the amygdala, frontal lobes, and cortex would diminish impulse control:

> In Mr. Nelson's case, there is a reduced volume in frontal regions and the cortex is already at a hyper-activated state. When Mr. Nelson's amygdala becomes activated, his frontal lobe would be unable to exercise control as a normal one would, because his frontal lobe is not only damaged but is already operating at full capacity in its hyper-vigilant state. The situation is analogous to a car with weak brakes that are already engaged when it begins to race. The frontal lobe is unable to do its job and act as the brakes on the primitive emotional impulses emanating from the amygdala when the limbic system reaches its activated stage (the Klüver-Bucy syndrome).

A146. Dr. Gur also noted that "abnormalities in basal ganglia could further impair rational performance under stress because they supply the neurotransmitter dopamine, which is necessary for intact frontal lobe functioning. The resulting behavior of someone with such brain damage would be disorganized, erratic and failing to adjust to situational demands." A146.

Despite these abnormalities, however, Dr. Gur opined that a person with Nelson's impairments could succeed in a structured setting: "Notably, such individuals do respond well to structured environments, where the complexity of the surrounding and need for decision-making

is reduced." A146-47.

The district court entirely discounted Dr. Gur's testimony:

> Dr. Gur opined that the abnormalities in Mr. Nelson's brain were important for regulating behavior. However, Dr. Gur admitted that he had not actually conducted a neuropsychological evaluation of Mr. Nelson. Dr. Gur also admitted that in his testing there was no comparative value for the lesion found in Nelson's brain imaging by looking at Exhibit P80 at 11 (Evid. Tr. 600-01.) Consequently, with no baseline comparison value, his imaging provides no useful information.

97 F. Supp. 3d 1146. The district court's discounting of Dr. Gur's testimony on these grounds is plainly unreasonable. First, the claim that Dr. Gur "admitted" that he had not conducted a neuropsychological evaluation is an admission without any relevance; Dr. Gur was not retained to conduct a neuropsychological evaluation, but rather to consider the evaluations performed by Drs. Gelbort and Martell in concert with the neuroimaging data. As all three experts agreed, the neuroimaging results were entirely consistent with the results of the neuropsychological examinations, which established evidence of brain dysfunction and damage. Both Drs. Gelbort and Martell testified that their neuropsychological testing results were valid; the fact that Dr. Gur relied on them, rather than perform his own evaluation, does not

undermine his opinion in the least.

The court's other criticism of Dr. Gur's opinion is that his behavioral imaging provides no useful information because there is no "baseline comparison value." But that conclusion is unsupported by the record: There was no evidence introduced at the § 2255 hearing that supports the claim that behavioral neuroimaging provides no useful information absent a "baseline comparison value."[23] Dr. Gur certainly never testified to that, nor did the Government put on any such evidence. (Indeed, behavioral neuroimaging is not intended to provide baseline comparison values; it merely translates the neuropsychological testing results into visual data. HT 571. It is the underlying neuropsychological data that provides the baseline comparison values (HT 652-53, 679-81); as even Dr. Martell conceded, his data showed

---

[23] The district court's statement regarding baseline comparison values appears to be copied almost verbatim from the Government's post-hearing brief. *Compare* Government's Proposed Findings of Fact And Conclusions of Law (ECF Doc. No. 268 at 32 ("Dr. Reuben Gur, neuropsychologist with a specialty in brain imaging and behavior, testified that in his testing there is no comparative value for the lesion found in Nelson's brain imaging by looking at Exhibit P80 at 11. (Evid. Tr. 600-01.) Consequently, with no baseline comparison value, his imaging looks nice, but really provides no useful information."). The Government's characterization of Dr. Gur's testimony was unfounded; it cited no evidence for the claim that neurobehavioral imaging provides "no useful information" absent baseline comparison values.

that, in comparison to the rest of the population, Nelson functions in the bottom 1%.)

Moreover, even if one were to discount the behavioral imaging that was based on the neuropsychological testing, Dr. Gur's opinion was still supported by the MRI and PET scans, which *independently* confirmed that there were structural and functional abnormalities in Nelson's brain in the regions responsible for executive functioning, emotional regulation, and impulse control. Given that the MRI and PET evidence was unrebutted, the district court unreasonably failed to consider the effect that Dr. Gur's testimony might have had on the jury.

b. Michael Gelbort, Ph.D.

Dr. Gelbort conducted a neuropsychological evaluation of Appellant. The district court's decision devotes exactly one sentence to his testimony: that Dr. Gelbort's results "confirmed that Nelson suffered [from] frontal lobe dysfunction." 97 F. Supp. 3d at 1155. The opinion omitted any further analysis of Dr. Gelbort's testimony about the nature of frontal lobe dysfunction, the extent of Nelson's frontal lobe damage, and how this dysfunction impaired Nelson's cognition and behavior.



Appellate Case: 15-3160 Page: 88 Date Filed: 11/17/2017 Entry ID: 4602011

As Dr. Gelbort noted in his report, Nelson's testing results indicated "frontal lobe disturbance/dysfunction" which "has an effect on his everyday thinking and reasoning capacities," and manifests as "impaired reasoning and learning memory abilities." A180. As he explained during his testimony, the frontal lobes of the brain are like "the gas pedal and brake pedal of our behaviors. They allow us to initiate as well as to inhibit." HT 395. Damage or dysfunction in these areas of the brain correspondingly affect a person's ability to exercise appropriate judgment and effectively control one's impulses or inhibit behavior. HT 396, 408-09.

Of particular significance was Dr. Gelbort's testimony regarding the nature of "impulsive behavior." HT 412. "[T]he way behavior unfolds is that you can have impulsive behavior that takes time and develops slowly where there's plenty of time to say, no, I shouldn't do this, but it's still an impulsive behavior even though it happens over time slowly." HT 413. This testimony was especially critical because it rebutted the Government's claim that since the commission of the crime unfolded over an extended period of time, Nelson's behavior demonstrated planning as opposed to impulsivity. HT 649. As Dr.

Gelbort explained, impaired impulsivity and inhibition does not manifest solely as reactive behavior; it is also expressed as an impaired ability to effectively weigh and deliberate—the lack of inhibition is not merely in the behaviors, but in the ideas themselves that instigate the behaviors, and the nature of frontal lobe dysfunction is that one's ability to apply the brakes and inhibit a course of behavior once it is started is impaired. HT 408-09, 414. Thus, behavior that appears on the surface to be planned or premeditated (because it involves a sequence of actions over time) can be deceiving because in persons with frontal lobe dysfunction, the ability to inhibit the impaired judgment that guides a slowly-unfolding course of action is disrupted. HT 413-14.[24] Indeed, the Government specifically cross-examined Dr. Gelbort about the facts of the crime in this case, and it was his expert opinion that Nelson's behavior was consistent with the type of impaired inhibition found in persons with frontal lobe dysfunction. HT 409-14.

Here, the district court unreasonably failed to consider that the jury might have reasonably relied upon Dr. Gelbort's testimony to find that Nelson's frontal lobe impairments reduced the volitional nature of

[24] This testimony was corroborated by Dr. Gur. *See* HT 565-67.

his behavior, which in turn may have influenced its assessment of his moral culpability. *See Sears*, 561 U.S. at 951 (evidence of defendant's frontal lobe impairments "might well have helped the jury understand [the defendant], and his horrendous acts").

c. Xavier Amador, Ph.D.

Dr. Amador is a clinical and forensic psychologist. In addition to corroborating Dr. Gelbort's finding that Nelson suffered from frontal lobe dysfunction, Dr. Amador determined that Nelson's mental health was also impaired by a cognitive disorder, post-traumatic stress disorder, and psychosis, and he also showed signs of paranoid thinking. A226-50. In particular, Dr. Amador opined that Nelson was severely mentally ill and in a dissociative state at the time of the offense, and thus unable to appreciate the nature and quality or wrongfulness of his acts. HT 440, 443-45.

