**No. 15-3160**
IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

Keith D. Nelson,
Appellant,

vs.

United States of America,
Appellees.

---

On Appeal from the United States District Court
for the Western District of Missouri
Case No. 4:04-8005-cv-W (FJG)

---

# ADDENDUM TO OPENING BRIEF OF APPELLANT

---


Jon M. Sands
Federal Public Defender
Paula K. Harms
Assistant Federal Public Defender
Capital Habeas Unit
850 W. Adams Suite 201
Phoenix, Arizona 85007
602-382-2816 telephone
602-889-3960 facsimile
Paula_Harms@fd.org

David A. Ruhnke
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
973-744-1000 telephone
dr@ruhnkeandbarrett.com

Counsel for Appellant Keith D. Nelson

TABLE OF CONTENTS

1. District court order denying § 2255 relief, ECF Doc. No. 61 (11/21/06)……………………………………………………………........1

2. Judgment, ECF Doc. No. 62 (11/21/06)………………...…………………3

3. Post-remand district court order denying § 2255 relief, 97 F. Supp. 3d 1131 (W.D. Mo. 3/31/15)…….…..…………………….......4

4. Post-remand Judgment, ECF Doc. No. 270 (4/7/15)……………….27

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| Keith D. Nelson, | | ) |
| | Movant, | ) |
| vs. | | ) No. 04-8005-CV-W-FJG |
| | | ) Crim. No. 99-0303-01-CR-W-FJG |
| United States of America, | | ) |
| | Respondent. | ) |

**ORDER**

Movant entered a guilty plea on October 25, 2001, and was sentenced to death on March 11, 2002. He timely filed an appeal to the Eighth Circuit Court of Appeals who subsequently issued an opinion and mandate (Doc. #475) affirming the judgement of the District Court.

Now pending before this Court is movant's motion pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence (Doc. #25), filed November 6, 2005, and motion to disqualify and recuse judge (Doc. #53), filed August 21, 2006. The Court finds that it has jurisdiction over this matter.

Movant's motion pursuant to 28 U.S.C. § 2255 (Doc. #25) to vacate the conviction and sentence imposed is hereby denied for the following reasons.

The reasons movant alleges are not meritorious and not supported by the record. The claims of ineffective assistance of trial and appellate counsel fall within the broad perimeters of trial strategy. Lockhart v. Fretwell, 506 U.S. 364 (1993). Movant's decision not to make himself available for examination by the government's mental health experts precluded the use of his mental health experts. That was a decision movant made with knowledge of the consequences. The record is clear on that point and set forth in this Court's order (Doc. #403), filed November 19, 2001. While the government has requested that movant's trial and appellate counsel submit affidavits or to a hearing to further explain their reasons for this strategy, this Court finds no further record is necessary. In all of the other respects, the Court finds the government's legal

analysis provided in opposition to the movant's motion pursuant to 28 U.S.C. § 2255 (Doc. #39) to be a thorough and accurate analysis of movant's argument and adopts it by reference hereto.

Further, the movant's motion to disqualify and recuse (Doc. #53) is hereby denied. The government's response to that motion (Doc. #56) succinctly states this Court's position. The Court adopts the government's legal analysis as its own and incorporates same by reference hereto. Since the movant was unable to raise legally sufficient arguments in this 28 U.S.C. § 2255 motion (Doc. #25), by this recusal argument he seeks an end-run to get a new trial in this matter.

Movant received a fair trial. He had the benefit of trial and appellate counsel, skilled in representing persons charged with capital offenses. I know of no trial which is error free however, there were no errors in movant's trial requiring a reversal or resentence.

**JUDGMENT**

Upon review of movant's 28 U.S.C. § 2255 motion (Doc. # 25) and the government's response (Doc. #39), the Court hereby denies movant's request to vacate, set aside or correct the sentence herein. The Court also denies movant's motion to disqualify (Doc. #53). This Court believes that the arguments set forth by the respondent (Docs. #39, #56) present a thorough legal and factual analysis and adopts respondent's analysis and conclusions as its own by reference hereto.

For the aforesaid reasons movant's motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255 (Doc. #25), filed November 6, 2005, and motion to disqualify (Doc. #53), filed August 21, 2006, are denied.

The Court further finds that the issues presented by movant are resolvable by the record and, therefore, no evidentiary hearing will be granted.

/s/Fernando J. Gaitan, Jr.
Fernando J. Gaitan, Jr.
United States District Judge

Dated: November 21, 2006
Kansas City, Missouri

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| Keith D. Nelson, | | ) |
| | Movant, | ) |
| vs. | | ) No. 04-8005-CV-W-FJG |
| | | ) Crim. No. 99-0303-01-CR-W-FJG |
| United States of America, | | ) |
| | Respondent. | ) |

**JUDGMENT IN A CIVIL CASE**

____ **Jury Verdict.** This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

_X_ **Decision by Court.** This action came before the Court. The issues have been determined and a decision has been rendered.

**IT IS ORDERED AND ADJUDGED** that

movant's motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255 (Doc. #25), filed November 6, 2005, and motion to disqualify (Doc. #53), filed August 21, 2006, are denied.

The Court further finds that the issues presented by movant are resolvable by the record and, therefore, no evidentiary hearing will be granted.

November 21, 2006
Date

Patricia L. Brune
Clerk

**/s/ Rhonda Enss**
(by) Deputy Clerk

97 F.Supp.3d 1131
United States District Court,
W.D. Missouri,
Western Division.

Keith D. NELSON, Petitioner,
v.
UNITED STATES of America, Respondent.

No. 04–8005–CV–W–FJG.
|
Signed March 31, 2015.

**Synopsis**
**Background:** After defendant's conviction for instate kidnapping resulting in death and sentence of death was affirmed, 347 F.3d 701, the District Court, Fernando J. Gaitan, Jr., J., 2007 WL 1115208, denied defendant's motion to vacate his sentence. On appeal, the United States Court of Appeals for the Eighth Circuit, 297 Fed.Appx. 563, remanded to District Court for evidentiary hearing on defendant's motion to vacate.

**Holdings:** After hearing, the District Court, Fernando J. Gaitan, Jr., J., held that:

[1] defendant's counsel was not deficient in mitigation investigation or presentation of mitigation case during penalty phase;

[2] counsel's decision to cancel mental health examination amounted to deficient performance;

[3] counsel's deficient performance in failing to present mental health evidence did not prejudice defendant; and

[4] prosecutor's statements during closing argument did not infect defendant's trial with unfairness.

Motion denied.

**Attorneys and Law Firms**

***1134** David A. Ruhnke, Ruhnke & Barrett, Montclair, NJ, Jon M. Sands, Fed. Public Defender, Paula K. Harms, Asst. Fed. Public Defender, Phoenix, AZ, Gary E. Brotherton, Legal Writes, LLC, Columbia, MO, for petitioner.

Tammy Dickinson, U.S. Atty., David M. Ketchmark, Jeffrey E. Valenti, Lajuana M. Counts, Asst. U.S. Attys., Kansas City, MO, for respondent.

## ORDER

FERNANDO J. GAITAN, JR., District Judge.

## I. BACKGROUND

On October 14, 1999, Keith Nelson was charged with interstate kidnapping resulting in death and interstate travel with intent to engage in a sexual act with a child under the age of twelve. On October 25, 2001, Nelson entered a plea of guilty to count one and proceeded to the penalty phase of the trial. On November 13, 2001, a jury was selected and trial began the following day. On November 28, 2001, the jury recommended imposition of the death penalty. On December 18, 2001, Nelson filed a Motion for a New Trial. On February 28, 2002, this Court denied Nelson's Motion for New Trial. On March 11, 2002, the Court imposed a sentence of death. Nelson filed a Notice of Appeal to the Eighth Circuit. On October 22, 2003, the Court of Appeals affirmed the conviction and sentence. The United States Supreme Court denied Nelson's petition for certiorari review on November 8, 2004. On November 10, 2004, Nelson filed a motion seeking appointment of counsel to represent him in connection with his post-conviction challenges. Counsel was appointed on December 14, 2004 and Nelson filed a § 2255 motion to set aside his conviction and sentence of death on November 6, 2005. On August 21, 2006, Nelson filed a motion to disqualify this Court from further participation in the case. On November ***1135** 21, 2006, this Court determined that no evidentiary hearing was necessary and denied Nelson's motion to disqualify and recuse and also denied Nelson's § 2255 motion to vacate, set aside or correct his sentence. Nelson then appealed the denial to the Eighth Circuit Court of Appeals.

On October 30, 2008, the Eighth Circuit Court of Appeals granted Nelson's motion for a certificate of appealability on six claims of ineffective assistance of trial and appellate counsel and remanded the case to this Court with directions to hold an evidentiary hearing on these claims

and to make findings of fact and conclusions of law concerning them. The six claims which the Eighth Circuit remanded were [1] :

A. Allegations of Trial Counsel's Constitutional Ineffectiveness:

(2) & (3) Failure to conduct adequate mitigation investigation including failure to move for a continuance to complete one.

(4) Failure to conduct adequate investigation of defendant's mental health.

(5) Advising or instructing defendant to decline to submit to a mental health examination by a government examiner.

(15) Failure to make objections:

(e) to allegedly inflammatory and improper comments in the Government's closing argument and rebuttal.

B. Allegations of Appellate Counsel's Constitutional Ineffectiveness:

(1) Failure to conduct adequate review of the trial record and the law.

(2)(c) Failure to raise on appeal the Government's allegedly improper comments in closing arguments.

The Court held an evidentiary hearing on these claims on April 14–17, 2014. The Court now makes the following Findings of Fact and Conclusions of Law.

## II. STANDARD

Our analysis of the ineffectiveness claims is governed by *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to succeed on an ineffectiveness claim, Nelson must show "both deficient performance by counsel and prejudice." *Id.* at 687–88, 104 S.Ct. 2052. In *Johnson v. U.S.,* 860 F.Supp.2d 663 (N.D.Iowa 2012), the Court stated:

> To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." *[Strickland],* 466 U.S. at 688, 104 S.Ct. 2052.... The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687, 104 S.Ct. 2052. *Harrington v. Richter,* 562 U.S. 86, 104, 131 S.Ct. 770, 787, 178 L.Ed.2d 624 (2011); *Premo v. Moore,* 562 U.S. 115, 131 S.Ct. 733, 739, 178 L.Ed.2d 649 (2011) (quoting *Richter* ). Also, the court " 'must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." ' " *King* [*v. U.S.*], 595 F.3d [844] at 852–53 [ (8th Cir.2010) ] (quoting *Ruff v. Armontrout,* 77 F.3d 265, 268 (8th Cir.1996), in turn quoting *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052). There are two substantial ***1136** impediments to making the required showing of deficient performance. First, " '[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.' " *United States v. Rice,* 449 F.3d 887, 897 (8th Cir.2006) (quoting *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052). Second, "[t]here is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " *Id.* (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052); *Davis v. Norris,* 423 F.3d 868, 877 (8th Cir.2005) ("To satisfy this prong [the movant] must overcome the strong presumption that his counsel's conduct fell within the wide range of reasonable professional assistance.")

*Id.* at 741. In *United States v. Orr,* 636 F.3d 944, 952 (8th Cir.2011), the Court stated, "strategic choices made after a thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after a less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." However, as noted in *Armstrong v. Kemna,* 534 F.3d 857, 864–65 (8th Cir.2008), "[o]n the other hand, strategic choices resulting from lack of diligence in preparation and investigation [are] not protected by the presumption in favor of counsel."

