**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

---

No. 15-3160

---

**KEITH D. NELSON,**

Appellant,

v.

**UNITED STATES OF AMERICA,**

Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI, WESTERN DIVISION
HONORABLE FERNANDO J. GAITAN, JR., SENIOR DISTRICT JUDGE

---

# BRIEF FOR THE UNITED STATES

---


TIMOTHY A. GARRISON
United States Attorney

JEFFREY E. VALENTI
DAVID M. KETCHMARK
LAJUANA M. COUNTS
Assistant United States Attorneys

Charles Evans Whittaker Courthouse
400 East 9th Street, 5th Floor
Kansas City, Missouri 64106
Telephone: (816) 426-3122

*Attorneys for Appellee*

## SUMMARY OF THE CASE

Appellant Keith Nelson pleaded guilty to kidnapping and murdering 10-year-old Pamela Butler and, after the penalty phase trial, the jury sentenced him to death after considering the mitigating and aggravating factors. After his death sentence was affirmed, Nelson filed a § 2255 motion alleging a number of ineffective assistance of counsel claims, which were denied without a hearing. This Court remanded for an evidentiary hearing on some issues and others were denied outright. After the evidentiary hearing, the district court denied Nelson's claims. This Court has ordered the parties to file briefs addressing those issues denied and an expanded issue on ineffective assistance of counsel challenging Nelson's guilty plea.

The district court's rulings denying Nelson's ineffective assistance of counsel claims were correct in that Nelson was not prejudiced by trial counsel's failure to pursue further mitigation evidence during the penalty phase. Nelson's expanded claim of ineffective assistance of counsel in his guilt phase, premised on an insanity defense, should be dismissed where this issue constitutes a second or successive § 2255 that Nelson has failed to seek permission to file, and this issue does not relate back to any of his original issues raised.

The Government agrees that 30 minutes per side would be sufficient time to address the issues raised.

# TABLE OF CONTENTS


**Page**

SUMMARY OF THE CASE ........................................................................ i

TABLE OF CONTENTS ........................................................................ ii

TABLE OF AUTHORITIES ........................................................................ iv

STATEMENT OF THE ISSUES ........................................................................ 1

STATEMENT OF THE CASE ........................................................................ 3

A. Procedural History ........................................................................ 3

B. Statement of the Facts ........................................................................ 11

SUMMARY OF THE ARGUMENTS ........................................................................ 22

ARGUMENTS

I. Following the evidentiary hearing in this matter, the district court correctly analyzed trial counsel's performance under the appropriate standard and concluded that Nelson was not prejudiced by defense counsel's "strategically deficient" performance ........................ 26

II. Nelson's claim of ineffective assistance of counsel on the basis that counsel advised him to plead guilty where he had an insanity defense should be dismissed because this issue was not one of the issues the Eighth Circuit remanded for an evidentiary hearing nor does it relate back to issues raised in his original § 2255 motion, and thus, it constitutes a second or successive § 2255 motion that cannot be filed or considered until this Court grants permission in accordance to the requirements under the 28 U.S.C. § 2255(h) ........................................................................ 72

CONCLUSION ........................................................................ 83

CERTIFICATE OF COMPLIANCE....................................................84

CERTIFICATE OF SERVICE....................................................85



Appellate Case: 15-3160 Page: 4 Date Filed: 02/12/2018 Entry ID: 4629195

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Abdullah v. United States*, 240 F.3d 683 (8th Cir. 2001) .............................73

*Armstrong v. Kemna*, 534 F.3d 857 (8th Cir. 2008) .............................. 28, 29

*Baranski v. United States*, – F.3d –, No. 16-3699, 2018 WL 503066 (8th Cir. Jan. 23, 2018) ....................................................2, 74

*Buck v. United States*, 580 U.S. —, 137 S.Ct. 759 (2017) ...........................11

*Butler v. United States*, 340 F.2d 63 (8th Cir. 1965) ....................................74

*Davenport v. United States*, 217 F.3d 1341 (11th Cir. 2000)........................74

*Devose v. Norris*, 53 F.3d 201 (8th Cir. 1995) ............................................74

*Dodd v. United States*, 614 F.3d 512 (8th Cir. 2010) ...................................76

*Harrington v. Richter*, 562 U.S. 86 (2011)..................................................27

*Johnson v. United States*, 860 F.Supp.2d 663 (N.D. Iowa 2012)..................65

*Mayle v. Felix*, 545 U.S. 644 (2005)...........................................................76

*Nelson v. United States*, 97 F.Supp.3d 1131 (W.D. Mo. Mar. 31, 2015)............ .................................................... 10, 22, 31, 38, 39, 40, 46, 48, 49, 50, 52, 54, 55, 58, 59, 65, 66, 67, 68, 69, 71

*Nelson v. United States*, 297 Fed.Appx. 563 (8th Cir. 2008)....... 9, 10, 78, 81

*Nelson v. United States*, 543 U.S. 978 (2004) ................................................8

*Ortiz v. United States*, 664 F.3d 1151 (8th Cir. 2011)...................... 26, 27, 54

*Petty v. Card*, 195 F.3d 399 (8th Cir. 1999) .................................................74

*Porter v. McCollum*, 558 U.S. 30, 130 S.Ct. 447 (2009) ..............................69

*Roundtree v. United States*, 751 F.3d 923 (8th Cir. 2014) ............................22

*Sears v. Humphrey*, 294 Ga. 117 (2013) .............................................. 70, 71

*Sears v. Upton*, 561 U.S. 945 (2010)........................................... 1, 29, 49, 69

*Sinisterra v. United States*, 600 F.3d 900 (8th Cir. 2010).............................68

*Strickland v. Washington*, 466 U.S. 668 (1984)............... 2, 22, 27, 28, 29, 51

*United States v. Allen*, 247 F.3d 741 (8th Cir. 2001) ............................. 66, 67

*United States v. Craycraft*, 167 F.3d 451 (8th Cir. 1999) .............................76

*United States v. Harrison*, 469 F.3d 1216 (8th Cir. 2006) ............................76

*United States v. Hernandez*, 436 F.3d 851 (8th Cir. 2006) ............................76

*United States v. Lambros*, 404 F.3d 1034 (8th Cir. 2005).........................2, 81

*United States v. Lawson*, 155 F.3d 980 (8th Cir. 1998) ...............................74

*United States v. Nelson*, 347 F.3d 701 (8th Cir. 2003)...................................8

*United States v. Taylor*, 258 F.3d 815 (8th Cir. 2001) .................................22

*Wiggins v. Smith*, 539 U.S. 510 (2003) .......................................................51

*Wong v. Belmontes*, 558 U.S. 15, 130 S.Ct. 383 (2009)...............................68

*Worthington v. Roper*, 631 F.3d 487 (8th Cir. 2011) ...................................22

**Statutes**

18 U.S.C. § 1201 ....................................................................................3, 17

18 U.S.C. § 2241 ....................................................................................3, 17

28 U.S.C. § 2244(b) ......................................................................................75

28 U.S.C. § 2255 .......... 9, 26, 74

28 U.S.C. § 2255(h) .......... ii, 2, 25, 72, 73, 81



Appellate Case: 15-3160 Page: 7 Date Filed: 02/12/2018 Entry ID: 4629195

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

---

No. 15-3160

---

**KEITH D. NELSON,**

Appellant,

v.

**UNITED STATES OF AMERICA,**

Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI, WESTERN DIVISION
HONORABLE FERNANDO J. GAITAN, JR., SENIOR DISTRICT JUDGE

---

## STATEMENT OF THE ISSUES

---

**I.**

Whether, following the evidentiary hearing in this matter, the district court correctly analyzed trial counsel's performance under the appropriate standard and concluded that Nelson was not prejudiced by defense counsel's "strategically deficient" performance.

**<u>Cases</u>**

*Sears v. Upton*, 561 U.S. 945 (2010)



Appellate Case: 15-3160 Page: 8 Date Filed: 02/12/2018 Entry ID: 4629195

*Strickland v. Washington*, 466 U.S. 668 (1984)

**II.**

Whether Nelson's claim of ineffective assistance of counsel on the basis that counsel advised him to plead guilty where he had an insanity defense should be dismissed, where this issue was not one of the issues the Eighth Circuit remanded for an evidentiary hearing nor does it relate back to issues raised in his original § 2255 motion, and thus, it constitutes a second or successive § 2255 motion that cannot be filed or considered until this Court grants permission in accordance to the requirements under the 28 U.S.C. § 2255(h).

**<u>Cases and Authorities</u>**

*United States v. Lambros*, 404 F.3d 1034 (8th Cir. 2005)

28 U.S.C. § 2255(h)

*Baranski v. United States*, – F.3d –, No. 16-3699, 2018 WL 503066 (8th Cir. Jan. 23, 2018)



Appellate Case: 15-3160 Page: 9 Date Filed: 02/12/2018 Entry ID: 4629195

## STATEMENT OF THE CASE

### *A. Procedural History*

On October 12, 1999, 10-year-old Pamela Butler was kidnapped by the movant, Keith D. Nelson, in broad daylight from near her Kansas City, Kansas, home while she was roller skating. Two days later, a complaint was filed charging Nelson with kidnapping. On October 15, 1999, Pamela Butler's dead body was recovered from the woods near a church in Grain Valley, Missouri.

One week later, on October 21, 1999, a federal grand jury in the Western District of Missouri returned a two-count indictment charging Nelson with kidnapping resulting in death, in violation of 18 U.S.C. § 1201, and transportation of a minor for sexual relations resulting in death, in violation of 18 U.S.C. § 2241. (DCD 5.)[1] The Government subsequently filed a "Notice of Intent to Seek the Death Penalty." Nelson pleaded not guilty to both charges. This criminal matter was assigned to the Honorable Fernando J. Gaitan, Jr., United States District Judge for the Western District of Missouri.

Nelson was represented at trial by Patrick Berrigan and Susan Hunt, two highly-experienced litigators who specialize in the field of criminal

[1] "DCD" refers to the district court's docket entry report for Nelson's underlying criminal case, Case No. 99-00303-01-CR-W-FJG.



Appellate Case: 15-3160 Page: 10 Date Filed: 02/12/2018 Entry ID: 4629195

defense.[2] Patrick Berrigan was then and is now, an experienced death penalty litigator. He previously worked for the State Public Defender System and was assigned to the Capital Crimes Section. Though he was in private practice when he represented Nelson in this matter, Berrigan has since returned to the State Public Defender System and is assigned, once again, to the Capital Crimes Section. On appeal, Nelson was represented by Ms. Hunt and Jennifer Brewer, both experienced appellate counsel.

On May 10, 2001, the Government filed a motion for the discovery of mental health evidence to be used in the penalty phase of the capital trial and seeking a court-ordered mental health evaluation. Thus, protracted litigation commenced on the manner, means, and identity of any Government-sponsored mental health evaluation. Nelson, through counsel, fought a

[2]When Nelson was first charged, he was represented by Dan Franco, who entered his appearance as retained counsel on October 20, 1999. By all accounts, Mr. Franco provided companionship, but no legal representation. On October 21, 1999, Larry Pace with the Federal Public Defender's Office was appointed as learned counsel. Mr. Pace took over primary case responsibility and used his investigator, Ron Ninemire, to assist him with his investigation. On November 2, 1999, Bill Shull and Susan Hunt were also appointed to represent Nelson under the C.J.A. Mr. Pace developed a conflict in the case and on July 28, 2000, filed a motion to the court to be removed. Ron Ninemire collected the investigative file materials and provided them to Mr. Shull and Ms. Hunt sometime around September 12, 2000. By November of 2000, Nelson began losing confidence in Mr. Shull, who was eventually removed from the case in February 2001. On February 20, 2001, Patrick Berrigan was appointed to be learned counsel.

delaying action on when, if, and how such a mental health evaluation would be conducted. (Depo. Exh. 219.)[3] Eventually, after losing the battle regarding whether the Government would be able to conduct its own mental health evaluation, Nelson, upon advice of counsel, refused to meet with the Government's experts. On October 18, 2001, Magistrate Judge Sarah W. Hays held a status conference and discussed with Nelson the consequences of failing to submit to the Government mental health evaluation. Nelson acknowledged his refusal to cooperate and indicated on the record that he understood that the decision was his, and his alone to make, and that he knew the district court may preclude him from adducing mental health evidence if he continued to refuse participation. (Evid. Hrg. Exh. 64.) On October 23, 2001, the district court held a hearing to discuss whether Nelson would be able to use mental health evidence at trial in light of his refusal to cooperate with the Government's mental health evaluation. The district court indicated that exclusion of evidence was likely. (Evid. Hrg. Exh. 66.) On October 26, 2001, the district court excluded mental health evidence. (Evid. Hrg. Exh. 68.)

Trial dates were set and continued several times. On February 16, 2001, Patrick Berrigan filed a motion to continue the trial from the April 2001

---

[3]"Depo. Exh." refers to an exhibit used during the deposition of Patrick Berrigan taken on October 19, 2012.

docket until the October/November 2001 docket to conduct further investigation on the mitigation phase. (DCD 193.) The trial date was moved to October 29, 2001. On October 25, 2001, Nelson pleaded guilty to Count One of the indictment, which charged him with kidnapping resulting in death. During his guilty plea, Nelson agreed that at the time he committed this crime he was not suffering from a mental disease or defect that would exclude his criminal responsibility, nor make him incompetent to enter into his guilty plea. (Plea Tr. 21.) Under the terms of the plea agreement, the Government would dismiss Count Two, and the case would proceed to a penalty phase trial to begin on November 5, 2001. (*See* Plea Agrmt. dated Oct. 25, 2001, DCD 338.)

On October 28, 2001, Nelson ingested a non-fatal quantity of pills. He was taken from his place of confinement at CCA to a hospital for treatment and observation. On October 31, 2001, defense counsel filed both a motion for a continuance and a motion for a competency examination.

On November 7, 2001, the district court heard evidence from Assistant Warden Moore, CCA, that Nelson told Assistant Shift Supervisor Allen that he had no intention of killing himself, but "that in a case like his, the name of the game, or the idea is to postpone, postpone, postpone."

