No. 15-3160

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

Keith D. Nelson,

Appellant,

vs.

United States of America,

Appellees.

On Appeal from the United States District Court
for the Western District of Missouri
Case No. 4:04-8005-cv-W (FJG)

**APPENDIX TO**
**APPELLANT'S PETITION FOR REHEARING/REHEARING *EN BANC***


*/s/Paula K. Harms*
Jon M. Sands
Federal Public Defender
Paula K. Harms
Assistant Federal Public Defender
Capital Habeas Unit
850 W. Adams Suite 201
Phoenix, Arizona 85007
602-382-2816 telephone
602-889-3960 facsimile

*/s/ David A. Ruhnke*
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
973-744-1000 telephone
973-746-1490 facsimile
dr@ruhnkeandbarrett.com

# Appendix A

# United States Court of Appeals
## For the Eighth Circuit

---

No. 15-3160

---

Keith D. Nelson

*Movant - Appellant*

v.

United States of America

*Respondent - Appellee*

---

Appeal from United States District Court
for the Western District of Missouri - Kansas City

---

Submitted: April 11, 2018
Filed: November 28, 2018

---

Before SMITH, Chief Judge, WOLLMAN and COLLOTON, Circuit Judges.

---

SMITH, Chief Judge.

Keith D. Nelson pleaded guilty to interstate kidnapping resulting in the death of ten-year-old Pamela Butler. At the penalty phase of the trial, the jury sentenced him to death after consideration of aggravating and mitigating factors. After this court affirmed his death sentence, *see United States v. Nelson (Nelson I)*, 347 F.3d 701 (8th Cir. 2003), *cert. denied*, 543 U.S. 978 (2004), Nelson moved for habeas relief under

28 U.S.C. § 2255 to set aside his conviction and sentence of death. The district court denied the motion without a hearing. We subsequently remanded for an evidentiary hearing on six issues. *See Nelson v. United States (Nelson II)*, 297 F. App'x 563 (8th Cir. 2008) (per curiam). Following the evidentiary hearing, the district court denied Nelson's claims. For purposes of our appellate review, we ordered the parties to brief the three claims for which the district court denied relief. In addition, we granted Nelson's motion to modify the certificate of appealability and expanded it to include Nelson's claim that his trial counsel was ineffective for advising him to plead guilty.

Having thoroughly reviewed the record, we affirm the district court's denial of § 2255 relief to Nelson.

## I. *Background*[1]

### A. *Underlying Facts*

On September 29, 1999, Nelson approached James Robinson in the parking lot of a temporary work service in Kansas City, Kansas, and asked Robinson if he wanted a job hauling cement out of a basement. Robinson responded that he did. The two left the lot in a white Ford F–150 pickup truck driven by Nelson. Nelson and Robinson had never met before. While at the job site, Nelson told Robinson that he would like to kidnap a woman and take her away from the city to torture, rape, electrocute, kill, and bury her. Nelson said that he wanted to do this because he was definitely going back to prison for other charges. He felt he ought to go back for something big. The statements bothered Robinson, but he dismissed them as Nelson simply joking crudely. He decided not to contact the police.

Just three days later, Michanne Mattson was attacked outside of her apartment building. Mattson was driving home from a friend's house in the early morning when

[1]The following facts are taken substantially from *Nelson I,* 347 F.3d at 704–06, without further attribution.



Appellate Case: 15-3160 Page: 4 Date Filed: 02/13/2019 Entry ID: 4756226
Appellate Case: 15-3160 Page: 2 Date Filed: 11/28/2018 Entry ID: 4730179

she passed a white pickup truck parked alongside the road. After she passed the truck, it followed her for some distance into the parking lot of her apartment complex. She exited her vehicle and noticed that a man had exited the white truck. As she approached the door to her apartment building, the same man, whom she later identified as Nelson, confronted her on the sidewalk in a well lit area in front of her building. After a brief exchange, Mattson turned to go into the building, and Nelson rushed up behind her, grabbed her, and placed an eight-inch knife to her throat. He forced a handcuff onto Mattson's left wrist and dragged her through the parking lot toward his vehicle, exclaiming that she had better shut up and that he was going to kill her. Mattson continued to struggle, eventually escaping Nelson's grasp and calling for help. Nelson ran back to his truck and drove away.

On October 12, 1999, Nelson told an acquaintance that he had spotted a young girl in the Kansas City, Kansas area that he wanted to kidnap, rape, torture, and kill, and that now was the time to do it. Shortly thereafter, several individuals spotted Nelson in the area of 11th and Scott Streets in a white pickup truck. At that time, ten-year-old Pamela Butler ("Pamela") was rollerblading in the street near her home in the same area. Nelson parked his vehicle at the side of the street and lay in wait. As Pamela skated near the slightly ajar door of the truck, Nelson quickly jumped out of the truck, grabbed her around the waist, and threw her into the truck. Pamela's sister, Penny Butler ("Penny"), saw Nelson grab her sister and her sister's struggle with Nelson in the cab of the truck. Several other witnesses also saw the kidnapping. One person even gave chase in his own vehicle. Nelson eluded him, but the witness was able to write down the license plate number of the truck—Missouri plate number 177-CE2. Several other eyewitnesses verified the truck's license plate number.

Later that evening, the custodian of the Grain Valley Christian Church in Kansas City, Missouri, and his wife saw a suspicious white truck with Missouri license plate number 177-CE2 parked in the church lot. The custodian's wife wrote down the plate number and noticed an afghan in the front seat of the truck. They

contacted the police after seeing the kidnapping story on the ten o'clock news and informed them of the location of the truck. When the police arrived at the church, the truck was gone.

The truck was found abandoned the next day in Kansas City, Missouri. A police dog that had been provided with some of Pamela's clothing was dispatched to Nelson's mother's house and alerted to an afghan found inside the residence. That same day a large manhunt for Nelson commenced. On October 14, a civilian employee of a police department spotted Nelson hiding under a bridge. After he was spotted, Nelson went into the river and attempted to get away. When he made it back to shore, he was surrounded by railroad workers who detained him until the authorities arrived. After the authorities arrived, an onlooker shouted, "Where is the little girl?"[2] Nelson turned to an officer and stated, "I know where she's at, but I'm not saying right now." His capture was broadcast live on television. The next day the police found Butler's body in a wooded area behind the Grain Valley Christian Church. That discovery was broadcast on local television, and the United States Attorney held a live press conference from the discovery site. Subsequent investigation revealed that Pamela had been raped and then strangled to death with wire. The DNA in seminal fluid obtained from Pamela's underpants matched Nelson's DNA.

On October 21, 1999, a federal grand jury charged Nelson with (1) the kidnapping and unlawful interstate transportation of Pamela for the purpose of sexual abuse which resulted in the death of the victim in violation of 18 U.S.C. § 1201(a)(1) and (g) and 18 U.S.C. § 3559(d) (1994); and (2) traveling across state lines with the intent to engage in a sex act with a female under the age of twelve which resulted in

---

[2]Our prior opinion records the onlooker as shouting, "[W]here is the little girl?" *Nelson I*, 347 F.3d at 705. The jury trial transcripts reflects that the onlooker yelled out, "What about the girl?" Tr. of Jury Trial, Vol. IV, at 268, *United States v. Nelson*, No. 4:99-cr-00303-FJG (W.D. Mo. Nov. 19, 2001), ECF No. 462.