Although Dr. Amador's report and testimony shed significant light on the way Nelson's mental illness impaired his ability to regulate his behavior and otherwise reduced his culpability, the district court failed to consider the effect this testimony might have had on the jury. Indeed, the district court cut off Dr. Amador mid-sentence during his direct



Appellate Case: 15-3160 Page: 91 Date Filed: 11/17/2017 Entry ID: 4602011

testimony with the following:

> THE COURT: I think we've covered enough of this. This would be more appropriate for a full-blown hearing *if the court wanted to reverse its position.*

HT 443.

The court's statement is troubling in a number of respects. First, it illustrates that the court adopted a flawed prejudice analysis: "The question is not whether a particular judge would have imposed a different sentence, but rather whether there was a 'reasonable probability' that the sentence would have been different" which requires "an objective evaluation of the evidence." *Griffin v. Pierce*, 622 F.3d 831, 845 (7th Cir. 2010). This is precisely why the *Porter* inquiry is focused on the effect that the mitigating evidence might have had on the sentencing jury, rather than the presiding habeas court. *Porter*, 558 U.S. at 37-38. *See also Raygoza v. Hulick*, 474 F.3d 958, 964 (7th Cir. 2007) ("The fact that [*Strickland*] inquiry must be objective" means that in cases "where the original state trial judge also presided over the post-conviction proceeding…we cannot accept as conclusive the judge's statement that the new evidence would not have made a difference to the outcome of the case"). The proper inquiry was thus not whether "the



Appellate Case: 15-3160 Page: 92 Date Filed: 11/17/2017 Entry ID: 4602011

court wanted to reverse its position" based on Dr. Amador's testimony, but what effect that expert evidence might have had on Nelson's jury.

Second, the court's candid interjection strongly suggests that, despite this Court's remand order, it never intended to conduct the type of "full-blown hearing" necessary to properly apply the *Strickland* standard to Appellant's IAC claims. The court implied it had already pre-judged Appellant's claims and was not going to "reverse its position," regardless of the evidence adduced at the hearing. Indeed, the court's flawed application of the *Strickland* standard appears to be symptomatic of its prejudgment of this case.

d. Leslie Lebowitz, Ph.D.

Dr. Lebowitz is a clinical psychologist with a particular expertise in the effects of complex trauma on psychological development and behavior. She provided extensive testimony regarding the sustained abuse and neglect inflicted on Appellant and the manner in which it impacted him. Her testimony was not challenged and the Government elected not to cross-examine her.

Dr. Lebowitz testified that Appellant "experienced the most severe kind of trauma, which is chronic, severe developmental trauma." HT



Appellate Case: 15-3160 Page: 93 Date Filed: 11/17/2017 Entry ID: 4602011

535. As a result of the “onslaught of horrifying life experiences” inflicted upon Appellant, “every single developing system in his self, his emotional system, his cognitive system, his biological system, his capacity to attach, all of those fundamental systems [were] under continuous and relentless assault from the violence.” HT 538-39. As Dr. Lebowitz explained, “[t]he problem with Mr. Nelson’s life is that it was a continuous, relentless barrage of trauma and neglect, and the ubiquity of what happened, the variety of what happened, the utter lack of rescue or protection and the amount of time, the slough of development over which these experiences happened create a kind of toxic load that is qualitatively unlike other things.” HT 546-47. This was happening “during the period of life in which his brain [was] under the most rapid period of development in which [he was] growing more neuro connections than [he was] losing.” HT 538. As a result, the parts of the brain and of the psychological developmental process that are involved in inhibiting impulses and regulating behavior were damaged. HT 545-46.

Dr. Lebowitz’s testimony was significant precisely because it highlighted that much of the psychological damage that was done to



Appellate Case: 15-3160 Page: 94 Date Filed: 11/17/2017 Entry ID: 4602011

Nelson occurred at a time when he was utterly defenseless; he did not choose to be beaten as an infant or sexually assaulted as a child. Moreover, Dr. Lebowitz's testimony illuminated how the relentless abuse and neglect that Nelson experienced in his formative developmental years had far-reaching impacts into Nelson's ability to regulate his behavior and control his impulses as an adult. A205-06. ("While change and growth occur over the course of the lifecycle, the foundations of the self are constructed in childhood and adolescence and this period is our most permeable and vulnerable time of life. Harm that occurs here affects everything that comes after. The type of maltreatment [suffered by Nelson] affects all aspects of experience and functioning, from the basic biology and reactivity of the body, to feeling, to higher order thinking and to all aspects of behavior."). The district court failed to consider the effect that this expert evidence might have had on the jury, especially in a case such as this where the notion that childhood trauma can significantly impair one's behavior cognition and behavior as an adult was central to the mitigation case.



Appellate Case: 15-3160 Page: 95 Date Filed: 11/17/2017 Entry ID: 4602011

e. Daniel Martell, Ph.D.

The district court wholly credited Dr. Martell's testimony that Nelson's brain damage did not "play[] a significant role in him committing the crime." 97 F. Supp. 3d at 1146. Contrary to *Porter,* however, the court failed to assess how the *balance* of the evidence adduced at the hearing might have affected the jury. Indeed, as Dr. Martell himself acknowledged, Nelson's case was one of "convergent validity," meaning all of the neuropsychological testing, brain imaging, medical records, and social history evidence independently came to the same conclusion, that Nelson has significant frontal lobe damage. HT 673-74. Stated differently, the overwhelming weight of the evidence proved that Nelson has pronounced damage to the area of the brain responsible for planning, decision-making, impulsivity and regulation of behavior.

The *Porter* error here is particularly egregious because not only was Dr. Martell the outlier in terms of his opinion—every other expert opined that Nelson's significant brain damage impaired his judgment, behavior, and impulsivity—but his testimony was thoroughly impeached, and the court failed to assess how that might have impacted



Appellate Case: 15-3160 Page: 96 Date Filed: 11/17/2017 Entry ID: 4602011

the jury.

As other courts have noted, Dr. Martell has "a perceptible habit of not reporting objective findings that detract[] from his ultimate conclusions." *Allen v. United States*, 2014 WL 2882495 at *104 (E.D. Mo. 6/25/14). That reputation was confirmed at Appellant's hearing. For example, Dr. Martell administered three different instruments that measure frontal lobe performance and test for impairments in impulsivity and inhibition: the Stroop Test, the Trail-Making B Test, and the FrSBE (Frontal System Behavior Examination). HT 674-91. In his report, Dr. Martell benignly described Nelson's performance on these tests as demonstrating "mild impairment." P54 at 37-38. On cross-examination, however, Dr. Martell was confronted with the "objective findings" of his own testing that he omitted from his report, which painted a much different picture about the extent of Nelson's impairments.

Specifically, Dr. Martell recorded in his raw data the "T-Score" that Nelson achieved on each test. A T-Score is what allows the examiner to compare an individual's performance on a standardized test to that of the population as a whole. In a standard distribution of



Appellate Case: 15-3160 Page: 97 Date Filed: 11/17/2017 Entry ID: 4602011

the population, which is represented by a "bell curve," a T-Score of 50 represents the average, or the mean (HT 652) – i.e., the center of the bell curve (indicated by the red arrows below):




**EXH. P88**

The area underneath the curve shows the percentage of the population that falls within that range; thus, the mean—the middle of the bell curve—represents roughly 68% of the population. HT 652.

People who function below the mean fall on the left side of the bell curve. The metric for defining distance from the mean—i.e., how far one

is from the center of the bell curve—is called standard deviation. HT 567-69.

For T-Scores, standard deviation is measured in increments of 10. Thus, a T-Score of 40 is one standard deviation below the mean (50-10=40):




**EXH. P88**

Similarly, a T-Score of 30 is two standard deviations below the mean; a T-Score of 20 is three standard deviations below the mean, etc. HT 677, 679. The more standard deviations below the mean one is, the more deficient one's performance is relative to the rest of the population. *Id.*

A person whose performance is two standard deviations from the mean is in the bottom 2% of the population. HT 652-53. A person who is three standard deviations from the mean is in the bottom .13% of the population; 99.8% of the population performs better. HT 653.