## III. DISCUSSION

### A. Failure to Conduct Adequate Mitigation Investigation Including Failure to Move for a Continuance to Complete One—Claims A(2) & (3)

#### 1. Mitigation Investigation

Susan Hunt and Bill Shull discussed the need for a mitigation investigation to investigate statutory and non-statutory mitigating factors. They also discussed gathering records. Ron Ninemire, at the direction of Larry Pace, lead the mitigation investigation. (Evid. Tr. 26)[2]. The defense team filed a motion on July 20, 2000, in order to receive additional time to prepare the mitigation case and the mental health issues. (Evid. Tr. 31–32). The trial was continued until April 23, 2001. (Evid. Hg. Ex. P26, Evid. Tr. 36). Hunt traveled to Texas and California to conduct mitigation investigation. In California, Hunt attempted to obtain records demonstrating that Nancy Nelson had lived in a battered women's shelter. Ninemire gathered records, and interviewed several people in White Settlement, Texas. (Evid. Tr. 91.) Ninemire chronicled the team's various investigative efforts and after being removed from the case because of a conflict, created a detailed letter dated September 12, 2000, which documented a to-do list of what had been done and what needed still to be done. (Evid. Tr. 88.) That letter was passed along to Bill Shull and Hunt as Nelson's remaining counsel. (Evid. Tr. 8889.). In her testimony at the evidentiary hearing, Susan Hunt said that in his letter, Mr. Ninemire's investigation found that Nelson and his brothers were physically and/or sexually abused during their formative years by their mother and men she brought into the home, that Nelson had been hospitalized immediately after his birth, and that some of his brothers suffered from schizophrenia. Furthermore, Mr. Ninemire suggested that further investigation should include a psychiatric examination of Nelson. (Evid. Tr. 113.) During his testimony, Shull stated that he was familiar with the circumstances of Nelson's birth—being the second born of twins and possibly being a fetal/alcohol ***1137** baby, as well as Nelson's sudden personality change in the ninth grade, and extended bed wetting. (Evid. Tr. 153.) Shull had knowledge that fetal alcohol syndrome could lead to neurological damage or impairments. (Evid. Tr. 154.). After Ninemire was removed from the case, defense counsel obtained the services of two different investigators, Dan Grothaus and Tim Murphy. (Evid. Tr. 49; Evid. Hrg. Exh. P38 at 79.) Grothaus was a former investigative journalist and documented his progress. (Evid. Hrg. Exh. 10.) By letter dated October 25, 2000, Grothaus kept the defense team informed about his investigation. (Evid. Tr. 89–90.). As the investigation progressed, the defense team secured funding from the court to retain Tena Francis, a seasoned death penalty mitigation investigator. However, despite the fact that it was her usual practice to see her clients as often as possible, she only saw Nelson twice, on consecutive days in February 2001. No one else from her office ever visited with Nelson either. (Evid. Tr. 477). It was Ms. Francis' intention to turn the mitigation investigation over to her associate, Deborah Haddad. (Evid. Tr. 480). However, a dispute arose between Ms. Haddad and defense counsel and she did not continue working on the case. (Evid. Tr. 481–482). After this no one from Ms. Francis' office was working on the case and Ms. Francis could not step back in due to her involvement with other cases. (Evid. Tr. p. 482, Ex. P9A).

In May 2001, Ms. Francis provided a first draft of a chronology and a social history to defense counsel. This draft was not updated or supplemented prior to the start of the penalty phase. (Ex. P9 at 34–57). In an affidavit dated June 30, 2001, Ms. Francis stated that as of May 18, 2001, she and her associates had spent a total of 267 hours on Nelson's case. (Evid. Tr. 495–96). Lisa Murphy, who also worked with Ms. Francis conducted some interviews and facilitated some interviews in White Settlement, Texas in late August or early September 2001. (Evid. Tr. 491). On September 19, 2001, in a sealed motion to this Court, defense counsel and Tena Francis indicated that "extensive mitigation work on the case" had been completed. Correspondingly, in the billing hours of Tena Francis, Patrick Berrigan, and Susan Hunt, it is clear that this statement is true. Ms. Francis admitted that from July 1, 2001 going forward, her firm billed a total of 162 hours on Nelson's case. She stated that this was in addition to the 267 hours already billed. (Evid. Tr. 507). Thus, the total amount of hours billed by Ms. Francis' firm was 429 hours for Nelson's mitigation case. (Plaintiff's Exhibits, P36, 36A). Francis obtained additional records of Nelson's birth, abusive upbringing, lack of educational achievement, and other mitigation issues. She provided the defense team with a binder of this information before trial, and this information was presented to the jury for their consideration of whether a life or death sentence should be imposed.

### 2. Mitigation Evidence Presented to the Jury During the Penalty Phase

The first witness called to testify during the mitigation phase of the trial was Nancy Nelson, defendant's mother. Ms. Nelson testified in detail regarding Nelson's violent and abusive father, Kenneth Morse. She told the jury that Morse frequently beat her and was also abusive to her boys. She described for the jury in disturbing detail how on one occasion Morse tied her up and shocked her with an electrical cord. Morse would also lock her in closets in their home. Ms. Nelson moved herself and the children, including Keith, to California and Texas to get away from Morse. She also testified that Keith was diagnosed with dyslexia and was a poor student, he ***1138** frequently had fights and behavior problems in school, and he had a bed-wetting problem well into his teen years. The jury also heard Ms. Nelson admit that she was an alcoholic and that two of her children were schizophrenic. Ms. Nelson told the jury that because she had to work long hours to support her children she was frequently away from the home, which required the boys to take care of themselves. As a result, the boys often got into trouble at school and in the community. (Trial Tr. 598–694.) [3]

Mary Smith, Nelson's aunt (Nancy Nelson's sister), testified that she and Nancy's stepfather were both abusive alcoholics. She told the jury that Kenneth Morse, Nelson's father, regularly beat Nancy and that he would also lock her up in the home. Ms. Smith helped Nancy and the kids get away from Morse when they moved to California and Texas. Ms. Smith also testified about Nelson's disadvantaged and difficult childhood. (Trial Tr. 712–24.)

Georganna Romero, another aunt (also Nancy Nelson's sister), testified that Morse beat and tortured Nancy and related how on one occasion Morse tried to electrocute Nancy. Ms. Romero described the poor living conditions of Nancy Nelson's home in Texas and further described how the house smelled of urine. (Trial Tr. 725–38.).

Irene Wood testified that she helped Nancy Nelson and her five boys get a home, clothing, and personal items when they moved to Texas. She conveyed the poor conditions of Nelson's childhood in Texas. Ms. Wood also insisted that Nancy Nelson use the last name of Smith so that Morse could not locate her in Texas. (Trial Tr. 740–49.)

Melvin Lister, a guard at the Community Corrections of America (CCA) federal holding facility in Leavenworth, Kansas, testified that he worked in the segregation area of CCA when Nelson was housed in that facility. Lister told the jury that Nelson was frequently threatened and harassed by other inmates at the facility. (Trial Tr. 749–57.) Lieutenant Bruce Roberts, another CCA employee, also testified that Nelson was frequently verbally harassed by other inmates. During the 25 months that Nelson had been housed at CCA, he had never tried to escape. Roberts did not consider Nelson to be a threat while he was housed at CCA. (Trial Tr. 767–84.)

Kenneth Nelson, Nelson's twin brother, testified he was a satellite communications maintenance operator and installer in the U.S. Army, and described his career in the U.S. Army as a successful career. He graduated from high school with a 3.69 grade point average. Kenneth told the jury about his family's disadvantaged and impoverished childhood, and described an abusive boyfriend of his mother, Nancy Nelson. He and Keith would frequently burglarize and steal from homes when they lived in Texas. Kenneth also told the jury that his mother seriously neglected him and his brothers. He said that his mother was never around and that she was always at the bar working or drinking alcohol. Kenneth straightened his life out when he moved back to Missouri and lived with his aunt and uncle, where he became involved in high school football, worked at a grocery store as a stocker, and subsequently did well in school. (Trial Tr. 798–839.)

David Cunningham, Nelson's employer, testified he owned a basement waterproofing business. Cunningham described Nelson as a pleasant employee and a good worker. He felt that Nelson was reliable and conscientious when working for his business. (Trial Tr. 849–55.)

***1139** The defense also played a recorded conversation to the jury between Nelson and his girlfriend, Kerri Dillon. The phone conversation was recorded when Nelson called his mother who then patched Ms. Dillon into a third-party phone call. The conversation was recorded by CCA officials as a part of a routine practice in which all phone conversations of inmates are recorded. In the conversation, among other things, Ms. Dillon and Nelson discussed her recent pregnancy by Nelson. In the

conversation, Nelson also appears to express remorse for his involvement in the murder of ten–year–old Pamela Butler. He tells Ms. Dillon of his intent to tell law enforcement authorities of his involvement in the crime. Nelson states in the conversation as follows: "I'm just gonna do the right thing for once in my life." (Trial Tr. 861.)

Steven Nelson, Keith Nelson's youngest brother, testified that he was employed as an engineer and was successful in his career. Following high school, Steven attended DeVry Institute in Kansas City and had a 3.9 grade point average. He described his disadvantaged childhood in Texas and further described how his mother Nancy neglected him and his brothers. Steven also described Keith's bed-wetting problem, told the jury his mother was never home and was either working or drinking, and that he and his brothers had to take care of themselves most of the time. (Trial Tr. 863–87.)

Gene Thompson was the landlord for the Nelson family when they lived in Texas. He testified that the Nelson family lived in Section 8 housing, and described the poor, unkempt conditions of the Nelson home. Thompson told the jury that when the Nelson family left the rental property it was in extremely poor condition. (Trial Tr. 895–903.)

Rhonda Monroe, a former babysitter in Texas, testified she was the babysitter for the Nelson children when Nancy Nelson was at work. Nancy Nelson would bring the children to Ms. Monroe's home and leave them when she went to work. Ms. Monroe testified Keith Nelson had a bed-wetting problem, and that her husband would punish Keith by spanking him with a belt. Her husband was an alcoholic, and was very abusive towards Keith and his brothers and that they were scared of her husband. When her husband was home the Nelson boys would be required to stay in one room in her home. If they left the room her husband would spank the boys with a belt. (Trial Tr. 904–16.)

Jennifer Monroe, Rhonda Monroe's daughter, testified that the Nelson boys were always required to stay in one room when her mother was babysitting them. Her stepfather, Billy Reese, was always spanking the boys with a belt. She said that the Nelson boys were extremely afraid of her stepdad. (Trial Tr. 919–27.)

Ellen Crutsinger, a former teacher of several of the Nelson boys in Texas, testified that Keith was in a special education class and that he struggled while in school. She further described Keith helping a crippled girl in a wheelchair while in elementary school. Keith would push the girl around the school grounds in her wheelchair and that they developed a friendship. Ms. Crutsinger further testified that Nancy Nelson never attended the "meet the teacher" nights at the school. (Trial Tr. 928–36.)

Michael Griffith, a former neighbor of the Nelsons in Texas, testified that Nancy Nelson was never at home and the boys were frequently left alone to fend for themselves. Mr. Griffith did little things to try to help the Nelson family such as doing plumbing repairs at no charge. He testified that the Nelson house was always messy and unclean. He also told the jury that Nelson's brothers would make fun of ***1140** him because of his bed-wetting problem. (Trial Tr. 940–51.)

Homer Dear, Nelson's former school principal and also a former Texas State Representative, testified that he knew the Nelson family when they were living in Texas and he was their principal at an elementary school. Mr. Dear believed the Nelson boys were physically and mentally abused. He described the Nelson family as a very poor family and further described how he had tried to help them. He described the poor hygiene of the Nelson boys and told the jury how he would require the boys to take showers and would give them clothing at the school. Mr. Dear bought clothes for the boys at a store on at least one occasion. He also visited the Nelson home and described the house as unclean. (Trial Tr. 951–59.)

Finally, Nelson called expert defense witness Dr. Mark Cunningham to testify on his behalf. Dr. Cunningham is a clinical and forensic psychologist who frequently testifies as a mitigation and sentencing expert in capital cases around the United States. He testified concerning the effect of childhood abuse and neglect on Nelson's character and development. In his lengthy testimony, Dr. Cunningham explained to the jury how the squalid conditions and abusive and violent nature of Keith Nelson's childhood affected the formation of Nelson's character. Dr. Cunningham also told the jury that Nelson would be less violent as he aged. (Trial Tr. 964–1025.).