Assistant Warden Moore testified that Nelson had made a similar statement to Correctional Officer Taylor. (Nov. 7 Hrg. Tr. 12-13.)[4]

The district court hired psychiatrist Dr. William Logan to examine Nelson for purposes of assisting the court in determining whether there existed sufficient doubt about Nelson's competency. Dr. Logan reported that Nelson had both a rational and a factual understanding of the charges and could assist his attorneys in preparation of his defense. He further reported that Nelson suffered from depression, but was not currently suicidal. (Logan Hrg. Tr. 5.)[5] Defense counsel, acquainted with Dr. Logan's qualifications, recommended that (1) Dr. Logan be appointed as a mental health treatment professional for Nelson; (2) that he be allowed to prescribe any medications for him that he adjudged necessary (Logan Hrg. Tr. 11, 15-16); and (3) that the trial proceed on schedule, barring any delays attributable to medication and assuming no further issue of competency. (Logan Hrg. Tr. 16.)

On November 13, 2001, a jury was selected to hear the penalty proceedings of the case, which began on November 19. On November 28, the jury returned a verdict of death against Nelson for the kidnapping and

---

[4] "Hrg. Tr." refers to the hearing held before Judge Gaitan on November 7, 2001.

[5] "Logan Hrg. Tr." refers to the testimony of Dr. William Logan, held November 7, 2001, before Judge Gaitan.

subsequent murder of Pamela Butler. Judgment was imposed by the district court in accordance with the jury's verdict, and on March 12, 2002, Nelson was sentenced to death.

Nelson appealed his conviction and sentence to the Eighth Circuit Court of Appeals in Case No. 02-1757. He raised the following issues on direct appeal:

1. Whether Nelson received a fair trial by an impartial jury when the district court improperly denied Nelson's: (a) motion for change of venue; (b) motion for sequestered jury; and (c) motion for additional peremptory strikes;

2. Whether the district court conducted a constitutionally effective voir dire that reasonably assured Nelson's right to a fair and impartial jury;

3. Whether the district court properly denied Nelson's challenges for cause and properly granted the Government's challenges for cause;

4. Whether the district court properly instructed the jury on the correct legal standards that it was to use in deliberating on a just verdict; and

5. Whether the district court properly admitted victim impact evidence.

On October 22, 2003, Nelson's conviction and sentence were affirmed in *United States v. Nelson*, 347 F.3d 701 (8th Cir. 2003).

On November 8, 2004, the United States Supreme Court denied Nelson's petition for a writ of certiorari in Case No. 03-10620. *See Nelson v. United States*, 543 U.S. 978 (2004).



Appellate Case: 15-3160 Page: 15 Date Filed: 02/12/2018 Entry ID: 4629195

Nelson then filed a motion to vacate his sentence under 28 U.S.C. § 2255. He alleged a multitude of issues and sub-issues (nearly 60 in total) that he claimed warranted an order vacating his sentence. He alleged his rights guaranteed by the Fifth and Sixth Amendments of the United States Constitution and the laws of the United States were violated because the performance of both his trial and appellate counsel fell below an objective standard of reasonableness under prevailing professional norms, and there was a reasonable probability that, but for counsels' unprofessional errors, the result of the proceedings at trial and on appeal would have been different. The district court denied Nelson's claim without holding a hearing. (Nelson Adden. 1-3.)

Nelson filed a certificate of appealability, which the Eighth Circuit granted in part, remanding the case to district court with directions to hold an evidentiary hearing and make findings of fact and conclusions of law solely on six of the approximately 60 issues regarding trial and appellate counsels' representation. *Nelson v. United States*, 297 Fed.Appx. 563, 565-66 (8th Cir. 2008). The Eighth Circuit upheld the district court's rulings on the other ineffective assistance of counsel claims that were not part of the remand. *Id.* at 566. The allegations of trial counsel's constitutional ineffectiveness were (1) failure to conduct adequate mitigation investigation including failure to move for a continuance to complete one; (2) failure to conduct adequate

investigation of Nelson's mental health; (3) advising or instructing Nelson to decline to submit to a mental health examination by a government examiner; and (4) failure to make an objection to allegedly inflammatory and improper comments in the Government's closing argument and rebuttal. The allegations of appellate counsels' constitutional ineffectiveness included (5) failure to conduct adequate review of the trial record and the law; and (6) failure to raise on appeal the Government's allegedly improper comments in closing argument. *Id*. at 565-66.

The district court, on April 14-17, 2014, held an evidentiary hearing to address the six remanded issues. On March 31, 2015, the court issued its Order denying habeas relief on each of those six issues, and also denying Nelson a certificate of appealability. *Nelson v. United States*, 97 F.Supp.3d 1131 (W.D. Mo. Mar. 31, 2015). On February 29, 2016, Nelson filed a request for an issuance of a certificate of appealability (COA) from this Court on the six issues previously ruled on by the district court as a result of this court's original remand. Not simply limiting his appeal to the six issues before the district court, Nelson has also sought this Court to revisit its own ruling on the original post-conviction issues for which a remand was not ordered.

The Government filed a response in opposition on June 27, 2017. This Court, on September 15, 2016, denied Nelson's COA.[6]

Nelson filed a petition for en banc hearing, and the case was held in abeyance until the United States Supreme Court issued its decision in *Buck v. United States*, 580 U.S. —, 137 S.Ct. 759 (2017), which was filed on February 22, 2017. Thereafter, Nelson filed a petition for rehearing, and the Government filed its response. On July 19, 2017, this Court granted Nelson's petition for rehearing by the panel, and denying as moot his petition for en banc rehearing, setting a briefing schedule. Nelson then filed a motion to modify his certificate of appealability on August 21, 2017, which was granted to expand to include the claim that trial counsel was ineffective for advising him to plead guilty.

### ***B. Statement of the Facts***

#### *1. Nelson's Underlying Criminal Conduct*

On September 29, 1999, Nelson picked up James Shannon Robinson at a temporary labor service to do construction work. (Trial Tr. 90-91.)[7] During the day they spent working together, Nelson revealed that he wanted to kidnap a female, take her to a remote location where he could torture her, rape her,

---

[6]Judges Roger L. Wollman, Lavenski R. Smith and Steven M. Colloton.

[7]"Trial Tr." refers to the trial transcript in this case.

electrocute her, and then kill and bury her. (Trial Tr. 95.) Nelson bragged that he was going back to the "pen" anyway, and "wanted to go for something big." (Trial Tr. 96.) Robinson did not report this to the authorities at the time because he simply did not believe Nelson. (Trial Tr. 99.)

Only ten days before the kidnapping of Pamela Butler on October 2, 1999, in the middle of the night, Nelson, holding a knife to the throat of Michanne Mattson, a medical student, attempted to drag her kicking and struggling from her apartment parking lot to his white Ford pickup. (Trial Tr. 105, 118, 146.) Finally, she dropped limply to the pavement. Despite the fact that Nelson had managed to get handcuffs around one of her wrists, he could drag her no more, and he broke off the attack, warning her over and over, "If you look at me, bitch, I'll kill you." (Trial Tr. 115-16.) He fled in his pick-up truck.

Around 4:00 p.m., on Tuesday, October 12, 1999, Nelson told a friend of his that he knew where a 14-year-old girl was and that "right now is the time to get her, take her, kill her, rape her." (Trial Tr. 149.) A little over one hour later in Kansas City, Kansas, 10-year-old Pamela Butler left her home on her roller skates to go one and one-half blocks to the local gas station to buy some cookies and soda. (Trial Tr. 171-75, 188-89.) Her sister, 11-year-old Penny Butler, was playing on the front porch and watched her sister leave. (Trial Tr. 174.)

Meanwhile, a white Ford pickup had parked along Scott Street, the route Pamela had taken, the driver's door left ajar. (Trial Tr. 61-63, 175.) Pamela skated the same route home. As she neared the pickup, Nelson "came up from out the truck and grabbed her and threw her in the truck and slammed the door." (Trial Tr. 176.)

Seeing this, Penny Butler began screaming. (Trial Tr. 176, 189.) Hearing her screams, teenage sister Casey Eaton came out of the house and looked to where Penny was pointing and saw a white pickup pulling away. (Trial Tr. 189.) As the pickup drove past the screaming girls, Nelson gestured to them with his middle finger. (Trial Tr. 177, 192.)

The sounds of the screams and the squealing of tires attracted the attention of Paul Wilt who was sitting in his truck visiting a friend nearby. (Trial Tr. 206.) Wilt gave chase and, although he eventually lost sight of Nelson's truck, he was able to get its license tag number -- 177CE2. (Trial Tr. 210.)

Between 6:30 p.m. and 7:00 p.m. that same evening, Carl and Shirley Condra drove to their church, the Grain Valley, Missouri Christian Church, on an errand. Parked behind the church was a white Ford pickup, license plate number 177CE2. The truck was unlocked and empty. Suspicious of the truck, they tried to find a police officer. Finding none, they went home. Seeing the



Appellate Case: 15-3160 Page: 20 Date Filed: 02/12/2018 Entry ID: 4629195

10:00 p.m. news of the abduction and description of the truck used, they immediately called the police. (Trial Tr. 69-70.)

Sometime around 8:00 p.m. or thereafter that same evening, Nelson drove to his mother's house in Kansas City, Missouri. (Trial Tr. 77.) Thereafter, he and his mother drove to the Oasis Bar which was one and one-half blocks away from the victim's home. (Trial Tr. 77.) While Nancy Nelson drank, her son played a video game. (Trial Tr. 89, 699.) Leaving the bar, they stopped at the gas station where Pamela Butler had bought her cookies and soda. Nelson bought Pepsi and some cigarettes. (Trial Tr. 700-01.)

Nelson and his mother were at his girlfriend's house when the news was broadcast about the child's abduction. Nelson registered no anxiety, no remorse, no grief, or other reaction. They left and returned to Nancy Nelson's residence. (Trial Tr. 77, 699-702.)

At around 11:00 p.m., Patti Griffith, Nancy's next-door neighbor, saw Nelson on the passenger side of the white pick-up wiping the dashboard and underneath areas while periodically glancing up and down the street. (Trial Tr. 220-22.) Later that same night, Mrs. Griffith was awakened by a noise. When she looked out of her window, she noticed that the pickup truck was gone and that Nelson was pacing around in his yard. (Trial Tr. 223-24.)

Around 2:00 a.m. on Wednesday, October 13, Nelson called for a cab. The dispatcher who took the call remembered him as calm, as "real cool" and



Appellate Case: 15-3160 Page: 21 Date Filed: 02/12/2018 Entry ID: 4629195

"cool as a cucumber," even to the point of telling her a joke. (Trial Tr. 226-27.)

Around 9:00 a.m. on Wednesday, the white Ford pickup truck, license number 177CE2, was found abandoned ten blocks from the Nelson residence. (Trial Tr. 79.) The truck, appearing to have been recently cleaned, had been left unlocked with the keys laying on the floorboard. (Trial Tr. 79-80, 252-53.)

The manhunt for Nelson and the search for the 10-year-old child, Pamela Butler, continued throughout Wednesday with no success except for a brief sighting of Nelson in the vicinity of his girlfriend's home. Nelson eluded capture. (Trial Tr. 233-36.)

On Thursday, October 14, Laurie Torrez, a civilian employee of the Kansas City, Kansas Police Department, took lunch to her husband at the Santa Fe rail yards and, taking a detour along the dike road (Trial Tr. 237-39), spotted Nelson under the 18th Street Bridge. She called the police. (Trial Tr. 240-41.)

Nelson had injured his leg while attempting to lower himself from the bridge and, being unable to escape, he submitted to capture. (Trial Tr. 585-87.) Before a helicopter arrived to extract him from the area, a considerable crowd of watchers had assembled. (Trial Tr. 266-68.) From somewhere in the crowd, a voice yelled out, "What about the girl?" (Trial Tr. 268.) Nelson



Appellate Case: 15-3160 Page: 22 Date Filed: 02/12/2018 Entry ID: 4629195

looked at Officer Keith, the arresting officer, and said, "I know where she's at, but I'm not saying right now." (Trial Tr. 269.) Nelson was airlifted to KU Medical Center for treatment for his injured knee. (Trial Tr. 270.)

Later that same day, a complaint was filed against Nelson for the kidnaping of 10-year-old Pamela Butler. Her body, however, had not yet been found.

The information provided by Mr. and Mrs. Condra had prompted law enforcement to intensify searching efforts on the fields, woods, and ponds in the vicinity of the Grain Valley, Missouri, Christian Church.

On Friday, October 15, law enforcement personnel, searching shoulder to shoulder woods and fields east of the church, discovered the white sports bra Pamela had last been wearing, nearby, her underpants, and then 10-year-old Pamela Butler's nude body buried under a pile of brush. (Trial Tr. 85, 285-93.) A ligature of wire was around her throat. (Trial Tr. 303, 319.)

Results of the autopsy revealed numerous scrapes and abrasions and blunt trauma injury to the mouth and head. (Trial Tr. 321-27.) Her hymen had been torn near the time of death and there was evidence of redness and irritation in the genital area consistent with a sexual assault having occurred. (Trial Tr. 327-29.) The cause of death was strangulation. (Trial Tr. 329.)

The child's underpants were submitted to the Federal Bureau of Investigation for DNA analysis. (Trial Tr. 87.) Examination revealed the



Appellate Case: 15-3160 Page: 23 Date Filed: 02/12/2018 Entry ID: 4629195

presence of semen in the crotch area of the underpants. (Trial Tr. 345.) When compared to a sample of Nelson's blood, testing showed conclusively that he was the source of the DNA in the semen stain. (Trial Tr. 346.)

### 2. *Nelson's Charges, and the District Court Proceedings*

On October 21, 1999, the federal grand jury returned a two-count indictment charging Nelson with a violation of 18 U.S.C. § 1201, Murder During a Kidnapping, and 18 U.S.C. § 2241, Transportation for Sexual Relations with a Minor Resulting in Death. (DCD 5, Indictment, 10/21/99.) Nelson pleaded not guilty to both charges.

On April 20, 2000, the Government filed a "Notice of Intent to Seek the Death Penalty" (amended June 9, 2000), alleging both statutory and non-statutory aggravators. (DCD 67, 88.) Among the non-statutory aggravators alleged was that the offense was particularly cruel and involved serious mental and physical abuse to this child and that Nelson completely lacked remorse for having killed her. These allegations were most evident from the trial testimonies of inmate Frazier, who described the torture cell Nelson intended to build in order to hold his victims captive before raping and killing them (Trial Tr. 503-04), and inmate Bailey who overheard Nelson mimicking the child's "high-pitched screams . . . cries for mommy. Help me. Don't hurt me. Don't kill me." (Trial Tr. 362.) In obvious disgust, Bailey asked Nelson

"[h]ow could [he] do that to that little girl?" Nelson simply responded, "You wouldn't believe it." (Trial Tr. 363.)