Appellate Case: 15-3160 Page: 6 Date Filed: 02/13/2019 Entry ID: 4756226
Appellate Case: 15-3160 Page: 4 Date Filed: 11/28/2018 Entry ID: 4730179

the death of the victim in violation of 18 U.S.C. §§ 2241(c), 2245, and 3559(d). On October 25, 2001, Nelson pleaded guilty to count one of the indictment, and the district court, upon the government's request and in accord with the plea agreement, dismissed count two of the indictment. Several days later, Nelson attempted suicide by ingesting a large amount of prescription medicine. He was treated at a local hospital, and the case then proceeded to the penalty phase of the trial in November 2001. The jury hearing the penalty phase returned a verdict that death should be imposed.

At sentencing, the district court offered Nelson the opportunity to address the court. Nelson, showing no remorse for what he had done, blistered the district court and the victim's family with a profanity laden tirade. The jury returned a verdict of death against Nelson, and the district court imposed the death sentence in accordance with the jury's verdict. The district court subsequently denied Nelson's motion for a new trial.

B. *Procedural History*

Nelson appealed to this court, and we affirmed the district court's judgment. *Nelson I*, 347 F.3d at 704. Thereafter, the Supreme Court denied Nelson's petition for certiorari. *Nelson v. United States*, 543 U.S. 978 (2004).

Nelson then moved to vacate, set aside, or correct his sentence in the district court. *See* 28 U.S.C. § 2255. The district court determined that no evidentiary hearing was necessary and that it could resolve Nelson's claims from the trial record. The district court dismissed Nelson's § 2255 motion and a companion motion to disqualify the district judge, and it subsequently denied Nelson's motion to alter or amend the judgment. *See* Fed. R. Civ. P. 59. Nelson filed a notice of appeal and sought a certificate of appealability from the district court. He sought certification on each of his 60 separate claims of ineffective assistance of trial and appellate counsel in his § 2255 motion, the denial of his recusal motion, and the separate denial of his



Appellate Case: 15-3160 Page: 7 Date Filed: 02/13/2019 Entry ID: 4756226
Appellate Case: 15-3160 Page: 5 Date Filed: 11/28/2018 Entry ID: 4730179

motion for additional funding of expert and investigative services. The district court denied the certificate. Nelson then filed a motion for a certificate of appealability with this court.

We granted a certificate of appealability on six claims in Nelson's § 2255 motion:

> A. Allegations of Trial Counsel's Constitutional Ineffectiveness:
>
> (2) & (3) Failure to conduct adequate mitigation investigation including failure to move for a continuance to complete one.
>
> (4) Failure to conduct adequate investigation of defendant's mental health.
>
> (5) Advising or instructing defendant to decline to submit to a mental health examination by a government examiner.
>
> (15) Failure to make objections:
>
> (e) to allegedly inflammatory and improper comments in the Government's closing argument and rebuttal.
>
> B. Allegations of Appellate Counsel's Constitutional Ineffectiveness:
>
> (1) Failure to conduct adequate review of the trial record and the law.
>
> (2)(c) Failure to raise on appeal the Government's allegedly improper comments in closing arguments.

*Nelson II*, 297 F. App'x at 565–66 (italics omitted).



Appellate Case: 15-3160 Page: 8 Date Filed: 02/13/2019 Entry ID: 4756226
Appellate Case: 15-3160 Page: 6 Date Filed: 11/28/2018 Entry ID: 4730179

We remanded the case to the district court, directing it to hold an evidentiary hearing on these issues and to make findings of fact and conclusions of law. We denied a certificate of appealability on the remaining claims.

On remand, the district court held an evidentiary hearing to address the six issues. It denied habeas relief and denied Nelson a certificate of appealability. *See Nelson v. United States (Nelson III)*, 97 F. Supp. 3d 1131 (W.D. Mo. 2015). Nelson then moved this court for issuance of a certificate of appealability, which we denied.

Nelson petitioned for rehearing by the panel or en banc, and the case was held in abeyance until the Supreme Court issued its decision in *Buck v. Davis*, 137 S. Ct. 759 (2017). Thereafter, Nelson filed a petition for rehearing, and the government filed its response. We granted Nelson's petition for panel rehearing. We subsequently granted Nelson's motion to modify the certificate of appealability and expanded it to include the claim that Nelson's trial counsel was ineffective for advising him to plead guilty.

## II. *Discussion*

When reviewing a district court's denial of a § 2255 motion, we apply de novo review "to the district court's legal conclusions, and mixed questions of law and fact, but we review underlying factual findings for clear error." *Ortiz v. United States*, 664 F.3d 1151, 1164 (8th Cir. 2011) (citing *United States v. Hernandez*, 436 F.3d 851, 855 (8th Cir. 2006); *United States v. Duke*, 50 F.3d 571, 576 (8th Cir. 1995)).

On appeal, Nelson asserts that his trial counsel rendered constitutionally ineffective assistance of counsel by: (1) failing to conduct an adequate mitigation investigation, including failing to move for a continuance to complete one; (2) failing to conduct an adequate investigation of Nelson's mental health; (3) advising or instructing Nelson to decline to submit to a mental health examination by a government examiner; and (4) advising Nelson to plead guilty.

Nelson's claim that his trial counsel was "so defective as to require reversal of [his] . . . death sentence has two components." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "First, [Nelson] must show that [his] counsel's performance was deficient." *Id.* To satisfy this requirement, Nelson must show that his "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [Nelson] by the Sixth Amendment." *Id.*

"Second, [Nelson] must show that the deficient performance prejudiced the defense. This requires showing that [his] counsel's errors were so serious as to deprive [Nelson] of a fair trial, a trial whose result is reliable." *Id.* To prove prejudice, Nelson "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Because Nelson challenges his death sentence, the relevant "question is whether there is a reasonable probability that, absent the errors, the factfinder . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695. "To assess that probability, we consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweig[h] it against the evidence in aggravation.'" *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (per curiam) (alteration in original) (quoting *Williams v. Taylor*, 529 U.S. 362, 397–98 (2000)). This "standard applies—and will necessarily require a court to 'speculate' as to the effect of the new evidence—regardless of how much or how little mitigation evidence was presented during the initial penalty phase." *Sears v. Upton*, 561 U.S. 945, 956 (2010) (per curiam). Such standard "is the proper prejudice standard for evaluating a claim of ineffective representation in the context of a penalty phase mitigation investigation." *Id.*

If Nelson cannot "make[] both showings [of deficient performance and prejudice], it cannot be said that [his] . . . death sentence resulted from a breakdown



Appellate Case: 15-3160 Page: 10 Date Filed: 02/13/2019 Entry ID: 4756236
Appellate Case: 15-3160 Page: 8 Date Filed: 11/28/2018 Entry ID: 4730179

in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687. But "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.* at 697.