On the Stroop test, Martell recorded that Nelson received a T-Score of 22 on the Color-Word portion of the Stroop (indicated by the red arrow):




**EXH. P86 at 20**

A T-Score of 22 is almost three standard deviations below the mean:




**EXH. P88**

Nelson's T-score, which put him at the tail end of the bell curve, placed him in the *bottom 1% of the population* in terms of his functioning.[25]

---

[25] Although Dr. Martell adopted the questioner's assertion at the hearing that the test results on the Color-Word portion of the Stroop were two standard deviations below the mean (HT 676), the actual T-Score was 22 (A392), which is nearly three standard deviations below the mean. HT 651-53. *See also* Muriel D. Lezak et al., Neuropsychological Assessment 166-67 (5th ed. 2012); *id.* at 416-18 (discussing Stroop test).

On the Trail-Making B Test, Dr. Martell recorded a T-Score of 32:




**EXH. P86 at 15**

Nelson's T-Score was nearly *two standard deviations* below the mean, placing him at about the *bottom 2% of the population* in terms of his functioning. HT 678-79. Similarly, Nelson's results on the FrSBE were more than *three standard deviations* below the mean, placing him in the *bottom 1% of the population* in terms of his functioning. HT 679-81.

Dr. Martell's raw data told a story that was very different than his retained expert opinion. Indeed, no less than the Supreme Court has recognized that results such as these on the Stroop Test and Trail-Making B Test constitute powerful mitigation in a capital case. *See Sears v. Upton*, 561 U.S. 945, 950 (2010) (*per curiam*) (noting that capital petitioner's scores on Stroop Test and Trail-Making B Test, placing him in the bottom first percentile, was "clear and compelling

evidence" of "pronounced frontal lobe pathology"). Yet Dr. Martell consistently failed to report his objective findings: that *every* test he administered to assess Nelson's frontal lobe functioning—which regulates behavior and controls impulses and inhibition—showed significantly pronounced dysfunction that placed Nelson at the very bottom of the population.

Dr. Martell was impeached on several other occasions on cross-examination. At one point, he suggested that Nelson's average I.Q. score undermined the conclusion that he had frontal lobe problems. HT 670. He quickly retreated once he was confronted with his sworn testimony in another proceeding where he (correctly) testified that IQ tests do not detect frontal lobe damage, so one can have both normal IQ and "massive injury" to the frontal lobes. HT 670-72.[26]

Dr. Martell was also cross-examined about his disagreement with Dr. Amador about whether Nelson suffered from psychosis. Dr. Amador's opinion was partly based on Nelson's consistent experience of

---

[26] As another court has observed, Dr. Martell's opinion appears to be dictated based on which party has retained him: "Dr. Martell's testing practices and his testimony clearly demonstrate consistent bias in reporting scores and the importance of cross-examination in exposing incredible testimony." *Allen*, 2014 WL 2882495 at *109.



Appellate Case: 15-3160 Page: 103 Date Filed: 11/17/2017 Entry ID: 4602011

tactile hallucinations, i.e., that someone was poking him in his back, even though nobody else was present. Dr. Martell opined that Nelson merely had a dermatological disorder. HT 644. When confronted with two medical reports showing Nelson had no such dermatological disorder, Dr. Martell's basis for disputing Dr. Amador's diagnosis was impeached. HT 658-61.

Most damning of all, Nelson introduced into evidence Dr. Martell's reports from two other capital cases, *Fields v. USA* (P84)[27] and *Allen v. USA* (P85),[28] where he administered the same battery of tests that he

---

[27] Over several days, Fields tracked a married couple that was camping. One night, he hid near their campsite and waited until it grew dark. Wearing a homemade ghillie suit (a covering for head and body made to resemble underbrush that Fields referred to as his sniper suit) and carrying a camouflaged and powerfully scoped rifle, he watched the couple for 20 minutes as they sat at a table. From his sniper location, he shot the husband in the face. As the wife ran toward the couple's van, Fields fired a bullet that tore through her foot. As she reached the passenger door, Fields shot her in the side of her head. He then ran out to her and shot her in the back of the head. He then returned to the table and shot the husband a second time in the head. Fields left the campsite and returned hours later to rummage through the van and steal items. *United States v. Fields*, 516 F.3d 923, 927 (10th Cir. 2008).

[28] Allen was convicted of killing a security guard during an armed bank robbery. He and a co-defendant planned the robbery after studying movies depicting assault-style takeover armed bank robberies. They obtained a Russian SKS semiautomatic assault rifle, a Chinese SKS semiautomatic assault rifle, a twelve-gauge shotgun, and



Appellate Case: 15-3160 Page: 104 Date Filed: 11/17/2017 Entry ID: 4602011

had to Nelson. In each case, Dr. Martell opined that the defendants' scores established "profound" and "severe" frontal lobe deficits such that their cognition and behavior was necessarily impaired at the time of the offense. A451-53, A456-57, A434-35, A438-40. Yet Dr. Martell refused to draw the same conclusion here, despite Nelson's scores being equal to or *worse* than those defendants.'[29] Moreover, in *Allen*, Dr. Martell noted that there was "a wealth of scientific literature" that explained how Allen's brain impairments and life experiences—which included "physical abuse, neglect, and abandonment in the home" that was strikingly similar to Nelson's—were "connect[ed]…to the very outcomes that he had experienced in life up to and including the instant offense itself[.]" A439-40. Notably, Dr. Martell brought none of this "wealth of scientific literature" to bear on Nelson's case.

---

approximately two hundred rounds of ammunition. The night before the robbery, they stole two vans for use as the first two getaway vehicles after the robbery, with a third car of their own to be used as the last getaway vehicle. *United States v. Allen*, 247 F.3d 741, 756 (8th Cir. 2001).

[29] Notably, Dr. Martell chastised an expert in *Fields* for minimizing the defendant's impairments and exaggerating his functioning in the face of clear neuropsychological data to the contrary. A452-54.

Dr. Martell demonstrated a consistent bias in this case. He failed to report objective findings that undermined his opinion; committed errors in his scoring of tests that overstated Nelson's abilities; was caught giving misleading testimony; and displayed a willingness to shade his testimony to favor the party that had retained him. "This, together with Dr. Martell's consistent errors and failure to report results detrimental to his goals, drives a stake into the heart of Dr. Martell's credibility." *Allen*, 2014 WL 2882495 at *107.

### C. Had the jury heard the mitigation evidence presented at the § 2255 hearing, there is a reasonable probability that at least one juror would have struck a different balance.

The prejudice inquiry requires a showing that, but for counsel's errors, "there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537. This "do[es] not require a defendant to show 'that counsel's deficient conduct more likely than not altered the outcome' of his penalty proceeding, but rather that he establish 'a probability sufficient to undermine confidence in [that] outcome.'" *Porter*, 558 U.S. at 44 (quoting *Strickland*, 466 U.S. at 693-94). Prejudice may be found even where "counsel presented what could be described as a superficially reasonable

mitigation theory during the penalty phase." *Sears*, 561 U.S. at 954.

In conducting the prejudice analysis, the court cannot look at individual pieces of mitigation evidence in isolation to determine whether that evidence on its own establishes a reasonable probability of a different outcome; rather, the court must "evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding." *Williams,* 529 U.S. at 397.

Here, *Strickland* prejudice is established because the totality of the evidence would have: (1) corrected or rebutted an assumption of which the jury was inaccurately led to believe during sentencing, *see Griffin*, 622 F.3d at 845; *Johnson*, 544 F.3d at 603-04; (2) provided details of a period of Nelson's life referenced only in passing during the trial, *see Sowell v. Anderson*, 663 F.3d 783, 789 (6th Cir. 2011); *Neal v. Puckett*, 286 F.3d 230, 243-44 (5th Cir. 2002) (*en banc*); and (3) demonstrated mitigating factors not presented at trial and not known to the jury, *see Foust v. Houk*, 655 F.3d 524, 539-46 (6th Cir. 2011); *Williams v. Allen*, 458 F.3d 1233, 1245 (11th Cir. 2006); *Robinson v. Moore*, 300 F.3d 1320, 1347 (11th Cir. 2002).