© 2017 Thomson Reuters. No claim to original U.S. Government Works.

### 3. Mitigation Evidence Which Should Have Been Presented to the Jury

Jill Miller, MSSW, testified at the evidentiary hearing. She stated that she prepared a social history of Mr. Nelson and discovered a multigenerational history of mental illness, a history of alcoholism, substance abuse on both sides of the family, domestic abuse on both sides of the family, inappropriate sexual behavior and criminal sexual misconduct. She also discovered that there was severe poverty on the Morse side of the family. Ms. Miller testified that she was able to gather additional medical records on Nancy Nelson, evidencing the abuse she suffered as well as medical records for one of Nelson's brothers, showing that he suffered from schizophrenia. (Ev. Tr. 359–361). Ms. Miller also testified that even though the trial team had gathered school records for Nelson, they were never introduced during the penalty phase. (Evid. Tr. 364–365). She also testified that there were additional school records that have been gathered since the penalty hearing, and were available at the time, but were not gathered by Tena Francis or her staff (Evid. Tr. 368). Ms. Miller stated that Tena Francis investigators did not gather any records at all related to the Morse side of the family. (Evid. Tr. P. 372).

On cross-examination, Ms. Miller admitted that she had been actively working on gathering records in this case for over five years. Ms. Miller also admitted that when she prepared her psychosocial history report, she relied on the earlier work that Ms. Francis and her associates had done, including interviews with 13 or 14 witnesses. She also looked at interview notes prepared by Deborah Haddad, memos written by Dan Grothaus, Ron Ninemire, interview notes of Ron Ninemire and memos of interviews by Lisa Murphy. (Evid. Tr. 381).

Nelson also argues that the mitigation investigation should have included testimony from a psychologist, such as Dr. Lebowitz, to testify regarding the severity of Nelson's history of childhood maltreatment and the effects that this might have had on him. Dr. Lebowitz testified that Nelson's family tree was "absolutely riddled with major psychopathology, substance abuse, and patterns of interpersonal violence and ***1141** neglect." (Evid. Tr. P. 530). Dr. Lebowitz stated that Nelson was born to a mother who was battered and was unprepared to parent him. She testified that he was severely neglected by his mother, she did not protect him from abuse and later on he was also beaten and emotionally abused by her. (Evid. Tr. P. 532). Dr. Lebowitz testified to the extraordinary violence and neglect that Nelson was exposed to by both his parents and other individuals who cared for him when he was younger and what sort of impact this had on him. (Evid. Tr. 538–542). Nelson argues that if the nature and quality of the maltreatment he suffered at the hands of the adults charged with his care, had been properly investigated and presented, it would have weighed heavily on the life side of the balance and there is a reasonable probability that at least one juror, presented with this additional information, might have struck a different balance.

### 4. Failure to Move For a Continuance

In the summer of 2001, Berrigan had health issues that necessitated heart bypass surgery which took place on August 8, 2001. Berrigan and Hunt had a meeting at CCA with Nelson about Berrigan's surgery. Nelson wanted the trial continued so that Berrigan could have time to recover, but Berrigan decided that he was not going to ask for a continuance. (Evid. Tr. 66–67.) Hunt testified about Berrigan's decision to not file a continuance motion with Nelson, stating that Berrigan assured her that he could get everything done, and Hunt and Nelson accepted Berrigan's decision. (Evid. Tr. 110.) Whether she ultimately agreed with the decision to proceed to trial or not, Hunt never informed this Court that she was concerned about Berrigan's health, nor did she express any concerns about whether or not the defense team was ready to go to trial and, correspondingly, never filed for a continuance on her own. In regards to his surgery, Berrigan said, it "depends on how you look at it." It [the trial] was set for a couple of months after his surgery, and as he "look [s] back on it now, of course, I know I wasn't ready.... I wasn't ready, but I guess I didn't particularly assess whether I was ready or not after having bypass surgery." Berrigan testified that he thought "we were going to trial in October, period"—there was "never a promise ... it will be continued eight months, nine months, a year." (Evid. Tr. 231–32.) Berrigan testified that he just lost a bunch of time, but he is not sure even if he had asked for a continuance he would have used his health as a reason. No motion for a continuance was ever filed. (Evid. Tr. 234.). After his surgery, Berrigan testified that he was able to devote a significant amount of time in terms

of getting up to speed for Nelson's case. (Evid. Tr. 263.) Nelson never made the magistrate or district judge aware of his concerns that his case was not going to be ready for trial.

### 5. Analysis

**[1]** **[2]** "Evidence of a difficult family history and of emotional disturbance is typically introduced by defendants in mitigation." *Eddings v. Oklahoma,* 455 U.S. 104, 115, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). "Before deciding what mitigating evidence, if any, should be presented to the jury during a capital penalty phase, counsel has a duty to conduct a thorough investigation into a defendant's background." *Honken v. U.S.,* 42 F.Supp.3d 937, 1089 (N.D.Iowa 2013) (citing *Porter v. McCollum,* 558 U.S. 30, 39, 130 S.Ct. 447, 175 L.Ed.2d 398 (2009)). In *Honken,* the Court noted:

> As a general matter, there is a strong presumption that counsel made all significant decisions while exercising reasonable professional judgment. *See Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. The deference owed to strategic ***1142** judgments is defined in terms of the adequacy of the investigation supporting such judgments. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91, 104 S.Ct. 2052....The principle concern in deciding whether counsel exercised reasonable professional judgment as to a defendant's mitigation case is whether the investigation was reasonable. *See Wiggins [v. Smith],* 539 U.S. 510, 522–23, 123 S.Ct. 2527, [156 L.Ed.2d 471 (2003) ] (citing *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052)....The performance of counsel is "measured for 'reasonableness under prevailing professional norms,' which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.' " *Id.* (citations omitted) (quoting *Strickland,* 466 U.S. at 688–89, 104 S.Ct. 2052).
>
> *Id.* at 1089–90.

In the instant case, Nelson argues that while Tena Francis' organization billed for a substantial number of hours for the work performed, there was no evidence of any continuing effort to gather documents, locate additional witnesses, or update the first draft of the chronology and the social history. It was only toward the end of the summer of 2001, that Lisa Murphy, who had no social work training, assisted in locating witnesses and arranging interviews for counsel. Nelson argues that the testimony of Jill Miller, outlines how incomplete the mitigation investigation was when the case went to trial, including the complete failure to investigate the paternal side of Nelson's family. Nelson also argues that the "superficial mitigation presentation in this case presents a clear example of the state of affairs described in *Wiggins* where 'counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources.' " *Id.* at 524, 123 S.Ct. 2527. Nelson argues that there is a reasonable probability that one or more jurors if presented with a full and accurate picture of Nelson's life and impairments, would have struck a different balance.

The Court disagrees. This is not a case like *Wiggins* where counsel completely abandoned the investigation into Nelson's background. In *Wiggins,* after being convicted of first degree murder, robbery and two counts of theft, Wiggins elected to be sentenced by a jury. Counsel filed a motion for bifurcation of the sentencing proceedings, first intending to prove that Wiggins did not act as a principal in the first degree. If necessary, counsel then intended to present a mitigation case. However, the Court denied the motion and the sentencing proceedings commenced immediately. In the opening statement, counsel told the jurors that they would hear that the defendant had experienced a difficult life and it had not been easy for him. During the proceedings however, counsel introduced no evidence of the defendant's life history. Before closing arguments, counsel made a proffer to the Court to preserve the bifurcation issue and detailed the mitigation case which would have been presented had the court granted the bifurcation motion. The jury sentenced the defendant to death. In his habeas petition, Wiggins alleged that his counsel was ineffective for limiting the scope of the mitigation investigation. The Court noted that counsel's investigation drew from three sources: a psychologist's report which concluded that Wiggins had an IQ of 79, had difficulty coping with demanding situations and exhibited features of a personality disorder. Counsel also

had available ***1143** a PSI which had a one page account of Wiggins' personal history which described his "misery as a youth" and quoted his description of his background as "disgusting" and noting that he spent much of his life in foster care. Counsel also "tracked down" records kept by the Department of Social Services which documented his various placements. The Supreme Court in *Wiggins* stated that while counsel's investigation did not meet *Strickland's* performance standards, "we emphasize that *Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does *Strickland* require defense counsel to present mitigating evidence at sentencing in every case." *Id.* at 533, 123 S.Ct. 2527. The Court found that counsel's investigation did not reflect reasonable professional judgment and was not consistent with professional standards at the time nor reasonable in light of the evidence that counsel uncovered in the social service records. *Id.* at 534, 123 S.Ct. 2527. The Court found that the mitigating evidence that counsel failed to uncover was powerful. For example, the Court noted that "Wiggins experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother. He suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care. The time Wiggins spent homeless, along with this diminished mental capacities, further augment his mitigation case." *Id.* at 534–35, 123 S.Ct. 2527. The Court concluded that there is a reasonable probability that if the jury had heard this evidence, they would have returned a different sentence. *Id.* at 536, 123 S.Ct. 2527.

**[3]** The Court finds the *Wiggins* case distinguishable. Nelson's counsel conducted a thorough mitigation investigation and presented a comprehensive mitigation case to the jury. A mitigation specialist was hired and a social history report produced. As acknowledged earlier, the mitigation investigation did not proceed without interruptions. Ms. Francis testified that she only visited with Nelson twice, and she normally likes to see and talk with the client as much as possible. She also testified that once Ms. Haddad stopped working on the case, she should have notified the attorneys that her firm needed to be removed from the case and another person hired. However, she admitted that she "dropped the ball." (Evid. Tr. 495). However, despite "dropping the ball," Ms. Francis testified that she and the individuals working for her spent over 400 hours working on Nelson's case. (Evid. Tr. 507–08). This is not a case where only scant mitigation evidence was presented. Rather, the mitigation case was presented over a period of two days and Nelson's attorneys called seventeen witnesses to testify on his behalf. The witnesses included his mother, aunts, siblings, a former teacher, principal, family friends, a landlord, prison guards, an employer, former babysitter and her daughter and an expert forensic psychologist. Nelson also introduced a recorded conversation with his girlfriend, who is the mother of Nelson's child. The witnesses recounted the abuse suffered by Nelson, his siblings and his mother at the hands of his father, Kenneth Morse. The jury also heard testimony regarding Keith Nelson's chaotic home life including the family's frequent moves. Testimony was also given by the former babysitter who testified to the abuse Keith suffered at the hands of her husband. Nelson's former teacher also testified that Keith Nelson was in special education classes at school and that school was difficult for him. Dr. Mark Cunningham, a clinical and forensic psychologist also testified concerning the effect of childhood abuse and neglect on Nelson's character and development. Thus, unlike *Wiggins,* where "no evidence ***1144** of Wiggins' life history" was presented, in the instant case, the Court finds that although the mitigation case was not perfect, it was more than adequate. Unlike *Wiggins,* Nelson's habeas counsel has not uncovered any "powerful" new evidence. Rather, habeas counsel has simply discovered a larger quantity of mitigation evidence. It is always possible to discover additional records or new witnesses, the more time that is available. However, with over 400 hours devoted to the case, the Court finds that the mitigation evidence which was discovered and the mitigation case which was initially presented to the jury was sufficient. The Court is unsure why Berrigan did not request a continuance due to his surgery. As noted above, it is possible that more witnesses or evidence could have been uncovered if the case had been continued. However, Nelson has not shown that Berrigan's failure to request a continuance affected the mitigation case which his counsel presented. Thus, the Court finds that Nelson's counsel was not deficient in either the mitigation investigation or presentation of the mitigation case. Accordingly, the Court hereby **DENIES** relief on Claim A(2)—Failure to conduct an adequate mitigation investigation and Claim A(3)—Failure to move for a continuance to complete one.