Trial dates were set and continued several times until a final trial date of October 29, 2001, was ordered. On October 25, 2001, Nelson pleaded guilty to Count One of the indictment charging murder during a kidnapping. Under the terms of the plea agreement, the case would proceed to a penalty trial to commence November 5, 2001. (DCD 338, Plea Agrmt. Oct. 25, 2001.) Sometime on October 28, 2001, Nelson ingested a non-fatal quantity of pills. He was taken from his place of confinement at CCA to a hospital for treatment and observation.

On October 31, 2001, Nelson filed both a motion for continuance and a motion for competency examination.

On November 7, 2001, the court heard evidence from Assistant Warden Moore, CCA, that Nelson told Assistant Shift Supervisor Allen that he had no intention of killing himself, but "that in a case like his, the name of the game, or the idea is to postpone, postpone, postpone." Assistant Warden Moore testified that Nelson had made a similar statement to Correctional Officer Taylor. (Hrg. Tr. at 12-13.)[8]

---

[8]"Hrg. Tr." hereinafter refers to the hearing on the mental competency motion which took place on November 7, 2001.



Appellate Case: 15-3160 Page: 25 Date Filed: 02/12/2018 Entry ID: 4629195

The court engaged psychiatrist Dr. William Logan to examine Nelson for purposes of assisting the court in determining whether there existed sufficient doubt about Nelson's competency. (DCD 365, Order dated Oct. 31, 2001.)

Dr. Logan reported that Nelson had both a rational and a factual understanding of the charges and could assist his attorneys in preparation of his defense. Dr. Logan further reported that Nelson suffered from depression, but was not currently suicidal. (Logan Proc. Tr. 5.)[9] Defense counsel, acquainted with Dr. Logan's qualifications, recommended that: (1) Dr. Logan be appointed as a mental health treatment professional for Nelson; (2) that he be allowed to prescribe any medications for Nelson that he adjudged necessary (Logan Proc. Tr. 11, 15-16); and (3) and that the trial be commenced, barring any delays attributable to medication and assuming no further issue of competency. (Logan Proc. Tr. 16.)

Jury selection commenced on November 13, 2001, and trial of the penalty phase commenced the following week. During the penalty phase, the jury heard, in addition to the horrific facts of this case, about the uniqueness of victim Pamela Butler and the impact of her death on the lives of her family,

[9] "Logan Proc. Tr." refers to the transcript of proceedings with Dr. William Logan on November 7, 2001.



Appellate Case: 15-3160 Page: 26 Date Filed: 02/12/2018 Entry ID: 4629195

and also that Nelson had, among other things, three prior Missouri State convictions for stealing and a conviction for attempted escape from custody. (Trial. Tr. 475-77.) While in custody on this offense at CCA, Nelson talked about escaping (Trial Tr. 518-19), he unraveled a section of the prison fencing (Trial Tr. 520-21), and he fashioned two workable handcuff keys. (Trial Tr. 424-26.) Nelson threatened to mace his state probation officer (Trial Tr. 486), and while at CCA, in an unprovoked assault, he beat a correctional officer (Trial Tr. 455) and threatened to kill yet another correctional officer. (Trial Tr. 589.)

On November 28, 2001, the jury received the case, deliberated, and returned a unanimous verdict that death should be imposed, finding unanimously that all aggravating factors submitted had been established, with only one juror finding the existence of but a single mitigating factor. (DCD 420, Special Verdict Form.)

At sentencing, Nelson, in a stream of unrepentant hostility, demeaned the victim – "They say I'm evil; how can you kill a ten-year-old girl? It's not that hard . . . Nobody is special." (Sent. Tr. 4);[10] defamed the victim's family –"They weren't sad. They weren't depressed. They were happy to have the

[10]"Sent. Tr." refers to the sentencing transcript of proceedings held on March 11, 2002, before Judge Gaitan.



Appellate Case: 15-3160 Page: 27 Date Filed: 02/12/2018 Entry ID: 4629195

money."[11] (Sent. Tr. 7); defied the justice system – "I will never bow down to the system." (Sent. Tr. 5); and scoffed at the penalty he faced – "Sitting on death row, you think that's a burden on our back? . . . I basically don't give a _ _ _ _ (expletive deleted) . . . I don't care about life or death. Either which way." (Sen. Tr. 5.)

Pointing around the courtroom, Nelson insulted the prosecution team, the victim's family, one of his own attorneys, and court personnel with a two-word expletive and ended his invective with the final valediction, "Some of you will beat me to hell, if I do go to hell, so I'll see you when you get there." (Sent. Tr. 8.)

[11] An apparent reference to the money collected from friends, neighbors, and the community to assist the family following Pamela's death.



Appellate Case: 15-3160 Page: 28 Date Filed: 02/12/2018 Entry ID: 4629195

## SUMMARY OF THE ARGUMENTS

In his first point, Nelson argues that the district court, after holding an evidentiary hearing, erred in its analysis and conclusions denying Nelson's § 2255 motion. This Court remanded Nelson's post-conviction matter to the district court so that an evidentiary hearing could be held, and findings of fact and conclusions of law could be made, regarding *only six* of the 60-odd specific allegations of ineffective assistance of trial and appellate counsel Nelson raised in his § 2255 motion. To be entitled to relief on the six remanded claims of ineffective assistance of trial counsel, Nelson had to prove that defense counsels' performance was (1) unreasonably deficient, and (2) that he suffered such prejudice from the deficient performance that there is a reasonable probability the result would have been different – he would have received a life sentence rather than death. *See Roundtree v. United States*, 751 F.3d 923, 925 (8th Cir. 2014) (citing *United States v. Taylor*, 258 F.3d 815, 818 (8th Cir. 2001)). Failure to establish either prong would be fatal to Nelson's claims. *Worthington v. Roper*, 631 F.3d 487, 498 (8th Cir. 2011) (citing *Strickland v. Washington*, 466 U.S. 668, 697 (1984)).

The district court found and ruled, in a 53-page detailed order, that Nelson failed to establish prejudice regarding any of these six allegations. *Nelson v. United States*, 97 F.Supp.3d 1131 (W.D. Mo. Mar. 31, 2015). Contrary to testimony from defense counsel, who was highly-experienced in



Appellate Case: 15-3160 Page: 29 Date Filed: 02/12/2018 Entry ID: 4629195

death penalty cases, that he and the defense team simply "dropped the ball," the record reflects, and the district court found in assessing the witnesses' credibility, that defense counsels' actions were quite thorough and based on trial tactics designed to achieve the best outcome possible for Nelson. The district court ruled, based on testimony and exhibits from the evidentiary hearing, that trial counsel (and the trial team) obtained records and had numerous family members and other witnesses testify about Nelson's social history (abusive caretakers and a lack of educational achievements) and the significant issues he had from birth. The district court ruled that the information presented to the jury during the death penalty phase was an adequate mitigation investigation. The district court therefore concluded there was no need for any motion to continue the penalty phase to complete additional mitigation investigation.

The court further specifically ruled that in regard to Nelson's mental health, any failure to investigate by defense counsel was done "as a calculated strategy to act in a manner which is obviously deficient, so that on habeas review the Court will set aside the sentence." The court also found that defense counsel was volitionally "strategically deficient" in advising Nelson to not submit to examination by Government mental health experts based on their reasoned belief and experience that such evidence would be very harmful to the presentation of Nelson's defense. Furthermore, counsel consciously



Appellate Case: 15-3160 Page: 30 Date Filed: 02/12/2018 Entry ID: 4629195

chose to not utilize the monies approved for a neuropsychologist and to move forward with the trial as scheduled, believing that ample mitigation evidence had been collected which would provide the jury with the evidence needed to convince them to return a verdict imposing a life, not death, sentence. Even with trial counsel's deficient representation on the mental health investigation, if additional evidence of Nelson's brain damage had been presented, the court found that Nelson had "not shown that there is a reasonable probability that even one juror's decision would have been different," and therefore, Nelson failed to meet the prejudice prong and his ineffective assistance of counsel claim on this allegation was denied. The district court's rulings were not erroneous and this Court should affirm.

In his second point, the expanded issue Nelson's seeks to raise, he claims that he was provided ineffective assistance of counsel in being advised to plead guilty based on counsel's belief that Nelson did not have a viable insanity defense. This issue was not once raised in Nelson's original § 2255 motion, and it does not relate back to any of the issues he initially raised. Nelson's ineffective assistance of counsel claim relating to the waiver in his plea agreement did not put the Government on notice of his current claim or the factual basis for his claim, and thus his claim does not rise out of the same set of facts. Consequently, with this issue being new, Nelson was required to seek permission from this Court to file a second or successive § 2255 motion



Appellate Case: 15-3160 Page: 31 Date Filed: 02/12/2018 Entry ID: 4629195

in accordance with the requirements of 28 U.S.C. § 2255(h). He has failed to do so. Where this new issue is not properly before this Court, it should be summarily dismissed.



Appellate Case: 15-3160 Page: 32 Date Filed: 02/12/2018 Entry ID: 4629195

# ARGUMENTS

**I.**

**Following the evidentiary hearing in this matter, the district court correctly analyzed trial counsel's performance under the appropriate standard and concluded that Nelson was not prejudiced by defense counsel's "strategically deficient" performance.**

Nelson's first argument is that the district court incorrectly analyzed trial counsel's performance and erred in its finding that Nelson was not prejudiced by defense counsel's "strategically deficient" performance. There is not a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. The district court correctly applied the appropriate standard when it weighed the mitigation evidence presented at trial, plus the mitigation evidence at the evidentiary hearing against the aggravating evidence and determined that there was no probability sufficient to undermine confidence in the outcome. Therefore, the district court's ruling that Nelson was not prejudiced by counsel's performance should be upheld.

## *A.* ***Standard of Review***

This Court reviews *de novo* the district court's denial of a § 2255 motion as it relates to legal conclusions and mixed questions of law and fact. *Ortiz v. United States*, 664 F.3d 1151, 1164 (8th Cir. 2011). When reviewing the district court's factual findings this Court employs a clear error standard.

*Id.* "Even under a *de novo* review, the standard for judging counsel's representation is a most deferential one." *Harrington v. Richter*, 562 U.S. 86, 104 (2011). "The question is whether an attorney's representation amounted to incompetence under 'prevailing norms,' not whether it deviated from best practices or most common custom." *Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 690 (1984)).

### ***B. <u>Discussion</u>***

"A convicted defendant's claim that counsel's assistance was so defective to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and



Appellate Case: 15-3160 Page: 34 Date Filed: 02/12/2018 Entry ID: 4629195

it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* at 689; *see also Armstrong v. Kemna*, 534 F.3d 857, 863 (8th Cir. 2008) ("to avoid second-guessing trial counsel's assistance in the face of a guilty verdict, we make every effort 'to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'") (internal citation omitted). Therefore, a reviewing court must recognize "that trial counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, *id.* at 690.

"These standards require no special amplification in order to define counsel's duty to investigate . . . strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91. "In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the



Appellate Case: 15-3160 Page: 35 Date Filed: 02/12/2018 Entry ID: 4629195

circumstances, applying a heavy measure of deference to counsel's judgment." *Id.*; *see also Armstrong v. Kemna*, 534 F.3d 857, 865 (8th Cir. 2008).

In order to prevail on a claim of ineffectiveness, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, *id.* at 694.

"To assess [the] probability [of a different outcome under *Strickland*], we consider the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding – and reweigh[h] it against the evidence in aggravation. That same standard applies-and will necessarily require a court to "speculate" as to the effect of the new evidence – regardless of how much or how little mitigation evidence was presented during the initial penalty phase. . . . In all circumstances, this is the proper prejudice standard for evaluating a claim of ineffective representation in the context of a penalty phase mitigation investigation." *Sears v. Upton*, 561 U.S. 945, 955-56 (2010) (internal citations omitted).



Appellate Case: 15-3160 Page: 36 Date Filed: 02/12/2018 Entry ID: 4629195

1. *The District Court Properly Denied Nelson's Claim that Defense Counsel Failed to Adequately Conduct a Mitigation Investigation, and Failed to Ask for a Continuance to Complete One. Furthermore, any Mitigation Evidence that Could Have Been Presented to the Jury Was Not "New" Evidence. (Allegations (A)(2) & (A)(3)).*

Two of Nelson's claims remanded to the district court for an evidentiary hearing revolve around the mitigation investigation conducted by defense counsel and the evidence heard by the jury during the penalty phase. Nelson claims that his defense team provided ineffective assistance of counsel in the mitigating evidence presented, alleging that more should have been done, and that defense counsel should have asked for a continuance in order to conduct further mitigation investigation to include some of the testimony and exhibits submitted during the subsequent § 2255 evidentiary hearing. However, after holding the evidentiary hearing, the district court found, and correctly so, that much, if not all of this "new" mitigating evidence, had actually been presented to the jury for its consideration of whether to impose a life or death sentence on Nelson for his kidnapping and murder of 10-year-old Pamela Butler.

a. *Mitigation Evidence and Aggravating Evidence*[12]

Nelson called numerous mitigation witnesses to testify during the sentencing phase of his trial. The witnesses included his mother, aunts,

[12]All of this testimony given during Nelson's penalty phase is reflected and reiterated in the district court's order rejecting Nelson's claim that defense



Appellate Case: 15-3160 Page: 37 Date Filed: 02/12/2018 Entry ID: 4629195

siblings, former teacher, principal, family, friends, a landlord, prison guards, an employer, a former babysitter and her daughter, and an expert forensic psychologist who specializes in mitigation defense in capital cases. Nelson also introduced a recorded conversation with a girlfriend who is the mother of Nelson's child. These witnesses each testified about the difficult circumstances of Nelson's childhood and his neglectful, alcoholic mother, and abusive, absent father.