### A. *Prejudice Resulting From Inadequate Mitigation and Mental Health Investigation and Lack of Mental Health Examination*

For purposes of this opinion, we will begin by examining *Strickland*'s prejudice prong, "evaluat[ing] the totality of the available mitigation evidence . . . in reweighing it against the evidence in aggravation." *Williams*, 529 U.S. at 397–98 (citation omitted). Nelson argues that had the jury heard the mitigation evidence presented at the evidentiary hearing, a reasonable probability exists that at least one juror would have struck a different balance.

#### 1. *Totality of Mitigation Evidence*

##### a. *Brain Damage*

During the evidentiary hearing, Nelson called several expert witnesses to testify regarding his brain damage. Records adduced at the evidentiary hearing show Nelson was rushed to a special children's hospital after his birth because he had suffered a brain bleed, stopped breathing, and suffered from severe oxygen deprivation, leading to lasting effects on his frontal lobe—the part of the brain key to regulating behavior and impulse control. Dr. Carolyn Crawford, a neonatologist, analyzed Nelson's birth records. She testified that Nelson's mother received almost no prenatal care prior to Nelson's birth. In addition, she testified that Nelson was born prematurely and suffered several complications after his birth, resulting in his hospitalization. Dr. Crawford summarized the myriad problems, which were documented in Nelson's birth records, including his compromised neurological development. But she testified that information and studies on areas of brain injury and brain damage were not available in 2001—she could testify in terms of risk




Appellate Case: 15-3160 Page: 9 Date Filed: 11/28/2018 Entry ID: 4730179

factors, but she could not have offered this same testimony (i.e., the lingering effects of prenatal and neonatal insults) based upon her review of the records back in 2001.

Dr. Ruben Gur, Ph.D., a neuropsychologist with a speciality in brain imaging and behavior, conducted a neuroimaging study of Nelson's brain. He testified at the evidentiary hearing that MRI and PET neuroimaging confirmed that several areas of Nelson's brain suffered significant damage, including the frontal lobes, the amygdala, the hippocampus, and the basal ganglia. According to Dr. Gur, when these areas of the brain are damaged, an individual is not able to effectively engage in rational planning, maintain impulse control (especially sexual impulses), and inhibit risky or aberrant thoughts and behaviors. Dr. Gur opined that the structural damage that the MRI detected in the frontal regions of Nelson's brain "would indicate diminished executive functions such as abstraction and mental flexibility, planning, moral judgment, and emotional regulation, moderating limbic arousal and impulse control." Appellant's App. at 146. Likewise, Dr. Gur opined that the abnormal activity detected in the amygdala, frontal lobes, and cortex would diminish impulse control. He also noted that "abnormalities in basal ganglia could further impair rational performance under stress because they supply the neurotransmitter dopamine, which is necessary for intact frontal lobe functioning. The resulting behavior of someone with such brain damage would be disorganized, erratic and failing to adjust to situational demands." *Id.* Despite these abnormalities, Dr. Gur recognized that "such individuals do respond well to structured environments, where the complexity of the surrounding and need for decision-making is reduced." *Id.* at 146–47.

Also at the evidentiary hearing, Dr. Michael Gelbort, Ph.D., testified concerning his neuropsychological evaluation of Nelson. In his report, Dr. Gelbort noted that Nelson's testing results indicated "frontal lobe disturbance/dysfunction" which "has an effect on his everyday thinking and reasoning capacities" and manifests as "impaired reasoning and learning/memory abilities." *Id.* at 180. Dr. Gelbort explained that damage in these areas of the brain affects an individual's

ability to exercise judgment and control one's impulses. According to Dr. Gelbort, "[T]he way behavior unfolds is that you can have impulsive behavior that takes time and develops slowly where there's plenty of time to say, no, I shouldn't do this, but it's still an impulsive behavior even though it happens over time slowly." Tr. of Evidentiary Hr'g, Vol. II, at 413, *Nelson v. United States*, No. 4:04-cv-08005-FJG (W.D. Mo. Apr. 15, 2014), ECF No. 261. Dr. Gelbort opined that Nelson's behavior during the offense was consistent with frontal lobe dysfunction and showed abnormal disinhibition and impulsivity instead of planning.

Dr. Xavier Amador, Ph.D., a clinical and forensic psychologist, testified during the evidentiary hearing that, in his opinion, Nelson suffered from frontal lobe dysfunction and that Nelson's mental health was also impaired by a cognitive disorder (not otherwise specified), post-traumatic stress disorder, psychotic disorder (not otherwise specified), and a personality disorder that would impair his functioning. Dr. Amador also found that Nelson showed signs of paranoid thinking. Dr. Amador testified that he reviewed an affidavit prepared by Dr. Natalie Novik Brown, Ph.D., a fetal alcohol spectrum specialist, who opined that Nelson "may or may not be fetal alcohol [affected] but certainly had signs of neurological impairment that may be related to fetal alcohol syndrome." *Id.* at 431. He opined that Nelson was severely mentally ill and in a dissociative state at the time of the offense, meaning he was unable to appreciate the nature and quality or wrongfulness of his acts or conform his conduct to the requirements of the law. He concluded that Nelson committed the offense under the influence of severe mental disturbances that affected his perceptions, judgment, impulses, and ability to conform his conduct to the requirements of the law.

Dr. Dan Martell, a forensic neuropsychologist, who studies the brain and behavior, and particularly the effects of brain damage on human behavior, testified as a government witness at the evidentiary hearing. He evaluated Nelson on

September 9–10, 2010, for nine-and-a-half hours.[3] He identified Nelson as having "brain damage, brain dysfunction, [and] neurological impairments." Tr. of Evidentiary Hr'g, Vol. IV, at 657, *Nelson v. United States*, No. 4:04-cv-08005-FJG (W.D. Mo. Apr. 17, 2014), ECF No. 263. Dr. Martell acknowledged that this finding—and the identical findings of the other experts—are "evidence of mitigation." *Id.* at 658.

b. *Nelson's History and Characteristics*

At trial, several individuals testified about Nelson's characteristics and upbringing. Nancy Nelson ("Nancy"), Nelson's mother, testified that Nelson was diagnosed with dyslexia and was a poor student, frequently had fights and behavioral problems in school, and had a bed-wetting problem well into his teen years. Nancy also testified that two of her children were schizophrenic. She admitted that she was an alcoholic and that because she had to work long hours to support her children, she was frequently away from home, requiring the boys to care for themselves. This resulted in the boys often getting into trouble at school and in the community.

Mary Smith, Nancy's sister and Nelson's aunt, testified about Nelson's disadvantaged and difficult childhood. So too did Georganna Romero, Nancy's sister and Nelson's aunt, who described the poor living conditions of Nancy's home in Texas and further described how the house smelled of urine. Irene Wood testified that she helped Nancy and her five boys get a home, clothing and personal items when they moved to Texas. She recounted the poor conditions of Nelson's upbringing in Texas.