Appellate Case: 15-3160 Page: 107 Date Filed: 11/17/2017 Entry ID: 4602011

1. Inaccurate assumptions

a. Brain damage

Trial counsel affirmatively *misled* the jury into believing that Nelson did not suffer from brain damage, and that his criminal conduct was the result of "choices" that he made, rather than the actions of a man suffering from psychosis and severe damage in the parts of his brain responsible for regulating his impulses and behavior. For example, in his opening statement, trial counsel told the jury:

> Keith Nelson was four pounds five ounces when he was born. He was in respiratory distress and they took him to Children's Mercy Hospital and he spent a month in the hospital *and he recovered just fine.*

TT 38. In fact, Nelson did *not* recover just fine. As the evidence adduced at the § 2255 hearing established, the contemporaneous birth records indicated that he had bleeding in his brain. HT 519. During his emergency transport to Children's Mercy Hospital immediately after his birth, Nelson stopped breathing several times, and he suffered such a severe deprivation of oxygen that his infant body and limbs turned blue because of the lack of oxygen in his blood. HT 522-23. Far from "recovering just fine," the tremendous amount of stress placed on his

infant brain by the bleeding and lack of oxygen had lasting effects on the organic structures of Nelson's brain—in particular the frontal lobes, which are key to regulating behavior and impulse control. HT 434-35, 520, 583. The jury, however, never learned this crucial information, and trial counsel's statement undoubtedly left it with the false impression that Nelson was not a person who suffered from any brain damage or mental health problems.

Trial counsel compounded this problem in closing arguments by stating that Nelson "chose to kill Pamela Butler." TT 1135. Counsel's decision to make the case about Nelson's "choices" was something the Government immediately seized upon and exploited in closing arguments. *See* TT 1155-56 ("This case is about choices.") As the Government compellingly argued to the jury, what Nelson's "choice" revealed was that he was a "rotten human being" who was "evil at his core." TT 1158, 1161.

Had trial counsel presented the jury with the readily available evidence of Nelson's brain damage and mental illness, it would have been able to marshal powerful and compelling expert evidence that Nelson suffered from profound mental impairments

over which he had no control, and that these impairments directly affected his ability to engage in rational decision-making and regulate his conduct. Nelson was not a person who "chose" to do evil; he was someone with significant mental deficits that directly impaired his cognition and behavior. There is a reasonable probability that at least one juror might have found this evidence sufficiently reduced his moral culpability such that it warranted a sentence of life imprisonment without possibility of release, rather than death. As the Tenth Circuit explained in a capital § 2255 case,

> evidence of mental impairments "is exactly the sort of evidence that garners the most sympathy from jurors," *Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir. 2004), and that this is especially true of evidence of organic brain damage, *see Littlejohn* [*v. Trammell*, 704 F.3d 817, 864 (10th Cir. 2013)] ("Evidence of organic mental deficits ranks among the most powerful types of mitigation evidence available."). Organic brain damage is so compelling . . . because "the involuntary physical alteration of brain structures, with its attendant effects on behavior, tends to diminish moral culpability, altering the causal relationship between impulse and action." *Hooks* [*v. Workman*, 689 F.3d 1148, 1205 (10th Cir. 32012)].

*United States v. Barrett*, 797 F.3d 1207, 1231 (10th Cir. 2015).

b. Twin brother

Nelson had a twin brother, Kenneth. The Government argued that the fact that Kenneth went on to live a productive life despite growing up in the same dysfunctional home as Nelson proved that Nelson could have made the same choice, but instead pursued a life of crime. *See, e.g.*, TT 1124 ("His twin brother, who was raised in the same environment, has turned into a productive member of the United States Army. He's made the right decisions. This defendant decided to live a life of crime and he's going to have to deal with those consequences.")[30] This was a compelling "common sense" argument—and one which trial counsel could have effectively rebutted with readily available evidence.

Nelson's medical records refuted the idea that he and his twin entered the world on equal footing. Nelson faced significant health complications at birth, which his twin avoided, that had lasting impacts on his brain development. The resulting brain damage not only

---

[30] *See also* TT 1156 ("His brothers and sisters were raised in the same environment or his brothers, excuse me, in the same environment as he was. Regardless of what their intellectual capacities were, maybe they were smarter, maybe they were quicker, but they chose, they chose not to kill a ten-year-old girl. Hold him responsible for his actions by imposing the only appropriate sentence in this case, and that is a sentence of death. To not do so not only denigrates the victim Pamela Butler, it denigrates his brothers in the sense they've done right[.]").



Appellate Case: 15-3160 Page: 111 Date Filed: 11/17/2017 Entry ID: 4602011

distinguished Nelson from his twin in terms of innate cognitive strengths, it also affected the way they were treated by family and peers as early as infancy. For example, Nelson's health issues made him colicky; unable to deal with his crying baby, Kenneth Morse would resort to pouring beer down his infant son's throat, and tying a belt around his infant son's legs and swinging him around the room, hitting his head on the wall and furniture. A201. Nelson's innate vulnerabilities had cascading effects that led him to be singled out for more egregious abuse than his brothers were at home, at school, and in society. A83, A201. As Dr. Lebowitz explained:

> Within his sibling group, Keith seems particularly disadvantaged. His birth order insured that he was exposed to abuse from both his father and his disturbed older brother, as well as myriad babysitters. Further, his vulnerabilities and impairments increased the probability that within his family he would be targeted for higher levels of abuse. At the same time, these same impairments reduced the likelihood of finding success outside the home, (as compared to his twin, Kenneth, who was not cognitively impaired and more able to function successfully in school and later in work). Keith was sickly and developmentally delayed from the outset, reducing the possibility of developing a more functional adaptation.

A205.

The Government's claim that the two brothers had the same

upbringing and opportunities in life was demonstrably false. But for trial counsel's deficient performance, the jury would have understood that Nelson's life trajectory should not be measured against his twin; the two boys had innately different cognitive abilities, and Nelson suffered egregious physical and sexual abuse that his twin avoided. *Cf. Simmons*, 299 F.3d at 938 ("There was no evidence to suggest that [petitioner's] brother was beaten as consistently or severely as [petitioner], nor was there evidence to suggest that [petitioner's] brother was sexually abused during childhood.").

c. Domestic abuse

What little information the jury learned at the penalty-phase regarding the domestic violence perpetrated by Nelson's father, Kenneth Morse, was refuted at trial by Kenneth himself. He took the stand and flatly denied nearly every allegation made about his frequent and severe beatings of Nelson and his mother, Nancy. With no independent corroboration of any of these instances of abuse, the jury was allowed to believe the Government's argument that the defense had exaggerated what went on in the Nelson home. *See*, *e.g.,* TT 1157.

For example, Nancy testified that when she was pregnant with



Appellate Case: 15-3160 Page: 113 Date Filed: 11/17/2017 Entry ID: 4602011

her son, Paul, Kenneth Morse threw her to the ground and beat and stomped on her so severely that she lost her spleen. TT 618-20. Under oath, Kenneth Morse denied this ever happened. TT 1065-66. Had trial counsel obtained Nancy's medical records, they could have corroborated her account; contemporaneous evidence showed she did, in fact, undergo a splenectomy in October of 1975, while she was pregnant with Paul:


CASE NO.
NANCY NELSON
PATIENT'S NAME
ADDRESS ~~3136 No 12~~
INSURANCE
DATE 7-27-73
TEL. NO. 321-8491 REFERRED BY Janet Colston
AGE SEX S.M.W.D.
1-29-56
Menst. 12-4 6 pads 1 heavy day - no cramps
Past - asthma age 7 - splenectomy - Indianapolis Oct 1975
allergies - chocolate
Fx R. ankle 1968
Norm. wt. Ht. 63" Max wt 238 - 1972

**EXH. 47 at 2**

Such evidence would have destroyed Kenneth Morse's credibility; had he been exposed as lying on the stand, the jury likely would have disbelieved his other denials, and rejected the Government's suggestion that the abuse perpetrated by Kenneth was exaggerated. Moreover, such a richly corroborated depiction of the domestic violence that Appellant suffered would have made for a more compelling mitigating presentation. *Simmons*, 299 F.3d at 939 ("a vivid description of [the

defendant's] poverty stricken childhood, particularly the physical abuse, and the assault…, may have influenced the jury's assessment of his moral culpability.")

d. Rebutting aggravators

Evidence of Nelson's severe mental impairments would have rebutted three key elements of the Government's case that were unanimously found by the jury:

(1) that Appellant "intentionally killed" the victim, thus satisfying the mental state requirement under 18 U.S.C. § 3591(a)(2);

(2) the statutory aggravating factor that the offense was committed after substantial planning and premeditation; and

(3) the non-statutory aggravating factor that Appellant would be a future danger.