**B. Failure to Conduct Adequate Investigation of Nelson's Mental Health and Advising or instructing Nelson to Decline to Submit to a Mental Health Examination by a Government Examiner—Claims A(4) & (5)**

**1. Mental Health Investigation**

As early as the spring of 2000, the defense team was aware that mental health would play an important role in the case. Larry Pace testified that mental health is always an important consideration in a death penalty case. (Evid. Tr. 608). In support of a motion to continue the trial, defense counsel informed this Court that two of Nelson's brothers had been diagnosed with schizophrenia and that further mental health evaluations needed to be completed. (Evid. Tr. 33.) In a note from her files regarding a defense team meeting on November 17, 2000, Ms. Francis chronicled the team's discussion of obtaining a neuropsychologist. (Evid. Tr. 40–41.) As a result, Dr. Dennis Cowan, who was local and highly recommended, was hired. (Evid. Tr. 42.) By December 12, 2000, Dr. Mark Cunningham was hired to review the records that had been collected and to serve as a "teaching witness" on Nelson's traumatic background for the jury. (Evid. Tr. 43–44.) After Berrigan became involved with the case he began handling the bulk of the mitigation responsibilities, including the mental health issues. Berrigan believed that a neuropsychological examination needed to be done and was aware that Dr. Cowan had been approved by this Court. Dr. Cowan was poised to conduct an examination and evaluation of Nelson. (Evid. Tr. 196.) Berrigan's CJA worksheet (Evid. Hrg. Exh. P17A) indicates that he called Dr. Cowan the day before the evaluation was scheduled to occur and canceled it. (Evid. Tr. 198.) Berrigan testified that he canceled Dr. Cowan's evaluation because he had had prior experience with Dr. Cowan and thought that he could obtain someone with more of a national reputation. (Evid. Tr. 199.) Additionally, Berrigan had just been appointed to the case and did not feel the need to use an expert chosen by another attorney. Berrigan admitted that he wanted to wait and do the mental evaluation later in the case, once he knew more about the case and at a time when he had a better handle on the discoverability of what he uncovered. (Evid. Tr. 199–200.). However, Berrigan never commissioned a neuropsychological evaluation and testified that "we dropped the ball. It should have ***1145** happened. Other things came up to the forefront, and I never got back to it. There's no excuse, really no excuse at all." (Evid. Tr. 200). Berrigan admitted that in another § 2255 case he handled, he also testified that he had dropped the ball on certain aspects of the client's representation. Berrigan agreed that the death penalty in that case was set aside and the penalty phase was going to be retried. He admitted that he has a philosophical opposition to the death penalty and that when a court sets aside a death sentence, it gives his client another bite at the apple. (Evid. Tr. 259–260). No assessment of Nelson for brain damage, dysfunction or other cognitive impairment was ever conducted. (Evid. Tr. 196).

**2. Advising Nelson To Decline Examination by Government Mental Health Expert Witnesses**

The record clearly establishes that after Berrigan was appointed to the case, he filed a number of motions on how, when, and if the Government would be allowed to conduct a mental health evaluation of Nelson. Once this Court ordered the evaluation, Berrigan systematically objected to the manner in which the evaluation would be conducted and attempted to have the court intervene on what subjects, if any, the Government could question Nelson about. The litigation in this area began in May 2001 and continued until after Nelson pled guilty. Berrigan testified that he had past bad experiences in death penalty cases with mental health evidence and indicated that "... the problem with neuropsych testing is certainly if you don't talk about the defendant's history, that's going to be the subject of cross-examination by the government prosecutors. If you had a neurologist, that really isn't part of their job. I mean, somebody who's just doing, for example, objective medical testing, such as brain imaging, doesn't really have occasion to have any discussion with the client about their history or the events of the alleged crime." (Evid. Tr. 219.) Tena Francis testified and her records confirm that Berrigan was skeptical about a neuropsychological examination and wanted more objective testing, or something along the lines of a neurological evaluation. Finally, Berrigan explained that the discoverability of mental health evidence was not well-settled under federal law at the time of Nelson's trial (2001). While on the witness stand, this Court asked Berrigan to explain his concern with the Government's examination of Nelson's mental health. Berrigan explained that in 2000 in state court, the law was that if the defense put on mental health

evidence, the Government would have the opportunity to examine the defendant. In Berrigan's experience, if the Government put on its psychologist in the penalty phase, it "was devastating testimony" and he lost his case. (Evid. Tr. 227.) Consequently, Berrigan wanted to delay any examination, so as to not give the Government additional, damaging evidence. Berrigan was aware that the Government had sent Dr. Dan Martell and Dr. Park Dietz to see Nelson at CCA and that Nelson refused to see Dr. Martell (and would have refused to see Dr. Dietz). (Evid. Tr. 234.). Berrigan testified that he was familiar with Dr. Martell (neuropsychologist) and Dr. Dietz (psychologist) and that both doctors had a national reputation. Berrigan's main concern about these two experts was that they would be biased against his client and would therefore be "pro-government." Berrigan believed they would testify in a way that would effectively refute Nelson's defense and he did not want them to be the last witnesses the jury heard from before beginning deliberations. Berrigan indicated that those fears, in part, were the reason why he engaged in a protracted litigation to prevent the Government from being able to conduct its own mental health evaluation. (Evid. Tr. 264.). In the end, the Court ***1146** allowed Nelson to present the testimony of Dr. Cunningham. Dr. Cunningham was able to provide some expert mental health testimony about Nelson, but he did so from a review of the records, rather than an interview with Nelson. Consequently, Berrigan was able to prevent the negative mental health testimony of the Government experts he feared, but he was only able to introduce some limited mental health evidence that discussed Nelson's horrible childhood environment. Berrigan further explained that the advice to not submit to an interview "... was the strategic decision I made, and I advocated it very strongly." (Evid. Tr. 265.) Nelson could have gone against that advice, but did not. (Evid. Tr. 265–66.). Berrigan supported this strategy by challenging the Government's ability to conduct its own mental health evaluation at every turn. Only when he was unsuccessful, did he reach the calculated, strategic decision to recommend to Nelson that he not cooperate with the Government's evaluation. Berrigan admitted that this strategy was a product of his professional experience handling a number of death penalty cases. In those cases, Berrigan explained, if the last thing the jury heard before beginning deliberations was the Government's mental health expert, he lost. Berrigan's decision was to have Nelson exposed to less evidence that could result in the jury finding that the aggravating factors outweighed any mitigating factors, resulting in a hope that Nelson would receive a life sentence.

### 3. Mental Health Testimony Nelson Claims Should Have Been Presented.

During the evidentiary hearing, Nelson called several expert witnesses to testify regarding his brain damage. Dr. Carolyn Crawford, a neonatologist, summarized the myriad problems which were documented in Nelson's birth records, including compromised neurological development. (Evid. Tr. 514–526). However, during the evidentiary hearing, Dr. Crawford testified that information/studies on areas of brain injury and brain damage were not available in 2001—she could testify in terms of risk factors, but she could not have offered this same testimony (i.e. the lingering effects of prenatal and neonatal insults) based upon her review of the records back in 2001. (Evid. Tr. 525.).

Dr. Reuben Gur, neuropsychologist with a specialty in brain imaging and behavior also testified. Dr. Gur testified that the MRI test, the PET test and the neuropsych testing all showed frontal system damage in Mr. Nelson's brain. (Evid. Tr. 582). Dr. Gur opined that the abnormalities in Mr. Nelson's brain were important for regulating behavior. However, Dr. Gur admitted that he had not actually conducted a neuropsychological evaluation of Mr. Nelson. Dr. Gur also admitted that in his testing there was no comparative value for the lesion found in Nelson's brain imaging by looking at Exhibit P80 at 11. (Evid. Tr. 600–01.) Consequently, with no baseline comparison value, his imaging provides no useful information.

Dr. Dan Martell, a forensic neuropsychologist, who studies the brain and behavior, and particularly the effects of brain damage on human behavior, testified as a government witness. (Evid. Tr. 631.) Government Exhibit 118A is his CV, and Government Exhibit 118 is a copy of his report on Nelson. (Evid. Tr. 634.) He evaluated Nelson on September 9–10, 2010, for 9 1/2 hours at Terre Haute. (Evid. Tr. 635–36.) He previously attempted to evaluate Nelson earlier in the fall of 2001 at the Government's request, but Nelson refused to be evaluated. (Evid. Tr. 636.) Despite the level of brain 24 impairment from the testing and examination, Dr. Martell testified that looking at Nelson's behavior in the course of committing the crime, there was no finding of ***1147** impulsivity. Dr.

Martell continued by stating that Nelson tried to carry out his fantasy on another victim, and when that did not work, he selected another youthful, more easily controlled victim. Nelson laid in wait, hid himself, brought electrical cords to bind the victim, kidnapped her, he took off at a high rate of speed in such a way that people would not be able to see him or identify him. He took the victim to a secluded area, bound her up so she could not get away—these things, Dr. Martell argued, show planning as opposed to impulsive acting out. For those reasons, Dr. Martell did not believe that Nelson's brain damage played a significant role in him committing this crime. (Evid. Tr. 649.). Dr. Martell also testified that he did not believe that Nelson met the standards with regard to not understanding the wrongfulness of his behavior, because Nelson attempted to avoid being seen and attempted to get rid of incriminating evidence. Dr. Martell testified, "If you didn't know it was wrong, there's no reason to get rid of the truck, to wipe it down for evidence, to try and remove fibers from the crime scene that could identify him." (Evid. Tr. 650). Dr. Martell testified that he had reviewed the reports of Dr. Daniel Foster, Dr. Michael Gelbort, Natalie Novick Brown, Dr. Xavier Amador, Dr. Carolyn Crawford, Dr. Leslie Lebowitz, Dr. Ruben Gur, a social history report prepared by Jill Miller and one of the dermatological reports from Dr. Roger Jones. Dr. Martell testified that none of these reports changed his opinions regarding Nelson. (Evid. Tr. 651, 656–659).

#### 4. *Standard*

> **[4]** **[5]** **[6]** In the context of a claim that relates to the failure to pursue a mitigation strategy based on expert psychological testimony, the focus is on whether counsel conducted an adequate investigation and whether counsel's decision to refrain from further investigation and presentation of mental health mitigation was reasonable.... It must be determined whether there was any reasonable justification for counsel's conduct and whether the course of action taken by counsel would not have been taken by any reasonably competent attorney.
>
> *Honken v. U.S.,* 42 F.Supp.3d at 1090–91 (internal citations omitted).
>
>> The extent of trial counsel's preparation for the mitigation phase does not have to be "ideal," and the court's inquiry must not disregard what trial counsel *did* do. [*Worthington v. Roper,* 631 F.3d 487, 501 (8th Cir.2011) ]. Deficient performance is established only " 'where the record is clear that no reasonable attorney ... would have failed to pursue further evidence.' " *Id.* (quoting *Link [v. Luebbers],* 469 F.3d [1197] at 1203 [ (8th Cir.2006) ] ).
>
> *Johnson v. U.S.,* 860 F.Supp.2d 663, 878 (N.D.Iowa 2012).

#### 5. Was Counsel's Performance Deficient?

Berrigan testified at the evidentiary hearing that when the case was tried in 2001, the established norms of capital defense representation required an investigation into a defendant's mental health. (Evid. Tr. 193). Berrigan testified that coming into the case, he knew according to the standard of care and practice, "that there should be a psychological examination, evaluation, investigation of Mr. Nelson." (Evid. Tr. 195). Berrigan testified that he had never changed his mind about the need for a neurological or neuropsychological examination of Nelson, he intended to get it done eventually, but it was never scheduled. (Evid. Tr. 200).