The first witness was Nelson's mother, Nancy Nelson, who testified in detail concerning Nelson's violent and abusive father, Kenneth Morse. She told the jury that that Morse frequently beat her and was also abusive to her boys. She described for the jury, in disturbing detail, how on one occasion Morse tied her up and shocked her with an electrical cord. Morse would also lock her in closets in their home. Ms. Nelson moved her and the children, including Keith, to California and Texas to get away from Morse. She also testified that Nelson was diagnosed with dyslexia and was a poor student, he frequently had fights and behavior problems in school, and he had a bed-wetting problem well into his teen years. The jury also heard Ms. Nelson admit that she was an alcoholic and that two of her children were schizophrenic. Ms. Nelson told the jury that because she had to work long

---

counsel was ineffective in obtaining and presenting mitigating evidence at trial. *Nelson v. United States*, 97 F.Supp.3d 1131 (W.D. Mo. Mar. 31, 2015).



Appellate Case: 15-3160 Page: 38 Date Filed: 02/12/2018 Entry ID: 4629195

hours to support her children she was frequently away from the home, which required the boys to take care of themselves. As a result, the boys often got into trouble at school and in the community. (Trial Tr. 598-694.)[13]

Mary Smith, Nelson's aunt (Nancy Nelson's sister), testified that she and Nancy's stepfather were both abusive alcoholics. She told the jury that Kenneth Morse, Nelson's father, regularly beat Nancy and that he would also lock her up in the home. Ms. Smith helped Nancy and the kids get away from Morse when they moved to California and Texas. Ms. Smith also testified about Nelson's disadvantaged and difficult childhood. (Trial Tr. 712-24.)

Georganna Romero, another aunt (also Nancy Nelson's sister), testified that Morse beat and tortured Nancy and related how on one occasion Morse tried to electrocute Nancy. Ms. Romero described the poor living conditions of Nancy Nelson's home in Texas and further described how the house smelled of urine. (Trial Tr. 725-38.)

Irene Wood testified that she helped Nancy Nelson and her five boys get a home, clothing, and personal items when they moved to Texas. She conveyed the poor conditions of Nelson's childhood in Texas. Ms. Wood also

[13] "Trial Tr." refers to the evidence presented during the death penalty phase trial held before the Honorable Fernando J. Gaitan, Jr. on November 19-28, 2001.

insisted that Nancy Nelson use the last name of Smith so that Morse could not locate her in Texas. (Trial Tr. 740-49.)

Melvin Lister, a guard at the Community Corrections of America (CCA) federal holding facility in Leavenworth, Kansas, testified that he worked in the segregation area of CCA when Nelson was housed in that facility. Lister told the jury that Nelson was frequently threatened and harassed by other inmates at the facility. (Trial Tr. 749-57.) Lieutenant Bruce Roberts, another CCA employee, also testified that Nelson was frequently verbally harassed by other inmates. During the 25 months that Nelson had been housed at CCA, he had never tried to escape. Roberts did not consider Nelson to be a threat while he was housed at CCA. (Trial Tr. 767-84.)

Kenneth Nelson, Nelson's twin brother, testified he was a satellite communications maintenance operator and installer in the United States Army, and described his career in the United States Army as a successful career. He graduated from high school with a 3.69 grade point average. Kenneth told the jury about his family's disadvantaged and impoverished childhood, and described an abusive boyfriend of his mother, Nancy Nelson. He and Nelson would frequently burglarize and steal from homes when they lived in Texas. Kenneth also told the jury that his mother seriously neglected him and his brothers. He said that his mother was never around and that she was always at the bar working or drinking alcohol. Kenneth straightened his

life out when he moved back to Missouri and lived with his aunt and uncle, where he became involved in high school football, worked at a grocery store as a stocker, and subsequently did well in school. (Trial Tr. 798-839.)

David Cunningham, Nelson's employer, testified he owned a basement waterproofing business. Cunningham described Nelson as a pleasant employee and a good worker. He felt that Nelson was reliable and conscientious when working for his business. (Trial Tr. 849-55.)

The defense also played a recorded conversation to the jury between Nelson and his girlfriend, Kerri Dillon. The phone conversation was recorded when Nelson called his mother who then patched Ms. Dillon into a third-party phone call. The conversation was recorded by CCA officials as a part of a routine practice in which all phone conversations of inmates are recorded. In the conversation, among other things, Ms. Dillon and Nelson discussed her recent pregnancy by Nelson. In the conversation, Nelson also appears to express remorse for his involvement in the murder of ten-year-old Pamela Butler. He tells Ms. Dillon of his intent to tell law enforcement authorities of his involvement in the crime. Nelson states in the conversation as follows: "I'm just gonna do the right thing for once in my life." (Trial Tr. 861.)[14]

[14]The recorded conversation was played for the jury's consideration of mitigation evidence.



Appellate Case: 15-3160 Page: 41 Date Filed: 02/12/2018 Entry ID: 4629195

Steven Nelson, Nelson's youngest brother, testified that he was employed as an engineer and was successful in his career. Following high school, Steven attended DeVry Institute in Kansas City and had a 3.9 grade point average. He described his disadvantaged childhood in Texas and further described how his mother neglected him and his brothers. Steven also described Nelson's bed-wetting problem, told the jury his mother was never home and was either working or drinking, and that he and his brothers had to take care of themselves most of the time. (Trial Tr. 863-87.)

Gene Thompson was the landlord for the Nelson family when they lived in Texas. He testified that the Nelson family lived in Section 8 housing, and described the poor, unkempt conditions of the Nelson home. Thompson told the jury that when the Nelson family left the rental property it was in extremely poor condition. (Trial Tr. 895-903.)

Rhonda Monroe, a former babysitter in Texas, testified she was the babysitter for the Nelson children when Nancy Nelson was at work. Nancy Nelson would bring the children to Ms. Monroe's home and leave them when she went to work. Ms. Monroe testified Nelson had a bed-wetting problem, and that her husband would punish Nelson by spanking him with a belt. Her husband was an alcoholic, and was very abusive towards Nelson and his brothers and that they were scared of her husband. When her husband was home the Nelson boys would be required to stay in one room in her home. If



Appellate Case: 15-3160 Page: 42 Date Filed: 02/12/2018 Entry ID: 4629195

they left the room her husband would spank the boys with a belt. (Trial Tr. 904-16.)

Jennifer Monroe, Rhonda Monroe's daughter, testified that the Nelson boys were always required to stay in one room when her mother was babysitting them. Her stepfather, Billy Reese, was always spanking the boys with a belt. She said that the Nelson boys were extremely afraid of her stepdad. (Trial Tr. 919-27.)

Ellen Crutsinger, a former teacher of several of the Nelson boys in Texas, testified that Nelson was in a special education class and that he struggled while in school. She further described Nelson helping a crippled girl in a wheelchair while in elementary school. Nelson would push the girl around the school grounds in her wheelchair and that they developed a friendship. Ms. Crutsinger further testified that Nancy Nelson never attended the "meet the teacher" nights at the school. (Trial Tr. 928-36.)

Michael Griffith, a former neighbor of the Nelsons in Texas, testified that Nancy Nelson was never at home and the boys were frequently left alone to fend for themselves. Mr. Griffith did little things to try to help the Nelson family such as doing plumbing repairs at no charge. He testified that the Nelson house was always messy and unclean. He also told the jury that Nelson's brothers would make fun of Nelson because of his bed-wetting problem. (Trial Tr. 940-51.)



Appellate Case: 15-3160 Page: 43 Date Filed: 02/12/2018 Entry ID: 4629195

Homer Dear, Nelson's former school principal and also a former Texas State Representative, testified that he knew the Nelson family when they were living in Texas and he was their principal at an elementary school. Mr. Dear believed the Nelson boys were physically and mentally abused. He described the Nelson family as a very poor family and further described how he had tried to help them. He described the poor hygiene of the Nelson boys and told the jury how he would require the boys to take showers and would give them clothing at the school. Mr. Dear bought clothes for the boys at a store on at least one occasion. He also visited the Nelson home and described the house as unclean. (Trial Tr. 951-59.)

Finally, Nelson called expert defense witness Dr. Mark Cunningham to testify on his behalf. Dr. Cunningham is a clinical and forensic psychologist who frequently testifies as a mitigation and sentencing expert in capital cases around the United States. He testified concerning the effect of childhood abuse and neglect on Nelson's character and development. In his lengthy testimony, Dr. Cunningham explained to the jury how the squalid conditions and abusive and violent nature of Nelson's childhood affected the formation of his character. Dr. Cunningham also told the jury that Nelson would be less violent as he aged. (Trial Tr. 964-1025.)

The district court, in its order, discusses the mitigating work done by the defense team and evidence presented at trial as compared to the "new"

evidence presented for the evidentiary hearing. In fact, the defense team, in a sealed document to the court dated September 19, 2001, stated that "'extensive mitigation work on the case' had been completed," with the corresponding billing hours demonstrating this statement to be accurate. *Nelson v. United States*, 97 F.Supp.3d 1131, 1137 (W.D. Mo. Mar. 31, 2015). Mitigation investigator Tena Francis testified that her firm had billed a total of 429 hours for Nelson's mitigation case. *Id.* (citing Evid. Tr. 507[15] and Gov. Exhs. P36, P36A.) Ms. Francis provided a binder to the defense team with mitigation evidence on Nelson's traumatic birth, abusive upbringing, troubled educational issues, among other things, and this was presented to the jury for their consideration of whether to impose a life sentence or the death penalty.

Nelson alleges that additional mitigation evidence should have been presented. Nelson points to the evidence offered by Jill Miller, MSSW (Master of Science in Social Work), during the evidentiary hearing. This evidence included a social history of Nelson on both sides of his family, which included "a multigenerational history of mental illness, a history of alcoholism, substance abuse on both sides of the family domestic abuse on both sides of the family, inappropriate sexual behavior and criminal sexual

[15]"Evid. Tr." refers to the transcript of the evidentiary hearing held on April 14 through 17, 2014, before Judge Gaitan.



Appellate Case: 15-3160 Page: 45 Date Filed: 02/12/2018 Entry ID: 4629195

misconduct." *Nelson*, *id.* at 1140. But, Ms. Miller admitted that she relied on the earlier work Nelson's original defense team, including the report of Tena Francis and the interview notes from Dan Grothaus, Ron Ninemire, and Deborah Haddad. Ms. Miller testified that she used these materials, available to the original defense team, to prepare her psychosocial history report on Nelson. Perhaps most significantly, Ms. Miller stated that given the slower pace of post-conviction work, she had been afforded over five years to gather her records. *Nelson*, *id.* (citing Evid. Tr. 381.) Nelson further argued that information that his original defense team, at the mitigation phase trial, should have presented testimony from Dr. Lebowitz about the severity of the maltreatment Nelson endured during childhood, and the effects it had on him. Though Dr. Lebowitz did not testify at the penalty phase trial, the type of information that she testified to at the evidentiary hearing was generally submitted to the jury for their consideration during the penalty phase trial.

As the district court found, "Nelson's habeas counsel has not uncovered any 'powerful' new evidence. Rather, habeas counsel has simply discovered a larger quantity of mitigation evidence." *Nelson*, *id.* at 1143. Indeed, as the record makes clear, the evidence produced at the evidentiary hearing was of the same type and tenor as that produced years earlier in the penalty phase trial. On habeas review, counsel simply had more time and therefore uncovered a greater volume of evidence, but nothing truly new, or powerful.



Appellate Case: 15-3160 Page: 46 Date Filed: 02/12/2018 Entry ID: 4629195

The court made this finding even though defense counsel Pat Berrigan did not ask for the penalty phase to be continued. The court concluded that while it was "possible" for more witnesses and evidence to be uncovered, Nelson had not shown here that "Berrigan's failure to request a continuance affected the mitigation case which his counsel presented." *Nelson*, *id.* at 1144. "This is not a case where only scant mitigation evidence was presented. Rather, the mitigation case was presented over a period of two days and Nelson's attorneys called seventeen witnesses to testify on his behalf." *Nelson*, *id.* at 1143.

Susan Hunt and Bill Shull talked about the need for a mitigation investigation to investigate statutory and non-statutory mitigating factors, and noted that records must necessarily be gathered. Ron Ninemire, at the direction of Larry Pace, was leading the mitigation investigation. (Evid. Tr. 26.) After assessing where they were in the preparation of their case, the defense team filed a continuance motion on July 20, 2000, in order to receive additional time to get the mitigation case, including the mental health issues, ready. (Evid. Tr. 31-32.) The trial was continued to April 23, 2001. (*See* Evid. Hrg. Exh. P26; DCD 119, 121; Evid. Tr. 36.)

Hunt traveled to Texas and California to conduct mitigation investigation. In California, Hunt attempted to obtain records demonstrating that Nancy Nelson had lived in a battered women's shelter back in Sacramento



Appellate Case: 15-3160 Page: 47 Date Filed: 02/12/2018 Entry ID: 4629195

(Visalia), California. When Larry Pace and Ron Ninemire were still on the case, Ninemire was the chief investigator in connection with the mitigation investigation. Ninemire was gathering records, and interviewed several people in White Settlement, Texas. (Evid. Tr. 91.) Ninemire chronicled the team's various investigative efforts and after being removed from the case because of a conflict, created a detailed letter dated September 12, 2000, which documented a to-do list of what had been done and what needed still to be done. (Evid. Tr. 88.) That letter was passed along to Bill Shull and Hunt as Nelson's remaining counsel. (Evid. Tr. 88-89.)

During his testimony, Shull stated that he was familiar with the circumstances of Nelson's birth – him being the second born of twins and possibly being a fetal/alcohol baby, as well as Nelson's sudden personality change in the 9th grade, and extended bed wetting. (Evid. Tr. 153.) Shull had knowledge that fetal alcohol syndrome could lead to neurological damage or impairments. (Evid. Tr. 154.)

After Ninemire was removed from the case, defense counsel obtained the services of two different investigators, Dan Grothaus and Tim Murphy. (Evid. Tr. 49; Evid. Hrg. Exh. P38 at 79.) Grothaus was a former investigative journalist and documented his progress. (Evid. Hrg. Exh. 10.) By letter dated October 25, 2000, Grothaus kept the defense team informed about his investigation. (Evid. Tr. 89-90.) As the investigation progressed, the defense



Appellate Case: 15-3160 Page: 48 Date Filed: 02/12/2018 Entry ID: 4629195

team secured funding from the court to retain Tena Francis, a seasoned death penalty mitigation investigator. On September 19, 2001, in a sealed motion to the district court, defense counsel and Ms. Francis indicated that "extensive mitigation work on the case" had been completed. Correspondingly, in the billing hours of Ms. Francis, Patrick Berrigan, and Susan Hunt, it is clear that this statement is true.