Two of Nelson's brothers testified about Nelson's childhood. Steven Nelson ("Steven"), Nelson's youngest brother, testified that he is employed as an engineer

---

[3]Dr. Martell previously attempted to evaluate Nelson in the fall of 2001 at the government's request, but Nelson refused to be evaluated.



Appellate Case: 15-3160 Page: 14 Date Filed: 02/13/2019 Entry ID: 4756226
Appellate Case: 15-3160 Page: 12 Date Filed: 11/28/2018 Entry ID: 4730179

and has a successful career. After high school, Steven attended DeVry Institute in Kansas City, where he had a 3.9 grade point average. He recounted his disadvantaged childhood in Texas and how his mother Nancy neglected him and his brothers. He corroborated testimony of Nelson's bed-wetting problem, how his mother was never home and was either working or drinking, and how he and his brothers had to take care of themselves most of the time.

Kenneth Nelson ("Kenneth"), Nelson's twin brother who suffered no trauma at birth, testified he is a satellite communications maintenance operator and installer in the U.S. Army. He characterized his career as successful. He graduated from school with a 3.69 grade point average. He testified about his family's disadvantaged and impoverished childhood, telling the jury that his mother seriously neglected him and his brothers. He stated that his mother was never around and was always at the bar working or drinking alcohol. He also described an abusive boyfriend of his mother. According to Kenneth, he and Nelson would frequently burglarize and steal from homes when they lived in Texas. But Kenneth straightened his life out when he moved back to Missouri and lived with his aunt and uncle, where he became involved in high school football, worked at a grocery store as a stocker, and did well in school.

Gene Thompson was the Nelson family's landlord when they lived in Texas. He testified that they lived in Section 8 housing and described the poor, unkempt conditions of their home. Thompson stated that when the Nelson family left the rental property, it was in extremely poor condition.

Michael Griffith, a former neighbor of the Nelson family in Texas, testified that Nancy was never home and the boys were frequently left alone to fend for themselves. Griffith stated that he did little things to try to aid the Nelson family, such as plumbing repairs at no charge. He testified that the home was always messy and unclean. He also testified that Nelson's brothers made fun of him because of his bed-wetting problem.



Appellate Case: 15-3160 Page: 15 Date Filed: 02/13/2019 Entry ID: 4756226
Appellate Case: 15-3160 Page: 13 Date Filed: 11/28/2018 Entry ID: 4730179

Rhonda Monroe ("Rhonda"), a former babysitter for the Nelson children in Texas, testified that when Nancy would go to work, she would bring the children to Rhonda's home. Rhonda testified Nelson had a bed-wetting problem and that Rhonda's husband would punish Nelson by spanking him with a belt. Rhonda's husband was an alcoholic and was very abusive towards Nelson and his brothers; they were very scared of him. When Rhonda's husband was home, the Nelson boys were required to stay in one room of Rhonda's home. If they left the room, Rhonda's husband would spank the boys with a belt. Rhonda's daughter, Jennifer Monroe ("Jennifer"), testified that the Nelson boys were always required to stay in one room when her mother was babysitting them. According to Jennifer, her stepfather, Billy Reese, was always spanking them with a belt. She testified that the Nelson boys were extremely afraid of her stepfather.

Ellen Crutsinger, a former teacher to several of the Nelson boys in Texas, testified that Nelson was in a special education class and struggled while in school. She recalled Nelson helping a crippled girl in a wheelchair while in elementary school. Nelson would push the girl around the school grounds in her wheelchair, and the two developed a friendship. Crutsinger testified that Nancy never attended the "meet the teacher" nights at the school.

Homer Dear, Nelson's former school principal and a former Texas State Representative, testified that he knew the Nelson family during the time they lived in Texas and that he was the boys' principal at the elementary school. Dear believed the boys were physically and mentally abused. He described the Nelson family as a very poor family and also described how he had tried to help them. He testified about the boys' poor hygiene and how he would require the boys to take showers and would give them clothing at the school. According to Dear, he bought clothes for the boys at a store on at least one occasion. He also visited the Nelson home and described the house as unclean.



Appellate Case: 15-3160 Page: 16 Date Filed: 02/13/2019 Entry ID: 4756226
Appellate Case: 15-3160 Page: 14 Date Filed: 11/28/2018 Entry ID: 4730179

David Cunningham, Nelson's employer, described Nelson as a pleasant employee and a good worker. He characterized Nelson as reliable and conscientious when working for his basement waterproofing business.

At trial, Nelson called expert defense witness Dr. Mark Cunningham to testify on his behalf. Dr. Cunningham is a clinical and forensic psychologist who frequently testifies as a mitigation and sentencing expert in capital cases in the United States. He testified about the effect of childhood abuse and neglect on Nelson's character and development. Dr. Cunningham explained how the squalid conditions and abusive and violent nature of Nelson's childhood affected the formation of Nelson's character. According to Dr. Cunningham, Nelson would become less violent as he aged.

c. *Nelson's Father and Family Background*

At trial, Nancy testified in detail about Kenneth Morse, Nelson's violent and abusive father. She told the jury that Morse frequently beat her and was abusive to her boys, too. She recounted for the jury in detail how Morse, on one occasion, tied her up and shocked her with an electrical cord. In addition, Morse would lock her in closets in their home. On another occasion, Nancy testified that when she was pregnant with her son Paul, Morse threw her to the ground and beat and stomped on her so severely that she had to have her spleen removed. Nancy moved with her children, including Nelson, to California and Texas to flee Kenneth. Smith testified that Morse regularly beat Nancy and that he would also lock her up in their home. Smith helped Nancy escape Morse when they moved to California and Texas. Romero testified that Morse beat and tortured Nancy. She recounted how Morse tried to electrocute Nancy.

During trial, Morse flatly denied almost every allegation made about his frequent and severe beatings of Nelson and his mother Nancy. But medical records adduced at the evidentiary hearing confirmed that Nancy did undergo a splenectomy in October 1975 while she was pregnant with Paul.



Appellate Case: 15-3160 Page: 17 Date Filed: 02/13/2019 Entry ID: 4756226
Appellate Case: 15-3160 Page: 15 Date Filed: 11/28/2018 Entry ID: 4730179

Evidence at the evidentiary hearing also disclosed Morse's background. Morse was one of 14 siblings born into severe poverty. His "siblings described him as . . . 'unbalanced[,'] 'always strange[,'] and always in trouble as a child." Appellant's App. at 61. He suffered from "'fits,' during which he would pull his hair, and bang his head on the walls, the floor or rocks. He would bite and pinch himself until he bled." *Id.* He "ate aspirin like it was candy" and ate chicken feces. *Id.* at 62. At age ten, he attacked his seven-year-old brother with an ax and cut off his toe. He was cruel toward animals and became increasingly violent with age. At age 17, he raped a 13-year-old girl. A year later, he attempted to rape a seven-year-old girl. Numerous family members acknowledged that Morse displayed symptoms of schizophrenia, including acting delusional and paranoid. In addition to Morse, other family members on Morse's side of the family also exhibited signs of mental illness, including episodes of delusions, depression, schizophrenia, psychosis, and paranoia. On one occasion, Morse's brother Fred was found in the woods with a gun, claiming to have seen and heard their dead brother Charlie, and was taken into custody and hospitalized. Morse's brother, Milas, and his sisters, Beth and Evelyn, suffer from depression and other mental health problems. Morse also has at least one nephew and three nieces that have been diagnosed with mental illnesses. Milas also received an 18-year sentence for raping his four-year-old great-granddaughter. Morse's nephew, Milas Jr., is alleged to have raped all three of his own children. Morse's nephew, Chester, raped his 13-year-old daughter.