First, Dr. Amador's expert opinion specifically rebutted the mental state factor. He opined that at the time of the offense, Nelson was in a dissociative state, that his capacity to appreciate the wrongfulness of his conduct was impaired, and that he committed the offense under severe mental and emotional disturbance.

Second, as every expert (including the Government's) agreed,

Nelson has damage to his frontal lobes and exhibits severe deficits in his executive functioning. Such evidence would have rebutted the "substantial planning and premeditation" aggravating factor because these deficits directly impaired his capacity to engage in rational planning and inhibit impulsivity. Indeed, Dr. Gelbort specifically opined that Appellant's behavior during the offense was entirely consistent with frontal lobe dysfunction and exhibited abnormal disinhibition and impulsivity, rather than planning.

Finally, the evidence developed at the hearing also rebutted the claim that Appellant would be a future danger in prison. As Dr. Gur opined, empirical evidence established that someone with Appellant's impairments would "respond well to structured environments, where the complexity of the surrounding and need for decision-making is reduced." A146-47.

Had the jury been presented with this evidence, there is a reasonable probability that at least one juror would have rejected these factors and would have struck a different balance. *See Rompilla v. Beard*, 545 U.S. 374 (2005) (counsel ineffective for failing to investigate mitigation that would have rebutted aggravators).

2. Mitigation that was only superficially mentioned

a. Juvenile incarceration

For nearly a decade of his life from early adolescence to young adulthood, Nelson was socialized by institutions of incarceration. Although the jury heard that he had been incarcerated multiple times as a youth, it was given no context for that information, other than it demonstrated early delinquency. In fact, Nelson was exposed to a number of traumatic incidents at these institutions, including physical and sexual assault, and engaged in a pattern of self-harm (including multiple suicide attempts). None of this information was presented to the jury.

When he was 14 years old, Nelson was sent to the Texas Youth Commission ("TYC"). TYC had a notorious history. Prior civil rights litigation had found numerous abuses in TYC facilities, including the physical abuse of juvenile inmates, use of tear gas and chemical crowd-control devices without limitation and at discretion of staff, racial segregation, withholding or neglecting to provide psychiatric services, and employment of staff whose personalities, backgrounds, or lack of qualifications made them likely to harm the individuals in their care.

A308. These lawsuits described the physical abuse of new boys (called "fresh fish"), uninformed assignments to homosexual (called "punk") dormitories, incident reports deliberately falsified to protect correctional officers, and the jargon used to describe specific forms of brutality (such as the "peel," in which boys were forced to bend over and then struck hard on the back). *Id.* Despite a settlement agreement in 1983, reports of sexual abuse and employee physical abuse continued well into the 21st century: in 2004, a former TYC Inspector published his account of these abuses under the provocative title *Raped by the State*, and in February of 2007, the Texas legislature filed Senate Bill 103, stating that "[r]esearch has shown that many of the youth incarcerated within the Texas Youth Commission were physically abused by employees." A308-09. Indeed, one of the psychologists who belatedly examined Nelson for trial counsel noted in his report that it was Nelson's "misfortune to be confined as a juvenile in Texas facilities. The Texas Department of Corrections was performing experimental frontal lobotomies on Conduct Disordered (Antisocial) teenagers as recently as the late 1960's as an experimental form of 'treatment.'" A308.

Nelson was placed at TYC Gainesville in a unit with 48 residents

and only two staff. A100. Riots were frequent, residents fought each other constantly, and staff struggled to impose any sort of control. *Id.* Standing only 5' 3" and weighing 155 lbs., Nelson became a frequent target of abuse. A99, A101. He was repeatedly raped by older residents in his unit. A101. He also witnessed other residents being sexually assaulted. *Id.* Nelson was frequently threatened by his peers, and was in fact physically assaulted numerous times. *Id.* Medical records document bruising and swelling on his face and around his left eye, and injuries to his nose, upper chest, and the back of his head. A101-02. He pleaded with staff to be put in isolation and separated from the other residents. A101. Staff, however, frequently had to put Nelson in restraints while in isolation to prevent him from injuring himself; on various occasions, he attempted to slash his wrists with a Coke can, the teeth from a comb, and his own fingernails. *Id.*[31] When Nelson was released from TYC after four months, the injuries to his face and left eye were still visible, as captured in this photo that his mother took

[31] A month prior to entering TYC, Nelson was placed in juvenile detention in Tarrant County. Upon admission, authorities noted that there were scars and cuts on his left forearm, and was listed as suicidal on several special room observation reports. A98. He would also hit himself in the face, causing a nosebleed, and then write on the walls or floor in his own blood. *Id.* He was also beaten by adult guards. A201.

when she picked him up in her car that day:



**EXH. P76 at 2**

Although clearly traumatized by his detention at TYC, Nelson never received any counseling or treatment. He shuttled back and forth between his dysfunctional home and other juvenile institutions. A102-08. At one point, his mother sent him to stay with his father in Kansas City, which was an equally toxic environment; Nelson's father would frequently abuse drugs and cuss at and beat Nelson's elderly and ailing grandmother. A108. Nelson, still just a child, was depressed and powerless. *Id.* One day he went down to the train yards and tried to kill himself by jumping in front of a moving train, but a railroad detective

intervened and brought Nelson back home. *Id.*

After returning to Texas, Nelson again found himself in and out of juvenile detention. One of those placements was at Boonville, a facility broken down into units of 200 boys each, with only two correctional officers per unit. A111. There was a great deal of racial tension, and staff pitted the races against each other. *Id.* As a young, small white resident, he was frequently singled out for abuse, which not only included beatings–medical records from his stay noted that he had sustained injuries to the head and face–but also sexual assault. A111-12.

Jill Miller's and Dr. Lebowitz's reports document the full history of Nelson's juvenile incarcerations, including numerous other incidents of abuse and self-harm that Nelson endured while incarcerated as a juvenile. A55-142, A189-213. That information, developed from records and witnesses readily available to trial counsel, tells a much different story than that of an incorrigible delinquent who could not reform himself. Rather, he was a small and frightened child who was repeatedly forced—but unable—to defend himself against older residents who beat and raped him. Powerless and incapable of



Appellate Case: 15-3160 Page: 121 Date Filed: 11/17/2017 Entry ID: 4602011

processing this relentless abuse, he frequently tried to injure himself as a way to get into protective custody and greater safety. A201-02. However, even in isolation Nelson was tormented by the abuse he suffered, as evidenced by his multiple attempts to take his own life. A290-91.

b. Morse side of family

Although the jury was provided some evidence regarding Nelson's upbringing, the focus was primarily on the difficulties that his mother, Nancy, faced during those years. Trial counsel completely failed to investigate the paternal (Morse) side of Nelson's family and present any of the following information.

Kenneth Morse was one of 14 siblings born into immense poverty. His entire family lived in a two-room shack without running electricity or water, and the older children would help feed the family by hunting and fishing for their food. A61. From a young age, he was described by his siblings as "unbalanced" and "strange." *Id.* He would have "fits," during which he would pull his hair, bang his head on the walls, the floor, or rocks, and bite and pinch himself until he bled. *Id.* He also ate "aspirin like it was candy," and would sneak into a nearby chicken coop

to eat the feces of the chickens. A62. When he was ten years old, he attacked his 7-year old brother with an ax and cut off his brother's toe. *Id.* He was also reportedly cruel toward animals. *Id.* As he grew older, he became increasingly violent; at age 17, he raped a 13-year old girl. A63. A year later, he attempted to rape a 7-year old girl. *Id.*

These details about Kenneth Morse were critical to understanding Nelson's upbringing because they corroborated the otherwise unsubstantiated accounts about Kenneth's menacing, violent, and erratic behavior in the Nelson home. Moreover, such information lent support to the notion that Kenneth himself was mentally ill; numerous family members acknowledged that he displayed symptoms of schizophrenia, including acting delusional and paranoid. A65.