Habeas counsel argue that when Berrigan accepted the case he was overworked and over-committed and he was working under an incorrect assumption that he would get only one continuance of the trial ***1148** date. Habeas counsel argue that during the time he was appointed on Nelson's case, Berrigan spent six weeks preparing for and trying a capital case in Kansas, he had U.S. Supreme Court deadlines in two or three capital cases where executions were pending, he was involved in another federal capital case in Iowa, he was involved in a complex medical malpractice case until July 2001, he underwent quintuple coronary artery bypass surgery on August 8, 2001 and on the same day he underwent surgery, he accepted an appointment in another demanding capital case in Kansas. When he entered the case, Berrigan informed his co-counsel, Susan Hunt, that he would be solely responsible for the mitigation case and that he would be "calling all the shots on mitigation issues." (Evid. Tr. 100). One of the first things Berrigan did was cancel the neuropsychological assessment that Dr. Cowan was scheduled to conduct, even though he testified that he knew that the issue of "potential neurological impairment and neurological deficits" was something which needed to be explored. (Evid. Tr. 197). When


Appellate Case: 15-3160 Page: 16 Date Filed: 11/17/2017 Entry ID: 4602018

Berrigan was asked at the evidentiary hearing about whether he should have accepted the Nelson case, he testified:

> Looking back, no, no. I have the most—utmost respect for Judge Hays. In fact, I think she's a brilliant judge, and I've had nothing but wonderful experiences with her. And the same is true of Judge Gaitan, frankly, who I've known almost—I've known him since the start of my legal career and both as a state court trial judge and appellate judge and a federal district judge. And I think looking back in my desire not to disappoint them in some way and the trust that they had put in me in taking Mr. Nelson's case, somehow blinded me to my responsibilities to Mr. Nelson, and there's no real good excuse for that. It's nothing but pride and conceit, and I regret it now that I ever agreed to get involved in the case..... I was very busy.

(Evid. Tr. 244–45).

Habeas counsel argue that this is "not a case where counsel acted out of ignorance of prevailing professional norms or did not know how to go about investigating potential neurocognitive deficits. Instead, this is a case where counsel were aware of their obligations but failed to meet them." (Nelson's Proposed Findings of Fact, p. 17).

The Court agrees that this is not a case where counsel acted out of ignorance or did not know how to go about investigating the mental health issues involved in this case. However, the Court does not find the reasons offered by counsel for failing to conduct the necessary mental health investigation to be credible. The reasons advanced by Berrigan that he "just dropped the ball" on finding a replacement neuropsychologist for Dr. Cowan (Evid. Tr. P. 229) or that he was blinded to his responsibilities by pride and conceit (Evid. Tr. 244–45), are simply unbelievable. Rather, the Court sees this as a calculated strategy to act in a manner which is obviously deficient, so that on habeas review the Court will set aside the sentence. This is a strategy which Berrigan recently successfully employed in another capital habeas case. *See Johnson v. U.S.,* 860 F.Supp.2d 663 (2012). In that case, Berrigan initially hired a mental health expert, Dr. Logan and directed him to explore Johnson's mental state at the time of the offenses. However, shortly thereafter, before Dr. Logan's second interview with Johnson, Berrigan directed Dr. Logan not to interview Johnson about or to address in any way, her mental state at the time of the offenses. Johnson argued that even after Dr. Logan identified a number of "red flags" suggesting that she suffered ***1149** from brain impairment, Berrigan did nothing to follow up on those red flags. Johnson also argued that Berrigan made no effort to keep Dr. Logan working or to initiate investigations by other mental health experts until shortly before her trial. She also argues that her counsel "bungled" their way through the requirements of Fed.R. Crim.P. 12.2. In that case, Berrigan admitted that his decision to preclude mental health evidence relating to her mental state at the time of the offenses was "a horrible mistake." *Id.* at 882. The Court further noted that the reason advanced by Berrigan for failing to present mental health evidence—because he had had a bad experience with the disclosure of mental health evidence in a capital case years earlier—a "once burnt, twice shy" excuse was not sufficient. The Court noted:

> Learned Counsel [Berrigan] did not do any real independent analysis—and certainly no consultation with either Johnson's trial experts or the other members of the trial team—of the issues presented by this case before rejecting that line of mitigation. If Learned Counsel's decision to reject such a mitigation defense was in some sense strategic, it was the worst strategic decision by any defense counsel that I have ever seen in my entire career: It effectively doomed Johnson's mitigation case from the start.

*Id.* at 886. The Court in that case found Berrigan's performance to be deficient. The Court also concluded that Johnson established prejudice because the expert testimony of brain dysfunction and impairment presented at the evidentiary hearing "paints a dramatically different picture of Johnson at the time of the offenses than trial counsel presented and offers a connection between her mental state and her conduct at the time of the offenses that was completely or almost completely missing from the

trial presentation." *Id.* at 890. The Court concluded that Johnson was entitled to relief from the verdicts because there was a " 'reasonable probability that a competent attorney, aware of the available mitigating evidence would have introduced it at sentencing, and that had the jury been confronted with this mitigating evidence, there is a reasonable probability that it would have returned with a different sentence.' " *Id.* 891 (quoting *Sinisterra v. United States,* 600 F.3d 900, 906 (8th Cir.2010)).

**[7]** In the instant case, the Court also finds that Berrigan's performance regarding investigation and presentation of the mental health testimony to be deficient. As noted above, at the time that Berrigan became involved with the case, the neuropsychologist, Dr. Cowan, had been hired and was ready to conduct his examination. However, the day before the examination, Berrigan cancelled the appointment. Berrigan testified that the evaluation should have taken place, but "we dropped the ball. It should have happened. Other things came up to the forefront, and I never got back to it. There's no excuse, really no excuse at all." (Evid. Tr. 200). Likewise, the Court also finds unbelievable Berrigan's explanation for why he did not have other mental assessments or examinations conducted of Nelson. Berrigan testified that in 2000, the law was unsettled regarding whether the government could examine a defendant if the defendant introduced evidence of mental health issues in the penalty phase. Berrigan testified that "I was hoping, frankly, you [the Court] might make the decision that maybe this evidence shouldn't come in, but it became very clear to me in the course of litigation and certainly in front of Magistrate Hays, that the government was going to get a mental health evaluation of our client if we went ahead and tried to put in mental health evidence of any form." (Evid. Tr. 228). "But we did litigate the issue does the government get access to Mr. Nelson, and the question had been resolved unequivocally, ***1150** yes, if you go ahead, Berrigan, and put on any psych testimony in this case, even in the penalty phase, they get access to Mr. Nelson, and that means they get to testify. And I thought that was a bad idea." (Evid. Tr. 229).

As early as May 2001, the Government had filed a motion seeking a psychiatric examination of Nelson. (Case No. 99–303, Doc. # 231). Berrigan objected to the scope of the information sought and also asserted that the Court should not compel Nelson to submit to a mental health examination by government experts. Alternatively, the defendant argued that if the Court compelled the defendant to undergo a government examination, it should impose significant safeguards. On August 17, 2001, Magistrate Hays entered an Order which granted in part the Government's Motion and imposed safeguards to preserve Nelson's rights. One of the safeguards imposed by the Court was that the results of any court-ordered examination as well as the results of any examination initiated by the defendant were to be filed under seal prior to the start of trial. The results were to be released only in the event of a guilty verdict and after the defendant confirmed his intent to offer mental health or mental condition evidence in mitigation. On September 4, 2001, defendant filed his Notice of Intent to Rely on Mental Health Evidence at the Penalty Phase of Trial. Defendant indicated that he intended to rely on the testimony of Dr. Dan Foster. As of the date of that filing, defendant indicated that Dr. Foster had not completed his evaluation of the defendant and no information as to his diagnostic conclusions was currently available. On September 21, 2001, defendant filed an appeal of Magistrate Hays' Order. On October 15, 2001, a government expert attempted to examine and conduct psychological testing of the defendant. However, Nelson refused to participate in such examination. In an Order dated October 26, 2001, the Court affirmed Judge Hays' August 17, 2001 Order, noting that the Eighth Circuit had recently stated in *United States v. Allen,* 247 F.3d 741 (8th Cir.2001), "[t]here is no doubt that a district court has the authority to order a defendant who states that he will use evidence from his own psychiatric examination in the penalty phase of a trial to undergo a psychiatric examination by a government-selected psychiatrist before the start of the penalty phase." *Id.* at 773, citing, *United States v. Webster,* 162 F.3d 308, 338–40 (5th Cir.1998), *cert. denied,* 528 U.S. 829, 120 S.Ct. 83, 145 L.Ed.2d 70 (1999). "The government must be able to put on a fair rebuttal to a defendant's mitigation evidence during sentencing." *Allen,* 247 F.3d at 773. The Government then subsequently filed on October 26, 2001, a motion to bar defendant from presenting any mental health testimony. In an Order dated November 15, 2001, the Court asked defendant to submit in camera, an outline of specifically what mental health testimony he intended to present in mitigation, and to outline which witnesses would be testifying regarding this issue and whether the testimony of these witnesses would be based on a personal examination they conducted of the defendant or whether their testimony would be based on other

matters, such as a review of the defendant's medical records. In materials submitted to the Court, Berrigan indicated that he intended to offer the testimony of two psychologists: Dr. Mark Cunningham and Dr. Daniel Foster. These witness would testify in basically three areas: 1) Testimony of Dr. Cunningham related to the defendant's future dangerousness; 2) Testimony of Dr. Cunningham related to risk factors and developmental obstacles which the defendant has exhibited and faced in childhood and adolescence. Berrigan stated that the testimony of Dr. Cunningham, although psychological testimony, is not ***1151** based on interviews with the defendant and will not attempt to explore Dr. Cunningham's opinions regarding the defendant's mental health, his psychological profile, any mental health diagnoses or any other psychological testimony pertaining specifically to the defendant. 3) Testimony of Dr. Foster. Berrigan stated that Dr. Foster is the forensic psychologist hired by the defense to evaluate the defendant's mental health. Dr. Foster met with Nelson for approximately nine hours and had also reviewed written materials. Berrigan indicated that he was unable to speak with Dr. Foster, but counsel stated he is not at all sure that Dr. Foster could base his mental health testimony regarding the defendant's pervasive developmental disorder on the memorandums and information provided by counsel alone. This Court concluded that the testimony of Dr. Foster would not be allowed, as it appeared that his testimony would be based at least in part on interviews conducted with the defendant. The court allowed the testimony of Dr. Cunningham on 1) future dangerousness and 2) psychological testimony relating to risk factors and developmental obstacles, because this testimony was not based on any interviews with or psychological tests of the defendant. (Case No. 99–303, Doc. # 403). Thus, it should have been obvious to Berrigan, shortly after his entry into the case that he would only be allowed to present mental health evidence in mitigation if the Government was also allowed an opportunity to conduct its own examination of the defendant. However, without knowing what the results of the examination would be, there is no reasonable basis for directing Nelson to refuse the examination.

As habeas counsel noted, "that litigation took place in a vacuum since the defense had not investigated Mr. Nelson's mental health and had no mental health case to present or protect." (Nelson's Proposed Findings of Fact and Conclusions of Law, p. 26). Habeas counsel also argue that it was unreasonable for Berrigan not to have Nelson examined, because "any defense mental-health evidence could be withdrawn if that evaluation were deemed harmful and the Government's experts would not be permitted to testify since their sole purpose was to rebut any defense case." (Nelson's Proposed Findings, p. 27).

The Court agrees and concludes that Berrigan was strategically deficient in cancelling the neuropsychological examination of Nelson and in failing to reschedule such examination and also in failing to have any other assessments conducted to assess whether Nelson suffered any brain damage, dysfunction or other cognitive impairments. The Court also finds that Berrigan was strategically deficient in advising Nelson not to submit to an examination by government experts, which effectively prevented him from presenting any mental health evidence in the mitigation phase.