As early as the spring of 2000, the defense team was aware that mental health would play a significant role in this case. Larry Pace testified that mental health is always an important consideration in a death penalty case. (Evid. Tr. 608.) In support of a motion to continue the trial, defense counsel informed the district court that two of Nelson's brothers had been diagnosed with schizophrenia and that further mental health evaluations needed to be completed. (Evid. Tr. 33.) In a note from her files regarding a defense team meeting on November 17, 2000, Ms. Francis chronicled the team's discussion of obtaining a neuropsychologist. (Evid. Tr. 40-41.) Consequently, Dr. Dennis Cowan, who was local and highly recommended, was hired. (Evid. Tr. 42.) By December 12, 2000, Dr. Mark Cunningham was hired to review the records that had been collected and to serve as a "teaching witness" on Nelson's traumatic background for the jury. (Evid. Tr. 43-44.)

The aggravating evidence of Nelson's kidnapping and murder of Pamela Butler, however, outweighed the mitigating evidence (even with the

larger quantity of mitigation evidence discovered by habeas counsel), and surely supported the jury imposing the death penalty. That trial testimony of the details of what happened included:

> On September 29, 1999, Nelson picked up James Shannon Robinson at a temporary labor service to do construction work. (Trial Tr. 90-91.) During the day they spent working together, Nelson revealed to Mr. Robinson that he wanted to kidnap a female, take her to a remote location where he could torture her, rape her, electrocute her, and then kill and bury her. (Trial Tr. 95.) Nelson bragged that he was going back to the penitentiary anyway, and "wanted to go for something big." (Trial Tr. 96.) Mr. Robinson did not report this to the authorities at the time because he simply did not believe Nelson. (Trial Tr. 99.)
>
> Only ten days before the kidnapping of Pamela Butler on October 2, 1999, in the middle of the night, Nelson, holding a knife to the throat of Michanne Mattson, a medical student, attempted to drag her kicking and struggling from her apartment parking lot to his white Ford pickup. (Trial Tr. 105, 118, 146.) Ms. Mattson testified that she finally dropped limply to the pavement. Despite the fact that Nelson had managed to get handcuffs around one of her wrists, he could drag her no more, and he broke off the attack, warning her over and over, "If you look at me, bitch, I'll kill you." (Trial Tr. 115-16.) Nelson fled in his pickup truck.
>
> Around 4:00 p.m., on Tuesday, October 12, 1999, Nelson told a friend of his that he knew where a 14-year-old girl was and that "right now is the time to get her, take her, kill her, rape her." (Trial Tr. 149.) A little over one hour later in Kansas City, Kansas, ten-year-old Pamela Butler left her home on her roller skates to go one and one-half blocks to the local gas station to buy some cookies and soda. (Trial Tr. 171-75, 188-89.) Her sister, 11-year-old Penny Butler, was playing on the front porch and watched her sister leave. (Trial Tr. 174.)
>
> Meanwhile, a white Ford pickup, with the driver's door left ajar, had parked along Scott Street, the route Pamela had

taken many times before. (Trial Tr. 61-63, 175.) She skated the same route home, and as she neared the pickup, Nelson "came up from out the truck and grabbed her and threw her in the truck and slammed the door." (Trial Tr. 176.) Seeing this, Penny Butler began screaming. (Trial Tr. 176, 189.) Hearing her screams, her teenage sister Casey Eaton came out of the house and looked to where Penny was pointing and saw a white pickup pulling away. (Trial Tr. 189.) As the pickup drove past the screaming girls, Nelson gestured to them with his middle finger. (Trial Tr. 177, 192.)

The sounds of the screams and the squealing of tires attracted the attention of Paul Wilt who was sitting in his truck visiting a friend nearby. (Trial Tr. 206.) Mr. Wilt gave chase and, although he eventually lost sight of Nelson's truck, he was able to get its license tag number – 177CE2. (Trial Tr. 210.)

Between 6:30 p.m. and 7:00 p.m. that same evening, Carl and Shirley Condra drove to their church, the Grain Valley, Missouri, Christian Church, on an errand. Parked behind the church was a white Ford pickup, license plate number 177CE2. The truck was unlocked and empty. Suspicious of the truck, they tried to find a police officer. Finding none, they went home. After seeing the 10:00 p.m. news of the abduction and description of the truck used, they immediately called the police. (Trial Tr. 69-70.)

Sometime around 8:00 p.m. or thereafter that same evening, Nelson drove to his mother's house in Kansas City, Missouri. (Trial Tr. 77.) He and his mother drove to the Oasis Bar which was a block and a half away from the victim Pamela Butler's home. (Trial Tr. 77.) While Nancy Nelson drank, her son played a video game. (Trial Tr. 89, 699.) After leaving the bar, they stopped at the gas station where Pamela Butler had bought her cookies and soda. Nelson purchased Pepsi and some cigarettes. (Trial Tr. 700-01.)

Nelson and his mother were at his girlfriend's house when the news was broadcast about Pamela Butler's abduction. Nelson registered no anxiety, no remorse, no grief, or other

reaction. They left and returned to Nancy Nelson's residence. (Trial Tr. 77, 699-702.)

At around 11:00 p.m., Patti Griffith, the next-door neighbor to Nancy Nelson, saw Nelson on the passenger side of the white pickup wiping the dashboard and underneath areas while periodically glancing up and down the street. (Trial Tr. 220-22.) Later that same night, Mrs. Griffith was awakened by a noise. When she looked out of her window, she noticed that the pickup truck was gone and that Nelson was pacing around in his yard. (Trial Tr. 223-24.)

Around 2:00 a.m., in the morning of Wednesday, October 13th, Nelson called for a cab. The dispatcher who took the call remembered him as calm, as "real cool" and "cool as a cucumber," even to the point of telling her a joke. (Trial Tr. 226-27.)

Around 9:00 a.m., on Wednesday morning, the white Ford pickup truck, license number 177CE2, was found abandoned ten blocks from Nelson's residence. (Trial Tr. 79.) The truck, which appeared to have been recently cleaned, had been left unlocked with the keys lying on the floorboard. (Trial Tr. 79-80, 252-53.) The manhunt for Nelson and the search for 10-year-old Pamela Butler continued throughout Wednesday with no success except for a brief sighting of Nelson in the vicinity of his girlfriend's home. (Trial Tr. 233-36.)

On Thursday, October 14th, Laurie Torrez, a civilian employee of the Kansas City, Kansas Police Department, took lunch to her husband at the Santa Fe rail yards and, taking a detour along the dike road (Trial Tr. 237-39), spotted Nelson under the 18th Street Bridge. She called the police. (Trial Tr. 240-41.)

Nelson had injured his leg while attempting to lower himself from the bridge and, being unable to escape, submitted to capture. (Trial Tr. 585-87.) Before a helicopter arrived to extract him from the area, a considerable crowd of watchers had assembled. (Trial Tr. 266-68.) From somewhere in the crowd, a voice yelled out, "What about the girl?" (Trial Tr. 268.)

> Nelson looked at Officer Keith, the arresting officer, and said, "I know where she's at, but I'm not saying right now." (Trial Tr. 269.) Nelson was airlifted to KU Medical Center for treatment for his injured knee. (Trial Tr. 270.)
>
> Later that same day, a complaint was filed against Nelson for the kidnapping of 10-year-old Pamela Butler. Her body, however, had not yet been found. The information provided by Mr. and Mrs. Condra had prompted law enforcement to intensify searching efforts on the fields, woods, and ponds in the vicinity of the Grain Valley, Missouri, Christian Church.
>
> On Friday, October 15, law enforcement personnel, searching shoulder to shoulder in the woods and fields east of the church, discovered the white sports bra Pamela had last been wearing. Nearby, they found her underpants, and then ten-year-old Pamela Butler's nude body was found buried under a pile of brush. (Trial Tr. 85, 285-93.) A wire ligature was wrapped around her throat. (Trial Tr. 303, 319.)
>
> Results of the autopsy revealed numerous scrapes and abrasions and blunt trauma injury to Pamela Butler's mouth and head. (Trial Tr. 321-27.) Her hymen had been torn near the time of death and there was evidence of redness and irritation in the genital area consistent with a sexual assault having occurred. (Trial Tr. 327-29.) The cause of her death was strangulation. (Trial Tr. 329.)
>
> Pamela Butler's underpants were submitted to the Federal Bureau of Investigation for DNA analysis. (Trial Tr. 87.) Examination revealed the presence of semen in the crotch area of her underpants. (Trial Tr. 345.) When compared to a sample of Nelson's blood, test results conclusively showed that he was the source of the DNA in the semen stain. (Trial Tr. 346.)

*Nelson*, 97 F.Supp.3d at 1152-54.

Among the non-statutory aggravators alleged in the Government's notice to seek the death penalty, was that the offense was particularly cruel



Appellate Case: 15-3160 Page: 53 Date Filed: 02/12/2018 Entry ID: 4629195

and involved serious mental and physical abuse to this child and that Nelson completely lacked remorse for having killed her. These allegations were most evident from the trial testimonies of inmate Frazier, who described the torture cell Nelson intended to build in order to hold his victims captive before raping and killing them. (Trial Tr. 503-04.) Inmate Bailey testified that he overheard Nelson mimicking the child's "high-pitched screams . . . cries for mommy. Help me. Don't hurt me. Don't kill me." (Trial Tr. 362.) In obvious disgust, Bailey asked Nelson "[h]ow could [he] do that to that little girl?" Nelson simply responded, "You wouldn't believe it." (Trial Tr. 363.)

In addition to the horrific facts of the case, the jury heard evidence about the uniqueness of victim Pamela Butler and the impact of her death on the lives of her family, and that Nelson had, among other things, three prior Missouri state convictions for stealing and a conviction for attempted escape from custody. (Trial Tr. 475-77.) Other evidence presented included information that while in custody on this offense at CCA, Nelson talked about escaping (Trial Tr. 518-19), he unraveled a section of the prison fencing (Trial Tr. 520-21), and he fashioned two workable handcuff keys. (Trial Tr. 424-26.) Nelson threatened to mace his State probation officer (Trial Tr. 486), and while at CCA, in an unprovoked assault, he beat a correctional officer (Trial Tr. 455) and threatened to kill yet another correctional officer. (Trial Tr. 589.)



Appellate Case: 15-3160 Page: 54 Date Filed: 02/12/2018 Entry ID: 4629195

The district court was correct in its ruling that trial counsel "was not deficient in either the mitigation investigation or presentation of the mitigation case." (DCD 269 at 19.) There were 17 witness that testified during the penalty phase in support of mitigating factors that the jury should consider in deciding whether or not to impose the death penalty for Nelson's killing of Pamela Butler. Those witnesses included close family, friends, neighbors, employers, educators, experts and others, who painted a vivid picture of Nelson's life – his social history and "red flags" in his background. The testimony spoke to who Nelson was as a person - mentally, physically, and emotionally. As the district court found, "Nelson's habeas counsel *has not uncovered any 'powerful' new evidence*. Rather, habeas counsel has simply *discovered a larger quantity* of mitigation evidence." *Nelson*, *id.* at 1144. (Emphasis added.) This finding by the court only deals with Nelson's social history.

In Nelson's brief, he argues that there is a fundamental misapplication of *Strickland* as it relates to the first prong analysis by the district court. (Nelson Brf. 46-50.) However, the court understood and properly applied *Strickland*. In the district court's order, as it is structured, the court discusses the mental health issues separate and apart from Nelson's social history. *See*, *e.g.*, *Nelson*, 97 F.Supp.3d at 1144-57 (discusses Nelson's mental health issues); *Nelson*, *id*. at 1136-44 (discussed Nelson's social history). The

district court ultimately applied the appropriate standard when it weighed the mitigation evidence presented at trial plus the mitigation evidence presented at the evidentiary hearing against the aggravating evidence. *Nelson*, *id.* at 1156 (citing *Sears v. Upton*, 561 U.S. 945, 956 (2010)).

### *b. Decision to Not Ask For a Trial Continuance*

In the summer of 2001, Patrick Berrigan had health issues that necessitated heart bypass surgery which took place on August 8, 2001. Berrigan and Hunt had a meeting at CCA with Nelson about Berrigan's surgery. Nelson wanted the trial continued so that Berrigan could have time to recover, but Berrigan decided that he was not going to ask for a continuance. (Evid. Tr. 66-67.) Hunt testified about Berrigan's decision to not file a continuance motion with Nelson, stating that Berrigan assured her that he could get everything done, and Hunt and Nelson accepted Berrigan's decision. (Evid. Tr. 110.) Whether she ultimately agreed with the decision to proceed to trial or not, Hunt never informed the district court that she was concerned about Berrigan's health, nor did she express any concerns about whether or not the defense team was ready to go to trial and, correspondingly, never filed for a continuance on her own.

In regards to his surgery, Berrigan said, it "depends on how you look at it." It [the trial] was set for a couple of months after his surgery, and as he "look[s] back on it now, of course, I know I wasn't ready. . . . I wasn't ready,

but I guess I didn't particularly assess whether I was ready or not after having bypass surgery." Berrigan testified that he thought "we were going to trial in October, period" – there was "never a promise . . . it will be continued eight months, nine months, a year." (Evid. Tr. 231-32.) Berrigan testified that he just lost a bunch of time, but he is not sure even if he had asked for a continuance he would have used his health as a reason. No continuance was ever filed. (Evid. Tr. 234.) After his surgery, Berrigan testified that he was able to devote a significant amount of time in terms of getting up to speed for Nelson's case. (Evid. Tr. 263.)

Nelson argues that trial counsel "unreasonably failed to seek a continuance" where it was apparent from a review of the record that Berrigan was not ready to proceed to trial in the fall of 2001. (Nelson Brf. 34, 35.) However, the record does not show that it was "apparent." The mitigation evidence presented was not scant, but was rather comprehensive, even considering the additional evidence now presented. As already argued and found by the district court, habeas counsel has not uncovered any "powerful" new evidence, and while "not perfect," the mitigation evidence as it related to Nelson's life history, was "more than adequate." *Nelson*, 97 F.Supp.3d at 1144. Consequently, defense counsel's performance was not ineffective, and the district court was correct in denying Nelson's claim.