Jill Miller, MSSW, testified at the evidentiary hearing. She stated that she prepared Nelson's social history and discovered a multigenerational history of mental illness, a history of alcoholism, substance abuse on both sides of the family, domestic abuse on both sides of the family, as well as inappropriate sexual behavior and criminal sexual misconduct. She also discovered that there was severe poverty on the Morse side of the family. Miller testified that she was able to gather additional medical records on Nancy, which showed the abuse that Nancy suffered and the medical records for one of Nelson's brothers, who suffered from schizophrenia.



Appellate Case: 15-3160 Page: 18 Date Filed: 02/13/2019 Entry ID: 4756226
Appellate Case: 15-3160 Page: 16 Date Filed: 11/28/2018 Entry ID: 4730179

Dr. Leslie Lebowitz, Ph.D., a clinical psychologist with particular expertise in the effects of complex trauma on psychological development and behavior, testified at the evidentiary hearing regarding the sustained abuse and neglect inflicted on Nelson and how it impacted him. She testified that Nelson's family tree was "riddled with major psychopathology, substance abuse, and patterns of interpersonal violence and neglect." Tr. of Evidentiary Hr'g, Vol. III, at 530, *Nelson v. United States*, No. 4:04-cv-08005-FJG (W.D. Mo. Apr. 16, 2014), ECF No. 262. She stated that Nelson was born to a mother who was battered and unprepared to parent him; she also testified that his mother severely neglected him, failed to protect him from abuse, and later beat and emotionally abused him. Dr. Lebowitz testified that Nelson "experienced the most severe kind of trauma, which is chronic, severe developmental trauma." *Id.* at 535. According to Dr. Lebowitz, as a result of the "onslaught of horrifying life experiences" inflicted upon Nelson, *id.* at 539, "every single developing system in his self, his emotional system, his cognitive system, his biological system, his capacity to attach, all of those fundamental systems [were] under continuous and relentless assault from the violence," *id.* at 538. She explained:

> The problem with Mr. Nelson's life is that it was a continuous, relentless barrage of trauma and neglect, and the ubiquity of what happened, the variety of what happened, the utter lack of rescue or protection and the amount of time, the slough of development over which these experiences happened create a kind of toxic load that is qualitatively unlike other things.

*Id.* at 546–47. Dr. Lebowitz opined this trauma occurred "during the period of life in which his brain [was] under the most rapid period of development in which [he was] growing more neuro connections than [he was] losing." *Id.* at 538. As a result, she testified, Nelson suffered damage to the parts of the brain and his psychological development that are involved in inhibiting impulses and regulating behavior.

d. *Incarceration History and History of Physical and Sexual Abuse*

During trial, the jury heard testimony regarding Nelson's time at the Community Corrections of America (CCA) federal holding facility in Leavenworth, Kansas. Melvin Lister, a CCA guard, testified that he worked in the segregation area of CCA when Nelson was housed there. Lister testified that inmates frequently threatened and harassed Nelson. Lieutenant Bruce Roberts, another CCA employee, testified that inmates frequently verbally harassed Nelson. During the 25 months that Nelson was housed at CCA, he never tried to escape. Roberts never considered Nelson a threat.

CCA officials, as a part of a routine practice in which all phone conversations of inmates are recorded, recorded a conversation between Nelson and his girlfriend, Kerri Dillon. At trial, the defense played that conversation for the jury. In the conversation, Dillon and Nelson discussed, among other things, Dillon's recent pregnancy by Nelson. Nelson appears to express remorse for Butler's murder, telling Dillon of his intent to tell law enforcement authorities of his involvement in the crime. Nelson states, "I'm just gonna do the right thing for once in my life." Tr. of Jury Trial, Vol. VIII, at 861, *United States v. Nelson*, No. 4:99-cr-00303-FJG (W.D. Mo. Nov. 26, 2001), ECF No. 466 (quoting Def.'s Ex. 113 at 16).

The evidentiary hearing disclosed that Nelson was physically and sexually assaulted while incarcerated as a youth and engaged in self-harm, including multiple suicide attempts. The evidence showed that Nelson was sent to the Texas Youth Commission (TYC) at age 14. While there, Nelson witnessed other residents being sexually assaulted and was physically assaulted several times. His medical records document bruising and swelling on his face and around his left eye and injuries to his nose, upper chest, and the back of his head. He requested that staff put him in isolation and separate him from the other residents. Staff frequently had to place Nelson in restraints while in isolation to prevent him from injuring himself because of his attempts to slash his wrists using a Coke can, the teeth from a comb, and his

own fingernails. Upon his release from TYC after four months, Nelson's facial injuries were still visible. After leaving TYC, Nelson moved between his mother's home and other juvenile institutions. His mother also sent him to his father's home in Kansas City, where Morse would frequently abuse drugs and cuss at and beat Nelson's elderly grandmother. One day, Nelson went to the train yards and attempted to kill himself by jumping in front of a moving train, but a railroad detective intervened. After Nelson returned to his mother in Texas, Nelson was once again in and out of juvenile detention, including Booneville. Medical records from this facility show that Nelson sustained injuries to his head and face; he was also sexually assaulted.

Evidence adduced at the evidentiary hearing also showed that Nelson was sexually victimized while in his mother's care. When Nelson was seven or eight years old, one of his mother's boyfriends molested him. And, while Nelson was living in an apartment complex in California, an older man anally penetrated him and forced him to perform oral sex.

2. *Totality of Aggravating Evidence*

a. *Offense of Conviction*

At trial, the government presented 30 witnesses over a two-day period. We have already recounted the egregious facts revealed through these witnesses' testimony in the background section of this opinion. *See supra* Part I. We recount some of this testimony in more detail here to clarify its use as aggravating evidence.

James Shannon Robinson testified that on September 29, 1999, he and Nelson spent the day working together on a job site where Nelson revealed to Robinson that he wanted to kidnap a female and then take her to a remote location where he could torture, rape, electrocute, and then kill and bury her. Nelson bragged he was going back to the penitentiary anyway, and he "wanted to go for something big." Tr. of Jury



Appellate Case: 15-3160 Page: 21 Date Filed: 02/13/2019 Entry ID: 4756226
Appellate Case: 15-3160 Page: 19 Date Filed: 11/28/2018 Entry ID: 4730179

Trial, Vol. III, at 96, *United States v. Nelson*, No. 4:99-cr-00303-FJG (W.D. Mo. Nov. 19, 2001), ECF No. 461.