Kenneth, however, was far from the only member of the Morse family who exhibited signs of mental illness. His brother, Fred (who he had attacked with an ax), had episodes of delusions, which primarily consisted of seeing and hearing their dead brother, Charlie. *Id.* On one occasion, Fred was found in the woods with a gun, claiming to have seen and heard Charlie, and was taken into custody and hospitalized. *Id.* Kenneth's brother, Milas, and his sisters, Beth and Evelyn, suffer from

depression and other mental health problems. A63-65. Kenneth also has at least one nephew and three nieces that have been diagnosed with mental illnesses, including schizophrenia, psychosis, paranoia, and depression. A64-66. There is also rampant incest in the Morse family: Kenneth's brother, Milas, received an 18-year sentence for raping his 4-year old great granddaughter; Kenneth's nephew, Milas Jr., is alleged to have raped all three of his own children; and Kenneth's nephew, Chester, raped his 13-year old daughter. A63-65.

Evidence of pervasive mental illness in the Morse family would have been powerful mitigating evidence. It would have demonstrated to the jury that Nelson was genetically vulnerable and predisposed to mental illness; in conjunction with Dr. Amador's expert testimony, the jury could have been given a credible and compelling understanding of the nature of Nelson's mental illness, and the extent to which his psychosis and cognitive dysfunction was inherited and interfered with his ability to appreciate the wrongfulness of his conduct.



Appellate Case: 15-3160 Page: 124 Date Filed: 11/17/2017 Entry ID: 4602011

### 3. Mitigating factors not presented at trial

#### a. Childhood rape

The jury heard no evidence of Nelson's repeated sexual assaults he endured as a child.[32] In addition to the rapes he endured in juvenile detention facilities, there was evidence that Nelson was sexually victimized on other occasions. When he was about 7 or 8, he was reportedly molested by one of his mother's boyfriends, who would occasionally babysit the Nelson boys while their mom was at work. A80. While living in a violent apartment complex in California, he was raped by an older man who anally penetrated him and forced him to perform oral sex. A75. Evidence of childhood sexual assault has long been recognized to be powerful mitigating evidence. *See Wiggins*, 539 U.S. at 534- 35 (2003) (describing as "powerful" the mitigating evidence that counsel failed to find, which included "repeated rape during his . . . years in foster care"); *Wharton v. Chappell*, 765 F.3d 953, 977 (9th Cir. 2014) ("Childhood sexual abuse can be powerful evidence in mitigation, particularly when it is not an isolated event."). As the Supreme Court

[32] Although Steven Nelson testified that a female babysitter played "doctor" with the Nelson boys and had them put a popsicle stick in her vagina, TT 873, there was no evidence presented of sexual assault against Appellant.

has noted, "[r]ape has a permanent psychological, emotional, and sometimes physical impact on the child. We cannot dismiss the years of long anguish that must be endured by the victim." *Kennedy v. Louisiana*, 554 U.S. 407, 435 (2008) (internal citation omitted). Indeed, courts have long held that a failure to investigate and present evidence of childhood sexual assault constitutes deficient performance because such evidence is uniquely compelling to capital sentencing juries. *See, e.g., Wiggins*, *supra* at 534-35; *Doe v. Ayers*, 782 F.3d 425, 455 (9th Cir. 2015) (evidence of brutal and repeated rape of the defendant in prison when he was 17-years old "alone would have stirred sufficient compassion or understanding in the jury to result in a life sentence"); *Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005) ( "the family history of sexual abuse [the petitioner] had known about growing up[] is the sort of evidence that could persuade a jury to be lenient").

In addition to evoking sympathy for the terror Nelson endured, such evidence would have contextualized his subsequent criminal behavior. The devastating and life-long effects of childhood sexual assault are well-known:

> The deep problems that afflict child-rape victims often become society's problems as well.

> Commentators have noted correlations between childhood sexual abuse and later problems such as substance abuse, dangerous sexual behaviors or dysfunction, inability to relate to others on an interpersonal level, and psychiatric illness. Victims of child rape are nearly 5 times more likely than nonvictims to be arrested for sex crimes and nearly 30 times more likely to be arrested for prostitution.

*Kennedy*, 544 U.S. at 468-69 (Alito, J., dissenting).

Tragically, one of the lasting effects of childhood sexual abuse is that victims are more likely themselves to perpetrate a sex crime because the abuse inappropriately shapes the child's sexual development. A204; Finkelhor, D. and Browne, A., *The Traumatic Impact of Child Sexual Abuse: A Conceptualization*, American Journal of Orthopsychiatry, 55: 530-541 (1985).[33] Although well-documented, the fact that the victim of a childhood sexual assault is more likely to later commit that same offense strikes most as counter-intuitive; that is all the more reason why expert evidence is necessary, to help a lay jury understand the long-term psychological effects of such abuse and the

---

[33] *See also* National Center for PTSD, "Child Sexual Abuse" (noting that childhood sexual trauma can cause "out-of-place sexual behaviors that are not expected in a child . . . Children, especially boys, might 'act out' with behavior problems. This could include being cruel to others.") Available at: www.ptsd.va.gov/public/types/violence/child-sexual-abuse.asp



Appellate Case: 15-3160 Page: 127 Date Filed: 11/17/2017 Entry ID: 4602011

way it “has the capacity to disorder sexual functioning.” A204.

This was particularly important given the emphasis the Government placed on Appellant’s purported deviant sexual desires. TT 1110-11. While evidence that Nelson was repeatedly raped as a child would not have excused his later conduct, it would have given the jury a more nuanced understanding of him as a person and shed some light on otherwise unexplainable behavior. Rather than view Nelson as simply a “rotten human being,” the jury might have recognized that his behavior was part of the ongoing the tragedy of his own sexual victimization as a defenseless child.

b. Brain damage and mental illness

The jury heard none of the extensive and compelling expert evidence regarding Nelson’s brain damage, which was corroborated by a number of sources and by experts in a variety of disciplines. Even the Government’s own expert conceded that Nelson’s frontal lobe damage was so severe his executive functions operated at the bottom 1% of the population. Similarly, the jury never learned that Nelson suffered from severe mental illness to which he was not only genetically predisposed, but was also made more severe by the relentless abuse to which he was



Appellate Case: 15-3160 Page: 128 Date Filed: 11/17/2017 Entry ID: 4602011

exposed beginning in his infant years. Together, these impairments reduced the volitional nature of his behavior and lessened his moral culpability.

There is a reasonable probability that at least one juror would have a struck a different balance had this mitigation been presented at trial because evidence of organic brain damage, mental illness, and trauma "is exactly the sort of evidence that garners the most sympathy from jurors." *Wilson v. Simmons*, 536 F.3d 1064, 1085 (10th Cir. 2008) (internal quotation marks and citation omitted). *See also Littlejohn v. Trammell*, 704 F.3d 817, 864 (10th Cir. 2013) ("Evidence of organic mental deficits ranks among the most powerful types of mitigation evidence available."); *Smith*, 379 F.3d at 942 (evidence of mental illness and brain damage is especially compelling mitigation according to "available empirical evidence as to juror attitudes").

Indeed, this Court has repeatedly recognized the uniquely mitigating power of mental health evidence and granted relief where trial counsel entirely failed to present readily available evidence of a defendant's mental impairments. *See Kenley*, 937 F.2d at 1309 (failure to present evidence of emotional disturbance and psychiatric disorder



Appellate Case: 15-3160 Page: 129 Date Filed: 11/17/2017 Entry ID: 4602011

prejudicial); *Hill*, 28 F.3d at 845-46 (finding reasonable probability that jury would not have given death penalty if counsel had presented evidence of mental disorder); *Antwine*, 54 F.3d at 1368 (finding "reasonable chance that Antwine would not have been sentenced to death if counsel had effectively presented evidence of Antwine's mental impairment at the penalty phase"); *Simmons*, 299 F.3d at 939 ("had this evidence of [childhood trauma] been presented, there is a reasonable probability that at least one of the jurors would have voted against imposition of the death penalty").