### 6. Was the Failure to Present Mental Health Evidence and Testimony Prejudicial?

**[8] [9] [10] [11]** As discussed above, the *Strickland* inquiry has two prongs and both prongs must be satisfied before relief is granted. To establish prejudice, petitioner "must establish a 'reasonable probability that a competent attorney, aware of the available mitigating evidence would have introduced it at sentencing, and that had the jury been confronted with this mitigating evidence, there is a reasonable probability that it would have returned with a different sentence.' " *Sinisterra,* 600 F.3d at 906 (quoting *Wong v. Belmontes,* 558 U.S. 15, 130 S.Ct. 383, 386, 175 L.Ed.2d 328 (2009)).

> "A claim of ineffective assistance based on the failure to consult and call an expert requires 'evidence of what a scientific expert would have stated' at trial in order to establish *Strickland* prejudice." ***1152** *Rodela–Aguilar v. United States,* 596 F.3d 457, 462 (8th Cir.2010) (quoting *Day v. Quarterman,* 566 F.3d 527, 538 (5th Cir.2009) and also citing *Delgado v. United States,* 162 F.3d 981, 983 (8th Cir.1998)). Even if counsel performed deficiently in failing to present more favorable expert testimony, a petitioner may not be able to prove prejudice, if the prosecution already had in its hands strong contrary expert testimony. *See Cole v. Roper,* 623 F.3d 1183, 1190 (8th Cir.2010). Similarly, a petitioner cannot show prejudice merely by showing that more documentation could have been offered to


Appellate Case: 15-3160 Page: 19 Date Filed: 11/17/2017 Entry ID: 4602018

> support a testifying expert's opinion; the petitioner must show that there is a reasonable probability that the jurors' decision would have been different, had all of the supporting documentation been introduced. *Williams [v. Norris]*, 612 F.3d [941] at 956 [ (8th Cir.2010) ].

*Johnson,* 860 F.Supp.2d at 880.

**[12]** In the instant case, as discussed above, habeas counsel have shown what type of mental health evidence could have been presented during the mitigation phase, had Berrigan and other members of the trial team adequately investigated Nelson's mental health. For example, Dr. Carolyn Crawford identified compromised neurological development Nelson suffered after his birth. The neuropsychological testing and imaging performed as part of the post-conviction challenge, showed that Nelson performed significantly below normal levels on standard testing instruments. Dr. Gur's analysis examined data from the neuropsychological testing, an MRI and a PET scan. This data confirmed that Nelson suffered brain damage.

In *Sears v. Upton,* 561 U.S. 945, 130 S.Ct. 3259, 177 L.Ed.2d 1025 (2010), the Supreme Court stated:

> "To assess [the] probability [of a different outcome under *Strickland],* we consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweig[h] it against the evidence in aggravation." *[Porter v. McCollum],* 558 U.S. at 41 [, 130 S.Ct. at 453–54] (internal quotation marks omitted; third alteration in original).
>
> That same standard applies—and will necessarily require a court to "speculate" as to the effect of the new evidence—regardless of how much or how little mitigation evidence was presented during the initial penalty phase....In all circumstances, this is the proper prejudice standard for evaluating a claim of ineffective representation in the context of a penalty phase mitigation investigation.

*Id.* at 956, 130 S.Ct. 3259.

In the instant case, the Court is convinced that even when the additional evidence of brain damage is added to the mitigation side of the scale, that the outcome would have been the same. In other words, the Court finds that Nelson has not shown that there is a reasonable probability that even one juror's decision would have been different.

### 7. Aggravation Evidence

The Government presented thirty witnesses over a two day period. James Shannon Robinson testified that on September 29, 1999, Nelson picked him up at a temporary labor service to do construction work. (Trial Tr. 90–91.) During the day they spent working together, Nelson revealed to Mr. Robinson that he wanted to kidnap a female, take her to a remote location where he could torture her, rape her, electrocute her, and then kill and bury her. (Trial Tr. 95.) Nelson bragged that he was going back to the penitentiary anyway, and "wanted to go for something big." (Trial Tr. 96.) Mr. Robinson did not ***1153** report this to the authorities at the time because he simply did not believe Nelson. (Trial Tr. 99.). Only ten days before the kidnapping of Pamela Butler on October 2, 1999, in the middle of the night, Nelson, holding a knife to the throat of Michanne Mattson, a medical student, attempted to drag her kicking and struggling from her apartment parking lot to his white Ford pickup. (Trial Tr. 105, 118, 146.) Ms. Mattson testified that she finally dropped limply to the pavement. Despite the fact that Nelson had managed to get handcuffs around one of her wrists, he could drag her no more, and he broke off the attack, warning her over and over, "If you look at me, bitch, I'll kill you." (Trial Tr. 115–16.) Nelson fled in his pickup truck.

Around 4:00 p.m., on Tuesday, October 12, 1999, Nelson told a friend of his that he knew where a 14–year–old girl was and that "right now is the time to get her, take her, kill her, rape her." (Trial Tr. 149.) A little over one hour later in Kansas City, Kansas, ten–year–old Pamela Butler left her home on her roller skates to go one and one-half blocks to the local gas station to buy some cookies and soda. (Trial Tr. 171–75, 188–89.) Her sister, 11–year–old Penny Butler, was playing on the front porch and watched her sister leave. (Trial Tr. 174.)

Meanwhile, a white Ford pickup, with the driver's door left ajar, had parked along Scott Street, the route Pamela had taken many times before. (Trial Tr. 61–63, 175.) She skated the same route home, and as she neared the pickup, Nelson "came up from out the truck and grabbed her and threw her in the truck and slammed the door." (Trial Tr.

 © 2017 Thomson Reuters. No claim to original U.S. Government Works. 

176.) Seeing this, Penny Butler began screaming. (Trial Tr. 176, 189.) Hearing her screams, her teenage sister Casey Eaton came out of the house and looked to where Penny was pointing and saw a white pickup pulling away. (Trial Tr. 189.) As the pickup drove past the screaming girls, Nelson gestured to them with his middle finger. (Trial Tr. 177, 192.) The sounds of the screams and the squealing of tires attracted the attention of Paul Wilt who was sitting in his truck visiting a friend nearby. (Trial Tr. 206.) Mr. Wilt gave chase and, although he eventually lost sight of Nelson's truck, he was able to get its license tag number—177CE2. (Trial Tr. 210.) Between 6:30 p.m. and 7:00 p.m. that same evening, Carl and Shirley Condra drove to their church, the Grain Valley, Missouri, Christian Church, on an errand. Parked behind the church was a white Ford pickup, license plate number 177CE2. The truck was unlocked and empty. Suspicious of the truck, they tried to find a police officer. Finding none, they went home. After seeing the 10:00 p.m. news of the abduction and description of the truck used, they immediately called the police. (Trial Tr. 69–70.) Sometime around 8:00 p.m. or thereafter that same evening, Nelson drove to his mother's house in Kansas City, Missouri. (Trial Tr. 77.) He and his mother drove to the Oasis Bar which was a block and a half away from the victim Pamela Butler's home. (Trial Tr. 77.) While Nancy Nelson drank, her son played a video game. (Trial Tr. 89, 699.) After leaving the bar, they stopped at the gas station where Pamela Butler had bought her cookies and soda. Nelson purchased Pepsi and some cigarettes. (Trial Tr. 700–01.) Nelson and his mother were at his girlfriend's house when the news was broadcast about Pamela Butler's abduction. Nelson registered no anxiety, no remorse, no grief, or other reaction. They left and returned to Nancy Nelson's residence. (Trial Tr. 77, 699–702.) At around 11:00 p.m., Patti Griffith, the next-door neighbor to Nancy Nelson, saw Nelson on the passenger side of the white pickup wiping the dashboard and underneath areas while periodically glancing up and ***1154** down the street. (Trial Tr. 220–22.) Later that same night, Mrs. Griffith was awakened by a noise. When she looked out of her window, she noticed that the pickup truck was gone and that Nelson was pacing around in his yard. (Trial Tr. 223–24.) Around 2:00 a.m., in the morning of Wednesday, October 13th, Nelson called for a cab. The dispatcher who took the call remembered him as calm, as "real cool" and "cool as a cucumber," even to the point of telling her a joke. (Trial Tr. 226–27.) Around 9:00 a.m., on Wednesday morning, the white Ford pickup truck, license number 177CE2, was found abandoned ten blocks from Nelson's residence. (Trial Tr. 79.) The truck, which appeared to have been recently cleaned, had been left unlocked with the keys lying on the floorboard. (Trial Tr. 79–80, 252–53.) The manhunt for Nelson and the search for 10–year–old Pamela Butler continued throughout Wednesday with no success except for a brief sighting of Nelson in the vicinity of his girlfriend's home. (Trial Tr. 233–36.) On Thursday, October 14th, Laurie Torrez, a civilian employee of the Kansas City, Kansas Police Department, took lunch to her husband at the Santa Fe rail yards and, taking a detour along the dike road (Trial Tr. 237–39), spotted Nelson under the 18th Street Bridge. She called the police. (Trial Tr. 240–41.) Nelson had injured his leg while attempting to lower himself from the bridge and, being unable to escape, submitted to capture. (Trial Tr. 585–87.) Before a helicopter arrived to extract him from the area, a considerable crowd of watchers had assembled. (Trial Tr. 266–68.) From somewhere in the crowd, a voice yelled out, "What about the girl?" (Trial Tr. 268.) Nelson looked at Officer Keith, the arresting officer, and said, "I know where she's at, but I'm not saying right now." (Trial Tr. 269.) Later that same day, a complaint was filed against Nelson for the kidnapping of 10–year–old Pamela Butler. Her body, however, had not yet been found. The information provided by Mr. and Mrs. Condra had prompted law enforcement to intensify searching efforts on the fields, woods, and ponds in the vicinity of the Grain Valley, Missouri, Christian Church.

On Friday, October 15, law enforcement personnel, searching shoulder to shoulder in the woods and fields east of the church, discovered the white sports bra Pamela had last been wearing. Nearby, they found her underpants, and then ten-year-old Pamela Butler's nude body was found buried under a pile of brush. (Trial Tr. 85, 285–93.) A wire ligature was wrapped around her throat. (Trial Tr. 303, 319.)

Results of the autopsy revealed numerous scrapes and abrasions and blunt trauma injury to Pamela Butler's mouth and head. (Trial Tr. 321–27.) Her hymen had been torn near the time of death and there was evidence of redness and irritation in the genital area consistent with a sexual assault having occurred. (Trial Tr. 327–29.) The cause of her death was strangulation. (Trial Tr. 329.)

Pamela Butler's underpants were submitted to the Federal Bureau of Investigation for DNA analysis. (Trial Tr. 87.) Examination revealed the presence of semen in the crotch

area of her underpants. (Trial Tr. 345.) When compared to a sample of Nelson's blood, test results conclusively showed that he was the source of the DNA in the semen stain. (Trial Tr. 346.)

On April 5, 2000, the Government filed a notice of intent to seek the death penalty (amended June 9, 2000), alleging both statutory and non-statutory aggravators. Among the non-statutory aggravators alleged was that the offense was particularly cruel and involved serious mental and physical abuse to this child and that Nelson completely lacked remorse for having killed her. These allegations were most ***1155** evident from the trial testimonies of inmate Frazier, who described the torture cell Nelson intended to build in order to hold his victims captive before raping and killing them. (Trial Tr. 503–04.) Inmate Bailey testified that he overheard Nelson mimicking the child's "high-pitched screams ... cries for mommy. Help me. Don't hurt me. Don't kill me." (Trial Tr. 362.) In obvious disgust, Bailey asked Nelson "[h]ow could [he] do that to that little girl?" Nelson simply responded, "You wouldn't believe it." (Trial Tr. 363.)

In addition to the horrific facts of the case, the jury heard evidence about the uniqueness of victim Pamela Butler and the impact of her death on the lives of her family, and that Nelson had, among other things, three prior Missouri state convictions for stealing and a conviction for attempted escape from custody. (Trial Tr. 475–77.) Other evidence presented included information that while in custody on this offense at CCA, Nelson talked about escaping (Trial Tr. 518–19), he unraveled a section of the prison fencing (Trial Tr. 520–21), and he fashioned two workable handcuff keys. (Trial Tr. 424–26.) Nelson threatened to mace his State probation officer (Trial Tr. 486), and while at CCA, in an unprovoked assault, he beat a correctional officer (Trial Tr. 455) and threatened to kill yet another correctional officer. (Trial Tr. 589.).