Appellate Case: 15-3160 Page: 57 Date Filed: 02/12/2018 Entry ID: 4629195

As the district court found after the evidentiary hearing, defense counsel in Nelson's case is distinguishable from *Wiggins v. Smith*, 539 U.S. 510 (2003), where defense counsel completely abandoned the investigation into that defendant's background when sentencing proceedings commenced immediately after the court denied defense counsel's motion for a bifurcated sentencing proceeding. The Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), does not require defense counsel to investigate every conceivable piece of mitigation evidence, and that did not change with the decision in *Wiggins*. *Wiggins*, *id.* at 533. And here in Nelson's case, the defense team uncovered a significant amount of mitigation evidence and presented it to the jury. The aggravating evidence, even with this other mitigating evidence that is not "new," was simply so heinous, that any jury would find that a sentence of death was warranted.[16]

[16]On November 28, 2001, the jury received the case, deliberated, and returned a unanimous verdict that death should be imposed, finding unanimously that all aggravating factors submitted had been established, with only one juror finding the existence of but a single mitigating factor. (*See* Special Verdict Form, DCD 420.)



Appellate Case: 15-3160 Page: 58 Date Filed: 02/12/2018 Entry ID: 4629195

2. *The District Court Properly Found that Defense Counsel's Failure to Investigate and Present Mental Health Evidence and Testimony, and Advise Nelson to Decline a Mental Health Examination, While Ineffective, Did Not Meet the Prejudice Prong under Strickland v. Washington, Because There was No Reasonable Probability that Even One Juror Would Have Voted to Sentence Nelson to Life in Prison. (Allegations (A)(4) & (A)(5))*.

In evaluating Nelson's allegations of ineffective assistance of counsel when defense counsel Berrigan did not present mental health evidence or testimony during the penalty phase, the district court found that counsel's performance was deficient, but further found that Nelson could not establish the prejudice prong. *Nelson*, 97 F.Supp.3d at 1149, 1157. In the court's ultimate finding that Nelson was not entitled to relief, it not only assessed what actions and steps Berrigan made to investigate Nelson's mental health, but the court also made an independent examination of the expert witnesses' testimony at the evidentiary hearing. *Nelson*, *id*. at 1155-56. While the court found that Berrigan's failure to further investigate Nelson's mental health and to advise him to decline to submit to a mental health examination by a government expert was "strategically deficient," the court nevertheless properly concluded that even if these additional experts had testified during the penalty phase and Nelson cooperated, there was not a reasonable probability that any jury would have come to a different conclusion than imposing the death penalty. *Id*. at 1156-57.



Appellate Case: 15-3160 Page: 59 Date Filed: 02/12/2018 Entry ID: 4629195

The record in this matter is replete with evidence that trial counsel, Patrick Berrigan, is an experienced capital litigator who has devoted the substantial part of his lengthy legal career in the defense of defendants facing the death penalty. (*See* Evid. Tr. 173 – Berrigan currently in the capital litigation division Missouri Public Defender System and handle cases in which clients charged with first-degree murder and state has indicated they are seeking the death penalty; Evid. Tr. 175 – first capital case was in 1986 and been doing capital cases more or less continuously since then. From 1990 until 1997, handled exclusively capital murder cases in state of Missouri; Evid. Tr. 176-77 – regularly attended capital training seminars, including Life in the Balance, which is typically a four-to-five day intensive seminar dealing exclusively with capital defense; Evid. Tr. 261 – tried a number of capital cases to verdict and attended capital training seminars including Life in the Balance in March 2001 during the timeframe of his representation in this case.) Additionally, the record in this matter is also replete with references to where trial counsel Berrigan acknowledge that he is very familiar with mental health issues in the context of mitigation investigations and presentations in a capital case. (*See* Evid. Tr. 192-93 – standard practice in death penalty cases to have mental health investigation and evaluation; Evid. Tr. 203 – mitigation investigators used in capital defense to examine several aspects of the defendant's life including behavioral and mental health issues; Evid. Tr. 215-



Appellate Case: 15-3160 Page: 60 Date Filed: 02/12/2018 Entry ID: 4629195

17 – Berrigan testified that he is aware of mental health and brain impairment issues because he has been engaged in capital defense for a number of years and has used neuropsychologists many times.) Furthermore, the record is replete with examples of where trial counsel Berrigan acknowledged that he was aware in this case that his client potentially suffered from mental health related issues. (*See* Evid. Tr. 196 – Berrigan testified he was aware neuropsychologist had been approved by the court and was poised to conduct an examination and evaluation before he cancelled it; Evid. Tr. 200 – Berrigan testified he never changed his mind about a neuropsychological examination of defendant but just dropped the ball and never got to it.)

It is against this backdrop that the district court correctly made a factual finding that trial counsel Berrigan's testimony that he "dropped the ball" regarding the mental health investigation was not credible and instead "strategically deficient" and consistent with the strategy employed by Berrigan in his capital representation of Angela Johnson in the Northern District of Iowa in front of the Honorable Mark Bennett, which resulted in her death sentence being vacated. *Nelson*, 97 F.Supp.3d at 1148. As this was a factual finding made by the district court following the evidentiary hearing, this Court utilizes the clear error standard in assessing whether the district court ruled correctly. *Ortiz*, 664 F.3d at 1164. The district found, and the record supports, that trial counsel Berrigan made this calculated decision to



Appellate Case: 15-3160 Page: 61 Date Filed: 02/12/2018 Entry ID: 4629195

be "strategically deficient" based upon a recognition that the added value of the mental health evidence would not ultimately change the conclusion that a death sentence was warranted and it was better to leave this as an habeas issue. *Nelson*, 97 F.Supp.3d at 1148.

*a. Defense Counsel's Mental Health Strategy*

During her representation, defense counsel Susan Hunt spent the majority of her time litigating a request to change venue and, based on her scientific background, obtaining an expert to review the Government's forensic evidence (since Nelson was adamant that he did not rape the victim). To advance Nelson's position on this issue, Hunt ultimately sought and obtained a forensic pathologist to examine DNA seminal stains and who reviewed the autopsy reports. (Evid. Tr. 51.) Berrigan, however, began handling the bulk of the mitigation responsibilities, including the mental health issues. Berrigan believed that a neuropsychological examination needed to be done and was aware that Dr. Cowan had been approved by the district court. Dr. Cowan was poised to conduct an examination and evaluation of Nelson. (Evid. Tr. 196.) Berrigan's CJA worksheet (Evid. Hrg. Exh. P17A) indicates that he called Dr. Cowan the day before the evaluation was scheduled to occur and canceled it. (Evid. Tr. 198.) Berrigan testified that he canceled Dr. Cowan's evaluation because he had had prior experience with Dr. Cowan (good and bad) and thought that he could obtain someone

with more of a national reputation. (Evid. Tr. 199.) Additionally, Berrigan had just been appointed to the case (within two weeks) and did not feel the need to use an expert chosen by another attorney. Berrigan admitted that he wanted to wait and do the mental evaluation later in the case, once he knew more about the case and at a time when he had a better handle on the discoverability of what he uncovered. (Evid. Tr. 199-200.)

Berrigan never commissioned a neuropsychological evaluation and testified that "we dropped the ball. It should have happened. Other things came up to the forefront, and I never got back to it. There's no excuse, really no excuse at all." (Evid. Tr. 200.) The record clearly establishes that after Berrigan was appointed to the case, he filed a number of motions on how, when, and if the Government would be allowed to conduct a mental health evaluation of Nelson. Once the district court ordered the evaluation, Berrigan systematically objected to the manner in which the evaluation would be conducted and attempted to have the court intervene on what subjects, if any, the Government could question Nelson about. The litigation in this area began in May 2001 and continued until after Nelson pled guilty. Berrigan testified that he had past bad experiences in death penalty cases with mental health evidence and indicated that ". . . the problem with neuropsych testing is certainly if you don't talk about the defendant's history, that's going to be the subject of cross-examination by the government prosecutors. If you had a

neurologist, that really isn't part of their job. I mean, somebody who's just doing, for example, objective medical testing, such as brain imaging, doesn't really have occasion to have any discussion with the client about their history or the events of the alleged crime." (Evid. Tr. 219.) Tena Francis testified and her records confirm that Berrigan was skeptical about a neuropsychological examination and wanted more objective testing, or something along the lines of a neurological evaluation. Finally, Berrigan explained that the discoverability of mental health evidence was not well-settled under federal law at the time of Nelson's trial (2001). While on the witness stand, the district court asked Berrigan to explain his concern with the Government's investigation of Nelson's mental health. Berrigan explained that in 2000 in state court, the law was that if defense put on mental health evidence, the Government would have the opportunity to examine the defendant. In Berrigan's experience, if the Government put on its psychologist in the penalty phase, it "was devastating testimony" and he lost his case. (Evid. Tr. 227.) Consequently, Berrigan made a calculated, strategic decision to delay any examination so as to not give the Government additional damaging evidence.

*b.* *Mental Health Experts Presented During the Evidentiary Hearing*

During the evidentiary hearing, defense expert witness Dr. Carolyn S. Crawford, a neonatologist, testified that information/studies on areas of brain injury and brain damage was not available in 2001 – she could testify in terms of risk factors, but she could not have offered this same testimony (i.e. the lingering effects of prenatal and neonatal insults) based upon her review of the records back in 2001. (Evid. Tr. 525.) Dr. Reuben Gur, neuropsychologist with a specialty in brain imaging and behavior, testified that in his testing there is no comparative value for the lesion found in Nelson's brain imaging by looking at Exhibit P80 at 11. (Evid. Tr. 600-01.) Consequently, with no baseline comparison value, his imaging looks nice, but really provides no useful information.

During the evidentiary hearing on the § 2255, Nelson suggested that additional mental health evidence regarding Nelson's brain damage through Dr. Crawford and Dr. Gur should have been presented to the jury for its consideration. The district court recognized in its order that Dr. Crawford summarized Nelson's compromised neurological development based on his birth records, but she also confirmed that some of the information and studies in this area were not available in 2001. *Nelson*, 97 F.Supp.3d at 1146. Significantly, the court concluded based on Dr. Crawford's testimony, that



Appellate Case: 15-3160 Page: 65 Date Filed: 02/12/2018 Entry ID: 4629195

"she could testify in terms of risk factors, but she could not have offered this same testimony (*i.e.* the lingering effects of prenatal and neonatal insults) based upon her review of the records back in 2001." *Id.* (citing Evid. Tr. 525).

Dr. Gur, likewise, testified about the MRI, PET, and neuropsychological testing he conducted on Nelson's brain showing frontal system damage, but that he had "no comparative value for the lesion found in Nelson's brain imaging" and that with no baseline comparison value, "his imaging provides no useful information. *Id.*

Dr. Dan Martell, a forensic neuropsychologist – one that studies the brain and behavior, particularly the effects of brain damage on human behavior – testified as a Government witness. (Evid. Tr. 631.) Dr. Martell has published in the field of psychology and neuropsychology between 25 to 30 times in peer-reviewed journals, and testified hundreds of times in state and federal court in approximately 150 cases, of which half, or 75, were federal cases. (Evid. Tr. 633.) Government Exhibit 118A is his CV, and Government Exhibit 118 is a copy of his report on Nelson. (Evid. Tr. 634.) He evaluated Nelson on September 9-10, 2010, for 9 ½ hours at Terre Haute in a private, quiet room with only a steel table separating him from Nelson. (Evid. Tr. 635-36.) He previously attempted to evaluate Nelson earlier in the fall of 2001 at the Government's request, but Nelson refused to be evaluated. (Evid. Tr. 636.) Dr. Martell determined from his testing and examination that

Nelson exhibited a level of brain impairment, or brain damage; however, he concluded that the brain impairment did not account for uncontrollable impulsivity. Dr. Martell continued by testifying that Nelson tried to carry out his fantasy on another victim, and when that did not work, he selected another youthful, more easily controlled victim. Nelson laid in wait, hid himself, brought electrical cords to bind the victim, kidnapped her, he took off at a high rate of speed in such a way that people would not be able to see him or identify him. He took the victim to a secluded area, bound her up so she could not get away – these things, Dr. Martell argued, show planning as opposed to impulsive acting out. For those reasons, Dr. Martell did not believe that Nelson's brain damage played a significant role in him committing this crime. (Evid. Tr. 649.)

Contrary to Dr. Amador's report regarding Nelson's sanity as it relates to the McNaughton standards, Dr. Martell's opinion was that Nelson did not meet the standards with regard to knowing the wrongfulness of his behavior. Dr. Martell's opinion was based on the facts that Nelson laid down in the seat prior to the kidnapping, which showed that Nelson had the knowledge that he was planning to do something wrong and he did not want to get caught. (Evid. Tr. 650.) Additionally, Dr. Martell was persuaded by Nelson's efforts to get rid of incriminating evidence, such as wiping down the truck, throwing the victim's clothes into the lake in order to get rid of forensic evidence (trace

fiber evidence that could link him to the crime), and scrubbing his fingerprints off. Dr. Martell testified that, "If you didn't know it was wrong, there's no reason to get rid of the truck, to wipe it down for evidence, to try and remove fibers from the crime scene that could identify him." (Evid. Tr. 650.)

Nothing in the evaluations from the other experts employed by Nelson subsequent to Dr. Martell's 2010 examination (by Drs. Daniel Foster, Michael Gelbort, Natalia Novick Brown, and Xavier Amador, as well as the social history prepared by Jill Miller, the neonatology report prepared by Dr. Carolyn Crawford, the trauma report by Dr. Leslie Lebowitz, the MRI and PET results, the bio-imaging report of Dr. Reuben Gur, and the dermatological report (but not the one dated May 6, 2011, from Terre Haute done by Dr. Roger Jones)) would have changed Dr. Martell's evaluation or opinions. (Evid. Tr. 651, 656-58.) When forming his opinion, Dr. Martell was aware that Nelson had two first degree relatives (brothers) who are diagnosed schizophrenics. (Evid. Tr. 662.)

The district court correctly determined that even if defense counsel had employed these additional mental health experts to testify during the penalty phase, Dr. Martell's testimony would have strongly countered their testimony, and there is a reasonable probability that the jury would have come to the same conclusion – that Nelson's kidnapping and murder of Pamela Butler warranted a death sentence.