On October 2, 1999—ten days before Pamela was kidnapped—Nelson, in the middle of the night, held a knife to the throat of Michanne Mattson, a medical student, and attempted to drag her kicking and struggling from her apartment parking lot to his white Ford pickup. Mattson testified that Nelson "told [her] not to say anything or he would cut [her] throat. And he said that several times, that he would kill [her] if [she] said anything." *Id.* at 112. Nelson handcuffed Mattson's left wrist. According to Mattson, he then pushed her toward the parking lot with the knife to her throat. Nelson told Mattson "he was going to kill [her] if [she] said anything, to keep quiet, you f***ing b***h, I'll kill you if you say anything." *Id.* at 113–14. Mattson stated that Nelson called her "a f'ing b***h" "[t]wo or three times." *Id.* at 114. Mattson eventually pushed away from Nelson and pulled the knife down from her throat and yelled for help, but Nelson's gloved hands were over her mouth. Mattson dropped to her knees, and Nelson started dragging Mattson by the handcuffs out to the parking lot while cursing at her. "He kept calling [her] a f***ing b***h and [saying] that he was going to kill [her]." *Id.* at 115. Mattson then dropped limply to the pavement, rolled away from him, and continued yelling. Nelson ripped Mattson's purse off her shoulder and ran to his truck, but he kept looking back at her saying, "If you look at me, b***h, I'll kill you. Don't look at me. Better run, b***h, I'll kill you." *Id.* at 116. Mattson testified Nelson said that about five times.

Around 4:00 p.m., on Tuesday, October 12, 1999—the day that Pamela was kidnapped—Nelson told an acquaintance "that he knows where a 14-year-old girl is, that right now is the time to get her, take her, kill her, rape her." Tr. of Jury Trial, Vol. IV, at 149. Nelson was "hyper" and "anxious." *Id.* A little over an hour later in Kansas City, Kansas, ten-year-old Pamela left her home on her roller skates to go one-and-a-half blocks to the local gas station to buy some cookies and soda. Her 11-year-old sister Penny was playing on the front porch and saw her sister leave.



Appellate Case: 15-3160 Page: 22 Date Filed: 02/13/2019 Entry ID: 4756226
Appellate Case: 15-3160 Page: 20 Date Filed: 11/28/2018 Entry ID: 4730179

Penny testified that before Pamela returned home, a white Ford pickup had parked along the street with the driver's door left ajar. Penny saw Pamela skating toward home, the same way she had skated toward the convenience store. Pamela skated toward the pickup truck; when she approached the truck, Penny testified hat Nelson "came up from out the truck and grabbed her and threw her in the truck and slammed the door and drove by." *Id.* at 176. Penny began screaming. Hearing her screams, her teenage sister Casey Eaton came out of the house and looked to where Penny was pointing and saw a white pickup truck pulling away. As Nelson drove past the screaming girls, he "flipped [them] off." *Id.* at 177. The girls' screaming and the tires' squealing attracted the attention of Paul Wilt who was sitting in his truck visiting a friend nearby. Wilt gave chase, but eventually lost sight of the truck. He was able to get its license tag number—177-CE2.

Between 6:30 and 7:30 p.m. that same evening, Carl and Shirley Condra drove to their church, Grain Valley Christian Church in Grain Valley, Missouri. The Condras saw a white Ford pickup truck with the license plate number 177-CE2 parked behind the church. The truck was unlocked and empty. The Condras did not recognize the truck as belonging to any member of the congregation and believed its presence to be suspicious. They tried to find a police officer, but found none and went home. Later that night, after seeing the 10:00 p.m. news of Pamela's abduction which included a description of the truck, they immediately called the police.

Sometime around 8:00 p.m. or thereafter that evening, Nelson drove to his mother Nancy's house in Kansas City, Missouri. Nelson and his mother then drove to the Oasis Bar, which was a block and a half away from Pamela's home. Nancy drank, while Nelson played a video game. After they left the bar, they stopped at the gas station where Pamela had bought her cookies and soda. Nelson purchased a soda and cigarettes. Nelson and Nancy were at his girlfriend's house when the news broadcast Pamela's abduction. Nelson showed no anxiety, remorse, grief, or other reaction. Nelson and Nancy then returned to Nancy's house.



Appellate Case: 15-3160 Page: 23 Date Filed: 02/13/2019 Entry ID: 4756226
Appellate Case: 15-3160 Page: 21 Date Filed: 11/28/2018 Entry ID: 4730179

At 11:00 p.m., Patti Griffith, Nancy's next-door neighbor, saw Nelson on the passenger side of the white pickup truck wiping the dashboard and underneath areas while periodically glancing up and down the street. Later that night, a noise awakened Griffith. She looked out the window and noticed that the pickup truck was gone, and Nelson was pacing around in his yard.

Around 2:00 a.m. on the morning of Wednesday, October 13, 1999, Nelson called for a cab. The dispatcher who took the call recalled Nelson being "real cool" and "cool as a cucumber"; Nelson even told the dispatcher a joke. *Id.* at 227.

Around 9:00 a.m. that morning, a white Ford pickup truck with the license number 177-CE2 was found abandoned ten blocks from Nelson's residence. The truck appeared to have been recently cleaned; it was left unlocked with the keys lying on the floorboard. The manhunt for Nelson and the search for Pamela continued throughout Wednesday.

On Thursday, October 14, 1999, Laurie Torrez, a civilian employee of the Kansas City, Kansas Police Department, spotted Nelson under the 18th Street Bridge and called the police. Nelson had injured his leg while attempting to lower himself from the bridge. He was unable to escape and submitted to capture. Before a helicopter arrived to extract him from the area, a large crowd of watchers assembled. A member of the crowd yelled out, "What about the girl?" *Id.* at 268. Nelson looked at the arresting officer and said, "I know where she's at, but I'm not saying right now." *Id.* at 269. Later than day, a complaint was filed against Nelson for the kidnapping of Pamela. Pamela remained missing.

On Friday, October 15, 1999, law enforcement personnel who were searching the woods and fields east of the church first discovered Pamela's white sports bra. They then discovered her underpants. Her nude, lifeless body was found buried under a pile of brush. A wire ligature was wrapped around her throat.



Appellate Case: 15-3160 Page: 24 Date Filed: 02/13/2019 Entry ID: 4756226
Appellate Case: 15-3160 Page: 22 Date Filed: 11/28/2018 Entry ID: 4730179

Autopsy results revealed numerous scrapes and abrasions and blunt force trauma to Pamela's mouth and head. Her hymen had been torn near the time of death. Redness and irritation present in her genital area was consistent with sexual assault. The cause of death was strangulation.

Pamela's underpants were submitted to the Federal Bureau of Investigation (FBI) for DNA analysis. The FBI's DNA analysis revealed the presence of semen in the crotch area of Pamela's underpants. When compared to Nelson's blood sample, test results conclusively showed that he was the source of the DNA in the semen stain.