4. Conclusion

At the § 2255 hearing, Nelson presented the readily available mitigation evidence that trial counsel could have presented had they investigated the "red flags" identified by predecessor counsel and followed the leads a competent investigation would have produced. The mitigation case presented to the jury at trial brooks no comparison with the vastly expanded evidence proffered at the § 2255 hearing. This included expert mental health evidence that established that Nelson is and was severely mentally ill at the time of the offense, exhibiting clear signs of psychosis and other psychiatric problems that impaired his

ability to think and act rationally. Similarly, the § 2255 evidence demonstrated that Nelson suffers from profound organic brain damage; in terms of executive functioning—that is, the set of cognitive processes that govern planning, decision-making, reasoning, and impulse control—Nelson operates in the *bottom 1%* of the population. Had such evidence been presented to the jury, it "would have served to reduce the volitional nature of the crime, as well as [Nelson's] ability to plan and act rationally, and as a result, undercut the senselessness and cold-blooded nature of the crime as stressed by the prosecutor[.]" *Ferrell*, 640 F.3d at 1235.

The § 2255 hearing also established that the trial presentation was incomplete and unreasonably omitted significant mitigating information. For example, the jury never learned that Nelson was sexually abused as a child, including being repeatedly raped and beaten while incarcerated in a notorious juvenile detention facility in Texas. Nor did it hear expert evidence about the long-term implications that such sexual and physical assault had on Nelson; in addition to providing the jury with a more nuanced understanding of his psychological, emotional, and sexual development, such evidence—

combined with the extensive expert evidence of his mental illness and brain damage—would have painted a significantly more detailed picture of Nelson's impairments and presented a more sympathetic picture of him as a person. Deprived of this more comprehensive understanding of his background, the jury was allowed to believe the Government's argument that Nelson was simply a "rotten human being" who was "evil at his core," TT 1158, 1161, rather than a person whose brutal upbringing and mental limitations evokes both a palpable measure of human sympathy and a concomitant allowance for human frailty that augurs in favor of mercy.

The "post-conviction evidence differs from that heard by the jury not only in degree but also in kind, and forms a mitigation story that bears no relation to the story the jury heard." *Johnson*, 544 F.3d at 606. Had the jury heard this more detailed and humanizing story of Nelson's life, there is a reasonable probability that at least one juror would have struck a different balance.



Appellate Case: 15-3160 Page: 132 Date Filed: 11/17/2017 Entry ID: 4602011

POINT TWO

THE DISTRICT COURT ERRED IN DENYING APPELLANT'S CLAIM THAT TRIAL COUNSEL WAS INEFFECTIVE FOR ADVISING HIM TO PLEAD GUILTY.

Prior to trial, Mr. Berrigan advised Appellant that there was no viable defense to the charges against him. He therefore counseled him to enter a guilty plea, proceed to trial only on the sentencing phase of his capital trial, and argue that his plea established an acceptance of responsibility for purposes of punishment. Because Appellant would be pleading guilty to a capital offense, that conviction would necessarily expose him to one of two mandatory sentences: death, or life imprisonment without possibility of release. Accepting his lawyer's representation that he had no defense to the charges, Appellant followed his advice and pled guilty, thereby waiving his right to a jury determination on the charges he faced.

As evidence adduced in the § 2255 proceedings made clear, the advice on which this plea was based was erroneous. Appellant did in fact have a defense to the capital charges, had his trial counsel done the necessary investigation: He could have presented an affirmative defense of insanity under 18 U.S.C. § 17. Evidence that Appellant was suffering

from a severe mental disease or defect at the time of the offense has now been established through expert testimony developed during the § 2255 proceedings. Indeed, based on that and other evidence, the district court found that trial counsel's paltry investigation into his client's mental health constituted deficient performance on several grounds.[34] *See Nelson*, 97 F. Supp. 3d at 1149 (finding counsel's "investigation and presentation of the mental health testimony to be deficient").

Mr. Berrigan's advice to plead guilty was thus not an informed strategic decision; it was made in a vacuum, without the benefit of an investigation into Appellant's mental health. As a result of counsel's erroneous advice, Appellant forfeited his right to a jury trial. Had he been properly advised of the availability of a defense, Appellant would not have entered a plea but would have availed himself of the applicable defense and gone to trial, taking a chance that he might never reach the penalty phase that his guilty plea ensured.

---

[34] Although this ruling is directly relevant to the IAC claim regarding the plea, that claim was not before the district court at the hearing; this Court remanded Appellant's case on a limited number of claims, including counsel's failure to investigate and present mental health evidence at the penalty phase proceedings, so the district court did not have jurisdiction to revisit its previous denial of the IAC claim concerning the plea.

A. Relevant procedural background

When he filed his post-conviction motion pursuant to 28 U.S.C. § 2255, Appellant sought to vacate his conviction on the ground (among others) that, in accepting a plea, he received ineffective assistance of counsel in violation of the Sixth Amendment. In its response to the § 2255 motion, the Government contended that the record plea colloquy was constitutionally sufficient, but nevertheless noted the necessity of taking evidence on the question of how Appellant reached the decision to plead and waive his trial jury rights. *Government Response to § 2255* at 46-47. The district court, however, denied Appellant's § 2255 motion in its entirety without an evidentiary hearing. The court did not specifically address Appellant's IAC claim regarding his guilty plea; it simply held that all decisions by trial counsel were strategic. The district court then summarily denied the entire § 2255 motion in a two-page order. A21-22.

Although this Court subsequently remanded this case to the district court for an evidentiary hearing, the remand did not encompass Appellant's claim that trial counsel was ineffective for advising him to plead guilty—and therefore the district court did not revisit its previous

denial of that claim. Nevertheless, evidence relevant to that claim was developed during the course of the § 2255 hearing.

Specifically, Dr. Xavier Amador, a forensic and clinical psychologist retained for the § 2255 proceedings, conducted an extensive evaluation of Appellant and testified that at the time of the offense, Appellant suffered from a severe mental disease or defect and was unable to appreciate the nature and quality or the wrongfulness of his acts. HT 443-45.[35] In other words, Appellant could establish an affirmative defense of insanity.

After taking evidence, the district court reversed itself on the question of whether trial counsel had conducted an adequate investigation into Appellant's mental health; it now found that trial counsel's investigation was, in fact, "deficient" and that trial counsel unreasonably failed "to have any other assessments conducted to assess whether Nelson suffered any brain damage, dysfunction or other cognitive impairments." *Nelson*, 97 F. Supp. 3d at 1149. Although the court ultimately denied relief, these findings and the evidence adduced

---

[35] Dr. Amador also submitted reports setting out his expert opinion on this matter. A214-51.

at the hearing are relevant to Appellant's claim that trial counsel was ineffective for advising him to plead guilty.

B. Trial counsel unreasonably failed to conduct an adequate investigation prior to advising Appellant to plead guilty.

Before deciding whether to plead guilty, a defendant is entitled to the effective assistance of competent counsel. *Lafler v. Cooper,* 556 U.S. 156, 162 (2012); *Padilla v. Kentucky*, 559 U.S. 356 (2010). Appellant's attorneys unquestionably had a duty to conduct a reasonable investigation prior to counseling him to plead guilty to a capital offense. *See, e.g., Thomas v. Lockhart*, 738 F.2d 304, 308 (8th Cir. 1984) (prior to entering plea, trial counsel "also fell short in the performance of his duty by failing to investigate the seriousness of the mental problems from which Thomas suffered"); *United States v. Mooney*, 497 F.3d 397, 404 (4th Cir. 2007) (finding deficient performance of counsel regarding plea and noting counsel has the responsibility to conduct "appropriate investigations, both factual and legal, to determine if matters of defense can be developed.") (internal citations omitted).