### 8. Mitigation Evidence

As detailed above, Nelson presented numerous mitigation witnesses, including his mother, his aunts, siblings, a former teacher and principal, family friends, a landlord, prison guards, an employer, former babysitter and her daughter and a forensic psychologist, Dr. Cunningham. The jury heard the testimony of these witnesses describe Nelson's chaotic home life, the abuse suffered by Nelson and his mother at the hands of his violent father. The jury heard from Nelson's siblings how their mother was often absent and neglected them, the squalid living conditions that the family endured and how they often moved from place to place. There was also evidence presented describing the learning difficulties Nelson suffered throughout his years in school and how he was placed in special education classes. A former employer testified that while Nelson worked for him he was pleasant and was a good worker. The jury also heard from a prison guard about how Nelson was often threatened and verbally harassed by other inmates while he was housed at CCA. There was also evidence presented describing the physical abuse that Nelson suffered as a child when his mother left him with a babysitter. Dr. Cunningham also testified concerning the effect of the childhood abuse and neglect on Nelson's character and development. In his testimony, Dr. Cunningham explained how the squalid condition and abusive and violent nature of Nelson's upbringing affected the formation of his character. Dr. Cunningham testified that Nelson would be less violent as he aged.

During the Evidentiary Hearing, habeas counsel allege that if Berrigan had adequately investigated and presented evidence of Nelson's mental health, the following additional evidence would have been presented to the jury:

- The neuropsychological examination conducted by Michael Gelbort, Ph.D. in 2005(P53), which confirmed that Nelson suffered frontal lobe dysfunction.

- The assessment by Natalie Novik Brown, Ph.D. in 2006 in her preliminary investigation of Fetal Alcohol Spectrum Disorder (P48);

- The PET scan and MRI imaging conducted by a private imaging facility near Mr. Nelson's place of confinement in Terre Haute, Indiana in 2010 (P56 PET; P57 MRI);

***1156** • The findings of clinical psychologist Xavier Amador, Ph.D. (P60, 61, 62, 63). He testified that Nelson suffered from a cognitive disorder, not otherwise specified, post-traumatic stress disorder, psychotic disorder, not otherwise specified and a personality disorder which would impair his functioning. Dr. Amador also concluded that Nelson's capacity to appreciate the wrongfulness

of his conduct or to conform his conduct to the requirements of the law was significantly impaired. He also concluded that Nelson committed the offense under the influence of severe mental disturbances that affected his perceptions, judgment, impulses and ability to conform his conduct. (Evid. Tr. 436–440). He also testified that he saw evidence of a frontal lobe disturbance. (Evid. Tr. 441).

- The neuroimaging study by Ruben Gur, Ph.D. (P58, 59, 81). Dr. Gur testified that Nelson had significantly reduced white matter in both the front and occipital lobes of his brain. Dr. Gur testified that the MRI, the PET and the neuropsychological testing all showed that Nelson had structural damage to the frontal lobe of his brain. Dr. Gur opined that Nelson's abnormalities would make it difficult for him to regulate his behavior, including his sexual impulses (Evid. Tr. 582–83).

- The analysis of Mr. Nelson's birth records by neonatologist Carolyn Crawford, M.D. (P45). Dr. Crawford testified that Nelson's mother received almost no pre-natal care, before Nelson was born. Additionally, she testified that Nelson was born prematurely and he suffered several complications after his birth which required him to be hospitalized.

- Dr. Martell's own findings (P54). With regard to Mr. Nelson, Dr. Martell identified "brain damage, brain dysfunction and neurological impairments". (T4. 657.) Dr. Martell acknowledged that his findings —and the identical findings of the other experts— would be mitigating as to penalty. (Evid. Tr. 657–58.)

In assessing whether Nelson has shown that he was prejudiced by Berrigan's actions and inactions regarding the presentation of his mental health evidence, and whether he has shown that there is a reasonable probability of a different outcome, the Court considered "the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweig[hed] it against the evidence in aggravation." *Sears v. Upton,* 561 U.S. at 956, 130 S.Ct. 3259. After reweighing the evidence, the Court is convinced that the result would have been the same. While the circumstances surrounding Nelson's birth, childhood and early adulthood are distressing and why they may help to explain why he acted as he did, the Court does not believe that there is a reasonable probability that even one juror would have voted to sentence Nelson to life in prison. This conclusion is bolstered by the fact that only a single juror found the existence of only one mitigating factor—that "being subjected to physical and emotional abuse as a small child permanently altered Keith Dwayne Nelson's psyche and personality and detracted from his ability to be a successful and insightful adult." No jurors voted in favor of any of the remaining nine mitigating factors[4]. (Case No. 99–303, ***1157** Jury Verdict, Doc. No. 420). The aggravating evidence of the crime and the victim impact testimony was simply too overwhelming. No amount of mental health evidence or testimony relating to brain damage and a difficult upbringing could overcome the fact that Nelson kidnapped a ten-year old girl who had roller skated to the store to buy cookies, sexually assaulted her, strangled her and left her naked body in the woods. For these reasons the Court **DENIES** Nelson's Claim of Ineffective Assistance of Counsel on Claim A(4)—Failure to conduct adequate investigation of defendant's mental health and Claim A(5)—Advising or instructing defendant to decline to submit to a mental health examination by a government examiner.

### C. Failure to Make Objections to Allegedly Inflammatory and Improper Comments in the Government's Closing Argument and Rebuttal—Claim A(15)(e).

The following are the statements which Nelson believes were objectionable from the initial closing argument:

- The Government argued that the jury should vote for death because, "If this crime doesn't call for the death penalty, what crime does?" (Trial Tr. 1113.)

- The Government argued that the jury should vote for death because, "We need to protect our children. We need to send a message to guys like the defendant...." (Trial Tr. 1113.)

- The Government argued that the death penalty should be imposed because, "The community cries out for justice." (Trial Tr. 1114.)

- The Government argued that legally appropriate and relevant mitigating evidence was "all this excuse testimony" and a "guilt trip." (Trial Tr. 1123, 1124.)

- The Government argued that the jury should impose a death penalty simply because the Government


Appellate Case: 15-3160 Page: 23 Date Filed: 11/17/2017 Entry ID: 4602018

recommended it "without reservation." (Trial Tr. 1128.)

The following are the statements which Nelson believes were objectionable from the rebuttal closing argument:

- The Government argued that the case was about the "slaughter" of "our children." (Trial Tr. 1155.)
- The Government argued that legally appropriate and relevant mitigating evidence was "an excuse," "the blame game," "the abuse excuse," and an effort by trial counsel to claim the crime was "somebody else's fault." (Trial Tr. 1156.)
- The Government argued that the mitigating evidence was not worthy of jury consideration since it didn't "explain ***1158** why" the crime occurred. (Trial Tr. 1158.)
- The Government argued that Movant was "a rotten human being." (Trial Tr. 1158.)
- The Government argued that defense counsel's efforts to persuade the jury of mitigating evidence was "a smoke screen" and an attempt to "divert [the jury] from what this case is really about, the slaughter of an innocent." (Trial Tr. 1158–59.)
- The Government argued that defense counsel's efforts to persuade the jury of mitigating evidence masked counsel's true motive, i.e., "What they want you to do is have him escape justice." (Trial Tr. 1159.)
- The Government argued that mercy was weakness. (Trial Tr. 1159.)
- The Government argued that Appellant was "evil at his core." (Trial Tr. 1161.)
- The Government argued that jurors should rely on the prosecution's experience and expertise, and positioned the case as a referendum on capital punishment by telling the jury, "There is no clearer call for the death penalty than there is in this case," and, later, "If not him, who? If not now, when? If killing and raping a kid isn't enough, then we don't need a death penalty. We don't need a death penalty." (Trial Tr. 1161; 1163.)
- The Government argued that the jury should impose a sentence of death since the jury "represent[ed] the people of the United States in this case...." (Trial Tr. 1162.)
- The Government argued that the jurors should close their eyes and re-live the horrors of the victim's last hours, calling upon the jury to "Think about ... what that little girl was thinking," and to imagine, "What was she thinking?" and to "Imagine what she experienced in that last part of her life," and to "Close your eyes, and ... envision [the abduction and murder]." (Trial Tr. 1161–62.)
- The Government argued that a verdict of death was the only just verdict and that the jurors were "the dispensers of justice," and that the victim's mother "Waits for you to give her some justice. And justice in this case can only be had by imposing a sentence of death," essentially suggesting to the jury that a sentence of death should be imposed because that's what the victim's survivors wished. (Trial Tr. 1162.)
- The Government argued that, "[T]he death penalty was enacted for crimes like this." (Trial Tr. 1163.)

Berrigan testified at the Evidentiary Hearing that the comments were all improper and he should have objected to portions of the Government's closing argument, but he did not. He testified that he had no tactical reason for not objecting. (Evid. Tr. 241, 243). "The Eighth Circuit has been reluctant to grant habeas corpus relief to petitioners based solely on objectionable prosecutorial rhetoric in closing arguments. 'A claim of prosecutor misconduct in closing argument ... calls for an exceptionally limited review of this issue.' " *Evans v. King,* No. 10–4045(SRN/SER), 2012 WL 4128682, *20 (D.Minn. July 30, 2012) (quoting *James v. Bowersox,* 187 F.3d 866, 869 (8th Cir.1999)).

**[13] [14] [15]** Where there was no contemporaneous objection to statements alleged to be misconduct the appellate court reviews for plain error. *U.S. v. Coutentos,* 651 F.3d 809, 822 (8th Cir.2011). Under plain error review, to obtain relief, a defendant must show (1) that there was error; (2) that the error was plain; and (3) that it affected the defendant's substantial rights. *Id.* The ***1159** appellate court assesses the prejudicial effect of misconduct by considering: (1) the cumulative effect of the misconduct, (2) the strength of the properly admitted evidence of the defendant's guilt, and (3) the curative actions taken by the trial court. *Id.*

**[16] [17] [18]** "[A] prosecutor's improper comments [during argument to the jury] will be held to violate the Constitution only if they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Parker v. Matthews,* ––– U.S. ––––, 132 S.Ct. 2148, 2153, 183 L.Ed.2d 32 (2012) (quoting *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (in turn quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974))). "Federal habeas relief should only be granted if the prosecutor's ... argument was so inflammatory and so outrageous that any reasonable trial judge would have *sua sponte* declared a mistrial" and the petitioner established "a reasonable probability that the outcome [of the trial] would have been different but for the improper statements." *Kennedy v. Kemna,* 666 F.3d 472, 481 (8th Cir.2012) (citations omitted).

> To determine whether a prosecutor's statement infected Petitioner's trial with unfairness, the court examines the totality of the circumstances. *Kellogg v. Skon,* 176 F.3d 447, 451 (8th Cir.1999), *Antwine v. Delo,* 54 F.3d 1357, 1363 (8th Cir.1995) (listing factors including (1) the type of prejudice that arose from the argument, (2) defense counsel's efforts to minimize the effect in his argument, (3) whether [the] jury was properly instructed in the jury instructions, and (4) whether there is a reasonable probability that the outcome would have been different.)

*Robinson v. Dormire,* No. 4:10CV01205AGF, 2013 WL 5421963, *6 (E.D.Mo. Sept. 26, 2013).