Appellate Case: 15-3160 Page: 68 Date Filed: 02/12/2018 Entry ID: 4629195

*c.* *Advising or Instructing Nelson to Decline to Submit to a Mental Health Examination by a Government Examiner*

Another issue on remand was the circumstances under which Nelson refused to be evaluated by mental health experts. Berrigan was aware that the Government had sent Dr. Dan Martell and Dr. Park Dietz to see Nelson at CCA and that Nelson refused to see Dr. Martell (and would have refused to see Dr. Dietz). (Evid. Tr. 234.) Berrigan testified that he was familiar with Dr. Martell (neuropsychologist) and Dr. Dietz (psychologist) and that both doctors had a national reputation. Berrigan's main concern about these two experts was that they would be biased against his client and would therefore be "pro-government." Berrigan believed they would testify in a way that would effectively refute Nelson's defense and he did not want them to be the last witnesses the jury heard from before beginning deliberations. Berrigan indicated that those fears, in part, were the reason why he engaged in protracted litigation to prevent the Government from being able to conduct its own mental health evaluation. (Evid. Tr. 264.) In the end, Dr. Cunningham was able to provide some expert mental health testimony about Nelson, but did so from a review of the records, rather than an interview with Nelson. Consequently, Nelson was able to prevent the mental health testimony he feared, but was able to introduce some mental health evidence that discussed his horrible childhood environment.



Appellate Case: 15-3160 Page: 69 Date Filed: 02/12/2018 Entry ID: 4629195

Berrigan admitted that he had an "excellent" relationship with Nelson. Berrigan recommended that Nelson pleaded guilty to the charge and then proceed to trial on the penalty phase of the case. Berrigan hoped that in so pleading, Nelson would incur some empathy or sympathy from the public by taking responsibility for what he had done and, hopefully, obtain a better result on the sentence. That strategy "turned out to be a disastrous decision, but this decision regarding not speaking to Dr. Dietz and Dr. Martell was unequivocally my very strong advice to Mr. Nelson based on my experience, . . . and he followed it, as he did almost everything else I asked him to do." (Evid. Tr. 235.) Berrigan further explained that the advice to not submit to an interview ". . . was the strategic decision I made, and I advocated it very strongly." (Evid. Tr. 265.) Nelson could have gone against that advice, but did not. (Evid. Tr. 265-66.)

The record shows that at the time of the trial, defense counsel made a conscious and strategic decision to not have Nelson submit to a mental health evaluation by a government expert. Berrigan testified that the reason behind that decision to advise Nelson to not consent to a mental evaluation was because he was concerned that Dr. Martell might testify about his neurological examination of Nelson, and thought that was a "bad idea." (Evid. Tr. 236.) Berrigan testified that he believed at the time that this decision regarding not speaking to Dr. Dietz and Dr. Martell was unequivocally his strong advice to



Appellate Case: 15-3160 Page: 70 Date Filed: 02/12/2018 Entry ID: 4629195

Nelson based on his experience and Nelson followed it as he usually did. (Evid. Tr. 235.) Berrigan supported this strategy by challenging the Government's ability to conduct its own mental health evaluation at every turn. Only when he was unsuccessful, did he reach the calculated, strategic decision to recommend to Nelson that he not cooperate with the Government's evaluation. Berrigan admitted that this strategy was a product of his professional experience handling a number of death penalty cases. In those cases, Berrigan explained, if the last thing the jury heard before beginning deliberations was the Government's mental health expert, he lost.

Although Berrigan advised Nelson not to cooperate, it was ultimately Nelson's decision alone whether or not he took the advice. Magistrate Judge Hays explained to Nelson, on the record, that by failing to cooperate with the Government's evaluation, he ran the risk of having his own mental health evidence excluded from trial. Only days later, the district court told Nelson the same thing. In the face of these warnings, though, Nelson persisted in his decision to not participate.

In looking at the record in this case, Nelson's failure to participate is not surprising. During the trial, Nelson petitioned the district court to be allowed to not come to court when hearings and status conferences were held. During the § 2255 hearing in this matter, he similarly asked for leave of the court to absent himself from the proceedings. It is convenient now for post-

conviction counsel to allege deficient performance against Berrigan for recommending that Nelson not participate, when lack of participation is exactly what Nelson wants to do. Moreover, in prosecuting this § 2255 motion, current counsel similarly litigated the number of mental health evaluators the Government could use, whether video equipment would be allowed to be used, and what diagnostic tools would be allowed to be used.

Fighting to keep Nelson from mental health experts was, as the district court found, an ingrained "calculated strategy to act in a manner which is obviously deficient, so that on habeas review the Court will set aside the sentence." *Nelson*, 97 F.Supp.3d. at 1148 (citing *Johnson v. United States*, 860 F.Supp.2d 663 (N.D. Iowa 2012)). The court found Berrigan's testimony that he failed to conduct a mental health investigation out of "ignorance" to be incredible and "simply unbelievable." *Nelson*, *id.*

Contrary to his testimony at the evidentiary hearing that he "dropped the ball," Berrigan's decision was a thought-out strategic move to have Nelson exposed to less evidence that could result in the jury finding that the aggravating factors outweighed any mitigating factors, resulting in a hope that Nelson would receive a life sentence. The district court reached the conclusion that Berrigan had exercised a well-thought strategy in regards to Nelson's mental health evidence based on the following facts, that: (1) Dr. Cowan had already been hired and was ready to conduct an

examination of Nelson when Berrigan was appointed to this case, with Berrigan cancelling the examination a day before it was to take place (*Id.* at 1149); (2) Berrigan did not have other mental assessments done in order to prevent the Government from being able to conduct its own mental health examination of Nelson even though the court had imposed safeguards to preserve Nelson's rights by only ordering the release of any government examination "in the event of a guilty verdict and after [Nelson] confirmed his intent to offer mental health or mental condition evidence in mitigation" (*Id.* at 1150); (3) Nelson, in September 2001, filed a notice of intent to rely on mental health evidence at the penalty phase of trial through testimony of Dr. Dan Foster (*Id.*); (4) when a Government expert attempted to examine Nelson in October 2001, he refused to participate, even though this Court had issued an opinion in *United States v. Allen*, 247 F.3d 741 (8th Cir. 2001), that if a defendant indicated an intent to use his own psychiatric examination in the penalty phase, the defendant must undergo an examination by a government-selected psychiatrist before the start of the penalty phase (*Nelson*, *id.*); and (5) when defense counsel submitted an outline of witnesses that would be testifying on this issue, Berrigan indicated that Dr. Mark Cunningham and Dr. Foster would testify and present evidence on Nelson's future dangerousness, risk factors, and developmental obstacles he faced in childhood and adolescence. (*Id*. at 1150-51.) Based on this analysis, Berrigan was,

according to the district court, "strategically deficient" in the areas of Nelson's mental health issues. (*Id.* at 1151.)

In denying Nelson's mental health claims of ineffective assistance of counsel, the district court made credibility findings as to Berrigan's testimony. There is no doubt that Berrigan knew the standard of care and practice for psychological examinations and evaluations. The court rejected, and found incredible, Berrigan's testimony that he just did not get the mental health investigation and evaluation done. Specifically, the court found it "simply unbelievable" that Berrigan "'just dropped the ball' on finding a replacement neuropsychologist for Dr. Cowan . . . or that he was blinded to his responsibilities by pride and conceit. . . . Rather, the district court saw Berrigan's behavior as a calculated strategy to act in a manner which is obviously deficient, so that on habeas review that Court will set aside the sentence." *Nelson*, *id.* at 1148. This strong finding by the district court was anchored by the court's knowledge that Berrigan had used this strategy in another capital habeas case out of the Northern District of Iowa. *Id.* Consequently, the court found that Berrigan's actions were strategically deficient, so the question then became whether Nelson suffered any prejudice as a result. To obtain relief from ineffective assistance of counsel, Nelson must show that he suffered prejudice, that is, that "there was a reasonable probability that a competent attorney, aware of the available mitigating



Appellate Case: 15-3160 Page: 74 Date Filed: 02/12/2018 Entry ID: 4629195

evidence would have introduced it at sentencing, and that had the jury been confronted with this mitigating evidence, there is a reasonable probability that it would have returned with a different sentence." *Sinisterra v. United States*, 600 F.3d 900, 906 (8th Cir. 2010) (quoting *Wong v. Belmontes*, 558 U.S. 15, 19-20, 130 S.Ct. 383, 386 (2009)).

Here, the district court found that Nelson's habeas counsel established that certain mental health evidence could have been presented during the penalty phase, and had Berrigan and the trial team presented this evidence, experts would have testified that Nelson had "compromised neurological development" that he suffered during birth, that he "performed significantly below normal levels on standard testing instruments," and that neuropsychological testing confirmed that he "suffered brain damage." *Id.* at 1152. However, in considering the aggravating evidence presented at trial and Dr. Martell's testimony presented at the evidentiary hearing, Nelson failed to show "that there is a reasonable probability that even one juror's decision would have been different. *Id.* at 1157.

In reaching this conclusion, the district court painstakingly reviewed the trial testimony that was presented as aggravating evidence to the jury, *id.* at 1152-55, as well as the mitigating evidence that was presented at penalty phase and during the evidentiary hearing by habeas counsel. *Id*. at 1137-41, 1155-56. The additional mental health evidence presented during the



Appellate Case: 15-3160 Page: 75 Date Filed: 02/12/2018 Entry ID: 4629195

evidentiary hearing included the neurological examination by Dr. Michael Gelbort, the assessment by Dr. Natalie Novik Brown, the PET scan and MRI conducted by a private imaging facility near Terre Haute, Indiana, in 2010, the findings of clinical psychologist Xavier Amador which showed frontal lobe disturbance, the neuroimaging study by Dr. Gur, the analysis of Nelson's birth records by Dr. Crawford, and the findings of Dr. Martell that identified brain damage, brain dysfunction, and neurological impairments (but not impulsivity). *Id*. at 1155-56.

The district court utilized the proper prejudice review standard in evaluating Nelson's claim of ineffective assistance of counsel representation in the context of the penalty phase mitigation investigation, as outlined in *Sears v. Upton*, 561 U.S. 945 (2010). In *Sears*, the Supreme Court explained that in assessing the probability of a different outcome under *Strickland*, the trial court is to "consider the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding – and reweig[h] it against the evidence in aggravation." *Sears*, *id*. at 955-56 (quoting *Porter v. McCollum*, 558 U.S. 30, 130 S.Ct. 447, 453-54 (2009) (per curiam)). The Supreme Court went on to say, "[t]hat same standard applies – and will necessarily require a court to "speculate" as to the effect of the new evidence – regardless of how much or how little mitigation evidence was presented during the initial penalty phase." *Porter*, 558 U.S. 30



Appellate Case: 15-3160 Page: 76 Date Filed: 02/12/2018 Entry ID: 4629195

In *Sears*, the Supreme Court concluded that the Georgia courts did not properly weigh the "newly uncovered evidence of Sears' 'significant' mental and psychological impairments[17] along with the mitigation evidence introduced during Sears' penalty phase trial, to assess whether there is a reasonable probability that Sears would have received a different sentence after a constitutionally sufficient mitigation investigation." *Id.* at 956. Therefore, the Supreme Court granted certiorari and remanded to the Georgia courts so that a proper *Strickland* analysis, specifically as it relates to the prejudice prong, could be performed in the first instance by the state court. *Id.* at 956. On remand, the Georgia Supreme Court concluded that trial counsel conducted a reasonable investigation and developed a reasonable mitigation strategy and that defendant Sears failed to establish that he was prejudiced by any deficiency of his trial counsel's presentation of mitigation evidence. *Sears v. Humphrey*, 294 Ga. 117 (2013), *cert. denied*, *Sears v. Chatman*, 134 S.Ct. 2292 (2014).

In Nelson's case, unlike in *Sears*, the district court did not fail to correctly apply the *Strickland* standard. After re-weighing both the mitigation

[17] According to an expert who testified at the state evidentiary hearing, defendant Sears performed "at or below the bottom first percentile in several measures of cognitive functioning and reasoning. The cause of this abnormality appears to be significant frontal lobe brain damage Sears suffered as a child, as well as drug and alcohol abuse in his teens." *Id.* at 946.



Appellate Case: 15-3160 Page: 77 Date Filed: 02/12/2018 Entry ID: 4629195

evidence presented at trial and the evidence submitted and presented by habeas counsel, the district court concluded that it was "convinced that the result would have been the same," *id.* at 1157, that is, the jury would have imposed the death penalty had all of the now available mitigation evidence had been presented during trial. The district court found it significant that only one juror found the existence of only one of the nine mitigating factors, and that the aggravating factors were "simply too overwhelming" to come to any other conclusion than imposing the death penalty. *Id*. at 1156-57. Nelson's suggestion in his brief that the district court's application of S*trickland* was erroneous is not supported by an examination of the record in this matter and opinion issued by the district court. *See id.* This Court should come to the same conclusion, and affirm the district court's conclusion.



Appellate Case: 15-3160 Page: 78 Date Filed: 02/12/2018 Entry ID: 4629195

## II.

**Nelson's claim of ineffective assistance of counsel on the basis that counsel advised him to plead guilty where he had an insanity defense should be dismissed because this issue was not one of the issues the Eighth Circuit remanded for an evidentiary hearing nor does it relate back to issues raised in his original § 2255 motion, and thus, it constitutes a second or successive § 2255 motion that cannot be filed or considered until this Court grants permission in accordance to the requirements under the 28 U.S.C. § 2255(h).**

In his second point, that Nelson was allowed to file as an expanded issue, he claims the district court erred in denying his claim that defense counsel provided ineffective assistance of counsel in advising him to plead guilty on the basis that he did not have a "defense"[18] to the capital charges. (Nelson Brf. 123.) In his initial § 2255 motion, however, Nelson did not make this specific claim on this basis, and therefore, the district court never considered this issue. The issue then was regarding Nelson's guilty plea on the basis that the plea agreement provision that required him to "waive any

---

[18] The Government does not concede that Nelson has or had a valid defense of insanity. Instead, the bulk of the evidence in the record indicates otherwise. Dr. Logan examined Nelson shortly before the trial in this case commenced and found him competent; whereas, Dr. Martell, in his examination of Nelson, concluded that Nelson was competent at the time of the offense, citing to Nelson's exhaustive efforts to conceal his crime. Dr. Amador, on the other hand, made one improvident comment about Nelson's competence in his report provided to post-conviction counsel, for which he provided no support. Again, at the evidentiary hearing, Dr. Amador mentioned Nelson being incompetent, but did so of his own accord, rather than in response to a propounded question.

post-conviction challenge as to the guilty plea" was "an unenforceable condition and trial counsel were placed in a conflicted position when they advised Movant to accept the condition of the offer." (Gov. Appx. A12.) The only issues this Court remanded for an evidentiary hearing did not include any aspect of Nelson's decision to plead guilty upon the advice of defense counsel. Thus, his "advice to plead guilty" ineffective assistance of counsel issue was not part of the district court's ruling on remand in the certificate of appealability from this Court. Since Nelson's current issue is a new claim and does not relate back to his original timely-filed § 2255 motion, it is not properly raised in this certificate of appealability from the district court's § 2255 order that denied relief on other grounds. Rather, Nelson is required to file a petition in the appellate court seeking permission to file a second or successive § 2255 motion on this new issue in accordance with requirements under 28 U.S.C. § 2255(h), which requires the issue to be either newly discovered evidence or a new rule of constitutional law made retroactive to collateral cases by the Supreme Court. Since Nelson has not had this issue properly certified by this Court, the Government respectfully asks this Court to decline to consider it.