Inmates housed with Nelson also testified about discussions they had with Nelson. Inmate Edward Frazier testified that he and Nelson

> got into a conversation about . . . building a cell and [Nelson] said the cells would . . . have nothing in it besides cotton. He said that he would watch his victim like seven days a week and then at some point he would kidnap them, put them in that room. I asked him what did the room consist of. He said there would be cotton on the floor. They wouldn't have a bed. They wouldn't have a shower. The only thing they would have is a commode and they would get their toilet paper from the outside of it.

Tr. of Jury Trial, Vol. VI, at 503, *United States v. Nelson*, No. 4:99-cr-00303-FJG (W.D. Mo. Nov. 20, 2001), ECF No. 464.

According to Frazier, Nelson told him he was going to abduct "[m]ostly" women, *id.*, and that he planned on binding them down and "[d]o what he wanted to do with them," *id.* at 504. This included having sex with them. He told Frazier that "he knew how to get belts and how to tie a person down to where he could actually put them in different positions where he could have sex with them, and he described



Appellate Case: 15-3160 Page: 25 Date Filed: 02/13/2019 Entry ID: 4756226
Appellate Case: 15-3160 Page: 23 Date Filed: 11/28/2018 Entry ID: 4730179

it in detail." *Id.* He also told Frazier that after he was "done with them," he would "[k]ill them." *Id.* While he did not tell Frazier precisely how he would kill his victims, he did tell Frazier "that once he did kill them, that he would [dispose of the bodies] the old-fashioned way," which was "the river bed." *Id.*

Inmate Steven Bailey testified that his cell was next door to Nelson's cell. About 2:00 or 3:00 a.m. in March of 2000, Bailey heard a voice coming from Nelson's cell, which he recognized as Nelson's. He "heard high-pitched[,] low-volume type screams that sounded like a little girl" and "cries for mommy." Tr. of Jury Trial, Vol. V, at 361, *United States v. Nelson*, No. 4:99-cr-00303-FJG (W.D. Mo. Nov. 20, 2001), ECF No. 463. These sounds were repeated a couple of times during a five-to-ten minute period. In May of 2000, Bailey was awake reading around 3 or 4 a.m. in the morning when he heard sounds coming from Nelson's cell. He "heard a series of short high-pitched screams that were again low in volume. Heard cries for mommy. Help me. Don't hurt me. Don't kill me." *Id.* at 362. He recognized the voice as Nelson's. The next day, the same sounds occurred, lasting ten to fifteen minutes. This time, Bailey confronted Nelson, saying, "How could you do that to that little girl[?]" *Id.* at 363. Nelson replied, "You wouldn't believe it." *Id.*

b. *Victim Impact and Nelson's Address to the Court*

In addition to the evidence of guilt, the jury also heard evidence about the uniqueness of Pamela and the impact her death had on the lives of her family members.

When offered the opportunity to address the court, Nelson, showing no remorse for what he had done, blistered the district court and the victim's family with a profanity laden tirade.



Appellate Case: 15-3160 Page: 26 Date Filed: 02/13/2019 Entry ID: 4756226
Appellate Case: 15-3160 Page: 24 Date Filed: 11/28/2018 Entry ID: 4730179

c. *Escape Attempts and Prior Criminal History*

While in custody on this offense at CCA, Nelson talked about escaping, unraveled a section of the prison fencing, and fashioned two workable handcuff keys. Nelson threatened to mace his state probation officer. And, while at CCA, in an unprovoked assault, he beat a correctional officer and threatened to kill yet another correctional officer.

The jury also learned of Nelson's three prior Missouri state convictions for stealing and a conviction for attempted escape from custody.

d. *Dr. Martell's Testimony at the Evidentiary Hearing*

Dr. Martell, the government's expert witness, testified at the evidentiary hearing that "despite [Nelson's] level of brain impairment that's apparent on the testing and examination," looking at Nelson's behavior in the course of committing the crime, Dr. Martell found no impulsivity. Tr. of Evidentiary Hr'g, Vol. IV, at 649. Dr. Martell stated that Nelson tried to carry out his fantasy on another victim, and when that did not work, he selected another more youthful, more easily controlled victim. According to Dr. Martell, Nelson laid in wait, hid himself, brought electrical cords to bind the victim, kidnapped her, and took off at a high rate of speed in a manner that people would not be able to see him or identify him. He also took the victim to a secluded area and bound her up so she could not get away. Dr. Martell opined that Nelson's actions showed planning as opposed to impulsive acting out. For those reasons, Dr. Martell did not believe that Nelson's brain damage played a significant role in him committing this crime. Dr. Martell also testified that he did not believe that Nelson met the standards with regard to not understanding the wrongfulness of his behavior. He specifically noted that Nelson attempted to avoid being seen and attempted to get rid of incriminating evidence. Dr. Martell testified, "If you didn't know it was wrong, there's no reason to get rid of the truck, to wipe it down for evidence, to try and remove fibers from the crime scene that could identify him." *Id.* at 650. Dr. Martell testified that he had reviewed the reports of Dr. Daniel



Appellate Case: 15-3160 Page: 27 Date Filed: 02/13/2019 Entry ID: 4756226
Appellate Case: 15-3160 Page: 25 Date Filed: 11/28/2018 Entry ID: 4730179

Foster,[4] Dr. Gelbort, Dr. Brown, Dr. Amador, Dr. Crawford, Dr. Lebowitz, Dr. Gur, Dr. Miller, and Dr. Roger Jones.[5] Dr. Martell testified that none of these reports changed his opinions regarding Nelson.

3. *Reweighing of the Evidence*

We have now reweighed the totality of the available mitigation evidence—both that offered at trial and that offered at the evidentiary hearing—against the evidence in aggravation to determine whether a reasonable probability exists that Nelson would have received a different sentence. *See Porter*, 558 U.S. at 41. We conclude that the result would have been the same. This is not a case in which the "[t]he judge and jury at [Nelson's] original sentencing heard almost nothing that would humanize [Nelson] or allow them to accurately gauge his moral culpability." *See id.* (explaining that the judge and jury "learned about [the petitioner's] turbulent relationship with [his girlfriend], his crimes, and almost nothing else"). Nor is this a case where the "jury heard only one significant mitigating factor" before imposing the death penalty. *See Wiggins v. Smith*, 539 U.S. 510, 537 (2003) ("Wiggins' sentencing jury heard only one significant mitigating factor—that Wiggins had no prior convictions. Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." (citation omitted)). Instead, during the penalty phase, the jury heard substantial mitigating evidence that (1) Nelson was a poor student who suffered from dyslexia; (2) Nelson frequently fought and had behavioral problems in school; (3) Nelson had a bed-wetting problem well into his teen years, which he was teased for; (4) his mother was an alcoholic; (5) Nelson's mother was frequently away from

---

[4]Dr. Foster is the forensic psychologist that the defense hired to evaluate Nelson's mental health. The district court ultimately disallowed Dr. Foster's testimony during the penalty phase. *See Nelson III*, 97 F. Supp. 3d at 1151.