In *United States v. Kauffman,* 109 F.3d 186 (3d Cir. 1997), the Third Circuit reversed the district court's denial of relief in a § 2255 case where trial counsel entered a guilty plea without adequate



Appellate Case: 15-3160 Page: 137 Date Filed: 11/17/2017 Entry ID: 4602011

investigation into the client's mental health. It found that trial counsel's failure to explore the facts and law of an insanity defense was deficient even though counsel "may have found the strength of the government's case daunting…" *Id.* at 190. Instead, counsel's failure "resulted in a cursory, uniformed judgment call which deprived Kauffman of the affirmative defense of insanity and the meaningful representation which the Constitution requires." *Id.*

There is no dispute that Appellant's counsel failed to investigate his mental health, an investigation which would have revealed the factual basis for an affirmative defense to the charges against him. First, the district court explicitly found that trial counsel did not conduct an adequate mental health investigation, and that his failure to do so constituted deficient performance. *Nelson*, 97 F. Supp. 3d at 1149. This fact-finding is undisputed, and even in its recent pleadings before this Court, the Government does not contest it. *See*, *e.g.*, *Gov't Response to Appellant's Request for an Issuance of a COA* (filed 6/27/16) at 34 ("In evaluating Nelson's allegations of ineffective assistance of counsel when defense counsel Berrigan did not present mental health evidence or testimony during the penalty phase, the district court found that



Appellate Case: 15-3160 Page: 138 Date Filed: 11/17/2017 Entry ID: 4602011

counsel's performance was deficient…"); *id.* at 35 ("While the court found that Berrigan's failure to further investigate Nelson's mental health and to advise him to decline to submit to a mental health examination by a government's expert was 'strategically deficient'…"); *id.* at 48 ("Consequently, the court found that Berrigan's actions were strategically deficient, so the question then became whether Nelson suffered any prejudice as a result.").

Second, there is no plausible basis to claim that trial counsel's plea advice was strategic given this failure: Mr. Berrigan admitted that he conducted no investigation of any affirmative mental health defense for the guilt phase of trial. G112 at 105-06. *See Sowell*, 663 F.3d at 791 ("An attorney does not make a strategic decision by choosing to ignore a body of evidence, the contents of which are unknown. This is not strategy.")

Third, Mr. Berrigan testified that Appellant's decision to plead guilty was based solely on his legal advice, not on any independent desire to avoid going to trial. HT 235-36. Given these facts (and the pleadings before this Court) there is no dispute that counsel's failure to investigate Appellant's mental health constituted deficient

performance.

C. Appellant was prejudiced by counsel's omission.

In *Lee v. United States*, 137 U.S. 1958 (2017), the Supreme Court addressed the proper standard for determining whether a petitioner was prejudiced by trial counsel's advice to accept a guilty plea. There, Mr. Lee pleaded guilty to possession of ecstasy with the intent to distribute and was sentenced to a year and a day in prison. It was only after his plea that Lee, a lawful permanent resident of the United States, learned that deportation was mandatory for crimes like his. He subsequently filed a § 2255 motion alleging that when his attorney advised him to take the guilty plea and assured him that he would not be deported, he was deprived of his constitutional right to have the assistance of a competent lawyer. The Government agreed that trial counsel's performance was deficient, but it argued that Lee could not satisfy the prejudice standard because the case against him was overwhelming and he would have been convicted had he exercised his right to go to trial. The Sixth Circuit Court of Appeals agreed, holding that no rational defendant charged with a deportable offense and facing overwhelming evidence of guilt would proceed to trial rather than take



Appellate Case: 15-3160 Page: 140 Date Filed: 11/17/2017 Entry ID: 4602011

a plea deal with a shorter prison sentence. *Lee*, at 1964.

The Supreme Court reversed. Although noting that in most cases a defendant will not be able to show that he was prejudiced by taking a guilty plea when the evidence against him is overwhelming, the Court declined to enshrine that generalization in a categorical rule. As the Court acknowledged, both common sense and the Court's own case law established "that there is more to consider than simply the likelihood of success at trial." *Id.* at 1966. Instead, a defendant who is deciding whether to take a guilty plea will also consider the consequences of his conviction—after both a trial and a guilty plea. *Id.* And the fact that a defendant's odds of prevailing at trial may be very low does not control the inquiry: When the question is "what an individual defendant would have done, the possibility of even a highly improbable result"—an acquittal—"may be pertinent to the extent it would have affected his decisionmaking." *Id.* at 1967. When the consequences of a conviction "are, from the defendant's perspective, similarly dire, even the smallest chance of success at trial may look attractive. For example, a defendant with a not realistic defense to a charge carrying a 20-year sentence may nevertheless choose trial, if the prosecution's plea offer is 18 years." *Id.*



Appellate Case: 15-3160 Page: 141 Date Filed: 11/17/2017 Entry ID: 4602011

at 1966-67.

In Appellant's case, the decision to plead guilty was informed by trial counsel's ineffective representation. Like the petitioner in *Lee*, Appellant had "more to consider than simply the likelihood of success at trial" – he also had to consider the consequences of his conviction after a trial versus a guilty plea. A guilty plea to a capital count necessarily guaranteed one of two possible sentencing outcomes: life imprisonment without possibility of release, or a death sentence. Even if he "almost certainly" would have faced the very same outcome had he not pled guilty (though that has not been established here), going to trial would have given Appellant the opportunity to present an affirmative defense of insanity, and thereby at least allowed the *possibility* of a different outcome: a verdict of not guilty by reason of insanity ("NGRI"). The "possibility of even a highly improbable result"—an NGRI verdict—"may be pertinent to the extent it would have affected [Appellant's] decisionmaking." *Id.* at 1967. As the dissent in *Lee* clarified, "[t]his standard does not appear to be particularly demanding, as even a defendant who has only 'the smallest chance of success at trial'… may be able to satisfy it." *Id.* at 1974.



Appellate Case: 15-3160 Page: 142 Date Filed: 11/17/2017 Entry ID: 4602011

In fact, as the record demonstrates, the idea of pleading guilty came solely at the urging of Attorney Berrigan. G112 at 106; HT 235. Contemporaneous evidence shows that Appellant was primarily interested in contesting issues relating to the crime and unequivocally stated that the result of the punishment phase of the capital trial was irrelevant to him. 3/11/02 Transcript of Sentencing Hearing at 5-6. Given the evidence of mental impairments now credited by the district court, there is a reasonable probability that, had he been properly informed of a potential affirmative defense, Appellant would not have relinquished his only chance to contest the charges. But for trial counsel's error, there is a reasonable probability Appellant would have gone to trial rather than accept a conviction by guilty plea that guaranteed that he would either spend the rest of his life in prison, or be executed.



Appellate Case: 15-3160 Page: 143 Date Filed: 11/17/2017 Entry ID: 4602011

## CONCLUSION

For the reasons stated in Argument I, Appellant respectfully requests that this Court reverse the denial of relief pursuant to 28 U.S.C. § 2255 and order a new capital sentencing hearing. For the reasons stated in Argument II, Appellant requests that this Court reverse the denial of § 2255 relief and order a new trial, or, in the alternative, remand this matter to the district court for an evidentiary hearing and further proceedings.

Respectfully submitted this 15th day of November, 2017.

*/s/Paula K. Harms*
Jon M. Sands
Federal Public Defender
Paula K. Harms
Assistant Federal Public Defender
Capital Habeas Unit
850 W. Adams Suite 201
Phoenix, Arizona 85007
602-382-2816 telephone
602-889-3960 facsimile
Paula_Harms@fd.org

*/s/ David A. Ruhnke*
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
973-744-1000 telephone
973-746-1490 facsimile
dr@ruhnkeandbarrett.com

## CERTIFICATE OF COMPLIANCE

1. Exclusive of the portions exempted by Fed. R. App. P. 32(f), this document contains 25,864 words, according to the word count function of the Microsoft Office Word word processing software.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2010 (version 14.0.7173.5000) in 14-point font size and Century type style.

3. Pursuant to Local Rule 28A(h)(2), the undersigned certifies that the brief and addendum have been scanned for viruses and are virus-free.

/s/ Paula K. Harms
Attorney for Keith Nelson
Dated: November 15, 2017

## Certificate of Service

I hereby certify that on November 15, 2017, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/Robin Stoltze
Assistant Paralegal
Capital Habeas Unit



Appellate Case: 15-3160 Page: 146 Date Filed: 11/17/2017 Entry ID: 4602011