In analyzing the factors, the court presumes that Nelson was prejudiced by the comments made during the government's initial and rebuttal arguments. However, the Court also finds that Mr. Berrigan mitigated the effects of these statements in his closing argument. Mr. Berrigan stated in his closing argument:

> He didn't have to plead guilty. Didn't have to do it at all.
>
> But accepting responsibility does not automatically mean, as the prosecution suggested, that's the death penalty, that this is such a horrible crime there are no other options. Because if you'll recall when you came in here to be selected to sit, the judge asked you questions about that, is anybody here automatically going to impose the death penalty, and nobody, not one of you raised your hands.
>
> And then I asked you, do you remember, what about a case of the murder of a ten-year-old girl, murder and rape of a ten-year-old girl, in your mind, would the death penalty be the only appropriate penalty in the case? Nobody here raised their hands. The people that raised their hands, they were let go. Every one of you said no, I'm going to follow the instructions of the court. I can consider, even in that case, I can consider a sentence of life without parole, I can do that.
>
> And, indeed, that's what the law requires you to do. It requires that. There's no such thing as what Mr. Whitworth is talking about. There's no such thing as some crime that says you do this, you get the death penalty. That is absolutely in contravention of the law. Absolutely. We need not be here if that's the law. We need not have a hearing. This would have been settled. Death, death penalty for Keith Nelson.
>
> ***1160** But we obviously are here and we obviously presented evidence and you have been listening very intently. You have to make the determination.

(Trial Tr. p. 1135–36).

Berrigan also told the jury that it was up to each one of them to decide if the death penalty was appropriate in this case. He argued:

> The law says aggravating circumstances have to be proven beyond a reasonable doubt. You all have to agree.
>
> It says mitigating circumstances, you don't have to agree. You each decide in your own heart and conscience what do I think the mitigating circumstances are. What are they to me. And you weigh them yourself. You remember that difference.
>
> The law says if you want to impose the death penalty, all twelve people have to agree. Any one or two or three of you can say no, not for me. You have that power to do that because of the awesome individual responsibility that you take when you sign up as a juror in this kind

> of case. In your hands, each one of your hands, is the life of Keith Nelson because any one of you can say no, and then it doesn't happen. It doesn't happen at all. The judge has told you you're never required to impose the death penalty. It's never required.

(Trial Tr. p. 1137).

Mr. Berrigan also argued to the jury to refute some of the Government's statements regarding Pamela Butler:

> There has been some discussion by Mr. Whitworth remember Pamela Butler, remember what the end of her life must have been like. And I suspect we'll hear more of that, how horrific her death was. And nobody is disputing that. But ask yourself again why are they putting me through that? Is this to get me so inflamed and so impassioned that I'm not going to make a reasoned, calm, considered determination about what the punishment is going to be. Because that's what the law requires. That's what's in your instructions.

(Trial Tr. P. 1152).

**[19]** After reviewing these portions of Berrigan's closing argument, the Court finds that Berrigan adequately minimized any prejudicial effect from the Government's initial closing argument or rebuttal argument.

The Court also finds that the jury was properly instructed. In Penalty Phase Instruction No. 4, the jury was told, "[c]ertain things are not evidence. I shall list those things for you now: statements, arguments, questions and comments by lawyers representing the parties in the case are not evidence." (Case No. 99–303, Doc. # 419). Finally, with regard to the last factor, the Court finds that Nelson has not shown that there is a reasonable probability that he would have received a life sentence, if the improper arguments had been objected to. The crime in this case involved the kidnapping, sexual assault and strangulation of a ten–year–old girl. The Court finds that it is more likely that the jury voted for a death sentence based on the heinous facts of the case and was not swayed by the Government's improper closing arguments.

Accordingly, the Court hereby **DENIES** Nelson's Motion for Relief on Claim A(15)(e)—Failure to Make Objections to Allegedly Inflammatory and Improper Comments in the Government's Closing Argument and Rebuttal.

### *1161 D. Allegations of Appellate Counsel's Constitutional Ineffectiveness: Failure To Conduct Adequate Review of the Trial Record and the Law. Failure To Raise on Appeal the Government's Allegedly Improper Comments in Closing Arguments—Claims B(1) & B(2)(c)

When the case was set on the appeal schedule, Berrigan moved to withdraw and asked that his former co-worker at the State Public Defender System, Jennifer Brewer [5], be appointed to handle the appeal. Brewer handled a number of death eligible cases at the state and federal level and was focusing on appellate work. Consequently, she was appointed. Berrigan stated that he has great admiration for Jennifer Brewer and her appellate work. (Evid. Tr. 247.) He did not meet with her to discuss issues regarding the appeal, but he did hand her his trial notes. (Evid. Tr. 248.) Hunt maintained the appointment and continued to represent Nelson on appeal with Brewer.

Brewer had more capital case experience (trial and appellate) than Hunt and was located in St. Louis, while Hunt was in Kansas City. (Evid. Tr. 80.) Brewer was aware that this was Hunt's first capital trial. After being appointed, Brewer and Berrigan met face-to-face, with Berrigan giving Brewer his transcript and parts of the file to use for appeal preparation. (Evid. Tr. 132.) Hunt talked with Brewer via e-mail or phone. (Evid. Tr. 80–81.) Brewer went through and reviewed the trial transcripts, reading them completely to determine what issues she thought should be argued in the appeal. (Evid. Tr. 133.) Brewer testified that these issues were "sort of, I don't know, complex or technical, capital-specific issues, issues I had drafted before or issues that I had experience with in capital litigation." (Evid. Tr. 138.) Brewer stated that she believed that Hunt was going to draft the "more guilt-phase related issues or issues that didn't require any particular capital experience." (Evid. Tr. 138.) Brewer stated that she was familiar with the ABA guidelines for capital counsel, explaining that every possible issue should be explored that has some merit. (Evid. Tr. 117.) Hunt acknowledged that when page limitations are factored in not all possible issues are raised but your best issues. (Evid. Tr. 86.)

Hunt was handling the change of venue issue, statement of facts as relating to that issue, and some other issues involving jury selection, while Brewer was handling all appeal issues relating to the penalty phase. They communicated mostly via e-mail, sending drafts back and forth to each other. They applied for, and were granted, several extensions by the Eighth Circuit. (Evid. Tr. 81.) During the deposition taken in anticipation of the § 2255 hearing, Brewer accused Hunt of malfeasance by not handling the other appellate issues that were her responsibility. (Evid. Tr. 83.) Hunt denied the accusations and stated that those responsibilities were in fact Brewer's.

This dispute arose because each attorney believed the other should have raised additional issues on appeal. Hunt believed that Brewer should have prepared the issues because she was the more experienced appellate and capital litigator, while Brewer alleged that the responsibility was Hunt's. Brewer did not keep any documentation or notes with respect to the division of labor with Hunt on the brief. Brewer's account of the responsibilities in this matter is at odds with the fact that she was the editor of the brief. In other words, it was her responsibility to collect the parts each worked on, then put them ***1162** together in a single coherent document. Consequently, Brewer was the last person to set eyes on the brief. She would have seen it deficient, if indeed it was, and could have simply asked the court of appeals for an extension of time. Given the nature of the case (it being a capital matter), the request would have no doubt been granted. Brewer hides behind a docket entry that indicates that no further extensions will be allowed. The problem with this position is that on one previous occasion, in this very appeal, Brewer had been told that no further extensions would be allowed, but she nonetheless asked for a continuance and received it. (Evid. Hrg. 136.) Additionally, during her testimony, Brewer acknowledged that she was communicating with the appellate court right up until the time the brief was filed. (Brewer Depo. Tr. 81.) The need to do so was driven by the fact that Nelson's brief was overlong and Brewer needed the court's authority to obtain permission to file a longer than anticipated brief. (Brewer Depo. Tr. 79–81.) The appellate court granted her request. Through these contacts Brewer never chose to ask for additional time to file the brief later, to supplement the brief, or to file a Rule 28(j) letter. (Evid. Tr. 139.)

Nelson argues that Ms. Brewer agreed that the government's closing arguments were improper. (Evid. Tr. 118). She also agreed that these were significant and obvious issues that were stronger than some of those issues actually raised in the brief. (Evid. Tr. 126). Ms. Herndon stated that she had not made a strategic choice to omit these arguments and agrees that they should have been raised on appeal. Nelson argues that had these issues been raised on appeal, there is a reasonable possibility that his sentence of death would have been vacated on appeal.

**[20] [21] [22]** Ineffective assistance claims cannot be based on counsel's alleged failure to raise a meritless argument. *See Gray v. Bowersox,* 281 F.3d 749, 756 n. 3 (8th Cir.2002). Further, when a legal argument has no merit, it follows that a defendant cannot be prejudiced as a consequence of its absence as an appellate issue. *See Thompson v. Jones,* 870 F.2d 432, 434–35 (8th Cir.1988). "In other words, appellate counsel is not ineffective simply because that lawyer fails to raise an issue on appeal that has no substance." *Delk v. Smith,* No. 13–CV–89 (JRT/SER), 2014 WL 538586, *12 (D.Minn. Feb. 11, 2014). As noted above, the Court finds that there is no merit in Nelson's claim that his counsel was ineffective for failing to object to the Government's closing arguments. Accordingly, because the argument had no merit, Ms. Herndon and Ms. Hunt were not ineffective for failing to raise this issue on appeal. Therefore, the Court hereby **DENIES** Nelson's claims B(1) and B(2)(c).

## IV. CONCLUSION

For the reasons stated above, the Court hereby **DENIES** habeas relief on the six claims which were remanded from the Eighth Circuit Court of Appeals. The Court further denies Nelson a certificate of appealability, in that the issues raised are not debatable among reasonable jurists, nor could a court resolve the issues differently.

**All Citations**

97 F.Supp.3d 1131

Footnotes

1 The numbering of these claims reflects the original numbering of claims in the initial § 2255 motion.

2 The Evidentiary Transcripts can be found in Case No. 04–8005 (Docs. 260–263).

3 The Penalty Phase Transcripts can be found in (Case No. 99–303, Docs. 459–469).

4 The other mitigating factors submitted were:

2. “Many years of gross neglect and a lack of parental supervision contributed greatly to Keith Dwayne Nelson's own sense of self-worthlessness and depression.” 3. Despite his own deprived childhood, Keith Dwayne Nelson has shown affection, good judgment and love in caring for the young son of his former girlfriend, Kerri Dillion.” 4. “Keith Dwayne Nelson has been a devoted and caring son to his mother, Nancy Nelson.” 5. “Keith Dwayne Nelson has been a loyal and faithful brother to his four siblings.” 6. “In the past, Keith Dwayne Nelson has been a hardworking and dedicated employee to his boss, and a financially responsible boyfriend to his girlfriend and her son while they all lived together.” 7. “Keith Dwayne Nelson has admitted his guilt and pleaded guilty to the murder of Pamela Butler without any promise or expectation of leniency.” 8. “Keith Dwayne Nelson will be of low risk of violent behavior in prison and can live the rest of his life peacefully and productively if allowed to die of old age behind bars.” 9. “Keith Dwayne Nelson can be a positive influence on the life of his young son, counseling, teaching and caring for the boy as he grows up over the ensuing decades.” 10. “If allowed to live, Keith Dwayne Nelson can remember and agonize over the death of Pamela Butler which he caused on October 12, 1999 and in the process of many years of remorse and contrition, he will become a better person that the young man who caused her death.”

5 Jennifer Herndon was formerly known as Jennifer Brewer.

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

**THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| KEITH D. NELSON, | ) | |
| Movant, | ) | |
| v. | ) | |
| | ) | Civil No. 4:04-cv-08004-FJG |
| UNITED STATES OF AMERICA, | ) | Crim. No. 4:99-cr-00303-FJG-1 |
| Respondent. | ) | |

**JUDGMENT IN A CIVIL CASE**

_____**Jury Verdict**. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

X ____**Decision by Court.** This action came before the Court. The issues have been determined and a decision has been rendered.

It is ORDERED AND ADJUDGED THAT

habeas relief on the six claims remanded from the Eighth Circuit Court Appeals is DENIED. A certificate of appealability is denied.

March 31, 2015
Dated

Ann Thompson
Clerk of Court

April 7, 2015
Entered

/s/ Rhonda Enss
(by) Deputy Clerk