## *A. __Standard of Review__*

"Generally, a habeas claim cannot be raised by a petitioner for the first time on appeal." *Abdullah v. United States*, 240 F.3d 683, 685 (8th Cir. 2001)

(citing *See*, *e.g.*, *Petty v. Card*, 195 F.3d 399, 400 (8th Cir. 1999) (holding that an argument not raised before the district court is procedurally defaulted; *United States v. Lawson*, 155 F.3d 980, 982 (8th Cir. 1998) ("[I]ssues not presented to the district court will not be considered on appeal unless a finding of waiver would be unfair or unjust; and *Devose v. Norris*, 53 F.3d 201, 207 (8th Cir. 1995) (holding that habeas claim not included in petition and never raised by petitioner before the district court as basis for habeas relief is procedurally defaulted)).

The relation back doctrine of Rule 15(c) of the Federal Rules of Civil Procedure applies to civil actions brought under 28 U.S.C. § 2255, and is reviewed for abuse of discretion. *Davenport v. United States*, 217 F.3d 1341, 1343 n.4 (11th Cir. 2000).

"Although the strict doctrine of res judicata does not apply to § 2255 motions, . . . it is firmly settled that a motion under § 2255 cannot serve the office of an appeal and that issues disposed of on a prior appeal will not be reviewed again via such a motion." *Butler v. United States*, 340 F.2d 63, 64 (8th Cir. 1965) (internal citations omitted); *see also Baranski v. United States*, – F.3d –, No. 16-3699, 2018 WL 503066 at *2 (8th Cir. Jan. 23, 2018) ("Res judicata does not apply to successive petitions for federal habeas or 28 U.S.C. § 2255 relief. . . . However, limitations on the filing of successive habeas

petitions in 28 U.S.C. § 2244(b), a federal habeas statute, establish a "qualified application of the doctrine of res judicata.").

### ***B. Discussion***

In this last point, an expanded issue that was not included in this Court's remand for an evidentiary hearing, Nelson contends that the district court erred in "denying Appellant's claim that trial counsel was ineffective for advising him to plead guilty." (Nelson Brf. 123.) In order for this Court to consider Nelson's issue, it has to be related to the district court's ruling on the issues that were remanded for consideration and an evidentiary hearing by this Court. There was no such ruling from the district court relating to defense counsel's advice to plead guilty.

Nelson's original § 2255 motion was timely filed, but any new claims would be outside of the one-year statute of limitations period under the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).[19] If Nelson is contending that his current claim that defense counsel was ineffective for advising him to plead guilty when he had an insanity defense is simply an amendment and relates back to his original claim of receiving ineffective assistance of counsel based on a plea agreement waiver provision, he is wrong.

---

[19] Effective April 24, 1996, § 2255 motions must be filed within one year of the date a defendant's conviction becomes final, except in circumstances not applicable here.



Appellate Case: 15-3160 Page: 82 Date Filed: 02/12/2018 Entry ID: 4629195

This Court has held that provisions of Rule 15(c) of the Federal Rules of Civil Procedure apply to amendments to § 2255 motions. *See United States v. Harrison*, 469 F.3d 1216, 1217 (8th Cir. 2006); and *Dodd v. United States*, 614 F.3d 512, 515 (8th Cir. 2010). Rule 15(c) provides that an amendment to a pleading relates back to the date of the claim in the original pleading "if the claim asserted in the original pleading and the claim asserted in the amended pleading arose out of the same conduct, transaction, or occurrence." *United States v. Craycraft*, 167 F.3d 451, 457 (8th Cir. 1999) (citing Fed. R. Civ. P. 15(c)(2)). If the ineffective assistance conduct alleged in the first motion cannot be said to have "risen out of the same set of facts," then the amended issue cannot relate back and a movant's claim must be deemed as time-barred since it was filed outside of the statute of limitation. *Craycraft*, *id.* In order to arise out of the same conduct, transaction, or occurrence, the claims must be "tied to a common core of operative facts." *Mayle v. Felix*, 545 U.S. 644 (2005). The facts must be specific enough to put the opposing party on notice of the factual basis for the claim. *See United States v. Hernandez*, 436 F.3d 851, 858 (8th Cir. 2006). Pleadings filed under § 2255 are required to be "fact pleading" as opposed to "notice pleading" in order to comply with Rule 2 of the Rules Governing Section 2255 proceedings. *See Ellzey v. United States*, 324 F.3d521, 523-24 (7th Cir. 2003) (holding that a § 2255 motion that claims



Appellate Case: 15-3160 Page: 83 Date Filed: 02/12/2018 Entry ID: 4629195

ineffective assistance of counsel generally without factual detail or legal elaboration does not comply with Habeas Rule 2(b)).

In Nelson's initial § 2255 motion, he did not make the specific claim that defense counsel provided ineffective assistance of counsel based on Nelson having a "defense to the capital charges" as he now contends. There is nothing that would have prevented Nelson from alleging facts in support of this claim in his initial § 2255 motion. Rather, his original ineffective assistance of counsel claim for advice of counsel related to a provision in the plea agreement where Nelson waived his right to file a post-conviction challenge to his guilty plea. (Gov. Appx. A12.) In fact there was only one reference in Nelson's original § 2255 to his counsel providing ineffective assistance of counsel by advising him to plead guilty to Count One of the indictment in exchange for the Government dismissing Count Two and letting defense counsel argue that Nelson accepted responsibility for his actions, which was premised on the argument that, "This is an unenforceable condition and trial counsel were placed in a conflicted position when they advised Movant to accept the conditions of the offer while ostensibly avoiding post-conviction review of the reasonableness of that advice as it pertained to Movant's decision to enter a guilty plea." (Gov. Appx. A1-A19.) There is no further discussion or elaboration of this claim in that pleading or in their



Appellate Case: 15-3160 Page: 84 Date Filed: 02/12/2018 Entry ID: 4629195

memorandum in support of the § 2255 (*see* Gov. Appx. A20-46), or in their reply. (Gov. Appx. A47-A62.)

To further illustrate this point, in the motion to modify the certificate of appealability filed in this Court on August 21, 2017, they allege in the procedural history and background section that Berrigan "advised him [Nelson] that there was no viable defense to the charges against him." This statement is made without any citation to the record or original § 2255 pleadings. The point being, none exists. Nelson might attempt to justify this omission based upon the fact that an evidentiary hearing was not granted on this particular "issue," however, post-conviction counsel had every opportunity and obligation to factually allege all of the relevant grounds for relief based upon their discussion with their client. Nelson very easily could have informed post-conviction counsel if such a conversation had occurred and it could have been included in the original § 2255 motion. The absence is very telling.

The district court ruled on Nelson's claims without conducting an evidentiary hearing, Nelson appealed, and this Court upheld the district court's ruling with the exception of specific issues remanded to district court for an evidentiary hearing. *Nelson v. United States*, 297 Fed.Appx. 563, 566 (8th Cir. 2008). Nelson's ineffective assistance of counsel claim regarding advice to plead guilty only related to the provision in the plea agreement

where he waived his right to collaterally attack his guilty plea. None of the issues in this Court's remand related to Nelson's original ineffective assistance of counsel claim of advice of counsel to plead guilty – not based on the waiver in the plea agreement to not challenge his guilty plea in the post-conviction context, or on any basis.

As further evidence that Nelson's original "advice of counsel" claim did not relate to the issue he seeks this Court to expand now, during the evidentiary hearing his counsel pointedly made the distinction. During the evidentiary hearing there was a conversation between Nelson's counsel, David Ruhnke, and the court reinforcing the point that the advice of counsel issue, one, was not part of the court of appeals remand, and two, the evidence offered during the remand evidentiary hearing related only to the penalty and mitigation phase, not the guilt phase of Nelson's trial. Specifically, Mr. Ruhnke had the following colloquy with the court:[20]

> MR. RUHNKE: Your Honor, before we begin this morning, Mr. Valenti had raised an issue with me yesterday after court. We've reached a resolution of any dispute we had. I just want to put it on the

[20] When the Government received Dr. Amador's report, it noted the off-hand remark in the conclusion about Nelson's competence. Contact was immediately made with Nelson's post-conviction counsel, who assured Government counsel the competence issue was not properly before the court and would not be advanced at the § 2255 hearing. Unfortunately, when Dr. Amador testified, he injected the issue without being asked his opinion on the matter. At the conclusion of the day's hearing, Government counsel again contacted Nelson's post-conviction counsel and the following on the record colloquy took place the next morning.



Appellate Case: 15-3160 Page: 86 Date Filed: 02/12/2018 Entry ID: 4629195

record. Mr. Valenti called me after court to say that he had understood Dr. Amador to have testified that Mr. Nelson satisfied criteria for McNaughton insanity at the time of the offense, which he did, and that had also been in the report. Mr. Valenti thought, well, maybe he might have to reopen cross of Dr. Amador on the issue, and he recalled a conversation we had had sometime back where I'd represented to him that the -- although there was the opinion on McNaughton insanity, the remand in this case went only to the penalty phase and, therefore, that testimony would be relevant only to mitigation.

I recall that conversation. I recall the representation. I stand by that representation and, therefore, that *testimony was offered only on the issue of penalty and mitigation and not in any effort to argue that the guilty verdict would somehow be set aside*.

THE COURT: Yeah. Because that's not a subject for this court's consideration anyway.

MR. RUHNKE: That's correct. This case came back solely on the issue of penalty, Your Honor.

THE COURT: And limited issues at that.

MR. RUHNKE: To six questions on that, that's correct.

(Evid. Tr. 470-71.)

Nelson's current ineffective assistance of counsel claim based on allegedly being advised to plead guilty because he did not have a viable insanity defense does not relate back to his original claim, and therefore constitutes an issue needed to be filed in a second or successive § 2255 motion. In order to file such a motion, Nelson is required to file a request with the court of appeals seeking permission to file it. This Court will only certify and grant a movant permission to file a second or successive § 2255 motion if

the issue meets one of the following requirement: the issue is newly discovered evidence or a new rule of constitutional law made retroactive to collateral cases by the Supreme Court. 28 U.S.C. § 2255(h).

Under § 2255, a successive motion must be certified by an appropriate panel of a court of appeals that contain either: (1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by a clear and convincing evidence that no reasonable fact-finder would have found the movant guilty of the offense; or (2) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable. 28 U.S.C. § 2255(h). In the instant case, since Nelson did not seek certification from the Eighth Circuit on either of those grounds, this Court should dismiss his claim for lack of jurisdiction. *See United States v. Lambros*, 404 F.3d 1034, 1036 (8th Cir. 2005) (noting dismissal of § 2255 for failure to seek certification from court of appeals).

This Court specifically ruled, "We deny a certificate of appealability on *each and all of the other claims asserted in Nelson's § 2255 motion*, and *only those claims upon which we have granted a certificate are permitted to proceed*." *Nelson v. United States*, 297 Fed.Appx. 563, 566 (8th Cir. 2008). (Emphasis added.) Consequently, the remand did not include Nelson's "advice of counsel to plead guilty" claim in any form. This Court should not

allow Nelson to use his current pleading to bootstrap his new factually specific claim in his current pleading to his vague and broad claims in his original § 2255 motion. Thus, Nelson's ineffective assistance of counsel claim regarding advice of counsel is not properly before this Court and should be rejected.

## CONCLUSION

Based on the reasons and authorities set forth above, the Government respectfully asks this Court to affirm the district court's ruling, and affirm Nelson's conviction and sentence.

Respectfully submitted,

TIMOTHY A. GARRISON
United States Attorney

By /s/ *Jeffrey E. Valenti*

JEFFREY E. VALENTI
DAVID M. KETCHMARK
LAJUANA M. COUNTS
Assistant United States Attorneys

Charles Evans Whittaker Courthouse
400 East 9th Street, Room 5510
Kansas City, Missouri 64106
Telephone: (816) 426-3122

*Attorneys for Appellee*

## CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to Fed. R. App. P. 32(a)(7)(C), that this brief complies with the type-volume limitations in Fed. R. App. P. 32(a)(7)(B) and contains 19,178 words. The brief was prepared using Microsoft Word 2016 software. In making this certification I have relied upon the word-count feature of Microsoft Word 2016. Furthermore, the brief has been determined to be virus-free in compliance with Eighth Circuit Rule 28A(h).

David A. Ruhnke
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042

Jon M. Sands
Federal Public Defender
Paula K. Harms
Assistant Federal Public Defender
Capital Habeas Unit
850 West Adams, Suite 201
Phoenix, Arizona 85007

*Attorneys for Nelson*

/s/ *Jeffrey E. Valenti*
Jeffrey E. Valenti
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on February 9, 2018, the foregoing was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. A paper copy will be served on participants in the case by U.S. Mail, postage prepaid, within five days of the Court's notice that the brief has been reviewed and filed.

I hereby certify that a copy of the Government's brief was mailed on February ___, 2018, to:

David A. Ruhnke
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042

Jon M. Sands
Federal Public Defender
Paula K. Harms
Assistant Federal Public Defender
Capital Habeas Unit
850 West Adams, Suite 201
Phoenix, Arizona 85007

*Attorneys for Nelson*

/s/ *Jeffrey E. Valenti*
Jeffery E. Valenti
Assistant United States Attorney