[5]Dr. Martell reviewed a dermatological report prepared by Dr. Jones dated January 10, 2012, in which Dr. Jones examined Nelson and found his skin normal.



Appellate Case: 15-3160 Page: 28 Date Filed: 02/13/2019 Entry ID: 4756226
Appellate Case: 15-3160 Page: 26 Date Filed: 11/28/2018 Entry ID: 4730179

the home, resulting in the boys caring for themselves and getting into trouble; (6) Nelson and his siblings lived in poor conditions in a home that smelled of urine; (7) two of Nelson's siblings have schizophrenia; (8) Nelson's babysitter's husband was an alcoholic and abusive toward Nelson, particularly because of his bed-wetting problem; (9) Nelson showed kindness to a crippled girl in a wheelchair while in elementary school; (10) Nelson was physically and mentally abused as a child; (11) Nelson had poor hygiene as a child; (12) Nelson was a pleasant, reliable, and good worker; (13) the squalid conditions and abusive environment that Nelson lived in affected the formation of Nelson's character; (14) Nelson's father was violent and abusive to his mother and to Nelson, including using electric shock to abuse his mother on one occasion; (15) inmates frequently threatened and harassed Nelson at CCA; and (16) Nelson expressed he wanted to do the right thing in a recorded phone call at the CCA.

Having reweighed the evidence, including the additional mitigating evidence presented in the post-convicting proceeding, we conclude that there is no reasonable probability of a different outcome.

Accordingly, we affirm the district court's denial of Nelson's ineffective assistance claims for (1) failing to conduct an adequate mitigation investigation, including failing to move for a continuance to complete one; (2) failing to conduct an adequate investigation of Nelson's mental health; and (3) advising or instructing Nelson to decline to submit to a mental health examination by a government examiner because we conclude that no prejudice resulted.

### B. *Guilty Plea*

After we granted Nelson's petition for panel rehearing, we subsequently granted Nelson's motion to modify the certificate of appealability and expanded it to include the claim that Nelson's trial counsel was ineffective for advising him to plead guilty.



Appellate Case: 15-3160 Page: 29 Date Filed: 02/13/2019 Entry ID: 4756226
Appellate Case: 15-3160 Page: 27 Date Filed: 11/28/2018 Entry ID: 4730179

Prior to trial, Nelson's counsel advised him that there was no viable defense to the charges against him and counseled him to enter a guilty plea, proceed to trial only on the sentencing phase of his capital trial, and argue that his plea established an acceptance of responsibility for purposes of punishment. Nelson argues that the advice on which this plea was based was erroneous because he did have a defense to the capital charges—he could have presented an affirmative defense of insanity under 18 U.S.C. § 17. According to Nelson, he could have presented evidence that he was suffering from a severe mental disease or defect at the time of the offense. Nelson argues that counsel's advice to plead guilty was not an informed strategic decision; instead, it was made in a vacuum without the benefit of an investigation into his mental health. Had he been properly advised of the availability of the defense, Nelson argues he would have not entered a plea but would have availed himself of the applicable defense and gone to trial.

In response, the government argues that we should dismiss Nelson's claim of ineffective assistance based on counsel advising him to plead guilty where he had an insanity defense because this issue was not one of the issues on which we remanded for an evidentiary hearing, nor does it relate back to issues raised in Nelson's original timely-filed § 2255 motion. The government asserts that because this new claim does not relate back to Nelson's original, timely-filed § 2255 motion, it is not properly raised in the certificate of appealability from the district court's § 2255 order that denied relief on other grounds. Therefore, the government argues, the issue constitutes a second or successive § 2255 motion that cannot be considered until this court grants permission in accordance with the requirements under 28 U.S.C. § 2255(h).

"The relation back of an amendment is governed by Rule 15(c) and presents a question of law which this Court reviews de novo." *Robinson v. Clipse*, 602 F.3d 605, 607 (4th Cir. 2010). "An amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out




Appellate Case: 15-3160 Page: 28 Date Filed: 11/28/2018 Entry ID: 4730179

of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading . . . ." Fed. R. Civ. P. 15(c)(1)(B).

> To arise out of the same conduct, transaction, or occurrence, the claims must be tied to a common core of operative facts. An amended motion may raise new legal theories only if the new claims relate back to the original motion by arising out of the same set of facts as the original claims. The facts alleged must be specific enough to put the opposing party on notice of the factual basis for the claim. Thus, it is not enough that both an original motion and an amended motion allege ineffective assistance of counsel during a trial. The allegations of ineffective assistance must be of the same time and type as those in the original motion, such that they arise from the same core set of operative facts.

*Dodd v. United States*, 614 F.3d 512, 515 (8th Cir. 2010) (cleaned up).

In Nelson's original, timely-filed § 2255 motion, the only claim that he made with regard to defense counsel's alleged ineffectiveness as to his guilty plea is as follows:

> (18) Defense counsel advised and convinced Movant to plead guilty to count one of the indictment in exchange for the Government dismissing count two of the indictment and letting the defense argue that Movant had accepted responsibility for his actions, a contention that was unanimously rejected by the jury[.] To reach this agreement, Movant was required to waive any post-conviction challenge as to the guilty plea. This is an unenforceable condition and trial counsel were placed in a conflicted position when they advised Movant to accept the conditions of the offer while ostensibly avoiding post-conviction review of the reasonableness of that advice as it pertained to Movant's decision to enter a guilty plea.



Appellate Case: 15-3160 Page: 31 Date Filed: 02/13/2019 Entry ID: 4756226
Appellate Case: 15-3160 Page: 29 Date Filed: 11/28/2018 Entry ID: 4730179

Mot. Brought Pursuant to 28 U.S.C. § 2255 to Vacate the Conviction & Sentence Imposed at 11–12, *Nelson v. United States*, No. 4:04-cv-08005-FJG (W.D. Mo. Nov. 6, 2005), ECF No. 25.

We conclude that Nelson's claim that his trial counsel was ineffective for advising him to plead guilty is not of the same "time and type" as the ineffective-assistance claims in his original petition. In his original § 2255 motion, the issue was whether the plea agreement waiver of post-conviction relief placed trial counsel in a position of conflict because such relief might entail allegations and proof of their ineffectiveness. Nelson did not specifically raise whether defense counsel provided ineffective assistance of counsel in advising him to plead guilty on the basis that he did not have a defense to the capital charges. The district court denied Nelson's original § 2255 motion on all issues without an evidentiary hearing. On appeal, we granted a certificate of appealability on six issues and remanded for an evidentiary hearing to address those issues. *See Nelson II*, 297 F. App'x at 567. Nelson acknowledges that our "remand did not encompass [his] claim that trial counsel was ineffective for advising him to plead guilty." Appellant's Br. at 125. We, therefore, hold that Nelson's claim does not relate back to his original § 2255 motion.

## III. *Conclusion*

Accordingly, we affirm the district court's denial of § 2255 relief to Nelson.

______________________________